FILED

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

2019 MAY 20  PM 3: 21

MIDDLE DISTRICT FLORIDA
TAMPA. FLORIDA

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DR. CLARISSA ZAFIROV,  Plaintiff/Relator  v.  FLORIDA MEDICAL ASSOCIATES, LLC, d/b/a VIPCARE; PHYSICIAN PARTNERS, LLC; PHYSICIAN PARTNERS SPECIALITY SERVICES, LLC; SUN LABS USA, INC. ANION TECHNOLOGIES, LLC; ANTHEM, INC.; FREEDOM HEALTH, INC.; OPTIMUM HEALTHCARE, INC.; and SIDDHARTHA PAGIDIPATI,  Defendants. | CASE NO.  8:19 cv 1236 T23 Spf  COMPLAINT ALLEGING VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT  **FILED IN CAMERA AND UNDER SEAL - DO NOT PUT ON PACER** |

1.     DR. CLARISSA ZAFIROV ("Relator") brings this action on behalf of the UNITED STATES OF AMERICA ("UNITED STATES") for treble damages and civil penalties arising from the Defendants' conduct in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*.

2.     The violations of the FCA set forth herein have taken place for at least the preceding ten years from the date of the filing of this Complaint.

3.     The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to a governmental entity for payment or approval is liable for a civil penalty for each such claim, plus three times the amount of the damages suffered by the government. The Act allows any person having information regarding a false or fraudulent claim against the government to bring an action on behalf of herself (the "*qui tam* plaintiff" or "relator") and the government and to share in any recovery.

1

4.     The schemes described hereinafter give rise to FCA violations made by Defendants for submitting and causing the submission of false claims in violation of 31 U.S.C. § 3729(a)(1)(A), using and causing the use of false records and statements material to false claims in violation of § 3729(a)(1)(B), and using or causing the use of false records and statements material to the obligation to repay overpayments and avoiding the obligation to repay overpayments in violation of § 3729(a)(1)(G).

## THE PARTIES

5.     The UNITED STATES operates and administers the Medicare and Medicaid programs through the Department of Health and Human Services ("HHS"), which includes its operating division, Centers for Medicare and Medicaid Services ("CMS").  At all times relevant to this Complaint, CMS administered and supervised the Medicare Part C Program and made Medicare Advantage ("MA") risk-adjustment payments under Part C of the Program.

6.     *Qui tam* Plaintiff/Relator DR. CLARISSA ZAFIROV is a resident of the state of Florida and a Board-certified Family Medicine physician licensed to practice in Florida.  Dr. Zafirov has been an employee of Defendant Florida Medical Associates d/b/a VIPcare since 2018. Although her employment agreement is with FMA, her paychecks are issued by Sun Labs USA, Inc. as her employer.

7.     The "Provider Organization ("PO") Defendants" are as follows:

a.     Defendant FLORIDA MEDICAL ASSOCIATES, LLC d/b/a VIPcare (hereinafter referred to as "VIPcare") is a Florida Limited Liability Company whose Articles of Organization were filed on Feb. 22, 2006, and whose listed principal address is 601 S. Harbour Island Blvd, Suite 213, Tampa, Florida.  It filed its fictitious name

2

registration to do business as "VIPCARE" with the State of Florida Secretary of State on Feb. 26, 2018.

     b.     Defendant PHYSICIAN PARTNERS, LLC, (hereinafter referred to as "PP") is a Florida Limited Liability Company whose Articles of Organization were filed on June 26, 2012, and whose listed principal address is 601 S. Harbour Island Boulevard, Suite 200, Tampa, Florida.

     c.     Defendant PHYSICIAN PARTNERS SPECIALTY SERVICES, LLC f/k/a FMA Specialist, LLC (hereinafter referred to as "PPS") is a Florida Limited Liability Company whose Articles of Organization were filed on Dec. 28, 2012, and whose listed principal office address is 1714 SW 17th St., Ocala, Florida. PPS was formerly known as FMA Specialist, LLC, but filed a name change amendment to PHYSICIAN PARTNERS SPECIALTY SERVICES, LLC, with the Florida Secretary of State on April 27, 2015.

     d.     Defendant SUN LABS USA, INC. is a Florida corporation with its principal place of business at 1010 N. Florida Ave., Tampa, Florida. The President of Sun Labs USA, Inc. is Devaiah Pagidipati; Defendant Sidd Pagidipati is identified as an officer. The Articles of Incorporation state that it was "organized for the sole and specific purpose of engaging in every phase and aspect of the business of providing laboratory services and information technologies." Sun Labs USA, Inc. is the employer listed on Relator's paystubs.

8.     The "Medicare Advantage ("MA") Defendants" are as follows:

     a.     Defendant FREEDOM HEALTH, INC. ("Freedom") is a Florida corporation with its principal place of business in Tampa, Florida. Freedom is a health maintenance organization ("HMO") currently operating in twenty-five counties throughout

Florida pursuant to a certificate of authority from the Florida Office of Insurance Regulation and the approval of CMS and the Florida Agency for Health Care Administration ("AHCA"). Freedom participates in the MA program under contract with CMS.

b.      Defendant OPTIMUM HEALTHCARE, INC. ("Optimum") is a Florida corporation with its principal place of business in Tampa, Florida. Optimum is an HMO currently operating in twenty-five counties throughout Florida pursuant to a certificate of authority from the Florida Office of Insurance Regulation and the approval of CMS and AHCA. Optimum participates in the MA program under contract with CMS.

c.      Defendant ANTHEM, INC. is an Indiana corporation whose headquarters are located at 220 Virginia Avenue, Indianapolis, Indiana.  On or about Feb. 15, 2017, Anthem, Inc. paid over \$1.7 billion to buy America's 1st Choice.  America's 1st Choice includes Freedom Health, Inc., Optimum Healthcare, Inc., and America's 1st Choice of South Carolina, Inc.  These Medicare Advantage plans are described by ANTHEM, INC. as "a unified Medicare Advantage organization with a strong provider-focused health care model that offers HMO products, including Chronic Special Needs Plans (C-SNP) and Dual-Eligible Special Needs Plans, operating in South Carolina and Florida through the brands Optimum, Freedom Health, and America's 1st Choice of South Carolina." ANTHEM, INC. is grouped in this Complaint as a MA Defendant because, as the parent company directing the policies and practices, it is ultimately responsible for the policies and practices of its subsidiaries, named as MA Defendants herein.

9.      In addition to their standard MA plans, Freedom and Optimum contracted with CMS to operate C-SNPs for chronically ill and/or especially vulnerable beneficiaries. C-SNPs are

supposed to provide extra healthcare services and management to better facilitate care for at-risk beneficiaries. For example, a C-SNP might provide special disease management and care tracking programs for patients with conditions such as diabetes in order to ensure the patient is compliant with dietary and blood sugar management protocols. Because such plans are specifically designed to serve sicker members, the capitation rates are frequently higher for C-SNP plans than for traditional plans.

10.     The MA Defendants have a combined enrollment of over 135,000 Medicare Advantage members in 25 counties throughout Florida, and three counties in South Carolina. They also have enrolled more than 60,000 members in C-SNPs. Freedom and Optimum had a combined $1.55 billion in premium revenue in 2017.

11.     At all material times, the MA Defendants have had common ownership and control. Through February 2017, Freedom and Optimum were owned by America's 1st Choice Holdings of Florida, LLC; and after February 2017, by Defendant Anthem, Inc. Though they have separate CMS contracts and are operated under their own names, Freedom and Optimum are effectively the same entity. Upon information and belief, the companies share the same management and staff/employees and use the same offices, databases, network systems, storage facilities, and coders. Upon information and belief, the managers and employees conduct the business of both plans jointly and concurrently, such that Freedom and Optimum follow the same policies and engage in the same practices. The practices which lead to violations of the False Claims Act described herein are common to both Freedom and Optimum.

12.     Defendant ANION TECHNOLOGIES, LLC, ("Anion") is a Florida Limited Liability Company whose Articles of Organization were filed on June 1, 2007, and whose listed principal address is 601 S. Harbour Island Blvd, Suite 200, Tampa, Florida, with a mailing address

to Suite 213 – the same addresses as Defendants VIPcare and PP. Defendant Sidd Pagidipati is identified as a Member/Managing Member since 2017. Anion Technologies, upon information and belief, does business for the PO Defendants under the name Anion Healthcare Services. Anion Health Services involvement with the PO Defendants includes, but is not limited to, coding, billing and the daily distribution of the 5 Star Check Lists (as described more fully in Para. 54, *et seq.*, *infra.*) The majority of Anion's employees are based in Hyderabad, India, and the remainder are located in Ocala, Florida.

