**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

United States *ex rel.* Clarissa Zafirov,

     *Plaintiff/Relator*,

v.                                                                CASE NO. 8:19-cv-01236-SDM-SPF

Florida Medical Associates, LLC
d/b/a VIPcare; Physician Partners,
LLC; Physician Partners Specialty
Services, LLC; Sun Labs USA, Inc.;
Anion Technologies, LLC; Anthem,
Inc.; Freedom Health, Inc.; Optimum
Healthcare, Inc.; and Siddhartha Pagidipati,

     *Defendants*.

_____/

## FLORIDA MEDICAL ASSOCIATES, LLC, PHYSICIAN PARTNERS, LLC, PHYSICIAN PARTNERS SPECIALTY SERVICES, LLC, SUN LABS USA, INC., AND ANION TECHNOLOGIES, LLC'S MOTION TO DISMISS COMPLAINT FOR FAILURE TO STATE A CLAIM

The purported whistleblower in this case, Clarissa Zafirov, is a relatively junior physician who performed primary care services at Florida Medical Associates, LLC ("FMA") for only *seven* months before filing her *qui tam* suit. She was an employee of FMA, where she began working shortly after she completed her residency program. She was not just new to the practice of medicine; she also had no prior experience with Medicare Advantage, a specialized federal healthcare program that is at the heart of this case. Zafirov's lack of understanding of Medicare Advantage, and her lack of knowledge about billing practices, is evident throughout her complaint.

The fundamental errors in Zafirov's complaint stem not only from her inexperience with Medicare Advantage, but also from her lack of first-hand knowledge about any alleged false claims. Her tenure as an employee was narrowly circumscribed: she saw a limited number of

Page 1

patients at one of FMA's smaller offices in Venice, Florida. Neither she nor anyone in her office ever submitted a claim to a Medicare Advantage Organization, much less to the government. Neither she nor anyone in her office ever submitted risk adjustment score computations for patients. Neither she nor anyone in her office in Venice ever reviewed the payments that the government made to Medicare Advantage Organizations.[1]

Against this backdrop, Defendants FMA, Physician Partners, LLC ("Physician Partners"), Physician Partners Specialty Services, LLC ("Physician Partners Specialty Services"), Sun Labs USA, Inc. ("Sun Labs"), and Anion Technologies, LLC ("Anion") (collectively, the "Provider Defendants") move to dismiss Zafirov's complaint.

## ARGUMENT

Zafirov's complaint is legally deficient for at least six reasons: (1) it fails to plead fraud with sufficient particularity; (2) Zafirov has not and cannot show that any false claim was material to a government payment decision; (3) Zafirov's allegations are implausible; (4) the complaint is barred by the first-to-file doctrine; (5) Zafirov's allegations were publicly disclosed years ago; and (6) the complaint is foreclosed by the government action bar. Given these defects, and Zafirov's lack of knowledge about any billing practices at any Defendant, leave to amend would be futile.

---

[1] The Medicare Advantage Organizations named here are Freedom Health, Inc. ("Freedom") and Optimum Healthcare, Inc. ("Optimum") (collectively, the "Medicare Advantage Defendants").

# I.     Zafirov has not pleaded fraud with particularity.

### A.   The Complaint impermissibly lumps all defendants together without specifying who did what.

As a threshold defect, the Complaint fails because it alleges every defendant did everything wrong. This type of conclusory pleading is impermissible. Courts routinely dismiss complaints that "assert[] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). The Eleventh Circuit "ha[s] condemned repeatedly" this style of complaint. *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

The Complaint names nine different defendants but fails to specify who did what, much less when, where, and how. Instead, Zafirov lumps together five separate corporate entities— FMA, Physician Partners, Physician Partners Specialty Services, and Sun Labs—as the "PO Defendants" and then makes collective assertions of fraud against them. She makes no allegations whatsoever about Physician Partners Specialty Services, but simply identifies it as a party. Compl. ¶ 7.c. Her only specific allegation about Physician Partners is that it gave doctors a manual on how to use the 5 Star Checklists. Compl. ¶¶ 55, 62. And her only specific allegation about Sun Labs is that it issued her paycheck. Compl. ¶¶ 6, 7.d. Because Zafirov does not allege the role of each defendant in the alleged scheme, she cannot plausibly allege that the defendants acted *knowingly* in the scheme. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (noting that the False Claims Act's scienter requirement is "rigorous").

### B.   Zafirov has not pleaded fraud with the requisite particularity

Putting aside the plural pleading, the complaint fails to plead even one false *claim* with the requisite particularity. "The submission of a false claim is . . . the *sine qua non* of a False Claims Act violation." *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1302 (11th Cir.

2002). Allegations of purportedly "improper practices alone are insufficient to state a claim under the False Claims Act absent allegations that a specific fraudulent claim was in fact submitted to the government." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

To plead with particularity her direct false claims count under 31 U.S.C. § 3729(a)(1)(A), Zafirov must "allege the 'who,' 'what,' 'when,' and 'how' of fraudulent submission." *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1326–27 (11th Cir. 2009). To plead with particularity her false records count under 31 U.S.C. § 3729(a)(1)(B), Zafirov "must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012). She does neither.

