# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) *ex rel.* DR. CLARISSA ZAFIROV, ) ) Plaintiff/Relator ) ) v. ) ) FLORIDA MEDICAL ASSOCIATES, LLC, ) d/b/a VIPCARE; PHYSICIAN PARTNERS, LLC, ) PHYSICIAN PARTNERS SPECIALITY ) SERVICES, LLC; SUN LABS USA, INC. ) ANION TECHNOLOGIES, LLC; ANTHEM, ) INC.; FREEDOM HEALTH, INC.; OPTIMUM ) HEALTHCARE, INC.; and SIDDHARTHA ) PAGIDIPATI, ) ) Defendants. ) | CASE NO. 8:19-cv-01236 |

---

**RELATOR DR. CLARISSA ZAFIROV'S RESPONSE IN OPPOSITION TO DEFENDANTS FLORIDA MEDICAL ASSOCIATES, LLC, PHYSICIAN PARTNERS, LLC, PHYSICIAN PARTNERS SPECIALITY SERVICES, LLC, SUN LABS USA, INC. AND ANION TECHNOLOGIES, LLC'S MOTION TO DISMISS**

---

## TABLE OF CONTENTS

I.    Introduction ........................................................................................................... 1

II.   The allegations against the Provider Defendants satisfy
      Rules 8(a) and 9(b), Fed. R. Civ. P. ..................................................................... 2

      A.  Relator's complaint establishes with the specificity required by Rule 9(b) that false
          claims were submitted to the United States ......................................................3

          1.  Collective pleading is permissible when the groups are
              intentionally defined and the Defendants operate without distinction ........................3

          2.  Relator's complaint pleads a fraudulent scheme with the specificity
              required by Rule 9(b)......................................................................5

          3.  False claims submitted to artificially inflate risk scores
              under the Medicare Advantage program are material
              to the United States........................................................................11

      B.  Relator's complaint far exceeds plausibility.....................................................14

          1.  It is not implausible that Defendants' scheme resulted in
              the submission of false claims ...............................................................14

          2.  The artificially increased diagnosis codes are objectively false ................................17

III.  Relator's claims are not barred by the first-to-file statute ...................................... 18

IV.   Relator's claims have not been publicly disclosed, and even
      if they were, she is a consummate original source under 31 U.S.C.3730(e)(4)................... 21

V.    The "government action bar" does not bar this case,
      and it would have no implication for these defendants even if it did ................................ 22

VI.   Conclusion ........................................................................................................ 24

i

## I.      Introduction

Defendants Florida Medical Associates, LLC d/b/a VIPcare ("FMA" or "VIPcare"), Physician Partners, LLC ("PP"), Sun Labs USA, Inc. ("Sun Labs") and Anion Technologies, LLC ("Anion") (collectively "the Provider Defendants")[1] filed a motion to dismiss Relator's claims for failure to state a claim and various statutory limitations. Dkt. 44.

The *qui tam* relator is Dr. Clarissa Zafirov, M.D., a Board-certified family medicine physician. From October 2018 until the end of March 2020, she was employed by VIPcare, directed by PP and paid by Sun Labs, all of which are owned and/or controlled by Defendant Siddhartha Pagidipati. She was the sole physician at VIPcare's clinic in Venice, and treated Medicare patients who enrolled in Medicare Advantage plans operated by Defendants Freedom Health and Optimum Health. From the start, she was pressured by PP management to diagnose conditions which patients did not have, for the stated purpose of increasing her patients' "risk adjustment scores." Higher scores increase the amount of money the Medicare Advantage Defendants are paid by Medicare and, in turn, the Provider Defendants are paid by the MA defendants. Dkt. 1 at ¶ 49.

The providers raise all the usual defenses – Rule 9(b), Fed. R. Civ. P; first-to-file; public disclosure and the like – and a few others. None has merit, as Relator shows in these pages.  At bottom, Dr. Zafirov personally observed that the Provider Defendants' false claims were submitted to the insurance companies and Medicare. She knew that they lied about her diagnoses, but they still sought – and received – payment for them. Given the frequency and detailed nature of her observations of the fraudulent conduct described herein, this is all that is required of her at the

---

[1] Relator has notified the United States of her intent not to pursue allegations against Physician Partners Specialty Services, LLC ("PPSS") at this time.  Once the government has assented, as required by 31 U.S.C. § 3730(b)(1), Relator will file a dismissal without prejudice as to PPSS pursuant to Rule 41(a)(1), Fed. R. Civ. P. References in this brief to the "Provider Defendants" mean FMA, PP, Sun Labs and Anion only.

pleading phase. Adopting the iron-fisted standards that the Provider Defendants' encourage would insulate Medicare Advantage providers from False Claims Act cases brought by front-line physicians.  Yet, such practitioners are perhaps the only people situated to discover risk adjusting fraud on the ground, and to identify the facts needed to allege what the Court recognized early on to be, if true, "a widespread, fraudulent scheme in which managed-care entities and healthcare providers act in concert to bilk the public fisc and otherwise injure the public." Dkt. 11, *ex parte* Order, at 2. But these reporters are critical because, as the Court recognized, if Dr. Zafirov's allegations bare out, "the activity presents an ongoing and serious injury to the public." *Id*.

## II.    The allegations against the Provider Defendants satisfy Rules 8(a) and 9(b), Fed. R. Civ. P.

Motions to dismiss are to be denied when "a complaint . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim for relief is "plausible on its face" when the complaint's "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Resnick v. AvMed, Inc*., 693 F.3d 1317, 1325 (11th Cir. 2012), *quoting Iqbal*, 556 U.S. at 678. In *Iqbal*, the Court observed that a district court assessing a motion to dismiss "draw[s] on its judicial experience and common sense." 566 U.S. at 679.

"To establish a cause of action under §3729(a)(1)(A), a relator must prove three elements: (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, for payment or approval, (3) with knowledge that the claim was false." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017), citing §3729(a)(1)(A). "To prove a claim under §3729(a)(1)(B), a relator must show that: (1) the defendant made (or caused to be made) a

false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *Id.*, citing §3729(a)(1)(B).

