# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* DR. CLARISSA ZAFIROV, | ) | |
| | ) | |
| Plaintiff/Relator | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. 8:19-cv-01236 |
| FLORIDA MEDICAL ASSOCIATES, LLC, | ) | |
| d/b/a VIPCARE; PHYSICIAN PARTNERS, LLC, | ) | |
| PHYSICIAN PARTNERS SPECIALITY | ) | |
| SERVICES, LLC; SUN LABS USA, INC. | ) | |
| ANION TECHNOLOGIES, LLC; ANTHEM, | ) | |
| INC.; FREEDOM HEALTH, INC.; OPTIMUM | ) | |
| HEALTHCARE, INC.; and SIDDHARTHA | ) | |
| PAGIDIPATI, | ) | |
| | ) | |
| Defendants. | ) | |

---

## RELATOR DR. CLARISSA ZAFIROV'S RESPONSE IN OPPOSITION TO DEFENDANTS ANTHEM, INC., FREEDOM HEALTH, INC. AND OPTIMUM HEALTHCARE, INC.'S MOTION TO DISMISS

---

**TABLE OF CONTENTS**

I.   Introduction ......................................................................................................... 1

II.   Relator states a claim against Freedom
     and Optimum with the requisite specificity as
     required by Rule 9(B) ....................................................................................... 2

     A.  Freedom and Optimum submitted claims to the United States
         consistent with their regulatory obligations as Medicare
         Advantage organizations ........................................................................... 2

     B.  Relator's complaint alleges with particularity that Freedom and
         Optimum knowingly submitted false claims pursuant to their
         roles in the fraud scheme ........................................................................... 6

         1.  Collective pleading is permissible when the groups are
             intentionally defined and the defendants operate without distinction ........................... 7

         2.  The fraud scheme described by Relator reliably indicates
             that Freedom and Optimum submitted false claims to the
             United States ..................................................................................... 10

         3.  Relator's complaint also supports the allegation that the
             insurers made false statements based on both express
             and implied false certifications ........................................................... 14

III.  Relator's reverse False Claims Act allegations naturally follow
      the fraudulent submissions and fraudulent certifications ................................... 16

IV.   Relator's complaint is not barred by any statutory requirements
      of the False Claims Act ..................................................................................... 17

      A.  The public disclosure bar is not implicated because the prior
          disclosures do not relate to the allegations in Dr. Zafirov's complaint,
          and she is an original source that materially added information to the
          disclosures related to the *Sewell* case ...................................................... 17

          1.  There has been no public disclosure of the allegations made
              by Dr. Zafirov ..................................................................................... 18

          2.  The disclosures of prior fraudulent conduct by the MA Defendants
              in the *Sewell* matter is not substantially similar to the
              allegations in Relator's complaint ..................................................... 19

          3.  Relator is a consummate original source .......................................... 20

B.   Relator will not pursue pre-2014 claims against the MA Defendants ...........................21

V.   Should the Court believe the complaint fails to satisfy Rule 9(b)
     or otherwise should be dismissed, such dismissal should be without prejudice................... 21

VI.   Conclusion ..................................................................................................................... 22

## I.      Introduction

Defendants Anthem, Inc., Freedom Health, Inc. and Optimum Healthcare, Inc. (collectively the "MA Defendants")[1] move to dismiss Relator's False Claims Act complaint on four grounds: (1) failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P.; (2) failure to plead fraud with specificity under Rule 9(b), Fed. R. Civ. P.; (3) failure to allege plausibility under Rule 8(a); and (4) under the public disclosure bar set forth in 31 U.S.C. 3730(e)(4). The MA Defendants arguments are largely based on the misplaced assertion that they have an arms-length relationship with the Provider Defendants.  In fact, however,  Dr. Zafirov, in her role as a provider in a VIPcare clinic, personally observed the intertwined relationship between Freedom Health, Inc. ("Freedom"), Optimum Healthcare, Inc. ("Optimum"), Defendant Pagidipati, and the Provider Defendants which allowed the submission of inflated risk scores to pass through unchecked to the United States.

As Medicare Advantage insurers, Freedom and Optimum are the final line of defense in protecting the United States' massive financial investment in the care and treatment of the country's elderly population.  Relator, a physician who worked in a Venice, Florida clinic owned by some combination of the other defendants, alleges that they acted in concert with defendants Physician Partners, Florida Medical Associates, VIPcare, and related entities, to submit false diagnosis codes to the United States in order to illegally increase the amounts paid by Medicare for the patients' health care.

---

[1] Relator has notified the United States of her intent not to pursue allegations against Anthem, Inc. at this time.  Once the government has assented, as required by 31 U.S.C. § 3730(b)(1), Relator will file a dismissal without prejudice as to Anthem pursuant to Rule 41(a)(1), Fed. R. Civ. P. References in this brief to the "MA Defendants" mean Freedom and Optimum only.

For the reasons set forth in Relator's complaint and herein, Freedom and Optimum's motion to dismiss should be denied.

## II.    Relator states a claim against Freedom and Optimum with the requisite specificity as required by Rule 9(b).

### A.  Freedom and Optimum submitted claims to the United States consistent with their regulatory obligations as Medicare Advantage organizations.

Freedom and Optimum argue that Relator's complaint is deficient because it does not allege specific false claims, and that to infer the submission of any claims would "strip all meaning from Rule 9(b)'s requirements of specificity." Dkt. 41 at 8. These arguments misstate both the role of Rule 9(b) and the claims process under Medicare Advantage. In the unique context of the Medicare Advantage system, making claims for payment to the United States and distributing the fruits of those claims to providers is the *raison d'etre* of carriers such as Freedom and Optimum.

