# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA
*ex rel.* CLARISSA ZAFIROV,

      Plaintiff,

v.                                       Case No. 8:19-cv-1236-KKM-SPF

FLORIDA MEDICAL ASSOCIATES
LLC, et al.,

      Defendants.

_____

## <u>ORDER</u>

    In this unsealed False Claims Act action, the defendants move to dismiss Relator Clarissa Zafirov's complaint, (Docs. 41, 50, 51), which Zafirov opposes, (Docs. 56, 57, 59). The motions to dismiss are due to be granted. Zafirov's complaint fails to adequately allege that the defendants submitted false claims to the government, much less who submitted the claims, when they were submitted, and how those claims were submitted. *See* Fed. R. Civ. Proc. 9(b). Further, the public-disclosure bar prohibits Zafirov from bringing her claims as alleged because they are substantially the same as those in a previous qui tam case and she fails to adequately allege that she qualifies as an original source. As a result, the defendants' motions to dismiss will be granted without prejudice with leave to file an amended complaint to remedy the deficiencies identified below.[1]

_____

[1] The defendants raise a host of other potentially meritorious faults with Zafirov's complaint, including the

## I. BACKGROUND[2]

### A. Medicare Advantage Program

The United States operates and administers Medicare, a health insurance program for disabled individuals and individuals 65 years old or older. (Doc. 1 ¶¶ 5, 27.) The operating division for Medicare is the Centers for Medicare and Medicaid Services (CMS). (*Id.* ¶ 5.) Medicare consists of four distinct programs, Parts A through D. (*Id.* ¶ 28.) Relevant here is Medicare's Part C Program, called the Medicare Advantage Program. (*Id.*)

Under Medicare Advantage, the beneficiary enrolls in a plan that is typically managed by a private insurance company ("MA Organization"). (*Id.*) The MA Organization, in turn, contracts with a provider organization, such as a hospital network or a group of physicians, to furnish healthcare services to the beneficiary. (*Id.*) Unlike Medicare Parts A and B, where CMS reimburses healthcare providers for services provided via submission of claims (often known as a fee-for-service system), under Medicare Advantage, the Government pays each MA Organization a fixed, capitated amount each month for the provision of covered items and services for each plan beneficiary. (*Id.* ¶¶ 28,

---

failure to allege an "obligation" for purposes of a reverse False Claims Act, impermissible grouping of defendants, the first-to-file bar, and the government-action bar. Because Zafirov's complaint must be repleaded for the primary fault of failure to allege the requisite particularity required by Rule 9(b) for False Claims Act violations, the Court does not analyze all the remaining grounds as it is yet to be seen whether Zafirov can sufficiently replead the missing facts. But Zafirov should be mindful of these other grounds if she elects to file an amended complaint.

[2] The Court describes the facts, as it must, taking the allegations in Zafirov's complaint as true and construing them in the light most favorable to her. *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

30.) This payment does not depend on the amount of healthcare services provided to each enrollee. (*Id.*) The MA Organizations, in turn, enter into financial agreements to pay the provider organizations. (*Id.* ¶ 35.) Importantly, the provider organizations do not directly submit claims for payment to CMS. (*Id.*)

To determine the fixed, capitated amount of payment for each plan beneficiary, CMS uses a "bidding process[.]" (*Id.* ¶ 30.) In that process, each Medicare Advantage Plan, through a MA Organization, submits a bid amount, "which is then compared to an administratively set benchmark set by CMS based on a statutory formula." (*Id.*) The government adjusts the capitated payments for each beneficiary based on his or her demographic factors (age, gender, etc.) and his or her health conditions or status. (*Id.*) This adjustment by the government is called a "risk adjustment," "risk score," or "risk-adjustment factor," and it acts as a multiplier to the MA Organization's bid for covered services. (*Id.*) Generally, the higher the "risk score" for a plan beneficiary, the more money the MA Organizations receive for that beneficiary each month. (*Id.*)

