# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DR. CLARISSA ZAFIROV, | ) ) ) |
| Relator and Plaintiff, | ) ) ) Case No. 8:19-CV-01236-KMM-SPF |
| v. | ) ) Jury Trial Demanded |
| PHYSICIAN PARTNERS, LLC; FLORIDA MEDICAL ASSOCIATES, LLC, d/b/a VIPCARE; ANION TECHNOLOGIES, LLC; FREEDOM HEALTH, INC; and OPTIMUM HEALTHCARE, INC, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

---

## FIRST AMENDED COMPLAINT ALLEGING VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
## AND
## DEMAND FOR A JURY TRIAL

---

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................... 1

    A.  Summary of Fraudulent Scheme ............................................ 2
    B.  Resulting Claims and Retained Overpayments. ...................... 5

II.   PARTIES .................................................................................... 7

III.  JURISDICTION AND VENUE ...................................................... 12

    A.  Public Disclosure ................................................................ 12
    B.  Original Source ................................................................... 14

IV.   PROCEDURAL POSTURE ........................................................... 14

V.    THE FEDERAL FALSE CLAIMS ACT ........................................... 16

VI.   MEDICARE AND THE MEDICARE ADVANTAGE PROGRAM ............. 17

    A. The Medicare Advantage Risk-Adjustment System ................. 20
    B. The Role of Providers in the MA Risk Adjustment Process .... 24
    C. Repayment Obligations Under the Medicare Advantage Program ...... 27

VII.  ALLEGATIONS OF DEFENDANTS' CONDUCT RESULTING IN
      THE SUBMISSION OF FALSE CLAIMS ......................................... 29

    A. Allegations Against Physician Partners, Anion and VIPcare ................. 30

        i.    Overview of the Relationship between Physician Partners, Anion
              Technologies, and VIPcare ................................................. 32
        ii.   Overview of the 5 Star Checklist ....................................... 35
        iii.  Physician Partners Incentivized Employed Physicians to
              Increase the Risk Scores while Reducing Costs to
              Treat Freedom Patients .................................................... 47
        iv.   Physician Partners Directed and Pressured Physicians to Use Risk
              Adjusting Scores. ............................................................ 54

    B. Allegations Against Freedom and Optimum ........................... 75

VIII.   DEFENDANTS   KNOWINGLY   SUBMITTED   OR   CAUSED   TO   BE
        SUBMITTED FALSE OR FRAUDULENT CLAIMS ....................................... 83

IX.     EXAMPLES OF SPECIFIC FALSE OR FRAUDULENT
        CLAIMS SUBMITTED OR CAUSED TO BE SUBMITTED .......................... 85

        A. Claims Submitted Where Source of Diagnosis Code
           was Changed to Anonymous "Physician" ................................................. 85
        B. Codes Submitted in Relator's Name After She Said No
           or Expressly Notified of Inaccuracy ............................................................ 98
        C. Defendants' Failure to Return Overpayments ....................................... 108

X.      COUNTS ......................................................................................................... 117

## I.      INTRODUCTION

1.      This Civil Action brought by Relator Dr. Clarissa Zafirov alleges manipulation of the Medicare Advantage program from January 2014 through the present by one of Florida's largest healthcare providers, Defendant Physician Partners, LLC ("Physician Partners"), and two insurance companies, Defendants Freedom Health, Inc. ("Freedom") and Optimum Healthcare, Inc. ("Optimum"), who worked in tandem to bilk the United States out of millions of dollars in artificially-increased capitation payments. Taking advantage of a system intended to ensure senior citizens and severely disabled individuals have access to the healthcare services that they need, Physician Partners – for itself and through its subsidiaries Defendants Anion Technologies, LLC ("Anion") and Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare") – submitted unsupported diagnosis codes to Freedom and Optimum, who encouraged and accepted the inflated codes, and then paid Physician Partners with the United States' money.

2.      The United States relies on Medicare providers to honestly and accurately report the health conditions of its beneficiaries through diagnostic codes, and relies on its contracted Medicare Advantage insurers to ensure the accuracy of the providers' claims. As described in Section VI, payments under the Medicare Advantage program hinge on truthful submissions of diagnosis codes in the encounter data, which serve as the claim for payment. See ¶¶48-54.

1

3.     Thus, when participants in the Medicare Advantage program – whether providers or insurers – provide false diagnosis codes to make their beneficiaries look sicker and to increase payments from Medicare, those codes are false claims which violate the False Claims Act. And when recipients of inflated capitation payments fail to return overpayments to which they know they are not entitled, the recipients violate the "reverse False Claims Act" as well.

### A.     Summary of Fraudulent Scheme

4.     Physician Partners is a provider organization which employs or contracts with about 500 physicians who treat about 130,000 Medicare beneficiaries throughout Florida. Its subsidiary Anion is the billing arm of Physician Partners, employing chart reviewers in Florida and India to access patient records, evaluate diagnosis codes, and modify the codes to enhance risk scores. Physician Partners and Anion provide their management and services to contracted private practices, or to practices that are wholly owned and operated by Physician Partners, like VIPcare.

5.     Through policies, practices and procedures imposed on both contracted and employed physicians, Physician Partners and Anion systematically manipulate patient health records to document and submit unsupported conditions to increase their patients' "risk adjustment scores," which in turn substantially increases the amount that Medicare pays for the patients' care. The

unsupported risk-adjusting diagnoses are not a matter of medical judgment: They are fraud.

6.     Physician Partners' scheme could not have been successful without the knowledge and participation of Freedom and Optimum, the Medicare Advantage organizations who provide insurance coverage for approximately 90% of Physician Partners' patients. The entities are more than business affiliates; they are inextricably linked by Sidd Pagidipati, the CEO of Physician Partners who took the helm of the provider organization after the policies he implemented as the COO of Freedom and Optimum led those companies to a $32 million False Claims Act settlement. As described at ¶¶26-29, Freedom and Optimum operate as a single entity and are referred to collectively as "Freedom" throughout this Amended Complaint.

7.     Together, Physician Partners and Freedom directed healthcare providers how to code using false and misleading medical information to persuade physicians to set aside their medical judgment in favor of diagnosing inflated, serious conditions. Specifically, physicians, including Dr. Zafirov, were directed to use fictitious criteria to diagnose rare conditions like Major Depressive Disorder or Complicated Diabetes, to "diagnose" cancers which had long been in remission; to characterize prescribed use of pain medication as drug addiction;

and to diagnose conditions based on physical exam rather than the necessary diagnostic tests or imaging.

8.      The principal vehicle used by Physician Partners to implement its scheme is a document called a "5 Star Checklist," an Anion-generated form which "suggests" diagnoses that are ostensibly based on a patient's medical history, but in reality *only* suggest conditions that would increase a patient's risk score, and thus increase the amount that Medicare pays for that patient's care. Freedom knew that Physician Partners used these 5 Star Checklists as improper steering tools, but turned a blind eye so long as the documents were not kept in the patients' medical records. These Checklists are discussed throughout the factual allegations of this Amended Complaint, with a detailed explanation beginning at ¶105.

9.      The relator, Dr. Clarissa Zafirov is Board certified in Family Medicine and was employed as a VIPcare physician. She found countless "suggested" diagnoses on 5 Star Checklists which were not supported by the patient's symptoms, test results, or medical history. Dr. Zafirov's refusal to alter her coding to meet Physician Partner's financial demands was met with relentless, increasing pressure from her VIPcare administrators and directors, Anion chart reviewers, Physician Partners quality analysts and Physician Partners' senior administrators – first threatening her financial success through their bonus structure, and when that didn't work, repeatedly challenging her medical decision-making.

10.     Physician Partners, through Anion, routinely overruled Dr. Zafirov's medical judgment, submitting risk-adjusting diagnosis codes which Dr. Zafirov expressly rejected. The false claims sometimes indicated that Dr. Zafirov made the diagnosis even when she did not, and sometimes were modified to indicate that an unidentified "physician" made the diagnosis even when the medical record contained neither the physician's information nor the diagnosis.

11.     The Amended Complaint details Physician Partners' role in directing fraudulent coding in Section VII(A). Specifically, the financial incentives that they used to pressure employed physicians to diagnose risk-adjusting codes are discussed at ¶¶125-137. Physician Partners' training and directives to inflate risk scores are described at ¶¶138-157. And Physician Partner's use of direct pressure to accept their coding model is discussed at ¶¶158-179. The role that Freedom had in directing and causing the submission of false claims is discussed in Section VII(B) at ¶¶180-194.

**B.      Resulting Claims and Retained Overpayments**

12.     In response to the Court's Sept. 28, 2021 Order, Relator's Amended Complaint provides significant additional details regarding Defendants' fraudulent scheme, the resulting false claims, and the failure to return overpayments of fraudulently-obtained capitation payments.

13. As Dr. Zafirov discovered that false claims were being submitted, she began retaining copies of the 5 Star Checklists that she submitted to Anion. She also had access to Q360, Physician Partners' billing records system which recorded the codes submitted by Anion to Freedom and Optimum for each of her patients, including which codes were paid, the source of those codes, and the date of service on which the code was entered. Dr. Zafirov was also provided with credentials to Freedom's MRA/HEDIS physician portal which allowed her to access Freedom's Member Health Profiles and Prospective Possible Condition Reports. These reports identify the codes that were submitted from Freedom and Optimum to CMS for each patient, including the dates of service and the source for the submitted codes.

14. As described in Section VI, these submitted codes comprise the service record or "encounter data" that serves as the claim for payment in the Medicare Advantage program.

15. As a result of her three-part access, Dr. Zafirov is able to trace the false claims alleged in this case from "cradle to grave" – identifying the falsity of the code from the 5 Star Checklist through submission to the United States. Details of exemplar claims, including supporting documents, appear *infra* at Section IX. Specifically, false claims that were submitted with a changed "source" after Dr. Zafirov rejected the code are identified at ¶¶202-240, and false claims that were

submitted in Dr. Zafirov's name even though she did not make the diagnosis are identified at ¶¶241-271.

16.     The false codes also give rise to violations of the "reverse False Claims Act" because neither Physician Partners nor Freedom or Optimum returned overpayments attributable to the unsupported claims. Additional examples overpayments that were not returned are identified at ¶¶272-295.

17.     Through these claims, and as described throughout the Amended Complaint, Dr. Zafirov alleges with specificity that Physician Partners – by itself and through Anion and VIPcare – acted in concert with and severely disabled individuals who rely on the Medicare Advantage program to provide them with healthcare services. In doing so, the Defendants knowingly submitted unsupported diagnosis codes which cost the United States millions of dollars in artificially inflated capitation payments. Each of those unsupported codes is a false claim submitted in violation of the False Claims Act.

## II.   PARTIES

18.     The United States of America is the real party of interest in this case. The United States operates and administers the Medicare and Medicaid programs through the Department of Health and Human Services ("HHS"), which includes its operating division, the Centers for Medicare and Medicaid Services ("CMS"). At all times relevant to this Complaint, CMS administered the Medicare Part C

Program and made Medicare Advantage ("MA") risk-adjusting payments thereunder.

19.   *Qui tam* Plaintiff/Relator Dr. Clarissa Zafirov is a Board-certified Family Medicine physician licensed in the State of Florida. She also holds a Certification of College of Family Physicians in Canada.

20.   From October 2018 through March 2020, Dr. Zafirov was employed as a primary care physician at Florida Medical Associates d/b/a VIPcare. As described herein, Dr. Zafirov regularly interacted with billing and coding specialists from Physician Partners and Anion, attended and watched training sessions created by representatives of Physician Partners and Freedom Health, and had access to the insurers' billing portal for the express purpose of seeing which claims were submitted to the United States.

21.   Dr. Zafirov was provided with access credentials to both the Physician Partners' Q360 billing system and eClinicalWorks electronic medical records, as well as Freedom's MRA/HEDIS physician portal which provided access to claims data submitted from Freedom and Optimum to CMS for each of her enrolled beneficiaries.

22.   Defendant Physician Partners, LLC ("Physician Partners" or "PP") is a medical practice management company which advertises itself as coordinating services between physicians, payors and patients. Physician Partners is a Florida

8

limited liability company with a principal address of 601 S. Harbour Island Blvd., Suite 200, Tampa, Florida.

23. Physician Partners employs or manages more than 500 physicians providing services to approximately 130,000 patients. Physician Partners includes fully-owned and operated practice groups, such as Defendant Florida Medical Associates d/b/a VIPcare, for which Physician Partners assigns all patients, manages all billing, and establishes and implements all practices and procedures. Physician Partners also has management contracts with private medical practices through which it handles, *inter alia*, insurance credentialing, and all billing and coding for the practice.

24. Defendant Anion Technologies, LLC ("Anion"), which also does business as Anion Healthcare Services, is the wholly-owned billing and coding subsidiary of Physician Partners. For all providers, regardless of whether they have a private or affiliated practice, Physician Partners uses uniform billing and coding processes implemented through Anion. Anion's U.S.-based headquarters are located at the same address as Physician Partners, at 601 S. Harbour Island Blvd., Suite 200, Tampa, Florida, but a majority of its employees are located in and access patient records from Hyderabad, India or Ocala, FL. Anion's Ocala facility is located at 2955 SE 3rd St., Ocala, FL, which is also the listed address for SunLabs, Inc. – the entity which paid Dr. Zafirov's salary as a VIPcare physician.

25.     Defendant Florida Medical Associates, Inc. ("FMA") d/b/a VIPcare ("VIPcare") is a provider group which is fully affiliated with and operated by Physician Partners. VIPcare operates 45 clinics spanning 16 Florida counties, including its Venice location where Dr. Zafirov was employed as the sole physician. Although FMA does not publicly disclose its association with Physician Partners on its website, its mailing address and principal addresses are also 601 S. Harbour Island Blvd., Suite 200, Tampa, Florida. The policies, procedures, documents, and manuals utilized at VIPcare are created, distributed, and implemented by Physician Partners, and its billing is performed by Anion.

26.     Defendant Freedom Health, Inc. ("Freedom") is a health maintenance organization ("HMO") currently operating in 24 Florida counties, pursuant to a Certificate of Authority from the Florida Office of Insurance Regulation. Freedom is a wholly-owned subsidiary of Anthem, Inc., which acquired Freedom in 2018. Freedom is a Florida corporation with its principal place of business in Tampa. Relevant to this case, Freedom participates in the Medicare Advantage ("MA") program pursuant to Contract No. H5427 with CMS. As of October 2021, Freedom had 68,382 enrolled MA beneficiaries.

27.     Defendant Optimum Healthcare, Inc. is also an HMO operating in the same 24 counties throughout Florida, pursuant to a Certificate of Authority from the Florida Office of Insurance Regulation. Optimum is also a wholly-owned

subsidiary of Anthem, Inc., and is a Florida corporation with its principal place of business in Tampa. Relevant to this case, Optimum participates in the Medicare Advantage ("MA") program pursuant to Contract No. H5594 with CMS. As of October 2021, Optimum had 52,313 enrolled MA beneficiaries.

28.     Defendants Freedom and Optimum are sibling entities and operate indistinguishably from one another. Both are registered with the State of Florida with a mailing address of 4200 W. Cypress Street, Suite 1000, Tampa, Florida, 33607. They were jointly co-founded by Sidd Pagidipati (the owner and former CEO of Physician Partners), who was the Chief Operating Officer of both entities until approximately 2017. Presently, both companies have the same President, Chief Executive Officer, Director, Chief Medical Officer, Treasurer, Assistant Treasurer, Secretary and Assistant Secretary. Enrollees of both entities are directed to contact the companies at the same post office box, fax number and TTY extension through websites that are virtually identical except for color scheme and stock photographs.

29.     Freedom and Optimum refer to themselves collectively in publications distributed to its provider physicians. In contractual agreements with the United States, Freedom and Optimum have been referred to collectively as "Freedom," and statutory and regulatory obligations imposed on "Freedom" were

binding as to both entities. Accordingly, Relator refers to Freedom and Optimum collectively as "Freedom," unless otherwise specified.

## III.   JURISDICTION AND VENUE

30.   This Court has subject matter jurisdiction over this action per 28 U.S.C. § 1345 because the United States is the real-party-in-interest. In addition, the Court has subject matter jurisdiction over FCA claims for relief under 31 U.S.C. § 3732(a) and (b).

31.   Personal jurisdiction lies under 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, and transacts business in this District, or has committed the alleged acts in this District.

32.   Venue lies in this District under 28 U.S.C. §§ 1391(b), (c) and 31 U.S.C. § 3732(a) because the Defendants can be found in and/or transact business in this District; a substantial part of all of the events or omissions giving rise to the claims occurred in this District; and all of the Defendants are subject to the Court's jurisdiction under the FCA.

### A.   Public Disclosure

33.   This Court's order dated Sept. 28, 2021, concluded that Relator's allegations against Freedom, Optimum and Pagidipati in Relator's original complaint were publicly disclosed by documents related to a prior lawsuit

involving those parties, *U.S. ex rel. Sewell v. Freedom Health, et al.*, Civil Action No.

8:09-CV-01625 (M.D. Fl.).

34.     That case was filed in 2009 and all claims against the defendants were

dismissed in May 2017. The covered conduct in that case related to false claims

submitted between January 2008 and December 2013. In this case, Relator alleges

violations beginning in January 2014 through the present. None of the claims

alleged to be false in the *Sewell* matter are at issue in this case.

35.     The *Sewell* complaint alleged that Freedom and Optimum, at the

direction of Pagidipati, submitted unsupported diagnosis data which resulted in

manipulation of the risk adjustment scores of their enrolled beneficiaries. In the

Medicare Advantage industry, *all* allegations of fraud ultimately relate to the

submission of unsupported diagnosis data and the manipulation of the risk

adjustment score because that is the only way to increase funding from the

Government.

36.     The *Sewell* case identified five specific schemes developed by the

defendants to manipulate the risk adjustment data. None of those schemes

describe the allegations of this case – that Freedom and Optimum actively

participated in the operation of a provider group, including training providers on

how to code specific diseases, for the purpose of increasing risk scores of the

patients being treated by the provider group.

37.     In this Amended Complaint, Relator clarifies how her allegations are distinct from the *Sewell* allegations as to time, scope, and factual basis. Accordingly, Dr. Zafirov's allegations related to Freedom and Optimum in this Amended Complaint were not previously publicly disclosed as defined in the False Claims Act, 31 U.S.C. § 3730(e)(4).

### B.     Original Source

38.     Even if substantially the same allegations or transactions as alleged in this complaint were publicly disclosed by the *Sewell* case, Relator is an "original source" as defined in 31 U.S.C. § 3730(e)(4)(B). Relator voluntarily disclosed her allegations to the United States Attorney's Office for the Middle District of Florida on May 16, 2019, prior to the filing of this case, and has knowledge that is independent of and materially adds to any information disclosed in the *Sewell* litigation.

## IV.   PROCEDURAL POSTURE

39.     Relator filed the original complaint in this case on May 20, 2019, in the Middle District of Florida. The Court granted Relator's motion to place the case under seal pursuant to 31 U.S.C. § 3730(b)(2). Counsel for the United States sought a six-month extension of the initial seal date, which the Court granted on July 26, 2019. Dkt. 6.

