## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

United States *ex rel.* Clarissa Zafirov,

     *Plaintiff/Relator*,

v.                                CASE NO. 8:19-cv-01236-KMM-SPF

Physician Partners, LLC;
Florida Medical Associates, LLC
d/b/a VIPcare;
Anion Technologies, LLC;
Freedom Health, Inc.; and
Optimum Healthcare, Inc.,

     *Defendants.*
_____/

## PHYSICIAN PARTNERS, LLC, FLORIDA MEDICAL ASSOCIATES, LLC, AND ANION TECHNOLOGIES, LLC'S MOTION TO DISMISS THE AMENDED COMPLAINT

<u>ARGUMENT</u>

Defendants Physician Partners, LLC, Florida Medical Associates, LLC d/b/a VIPcare, and Anion Technologies, LLC (the "Provider Defendants") move to dismiss Relator Clarissa Zafirov's Amended Complaint with prejudice under Federal Rule of Civil Procedure 12(b). The Amended Complaint contains all the same fatal flaws the Court identified in dismissing her original complaint. Because Zafirov lacks any knowledge of Freedom's claims submissions to the Government and no further amendment can change the fact that her *qui tam* is a piggyback to fraud allegations the Government has already investigated and handled, dismissal should be with prejudice.

## I.     Zafirov's Amended Complaint fails for lack of particularity.

The Amended Complaint fails to plead even one false claim with the requisite particularity. Zafirov brings three categories of FCA claims against each of the Provider Defendants: (1) direct false claims under 31 U.S.C. § 3729(a)(1)(A); (2) false records under § 3729(a)(1)(B); and (3) "reverse" false claims under § 3729(a)(1)(G). To plead with particularity her direct false claims counts, Zafirov must allege the "'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009) (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005)). To plead with particularity her false records and reverse false claims counts, Zafirov "must identify the particular document and statement alleged to be false, who made or used it, when the statement

was made, how the statement was false, and what the defendants obtained as a result." *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012).

No matter which provision she invokes, "[t]he submission of a false claim is . . . the *sine qua non* of a False Claims Act violation." *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1302 (11th Cir. 2002). Allegations of "improper practices alone are insufficient to state a claim under the [FCA] absent allegations that a specific fraudulent claim was in fact submitted to the government." *Corsello*, 428 F.3d at 1014.

### A. Zafirov has still not pleaded any specific false claims.

Zafirov's Amended Complaint contains all the same deficiencies that led to the dismissal of her first complaint. To avoid dismissal, Zafirov must provide "some indicia of reliability" to support the allegation that an actual false claim was submitted. *Clausen*, 290 F.3d at 1311. She must satisfy this standard in one of two ways. Option one is "[p]roviding exact billing data—name, date, amount, and services rendered— or attaching a representative sample claim." *U.S. ex rel. Mastej v. Health Mgmt. Assocs.*, 591 F. App'x 693, 704 (11th Cir. 2014). Option two requires Zafirov to have "direct, first-hand knowledge" of fraudulent submissions "gained through her employment with the defendants" and explain the basis of such knowledge. *Id.* Zafirov cannot satisfy either option.

### 1. Zafirov has not provided any representative claims or exact billing data.

As to the first option, nothing has changed from Zafirov's first complaint to this one. In dismissing her original complaint, the Court stated that Zafirov "fail[ed] to

provide the dates these codes were submitted, the name of the individual or individuals that submitted the codes, how these codes impacted the amount of money that the defendants received from the federal government (materiality), or copies of a single bill or payment." *U.S. ex rel. Zafirov v. Fla. Med. Assocs. LLC*, 2021 WL 4443119, at *4 (M.D. Fla. Sep. 28, 2021). The Amended Complaint has all the same failings. It doesn't attach a representative claim. Nor does it provide exact billing data (*e.g.*, dates of submission, invoice numbers, or amounts of payments). It doesn't identify any individuals at the Provider Defendants who allegedly submitted improper codes to Freedom. It doesn't identify any individuals at Freedom who submitted such codes to the Government. Thus, Zafirov fails option one.

Zafirov tries to cure these deficiencies by listing examples of diagnosis coding she says was either (1) changed to misrepresent the provider who made the diagnosis or (2) submitted in her name after she rejected the diagnosis or asked that it be removed. But there are zero details about the circumstances under which any coding was allegedly falsified. Zafirov doesn't identify the dates any coding was allegedly falsified or any individual who allegedly falsified it. She doesn't even say whether it was falsified by Physician Partners, VIPcare, Anion, Freedom, or someone else.

Zafirov also doesn't identify the dates any allegedly falsified coding was submitted to Freedom or the name of any individual who made such submissions. More importantly, she does not identify the dates any allegedly falsified coding was submitted to the Government or the names of any individuals at Freedom who made

Page 4

such submissions. Zafirov admits she lacks such details. *See* Am. Compl. ¶ 294 ("There is no indication as to how Freedom came to append this code to Patient A."). Zafirov fails to identify any amounts by which Freedom's capitation payments increased as a result of any allegedly falsified coding or the dates Freedom allegedly received such payments. She does not identify the share of increased payments (if any) the Provider Defendants received as a result. These omissions are fatal to her claims.

