## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* DR. CLARISSA ZAFIROV, | ) | |
| | ) | |
| Plaintiff and Relator, | ) | |
| | ) | |
| v. | ) | NO. 8:19-cv-01236-KMM-SPF |
| | ) | |
| FLORIDA MEDICAL ASSOCIATES, | ) | |
| LLC, d/b/a VIPCARE; PHYSICIAN | ) | |
| PARTNERS, LLC; ANION | ) | |
| TECHNOLOGIES, LLC; FREEDOM | ) | |
| HEALTH, INC.; and OPTIMUM | ) | |
| HEALTHCARE, INC.; | ) | |
| | ) | |
| Defendants. | ) | |

_____

## **RELATOR'S RESPONSE IN OPPOSITION TO THE PROVIDER DEFENDANTS' MOTION TO DISMISS RELATOR'S AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

I.    Dr. Zafirov identifies false claims with a level of specificity
      that far exceeds the Rule 9(b) pleading standard............................................. 3

      A. The Eleventh Circuit requires reliable indicia that
         a false claim was submitted as a result of the alleged conduct .................. 4

      B.  Relator's Amended Complaint satisfies Rule 9(b)..................................... 7

II.   The Amended Complaint pleads every element of an FCA violation ........... 10

      A.    Contrary to the Provider Defendants' assertions,
            the Medicare Advantage program relies entirely
            on accurate diagnosis codes submitted by providers .......................... 11

      B.    False diagnosis codes are material .................................................... 13

      C.    The Provider Defendants caused the submission
            of false claims ................................................................................. 15

      D.    The diagnosis codes submitted by the Provider
            Defendants were objectively false...................................................... 16

III.  Dr. Zafirov properly pleads reverse false claims ......................................... 17

IV.   Relator's claims cannot be dismissed on public disclosure grounds ............. 18

V.    Relator's allegations against the Provider Defendants
      are not subject to the government action bar ............................................... 19

VI.   Conclusion........................................................................................... 20

Relator Clarissa Zafirov, M.D. filed an Amended Complaint (Dkt. 86, "AC") on November 11, 2021, alleging a fraud scheme perpetrated by Defendants Florida Medical Associates, LLC d/b/a VIPcare, Physician Partners, LLC and Anion Technologies, LLC ("the Provider Defendants") against the United States by submitting false diagnosis codes to inflate the risk scores for their patients enrolled in the Medicare Advantage program. Relator alleges that the Provider Defendants directed and pressured employed and contracted physicians to use risk-adjusting diagnosis codes (AC at ¶¶ 138-179); that Physician Partners financially incentivized physicians to increase patient risk scores (*id.* at ¶¶ 125-137); that Anion and Physician Partners distributed 5 Star Checklists to VIPcare physicians which misrepresented patient health status and encouraged improper diagnoses (*id.* at ¶¶ 105-124); and that the Provider Defendants falsified diagnosis codes when a physician did not cooperate with their directives (*id.* at ¶¶ 91, 202-271).

The Amended Complaint includes detailed analysis of these practices in the context of many specific patients, including the diagnosis codes the defendants submitted or caused to be submitted as a result of their fraudulent scheme. In a Medicare Advantage ("MA") case, that submission itself is the submission of a false claim. *U.S. ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1085 (N.D. Cal. Mar. 16, 2020); AC at ¶¶50-52; 182.[1] For example, Dr. Zafirov identifies blatant, egregious

---

[1] Defendants make the remarkable, if not preposterous, claim that diagnosis codes are "meaningless" in the MA system. Dkt. 96 at 15. To the contrary, such codes are the *lingua franca* of the MA program, responsible for determining the amount of that the United States

examples like Patient A, for whom the Provider Defendants submitted the risk-adjusting diagnosis code for a "complete traumatic amputation" of his foot but who plainly still had both feet firmly attached when Relator treated him in 2019 (AC at ¶¶ 118, 293) and Patient P, a senior citizen for whom the Provider Defendants were paid for the risk adjusting diagnosis code for anencephaly, a fatal birth defect (*id.* at ¶¶ 284, 285).

Dr. Zafirov provides extensive documentation of claims for Patients H, I, J, and K as examples of occasions in which she expressly rejected a diagnosis code, only to learn that defendants changed the code to appear as though it had come from a phantom, unnamed "physician." *Id.* at ¶¶ 203-240. And she also provides documentation of claims for Patients L, M and N as examples of occasions where the Provider Defendants submitted claims in Dr. Zafirov's name and refused to delete the code over her express denial of their accuracy, such as an email directly from Dr. Zafirov to a billing specialist saying "remove the code from [the patient's] medical record." *Id.* at ¶¶ 242-271.

