# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* DR. CLARISSA ZAFIROV, | ) | |
| | ) | |
| Plaintiff and Relator, | ) | |
| | ) | |
| v. | ) | NO. 8:19-cv-01236-KMM-SPF |
| | ) | |
| FLORIDA MEDICAL ASSOCIATES, | ) | |
| LLC, d/b/a VIPCARE; PHYSICIAN | ) | |
| PARTNERS, LLC; ANION | ) | |
| TECHNOLOGIES, LLC; FREEDOM | ) | |
| HEALTH, INC.; and OPTIMUM | ) | |
| HEALTHCARE, INC.; | ) | |
| | ) | |
| Defendants. | ) | |

## RELATOR'S RESPONSE IN OPPOSITION TO FREEDOM HEALTH AND OPTIMUM HEALTHCARE'S MOTION TO DISMISS RELATOR'S AMENDED COMPLAINT

# **TABLE OF CONTENTS**

I.    Relator alleges with specificity that the MA Defendants
       submitted false claims ............................................................................... 2

      A. Relator's allegations exceed the level of specificity
          required by Rule 9(b)................................................................................. 4

      B. The MA Defendants persistently refuse to acknowledge the
          content of their own documents................................................................ 8

      C. Relator's reverse false claims allegations are also
           pled with specificity............................................................................... 11

II.   Relator's allegations that the MA Defendants acted with
       knowledge satisfy Rule 8(a)........................................................................ 14

III.  Relator's claims cannot be dismissed on
       public disclosure grounds ............................................................................ 17

IV.  Relator's allegations are not subject to the
       government action bar ................................................................................. 18

V.    Conclusion ................................................................................................... 20

As Medicare Advantage Organizations, Defendants Freedom Health, Inc. and Optimum Healthcare, Inc. (the "MA Defendants"[1]) are fiscal intermediaries tasked with paying claims on behalf of the Government and acting as the United States' primary line of defense against fraud in Medicare Part C, the Medicare Advantage program. Relator Dr. Clarissa Zafirov alleges that Freedom and Optimum wholly abdicated their responsibilities by coordinating efforts to artificially increase their enrollees' risk adjustment scores with a provider group operated by their former CFO.

As set forth in an Relator's Amended Complaint filed on November 12, 2021 (Dkt. 86, "AC"), and described herein, Relator alleges – with specificity and supporting documentation – how Freedom and Optimum aided the Provider Defendants in providing misleading or expressly false written and oral coding instructions to their employed or contracted physicians (AC at ¶¶ 185-189), how Freedom and Optimum provided open access to the Provider Defendants' physicians to track their patient's risk adjustment scores (*id.* at ¶ 190), how Freedom and Optimum took an active role in case management of the Provider Defendants' patients in order to ensure code-capturing opportunities (*id.* at ¶¶ 191-194), and critically, how all of their conduct resulted in the submission of false claims for payment submitted to the United States (*id.* at ¶¶ 202-295). The MA Defendants cast themselves as an afterthought, arguing that Relator's complaint "primarily focuses on the Provider

---

[1] Freedom and Optimum do not challenge Relator's grouping of the two entities as the "MA Defendants." As Relator alleges, and Freedom and Optimum do not dispute, the entities are sister entities that operate virtually indistinguishably from one another and refer to themselves collectively in contracts and publications. Dkt. 86 at ¶¶ 26-29.

Defendants' conduct." Dkt. 97 at 4. But Relator alleges that "**Physician Partners'**
**scheme could not have been successful without the knowledge and participation of**
**Freedom and Optimum.**" AC at ¶ 6. It is for their critical involvement in the fraud
scheme that the MA Defendants have been named in this case.

Freedom and Optimum move to dismiss Relator's Amended Complaint for
failure to state a claim, failure to plead fraud with specificity, failure to allege a
plausible basis for their liability, and under the public disclosure and government
action bars. Dkt. 97 at 1. The MA Defendants' arguments lack legal support, ignore
allegations which do not fit their narrative, and require that the Court depart from its
obligation to accept factual allegations as true. For the following reasons, the MA
Defendants' motion is due to be denied in its entirety.

## I.    Relator alleges with specificity that the MA Defendants submitted false claims.

The MA Defendants begin their argument that Relator has not established the
MA Defendants' submission of a false claim with this remarkable statement: "The
FAC alleges inaccurate diagnoses for twenty patients. Not *one* of those allegations
show that the MA Defendants submitted claims to CMS for payment." Dkt. 97 at 6.
This is patently false. Time after time, Relator alleges with specificity that Freedom
and Optimum's billing records state that they submitted a false diagnosis code to CMS:

- **Patient A:** "FRH/OPT reported this HCC as previously paid." AC at ¶ 293.
  Physician Partners documents also reflect that the HCC was submitted and paid
  in 2016. *Id.* at ¶¶ 118, 293.

