UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
*ex rel.* DR. CLARISSA ZAFIROV,

    Plaintiffs,

v.                                                      Case No.: 8:19-cv-1236-T-23SPF

FLORIDA MEDICAL ASSOCIATES, LLC, *et al.*,

    Defendants.
_____/

## UNITED STATES' STATEMENT OF INTEREST

The United States of America respectfully submits this Statement of Interest, in accordance with 28 U.S.C. § 517 and with the Court's leave, to respond to several important legal questions raised by the Provider Defendants'[1] Motion to Dismiss the Relator's Amended Complaint (Dkt. 96). The United States has not intervened in this False Claims Act ("FCA") *qui tam* case and therefore is not a party to this action. Nevertheless, the United States remains the real party in interest, entitled to share in any recovery that may be obtained by Relator. *See* 31 U.S.C. § 3730(d); *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 934-35 (2009); *Timson v. Sampson*, 518 F.3d 870, 873 (11th Cir. 2008). And, because the FCA is the United States' primary civil tool for prosecuting fraud against the government, the United States has a substantial interest in the development of the law in this area. *See U.S. ex rel. Doe v.*

---

[1] The Provider Defendants are Physician Partners, LLC, Florida Medical Associates, LLC, and Anion Technologies, LLC.

*Staples, Inc.*, 773 F.3d 83, 84 (D.C. Cir. 2014) (citing S.Rep. No. 99-345, at 2, 4 (1986)).  As discussed below, the United States submits that, if proven, the allegations set forth in the Relator's Amended Complaint (Dkt. 86) that the Provider Defendants submitted unsupported diagnosis codes in connection with the Medicare Advantage program, such unsupported diagnosis codes could be material to the Government's decision to pay and could directly impact the amount of the payment received by a Medicare Advantage Organization ("MAO") and that the MAO then pays to the Provider Defendants.  The United States is not taking a position at this time on the merits of the factual allegations and only seeks to clarify any legal misconception that may arise based on the Provider Defendants' erroneous statements in their briefing.  Dkt. 96.

## DISCUSSION

I.  **Payments in the Medicare Advantage Program are predicated on diagnosis codes submitted by healthcare providers.**

The Medicare Advantage Program (also known as Medicare Part C) pays for care for the enrolled beneficiaries differently than traditional Medicare does under Parts A and B.  The Medicare Advantage Program utilizes a capitated (fixed) payment system whereby, rather than paying for individual services on a fee-for-service basis, the Centers for Medicare and Medicaid Services ("CMS"), pays a fixed monthly rate per beneficiary to MAOs, which are typically insurance companies who in turn contract with healthcare providers.  The details of how the capitated payment

2

is determined is discussed in detail in Relator Zafirov's Amended Complaint as well as various decisions by other courts and will not be rehashed in detail here. *See* Amended Complaint, Dkt. 86 at ¶¶ 55-66; *U.S. ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1020-1-21 (N.D. Cal. 2020); *U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1167-1170 (9th Cir. 2016) (Swoben); *U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 672-374 (9th Cir. 2018); *UnitedHealthcare Ins. Co. v. Becerra*, 9 F.4th 868, 874-877 (D.C. Cir. 2021).  Generally, however, the payment system in the Medicare Advantage program involves a complicated process utilizing the risk adjustment model developed by CMS.  The purpose of the risk adjustment model is to estimate the costs of care for each beneficiary based on a variety of factors including certain demographic and health factors.  The various factors are put into the model and the resulting output is a risk score that is used to calculate the capitated rate for the individual beneficiary that is ultimately paid to the MAO by Medicare.  The higher the risk score, the higher the capitated payment for the beneficiary.  This is referred to as "risk adjustment."  The MAO then pays its providers from the money it receives from CMS.  This case is about the diagnosis codes submitted by the Provider Defendants to the MAOs and, ultimately, to CMS, and that provide the basis for any risk adjustment payments made by Medicare.  As one court stated, "[the] diagnosis codes that medical providers submit are the **only factors** that CMS uses to determine a beneficiary's health status to calculate the beneficiary's risk score and thus to

calculate how much CMS will pay for that beneficiary." *U.S. ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1020 (N.D. Cal. Mar. 16, 2020) (emphasis added)[2].

The risk adjustment model is a complex model based the diagnosis codes that are part of the International Classification of Diseases, 10th Revision or the ICD-10. The ICD-10 identifies every diagnosis code available to healthcare providers to identify their patient's health conditions. The risk adjustment model groups these tens of thousands of diagnosis codes into Hierarchical Condition Categories ("HCCs") and only a small subset of these diagnosis codes, generally those representing chronic conditions that persist year over year, have an impact on a beneficiary's risk score, *i.e.* are risk adjusting diagnosis codes. For example, a diagnosis of the seasonal flu does not have an impact on risk score, in other words it does not risk adjust, but a diagnosis of congestive heart failure does have an impact on risk score. Thus, a beneficiary with congestive heart failure will have a higher risk score than a healthy beneficiary and, as a result, CMS will pay a higher capitated amount for that beneficiary than for a demographically identical beneficiary who does not have congestive heart failure.

