UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
*ex rel.* CLARISSA ZAFIROV,

       Plaintiff,

v.                              Case No. 8:19-cv-1236-KKM-SPF

FLORIDA MEDICAL ASSOCIATES
LLC d/b/a VIPCARE, PHYSICIAN
PARTNERS, LLC, ANION TECHNOLOGIES,
LLC, FREEDOM HEALTH, INC., and
OPTIMUM HEALTHCARE, INC.,

       Defendants.

_____

### ORDER

      Clarissa Zafirov, a board-certified family care physician, brings this *qui tam* action

under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, against Florida Medical

Associates doing business as VIPcare, Physician Partners, LLC, and Anion Technologies,

LLC, (the Provider Defendants), and Freedom Health, Inc., and Optimum Healthcare,

Inc., (the MA Defendants). Zafirov claims that the Provider Defendants "acted in concert"

with the MA Defendants "to artificially increase" the "risk adjustment scores of their

Medicare Advantage enrollees," which in turn fraudulently increased their capitated

payments from the government. (Doc. 86 ¶ 87.)

      The Court dismissed Zafirov's original FCA complaint without prejudice for three

reasons. First, Zafirov failed to allege the FCA violations with the requisite particularity under Federal Rule of Civil Procedure 9(b). Second, Zafirov's claims failed to clear the public-disclosure bar. Third, her initial complaint was a shotgun pleading. *See U.S. ex rel. Zafirov v. Fla. Med. Assocs. LLC*, No. 8:19-cv-1236, 2021 WL 4443119, at *4–9 (M.D. Fla. Sept. 28, 2021) (Mizelle, J.).

Zafirov realleges her FCA claims in an Amended Complaint. (Doc. 86.) The defendants once again move to dismiss her claims. (Doc. 97; Doc. 98.) Zafirov opposes both motions, (Doc. 106; Doc. 107), and the defendants have each replied, (Doc. 113; Doc. 114). After careful consideration, the motions to dismiss are denied.

## I. BACKGROUND

At the pleadings stage, the Court takes Zafirov's allegations as true and construes them in the light most favorable to her. *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

### A. Medicare Advantage

The United States government operates and administers the Medicare health insurance program through the Centers for Medicare and Medicaid Services (CMS), a division of the Department of Health and Human Services. (Doc. 86 ¶ 18.) Medicare covers individuals aged 65 and older, as well as certain disabled persons and consists of four distinct programs: Parts A through D. (*Id.* ¶¶ 46–47.) Under Parts A and B, known as

"traditional Medicare," CMS reimburses healthcare providers directly for each healthcare service they provide to beneficiaries (i.e., a fee-for-service system). (*Id.*) Part D deals with prescription drug coverage. (*Id.* ¶ 47) Part C—the relevant program here—is called Medicare Advantage. (*Id.* ¶ 48.)

Here is how Medicare Advantage works at a high level. A beneficiary enrolls in a plan managed by a private insurance company (an MA organization). (*Id.*) That MA organization, in turn, contracts with a provider organization, such as a hospital network or a group of physicians, to furnish healthcare services to the beneficiary. (*Id.* ¶ 67) Rather than using a fee-for-service system like the traditional Medicare programs, Medicare Advantage uses a capitated (i.e., a fee-per-patient) system. In this system, the government pays each MA organization a fixed amount each month per beneficiary. (*Id.* ¶¶ 55–57.)

To determine the fixed amount for each plan beneficiary, the MA Organization submits a bid amount to CMS "which is then compared to an administratively set benchmark set by CMS based on a statutory formula." (*Id.* ¶ 56.) The government adjusts the payments for each beneficiary based on his or her demographic factors (age, gender, etc.) and his or her health conditions or status. (*Id.* ¶ 57.) This adjustment by the government is called a "risk adjustment," "risk score," or "risk-adjustment factor," and it acts as a multiplier to the MA Organization's bid for covered services. (*Id.* ¶¶ 57–58.) Generally, the higher the "risk score" for a plan beneficiary, the more money the MA

Organizations receive for that beneficiary each month. (*Id.* ¶ 59.)

