UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA <br> *ex rel.* DR. CLARISSA ZAFIROV, <br> <br> Plaintiff and Relator, <br> <br> v. <br> <br> PHYSICIAN PARTNERS, LLC; FLORIDA MEDICAL ASSOCIATES, LLC, d/b/a VIPCARE; ANION TECHNOLOGIES, LLC; FREEDOM HEALTH, INC.; and OPTIMUM HEALTHCARE, INC., <br> <br> Defendants. | No. 8:19-cv-01236-KKM-SPF |

**RELATOR'S MOTION TO COMPEL DISCOVERY FROM PROVIDER DEFENDANTS REGARDING AFFILIATE PROVIDERS**

**I.   INTRODUCTION**

Defendant Physician Partners, LLC and its affiliate organizations Defendants Freedom Medical Associates, LLC d/b/a VIPcare and Anion Technologies, LLC, (collectively, "Provider Defendants") utilize a series of uniform billing and coding processes for hundreds of healthcare providers throughout Florida and the Southeast, some of whom have direct employment contracts and others have practice management contracts. ECF No. 86, at ¶¶ 23-24 ("Amended Complaint"). Nearly a year ago, the Provider Defendants agreed to produce documents related to all Physician Partners physicians from the outset of discovery. However, they have now pulled an about-face with just over three months remaining before the discovery cut-

1

off, declaring they will now not produce responsive information and documents for any "affiliated" (as opposed to employed) physician.

For the reasons set forth herein, Relator respectfully moves this Court to compel the Provider Defendants to respond to all discovery responses as to all Physician Partners physicians, both employed and affiliated.

## II.   RELEVANT DISCOVERY BACKGROUND

In 2022, following this Court's denial of Defendants' motions to dismiss Relator's Amended Complaint (ECF No. 124), the parties began the discovery process. Relator served separate Requests for Production to each of the three Provider Defendants on December 15, 2022. Therein, Relator defined, *inter alia*, the term "Physician Partners physician" to mean "any physician who is either (1) employed by Physician Partners, or (2) who associated with Physician Partners through a practice management contract or any other similar relationship other than an employment contract." In responses served on February 17, 2023, each Provider Defendant objected to the definition of "Physician Partners physician" as "vague and ambiguous and susceptible to multiple interpretations," but did not assert that the definition was overbroad or disproportionate to the needs of the case.[1] Instead, each Provider

---

[1] Provider Defendants did include such an objection to others of Relator's definitions, such as the term "patient." Relator had defined patient to mean "any individual who has received medical care." The Provider Defendants objected that the definition was "overly broad and seeking information that is not relevant or proportional to the needs of this case, as it purports to include all individuals who have received medical care from any provider." Notably, the Provider Defendants instead agreed to interpret that definition as "an individual who received care from a Physician Partners physician."

2

Defendant provided an identical statement, "[f]or the purpose of responding to the Requests and interpreting any Definition or Instruction that incorporate this term, [the respective Provider Defendant] interprets 'Physician Partners physician' to mean **a physician either directly employed by Physician Partners or associated with Physician Partners through a practice management contract.**"[2] (Emphasis added.)

That has remained the operative definition of "Physician Partners physician" for purposes of the Provider Defendants' discovery responses since that time. At no time up to the present has any Provider Defendant sought to amend their responses and objections with a different definition of "Physician Partners physician."

In or about November 2023, Relator met and conferred with all defendants to discuss an extension of the discovery deadlines because document production had been delayed while the parties were awaiting this Court's ruling on the temporal scope of discovery. During those discussions, the Provider Defendants initially took the position that they would agree to an extension only if, *inter alia*, "the parties can reach an agreement on the non-discovery of affiliated providers."[3] This marked the first attempt by from the Provider Defendants to narrow the scope of discovery to only employed physicians in contrast to their responses to earlier discovery requests. Relator rejected the attempt to exclude affiliated physicians from the scope of discovery, noting Relator could not "agree to negotiate a discovery extension which is

---

[2] Exhibit A (Physician Partners' Responses and Objections to Relator's First Set of Requests for Production).