13.     Coders and other employees located in Ocala and India communicate with the PO Defendants' physicians though various modes of communication. They are identified to Relator as employees of "Anion Healthcare Services," and sometimes of "Physician Partners." Upon information and belief, "Anion Healthcare Services" is managed and controlled by Defendant Pagidipati, and works closely in coordination with PP.

14.     "Anion Healthcare Services" has a website at www.anion.com. Anion Healthcare Services holds itself out as "offering provider billing, medical coding, claims entry and processing, and other services," and "has its roots strong in the US (in Florida and Massachusetts). Promoters & Business experts work from these offices interfacing with clients while all the operational processes happen at the offshore facility based in Hyderabad, India." "Anion Healthcare Services" is neither a business entity formed within the State of Florida, nor is "Anion Healthcare Services" registered to do business as a foreign for-profit corporation in the State of Florida. Upon information and belief, this entity is owned and controlled by Defendant Pagidipati.

15.     Defendant SIDDHARTHA "SIDD" PAGIDIPATI ("Pagidipati"), a resident of Tampa, Florida, is the former Chief Operating Officer ("COO") of Freedom and Optimum. He became COO of both Freedom and Optimum in 2007, and in 2017, agreed to individually pay

6

$750,000 to resolve, *inter alia*, the FCA Medicare Advantage upcoding FCA violations against him in *U.S. ex rel. Sewell v. Freedom Health, Inc., et al.*, Case No. 8:09-cv-1625 (M.D. Fla.). Having resigned from Freedom and Optimum, he has nevertheless continued to direct and carry out the False Claims Act violations by the MA and PO Defendants, as he not only owns but also controls the policies, procedures and operations of the PO Defendants – PPS, VIPcare and Anion. The PO Defendants in turn are capitated providers of the MA Defendants and are integrally involved in the MA Defendant FCA violations described herein.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action per 28 U.S.C. § 1345 because the UNITED STATES is the Plaintiff. In addition, the Court has subject matter jurisdiction over FCA claims for relief under 31 U.S.C. § 3732(a) and (b).

17.     This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, and transacts business in this District, or has committed the alleged acts in this District.

18.     Venue lies in this District under 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because the Defendants can be found in and/or transact business in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and all of the Defendants are subject to the Court's jurisdiction under the FCA.

## THE FEDERAL FALSE CLAIMS ACT

19.     The FCA is the primary civil remedial statute designed to deter fraud upon the UNITED STATES and reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. 99-345, at 1, as reprinted in

1986 U.S.C.C.A.N. 5266. "The Medicare Advantage capitation payment system is subject to the False Claims Act." *U.S. ex rel. Silingo v. WellPoint, Inc.,* 904 F.3d 667, 673 (9th Cir. 2018).

20.     First, a defendant violates the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a) (1)(A). As pertinent to this case, the term "claim" under Section 3729(b)(2) of the FCA includes "(A) . . . any request or demand, whether under a contract or otherwise, for money . . . that . . . (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money . . . requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money which is requested or demanded." *Id.* § 3729(b)(2).

21.     Second, a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).

22.     Third, a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Id.* § 3729(a)(1)(G). The FCA defines the term "obligation" to include "the retention of any overpayment." *Id.* § 3729(b)(3).

23.     Upon learning of a false diagnosis code resulting in an MA overpayment from CMS, the duty exists to delete or otherwise withdraw that code. *See U.S. ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1176–77 & n.8 (9th Cir. 2016). So doing would result in

8

CMS's electronic processing system recalculating the payment amount, which is the first step in CMS's process to recoup the overpayment. The failure to delete or withdraw these false codes after notice thereof constitutes the knowing retention of an overpayment in violation of 31 U.S.C. § 3729(a)(1)(G).

24.     Under the FCA, the terms "knowing" and "knowingly" include "actual knowledge of the information," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information," and "require no proof of specific intent to defraud." *Id*. § 3729(b)(1)(A),(B). Congress intended that the terms "knowing" and "knowingly" to "reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." S. Rep. No. 99-345, at 21, as reprinted in 1986 U.S.C.A.N. 5266, 5286 (quotations in original.) "It is intended that persons who ignore 'red flags' that the information may not be accurate or those persons who deliberately choose to remain ignorant of the process through which their company handles a claim should be held liable under the Act." H. Rep. No. 99-660, at 21 (1986) (to accompany False Claims Act of 1986, H.R. 4827). As used in this Complaint, the terms "knowing" and "knowingly" have the meaning ascribed to them by the FCA, as do their derivatives "knowledge," "known," and "knew."

25.     The term "material," as used in the FCA, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

26.     The FCA imposes liability of treble damages plus a civil penalty for each false claim in an amount (as pertinent here) not less than $5,500 and not more than $11,000 for claims submitted prior to August 1, 2016; not less than $10,781 and not more than $21,563 for claims

submitted between August 1, 2016 and February 3, 2017, and as appropriately statutorily adjusted for inflation each successive year under the Bipartisan Budget Act of 2015, Pub. L. 114-74, § 701, 129 Stat. 584, 599-601 (2015). See 31 U.S.C. § 3729(a)(1).

### THE MEDICARE ADVANTAGE SYSTEM

27.     Medicare is a federally-operated health insurance program administered by CMS benefiting individuals 65 and older and the disabled. *See* 42 U.S.C. § 1395c *et seq.*

28.     There are four parts to the Medicare Program. Part A covers inpatient care, Part B covers outpatient care, Part C is the Medicare Advantage Program discussed below, and Part D is prescription drug coverage. A beneficiary eligible for Medicare may choose to be covered under what is commonly referred to as "traditional" Medicare, which is Medicare Parts A and B, in which CMS reimburses healthcare providers for services rendered via submission of claims. This is known as a fee-for-service payment system. Another option for a Medicare beneficiary is Medicare Advantage, in which a beneficiary may opt instead to enroll in a Medicare Advantage Plan ("MA Plan") managed by a private insurance company ("MA Organization"). See Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28. The MA Plans are run by MA Organizations, which are often private insurers. *See* 42 C.F.R. §§ 422.2, 422.503(b)(2). Many MA Organizations contract with Provider Organizations ("POs") (hospital networks, physician groups, and other providers) to furnish healthcare services under the MA Plans.

29.     Pursuant to Medicare regulations, POs are classified as "first tier entities" and "related entities." *See id.* §§ 422.2 & 422.500. A first-tier entity "means any party that enters into a written agreement, acceptable to CMS, with an MA organization . . . to provide . . . healthcare services for a Medicare eligible individual under the MA program." *Id.*, §§ 422.2. A related entity

10

"means any entity that is related to the MA organization by common ownership or control and (1) [p]erforms some of the MA organization's management functions under contract or delegation; [or] (2) [f]urnishes services to Medicare enrollees under an oral or written agreement . . . ." *Id.* First tier and related entities must, among other things, perform their services in a manner that complies with the MA Organization's contractual obligations to the Government, *id.* at § 422.504(i)(3)(iii); agree to "comply with all applicable Medicare laws, regulations, and CMS instructions," *id.* at § 422.504(i)(4)(v); and receive effective compliance training and education relating to preventing fraud, waste, and abuse, *id.* at § 422. 503(b)(4)(vi)(C)(1). Furthermore, if a related entity or first tier entity generates data relating to an MA Organization's claims for payments from the MA Program, it (as well as the MA Organization) must certify the accuracy and truthfulness of that data. *Id.* at § 422.504(l)(3).

30.    In Medicare Part C, the Government pays to each MA Organization a fixed, capitated (per beneficiary enrollee in each MA Plan) amount, adjusted by the expected risk of each beneficiary, on a monthly basis for the provision of items and services that are covered for Medicare beneficiaries under Parts A and B of the Social Security Act. This per-member, per-month payment does not depend on the amount of healthcare services provided to an enrollee. Each year this payment is based on a bidding process with CMS, in which each MA Plan, through an MA Organization, submits a bid amount, which is then compared to an administratively set benchmark set by CMS based on a statutory formula. *See* 42 U.S.C. § 1395w-23; *see also* 42 C.F.R. § 422.2, subparts F and G. Since 2000, Congress has required that the capitated payments be adjusted for each MA Plan enrollee based on (1) each enrollee's demographic factors such as age, and gender, among others, and (2) each enrollee's health conditions, or "health status." See 42 U.S.C. § 1395w-23 (a)(1)(C). This is known as risk adjustment, and the risk score, sometimes

11

referred to as the risk-adjustment factor or "RAF," acts as a multiplier that is applied to the MA Organization's bid for covering Part A and B services. 42 U.S.C. § 1395w-23(a)(1)(G) and 42 C.F.R. § 422.308(e).