### 1.  Zafirov has failed to plead any specific false claims.

Zafirov has not alleged a *single* false claim in her Complaint. Nor has she identified one increased payment that resulted from an allegedly false diagnosis. The Complaint fails to provide any information essential to allege a false claim: which of the Provider Defendants—much less, which *individual* at a specific Provider Defendant—entered a false diagnosis code, when that code was entered, which of the Medicare Advantage Defendants submitted the code to CMS, or when it was submitted. She does not plead this information because she does not know it and could not have known it given her limited scope of employment as a physician with no access to or knowledge of the Defendants' billing practices. And, as such, any amendment would be futile.

Zafirov instead assumes that false claims *must* have been submitted because FMA employed "5 Star Checklists" and paid bonuses to some physicians. Yet, untethered allegations of misconduct that bear no connection to a specific false claim have never been sufficient to pass muster under Rule 9(b). Nor should they be sufficient now. Zafirov cannot rely on allegedly

improper practices to support "the inference that fraudulent claims were submitted"; rather, a "submission must be pleaded with particularity and not inferred from the circumstances." *Corsello*, 428 F.3d at 1013. Without showing that the 5 Star Checklists or doctor bonuses "ever converged to produce an actual false claim," Zafirov cannot state any False Claims Act violation. *Carrel v. AIDS Healthcare Foundation, Inc.*, 898 F.3d 1267, 1277 (11th Cir. 2018).

Even when Zafirov cites examples of patients whose diagnoses were allegedly falsified, she fails to allege "details related to the submission of a claim to Medicare, such as the date the claim was submitted or the amount of the payment requested." *See United States v. Fazzi Assocs., Inc.*, No. 1:15-cv-511, 2019 WL 6117299, at *7 (S.D. Ohio Nov. 18, 2019). She does not plead this because she cannot. She was never involved with billing or submission of any claim by the Medicare Advantage Defendants. That Zafirov must rely on allegations made "on information and belief" to support her claim underscores her lack of knowledge. *See* Compl. ¶¶ 72, 73. Allegations based "on information and belief" lack the "indicia of reliability" to allege a false claim. *See Corsello*, 428 F.3d at 1013–14.

In short, "[t]he complaint does little more than hazard a guess that [the Medicare Advantage Defendants] submitted false claims for Medica[re] reimbursement."  *Hopper*, 588 F.3d at 1326. Because Zafirov has no "personal knowledge of the payment terms or billing practices," she cannot state a False Claims Act violation. *United States ex rel. Seal 1 v. Lockheed Martin Corp.*, 429 F. App'x 818, 820 (11th Cir. 2011).

2.   Zafirov does not plead any false attestations by any of the Provider Defendants.

Zafirov does no better with her false records claim. This claim appears to be based on allegedly false attestations submitted by the Provider Defendants or the Medicare Advantage Defendants to CMS. *See* Compl. ¶ 42. Under CMS regulations, Medicare Advantage organizations must attest that their risk adjustment data is complete and accurate to the best of their knowledge, information, and belief. *See* 42 C.F.R. § 422.504(*l*). However, Zafirov does not identify any CMS regulation requiring *providers* to make such attestations or allege that any such attestations were made by any of the Provider Defendants. Zafirov's failure to identify any attestations, let alone any *knowingly false* attestations, requires dismissal of her false records claim. *See United States v. Scan Health Plan*, No. CV 09-5013-JFW (JEMx), 2017 WL 4564722, at *6 (C.D. Cal. Oct. 5, 2017). Again, Zafirov fails to plead these facts because she does not know them. No such facts exist.

## II.   Zafirov has not shown that the allegedly false statements or regulatory violations were "material" under *Escobar*.

Zafirov also fails to plead that any allegedly false statements were material. She does not plead materiality because she cannot. As this Court knows, the False Claims Act's materiality requirement is "rigorous" and "demanding." *Escobar*, 136 S. Ct. at 2002, 2003. The Supreme Court has held that the materiality requirement should be "strict[ly] enforce[d]" at the motion to dismiss stage. *Id.* at 2002, 2004 n.6. Zafirov bears the burden of "pleading facts to support allegations of materiality." *Id.* at 2004 n.6. She has failed to do so.

The complaint says almost nothing about materiality. Apart from quoting the statutory definition (Compl. ¶ 25), Zafirov's two counts against "All Defendants" allege, in conclusory fashion, that CMS "would have refused to make risk-adjusted payments to the MA Defendants" had it "been aware of" the "false coding." *Id.* ¶¶ 99, 103. The Supreme Court in *Escobar*

specifically held such allegations are insufficient. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. *Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.*" 136 S. Ct. at 2003 (emphasis added).

Nothing else in the complaint suffices to satisfy the materiality standard. Zafirov does not identify any express certification either signed by the Provider Defendants or presented to CMS. Therefore, her complaint against them must rest on an "implied certification" theory. *See Escobar*, 136 S. Ct. at 2001. To establish False Claims Act liability on this theory, two conditions must be satisfied: (1) "the claim does not merely request payment, but also makes representations about the goods or services provided" *and* (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* Zafirov cannot satisfy either *Escobar* condition.