"[W]ell-pleaded facts in a pleading are accepted as true at this stage, no matter how vehemently a defendant may dispute their veracity." *United States v. Crumb*, No. 15-0655-WS-N, 2016 U.S. Dist. LEXIS 112661, at *70 (S.D. Ala. Aug. 23, 2016). "[M]otions to dismiss are not intended to weigh potential factual evidence that parties may raise at trial, but rather to test whether the complaint alone states a claim upon which relief can be granted." *S-Fer Int'l, Inc. v. Stonesheets, LLC*, 2016 U.S. Dist. LEXIS 190241, at *14 (S.D. Fla. Jul. 22, 2016), citing *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1168 (11th Cir. 2014). The guiding inquiry is whether a plaintiff has pled sufficient factual allegations to "'raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012), quoting *Twombly*, 550 U.S. at 556.

### A. Relator's complaint establishes with the specificity required by Rule 9(b) that false claims were submitted to the United States.

#### 1. Collective pleading is permissible when the groups are intentionally defined and the Defendants operate without distinction.

The Provider Defendants assert as a "threshold defect" that Relator's complaint fails because it alleges that "every defendant did everything wrong." Dkt. 44 at 3. This is incorrect and inconsequential.

First, the facts.  Defendant Pagidipati owns or controls all of the Provider Defendants. Relator signed an employment agreement with Defendant VIPcare, but Defendant Sun Labs may have actually been Dr. Zafirov's employer; at least, her paychecks came from that entity and

identify it as such. Dkt. 1 at ¶ 6.[2] Defendant VIPcare's name was on the clinic assigned to Dr. Zafirov, and VIPcare personnel conducted much of the interactions with her. PP constructed the training and operating manuals provided to Dr. Zafirov, and represented that the 5 Star Checklists were generated by "algorithms" that "we built." *Id*. at ¶ 56. Each morning, Defendant Anion supplies the completed 5 Star Checklists which are the driving wheel of the fraud. *Id.* at ¶ 54. Anion also supplies billing and coding services. *Id. at* ¶¶ 12, 68-70. A Quality Assurance person named Sajitha Johnson sent Dr. Zafirov email with an Anion signature (*Id.* at ¶ 68), while in other correspondence she is identified as being a "Provider Educator" for PP (*Id.* at ¶ 13, alleging that people were identified as being with both Anion and PP).

As to the law, "[g]roup pleading is not disallowed *per se*." *United States ex rel. Allison v. SW Orthopaedic Specialists, PLLC,* No. CIV-16-0569-F, 2020 U.S. Dist. LEXIS 187010, at *21 (W.D. Okla. Oct 8, 2020). Rather, it is permissible when the allegations are "grouped together for the defendants with the same role and the plaintiffs [did not…assert] every allegation against all defendants generally." *United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 906 F. Supp. 2d 1288, 1298 (N.D. Ga. Nov. 16, 2012); *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018), citing *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016) (adding that "[t]here is no flaw in a pleading…where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct").

Relator does not group all of the defendants together. She defines two groups of corporate defendants based on their roles in the scheme. First, the Provider Organization Defendants (called

---

[2] Indeed, a verification of employment document sent to Relator after the filing of this case was sent on Sun Labs USA, Inc. stationary, signed by a PP employee and referred to Dr. Zafirov working at "our VIPcare clinic" from October 2018 until March 2020.

the "Provider Defendants" or "PD" throughout the briefs) are the entities owned or controlled by Defendant Pagidipati. They work in tandem to provide patients with healthcare services. Dkt. 1 at ¶ 7. Second, the Medicare Advantage Defendants (called the "MA Defendants") are the insurance companies responsible for receiving the claims from the Provider Defendants and paying the providers on behalf of the United States (Dkt. 1 at ¶¶ 8-11). Although the defendants group Anion Technologies under the Provider Defendants' umbrella (Dkt. 44 at 2), Relator did not do so in her complaint. Dkt. 1 at ¶¶ 12-14. These groupings are based on Relator's personal observations that the provider organizations, all commonly owned and controlled, operate without differentiating themselves. *Allison*, 2020 U.S. Dist. LEXIS 187010, at *21 (permitting group pleading where the terms are intentionally defined and "used with care").

The relationship between the Provider Defendants is akin to the Ninth Circuit's evaluation of collective allegations in *Silingo*, which recognized that group pleadings are appropriate when alleging a "wheel conspiracy-like fraud" that involves a "single member or group (the 'hub') separately agreeing with two or more members or groups (the 'spokes')." 904 F.3d at 678. Here, Defendant Pagidipati is the hub and each of his provider corporations are spokes in the scheme because their conduct is indistinguishable. "[A]ny parallel actions of the 'spokes' can be addressed by collective allegations." *Id.*; *accord Acciard v. Whitney*, 2008 U.S. Dist. LEXIS 98131, at *24 (M.D. Fla. Dec. 4, 2008) (allowing group pleading where "some defendants had the same role in the alleged fraudulent scheme, and there are certain allegations as to groups of defendants throughout the complaint").

### 2. Relator's complaint pleads a fraudulent scheme with the specificity required by Rule 9(b).

The Provider Defendants argue that the complaint should be dismissed because Relator "fails to plead even one false *claim* with the requisite particularity." Dkt. 44 at 3. To do so,

Defendants assert, she must plead the "who, what, when, and how" of specific fraudulent claims and false records. Dkt. 44 at 4. This is not what the Eleventh Circuit requires. Rather, a relator is to plead with a level of specificity which satisfies the twin purposes of Rule 9(b): "alert[ing] defendants to the precise misconduct with which they are charged and protect[ing] defendants against spurious charges[.]" *Matheny,*671 F.3d at 1222, *quoting Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001); *United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, 2011 U.S. Dist. LEXIS 59949, at *24 (M.D. Fla. June 6, 2011). "Thus, 'there is no *per se* rule that a False Claims Act complaint must provide exact billing data or attach a representative sample claim.'" *United States ex rel. Bingham v. BayCare Health Sys.*, 2015 U.S. Dist. LEXIS 107220, at *12 (M.D. Fla. Aug. 14, 2015) (Merryday, J.), *quoting United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006). "Rather, the complaint must provide some 'indicia of reliability . . . to support the allegation of *an actual false claim* for payment being made to the Government.'" *Id.*, *quoting Clausen*, 290 F.3d at 1311 (emphasis in original).