Medicare Advantage carriers are a hybrid of a fiscal intermediary that handles provider reimbursement for the United States, and an interested party whose own financial success depends on the ability of their providers to minimize expenses while maximizing risk-adjustment diagnoses and coding.  The insurers "provide Medicare Advantage health plans to the clinics' patients and are paid by Medicare on a per-patient basis; the plans in turn pay the clinics based on patient enrollment." *United States ex rel. Osheroff v. Humana, Inc*., 776 F.3d 805, 808 (11th Cir. 2015).

Risk adjustments allow insurers to increase the *per capita, per month* payments from the United States. Part of that money goes to the providers, and part of it stays with the insurers. But *all* of the money comes from the United States. The conflicts of interest which lurk in this arrangement are well-recognized, and a precise regulatory regime exists to guard against them. *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 672 (9th Cir. 2018).

The regulatory framework which governs the relationship between the United States, Medicare Advantage carriers like Freedom and Optimum, and providers like VIPcare and Physician Partners was recently, and carefully, detailed by *United States ex rel. Ormsby v. Sutter Health*, a Northern District of California case that unequivocally concluded, "The Medicare Advantage capitation payment system is subject to the False Claims Act." 444 F. Supp. 3d 1010, 1024-25 (N.D. Cal. Mar. 16, 2020), quoting *Silingo*, 904 F.3d at 673. The *Ormsby* court's thorough recitation is quoted at length because it cogently lays out the regulatory regime which governs the defendants' obligations.

> "Medicare beneficiaries have the option of receiving benefits through private health plans as an alternative to the traditional fee-for-service Medicare program." *Swoben*, 848 F.3d at 1167. "Under this option, known as Medicare Advantage or Medicare Part C, the government pays Medicare Advantage organizations a capitated (per enrollee) amount to provide medical benefits." *Id.* "Capitation means an amount is paid per person." *Silingo*, 904 F.3d at 672 (*citing* Capitation, Black's Law Dictionary (10th ed. 2014)). "Under Medicare Advantage's capitation system, private health insurance organizations provide Medicare benefits in exchange for a fixed monthly fee per person enrolled in the program — regardless of actual healthcare usage." *Id.* "These organizations pocket for themselves or pay out to their enrollees' providers the difference between their capitation revenue and their enrollees' medical expenses, creating an incentive for the organizations to rein in costs." *Id.* (citing Patricia A. Davis et al., Cong. Research Serv., R40425, *Medicare Primer* 20 (2017), https://fas.org/sgp/crs/misc/R40425.pdf (last visited Mar. 16, 2020)).
>
> "The government adjusts the monthly payments to Medicare Advantage organizations to reflect the health status of their enrollees." *Swoben*, 848 F.3d at 1167 (citing 42 U.S.C. § 1395w-23(a)(1)(C)(i), (a)(3); 42 C.F.R. § 422.308(c)(2)). "This ensures Medicare Advantage 'organizations are paid appropriately for their plan enrollees (that is, less for healthier enrollees and more for less healthy enrollees).'" *Id.* (quoting *Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4588, 4657 (Jan. 28, 2005)).

444 F.Supp.3d at 1022, *quoting Silingo*, 904 F.3d at 672-73, *and quoting United States v. United Healthcare Ins. Co. ("Swoben")*, 848 F.3d 1161 (9th Cir. 2016).

- 3 -

Having established the claims submission process, the *Ormsby* court details the origin of the information that is submitted to Medicare. Just as Dr. Zafirov has alleged, the diagnosis codes come from the provider and then the MA organizations pass on the data, ostensibly using best practices to ensure its validity:

> "Medicare Advantage organizations obtain diagnosis codes from healthcare providers after these providers have had medical visits with plan enrollees." *Silingo*, 904 F.3d at 672 (citing Ctrs. for Medicare and Medicaid Servs., Pub. No. 100-16, *Medicare Managed Care Manual*, ch. 7, § 40 (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/mc86c07.pdf (last visited Mar. 16, 2020)). "Physicians and other health care providers submit diagnosis codes to the Medicare Advantage organizations[.]" *Swoben*, 848 F.3d at 1167 (citing *Medicare Program; Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 74 Fed. Reg. 54,634, 54,674 (Oct. 22, 2009)). "In turn, Medicare Advantage organizations report the diagnosis codes that they receive to the Centers for Medicare and Medicaid Services ('CMS') for use in the risk adjustment model that is the key to calculation of capitation rates." *Silingo*, 904 F.3d at 672 (citing *Medicare Managed Care Manual*, ch. 7, § 40); *accord Swoben*, 848 F.3d at 1167. "The risk adjustment model deems a Medicare Advantage enrollee to be as healthy as the average Medicare beneficiary unless CMS receives updated diagnosis codes for the enrollee every year." *Silingo*, 904 F.3d at 672 (citing *Medicare Managed Care Manual*, ch. 7, §§ 20, 70, 70.2.5, 120.2.4). "These diagnosis codes contribute to an enrollee's risk score, which is used to adjust a base payment rate." *Swoben*, 848 F.3d at 1167-68 (citing 74 Fed. Reg. at 54,674).
>
> …
>
> "To combat the 'incentive for Medicare Advantage organizations to potentially over-report diagnoses,' Medicare regulations require risk adjustment data to be produced according to certain best practices." *Id.* (internal brackets omitted) (citing 79 Fed. Reg. at 2001). "Every diagnosis code submitted to CMS must be based on a 'face-to-face' visit that is documented in the medical record." *Id.* (citing *Medicare Managed Care Manual*, ch. 7, §§ 40, 120.1.1). "Medical records must be validated by qualifying 'physician/practitioner signatures and credentials.'" *Id.* (citing *Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 75 Fed. Reg. 19,678, 19,743 (Apr. 15, 2010)). "Further, electronic medical records must meet special signature requirements and use software that is 'protected against modification.'" *Id.* (citing Ctrs. for Medicare and Medicaid Servs., Pub. No. 100-08, *Medicare Program Integrity Manual*, ch. 3, § 3.3.2.4

- 4 -

(2018), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/PIM83c03.pdf (last visited Mar. 16, 2020)).