To determine the risk score for a plan beneficiary, CMS uses a risk-adjustment model that takes into account certain patient demographic factors, as well as medical conditions and previous diagnoses. (*Id.* ¶ 33.) To ensure the accuracy of any diagnosis, such diagnosis must follow an in-person visit between the patient and a physician during the relevant year and the diagnosis must be properly documented in the patient's medical

record when the physician saw the patient. (*Id.* ¶ 31.) To ensure consistency, CMS uses the International Classification of Diseases (ICD) codes to diagnose and identify health conditions. (*Id.*)

According to Zafirov, the typical process for submitting a claim to CMS is as follows: Provider organizations treat plan beneficiaries and submit patient data, including diagnosis codes, to MA Organizations. (*Id.* ¶ 32.) The MA Organizations, in turn, review and filter the data to ensure that it is accurate and complies with CMS requirements, and then submit the data and diagnosis codes to CMS through the Risk-Adjustment Processing System and the Encounter Data System. (*Id.* ¶¶ 32, 37, 40.) CMS uses the diagnosis codes to calculate a risk score for each beneficiary. (*Id.* ¶ 32.) CMS then uses that calculation to adjust the capitated payments to the MA organizations for each plan member. (*Id.*) Each Medicare Advantage patient's risk score is calculated annually. (*Id.* ¶ 34.)

MA Organizations often pay provider organizations through a capitated or gainsharing arrangement. (*Id.* ¶ 35.) Under a capitated arrangement, an MA Organization agrees to pay part of the capitation payment it receives from CMS to the provider organization, less an administrative percentage fee. (*Id.*) In a gainsharing arrangement, a provider organization receives incentive payments based on total revenue an MA Organization receives from CMS for patients to whom the provider organizations provided

healthcare service. (*Id.*) According to Zafirov, under this system, provider organizations are incentivized to increase the number of risk-adjusting diagnoses they report to MA Organizations and to report diagnosis codes "for more severe risk-adjusting medical conditions[,]" so that the beneficiaries that they treat will receive higher risk scores. (*Id.*)

## B. The Parties

Zafirov is a board-certified family medicine physician licensed to practice in Florida. (*Id.* ¶ 6.) She previously worked for Florida Medical Associates, one of the named defendants in this case, beginning in 2018. (*Id.*)

Zafirov divides the defendants into three categories: Medicare Advantage Defendants (MA Defendants), Provider Organization Defendants (Provider Defendants); and Siddartha Pagidipati individually. (*Id.* ¶¶ 7–15.)[3] The MA Defendants are Freedom Health (a health maintenance organization (HMO)), Optimum Healthcare (another HMO), and Anthem. (*Id.* ¶ 8.)[4] The Provider Defendants are Florida Medical Associates, Physician Partners, Physician Partners Specialty Services, Sun Labs USA, and Anion. (*Id.* ¶¶ 7, 15.)

---

[3] The Defendants disagree with Zafirov's grouping them together. (*See* Doc. 41 at 1 n.1.) But for the sake of consistency, they accept Zafirov's groupings in their briefing. (*See id.*) The Court does so too for purposes of clarity. But Zafirov should not interpret this format as an acceptance of her grouping for pleading purposes, especially in the light of the discussion below about shotgun pleading.

[4] Zafirov notified the government that she intends to drop her claims against Anthem. (Doc. 57 at 1 n.1.) Zafirov did not contest Anthem's arguments for why the case should be dismissed, at least as to Anthem. As a result, those arguments are considered conceded. If Zafirov chooses to file an amended complaint, she should omit any claims against Anthem.