40.     During that time, the Government was actively investigating the case as both a civil and criminal matter. Consistent with its ongoing investigation, the Government requested additional time for the case to remain under seal on or about Jan. 21, 2020. Dkt. 9, 10. The Court denied the request on January 28, 2020, eight months after the case was filed. Dkt. 11. The language of the order departed from the typical unsealing order, acknowledging the public harm associated with the conduct alleged by Relator:

> The relator alleges a widespread, fraudulent scheme in which managed-care entities and healthcare providers act in concert to bilk the public fisc and otherwise injure the public. If true, the activity presents an ongoing and serious injury to the public.

41.     The Government's investigation came to an end and the Government filed a notice not to intervene at that time. Dkt. 14. The Government later filed its notice of election to decline intervention. Dkt. 40.

42.     Relator timely served her complaint on Defendants, and Defendants responded with motions to dismiss. Dkts. 41, 50 and 51. Briefing was closed on the motions to dismiss on Dec. 16, 2020, upon filing of specific replies permitted by the Court. Dkt. 74 and 75. Less than a month later, on Jan. 8, 2021, this case was reassigned to Judge Mizelle. Dkt. 76.

43.     On Sept. 28, 2021, the Court entered an Order dismissing Relator's Complaint pursuant to Rule 9(b), Fed. R. Civ. P., and, as to certain defendants,

public disclosure grounds. Dkt. 81. The Court granted leave for Relator to file this amended complaint by Nov. 12, 2021. Dkts. 81, 84.

## V.   THE FEDERAL FALSE CLAIMS ACT

44.    The Civil War-era False Claims Act ("FCA") is the United States' primary tool to prevent and remedy fraud against the Government and its taxpayers. The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. 99-345, at 1, *reprinted at* 1986 U.S.C.C.A.N. 5266. Since the 1986 enactment of the modern version of the FCA, it has returned more than $64 billion to the United States.

45.    This case invokes three portions of the federal False Claims Act: 31 U.S.C. § 3729(a)(1)(A), (B) and (G). In salient part, the False Claims Act states,

[A]ny person who –

> A. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> B. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]…
>
> G.  Knowingly makes, uses, or causes to be made or use, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

16

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

## VI.   MEDICARE AND THE MEDICARE ADVANTAGE PROGRAM

46.   Medicare is a federally-operated health insurance program administered by CMS for the benefit of individuals 65 and older and certain disabled persons. *See 42* U.S.C. § 1395, *et seq.*

47.   There are four parts to the Medicare program. Part A covers inpatient care, Part B covers outpatient care, Part C establishes the Medicare Advantage program, and Part D is prescription drug coverage. A beneficiary eligible for Medicare may choose to be covered under Medicare Parts A and B, known as "traditional Medicare," in which CMS reimburses healthcare providers for services rendered via submission of claims for payment for each service provided. This is known as a fee-for-service payment system.

48.   Alternatively, as relevant here, Medicare beneficiaries can elect to enroll in Medicare Part C, the Medicare Advantage program. Beneficiaries who choose this program enroll in a Medicare Advantage plan that is managed by a private insurance company known in this context as a Medicare Advantage Organization, or "MAO." 42 U.S.C. §§ 1395w-21-28; 42 C.F.R. §§ 422.2, 422.503(b)(2). In the Medicare Advantage program, CMS does not reimburse

providers on a fee-for-service basis but pays providers in advance for the anticipated cost of treatment for each beneficiary.

49.     The Medicare Advantage payment process, as graphically illustrated by HHS-OIG, is as follows:



50.     The CMS graphic shows that the information that triggers payment in the Medicare Advantage system is not a standalone "claim for payment" such as those submitted in traditional fee-for-service Medicare. Rather, the service record entered in the CMS encounter data system is itself the claim for payment.

51.     As described in a *Medicare Provider Manual* (pg. 82) jointly published by Defendants Freedom and Optimum and provided to Dr. Zafirov in the course of her employment, "[c]laims submitted under a capitation contract are referred to as 'encounter data.'" Encounter data includes several pieces of information, the most important of which is the clinical conditions with which a patient has been diagnosed.

52.     Because the submission of encounter data is itself the claim for payment, "an unsupported code submitted by a Medicare Advantage insurer [ ] triggers overpayment in every case. That is because individual codes in that program are used to determine payments, not as data points in a complex and rigorous statistical model." *Unitedhealthcare Ins. Co. v. Becerra*, 9 F.4th 868, 890 (D.C. Cir. 2021).

53.     When an overpayment is identified and must be returned, as described *infra*, the MAO or provider does not send a specific amount of money back to the United States, but rather "it is the act of submitting the corrected data to CMS…that constitutes fulfillment of the requirement to report and return the overpayment." 79 Fed. Reg. 29,921. The return of funds then occurs through "routine processing." *Id.* at 29,920.

54.     "The Medicare Advantage capitation payment system is subject to the False Claims Act." *U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 673 (9th Cir. 2018).

### A.     The Medicare Advantage Risk-Adjustment System

55.     The Medicare Advantage capitated system means that, each month, the Government pays a fixed amount per beneficiary enrolled in each MA Plan to each MAO. The baseline capitated amount is determined by an annual bid which is then adjusted by the expected risk of each beneficiary.

56.     The per-member-per-month payment is not determined by the cost of healthcare services provided to an enrollee. Rather, each year, each MAO submits a bid amount for each of its MA plans, which is then compared to a benchmark set by CMS based on a statutory formula to establish the bid price, which is the baseline for the capitated payment. 42 U.S.C. § 1395w-23; 42 CFR § 422.2, subparts F and G.

57.     Since 2000, Congress has required that the bid price be adjusted for each MA Plan enrollee based on (1) the enrollee's demographic factors, including age and gender, among others, and (2) the enrollee's health status. This process is called "risk adjustment."

58.     Risk adjustment results in a "risk score," sometimes referred to as the "risk adjustment factor" or "RAF," which is a multiplier that is applied to the MA organization's bid price to determine the actual amount paid for each enrollee.

59.     The enrollee's health status adjustment is determined using the CMS Hierarchical Condition Category ("HCC") risk-adjustment model. In sum, CMS predicts that patients who have been diagnosed with certain conditions will cost the insurer more to treat than the average Medicare patient, so it adjusts the monthly payment to make up for that cost difference. Likewise, a person who is healthier than the average Medicare patient may cost less to treat, so the bid price is adjusted down for those patients.

60.     To make its predictive process even more accurate, CMS's model factors in the cost of certain co-morbidities, or multiple diagnoses whose treatments in combination are expected to be costlier than the cost of treating each disease separately. In sum, "the point of the Secretary's discretion to select, and obligation to apply, risk factors is to 'ensure that [Medicare Advantage insurers] are paid appropriately for their plan enrollees (that is, less for healthier enrollees and more for less healthy enrollees).'" *Becerra*, 9 F.4th at 874, quoting *Establishment of the Medicare Advantage Program*, 70 Fed Reg. 4588, 4657 (Jan 28, 2005).

61.     Medical conditions, represented by diagnosis codes, are grouped into Hierarchical Condition Categories, or HCCs, which are categories of clinically-

related medical diagnoses. 42 CFR § 422.2. Certain HCCs contain diagnoses codes which indicate major, severe and/or chronic illnesses and are predicted to require more expensive treatments. These are referred to as "risk-adjusting diagnosis codes" and are assigned a numerical risk-adjustment score. The numerical scores for all of the risk-adjusting conditions with which a patient is diagnosed are added together to determine the patient's ultimate Medicare Risk Adjustment, or "MRA," value.

62.    Not all diagnosis codes are risk-adjusting, meaning that conditions which are not expected to increase a patient's cost of treatment over an MAO's bid price do not have an associated risk-adjustment value and do not affect the amount paid for that beneficiary.

63.    The HCC model is prospective, such that it relies on risk-adjusting diagnosis codes from one year (the "date of service year") to determine payments in the following year (the "payment year").

64.    The Court of Appeals for the District of Columbia set forth the following explanation and example of how the Medicare Advantage risk adjustment model works in practice:

> To enable CMS to apply those relative factors to pay Medicare Advantage insurer at the correct risk-adjusted rate, the insurers must report to CMS the salient demographic and health characteristics of each of their Medicare-eligible beneficiaries. 42 CFR § 422.310(b), (d). CMS then combines the relative factors for a particular beneficiary to arrive at her individualized overall 'risk score.' *See* Pope et al.,

*Evaluation of the CMS-HCC Risk Adjustment Model: Final Report* 15, J.A. 532. CMS posits that an 'average beneficiary' in traditional Medicare has a risk score of 1.0. If a Medicare Advantage beneficiary has a risk score of exactly 1.0, CMS pays the insurer the base payment rate for that beneficiary's location. For Medicare Advantage beneficiaries with risk scores above 1.0, meaning they are of higher-than-average risk, CMS pays insurers more than the base payment rate; for beneficiaries with risk scores below 1.0, the payments are correspondingly lower than the base rate. But Medicare Advantage beneficiaries are not presumptively scored as 1.0; the per-capita payments that CMS makes to insurers instead depend on an aggregation of the beneficiaries' cost-predictive demographic and diagnostic factors.

CMS illustrates the operation of relative factors with an example:

> [U]nder the 2014 model, a 72-year-old woman living independently (relative factor 0.348), with diabetes without complications (relative factor 0.118), and multiple sclerosis (relative factor 0.556) would have a total risk score of 1.022, which means that she is expected to cost Medicare slightly more than the average traditional Medicare beneficiary (who would by definition have a risk score of 1.0)

[Government's Brief at 7] (citing Announcement of CY 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter, at 67-68 (Apr. 1, 2013), J.A. 276-77). In other words, as a woman near the younger end of the Medicare-eligible population and living outside any long-term institutional setting, this sample beneficiary starts with a risk score well below the overall Medicare average. The fact that she suffers from diabetes raises her risk score, but not by much, presumably because she has not experienced complications and ordinary diabetes care is not as costly as many other conditions common among older Americans. The larger bump, putting her over the average predicted costs of care even for the cost-intensive Medicare population, is that she suffers from multiple sclerosis. A Medicare Advantage insurer providing coverage to this woman therefore "would be paid 102.2 percent of the relevant base rate." *Id.* at 8.

23

*Becerra*, 9 F.4th at 875-76.

65.     The risk-adjustment model was created to incentivize cost-effective care and preventative medicine in an effort to reduce the rapidly increasing costs of the Medicare program, while ensuring that MAOs have sufficient funds available to meet their enrollees' healthcare needs. However, risk-adjusting creates a financial incentive for Medicare Advantage insurers to accept and approve diagnoses codes which make their beneficiaries appear sicker than they really are.

66.     "Overpayment to Medicare Advantage insurers is a serious drain on the Medicare program's finances. In 2016 alone, audits of the data submitted by Medicare Advantage insurers to CMS showed that CMS paid out an estimated $16.2 billion for unsupported diagnoses, equal to 'nearly ten cents of every dollar paid to Medicare Advantage organizations.'" *Becerra*, 9 F.4th at 872-73, quoting *Silingo*, 904 F.3d at 673, *citing* James Cosgrove, U.S. Gov't Accountability Ofc., GAO-17-761T, *Medicare Advantage Program Integrity: CMS's Efforts to Ensure Proper Payments* 1 (2017), https://www.gao.gov/assets/690/685934.pdf.

### B.     The Role of Providers in the MA Risk Adjustment Process

67.     Many MA organizations contract with Provider Organizations ("POs"), such as hospital networks and physician groups, to furnish healthcare services under the MA plans.

68.     MA organizations pay providers through a variety of arrangements, but many large POs, to include Physician Partners and VIPcare, enter into capitated and/or "gainsharing" arrangements with the MAOs which align their financial interests. In a capitated arrangement, the MAO enters into a contract to pay a portion of the per-enrollee payment from the Government to the PO. In "gainsharing" agreements, the POs receive incentive payments from the MAO based in whole or in part on total revenues that the MAO receives from the Government for the beneficiaries cared for by those providers.

69.     These financial arrangements align the interests of the MAO and the PO. When the PO increases a Medicare Advantage beneficiary's risk adjustment score, the MAO receives a higher capitation payment from the United States.

70.     Pursuant to Medicare regulations, providers can be classified as "first tier entities" or "related entities." See 42 CFR §§ 422.2, 422.500.

71.     A first-tier entity is "any party that enters into a written agreement, acceptable to CMS, with an MA organization…to provide…healthcare services for a Medicare eligible individual under the MA program." 42 CFR § 422.2.

72.     A related entity is "any entity that is related to the MA organization by common ownership or control and (1) [p]erforms some of the MA organization's management functions under contract or delegation; [or]

25

[f]urnishes services to Medicare enrollees under an oral or written agreement….”
42 CFR § 422.500.

73.     First-tier and related organizations must perform their services in a manner that complies with the MAO's contractual obligations to the Government; must agree to comply with all applicable Medicare laws, regulations and CMS instructions; and must receive effective compliance training and education relating to preventing fraud, waste and abuse. 42 CFR §§ 422.503-04.

74.     If a related or first-tier entity generates data relating to an MAO's claims for payment to the United States, both it and the MAO are required by law to certify that the data is accurate and truthful. 42 C.F.R. § 422.504(l)(1)-(4).

75.     Defendants Physician Partners and VIPcare are first-tier entities who provide healthcare services to Medicare Advantage patients by agreement with Freedom and Optimum.

76.      “[D]iagnosis codes, as reported by medical providers, are the only factors that CMS uses to determine a beneficiary's health status.” *U.S. ex rel. Ormsby v. Sutter Health*, 444 F.Supp.3d 1010, 1025 (N.D. Cal. Mar. 16, 2020).  Patient records are also critical as the only documentation of a Medicare Part C beneficiary's health status.

77.     As a result, “a traditional Medicare provider that submits an unsupported diagnosis code does not cause CMS to pay out any additional money,

whereas a Medicare Advantage provider that submits an unsupported diagnosis code does." *Id.* at 1021, n.1.

78.     "Notwithstanding any relationship(s) that the MA organization may have" with first tier and related entities, "the MA organization maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS." 42 C.F.R. § 422(i)(1).

### C.     Repayment Obligations Under the Medicare Advantage Program

79.     31 U.S.C. § 3729(a)(1)(G) is the "reverse False Claims" provision of the False Claims Act.  It provides that liability will attach when a defendant conceals, avoids, or decreases an "obligation to pay or transmit money or property to the Government." In 2010, Congress amended the definition of the term "obligation" to include "an established duty, whether or not fixed, arising from…the retention of any overpayment."

80.     The Affordable Care Act, enacted by Congress in 2010, includes what has come to be called the "Overpayment Rule."   42 U.S.C. § 1320a-7k(d). The Overpayment Rule obligates any person to report and return any overpayment that they receive from CMS within 60 days of identifying it. 42 U.S.C. § 1320a-7k(d)(1), (2).

81.     The statute defines "overpayments" as "any funds that a person receives or retains under [Medicare or Medicaid] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B).

82.     For purposes of the statute, the definition of the term "person" includes both the provider of services and Medicare Advantage organizations. 42 U.S.C. § 1320a-7k(d)(4)(C).

83.     In 2014, CMS promulgated the Overpayment Rule to implement the statutory requirement for MA Organizations. *Overpayment Rule*, 79 Fed. Reg. at 29,958 (codified at 42 CFR § 422.326(a)). The rule mirrors the statute: "If an MA organization has identified that it has received an overpayment, the MA organization must report and return that overpayment in the form and manner set forth in this section." 42 CFR § 422.326(b). An "identified overpayment" occurs when the MAO has determined, *or should have determined through the exercise of reasonable diligence*, that it received an overpayment. 42 CFR § 422.326(b) (emphasis supplied).

84.     The preamble to the Overpayment Rule states that "a risk adjustment diagnosis that has been submitted for payment but is found to be invalid because it does not have supporting medical record documentation would result in an overpayment." 79 Fed. Reg. at 29,921.

85.   The failure to report and return a knowing overpayment within 60 days of discovering it violates the reverse false claims provision of the False Claims Act. 42 U.S.C. § 1320a-7k(d)(3); 42 CFR § 422.326(e).

86.   Defendants Freedom and Optimum's *Medicare Provider Manual* (pg. 23) expressly recognizes that "[l]iability can also be created by the improper retention of an overpayment."

## VII.   ALLEGATIONS OF DEFENDANTS' CONDUCT RESULTING IN THE SUBMISSION OF FALSE CLAIMS

87.   Physician Partners and its subsidiaries, including Anion and VIPcare, acted in concert with Freedom and Optimum to artificially increase risk adjustment scores of their Medicare Advantage enrollees, making their patients look sicker than they were, thus fraudulently increasing costs to the government while minimizing the amount of money actually spent to treat the patients.

88.   In its September 28, 2021, Order (Dkt. 81 at 21-22), the Court directed that Relator clarify which conduct is attributable to which defendant. Relator endeavors to do so herein. However, Relator notes that it is critical to the success of this fraudulent scheme that all of the defendants operated in tandem, a relationship made possible largely by the knowledge and former control of Freedom and Optimum held by Siddhartha Pagidipati, the owner and CEO of Physician Partners.

89. But for these intertwined operations – where, *inter alia*, the Freedom instructed Physician Partners physicians how to increase risk scores and granted the physicians access to their internal claims submission portal, where Physician Partners allowed Freedom access to patients who were enrolled with other MAOs to persuade them to change programs, and where VIPcare bonused its employee physicians based on the risk scores of their Freedom patients – the conduct alleged herein could not have occurred.

### A. ALLEGATIONS AGAINST PHYSICIAN PARTNERS, ANION, AND VIPCARE

90. Defendants Physician Partners, Anion and VIPcare provide healthcare services to thousands of senior or severely-disabled citizens throughout Florida who receive their care under the Medicare Advantage program. They have created and implemented a coding process designed to inflate their patients' Medical Risk Adjustment (MRA) scores to increase their capitated payments by making the patients look sicker than they are.

91. Through coordinated efforts to maximize profits, Physician Partners and VIPcare engaged in high-pressure directives to ensure their physicians selected only risk-adjusting HCCs, including tying the physicians' compensation to their willingness to comply with the system. And when physicians like Relator would not comply, Anion submitted unsupported diagnosis codes anyway, either

expressly disregarding the physician's instructions or modifying the code to appear as if it came from some other source.

92.     In this way, Physician Partners ensured the implementation of its corporate directives to increase risk scores without regard to the actual physical condition of the patients.

93.     In reviewing hundreds of 5 Star Checklists in connection with her patients, Dr. Zafirov saw none where the defendants changed a diagnosis code which resulted in lowering the patient's MRA score.  Rather, this was always done to increase the patient's MRA score, and increase the funding from the United States.

94.     In Section IX, *infra*, Relator identifies patients who she encountered in the course of her employment at VIPcare whose encounter data was not supported by clinical findings. For some, Relator notified Physician Partners that past codes were inarguably wrong and should be changed, but they were not. For others, Relator expressly rejected the "suggested" codes but Anion submitted them in her name anyway. And for others still, Relator rejected codes so Anion submitted them under an anonymous "physician" descriptor, despite the medical records lacking any support therefor. The patients identified in this complaint are examples only; they are by no means all of the patients with respect to whom false claims were submitted.

95.    The submission of unsupported and false diagnosis codes by Anion, at the direction of Physician Partners and VIPcare, increased patients' risk scores and therefore the capitated payments received for those patients.

96.    However, despite the additional diagnoses, no additional medical services resulted. Often, expensive medical services that *were* actually needed were withheld. Relator's physician colleagues boasted of restricting specialist access, deterring hospital admissions in potentially life-threatening situations, and even touted the cost-saving repercussions when patients suffered untimely deaths. As described herein and specifically stated to Relator by her VIPcare Regional Director Alex Lavin at an in-person meeting at her office on September 26, 2019, Physician Partners' physicians were expected to "do whatever needs to be done" to increase risk scores and lower costs.