The Sixth Circuit's recent ruling in *United States ex rel. Owsley v. Fazzi Associates, Inc.*, 16 F.4th 192 (6th Cir. 2021), another Medicare "upcoding" case, is squarely on point and forecloses Zafirov's case. There, the relator alleged a fraudulent scheme to upcode patient data as part of inflated requests for prospective payment from CMS. *Id.* at 196. The relator identified several examples of patients whose coding was allegedly "altered" or "upcoded." *See id.* at 197. The Sixth Circuit held that these allegations were not allegations of "particular identified claims submitted pursuant to the fraudulent scheme." *Id.* (cleaned up). The relator identified "neither the dates on which she reviewed the OASIS forms for these patients, nor the dates of any related claims for payment, nor the amounts of any of those claims." *Id.* Similarly, Zafirov does not provide the dates of submission of any allegedly falsified coding to Freedom or to the Government. Nor does she identify the amounts by which any of Freedom's capitation payments allegedly increased.

Her failure to state these critical details renders Zafirov unable to plead that any allegedly falsified coding was done knowingly (as opposed to accidentally). *See U.S. ex*

*rel. Barrett v. Beauty Basics, Inc.*, 2015 WL 3650960, at \*5 (N.D. Ala. Jun. 11, 2015). Zafirov's assumption that false claims were submitted, without supporting details, does not suffice under Rule 9(b).[1]

### 2. Zafirov lacks personal knowledge of Freedom's submissions to the Government.

Zafirov fares no better on option two. As the Court stated in its dismissal order, Zafirov "does not allege personal knowledge of any of the MA Defendants screening and filtering bills from the Provider Defendants or personal knowledge of the MA Defendants' submissions to CMS." *Zafirov*, 2021 WL 4443119, at \*6. That is because she is an "outsider" of those entities. *Id.*

Zafirov was employed by VIPcare as a doctor. Am. Compl. ¶ 9. Neither VIPcare nor any other Provider Defendant submits diagnosis codes to the Government; only Freedom does. *See id.* ¶ 49. But Zafirov does not allege that she worked for Freedom (because she did not) and does not allege that she was familiar with Freedom's billing process (because she was not). Since Zafirov was a doctor "responsible for the provision of medical care, not a billing and coding administrator responsible for filing

---

[1] Moreover, Zafirov's allegations that the absence of certain medical documentation or treatment supporting diagnosis codes *must* mean there was fraud are not plausible. Zafirov's inability to access such information may be, for example, because the patient was receiving care from a different provider. Rule 8 requires an affirmative showing of unlawful conduct; allegations that support an alternative inference of permissible conduct are not enough. *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).

and submitting" claims for payment, she lacks the knowledge to state any FCA claims. *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006).

Nothing in the Amended Complaint changes this conclusion. The Court should not be misled by Zafirov's suggestion that she had access to Freedom's "online billing portal." Am. Compl. ¶ 190. She appends two categories of documents that she says are screenshots of Freedom's "billing portal." One is entitled "Member Health Profile" and purports to list diagnoses that "have been reported to CMS" at some unidentified point "in the past" for the particular patient. *See* Exs. 1-H8, 4-K9, 6-M7. But there is no claims data in those documents. There is no indication who submitted any codes, when they were submitted, or any amounts of payments. Nor is there any such data in the second category of screenshots, the "*Prospective Possible* Condition Report[s]." *See id.*; Ex. 8-O10. In fact, those documents contain even less information. Internal documents that lack billing data do not satisfy Rule 9(b). *See Clausen*, 290 F.3d at 1312, 1304 n.7; *Mitchell v. Beverly Enter., Inc.*, 248 F. App'x 73, 75 (11th Cir. 2007).

The other documents attached to the Amended Complaint do not help Zafirov satisfy her pleading burden. In support of her "representative" examples of false claims, she cites (1) screenshots of an "encounter" log, (2) screenshots of a "Five Star Form," and (3) various reports from specialty doctors. *See, e.g.*, Am. Compl. ¶ 203. Zafirov concedes that some of these documents are not medical records and were never submitted to the Government. *See* Am. Compl. ¶ 119. None of these documents contain claims data.

At best, these documents show suspected and documented diagnoses and patient conditions. Given that Zafirov was a doctor responsible for patient care, it is unremarkable that she could view this information. Her access to this information, though, did not give her access to the who, what, where, when, and how of any actual submissions to the Government. Without those details, Zafirov's claims do not meet the exacting standards of Rule 9(b).