This is not a case where the Provider Defendants cannot ascertain Dr. Zafirov's claims. Nor is there any doubt that false claims were actually submitted as a result of the Provider Defendants' conduct: Precise specifics of such claims are alleged. And this is not a case where there is any actual question that the Provider Defendants knew

---

will pay for each enrolled beneficiary. The Amended Complaint describes the process in detail (AC at ¶¶ 46-52; 76-77) and Relator further dispels the Provider Defendants' inaccurate representations about the MA program in Section II(A), *infra*.

their claims were (1) false and (2) material to the United States' payment. Still, the Provider Defendants move to dismiss Relator's amended complaint pursuant to Fed. R. Civ. P. 12(b), asserting that Relator's complaint fails for lack of specificity and failure to state a claim. Their motion disregards large swaths of the amended complaint, misstates pleading standards, and relies on a description of the Medicare Advantage program which is cut from whole cloth. Their arguments fail, and their motion should be denied in its entirety.

## I.    Dr. Zafirov identifies false claims with a level of specificity that far exceeds the Rule 9(b) pleading standard.

The Provider Defendants hinge their motion on assertions that Relator's amended complaint "fails to plead even one false claim with the requisite particularity" and that "nothing has changed" from Relator's original complaint. Dkt. 96 at 2, 3. This is simply wrong. The amended complaint includes *34 pages* of claims-related details, with corresponding documentation, which were not in Relator's original complaint and which speak directly to claims that were submitted by the providers to Freedom and Optimum, and thence to the United States. AC at ¶¶ 195-295, Exs. 1-8. The Provider Defendants say these allegations still run afoul of the idea that "improper practices *alone* are insufficient to state a claim under the [FCA] *absent allegations that a specific fraudulent claim was in fact submitted to the government.*" Dkt. 96 at 3, *citing Corsello v. Lincare*, 428 F.3d 1008, 1014 (11th Cir. 2005) (emphasis added). But Relator's amended complaint bears no resemblance to the complaint in *Corsello*, *Clausen*, or any of their progeny which were held to leave open the possibility that

claims were never actually submitted to the United States. Here, Relator alleges—and shows—specific examples of false claims that were submitted to the United States as a result of the Provider Defendants' conduct.

### A. The Eleventh Circuit requires reliable indicia that a false claim was submitted as a result of the alleged conduct.

Rule 9(b), Fed. R. Civ. P., requires that a complaint "state with particularity the circumstances constituting fraud." The Eleventh Circuit has interpreted this to mean that a relator may not simply describe a scheme and then make an unsupported allegation "that the defendants submitted false claims to the government for reimbursement." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006); *Clausen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1311 (11th Cir. 2002).

The "key inquiry" under Rule 9(b) is "whether the complaint includes 'some indicia of reliability' to support the allegation that an actual false claim was submitted." *U.S. v. HPC Healthcare, Inc.*, 723 F. App'x 783, 789 (11th Cir. 2018), *quoting Clausen*, 290 F.3d at 1311. While Rule 9(b) can be satisfied by submitting specific claims information (as Relator does here), "there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703-04 (11th Cir. 2014), *citing Clausen*, 290 F.3d at 1312 and n.21 (listing types of information that might help a plaintiff plead the submission of a claim with particularity but cautioning that Rule 9(b) "does not mandate all of this information for any of the alleged claims"). Rather, the Eleventh Circuit "evaluate[s] whether the allegations of a complaint

4

contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Atkins*, 470 F.3d at 1358; *U.S. v. Crumb*, No. 15-0655, 2016 U.S. Dist. LEXIS 112661, at *21-24 (S.D. Ala. Aug. 24, 2016).

In instances where a relator relies on "other means [ ] to present the required indicia of reliability that a false claim was actually submitted," the assessment evaluates whether the relator "explain[ed] the basis for her assertion that fraudulent claims were actually submitted," instead of relying on conjecture. *Mastej*, 591 F. App'x at 704. When the basis for a relator's knowledge of false claims comes from the relator's employment, the focus is not on a specific job title, but whether the relator's "access to possibly relevant information translated to knowledge of actual tainted claims presented to the government." *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1278 (11th Cir. 2018). For example, in *Walker v. R & F Props. of Lake Cnty., Inc.*, the relator's personal knowledge of allegations of billing fraud was sufficient because the relator, a nurse practitioner, received instructions about billing using the wrong codes, and her conversations with the defendant's office manager formed the basis for her belief that claims were actually submitted to the government. 433 F.3d 1349, 1360 (11th Cir. 2005).