- **Patient H:** "Through the access to the Freedom MRA/HEDIS Portal granted by Freedom to the Physician Partners' physicians, Dr. Zafirov observed that the false code from Physician Partners for HCC085, Unspecified diastolic (congestive) heart failure, was submitted by Freedom to the CMS with the date of service March 12, 2019." *Id.* at ¶ 210, Ex. 1-H8 (listing the code under the heading "The following are HCC related medical conditions that have been reported to CMS in the past for this member")

- **Patient J:** "[T]he Freedom Health Member Profile for Patient J reflects that the code for 'Malignant neoplasm of tonslar fossa' was submitted from Freedom to CMS, most recently with a date of service of Jan. 13, 2020." *Id.* at ¶ 227, Ex. 3-J6 (listing the code under the heading "The following are HCC related medical conditions that have been reported to CMS in the past for this member").

- **Patient K:** "Through the access to the Freedom MRA/HEDIS Portal granted by Freedom to the Physician Partners' physicians, Dr. Zafirov observed that the Prospective Possible Condition Report (which reflects possible HCCs for each patient based on conditions that were submitted from Freedom to CMS in the past) showed that the HCC for Vascular Disease was 'submitted previously' to CMS with a date of service of 02/25/2019…." *Id.* at ¶ 238, Ex. 4-K9 (listing the code under the heading "The following are HCC related medical conditions that have been reported to CMS in the past for this member.").

- **Patient M:** "As of October 2019, the Prospective Possible Condition Report for Patient M, accessed through the Freedom MRA/HEDIS Portal, reflected 'Major Depressive, Bipolar, and Paranoid Disorder' [as] an 'HCC previously submitted for Patient M, but now reflects the source of 'other physician' and a date of service of Oct. 9, 2018." *Id.* at ¶ 260, Ex. 6-M7. Also, "the Prospective Possible Condition Report shows the HCC for Spinal Cord Disorder/Injuries was previously submitted to CMS for Patient M, with a date of service of January 24, 2018, and a source of 'other physician.'" *Id.* at ¶ 264, Ex. 6-M7 (listing the codes under the heading "The following are HCC related medical conditions that have been reported to CMS in the past for this member.")

- **Patient O**: "[A]s of October 2019, the Prospective Possible Condition Report for Patient O, accessed through the Freedom MRA/HEDIS Portal, reflected Congestive Heart Failure as an 'HCC previously submitted' by the PCP (meaning Dr. Zafirov) with a date of service on Jan. 3, 2019." *Id.* at ¶ 281, Ex. 8-O10.

- **Patient P**: "Freedom's Member Health Profile for Patient P reflects that HCC for 'spinal cord disorders/injuries' was 'reported to CMS in the past for this member.'" *Id*. at ¶ 287 (with embedded image).

Beyond those direct allegations of the MA Defendants' submission of false diagnosis codes to CMS, Dr. Zafirov also includes additional examples that illustrate that the MA Defendants paid Physician Partners for false diagnosis codes. AC at ¶¶ 216, 249. Within the Medicare Advantage payment system, an allegation that the MAO paid a provider is synonymous to an allegation that the MA Defendants submitted the claim to the United States because that is the only way in which payments occur. *See* AC at ¶ 49; *U.S. ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 672-73 (9th Cir. 2018).

### A.    Relator's allegations exceed the level of specificity required by Rule 9(b).

These allegations exceed the requirements to successfully plead a False Claims Act case in the Eleventh Circuit. To survive a motion to dismiss a False Claims Act case, a complaint must satisfy Rule 9(b) by "stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The Eleventh Circuit has interpreted this to mean that a relator may not simply "portray[ ] the scheme and then summarily conclude[ ] that the defendants submitted false claims to the government for reimbursement." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006); *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311. Rather, the "key inquiry" under Rule 9(b) is "whether the complaint includes 'some indicia of reliability' to support the allegation that an actual false claim was submitted." *U.S. v.*

*HPC Healthcare, Inc.*, 723 F. App'x 783, 789 (11th Cir. 2018), *quoting Clausen*, 290 F.3d at 1311.