Given the critical role the diagnosis codes play in determining the capitated payments, CMS has a vested interest in ensuring these diagnosis codes are properly supported by beneficiaries' medical records. CMS requires, among many other

---

[2] Like the instant lawsuit, *Ormsby* was a False Claims Act case against a Medicare Advantage provider in which the government alleged that the providers submitted false risk-adjusting diagnosis codes to the MAOs, that were eventually submitted to the CMS, the government agency that administers the Medicare program.

things, that MAOs certify that the diagnosis codes they submit are accurate, complete and truthful. CMS also requires MAOs to have compliance programs in place to ensure diagnosis codes are accurate, complete and truthful. CMS does periodic audits of the diagnosis codes, to identify any unsupported codes and problematic coding patterns.

At the heart of the machinery of the Medicare Advantage Program are the diagnosis codes. Thus, the Provider Defendants' statement that "raw diagnoses codes are meaningless for risk adjustment purposes," Dkt. 96, p. 15, flies in the face of reality. It is true, as discussed above, that not all diagnosis codes risk adjust, but a blanket statement saying diagnosis codes are "meaningless" is simply wrong. If a provider submits a risk adjusting diagnosis code that is unsupported by the medical records, that risk adjusting diagnosis code (assuming it was the only one submitted within that HCC) will increase the risk score for that beneficiary and result in an improperly inflated payment.

## II.   The intervening steps between the initial diagnosis code and the payment are akin to the claims payment process under traditional Medicare.

The Provider Defendants go on to argue, incorrectly, that the intervening steps between a healthcare provider submitting a diagnosis code and the final capitated payment somehow break the causal link between a diagnosis code and the capitated payment. Dkt. 96, p. 16. The Provider Defendants argue "[t]his multi-layered processing and review system breaks any causal link between the Provider

5

Defendants' raw diagnosis codes and the finalized risk adjustment data the MA Defendants submit to CMS for payment." Dkt. 96, p. 16. Again, not only does such a statement fly in the face of the role diagnosis codes play in the MA program, the over-breadth of this statement renders it incorrect.

As discussed above, the HCC model is indeed complex. The Provider Defendants correctly characterize it as a "multi-layered process[]" that involves "complex multi-dimensional calculus that does not turn on any single input." Dkt. 96, p. 17. Additionally, the capitated payment from CMS does not go directly to a provider but rather goes to the MAO which then has its own internal multi-layered process to calculate the provider's portion of the capitated payment.

The courts that have dealt with the MA program's capitated payment system have understood the reimbursement system and, despite its complexity, have never held that the causal link is broken between a provider and the payment made for the provider's beneficiary. To the contrary, the courts have concluded that a diagnosis code that originates with a healthcare provider is the "key" to determining the capitation payment for that beneficiary. *Ormsby*, 444 F. Supp. 3d at 1022-1023.

The court in *Ormsby* stated it concisely. "When MA Participants submit false risk-adjusting diagnosis codes, CMS pays more money (and, conversely, when they delete risk-adjusting diagnosis codes, CMS pays less money.)" *Ormsby*, 444 F. Supp. 3d at 1085-1086. This is how the system is designed to work. The Provider Defendants' position that the intervening steps to process diagnosis codes somehow

6

insulates them from liability is wrong. A healthcare provider, including the Provider Defendants here, absolutely faces liability for violations of the FCA if that provider knowingly submits a risk adjusting diagnosis code that is unsupported by the medical record he or she created and then received payment in connection to that diagnosis code.[3]

## CONCLUSION

For these reasons, the United States respectfully asks the Court to find that an unsupported diagnosis code originating from a healthcare provider can be the basis for FCA liability, despite the Provider Defendants' blanket assertions otherwise.

Respectfully submitted,

**BRIAN M. BOYNTON**
Principal Deputy Assistant Attorney General

**ROGER B. HANDBERG**
United States Attorney

JAMIE A. YAVELBERG
PATRICIA L. HANOWER
J. JENNIFER KOH
Attorneys, Civil Division
United States Department of Justice

Dated:  June 15, 2022      By:      *s/ Sean P. Keefe*
SEAN P. KEEFE
Assistant United States Attorney
Florida Bar No. 0413828

---

[3] The False Claims Act defines "knowingly" to include actual knowledge, acting in deliberate ignorance of the truth or acting in reckless disregard of the truth. 31 U.S.C. §3729(b)(1).

>400 North Tampa Street, Suite 3200
>Tampa, FL 33602
>Telephone: (813) 274-6000
>Facsimile: (813) 274-6200
>E-mail: sean.keefe@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will provide electronic service to all counsel of record.

>*/s/ Sean P. Keefe*
>SEAN P. KEEFE
>Assistant United States Attorney