An enrollee's health status adjustment is determined using the CMS Hierarchical Condition Category risk-adjustment model. (*Id.*) This model groups medical conditions represented by diagnosis codes into categories of clinically related diagnoses, known as Hierarchical Condition Categories (HCCs). Certain HCCS contain diagnosis codes that indicate major, severe, and/or chronic illnesses and are predicted to require more expensive treatments. These are known as risk-adjusting diagnosis codes. (*Id.* ¶ 61.) Not all diagnosis codes are risk-adjusting because not all conditions are expected to increase a patient's cost of treatment. (*Id.* ¶ 62.)

## B. This Action

Zafirov is a board-certified family medicine physician licensed to practice in Florida. (*Id.* ¶ 19.) From October 2018 through March 2020, she worked for VIPcare, one of the named defendants in this case. (*Id.* ¶ 20.) Zafirov had access to both the Provider Defendants' billing system and electronic medical records and the MA Defendants' physician portal, which provided claims data for each of her enrolled beneficiaries. (*Id.* ¶ 21.)

The MA Defendants are Freedom Health, Inc., (a health maintenance organization (HMO)) and Optimum Healthcare, Inc., (another HMO). (*Id.* ¶¶ 26–27.) The MA Defendants are sibling entities and operate indistinguishably from one another. (*Id.* ¶ 28.)

The Provider Defendants are Physician Partners, LLC, Anion Technologies, LLC, and Florida Medical Associates, Inc., d/b/a VIPcare. (*Id.* ¶¶ 22–25.) VIPcare is a provider group which is wholly owned and operated by Physician Partners. (*Id.* ¶¶ 23, 25.) Anion is a wholly owned billing and coding subsidiary of Physician Partners. (*Id.* ¶ 24.)

Zafirov brings twelve different FCA claims, 31 U.S.C. §§ 3729(a)(1)(A), (B), (G), against the three Provider Defendants separately and the MA Defendants collectively. (*Id.* ¶¶ 296–346.) To support these claims, Zafirov alleges that the Provider Defendants "have created and implemented a coding process to inflate their patients' " risk scores and to increase their capitated payments. (*Id.* ¶ 90.) The Amended Complaint alleges that the Provider Defendants pressured their physicians—including Zafirov—using various means (including financial incentives) to select only risk-adjusting diagnosis codes and submitted unsupported codes when their physicians would not comply. (*Id.* ¶ 91.) In this way, the Provider Defendants increased the risk scores of their patients "without regard to the actual physical condition of the patients." (*Id.* ¶ 92, 95.) Moreover, despite these extra diagnoses, "no additional medical services resulted" and "expensive medical services that *were* actually needed were withheld." (*Id.* ¶ 96.)

Zafirov further alleges that the MA Defendants, in turn, submitted false and incorrect diagnosis codes to CMS to increase the capitated payments. (*Id.* ¶¶ 180–94.) The MA Defendants not only failed to "conduct appropriate oversight" of the Provider

Defendants submissions as required by the Medicare Advantage regulatory regime, (*id.* ¶¶ 181–82), but also took "an active role in the operations" of the Provider Defendants by (1) educating physicians with coding guidance and (2) allowing physicians access to the billing portal, (*id.* ¶ 184–90).

The upshot, according to Zafirov, is that each of the defendants knowingly "submitted and caused to be submitted false claims" to the government in the form of unsupported risk-adjusting diagnosis codes. (*Id.* ¶¶ 195, 201.) The Amended Complaint contains over twenty specific patient examples of the alleged false claims, including the surrounding factual context and supported by the coding information. (*Id.* ¶¶ 202–95.)