[3] Exhibit B (J. Mehta email, Nov. 22, 2023).

dependent on Relator agreeing not to seek discovery from a large subset of providers who are part of the case and have been from the outset."[4] The parties ultimately reached agreement on the extension of the discovery cutoff, and, by phone, Relator invited a letter setting forth the Provider Defendants' position on the scope of discovery as to affiliated physicians if the Provider Defendants had a reason to believe such physicians were not part of the case. No such letter was received at that time.

### III. DISCOVERY REQUESTS AT ISSUE

On December 22, 2023, Relator served Interrogatories on Defendants Physician Partners and Anion. Mindful of the issue raised by the Provider Defendants as to the scope of the providers, Relator included a definition which sought to incorporate both how the Provider Defendants had themselves defined "Physician Partners physician" in response to Relator's Requests for Production and Physician Partners' public representations of who is a Physician Partners physician: Relator defined the term "Physician Partners physician" as "any provider who has been listed in a Physician Partners Provider Directory" (which such directories include both employed and affiliated providers).[5]

Physician Partners and Anion responded with Answers to the Interrogatories on January 22, 2024, which were unverified but signed as to objections by counsel.[6] Directly contradictory to the position taken more than a year earlier in response to the

---

[4] Exhibit B (J. Estes email, Nov. 27, 2023).
[5] Exhibit C (Relator's First Set of Interrogatories).
[6] Verified Answers were ultimately served on February 8, 2024.

4

Requests for Production, these Answers set forth the following objection to the definition of "Physician Partners physician":

> Physician Partners objects to the definition of "Physician Partners physician" to the extent it purports to include physicians who were not employed by Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare") or any other Defendant or related entity but were only affiliates. Employed physicians, such as Dr. Zafirov, are W-2 employees who work exclusively for VIPcare. As employees, those physicians receive most, if not all, of their income and benefits from VIPcare. Employed physicians have an employment agreement with VIPcare, and their compensation is comprised mostly of a base salary, with the possibility of various additional incentive payments. By contrast, affiliated physicians are independent owners and operators of their respective practices. In general, affiliated physicians' income derives from several sources, only one of which is Physician Partners. That is because those physicians typically have contractual relationships with other Medicare Advantage plans, as well as other independent physician associations. Physician Partners' contracts with affiliates also vary whereby some affiliates are paid on a fee-for-service basis, while others have chosen a capitation payment model. In other words, there may be stark differences even among Physician Partners' affiliated physicians. Moreover, as independent business owners, affiliated physicians have autonomy over their facilities and patient scheduling. Employed physicians, such as Dr. Zafirov, do not. Rather, VIPcare enjoys unfettered access to the facilities, and employed physicians' patient scheduling is dictated by VIPcare. In addition, affiliated physicians hire and manage their own staff; employed physicians do not. Affiliated physicians select their own EMR, but employed physicians must use the eClinicalWorks EMR. Further, affiliated physicians typically manage their own coding, billing, and referrals. Employed physicians, on the other hand, have their billing processed by VIPcare, with support from Anion Technologies, LLC ("Anion"). Affiliate physicians are documenting and adding or deleting diagnoses and diagnosis codes, creating and managing medical records, and doing coding and billing of claims to health plans in all kinds of different EMR systems than the eClinicalWorks EMR system used by VIPcare physicians, which would greatly increase the burden on the parties in having to deal with multiple different EMR systems on all these issues if affiliate physicians were included in discovery. There are significant differences between employed physicians on the one hand and affiliated physicians on the other. Also, there are significant variations among the affiliated

physicians, such as how they are paid by Physician Partners and how those affiliated physicians manage their practices. These differences make discovery regarding affiliated physicians not relevant to Dr. Zafirov's claims. For these reasons, along with the other objections noted in Physician Partners' written objections to Dr. Zafirov's discovery requests in this matter, Physician Partners will not provide discovery regarding affiliated physicians. Physician Partners answers the Interrogatories only with regard to VIPcare employed physicians, and only in relation to Medicare Advantage beneficiaries of Freedom and Optimum, not other patients or plans.[7]

Despite numerous phone conferences and the exchange of position letters,[8] the parties have been unable to come to an agreement on this issue.

In a telephonic meet-and-confer on February 2, 2024, the Provider Defendants asserted for the first time that they do not intend to produce documents responsive to Relator's RFPs using the definition they set forth more than a year ago. Thus, although no Provider Defendant has submitted amended responses to the RFPs changing the long-agreed-upon definition, Relator also moves to compel the Provider Defendants' production in response to Relator's RFPs in addition to their interrogatory responses.