31.     The ICD classifications set forth the standards accepted by CMS and the healthcare industry for the identification of diagnosis codes for health conditions. See 45 C.F.R. § 162.1002(a)(1)(i), (b)(1), (c)(2)(i); 42 C.F.R. § 422.310(d)(1); CMS, *Medicare Managed Care Manual* Chapter 7, Exhibit 30 (Rev. 57, Aug. 13, 2004). ICD codes are alphanumeric codes used by the healthcare providers, insurance companies and public health agencies to represent diagnoses; every disease, injury, infection and symptom has its own code. The applicable standards for these ICD diagnosis codes are set forth in the International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9") through October 1, 2015, and thereafter the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10"). To ensure accuracy, the patient's diagnoses must result from a face-to-face encounter between physician and patient during the relevant year and must be appropriately documented in the patient's medical record at the time of the encounter. In addition, codes should be based on documented conditions that require or affect patient care treatment or management. *See* CMS, *Medicare Managed Care Manual* Chapter 7, § 111.8 (Rev. 57, Aug. 13, 2004), *see also* CMS, *2008 Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide* (2008).

32.     POs submit patient encounter data, including diagnosis codes, to MA Organizations for their MA Plan enrollees. The MA Organizations, in turn, submit these diagnosis codes to CMS through what is known as the Risk-Adjustment Processing System ("RAPS") and through the Encounter Data System ("EDS"). CMS uses these diagnosis codes to calculate a risk score for each

12

beneficiary, which is then used to adjust the capitated payments to the MA Organizations for each MA Plan enrollee.

33.     To do so, CMS employs a risk-adjustment model, called the Hierarchical Conditions Category ("HCC") model, which takes into account both demographic factors (such as age and gender) and medical conditions of a patient to determine the risk scores for beneficiaries in MA Plans. The medical conditions, as represented by diagnosis codes, are grouped into HCCs, which are categories of clinically-related medical diagnoses. See 42 C.F.R. § 422.2. The diagnosis codes are grouped or "mapped" into HCCs that affect payment include major, severe, and/or chronic illnesses. These diagnosis codes are referred to as "risk-adjusting diagnosis codes." Not all diagnosis codes result in an adjustment in risk score and thus not all diagnosis codes affect payment. Related groups of diagnoses are ranked on the basis of disease severity and the cost associated with their treatment. With respect to health status, the HCC model relies on diagnosis codes documented by authorized healthcare providers, e.g., physicians in patient encounters during office visits and hospital outpatient and inpatient stays. In fact, diagnoses are the sole determinant in the calculation of any risk-adjustment payment based on a beneficiary's health status.

34.     The HCC model is prospective, meaning that it relies on risk-adjusting diagnosis codes from dates of service by a provider in one year (the "date of service year") to determine payments in the following year (the "payment year"). Each MA Plan beneficiary's risk score is calculated anew for the following year. The higher a MA Plan beneficiary's risk score, the higher the payments by CMS to the MA Organizations.

35.     Every month, CMS pays the MA Organizations the capitation amount as established by the bid and adjusted using its risk-adjustment methodology for each enrolled beneficiary. MA Organizations pay providers who care for beneficiaries through a variety of

arrangements; however, many large POs enter into a capitated or "gainsharing" arrangements with MAs that align their financial interests. Under a capitated arrangement, the MA Organization enters into a contract to pay a portion of the capitation payment from the Government to its Provider Organizations, less a percentage fee for administration as determined by its contracts. Frequently, the PO also enters into "gainsharing" agreements with the MA Organizations where they receive incentive payments based in whole or in part on total revenues that MA Organizations receive from the Government for the beneficiaries cared for by these gainsharing providers. These agreements incentivize POs and their providers to increase the number of risk-adjusting diagnoses they report to MA Organizations, and to report diagnosis codes for more severe risk-adjusting medical conditions. The more risk-adjustment payments obtained by the MA Organizations for the beneficiaries cared for by POs, the more money MA Organizations pay to POs pursuant to the capitation and gainsharing agreements. Hence, the patient risk-adjusting diagnosis codes that map to HCCs directly impact the payments received by the MA Organizations, POs, and their providers.

36.     CMS relies on the risk-adjusting diagnosis codes submitted by providers to determine and make accurate capitation payments for each patient enrolled in the Part C Program. "Accurate risk-adjusted payments rely on the diagnosis coding derived from the member's medical record." *See, e.g.*, 42 C.F.R. § 422.504(l)(3); CMS, *2013 National Technical Assistance Risk Adjustment 101 Participant Guide* 13 (2013).

37.     MA Organizations can delete diagnoses from both the Risk-Adjusting Processing System ("RAPS") and Encounter Data System ("EDS") to comply with their obligation to delete known erroneous, invalid, unsupported or otherwise false diagnosis codes previously submitted to CMS.  Indeed, the MA Organizations have an obligation to delete these false codes in their systems.  Doing so should cause the MA Organizations to delete those codes in the RAPS system,

14

and thereby cause CMS to adjust the RAF score for the patient downward and the capitated payment downward as well.

38.     Because submitting incorrect diagnosis codes increases risk adjustment payments, CMS requires MA plans to follow strict guidelines when submitting codes. See, e.g., 2008 Risk Adjustment Training for Medicare Advantage Organizations Participant Guide ("Participant Guide"). First, CMS requires that the patient must have been treated for the relevant diagnoses during a face-to-face encounter with a physician or a hospital during the year in question. The treating provider must document the facts supporting the coded diagnosis in the patient's medical record and sign and date the record.

39.     Only services provided by a treating physician, or by a hospital in an inpatient or outpatient setting may be included. CMS expressly prohibits MA plans from submitting "risk adjustment diagnoses based on any diagnostic radiology services." Participant Guide, at 4-3. The reason CMS prohibits MA plans from submitting codes based on radiology charts is that "[d]iagnostic radiologists typically do not document confirmed diagnoses. Confirmed diagnoses come from referring physician or physician extenders." Id. at 4-3. In other words, radiology services are not a valid provider type.

40.     MA plans are responsible for the content of risk adjustment data submissions to CMS, regardless of whether they submit the data themselves or through an intermediary. Before submitting data to CMS, MA plans are required to filter the data "to ensure that they submit data from only appropriate data sources." Participant Guide, at 4-11. For example, filters should include checking that physician data comes from face-to-face encounters with patients and ensuring that data does not come from non-covered providers, such as diagnostic radiology services.

15

41.     MA plans must also filter the data to ensure that only diagnoses treated through approved procedure types are included. In the CMS-HCC system, procedures are classified using Current Procedural Terminology ("CPT") codes. These codes show whether the type of service in question was a face-to-face procedure such as a physical examination, or a non-qualifying remote procedure, such as a laboratory test or radiology exam.

## Attestations/Certifications

42.     Given the importance of accurate information, CMS requires certifications signed by MA Organization executives regarding the truth and accuracy of coding and other patient information submitted to CMS.  These signed certifications are a condition of payment by CMS. 42 C.F.R. § 422.504(l)(2).  CMS also requires PO executives to certify the truth and accuracy of coding and other information submitted to MA Organizations.

43.     One of the annual certifications requires the MA organization to attest that the risk adjustment data it submits annually to CMS is "accurate, complete, and truthful."  The attestation acknowledges that risk adjustment information "directly affects the calculation of CMS payments … and that misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution."

## SUBSTANTIVE ALLEGATIONS

### Knowledge

44.     At all times relevant to this Complaint, Defendants knew the importance of risk adjustment and the workings of CMS's RAPS and EDS data systems, including but not limited to: (1) how the HCC model calculated a beneficiary's risk score; (2) the ICD classification system for diagnoses codes; (3) the mapping of risk-adjusting diagnosis codes to HCCs; (4) the importance of these risk-adjusting diagnosis codes in determining each beneficiary's risk score; (5) the direct

relationship between a beneficiary's RAF and the ultimate payments by CMS; (6) the requirements that each diagnosis code in a patient's records must result from a face-to-face encounter between health care provider and patient and be documented in the patient's medical records; (7) the importance of these requirements to payment under the Medicare Advantage program; and (8) the duty to delete known invalid, false or unsupported diagnosis codes and return overpayments to CMS.

45.     Despite this knowledge, Defendants violated the FCA as described herein, resulting in the submission of thousands of erroneous, invalid, phony, unsupported or otherwise false risk-adjusting diagnosis codes to CMS for tens of thousands of Medicare Advantage beneficiaries. These false claims inflated CMS's reimbursements by hundreds of millions of dollars.