First, Zafirov has no knowledge of and does not plead a single false diagnosis code that the Provider Defendants presented to CMS. The complaint contains allegations about only five patients with allegedly false diagnosis codes that were (in passive tense) "billed" or "submitted." Compl. ¶¶ 70, 72, 73, 74, 75.[2] These sparse allegations are insufficient to satisfy the first *Escobar* condition. Primarily, the allegation fails because a diagnosis code is not a "request [for] payment." Zafirov concedes that "[n]ot all diagnosis codes result in an adjustment in risk score and thus not all diagnosis codes affect payment." Compl. ¶ 33. Because she was not involved in any billing or claim submission while employed at FMA, Zafirov does not tie any of the five allegedly false

---

[2] Zafirov's allegations about inadequate patient care (Compl. ¶¶ 89–90) and physician bonuses (*id.* ¶¶ 80–88) have nothing to do with claims for payment from the government and thus cannot lead to False Claims Act liability.

diagnosis codes to a specific Provider Defendant or explain how any false code made its way from a Provider Defendant, through a Medicare Advantage insurer, to CMS. Even assuming that the five diagnosis codes were "false," the complaint is devoid of any allegation that a misdiagnosis resulted in a higher risk score for a patient or a higher capitated payment in the following year. Nitpicking "only a subset of a subset of the data" reported to CMS under a program as complex as risk scoring cannot satisfy the materiality requirement. *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 543–44 (10th Cir. 2020).

Second, Zafirov does not identify any "material statutory, regulatory, or contractual requirement" that the Provider Defendants violated. *Escobar*, 136 S. Ct. at 2001. She contends that the "MA Defendants" breached their overpayment obligations established by the 2013 Medicare Managed Care Manual. Compl. ¶ 92. This Manual, though, is not a statute, not a regulation, and not a contract. It is non-binding guidance provided to the Medicare Advantage Defendants, not the Provider Defendants. With no allegation that any Provider Defendant violated any statute, regulation, or contractual requirement that was material to CMS's payment decisions, Zafirov's claims fail for lack of materiality. *See United States ex rel. Rasmussen v. Essence Grp. Holdings Corp.*, No. 17-3273-CV-S-BP, 2020 WL 4381771, at *5–7 (W.D. Mo. Apr. 29, 2020).

Zafirov is unsuccessful at making a False Claims Act case from general criticisms of the 5 Star Checklists. There is nothing wrong or illegal in using chart review to fully assess the health risks that any given patient poses to an insurance pool. *See Rasmussen*, 2020 WL 4381771, at *4– *5 (citing *Untied States ex rel. Gray v. UnitedHealthcare Ins. Co.*, No. 15-cv-7137, 2018 WL 2933674, at *7 (N.D. Ill. Jun. 12, 2018)). CMS has repeatedly investigated and approved chart review as a means of collecting diagnosis codes, notwithstanding its concerns that such review could increase payments. *See* HHS OIG, *Billions in Estimated Medicare Advantage Payments*

*from Chart Reviews Raise Concerns* 4 (Dec. 2019), https://oig.hhs.gov/oei/reports/oei-03-17-00470.asp (stating that MAOs "may employ third-party vendors to examine beneficiaries' medical records by using staff with clinical or coding experience or by using artificial intelligence software. MAOs may report diagnoses identified by these reviews to the encounter data as chart review records . . . ."); CMS, *Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter* 34 (Apr. 6, 2015), https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2016.pdf (noting that encounter data system to which CMS is transitioning "accepts diagnoses obtained through chart review").

Zafirov also cannot establish materiality because CMS knows about diagnosis coding errors yet continues to pay, both generally and in this case. Generally, in the Medicare Advantage context, the government is aware that there is a margin of error built into claims data submitted to it and the government expressly accounts for this error. *See UnitedHealthcare Ins. Co. v. Azar*, 330 F. Supp. 3d 173, 180 (D.D.C. 2018). More specifically to this case, CMS—through review of annual Independent Review Organization reports—audits the Medicare Advantage insurers here as part of the *Sewell* settlement and Corporate Integrity Agreement. *See* **Exhibit A**, at App'x C. This includes their diagnosis codes. *Id.* CMS continues to pay capitated payments every year, despite the allegations in *Sewell* and here. The government's decision to continue paying capitated payments to the Medicare Advantage insurers here belies any allegation that erroneous or false diagnosis codes are material.[3] "[I]f the Government pays a particular claim in full despite its actual

_____

[3] Further, even if there was a concern with certain diagnoses codes (which there is not) CMS' own guidance provides a six-year lookback for the remittance of any overpayments. *See* CMS, *Guidance for Reporting and Returning Medicare Advantage Organization and/or Sponsor Identified Overpayments to the Center for Medicare & Medicaid Services* 3 (Feb. 18, 2015),

knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 136 S. Ct. at 2003.

Finally, the government's decision not to intervene shows that any allegedly incorrect diagnosis coding was not material. *See* Doc. 40 (government's notice of election to decline intervention); *Polansky v. Executive Health Res.*, 422 F. Supp. 3d 916, 938 (E.D. Pa. 2019) ("Post-*Escobar*, numerous federal courts have found insufficient FCA materiality where the government investigated a relator's allegations but chose not to intervene or otherwise address the defendant's allegedly improper behavior."). The government has investigated Zafirov's allegations and declined to take action, either in this *qui tam* action or under the Corporate Integrity Agreement from *Sewell*. Zafirov therefore cannot plausibly allege that any of the Defendants' actions affected the government's payment decision.

## III.    Zafirov's claims are implausible.

The complaint also fails because its allegations about both false claims and false records are implausible.