The Eleventh Circuit has "championed a 'nuanced, case-by-case approach' for examining whether the requisite indicia of reliability are present." *Crumb*, 2016 U.S. Dist. LEXIS 112661 at *21-24, *citing United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed. Appx. 693, 703-04 (11th Cir. 2014). While a relator must offer more than a conclusory allegation that false claims were submitted as a result of a defendant's fraudulent conduct, "'there are no bright-line rules' in this inquiry." *Id.* at 23-24. "Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but *alternative means are also available to satisfy the rule*." *Mastej*, 591 Fed. Appx.at 704, *quoting Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir. 1988) (emphasis added).

Thus, while a complaint must reliably indicate that a claim was submitted (and pleading the "who, what, when, where and how" of a specific false claim is one way of satisfying that obligation, *it is not the only way. Id.*; *United States ex rel. Troncoso v. Rego Int'l, LLC*, 2018 U.S. Dist. LEXIS 81500, at *10 (S.D. Fla. May 15, 2018) (denying a motion to dismiss where Relator "[did] not identify any particular [false] claims or the 'who, what, where, why' as to each violation [but] has provided the requisite indicia of reliability."). And where, as here, the allegations are complex and precise, a "detailed mosaic of complementary allegations does support a reasonable inference that the defendant is liable for the misconduct alleged." *Crumb*, 2016 U.S. Dist. LEXIS 112661, at *95.

This Circuit is now "more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." *Matheny*, 671 F.3d at 1230; *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 187 (5th Cir. 2005) ("[T]he Eleventh Circuit itself has moved away from *Clausen*'s most exacting language, accepting less billing detail in a case where particular allegations of a scheme offered indicia of reliability that bills were presented."); *United States ex rel. Willis v. Angels of Hope Hospice, Inc.*, 2014 U.S. Dist. LEXIS 20959, at *17-24 (M.D. Ga. Feb. 20, 2014) (tracking the evolution of the Eleventh Circuit's Rule 9(b) jurisprudence and noting the trend towards allowing cases which do not provide actual evidence of a specific false claim).

In fact, however, and contrary to the Defendants' assertion, Dr. Zafirov does far more than allege that false claims "*must* have been submitted because FMA employed '5 Star Checklists' and paid bonuses to some physicians." Dkt. 44 at 4. Relator bases her allegations on the same factors on which she based her diagnoses: objective evidence that she observed first-hand as a physician in a VIPcare clinic treating patients whose billing records were actually included in

records available to her. Relator received and reviewed hundreds of 5 Star Checklists that listed diagnoses that did not comport with her patients' medical histories and her own observations upon physical examination. Dkt. 1 at ¶ 64. And without exception, they did not comport because they were *always* inflated, never decreased. Her professional judgment was ignored and she was pressured by PP and Anion billing specialists to change her diagnoses from non-risk-adjusting conditions to risk-adjusting conditions (but never vice versa); she was also criticized for "care gaps" (the equivalent of professional demerits[3]) if she would not agree to diagnose a patient with the "suggested" condition. Dkt. 1 at ¶¶ 66-68, 72.

The fly in the Defendants' ointment is that Dr. Zafirov had full-time, necessary access to their electronic medical records system which indicates which codes were claimed, and which claims submitted by the Provider Defendants to the MA Defendants were paid. It is part of the information she used to review the medical history of her patients. Despite refusing to accede to the Provider Defendants' demands that she code diagnoses which were not supported by medical judgment or physical findings, Dr. Zafirov personally observed in those billing records that 5-Star Checklist conditions which she had *rejected* showed up as having been diagnosed by her – and not just billed under her name, but actually paid. *Id*. at ¶ 70. She also personally observed 5 Star Checklists which indicated that a condition was "reported" (meaning billed, paid, and factored into a patient's risk-adjustment capitation rate) within the past three years (*Id.* at ¶ 61), even though the patient objectively did not have that condition (*e.g*., *id.* at ¶¶ 63, 71-74). The fact that one of her patients was "diagnosed" with (and the insurance company had paid on the basis of) a serious, but absent, birth defect – and had been diagnosed with it three times before – is an appalling example, but far from the only one. *Id*. at ¶ 63.

---

[3] "Care gap" is not an industry term. Rather, it is a term unique to the Provider Defendants, serving as a euphemism for the refusal to accept, and diagnose, a 5 Star Check List "recommendation."

With respect to another patient, Dr. Zafirov was directed to "consider" a litany of 5 Star "recommendations:" Rheumatoid arthritis, risk adjustment of .374; malnutrition, risk adjustment of .713; opioid dependence, risk adjustment of .420; and peripheral vascular disease, .299. Dkt. 1 at ¶ 72. She found no evidence of any of these conditions and refused to diagnose them. *Id*. The next 5 Star Checklist for the patient included all the same "recommendations," and identified them as "care gaps" which Dr. Zafirov was directed to "close." *Id*. But worse yet, in 2017, the patient had been coded with anencephaly (the code was attributed in billing records to another of Defendants' physicians; it is unclear if the physician assented to that reporting). *Id*. Anencephaly is a neural tube birth defect with a near-100% fatality rate with the first year of life.

Relator need not plead every detail for every claim; rather "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." *United States ex rel. Graves v. Plaza Med. Ctrs. Corp.*, 2015 U.S. Dist. LEXIS 184688, at *3-4 (S.D. Fla. Jan. 23, 2015), *quoting Clausen*, 290 F.3d at 1312 n.21. She does far more than this. Despite the Provider Defendants' assertions, these details far exceed an "inference that fraudulent claims were submitted." Dkt. 44 at 5, quoting *Corsello*, 428 F.3d at 1013. Rather, these are direct examples of patients whose medical records contained false and unapproved diagnosis codes which were marked "reported" and the associated claims were marked "paid" within the Provider Defendants' electronic medical records system.