*Id.* at 1022-24.

Finally, *Ormsby* confirms, as Relator asserts (Dkt. 1 at ¶¶ 42-43), the certifications which accompanies every submission of diagnosis data "as a condition to receiving payment:"

> "As a further bulwark against fraud, Medicare Advantage organizations must certify the accuracy, completeness and truthfulness of the data they provide to CMS, including risk adjustment data, as a condition to receiving payment[.]" *Swoben*, 848 F.3d at 1168 (citing 42 C.F.R. § 422.504 (l)); *accord Silingo*, 904 F.3d at 673 ("[I]t is an express condition of payment that a Medicare Advantage organization 'certify (based on best knowledge, information, and belief) that the [risk adjustment] data it submits . . . are accurate, complete, and truthful.'") (brackets and ellipsis in original) (quoting 42 C.F.R. § 422.504(l)(2)). "The organization also is required to 'adopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with CMS'[s] program requirements,' such as written standards of conduct, the designation of a compliance officer, and other listed minimum requirements." *Silingo*, 904 F.3d at 673 (internal brackets omitted) (quoting 42 C.F.R. § 422.503(b)(4)(vi)). Among other things, the compliance programs must "includ[e] 'procedures for internal monitoring and auditing' and for 'ensuring prompt responses to detected offenses.'" *Swoben*, 848 F.3d at 1174 (internal brackets omitted) (quoting 42 C.F.R. § 422.503(b)(4)(vi), (vi)(F), (vi)(G)).

*Id*. at 1024; see also Dkt. 1 at ¶ 42. The claims submission process described by *Ormsby* parallels the process as described in Relator's complaint. Dkt. 1 at ¶¶ 27-43.

It is not an impermissible inference to deduct that Freedom and Optimum, contracted to perform regulated duties as Medicare Advantage organizations which can *only* be accomplished by the submission of diagnostic codes to the United States for monthly capitation calculations, would only have performed the task of paying the Provider Defendants for their patient care and diagnoses if they had also performed the task of obtaining the money based on those diagnoses.

Indeed, "[i]t would stretch the imagination to infer the inverse." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 192 (5th Cir. 2009).

### B. Relator's complaint alleges with particularity that Freedom and Optimum knowingly submitted false claims pursuant to their roles in the fraud scheme.

The insurers assert that Relator's complaint fails to provide the specific details of any individual false claim.  They rely, for this argument, on the most inflexible interpretation of Rule 9(b) which they justify by citation to *United States ex rel. Clausen v. Lab Corp. of Am.*, 290 F.3d 1301 (11th Cir. 2002). *Clausen* is not as rigid as the Defendants argue. The panel held that Rule 9(b) cannot be satisfied when a relator concludes "*without any stated reason for [her] belief* that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government," but it does not foreclose all False Claims Act cases submitted without a claim attached. *Id*. at 1311 (emphasis supplied).

Rather, *Clausen* demands that, "some indicia of reliability" must be pled to sufficiently allege that a false claim for payment was made to the United States. *Id.* As this Court recognized in *United States ex rel. Bingham v. BayCare Health System,*  2015 U.S. Dist. LEXIS 107220, at **11-12 (M.D. Fla. Aug. 14, 2015), "Rule 9(b) exists to prevent spurious charges and provide notice to defendants of their alleged misconduct, not to require plaintiffs to meet a summary judgment standard before proceeding to discovery."  *Id.*, *quoting U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.,* 2011 U.S. Dist. LEXIS 59949, at *8 (M.D. Fla. June 6, 2011)

With those purposes in mind, the Eleventh Circuit has "championed a 'nuanced, case-by-case approach' for examining whether the requisite indicia of reliability are present." *United States ex rel. Crumb*, 2016 U.S. Dist. LEXIS 112661, at *21-24 (S.D. Ala. Aug. 24, 2016); *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed. Appx. 693, 704 (11th Cir. 2014). While a relator must offer more than a conclusory allegation that false claims were submitted as a result of

a defendant's fraudulent conduct, "'there are no bright-line rules' in this inquiry." *Crumb,* 2016 U.S. Dist. LEXIS 112661, at *23-24, *citing Mastej*, 591 Fed. Appx. at 704.

In sum, this Circuit is now "more tolerant towards complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1230; *Grubbs*, 565 F.3d at 187 ("[T]he Eleventh Circuit itself has moved away from *Clausen*'s most exacting language, accepting less billing detail in a case where particular allegations of a scheme offered indicia of reliability that bills were presented"); *United States ex rel. Willis v. Angels of Hope Hospice, Inc.*, 2014 U.S. Dist. LEXIS 20959, at *17-24 (M.D. Ga. Feb. 20, 2014) (tracking the evolution of the Eleventh Circuit's Rule 9(b) requirement and noting the trend towards allowing cases pled without the particularities of a specific false claim).

### 1. Collective pleading is permissible when the groups are intentionally defined and the defendants operate without distinction.