Pagidipati is the former Chief Operating Office of Freedom and Optimum. (*Id.* ¶ 15.) Although he resigned from Freedom and Optimum, Zafirov claims that Pagidipati continued to direct and carry out violations under the False Claims Act through the MA Defendants and Provider Defendants. (*Id.*) She alleges that he "not only owns but also controls the policies, procedures and operations of the P[rovider] Defendants." (*Id.*)

The MA Defendants have common ownership and control. (*Id.* ¶ 11.) America's 1st Choice Holdings of Florida owned Freedom and Optimum through February 2017; afterward, Anthem owned Freedom and Optimum. (*Id.*) Freedom and Optimum, Zafirov alleges, "share the same management and staff [and] employees and use the same offices, databases, network systems, storage facilities, and coders" and "the managers and employees conduct the business of both plans jointly and concurrently[.]" (*Id.*)

### C. Zafirov's Allegations

Zafirov brings three counts for violations of the False Claims Act, the first two against all the defendants and the third against only the MA Defendants. (Doc. 1 at 42–43.) But because Zafirov realleges all the factual allegations into each count, it is difficult if not impossible to distinguish which allegations are intended to support which count, despite alleging the same basic scheme to defraud throughout her complaint. (*See id.* ¶¶ 97, 101, 105.)

Zafirov alleges that the Provider Defendants engaged in fraudulent activity to

increase their gainsharing payments from the MA Defendants. (*Id.* ¶ 49.) Those practices included causing physicians to bring in patients for medically unnecessary office visits so the physicians could capture diagnosis codes; submitting diagnosis codes to increase CMS payments even if the patient did not have the condition diagnosed or was not treated in-person during the year at issue; using coders to review medical records for "missing" diagnosis codes without regard to CMS and ICD coding standards; and pressuring physicians to provide false diagnoses through the use of required checklists, known as the "5 Star Check List." (*Id.*)

Zafirov alleges that the MA Defendants, in turn, submitted false and incorrect diagnosis codes to CMS to increase the capitated payments. Zafirov alleges that the MA Defendants submitted three types of incorrect codes. First, she alleges that Freedom submitted codes from impermissible sources (i.e., outside of in-person encounters, as required by CMS regulations). (*Id.* ¶ 51.) Second, she alleges that Freedom and other defendants "upcoded" by replacing codes chosen by doctors with "higher-value" codes that were more likely to increase a beneficiary's risk score.  (*Id.* ¶ 52.) Third, she alleges that the MA Defendants submitted "entirely inapplicable conditions" that were not based on a beneficiary's medical conditions, but instead, were based on recommendations contained in the "5 Star Check List." (*Id.* ¶ 53.) Zafirov claims that these actions, as well as others described in her complaint, violate the False Claims Act.

7

### E. Procedural History

In May 2019, Zafirov filed this action against the defendants. (Doc. 1.) The government declined to intervene, and the Court unsealed the case in June 2020. (Docs. 14, 17.) The MA Defendants, the Provider Defendants, and Pagidipati each move to dismiss Zafirov's complaint. (Docs. 41, 50, 51.) Consistent with the Court's orders directing them to do so, the Provider Defendants and MA Defendants replied to Zafirov's opposition to their motions to dismiss. (Docs. 74, 75.)

## II. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Additionally, Federal Rule of Civil Procedure 9(b) requires a party "alleging fraud . . . [to] state with particularity the circumstances constituting fraud[.]" To satisfy this heightened-pleading requirement in a *qui tam* action, "a realtor must allege the actual submission of a false claim because the False Claims Act does not create liability merely for a health care provider's disregard of government regulations or improper internal policies unless the provider asks the government to pay amounts it does not owe." *Carrell v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275

(11th Cir. 2018) (cleaned up). When reviewing a motion to dismiss, courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).[5]

## III. ANALYSIS

The False Claims Act allows private persons to bring civil actions on the United States' behalf for fraudulent claims. *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1307 (11th Cir. 2002). Most relevant to Zafirov's allegations here, the False Claims Act prohibits a person from (1) knowingly presenting a false or fraudulent claim to the government for payment; (2) knowingly making a false record or statement material to a false or fraudulent claim; and (3) knowingly making "a false record or statement material to an obligation to pay or transmit money or property to the [g]overnment" or knowingly concealing or improperly avoiding or decreasing "an obligation to pay or transmit money or property to the [g]overnment." 31 U.S.C. § 3729(a)(1)(A), (B), (G).