### i. Overview of the Relationship between Physician Partners, Anion Technologies, and VIPcare

97.    Physician Partners advertises itself as "the intersection of patients, providers and payors" with more than 129,000 patients, more than 500 providers and relationships with 14 payor entities. www.phypartners.com (last accessed Nov. 2, 2021).

98.    Physician Partners associates with providers in one of two ways. First, it employs physicians through PP-owned provider groups which have their own name and internal corporate structure but are part of the Physician Partners

corporate entity. Second, it enters into management contracts with independent physician practices wherein the physician maintains ownership of the practice, but Physician Partners assumes operational control.

99.    VIPcare is in the former category – it is wholly owned and operated by Physician Partners. Under the VIPcare brand name, Physician Partners operates 45 clinic locations, each of which has one or more primary care physicians and a small nursing and clinical staff. The physicians sign employment contracts with FMA, receive their paychecks through another Physician Partners affiliate called SunLabsUSA (which shares an address with Anion) and are considered employees of Physician Partners.

100.    Dr. Zafirov was employed as the primary care physician at a VIPcare clinic located in Venice, FL. When Dr. Zafirov requested an employment verification letter, she received a letter on SunLabsUSA letterhead which stated, "Dr. Zafirov practiced in our ambulatory primary care clinic for an assigned Medicare-focused patient panel…. She held the position of Physician at our VIPcare clinic located at 333 Tamiami Trail S, Suite 102, Venice, FL during this period." The letter was signed by Katrina Hall, Team Resources Operations Manager, whose signature block provided a Physician Partners email address, teamresources@phypartners.com.

101.    In Relator's experience, and as described herein, VIPcare approved and implemented the directives set forth by Physician Partners. Accordingly, any conduct or policies attributable to Physician Partners are also attributable to VIPcare.

102.    Among the policies and practices implemented by Physician Partners is the use of Anion as the billing and coding entity for all of Physician Partners' physicians, whether employed or independent. Anion employees – some located in Florida and others in Hyderabad, India – interact with a patient's medical record before and after each encounter.

103.    On the day of or just before a patient visit, an Anion representative generates a "5 Star Checklist" (described in detail below) for the patient and transmits it to the physician for use during the visit.

104.    Following a patient visit, an Anion representative reviews the physicians' notes, the physicians' diagnostic coding, and the 5 Star Checklist (if used). If the physician has not appended the codes suggested by Anion on the 5 Star form, or any codes which the Anion representative suggests upon review of the physician's notes, then the Anion representative engages directly with the physician to add the suggested HCCs. As described below, Anion representatives have complete access to the Physician Partners' patient records, enabling them to modify a physician's coding without the consent of the physician.

## ii. Overview of the 5 Star Checklist

105.   At the heart of Defendants' scheme to increase patient risk scores is the use of their proprietary code-steering form called the "5 Star Checklist." The Checklist is created in advance of every patient visit by an Anion employee, who populates a daily electronic folder with 5 Star Checklists for all patients scheduled for visits that day. Each morning, an Anion associate based in India, typically Ratnakar Mekala (whose signature block identifies him as Anion Healthcare Services | Process Associate - Provider Department), sends an email to the clinics that the 5 Star Checklists for that day are available and loaded into a Google Docs drive. Each doctor or office then goes onto the drive, downloads the forms for the day, and prints them in hardcopy.

106.   VIPcare Medical Director Dr. Sangeeta Hans instructed Relator at the beginning of her employment that VIPcare physicians *must* complete a 5 Star Checklist for each patient at least once per year, but later instructed that it must be done twice a year. A Checklist is generated by Anion before every patient visit, regardless of whether one or two have already been completed that calendar year.

107.   Despite the importance of the 5 Star Checklist to Anion's coding, Emily Gallman, Senior Director of Healthcare Operations at VIPcare, encouraged Dr. Zafirov to have her medical assistant simply accept the diagnoses on the 5 Star

35

Checklists and Dr. Zafirov could "just sign them" instead of completing the records herself.

108.   The following is an example of a typical 5 Star Checklist, annotated to describe each section of the form:



Annotation Key:

1 – The information at the top of the form provides the name of the current primary care physician, followed by the patient's name, patient number, date of birth, age, gender, risk score for the previous

year and the patient's insurance provider and plan. In this example, the patient had an MRA score of 1.007 the prior year, meaning he was very close to the average Medicare patient.

2 – The rectangular bar acts as a dashboard to track how much of the potential risk score suggested by Anion has been coded so far. At the beginning of each calendar year, the rectangle is completely white and says "100% | X.XX" where the X.XX reflects the maximum risk score if the physician agreed with every HCC suggested by Anion. As the suggested risk-adjusting HCCs are diagnosed, the white bar begins to fill up with grey, reflecting the percentage of maximum risk score that the physician has diagnosed. In this example, the patients' MRA score would be 1.842 if all the suggested conditions were accepted, meaning Freedom would receive 184.2% of the negotiated bid price for this patient.

3 – Each white bubble corresponds with a suggested HCC on the table below. All bubbles are white at the beginning of a calendar year, and are greyed out and checked once the HCC has been coded for that patient. The bubbles serve as a visual tally of the specific codes which have been suggested and which are still available to increase the patient's risk score.

4 – An ICD-10 code, often referred to as a "diagnosis code," is an alphanumeric code assigned to every disease process by the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10"). Each HCC is comprised of a series of related ICD codes. In this exemplar form, there is only one suggested ICD-10 code under each HCC, but often 5 Star Checklists include two or more suggested ICD-10 codes under an HCC. Once an ICD-10 code is diagnosed, it closes out that HCC and any subsequent ICD-10 codes under that same HCC will not increase the risk score any further. **There are no ICD codes on 5 Star Checklists which are associated with a non-risk-adjusting HCCs.**

5 – The ICD Description is a brief description of the associated ICD-10 code. The ICD-10 provides a detailed description of what diseases processes must be present to code each diagnosis; the name provided here is a short-form description for purposes of the 5 Star Checklist only.

6 – The "Times Reported" category shows the number of times the specific ICD-10 code was reported in the previous three years. A number in one of those three columns means that Physician Partners submitted that code as part of the patients' encounter data in the specified year. Certain of the numbers should be consistent year to year (i.e. unchangeable physical characteristics like an amputation or interminable diseases like cystic fibrosis or multiple sclerosis) and others will change depending on a patient's health condition.

7 – The "Source" column purports to identify the reason that a submitted a suggested code was placed on the 5 Star Checklist. The options for this column include "Current PCP," "Physician" or "Hospitalist" to indicate a condition that was previously reported to CMS by one of those providers, "past history" to identify a condition that was previously reported to CMS but the specific provider is unknown, "Clinically Inferred Criteria" to identify a condition that is selected by a chart reviewer based on the existence of other medical conditions, and "Review Suspect" to identify a condition that is selected by a chart reviewer based on some other criteria.

8 – The "Comments" field is where the patient's current primary care physician communicates findings to the Anion representative who is conducting the post-encounter chart review. The physician marks "yes," "no," or some other response to convey whether the code should be submitted for the patient. Anion may also put notes in the "Comments" section to explain why a certain condition was suggested.

9 – The "Codes/Conditions Already Reported" chart identifies HCCs – with the corresponding specific ICDs – which have already been diagnosed for that patient in the current calendar year, including the first date of service on which the code was identified and any subsequent dates of service on in which the code was identified. In this section of the chart, "source" indicates the person who actually diagnosed the reported code, so it only has three viable options – "Current PCP" to indicate the doctor presently seeing the patient, "Physician" which indicates a physician other than the current PCP, or "Hospital" if a patient received care in a hospital which resulted in an additional diagnosis. The HCCs in this section correlate to the

bubbles which are greyed-in as described in Section 4 of this paragraph.

109.    For patients who are new to Physician Partners or Freedom, the 5 Star Checklist for their first visit is a standard template, rather than drawn from their transferred medical records. The form has a header that says, "PLEASE EVALUATE, ASSESS AND TREAT," and then states, "Listed in the table below are common deseases [sic] that are high prevalent in senior population [sic]. Please complete a comprehensive assessment and evaluate if any of the potential conditions exist on this member. If a condition(s) exist, mark Yes on the last column of the checklist and document appropriately on your progress note." *Every* condition listed has a risk-adjusting diagnosis code; there are no suggested codes which would not result in a risk adjustment, regardless of prevalence in the senior population. The associated comments are also medically inaccurate and misleading.

110.    The following is an example of a standard new-patient 5 Star Checklist which bears a "No" marking from Dr. Zafirov indicating that the patient did not have any of the suggested ailments:



111.    Physician Partners published a *2020 Quality Training Manual* ("*QTM*")
and distributed it to physicians, including Relator, in or about February 2020. The
*2020 QTM* included a "Know Your 5 Star Checklist" page which identified the
various parts of a 5 Star Checklist. On the example graphic, Physician Partners
included a section for "conditions that were marked as not active this year" which

would appear between the top and bottom tables on the example checklist shown above.

112.   Ostensibly, conditions in that section would no longer show up as "care gaps" once they had been identified as inactive. However, in Relator's review of thousands of 5 Star Checklists, she very rarely – if ever – saw that section present on a 5 Star Checklist. Rather, even when she expressly stated "no" to a suggested condition, that condition would remain on the suggested list unless or until it was diagnosed; there were no options to render a condition "inactive."

113.   In the *QTM*, Physician Partners responded to a "Frequently Asked Question" about conditions marked with "no," and acknowledged that physician judgement would be overruled by the Anion review team:

> Why do conditions that have been marked as "No" keep appearing on the 5 Star Checklist?

> Conditions that the PCP has said "No" to *and our review team does not find evidence of,* then the condition will appear in the middle (Inactive section) of the 5 Star Checklist. [sic] These are conditions that Physician Partners has received claims, billing, PCP encounters, specialist notes, etc within the past 3 years. These conditions will continue to appear on the 5 Star Checklist to ensure that all data is given to our providers."

(Emphasis added.) Of note, as described below, these conditions are not gathered from patient-specific information but from trend data.

114.   The "frequent" refusal to accept a "no" is consistent with the message that Dr. Sangeeta Hans, VIPcare's Medical Director, conveyed to Relator in a

meeting on Aug. 9, 2019. Dr. Hans explained that even if Dr. Zafirov wrote "no" to reject a suggested condition, Anion would continue to suggest the condition on future 5 Star Checklists because "they" (meaning the Anion chart reviewers) did not agree with Relator, despite the fact that the chart reviewers are not medical professionals. Dr. Hans informed Relator that she would personally begin holding meetings with Relator to evaluate her coding decisions, even though Dr. Hans had not evaluated or treated any of the patients herself.

115.   The prior version of the *Quality Training Manual* provided to physicians by Physician Partners described the 5 Star Checklist in more detail, including how the data is aggregated, and how it should be used by a physician. The manual predicted that some physicians may be too busy to look at the medical records of a patient. Rather than direct that physicians must review all necessary documentation to provide appropriate care, Physician Partners condones using the 5 Star Checklist as a shortcut around performing that basic standard of care:

> How will it help the member or [Primary Care Physician]?
>
> Primary Care Physician does not have time to always review specialist notes and hospital discharge summaries, which means there is a chance that PCP may not know all the medical conditions that were addressed by the specialists and hospitals. We gather all that information and present it on the 5 star checklists so that PCP can continue to monitor those conditions and help members achieve better health outcomes.

116.    Moreover, the *QTM* recognized that, despite the 5 Star Checklist stating on its face that it is provided "to show the past medical conditions of the patient," that is not true. The data is gathered from industry trends and from algorithms written into Defendants' system, regardless of whether any physician who actually treated the patient ever diagnosed that condition:

> Where are the chronic medical codes coming from?
>
> Health plans provide us monthly claims files, these files include claims details from all medical providers the members have visited, we extract chronic diagnosis codes from the claims and report them on 5 star checklist [sic].
>
> What are the suspect conditions?
>
> The monthly data that we receive from health plans also include Rx claims and Lab test results. We built suspect algorithms in our system that looks for medications specific to certain chronic conditions and abnormal test results that lead to potential chronic conditions, if such conditions are not already addressed or reported by the PCP, we present them as suspect conditions on the 5 star checklists. These are only suspect conditions and its for the PCP to determine if the conditions are not [sic].

117.    Based on Relator's review of hundreds of 5 Star Checklists and the associated medical charts for her patient panel, the 5 Star Checklists and subsequent billing records routinely include at least three categories of conditions which are inapplicable and not reflective of a patient's actual medical status: (1) diagnoses that have no clinical support but were assigned to the patient at random or based entirely on the algorithms created by Physician Partners and Anion; (2)

diagnoses that may have been historically-accurate but are no longer applicable, e.g. cancer which has been treated and is remission; or (3) conditions which are tangentially related to notes in the patient's chart but are not supported by clinical evidence, e.g. recommending COPD for every patient who ever smoked.

118.   The sometimes-preposterous nature of these suggested diagnoses is illustrated by, for example, Patient A.[1] Dr. Zafirov treated Patient A on July 23, 2019. The 5 Star Checklist provided by Anion for Patient A's visit included a suggestion for "complete traumatic amputation of unspecified foot, level unspecified, initial encounter" based on "past history." Except the patient plainly had *not* had either foot amputated (traumatically or otherwise) and, despite the marking that the code had been diagnosed in 2016, it had not actually been. There was nothing in the patient's chart related to an amputation, and the suggestion was completely unfounded.



---

[1] Relator has deidentified all of the patients referenced in this complaint and assigned a name of Patient A, Patient B, etc. Relator can provide the complete patient information to the Court *in camera* upon request, or to Defendants upon entry of a qualified protective order under the Health Insurance Portability and Accountability Act ("HIPAA").

119.    At the end of a patient visit, the 5 Star Checklist is submitted to Anion along with the rest of the medical chart, including the physician's notes. The physician is required to sign the Checklist, certifying, "I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date." Although the forms are submitted to Anion for billing, they are not placed in the patients' permanent medical records so they cannot be accessed again by the physician once sent to Anion. Dr. Zafirov began keeping copies of her 5 Star Checklists once she determined that Anion had submitted codes which she had specifically rejected.

120.    If a physician had true autonomy over the diagnosis codes applicable to a patient, Anion would accept the 5 Star Checklists as submitted. However, billing specialists at Anion reviewed every chart to determine if the physician rejected any of the suggested conditions on the 5 Star Checklist. If the physician failed to code for a condition on the 5 Star Checklist, regardless of the "source" of that code, then the condition is logged as a "care gap" – the equivalent of a demerit for each unapproved code.

121.    "Care gaps" are monitored by Anion, Physician Partners and VIPcare management, and reports documenting "care gaps" are sent to physicians identifying every instance in which a physician did not diagnose a condition that was on the 5 Star Checklist. The care gap remains on the physician's record until

45

the physician reviews the billing suggestion from the Anion employee and either agreed to make the suggested changes or reaffirms the initial diagnosis.

122.    Chart reviews are not inherently improper: there are some appropriate occasions where Anion's chart review determines that a physician has entered a diagnostic code but has not closed out the note, has coded a diagnosis but did not document one part of the care necessary to support the code, or even where a physician has documented all of the necessary conditions for a diagnosis in the notes but left the diagnosis code off of the coding paperwork.

123.    However, in Relator's experience, a substantial majority of Anion's "care gaps" related to conditions that the physician has said do not exist and Anion wanted to add anyway, conditions that a physician has coded as less severe and Anion wanted to upcoded to appear more severe, or conditions that the physician simply did not discuss but a chart reviewer wanted to apply.

124.    Care gaps are not issued for non-risk adjusting diagnoses, meaning even if a physician's note makes clear that the physician intended to diagnose a non-risk adjusting diagnosis code but forgot to do so, the Anion chart reviewers will not create a "care gap" and will not flag that code as an area of review for the physician. Thus, despite the name, "care gaps" are unrelated to patient care and exclusively refer to gaps in risk-adjusting diagnosis codes.

### iii. Physician Partners Incentivized Employed Physicians to Increase the Risk Scores while Reducing Costs to Treat Freedom Patients.

125.   Physician Partners incentivizes physicians to participate in inflating MRA scores by aligning the financial interests of the physician with the financial interests of Physician Partners, much akin to how the gainsharing relationship between Physician Partners and the MAOs align their financial interests. In fact, the physicians are bound by contract to provide treatment "in accordance with FMA's care protocols, quality assurance program, standard operating procedures and managed care requirements" and to "execute any such required forms, including without limitation, assignments, as may be required to facilitate billing and other data captured by FMA for services performed by Physician pursuant to [the Employment] Agreement."

126.   Pursuant to those obligation, Physician Partners, Anion and VIPcare exert consistent pressure to ensure that the physicians participate in their protocols and procedures as expected. And to add additional pressure, Physician Partners directly tie the physician's financial success to their willingness to inflate their patients' risk adjustment scores, both for employed and contracted physicians.

127.   Specifically, in 2018, VIPcare's Performance Bonus Program – as directed by Physician Partners – allowed physicians three opportunities to achieve

financial incentives: (1) Monthly Training Bonus, (2) Quality Performance Bonus, and (3) Financial Performance Bonus.

128.    The first two categories are innocuous, and their value is relatively minimal compared to the Financial Performance metric. The Monthly Training Bonus provides $300 bonus for each meeting attended by the physicians, up to an annual limit of $3,600. The Quality Performance Bonus – arguably the most important metric to ensure proper patient care – incentivizes physicians to maintain high scores on the Healthcare Effectiveness Data and Information Set ("HEDIS") which uses nearly 100 factors to assess quality of care. Physicians who maintained HEDIS Star Scores of 4.5-4.74 out of 5 earn up to $5,000 per year, while physicians who have HEDIS Star Scores of 4.75 or greater earn up to $10,000 per year.

129.    The third category, however, directly implicates a physician's willingness to comply with the directives to boost risk adjustment scores. To earn the maximum Financial Performance Bonus, a physician must see more than 600 Freedom Medicare Advantage ("FR MA") patients in a year, and then the physician can be awarded up to 50% of the surplus associated with those patients.

| III. FINANCIAL PERFORMANCE BONUS | | |
|---|---|---|
| **GOAL: SURPLUS**<br>**IPA BONUS PROGRAM – INDIVIDUAL PCP PERFORMANCE** | | |
| **FR MA PATIENTS** | **ANNUAL POTENTIAL BONUS** | **PAYMENT FREQUENCY** |
| 100 - 249 | 50% of Surplus Up To $20,000 | Quarterly |
| 250 - 599 | 50% of Surplus Up To $50,000 | Quarterly |
| 600+ | 50% of Surplus Up To $100,000 | Quarterly |

130.   Because the bonus considers *only* Freedom Medicare Advantage patients, the physician can *only* generate bonus income by increasing the risk scores and reducing expenditures for their Freedom patients. Relator was advised by VIPcare Senior Direction Gallman that the target capitated payment amount is $800 per patient per month to maximize the bonus.

131.   Relator and her physician-colleagues were also consistently pressured to reduce expenses which are typically related to (1) in-patient hospital admissions, (2) professional expenses like imaging or specialist referrals, and (3) prescription drugs. A physician can reduce expenses by avoiding hospital admissions, writing generic prescriptions instead of brand names, referring patients to use VIPcare's in-house imaging resources, or withholding specialist referrals. If a physician can maximize risk scores and minimize expenditures, the physician is entitled to up to $100,000 over and above their already-generous salaries.