    3.  <u>Zafirov's reverse false claims counts fail.</u>

Zafirov's reverse false claims counts should be dismissed. First, as the Court stated in its dismissal order, Zafirov's reverse false claims allegations fail because she has not pleaded any submissions to the Government with particularity. *Zafirov*, 2021 WL 4443119, at *6.

Second, the allegations fail because they merely duplicate her direct false claim and false records counts. The reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability on one who knowingly attempts to conceal, avoid, or decrease "an obligation to pay or transmit money . . . to the Government." An "obligation" is "an established duty, whether or not fixed," arising from a contract, statute, regulation, or retention of an overpayment. *Id.* § 3729(b)(3).

Zafirov's theory of reverse false claim liability is inconsistent with these provisions. A relator's theory cannot rely on circular logic:

> Pre- and post-FERA decisions hold that because the duty must be "established," reverse false claim liability cannot be premised solely on the conduct that creates the "obligation." The rationale for this rule is that the defendant cannot conceal, avoid, or decrease an obligation before the conduct that created the obligation occurred. Otherwise, any

Page 8

actionable false statement or false claim could automatically trigger an obligation to repay.

John T. Boese & Douglas W. Baruch, *Civil False Claims & Qui Tam Actions* § 2.01[G][2][a] (5th ed. 2020 (2021-4 Supp.)) (footnotes omitted) (collecting cases).

Zafirov therefore cannot base an obligation to repay a false claim on the Defendants' alleged submission of a false claim in the first place. Yet, that is exactly what the Amended Complaint does by asserting that "[t]he false codes also give rise to violations of the 'reverse False Claims Act' because [no Defendant] returned overpayments attributable to the unsupported claims." Am. Compl. ¶ 16.

Even if the reverse false claims allegations were not redundant, the allegations fail for lack of particularity. Zafirov does not identify any specific amounts the Provider Defendants collected that they should have returned. Nor does she identify any specific false statements or documents made by the Provider Defendants to conceal or avoid returning any overpayments received pursuant to any allegedly improper diagnosis codes. *See U.S. ex rel. Heesch v. Diagnostic Physicians Grp., P.C.*, 2014 WL 2155363, at *9 (S.D. Ala. May 22, 2014). Zafirov's reverse false claims counts should therefore be dismissed.

## B. Zafirov's allegations of purportedly improper practices do not state a claim.

Zafirov's allegations about "Five Star Checklists," doctor bonuses, "pressure" on doctors to make certain coding decisions, and other purportedly improper

practices[2] do not state a claim. Zafirov cannot rely on allegedly improper practices to support "the inference that fraudulent claims were submitted"; rather, "submission must be pleaded with particularity and not inferred from the circumstances." *Corsello*, 428 F.3d at 1013. Without showing that any allegedly improper practices "ever converged and produced an actual false claim," Zafirov fails to state a viable FCA violation. *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1277 (11th Cir. 2018).

## II.      Zafirov has not plausibly pleaded the elements of any FCA violations.

### A. Zafirov has not plausibly pleaded materiality.

Zafirov fails to plead that any allegedly false claims were material. Materiality asks whether a false statement has "a natural tendency to influence, or be capable of influencing," the Government's payment decision. 31 U.S.C. § 3729(b)(4). *See also Univ. Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 176, 193–95 (2016). The FCA's materiality requirement is "rigorous" and "demanding," *Escobar*, 579 U.S. at 194, 195 n.6, and should be "strict[ly] enforce[d]" at the motion to dismiss stage, *id.* at 192, 195 n.6 (quotation omitted). Zafirov bears the burden of "pleading facts to support allegations of materiality." *Id.* at 195 n.6. She has failed to do so.

At best, Zafirov offers only two allegations in support of materiality. First, she states that "truthful submission of . . . diagnosis codes . . . is a material requirement of [MA Defendants'] contract with the United States." Am. Compl. ¶ 198. Second, she

---

[2] Zafirov's allegations of inadequate patient care have nothing to do with whether incorrect diagnosis codes were submitted to the Government and should be disregarded.

asserts that, had the Government "been aware of [Defendants'] conduct, it would have refused to pay."[3]

*Escobar* specifically held that such allegations are insufficient. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. *Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.*" 579 U.S. at 194.

Even assuming any diagnosis codes were "false" (which they weren't), the Amended Complaint is devoid of any allegation that a misdiagnosis resulted in a higher capitated payment in the following year. As this Court stated in dismissing her original complaint, Zafirov fails to plead how any allegedly false codes "impacted the amount of money that the defendants received from the federal government (materiality)." *Zafirov*, 2021 WL 4443119, at *4. Zafirov includes no allegations in her Amended Complaint to change this conclusion.