In asserting that Relator has not pled specific false claims, the Provider Defendants place outsized reliance on *U.S. ex rel. Owsley v. Fazzi Assocs.*, 16 F.4th 192 (6th Cir. 2021). *Owsley* is not relevant here. First, it is not a Medicare Advantage case, so the type of information submitted as a claim for payment is fundamentally different.

Rather, that case involved upcoding of home health care visits in traditional Medicare, and the relator was unable to allege that upcoded visits were in fact billed to the United States. *Owsley,* 16 F.4th at 196-97. Notably, the *Owsley* court reinforced that "the touchstone is whether the complaint provides the defendant with notice of a specific representative claim that the plaintiff thinks is fraudulent." *Id.* at 197. Here, even at this earliest litigation phase, Dr. Zafirov shows with precise specificity that the Provider Defendants did, in fact, submit false diagnosis codes to the insurers, and received payment for those false diagnosis codes.

Dr. Zafirov's allegations against the Provider Defendants align with *U.S. ex rel. Ormsby v. Sutter Health,* a case which addresses the liability of a provider who, like these defendants, submitted false diagnosis codes to a Medicare Advantage organization. The *Ormsby* complaint satisfied Rule 9(b) because it alleged that incorrect diagnosis codes were submitted for ten patients; it did not identify when or how the claims were submitted to which Medicare Advantage organization ("MAO") or from any MAO to the United States; did not identify who specifically submitted the claims; and did not set out the dates on which codes were transmitted to the United States. 444 F. Supp. 3d at 1045-48.

As here, the *Ormsby* allegations included a specific patient, an allegedly false diagnosis code, a year that the code was submitted, and a brief explanation of why the

code was false.[2] In the Medicare Advantage context, that is enough. *Id.* at 1082 ("[T]he government has alleged with the requisite particularity that Sutter and PAMF submitted claims predicated on false diagnosis codes").

### B.    Relator's Amended Complaint satisfies Rule 9(b).

Dr. Zafirov's amended complaint fully meets the Eleventh Circuit's challenge. In sum, she alleges that the Provider Defendants lied about their patients in order to improperly increase risk scores. These lies directly resulted in the submission of inaccurate, unsupported, and falsified risk-adjusting diagnosis codes, which are false claims in the Medicare Advantage program: **"The false claims at issue here are false diagnosis codes."** *Ormsby*, 444 F. Supp. 3d at 1085 (emphasis added); *see also* AC at ¶¶ 50-52, 182.

Drawing from her practice as a VIPcare primary care physician, Dr. Zafirov provides specific examples, with precise documentation, of (1) representative patients whose medical records were altered to reflect that some other "physician" submitted

---

[2] The *Ormsby* Patients B through J were all described using the following format: "Patient B – PAMF and Sutter submitted an ICD-9 diagnosis code for malignant neoplasm of thyroid gland for Patient B for date of service year 2012. This diagnosis code mapped to HCC 10 and increased reimbursement from CMS. However, Patient B's medical records and treatment show the falsity of this coding because (1) Patient B's thyroid cancer was treated by thyroidectomy in July 2007, and (3) there was no evidence of treatment, evaluation, or management of thyroid cancer in this patient's 2012 medical records." *Ormsby* Complaint-in-Intervention, No. 3:15-cv-01062, Dkt. 41, at ¶133 (N.D. Cal. Mar. 4, 2019). The only other patient, Patient A, was identified when one of the MAOs requested medical records to support a prostate cancer diagnosis from 2010 and the relator determined that the medical chart did not support the diagnosis. No other information about Patient A was alleged.

the code when Relator attempted to have a false code removed; (2) additional patients for whom codes were submitted under Dr. Zafirov's name even after she expressly rejected the inaccurate codes; (3) the false diagnosis codes that were submitted; (4) the risk adjustment values of those codes; (5) the years during which the claims were submitted; and (6) evidence which shows why the codes are false. AC at Section IX(A) and (B).[3] To be clear, Dr. Zafirov personally treated each patient, personally reviewed his or her records and medical history, personally accessed and viewed the billing records in the Physician Partners' online portal, and personally compared the electronic medical and billing records to the diagnosis codes that she submitted.[4]