While Rule 9(b) can be satisfied by submitting specific claims information (as Relator does here), "there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703-04 (11th Cir. 2014), *citing Clausen*, 290 F.3d at 1312 and n.21 (listing some of the types of information that might help a plaintiff plead the submission of a claim with particularity but cautioning that Rule 9(b) "does not mandate all of this information for any of the alleged claims"). "[T]he identification of specific claims is only one way to satisfy Rule 9(b)'s requirements, but it is not the only way." *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253, 2012 U.S. Dist. LEXIS 96434, at *22 (S.D. Fla. July 12, 2012) (public filings showing Government payor revenue combined with a spreadsheet of exemplar claims was sufficient and was distinct from cases like *Clausen*, *Corsello*, *Atkins* or *Hopper* that had no reliable indicia of actual claims submitted to the Government).

In instances where a relator relies on "other means [ ] to present the required indicia of reliability that a false claim was actually submitted," the assessment evaluates whether the relator "explain[ed] the basis for her assertion that fraudulent claims were actually submitted," instead of relying on bald statements, rumors, or conjecture. *Mastej*, 591 F. App'x at 704. There are no bright-line rules as to what kind of relator or what exact information will satisfy Rule 9(b); rather, the Eleventh Circuit

"evaluate[s] whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Atkins*, 470 F.3d at 1358; *U.S. v. Crumb*, No. 15-0655, 2016 U.S. Dist. LEXIS 112661 at *21-24, *citing Mastej*, 591 F. App'x at 703-04.

Here, Relator's direct, supported allegations of false diagnosis codes submitted to CMS by the MA Defendants–set forth above–far surpass the level of specificity required to provide, with indicia of reliability, that false claims were actually submitted. *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1313 (stating that relator needed to identify "information linking the [ ] schemes to the submission of any actual claims"). And in addition to attaching actual records of claims submissions, Relator *also* alleges (1) what was submitted to the United States (false diagnosis codes); (2) when they were submitted (the associated dates of services plus the years each code was submitted); (3) the impact on the government (the risk adjustment value of each false diagnosis code); and (4) the context to explain why the diagnosis codes were false. *See* AC at ¶¶ 202-271, Exs. 1-8.

The combination of actual documents and the additional detail alleged by Relator does not require the Court to make any unwarranted inferences about the submission of claims. *Osheroff*, 2012 U.S. Dist. LEXIS 96434, at *25. Nor is more required of Relator at the pleading phase. *Clausen*, 290 F.3d at 1312 and n.21 (listing some of the types of information that might help a plaintiff plead the submission of a

claim with particularity but cautioning that Rule 9(b) "does not mandate all of this information for any of the alleged claims").[2]

The MA Defendants dissect Relator's allegations "that Provider Defendants submitted the claims to the *MA Defendants*, and that the MA Defendants paid *Provider Defendants*" to conclude that the allegations are "insufficient to state a claim *against the MA Defendants*." Dkt. 97 at 7 (emphasis in original). Examining only the allegations related to Patient I, L and N, the MA Defendants rely on *Mitchell v. Beverly Enters., Inc.*, in which the court found it insufficient for a relator to plead only her "belief that claims requesting illegal payment must have been submitted, were likely submitted or should have been submitted." *Id.* at 7-8, *citing* 248 F. App'x 73 (11th Cir. 2007). But the case is inapposite: Relator does not rely on her *belief* that claims were submitted and paid; she relies on the MA Defendants' documents which *expressly say claims were submitted and paid*.

---

[2] The MA Defendants fault Relator for not identifying "any person – or corporate team or department – responsible for submitting diagnosis code data to CMS." She does not need to do so; the identification of Freedom and Optimum as the entities responsible for submitting claims to the United States is sufficient. *U.S. v. Omnicare, Inc.*, No. 1:11-cv-962, 2013 U.S. Dist. LEXIS 75696, at *23-25 n.12 (N.D. Ga. May 17, 2013) ("The *Hopper* court found that the plaintiffs had not identified 'the specific persons *or* entities' engaged in false claims. Relator here has identified specific entities—Defendants."). Moreover, the MA Defendants assert that allegations that "claims were submitted 'within a few days'" were rejected in Clausen as identifying when the claims were submitted. That is not correct. *Clausen* rejected the allegation that a claim would have been submitted "on the date of service or within a few days thereafter" *without* any reference to an actual date that any actual service was performed or resulting claim was submitted. 290 F.3d at 1312 ("No actual dates of claims were alleged…Instead he attached one blank claim form and alleged that certain tests would have been billed on this form with certain test and diagnostic codes filled in").