## C. Procedural History

In May 2019, Zafirov filed this action against the defendants. (Doc. 1.) The government declined to intervene, and the Court unsealed the case in June 2020. (Docs. 14, 17.) Following motions to dismiss from the defendants, (Docs. 41, 50, 51), the Court dismissed Zafirov's original complaint without prejudice. (Doc. 81.) On November 12, 2021, Zafirov filed her Amended Complaint. (Doc. 86.) The defendants again moved to dismiss Zafirov's Amended Complaint. (Doc. 97; Doc. 98.) Zafirov opposes those motions. (Doc. 106; Doc. 107.) With leave of the Court, the defendants filed replies to Zafirov's responses. (Doc. 113; Doc. 114.) In March 2022, the United States filed a notice indicating its objection to dismissal based on the public disclosure bar. (Doc. 105.) And in

June 2022, with the Court's leave, the United States also filed a statement of interest as a real party in interest under 28 U.S.C. § 517, (Doc. 120), and the Provider Defendants responded, (Doc. 120).

## II. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Additionally, Federal Rule of Civil Procedure 9(b) requires a party "alleging fraud . . . [to] state with particularity the circumstances constituting fraud[.]" To satisfy this heightened-pleading requirement in a *qui tam* action, "a realtor must allege the actual submission of a false claim because the False Claims Act does not create liability merely for a health care provider's disregard of government regulations or improper internal policies unless the provider asks the government to pay amounts it does not owe." *Carrell v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018) (cleaned up). When reviewing a motion to dismiss, courts should limit their "consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

## III. ANALYSIS

The False Claims Act, 31 U.S.C. § 3729 *et seq.*, creates liability for individuals "who present or directly induce the submission of false or fraudulent claims" to the government. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016); *see* § 3729(a)(1)(A), (B), (G) (forbidding knowingly (1) presenting a false claim to the government; (2) making a false record or statement material to false claim; and (3) knowingly concealing or improperly avoiding or decreasing an obligation to pay or transmit money to the government). Under certain circumstances, the False Claims Act allows private persons to bring civil actions on the United States' behalf against violators. § 3730(b); *see Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1272 (11th Cir. 2018).

As an initial matter, the Court concluded in its prior dismissal order that the public-disclosure bar served as an alternate basis for the dismissal of Zafirov's original complaint. *See Zafirov*, 2021 WL 4443119, at *6–8. The government has since notified the Court that it opposes dismissal of Zafirov's FCA claims based on the public-disclosure bar. (Doc. 105); *see* § 3730(e)(4)(A) ("The court shall dismiss an action or claim under this section, *unless opposed by the Government*, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed." (emphasis added)); *see also U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810–11 (11th Cir. 2015) (noting that the

FCA, as amended in 2010, provides that the government may oppose dismissal and allow the case to proceed where the public disclosure bar would otherwise apply). In the light of the government's notice, the defendants' arguments that Zafirov's Amended Complaint should be dismissed due to the public-disclosure bar are moot.

The defendants raise three other arguments for dismissal in their motions. First, they argue that Zafirov's Amended Complaint should be dismissed because she again did not state her FCA claims with particularity. Next, they argue that Zafirov failed to state her FCA claims under Rule 8(a). Finally, they argue that the government action bar from 31 U.S.C. § 3730(e)(3) requires dismissal. As explained below, these arguments fail.

## A.  Zafirov States Her FCA Claims with Particularity

Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting" fraud "be stated with particularity." Fed. R. Civ. P. 9(b); *see Clausen*, 290 F.3d at 1308–09 (holding complaints alleging FCA violations are governed by Rule 9(b)). The complaint must allege "'facts as to time, place, and substance of the defendant's alleged fraud,' [and] 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Clausen*, 290 F.3d at 1310 (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567–68 (11th Cir. 1994)). "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