The parties reached impasse on this issue on February 2, 2024.

---

[7] Exhibit D (Physician Partners' Responses and Objections to Relator's First Set of Interrogatories). An identical objection is set forth in Anion's Responses and Objections.

[8] Relator responded via email to the objection, identifying specific portions of the Amended Complaint that discuss both employed and affiliate providers, highlighting the definition of "Physician Partners physician" that Provider Defendants themselves previously created, and addressing why the objections set forth contained inappropriate substantive factual representations which Relator is entitled to test. Relator's email is attached hereto as Exhibit E. In response, the Provider Defendants offered a letter laying out their position. However, the position paper submitted by Physician Partners was almost identical to the language contained in their Responses and Objections, and included no response to the points raised by Relator. Their response is attached hereto as Exhibit F.

## IV. ARGUMENT

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). Relevance, for purposes of discovery, is construed broadly to include any matter that "bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Gov't Emples. Ins. Co. v. Martineau*, No. 8:19-cv-1382, 2020 U.S. Dist. LEXIS 78816, at *2-3 (M.D. Fla. May 5, 2020), *quoting Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). For the proportionality inquiry, the court considers factors enumerated by Rule 26(b)(1), Fed. R. Civ. P.: "the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

The trial court "is give[n] wide discretion in setting the limits of discovery" and "[t]he Federal Rules of Civil Procedure strongly favor full discovery whenever possible." *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985). When a discovery request has been propounded, "[t]he party resisting discovery has the burden to show that the requested discovery is not relevant and that the production of such discovery would be unduly burdensome." *Benavides v. Velocity IQ, Inc.*, No. 8:05-cv-1536, 2006 U.S. Dist. LEXIS 14777, at *6 (M.D. Fla. Mar. 15, 2006).

### A. Relator's Amended Complaint alleges a fraudulent scheme implicating all Physician Partners' physicians.

Relator's Amended Complaint plainly sets forth allegations regarding both affiliated and employed Physician Partners' physicians. To wit, Relator alleges that "Physician Partners is a provider organization which employs or contracts with about 500 physicians" and that "[t]hrough policies, practices and procedures imposed on both contracted and employed physicians, Physician Partners and Anion systematically manipulate patient health records to document and submit unsupported conditions to increase their patients' 'risk adjustment scores,' which in turn substantially increases the amount that Medicare pays for the patients' care." ECF No. 86 at ¶¶ 4-5.

Relator specifically alleges that Physician Partners, as a matter of "polic[y] and practice[]" used Anion as a billing and coding entity for "all of Physician Partners' physicians, whether employed or independent." *Id.* at ¶ 102. The interplay between Anion and Physician Partners is critical to Relator's allegations, in that Anion generated the "5 Star Checklists," reviewed the Checklists against the physicians' notes and the physicians' diagnostic coding, and would then pressure physicians to add Anion's suggested codes, or simply add them without the physician's consent if the physician would not acquiesce. *Id.* at ¶¶103-104.[9] This practice was in no way limited

---

[9] As alleged in the Amended Complaint: At the heart of Defendants' scheme to increase patient risk scores is the use of their proprietary code-steering form called the "5 Star Checklist." The Checklist is created in advance of **every** patient visit by an Anion employee, who populates a daily electronic folder with 5 Star Checklists for **all** patients scheduled for

8

to physicians employed by VIPcare (a Physician Partners subsidiary), but rather the policies and practices described in detail in Relator's Amended Complaint were used by Physician Partners universally. *Id.* at ¶ 102. Because of the universal standards employed by Physician Partners – including the printed Quality Training Manual, the 5 Star Bootcamp videos published on Physician Partners' (not just VIPcare's) internal website, access granted to all Physician Partners physicians to the Freedom billing portal, and the 5 Star Checklists pushed out by Anion to all Physician Partners physicians – Relator alleges that each Defendant acted with actual knowledge, deliberate ignorance or reckless disregard "that the diagnoses codes submitted by Physician Partners, through Anion *on behalf of VIPcare and other contracted and affiliated providers*, to Freedom and Optimum, and from Freedom and Optimum to the United States" were not accurate, complete, and truthful and were, in fact, factually false. *Id.* at ¶¶ 199-200 (emphasis added).