46.     Defendants had this knowledge not only because they are in the business of operating MA Plans and POs, but their principals are all seasoned executives of MA Plans.  In fact, both the MA and PO Defendants are entities which are largely comprised of and led by the same individuals in control of the entities previously sued under the FCA in *U.S. ex rel. Sewell v. Freedom Health, Inc., et al.*, Case No. 8:09-cv-1625 (M.D. Fla.) which settled in 2017 for approximately $32.5 million.

**Overview of FCA Violations**

47.     Despite Freedom/Optimum and Pagidipati's previous lawsuit and settlement, the Defendants violated the FCA *again* – brazenly and knowingly – resulting in the submission of false and unsubstantiated risk adjustment data to CMS in order to unlawfully increase their capitation payments. Defendants' unlawful practices include, without limitation: (a) using coders to submit and cause physicians to submit false diagnoses, ultimately resulting in the submission of false risk adjustment data to CMS; (b) misleading and inducing physicians to code improperly,

17

resulting in phony diagnoses assigned and recorded in the medical records of thousands of patients; (c) incentivizing physicians to report and record phony diagnosis codes; (d) knowingly using an automated submission processing system that was incapable of filtering out invalid data; (e) knowingly causing physicians to perform medically unnecessary and unreasonable procedures in order to increase risk scores; and (f) knowingly failing to have any meaningful compliance program and failing to abide by its commitments pursuant to its Corporate Integrity Agreement entered into with the Office of the Inspector General of the United States Department of Health in or about May, 2017.

48.     Through each of these fraudulent schemes, practices and machinations, the MA Defendants have knowingly submitted to CMS hundreds of thousands of false and unsubstantiated diagnosis codes, in order to fraudulently obtain higher capitation rates than they were entitled to receive.

49.     The PO Defendants, for reasons including but not limited, to increasing their own per-member-per-month risk adjustment gain sharing payments from the MA Defendants, engaged in, among others, the following unlawful practices:

a.     First, the PO Defendants (and the MA Defendants) caused physicians to bring members in for medically unnecessary office visits for the sole purpose of capturing diagnosis codes. These visits were not for the benefit of the patient. Instead, the Defendants caused these visits to happen solely for the purpose of increasing risk adjustment-based reimbursement. Once a patient signs up for an MA Defendant's program, she is pressured to see her PO-assigned primary care physician at least four times a year, if not more frequently. If a patient is not responsive to VIPcare trying to schedule visits, then Freedom itself will call the patient repeatedly and hassle if the visit is not

18

scheduled. While this seems counterintuitive because more resources are expended by the PO Defendants to conduct these visits, it actually gives the physician more opportunities to insert phony diagnoses on the 5 Star Check Lists (see Paragraph 54, et seq., for an explanation of the "5 Star Check Lists"). utilize the PO Defendants' "Five Star" system to increase risk-adjustment scores, thereby increasing the future reimbursements to the MA Defendants.

  b.  Second, the PO Defendants submit as many phony diagnosis codes as possible, by reviewing patient records in order to look for any hint of medical conditions that correspond to HCC codes that substantially increase CMS payments, and then claim that the patient was treated for that condition — regardless of whether the patient actually has the condition or was treated for it in the year in question by a qualified provider in a face-to-face visit.

  c.  Third, the PO Defendants' team of coders scour medical records looking for "missing" diagnosis codes for use by physicians. Coders are instructed to ignore CMS and ICD coding standards in order to maximize the number of codes they send to CMS for risk adjustment. Coders review patient records in order to "suggest" phony additional diagnosis codes to physicians. In one very common and flagrant example, physicians are encouraged to diagnose any patient who has ever been on an antidepressant medication as having Major Depressive Disorder ("MDD"), a complex condition with numerous diagnostic criterial as well as consequences for the future health care of the patient. For example, in a May 2019 "Performance Forum," a monthly training meeting for VIPcare physicians, Defendant VIPcare posted a slide stating that it was a "rework trend" (meaning areas that needed to be addressed and "reworked") where there were 110 instances in which a patient had a

score of 5-or-higher on a standardized Patient Health Questionnaire ("PHQ-9") but MDD was not assessed. However, the industry standard – consistent with the guidance provided by the PHQ-9 test-makers – is that a patient must have a score of 10 or higher before MDD is even *considered.* A score of 5 is typically associated with mild depression at most.

d. Fourth, the coders populate forms with the recommended diagnosis codes and send them to the PO physicians in the form of a "5 Star Check List." The Check List is specifically designed to induce the physicians to report phony diagnoses codes. The information on the Check Lists includes new suggested diagnoses, the diagnostic codes, and remarkably, the effect which each code will have on the individual patient's risk adjustment score (and ultimately on the physician's bonus). For example, Patient D.F., born in May 1947, may or may not have had an episode of depression in 2017. The relevant 5 Star Check List directed Relator to evaluate him for Major Depressive Disorder, which the patient did not manifest and of which he had no history. However, the 5 Star Check List included a "bubble" at the top with the HCC diagnostic group for MDD and showed that the Risk Adjustment Factor for MDD was .346, meaning that diagnosing the condition would make the patient more valuable to all defendants – and would also increase the physician's compensation.

50. In reviewing the patient charts generated by VIPcare colleagues like Dr. Akhil Patel and Dr. David Hunt, and other physicians within the Freedom network like Dr. Rick Simovitz (and Dr. George Mansour, as stated to Relator by another colleague), Relator identified flagrant coding violations related to Defendants' 5 Star Check Lists. Relator found that physicians routinely coded, and Freedom accepted, every condition the doctor could conceivably find and then

assigned the highest possible code to those conditions, regardless of whether the diagnoses were supported by the ICD or whether the coding violated CMS rules.

51.     She determined that Freedom typically submitted three types of incorrect codes. First, Freedom submitted codes from impermissible sources (i.e., outside of any face-to-face encounter between physician and patient) such as laboratory, electrocardiogram ("EKG"), and radiology reports, and external specialist physicians, even though Freedom knows that ICD coding guidelines forbid Freedom to submit codes based on these sources alone.

52.     Second, Freedom, Anion, and the physicians (pursuant to Defendants' scheme), "upcoded" certain medical conditions by replacing codes chosen by doctors with higher-value codes that had no support in the medical records.  For example, for members with multiple, coexisting conditions, Freedom coded one condition as a complication of the other, when the medical records did not support a causal relationship between them.  Freedom coded in this manner because Medicare assigns more valuable HCCs to conditions where a causal relationship exists.

53.     Third, Relator noted that 5 Star Check Lists had entirely inapplicable conditions – conditions that the patients denied, that she could find no mention of them in the patients' medical records, and that specialist records often directly refute as well.  As noted, the 5 Star Check List is crafted to make clear to the VIPcare physician that additional diagnoses increase risk scores.  When Relator spoke to Emily Gallman, Senior Director of Healthcare Operations at VIPcare, in May 2019 about how to increase annual bonuses, Gallman explained to Relator that VIPcare physicians need only to accept the "white circles" on the form in order to drive up the risk scores.  Together, Relator and Gallman looked at one patient's Checklist, and Gallman pointed out that had Relator coded five additional diagnoses, which were indicated by five "white circles" on the form, the risk score for the patient would have increased by the amount shown on the form.  Gallman further

21

explained that agreeing to add those additional diagnoses, even though Relator found them unsupported by the patient's clinical presentation and medical records, would have contributed to Relator's substantial annual bonus.

### Use of "5 Star Check List" to Implement Phony Coding Scheme

54.     Inducements as well as pressure on physicians to capitalize on the risk adjustment process is seamlessly and systematically enhanced through the use of the "5 Star Check List." The checklist is created in advance of every patient visit by an Anion employee, who populates a daily electronic folder with patients scheduled for visits that day. Each morning, an Anion associate, typically Ratnakar Mekala, an Anion Healthcare Services Process Associate, Provider Dept., in Hyderabad, India, sends an email that the 5 Star Check Lists for the date are available and loaded into a shared Google Docs drive. Each doctor or office then goes onto the drive and downloads the forms for the day.

55.     A manual provided to physicians by Defendant Physician Partners describes the 5 Star Check List, how the data is aggregated, and how it should be used by a physician. Of note, the manual explicitly condones that some physicians are too busy to look at the medical record of a patient. Rather than direct that the physician must review all necessary documents to provide appropriate care, the 5 Star Check List is intended to be a shortcut around performing that basic standard of care.

How will it help the member or PCP?

Primary Care Physician does not have time to always review specialist notes and hospital discharge summaries, which means there is a chance that PCP may not know all the medical conditions that were addressed by the specialists and hospitals. We gather all that information and present it on the 5 star checklists so that PCP can continue to monitor those conditions and help members achieve better health outcomes.