### A.    *Zafirov cannot plausibly allege the Provider Defendants caused the presentment of any false claims or caused the government to pay any false claims.*

Zafirov's theory of "fraud" is that the Provider Defendants' business practices caused physicians to improperly diagnose patients. Her primary focus is on the 5 Star Checklists. The 5 Star Checklists gather available information about a patient's potential current medical conditions in a single place for physicians to review as they evaluate a patient. This information is gathered by algorithms that aggregate historical data in a patient's medical charts to identify possible disease conditions for physicians to consider and, if appropriate, evaluate using their independent clinical

---

https://cssoperations.com/internet/cssc3.nsf/files/Overpayment%20Memo02182015.pdf/$FIle/O verpayment%20Memo02182015.pdf.

judgment. Zafirov's theory is that the 5 Star Checklists cause the Provider Defendants' physicians to write incorrect diagnoses. This theory is implausible as (1) physician judgment, not a checklist, reigns supreme in medical decision-making and (2) even if there was "pressure" to apply incorrect diagnosis codes—which there was not—the chain of causation is too attenuated to support liability.

> 1. *Physician judgment is the starting—and ending—point for medical diagnoses.*

Zafirov's theory is not plausible. A physician uses her medical judgment, not a checklist, to diagnose patients. Zafirov admits that 5 Star Checklists are not diagnoses; they are simply a list of potential medical conditions based on information in a patient's medical files. *See* Compl. ¶¶ 55–56. She asserts that patients sometimes do not suffer from certain conditions included on the Checklist. But her allegations highlight the fact that a physician must ultimately bring her medical judgment to bear to form a diagnosis. This is exactly what Zafirov allegedly did. *See* Compl. ¶¶ 67, 70, 71, 72. By way of analogy, Westlaw may suggest authorities based on a researcher's search terms. But a lawyer must read and analyze those authorities to decide whether to cite them in her brief. Like Westlaw's "smart" search results, 5 Star Checklists are created by filtering large amounts of data to identify conditions that a physician might consider in forming her professional opinion. Ultimately, however, the physician must decide on the appropriate diagnosis, as the lawyer must decide on which cases to cite in her brief.

It is telling that Zafirov has not alleged that the 5 Star Checklists or any of the Defendants' other allegedly improper practices interfered with any physician's medical judgment. To the contrary, her allegations reveal the opposite. Zafirov notes that her employment agreement gives her exclusive control over her medical judgment and nothing in the agreement interferes with her professional autonomy. Compl. ¶ 81. It is also clear from the Complaint that Zafirov was exercising her professional judgment by rejecting 5 Star Checklist's data points.

Zafirov is equally unsuccessful in her allegation that the Provider Defendants caused physicians to schedule medically unnecessary visits with patients for the sole purpose of obtaining diagnosis codes. Compl. ¶ 49.a. Unlike fee-for-service Medicare, CMS does not pay the Provider Defendants for each visit. Additional visits cost providers and insurers more money. If the Defendants' only goal were to capture codes, they would not need to schedule regular visits—they could capture all codes in a single visit. What is more, Zafirov cannot square her claims about unnecessary visits with her later suggestion that the defendants withheld necessary care from patients.[4] Zafirov's theories are therefore not plausible. *See Rasmussen*, 2020 WL 4381771, at *4 (holding that alleged "medically unnecessary" office visits "cannot support a claim under the FCA" because CMS is not billed for them).

Physicians exercising medical judgment make diagnoses. Zafirov does not allege that anyone forced her (or anyone else) to misdiagnose a patient. Nor does she allege that the business practices she faults caused a physician to change a diagnosis code. Thus, these allegations must fail for lack of plausibility.

### 2. Zafirov's Theory Establishes a Far Too Attenuated Theory of Causation

Zafirov's theory of presentment of false claims is implausible for a second reason: it simply stretches the theory of causation too far. As noted above, the ultimate diagnosis of any patient turns on the physician's clinical judgment. No claim can be submitted unless a physician herself signs off on the diagnosis.

Notwithstanding this, Zafirov seeks to shift liability to the Provider Defendants, who do not have contracts with CMS and do not present any diagnosis codes to CMS. Physician Partners

---

[4] Zafirov's allegations concerning the quality of patient care have no bearing on her claims that the defendants submitted false diagnosis codes to the government. The Court should disregard those allegations.

and FMA submit diagnosis codes to the Medicare Advantage Defendants, but these diagnosis codes are not requests for payment. As Zafirov acknowledges, "[n]ot all diagnosis codes result in an adjustment in risk score and thus not all diagnosis codes affect payment." Compl. ¶ 33. Raw diagnosis codes do not entitle Physician Partners, the only Provider Defendant in privity with Freedom or Optimum, to receive payment, either from a Medicare Advantage Defendant or the government. Moreover, raw diagnosis codes are meaningless for risk adjustment purposes.