Defendants resort to the demand that, in addition to the false claims submitted to Freedom and Optimum, Dr. Zafirov must also produce associated claims from the insurers to Medicare. However, the claims which are false as to the Provider Defendants are those which it certified in its submissions to the MA Defendants. And as to those claims, *only* risk-adjusting diagnoses are suggested on the 5 Star Checklists distributed every day to physicians, accompanied by the

condition's risk-adjusting score and a progress bar that is completed once a patient's risk score has been maximized for the year. Dkt. 1 at ¶ 59. This practice of *only upcoding* makes sense only if there is a financial benefit to the increased risk score, which only occurs if the capitation rate is increased. Moreover, all patient examples in the complaint were Freedom insureds; it beggars credulity to think that the insurers were continuing to pay the providers for patients, for whom the insurers were not paid by the United States.

"Rule 9(b) does not require omniscience; rather the rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Allison*, 2020 U.S. Dist. LEXIS 187010, at *17-18. Here, Relator has personally examined her patients and their medical records. She also has observed hundreds of documents which she knows were submitted by the Provider Defendant to the MA Defendants for the purpose of claiming and receiving risk-enhanced capitation payments. This conduct, personally observed and recited throughout Relator's complaint, clearly violates 31 U.S.C. § 3729(a)(1)(A) as well as (a)(1)(B).

The false records submitted by the Provider Defendants, then, are the false diagnostic codes submitted to Freedom and Optimum. Defendants concede that, as Relator alleged, "Physician Partners and FMA submit diagnosis codes to the Medicare Advantage Defendants" (Dkt. 44 at 12-13) which submissions constitute false records because, as described above, the Provider Defendants knew the diagnostic codes were false. Although the Provider Defendants take issue with how Relator describes the risk adjustment process, they also repeatedly concede that the diagnosis codes are the first step of the process. Dkt. 44 at 13-14, citing CMS Pub. No. 100-16, *Medicare Managed Care Manual*, ch. 7, § 120 (2014), and CMS *Encounter Data Submission and Processing Guide 11* (2018)). As in *Escobar*, specific representations – such as codes on a healthcare form – are misrepresentations when they are conveyed "without disclosing [the

defendant's] many violations" underlying those claims. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2016 ("[T]hese representations were clearly misleading in context.")  Thus, for the same reasons set forth above and because of Defendants' concessions, Relator has also satisfied her burden of pleading false reports under 31 U.S.C. 3730(a)(1)(B).

### 3. False claims submitted to artificially inflate risk scores under the Medicare Advantage program are material to the United States.

Remarkably, the Provider Defendants assert that Dr. Zafirov fails to show that the false statements and regulator violations were "material" to the United States. Here, the Provider Defendants do admit that Relator identified a series of false diagnosis codes, but try to counter that acknowledgment by asserting that "not all diagnosis codes result in an adjustment in risk score and thus not all diagnosis codes affect payment." Dkt. 44 at 7, *quoting* Dkt. 1 at ¶ 33. Thus, they contend, she does not assert that the misdiagnoses resulted in a higher risk score for the patients. Dkt. 44 at 8.

This peculiar interpretation of Dr. Zafirov's complaint is inconsistent with its allegations: Dr. Zafirov does not assert that the Provider Defendants falsely submitted diagnostic codes that had no impact on risk scores. Rather, the entire fraud scheme was implemented to increase risk scores by submitting diagnostic codes which had risk-adjusting values rather than the less serious (but medically appropriate) non-risk-adjusting scores. The 5 Star forms *only* "suggest" risk-adjusting scores (which have a corresponding payment increase) and *only* tally risk-adjusting scores in the progress bar at the top of the sheet. Dkt. 1 at ¶¶ 58-59. They do not suggest diagnostic codes with no upward payment impact. Further, the "care gap" demerits were only issued when a physician failed to increase a diagnosis to the risk-adjusting code. Id. at ¶¶ 66-67. The demerits were never used when a physician failed to decrease a diagnosis to the risk-adjusting rate. Even

more, the chart reviewers *only* identified risk-adjusting codes from patient medical records. Id. at ¶¶ 60-61.

The Defendants attempt to deflect the obvious materiality of submitting knowingly false risk-adjusting diagnosis codes by characterizing Dr. Zafirov's complaint as nothing more than a criticism of a chart review system, which it asserts that the Government knows has errors and continues to employ anyway. Unsurprisingly, the CMS guidance cited by the Provider Defendants does not indicate that the United States has endorsed the knowing submission of false claims by virtue of a chart review system. To the contrary, it warns about the potential risks of chart reviews that only increase risk scores and indicates that the conduct *is* material to the United States. The full passage reads:

> **Federal entities have questioned [Medicare Advantage Organizations'] use of chart reviews to add diagnoses for risk adjustment. Risk adjustment may provide opportunities for MAOs to inappropriately inflate Medicare Advantage payments through the submission of unsupported diagnoses.** Chart reviews appear particularly vulnerable to such misuse by MAOs. By allowing MAOs to add or delete diagnoses, chart reviews can be a tool to improve the accuracy of risk-adjustment-eligible data submitted to CMS. However, MAOs may use chart reviews to mainly increase their risk-adjusted payments. In 2017, the United States joined a whistleblower lawsuit filed under the False Claims Act alleging that an MAO used the results of chart reviews to report diagnoses that the treating physician did not originally report but did not use the chart review results to delete diagnoses found to be invalid by these chart reviews. In 2016, GAO stated concern that diagnoses collected from MAOs' retrospective chart reviews may be less likely to be supported by medical records compared to diagnoses submitted to MAOs by providers.

HHS-OIG, *Billions in Estimated Medicare Advantage Payments from Chart Reviews Raise Concerns* (Dec. 2019) (emphasis supplied).[4] The commentary by no means ratifies chart review by internal coders who override physicians' professional judgment.

---

[4] Available at https://oig.hhs.gov/oei/reports/oei-03-17-00470.asp; last accessed Oct. 18, 2020.