Freedom and Optimum argue that Relator refers to them "as if they are interchangeable or a single entity" and therefore does not describe with particularity their participation in the fraudulent scheme. Dkt. 41 at 14-15. While it is impermissible to lump together defendants when doing so would "result in a lack of clarity as to what conduct is alleged against each individual defendant," it *is* permissible when the allegations are "grouped together for the defendants with the same role and the plaintiffs [did not...assert] every allegation against all defendants generally." *United States ex rel. Bibby v. Wells Fargo Bank, N.A.*, 906 F. Supp. 2d 1288, 1298 (N.D. Ga. Nov. 16, 2012); *United States ex rel. Allison v. Sw. Orthopaedic Specialists, PLLC*, 2020 U.S. Dist. LEXIS 187010, at *21 (W.D. Okla. Oct. 8, 2020) ("Group pleading is not disallowed *per se*.").

Particularly in the Medicare Advantage context, "[t]here is no flaw in a pleading…where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *Swoben*, 848 F.3d at 1184. And when defendants participate in a "wheel conspiracy" where "a single member or group (the 'hub') separately agree[s] with two or more other members of the group (the 'spokes')," then "any parallel actions of the 'spokes' can be addressed by collective allegations." *Silingo,* 904 F.3d at 678, *quoting* Black's Law Dictionary, "Conspiracy" (allowing group pleading where each MAO had the same operative contracts and each "passed on [ ] inflated diagnosis information in the same way."). Such group pleadings are accepted even when the defendants are "unrelated, dissimilar defendants with no relevant business connections," much less the commonly-owned and -operated entities at issue in this case. *Id. at* 678.

Freedom and Optimum do not argue that they are "unrelated, dissimilar defendants with no relevant business connection."[2] Nor could they; Relator alleges, based on her personal observations and publicly available corporate records, that Freedom and Optimum are "effectively the same entity" that "share the same management and staff/employees" who "conduct the business of both plans jointly and concurrently." Dkt. 1 at ¶ 11.

Dr. Zafirov's allegations are bolstered by the documents the MA Defendants ask the Court to judicially notice, including the *Sewell* complaint itself, which alleges that "[Sidd Pagidipati] became COO of both Freedom and Optimum following Dr. Patel's acquisition in 2007" (Dkt. 42, Exhibit A at ¶ 35) and a news article which identifies Freedom Health and Optimum HealthCare

---

[2] The MA Defendants challenge Relator's group pleading but also adopt the grouping and respond in kind. Neither Freedom nor Optimum raise any defenses independently of one another and have moved jointly to stay discovery. Dkt. 43.

as "two of [Freedom Health, Inc.'s] insurance plans."[3] Moreover, Relator has pled the exact sort of "wheel conspiracy-like fraud" described in *Silingo* wherein Defendant Pagidipati is the "hub" and each of the corporate entities is a "spoke" that participates in the scheme pursuant to their common ownership, direction, control or relationship. *Silingo*, 904 F.3d at 678. The grouping of Freedom and Optimum together is not accidental or random; it is appropriate based on the nature of their relationship and their identical roles in the fraud scheme. *See Allison*, 2020 U.S. Dist. LEXIS 187010, at *21 (permitting group pleading where the terms are intentionally defined and "used with care."). Here, as in *Silingo*, "[a] good claim against one defendant did not become inadequate simply because a co-defendant was alleged to have committed the same wrongful acts." 904 F.3d at 677.

Given the appropriateness of the group allegations, particularly in the Medicare Advantage context, Defendants instead assert that Relator should have identified a "person – or even any corporate team or department – responsible for any aspect of submitting diagnosis code data to CMS." Dkt. 41 at 15. This is not required by Rule 9(b), and for good reason; it would not alter the MA Defendants' ability to defend themselves by Relator reciting back to them the names of their own employees or corporate departments. This sort of demand is the very reason why the rubric of "who, what, where, when and how" are not always necessary. Rather, Relator has identified Freedom and Optimum as closely-allied Medicare Advantage organizations, and has described the indisputable role of those organizations to submit diagnosis code data to CMS. This is the indicia

---

[3] Dkt. 42, Exhibit G, "Medicare Advantage Insurer Settles Whistleblower Suit for $32 Million," *NPR*, May 31, 2017 ("Freedom Health, Inc., a Florida Medicare Advantage insurer, has agreed to pay nearly $32 million to settle a whistleblower lawsuit. The suit, settled on Tuesday, alleged that two of the company's insurance plans exaggerated how sick patients were and took other steps to overbill the government health program for the elderly. The two plans are Freedom Health and Optimum HealthCare, both based in Tampa.")

of reliability that *someone* there submitted the claims; the names of those people are not necessary to satisfy Rule 9(b).

### 2. The fraud scheme described by Relator reliably indicates that Freedom and Optimum submitted false claims to the United States.

Despite Defendants' assertion of absolutist requirements, "[a]llegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but *alternative means are also available to satisfy the rule*." *Mastej*, 591 Fed. Appx.at 704 (emphasis added), *quoting Durham v. Bus. Mgmt. Assocs*., 847 F.2d 1505, 1512 (11th Cir. 1988). While pleading the "who, what, when, where and how" of a specific false claim is *one way* of satisfying the "indicia of reliability" obligation, it is not the *only way*. *Id.* ("[T]here is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim"); *United States ex rel. Troncoso v. Rego Int'l, LLC*, 2018 U.S. Dist. LEXIS 81500 (S.D. Fla. May 15, 2018) (denying a motion to dismiss where Relator "[did] not identify particular false claims or the 'who, what, where, why' as to each violation [but] has provided the requisite indicia of reliability"). And where, as here, the allegations are complex and precise, a "detailed mosaic of complementary allegations does support a reasonable inference that the defendant is liable for the misconduct alleged." *Crumb*, 2016 U.S. Dist. LEXIS 112661, at *95.