### A. Zafirov's Claims Fail for Lack of Particularity

The defendants argue that Zafirov's allegations fail to satisfy Rule 9(b)'s particularity

---

[5] The Court granted the MA Defendants' unopposed motion to take judicial notice of the following items: the second amended complaint in *Sewell*; the Notice of Settlement in *Sewell*; the settlement agreement in *Sewell*; the *Sewell* Corporate Integrity Agreement (CIA); the Department of Justice press release about the settlement in *Sewell*; and various publicly available news articles discussing the settlement in *Sewell*. (*See* Doc. 79.); *see also United States ex rel. McFarland v. Fla. Pharmacy Sols.*, 358 F. Supp. 3d 1316, 1323 n.5 (M.D. Fla. 2017) (Merryday, J.) (taking judicial notice of documents to decide whether public-disclosure bar applies).

requirement because she does not identify any claim that either the MA Defendants, the Provider Defendants, or Pagidipati submitted to the federal government. The Court agrees.

Even though Zafirov alleges that the MA Defendants submitted "hundreds of thousands" of false diagnosis codes to CMS, (Doc. 1 ¶ 48), she fails to provide the dates these codes were submitted, the name of the individual or individuals that submitted the codes, how these codes impacted the amount of money that the defendants received from the federal government (materiality), or copies of a single bill or payment. In short, she fails to provide any "indicia of reliability . . . to support the allegation of *an actual false claim* for payment being made to the [g]overnment." *Clausen*, 290 F.3d at 1311.

Viewing the complaint in the light most favorable to Zafirov, she provides a few examples in her 44-page complaint, none of which are sufficient to satisfy Rule 9(b). In the first example, she alleges that, after seeing a patient who she believed did not exhibit a pre-existing condition and indicating as much on the patient's chart, nevertheless Anion "billed the code under [her] name, and the code is identified in the patient's record as having been paid." (Doc. 1 ¶ 70.) The second example is even more tepid: Zafirov examined a patient with a chart indicating previously diagnosed conditions which she disagreed were manifested in the patient. (*Id.* ¶ 71.) But she does not allege that any Provider Defendant submitted any particular code to an MA Defendant or that an MA Defendant submitted

a claim to CMS. The next two examples are likewise lacking in specificity. Zafirov saw a patient but did not believe that the patient had the conditions earlier noted in his chart; nonetheless, Freedom paid the claim and "upon information and belief" submitted a false diagnosis to CMS. (Doc. 1 ¶ 72.) And again in the next example, she alleges the same sort of reliance "upon information and belief" that Freedom submitted claims to CMS for a patient without a formal diagnosis of leukemia. (Doc. 1 ¶ 73.) In the final example, although she omits the phrase "upon information and belief," she fails to provide any details of the alleged submission, relying instead on a bare assertion that a false claim was, in fact, submitted by Freedom to CMS. (Doc. 1 ¶ 74). She did not provide specific allegations regarding any other MA Defendant, nor does she allege that the Provider Defendants or Pagidipati submitted any false claims directly to the government. These allegations plainly fail to "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions," as required under Eleventh Circuit precedent for False Claims Act violations. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

While seemingly admitting that her complaint lacks important details regarding the who, what, where, when, and how of a fraudulent submission, Zafirov nonetheless argues that her allegations have sufficient "indicia of reliability" because: (1) she personally reviewed medical records showing that Freedom paid the Provider Defendants based on false diagnoses; and (2) it is unlikely that Freedom would have paid those claims if it was

not being reimbursed by the federal government due to Freedom's interest in its own financial success. But even these allegations fail to allege "*an actual false claim* for payment[.]" *Clausen*, 290 F.3d at 1311. A plaintiff may not point to "improper practices of the defendant[s] to support the inference that fraudulent claims were submitted because submission cannot be inferred from the circumstances." *Carrel*, 898 F.3d at 1275 (cleaned up).