132.    Gallman often spoke to Relator about her compensation and bonus potential. In one such conversation in May 2019, Gallman advised Relator that VIPcare physicians need only to "accept the white circles" to increase their bonuses, a reference to the white bubbles at the top of the 5 Star Checklist which represent every HCC suggested by Anion. Gallman also encouraged Relator to minimize expenses by, for example, contacting oncologists who recommended expensive infusion treatments to "see what they want." Relator understood this to mean to inquire about what kind of treatment the doctor would provide and to ration referrals to expensive oncologists to keep the expenses low. Gallman made clear to Relator that the more that VIPcare had to spend on a patient's specialist care, the less money would be available to pay Relator's bonus.

133.    VIPcare's Regional Director, Alex Lavin, reiterated this message to Relator in a Zoom conversation held on Aug. 9, 2019. In a meeting also attended by Dr. Sangeeta Hans, VIPcare's Medical Director, Lavin told Relator that he wanted to explain the Physician Partner financial model to her, and that her most important focuses needed to be limiting hospital and emergency room admissions while coding the way she was directed. Lavin specifically stated to Relator that having a higher risk score is important, and that the better she does with the parameters that he described, the more money she would make in bonus payments.

134.   Just one week later, on Aug. 15, 2019, Gallman, Lavin and Hans held another Zoom meeting with Relator to walk through the bonus structure yet again. Together, the VIPcare representatives emphasized that Relator needed to increase her patients' average risk score in order to be profitable, and her target needed to be at least 1.5. Dr. Hans stated that her MRA score was 1.96 (meaning her patients, *on average*, receive nearly 200% of the capitated bid price). Dr. Hans also mentioned that her prescription drug expenses used to be very high due to her cancer patients, but a number of those patients have died so her numbers are better now.

135.   Of note, on another occasion, on Nov. 13, 2019, in a monthly meeting for all VIPcare physicians, Dr. Hans shared her cost-saving story wherein she withheld a referral to a hematologist-oncologist for a young man in his 20s who had metastatic breast cancer and convinced him to go to hospice instead. Dr. Hans admitted that, "if I would have sent him on to oncology, they would have promised they can cure this." The young man's cancer had metastasized, so based on *her* opinion (as a primary care doctor), the expensive specialist care would not be successful and the less-expensive hospice was the right decision. Dr. Hans parlayed the story into a discussion of advanced directives and DNRs for patients who she thought wouldn't survive CPR.

136.   When Relator began employment at VIPcare, she took over a patient panel that had been previously treated by other VIPcare or Physician Partner

51

physicians. In evaluating her patient records, Relator encountered several patients where she determined that referrals to specialists had been withheld, thus reducing VIPcare's costs and increasing those physicians' bonus pools. The following are examples of such rationed care:

a. Patient B, a 95-year-old veteran of World War II, was seen by Dr. David Hunt on Sept. 4, 2018. At 109 pounds and 5 feet, 9 inches tall, Patient B was severely malnourished and had low white count. Patient B was seen by Dr. Akhil Patel on Oct. 25, 2018. Both physicians stated the patient declined interventions, although he had dementia and his mental capacity was in question. The patient was told by Dr. Patel that his diet of Boost alone was adequate for nutrition; no further evaluation or work-up was performed. When Patient B became Dr. Zafirov's patient, she provided two different referrals to appropriate specialists which he readily accepted. From those referrals, Patient B was found to suffer from a likely leukemia and an esophageal stenosis, both treatable conditions which had been contributing to his weight loss.

b. Patient C was seen by Dr. Rick Simovitz on multiple occasions for evaluation of a painful abdominal hernia. Patient C reported to Relator that he begged for a referral to a surgeon, which Dr. Simovitz

refused. The patient brough his son in to discuss the situation, but still no referral was made. When Patient C became Dr. Zafirov's patient, she ordered imaging that revealed a partially incarcerated hernia, which can be life-threatening. Dr. Zafirov immediately referred him to a specialist for a hernia repair.

c. Patient D was seen by Dr. Patel several times in 2018, during which worsening renal function was diagnosed as approaching stage IV (severe) kidney disease. The condition had been billed on multiple visits, but Patient D was never referred to a nephrologist. When Dr. Zafirov treated him, Patient D reported that he was unaware that he had ever been diagnosed with approaching stage IV kidney disease. Dr. Zafirov referred him to nephrology and cardiology specialists who promptly began to treat him.

d. Patient E was examined by Dr. Patel on Sept. 6, 2018. Dr. Patel ordered imaging for screening and subsequently told Patient E that the imaging was normal. Dr. Patel commented in his note, "CT abdomen without significant findings supporting weight loss." There was no further follow-up done or referral made. When Patient E became Dr. Zafirov's patient, she reviewed the radiologist's report from the CT scan and determined that it had identified thyroid calcifications

(associated with possible malignancy), emphysema, lung nodules and heavy coronary plaque, gallbladder sludge, adrenal adenoma, renal calculi, and prostate enlargement. A number of those conditions required further imaging and/or referrals, and several could have contributed to the patient's weight loss. Dr. Zafirov promptly made referrals to the appropriate specialists.

137.    Relator also spoke directly with other physicians who indicated that the financial incentives were, in fact, considerations in their patient care decisions. For example, during an August 2019 Monthly Forum Meeting attended by most (possibly all) VIPcare physicians, Relator discussed with Dr. Esenbike Bek (North Port clinic physician) the notion that Physician Partners directed them to administer IV fluids in their offices rather than send patients to the hospital. Relator stated that she would not do so for patients with certain co-morbidities because it was too risky, particularly when there was a hospital right next door. Dr. Bek agreed, but questioned what would happen to their bonuses and wouldn't they lose the bonuses if they sent the patient to the hospital? Dr. Zafirov countered that whatever the bonus would be was not worth losing her medical license.

### iv.    Physician Partners Directed and Pressured Physicians to Use Risk Adjusting Scores

138.    Physician Partners engages with its physicians – both employed and contracted - in person, in writing, via Zoom, and through pre-recorded training

videos to convey and enforce its expected coding protocols. At various times, Physician Partners interacted with physicians directly, and at other times, its messaging was conveyed through VIPcare, Anion, and, remarkably, Freedom and Optimum. The directives have a consistent message: make more money by utilizing only risk-adjusting diagnosis codes to inflate a patients' risk score, even when such codes are inconsistent with or unsupported by the physician's medical training.

139.   Physician Partners has favored conditions which it heavily emphasizes in trainings, on 5 Star Checklists, and in one-on-one "training sessions" with physicians like Relator whose diagnostic coding does not meet Physician Partner's expectations. These favored conditions include Diabetes with Manifestation (HCC018), Diabetes without Manifestations (HCC019), Malnutrition (HCC021), Morbid Obesity (HCC022), Drug/Alcohol Dependence (HCC055), Major Depressive Disorder (HCC058), Congestive Heart Failure (HCC085), Vascular Disease (HCC108), COPD (HCC111), Chronic Kidney Disease Stage 5 (HCC136), Chronic Kidney Disease Stage 4 (HCC137), and Angina Pectoris (HCC088).

140.   Some or all of Physician Partners' favored conditions were suggested on many 5 Star Checklists prepared by Anion, regardless of the patient's medical history. For example, Relator reviewed sixty 5 Star Checklists prepared for her

patients throughout February and March 2019. For those patients, Relator found no patients for whom she found all suggested codes to be supported by clinical evidence. One patient had a risk score of 3.256 in the prior year, but her first 5 Star Checklist of 2019 had 21 conditions suggested which, if accepted by the patient's physician, would yield a total risk score of 6.052. Her capitated payment would be more than 600% of the baseline payment. The suggested codes included favored conditions HCC055, HCC108, HCC088, along with several forms of cancer that she did not have. Relator rejected 19 of the 21 codes as unsupported by clinical findings.

141.   Another patient treated by Dr. Zafirov had a risk score of 1.671 in the prior year, but the 5 Star Checklist supplied by Anion suggested 11 conditions which would have yielded a total risk score of 3.193 if submitted. The suggested codes included favored conditions HCC018, HCC058, HCC108, and HCC088, along with several cancers that he did not have. All suggestions were rejected.[2]

---

[2] For all documents used in or attached to this Amended Complaint, Relator has redacted all Protected Health Information and any other information which may potentially lead to the identity of the patient. Relator has non-redacted copies in her possession and can provide them to the Court or other parties upon request.



142.   For the 60 patients represented in the sample of records from February-March 2019, Relator rejected approximately 446 of approximately 523 suggested conditions – an 85% rejection rate. With respect to the favored chronic diagnosis, for these 60 patients, Relator rejected 15 recommended diagnoses of

Congestive Heart Failure, 18 recommended diagnoses of Major Depressive Disorder, 23 recommendations of Chronic Obstructive Pulmonary Disorder, 25 recommendations of Peripheral Vascular Disease, 8 recommendations of Type 2 Diabetes, and 29 recommendations of Nonthrombocytopenic Purpura. In Relator's personal observations and experience, the rejection rate in this sample is representative of the universe of patients she evaluated using the 5 Star Checklists.

143.    In one very common and flagrant example, physicians are pressured to diagnose any patient who has ever been on an antidepressant as having Major Depressive Disorder ("MDD"), a risk-adjusting HCC which has numerous diagnostic criterial and potentially serious consequences for the future healthcare of the patient. For example, in a May 2019 "Performance Forum" (a monthly training meeting for VIPcare physicians), a VIPcare representative presented a slide which stated that there had been 110 instances in which a patient had a score of five or higher on a standardized Patient Health Questionnaire ("PHQ-9") but MDD had not been diagnosed. The MDD care gaps were identified this as a "rework trend," meaning that the code need to be addressed and revised.

144.    However, the industry standard – consistent with the guidance provided by the PHQ-9 test-makers – is that a patient must have a PHQ-9 score of 10 or higher before MDD is even *considered*. A score of five is typically associated

with mild depression at most, and mild depression is not a risk-adjusting diagnosis.

145.   Through Physician Partners' Q360 electronic records system, Relator had access to reports which showed the frequency with which other VIPcare physicians diagnosed the favored conditions, including major depressive disorder. These reports indicate that the result of Defendants' concerted effort to increase diagnosis of risk-adjusted conditions is that many VIPcare patients have been diagnosed with serious medical conditions at far greater rates than the Medicare population at large.

146.   For example, with respect to Major Depressive Disorder, the prevalence among Medicare beneficiaries is about 4%, meaning four of every 100 patients suffer from the condition. Diniz, B., *Major Depressive Disorder in Older Adults,* accessed at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4615590/ (2014). However, many of the VIPcare physicians diagnosed the condition with far greater frequency – some as much as eight or nine times as often:

| Physician | Prevalence of MDD in 2017 & 2018 |
|---|---|
| Dr. Gil Gutierrez | 25% |
| Dr. David Hunt | 14% |
| Dr. Auxi Peachy | 23% |
| Dr. James Goskowski | 30% |
| Dr. Claudine Fredericks | 29% |
| Dr. John Watson | 16% |
| Dr. Stephen Seecharan | 25% |
| Dr. Myriam A.E. Miller | 31% |

| | |
|---|---|
| Dr. Charles Powers | 10% |
| Dr. Veronica Machado | 31% |
| Dr. Paula Gregory | 16% |
| Dr. Jerome Lopez | 24% |
| Dr. Lawrence Campo | 12% |
| Dr. Jose Llamas | 25% |
| Dr. Rodger Rothenberger | 23% |

147.   In another avenue to influence its providers' coding, Physician Partners uses its Anion chart reviewers to falsely modify patients' "Problem Lists" in their charts to influence treating physicians to agree to suggested diagnosis codes. Problem Lists are a specific section of a patient's medical record where the physician can keep a working diagnostic list. In Dr. Zafirov's experience, the Problem List is a way for physicians to make notes for themselves to review when the patient returns. It may also be a way for physicians to communicate with other physicians in the same practice who may take over the patient's care or see the patient if the PCP is unavailable.  It serves as a quick-view list of a patient's medical condition that a physician *should* be able to rely on at the start of a patient visit without needing to review the entire medical chart every time. Because of the importance of an accurate problem list, no one should make additions, removals, or any other edits to the problem list other than the treating physician.

148.   The Problem List is housed in the patient's eClinicalWorks medical record, not in the Q360 billing system. The Problem List has nothing to do with

billing and there is no valid reason for a billing representative to have the ability to edit it.

149.  Codes entered into the Problem List are not yet claims submitted for payment to an insurer or the United States, so the entrance of unsupported codes on the Problem List is not, in and of itself, a false claim. However, entering codes to appear as though another physician has already diagnosed those codes has the intended purpose of pushing the next physician towards those codes rather than allowing the physician to evaluate the patient with a clean, or at least accurate, slate.

150.  Dr. Zafirov identified several occasions where dozens of suggested codes were added to a patient's problem list by various individuals and then removed shortly thereafter by the treating physician because the codes were unsupported by clinical evidence. While the Problem List shows the name of the person who entered the code, it does not say whether that person is a physician or not. However, Dr. Zafirov determined that the individuals who entered the codes were non-physician Anion representatives.

   a.  For example, Dr. Zafiov was seeing patients for Dr. Amit Ford on or about June 25, 2019, including Patient F. In reviewing Patient F's chart to prepare for the visit, Dr. Zafirov noted that Dr. Ford had removed fourteen conditions from Patient F's Problem List. Dr. Zafirov

determined that seventeen codes, including all of the removed codes, had been entered into the Problem List by an individual named Syed Dastagir on May 9, 2019. Syed Dastagir is an employee of Anion Technologies. Of those conditions, twelve were variations on Type 2 Diabetes, some of which were internally inconsistent with one another (i.e. "Type 2 diabetes mellitus with unspecified diabetic retinopathy without macular edema" and "Type 2 diabetes mellitus with unspecified diabetic retinopathy with macular edema"). Other codes were duplicative, such as three individual codes for a right eye, left eye, and both eyes.  Although Dr. Ford had removed the entries for "hypertensive heart disease with heart failure" and "unspecified diastolic (congestive) heart failure," the 5 Star Checklist for RW still listed both conditions as suggested diagnoses

| Action Taken | Code | Item Name | Item Type | Previous Value | Current Value | Modified By | Modified Da |
|---|---|---|---|---|---|---|---|
| Viewed problem list | | | | | | Ford, Anit D | 05/10/2019 16:3 |
| New record added | E11.69 | Type 2 diabetes melitus with other specified complication | | | | Dastagir, Syed | 05/09/2019 20:3 |
| New record added | E11.65 | Type 2 diabetes melitus with hyperglycemia | | | | Dastagir, Syed | 05/09/2019 20:39 |
| New record added | E11.42 | Type 2 diabetes melitus with diabetic polyneuropathy | | | | Dastagir, Syed | 05/09/2019 20:39 |
| New record added | E11.40 | Type 2 diabetes melitus with diabetic neuropathy, unspecified | | | | Dastagir, Syed | 05/09/2019 20:39: |
| New record added | E11.36 | Type 2 diabetes melitus with diabetic cataract | | | | Dastagir, Syed | 05/09/2019 20:39: |
| New record added | E11.3313 | Type 2 diabetes melitus with moderate nonproliferative diabetic retinopathy with macular edema, bilateral | | | | Dastagir, Syed | 05/09/2019 20:39:2 |
| New record added | E11.3312 | Type 2 diabetes melitus with moderate nonproliferative diabetic retinopathy with macular edema, left eye | | | | Dastagir, Syed | 05/09/2019 20:39:2 |
| New record added | E11.3311 | Type 2 diabetes melitus with moderate nonproliferative diabetic retinopathy with macular edema, right eye | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | E11.319 | Type 2 diabetes mellitus with unspecified diabetic retinopathy without macular edema | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | E11.311 | Type 2 diabetes melitus with unspecified diabetic retinopathy with macular edema | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | E11.29 | Type 2 diabetes melitus with other diabetic kidney complication | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | E11.22 | Type 2 diabetes mellitus with diabetic chronic kidney disease | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | H35.3232 | Exudative age related macular degeneration of both eyes with inactive choroidal neovascularization | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | I50.30 | Unspecified diastolic (congestive) heart failure | | | | Dastagir, Syed | 05/09/2019 20:39:25 |

Page 3 of 4 · View 31 - 45 of 48

| Action Taken | Code | Item Name | Item Type | Previous Value | Current Value | Modified By | Modified D |
|---|---|---|---|---|---|---|---|
| Record removed | I11.0 | Hypertensive heart disease with heart failure | | | | Ford, Anit D | 05/10/2019 18 |
| Record removed | I50.30 | Unspecified diastolic (congestive) heart failure | | | | Ford, Anit D | 05/10/2019 17: |
| Viewed problem list | | | | | | Ford, Anit D | 05/10/2019 17: |
| Record removed | E11.69 | Type 2 diabetes mellitus with other specified complication | | | | Ford, Anit D | 05/10/2019 16: |
| Record removed | E11.65 | Type 2 diabetes melitus with hyperglycemia | | | | Ford, Anit D | 05/10/2019 16: |
| Record removed | E11.40 | Type 2 diabetes melitus with diabetic neuropathy, unspecified | | | | Ford, Anit D | 05/10/2019 16:4 |
| Record removed | E11.3312 | Type 2 diabetes mellitus with moderate nonproliferative diabetic retinopathy with macular edema, left eye | | | | Ford, Anit D | 05/10/2019 16:42 |
| Record removed | E11.319 | Type 2 diabetes mellitus with unspecified diabetic retinopathy without macular edema | | | | Ford, Anit D | 05/10/2019 16:41: |
| Record removed | E11.29 | Type 2 diabetes melitus with other diabetic kidney complication | | | | Ford, Anit D | 05/10/2019 16:41: |
| Record removed | E11.36 | Type 2 diabetes melitus with diabetic cataract | | | | Ford, Anit D | 05/10/2019 16:40:5 |
| Record removed | E11.3313 | Type 2 diabetes mellitus with moderate nonproliferative diabetic retinopathy with macular edema, bilateral | | | | Ford, Anit D | 05/10/2019 16:40:5 |
| Record removed | E11.3311 | Type 2 diabetes mellitus with moderate nonproliferative diabetic retinopathy with macular edema, right eye | | | | Ford, Anit D | 05/10/2019 16:40:38 |
| Record removed | E11.311 | Type 2 diabetes melitus with unspecified diabetic retinopathy with macular edema | | | | Ford, Anit D | 05/10/2019 16:40:30 |
| Record removed | E11.22 | Type 2 diabetes mellitus with diabetic chronic kidney disease | | | | Ford, Anit D | 05/10/2019 16:40:23 |
| Record removed | F13.21 | Sedative, hypnotic or anxiolytic dependence, in remission | | | | Ford, Anit D | 05/10/2019 16:39:26 |

Page 2 of 4 · View 16 - 30 of 48

    b.  On another occasion that Dr. Zafirov was seeing patients for Dr. Ford,

Patient G had an appointment scheduled for June 19, 2019. Patient G

had been a patient of Dr. Patel before being assigned to Dr. Ford's patient panel. Dr. Zafirov noted an extensive Problem List for Patient G – 6 pages long. In reviewing the list to familiarize with the patient – as it is intended– Dr. Zafirov noted that a great deal of codes had been entered by Syed Dastagir while Patient G was a patient of Dr. Patel.  Specifically, she noted that Mr. Dastagir added 27 codes to Patient G's Problem List on May 15, 2019. Dr. Patel removed or modified 24 of those added codes the same day. The 5 Star Checklist provided by Anion noted that several codes were reported in the current year, including three forms of complicated diabetes that Dr. Patel had specifically removed from the Problem List, and listed several other removed codes as suggested diagnoses.