Zafirov also cannot plausibly plead materiality because CMS knows about diagnosis coding errors (if any) yet continues to pay. CMS, through review of annual Independent Review Organization reports, audits the MA Defendants as part of the *Sewell* settlement and Corporate Integrity Agreement. *See* **Exhibit A**, at App'x C. This includes their diagnosis codes. *Id.* CMS continues to pay the capitated payments every

---

[3] Am. Compl. ¶¶ 298, 302, 306, 310, 314, 318, 322, 326, 330.

year, despite the allegations in *Sewell* and here. This belies any allegation that erroneous diagnosis codes are material. "[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195. The government has investigated Zafirov's allegations and declined to take action, either in this *qui tam* or under the *Sewell* CIA. Zafirov therefore cannot plausibly allege that any of the Defendants' actions affected the Government's payment decision.

### B. Zafirov has not plausibly pleaded causation.

Zafirov has not pleaded that the Provider Defendants' conduct caused any false claims. Zafirov's theory of "fraud" is that the 5 Star Checklists caused doctors to improperly diagnose patients. The Checklists gather available information about a patient's potential current medical conditions in a single place for doctors to review as they evaluate a patient. This information is gathered by algorithms that aggregate historical data in a patient's medical charts to identify possible disease conditions for doctors to consider and, if appropriate, evaluate using their independent clinical judgment. *See* Am. Compl. ¶¶ 108, 115, 116. Zafirov's theory is not plausible because (1) clinical judgment, not a checklist, causes a doctor to make a diagnosis and (2) even if there was "pressure" to apply incorrect diagnosis codes (which there wasn't), those raw codes are too far removed from Freedom's claims submissions to show a causal link to the Provider Defendants.

1. Medical diagnoses are based on individualized clinical judgment, not a checklist.

Zafirov's theory is not plausible. A doctor uses her medical judgment, not a checklist, to diagnose patients. Zafirov repeatedly admits that 5 Star Checklists are not diagnoses; they are simply a list of "suggested" medical conditions based on information in a patient's medical files.[4] She asserts that patients sometimes do not suffer from some conditions included on the Checklist. But her allegations highlight that a doctor must ultimately bring her medical judgment to bear to reach a diagnosis. This is exactly what Zafirov alleges she did by rejecting the data points on certain Checklists.[5] By way of analogy, Westlaw may suggest authorities based on a researcher's search terms. But a lawyer must read and analyze those authorities to decide whether to cite them in her brief. Like Westlaw's "smart" search results, 5 Star Checklists are created by filtering large amounts of data to identify conditions that a doctor might consider in forming her professional opinion. Ultimately, however, the doctor must decide on the appropriate diagnosis, as the lawyer must decide on which cases to cite in her brief.

Doctors exercising medical judgment make diagnoses. Zafirov does not allege that anyone forced her (or anyone else) to misdiagnose a patient. Thus, the Amended Complaint's theory of "fraud" is not plausible.

2. <u>There is no proximate causation between raw diagnosis codes from the Provider Defendants' doctors and Freedom's claims submissions.</u>

---

[4] *See* Am. Compl. ¶¶ 8, 9, 94, 104, 108, 109, 110, 112, 114, 118, 120, 121, 132, 140, 141, 142, 147, 150, 171, 205, 215, 224, 225, 227, 232, 244, 253, 263, 268, 270 n.6, 285, 293.

[5] *See* Am. Compl. ¶¶ 108, 110, 141, 142, 161.

Zafirov's theory of presentment of false claims fails because there is no proximate causation between raw diagnosis codes from the Provider Defendants' doctors and Freedom's claims submissions. The Provider Defendants do not have contracts with CMS, do not present any diagnosis codes to CMS, and are not paid directly by CMS. Thus, the Provider Defendants can only be liable under 31 U.S.C. § 3729(a)(1)(A) if Zafirov plausibly alleges that they "cause[d] to be presented" false claims to the Government.

For "cause to be presented" claims, the Eleventh Circuit uses a proximate cause test. *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1107 (11th Cir. 2020). Zafirov must allege that the Provider Defendants' submission of allegedly unsubstantiated diagnosis codes to Freedom was (1) a substantial factor in inducing Freedom to submit claims for reimbursement, and (2) Freedom's submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of the Provider Defendants' conduct. *See id.*

Zafirov has not and cannot allege facts to support either prong. The Provider Defendants submit diagnosis codes from their doctors to the MA Defendants, but these codes are not "request[s]. . . for money." 31 U.S.C. § 3729(b)(2)(A). *Cf. United States v. Krizek*, 111 F.3d 934, 939–40 (D.C. Cir. 1997); *U.S. ex rel. Bahnsen v. Bos. Sci. Neuromodulation Corp.*, 2018 WL 4604307, at *4 (D.N.J. Sep. 24, 2018). Not all codes change a patient's risk score and thus not all codes affect payment. Raw diagnosis codes do not entitle Physician Partners—the only Provider Defendant in privity with

Page 14

the MA Defendants—to receive payment, either from a MA Defendant or the Government. And providers other than the Provider Defendants submit codes to the MA Defendants. *See, e.g.*, Am. Compl. ¶¶ 209, 223.