---

[3] The Provider Defendants fault Relator for not identifying "the dates these codes were submitted, the name of the individual or individuals that submitted the codes, how these codes impacted the amount of money that the defendants received from the federal government (materiality), or copies of a single bill or payment." Dkt. 96 at 4. This is flatly untrue: Dr. Zafirov *does* identify when claims were submitted and how the codes impacted the amount of money that the defendants received (AC at Section IX, including dates of patient visits associated with false diagnosis codes, years codes were submitted, and risk scores which serve as multipliers for the capitation payments) and she attaches documentation showing claims submitted by the Defendants (*id.* at Exs. 1-8). With respect to "who," the identification of Physician Partners and Anion as the entities responsible for submitting claims to the MAOs is sufficient. *U.S. v. Omnicare, Inc.*, No. 1:11-cv-962, 2013 U.S. Dist. LEXIS 75696, at *23-25 n.12 (N.D. Ga. May 17, 2013). And while Relator *does* identify details about the claims that Freedom and Optimum then submitted to the U.S., such details are not required to plead a case against these defendants. *U.S. ex rel. Schubert v. All Children's Health Sys.*, No. 8:11-cv-01687, 2013 U.S. Dist. LEXIS 163075, at *30 (M.D. Fla. Nov. 15, 2013) (where relator identified claims submitted to intermediary, but not details of claims to the United States, the court rejected the need for details of claim submission by the intermediary).

[4] The Provider Defendants supposition that perhaps certain patients' medical records did not support the diagnosis code because the "patient was receiving care from a different provider" is implausible (Dkt. 96 at 6, n.1) because primary care physicians obtain records from all providers to have a complete medical record. However, even if that was a possibility, "at the motion to dismiss phase, *all* reasonable inferences *must* be drawn in [Relator's] favor." *Davidson v. Maraj*, 609 F. App'x 994, 999 (11th Cir. 2015) (emphasis in original).

Dr. Zafirov's allegations for Patients H, I, J, K, L, M, N and O each include records and supporting documentation of false submissions to the Government. For example, with respect to Patient H, she alleges: Patient H's 5 Star Checklist provided by Anion included a suggested code for congestive heart failure (HCC 085/ICD I50.30/RFA 0.365) based on a previously submitted code from 2018, but Patient H did not show any clinical evidence of the disease when Relator treated him on March 25, 2019 so Dr. Zafirov marked "no" on the 5 Star Checklist provided to her by Anion (AC at ¶¶ 203-205, Exs. 1-H1-H3). Despite Dr. Zafirov's clinical rejection of the "suggested" diagnosis, that diagnosis code was submitted in Dr. Zafirov's name related to that patient visit (*id.* at ¶¶ 206, Exs. 1-H2, -H4).

Dr. Zafirov wrote "No and should be removed" on a subsequent 5 Star Checklist (*id.* at ¶ 207, Ex. 1-H5). Physician Partners and Anion then changed the diagnosis so that it was no longer attributed to Dr. Zafirov (instead asserting that an unnamed "physician" made the diagnosis) and changed the date of service to March 12, 2019 (*id.* at ¶ 208, Ex. 1-H6). In fact, Patient H did see a different physician on March 12, 2019, but that physician did not diagnose the patient with congestive heart failure (*id.* at ¶ 209, Ex. 1-H7). The unsupported diagnosis was reported to CMS by Freedom, and Physician Partners subsequently identified it as a "paid" code (*id.* at 206, 210, Exs. 1-H4, -H8). For Patient H, the diagnosis code for congestive heart failure is a false claim for payment that was submitted, and caused to be submitted, by

the Provider Defendants to the MAO for payment.[5]

The documentation is supported by Dr. Zafirov's first-hand experience speaking with the executives who made and enforced the coding directives and billing specialists who were responsible for submitting the claims and who endeavored to persuade her to accept false diagnosis codes (AC at ¶¶ 134-135, 160-166, 168-179), and a director who plainly established that Dr. Zafirov's job depended on her willingness to increase her patients' risk scores (*id.* at ¶¶ 96, 159, 167). These allegations–which must be accepted as true–support the conclusion: that the Provider Defendants' scheme "came to fruition" and resulted in "actionable damage to the public fisc." *Clausen*, 290 F.3d at 1311-1312.[6]

## II.   The Amended Complaint pleads every element of an FCA violation.

In addition to identifying false claims with specificity, the amended complaint describes in detail every element of an FCA violation. Motions to dismiss are to be denied when "a complaint . . . contain[s] sufficient factual matter, accepted as true, to

---

[5] Patient A (purportedly an amputee) does not include documentation, but Dr. Zafirov alleges with particularity, based on her personal observation, that Patient A has two feet. *Id.* at ¶ 118. Patients B-G are addressed in various levels of detail throughout the complaint as examples of how patients and their records were manipulated by Physician Partners and Anion. For example, Patients B- E reflect the impact of a practice that is focused on increasing profits by artificially inflating risk scores while refusing to spend the money associated with higher need patients. Doc. 86 at ¶ 136. Patient F and G show that Anion added dozens of risk-adjusting codes to a patient's Problem List–a section of a chart reserved for medical professionals to identify a patient's on-going medical needs–without input from a physician and without regard for the patient's actual medical condition. *Id.* at ¶ 150.