**B. The MA Defendants persistently refuse to acknowledge the content of their own documents.**

Despite the MA Defendants' steadfast refusal to acknowledge Relator's allegations, it is their own internal documents which confirm that false diagnosis codes were submitted to CMS. Two types of documents made available to Relator through the MA Defendants' portal–the Freedom Member Health Profile and the Prospective Possible Conditions Report–list the conditions submitted to CMS for a patient, the date of service for the submitted code, and the supposed source of the diagnosis code.[3] AC at ¶ 190. The MA Defendants dismiss these documents as not being "records of payments, or of the submissions of any claims for payment" and too far "divorced from the actual claims submission process" to serve as reliable indications of claims. Dkt. 97 at 8, 10. But that is exactly what these documents are: in the Medicare

---

[3] The MA Defendants' argument that the Court cannot consider Relator's documents in the Rule 9(b) evaluation because they may not serve to establish that she is an original source in a public disclosure evaluation is completely unsupported. The sole case on which the MA Defendants rely says nothing at all about whether documents can be considered in the Rule 9(b) analysis if they were obtained after the complaint was filed. *U.S. ex rel. Bernier v. InfiLaw Corp.*, 311 F. Supp. 3d 1288 (M.D. Fla. Apr. 23, 2018) (conducting a public disclosure evaluation first, and then evaluating the remaining non-publicly disclosed claims under Rule 9(b)). Defendants do not, and cannot, point to any case law which says that a relator can only plead a case based on the documents in hand at the time of the filing of the original complaint. To the contrary, courts have routinely allowed relators to supplement their complaints with information learned during a post-filing investigation, even when the documents come from the government, let alone from the relator herself in her normal course of business. *E.g., U.S. v. SouthEast Eye Specialists, PLLC*, No. 3:17-cv-00689, 2021 U.S. Dist. LEXIS 214508, at *16-19 (M.D. Tenn. Nov. 5, 2021)(collecting cases for the proposition that courts "appear united in their allowance of amended complaints based on information gleaned from government investigations").

Advantage system,[4] the submission of a diagnosis code to CMS *is* a claim for payment, so a record reflecting the submission of a specific diagnosis code to CMS *is* a record of the submission of a claim for payment. *U.S. ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995), *quoting U.S. v. Neifert-White Co.*, 390 U.S. 228, 233 (1968) ("A submission need not be an actual invoice to be a 'claim' or 'statement' under the Act….[T]his remedial statute reaches…to all fraudulent attempts to cause the Government to pay out sums of money'").[5]

Despite the fact that she clearly *did* have access to records of the submission of false claims (because she attached them to her complaint), the MA Defendants assail Dr. Zafirov for not being a corporate insider. But she need not be: she does "not need to further support [her] well-pled factual allegations with some other 'factual basis,' such as personal knowledge of the submission or employment in the compliance department." *Matheny*, 671 F.3d at 1225. Moreover, the Eleventh Circuit does not mandate that Relator be an "insider" of every defendant against whom she alleges fraud; the relevant question is whether her "access to possibly relevant information translated to knowledge of actual tainted claims presented to the government." *Carrel*

---

[4] Relator discusses the Medicare Advantage payment system at length in the Amended Complaint, ¶¶ 46-86, and in her Response in Opposition to the Provider Defendants' Motion to Dismiss, Dkt. 106, Section II(A). To avoid repetition, Relator incorporates both of those by reference as though fully set forth herein.

[5] The MA Defendant's reliance on non-MA cases to define a "claim" is misplaced. Dkt. 97 at 6, n.5. In the MA context, courts have recognized "the false claims at issue here are false diagnosis codes." *U.S. ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1085 (N.D. Cal. Mar. 16, 2020).

*v. AIDS Healthcare Found, Inc.*, 898 F.3d 1267, 1278 (11th Cir. 2018).

Dr. Zafirov has personal knowledge of actual submission of the false diagnosis codes because the MA Defendants granted her (and her Physician Partner colleagues) access to an online billing portal as a means to track their patients' risk adjustment scores. AC at ¶ 190. The portal showed, *inter alia*, "codes that had been submitted for a patient in the current year and in past years along with the dates of service for the past submissions…." *Id*. The documents from the portal reflected that the diagnosis codes were submitted in no uncertain terms: "The following are HCC related medical conditions that have been reported to CMS in the past for this member." *See*, *e.g.*, AC Ex. 1-H8. Though the MA Defendants persistently refuse to acknowledge the actual content of the documents that Relator included, the Court cannot join them in that obfuscation.