To meet the particularity standard in a *qui tam* action, "a relator must allege the actual submission of a false claim because the False Claims Act does not create liability merely for a health care provider's disregard of government regulations or improper internal policies." *Carrel*, 898 F.3d at 1275 (cleaned up) (quoting *Clausen*, 290 F.3d at 1311); *see also Corsello*, 428 F.3d at 1012 (noting that the actual "act of submitting a fraudulent claim to the government is the '*sine qua non* of a False Claims Act violation'" (quotation omitted)).) As such a complaint must offer "some indicia of reliability" supporting that "*an actual false claim* for payment" was made to the government. *Clausen*, 290 F.3d at 1311. Even detailed allegations of "an elaborate scheme for defrauding the government by submitting false claims" are insufficient to satisfy Rule 9(b), *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006), where a relator fails to allege the 'who,' 'what,' 'where,' 'when,' and 'how' of the submission of specific fraudulent claims to the government. *Corsello*, 428 F.3d at 1013–14.

This Court previously concluded that Zafirov's initial complaint failed to allege her FCA claims with particularity because she failed to provide any "indicia of reliability" to support her FCA claims. *See Zafirov*, 2021 WL 4443119, at *4–6 (quoting *Clausen*, 290 F.3d at 1311) ("[Zafirov] fails to provide the dates these codes were submitted, the name of the individual or individuals that submitted the codes, how these codes impacted the amount of money that the defendants received from the federal government (materiality),

or copies of a single bill or payment."). The Court identified an underlying problem for Zafirov in its previous order. While Zafirov did allege personal knowledge of the various improper acts by the Provider Defendants who allegedly provided false diagnosis codes to the MA Defendants, she did not allege personal knowledge of the MA Defendants' conduct—most importantly the MA Defendants' actual submissions of the allegedly false risk-diagnosis codes to CMS. However, after considering the extensive additional detailed allegations in her Amended Complaint, the Court concludes that Zafirov's Amended Complaint satisfies Rule 9(b)'s heightened pleading standard.

Zafirov's Amended Complaint contains nearly 100 pages of additional detailed allegations that include more than twenty specific patient examples. (Doc. 86 ¶¶ 13–15, 203–95.) Importantly, the Amended Complaint also contains new allegations that, as a provider physician, Zafirov had access to the MA Defendants' online portal and access to the records of the allegedly false diagnosis codes that were submitted to the government, which means Zafirov can trace the false claims from their inception with the Provider Defendants through to the MA Defendants and finally to the government. (*Id.*) The new allegations (and the supporting exhibits) that Zafirov could access the MA Defendants' physician portal and view reports that "the codes that were submitted from [the MA Organizations] to CMS for each patient, including the dates of service and the source for the submitted codes" are sufficient "indicia of reliability" to support Zafirov's False Claims

allegations even though she is an outsider to the MA Organizations. *Carrel*, 898 F.3d at 1275 (cleaned up).

Take two patient specific examples from the Amended Complaint to illustrate the point. The Amended Complaint describes the alleged False Claim as to "Patient H" as follows: "Through the access to the Freedom MRA/HEDIS Portal granted by Freedom to the Physician Partners' physicians, Dr. Zafirov observed that the false code from Physician Partners for HCC085, Unspecified diastolic (congestive) heart failure, was submitted by Freedom to the CMS with the date of service March 12, 2019. [T]he initial submission of a claim for congestive heart failure for Patient H was a false claim which fraudulently represented that Dr. Zafirov made that diagnosis. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States." (Doc. 86 ¶ 210–11, Ex. 1-H8 (listing the code under the heading "The following are HCC related medical conditions that have been reported to CMS in the past for this member).) The Amended Complaint also describes the alleged false claim as to "Patient J" as follows: "The billing section of Patient J's electronic medical record shows HCC-011 with five different ICD codes for tonsil cancer and bladder cancer as 'paid' for 2019. Moreover, the Freedom Health Member Profile for Patient J reflects that the code for 'Malignant neoplasm of tonslar foss' was submitted from Freedom to CMS, most recently with a date of service of Jan. 13, 2020.

However, as of the time Dr. Zafirov left VIPcare, there was no documentation in Patient J's medical record to suggest that he had been diagnosed with tonsil or bladder cancer in 2019." (*Id.* ¶ 227, Ex. 3-J6 (listing the code under the heading "The following are HCC related medical conditions that have been reported to CMS in the past for this member.").)