Moreover, the Provider Defendants themselves acknowledged the scope of Relator's allegations from the beginning of this case and for the first year of discovery. The Provider Defendants did not move to dismiss allegations related to the affiliated providers as distinct from the employed providers, nor even mentioned a distinction between the two. ECF No. 98. And in turn, the Court's rejection of Defendants' motion to dismiss confirms a focus on "physicians," not just "employed physicians." ECF No. 124 at 18 ("Zafirov plausibly alleges causation given the allegations in the

---

visits that day; the complaint does not allege any difference of whether the provider is employed by or affiliated with Physician Partners. ECF No. 86 at ¶105 (emphasis added).

9

Amended Complaint that the *Provider Defendants routinely overrode physician judgment* to submit false diagnosis codes and the allegations that the *Provider Defendants pressured Zafirov and others* to increase the risk scores of their patients") (emphasis added).

Further, the Provider Defendants' Answer to Relator's Amended Complaint admitted to allegations regarding both employed and affiliate providers without identifying any differences between the two. ECF No. 129, at, e.g., ¶ 111 (admitting that Physician Partners made their Quality Training Manual available to "physicians" without specification of employed or affiliate); ¶ 119 (admitting that "it was suggested that physicians submit completed 5 Star Checklists" without specification of employed or affiliate). And, as discussed in Section II, *infra*, Provider Defendants crafted their own definition of "Physician Partners physician" which specifically included "a physician either directly employed by Physician Partners or associated with Physician Partners through a practice management contract" – a definition they set forth without any objection to scope or relevance.

### B. In a case involving the same defendants, this Court found no distinction between employed and affiliated physicians.

Another matter involving Physician Partners and Freedom Health, Inc. is presently pending before this Court: *Mansour v. Freedom Health, Inc., et al.*, Case No. 8:22-cv-595-WFJ-AEP. In the *Mansour* case, Judge Jung recently rendered an opinion denying Defendants' motion to dismiss Dr. Mansour's retaliation claims which arise from his relationship with Physician Partners through a Physician Affiliate Agreement, thus rendering him in the category of "affiliated providers" for whom

Physician Partners seeks to avoid discovery in the instant case. No. 8:22-cv-595-WFJ-AEP, 2023 U.S. Dist. LEXIS 191273, at *2 (M.D. Fla. Oct. 25, 2023). In that case, Dr. Mansour alleged extensive control over his medical practice by Physician Partners, including some of the coding manipulation through the use of 5 Star Forms at issue here. *Id.* at *10-13. In evaluating Dr. Mansour's allegations and the role of Freedom and Physician Partners in his practice, Judge Jung described the relationship between the affiliated physician and Physician Partners as a "quasi employment relationship." *Id.* at *1.

This Court's finding in the *Mansour* case is wholly consistent with the allegations of Relator's complaint in the instant case, in that Physician Partners exercised the same control and provided the services at issue in this case (specifically, but not exclusively, coding guidance and training, chart reviews, and billing services) to physicians regardless of whether they were employed or contractually affiliated.

### C. The limited documents produced thus far confirm that Physician Partners and Freedom treated employed and affiliate providers equally.

One of the documents produced in discovery is the "Group Participation Agreement" entered into between Defendant Optimum HealthCare, Inc. ("Optimum") and Physician Partners. The purpose of the agreement is to define the relationship between Optimum and Physician Partners as it relates to the provision of healthcare services to Optimum beneficiaries by Physician Partners physicians. (PHYSPART_0000001). The agreement is clear that affiliated, or contracted, physicians are within the ambit of the relationship between the two parties, defining a

11

[Physician Partners] Physician as "[a] Participating Physician, who practices as a shareholder, partner, *subcontractor or employee* of [Physician Partners]."[10]

### D. Physician Partners fails to demonstrate any undue burden or lack of relevance.

Physician Partners has not made, and cannot make, a good faith argument regarding relevance or burden of providing discovery responses which include both affiliate and employed physicians. In addition to the definition of "Physician Partners physician" which the Provider Defendants themselves crafted nearly a year ago (described in Section II), Physician Partners also specifically agreed to produce documents related directly to affiliated physicians. For example, in response to a request for documents relating to "the compensation structure for physicians currently or formerly associated with Physician Partners through a practice management contract…" (Request for Production No. 19), Physician Partners responded:

> Subject to and without waiving the foregoing objections and its General Objections, Physician Partners will provide non-privileged documents sufficient to show the compensation structure for physicians associated with Physician Partners through a practice management contract . . .[11]

Further, neither the lengthy objections to Relator's interrogatory definition of "Physician Partners physician" nor the nearly identical position letter asserts any facts which would refute the relevance of affiliate providers to the allegations of this case.