22

56.     Moreover, the manual concedes that, despite the Checklist stating on its face that is based on the patient's past medical conditions, that is not true. The data is gathered from industry trends and from algorithms written into Defendants system to select conditions, regardless of whether any trained physician actually treating the patient has identified that condition as applicable.

> Where are the chronic medical codes coming from?
>
> Health plans provide us monthly claims files, these files include claims details from all medical providers the members have visited, we extract chronic diagnosis codes from the claims and report them on 5 star checklist.
>
> Where are the suspect conditions?
>
> The monthly data that we receive from health plans also include Rx claims and Lab test results. We built suspect algorithms in our system that looks for medications specific to certain chronic conditions and abnormal test results that lead to potential chronic conditions, if such conditions are not already addressed or reported by the PCP, we present them as suspect conditions on the 5 star checklists. These are only suspect conditions and its for the PCP to determine if the condition exists are not *[sic]*.

57.     As directed by VIPcare Medical Director Dr. Sangeeta Hans, physicians must complete a 5 Star Check List for each patient at least once per year, but may do so more often. The 5 Star Check List, which declares on its face not to be part of the patient's medical record, lists risk-adjusting conditions which have either been previously diagnosed by a physician or have been assigned to a patient's chart by a billing specialist, irrespective of the patient's actual medical history. The Check List may indicate whether a suggested diagnosis is based on the patient's "past history" or "clinical review," but usually does not state the reason for the recommended diagnosis (or if it does, it simply states that some test result or prior record is suspect for the new code).

58.     For patients new to Freedom and having their first visit at VIP, the 5 Star Check List does not have any diagnoses specific to the patient's reason for visit. Rather, the New Patient

5 Star Check List provides a disclaimer that has a headline "PLEASE EVALUATE, ASSESS, AND TREAT," and states, "Listed in the table below are common deseases *[sic]* that are high prevalent in senior population. Please complete a comprehensive assessment and evaluate if any of the potential conditions exist on this member. If a condition(s) exist, mark Yes on the last column of the checklist and document appropriately on your progress note." Categorized by HCC code, a predetermined set of conditions are listed with their ICD code, description, and associated Risk-Adjustment Factor. All of the conditions have risk-adjusting diagnosis codes; there are no conditions listed which would not result in a risk adjustment, regardless of how prevalent they may be in the senior population.

59.     At the top of the page, the 5 Star Check List includes a series of bubbles, each populated with an HCC code that is a suggested condition on the checklist. No code is suggested unless the corresponding diagnosis would increase the patient's risk adjustment score. Each circle is white until a physician agrees to code one of the diagnoses associated with that HCC. Once an HCC has been coded during that calendar year, the circle will be greyed out. The circles also correspond to a horizontal bar which tracks the percentage of HCC codes selected by a physician (represented by the color grey) or still unselected by the physician (represented by the color white). Thus, for new patients, the entire percentage bar is white and marked with 100%, meaning 100% of the codes have yet to be evaluated. If a physician determines that the patient should be diagnosed with a risk-adjusting condition, the associated HCC bubble will be greyed out and the horizontal bar will be greyed out in the appropriate percentage (i.e. 10% filled in grey if one-out-of-ten HCCs is coded).

60.     If a patient has been seen at VIPcare in the past or was enrolled with Freedom and used another primary care physician, the 5 Star Check List will show greyed out bubbles for any

conditions that were already diagnosed that calendar year and the percentage bar will reflect what percent of the possible risk adjusted score has already been coded, what percent of recommended conditions remains undiagnosed, and the maximum risk adjustment if all diagnoses are accepted. The remaining fields are populated with conditions that have been assigned to the patient by one of Anion's billers or coders. The suggested conditions may be based (accurately or exaggeratedly) on the patient's medical chart, but often are protocol-driven suggestions which are seemingly assigned at random, based on annual trends, or otherwise improper sources. The Check List must be submitted by a physician at least once per year, but is provided for every visit regardless of whether it has already been completed because a physician may choose to complete it again to close-out some of the HCC bubbles and thereby increase his performance percentage.

61.    As with the common conditions listed for a new patient, every listed condition on a returning patient's 5 Star Check List identifies the Risk Adjustment Factor that applies if the physician codes that condition again. The Checklist also shows how many times the condition has been "reported" (meaning billed and therefore factored into the risk adjustment score) in the previous three years, and whether the condition has already been reported for the current year. The form does not tell the physician whether the condition was actually diagnosed by another physician based on a physical assessment of the patient, whether it was agreed to by a physician based on an Anion suggestion, or whether it was simply added by an Anion biller without a physician's knowledge or input.

62.    The 5 Star Check List states: "Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note." In practice, however, the patient's medical records routinely do not support the risk-enhancing conditions suggested on

the form, and the Quality Training manual provided by Defendant Physician Partners confirms the suggestions are not *actually* based on the patient's past medical conditions. Based on Relator's review of several thousand 5 Star Check Lists and the associated medical charts for her patient panel, the forms and subsequent billing records routinely include at least three categories of conditions which are inapplicable and not related to the patient's actual medical status: (1) diagnoses that have no clinical support but were assigned to the patient at random or are seemingly based on protocols set for billing professionals, (2) diagnoses that may have been historically-accurate but are no longer applicable, *e.g.* cancer which has been treated and is in remission, and (3) conditions which are tangentially related to other notes in the chart but not supported by the record or examination (for example, COPD is "recommended" for every patient who ever smoked).

63.     The sometimes-preposterous nature of these proposed diagnoses is illustrated by, for example, Patient M.E., age 76. The 5 Star Check List provided to Relator suggested a diagnosis of microcephaly with a Risk Adjustment Factor of .509. Microcephaly was reported two times in 2018 and two times in 2017, although the patient was seen at least six times in 2018 and at least four times in 2017. Microcephaly is a very rare birth defect (2-12 out of 10,000 live births) in which a patient has an abnormally small head. It is a permanent condition which would be present at all visits or does not exist at all. Based on Relator's physical examination of the patient, the patient does not have microcephaly and there is nothing in the medical charts to suggest otherwise. In addition, this patient's 5 Star Check List suggested thrombotic microangiopathy and Type II diabetes, which were not reflected in the patient's history, had no clinical evidence, and of which the patient denied having when questioned by Relator. M.E. was also coded as having Major Depressive Disorder when she only had anxiety, an abdominal aortic aneurysm when her vascular

study was normal, and nonthrombocytopenic pupurea when she had no subjective or objective evidence of the same.

64.     Relator observed a similar pattern of unsubstantiated diagnoses and medically-questionable diagnosing and coding practices on a daily basis.

65.     During a patient's visit, the physicians are required by their employment contracts to use the 5 Star Check List as a guide in evaluating the patient. Although the physician may mark up the form according to their own findings, the significant part is whether the physician writes "Yes" (or something similar) in the "Comments" column to indicate agreement with that condition existing for the patient at the time of the evaluation, or "No" (or something similar) indicating that the suggested condition is not supported and should not be billed for the patient. Once completed at the end of a patient visit, the 5 Star Check List is submitted along with the rest of the medical chart, including the physician's notes, to Anion. The physician is required to sign the Check List certifying, "I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date." Although the forms are submitted to Anion for billing, they not placed in the patient's permanent medical record.

66.     If a physician had true autonomy over the diagnosis codes applicable to a patient, Anion would accept the 5 Star Check List as submitted by the physician. However, billing specialists at Anion reviewed every submitted chart to determine if the physician left off any of the suggested common conditions or any of the previously diagnosed conditions on the 5 Star Check List. If the physician failed to treat and code for a condition on the 5 Star Check List, then the condition is logged as a "care gap" and the physician is given the equivalent of a demerit for each such care gap. Upon information and belief, the care gaps associated with each patient

directly correlate to the number of white bubbles which remain at the top of the 5 Star Check List after a patient visit.

67. "Care gaps" are monitored by PO Defendant management and reports are sent to physicians periodically, identifying every incident in which a physician did not diagnose and code a condition that was on the 5 Star Check List. A care gap remains on a physician's record until the physician reviews a billing suggestion made by an Anion employee and either agrees to make the suggested changes or reaffirms the initial diagnosis that the suggested HCC codes are not applicable to that patient. There are some appropriate suggestions wherein a physician has put all of the coding that the PO Defendants want, but has not closed out the note or has not documented one part of the care as necessary. However, in Relator's practice, a substantial majority of Anion's billing suggestions relate to conditions that the physician has said do not exist and Anion wants to change, conditions that a physician has billed as less severe and Anion wants to upcode to appear more severe, or conditions that the physician simply did not discuss at all and Anion has determined should apply based on the billing representative's review of the chart. For example, a review of sixty 5 Star Check Lists from patient visits in February and March of 2019 revealed well over 200 "care gaps" – diagnoses which Anion urged Relator to use as upward risk adjustments, but which Relator found unsupported by the patient's condition and chart.