Before a diagnosis code can even *possibly* lead to increased payment, Medicare Advantage insurers must subject these codes to multiple levels of processing and review. Medicare Advantage insurers must verify that the code came from one of three acceptable data sources: a hospital inpatient stay, an outpatient facility, or a physician. CMS, Pub. No. 100-16, *Medicare Managed Care Manual*, ch. 7, § 120 (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c07.pdf. They must then format the codes along with four other data points (claim number, service from date, service through date, and provider type) into "diagnosis clusters" for submission to the Risk Adjustment Processing System (RAPS).[5]

---

[5] CMS also uses the Encounter Data Processing System (EDPS), to translate diagnosis codes into risk adjustment data. *See* CMS, *Encounter Data Submission and Processing Guide* 11 (2018), https://www.csscoperations.com/internet/cssc4.nsf/files/ED_Submission_Processing_Guide.pdf/$FIle/ED_Submission_Processing_Guide.pdf. The EDPS relies on "encounter data," which is "data representing each item and service provided to a Medicare Advantage enrollee," to calculate risk adjustment scores. *Id.* at ch. 1.1. Like the RAPS, the EDPS also contains multiple levels of review and processing as it translates diagnosis data into risk adjustment data. *See id.* at Figure 1.1; ch. 1.3. Although CMS seeks to rely more heavily on the EDPS to calculate risk scores going forward, the RAPS was the primary determinant of Medicare Advantage patients' risk scores during the relevant timeframe. *See* CMS, *2021 Medicare Advantage and Part D Advance Notice Part II Fact Sheet* (Feb. 5, 2020), https://www.cms.gov/newsroom/fact-sheets/2021-medicare-advantage-and-part-d-advance-notice-part-ii-fact-sheet (explaining that the RAPS accounted for 75–90 percent of patients' risk scores between 2015 and 2019). Thus, this brief's focus is on the RAPS.

*Id.* Medicare Advantage insurers then "submit the five data elements in the RAPS format . . . to the Front End Risk Adjustment System (FERAS) for initial edit checks." *Id.*

FERAS and RAPS are the first layer of Medicare Advantage insurers' array of tools to verify their risk adjustment data. After Medicare Advantage insurers submit diagnosis clusters, FERAS and RAPS generate various reports identifying errors and showing the disposition of entered data "so plans can verify their data and project their payment." *Id.* Medicare Advantage insurers review these reports to identify and correct errors, including duplicate diagnosis clusters. *See id*. § 120.2.5. After editing, "[f]inalized diagnosis clusters are stored in the RAPS database and used for the calculation of risk scores." *Id*. § 120. CMS also generates several reports, including Monthly Membership Reports and Model Output Reports, for insurers to verify their data. *See id.* § 120.3.

This multi-layered processing and review system breaks any causal link between the Provider Defendants' raw diagnosis codes and the finalized risk adjustment data the Medicare Advantage Defendants submit for payment. This alone requires dismissal of the direct false claims count, because the Provider Defendants could not have "[themselves] submitt[ed] or directly caus[ed] the submission of a false claim." *Hopper*, 588 F.3d at 1329. *See also United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 597 F. Supp. 2d 1280, 1292 (M.D. Fla. 2009) (stating that there must be "a strong and direct causal link between the defendant's actions and the submission of a false claim" and holding that link was missing where downstream entity "had no control over" Medicare entity's claims procedures, "gave no suggestion or instruction . . . regarding its Medicare submissions, and in no way participated in . . . submission of bills to Medicare").

Moreover, an incorrect diagnosis code itself does not lead to increased payment. Diagnoses are classified according to severity "so that a person is coded only for the most severe manifestation among related diseases." CMS, *Report to Congress: Risk Adjustment in Medicare Advantage* 17 (Dec. 2018), https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/RTC-Dec2018.pdf. The CMS-HCC also excludes diagnoses that are vague or nonspecific (like symptoms), discretionary, medically insignificant, and transitory or definitively treated. *Id.* at 19. The model also considers demographic information, like sex and age. *Id.* at 20. The ultimate capitated payment is a complex multi-dimensional calculus that does not turn on any single input. CMS takes into account geography, the bid submitted by the insurer, the number of patients, and other factors in deciding the capitation rate to an insurer. *See Azar*, 330 F. Supp. 3d at 178; 42 C.F.R. § 422.308. Due to this complex calculus, any causal link between an incorrect diagnosis and an increased payment is too attenuated to support Zafirov's theory of false claims.

### B. Zafirov has not plausibly alleged any objectively false claims or records.

Zafirov has not shown that any of the Provider Defendants' diagnosis codes were objectively false. As the Eleventh Circuit recently held, for a claim to be "false" under the False Claims Act, a relator "must show an objective falsity." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1298 (11th Cir. 2019). In the context of medical judgments like the diagnoses at issue here, "a reasonable difference of opinion among physicians reviewing medical documentation *ex post* is not sufficient on its own to suggest that those judgments—or any claims based on them—are false under the FCA." *Id.* at 1297. Zafirov's disagreements with the potential diagnoses identified by the 5 Star Checklists and ultimately diagnosed by other physicians do not plausibly allege any objectively false claims or records. Zafirov's second-guessing other physicians cannot be the basis of a False Claims Act violation.

Zafirov's references to allegedly improper corporate practices likewise do not state any objectively false claims. Zafirov must show that "the clinical judgment on which the claim is based contains a flaw that can be demonstrated through verifiable facts." *Id.* She cannot do this by merely second-guessing other physicians and questioning the Provider Defendants' business practices.

## IV.   Because there is analogous *qui tam* action pending in this District, the Court should dismiss this case under the FCA's first-to-file rule.