The position of the United States regarding the materiality of false diagnosis codes by providers (like the PO Defendants here) is established in detail in *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1025-26 (N.D. Cal. 2020). There, the Court recognized the Government's position as follows:

> With respect to health status, CMS's HCC model **relies on diagnosis codes documented by treating physicians during office visits** and hospital outpatient and inpatient stays. Medical providers (*e.g.*, physicians, or organizations that employ physicians such as [the provider defendants] submit the diagnosis codes to CMS, which uses the codes to determine a beneficiary's health status in order to calculate the beneficiary's risk score. **These diagnosis codes, as reported by medical providers, are the only factors that CMS uses to determine a beneficiary's health status.** Medicare regulations and guidance are clear that CMS relies on these diagnosis codes to make accurate payments for each beneficiary enrolled in the Medicare Advantage program.
>
> **The higher a beneficiary's risk score, the higher the payments that CMS makes to MA Organizations for that beneficiary. When medical providers submit more risk-adjusting diagnosis codes, they increase the amount that CMS pays.**

*Id.* ("the government alleges the following about diagnosis codes and their role in the Medicare Advantage program")(emphasis supplied). Providers – like the *Ormsby* defendants and the Provider Defendants here – are the gatekeepers of the rates at which MA Organizations are paid. If beneficiaries' records are upcoded, the Government suffers monetary damages originating directly from the Provider Defendants. This is the *sine qua non* of a material falsity:  an assertion that has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Escobar*, 136 S. Ct. at 1996, *citing* 31 USC § 3729(b)(4).

Defendants also offer no support for the representation that the United States knows about the Provider Defendants intentional and knowing submission of false diagnosis codes and pays those codes anyway, either generally or specifically in this case. The *UnitedHealthcare* case makes no representations of that nature. 330 F. Supp. 3d 173, 180 (D.D.C. 2018). And the Provider

Defendants do not, and cannot, assert that the audits of Freedom and Optimum stemming from the *Sewell* case uncovered the artificial inflation of the diagnosis codes orchestrated and executed by PP, FMA, Sun Labs and Anion. Relator does not dispute that the Government's payment of a claim with "*actual* knowledge that certain requirements were violated" would speak to materiality (though is not in itself determinative). *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1104 (11th Cir. 2020), *quoting Escobar*, 136 S. Ct. at 2003-04. But Relator does not allege, and the Provider Defendants do not argue, that the United States had *any* knowledge of the falsity of the Provider Defendants claims to the insurers which increased the capitation rate paid by the United States, let alone full, actual knowledge.

Lacking meaningful arguments regarding the materiality of their submission of false risk-adjusting diagnosis codes to artificially increase capitation payments, the Provider Defendants resort to the universally-discredited, assertion that Dr. Zafirov's allegations are immaterial because the United States did not intervene. This is at best feckless. *E.g., United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006). Relator incorporates her response to that argument as raised by Defendant Pagidipati as though fully set forth herein. Dkt. 59.

### B. Relator's complaint far exceeds plausibility.

#### 1. It is not implausible that Defendants' scheme resulted in the submission of false claims.

The Provider Defendants assert that it is implausible that the scheme alleged by Dr. Zafirov's led to false claims because "(1) physician judgment, not a checklist, reigns supreme in medical decision-making, and (2) … the chain of causation is too attenuated to support liability." Dkt. 44 at 11.

These assertions simply do not comport with reality—much less the allegations of Dr. Zafirov's complaint. The central point of the Defendants' practices is unrelenting pressure on

physicians to close "care gaps" identified on serial 5 Star Check Lists, threatening their compensation until they give in. The Defendants describe a fanciful version of their coding and claims submission process which centers around physician autonomy, which bears no resemblance to the actual practices experienced and described by Dr. Zafirov. Relator's allegations as to the actual practices of the Provider Defendants are not based on third-hand knowledge or on "information and belief" – they are based on her first-hand experiences as the primary care physician for hundreds of patients. And they are taken as true. *Iqbal*, 129 S. Ct. at 1950

Contrary to the providers' assertions, their impact on coding is *not* limited to the innocent creation of suggestive 5 Star Checlists (Dkt. 44 at 11[5]): This is not at all what Relator alleges. Rather, she alleges that the Provider Defendants intended to and did interfere with professional medical judgment, and worse yet, actually changed codes without her consent when the badgering did not work. Dkt. 1 at ¶¶ 49, 53, 62, 65-72.

In addition to the examples identified in Relator's complaint, the lack of physician autonomy with respect to submitted diagnosis codes is supported directly by another FCA cases which has been filed against the Provider Defendants by Dr. George Mansour – another physician whose practice was acquired and managed, and whose billings were handled, by the Provider Defendants. *United States ex rel. Mansour v. Freedom Health, Inc., et al.*, No. 8:19-cv-02977-CEH-JSS, Dkt. 13 at ¶¶ 63-70. [6]

---

[5] In an odd and unavailing thought experiment, Provider Defendants equate the 5 Star forms to the "smart" search results generated by a legal search engine like Westlaw. A better analogy would be, diagnosis-harvesters masquerading as medical coders telling board-certified physicians to diagnose nonexistent diseases in Medicare patients or lose their bonuses.  That is what happened.

[6] The Court can take judicial notice of documents filed in other cases for the purpose of recognizing the subject matter of the litigation. *Martin K. Eby Constr. Co. v. Jacobs Civil, Inc.*, No. 3:05-cv-394-J-32TEM, 2006 U.S. Dist. LEXIS 45966, at *5 (M.D. Fla. July 6, 2006), *citing Universal Express, Inc. v. United States SEC*, 177 Fed. App'x. 52, at *1-2 (11th Cir. 2006).

The Provider Defendants argument that Relator's theory of causation is too attenuated because they "do not have contracts with CMS and do not present any diagnosis codes to CMS." Dkt. 44 at 12. Thus, they assert, they are insulated from False Claims Act liability by hiding behind the shield of a Medicare Advantage Organization. But the argument that Medicare Advantage providers enjoy a free-fire zone for fraud makes no sense, in part because they are, as noted above, gatekeepers to the payment process, and also because they are specifically required to certify the probity of their claims:

> [M]edical providers [ ] that contract with MA Organizations must certify that the data (**including diagnosis codes**) they submit are "accurate, complete, and truthful." 42 C.F.R. § 422.504(l)(3). They also are subject to the MA Organization's compliance and training requirements, 42 C.F.R. § 422.503(b)(4)(vi)(C), and must "comply with all Medicare laws, regulations and CMS instructions," 42 C.F.R. § 422.504(i)(4)(v). "**The importance of accurate data certifications and effective compliance programs is obvious: if enrollee diagnoses are overstated, then the capitation payments to Medicare Advantage organizations will be improperly inflated**."