A "detailed mosaic of complementary allegations" describes Dr. Zafirov's complaint. She is a Board-certified family medicine physician who was hired by Defendant Florida Medical Associates d/b/a VIPcare, although her paychecks came from Sun Labs USA, Inc., her practice policies and procedures were dictated by Physician Partners, and her billing and coding was effectuated by Anion Technologies, Inc. (Dkt. 1 at 6, 7(d), 13, 54, 55), all entities under the ownership, operation and control of Defendant Siddhartha Pagidipati. Defendant Pagidipati cut his teeth in the healthcare industry with Freedom Health and Optimum HealthCare, founding them in

conjunction with his father and then serving as the Chief Operating Officer beginning in 2007. Dkt. 42, Ex. A at ¶ 35.

Only a year after Pagidipati took the COO reins, the United States alleged that Freedom Health and Optimum HealthCare began engaging in a scheme to "submit[ ] unsupported diagnosis data and diagnosis codes to CMS in connection with Medicare Advantage contracts H5427 and H5594 which resulted in inflated payment from CMS." Dkt. 42, Ex. C at 3. Freedom Health and Optimum HealthCare entered into an on-going Corporate Integrity Agreement and continued their operations as Medicare Advantage organizations under increased scrutiny; Defendant Pagidipati walked away and assumed complete control of Defendant Physician Partners, LLC, and all of its attendant corporations. Dkt. 42, Ex. D; Corporate Records of Provider Defendants.[4]

A year or so later, after Defendant Pagidipati took over management of the Provider Defendants, Dr. Zafirov began her tenure at the VIPcare clinic location in Venice, FL. Dkt. 1 at ¶ 6. In that role, she had access to her employer's electronic medical records systems which included the patients' coding and billing history. Dr. Zafirov began observing patient charts where Physician Partners submitted diagnoses inconsistent with the patient's condition or with ICD requirements and CMS rules, but Freedom paid the claims and submitted those codes to the United States. Dkt. 1 at ¶ 51. By way of example, Relator's complaint identifies a patient in connection with whom Freedom submitted claims to CMS for 2015-17 seeking risk-adjusted payment for leukemia, when

---

[4] Each entity is a registered corporation in the State of Florida so all of their corporate information is available on the State of Florida's "SunBiz" website which provides public access to business records filed with the Florida Secretary of States. The Court can take judicial notice of the public records filed with the State of Florida and available on www.sunbiz.com, the Florida Division of Corporations' searchable website, because such records are "not subject to reasonable dispute." *Horne v. Potter*, 392 F. App'x. 800, 802 (11th Cir. 2010) (holding that a court can judicial notice of documents without converting the motion to dismiss to a motion for summary judgment); *Memmo v. Direct Supply of Wis., Inc.*, 2018 U.S. Dist. LEXIS 232519, at *3 (M.D. Fla. July 6, 2018) (taking judicial notice of records on Florida's "Sunbiz" profile from the Florida Dept. of State's website).

he had not been properly diagnosed (Dkt. 1 at 73) and a patient coded as diagnosed with two malignancies, but of which the patient was unaware and had not been treated (Dkt. 1 at 74). In one of the most egregious examples, she personally observed electronic medical records which indicated payment by Freedom for anencephaly in an 83-year-old male – even though anencephaly is a rare and severe birth defect with a 100% fatality rate within the first year of life. Dkt. 1 at ¶ 72.

The records system also included consolidated provider data for VIPcare providers, which identified billing trends year-over-year. Dr. Zafirov personally observed data which showed that the MA Defendants accepted and paid Physician Partners/VIPcare for diagnosis codes at frequencies far in excess of their frequency in the Medicare population. Dkt. 1 at ¶ 77. For example, at least fifteen physicians billed "major depressive disorder" (a favored suggestion on 5 Star forms) at two to four times the rate it occurs in the Medicare patient population. *Id.* She observed the same or similar trends for other favored diagnoses as well. *Id*. at ¶ 78. It is plainly plausible that, when 30% of a doctor's patients were diagnosed with a condition which afflicts 7% of Medicare insureds, the Medicare Advantage companies were being reimbursed by the United States for the resulting risk-adjusted premium enhancements.

Dr. Zafirov also observed that the intense scrutiny and pressure to modify diagnosis codes over a physician's professional medical opinion was tied directly to her employers' relationship with the MA Defendants, such that the physicians' bonuses were derived from increasing the risk scores of Freedom patients (likely owing to the Freedom patient panel being far larger than the Optimum patient panel). Dkt. 1 at ¶ 86. Emily Gallman, the Senior Director of Healthcare Operations, advised Dr. Zafirov that referring patients to specialists for expensive treatments caused Freedom to pay out money on behalf of a patient, which in turn resulted in "less money to

pay Relator's bonus." *Id*. at ¶ 88. Relator learned that the bonuses could be met because the MA Defendants continued to accept falsely-adjusted risk scores because it enabled them to drive up the capitation rate, but there would be no related uptick in spending because patients were not actually treated for those bogus conditions. *Id.* at ¶ 89.

In short, Dr. Zafirov plausibly alleges, with sufficient specificity, that Freedom and Optimum did not execute their obligations to make "good faith efforts to certify the accuracy, completeness, and truthfulness of encounter data submitted." Medicare Program; Medicare+Choice Program, 65 Fed. Reg. 40,170 40,268 (June 29, 2000). The result is that they reap the rewards of the system Defendant Pagidipati put in place, now through the activities of the provider organizations rather than originating with the insurers. The interrelated nature of these companies made Freedom and Optimum enablers of fraud, rather than the protectors of the public fisc which Congress and the regulatory system require them to be, "fall[ing] prey to greed" while flying under the radar of their Corporate Integrity Agreement. *Silingo*, 904 F.3d at 672 (cautioning that, "human nature being what it is, Medicare Advantage organizations also have some incentive to improperly inflate their enrollees' capitation rates, if these organizations fall prey to greed.").