For example, in *Carrel*, the Eleventh Circuit held that a "mosaic of circumstances" that were "consistent with the[] accusations" that false claims were submitted was insufficient to allege fraud with particularity. *Id.* at 1277. In that case, the plaintiffs alleged that the defendants frequently provided prohibited incentives to employees and patients and frequently requested reimbursement from the federal government, such that there was a "mathematical probability" that the defendants "must have submitted a false claim at some point." *Id.* Yet, even there, the Eleventh Circuit rejected the claim, noting that "[s]peculation that false claims must have been submitted is insufficient" to satisfy Rule 9(b). *Id.* (cleaned up). And in *United States ex rel. Atkins v. McInteer*, the Eleventh Circuit held that the claims of an insider doctor responsible for providing medical care were insufficient to show that the defendants "*actually submitted* reimbursement claims," where the doctor was "not a billing and coding administrator responsible for filing and submitting the . . . claims" and relied instead on "rumors from staff and observ[ations of] records of

what he believed to be the shoddy medical and business practices of two" other doctors. 470 F.3d 1350, 1359 (11th Cir. 2006).

Here, Zafirov does not allege specifics demonstrating that any of the defendants actually submitted a false claim to the government. At most, her allegations regarding the specific conduct of the various defendants are *consistent with* the allegation that Defendants submitted a false claim to the government. But Rule 9(b) requires more than inferences, consistencies, and suppositions. It is not enough for a realtor to simply allege that fraudulent claims "must have been submitted, were likely submitted[,] or should have been submitted[.]" *Clausen*, 290 F.3d at 1311.

To be sure, the Eleventh Circuit has noted that courts should be "more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012). While true that Zafirov alleges personal knowledge of the various improper acts by the Provider Defendants in coding for patients, she does not allege personal knowledge of any of the MA Defendants screening and filtering bills from the Provider Defendants or personal knowledge of the MA Defendants' submissions to CMS. And it seems awfully difficult for her to do so successfully in an amended complaint as an outsider of those entities. But these are the very kind of "specific details" about false claims that establish

"'the indicia of reliability' necessary under Rule 9(b)[.]" *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010).

Here, Zafirov does not provide specific details of any false claims actually submitted by the MA Defendants to the Government. And she fails to allege that her actual employer or any of the other Provider Defendants submitted any false claims to the federal government themselves. Finally, she fails to allege any personal knowledge of the billing practices of the MA Defendants—the defendants responsible for submitting claims to the federal government under the Medicare Advantage program. Zafirov's personal knowledge of the practices of the Provider Defendants is no substitute for necessary details regarding claims submitted to the federal government.

Zafirov also claims that the Defendants committed a "Reverse False Claims Act" violation. This claim, too, fails for lack of particularity. A reverse false claim results from the defendant avoiding payment due to the government. *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d at 1217, 1222 (11th Cir. 2012). Specifically, the False Claims Act imposes liability on any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the [g]overnment[.]" 31 U.S.C. § 3729(a)(1)(G). Zafirov explained her theory as follows: "When the MA Defendants continuously submitted knowingly false claims accompanied by knowingly false certifications of compliance, the result was a false record that concealed their

obligation to repay the enhanced capitation rate that was not based on their enrollees' *actual* medial [sic] needs." (Doc. 57 at 16.) But as explained above, Zafirov fails to allege with particularity *any* false statement or record actually submitted to the federal government. Given that Zafirov's Reverse False Claims Act claim rests on the defendants' submission of false records to the federal government, and given that she fails to allege with particularity any false claim or record actually submitted to the federal government, her Reverse False Claims Act claim necessarily fails.