151.  Another means by which Physician Partners provides coding guidance to its physicians is through a series of videos called "Five Star University" that is posted on their physician portal. The hours-long video series is broken into segments consistent with the Physician Partners favored diagnoses, plus additional videos for overviews of the Medicare Risk Adjustment System and Documentation Guidelines. Five Star University recordings are presented by Dr. Eric Haas, Chief Medical Officer of Physician Partners; Dr. Ford Brewer, who is

identified only as a "Career Medical Director;" and Dr. Dennis Mihale, Medical

Director of Freedom Health, as pictured below.



152. Five Star University's "Bootcamp Introduction" video directs physicians to the "Quick Coding Guide" in the Physician Partners' *Quality Training Manual*, noting "This colorful laminated tool will help you pick the right diagnosis code for specific disease conditions. We listed about 200 ICD-10 codes with their risk value." This statement is emblematic of Physician Partners' coding directive: Physician Partners represents that the Quick Coding Guide will have "the right diagnosis code," but the Guide *only* contains risk-adjusting codes.

153. The condition-specific videos primarily include guidance and case studies which focus on instructing physicians on opportunities to increase a

patient's risk score, opportunities which often are loosely connected to actual medical science or medical standards.

154.   For example, a video on vascular disease suggests that the diagnosis can be made by physical examination only, rather than the clinical standard of doppler imaging, and recommends the risk-adjusting code for peripheral vascular disease if a patient has leg pain in place of the non-risk adjusting code for "pain in the legs."

155.   A Five Star University video on morbid obesity suggests that a patient has obesity hypoventilation syndrome so long as the patient has a high BMI and sleep apnea, which is inconsistent with the American Thoracic Society's directive that the diagnosis requires additional symptoms that must be confirmed by an arterial blood gas.

156.   A Five Star University video addressing drug dependence states that a patient who had dependency issues 20 years before should *always* be considered to be in remission even if they had no recent issues. Under the risk-adjustment system, "past history" is not risk-adjusting while "in remission" is; thus, diagnosing "remission" results in extra money for the defendants, while noting the patient's past history does not.

157.   The Five Star University videos also characterize certain conditions as common in an effort to influence physicians to become comfortable frequently

coding conditions which are actually quite rare.  For example, in a video regarding major depressive disorder, Dr. Brewster leads off by stating, "This is one of the most common, highly prevalent conditions in our senior population." This statement is simply false: minor depression may be very common, but Major Depressive Disorder is not and has specific diagnostic criteria. "The prevalence of major depressive disorder at any given time in community samples of adults age 65 and older ranges from 1-5% . . . with the majority of studies reporting prevalence in the lower end of the range." Fiske, A., et al. *Depression in Older Adults*, Annual Rev. Clin. Psychol. 2009, 5: 363-389, accessed at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2852580/; see also Para 146, *supra*.

158.    When the videos and published guidance are not successful in convincing a doctor to code in a manner which inflates risk scores, Physician Partners begins a concerted, direct effort to pressure the nonconforming physician to change their diagnostic practices. Relator was one such physician.

159.    In or around August 2019, Dr. Zafirov was required to participate in routine meetings with a then-newly-hired VIPcare Regional Director named Alex Lavin.  Mr. Lavin repeatedly told Dr. Zafirov that VIPcare and Physician Partners were not happy with her coding and the level of her average MRA score, and that

she needed to change her coding practices to be consistent with the Physician Partners financial model.

160.    When Relator expressed resistance to changing her medical practice to achieve some desired financial outcome, Lavin began scheduling Relator for regular meetings – sometimes alone and sometimes with Dr. Sangeeta Hans (Chief Medical Officer of VIPcare), Emily Gallman (Senior Director of Healthcare Operations of VIPcare), Sajitha Johnson (Physician Partners Quality Analyst), and various other individuals who detailed the coding and billing practices with which she was expected to comply. In addition, Relator was required to "check in" with Lavin weekly to discuss her hospital admission rates, HEIDIS data, and her completion of 5 Star Checklists.

161.    On Aug. 21, 2019, Relator had a meeting via Zoom with Hans, Lavin, Johnson and a Physician Advisor named Kothari. Relator's nurse, Catherine Davis, attended as well. The meeting began with the presentation of a chart which compared Relator's coding prevalence to the physicians who treated that practice before her, where every area in which she had a lower prevalence than the previous physicians was marked in red. All of the conditions that were presented on the slide were Physician Partners' favored conditions. For example, the chart showed that Relator diagnosed 15 patients with drug dependency whereas it had been "previously validated" for 80 of the patients in the past; Relator diagnosed 4

with malnutrition as compared to 71 in the past; and Relator diagnosed 21 with major depression as compared to 123 in the past. Lavin and Hans made clear that they believed it was Relator who was under-coding now, not that the prior diagnoses had been improper.



162.   In the same meeting, Dr. Hans then proceeded to walk Dr. Zafirov step-by-step through risk-adjusting diagnoses which she believed Dr. Zafirov should adopt, including medical advice that was either inconsistent with Relator's medical training or blatantly wrong. For example, with respect to diabetes, Dr. Hans advised Dr. Zafirov that *all* diabetes is complicated diabetes.  This is flatly false: not only is it medically inaccurate, but there are separate codes for Diabetes

Without Complications (HCC 19), Diabetes with Chronic Complications (HCC 18)

and Diabetes with Acute Complications (HCC 17).[3]

163.   The reason Dr. Hans wanted all diabetes diagnoses to be

"complicated" is easily discerned:  the Risk Adjustment Factor for "Diabetes" is

approximately 0.105, while the Risk Adjustment Factor for "Diabetes with [chronic

or acute] complications" is 0.302 or greater—almost three times as high. A report

prepared under contract for CMS for the purpose of evaluating the Risk

Adjustment Model makes this point clearly:

> For example, if a beneficiary is diagnosed with uncomplicated
> diabetes only, his or her expenditure prediction will be relatively
> modest. But if a beneficiary has diagnoses for diabetes with chronic
> complications, congestive heart failure, vascular disease, cancer, and
> chronic obstructive pulmonary disease, his or her predicted
> expenditures will be much higher.

Pope, G., et al., *Evaluation of the CMS-HCC Risk Adjustment Model*, at 27-28 (RTI

Int'l, March 2011).

164.   In that same meeting, Dr. Hans also instructed Dr. Zafirov to diagnose

Congestive Heart Failure ("CHF") – a risk-adjusting diagnosis – for any patient

---

[3] Dr. Hans would go on to repeat this directive several more times. At a Weekend Training Bootcamp held on Sept. 21, 2019, Dr. Hans was discussing prevalence rates of various conditions, and stated several times that 0% of patients should have uncomplicated diabetes. At the VIPcare Annual meeting on Jan. 11, 2020, which was attended by Physician Partners senior staff and VIPcare physicians. Dr. Hans announced during a seminar that, "There should not be a patient out there that does not have a complication."

who had structural cardiac damage which was a *potential* precursor to CHF, even when the patient did not yet have actual indications of CHF.  Dr. Hans's direction is expressly contradicted by Medicare guidelines which state that the submission of codes that are simply documented as suspected or possible should be avoided.

165.    Also in the same meeting, Dr. Hans repeatedly asserted that Dr. Zafirov would not be "diagnosing" the condition just because she coded it. This is palpably false, as the codes themselves are called "diagnosis codes" and the submission of the code is the only means by which a provider indicates to CMS that a patient has been diagnosed with a condition.

166.    Dr. Zafirov later asked Mr. Lavin if Dr. Hans had similar conversations with other employed physicians. Lavin confirmed she had done so several times.

167.    The following day, August 22, 2019, Mr. Lavin showed up to Relator's office in person even though he had scheduled a Zoom meeting.[4] Lavin told Relator that they had "very serious things" to discuss. Lavin – with no medical

---

[4] Lavin's demeanor in that unexpected, in-person meeting made Dr. Zafirov very uncomfortable. Relator learned days later that Lavin had a lengthy criminal history, including being incarcerated in the Florida prison system on an Aggravated Battery with a Deadly Weapon conviction. Physician Partners and VIPcare had not notified Dr. Zafirov of this and did nothing to stop Lavin from showing up after hours, unannounced, at the office of a female physician. After learning this information, Relator felt Lavin's unannounced visit to be a subtle threat that she cooperate as he requested. As a result, Dr. Zafirov increased the security at her home and took measures not to be alone in her office any longer.

background at all – argued with Dr. Zafirov about her diagnostic coding and argued that she needed to "meet in the middle" with what was expected of her. He also explained that her projected risk score for the following year would be around .7 - 1 (which, with 1 being the calculated average Medicare beneficiary's risk score, is to be expected), and that if she wanted to put money in her own pocket, that would be a factor.

168.   For the next several weeks, Dr. Zafirov was required to have regular meetings with Dr. Hans, Johnson, Lavin and occasionally Gallman, Nursing Manager Jan Morsey, or other Anion chart reviewers. The phone calls became weekly interrogations, where Dr. Hans challenged Dr. Zafirov on specific diagnoses in her charts and Dr. Zafirov was forced to repeatedly defended her medical judgment.

169.   For example, on Sept. 12, 2019, Dr. Hans chastised Dr. Zafirov for sending a patient to the emergency room instead of seeing her in the office first. Dr. Zafirov noted that the patient had acute worsening shortness of breath and a delay in care could have been dangerous. Despite having the patient's chart accessible, it was not until Dr. Zafirov pointed out that the patient had severe congestive heart failure and wore a LifeVest that Dr. Hans conceded that she had made the right choice.

170.    Lavin again came to Dr. Zafirov's clinic unannounced on Sept. 26, 2019, and spoke to her for approximately 90 minutes. He said that her clinic was getting negative attention and she was being watched closely. Lavin stated that Dr. Hans and Anion chart reviewers were looking through all of Dr. Zafirov's charts and that Dr. Hans was unhappy about continuing the weekly sparring phone calls about Dr. Zafirov's coding. Lavin told Dr. Zafirov that Physician Partners has certain expectations of her and that her continued employment depended on her to "cod[ing] more aggressively" and reaching a target MRA of 1.5-1.6.

171.    By telling her to "code more aggressively," Lavin made clear that Dr. Zafirov was expected to accede to the risk-adjusting diagnoses "suggested" on her patients' 5 Star Checklists.

172.    Pressure steadily increased following the threat to Dr. Zafirov's job. One way this happened was the introduction of additional people into the meetings to criticize Relator's coding and persuade her to change.

173.    On Oct. 16, 2019, Dr. Zafirov was required to attend a meeting with a nurse in her clinic, Catherine Davis, Sajitha Johnson, Cassidy Cooper, a Physician Partners "Quality Analyst," and Dr. Rajiv Patel, "Physician Consultant/Trainer."

174.    In that meeting, Dr. Patel pushed Dr. Zafirov to find alternative risk-adjusting diagnosis codes if she did not want to diagnose their favored codes; for

example, he urged her to diagnose "mood disorder," a risk-adjustment diagnosis, rather than minor depression if she was unwilling to diagnose Major Depressive Disorder.

175.    Dr. Patel also stated to Dr. Zafirov that she should have diagnosed cardiomyopathy based on a years-old imaging result, despite the fact that the patient in question was under the care of a cardiologist who had made no findings of cardiomyopathy. Dr. Patel stated to Dr. Zafirov, "We [primary care physicians] don't look at the notes of cardiology to make our diagnoses."

176.    On Nov. 6, 2019, Relator was required to attend a 90-minute meeting with Emily Gallman and Dr. Eric Haas, Chief Medical Officer of Physician Partners.

177.    Given Dr. Haas's position, Dr. Zafirov relayed to him her concerns about delayed referral approvals by Freedom when she referred to an outside specialist, as well as missing records transmitted by Anion to the primary care physicians from specialists. Dr. Haas asserted that Physician Partners' Preferred Providers were "better" because they were more cost-efficient and have lower hospital admissions. Dr. Haas provided Dr. Zafirov with a list of specialists who he wanted her to use because they use surgery centers instead of hospitals. This list was provided to Physician Partners by Freedom.

178.   Dr. Haas also criticized Dr. Zafirov for not administering a drug, Procrit, to her end-stage renal disease patients rather than referring such patients to a nephrologist. Procrit should always be administered under the supervision of a nephrologist for end-stage renal disease patients. Dr. Haas advised her that other VIPcare physicians were administering Procrit in their clinics, a decision that would allow those physicians to reduce expensive specialist costs and increase the physicians' potential bonus payments.

179.   Dr. Haas provided Dr. Zafirov with a list of the patients he viewed to be her most high-cost, high-risk patients who had recently been to the hospital to review how she had managed their care and coded their diagnoses. Dr. Haas reviewed five patients in depth with Dr. Zafirov, in response to which she identified clinical findings that he had ignored and repeated her explanation as to why she rejected conditions that were inconsistent with her evaluation of the patient.

### B.  ALLEGATIONS AGAINST FREEDOM AND OPTIMUM.

180.   The conduct of Physician Partners, VIPcare and Anion which led to the submission of false claims was only possible because of the Providers' close relationship with Freedom and Optimum, the MAOs responsible for approximately 90% of the Providers' enrolled patients. Freedom and Optimum's role in the submission of these false claims comes not only from their failure to

conduct appropriate oversight Physician Partner's submitted claims, but from the MAOs' role in the operation of Physician Partners.

181.    The role of Freedom and Optimum as gatekeepers to the providers' access to Medicare and Medicaid funds is precisely delineated in the regulatory regime. CMS requires as "a condition for receiving a monthly payment," that a Medicare Advantage insurer,

> agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract [with CMS] on a document that certifies (based on best knowledge, information, and belief), the accuracy, completeness, and truthfulness of relevant data that CMS requests. Such data include specified enrollment information, encounter data, and other information that CMS may specify.

42 CFR § 422.504(l). The signatory must certify that "the information relied upon by CMS in determining payment (based on best knowledge, information and belief) is accurate, complete, and truthful. 42 CFR 422.504(l)(1).

182.    Freedom and Optimum convey the regulations to providers through a jointly published and distributed *Medicare Provider Manual* ("*MPM*") which bears the logos of both entities on its face and which collectively refers to the two health plans as "we" throughout. Accordingly, all statements made in the *MPM* implicate the knowledge of both defendants without distinction. The *Medicare Provider Manual* acknowledges, *inter alia*, that:

a. A claim submitted to an intermediary, such as a managed care organization, is included in the definition of a claim "submitted to the government" (pg. 23);

b. Liability to the Government attaches not only from the submission of false claims but from the improper retention of an overpayment (pg. 23).

c. Indicators of fraud, waste and abuse include upcoding, the use of fictitious providers, and statistical outliers (pg. 28);

d. In the Medicare Advantage context, the "claim" is the encounter data submitted after a patient visit (pg. 82).

183.   Despite Freedom and Optimum's knowledge of their obligations to the United States, the entities developed a unique relationship with Physician Partners – the provider group run by Sidd Pagidipati, the MAOs' former Chief Operating Officer who paid $750,000 in 2017 to resolve False Claims Act violations related to his conduct and management of the entities.

184.   Far from a third-party claims reviewing and processing entity, Freedom took an active role in the operations of Physician Partners including educating physicians on Physician Partners' coding expectations, allowing Physician Partners' physicians access to the Freedom billing portal to review codes submitted to CMS and the patients' running MRA scores, and contacting patients

on behalf of VIPcare to schedule visits. In return, Physician Partners not only increased the profitability of Freedom by submitting inflated risk adjustments, but also allowed Freedom access to its patient records for the purpose of contacting non-Freedom patients to persuade the patient to change their MAO.

185.   With respect to training, Freedom presented a united force with Physician Partners in the Five Star University video series, described above. In particular, Dr. Dennis Mihale, in his capacity as the Medical Director of Freedom Health Plans, provided commentary for several hours over a series of more than a dozen videos, offering both general commentary on coding and specific advice on the discussed conditions.



186.   In his introduction, Dr. Mihale tacitly implies that coding supersedes medical education and experience, stating, "In medical school, we will say,

'history of' because we weren't trained in coding." He continues by suggesting that the physician could just be a bit creative with the coding to achieve a risk adjustment: "Sometimes, you say 'history of,' you just can't do it. But if you put a comma there and say 'active,' then we've done the right kind of coding." In making such an assertion, Dr. Mihale conveyed to the entire 500+ Physician Partner physician network that it is appropriate in Freedom's perspective to code a past condition as active just by "put[ting] a little comma there."

187.   Notably, Dr. Mihale also suggested that physicians may alter their documentation to satisfy certain codes for the purposes of risk adjusting. For example, Dr. Mihale stated that dementia may become a risk-adjusting code the following year and that if it is "we're going to share it with you and then you can adjust your documentation properly." This either presupposes that physicians are not currently documenting their patient's conditions accurately because the disease is not risk adjusting (contrary to standards of medical care) or that the physicians will change their documentation to satisfy different criteria once a code becomes risk-adjusting.

188.   Dr. Mihale participated in offering guidance throughout the entire Five Star University video series, either by affirmatively giving coding guidance or by agreeing with the guidance offered by Drs. Haas or Brewster. Because of his

role, it was clearly conveyed to all of Physician Partners' physicians that the guidance presented in Five Star University is endorsed and approved by Freedom.

189.   Freedom also provided coding guidance directly to Physician Partners physicians through written mailers which emphasized the use of risk-adjusting codes in place of less severe, non-risk-adjusting conditions. For example, a mailer of a "case study" related to "Alcohol Abuse vs Alcohol Dependence" identified that the "ICD-10 classifies alcohol and drug dependence as use, abuse and dependence. but it does not provide guidance as to when each condition is proper. Rather, the graphic shows two alternative coding options – one with a risk-adjusting HCC for alcohol dependence and one with a non-risk-adjusting code for alcohol abuse; it describes use of the latter as a "common error."

| ICD-10-CM Codes:<br>Using the above documentation | Part C:<br>HCC Weight |
|---|---|
| Alcohol Dependence, Uncomplicated (F10.20) | 0.383 (HCC 55) |
| Alcoholic Liver Damage Unspecified (K70.9) | 0.390 (HCC 28) |
| | Total: 0.773 |

**Below are Common errors in documenting Alcohol Dependence:**

| ICD-10-CM Codes:<br>Incorrect Coding | Part C:<br>HCC Weight |
|---|---|
| Alcohol Abuse Uncomplicated (F10.10) | 0 |
| Alcoholic Liver Damage (K70.9) | 0.390 (HCC 28) |
| | Total: 0.390 |

190.   Freedom's coding guidance is complimented by Freedom allowing Physician Partner's physicians to access to Freedom's online billing portal, the MRA/HEDIS Portal. Physicians had access to several different parts of the portal, including patient specific charts identifying the codes that had been submitted for a patient in the current year and in past years along with the dates of service for the past submissions, as well as a report that showed every patient in the physician's Freedom panel with their running MRA scores for the past year, current year, and the score predicted for the following year, as well as the decrease year-over-year (if any).