Moreover, raw diagnosis codes are meaningless for risk adjustment purposes. Before a diagnosis code can even *possibly* lead to increased payment, MA insurers must subject these codes to multiple levels of processing and review. MA insurers must verify that the code came from one of three acceptable data sources: a hospital inpatient stay, an outpatient facility, or a physician.[6] They must then format the codes along with four other data points (claim number, service from date, service through date, and provider type) into "diagnosis clusters" for submission to the Risk Adjustment Processing System (RAPS).[7] *Id.* MA insurers then "submit the five data

---

[6] CMS, Pub. No. 100-16, *Medicare Managed Care Manual*, ch. 7, § 120 (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c07.pdf.

[7] CMS also uses the Encounter Data Processing System (EDPS), to translate diagnosis codes into risk adjustment data. *See* CMS, *Encounter Data Submission and Processing Guide*, ch. 1 (2020), https://www.csscoperations.com/internet/cssc4.nsf/files/ED_Submission_Processing_Guide.pdf/$FIle/ED_Submission_Processing_Guide.pdf. The EDPS relies on "encounter data," which is "data representing each item and service provided to an MA enrollee," to calculate risk adjustment scores. *Id.* at ch. 1.1. Like the RAPS, the EDPS also contains multiple levels of review and processing as it translates diagnosis data into risk adjustment data. *See id.* at Figure 1.1; ch. 1.3. Although CMS seeks to rely more heavily on the EDPS to calculate risk scores going forward, the RAPS was the primary determinant of Medicare Advantage patients' risk scores during the relevant timeframe. *See* CMS, *2021 Medicare Advantage and Part D Advance Notice Part II Fact Sheet* (Feb. 5, 2020), https://www.cms.gov/newsroom/fact-sheets/2021-medicare-advantage-and-part-d-advance-notice-part-ii-fact-sheet (explaining that the RAPS accounted for 75–90 percent of patients' risk scores between 2015 and 2019). Thus, this brief's focus is on the RAPS.

elements in the RAPS format . . . to the Front End Risk Adjustment System (FERAS) for initial edit checks." *Id.*

FERAS and RAPS are the first layer of MA insurers' array of tools to verify their risk adjustment data. After MA insurers submit diagnosis clusters, FERAS and RAPS generate various reports identifying errors and showing the disposition of entered data "so plans can verify their data and project their payment." *Id.* MA insurers review these reports to identify and correct errors, including duplicate diagnosis clusters. *See id.* § 120.2.5. After editing, "[f]inalized diagnosis clusters are stored in the RAPS database and used for the calculation of risk scores." *Id.* § 120. CMS also generates several reports, including Monthly Membership Reports and Model Output Reports, for insurers to verify their data. *See id.* § 120.3.

This multi-layered processing and review system breaks any causal link between the Provider Defendants' raw diagnosis codes and the finalized risk adjustment data the MA Defendants submit to CMS for payment. *See U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 597 F. Supp. 2d 1280, 1292 (M.D. Fla. 2009) (no causation where downstream entity "had no control over" Medicare entity's "claims procedures, gave no suggestion or instruction . . . regarding its Medicare submissions, and in no way participated in . . . submission of bills to Medicare"). This multi-layered system, with its data input requirements, edit checks, and output reports, also illustrates just how far removed the exhibits attached to the Amended Complaint are from any actual claims data formatted to CMS's requirements for submission.

Moreover, an incorrect diagnosis code itself does not lead to increased payment. Diagnoses are classified according to severity "so that a beneficiary's risk score includes only the most severe manifestation among related diseases."[8] The CMS-HCC also excludes diagnoses that are vague or nonspecific (like symptoms), discretionary, medically insignificant, and transitory or definitively treated. *Id.* at 19. The model also considers demographic information, like sex and age. *Id.* at 20. The ultimate capitated payment is a complex multi-dimensional calculus that does not turn on any single input. CMS takes into account geography, the bid submitted by the insurer, the number of patients, and other factors in deciding the capitation rate. *See* 42 C.F.R. §§ 422.304(a), 422.308. Due to this complex calculus, there is no proximate causation between the Provider Defendants' alleged submission of an incorrect diagnosis code to Freedom and an increased payment to the MA Defendants.

### C. Zafirov has not plausibly pleaded objective falsity.

Zafirov has not shown that any of the Provider Defendants' diagnosis codes were objectively false. For a claim to be "false" under the FCA, a relator "must show an objective falsity." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1298 (11th Cir. 2019). In the context of medical judgments like the diagnoses at issue here, "a reasonable difference of opinion among physicians reviewing medical documentation *ex post* is not sufficient on its own to suggest that those judgments—or

---

[8] CMS, *Report to Congress: Risk Adjustment in Medicare Advantage* 18 (Dec. 2021), https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf.

any claims based on them—are false under the FCA." *Id.* at 1297. Zafirov's disagreements with the potential diagnoses identified by the 5 Star Checklists or coded by other providers do not plausibly allege any objectively false claims or records. Zafirov's second-guessing other doctors cannot be the basis of a FCA violation.