[6] The Provider Defendants would have it that Dr. Zafirov must have personal knowledge of the Medicare Advantage organizations' billing processes. The cases do not support this assertion. *Matheny*, 671 F.3d at 1225.

'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim for relief is "plausible on its face" when the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012), *quoting Iqbal*, 556 U.S. at 678.

Motions to dismiss are not intended to weigh potential factual evidence that parties may raise at trial, but rather to test whether the complaint alone states a claim upon which relief can be granted. *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1168 (11th Cir. 2014). The guiding inquiry is whether a plaintiff has pled sufficient factual allegations to "'raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012), *quoting Twombly*, 550 U.S. at 556.

### A. Contrary to the Provider Defendants' assertions, the Medicare Advantage program relies entirely on accurate diagnosis codes submitted by providers.

The Provider Defendant's motion is largely predicated on a representation that physician's diagnoses are "meaningless" to the Medicare Advantage system (Dkt. 96 at 15). This is wholly counterfactual, and their arguments falter under a correct assessment of the MA program. The actual MA capitated system is described in detail in Relator's amended complaint. AC at ¶¶ 55-66. Critically, and unequivocally, "the Medicare Advantage capitation payment system is subject to the False Claims Act." *U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 673 (9th Cir. 2018).

The United States pays the MAOs a monthly capitation fee. This fee is adjusted "to 'ensure that [Medicare Advantage insurers] are paid appropriately for their plan enrollees (that is, less for healthier enrollees and more for less healthy enrollees).'" AC at ¶ 60, *quoting Becerra*, 9 F.4th at 874. Those adjustments are based on the patient's actual condition, which can be determined only by a physician or qualified provider who actually treats the patient. In proper practice, the patient sees her physician, who documents findings, treats conditions, and records diagnosis codes. Those codes determine if and how the patient's risk score should be adjusted. AC at ¶ 64, *quoting Becerra*, 9 F.4th at 875-76.

Without citing any support, the Provider Defendants advance the remarkable—and incorrect—assertion that "raw diagnosis codes are meaningless for risk adjustment purposes." Dkt. 96 at 15. In fact, diagnosis codes from the providers are the foundation of the risk adjustment process: "Physicians and other healthcare providers submit diagnosis codes to the [MAOs].   In turn, [MAOs] report the diagnosis code that they receive to [CMS] for use in the risk adjustment model that is **the key to calculation of capitation rates**." *Ormsby*, 444 F. Supp. 3d at 1022-23 (cleaned up, emphasis added). The MAOs have oversight obligations and code-verifying responsibilities (which Relator also alleges were unfulfilled, AC at ¶¶ 180-194), but the *sine qua non* of the Medicare Advantage payment hinges on the first step:

> Medical providers (e.g. physicians, or organizations that employ physicians [ ]) submit the diagnoses codes to CMS, which uses the codes to determine a beneficiary's health status in order to calculate the beneficiary's risk score. **These diagnosis codes, as reported by medical**

**providers, are the only factors that CMS uses to determine a beneficiary's health status.** Medicare regulations and guidance are clear that CMS relies on these diagnosis codes to make accurate payments for each beneficiary enrolled in the Medicare Advantage program.

*Ormsby*, 444 F. Supp. 3d at 1025 (setting forth the Government's explanation of the MA process, emphasis added); *accord U.S. ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1167-68 (9th Cir. 2015) ("The risk adjustment methodology relied on enrollee diagnoses…These diagnosis codes contribute to an enrollee's risk score, which is used to adjust a base payment rate").

As such, false diagnosis codes directly cause financial harm to the United States: **"A traditional Medicare provider that submits an unsupported diagnosis code does not cause CMS to pay out any additional money, whereas a Medicare Advantage provider that submits an unsupported diagnosis code does."** AC at ¶77, *quoting Ormsby*, 444 F. Supp. 3d at 1021, n.1(emphasis supplied).

> ### B.    False diagnosis codes are material.