At bottom, the MA Defendants' efforts to discredit or miscast the allegations and documents set forth by Relator do nothing to diminish the weight of the information contained therein. Under Rule 9(b), Relator has an obligation to "include 'some indicia of reliability' to support the allegation that an actual false claim was submitted." *Clausen*, 290 F.3d at 1311. It is impossible to imagine a stronger indication that the MA Defendants actually submitted a code to CMS than their own internal records reflecting that the codes were submitted to CMS. In short, the *only* reasonable inference from Relator's allegations—which must be accepted as true—is that the MA

Defendants' scheme "came to fruition" and resulted in "actionable damage to the public fisc." *Clausen*, 290 F.3d at 1311-1312.[6]

### C.   Relator's reverse false claims allegations are also pled with specificity.

A "reverse false claim" derives when a defendant "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). As here, a relator successfully pleads a "reverse false claim" when she alleges: "(1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or caused to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation." *Matheny*, 671 F.3d at 1222.

As described above, Relator has identified with specificity that the MA Defendants knowingly made false records which were material to payment by the United States by submitting false diagnosis codes. *See* Section I(A), *supra*. And there

---

[6] The MA Defendants make a pitch, in a footnote, to limit Relator only to the specific false claims set forth in the Amended Complaint. Dkt. 97 at 13, n.1. For this failing proposition, the MA Defendants rely solely on *Graves. v. Plaza Medical Centers, Corp.*, 2014 U.D. Dist. LEXIS 143269 (S.D. Fla. Oct. 7, 2014). Yet, that *Graves* opinion was followed by a clarifiying opinion which expressly rejected that exact proposition: "[T]he Court never stated that Rule 9(b) cannot be satisfied where Relator fails to provide detailed facts for each and every instance of fraud. This is impractical, particularly at the motion to dismiss stage, and case law does not support such a requirement." *U.S. ex rel. Graves v. Plaza Med. Ctrs.Corp.*, No. 10-23382, 2015 U.S. Dist. LEXIS 184688, at *3 (S.D. Fla. Jan. 23, 2015) ("The Court finds that Relator has set forth sufficient facts–*under Rule 9(b) at the motion to dismiss stage*–to suggest that the identified claims are representative of a larger pool of false claims.")(emphasis in original). There is nothing about the representative claims identified by Relator that suggests that they are unique rather than representative of a larger pool of false claims, and so there is no basis for the throttling of discovery—especially when the issue is not yet before the Court.

can be no plausible debate that the MA Defendants had an obligation to return any known overpayment. AC at ¶¶ 79-86. "For more than a decade, CMS 'has required repayment to CMS of any costs that were based on unsupported diagnosis codes.'" *Ormsby*, 444 F. Supp. 3d at 1072, *quoting UnitedHealthcare Ins. Co. v. Azar*, 330 F. Supp. 3d 173, 180 (D.D.C. Sept. 17, 2018) ("No court [ ] has held that an MA participant can keep and not report or return payments based on unsupported codes"). Moreover, auditing and assessing the validity of codes, including using "measures that prevent, detect, and correct non-compliance with CMS' program requirements" is a primary function of an MA organization. *Silingo*, 904 F.3d at 673.

The MA Defendants assert that Relator does not plead reverse false claims violations because their overpayment obligation did not occur until after the initial payment was received. But that is precisely what Relator alleges: liability related to the MA Defendants' conduct *after* they knew or should have known that codes they had submitted were false. For example, for Patient A, Relator does not allege that original submission of the diagnosis code for an amputated foot is a false claim *by Freedom*. AC at ¶¶ 293-294. However, Freedom failed to reverse that code even though there were no other attendant or related codes to the amputation (because it did not happen)– meaning that Freedom continued to submit and collect the inflated capitation payment at least throughout 2016. *Id*. Freedom's failure to satisfy its known obligation to identify and return unsupported payment to the United States established reverse false

claims liability. [7]

Similarly, for Patient R, Relator does not allege the original submission of the diagnosis code for leukemia was a false claim *by Freedom*. *Id*. at ¶ 295. However, as with Patient A, Freedom failed to reverse that code even though there were no other codes related to the treatment of cancer (because the patient did not have cancer). *Id.* In short, Freedom knew or should have known that Patient A's cancer code was false, and its continual submission of that unsupported diagnosis code for three years was in violation of its repayment obligations and established reverse false claims liability. AC at ¶ 85, *citing* 42 U.S.C. § 1320a-7k(d)(3); 42 C.F.R. § 422.326(e) ("The failure to report and return a knowing overpayment within 60 days of discovering it violated the reverse false claims provision of the False Claims Act").[8]

This is all that is needed to allege reverse false claims. *U.S. ex rel. Herbold v. Doctor's Choice Home Care, Inc.*, 2019 U.S. Dist. LEXIS 188682 at *43-44 (M.D. Fla. Oct. 31, 2019)(finding reverse false claims allegations sufficient where "the complaint alleges with particularity that all Defendants were aware that their claims for reimbursement were tainted, but they never repaid the United States for the money Defendants received from the tainted claims").