These patient-specific allegations—and the others in the Amended Complaint—go far beyond a simple "portrayal of the scheme" and a "summar[y] conclu[sion] that the defendants submitted false claims to the government for reimbursement." *McInteer*, 470 F.3d at 1359; *see also Clausen*, 290 F.3d at 1311. Far from relying on bald statements, rumors, or conjectures, *see Mastej*, 591 F. App'x at 704, Zafirov's detailed allegations derived from her personal knowledge of the Provider Defendants' medical records and her access to the MA Defendants online portal for physicians provide the requisite "indicia of reliability." *Clausen*, 290 F.3d at 1311; *see U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253, 2012 U.S. Dist. LEXIS 96434, at *22 (S.D. Fla. July 12, 2012) (public filings showing government payor revenue combined with a spreadsheet of exemplar claims was sufficient and was distinct from cases like *Clausen*, *Corsello*, *Atkins*, or *Hopper* that had no reliable indicia of actual claims submitted to the government). Zafirov successfully identifies "information linking the [] schemes to the submission of [] actual claims" by alleging (1) what was submitted to the United States (false diagnosis codes); (2) when they were submitted (the associated dates of services plus the years each code was submitted);

(3) the impact on the government (the risk adjustment value of each false code); and (4) the context to explain why the codes were false. (*See* Doc. 86 ¶¶ 202–71, Doc. 86-1; Doc. 86-2; Doc. 86-3; Doc. 86-4; Doc. 86-5; Doc. 86-6; Doc. 86-7; Doc. 86-8.)

The MA Defendants argue that even though Zafirov had access to records of the diagnosis code submissions to CMS, these documents are not "records of payments, or of the submission of any claims for payment" and are too far "divorced from the actual claims submission process" to serve as reliable indication of claims. (Doc. 87 at 8, 10.) The Provider Defendants, in their turn, argue that "raw diagnosis codes are meaningless for risk adjustment purposes." (Doc. 96 at 15.) These arguments fail to persuade.

The "diagnosis codes that medical providers submit are the *only* factors that CMS uses to determine a beneficiary's health status to calculate the beneficiary's risk score and thus to calculate how much CMS will pay for that beneficiary." *U.S. ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1020 (N.D. Cal. Mar. 16, 2020) (emphasis added). As the government notes in its statement of interest, the diagnosis codes stand at the "heart of the machinery of the Medicare Advantage Program." (Doc. 120 at 5.) The risk-adjustment model (see *supra* Part I.A) categorizes tens of thousands of diagnosis codes, a subset of which impact the beneficiary's risk score (i.e., risk-adjusting codes). Where a beneficiary is assigned a risk-adjusting code, CMS will pay a higher capitated amount for the beneficiary. (*Id.* at 4–5.) Therefore, while not all diagnosis codes are risk-adjusting, it

14

is perfectly accurate to say—as Zafirov does in her Amended Complaint—that where a provider submits a false risk-adjusting diagnosis code to an MA organization and that organization then submits the code to the government, the risk adjusting code will increase the risk score for that beneficiary. Because payments in the Medicare Advantage system are predicated on diagnosis codes, therefore, Zafirov's allegations in her Amended Complaint and her supporting documents detailing the alleged submission of false risk adjusting codes to from the Provider Defendants to the MA Defendants to the government meets the Rule 9(b) standard. *See Mastej*, 591 F. App'x at 703–04 ("[T]here is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim.").