---

[10] PHYSPART_0000001 was produced with a designation "Confidential – Business Information." However, counsel for Physician Partners agreed to Relator quoting the selected definition without that portion of the brief being filed under seal. The entire document can be filed under seal for the Court's review if so requested.

[11] *See* Exhibit A (Responses and Objections to Relator's First Set of Requests for Production).

12

As set forth in full in Section III, *supra*, the Provider Defendants' objection and letter describe some economic implications of being an employee that have no relation to the allegations of this case (i.e. potential to earn additional income from other MAOs, paying for their own health insurance, selecting their own EMR, etc.). However, the Provider Defendants do not even mention the universality of the conduct alleged in Relator's Amended Complaint to be at the heart of the fraudulent scheme, including the use of the 5 Star Checklists as a steering tool for increasing risk adjustment scores, corporate-wide training materials and programs which push the use of high-value risk-adjusting codes, chart reviews to increase coding after a patient visit, and high-pressure tactics aimed at getting providers to participate in Physician Partners' financial model.[12] Simply, highlighting some differences that are not relevant to the claims and defenses of this case does not change the reality of the similarities between employed and affiliated physicians, especially where those similarities are inescapably relevant.

When, as here, "discovery appears relevant on its face, the party resisting the discovery has the burden to establish facts justifying its objections by demonstrating that the requested discovery . . . does not come within the scope of relevance as defined under Fed. R. Civ. P. 26(b)(1)." *Gov't Emples. Ins. Co.*, 2020 U.S. Dist. LEXIS 78816, at *2-3. Rather than do so, Physician Partners summarily concludes that because there

---

[12] In fact, the only sentence which could be read to be addressing the allegations of this case is caveated with the word "typically" – "affiliated physicians typically manage their own coding, billing, and referrals." Thus, even if the assertions were to be taken as facts, the Provider Defendants' objection concedes that at least a subset of the affiliated providers do not manage their own coding, billing, and referrals.

13

are "variations" with regards to how affiliated physicians are paid by Physician Partners and how they manage their practices, discovery regarding these physicians is "not relevant to Dr. Zafirov's claims." But even if the Provider Defendants had set forth relevant distinctions between the employed and affiliate providers, Relator would still be entitled to test those statements through discovery rather than accept the factual representations as true. *Stern v. John M. O'Quinn, et al.*, No. 07-60534, 2008 U.S. Dist. LEXIS 141441, at *10-11 (S.D. Fla. Oct. 24, 2008) (plaintiff entitled to test veracity of defendant's summary representations); *Sony Computer Entm't Am. v. Nasa Elecs. Corp.*, No. 07-20819, 2008 U.S. Dist. LEXIS 135403, at *9 (S.D. Fla. Feb, 22, 2008) (witnesses "opened the door" to discovery on topic by making a declaration and plaintiff is entitled to test the reliability of those statements). Here, Relator is entitled to the discovery related to affiliated providers writ large, and, to the extent the objections or letter address any relevant aspects of the affiliate provider relationships, Relator is also entitled to specifically test the reliability of those statements.

Finally, even if Physician Partners could establish facts supporting that affiliated providers were not subject to the same fraudulent scheme as employed providers, such differences would still be relevant and discoverable, as they would illustrate Physician Partners' knowledge as to how they should – and should not – use coding reviewers to engage with providers, and would highlight distinctions between how different groups of providers were pressured pursuant to Defendants' fraudulent scheme. *Collier Hma Physician Mgmt., Ltd. Liab. Co. v. NCH Healthcare Sys., Inc.*, No. 2:18-cv-408, 2020 U.S. Dist. LEXIS 268782, at *35-36 (M.D. Fla. Aug. 13, 2020) (holding that discovery

14

relating to the tracking of referrals from non-employed physicians was relevant in assessing differences between how employed and non-employed physicians were being treated in the context of the plaintiff's claims). Indeed, relevance encompasses any matter that "bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Gov't Emples. Ins. Co.*, 2020 U.S. Dist. LEXIS 78816, at *2-3.