68. As physicians accumulate care gaps, PO Defendant and Anion billing administrators require the physicians to schedule time to do an individual review and to explain the reasons why the physician did not code a specific diagnosis. By way of example, on or about Feb. 12, 2019, Anion employee, Quality Analyst Sajitha Johnson, emailed Relator with a significant list of patients following a "huddle discussion" about the care gaps. Sajitha stated to Relator, "If you decide to make an addendum or disagree with a condition, let me know so I can

28

have the team close out reworks accordingly. Otherwise, these will remain as pending care gaps until they are addressed in a future 2019 progress note." Sajitha did not give Relator an option to clear the "care gaps" by reviewing the gaps and making an affirmative determination that the condition was not present. The care gap would only be cleared – and therefore not counted against Relator – if Relator made changes.

69. In addition to the physician's secondary review process at the direction of an Anion representative, Anion representatives also make billing changes based on notes from a patient visit, regardless of whether the physician expressly agrees to the change or not. For example, Relator is aware of certain instances where she indicated "No" to a condition on a the 5 Star Check List, but an Anion billing representative reviewed her notes and submitted a bill in her name where she did not expressly reject a condition but documented that it was "not confirmed" or "needs further investigation."

70. For example, Patient K.S. was examined by Relator on Jan. 3, 2019. Her 5 Star Check List identified arteriole disorder. Relator determined that the patient did not have any conditions which would support that diagnosis, and therefore marked "no" the 5 Star Check List, which was returned in due course to Anion. Subsequent documentation revealed that Anion nonetheless billed the code under Dr. Zafirov's name, and the code is identified in the patient's record as having been paid.

71. In addition, Relator identified many other instances of submissions of factitious diagnoses which were not supported by the patient's actual medical condition. Among many examples, one of Relator's Freedom patients is J.C., a 77-year-old man. Relator first saw him on March 1, 2019. Anion provided a 5-Star Check List for J.C. which, based on "past history," proposed diagnoses of Primary Pulmonary Hypertension ("PPH") and Chronic Obstructive

Pulmonary Disease ("COPD"). "Past History," in 5 Star parlance, means that PO Defendant coding personnel, presumably in India, saw breadcrumbs which led them to direct the VIPcare physician to evaluate, and hopefully diagnose, these conditions. Each of these conditions is very serious. Symptoms of PPH, which is high blood pressure in the lungs, include shortness of breath, fatigue, dizziness, chest pain, and swelling of the lower extremities and abdomen. COPD, which is a chronic inflammatory lung disease, including shortness of breath, cough, excessive mucous production and wheezing. When Relator examined J.C., she did not find symptoms which would support either diagnosis.

72. In addition, a particularly egregious, but hardly unique, situation is that of Patient C.B., an 83-year-old male who has participated in Freedom's Part C plan since 2009. Relator examined him in early March 2019. His 5 Star Check List directed Relator to evaluate him for, among other things, rheumatoid arthritis, which carries a risk adjustment of .374; malnutrition, which carries a risk adjustment of .713; opioid dependence, which carries a risk adjustment of .420; and peripheral vascular disease, which carries a risk adjustment of .299. Relator found none of these conditions and refused to diagnose any of them. A follow-up 5 Star Check List dated Mar. 18, 2019, included all the same recommended diagnoses, identified six "care gaps," and showed that she had only accomplished 14% of the expected risk adjustment enhancement. (Three care gaps remain as of the date of filing of this complaint, even though Relator has submitted subsequent 5 Star Check Lists reaffirming her medical judgment on those conditions.) But most egregiously, billing included in Patient C.B.'s file shows that, in 2017, his then-physician identified him as having anencephaly; Freedom paid that claim and, upon information and belief, assigned C.B. that diagnosis in documents submitted to CMS. Anencephaly, according to the CDC, "is a serious birth defect in which a baby is born without parts of the brain and skull. It is a

type of neural tube defect (NTD). As the neural tube forms and closes, it helps form the baby's brain and skull (upper part of the neural tube), spinal cord, and back bones (lower part of the neural tube) . . . [a]lmost all babies born with anencephaly will die shortly after birth."

73.    Additionally, Freedom Patient B.G. was diagnosed by Dr. Rick Simovitz, a non-VIPcare physician for at least the years 2015-2017, as having Chronic Lymphocytic Leukemia, a type of bone marrow cancer. Upon information and belief, Freedom submitted claims and documentation to CMS for B.G in at least the years 2015, 2016, 2017 as if he had Chronic Lymphocytic Leukemia.  In 2018, Patient B.G. became a patient of VIPcare. Relator's review of patient care notes confirm that the patient *did not* have a formal CLL diagnosis and had not seen a hematologist/oncologist, nor was ever even referred to one for further evaluation.  Patient B.G. does not have CLL, yet Defendant Anion coded  B.G. as if he had CLL, and Defendant Freedom submitted claims and other documentation to CMS with the phony CLL diagnosis in order to unlawfully maximize reimbursement for this patient.  Patient B.G. was also coded as having peripheral vascular disease, pupurea and MDD – all of which were unsubstantiated by clinical exam, history and patient report.

74.    In another instance of Defendants' falsely coding a patient with cancer, Patient A.B. was diagnosed and billed for malignant neoplasm of connective tissue in 2018, even though an oncologist from Moffit Cancer Center noted that the patient only had a benign angiofibroma, and the patient denied ever having a malignant cancer diagnosis. Malignant neoplasm of the prostate was also diagnosed in 2017 and submitted by VIPcare physician Dr. Patel on five different occasions, though A.B. stated he never had that and did not received treatment for it. Patient A.B. was also coded as having purpurea which had no evidence on examination, and opoid dependence even though he only used it post-operatively as diagnosed. A.B.'s records also show that the PO

Defendants characterized A.B. as having at least two other diagnoses for which Freedom submitted claims and other documentation to CMS, even though the medical records do not support those diagnoses.

75. The 5 Star Check List for patient W.D., a 69-year-old man who told Relator that he works as a landscaper, called for a diagnosis of diabetes "with diabetic peripheral angiopathy without gangrene." Relator examined W.D. on Jan. 23, 2019, and found no evidence of diabetes. She documented both the rejection of the diagnosis and the reasons why, writing: "Question completeness of initial diagnosis. Patient may have been prediabetes but it does not seem the lab criteria quite matches the diagnosis. If it is a question later on, will repeat [testing]." Remarkably, despite this clear rejection and request for additional confirmatory testing if necessary, a subsequent 5 Star Check List sent to Relator by Anion in mid-May 2019 represents that W.D.'s "current PCP" diagnosed "Type 2 diabetes with diabetic peripheral angiopathy without gangrene" and the associated billing records show the HCC associated with this diagnoses was billed and paid in 2019.

76. On or around May 18, 2019, Defendant Anion's "Quality Analyst" Sajitha Johnson asked Relator whether she maintained copies of any of her old 5 Star Check Lists. On information and belief, the reason for this request was that the Defendants intend that VIPCare physicians not be able to review those checklists because they repeatedly "suggest" conditions that the doctors identify conditions which they already have rejected, and have also billed conditions under a physician's name which the physician has rejected.

77. Relator has access to charts which show the frequency with which other VIPcare physicians diagnose the PO Defendants' favored, chronic conditions. The result of all Defendants conduct, often coordinated and in concert with one another, is that many more patients have been

diagnosed with these and other serious medical conditions than in the Medicare population at large. With respect to Major Depressive Disorder, for example, its prevalence among Medicare beneficiaries is about 7%, meaning seven of every 100 patients suffer from the condition. However, many of the PO physicians diagnose the condition with far greater frequency. For example, the following are the percentages of patients diagnosed with MDD by the listed physicians:

| Physician | 2017 | 2018 |
|---|---|---|
| Dr. Gil Gutierrez | 25% | 25% |
| Dr. David Hunt | 14% | 14% |
| Dr. Auxi Peachey | 23% | 23% |
| Dr. James Goszkowski | 30% | 30% |
| Dr. Claudine Frederiks | 29% | 29% |
| Dr. John Watson | 16% | 16% |
| Dr. Stephen Seecharan | 25% | 25% |
| Dr. Myriam A.E. Miller | 31% | 31% |
| Dr. Charles Powers | 10% | 10% |
| Dr. Veronica Machado | 31% | 31% |
| Dr. Paula Gregory | 16% | 16% |
| Dr. Jerome Lopez | 24% | 24% |
| Dr. Lawrence Campo | 12% | 12% |
| Dr. Jose Llamas | 25% | 25% |
| Dr. Rodger Rothenberger | 23% | 23% |

78.     Other phony diagnoses similarly included in patient charts and billing documentation, to include the 5 Star Forms, by the PO and MA Defendants, include, among many others, malnutrition, morbid obesity, drug dependency, and cardiac and vascular problems.