Under the False Claims Act's "first-to-file" bar, "[w]hen a person brings an action under [the FCA], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). In other words, the first-to-file bar *only* "permits courts to exercise jurisdiction over the *first* privately-commenced *qui tam* claim filed based on a particular set of facts." *Makro Capital of Am. v. UBS AG*, 543 F.3d 1254, 1257 (11th Cir. 2008) (emphasis added). If another, similar *qui tam* action is already pending, no further actions lie. Courts assess similarity "by comparing the complaints side-by-side, and asking whether the later complaint 'alleges a fraudulent scheme the government already would be equipped to investigate based on [the first] [c]omplaint.'" *See United States ex rel. Heath v. AT&T, Inc.,* 791 F.3d 112, 121 (D.C. Cir. 2015) (quoting *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011)).

That is likely the case here. The Court unsealed this case at least in part because the United States "cit[ed] the existence of a similar, sealed *qui tam* action in the Middle District of Florida." *See* Doc. 8, at 1. In the government's view, that "similar, sealed *qui tam* action" is apparently analogous enough to "equip it" to investigate Zafirov's instant allegations. *See Heath*, 791 F.3d at 121. That first-filed action likely strips this Court of jurisdiction under the first-to-file bar.

That the other case remains under seal does not change the analysis because sealed cases also trigger the first-to-file rule. *See United States ex rel Wilson v. Bristol-Myers Squibb, Inc.*, 750

F.3d 111, 117 (1st Cir. 2014); *United States ex rel. Bartz v. Ortho-McNeil Pharm.*, 856 F. Supp. 2d 253, 268 (D. Mass. 2012) ("[A] sealed Complaint is considered for purposes of the first-to-file bar."); *see also United States ex rel. Carter v. Halliburton Co.*, 144 F. Supp. 3d 869, 872 (E.D. Va. 2015) (acknowledging that "a sealed action . . . destroyed this Court's subject matter jurisdiction due to the first-to-file bar"). Instead of continuing under questionable jurisdiction, the Court should dismiss this case.[6]

## V.   Because Zafirov's case hinges on information publicly disclosed years ago, the False Claims Act's public disclosure bar requires dismissal.

The public disclosure bar is an independent reason Zafirov's complaint fails. Like the first-to-file bar, which forecloses copycat claims, the False Claims Act contains a public disclosure bar that prevents plaintiffs from bringing "parasitic lawsuits" based on publicly available information. *Cooper v. Blue Cross and Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 (11th Cir. 1994) (quoting legislative history). Under the public disclosure bar,[7] the Court "shall dismiss an action or claim" whenever "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in any of three ways: (1) a federal hearing in which the government is a party; (2) in a federal report, hearing, audit, or investigation; or (3) from the news media. *See* 31 U.S.C. § 3730(e)(4).

---

[6] At minimum, the Court should stay this litigation until additional information about this "similar, sealed qui tam action" is revealed. *Cf. Samson v. United HealthCare Servs., Inc.*, No. C19-0175JLR, 2020 WL 3971390, at *6–7 (W.D. Wash. July 14, 2020) (staying subsequent litigation "under the first-to-file rule due to potential issues" overlapping with the still-uncertain first action) (citing *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 795 (6th Cir. 2016)).

[7] Though Congress amended the False Claims Act's public disclosure bar in 2010, the "change is not significant." *Bellevue v. Univ. Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718 (7th Cir. 2017) (observing that the amendment accords with the pre–existing interpretation "of this circuit and most other circuits."). The Eleventh Circuit adopted the pre-amendment public disclosure bar test, with minor modifications. *See United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 (11th Cir. 2015) (reaffirming the *Cooper* three–part public disclosure bar test).

The public disclosure bar "prevents opportunistic suits by private persons who heard of fraud but played no part in exposing it." *See Cooper*, 19 F.3d at 565. Under the Eleventh Circuit's three-part test, the public disclosure bar requires dismissal if: (A) "the allegations made by the plaintiff [have] been publicly disclosed," (B) that "disclosed information" is "substantially the same" as the plaintiff's allegations, and (C) the plaintiff is not "an 'original source' of that information." *See United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 (11th Cir. 2015). Zafirov's case is copied and pasted from old lawsuits and national media coverage; thus, this is a quintessential example of an "opportunistic suit[] by [a] private person who heard of fraud but played no part in exposing it." *Cooper*, 19 F.3d at 565.

### A. *Zafirov's allegations were publicly disclosed.*

Under *Cooper*, the first question is "whether the allegations or transactions at issue were publicly disclosed." *Humana*, 776 F.3d at 812. Under each of the False Claim Act's three public disclosure paradigms, these allegations have been "publicly disclosed." They were discussed in (1) prior federal hearings, (2) prior federal reports, hearings, audits, and investigations, and (3) the news media.

*First*, these allegations appeared in a prior civil hearing in which the Government was a party. 31 U.S.C. § 3730(e)(4)(A)(i). The *Sewell* case, which Zafirov refers to in her complaint, involved indistinguishable allegations that Freedom, Optimum, Pagidipati, and others "knowingly submit[ed] incorrect and unsubstantiated risk adjustment data to CMS in order to fraudulently increase their capitation payments." *Compare United States ex rel. Sewell v. Freedom Health, Inc., et al.*, No. 8:09-cv-1625-T-35TGW (M.D. Fla.), Doc. 44, Second Am. Compl. ¶ 9 *with* Compl. ¶ 47 (Defendants caused "submission of false and unsubstantiated risk adjustment data to CMS in order to unlawfully increase their capitation payments."). Because the United States was a party

to that suit, everything it revealed was "publicly disclosed" within the meaning of the statute. *See* 31 U.S.C. § 3730(e)(4)(A)(i).