> The Medicare Advantage capitation payment system is subject to the False Claims Act.

*Ormsby*, 444 F.Supp.3d at 1024-25 (emphasis supplied), *quoting Silingo*, 904 F.3d at 673 (denying providers' motions to dismiss); *accord United States ex rel. Schubert v. All Children's Health Sys.*, 2013 U.S. Dist. LEXIS 163075, at *19-20 (M.D. Fla. Nov. 15, 2013) (collecting cases in the Medicaid context that false claims are actionable when it is a "natural and foreseeable consequence" that the United States will ultimately provide funds to pay that claim).

Relator recognizes that the Medicare Advantage program has endeavored to create a claims submission process which, *when operated truthfully and accurately,* takes a vast quantity of physician-determined diagnostic codes and, after a series of computer algorithms, output a risk capitation rate based on several different metrics. But as the Provider Defendants concede (*e.g.,*

Dkt. 44 at 13), one of the primary variables is a patient's health status, which is determined by diagnostic codes. The chain of causation should have two links: The diagnostician to the insurer, the insurer to the United States. The defendants' relentless push for more money based on unsupported (and thus false) diagnoses make a new chain: The diagnostician to data manipulators back to the doctors (or, sometimes not), and only once the coding pressure was accomplished, to the insurer, and then the insurer to the United States.

### 2. The artificially increased diagnosis codes are objectively false.

Defendants assert in a single paragraph that Dr. Zafirov has not shown that the diagnosis codes were objectively false and therefore she cannot plausibly state a claim. Dkt. 44 at 15. First, Dr. Zafirov has identified claims that *are* objectively false, such as coding a patient for cancer or microcephaly when those conditions do not exist (Dkt. 1 at ¶¶ 63, 73, 74), or worse, coding for conditions that are incompatible with life like anencephaly (the absence of portions of the brain). Dkt. 1 at ¶ 72. When diagnosis codes are determined and submitted by a non-physician coder without the physician's involvement (or worse, despite the physician's express rejection of the claim), it is not a question of one physician second-guessing another – it is a code that is false on its face because it does not meet the Medicare billing regulations. "Every diagnosis code submitted to CMS must be based on a 'face-to-face' visit that is documented in the medical record. Medical records must be validated by qualifying 'physician/practitioner signatures and credentials." *Ormsby*, 444 F.Supp.3d at 1023-24, quoting *Silingo*, quoting *Medicare Managed Care Manual*, ch. 7, §§ 40, 120.1.1 and *Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 75 Fed. Reg. 19,678, 19,743 (Apr. 15, 2010). Relator plainly alleges that the diagnosis codes are *not* based on the physician's medical records

or independent judgment and cannot be validated by physician signature as demanded to be viable diagnosis codes submitted to the Medicare Advantage program.

## III.    Relator's claims are not barred by the first-to-file statute.

The False Claims Act's "first-to-file" rule provides that "when a person brings an action… no other person other than the Government may intervene or bring a related action based on the facts underlying the pending action." *United States ex rel. Cho v. H.I.G. Capital, LLC*, No. 8:17-cv-983-T-33AEP, 2020 U.S. Dist. LEXIS 155373, at *15 (M.D. Fla. Aug. 26, 2020), quoting 31 U.S.C. § 3730(b)(5). The first-to-file analysis is a simple one:

> A second action is "related" if it is "based on the facts underlying the pending action." The Eleventh Circuit's only explicit instruction on this prong of the first-to-file bar is "once one suit has been filed by a relator or by the government, all other suits against the same defendants based on the same kind of conduct would be barred." *Cooper [v. Blue Cross & Blue Shield of Florida, Inc.]*, 19 F.3d 562, 567 [(11th Cir. 1994)] [string citations omitted]. Other district and appellate courts have established more detailed tests under this prong, and "[t]he overwhelming majority of courts considering first-to-file issues have interpreted Section 3730(b)(5) to apply when a later-filed *qui tam* complaint is based on either (1) the same 'type of fraud,' (2) the same 'essential elements' of fraud, or (3) the same 'material elements' of fraud." John T. Boese, Civil False Claims and *Qui Tam* Actions, 4-183-4-184 (2014-1 Supplement).

*United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 157 F. Supp. 3d 1311, 1326-37 (N.D. Ga. 2015). The analysis depends on a side-by-side comparison of the complaints. *United States ex rel. Urquilla-Diaz v. Kaplan Univ.*, 2016 U.S. Dist. LEXIS 189155, at *13 (S.D. Fla. Mar. 24, 2016).

There are two other False Claims Act cases presently pending in this District which include some, though not all, of the same defendants as this case. They are identified in Dkt. 53. Only one – *United States ex rel. Fernandez v. Freedom Health, Inc., et al.*, No. 8:18-cv-01959-MSS-JSS (M.D. Fla.) – was filed before this case, so although the Provider Defendants never identify which

case they claim "likely strips the Court of jurisdiction[7] under the first-to-file bar," (Dkt. 44 at 16) Relator assumes it to be this one for purposes of responding to Defendants' motion.[8] However, simply being "related" or "similar" per the Local Rules is a far stretch from being "related" under the constraints of the first-to-file analysis, in which the Provider Defendants do not engage.[9]

The *Fernandez* complaint does not overlap Dr. Zafirov's complaint by asserting the same type or elements of a fraud scheme. In sixteen paragraphs, Mr. Fernandez, a former corporate outsider who alleges that he was CEO of a "radiology physician service business" that contracted with Physician Partners, alleges that Physician Partners forged physician signatures on prescriptions to create mass-mailed instructions for patients to schedule ultrasounds and echocardiograms that were not medically necessary. Fernandez asserts that physicians employed by his company received pressure to use "weighted codes" and that Physician Partners refused to accept reports without the desired coding, all to increase patient risk scores.  No examples of patients or false claims are alleged.