Despite Defendants' protestations, Dr. Zafirov's allegations are quite different from those in cases like *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006) and *Corsello v. Lincare, Inc.*, 428 F.3d 1008 (11th Cir. 2005). Rather, unlike the corporate-outsider issue that gave rise to *Clausen* and many of its progeny, Dr. Zafirov more closely resembles the relator contemplated in *Mastej* who could satisfy Rule 9(b) with "direct, first-hand knowledge of the defendants' submission of false clams gained through her employment" – even though she was not employed by Freedom or Optimum. *Mastej*, 591 Fed. Appx. at 704. Instead, she was employed by the provider organizations in contractual privity with them and whose electronic health records

systems kept track of whether the MA Defendants had accepted *and paid* the claims submitted with specific diagnostic codes, claims that the MA Defendants were obligated to submit to the United States for monthly recalculation of the capitation rate.

To build an iron wall between the MA Defendants and the PO Defendants – when the entities themselves did not do so – risks effectively insulating the entire Medicare Advantage system from False Claims Act cases driven by providers with actual knowledge of false diagnostic code submissions to an MAO and a "stated reason for [her] belief that claims requesting illegal payments" were submitted to the United States. *Clausen*, 290 F.3d at 1311. Demanding more at the pleading phase would be precisely the "ask[ing] for the impossible" that the *Clausen* dissent feared. *Id.* at 1317 (Barkett, J, dissenting).

### 3. Relator's complaint also supports the allegation that the insurers made false statements based on both express and implied false certifications.

The totality of Relator's complaint, evaluated within the confines of the regulatory framework which governs the Medicare Advantage program, supports the allegation that Freedom and Optimum also made "legally false" claims to the United States. A claim is "legally false" when "the supplier has falsely certified compliance with the applicable statutes and regulations, but nevertheless has submitted a [false] claim." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 116 F. Supp. 3d 1326, 1345 (S.D. Fla. July 13, 2015), *aff'd* 857 F.3d 1148 (11th Cir. 2017); *United States v. Public Warehousing Co.*, 2017 U.S. Dist. LEXIS 37643, at *22 (N.D. Ga. Mar. 16, 2017). Legally false claims, or false certifications, can be expressly false or impliedly false. Under both theories of liability, the certification must have been material to the Government's decision to pay. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989, 2001-04 (2016). An express false certification occurs when the claim bears the false certification on its face and when the certification is a part of the claims submission process. *Phalp*, 116 F. Supp. 3d at 1345.

As Medicare Advantage organizations, Freedom and Optimum are obligated to expressly certify the "accuracy, completeness, and truthfulness" of the risk-adjusting codes they submit based on "best knowledge, information, and belief." Dkt. 1 at ¶¶ 42-43; 65 Fed. Reg. 40,170, 40,268; 42 C.F.R. 422.504(l):

> As a condition for receiving a monthly payment under subpart G of this part, the MA organization agrees that [one of its enumerated officers] must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of relevant data that CMS requests."

The certification represents that the Medicare Advantage organizations employed certain "best practices" to ensure the accuracy of data received from third parties before making the final certifications of accuracy to the United States. 65 Fed. Reg. 40,170, 40,268. These obligations include adopting and implementing an effective compliance program which includes measures to "prevent, detect, and correct non-compliance with CMS's program requirements." 42 C.F.R. 422.503(b)(4)(vi).

Relator's complaint alleges that all claims and certifications made to the United States were false, just as the certifications made by the provider defendants to the insurers were false. Dkt. 1 at ¶¶ 47-49. The MA Defendants did not reject or correct codes submitted by the PO Defendants which were inconsistent with the patients' conditions, turned a blind eye to coding rates which far exceeded the average prevalence rates, failed to provide adequate compliance training, and contrary to their obligations, supported the PO Defendants in pressuring physicians and patients to engage in medically unnecessary code-capturing visits. Dkt. 1 at ¶¶ 47, 51-53. By failing to engage in any of the best practices demanded of them and willfully engaging in conduct intended to increase the risk adjustment scores of enrollees receiving care by Physician Partners or a related entity, Freedom and Optimum's monthly certifications "(based on best knowledge, information,

and belief) [of the] accuracy, completeness, and truthfulness of relevant data that CMS requests" are express false certifications and all attendant claims were false claims. Dkt. 1 at ¶¶ 42-43.

**III.      Relator's reverse False Claims Act allegations naturally follow the fraudulent submissions and fraudulent certifications.**

A "reverse false claim" derives when a defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 USC 3729(a)(1)(G).[5] As here, a relator successfully pleads a "reverse false claim" when it alleges: "(1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation." *Matheny*, 671 F.3d at 1222.

Each of these elements has already been addressed herein and is supported by Relator's complaint. When the MA Defendants continuously submitted knowingly false claims accompanied by knowingly false certifications of compliance, the result was a false record that concealed their obligation to repay the enhanced capitation rate that was not based on their enrollees' *actual* medial needs. This is all that is needed at the motion to dismiss phase to establish a reverse false claim in the Medicare Advantage context. "For more than a decade, CMS 'has required repayment to CMS of any costs that were based on unsupported diagnosis codes.'" *Ormsby*, 444 F. Supp. 3d. at 1072, *quoting UnitedHealthcare Ins. Co. v. Azar*, 330 F. Supp. 3d 173, 180 (D.D.C. 2018) ("No court [ ] has held that an MA Participant can keep and not report or return payments based on unsupported codes.").