Accordingly, the Court finds that Zafirov's complaint fails to allege with specificity that any of the defendants submitted a false claim to the federal government.[6]

## B. Zafirov's Claims Are Barred under the Public Disclosure Bar

Zafirov's claims against the MA Defendants and Pagidipati must also be dismissed for the independent reason that her claims are barred under the public disclosure bar. The False Claims Act requires a court to dismiss an action or claim if substantially the same allegations were publicly disclosed prior to the initiation of the qui tam action. *See* § 3730(e)(4)(A). An exception exists if the relator is an original source of the information. *See id.* Courts typically employ a three-part inquiry to decide whether the public-disclosure

---

[6] Zafirov's claims against Pagidipati, the sole individual defendant in the case, also fail because she has not alleged with particularity any instances where Pagidipati personally submitted a false claim or caused a false claim to be submitted to the government, as required by False Claims Act. *See United States v. Pub. Warehousing Co. KSC*, 242 F. Supp. 1351, 1360–61 (N.D. Ga. 2017) (dismissing claims against an individual identified as the "owner/director" of an entity whose personal involvement in any False Claims Act violations was not alleged). Alleging that Pagidipati held a position of authority over the Provider Defendants is insufficient.

bar applies: (1) before the filing of the qui tam complaint, had there been any public disclosures alleging fraud or from which fraud might be inferred? (2) If so, are the allegations in the complaint substantially the same as allegations or transactions described in the public disclosure? (3) If yes, is the complaint nonetheless allowed because the relator is an original source of the information? *See United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 (11th Cir. 2015).

The first prong looks at whether information has been disclosed in a federal court proceeding; "in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation"; or the news media. § 3730(e)(4)(A); *Osheroff*, 776 F.3d at 812. The "sources of public disclosure in § 3730(e)(4)(A) . . . suggest that the public disclosure bar provides 'a broa[d] sweep.'" *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408 (2011) (quotation omitted). Further, "news media" includes newspaper advertisements and publicly available websites. *Osheroff*, 776 F.3d at 813.

Here, the defendants argue that Zafirov's claims are based on a publicly disclosed False Claims Act case previously settled: the *Sewell* litigation. Specifically, the defendants cite as public disclosures the settlement agreement in *Sewell*, the Corporate Integrity Agreement (CIA) in that case, a Department of Justice press release about that case, and various news articles discussing the fraud in that case. (*See* Doc. 74 at 5.)

The defendants are correct—and Zafirov does not dispute—that the *Sewell*

settlement agreement, the CIA with the Office of the Inspector General of the Department of Health and Human Services (which was publicly available on the Inspector General's website), the Department of Justice press release, and various new articles discussing the alleged FCA violations by defendants Freedom Health, Optimum, and Pagidipati were public documents under the statute. (Doc. 42, Exs. A–H.)  Instead, Zafirov focuses on the other two prongs: whether the allegations in the publicly disclosed documents are substantially similar to her complaint and whether she is an original source of information.

The second step of the public-disclosure analysis asks whether the complaint's allegations are "substantially the same" as those publicly disclosed. *Osheroff*, 776 F.3d at 814. This prong is satisfied if the plaintiff bases her claim "*in any part* on . . . publicly disclosed information[.]" *Id.* (quoting *Battle v. Bd. of Regents*, 468 F.3d 755, 762 (11th Cir. 2006)). This prong does not require a "complete identity" of allegations; rather, "[t]he key inquiry is whether the disclosures could have put the government on notice of the fraud alleged in the qui tam complaint." *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 523 (6th Cir. 2020) (cleaned up). As a result, the Eleventh Circuit has described this test as a "quick trigger" to get to the more exacting original-source inquiry. *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 568 n.10 (11th Cir. 1994).

Here, Zafirov's claims against Freedom, Optimum, and Pagidipati are substantially the same as those disclosed as part of the *Sewell* case. The *Sewell* case stems from a 2009