191.   In return for Freedom's guidance and open access to its billing records, Physician Partners encouraged its physicians to actively engage with Freedom insurance agents in manners wholly unique to Freedom as compared to any other MAO. For example, on Sept. 19, 2019, a bus of approximately 20 Freedom agents arrived at Relator's office, guided by a Physician Partners representative. The Freedom agents included regional insurance agent Danny Stearns. The year prior, Dr. Rand Hans, Regional Director of Operations for VIPcare, and Stearns asked approached Dr. Zafirov and her nurse, asking for Stearns to be granted access to Dr. Zafirov's non-Freedom patient list and for Dr. Zafirov to provide contact information for each patient. Dr. Hans and Stearns were

clear that the information would be used for Stearns could visit the patients in their homes or in Dr. Zafirov's office in an effort to convert them to a Freedom patient.

192.   Physician Partners never brought representatives of any other MAO to Dr. Zafirov's office, never asked her to give access to her patient information to any other MAO, and never encouraged her to hold meet-and-greets with agents who enrolled patients in other MAOs. These were services only provided by Physician Partners to Freedom and Optimum.

193.   For the patients already on the Freedom panel, Freedom took an active role in helping manage Physician Partner's patient care. For example, Physician Partners and Freedom both financially benefited by physicians completing HEIDIS data for each patient, but such data could only be completed at an in-person patient visit and not every patient needed to be seen every year. Relator agreed to try to reach a patient a few times to get them to come in, but if they did not have any medical needs, she was not willing to harass the patient to come in. However, if Freedom determined that HEDIS data had not been captured for a patient in a calendar year, Freedom would repeatedly call the patient on VIPcare's behalf until the patient acquiesced and scheduled a visit.

194.   In addition to Freedom's active role in guiding the coding practices of Physician Partners' physicians, Freedom had or should have had actual knowledge of the policies and practices at Physician Partners which caused false

claims to be made. For example, on Jan. 9, 2020, Dr. Zafirov had a phone call with Dr. Hans, Alex Lavin and Emily Gallman wherein Dr. Zafirov raised a variety of concerns, including both Freedom and Physician Partners' refusals to accept referrals to non-preferred specialists. Dr. Hans stated to Dr. Zafirov that they (meaning the VIPcare administrators) held weekly meeting with Freedom and would discuss the issue then. Based on other conversations with Lavin, Dr. Zafirov understood this to be the standard procedure when a physician made a complaint – reach out to Freedom and handle the conversation together.

## VIII. DEFENDANTS KNOWINGLY SUBMITTED OR CAUSED TO BE SUBMITTED FALSE OR FRAUDULENT CLAIMS

195.   By their conduct alleged in this complaint, each Defendant knowingly presented or caused to be presented, false or fraudulent claims; knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; knowingly made, used or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government; and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money to the United States.

196.   The terms "knowing" and "knowingly" are defined by the False Claims Act to mean that, with respect to information, a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the

information." 31 U.S.C. § 3729(b)(1). Knowledge under the False Claims Act does not require proof of a specific intent to defraud. *Id.*

197.   All of the Defendants knew that the intended and foreseeable consequence of their fraudulent scheme was the overpayment of claims submitted to the United States pursuant to the Medicare Advantage program.

198.   Defendants knew that truthful submission of encounter data, including diagnosis codes, is material to Medicare's decision to pay claims and is a material requirement of Freedom and Optimum's contract with the United States, which requirements flowed to Physician Partners, Anion and VIPcare as first-tier or related entities.  Defendants knew that the falsification of diagnosis codes directly affects the amount of reimbursement under the MA Program and renders the claim, via the encounter data, factually false.

199.   As alleged throughout this complaint, each Defendant acted with actual knowledge that the diagnoses codes submitted by Physician Partners, through Anion on behalf of VIPcare and other contracted and affiliated providers, to Freedom and Optimum, and from Freedom and Optimum to the United States, were not accurate, complete and truthful and were, in fact, factually false.

200.   Alternatively, each Defendant acted with deliberate ignorance or reckless disregard as to the truth or falsity of the diagnoses codes submitted by Physician Partners, through Anion on behalf of VIPcare and other contracted and

affiliated providers, to Freedom and Optimum, and from Freedom and Optimum to the United States.

201.    As a result of the conduct alleged in this complaint, Defendants submitted and caused to be submitted false claims, examples of which are identified below.

## IX.    EXAMPLES OF SPECIFIC FALSE OR FRAUDULENT CLAIMS SUBMITTED OR CAUSED TO BE SUBMITTED

### A.    Claims Submitted Where Source of Diagnosis Code was Changed to Anonymous "Physician"

202.    The following patients are examples where a diagnostic code was listed on a 5 Star Checklist as a code that was submitted for the current year with "Current PCP" listed as the source of the diagnostic code. For each of the listed examples, Dr. Zafirov was the "Current PCP" and did not submit the code. When Dr. Zafirov marked on a subsequent 5 Star Checklist that the patient did not have that condition and/or that she did not submit the code, Defendants did not remove the code but instead changed the source simply to "Physician" – a designation which indicates a physician other than the patient's current primary care provider.   However, the records show that the codes were originally represented as being submitted by Dr. Zafirov and there were no other physicians that treated the patients or provided the code in question. For clarity, select 5 Star Checklists or screenshots from each patient's medical records are identified and

attached hereto as Exhibits to provide a step-by-step illustration of the changed documentation.

## Patient H

203.    Patient H was a 73-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP Savings (HMO SNP) plan. The following documents are associated with Patient H:

1. **Exhibit 1-H1**: Screenshot of Patient H's "PCP Encounter & PCP Claims" log from May 31, 2018
2. **Exhibit 1-H2**: Screenshot of Patient H's "PCP Encounter & PCP Claims" log from January/February 2019
3. **Exhibit 1-H3**: March 25, 2019 5 Star Checklist
4. **Exhibit 1-H4:** Screenshot of Paid Claims for 2019
5. **Exhibit I-H5**: April 2019 Five Star Form
6. **Exhibit 1-H6**: Subsequent Five Star Form
7. **Exhibit I-H7**: Dr. Barry Weckesser Cardiology Report from March 12, 2019
8. **Exhibit 1-H8**: Freedom Health Member Health Profile

204.    Patient H was previously a patient of Dr. Akhil Patel. Patient H's records show that the diagnostic code for congestive heart failure (HCC 085 / ICD I50.30) was submitted under Dr. Patel's name on May 31, 2018.  **Exhibit 1-H1.**  Dr. Patel treated Patient H again in January 2019 for knee pain.  He submitted a non-risk-adjusting code for hypertension, but did not code any HCCs at that time. **Exhibit 1-H2.**

205.    Dr. Zafirov saw Patient H on March 25, 2019, in follow-up to a January 2019 general physical. At that time, Dr. Zafirov marked "no" next to the suggested

code for HCC 085, "unspecified diastolic (congestive) heart failure" on the 5 Star Checklist submitted by Anion. **Exhibit 1-H3.**

206.   Despite Dr. Zafirov's rejection of the "proposed" congestive heart failure diagnosis, Patient H's billing record, under "PCP Encounters & PCP Claims," reflect that the code for congestive heart failure was submitted for payment under Dr. Zafirov's name on Feb. 25, 2019 (which appears to be a scrivner's error for March 25, 2019, when Patient H was actually seen).  ***See* Exhibit I-H2.**   It is listed as a "paid code" for 2019, along with a notation that it was reported four times the previous year (while Patient H was a patient of Dr. Patel) but not in the five years before that. **Exhibit I-H4.**

207.   Dr. Zafirov saw Patient H again on April 17, 2019.  By that time, HCC 085 for "unspecified diastolic (congestive) heart failure" was on the 5 Star Check List as a "condition already reported in the current year" with the listed source of "Current PCP" (who was Dr. Zafirov) and both the first and last date of service as Feb 25, 2019 (again, assumed to be a scriver's error as Dr. Zafirov saw Patient H on March 25, 2019, not February 25, 2019).  Dr. Zafirov marked "No and should be removed" on the 5 Star Checklist next to that entry and returned the form. **Exhibit I-H5** (emphasis in original).

208.   Rather than remove the code as ordered by Dr. Zafirov, a subsequent 5 Star Checklist, dated Aug. 12, 2019, still identified HCC 085, "unspecified

diastolic (congestive) heart failure," as a reported condition. **Exhibit 1-H6.** However, the source was changed from "Current PCP" simply to "Physician" and the last date of service was changed to March 12, 2019, a date on which Dr. Zafirov did not see Patient H.

209.   Patient H did see a physician on March 12, 2019 – Dr. Barry Weckesser, a cardiologist with The Heart Institute of Venice.  Dr. Weckesser conducted a full cardiac assessment and his notes are in Patient H's medical record.  **Exhibit 1-H7.** While Dr. Weckesser notes his impressions of hypertension, mild carotid artery disease, insulin dependent diabetes and mitral insufficiency, he does not diagnose or even mention congestive heart failure anywhere in his notes. There is no indication anywhere else in Patient H's medical file of any physician diagnosing her with congestive heart failure that year.

210.   Through the access to the Freedom MRA/HEDIS Portal granted by Freedom to the Physician Partners' physicians, Dr. Zafirov observed that the false code from Physician Partners for HCC085, Unspecified diastolic (congestive) heart failure, was submitted by Freedom to the CMS with the date of service March 12, 2019. **Exhibit 1-H8.**

211.   The initial submission of a claim for congestive heart failure for Patient H was a false claim which fraudulently represented that Dr. Zafirov made that diagnosis. This false claim was submitted for payment to Freedom by Anion

on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

212.    Physician Partner's decision to falsify the coding source rather than to submit correct records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect resulted in a false record used to conceal an obligation under the Overpayment Rule.

## **Patient I**

213.    Patient I was an 81-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP (HMO SNP) plan. The following documents are associated with Patient I:

1. **Exhibit 2-I1**: January 2019 Five Star Form
2. **Exhibit 2-I2**: April 2019 Five Star Form
3. **Exhibit 2-I3**: Screenshot of Paid Claims for 2019
4. **Exhibit 2-I4**: April 26, 2019 Five Star Form

214.    Patient I was a frequent patient of Dr. Zafirov. Dr. Zafirov discussed his physical history with him at length and reviewed the entirety of his medical chart.  Patient I had prostate cancer in 1999 – more than twenty years ago – which was resolved without need for further therapy.  He has not had any active cancer since that time.

215.    Dr. Zafirov first saw Patient I on January 31, 2019.  The attendant 5 Star Checklist provided by Anion, **Exhibit 2-I1**, identified Dr. Akhil Patel as the Current PCP because this was Patient I's first visit since he was placed into Dr.

Zafirov's patient panel.  The 5 Star Checklist suggested HCC012 ("Breast, Prostate, and Other Cancers and Tumors") with the specific diagnosis of ICD-10 C61, "Malignant neoplasm of prostate." The source of the code was "Past History," and the 5 Star Checklist showed that the HCC was reported twice in 2017 and four times in 2016.  Dr. Zafirov wrote "No in remission" next to the risk-adjustment code.  **Exhibit 2-I1.**

216.   Dr. Zafirov saw Patient I on April 26, 2019. For that visit, Anion provided a 5 Star Checklist which had the HCC 012 risk-adjustment bubble greyed in; included the associated MRA risk-adjustment score of .154 on the progress bar at the top of the form. Under the heading "BELOW CODES/CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR," Anion had listed "Malignant neoplasm of prostate" as assigned on a date of service of April 2, 2019, and the source for the submitted diagnosis was "Current PCP," meaning Dr. Zafirov, who was then the established PCP. **Exhibit 2-I2.**

217.   Dr. Zafirov did not treat Patient I on April 2, 2019, and the patient's medical record did not document any physician visit on that or any other date between January 31, 2019 and the visit of April 26, 2019.  Thus, there is no evidence of any medical care which could have given rise to a diagnosis of prostate cancer for Patient I on April 2, 2019. Dr. Zafirov did not assign that diagnosis code on any other day either.

218.   Dr. Zafirov consulted Physician Partners' billing records and determined that the HCC012 code was identified as "Paid" for 2019.  **Exhibit 2-I3.**

219.   In or about August 2019, Dr. Zafirov reviewed the then-current 5 Star Checklist for Patient I.   **Exhibit 2-I4**.   The code for "malignant neoplasm of prostate" was still on the form, and the date of service was still April 2, 2019. However, the "Source" column was altered to read "Physician" instead of "Current PCP."   *Id*.   There is nothing in Patient I's medical record that indicates that any physician other than Dr. Zafirov saw Patient I – much less diagnosed him with prostate cancer – in April 2019 (or any other time since 1999).

220.   The submission of a claim for prostate cancer for Patient I was a false claim which fraudulently represented that Dr. Zafirov made that diagnosis. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

221.   Physician Partner's decision to falsify the coding source rather than to submit correct records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect resulted in a false record used to conceal an obligation under the Overpayment Rule.

## Patient J

222.   Patient J was a 72-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP Savings (HMO C-SNP) plan. The following documents are associated with Patient J:

1. **Exhibit 3-J1**: Dr. Andy Trotti Oncology Report
2. **Exhibit 3-J2**: January 2019 Five Star Form
3. **Exhibit 3-J3**: May 2019 Five Star Form
4. **Exhibit 3-J4**: Subsequent Five Star Form
5. **Exhibit 3-J5**: Screenshot of Paid Claims for 2019
6. **Exhibit 3-J6**: Freedom Health Member Health Profile

223.   Patient J is a 72-year-old who had tonsil cancer in 2017. By 2019, his cancer was in remission and he was in overall good health. On Jan. 3, 2019, Patient J visited his oncologist, Dr. Andy Trotti, for a follow-up examination. Dr. Trotti's report states that he found "No evidence of disease." **Exhibit 3-J1.** Follow-up visits after a cancer is in remission do not generate HCC risk-adjusting codes.

224.   Dr. Zafirov first examined Patient J on January 21, 2019. The 5 Star Checklist associated with his initial visit listed five "suggested" diagnoses under "HCC 011 – Colorectal, Bladder and Other Cancers," including ICD C09.9 for "Malignant neoplasm of tonsil, unspecified" which had been reported 82 times in 2017 and 8 times in 2018 with a source of "Current PCP." Because Patient J had not been formally transferred to Dr. Zafirov's patient panel yet, the reference to "Current PCP" at that time meant Dr. Patel. There were also suggested diagnoses of other forms of tonsil cancer, bladder cancer, and a general "malignant neoplasm of head, face and neck." Dr. Zafirov marked "No" next to all of the suggested

cancer diagnoses, and wrote "No, now in remission" with brackets next to the first two codes for throat cancer. **Exhibit 3-J2.**

225. Dr. Zafirov next examined Patient J on May 21, 2019. A new 5 Star Checklist was provided by Anion. The bubble for HCC011 – the cancer diagnosis code - was colored in and the risk-adjustment bar was increased by .317, which is the risk adjustment for HCC 011. **Exhibit 3-J3.** There were no conditions on the list for "conditions already reported in the current year" but all of the HCC 011 codes had been removed from the suggested diagnosis code list.

226. On or about August 11, 2019, Dr. Zafirov reviewed the then-current 5 Star Checklist for Patient J. At that time, under the heading "BELOW CODES/CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR," Anion had listed "Malignant neoplasm of tonsil, unspecified" as assigned on a first date of service of Jan. 3, 2019, and a last date of service as June 6, 2019. **Exhibit 3-J4.** The source of the code had been changed from "Current PCP" to "Physician Hospital."

227. The billing section of Patient J's electronic medical record shows HCC 011 with five different ICD codes for tonsil cancer and bladder cancer as "paid" for 2019. **Exhibit 3-J5.** Moreover, the Freedom Health Member Health Profile for Patient J reflects that the code for "Malignant neoplasm of tonslar fossa" was submitted from Freedom to CMS, most recently with a date of service of Jan. 13,

2020. However, as of the time that Dr. Zafirov left VIPcare, there was no documentation in Patient J's medical record to suggest that he had been diagnosed with tonsil or bladder cancer in 2019 and he was not receiving any treatment for cancer at his last visit with Dr. Zafirov.

228.    The submission of a claim for cancer for Patient J was a false claim which fraudulently represented that an anonymous "Hospital Physician" made that diagnosis. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

229.    Further, Physician Partner's decision to falsify the coding source rather than to submit correct records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect resulted in a false record used to conceal an obligation under the Overpayment Rule.

## Patient K

230.    Patient K was an 80-year-old Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP Savings (HMP SNP) plan. The following documents are associated with Patient K:

1. **Exhibit 4-K1**: Screenshots of PCP Claims and PCP Encounters listed in Dr. Patel's name for January 2019
2. **Exhibit 4-K2**: January 2019 Five Star Form
3. **Exhibit 4-K3**: Dr. Zafirov's Notes on January Five Star Form
4. **Exhibit 4-K4**: Screenshot of PCP Claims and PCP Encounters for 2019

5. **Exhibit 4-K5**: April 2019 Five Star Form
6. **Exhibit 4-K6**: Screenshot of Paid Claims for 2019
7. **Exhibit 4-K7**: May 2019 Five Star Form
8. **Exhibit 4-K8**: Subsequent Five Star Form
9. **Exhibit 4-K9**: Freedom Health Prospective Possible Condition Report

231.   Patient K is an 80-year-old who had been a patient of Dr. Rick Simovitz, a Freedom provider before becoming a patient of Dr. Akhil Patel at VIPcare. She officially became part of Dr. Zafirov's panel in Feb. 2019, but Dr. Zafirov first treated her in Jan. 2019 and several times subsequently since then. The PCP Encounters and Claims records list Dr. Patel as the PCP who submitted codes in January 2019 (**Exhibit 4-K1**), but 5 Star Checklist from January 7, 2019, was submitted by Dr. Zafirov, indicating that some of the visits where Dr. Zafirov saw Patient K may have been documented under Dr. Patel's name

232.   The 5 Star Checklist provided by Anion in January 2019 suggested three codes related to peripheral vascular disease (HCC108), all of which were billed in 2018, even though Dr. Patel's 2018 note establishing patient care makes no mention of this condition. **Exhibit 4-K2.** Dr. Zafirov did not find support for any of the diagnoses on the 5 Star Checklist, and she noted "no mention in cardiology notes, no u/s result" on the personal notes she made on another version of the form.  **Exhibit 4-K3.**

233.   Dr. Zafirov treated Patient K again on Feb. 25, 2019. The PCP Encounter and Claims data from that day reflect a code of HCC 018, ICD I70.201,

"unspecified atherosclerosis of native arteries of extremities, right leg" in Dr. Zafirov's name. **Exhibit 4-K4**. However, peripheral vascular disease cannot be diagnosed without diagnostic tests which Dr. Zafirov did not perform and Dr. Zafirov did not diagnose Patient K with that condition.