## III.   The public disclosure bar forecloses Zafirov's claims.

The public disclosure bar independently bars the Amended Complaint. The FCA's public disclosure bar prevents plaintiffs from bringing "parasitic lawsuits" based on publicly available information. *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 (11th Cir. 1994) (quoting legislative history). *See also* 31 U.S.C. § 3730(e)(4).

Under the Eleventh Circuit's three-part test, the public disclosure bar requires dismissal if: (a) "the allegations made by the plaintiff [have] been publicly disclosed," (b) that "disclosed information" is "substantially the same" as the plaintiff's allegations, and (c) the plaintiff is not "an 'original source' of that information." *See U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 (11th Cir. 2015) (quoting *Cooper*, 19 F.3d at 565 n.4). Zafirov "bears the burden of proving that the public disclosure bar does not preclude h[er] FCA action." *U.S. ex rel. Brown v. BankUnited Trust 2005-1*, 235 F. Supp. 3d 1343, 1354 (S.D. Fla. 2017) (quotation omitted).

As this Court held in dismissing Zafirov's original complaint, the public disclosures of fraud in *Sewell* bar Zafirov's case. *Zafirov*, 2021 WL 4443119, at *6–8. Her Amended Complaint does nothing to change this holding (because it cannot).

### A. Zafirov's allegations were publicly disclosed.

Zafirov's allegations were publicly disclosed in the *Sewell qui tam* action. Under *Cooper*, the first question is "whether the allegations or transactions at issue were publicly disclosed." *Osheroff*, 776 F.3d at 812. Under at least two of the FCA's public disclosure paradigms, these allegations have been "publicly disclosed." They were discussed in (1) prior federal hearings and (2) the news media.[9]

First, these allegations appeared in a prior civil hearing in which the Government was a party. 31 U.S.C. § 3730(e)(4)(A)(i). The *Sewell* case involved indistinguishable allegations that Freedom, Optimum, Pagidipati, and others "knowingly submit[ed] incorrect and unsubstantiated risk adjustment data to CMS in order to fraudulently increase their capitation payments." *Compare U.S. ex rel. Sewell v. Freedom Health, Inc., et al.*, No. 8:09-cv-1625-T-35TGW (M.D. Fla.), Doc. 44, Second Am. Compl. ¶ 9 *with* Am. Compl. ¶ 17 ("[T]he Defendants knowingly submitted unsupported diagnosis codes which cost the United States millions of dollars in artificially inflated capitation payments."). *Sewell* resulted in a Corporate Integrity Agreement that is publicly available on the HHS OIG's website and is linked in a DOJ press release about the case.[10] These qualify as public disclosures.

---

[9] In the last round of motions to dismiss, Zafirov did not dispute that the public disclosures in *Sewell* satisfy prong one of the *Cooper* test. *Zafirov*, 2021 WL 4443119, at *7.

[10] *See* DOJ, *Medicare Advantage Organization and Former Chief Operating Officer to Pay $32.5 Million to Settle False Claims Act Allegations* (May 30, 2017),

Second, these allegations were publicly disclosed in the news media. 31 U.S.C. § 3730(e)(4)(A)(iii). When *Sewell* settled, it generated significant press coverage. *The New Yorker* featured a multi-page unpacking of the *Sewell* allegations. *See* Sheelah Kolhatkar, *The Personal Toll of Whistle-Blowing,* The New Yorker, Jan. 28, 2019. *The New Yorker* revealed that "Freedom pressured doctors to . . . assign additional codes that the internal data miners thought would be more profitable." *Compare id. with* Am. Compl. ¶ 91 ("Physician Partners and VIPcare engaged in high-pressure directives to ensure their physicians selected only risk-adjusting HCCs."); *id.* ¶ 4 ("Its subsidiary Anion is the billing arm of Physician Partners, employing chart reviewers . . . to access patient records, evaluate diagnosis codes, and modify the codes to enhance risk scores."). Other national news media covered the allegations.[11] Thus, the first prong of the *Cooper* test (public disclosure) is established.

### B. Zafirov's allegations are substantially similar to the public disclosures.

Zafirov's allegations are cut from the same cloth as the publicly disclosed information. After establishing public disclosure, *Cooper* next asks "whether the

---

https://www.justice.gov/opa/pr/medicare-advantage-organization-and-former-chief-operating-officer-pay-325-million-settle (last visited Jan. 14, 2022); HHS OIG, *Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and Freedom Health Inc. and Optimum Healthcare, Inc.*, https://www.oig.hhs.gov/fraud/cia/agreements/Freedom_Health_Inc_and_Optimum_Healthcare_Inc_05112017.pdf (last visited Jan. 14, 2022).