The Provider Defendants assert that Dr. Zafirov's allegations are not material because she does not identify "how any allegedly false codes impacted the amounts of money that the defendants received from the federal government." Dkt. 96 at 11. This is simply not so: the amended complaint describes in detail how the submission of unsupported and improper risk-adjusting diagnosis codes illegally causes the United States to overpay. AC at ¶¶ 46-78. "[W]hen MA Participants submit false risk-adjusting diagnosis codes, CMS pays more money (and, conversely, when they delete risk-adjusting diagnosis codes, CMS pays less money). This establishes that the

diagnosis codes are material." *Ormsby*, 444 F. Supp. 3d at 1085-86; *U.S. ex rel. White v. Mobile Care EMS & Transp., Inc.*, No. 1:15-cv-555, 2021 U.S. Dist. LEXIS 199744, at *40-41 (S.D. Ohio. Oct. 18, 2021)("[A]nything that 'tends to influence' the payment of claims under the [MAO]-administered government program would be 'material' for FCA purposes…").

The Provider Defendants also assert that the submission of erroneous diagnosis codes is not material because "CMS continues to pay the capitated payments every year, despite the allegations in *Sewell* and here." Dkt. 96 at 11-12.[7] Their reliance on the *Sewell* case and Corporate Integrity Agreement are specious: none of the Provider Defendants had anything to do with that case. Moreover, the United States' prosecution of the *Sewell* case underscores that accurate diagnosis codes *are* material to the United States. *Univ. Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 176, 194, 136 S.Ct. 1989, 2003 (2016)(considering whether "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement").[8]

---

[7] "*Sewell*" is a reference to *U.S. ex rel. Sewell v. Freedom Health, et al.*, No. 8:09-CV-01625 (M.D. Fla.).

[8] Defendants' arguments that the allegations are not material because the United States did not to intervene in this matter and because it pays claims while the cause is progressing have both been rejected. *E.g.*, *Atkins*, 470 F.3d at 1360 n.17 ("[C]ourts 'do not assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrongdoing insufficient or the *qui tam* relator's allegations [of] fraud to be without merit"); *U.S. ex rel. Armstrong v. Andover Subacute & Rehab Ctr. Servs. One*, No. 12-03319, 2019 U.S. Dist. LEXIS 165286, at *14, n.16 (D.N.J. Sept. 26, 2019) ("That the United States continued to make payments to [the Defendants] after Relator filed his complaint…does not factor into the materiality analysis at [the motion to dismiss] stage").

**C.     The Provider Defendants caused the submission of false claims.**

The Provider Defendants also argue that they did not cause any false claims because "clinical judgment, not a checklist, causes a doctor to make a diagnosis" and because "raw codes are too far removed from Freedom's claims submission to show a causal link to the Provider Defendants." Dkt. 96 at 12.

First, this argument ignores the complaint's allegations that physician judgment was routinely overridden by the Provider Defendants. *See*, e.g. AC at ¶ 91 ("Through coordinated efforts to maximize profits, Physician Partners and VIPcare engaged in high-pressure directives to ensure their physicians selected only risk-adjusting HCCs… **And when physicians like Relator would not comply, Anion submitted unsupported diagnosis codes anyway, either expressly disregarding the physician's instructions or modifying the code to appear as if it came from some other source.**") (emphasis added); *accord* ¶¶10, 15, 94, Section IX(A)-(B). Those false diagnosis codes submitted by providers are not "removed from" the claims: they *are* the claims. *Ormsby*, 444 F. Supp. 3d at 1086 ("[B]y alleging that [defendants] submitted false diagnosis codes that caused CMS to pay them money, the plaintiffs sufficiently plead causation").

Second, Relator alleges that the whole purpose of the 5-star scheme was to coerce physician judgment, and the sort of unrelenting pressure alleged by Dr. Zafirov[9]

---

[9] Dr. Zafirov alleges that physicians were financially pressured to increase the risk scores of their patients (AC at ¶¶ 125-131); pressured to bring patients in for visits without any medical

is sufficient to establish a causal connection between the Provider Defendants' actions and the submission of false claims. *Ormsby*, 444 F. Supp. 3d at 1029 (finding sufficiently pled causation included "pressuring physicians to add diagnosis codes to patient medical records"); *U.S. ex rel. Hayward v. SavaSeniorCare, LLC*, No. 3:11-00821, 2016 U.S. Dist. LEXIS 132336, at *13-18 (M.D. Tenn. Sept. 27, 2016)(denying motion to dismiss allegations of "constant pressure" to miscode patients to increase Medicare billings).