---

[7] The MA Defendants' insistence that the claim was not specific because it was not submitted again in 2020 is irrelevant. Freedom's repayment obligation relates to the false diagnosis code submitted in 2016.

[8] Relator makes other similar allegations of the MA Defendants' failure to correct diagnosis codes after they knew or should have known that they caused overpayments. *See*, *e.g.* AC at ¶¶ 262, 266.

## II.    Relator's allegations that the MA Defendants acted with knowledge satisfy Rule 8(a).

While a relator must allege that a defendant knowingly submitted false claims, "at the pleading stage, knowledge and other conditions of a person's mind may be alleged generally." *Matheny*, 671 F.3d at 1224, *citing* Fed. R. Civ. P. Rule 9(b); *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 88 (11th Cir. 2008) (recognizing that "conclusory allegations" that a defendant acted knowingly are sufficient). Defendants' efforts to graft specificity requirements onto knowledge allegations fail because "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008). The MA Defendants admit Relator has done this. Dkt. 97 at 16-17, *citing* AC ¶¶ 199-200 ("Relator asserts that the MA Defendants acted with 'actual knowledge' or, alternatively, 'with deliberate ignorance or reckless disregard as to the truth or falsity' of codes allegedly submitted to the United States"); *see also* AC at ¶¶ 17, 195-201, 334, 339, 344.[9]

---

[9] Defendants assert that Relator's claim fails because she does not identify that "any single MA Defendant employee knew that any diagnosis code identified in her complaint was, in fact, false." Dkt. 97 at 17. First, Relator *does* identify that Freedom and Optimum's Chief Medical Officer, Dr. Dennis Mihale knew that the coding guidance he disseminated to more than 500 physicians was false. AC at ¶¶ 185-188. But moreover, Relator need not include that level of specificity to generally plead knowledge. *E.g.*, *Silingo*, 904 F.3d at 680-681 (recognizing that relator pled sufficient knowledge allegations, which did not name a specific individual). Second, Relator does not rely on "innocent scraps" of knowledge that would be prohibited by collective pleading. *U.S. v. EDMC,* 871 F. Supp. 2d 433, 453 (W.D. Pa. May 11, 2012)("Because government funding represented such a significant source of [the defendant's] revenues, it is plausible that any conduct which would have imperiled those revenues… would

The MA Defendants instead argue that Relator's knowledge allegations are not plausible. Dkt. 97 at 17-19. But Defendants' arguments (1) fail to acknowledge that Relator pled that the MA Defendants had an obligation to undertake business practices which would enable them to certify the "accuracy, completeness, and truthfulness" of the diagnosis codes "based on best knowledge, information, and belief" and (2) require the Court to draw inferences against Relator, which is improper at this procedural stage.

First, Dr. Zafirov alleges "concrete signs" that plausibly show that the MA Defendants knowingly participated in the fraud alleged by Relator. *Silingo*, 904 F.3d at 680. For example, she alleges that the false diagnosis codes were not actually submitted by any physician or qualified provider. AC at ¶¶ 91, 202-271. The failure to provide required documentation (which includes the diagnosing provider's signature) gave–or should have given–the MA Defendants knowledge that the claims were false. *Medicare Program Integrity Manual*, ch. 3, § 3.3.2.4 (describing requirements for handwritten and electronic signatures); *accord Policy and Technical Changes to the [MA Program]*, 75 Fed. Reg. 19,678, 19,742 (Apr. 15, 2010) ("Medical records with missing signatures or credentials are scored as errors under [risk adjustment data validation] audit procedures"). Relator also alleges the submission of certain diagnosis codes, such as microcephaly or anencephaly, that were so unusual or extreme that their

---

have required approval from the highest levels of [ ] management. In sum, Plaintiffs have pled the involvement and knowledge of senior officials").

existence alone would have raised red flags for any reasonable MA organization. AC at ¶¶ 263-265, 284-288; *Silingo*, 904 F.3d at 680.[10] The failure to identify and correct false codes in either of those circumstances creates a reasonable inference that the MA Defendants acted with actual knowledge, deliberate ignorance or reckless disregard of the falsity of the claims. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[11]