Further, Zafirov's reverse false claims allegations are also sufficiently particular to satisfy Rule 9(b). A reverse false claim results from the defendant avoiding payment due to the government. *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012). Specifically, the False Claims Act imposes liability on any person who "knowingly and improperly avoids or decreases an obligation to payor transmit money or property to the [g]overnent[.]" 31 U.S.C. § 3729(a)(1)(G); *see Ormsby*, 444 F. Supp. 3d at 1072 ("For more than a decade, CMS 'has required repayment to CMS of any costs that were based on unsupported diagnosis codes.'" (quoting *UnitedHealthCare Ins. Co. v. Azar*, 330 F. Supp. 3d 173, 180 (D.D.C. 2018))). Zafirov's reverse false claims act theory

is that the defendants knew or should have known false codes were submitted to the government and that "by failing to submit proper codes to convey the accurate information," the defendants also violated § 3729(a)(1)(G) "for each" patient example identified in the Amended Complaint. (Doc. 86 ¶¶ 272–74.) Further, the Amended Complaint also provides multiple specific patient examples, along with the surrounding factual context and documentation, where the Provider Defendants, the MA Defendants, or both "had knowledge of the falsity of their codes and failed to submit correct codes pursuant to their overpayment obligations." (*Id.* ¶ 274; *see also id.* ¶¶ 275–95.) Zafirov's reverse false claim allegations, therefore, also pass must under Rule 9(b).

## B. Zafirov Successfully States Her FCA Claims under Rule 8(a)

To properly plead her FCA claims, Zafirov needs to allege that the defendants acted with the requisite knowledge. § 3729(a)(1); *see Clausen*, 290 F.3d at 1311 (noting that FCA liability requires that a defendant "knowingly asks the [g]overnment to pay amounts it does not owe"). The MA Defendants rightly acknowledge that Rule 9(b) allows Zafirov to allege knowledge generally. (Doc. 97 at 16); *see Matheny*, 671 F.3d at 1224 ("[A]t the pleading stage, knowledge and other conditions of a person's mind may be alleged generally."); *see also W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 88 (11th Cir. 2008) (recognizing that "conclusory allegations" that a defendant acted knowingly are sufficient under Rule 9(b)). And that is exactly what Zafirov does in

her Amended Complaint. (Doc. 87 ¶¶ 195–201 (alleging the defendants knowingly submitted or caused to be submitted false or fraudulent claims).

The MA Defendants argue that Zafirov's general knowledge allegations are not sufficient to meet Rule 8's requirements because "she fails to allege facts sufficient to make these allegations plausible." (Doc. 97 at 16–20.) Not so. Drawing all inferences in favor of Zafirov, the Court is persuaded that Zafirov has alleged sufficient facts to support her allegations that the MA Defendants knowingly participated in the alleged fraud. For example, Zafirov alleges that many of the false diagnosis codes were not submitted by any physician or qualified provider, which permits an inference that the MA Defendants should have seen this as a red flag. (Doc. 86 ¶¶ 91, 202–71.) She also alleges that certain of the submitted codes were so unusual or extreme that their existence alone should have raised a red flag. (*Id.* ¶¶ 263–65). And she alleges that the Provider Defendants submitted risk-adjusting diagnosis codes at rates well above the national averages, which also is a red flag. (*Id.* ¶¶ 145–46.) These and other "concrete signs" of fraud alleged by Zafirov permit an inference that the MA Defendants had knowledge at the pleading stage. *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 680 (9th Cir. 2018); *see Iqbal*, 556 U.S. at 678.

The Provider Defendants' arguments that Zafirov failed to plausibly allege materiality and causation also fail. (Doc. 98 at 10–18.) The Court already rejected the