Physician Partners likewise fails to establish any burden, let alone an undue burden, that would manifest as a result of producing the discovery sought. A party objecting to discovery on burdensomeness grounds must "specifically articulate any burden that they would face by producing such information." *Fla. Virtual Sch. v. K12, Inc.*, No. 6:20-cv-2354, 2022 U.S. Dist. LEXIS 131191, at *10 (M.D. Fla. Apr. 1, 2022). Physician Partners merely alleges that "[a]ffiliate physicians are . . . doing coding and billing of claims to health plans in all kinds of different EMR systems" and that this "would greatly increase the burden on the parties in having to deal with multiple different EMR systems . . . if affiliate physicians were included in discovery."[13] But Physician Partners makes no effort to explain how this creates an undue burden, or what that burden is. As such, their argument should be rejected. *Legion Sys., Ltd. Liab. Co. v. Valiant Glob. Def. Servs., Inc.*, No. 8:20-cv-2321, 2022 U.S. Dist. LEXIS 236899, at *16-17 (M.D. Fla. Dec. 22, 2022) ("reject[ing] and overrul[ing] [the defendant's] unsubstantiated objections based on burden and expense" where the

---

[13] *See* Exhibit D (Responses and Objections to Relator's First Set of Interrogatories).

15

defendant "ma[de] no meaningful effort to calculate or quantify the burden or expense associated with full compliance, nor d[id] Defendant support its conclusory assertions of burden and expense with evidence (*e.g.*, a supporting affidavit or declaration attesting to the volume of documents involved and the number of personnel hours to be expended)").

## V.   CONCLUSION

For the reasons set forth above, Relator respectfully requests that this Court compel the Provider Defendants to respond to all discovery requests using the definition to which the Provider Defendants themselves created and agreed to nearly a year ago: "'Physician Partners physician' [means] **a physician either directly employed by Physician Partners or associated with Physician Partners through a practice management contract.**"

Respectfully submitted this 12th day of February, 2024,

/s/ Jillian L. Estes
Jillian L. Estes (Fla Bar No. 0055774)
Frederick Morgan, Jr. (OH Bar No. 0027687)
Jonathan M. Lischak (OH Bar No. 0097669)
Morgan Verkamp LLC
4410 Carver Woods Dr., Suite 200
Cincinnati, Ohio 45242
Telephone: (513) 651-4400
Fax: (513) 651-4405
Email: jillian.estes@morganverkamp.com
rmorgan@morganverkamp.com
jonathan.lischak@morganverkamp.com

Kenneth J. Nolan (Fla. Bar No. 603406)
Marcella Auerbach (Fla. Bar No. 249335)

16

NOLAN, AUERBACH & WHITE, LLP
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL  33301
Phone: (954) 779-3943
Fax: (954) 779-3937
ken@whistleblowerfirm.com
marcellla@whistleblowerfirm.com

Adam T. Rabin (Fla. Bar No. 985635)
Havan M. Clark (Fla. Bar No. 1026390)
RABIN KAMMERER JOHNSON
1601 Forum Place, Suite 201
West Palm Beach, FL 33401
Phone: (561) 659-7878
Fax: (561) 242-4848
arabin@rkjlawgroup.com
hclark@rkjlawgroup.com
e-filing@rkjlawgroup.com

*Counsel for Relator Dr. Clarissa Zafirov*

## LOCAL RULE 3.01(g) CERTIFICATION

I, Jillian Estes, hereby certify that, consistent with Local Rule 3.01(g), Relator has conferred with the Provider Defendants telephonically and in written position papers in an effort to resolve this motion. The parties were unable to reach a resolution on the relief sought herein.

/s/ Jillian L. Estes
Jillian L. Estes

## CERTIFICATE OF SERVICE

I, Jillian Estes, hereby certify that foregoing motion was served on February 12, 2024, to all parties of record via the CM/ECF electronic filing system.

/s/ Jillian L. Estes
Jillian L. Estes