79.     A review of sixty 5 Star Check Lists provided to Relator regarding her patients in February and March 2019 show no patient with respect to whom she found all "recommended" diagnoses to be supported by objective evidence. For one patient (R.F.), 21 conditions were "recommended" and 20 were rejected. For another (T.B.), 11 were recommended, and all were rejected. For these 60 patients, Relator rejected approximately 446 of approximately 523

"recommended" diagnoses—85%. With respect to favored chronic diagnoses, Relator rejected, among these 60 patients and among other diagnoses, 15 recommended diagnoses of Congestive Heart Failure; 18 recommended diagnoses of Major Depressive Disorder; 23 recommendations of Chronic Obstructive Pulmonary Disorder; 25 recommendations of Peripheral Vascular Disease; and 29 recommendations of Nonthrombocytopenic Purpura; and eight recommendations of Type 2 Diabetes.

### Physician Compensation and Performance

80.     The expectation for VIPcare physicians (and upon information and belief, all PO Defendant physicians) to participate in inflating MRA scores is established during the hiring process.  In exchange for attractive working conditions –  low-volume daily patient visits (sometimes less than 5-10 patients per day) with comparatively high compensation – a new physician must enter into an employment agreement which demands, *inter alia*, that the physician "follow the direction of FMA with respect to all administrative matters pertaining to the services provided pursuant to this Agreement."  Further, the physician must agree to provide treatment "in accordance with FMA's care protocols, quality assurance program, standard operating procedures and managed care requirements" and to "execute any such required forms, including without limitation, assignments, as may be required to facilitate billing and other data capture by FMA for services performed by Physician pursuant to this Agreement."

81.     Despite the MA and PO Defendants' complete control of billing and administrative oversight, the employment agreement, on its face, purports to protect physician autonomy, stating, "Physician shall be responsible for and shall have complete authority, responsibility, supervision and control over the provision of any and all services rendered by Physician for which a license is required to practice medicine within the State of Florida, including without limitation, the

provision of diagnoses, treatments, procedures performed for and on behalf of patients ("Medical Services"). Nothing herein is intended to interfere with Physician's professional autonomy as a physician."

82. In practice, no such autonomy exists. The Defendants exert consistent pressure to ensure the physicians participate as expected, and the PO Defendants heavily incentivize physicians to comply with the expectations to enter false diagnosis codes to artificially inflate patients' risk adjustment scores.

83. In addition to consistent pressure by PO and MA Defendants, to include Anion billers and upper management to modify diagnosis codes and close "care gaps," the PO Defendants implemented a bonus system which hinged physicians' personal financial gains on their willingness to increase risk assessment scores as high as possible. By creating a system which is based on surplus – payments taken in minus incurred expenses – Defendants incentivized physicians to boost the incoming funds to have a higher starting point for the calculation. In a capitated system, the only way that a physician can influence the amount of money taken in for each patient is to increase the risk adjustment score. With an average patient load of 300, each physician cares for a patient load which results in approximately to $3 million in capitated payments to the MA Defendants, varying based on the risk scores assigned to a specific physician's and patient panel.

84. In 2018, VIPcare's Performance Bonus Program had three opportunities to achieve the financial incentives: (1) Monthly Training Bonus, (2) Quality Performance Bonus, and (3) Financial Performance Bonus. The first two categories are innocuous and relatively minimal as compared to the Financial Performance metric. The Monthly Training Bonus provides a Per Meeting bonus of $300 for each meeting attended by the physician, up to an annual limit of $3,600.

The Quality Performance Bonus – arguably the most important metric to ensure proper patient care – incentivizes physicians to maintain high scores on the Healthcare Effectiveness Data and Information Set ("HEDIS") which uses nearly 100 metrics to assess quality of care. Physicians who have HEDIS Star Scores of 4.5-4.74 out of 5 earn up to $5,000 per year, where physicians who have HEDIS Star Scores of 4.75 or greater earn up to $10,000 per year.

85.    The third category, however, directly implicates a physician's willingness to boost risk assessment scores. To earn the maximum Financial Performance Bonus, a physician must see more than 600 Freedom Medicare Advantage patients in a year, and then the physician may be awarded up to 50% of the surplus associated with those patients. The profits associated with each patient are derived by their adjusted capitation rate, or MRA score. Relator has been advised by Emily Gallman that the target capitated payment amount is $800 per patient per month to max out the bonus. The total incoming funding attributable to qualifying patients is then reduced by expenses associated with those patients. The expenses are typically related to (1) in-patient hospital admissions, (2) professional expenses like imaging, referrals and/or associated expenses, and (3) prescriptions. A physician can reduce expenses by avoiding admitting patients to a hospital, by writing generic prescriptions instead of brand names, by referring patients to use VIPcare's in-house imaging resources, by withholding or reducing the number of specialist referrals. If a physician can maximize funding and minimize expenses, the physician can and does receive up to $100,000 over and above their already-generous salaries.

| III. FINANCIAL PERFORMANCE BONUS | | |
|---|---|---|
| **GOAL: SURPLUS** | | |
| **IPA BONUS PROGRAM – INDIVIDUAL PCP PERFORMANCE** | | |
| **FR MA PATIENTS** | **ANNUAL POTENTIAL BONUS** | **PAYMENT FREQUENCY** |
| 100 - 249 | 50% of Surplus Up To $20,000 | Quarterly |
| 250 - 599 | 50% of Surplus Up To $50,000 | Quarterly |
| 600+ | 50% of Surplus Up To $100,000 | Quarterly |

86.     Each physician's bonus is largely computed on the basis of the average risk score of her Freedom patients. Remarkably, only the risk scores of Freedom insureds are effectively taken into account. Thus, the 5 Star Check List forms use the physician's economic interest to induce the physicians to code the patient with additional diagnoses which are proposed by PO Defendant/Anion employees in India, which in turn allows Freedom to demonstrate to the CMS that its enrolled population is sicker than average, thus driving up its capitation rate for the next year and future years.

87.     Bonuses are also based on the total cost expended by the MA Defendants on patients under their care. These out of pocket expenses, paid for by either the MA Defendants or PO Defendants, include hospital costs, diagnostic test costs, prescription drug costs, and so on. The lower the total cost, the higher the evaluation (and therefore bonus) the physician receives. This rationing of care, advocated by Defendants, runs counter to appropriate patient care and violates both the contractual obligation of the MA Defendants to CMS, and the mandatory statutory condition of payment requirements required by law.

88.     Physicians are incentivized to minimize or withhold medically reasonable and necessary referrals to specialists. In reference to ways to reduce the expenses that count against

37

the Financial Performance bonus, Senior Director of Healthcare Operations Emily Gallman advised Relator to contact oncologists who wanted to treat a VIPcare patient with expensive infusions to "see what they want." Relator understood this to mean asking the oncologist about what kind of treatment he would provide and ration the referrals in the same way that other physicians (like Dr. Hans) do to keep their expenses low. Gallman made clear to Relator that the more Freedom/Optimum had to spend on a patient's specialist care, the less money would be available to pay Relator's bonus.