*Second,* these allegations were also publicly disclosed in prior government investigations, reports, and audits. 31 U.S.C. § 3730(e)(4)(A)(ii). CMS and industry groups have been in conversation about incorrect diagnosis coding for a decade. When CMS proposed RADV audits, Medicare Advantage insurers quickly made the agency aware of imperfections in risk adjustment data. This prompted CMS to create the Fee-for-Service Adjuster to account for errors. *See Azar*, 330 F. Supp. 3d at 179–80. Moreover, the challenges of ensuring accurate and complete diagnosis data are the subject of an ongoing conversation between CMS and industry groups regarding risk adjustment payment methodology. *See* CMS, *Announcement of Calendar Year (CY) 2019 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter* 54–56 (Apr. 2, 2018), https://www.cms.gov/MEDICARE/HEALTH-PLANS/MEDICAREADVTGSPECRATESTATS/DOWNLOADS/ANNOUNCEMENT2019.PDF; CMS, *Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter* 33–35 (Apr. 6, 2015), https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/ Announcement2016.pdf. Zafirov's Complaint does not reveal anything the government does not already know.

*Third,* and finally, these allegations were publicly disclosed in the news media. 31 U.S.C. § 3730(e)(4)(A)(iii). When *Sewell* ultimately settled,[8] it generated significant press coverage. *The*

---

[8] Importantly, the *Sewell* settlement agreement contained an express disclaimer of wrongdoing or liability. As Pagidipati stated at the time of settlement, the parties "agreed to disagree without any admission of liability to avoid the time and expense of prolonged litigation." Margie Manning, *Kiran Patel's Health Insurance Firms Agree to $32M Settlement with the Feds*,

*New Yorker* featured a multi-page unpacking of the *Sewell* allegations. *See* Sheelah Kolhatkar, *The Personal Toll of Whistle-Blowing,* The New Yorker, Jan. 28, 2019. "Freedom pressured doctors to schedule unnecessary appointments," *The New Yorker* revealed, "and to assign additional codes that the internal data miners thought would be more profitable." *Id*. *Accord* Compl. ¶ 45 (alleging Defendants "caused physicians to bring members in for medically unnecessary office visits" and "submit as many phony diagnosis codes as possible"). Other national news media covered the allegations. *See* Fred Schulte, *Medicare Advantage Insurer Settles Whistleblower Suit for $32 Million*, NPR (May 31, 2017), https://www.npr.org/sections/healthshots/2017/05/31/530868367/ medicare-advantage-insurers-settle-whistleblower-suit-for-32-million. Zafirov's allegations are old news. Thus, the first prong of the *Cooper* test—"public disclosure"—is established.

> B.  *Zafirov's allegations are substantially similar to, and often word-for-word pulled from, publicly disclosed information.*

Zafirov's allegations are cut from the same cloth as the publicly disclosed information. After establishing public disclosure, *Cooper* next asks "whether the complaint's allegations are 'substantially the same' as the publicly disclosed allegations or transactions." *Humana*, 776 F.3d at 814. Because "the FCA 'is most naturally read to preclude suits based in *any part* on public[ly] disclosed information," this is not an especially demanding inquiry. *See Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 762 (11th Cir. 2006) (emphasis in original). Under this prong's "quick trigger," it is more than enough that there is "significant overlap" between the complaint and public disclosures. *Humana*, 776 F.3d at 814.

Zafirov's claims are more than substantially similar. They are often the *same*, word-for-word, as earlier public disclosures. Comparing this complaint with the *Sewell* complaint shows

---

Tampa Bay Times Journal (May 31, 2017), https://www.bizjournals.com/tampabay/news/ 2017/05/31/kiran-patel-s-health-insurance-firms-agree-to-32m.html.

that the core claims (that insurance providers, providers, and physicians improperly inflated capitation payments) and defendants (including Optimum, Freedom, and Pagidipati) in the two lawsuits are the same. A side-by-side comparison of the two complaints underscores just how much Zafirov took from *Sewell*.

| Sewell Second Amended Complaint | Zafirov's Current Complaint |
| --- | --- |
| Defendants "knowingly submit incorrect and unsubstantiated risk adjustment data to CMS in order to fraudulently increase their capitation payments" (¶ 9) | Defendants "result[ed] in the submission of false and unsubstantiated risk adjustment data to CMS in order to unlawfully increase their capitation payments" (¶ 47) |
| Defendants "scour medical records looking for 'missing' diagnosis codes" to submit" to CMS (¶ 109) | Defendants "scour medical records looking for 'missing' diagnosis codes" to submit to CMS (¶ 49) |
| Defendants "cause their physicians to bring in certain members for medically unnecessary office visits with members for the sole purpose of capturing diagnosis codes. The office visits are not . . . for the benefit of the patient. Instead, [Defendants] cause these visits to happen solely for the purpose of fraudulently increasing their risk adjustment-based reimbursement." (¶ 113) | Defendants "caused physicians to bring members in for medically unnecessary office visits for the sole purpose of capturing diagnosis codes. These visits were not for the benefit of the patient. Instead, the Defendants caused these visits to happen solely for the purpose of increasing risk adjustment-based reimbursement." (¶ 49.a). |

Zafirov's allegations more than "significant[ly] overlap" with this public information. *Humana*, 776 F.3d at 814. They are virtually identical to those in *Sewell*. Simply put, this is *Sewell* redux, with Zafirov apparently hoping to reap her own bounty from practices the government has already resolved and will continue to audit through independent third parties through 2022.