---

[7] Defendants assert as though received wisdom, based on a district court case from Virginia, that the first-to-file doctrine is jurisdictional. Doc. 44 at 16-17.  This is at best misleading.  Recent authority from this Court, following a decision by the D.C. Circuit, squarely holds just the opposite. *United States v. Infilaw Corp.*, 347 F. Supp. 3d 1075, 1082-83 (M.D. Fla. Nov. 8, 2018), following *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 121 n.4 (D.C. Cir. 2015).  The First and Second Circuits have since followed *Heath. United States v. Millenium Labs., Inc.*, 923 F.3d 240, 248 (1st Cir. 2019); *United States ex rel. Hayes v. Allstate Ins. Co.*, 853 F.3d 80, 85 (2d Cir. 2017).

[8] Dr. George Mansour's case – *United States ex rel. Mansour v. Freedom Health, Inc., et al.*, No. 8:19-cv-02977-CEH-JSS – describes experiences and a scheme essentially identical similar to those described by Dr. Zafirov. Dr. Mansour's complaint was filed several months after Dr. Zafirov's, so it triggers no first-to-file inquiry here.

[9] Both cases were still sealed when defendants filed their papers. However, they have had the *Fernandez* complaint for a month and have not filed anything addressing the proper analysis.  Moreover, in the breezy style which pervades their papers, the Defendants assert, without the slightest factual basis, that "[i]n the government's view, [Fernandez] is apparently analogous enough to 'equip it' to investigate Zafirov's instant allegations." *Id.* The Defendants presumably  are aware that it is the practice of the United States to advise relators of cases against the same parties.

It is hardly surprising that both complaints allege schemes to increase risk scores in order to secure higher payments from Medicare: That is how such fraud in the Medicare Advantage programs generally work, and it is certainly the centerpiece of defendants' business model.  But Mr. Fernandez makes no allegations beyond the fraudulent diagnostic scans (nor could he have, given his status as an outside contractor). He makes no reference that Physician Partner's physicians were required to employ 5-Star Check Lists providing only risk-adjusting diagnostic codes that falsely represented a patient's health history, that physicians were aggressively pressured to close "care gaps" by agreeing to submit codes that were not medically supported, that diagnostic codes were submitted in physicians' names after the physicians had denied the codes, that Physician Partners acted in concert with FMA, Anion, SunLabs and PPSS to conduct chart reviews following patient visits to extract codes beyond those entered by a physician using his or her professional judgment, or that Freedom and Optimum were complicit in the arrangement by accepting the plainly false submissions without oversight or review owing to the enduring oversight by Defendant Sidd Pagidipati.

The *Fernandez* complaint cannot be reasonably interpreted to have put the Government on notice or equipped it to investigate a scheme any broader than the unnecessary diagnostic scans. *See Urquilla-Diaz*, 2016 U.S. Dist. LEXIS 189155, at *18 (denying a motion to dismiss a second-in-time complaint that was based on the "same type of fraudulent scheme" because the first-in-time complaint was "not enough to have put the United States on notice that the scheme was broader" than the single facility for which the relator had knowledge). As such, the mere existence of the *Fernandez* complaint does not establish a basis for dismissal this case, and especially not for dismissal with prejudice as the Provider Defendants urge.[10]

---

[10] Any dismissal based on the first-to-file bar should be without prejudice. *Infilaw Corp.*, 347 F.Supp.3d at 1081. This maxim is particularly important given the current posture of the *Fernandez* case. Counsel for

IV.     **Relator's claims have not been publicly disclosed, and even if they were, she is a consummate original source under 31 U.S.C. 3730(e)(4).**

The Eleventh Circuit applies a three-part test to ascertain if the so-called "public disclosure bar" set forth in 31 U.S.C. 3730(e)(4) precludes a relator's ability to bring a False Claims Act case. First, "have the allegations made by the plaintiff been publicly disclosed?" If they have, "are the allegations in the complaint substantially the same as the allegations or transactions contained in public disclosures?" and third, "if yes, is the plaintiff an 'original source' of that information?" *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 (11th Cir. 2015) (internal citation omitted). Here, the Provider Defendants arguments fail resoundingly on the first two elements, and Relator plainly satisfies the third.

The Provider Defendants nominate three candidates as public disclosures – (1) the *Sewell* case, which the PO Defendants assert included "indistinguishable allegations that Freedom, Optimum, Pagidipati, and others 'knowingly submit[ed] incorrect and unsubstantiated risk adjustment data to CMS in order to fraudulently increase their capitation payments;" (2) CMS and industry group investigations, reports and audits that address the "challenges" with risk adjusting methodology in general; and (3) news media covering the resolution of the *Sewell* case.

The first and third purported disclosures mirror those presented by the MA Defendants in their motion to dismiss. Dkt. 41 at 20, *et seq.* While the arguments fail for the MA Defendants as well, the analysis at least merits some evaluation in that context. Relator addresses the

---

Mr. Fernandez withdrew and Mr. Fernandez is presently *pro se*. Fernandez Dkt. 23. The Court has given Mr. Fernandez until Oct. 25, 2020 to secure counsel. Fernandez Dkt. 24. However, Mr. Fernandez was indicted by this District's Grand Jury on Sept. 30, 2020 on counts of healthcare fraud and aggravated identity theft. *United States v. Fernandez*, No 6:20-cr-00132-RBD-EJK-1, Dkt. 5. Public records indicate he has been arrested and remanded to custody with the right to make a bail application at a later time. Fernandez Criminal Dkt. 6, 7. A public defender has been appointed in his criminal matter (*Id.* at Dkt. 8); no counsel has yet to make an appearance in the False Claims Act case. Because relators cannot proceed *pro se*, Magistrate Judge Sneed ordered Fernandez to secure replacement counsel by October 28, 2020.

inapplicability of the public disclosure bar in full in response to the MA Defendant's motion to dismiss and incorporates those arguments as though fully set forth herein. Dkt. 57. In sum, public disclosures that do not bar a subsequent proceeding against the entities involved in the prior lawsuit certainly does not bar proceedings against parties who had no role in the prior case. *Id.* (conducting public disclosure on a claim-by-claim and dismissing some but not others); *United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d at 1273 ("[T]he bar operates to preclude only those claims that are based on information publicly disclosed.").