---

[5] Relator acknowledges scrivener's error in captioning the Counts at the conclusion of her case. Relator will submit an amended complaint correcting those errors if the Court so desires, but respectfully submits that the language in the Counts remedies the typographical errors in the titles.

IV.    **Relator's complaint is not barred by any statutory requirements of the False Claims Act.**

A.    **The public disclosure bar is not implicated because the prior disclosures do not relate to the allegations in Dr. Zafirov's complaint, and she is an original source that materially added information to the disclosures related to the *Sewell* case.**

The MA Defendants assert disclosures of a prior lawsuit and settlement – or media related to that settlement – protects them from facing allegations for unrelated fraud perpetrated on the United States for years after the period of covered conduct. This incredulous position is neither supported by law nor logic. "The public disclosure bar is intended to encourage suits by whistle-blowers with genuinely valuable information, while discouraging litigation by plaintiffs who have no significant information of their own to contribute." *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 570 (9th Cir. 2016), citing *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294-95 (2010). It is not intended to immunize defendants from facing independent allegations from a relator with first-hand knowledge and experiences alleging a distinct fraud scheme – as the MA Defendants encourage here.

The Eleventh Circuit has established a three-part inquiry to ascertain if the so-called "public disclosure bar" set forth in 31 U.S.C. 3730(e)(4) precludes a relator's ability to bring a False Claims Act case: "(1) 'have the allegations made by the plaintiff been publicly disclosed;' (2) if so, are the allegations in the complaint substantially the same as the allegations or transactions contained in public disclosures, and (3) 'if yes, is the plaintiff an original source of that information.'" *United States ex rel. Lorona v. Infilaw Corp.*, 2019 U.S. Dist. LEXIS 135300, *36-38 (M.D. Fla. Aug. 12, 2019), *quoting Osheroff*, 776 F.3d at 812.  Here, the MA Defendants arguments fail on the first two elements, and Relator plainly satisfies the third.

- 17 -

**1.   There has been no public disclosure of the allegations made by Dr. Zafirov.**

The MA Defendants identify the public announcements of the *Sewell* action case –
including the case itself, a Department of Justice Press Release, and newspaper articles – as
qualifying disclosures, which they undoubtedly would be *if* they made *any* reference to Dr.
Zafirov's allegations of a scheme perpetrated by Defendant Pagidipati and the Provider
Organizations and implemented in concert with the knowing participation of Freedom and
Optimum. The disclosures do, unsurprisingly, reveal the existence of the *Sewell* case, but it is clear
on their face that they do not present any of the essential elements of the fraud scheme described
by Dr. Zafirov. But the Eleventh Circuit's cases require that the disclosure actually "allege the
defendant engaged in the type of wrongdoing alleged in the plaintiff's complaint." *United States
ex rel. Compton v. Circle B Enters.*, 2010 U.S. Dist. LEXIS 22749, at \*13-15 (M.D. Ga. Mar. 11,
2010), *quoting Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 567 (11th Cir.
1994).

Here, the MA Defendants do not assert that the disclosures they have identified do that.
Disclosures of other, earlier allegations of fraud by some of the same entities do not bar disclosure
of other, or later, frauds; it merely demonstrates potential proclivity. The public disclosure bar is
not implicated if the disclosures are not of the fraud alleged in *this* complaint. *United States ex rel
Baklid-Kunz v. Halifax Hosp. Med Ctr.*, 2011 U.S. Dist. LEXIS 59949, at \*18-20 (M.D. Fla. June
6, 2011). Where the first element of the test is not satisfied, no further inquiry is required at the
public disclosure bar is not triggered. *Compton*, 2010 U.S. Dist. LEXIS 22749, at \*17.
Accordingly, the public disclosure inquiry stops here.

     **2.**   **The disclosures of prior fraudulent conduct by the MA Defendants in the *Sewell* matter is not substantially similar to the allegations in Relator's complaint.**

Even if the Court finds that the *Sewell* complaint and the attendant media disclosures are public disclosures of the allegations Dr. Zarifov's complaint, the public disclosure inquiry fails. The second element of the public disclosure analysis "queries whether there exists 'significant overlap' between the [*qui tam*] allegations and the putative, publicly disclosed information." *United States ex rel. Chiba v. Guntersville Breathables Inc.*, 421 F. Supp. 3d 1241, 1260, (N.D. Ala. 2019), quoting *Osheroff*, 776 F.3d at 814. This tests for "substantial sameness" by looking to factors such as "whether the complaint 1) presents genuinely new and material information beyond what has been publicly disclosed; 2) alleges a different kind of deceit; 3) requires independent investigation and analysis to reveal any fraudulent behavior; 4) involves an entirely different time period than the publicly disclosed allegations; and 5) supplies vital facts not in the public domain." *United States ex rel. Gilbert v. Va. Coll., LLC*, 305 F.Supp.3d 1315, 1321 (N.D. Ala. 2018), *citing Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718-19 (7th Cir. 2017) (applying the "substantial sameness" analysis).

Here, the MA Defendants only argument that this element is satisfied because Relator references the existence of the *Sewell* action and recycles some applicable language from the *Sewell* complaint that is consistent with Dr. Zafirov's personal observations. Dkt. 41 at 22; *see also* Dkt. 1 at ¶ 50 ("In reviewing the patient charts…Relator found that physicians routinely coded, and Freedom accepted…."). Defendants offer no legal support for their assertion that either of these foreclose *any*, let alone all, of the *Bellevue* elements. These clauses alone *do not* cause "significant overlap" for purposes of invoking the public disclosure bar. *See United States ex rel. Herman v. Coloplast Corp.*, 327 F. Supp. 3d 358, 362 (D. Mass. Aug. 17, 2018) (evaluating public

disclosure and government action cases by the same standards, and finding that a relator's case is not barred even where the relator's complaint included identical language from an earlier-filed complaint).