False Claims Act suit initiated by David Sewell against several defendants, including Freedom Health, Optimum, and Pagidipati. *See United States ex rel. Sewell v. Freedom Health Inc.,* No. 8:09-cv-1625-MSS-AEP (M.D. Fla. Aug. 17, 2009). Sewell alleged that Freedom Health, Optimum, and Pagidipati fraudulently submitted improper diagnosis codes to CMS to increase their risk-adjustment payments, failed in their obligations to CMS to correct erroneously submitted diagnosis codes, and used coding auditors to upcode diagnoses so that risk-adjustment payments would increase. (Doc. 42-1 ¶¶108–85.) These allegations are nearly identical to those made by Zafirov. (*See* Doc. 1 ¶¶47–49, 52, 92–93) (alleging that Freedom, Optimum, and Pagidipati submitted "phony diagnoses" in order to "increase risk scores," knowingly failed to correct "erroneous risk-adjusting diagnoses codes" submitted to CMS or to "return . . . any overpayments," and used a "team of coders" to suggest "phone additional diagnosis codes to physicians" and "upcode[] certain medical conditions"). Indeed, in numerous paragraphs throughout her complaint, Zafirov copied verbatim allegations directly from the *Sewell* compliant. (*See* Doc. 50 at 20–21; Doc. 75 at 4.) The substantial similarity between Zafirov's allegations against Freedom Health, Optimum, and Pagidipati and the documents disclosed as part of the *Sewell* case is sufficient to satisfy the second prong's "quick trigger."[7]

---

[7] Zafirov argues that her allegations against the Provider Defendants are not barred because none of those entities are named or specifically identified in the prior public disclosure. (Doc. 56 at 22 (citing *Cooper,* 19 F.3d at 566.) The Court is inclined to agree. Nonetheless, given the Court's dismissal of the allegations against the Provider Defendants on other grounds, the Court need not resolve this question at this time.

Under the third step of the public-disclosure analysis, the court may nonetheless allow a complaint that is substantially similar to a prior public disclosure to proceed if the relator is an "original source" of the allegations. *Osheroff*, 776 F.3d at 814–15. Under the False Claims Act, an "original source" means a person who: (1) prior to the relevant public disclosure, voluntarily disclosed to the government the information on which her allegations are based, or (2) has independent knowledge of and "materially adds" to the publicly disclosed allegations and voluntarily provided that information to the government before filing her action. § 3730(e)(4)(B). Information fails to "materially add[]" to the publicly disclosed allegations if the prior disclosures were already sufficient to give rise to an inference regarding the current fraud allegations. *Osheroff*, 776 F.3d at 815. Additionally, mere background information that helps the public better understand or contextualize a public disclosure is not enough to find that a relator qualifies as an original source. *Id.* at 815.

As a threshold matter, Zafirov fails to make the necessary allegations to qualify as an "original source" under the False Claims Act. Nowhere in her complaint does Zafirov allege that she voluntarily disclosed her allegations to the government before the public disclosures in *Sewell*. Nor does she allege in her complaint that she voluntarily disclosed her allegations to the government before she initiated this action. In her opposition to the MA Defendants' motion to dismiss, Zafirov asserts that she provided her information to

the government before filing her complaint. (Doc. 57 at 20.) But the complaint itself lacks this allegation. *See Bruhl v. Price Waterhousecoopers Int'l*, No. 03-23044-CIV-MARRA, 2007 WL 997362, at *4 (S.D. Fla. Mar. 27, 2007) (Marra, J.) ("The Plaintiffs cannot supplant the allegations of the [complaint] with new arguments set forth in their response to a motion to dismiss."). Zafirov's failure to properly allege that she voluntarily disclosed her allegations to the government disqualifies her as an original source.

More fundamentally, Zafirov also does not qualify as an original source because her allegations fail to materially add to the public disclosures in *Sewell*. Her allegations about the MA Defendants' fraudulent scheme are largely addressed in the *Sewell* action. The government investigated the allegations in *Sewell*, settled those claims, and entered into a CIA with Freedom and Optimum. Given the similarity (and in many instances, overlap) between Zafirov's allegations and the allegations in *Sewell*, the public disclosures in *Sewell* were enough to give rise to an inference of the same alleged fraud in this case. *See Osheroff*, 776 F.3d at 815. Indeed, a side-by-side review of Zafirov's compliant and the allegations publicly disclosed in *Sewell* reveals that Zafirov is not alleging a new scheme as much as she is alleging a perpetuation of a previously disclosed scheme. In effect, Freedom, Optimum, and Pagidipati are—according to Zafirov—up to their usual antics. (Doc. 1 ¶47 ("Despite Freedom/Optimum and Pagidipati's previous lawsuit and settlement, the Defendants violated the FCA *again*.").); (Doc. 57 at 21 (arguing that the previous fraud