234.   An April 18, 2019, 5 Star Checklist listed HCC 018, ICD I70.201, "unspecified atherosclerosis of native arteries of extremities, right leg," as a "condition already reported in the current year" with first and last date of service of Feb. 25, 2019 and a source of "Current PCP," meaning Dr. Zafirov.  **Exhibit 4-K5**. HCC 018, ICD I70.209, "unspecified atherosclerosis of native arteries of extremities, unspecified extremity," was listed for the same dates of service but with a source of "Other Provider." Physician Partners claimed not to have received the 5 Star Checklist that Dr. Zafirov submitted in April 2019, and she had to resubmit a 5 Star Checklist for the April visit later in the year.  *See* **Exhibit 4-K5**, date line

235.   Both codes are listed in Patient K's billing record as paid in 2019. **Exhibit 4-K6.**

236.   Shortly after Dr. Zafirov resubmitted the form, Anion began changing the "source" of the unsupported atherosclerosis diagnosis.  In or about May 2019, a the 5 Star Checklist for Patient K showed that the "unspecified extremity" code

was removed completely, but four other conditions were changed from a generic "physician" or "physician hospital" to "Current PCP." **Exhibit 4-K7.**

237.   In or about August 2019, another 5 Star Checklist reflected that Anion changed the "source" once again, making it appear as though some other physician made the diagnosis.  The code for "unspecified atherosclerosis of native arteries of extremities, unspecified extremity" that was previously removed has been added back, still with a source of "other provider" but on the same date that Dr. Zafirov rendered services to Patient K.  **Exhibit 4-K8.**

238.   Through the access to the Freedom MRA/HEDIS Portal granted by Freedom to the Physician Partners' physicians, Dr. Zafirov observed that the Prospective Possible Condition Report (which reflects possible HCCs for each patient based on conditions that were submitted from Freedom to CMS in the past) showed that the HCC for Vascular Disease was "submitted previously" to CMS with a date of service of 02/25/2019 – the same date and code which was falsified by Physician Partners with repeatedly-changing "sources." **Exhibit 4-K9.**

239.   The submission of a claim for unspecified athlerosclerosis for Patient K was a false claim which fraudulently represented various sources diagnosed the unsupported code, when none actually did. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

240.   Further, Physician Partner's decision to falsify the coding source rather than to submit correct records to remove the code resulted in a false record used to conceal an obligation under the Overpayment Rule.

**B.    Codes Submitted in Relator's Name After She Said No or Expressly Notified of Inaccuracy**

241.   The following patients are examples where a code was submitted in Dr. Zafirov's name and was left on the patient record even after Dr. Zafirov has expressly stated on a 5 Star Checklist or by email that the code is inaccurate.  In these examples, Dr. Zafirov did not initially enter the diagnosis codes, but rather an Anion billing representative appended them following chart reviews.

<u>**Patient L**</u>

242.   Patient L was an 81-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Optimum Diamond Rewards (HMO SNP) plan. The following documents are associated with Patient L:

1. **Exhibit 5-L1**: Dr. Zafirov's Progress Note from January 2019
2. **Exhibit 5-L2**: January 2019 Five Star Form
3. **Exhibit 5-L3**: Screenshot of PCP Encounters and PCP Claims
4. **Exhibit 5-L4**: Dr. Zafirov's Progress Note from February 2019
5. **Exhibit 5-L5**: Subsequent Five Star Form
6. **Exhibit 5-L6**: Screenshot of Paid and Excluded Claims for 2019

243.   Patient L was a patient of both Dr. Patel and Dr. Simovitz before being assigned to Dr. Zafirov's patient panel. Dr. Zafirov treated Patient L on January

23, 2019. Dr. Zafirov's progress note from that visit states, "Patient has a past diagnosis of diabetes however at the time of diagnosis in 16 hemoglobin A1C not seen above 6.5." **Exhibit 5-L1**. Under the detailed notes assessing that condition, Dr. Zafirov wrote, "Question initial diagnosis since patient does not follow any particular diet, eats what he wants and maintains his blood sugars with minimal effort. Patient has never had a hemoglobin A1C greater than 6.5."

244. The 5 Star Checklist provided by Anion for Patient L's January 2019 visit recommended three codes for HCC 018, Diabetes with Chronic Complications, but none for uncomplicated diabetes. Based on her clinical findings, Dr. Zafirov wrote "no" next to each of the suggested codes and included, "awaiting lab confirmation" on ICD E11.40, "Type 2 diabetes mellitus with diabetic neuropathy, unspecified." **Exhibit 5-L2.**

245. Despite Dr. Zafirov writing "no" on the submitted 5 Star Checklist, the PCP Encounter and Claims section of the patient's Physician Partners billing records reflected that the ICD code E11.65 for "Type 2 diabetes mellitus with hyperglycemia" was submitted to Optimum, with the source for this code noted as "progress notes" indicating that an Anion representative scanned Dr. Zafirov's progress notes and pulled the code from there. **Exhibit 5-L3**.

246. Dr. Zafirov treated Patient L again on Feb. 25, 2019. At that time, she wrote in the progress notes, "We did check a fasting glucose tolerance test with

labs to confirm diabetes which patient showed to have a glucose level in the 200s as the 1 hour mark." In the detailed notes, Dr. Zafirov diagnosed Patient L with "Type 2 diabetes mellitus *without complication*, without long-term use of insulin" (emphasis supplied) and noted "Well-controlled hemoglobin A1C in normal range." She did not include any mention of any complicating factors. **Exhibit 5-L4**.

247.   Despite Dr. Zafirov's notations in January, the 5 Star Checklist for Patient L as of August 2019 showed *both* HCC 018 for "Type 2 diabetes mellitus with hyperglycemia" *and* HCC 019 for "Type 2 diabetes mellitus without complications" as conditions reported in 2019. **Exhibit 5-L5.**

248.   Although the two codes are contradictory, Physician Partners did not remove the HCC 018 code for diabetes with a complication. Rather, the 5 Star Checklist provided by Anion still lists the date of service as Jan. 23, 2019, with Current PCP as the source. However, HCC 019 for uncomplicated diabetes is *also* listed with a date of service of Feb. 25, 2019, with Current PCP as the source – this second code is correct and should be the only one reported in 2019.

249.   The billing records reflected in Physician Partner's electronic medical records reflect that that is not a possibility to bill for both complicated and uncomplicated diabetes. CD's records show that the correct code of HCC019 (diabetes without complications) is an "excluded code" because HCC019 (diabetes

with chronic complications) – the far more expensive but false code - was also submitted and paid for 2019.  **Exhibit 5-L6.**

250.   The submission of a claim for Type 2 diabetes mellitus with hyperglycemia was a false claim because it falsely represented that Dr. Zafirov submitted that diagnosis code when she expressly denied it. This false claim was submitted for payment to Optimum by Anion on behalf of Physician Partners and VIPcare. It was paid by Optimum on behalf of the United States.

251.   Further, once Dr. Zafirov diagnosed Patient L with uncomplicated diabetes, Physician Partner's decision not to correct the previous code with the less expensive but accurate code is a violation of their obligations under the Overpayment Rule.

### Patient M

252.   Patient M was a 76-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom Medicare Plan Rx (HMO) plan. The following documents are associated with Patient ME:

1. **Exhibit 6-M1**: February 2019 Five Star Form
2. **Exhibit 6-M2**: Dr. Zafirov's Progress Note from Feb 2019
3. **Exhibit 6-M3**: Screenshot of Paid Claims from 2019
4. **Exhibit 6-M4**: July 2019 Five Star Form
5. **Exhibit 6-M5**: July 2019 Email to Sajitha Johnson
6. **Exhibit 6-M6**: Subsequent Five Star Form
7. **Exhibit 6-M7**: Freedom Prospective Possible Condition Report

253.    Patient M is a 76-year-old who was previously a patient of Dr. Patel. Dr. Zafirov treated Patient M on Feb. 15, 2019. The 5 Star Checklist provided by Anion for that visit listed two suggested codes under HCC 058, Major Depressive, Bipolar, and Paranoid Disorders.[5] **Exhibit 6-M1**.  Dr. Zafirov marked "No" next to both ICD F33.9 for "Major depressive disorder, recurrent, unspecified" and ICD F32.4 for "Major depressive disorder, single episode, in partial remission," which had been reported four and three times the previous year, respectively.

254.    Dr. Zafirov's progress notes from that date of service indicate a score of 0 on the PHQ-9 mental health assessment test, noted that Patient M takes Celexa for anxiety instead of depression, and specifically noted (twice) that the patient denies and has no history of depression.  **Exhibit 6-M2**.  Per standard protocol, Dr. Zafirov included an assessment for Major Depressive Disorder, but her notes and 5 Star Checklist both plainly indicate she was *not* diagnosing that condition.

255.    In July 2019, Dr. Zafirov reviewed Patient M's medical records and noted that the billing records show that HCC 059, the code for MDD was captured from the Feb. 2015 visit with Dr. Zafirov as the source and is marked as "paid" for 2019.  **Exhibit 6-M3**.  In addition, HCC 058 for "reactive and unspecified

5 The current HCC code for "Major Depressive, Bipolar and Paranoid Disorders" is HCC 059 as of 2018.  It was HCC 058 in 2017 and prior.  HCC 058 is now the code for "Reactive and Unspecified Psychosis."

psychosis" is listed as "paid" in 2019, though no other details are provided for that code.

256.   A July 2019 5 Star Checklist also showed HCC 058, ICD F32.4 as a condition already reported in 2019 with a date of service as Feb. 15, 2019 by "Current PCP."   **Exhibit 6-M4**.   Dr. Zafirov circled the code and wrote at the bottom the page, "Patient does not have major depressive disorder. Please amend."

257.   Dr. Zafirov also emailed Physician Partner's Quality Analyst Sajitha Johnson or about July 19, 2019, and specifically asked that the code be removed from Patient M's medical records.   **Exhibit 6-M5**.   She wrote,

> In regards to [Patient M], if you read below the code, it is stated not once, but twice that she does not have major depression in the note.   The patient is adamant that she is only taking for anxiety.   It was meant to be a comment on the condition and not a diagnosis.   The note makes that very clear.   Not only that, but it has been marked "no" on the 5-star sheet I turned in to you. As far as what physicians coded before me, my responsibility lies in my own evaluation in the room with the patient.   I do think that in regards to diagnosis, it is very important that this is done accurately.   I would assume that your team also reads the physicians commentary on a condition as this is relevant.   If there are previous codes on the chart, I will comment and then remove them from the chart after the visit.

> So yes, please remove the code from her medical records.

258.   Despite this clear directive from Dr. Zafirov, the code remained on Patient M's medical record. In or about August 2019, the then-current 5 Star

Checklist showed HCC 059, ICD F32.4 for "Major depressive disorder, single episode, in partial remission" with a date of service on Feb. 15, 2019 by "Current PCP," (meaning Dr. Zafirov) under the conditions already reported in the current year. **Exhibit 6-M6**.

259.   Physician Partner's submission of a claim for major depressive disorder for Patient M was a false claim which fraudulently represented that Dr. Zafirov submitted that diagnosis code when she did not. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

260.   As of October 2019, the Prospective Possible Condition Report for Patient M, accessed through the Freedom MRA/HEDIS Portal, reflected "Major Depressive, Bipolar, and Paranoid Disorder" an "HCC submitted previously" for Patient M, but now reflects the source of "other physician" and a date of service of Oct. 9, 2018. This indicates that Physician Partners or Freedom removed Dr. Zafirov's diagnosis code, but did not correct the codes which were previously submitted despite lack of any objective clinical evidence. **Exhibit 6-M7.**

261.   Even if Physician Partners did ultimately remove the code as submitted by Dr. Zafirov, the decision not to submit correct records to remove the prior unsupported code is a violation of their obligations under the Overpayment Rule.

262.    Further, if Physician Partners submitted a code and then corrected the submission because the code was unsupported, Freedom knew or should have known that previous diagnosis of that same code were also unsupported. The failure to evaluate the prior code submissions and to submit corrected information to CMS is a violation of Freedom's obligations under the Overpayment Rule.

263.    In addition, the February 2019 5 Star Checklist provided to Dr. Zafirov for Patient M suggested a diagnosis of microcephaly under the HCC 072, Spinal Cord Disorders/Injuries, which carries a risk adjustment factor of .509. **Exhibit 6-M1.** The 5 Star Checklist revealed that the code has been submitted to Freedom two times in 2018 and two times in 2017, although the patient was seen at least six times in 2018 at least four times in 2017. Microcephaly is a very rare, incurable birth defect (2-12 out of 10,000 live births) in which a baby's head is significantly smaller than normal, often accompanied by intellectual impairment. https://www. cdc.gov/ncbddd/birthdefects/microcephaly.html. It is a permanent condition which would either be present at all visits or does not exist at all. There are no records in Patient M's chart which support a microcephaly diagnosis and Dr. Zafirov's physical examination of the patient confirmed that the patient did not have the rare disorder, then or ever before.

264.    The Prospective Possible Condition Report shows that the HCC for Spinal Cord Disorder/Injurie was previously submitted to CMS for Patient M,

with a date of service of January 24, 2018, and a source of "other physician." Physician Partner's submission of a claim for microcephaly for Patient M was a false claim which fraudulently represented condition had been diagnosed by a physician when there is no support for it in the medical record. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

265. Further, because microcephaly is a permanent condition, Dr. Zafirov's notation that the condition did not exist should have caused Physician Partners to submit correct records to remove the prior unsupported code. The failure to do so is a violation of their obligations under the Overpayment Rule.

266. Likewise, the presence of the diagnoses code for a permanent birth defect – particularly one with such a large MRA score - in some years but not in others should have caused Freedom to review the code and reject it as applied to Patient M because it was not medically supported. The failure to conduct such a review and to submit correct records to remove the unsupported code is a violation of their obligations under the Overpayment Rule.

## Patient N

267. Patient N was a 70-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP Savings (HMP SNP) plan. The following documents are associated with Patient N:

1. **Exhibit 7-N1**: January 2019 Five Star Checklist
2. **Exhibit 7-N2**: Dr. Zafirov's Progress Note from Jan. 23 visit
3. **Exhibit 7-N3**: May 2019 Five Star Checklist

268.    Dr. Zafirov treated Patient N on or about Jan. 23, 2019. The 5 Star Checklist provided to Dr. Zafirov by Anion in advance of that appointment suggested a diagnoses of "[diabetes] with diabetic peripheral angiopathy without gangrene." **Exhibit 7-N1.** On the 5 Star Checklist, Relator wrote "No – see below" and included a detailed explanation of why she was rejecting both the suggested diagnosis and why she questioned even the original diagnosis of diabetes for Patient N.

269.    Dr. Zafirov also documented both the rejection of the diagnosis and the reasons why in her progress notes, writing, "Question completeness of initial diagnosis Patient may have been prediabetes but it does not seem the lab criteria quite matches the diagnosis. If it is a question later on, will repeat [testing]." **Exhibit 7-N2.**

270.    Patient N returned to Dr. Zafirov on May 18, 2019 for a follow-up visit. Despite Dr. Zafirov's previous notations, the 5 Star Checklist provided by Anion for the May 2019 visit reflected "[diabetes] with diabetic peripheral angiopathy without gangrene" in the "BELOW CODES/CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR" section with the source of "Current PCP" (meaning Dr. Zafirov) and a date of service of Jan. 22, 2019 – the

same visit on which Dr. Zafirov expressly denied such condition (with a scrivner's error adjusting the date by one day). **Exhibit 7-N3.[6]**

271.   The submission of a claim for diabetes with diabetic peripheral angiopathy without gangrene for Patient N was a false claim because it fraudulently represented that Dr. Zafirov assigned that specific diagnostic code when she expressly rejected it. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

### C.   Defendants' Failure to Return Overpayments

272.   Each of the patient examples in this Amended Complaint resulted in claims for which Physician Partners had actual knowledge of their falsity. By failing to submit proper codes to convey the accurate information to Freedom which would then be passed on to the United States, Physician Partners violated its obligations under the Overpayment Rule and failed to return funds in violation of 31 U.S.C. 3729(a)(1)(G).

---

[6] Of note, on the same date that Dr. Zafirov received the 5 Star Checklist for Patient N which reflected billing that directly contradicted her notations, Sajitha Johnson, the Quality Analyst assigned to Relator, questioned Relator as to whether she maintained copies of any of her old 5 Star Checklists. Relator understood the reason for that inquiry to be because Physician Partners and Anion did not want VIPcare physicians to be able to review their notes on past checklists because Anion continued to suggest codes which had already been rejected or billed conditions under the physician's name despite the physician's rejection of that code.

273.   Likewise, Freedom and Optimum had or should have had knowledge of the falsity of the claims submitted to it by Physician Partners. For each of the above patient examples, by failing to submit proper codes to convey accurate information to CMS, Freedom and Optimum violated their repayment obligations under the Overpayment Rule and failed to return funds in violation of 31 U.S.C. 3720(a)(1)(G).

274.   In addition to the patients identified throughout the Amended Complaint, the following are specific examples where Physician Partners, the MAOs or both had knowledge of the falsity of their codes and failed to submit correct codes pursuant to their overpayment obligations.

## Patient O

275.   Patient O was a 69-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP Savings (HMP SNP) plan. The following documents are associated with Patient O:

1. **Exhibit 8-O1**: January 2019 Five Star Form
2. **Exhibit 8-O2**: Screenshot of Paid Claims for 2019
3. **Exhibit 8-O3**: March 2019 Five Star Form
4. **Exhibit 8-O4**: Dr. Zafirov's Progress Note from March 2019
5. **Exhibit 8-O5**: Dr. Barry Weckesser Cardiology Report from May 2019
6. **Exhibit 8-O6**: Dr. Zafirov's Amended Progress Note from Jan. 2019
7. **Exhibit 8-O7**: Subsequent Five Star Form
8. **Exhibit 8-O8**: Screenshot of PCP Encounters and PCP Claims for 2019
9. **Exhibit 8-O9**: Screenshot of Paid Claims for 2019

10. **Exhibit 8-O10**: Freedom Prospective Possible Condition Report

276.    This is an example where Dr. Zafirov admits to making a mistake on her patient's Five Star form. However, despite Dr. Zafirov's efforts, Physician Partners refused to correct the code even after Dr. Zafirov identified it as an error.

277.    Patient O was a patient of Dr. Patel before getting switched to Dr. Zafirov's panel. On January 3, 2019, Dr. Zafirov treated Patient O and submitted a Five Star form that said "OK yes" next to "HCC 085, ICD I50.30, "unspecified diastolic (congestive) heart failure." **Exhibit 8-O1.**  The billing records show that code as paid in 2019, and the detailed record shows that the date of service was Jan. 3, 2019, with Dr. Zafirov as the billing provider.  **Exhibit 8-O2.**

278.    On March 4, 2019, Dr. Zafirov noted that the 5 Star Checklist provided by Anion reflected HCC 085 as a submitted code.  **Exhibit 8-O3.**  Dr. Zafirov circled the code and marked on the bottom of the form, "HCC 085 – should be corrected. Patient does <u>NOT</u> have.  Should be amended."  She further noted in the medical record, "Patient scheduled to see cardiology in the next few months.  Patient has a grade 1 diastolic dysfunction which is not abnormal for age on cardiac echo.  Does not qualify for congestive heart failure as previously on problem list." **Exhibit 8-O4**.

279.    Patient O was seen by a cardiologist on May 13, 2019. The cardiologist made no references to congestive heart failure anywhere in the notes.  **Exhibit 8-**

**O5**.  Dr. Zafirov then went back to her January Progress Note, and added an amendment to the note on May 15, 2019, which stated, "Amendment to chart. No CHF. Should not be included in problem list." **Exhibit 8-O6**.

280.   Despite Dr. Zafirov's repeated attempts to correct the code and amend the billing, the code continued to appear on Patient O's 5 Star Checklist with the date of service of Jan. 3, 2019 and the source as "Current PCP."  **Exhibit 8-O7.**  The PCP Encounters & PCP Claims records also still show the HCC 085 code as submitted by Dr. Zafirov *and* Dr. Patel, *both* on Jan. 3, 2019 (**Exhibit 8-O8**), although only Dr. Zafirov treated Patient O that day.