[11] *See* Fred Schulte, *Medicare Advantage Insurer Settles Whistleblower Suit for $32 Million*, NPR (May 31, 2017), https://www.npr.org/sections/healthshots/2017/05/31/530868367/medicare-advantage-insurers-settle-whistleblower-suit-for-32-million.

complaint's allegations are 'substantially the same' as the publicly disclosed allegations or transactions." *Osheroff*, 776 F.3d at 814. "This prong is satisfied if the plaintiff bases her claim "*in any part* on . . . publicly disclosed information." *Zafirov*, 2021 WL 4443119, at *7 (quoting *Osheroff*, 776 F.3d at 814). A "complete identity" of allegations is not required; "rather, '[t]he key inquiry is whether the disclosures could have put the government on notice of the fraud alleged in the qui tam complaint.'" *Id.* (quoting *U.S. ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 523 (6th Cir. 2020)). "As a result, the Eleventh Circuit has described this test as a 'quick trigger' to get to the more exacting original-source inquiry." *Id.* (quoting *Cooper*, 19 F.3d at 568 n.10).

As this Court has already held, Zafirov's claims are substantially similar as those in *Sewell*. *Id.* The two cases contain virtually identical allegations about how "Freedom Health, Optimum, and Pagidipati fraudulently submitted improper diagnosis codes to CMS to increase their risk-adjustment payments, failed in their obligations to CMS to correct erroneously submitted diagnosis codes, and used coding auditors to upcode diagnoses so that risk-adjustment payments would increase." *Id.*

The Provider Defendants, although not named in *Sewell*, are covered by the public disclosure bar. *See Maur*, 981 F.3d at 526 (adding as new parties corporate affiliates of and business personally owned by prior *qui tam* defendants did not change public disclosure analysis); *U.S. ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 849 (6th Cir. 2020) (allegations of "a single hospice facility" were enough to put the Government "on notice of the corporate-wide conduct alleged in this case"); *U.S. ex*

*rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 511, 514 (6th Cir. 2009) (public disclosures were sufficient even though "defendants involved [were] slightly different" because the disclosures "revealed the same kind of fraudulent activity"). Prong two "does not demand that the disclosures identify the defendant by name as the wrongdoer." *U.S. ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 751 (10th Cir. 2019). "[I]t is enough that the public disclosures alleged industry-wide fraud and provide[d] enough information to link the defendant to the scheme." *Id.* (cleaned up).

The Provider Defendants are downstream of Freedom and Optimum in the Medicare Advantage network and alleged to be under the control of Pagidipati, all of whom *were* named in the *Sewell* disclosures. Zafirov herself admits that these downstream defendants were a necessary part of the alleged fraud. *See* Am. Compl. ¶ 6 ("The entities are more than business affiliates; they are inextricably linked by Sidd Pagidipati, the CEO of Physician Partners who took the helm of the provider organization after the policies he implemented as the COO of Freedom and Optimum led those companies to a $32 million False Claims Act settlement."); *id.* ¶ 88 ("[I]t is critical to the success of this fraudulent scheme that all of the defendants operated in tandem, a relationship made possible largely by the knowledge and former control of Freedom and Optimum held by Siddhartha Pagidipati, the owner and CEO of Physician Partners."). Adding new Provider Defendants does not change the fact that Zafirov's allegations are substantially similar to those in *Sewell*.

Page 22

Further, the Government knows the exact source of each diagnosis code that is submitted by Freedom. If it were concerned about the correctness of any coding, it has all the tools to investigate, including the *Sewell* CIA audits and CMS's ordinary regulatory processes (such as the Risk Adjustment Data Validation audits, which all Medicare Advantage insurers are subject to). *See United States v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1019 (9th Cir. 1999) (public disclosures sufficiently identified unnamed defendants who were part of "a narrow class of suspected wrongdoers" and the Government "would have ready access to documents identifying those" parties).

It also does not matter that Zafirov alleges fraud that post-dates *Sewell*. Courts "consistently f[ind] that continuing fraud in a new time period is not a new fraud, but is . . . substantially similar to prior public disclosures." *United States v. Medco Health Sols., Inc.*, 2017 WL 63006, at *8 (D. Del. Jan. 5, 2017). Because cases that overlap with prior public disclosures in "*any part*" are substantially similar, *Zafirov*, 2021 WL 4443119, at *7, Zafirov's allegations satisfy prong two.

### C. Zafirov is not an original source.

Finally, Zafirov cannot show she is an "original source" to avoid application of the public disclosure bar. She has not and cannot prove that she voluntarily disclosed everything in her complaint to the government before the original public disclosure (*i.e.*, *Sewell*). 31 U.S.C. § 3730(e)(4)(B). Thus, she must show that she has "independent" knowledge which "materially adds" to the public disclosures *and* that

she has voluntarily provided all such information to the government before filing this action. *Id.* Here too, she fails.