### D. The diagnosis codes submitted by the Provider Defendants were objectively false.

In a single paragraph, the Provider Defendants argue that that Dr. Zafirov "has not shown that any of the Provider Defendants' diagnosis codes were objectively false" by casting her allegations as mere differences of opinion. Dkt. 96 at 17-18.[10] However, the allegations here do not turn on matters of opinion. Relator has identified claims that, *inter alia*, are factually false (amputation, microcephaly or anencephaly) and diagnoses which were not made by a physician, but instead were falsified by the

---

need just to capture diagnosis codes (*id.* at ¶ 193); issued demerit-equivalents for refusing to accept suggested codes (*id.* at ¶¶ 120-121); given inaccurate coding guidance directing physicians to use risk-adjusting codes even when not medically indicated (*id.* at ¶¶ 138-144, 151-157); and provided with Problem Lists which were altered by Anion coders (*id.* at ¶¶ 147-150). The pressure was effective, leading to physicians making medical decisions based on their employer's pressure, rather than on independent medical judgment (*id.* at ¶¶137, 145-146), and when it was not, Physician Partners applied direct pressure to convince a physician to conform their diagnostic practices (*id.* at ¶¶ 158-179).

[10] The sole case on which Defendants rely is *U.S. v. AsceraCare, Inc.*, 938 F.3d 1278, 1298 (11th Cir. 2019). But that case addressed the sufficiency of evidence on summary judgment, not the sufficiency of pleadings.

Provider Defendants. AC at Section IX(A) and (B); *accord Silingo*, 904 F.3d at 673

("Every diagnosis code submitted to CMS must be based on a face-to-face visit that is

documented in the medical record. Medical records must be validated by qualifying

physician/ practitioner signatures and credentials.")(internal quotations omitted).

Thus, the claims are objectively false.

### III.  Dr. Zafirov properly pleads reverse false claims.

A "reverse false claim" occurs when a defendant "knowingly conceals or

knowingly and improperly avoids or decreases an obligation to pay or transmit money

or property to the Government." 31 U.S.C. § 3729(a)(1)(G). There can be no

meaningful dispute that the Provider Defendants had an obligation to return any

known overpayment. AC at ¶¶ 79-86. "For more than a decade, CMS 'has required

repayment to CMS of any costs that were based on unsupported diagnosis codes.'"

*Ormsby*, 444 F. Supp. 3d at 1072, *quoting UnitedHealthcare Ins. Co. v. Azar*, 330 F. Supp.

3d 173, 180 (D.D.C. Sept. 17, 2018) ("No court [ ] has held that an MA participant

can keep and not report or return payments based on unsupported codes").

The Provider Defendants assert that Dr. Zafirov's reverse false claims counts

should be dismissed because she has not pled submissions to the Government with

particularity. Dkt. 96 at 8. But Relator has done so in two ways. First, the Amended

Complaint expressly identifies specific instances in which the Provider Defendants

concealed their obligations under the Overpayment Rule. *See* AC at ¶¶ 272-295.

Second, while the Provider Defendants argue that Dr. Zafirov simply relies on

the submission of false claims to also establish reverse false claims, her allegations establish the distinction. For example, for Patients H, I, J and K, direct false claims arose from the submission of an unsupported diagnosis code not provided or certified by a physician. AC at ¶¶ 211, 220, 228, 239. The reverse false claim occurred when the Provider Defendants created a false record that changed the provider from Dr. Zafirov to some anonymous "physician" rather than to correct the code and return the associated payment. AC at ¶¶ 212, 221, 229, 240.

The defendants do not point to any case which holds that a provider cannot submit a direct false claim and a reverse false claim for the same patient. Rather, while a relator cannot simply recast direct false claims as reverse false claims, Dr. Zafirov does not do that. *See U.S. v. Cockerell Dermatopathology, P.A.*, No. 3:21-CV-0672, 2021 U.S. Dist. LEXIS 201997, at *31-32 (N.D. Tex. Oct. 20, 2021) ("Even though the reimbursement required for the reverse false claims stems from the actions alleged in the direct false claims," claims were not redundant where complaint alleged "a separate obligation that arose independent of the affirmative false claims.")(internal quotations omitted).[11]

## IV.   Relator's claims cannot be dismissed on public disclosure grounds.

The False Claims Act states, in relevant part, that "[t]he court shall dismiss an

---

[11] The Provider Defendants' argument that Relator must include details like the amount of the payment to be returned is unavailing; such specificity is not required. *Matheny*, 671 F.3d at 1226-27 (applying the *Clausen* standard to details of overpayment to conclude that "Rule 9(b) does not mandate all of that information for each alleged claim").

action or claim under this section, *unless opposed by the Government*, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed…." 31 U.S.C. § 3740(e)(4)(A) (emphasis added). The United States notified the Court on March 8, 2022, that it is exercising its authority to oppose the dismissal of Relator's case. Dkt. 105. Accordingly, the case cannot be dismissed on public disclosure grounds. *Mazza v. Miami-Dade Co.*, No. 10-24546, 2013 U.S. Dist. LEXIS 191950, at *6 (S.D. Fla. Aug. 12, 2013) (when "the United States has opposed dismissal on this basis, the Court's directive is clear–the Provider Defendants' motion to dismiss on this ground must be denied").