Moreover, *even if* the MA Defendants employed an effective claims review process, Relator alleges that "Freedom and Optimum's role in the submission of these false claims comes not only from their failure to conduct appropriate oversight of Physician Partner's submitted claims, *but from the MAO's role in the operation of Physician Partners.*" AC at ¶ 180 (emphasis added). The MA Defendants' arguments with respect to these allegations are fact disputes, which are to be be resolved in Relator's favor on motion to dismiss. *U.S. v. Crumb*, No. 15-0655-WS-N, 2016 U.S. Dist. LEXIS 112661, at *70 (S.D. Ala. Aug. 23, 2016) ("[W]ell-pleaded facts in a pleading are accepted as

---

[10] Relator also alleges that the Provider Defendants submitted risk-adjusting diagnosis codes at rates that far exceeded the national averages, a red flag ample to raise concern that that the claims were false. AC at ¶¶ 145-146. "[O]ne would expect that a sophisticated company would notice when its contractor's work is too good to be true." *Silingo*, 904 F.3d at 680.

[11] Defendants rely on *U.S. v. Scan Health Plan*, No. 09-5013, 2107 U.S. Dist. LEXIS 174308, for the proposition that an "MA organization need not validate codes submitted by providers through chart review programs." Dkt. 97 at 18. Relator does not allege this. She alleges that the Defendants knew they had an obligation to ensure the accuracy of their claims (E.g. AC at ¶¶ 181-182); chart reviews are one way to satisfy that obligation.

true at this stage, no matter how vehemently a defendant may dispute their veracity").[12]

## III.   Relator's claims cannot be dismissed on public disclosure grounds.

The False Claims Act states, in relevant part, that "[t]he court shall dismiss an action or claim under this section, *unless opposed by the Government*, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed…." 31 U.S.C. § 3740(e)(4)(A) (emphasis added). In sum, the statute provides that a court *cannot* dismiss an action on the grounds of public disclosure over the objection of the government. *Marjan Mazza v. Miami-Dade Co., et al.*, No. 10-24546, 2013 U.S. Dist. LEXIS 191950, at *6 (S.D. Fla. Aug. 12, 2013) (when "the United States has opposed dismissal on this basis, the Court's directive is clear–the Defendants' motion to dismiss on this ground must be denied"); *U.S. ex rel. Scutellaro v. Capitol Supply, Inc.*, No. 10-1094, 2017 U.S. Dist. LEXIS 59531, at *53 (D.D.C. Apr.

---

[12] Relator (a Board-certified family medicine physician) stands by her allegations regarding the inaccuracy of the coding instructions. AC at ¶¶ 19, 185-189. For example, despite the MA Defenadnts' arguments, *nowhere* on the mailer does it direct physicians to code for alcohol dependence "only when properly supported by diagnostic criteria." Dkt. 97 at 20. Rather, the mailer does not have sufficient detail in the patient example to differentiate between whether that patient met the DSM-V/ICD-10 descriptions of alcohol abuse (a non-risk adjusting condition) or alcohol dependence (a risk-adjusting condition). So the direction that a patient with those circumstances should be diagnosed with alcohol dependence, and that it would be an "error" to code the patient with alcohol abuse, is inaccurate and misleading. Likewise, with respect to the video, whether a patient has a "history of" a disease (and is therefore no longer risk-adjusting) or whether the disease should be coded as active (and therefore risk-adjusting) takes far more into account than whether the patient is still taking medication or not. For example, certain cancers may result in the patient taking some sort of medication for the rest of their lives, but that does not mean the disease process is active. Advising the doctors to make that decision based solely on the presence or absence of a medication is inaccurate and misleading, as Dr. Zafirov alleges.

19, 2017) (the United States objection to dismissal on public disclosure grounds "forecloses dismissal of the relator's claims"); *U.S. ex rel. Baker v. Community Health Sys., Inc.*, No. 05-279, 2014 U.S. Dist. LEXIS 184578, at *72-73 (D.N.M. May 16, 2014) (same); *U.S. ex rel. Conroy v. Select Med. Corp.*, 211 F. Supp. 3d 1132, 1151 (S.D. Ind. Sept. 30, 2016) (same).

The United States notified the Court on March 8, 2022, that it is exercising its authority to object to dismissal of Relator's case on public disclosure grounds. Dkt. 105. Accordingly, the public disclosure inquiry ends there, and the case cannot be dismissed on those grounds.