Provider Defendants' erroneous assertion—which underlies these arguments—that the raw diagnosis codes are "meaningless" to the Medicare Advantage system. *See supra* Part III.A; *see also* (Doc. 86 ¶ 77 (quoting *Ormsby*, 444 F. Supp. 3d at 1021 n.1 ("A traditional Medicare provider that submits unsupported diagnosis code does not cause CMS to pay out any additional money, whereas a Medicare Advantage provider that submits an unsupported diagnosis code does.")).) Here, Zafirov plausibly alleges materiality given the Amended Complaint's detailed description of how the submission of unsupported and improper risk-adjusting diagnosis codes resulted in overpayments from the government. (Doc. 86 ¶¶ 46–78); *see U.S. ex rel. White v. Mobile Care EMS & Transp., Inc.*, No. 1:15-cv-555, 2021 WL 6064363, at *14 (S.D. Oh. Oct. 18, 2021) ("[A]nything that 'tends to influence' the payment of claims under the [Medicare Advantage] program would be 'material' for FCA purposes."). And Zafirov plausibly alleges causation given the allegations in the Amended Complaint that the Provider Defendants routinely overrode physician judgment to submit false diagnosis codes and the allegations that the Provider Defendants pressured Zafirov and others to increase the risk scores of their patients. (Doc. 86 ¶¶ 91, 94, 125–31); *see Ormsby*, 444 F. Supp. 3d at 1086 ("[B]y alleging that [defendants] submitted false diagnosis codes that caused CMS to pay them money, the plaintiffs sufficiently plead causation."); *id.* at 1029 (concluding causation was sufficiently pled where allegations included "pressuring physicians to add diagnosis codes to medical

18

records").

The Court, therefore, concludes the Amended Complaint successfully pleads its FCA claims.

## C. The Government-Action Bar Does Not Apply

The government-action bar prevents an FCA action "which is based upon allegations or transactions which are subject to a civil suit or an administrative civil money penalty proceeding in which the [g]overnment is already a party." 31 U.S.C. § 3730(e)(3). To determine whether the government-action bar applies, courts look at "whether the two cases can be properly viewed as having the qualities of a host/parasite relationship, i.e., whether the *qui tam* case is receiving support, advantage, or the like from the host case (in which the government is a party) without giving any useful or proper return to the government (or at least having the potential to do so). *U.S. ex rel. Herman v. Coloplast Corp.*, 327 F. Supp. 3d 358, 364 (D. Mass. 2018).

To begin, there is nothing parasitic about the allegations against the Provider Defendants because those defendants are not named or specifically identified in *Sewell* and none of the allegations against them were ever raised in that case. *See U.S. ex rel. S. Prawer & Co. v. Fleet Bank*, 24 F.3d 320, 328 (1st Cir. 1994) (finding case against defendants not named in previous action was not subject to the government-action bar). And the allegations in *Sewell* as related to the MA Defendants are materially different (e.g.,

different alleged false claims) from the allegations here such that—if Zafirov is successful—the government would receive "a useful and proper return" beyond what was already recovered in *Sewell*. In addition to the financial recovery available from this case, there is also the potential that this case could lead to novel corporate integrity agreements involving the defendants that could also benefit the United States.

While the government-action bar does not include a veto clause like the public-disclosure bar, courts have considered the government's views as a factor counseling against the application of the government-action bar. *See, e.g.*, *Herman*, 327 F. Supp. 3d at 364 (D. Mass. 2018) ("While the government action bar does not provide the government with veto power . . . the United States' perception is nevertheless instructive here because it goes directly to the question of 'useful or proper return to the [g]overnment."). Here, while the government has declined to intervene in this action and has not taken a position on the merits of Zafirov's allegations, the government opposes dismissal based on the public-disclosure bar, (Doc. 105), and has indicated that it believes Zafirov's theory of the case is sound, (Doc. 120 ("[T]he United States respectfully asks the Court to find that an unsupported diagnosis code originating from a healthcare provider can be the basis for FCA liability.").) While the government has not specifically indicated its views on the government-action bar, its actions so far in this case at least indicate that it does not view the action as parasitic.

With these considerations in mind, the Court concludes the government-action bar does not apply.

## IV. CONCLUSION

Accordingly, the following is **ORDERED**:

1.    Freedom and Optimum's Motion to Dismiss (Doc. 97) is **DENIED**.

2.    Physician Partners, VIPcare, and Anion's Motion to Dismiss (Doc. 98) is **DENIED**.

3.    In accord with the Court's previous order, (Doc. 89), within ten days of the defendants' filing their answers, the parties must file an amended case management report.

**ORDERED** in Tampa, Florida, on September 12, 2022.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**