89.     The PO Defendants, through various schemes, inducements, artifices, and artificial layers of approval, engaged in conduct which resulted in PO physicians failing to refer patients to specialists, despite obvious medical necessity and, in some cases, patient pleas for specialist care. Relator has personally identified multiple such patients, and in many cases, patients have suffered harm due to the lack of (or delay in receiving) medically reasonable and necessary specialist care. For example:

> a.  Patient R.H., a 95-year-old veteran of World War II, was seen by Dr. Hunt on September 4, 2018. At 109 pounds and 69 inches tall, he was severely malnourished and had low white count. He was then seen by Dr. Patel on October 25, 2018. Both physicians stated the patient declined interventions although he has dementia and capacity currently in question. The patient was told by Dr. Patel that his diet of Boost alone was adequate for nutrition. No further evaluation or workup was performed. When R.H. became Relator's patient, she provided two different referrals to appropriate specialists which he readily accepted. From those referrals, R.H. was found to suffer from a likely leukemia and an esophageal stenosis.

b.  Patient S.S. was seen by Dr. Simovitz on multiple occasions for evaluation of a painful abdominal hernia. He reported to Relator that he begged for a referral to a surgeon, which Dr. Simovitz refused. The patient brought his son in to discuss the situation, but no referral was made. When S.S. became Relator's patient, imaging revealed a partially incarcerated hernia, which can be life-threatening. Relator immediately referred him to a specialist for a hernia repair. Relator examined him in December 2018 and in January, March, and April 2018, and understands that hernia repair has been or will be effectuated.

c.  Patient W.M. was seen by Dr. Patel several times in 2018. Worsening renal function was diagnosed as approaching stage IV (severe) kidney disease. The condition had been billed on multiple visits, but was never referred to a nephrologist. When Relator treated him, he reported that he was unaware he had been diagnosed with approaching Stage IV kidney disease. She immediately referred him to nephrology and cardiology specialists, who continue to treat him.

d.  Patient W.L. was examined by Dr. Patel on September 6, 2018. Dr. Patel ordered imaging for screening and subsequently told W.L. that the imaging was normal. Dr. Patel commented in his note, "CT abdomen without significant findings supporting weight loss." There was no further follow up or referral done. When W.L. became her patient, Relator reviewed the radiologist's report from CT scan, and determined that it had identified thyroid calcifications (associated with possible malignancy), emphysema, lung nodules and heavy coronary plaque, gallbladder sludge, adrenal adenoma, renal calculi, prostate

enlargement. A number of these conditions required further imaging and/or referrals, which Relator promptly made to the appropriate specialists.

90.     Physicians are incentivized to minimize or withhold medically reasonable and necessary referrals to specialists. In reference to ways to reduce the expenses that count against the Financial Performance bonus, Senior Director of Healthcare Operations Emily Gallman advised Relator to contact oncologists who wanted to treat a VIPcare patient with expensive infusions to "see what they want." Relator understood this to mean asking the oncologist about what kind of treatment he would provide and ration the referrals in the same way that other physicians (like Dr. Hans) do to keep their expenses low. Gallman made clear to Relator that the more Freedom/Optimum had to spend on a patient's specialist care, the less money would be available to pay Relator's bonus.

### Lack of Effective Compliance Programs

91.     Defendants knowingly pursued these FCA violations without any meaningful compliance training programs for their affiliated physicians, coders, and other employees or contractors relating to preventing Part C fraud, waste, or abuse. This, despite that Defendants Freedom and Optimum are under strict legal obligations pursuant to the Corporate Integrity Agreement.

### Failure To Return Overpayments

92.     CMS audits MA Organizations, and the MA Organizations in turn audit providers, concerning the accuracy of their coding because of its importance to MA Plan reimbursement. In the event that erroneous risk-adjusting diagnoses codes are "swept" into the reimbursement system, CMS requires the return of any overpayments. *See* Medicare Managed Care Manual, Chapter 7, § 40 (June 2013); *Swoben*, 848 F.3d at 1176–77 & n.8 (9th Cir. 2016).

93.     Instead of reimbursing CMS for the overpayments, conducting further audits, and funding compliance and training programs, Defendants turned a blind eye at best; and at worst, intentionally doubled down on their scheme to increase risk-adjusting diagnosis codes. Defendants knew that the diagnosis codes being submitted to CMS were false and knew that the submission of these false risk-adjusting codes would inflate the Medicare Part C payments.

### Patient Harm Due To Phony Patient Diagnoses

94.     The result of the violations of the False Claims Act described herein are not just monetary – Defendants scheme results in significant patient harm. First, the false diagnosis codes, whether upcoded or entirely false, drive patient care. Physicians, whether primary care successors or specialists, make medical decisions for treatment specifically based upon information in each patients' chart.  If previous diagnoses are false, subsequent diagnoses and care suffers.

95.     Second, the patients themselves make decisions based upon their being labeled with false diagnoses.  For example, many of the patients have been falsely told they have Major Depressive Disorder or Alcohol Dependency and will take certain courses of action they otherwise would not.

96.      Third, the phony diagnoses affect the patients' relationships with third parties. Patients will be forced to choose between including the phony diagnoses in a life insurance, health insurance or job application even though the diagnoses are false, or to deny the diagnoses at the risk of being accused of withholding information on "diagnosed" condition.  If a patient is made to appear sick enough, he may have increased difficulty getting new health insurance, thereby forcing the patient to maintain coverage with the MA Defendants.

## FIRST CLAIM FOR RELIEF

### False Claims Act: Reverse False Claims
### 31 U.S.C. § 3729 (a)(1)(A) Against All Defendants

97.     The Relator repeats and re-alleges the allegations contained in ¶¶ 1 to 96 above as though they are fully set forth herein.

98.     All Defendants violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and causing the presentment of false or fraudulent claims for payment or approval resulting in inflated Medicare reimbursements to which they were not entitled.

99.     Had CMS been aware of Defendants' knowing false coding, it would have refused to make risk-adjustment payments based on the false coding and/or pursued other legal remedies to avoid the potential disruption of MA Plan benefits to thousands of Medicare beneficiaries to whom Defendants provided healthcare services

100.     By virtue of the said acts of concealment and/or improper avoidance, the UNITED STATES has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## SECOND CLAIM FOR RELIEF

### False Claims Act: Reverse False Claims
### 31 U.S.C. § 3729 (a)(1)(B) Against All Defendants

101.     The Relator repeats and re-alleges the allegations contained in ¶¶ 1 to 96 above as though they are fully set forth herein.

102.     All Defendants violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, and causing to be made or used, false records and statements material to false or fraudulent claims resulting in inflated Medicare reimbursements to which they were not entitled.

103. Had CMS been aware of all Defendants' knowing false coding, it would have refused to make risk-adjustment payments to the MA Defendants based on the false coding and/or pursued other legal remedies to avoid the potential disruption of MA Plan benefits to thousands of Medicare beneficiaries.

104. By virtue of the said false records, statements, and other acts of concealment and improper avoidance, the UNITED STATES has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

### THIRD CLAIM FOR RELIEF

#### False Claims Act: Making or Using False Records or Statements
#### 31 U.S.C. § 3729 (a)(1)(G) against MA Defendants

105. The Relator repeats and re-alleges the allegations contained in ¶¶ 1 to 96 above as though they are fully set forth herein.

106. MA Defendants violated 31 U.S.C. § 3729(a) (1)(G) as follows: the MA Defendants knowingly made or used, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money to the United States. The MA Defendants also knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government by failing to repay Medicare overpayments to which they were not entitled.

107. Had CMS been aware of Defendants' knowing false coding and knowing failure to return overpayments, it would have taken steps to recover them.

108. By virtue of the said false records and statements, the UNITED STATES has incurred damages and therefore is entitled to treble damages under the FCA, plus a civil penalty of each violation of the Act.

WHEREFORE, Plaintiff/Relator requests the Court grant judgment for Plaintiff/Relator and the United States against the Defendants, as follows:

a.   For civil penalties for each false claim submitted, pursuant to 31 U.S.C. § 3729(a), and as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, amended by the Debt Collection Improvement Act of 1996 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

b.   For three times the amount of damages proved, pursuant to 31 U.S.C. § 3729(a);

c.   For Relator's reasonable attorney's fees and costs, in accordance with 31 U.S.C. § 3730(d);

d.   For the maximum Relator's share award, pursuant to 31 U.S.C. § 3729(d);

e.   For pre-judgment and post-judgment interest permitted as provided by law; and

f.   For such other and further relief as may be appropriate and authorized by law.

Respectfully submitted this 20th day of May, 2019,

_____
Kenneth J. Nolan (Fla. Bar No. 603406)
Marcella Auerbach (Fla. Bar No. 249335)
NOLAN, AUERBACH & WHITE, LLP
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL  33301
Phone: (954) 779-3943
Fax: (954) 779-3937
ken@whistleblowerfirm.com
marcellla@whistleblowerfirm.com

Jillian L. Estes  (Fla. Bar No. 0055774)
Frederick M. Morgan, Jr. (Ohio Bar No. 0027687)
MORGAN VERKAMP LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Phone: (513) 651-4400
Fax: (513) 651-4405

jillian.estes@morganverkamp.com
rmorgan@morganverkamp.com

**Counsel for Relator Dr. Clarissa Zafirov**

## CERTIFICATE OF SERVICE

I, Jillian L. Estes, hereby certify that a true and correct copy of the foregoing Complaint was served by U.S. Mail on the Office of the Attorney General of the United States of America and on the Office of the United States Attorney for the Middle District of Florida on this 20th day of May, 2019.  The Complaint was not served on the Defendant pursuant to 31 U.S.C. 3730(b)(2).

Jillian L. Estes