C.  *Zafirov is not the original source of the allegations.*

Finally, Zafirov cannot show she is an "original source" to avoid application of the public disclosure bar, because she has not and cannot prove that she either (1) voluntarily disclosed everything in her complaint to the government before the original public disclosure (*e.g.*, *Sewell*) or (2) has "independent" knowledge which "materially adds" to the public disclosures *and* that she has voluntarily provided all such information to the government before filing this action. 31 U.S.C. § 3730(e)(4)(B).

As such, because each and every prong of the *Cooper* public disclosure test is satisfied, this Court should dismiss the complaint.

## VI.    The government action bar blocks Zafirov's case.

As another basis for dismissal, the False Claims Act's "government action bar" blocks *qui tam* suits "based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." *See* 31 U.S.C. § 3730(e)(3) (the government action bar). For these purposes, an action is "based upon" an earlier government-related action "if the relator's case is receiving support, advantage, or the like from the 'host' case . . . ." *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 256, 262 (E.D. Pa. 2020) (internal quotation marks and citations omitted). Because the "inquiry is essentially a test of factual similarity," courts look "for signs of a host/parasite relationship" between the earlier action and later one. *Id.* (quotation omitted). In a nutshell, "[i]f a relator's allegations are the same" as already-made allegations, "or are similar enough to be characterized as feeding off the government's allegations, the government action bar applies." *Id.* "Piggy-back *qui tam* lawsuits," like this one, which "seek[] to remedy 'fraud' arising from a situation previously addressed by the

government," cannot clear the government action bar. *See United States ex rel. Stone v. AmWest Sav. Ass'n*, 999 F. Supp. 852, 855–56 (N.D. Tex. 1997).

*Sewell* triggers the government action bar. "If an allegation of fraud has already been made" in the earlier government-involved action, "the analysis is straightforward." *See United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 708 (7th Cir. 2014). Zafirov pulls her allegations wholesale from *Sewell*, making her case a textbook "parasite" to *Sewell*'s "host." *Sturgeon*, 438 F. Supp. 3d at 262. The whole point of the government action bar is to forestall "parasitic *qui tam* lawsuits that receive support from an earlier case without giving the government any useful return," beyond "additional monetary recovery." *Pacult v. Walgreen Co.*, No. 08-cv-542-SLC, 2011 WL 13209584, at *10 (W.D. Wis. June 14, 2011) (observing that there is "no useful return to the government" if, as here, the "government decline[s] to intervene in [the] second qui tam action"). Because that is precisely the case here, Zafirov's case fails.

### Leave to Amend Would Be Futile

As explained repeatedly above, allowing Zafirov to amend the complaint will not fix her lack of knowledge. Relators like Zafirov who observe allegedly improper practices but are not involved in submitting claims lack the knowledge of corporate billing and claims processing required to state a False Claims Act violation. *See Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 721 (11th Cir. 2012) (holding that relators that observe contract violations but do not have first-hand knowledge of billing practices "lack the type of knowledge that normally will support an FCA complaint"). Because Zafirov has left FMA, and because her role while there did not involve claim submission, she cannot cure the fact that she has no personal knowledge of payment and billing practices. *See Seal 1*, 429 F. App'x at 820 (stating that failure to allege "any personal knowledge of the payment terms or billing practices . . . . is fatal to [a] FCA complaint");

*see also United States ex rel. Shurick v. Boeing Co.*, 330 F. App'x 781, 784 (11th Cir. 2009) (affirming dismissal of FCA complaint because relator "lack[ed] personal knowledge of the invoices and fails to allege facts that establish that invoices were actually submitted to the government"). Zafirov is hoping to get around her lack of knowledge with discovery. But "[t]he particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (quotation omitted). Zafirov should not be allowed to impose the burden and expense of discovery on Defendants in an attempt to cure her lack of knowledge. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560 (2007). For this reason, dismissal should be with prejudice. *See United States ex rel. McFarland v. Florida Pharmacy Solutions*, 358 F. Supp. 3d 1316, 1331 (M.D. Fla. 2017) (dismissing False Claims Act complaint with prejudice where pleadings showed that the relator "lacks both specific knowledge about the submission of a consultation claim and access to information about a physician's submission of a consultation claim").

## CONCLUSION

For all of the foregoing reasons, the Provider Defendants respectfully submit that Zafirov's Complaint should be dismissed with prejudice.

Dated: September 22, 2020

Respectfully submitted,

*/s/ A. Lee Bentley, III*
A. Lee Bentley III
Jason P. Mehta
Kyle W. Robisch
BRADLEY ARANT BOULT CUMMINGS LLP
100 North Tampa Street, Suite 2200
Tampa, Florida 33602
Tel: (813) 559-5500

Counsel for Defendants Florida Medical Associates, LLC, Physician Partners, LLC, Physician Partners Specialty Services, LLC, Sun Labs USA, Inc., Anion Technologies, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 22, 2020, I filed the foregoing with the Court's electronic filing system, which will cause a copy to be served upon all counsel of record.

<u>*/s/ A. Lee Bentley, III*                    </u>
OF COUNSEL