The Provider Defendants offer only one "disclosure" not identified by the MA Defendants: the CMS and industry reports of general fraud in the Medicare Advantage program. These reports to do not salvage their arguments. The industry reports do not address provider organizations who knowingly and intentionally submit false data regarding patient health conditions for the purpose of artificially inflating risk adjustment scores, and certainly do not include information that would implicate the Provider Defendants either directly or impliedly. These sorts of general allegations of industry-wide fraud without any particulars tying specific conduct to a specific defendant have been roundly rejected as a qualifying "public disclosure" by the Eleventh Circuit. *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 566 and n.7 (11th Cir. 1994) (allegations of widespread fraud "made in sources in which [the defendant] was not specifically named or otherwise directly identified are insufficient to trigger" the public disclosure bar); *United States ex rel. McFarland v. Fla. Pharm. Sols.*, 358 F. Supp. 3d 1316, 1323 (M.D. Fla. July 24, 2017) (same). Given that these industry reports are not qualifying disclosures, no further inquiry is necessary.

## V. The "government action bar" does not bar this case, and it would have no implication for these defendants even if it did.

Section 31 U.S.C. § 3730(e)(3) provides: "In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit

or an administrative civil money penalty proceeding in which the Government is already a party."
The defendants claim that *Sewell* – a case in which they had no involvement at all, and which
addressed none of the allegations in Dr. Zafirov's complaint – bars this case.

The government action bar is "most sensibly analyzed by asking 1) whether the allegations
and transactions in this case are already being or have been litigated; 2) whether that litigation is
or was in a civil suit or administrative civil money penalty proceeding; and 3) whether the
government was a party in the earlier case." *Taul ex rel. United States v. Nagel Enters.*, 2016 U.S.
Dist. LEXIS 7975, at *11 (N.D. Ala. Jan. 25, 2016).  The *Taul* court recognized that "except where
the *qui tam* action was truly derivative of a government action, Congress intended that the
jurisdictional bar be a narrow one, not one that sweeps up all related claims within its ambit." *Id.*
at *14. The government action bar only applies if the government has had the opportunity to review
the allegation and has already decided not to pursue the claim. *Schagrin v. LDR Indus., Inc.*, No.
14 C 9125, 2018 U.S. Dist. LEXIS 86107, at *12 (N.D. Ill. May 23, 2018).

The allegations and transactions in this case have not been litigated in *Sewell* or any other
case. The only argument the Provider Defendants assert to this end is that, because the complaints
contain three similar sentences, Dr. Zafirov "pulls her allegations wholesale from *Sewell*, making
her case a textbook 'parasite' to *Sewell*'s 'host.'" Dkt. 44 at 23. Not only is the "parasitic"
conclusion an obvious exaggeration, but simply mirroring language does not invoke the
government action bar. *United States ex rel. Herman v. Coloplast Corp.*, 327 F. Supp. 3d 358, 362
(D. Mass. Aug. 17, 2018) (finding that the government action bar does not apply even where the
relator's complaint included identical language from an earlier-filed complaint). Rather, a court
must evaluate "whether the *qui tam* case is receiving support, advantage, or the like from the host
case (in which the government is a party) without giving any useful or proper return to the

government (or at least having the potential to do so)." *Id.*, *quoting United States ex rel. Prawer & Co. v. Fleet Bank of Maine*, 24 F.3d 320, 328 (1st Cir. 1994) (internal quotation marks removed).

Relator's case obviously is not receiving support or advantage from the long-dismissed *Sewell* case, which contained no allegations related to PP or any of its related provider organizations and does not address the manipulation of risk adjustment scores by provider organizations acting in tandem with the insurers. Moreover, even if the Court determined that this case received "support or advantage" from *Sewell*, it unquestionably delivers significant returns to the Government by detailing the fraud scheme between these Provider Defendants, Defendant Pagidipati, and the Medicare Advantage Defendants which was never referenced in the *Sewell* case and, thus, which the Government was previously unaware and unequipped to investigate. *Sturgeon v. PharMerica Corp.*, 438 F. Supp. 3d 246, 267 (E.D. Pa. Feb. 5, 2020) (rejecting application of the government action bar where two cases had same defendants but were factually distinct). Thus, it is beyond reasonable dispute that this case identifies a fraud scheme "that the government has not yet attempted to remedy" and therefore is not precluded by the government action bar. *Prawer*, 24 F.3d at 328-29.

## VI.    Conclusion

For the reasons set out here, and based on the allegations of the Complaint, the motion to dismiss should be denied.[11]

---

[11] Relator believes that her complaint is sufficiently specific as pled, and that the Provider Defendants' other arguments are unavailing. However, should the Court conclude that dismissal is appropriate, Relator asks that it be without prejudice and that she be given 45 days from the date of the Court's order within which to file an amended complaint addressing any concerns identified by the Court. *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001), quoting *Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991) ("Where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice") (internal quotation omitted). Relator respectfully urges that this is particularly appropriate here, where Relator continued to work for the Provider Defendant, treating patients and reviewing her patients' 5 Star Checklists, medical records, and

Respectfully submitted this 20th day of October, 2020,

 /s/ Jillian L. Estes
Frederick M. Morgan, Jr. (Ohio Bar No. 0027687)
Jillian L. Estes (Fla. Bar No. 0055774)
Jonathan Lischak (Ohio Bar No. 97669)
MORGAN VERKAMP LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Phone: (513) 651-4400
Fax: (513) 651-4405
rmorgan@morganverkamp.com
jillian.estes@morganverkamp.com
jonathan.lischak@morganverkamp.com

Kenneth J. Nolan (Fla. Bar No. 603406)
Marcella Auerbach (Fla. Bar No. 249335)
NOLAN, AUERBACH & WHITE, LLP
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL 33301
Phone: (954) 779-3943
Fax: (954) 779-3937
ken@whistleblowerfirm.com
marcellla@whistleblowerfirm.com

**Counsel for Relator Dr. Clarissa Zafirov**

## CERTIFICATE OF SERVICE

I, Jillian Estes, hereby certify that the foregoing Notice was served on October 20, 2020, to all parties of record via the CM/ECF electronic filing system.

 /s/ Jillian L. Estes
Jillian L. Estes (Fla. Bar No. 0055774)

---

billing records for many months after the complaint was filed, and so would be entitled to seek leave to file a supplemental complaint pursuant to Rule 15(d), Fed. R. Civ. P.