Further, under the *Bellevue* factors, there is no "substantial sameness" between Dr. Zafirov's complaint and the disclosures related to the *Sewell* case. Dr. Zafirov's case presents copious new information that was not in the *Sewell* case or any related articles – that Freedom and Optimum participated in a different scheme in coordination with different defendants over a different time period that would, and did, require a wholly different investigation to evaluate. *Chiba*, 421 F. Supp. 3d at 1261. Accordingly, the cases are not "substantially the same" as any disclosures made in or related to the *Sewell* case.

### 3.  Relator is a consummate original source.

Even if the *Sewell* case and articles about it were found to have publicly disclosed Dr. Zafirov's allegations, her claims would not be barred. She is precisely the sort of relator who qualifies as an original source under 31 U.S.C. 3730(e)(4)(B)(ii). She voluntarily provided her information to the Government before filing this case, and she has extensive first-hand knowledge that is "independent of and materially adds to the publicly disclosed allegations or transactions." Nothing in any prior disclosure indicates that, after leaving Freedom, Defendant Pagidipati implemented a fraud scheme utilizing Physician Partners, FMA, PPSS, Sun Labs USA and Anion Technology to employ and exert control over providers and coders to submit false codes which would then be submitted to the United States as increased capitation rates by utilizing the system he put in place at Freedom and Optimum. *United States ex rel. Patel v. GE Healthcare, Inc.*, 2017 U.S. Dist. LEXIS 159562, *11-12 (M.D. Fla. Sep. 28, 2017) (allegations of continuing fraud after a settlement "materially add" to public disclosures, as do allegations of wholly separate schemes

by the same defendants). Even if the Government already had a general idea that Freedom, Optimum and Defendant Pagidipati were bad actors, they did not and could not have known the fraud that Dr. Zafirov has alleged. *United States ex rel. McFarland v. Fla. Pharm. Sols.*, 358 F. Supp. 3d 1316, 1323 (M.D. Fla. July 24, 2017) (Merryday, J.). She is, thus, an original source and the public disclosure bar does not restrict any of Relator's claims against the Provider Defendants.

### B.  Relator will not pursue pre-2014 claims against the MA Defendants.

The MA Defendants are incorrect as to their assertion that a six-year statute of limitations limits Relator's claims to those arising after May 20, 2013. The United States has squarely held that the ten-year statute of limitations applies in a False Claims Act case regardless of whether the Government intervenes in the matter or not. *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019), *aff'g United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1083 (11th Cir. 2018). Accordingly, her pre-2014 claims against the MA Defendants are not time-barred. Further, because the false claims in this case are distinct in nature and time from those alleged and resolved in *Sewell*, Relator maintains that the allegations she raises are not precluded by the dictates of *res judicata* and nor would Relator seek recovery for claims that have already been paid.

However, to narrow the issues before the Court, Relator will not pursue pre-2014 claims against the MA Defendants.

### V.  Should the Court believe the complaint fails to satisfy Rule 9(b) or otherwise should be dismissed, such dismissal should be without prejudice.

Relator believes that her complaint is sufficiently specific as pled, and that the defendants' other arguments are unavailing. However, should the Court conclude that dismissal is appropriate, Relator asks that it be without prejudice and that she be given 45 days from the date of the Court's order within which to file an amended complaint addressing any concerns identified by the Court.

*Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) ("where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice") (internal quotation omitted). Relator respectfully urges that this is particularly appropriate here, where Relator continued to work for the Provider Defendant, treating patients and reviewing her patients' 5 Star Checklists, medical records, and billing records for many months after the complaint was filed, and so would be entitled to seek leave to file a supplemental complaint pursuant to Rule 15(d), Fed. R. Civ. P., which provides that

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense.

## VI.     Conclusion

Had the MA Defendants acted as the law requires, the United States would not have paid the MA Defendants based false codes, diagnoses, and risk adjustments at issue. The MA Defendants' false claims were submitted in line with the false records and statement of the Provider Defendants, and when the MA Defendants had the opportunity and obligation to protect the Government's funds, they failed to do so. As described by Relator in detail, the MA Defendants did not act as the gate-keepers they are supposed to be; rather they acted to bolster their own and the Provider Defendants' profits at the expense of the United States. For these reasons, the motions before the Court should be denied.

Respectfully submitted this 20th day of October, 2020,

  /s/ Jillian L. Estes
Frederick M. Morgan, Jr. (Ohio Bar No. 0027687)
Jillian L. Estes (Fla. Bar No. 0055774)

- 22 -

Jonathan Lischak (Ohio Bar No. 97669)
MORGAN VERKAMP LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Phone: (513) 651-4400
Fax: (513) 651-4405
rmorgan@morganverkamp.com
jillian.estes@morganverkamp.com
jonathan.lischak@morganverkamp.com

Kenneth J. Nolan (Fla. Bar No. 603406)
Marcella Auerbach (Fla. Bar No. 249335)
NOLAN, AUERBACH & WHITE, LLP
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL 33301
Phone: (954) 779-3943
Fax: (954) 779-3937
ken@whistleblowerfirm.com
marcellla@whistleblowerfirm.com

***Counsel for Relator Dr. Clarissa Zafirov***

## CERTIFICATE OF SERVICE

I, Jillian Estes, hereby certify that the foregoing Notice was served on October 20, 2020, to all parties of record via the CM/ECF electronic filing system.

 _/s/ Jillian L. Estes_____
Jillian L. Estes (Fla. Bar No. 0055774)