disclosed in *Sewell* "demonstrates potential proclivity").) This dooms Zafirov's claim to be an original source. The CIA from *Sewell* remains in effect at the time of this order, which means that the federal government is *to this day* still dealing with the fraud disclosed in *Sewell.* (Doc. 42-4.) Alleging the perpetuation of a fraud that the government is aware of and actively handling does not materially add to the prior public disclosures. *See Maur*, 981 F.3d at 528 ("[B]y merely providing additional instances of fraud during the oversight period, Maur has failed to offer" sufficient information to qualify as an original source). As a result, Zafirov does not qualify as an "original source," and her claims against the MA Defendants and Pagidipati are barred under the public disclosure bar.

C.   **Zafirov's Claims Against the Provider Defendants Constitute an Impermissible Shotgun Pleading**

Throughout her complaint, Zafirov impermissibly groups the Provider Defendants together in her allegations. Specifically, Zafirov lumps together numerous corporate entities (Florida Medical Associates, Physician Partners, Physician Partners Specialty Services, Sun Labs, and Anion) and collectively alleges that they committed fraud. However, "asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions" is a form of a shotgun pleading. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). Importantly, shotgun pleadings fail "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* Indeed, although

she directs some allegations toward Physician Partners and VIPcare (Florida Medical Associates), Zafirov's complaint fails to clearly specify which Provider Defendant (especially with respect to Physician Partners Specialty Services and Sun Labs USA) committed whichever act that resulted in those false claims. This failure gives the individual Provider Defendants no notice about which claims apply to them and the grounds for those claims. Accordingly, the Court also concludes that Zafirov's claims against the Provider Defendants should be dismissed as an impermissible shotgun pleading.

As noted earlier, the entire complaint might also suffer from being a shotgun pleading for failure to identify which factual allegations apply to which counts by realleging all of the factual allegations in each count. In repleading (if Zafirov so elects), she must specify more precisely which background and factual allegations relate to which False Claims Act counts and which Defendants are responsible for what conduct.

## IV. CONCLUSION

Zafirov's complaint is dismissed without prejudice for failure to allege the False Claims Act violations with sufficient particularity as required by Rule 9(b). Further, as alleged, the public-disclosure bar prohibits Zafirov from bringing her claims against the MA Defendants and Pagidipati because they are substantially the same as those in a previous qui tam case and she fails to adequately allege that she qualifies as an original source. Her complaint likewise constitutes an impermissible shotgun pleading, at least as

it concerns the Provider Defendants. As this complaint was Zafirov's first attempt at pleading the False Claims Act violations and it is not necessarily futile to permit her to replead (although the Court notes it might be difficult given her apparent lack of personal knowledge), the Court must permit her one opportunity to amend her complaint.[8] *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) ("Ordinarily, a party must be given at least one opportunity to amend before the district court dismisses the complaint."). Accordingly, the following is **ORDERED**:

1.  The MA Defendants' motion to dismiss (Doc. 41) is **GRANTED**.

2.  The Provider Defendants' motion to dismiss (Doc. 50) is **GRANTED**.

3.  Pagidipati's motion to dismiss (Doc. 51) is **GRANTED**.

4.  By **October 22, 2021**, Zafirov may file an amended complaint.

**ORDERED** in Tampa, Florida, on September 28, 2021.

Kathryn Kimball Mizelle
United States District Judge

---

[8] In her opposition to the MA Defendants' motion to dismiss, Zafirov concedes that certain of her claims are barred by the statute of limitations. (Doc. 57 at 21). The Court expects that Zafirov will exclude these claims in any amended complaint.