281.   As of August 2019, the billing records still showed HCC 085 for congestive heart failure as a paid code for 2019. **Exhibit 8-O9.** Moreover, as of October 2019, the Prospective Possible Condition Report for Patient O, accessed through the Freedom MRA/HEDIS Portal, reflected Congestive Heart Failure as an "HCC previously submitted" by the PCP (meaning Dr. Zafirov) with a date of service of Jan. 3, 2019. **Exhibit 8-O10.**

282.   In this case, the initial submission of the claim for congestive heart failure was not a false claim because Dr. Zafirov had marked "OK" for that code on her 5 Star Checklist. That claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

283.   However, Physician Partner's refusal to submit correct records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect is a violation of its obligations under the Overpayment Rule.

**<u>Additional Patient Examples</u>**

284.   In one egregious example, Dr. Zafirov reviewed the billing records of Patient P, an 83-year-old on her Freedom patient panel, in association with a patient visit in March 2019. Relator determined that the patient's Q360 electronic record reflected that Physician Partners was paid in 2017 for risk-adjusting HCC072 (spinal cord disorders/injuries) for the ICD-9 code Q00.0, anencephaly. The billing record shows the code was reported only once in 2017, never before or after.

| HCC | HCC Description | ICD | ICD9 Description | # of times reported in service years | | | | | | | | Logic number |
| --- | --- | --- | --- | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | <=2011 | |
| HCC040 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | M06.4 | Inflammatory polyarthropathy | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HCC048 | Coagulation Defects and Other Specified Hematological Disorders | D69.2 | Other nonthrombocytopenic purpura | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | D69.6 | Thrombocytopenia, unspecified | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | |
| HCC072 | Spinal Cord Disorders/Injuries | Q00.0 | Anencephaly | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HCC108 | Vascular Disease | I71.4 | Abdominal aortic aneurysm, without rupture | 8 | 4 | 3 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | I73.9 | Peripheral vascular disease, unspecified | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

2017 Paid (4)

285.   Anencephaly, as defined by the CDC, "is a serious birth defect in which a baby is born without parts of the brain and skull. It is a type of neural tube defect (NTD). As the neural tube forms and closes, it helps form the baby's brain

and skull (upper part of the neural tube), spinal cord, and back bones (lower part of the neural tube)…Almost all babies born with anencephaly will die shortly after birth." A patient would either always or never have anencephaly; Patient P unequivocally does not. The anencephaly diagnosis code is so preposterous that Anion did not put it on Patient P's 5 Star Checklists as a suggested diagnosis code.

286.  Whether the code was initially submitted intentionally or accidently, its continued presence on the "2017 Paid" list indicates that it was not reversed. Physician Partners' failure to submit correct records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect is a violation of its obligations under the Overpayment Rule.

287.  Freedom's Member Health Profile for Patient P reflects that HCC072 for "spinal cord disorders/injuries" was "reported to CMS in the past for this member." However, unlike every other submitted code, the HCC072 entry does not include a provider type, diagnosis code, diagnosis description or date of service.

| Provider Type | Confirmed 2020 DOS | RA FACTOR | Diagnosis Code | Diagnosis Description | Date Of Service | CMS HCC | CMS HCC Description |
|---|---|---|---|---|---|---|---|
| | N | 0.461 | | | | HCC072 | Spinal Cord Disorders/Injuries |
| Physician | Y | 0.521 | H35.32 | Exudative age-related macular degeneration, right eye, with active choroidal neovascularization | 1/6/2020 | HCC124 | Exudative Macular Degeneration |
| Physician | Y | 0.268 | I48.91 | Unspecified atrial fibrillation | 1/24/2020 | HCC096 | Specified Heart Arrhythmias |
| Physician | N | 0.219 | K56.41 | Fecal impaction | 3/8/2019 | HCC033 | |

288.    Freedom knew or should have known that a diagnosis code for anencephaly for a senior citizen was false or accidental, particularly a code that was submitted only once for the patient. Still, Freedom submitted the code to CMS and increased Patient P's risk score by .481. Freedom's failure to identify this clearly inaccurate code as incorrect or fraudulent, and its resulting failure to submit correct records to remove the code is a violation of its obligations under the Overpayment Rule.

289.    In another instance, Physician Partners submitted claims for Patient Q for malignant neoplasm of connective tissue in 2018, even though an oncologist from Moffit Cancer Center noted that the patient only had an angiofibroma, which is a benign condition. Physician Partners also submitted diagnosis codes for malignant neoplasm of the prostate (prostate cancer) during five encounters in 2017, although there is no record in his medical chart for receiving any treatment for prostate cancer. Patient Q's medical record contains no support for either cancer diagnosis and the patient denied having ever been diagnosed with cancer during his evaluation by Dr. Zafirov.

290.    Dr. Zafirov reported on Patient Q's 5 Star Checklist that Patient Q did not have cancer, that he reported, "I've had every test in the world for cancer and nothing," and that patient had no history of prostate cancer. Still, HCC010 for two forms of malignant neoplasm of connective tissue were reported five times in 2018

(4 times for ICD-10 C49.9 and one time for ICD-10 C49.6) and HCC012 for unspecified malignant neoplasm was reported twice in 2018 and once in 2017 for ICD-10 C80.1. Physician Partners should have submitted corrected records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect. The failure to do so is a violation of its obligations under the Overpayment Rule.

291.   Freedom also knew or should have known that the Physician Partner's repeated codes for cancer were false because Patient Q never received any treatments related to a cancer diagnosis, let alone two different types of cancer. Given that the entire purpose of increased MRA scores is to provide funding to treat the diagnosed condition, Freedom's failure to return payments for cancer that was "diagnosed" but never treated is a violation of its overpayment obligations.

292.   The following failures to return overpayments are specific to Freedom:

293.   Paragraph 118, *supra*, describes Patient A, whose 5 Star Checklist from July 23, 2019, included the remarkable suggestion of "complete traumatic amputation of unspecified foot, level unspecified, initial encounter" with a source of "past history." Noting that the patient plainly had *not* had one of her feet amputated, Dr. Zafirov reviewed patient's electronic medical records and identified that Physician Partner's listed the HCC in its 2016 paid claims but

without any specific ICD or reporting date.  The HCC appears again in a section called "2017 Leftover" with a notes that clarify "Not previously paid but pending b/c of logic #82." The next column reports that "FRH/OPT reported this HCC as previously paid.   ICDs not provided by the plan/s." "FRH/OPT" means Freedom/Optimum and the information links to the data from Freedom's MRA/HEDIS billing portal.

| | | | b/c of logic #82 | |
|---|---|---|---|---|
| HCC173 | Traumatic Amputations and Complications | Chronic | Not previously paid but pending b/c of logic #82 | FRH/OPT reported this HCC as previously paid. ICDs not provided by the plan/s. |

294.    There is no indication as to how Freedom came to append this code to Patient A. Freedom either had actual knowledge that it was completely fabricated or should have known that the code for an amputation was inaccurate when it was submitted only once, without any supporting documentation or any related treatment. Freedom should have submitted corrected records to remove the code because it lacked any clinical support, and the failure to do so is a violation of its obligations under the Overpayment Rule.

295.    In another example, prior to becoming a VIPcare patient, Patient R was treated by Freedom provider Dr. Rick Simovitz for at least the years 2015-2017. During those years, Freedom submitted diagnostic codes to CMS indicating Patient R had Chronic Lymphocytic Leukemia ("CLL"), a type of bone marrow cancer. However, Patient R's medical records indicate that she did not have a

formal CLL diagnosis and had not seen a hematologist, nor was ever even referred to one for further evaluation. When Patient R did not receive any treatment for CLL, nor did the medical records did identify even a referral for treatment for CLL, Freedom should have submitted corrected codes to remove because it lacked any clinical support. Freedom's failure to do so is a violation of its overpayment obligations.

### FIRST CLAIM FOR RELIEF
**Violations of 31 U.S.C. § 3729(a)(1)(A)**
**Against Physician Partners, LLC ("Physician Partners")**

296.   Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) resulted in false claims submitted or caused to be submitted by Physician Partners in violation of 31 U.S.C. § 3729(a)(1)(A).

297.   Defendant Physician Partners violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and causing the presentment of false or fraudulent claims for payment or approval. By engaging in this conduct, Physician Partners caused inflated Medicare reimbursements to which neither it nor the Medicare Advantage organizations were entitled.

298.    Had the United States been aware of Physician Partners' conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Physician Partners provide services.

299.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**SECOND CLAIM FOR RELIEF**
**Violations of 31 U.S.C. § 3729(a)(1)(B)**
**Against Physician Partners, LLC ("Physician Partners")**

300.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) illustrate false claims by Physician Partners in violation of 31 U.S.C. § 3729(a)(1)(B).

301.    Defendant Physician Partners violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. By engaging in this conduct, Physician Partners caused inflated Medicare reimbursements to which neither it nor the Medicare Advantage organizations were entitled.

302.   Had the United States been aware of Physician Partners' conduct, it would have refused to pay the inflated, risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Physician Partners provide services.

303.   By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

### THIRD CLAIM FOR RELIEF
**Violations of 31 U.S.C. § 3729(a)(1)(G)**
**Against Physician Partners, LLC ("Physician Partners")**

304.   Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A), (B) and (C) illustrate false claims by Physician Partners leading to violations of 31 U.S.C. § 3729(a)(1)(G), except for Paragraphs 293-295 which apply to Defendants Freedom and Optimum only.

305.   Defendant Physician Partners violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealing or knowingly and improperly avoiding or decreasing an

obligation to pay or transmit money to the Government. In engaging in this conduct, Physician Partners retained Medicare overpayments to which it was not entitled.

306.   Had the United States been aware of Physician Partners' conduct, it would have demanded repayment of the inflated capitation payments, would have refused to pay the inflated risk-adjusted payments, and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Physician Partners provide services.

307.   By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**FOURTH CLAIM FOR RELIEF**
**Violations of 31 U.S.C. § 3729(a)(1)(A)**
**Against Anion Technologies, LLC ("Anion")**

308.   Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) resulted in false claims submitted or caused to be submitted by Anion in violation of 31 U.S.C. § 3729(a)(1)(A).

309.    Defendant Anion violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and causing the presentment of false or fraudulent claims for payment or approval. By engaging in this conduct, Anion caused inflated Medicare reimbursements to which neither it, Physician Partners, VIPcare, nor the Medicare Advantage organizations were entitled.

310.    Had the United States been aware of Anion's conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries for whom Anion, through Physician Partners, provides services

311.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**FIFTH CLAIM FOR RELIEF**
**Violations of 31 U.S.C. § 3729(a)(1)(B)**
**Against Anion Technologies, LLC ("Anion")**

312.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide

121

critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) illustrate false claims by Anion in violation of 31 U.S.C. § 3729(a)(1)(B).

313.   Defendant Anion violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. By engaging in this conduct, Anion caused inflated Medicare reimbursements to which neither it, Physician Partners, VIPcare, nor the Medicare Advantage organizations were entitled.

314.   Had the United States been aware of Anion's conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries for whom Anion, through Physician Partners, provides services.

315.   By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**SIXTH CLAIM FOR RELIEF**
**Violations of 31 U.S.C. § 3729(a)(1)(G)**
**Against Anion Technologies, LLC ("Anion")**

316.   Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support

of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A), (B) and (C) illustrate false claims by Anion leading to violations of 31 U.S.C. § 3729(a)(1)(G), except for Paragraphs 293-295 which apply to Defendants Freedom and Optimum only.

317.   Defendant Anion violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government. In engaging in this conduct, Anion caused Physician Partners to retain Medicare overpayments to which it was not entitled.

318.   Had the United States been aware of Anion's conduct, it would have demanded repayment of the inflated capitation payments, would have refused to pay the inflated risk-adjusted payments, and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries for whom Anion, through Physician Partners, provides services.

319.   By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## SEVENTH CLAIM FOR RELIEF
### Violations of 31 U.S.C. § 3729(a)(1)(A)
### Against Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare")

320.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) resulted in false claims submitted or caused to be submitted by VIPcare in violation of 31 U.S.C. § 3729(a)(1)(A).

321.    Defendant VIPcare violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing the presentment of false or fraudulent claims for payment or approval. By engaging in this conduct, VIPcare caused inflated Medicare reimbursements to which neither it, Physician Partners, nor the Medicare Advantage organizations were entitled.

322.    Had the United States been aware of VIPcare's conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom VIPcare provide services.

323.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## EIGHTH CLAIM FOR RELIEF
### Violations of 31 U.S.C. § 3729(a)(1)(B)
### Against Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare")

324.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) illustrate false claims by VIPcare in violation of 31 U.S.C. § 3729(a)(1)(B).

325.    Defendant VIPcare violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. By engaging in this conduct, VIPcare cause inflated Medicare reimbursements to which neither it, Physician Partners, nor the Medicare Advantage organizations were entitled.

326.    Had the United States been aware of VIPcare's conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom VIPcare provides services.

327.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## NINTH CLAIM FOR RELIEF
### Violations of 31 U.S.C. § 3729(a)(1)(G)
### Against Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare")

328.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A), (B) and (C) illustrate false claims by VIPcare leading to violations of 31 U.S.C. § 3729(a)(1)(G), except for Paragraphs 293-295 which apply to Defendants Freedom and Optimum only.

329.    Defendant VIPcare violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government. In engaging in this conduct, VIPcare retained Medicare overpayments, or caused Physician Partners to retain overpayments, to which neither entity was entitled.

126

330.    Had the United States been aware of VIPcare's conduct, it would have demanded repayment of the inflated capitation payments, refused to pay the inflated risk-adjusted payments, and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom VIPcare provide services.

331.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**TENTH CLAIM FOR RELIEF**
**Violations of 31 U.S.C. § 3729(a)(1)(A)**
**Against Freedom Health, Inc. and Optimum Healthcare, Inc.**
**("Freedom and Optimum")**

332.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(B) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) resulted in false claims submitted or caused to be submitted by Freedom and Optimum in violation of 31 U.S.C. § 3729(a)(1)(A).

333.    As specifically described in Paragraphs 26-29, Freedom and Optimum are indistinguishable entities who operate in tandem, including for purposes of contracting with and executing obligations to the United States. Accordingly, the

allegations made in this Count are made against both Freedom and Optimum, jointly and severally.

334.   Defendants Freedom and Optimum violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and causing the presentment of false or fraudulent claims for payment or approval. By engaging in this conduct, Freedom and Optimum caused inflated Medicare reimbursements to which neither they nor the providers were entitled.

335.   Had the United States been aware of Freedom and Optimum's conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Freedom and Optimum provide services.

336.   By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

<u>ELEVENTH CLAIM FOR RELIEF</u>
**Violations of 31 U.S.C. § 3729(a)(1)(B)**
**Against Freedom Health, Inc. and Optimum Healthcare, Inc.**
**("Freedom and Optimum")**

337.   Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(B) in support of this Count. The paragraphs not specifically realleged in this Count provide critical

contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) illustrate false claims by Freedom and Optimum in violation of 31 U.S.C. § 3729(a)(1)(B).

338.    As specifically described in Paragraphs 26-29, Freedom and Optimum are indistinguishable entities who operate in tandem, including for purposes of contracting with and executing obligations to the United States. Accordingly, the allegations made in this Count are made against both Freedom and Optimum, jointly and severally.

339.    Defendants Freedom and Optimum violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. By engaging in this conduct, Freedom and Optimum cause inflated Medicare reimbursements to which neither they nor the providers were entitled.

340.    Had the United States been aware of Freedom and Optimum's conduct, it would have refused to pay the inflated, risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Freedom and Optimum provide services.

341.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**TWELFTH CLAIM FOR RELIEF**
**Violations of 31 U.S.C. § 3729(a)(1)(G)**
**Against Freedom Health, Inc. and Optimum Healthcare, Inc.**
**("Freedom and Optimum")**

342.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(B) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A), (B) and (C) illustrate false claims by Freedom and Optimum leading to violations of 31 U.S.C. § 3729(a)(1)(G).

343.    As specifically described in Paragraphs 26-29, Freedom and Optimum are indistinguishable entities who operate in tandem, including for purposes of contracting with and executing obligations to the United States. Accordingly, the allegations made in this Count are made against both Freedom and Optimum, jointly and severally.

344.    Defendants Freedom and Optimum violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the United States,

or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government. In engaging in this conduct, Freedom and Optimum retained Medicare overpayments, or caused providers to retain overpayments, to which they were not entitled.

345.   Had the United States been aware of Freedom and Optimum's conduct, it would have demanded repayment of the inflated capitation payments, refused to pay the inflated risk-adjusted payments, and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Freedom and Optimum provide services.

346.   By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## PLEA

WHEREFORE, Plaintiff/Relator requests the Court grant judgment for Plaintiff/Relator and the United States against the Defendants, as follows:

a.   For three times the amount of damages proved, pursuant to 31 U.S.C. § 3729(a).

b.   For mandatory civil penalties for each false claim submitted, pursuant to 31 U.S.C. § 3729(a), as adjusted. For violations submitted before Nov. 5, 2015, the minimum mandatory penalty is $5,500 and the

maximum mandatory penalty is $11,000. For false claims submitted to the United States or after Nov. 5, 2015, the amount of the penalties will be determined at the time the penalties are assessed. The minimum mandatory penalty is presently $11,181 per false claim submitted on or after Nov. 5, 2015, and the maximum mandatory penalty is presently $22,363 per false claim submitted on or after Nov. 5, 2015.

c.   For Relator's reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d);

d.   For the maximum Relator's share award, pursuant to 31 U.S.C. § 3730(d);

e.   For pre-judgment and post-judgment interest as provided by law; and

f.   For such other and further relief as may be appropriate and authorized by law.

## <u>JURY TRIAL DEMAND</u>

Relator demands a trial by jury for all issues so triable.

Respectfully submitted this 12th day of November, 2021,

/s/   Frederick M. Morgan, Jr.
Frederick M. Morgan, Jr. (Ohio Bar No. 0027687)
Jillian L. Estes  (Fla. Bar No. 0055774)
MORGAN VERKAMP LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Phone: (513) 651-4400
Fax: (513) 651-4405
jillian.estes@morganverkamp.com
rmorgan@morganverkamp.com

Kenneth J. Nolan (Fla. Bar No. 603406)
Marcella Auerbach (Fla. Bar No. 249335)
NOLAN, AUERBACH & WHITE, LLP
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL   33301
Phone: (954) 779-3943
Fax: (954) 779-3937
ken@whistleblowerfirm.com
marcellla@whistleblowerfirm.com

Ryon McCabe (Fla. Bar No. 0009075)
Havan M. Clark (Fla. Bar No. 1026390)
MCCABE RABIN, P.A.
1601 Forum Pl., Suite 201
West Palm Beach, FL 33401
Phone: (561) 659-7878
Fax: (561) 242-4848
rmmcabe@mccaberabin.com

**Counsel for Relator Dr. Clarissa Zafirov**

## CERTIFICATE OF SERVICE

I, Frederick M.  Morgan, Jr., hereby certify that the foregoing motion was served on Nov. 12, 2021, to all parties of record via the CM/ECF electronic filing system.

/s/  Frederick M. Morgan, Jr.
Frederick M. Morgan, Jr.

134