As the Court has already held, Zafirov is not an original source. "Her allegations about the MA Defendants' fraudulent scheme are largely addressed in the *Sewell* action." *Zafirov*, 2021 WL 4443119, at *8. Zafirov's allegations of a scheme to submit incorrect diagnosis codes to CMS and inflate capitation payments are no different than what the relator alleged in *Sewell*. The Government is still dealing with those allegations to this day through the *Sewell* CIA. "Alleging the perpetuation of a fraud that the government is aware of and actively handling does not materially add to the prior public disclosures." *Id.* (citing *Maur*, 981 F.3d at 528). Zafirov is not an original source and therefore cannot clear the public disclosure bar.[12] Moreover, as a result, the Court cannot consider any publicly disclosed allegations in considering whether the Amended Complaint satisfies Rule 9(b). *See U.S. ex rel. Bernier v. InfiLaw Corp.*, 311 F. Supp. 3d 1288, 1298 (M.D. Fla. 2018).

## IV.    The government action bar forecloses Zafirov's case.

The FCA's "government action bar" is an independent reason that Zafirov's case should be dismissed. The government action bar requires dismissal of *qui tam* suits "based upon allegations or transactions which are the subject of a civil suit . . . in which

---

[12] Moreover, Zafirov cannot use alleged screenshots of the Defendants' internal medical portal taken *months* after she filed the complaint to show she is an original source because she cannot show she voluntarily disclosed that information to the Government before filing suit. *See* 31 U.S.C. § 3730(e)(4)(B)(ii).

the Government is already a party." 31 U.S.C. § 3730(e)(3). An action is "based upon" an earlier government-related action "if the relator's case is receiving support, advantage, or the like from the 'host' case (in which the government is a party)." *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 256, 262 (E.D. Pa. 2020) (cleaned up). Because the "inquiry is essentially a test of factual similarity," courts look "for signs of a host/parasite relationship" between the earlier action and later one. *Id.* (quotation omitted). "[P]iggy-back *qui tam* lawsuits," like this one, which "seek[] to remedy 'fraud' arising from a situation previously addressed by the government," cannot clear the government action bar. *See U.S. ex rel. Stone v. AmWest Sav. Ass'n*, 999 F. Supp. 852, 855–56 (N.D. Tex. 1997) (cleaned up).

*Sewell* triggers the government action bar.[13] "If an allegation of fraud has already been made" in the earlier action, "the analysis is straightforward." *See U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 708 (7th Cir. 2014). Zafirov's allegations of Medicare Advantage fraud perpetuated through submission of incorrect diagnosis codes are no different than *Sewell*. This makes her case a textbook "parasite" to *Sewell*'s "host." *Sturgeon*, 438 F. Supp. 3d at 262. The whole point of the government action bar is to "prevent parasitic *qui tam* lawsuits that receive support from an earlier case without giving the government any useful return," beyond "additional monetary

---

[13] For purposes of the government action bar, the Government is "already a party" even in *qui tam* cases that have already settled. *See U.S. ex rel. Bennett v. Biotronik*, 876 F.3d 1011, 1021 (9th Cir. 2017).

recovery." *Pacult v. Walgreen Co.*, 2011 WL 13209584, at *10 (W.D. Wis. June 14, 2011). That is especially true here where the Government has already addressed the fraud allegations through the *Sewell* CIA. Zafirov's case therefore fails the government action bar.

<u>C</u><u>ONCLUSION</u>

For these reasons, Zafirov's Amended Complaint should be dismissed. Allowing Zafirov to sweep seven years of patient visits into a single lawsuit and impose costly and burdensome discovery on the Defendants based on sparse information would contravene the gatekeeping requirement of Rule 9(b). *See Clausen*, 290 F.3d at 1313 n.24. Because Zafirov lacks the knowledge of Freedom's claims submissions to ever state any FCA claims; cannot cure the fact that her *qui tam* is a piggyback to fraud allegations that have already been made public and handled by the Government; and has already been allowed leave to amend once, no further amendment can cure the fundamental flaws in Zafirov's case. Dismissal should therefore be with prejudice.


Dated: January 14, 2022


Respectfully submitted,


*/s/ A. Lee Bentley, III*
A. Lee Bentley III
Florida Bar No. 1002269
Jason P. Mehta

Page 26

Florida Bar No. 106110
Kyle W. Robisch
Florida Bar No. 113089
BRADLEY ARANT BOULT CUMMINGS LLP
100 North Tampa Street, Suite 2200
Tampa, Florida 33602
Tel: (813) 559-5500
Facsimile: (813) 229-5946
Primary E-mail: lbentley@bradley.com
Primary E-mail: jmehta@bradley.com
Primary E-Mail: krobisch@bradley.com
Secondary E-Mail: dmills@bradley.com

Counsel for Defendants Florida Medical
Associates, LLC, Physician Partners, LLC,
Physician Partners Specialty Services, LLC,
Sun Labs USA, Inc., Anion Technologies,
LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 14, 2022, I filed the foregoing with the Court's electronic filing system, which will cause a copy to be served upon all counsel of record.

*/s/ A. Lee Bentley, III*
OF COUNSEL

4859-3114-8041.1