## V.     Relator's allegations against the Provider Defendants are not subject to the government action bar.

The Provider Defendants' attempt to evoke the so-called "government action bar" because of the *Sewell* case fails *ab initio*. None of the Provider Defendants were parties to *Sewell* and none of the allegations related to the Provider Defendants were ever raised in that case. "It is, as a threshold matter, wholly unlike the one the drafters of § 3730(e)(3) almost certainly had in mind and sought to preclude…" *U.S. ex rel. S. Prawer & Co. v. Fleet Bank*, 24 F.3d 320, 328 (1st Cir. 1994) (finding case against defendants not named in a previous action was not subject to the government action bar). This Court has already acknowledged that it was "inclined to agree" that Relator's "allegations against the Provider Defendants are not barred [by the public disclosure bar] because none of those entities are named or specifically identified in

the prior public disclosure." Dkt. 81 at 18, n.7. That reasoning applies with the same force to the government action bar.

Finally, while the government action bar does not include a government veto clause, courts have routinely considered the Government's decision as a factor counseling against the application of the government action bar. *U.S. ex rel. Herman v. Coloplast Corp.*, 327 F. Supp. 3d 358, 364 (D. Mass. 2018) ("While the government action bar does not provide the government with veto power…the United States' perception is nevertheless instructive here because it goes directly to the question of 'useful or proper return to the Government'"), *citing U.S. ex rel. Berntsen v. Prime Healthcare Servs., Inc.*, No. 11-CV-8214 PJW, 2014 U.S. Dist. LEXIS 188722, at *3 (C.D. Cal. Nov. 20, 2014) ("[W]here the Government indicates that it supports the relator's action, it would be illogical for the Court to conclude that the relator's action was parasitic").

## VI.    Conclusion

For the reasons set forth here, and based on the allegations of the Amended Complaint, the Provider Defendants' motion to dismiss should be denied.[12]

---

[12] While Relator believes that her Amended Complaint exceeds the requisite pleading standard, Relator seeks leave to amend to address any infirmities that the Court may identify. It is not uncommon for a Court to allow a Relator more than one opportunity to cure non-jurisdictional pleading defects. *See, e.g. U.S. ex rel. Schubert v. All Children's Health Sys.*, No. 8:11-cv-1687, 2013 U.S. Dist. LEXIS 53932, at *15 (M.D. Fla. Apr. 15, 2013) (permitting Third Amended Complaint, for which subsequent motion to dismiss was denied); *U.S. ex rel. Armfield v. Gills*, No. 8:07-CV-2374, 2011 U.S. Dist. LEXIS 162016, at *11 (M.D. Fla. Nov. 4, 2011) (permitting Fourth Amended Complaint, for which subsequent motion to dismiss was denied).

Respectfully submitted this 8th day of March, 2022,

/s/ Jillian L. Estes
Frederick M. Morgan, Jr. (Ohio Bar No. 0027687)
Jillian L. Estes (Fla. Bar No. 0055774)
Jonathan Lischak (Ohio Bar No. 97669)
MORGAN VERKAMP LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Phone: (513) 651-4400
Fax: (513) 651-4405
rmorgan@morganverkamp.com
jillian.estes@morganverkamp.com
jonathan.lischak@morganverkamp.com

Adam T. Rabin (Fla. Bar No. 985635)
Havan Clark (Fla. Bar No. 1026390)
RABIN KAMMERER JOHNSON
1601 Forum Place, Suite 201
West Palm Beach, FL 33401
Phone: (561) 659-7878
Fax: (561) 242-4848
arabin@rkjlawgroup.com
hclark@rkjlawgroup.com

*Counsel for Relator Dr. Clarissa Zafirov*

## CERTIFICATE OF SERVICE

I, Jillian Estes, hereby certify that the foregoing Response in Opposition was served on March 8, 2022, to all parties of record via the CM/ECF electronic filing system.

/s/ Jillian L. Estes
Jillian L. Estes