## IV.    Relator's allegations are not subject to the government action bar.

Section 31 U.S.C. § 3730(e)(3) provides, "In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject to a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." Courts properly determine the application of the government action bar by "looking first to whether the two cases can be properly viewed as having the qualities of a host/parasite relationships, i.e., whether the *qui tam* case is receiving support, advantage, or the like from the host case (in which the government is a party) without giving any useful or proper return to the government (or at least having the potential to do so)." *U.S. ex rel. Herman v. Coloplast Corp.*, 327 F. Supp. 3d 358, 362 (D. Mass Aug. 17, 2018), *citing U.S. ex rel. S. Prawer & Co. v. Fleet Bank of Maine*, 24 F.3d 320, 326 (1st Cir. 1994) (internal quotations removed)

Preliminarily, while the government action bar does not include a government veto clause, courts have routinely considered the Government's decision to issue a veto in the public disclosure bar as a factor counseling against the application of the government action bar. *Herman*, 327 F. Supp. 3d at 364 (noting that "the United States' perception is nevertheless instructive here because it goes directly to the question of 'useful or proper return to the Government'"); *Berntsen v. Prime Healthcare Servs., Inc.*, No. 11-CV-8214 PJW, 2014 U.S. Dist. LEXIS 188722, at *3 (C.D. Cal. Nov. 20, 2014) ("[W]here the Government indicates that it supports the relator's action, it would be illogical for the Court to conclude that the relator's action was parasitic").

The MA Defendants' assertion that Relator "does not offer materially new allegations to those in *Sewell*" is palpably absurd. The *Sewell* case, unlike this one, did not allege that Freedom and Optimum took an active role in a scheme to increase patients' risk adjustment scores of patients treated at the provider group operated by their former CFO, nor that they turned a blind eye to the resulting false claims they helped create and perpetuate. The notion that the cases are overlapping because both involve increased risk scores sweeps with too broad of a brush; that is the only way that payments are increased in the MA system, so all fraudulent conduct within the MA system necessarily shares that goal.

Defendants make no effort to argue that this case does not have the potential to offer a "useful or proper return" to the Government beyond what was already recovered in the *Sewell* matter. And rightfully so, because in addition to the substantial

financial recovery available from this case, False Claims Act cases also carry the potential for corporate integrity agreements (as the MA Defendants well know). Allegations that expose MA organizations creating and implementing a fraud scheme with a practice group operated by their former CFO (who paid $700,000 for his role in the MA organizations' past fraudulent conduct) have the potential to result in an agreement that closely monitors, or even prohibits, the relationship between those entities–an arrangement that would be of great value of the United States and could not have been accomplished from the prior *Sewell* case.

## V.    Conclusion

For the reasons set forth here, and based on the allegations in the Amended Complaint, Freedom and Optimum's motion to dismiss should be denied in its entirety.[13]

Respectfully submitted this 8th day of March, 2022,

/s/ Jillian L. Estes
Frederick M. Morgan, Jr. (Ohio Bar No. 0027687)
Jillian L. Estes (Fla. Bar No. 0055774)
Jonathan Lischak (Ohio Bar No. 97669)
MORGAN VERKAMP LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202

---

[13] While Relator believes that her Amended Complaint far exceeds the specificity pleading standard, Relator seeks leave to amend to address any pleading infirmities that the Court may identify. It is not uncommon for a Court to allow a relator more than one opportunity to cure non-jurisdictional pleading defects. *See, e.g. U.S. ex rel. Schubert v. All Children's Health Sys.*, No. 8:11-cv-1687, 2013 U.S. Dist. LEXIS 53932, at *15 (M.D. Fla. Apr. 15, 2013)(permitting Third Amended Complaint, which ultimately did survive motion to dismiss); *U.S. ex rel. Armfield v. Gills*, No. 8:07-CV-2374, 2011 U.S. Dist. LEXIS 162016, at *11 (permitting Fourth Amended Complaint, for which subsequent motion to dismiss was denied).

Phone: (513) 651-4400
Fax: (513) 651-4405
rmorgan@morganverkamp.com
jillian.estes@morganverkamp.com
jonathan.lischak@morganverkamp.com

Adam T. Rabin (Fla. Bar No. 985635)
Havan M. Clark (Fla. Bar No. 1026390)
RABIN KAMMERER JOHNSON
1601 Forum Place, Suite 201
West Palm Beach, FL 33401
Phone: (561) 659-7878
Fax: (561) 242-4848
arabin@rkjlawgroup.com
hclark@rkjlawgroup.com
e-filing@rkjlawgroup.com

*Counsel for Relator Dr. Clarissa Zafirov*

## CERTIFICATE OF SERVICE

I, Jillian Estes, hereby certify that the foregoing Response in Opposition was served on March 8, 2022, to all parties of record via the CM/ECF electronic filing system.

/s/ Jillian L. Estes
Jillian L. Estes