# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA
ex rel. DR. CLARISSA ZAFIROV,

       Plaintiff/Relator,

v.

FLORIDA MEDICAL ASSOCIATES,
LLC, d/b/a VIPCARE; PHYSICIAN
PARTNERS, LLC; ANION
TECHNOLOGIES, LLC; FREEDOM
HEALTH, INC.; and OPTIMUM
HEALTHCARE, INC.,

       Defendants.

Case No. 8:19-cv-01236

## DEFENDANT PHYSICIAN PARTNERS, LLC'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33 and Section IV of the Handbook on Civil Discovery Practice in the United States District Court for the Middle District of Florida, Defendant Physician Partners, LLC ("Physician Partners") by and through its undersigned counsel, hereby serves its objections and responses to Relator Dr. Clarissa Zafirov's ("Zafirov" or "Plaintiff") First Set of Interrogatories to Defendant Physician Partners, LLC (the "Interrogatories").

## PRELIMINARY STATEMENT

This response represents Physician Partners' diligent and best efforts to respond to discovery based upon its investigation thus far. This response is given without prejudice to Physician Partners' right to produce evidence of any additional or subsequently discovered facts, or otherwise assert factual and legal

contentions as further facts are ascertained, analyses are made, and legal research is completed. The following responses are based solely upon such information and documents as are presently available and specifically known to Physician Partners to date. They disclose or set forth information and documents based upon Physician Partners' current contemplation, information, and understanding of the issues involved in this matter. Any production of information or documents by Physician Partners in response to Zafirov's Interrogatories is subject to Physician Partners' right to object to the admission in evidence of any and all such information and documents on grounds, including but not limited to, that they are not relevant to any claim or defense in this action, are otherwise inadmissible, or were produced inadvertently, any and all of which objections Physician Partners reserves and does not waive.

## **GENERAL OBJECTIONS**

1.      Physician Partners incorporates the following objections into each of the responses and objections to each Interrogatory as though fully set forth therein. The assertion of the same, similar, or additional objections or the provision of partial answers and/or individual responses to individual Interrogatories does not waive any of Physician Partners' objections as set forth below. Physician Partners' responses herein are based on a reasonably diligent and good faith inquiry and represent Physician Partners' current knowledge as of the date these responses and objections are made. Further investigation may reveal additional facts, information, or documents that could lead to additions to,

changes in, and/or variations from the responses herein. Physician Partners expressly reserves the right to amend or supplement their objections and responses for any reason.

2. Physician Partners objects to the Interrogatories as imposing obligations that are in excess of, and/or inconsistent with, the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Middle District of Florida, the Handbook on Civil Discovery Practice, or any other applicable law, statute, rule or decision. Among other things, Physician Partners objects that the Interrogatories are inconsistent with Federal Rules of Civil Procedure 26 and 33 and Section IV.A.2. of the Handbook on Civil Discovery Practice because they "impose unreasonable burdens" on Physician Partners by propounding multiple subparts in interrogatories and by requesting detailed listings of vast amounts of information and documents, in excess of anything proportional to the needs of this case. Physician Partners also objects that the Interrogatories are inconsistent with Section IV.C.4. of the Handbook on Civil Discovery Practice because they appear to be "designed to force an exhaustive or oppressive catalogue of information." Because the Interrogatories violate these provisions and ask for descriptions of vast amounts of information and documents, Physician Partners has no choice but to respond by producing business records pursuant to Federal Rule of Civil Procedure 33(d) without drafting a detailed identification of each individual record, as Zafirov can locate

and identify the records among Physician Partners' rolling document productions as readily as Physician Partners could.

3.     Physician Partners objects to the Interrogatories and Instructions to the extent they purport to impose an obligation on Physician Partners to conduct anything beyond a reasonable and diligent search of reasonably accessible information and files (including electronic files) where responsive information and documents reasonably would be expected to be found. Subject to the objections stated, Physician Partners will conduct a search of its reasonably accessible hard-copy and active-system electronic files for responsive information or documents.  Any Interrogatories that seek to require Physician Partners to go beyond such a search are overbroad, unduly burdensome, disproportionate to the needs of this case, and therefore objectionable. Further, by indicating that it will produce non-privileged, responsive documents, Physician Partners does not make a representation that such documents exist or are in Physician Partners' possession, but only that Physician Partners will conduct the reasonable searches indicated for the documents or information indicated.

4.     Physician Partners' production of documents is not a waiver of any of the objections set forth herein or an admission or acknowledgment that such material is relevant to the subject matter of this action or admissible in evidence, nor shall such production be construed as adopting a legal position. Further, the production and these responses are without prejudice to and not a waiver of (i) Physician Partners' right to contend at trial or any other proceeding in this action

4

that such material is inadmissible, irrelevant, immaterial, or not a proper basis for discovery; and (ii) any objection by Physician Partners to future use of such documents that Zafirov may attempt to make. In addition, these responses and productions of business records are made solely for the purposes of this action.

5.      Physician Partners objects to the Interrogatories to the extent that they seek information that is confidential, proprietary, commercially sensitive or that constitutes private, personal or financial information of Physician Partners' employees, partners, clients, or patients; protected health information ("PHI") under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"); information protected under Federal Rule of Civil Procedure 26(c), the attorney-client privilege, the attorney work-product doctrine, settlement privilege, common interest doctrine, or any other rule of privilege, confidentiality, or immunity provided by law or other applicable law; and information that has been provided to Physician Partners on a confidential basis or that is subject to the terms of any confidentiality order or agreement.  The inadvertent production of any document subject to the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity shall not constitute a waiver of the privilege or immunity.

6.      In response to Zafirov's incorporation of definitions from her First Request for Production served on December 15, 2022, Physician Partners objects to such definitions and hereby incorporates its objections and definitions

5

from its February 17, 2023 objections and responses to Zafirov's First Request for Production.

7.     Physician Partners objects to the definition of "Physician Partners physician" to the extent it purports to include physicians who were not employed by Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare") or any other Defendant or related entity but were only affiliates. Employed physicians, such as Dr. Zafirov, are W-2 employees who work exclusively for VIPcare. As employees, those physicians receive most, if not all, of their income and benefits from VIPcare. Employed physicians have an employment agreement with VIPcare, and their compensation is comprised mostly of a base salary, with the possibility of various additional incentive payments. By contrast, affiliated physicians are independent owners and operators of their respective practices.   In general, affiliated physicians' income derives from several sources, only one of which is Physician Partners. That is because those physicians typically have contractual relationships with other Medicare Advantage plans, as well as other independent physician associations. Physician Partners' contracts with affiliates also vary whereby some affiliates are paid on a fee-for-service basis, while others have chosen a capitation payment model. In other words, there may be stark differences even among Physician Partners' affiliated physicians. Moreover, as independent business owners, affiliated physicians have autonomy over their facilities and patient scheduling. Employed physicians, such as Dr. Zafirov, do not. Rather, VIPcare enjoys unfettered access to the facilities, and employed

4853-8220-1498.4

physicians' patient scheduling is coordinated by VIPcare.  In addition, affiliated physicians hire and manage their own staff; employed physicians do not. Affiliated physicians select their own EMR, but employed physicians must use the eClinicalWorks EMR.  Further, affiliated physicians typically manage their own coding, billing, and referrals. Employed physicians, on the other hand, have their billing processed by VIPcare, with support from Anion Technologies, LLC ("Anion").  Affiliate physicians are documenting and adding or deleting diagnoses and diagnosis codes, creating and managing medical records, and doing coding and billing of claims to health plans in all kinds of different EMR systems than the eClinicalWorks EMR system used by VIPcare physicians, which would greatly increase the burden on the parties in having to deal with multiple different EMR systems on all these issues if affiliate physicians were included in discovery. There are significant differences between employed physicians on the one hand and affiliated physicians on the other. Also, there are significant variations among the affiliated physicians, such as how they are paid by Physician Partners and how those affiliated physicians manage their practices. These differences make discovery regarding affiliated physicians not relevant to Dr. Zafirov's claims. For these reasons, along with the other objections noted in Physician Partners' written objections to Dr. Zafirov's discovery requests in this matter, Physician Partners will not provide discovery regarding affiliated physicians. Physician Partners answers the Interrogatories only with regard to VIPcare employed

physicians, and only in relation to Medicare Advantage beneficiaries of Freedom and Optimum, not other patients or plans.

## **INTERROGATORIES**

### **INTERROGATORY NO. 1:**

Describe the relationship between You, Florida Medical Associates, Inc. d/b/a VIPcare, Anion Technologies, SunLabs USA,Inc. and any other entity with respect to the employment of Dr. Clarissa Zafirov. This interrogatory specifically seeks, but is not limited to, the role of each entity in the decision to hire Dr. Zafirov and the role of each entity in determining her compensation (including bonus payments).

### **RESPONSE TO INTERROGATORY NO. 1:**

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, compound and multiplicative in asking at least three Interrogatories for describing the relationship between four or more entities with respect to the employment of Zafirov, the role of each of four or more entities in the decision to hire Zafirov, and the role of each of one or more entities in determining Zafirov's compensation including bonus payments.  This Interrogatory also seeks information neither relevant nor proportional to the needs of this litigation. Describing the relationship between four or more entities with respect to the employment of Zafirov, the role of each of four or more entities in the decision to hire Zafirov, and the role of each of one or more entities in determining Zafirov's

8

compensation including bonus payments is not material to any claim or defense in this case and is not proportional to the needs of this litigation because which entity may or may not have made hiring or employment-related decisions about Zafirov are not material to proving or negating any element of the False Claims Act causes of action in the Amended Complaint. Subject to and without waiving any objections, Physician Partners states that VIPcare made the decision to hire Zafirov. SunLabs USA, Inc. handled payroll, issuing W-2s, and other ministerial acts relating to payment of compensation to Zafirov. Physician Partners provided reports and calculations of certain elements of Zafirov's compensation such as calculation of her HEDIS bonus, if any, to VIPcare, and VIPcare would implement compensation to Zafirov, according to the terms of Zafirov's contract. Physician Partners is not aware of Anion participating in the decision to hire Zafirov or deciding Zafirov's compensation.

**INTERROGATORY NO. 2:**

Describe how compensation is determined for all Physician Partners physicians, including base pay, bonuses, and any other forms of remuneration available to a physician in relation to their employment as a healthcare provider.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome in asking how compensation was determined for "all" Physician Partners physicians, presumably meaning individual compensation

9

determinations for every Physician Partners physician over a four-year period, which is not proportional to the needs of this litigation. In addition, Zafirov was an employed VIPcare physician, not an affiliate physician, and the allegations in her Amended Complaint relate to her experience as an employed VIPcare physician. Physician Partners will not answer this Interrogatory with regard to non-employed affiliate physicians for the reasons set forth in the General Objections above, only with regard to VIPcare employed physicians providing care to Freedom/Optimum Medicare Advantage members. Subject to and without waiving any objections, pursuant to Federal Rule of Civil Procedure 33(d) and on the grounds that the answer to this Interrogatory may be determined by examining documents and the burden of deriving or ascertaining the answer will be substantially the same for either party, Physician Partners is producing representative Physician Employment Agreements with VIPcare setting forth the elements of potential compensation VIPcare physicians could earn, including annual base salary, various incentive compensation such as performance bonuses, quality bonuses, HEDIS bonuses, and bonuses for attending trainings/meetings, a one-time commencement bonus for some VIPcare physicians, professional liability coverage, professional expense allowance, fringe benefits, and reimbursement for relocation/moving expenses for some VIPcare physicians.

**INTERROGATORY NO. 3:**

Identify all persons responsible for creating, drafting, editing, revising, and approving all language included in the Physician Partners "Quality Training

Manual," including what specific sections of the document the individual created, drafted, edited, revised, or approved and the year(s) in which the individual held that role.

### RESPONSE TO INTERROGATORY NO. 3:

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, compound and multiplicative in asking at least three Interrogatories for identifying "all" persons responsible for creating, drafting, editing, revising, and approving "all" language included in the Physician Partners Quality Training Manual, identifying what specific sections each individual either created, drafted, edited, revised, or approved, and asking what "years(s)" each individual held "that role," presumably referring to the "role" of creating, drafting, editing, revising, and approving "all" language included in the Physician Partners Quality Training Manual. This Interrogatory also seeks information neither relevant nor proportional to the needs of this litigation. Zafirov sued Physician Partners as an entity, not any individuals, and which individuals may have participated in creating, drafting, editing, revising, and approving "all" language included in the Physician Partners Quality Training Manual – whether the language has anything to do with Zafirov's claims or not – is not material to proving or negating any element of the False Claims Act causes of action in the Amended Complaint. It is also unduly burdensome to ask Physician Partners to try to determine or recall what individuals created, drafted, edited, revised, or approved each sentence in a

11

document that was drafted years ago. Subject to and without waiving any objections, Physician Partners states that it is not aware of any existing record of which individuals created, drafted, edited, revised, or approved which sentences in the Quality Training Manual. Generally speaking, the creation of the Quality Training Manual was a team effort, and the individuals who participated in creating, drafting, editing, revising, or approving the Quality Training Manual most likely included the following, including their respective departments at the time: Rajiv Patel and Arvind Chikile in Quality, Sriram Sundaramoorthy in Quality, and Kunal Patel in Health Services.

**INTERROGATORY NO. 4:**

Identify all persons responsible for creating, drafting, editing, revising, and approving all non-patient specific language included on the 5 Star Checklist, to include but not limited to the disclaimer that "This 5 Star checklist is not intended to be part of the patient's medical record" and the attestation immediately preceding the physician signature.

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information neither relevant nor proportional to the needs of this litigation. Zafirov sued Physician Partners as an entity, not any individuals, and which individuals may have participated in creating, drafting, editing, revising, and approving "all" non-patient specific language included on

12

the 5 Star checklist is not material to proving or negating any element of the False Claims Act causes of action in the Amended Complaint.  It is also unduly burdensome to ask Physician Partners to try to determine or recall which individuals created, drafted, edited, revised, or approved each sentence in a document that was drafted years ago. Physician Partners also objects to the vague reference to "non-patient specific language," which could mean sections that do not relate to patients at all or that do not relate to specific individual patients, among other possible meanings. Subject to and without waiving any objections, Physician Partners states that it is not aware of any existing record of which individuals created, drafted, edited, revised, or approved which sentences in the "non-patient specific language" in the 5 Star checklist form. Generally speaking, the creation of the 5 Star checklist form was a team effort, and the individuals who participated in creating, drafting, editing, revising, or approving the "non-patient specific language" in the 5 Star checklist form most likely included the following, including their respective departments at the time: Rajiv Patel and Arvind Chikile in Quality, Sriram Sundaramoorthy in Quality, Kunal Patel in Health Services, and CEO Sidd Pagidipati; Rupesh Shah may also have suggested revisions to the "non-patient specific language" in the 5 Star checklist form at some point.

**INTERROGATORY NO. 5:**

Describe each step in the lifecycle of a 5 Star checklist, from the time the checklist is generated through the disposition of the checklist, including the

13

corporate entity which and any individual(s) who are responsible for each step of the process. This interrogatory specifically seeks, but is not limited to, how the determination is made that a 5 Star checklist should be generated, the means of distribution to a provider, the receipt of a completed checklist from a provider, and the storage or destruction of the completed checklist.

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information neither relevant nor proportional to the needs of this litigation. The mechanics of such things as how 5 Star checklist forms are sent to or from providers, how they are stored, or which entities or individuals if any carry out such tasks are not material to proving or negating any element of the False Claims Act causes of action in the Amended Complaint. This Interrogatory also assumes, without providing any factual basis, that an individual makes a "determination" to generate a 5 Star checklist. This interrogatory is also vague in that it does not specify whether it is asking about a non-patient-specific 5 Star checklist form or a patient-specific 5 Star checklist; due to the reference to transmission to/from providers, Physician Partners will assume this Interrogatory is asking about an example of a patient-specific 5 Star checklist's lifecycle. In addition, Physician Partners will not answer this Interrogatory with regard to non-employed affiliate physicians for the reasons set forth in the General Objections above, only with regard to VIPcare employed

14

physicians providing care to Freedom/Optimum Medicare Advantage members. Subject to and without waiving any objections, Physician Partners states that it is not aware of any existing record of all the persons who carried out each individual task in the "lifecycle" of a 5 Star checklist years ago, between 2017 and 2020. Generally speaking, the trigger for the creation of a patient-specific 5 Star checklist was not related to an upcoming appointment for a patient, but rather the receipt of patient-specific data from Freedom/Optimum, including HCC data, claims data, pharmacy data, and lab data, among other data elements. Physician Partners' medical economics personnel, including Srinivas Vempati and Rushabh Rambhia, would receive the data from Freedom/Optimum, which was then loaded into and processed by the Q360 database with the assistance of Anion information systems personnel, including most likely Ramakrishna Dommaraju and team.

Q360 would process this data in accord with algorithms and other processing created with the assistance of personnel most likely including the following, including their respective departments at the time: Rajiv Patel and Arvind Chikile in Quality, Sriram Sundaramoorthy in Quality, and Kunal Patel in Health Services, including utilizing guidance and data from CMS, into a 5 Star checklist form, including past medical conditions, suspect/clinically inferred potential medical conditions, and conditions already reported in the current year, among other data. Although most data on the 5 Star checklist form was generated by algorithms/software in Q360, Anion chart reviewers could also

manually identify and add potential medical conditions in Q360 based on provider documentation, in which event those could be included on the 5 Star checklist as potential medical conditions. If and when an appointment was scheduled for which a 5 Star checklist may be used, Anion personnel, most likely including Ratnakar Mekala, would download the 5 Star checklist from Q360 and send the existing 5 Star checklist to the provider's office shortly before the appointment, typically by email.

The provider could use the 5 Star checklist when seeing the patient and could fill out the checklist. If the provider filled out and submitted the checklist, the provider typically faxed or emailed (or in more recent times, uploaded via portal) the completed 5 star checklist to Anion, which would then cause Anion's concurrent reviewers to get and review the provider's progress notes from the visit.   Anion's concurrent reviewers input into Q360 all conditions that the provider documented in the progress notes. If the provider said yes to a condition on the 5 star checklist but did not document addressing the condition in the progress note or if the provider said no to a condition on the 5 star checklist but the medical records document the existence and treatment of the condition, the concurrent reviewer generates a "rework" and the quality analysts alert the provider of these "reworks" in the event the provider chose to address and document that condition at the patient's next visit. The provider could also amend the progress note for that visit for omissions or other revisions, such as a patient treated for morbidly obese BMI for whom the provider inadvertently did not code

16

morbid obesity.  If the provider says no to the condition on the 5 Star checklist and the medical records do not document the existence and treatment of the condition, the condition would be marked as resolved without code in Q360. The completed 5 star checklist would be stored in Q360 under the member's profile; it would not be loaded into eClinicalWorks EMR, as the 5 Star Checklist was not part of the medical record.

**INTERROGATORY NO. 6:**

Identify and describe all communications You have had with any representative or employee of the United States regarding the 5 Star checklist.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad and seeks information neither relevant nor proportional to the needs of this litigation, as it asks about "all" communications with "any" representative or employee of the United States regarding the 5 Star checklist, whether they have anything to do with proving or negating any element of the False Claims Act causes of action in the Amended Complaint or not.  Physician Partners also objects to the vague term "representative" of the United States and will answer assuming this Interrogatory is asking about communications with federal government employees. Subject to and without waiving any objections, Physician Partners states that it is not aware of any such communications regarding the 5 Star checklist, other than potentially its litigation counsel's communications regarding

17

this litigation as set forth in the response to Interrogatory 7 below (and/or the Mansour or Fernandez litigation), to the extent that such communications may tangentially relate to the 5 Star Checklist as part of the litigation.

## INTERROGATORY NO. 7:

Identify and describe all communications You have had with any representative or employee of the United States regarding this lawsuit.

## RESPONSE TO INTERROGATORY NO. 7:

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad and seeks information neither relevant nor proportional to the needs of this litigation, as it asks about "all" communications with "any" representative or employee of the United States regarding this lawsuit even if not about the substantive defenses or claims in this case, much less material to proving or negating any element of the False Claims Act causes of action in the Amended Complaint.  Physician Partners also objects to the vague term "representative" of the United States and will answer assuming this Interrogatory is asking about communications with federal government employees. Subject to and without waiving any objections, Physician Partners states that its litigation counsel in this case, Jason Mehta, had several communications with Department of Justice counsel (at least Sean Keefe) in 2020 after the complaint was unsealed regarding whether Department of Justice counsel would be willing to discuss why the United States declined to

intervene or other information about the case, which Department of Justice counsel declined to do.

**INTERROGATORY NO. 8:**

Identify and describe all "training sessions" hosted or put on by You which provided advice, directions, instructions, guidance, or other information related to the use of 5 Star Checklists. This interrogatory specifically seeks, but is not limited to, the content of the training session, the date, the location, the presenter(s), the attendees, and a description of any documents provided in such sessions.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome in seeking multiple details about "all" training sessions, names of all attendees at every session, and "any" document provided, which is not proportional to the needs of this litigation. In addition, Physician Partners will not answer this Interrogatory with regard to non-employed affiliate physicians for the reasons set forth in the General Objections above, only with regard to VIPcare employed physicians providing care to Freedom/Optimum Medicare Advantage members.  Subject to and without waiving any objections, Physician Partners states that pursuant to Federal Rule of Civil Procedure 33(d) and on the grounds that the answer to this Interrogatory may be determined by examining documents and the burden of deriving or ascertaining the answer will be substantially the

19

same for either party, Physician Partners has produced materials for trainings which may have involved advice, directions, instructions, or guidance on the use of 5 Star Checklists, including Bootcamp/5 Star University videos, Quality Performance Forum slide decks and videos, and the Quality Training Manual, and such training may also have been provided in initial onboarding training with VIPcare Medical Director Dr. Sangeeta Hans and team and potentially quality or provider education huddles or other discussions with VIPcare physicians.

**INTERROGATORY NO. 9:**

Identify and describe all "training sessions" hosted or put on by You which provided advice, directions, instructions, guidance, or other information related to the role of diagnosis codes in the Medicare Advantage program, specific diagnosis codes to consider for a medical condition, or any other form of coding guidance. This interrogatory specifically seeks, but is not limited to, the content of the training session, the date, the location, the presenter(s), the attendees, and a description of any documents provided in such sessions.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome in seeking multiple details about "all" training sessions about "any" form of coding guidance, names of all attendees at every session, and "any" documents provided, which is not proportional to the needs of this litigation.  In addition, Physician Partners will not answer this Interrogatory with regard to non-

employed affiliate physicians for the reasons set forth in the General Objections above, only with regard to VIPcare employed physicians providing care to Freedom/Optimum Medicare Advantage members.   Subject to and without waiving any objections, Physician Partners states that pursuant to Federal Rule of Civil Procedure 33(d) and on the grounds that the answer to this Interrogatory may be determined by examining documents and the burden of deriving or ascertaining the answer will be substantially the same for either party, Physician Partners has produced materials for trainings which may have involved advice, directions, instructions, or guidance on the use of diagnosis codes for medical conditions in Medicare Advantage, including Bootcamp/5 Star University videos, Quality Performance Forum slide decks and videos, and the Quality Training Manual, and such training may also have been provided in initial onboarding training with VIPcare Medical Director Dr. Sangeeta Hans and team and potentially quality or provider education huddles or other discussions with VIPcare physicians.

**INTERROGATORY NO. 10:**

Describe all processes by which You receive compensation from the United States, either directly or through an intermediary using funds provided by the United States (such as a managed care organization).

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad, unduly

21

burdensome, and seeks information not proportional to the needs of this litigation. The mechanics of "all" processes by which the United States pays Medicare Advantage compensation is publicly available in CMS regulations and documents that Plaintiff can look up as easily as Physician Partners can, and providing a detailed description of "all" such processes is overly burdensome and not proportionate or material to proving or negating any element of the False Claims Act causes of action in the Amended Complaint. In addition, Physician Partners will not answer this Interrogatory with regard to non-employed affiliate physicians for the reasons set forth in the General Objections above, only with regard to VIPcare employed physicians providing care to Freedom/Optimum Medicare Advantage members. Subject to and without waiving any objections, Physician Partners states that it does not receive any such compensation directly from the United States. Physician Partners receives compensation from managed care organizations such as Freedom/Optimum, which may include federally-funded premiums that were paid to Freedom/Optimum. Freedom/Optimum paid Physician Partners a service fund settlement amount periodically for past months pursuant to IPA (independent physician association) premiums that are a percentage of premiums Freedom received, net of medical and related expenses and certain other expenses such as stop/loss premiums Physician Partners pays to a reinsurer and accounting for such items as IBNR (incurred but not reported claims).

**INTERROGATORY NO. 11:**

22

Describe each step in the process by which diagnosis codes related to Medicare Advantage beneficiaries are transmitted from a Physician Partners physician to the United States, including the corporate entity which is responsible for each step of the process and any intermediary entity involved in the process.

## RESPONSE TO INTERROGATORY NO. 11:

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information not proportional to the needs of this litigation. The mechanics of "each" step in the process by which by which diagnosis codes documented by physicians in treating Medicare Advantage beneficiaries are transmitted to the United States is publicly available in CMS regulations and documents that Plaintiff can look up as easily as Physician Partners can, and providing a detailed description of "each" step of such process is overly burdensome and not proportionate or material to proving or negating any element of the False Claims Act causes of action in the Amended Complaint. In addition, Physician Partners will not answer this Interrogatory with regard to non-employed affiliate physicians for the reasons set forth in the General Objections above, only with regard to diagnosis codes documented by VIPcare employed physicians providing care to Freedom/Optimum Medicare Advantage members. Subject to and without waiving any objections, Physician Partners states that the typical process by which diagnosis codes documented by VIPcare physicians in their progress notes go from VIPcare physicians to a clearinghouse

23

and then to Freedom/Optimum, after which they may or may not ultimately go to the United States by Freedom/Optimum, which is a process that Plaintiff can ask Freedom/Optimum about, is as follows: VIPcare physicians document diagnosis codes in assessment/treatment sections or other acceptable areas of their progress notes from patient visits in eClinicalWorks EMR. The Anion billing team then clicks in the system to create a claim, which is done in an automated process unless there are more than 12 diagnosis codes noted, in which case Anion must manually create multiple claims since the electronic (837p) claim process can only handle up to 12 diagnosis codes in a single claim.  In creating claims, the eClinicalWorks system pulls ICD diagnosis codes noted by VIPcare physicians in progress notes into the claims.  If there are expired or unspecified codes or other issues preventing a diagnosis documented by a physician in a progress note from being linked to a diagnosis code in a claim, the diagnoses documented in the claim by VIPcare physicians may be mapped by Anion codes or billers to the new/unexpired diagnosis codes as applicable. To submit claims, Anion clicks in the system to generate a batch of claims to be submitted to a clearinghouse, which clearinghouse then formats the claims and separates them to submit to the applicable plan for each claim, such as Freedom or Optimum.

**INTERROGATORY NO. 12:**

State Your understanding of the role of diagnosis codes in the Medicare Advantage program, including how risk-adjusting diagnosis codes impact the amount of money that You receive on monthly and/or annual basis.

24

**RESPONSE TO INTERROGATORY NO. 12:**

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information not proportional to the needs of this litigation. The role of diagnosis codes in the Medicare Advantage program, including how they may impact amounts paid, is publicly available in CMS regulations and documents that Plaintiff can look up as easily as Physician Partners can, and asking Physician Partners to providing a description of such role is overly burdensome and not proportionate or material to proving or negating any element of the False Claims Act causes of action in the Amended Complaint. To the extent this Interrogatory is asking for how particular risk-adjusting diagnosis codes impacted particular amounts Physician Partners received, that is unduly burdensome and not proportionate to the needs of the case. Physician Partners further objects that this Interrogatory is more appropriately directed to Freedom/Optimum, as those are the entities that have contracts with the federal government and submit health plan bids, diagnosis codes, and other information to the federal government that may or may not affect the premiums that Freedom/Optimum is paid by the government. In addition, Physician Partners will not answer this Interrogatory with regard to non-employed affiliate physicians for the reasons set forth in the General Objections above, only with regard to VIPcare employed physicians providing care to Freedom/Optimum Medicare Advantage members.

25

Subject to and without waiving any objections, Physician Partners generally understands that CMS publishes guidance on whether and which diagnosis codes may be risk-adjustable if documented and submitted by approved types of providers and from certain acceptable data sources, in certain types of services such as face to face office visits, in certain places of service such as physician offices, and other parameters promulgated by CMS. Although Plaintiff should instead ask Freedom and Optimum rather than Physician Partners what Freedom's and Optimum's processes are, generally speaking, plans must format the codes along with at least four other data points (claim number, service from date, service through date, and provider type) into diagnosis clusters for submission to the Risk Adjustment Processing System (RAPS) (or the Encounter Data Processing System (EDPS)). Plans then submit the five data elements in the RAPS format to the Front End Risk Adjustment System (FERAS) for initial edit checks. FERAS and RAPS are the first layer of MA insurers' array of tools to verify their risk adjustment data. After plans submit diagnosis clusters, FERAS and RAPS generate various reports identifying errors and showing the disposition of entered data so plans can verify their data. Plans review these reports to identify and correct errors, including duplicate diagnosis clusters. After editing and presumably other processes, finalized diagnosis clusters are stored in CMS's RAPS database and used for the calculation of risk scores. CMS also generates reports, including Monthly Membership Reports and Model Output Reports, for plans to verify their data.

26

Physician Partners generally understands that under the CMS-HCC calendar and the CMS-HCC model active to the applicable payment year, CMS calculates total risk scores based on a variety of factors, including those noted above, demographic information such as sex, age, and disability, and HCC risk score factors (e.g., HCCs that patients qualify for and any applicable interactions between diseases/conditions, minus any applicable exclusions of similar diseases/conditions), taking into account local benchmarks as well as information from the applicable health plan bids, that among other factors ultimately results in capitation rates and premium amounts paid to plans. Those premium amounts may or may not be affected by a particular diagnosis code documented by a VIPcare physician, depending on numerous factors such as whether the diagnosis code was submitted to the government, whether it was risk-adjustable, whether it was excluded, whether it was deleted, whether the same code had already been submitted for the applicable year by another approved type of provider in approved types of services in approved places of service among other parameters promulgated by CMS, and many other factors including multiple layers of review and processing such as through the RAPS, FERAS, and/or EDPS systems.

**INTERROGATORY NO. 13:**

Identify and describe all complaints made to You by any provider, patient, patient representative or other individual related to services rendered (or failed to be rendered) by a Physician Partners physician, including but not limited to

27

complaints related to diagnosis codes submitted to the United States (directly or through a Medicare Advantage organization) for any Medicare Advantage beneficiary. This interrogatory specifically seeks, but is not limited to, the content of the complaint, the date, the method by which the complaint was conveyed (phone call, electronic mail, internet submission, etc.), the person(s) to whom the complaint was made, the efforts You undertook to investigate the complaint (if any), and the steps taken to resolve or close out the complaint (if any).

## RESPONSE TO INTERROGATORY NO. 13:

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and seeks information neither relevant nor proportional to the needs of this litigation because it asks for *all* "complaints" of *any* kind by *any* individual related to *any* services rendered (or failed to be rendered) by *any* Physician Partners physicians over a multi-year period, without sufficient limitation or connection to the claims or defenses at issue in this litigation. Physician Partners interprets "complaint" as meaning a legal action filed in court, as the Interrogatories define terms as set forth in Zafirov's First Request for Production, which defines this term as "the Amended Complaint filed in this matter on November 12, 2021." Physician Partners will only answer this Interrogatory regarding complaints of alleged false diagnoses allegedly submitted to the United States through Freedom/Optimum, not any complaint of any kind, and will not answer this Interrogatory with regard to non-employed affiliate

28

physicians for the reasons set forth in the General Objections above, only with regard to complaints by VIPcare employed physicians providing care to Freedom/Optimum Medicare Advantage members. Subject to and without waiving any objections, Physician Partners states that it is not aware of any such complaints other than by the Plaintiff in this case, Clarissa Zafirov, and the plaintiffs in the Mansour and Fernandez litigation. The contents of Zafirov's complaint, the date she filed it, the method by which her complaint was filed, and the person(s) to whom her alleged complaints were made are all set forth in the court file in this case, and Physician Partners' efforts undertaken to investigate and respond to Zafirov's complaint are currently in process.

### INTERROGATORY NO. 14:

Describe the circumstances in which you allege that the United States gained "prior knowledge of the facts underlying the allegedly false claims" as asserted in Your Eighth Affirmative Defense.

### RESPONSE TO INTERROGATORY NO. 14:

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory as a premature contention interrogatory inconsistent with Section IV.C.2. of the Handbook on Civil Discovery Practice as not qualifying under either subsection (1) or (2) of Section IV.C.2. and because "Interrogatories that purport to require a detailed narrative of the opposing parties' case are generally improper because they are overbroad and oppressive." Physician Partners objects that this Interrogatory is overbroad, unduly burdensome, and

29

seeking information not proportional to the needs of this litigation in asking for a description of all circumstances by which the United States knew any fact underlying any allegedly false claim. Subject to and without waiving any objections, Physician Partners states that CMS knows about diagnosis coding errors (if any) yet continues to pay. CMS, through review of annual Independent Review Organization reports, audited Freedom and Optimum as part of the *Sewell* settlement and Corporate Integrity Agreement, including their diagnosis codes. CMS continued to pay the capitated payments every year, despite the allegations in *Sewell* and here. The government has investigated Zafirov's allegations and declined to take action, either in this *qui tam* or under the *Sewell* CIA. In addition, these allegations appeared in a prior civil hearing in which the government was a party. The *Sewell* case involved indistinguishable allegations that Freedom, Optimum, Pagidipati, and others "knowingly submit[ed] incorrect and unsubstantiated risk adjustment data to CMS in order to fraudulently increase their capitation payments." *Compare U.S. ex rel. Sewell v. Freedom Health, Inc., et al.*, No. 8:09-cv-1625-T-35TGW (M.D. Fla.), Doc. 44, Second Am. Compl. ¶ 9 *with* Am. Compl. ¶ 17 ("[T]he Defendants knowingly submitted unsupported diagnosis codes which cost the United States millions of dollars in artificially inflated capitation payments."). *Sewell* resulted in a Corporate Integrity Agreement that is publicly available on the HHS OIG's website and is linked in a DOJ press release about the case. These allegations were also publicly disclosed in the news media. When *Sewell* settled, it generated significant press

30

coverage. *The New Yorker* featured a multi-page unpacking of the *Sewell* allegations. *See* Sheelah Kolhatkar, *The Personal Toll of Whistle-Blowing,* The New Yorker, Jan. 28, 2019. *The New Yorker* stated that "Freedom pressured doctors to . . . assign additional codes that the internal data miners thought would be more profitable." *Compare id. with* Am. Compl. ¶ 91 ("Physician Partners and VIPcare engaged in high-pressure directives to ensure their physicians selected only risk-adjusting HCCs."); *id.* ¶ 4 ("Its subsidiary Anion is the billing arm of Physician Partners, employing chart reviewers . . . to access patient records, evaluate diagnosis codes, and modify the codes to enhance risk scores."). Other national news media covered the allegations. *See, e.g.,* Fred Schulte, *Medicare Advantage Insurer Settles Whistleblower Suit for $32 Million*, NPR (May 31, 2017)

https://www.npr.org/sections/healthshots/2017/05/31/530868367/medicare-advantage-insurers-settle-whistleblower-suit-for-32-million.   Zafirov's allegations are cut from the same cloth as the publicly disclosed information. The Provider Defendants are downstream of Freedom and Optimum in the Medicare Advantage network and alleged to be under the control of Pagidipati, all of whom were named in the *Sewell* disclosures. Zafirov herself admits that these downstream defendants were a necessary part of the alleged fraud. *See* Am. Compl. ¶ 6 ("The entities are more than business affiliates; they are inextricably linked by Sidd Pagidipati, the CEO of Physician Partners who took the helm of the provider organization after the policies he implemented as the COO of

31

Freedom and Optimum led those companies to a $32 million False Claims Act settlement."); *id.* ¶ 88 ("[I]t is critical to the success of this fraudulent scheme that all of the defendants operated in tandem, a relationship made possible largely by the knowledge and former control of Freedom and Optimum held by Siddhartha Pagidipati, the owner and CEO of Physician Partners."). The government knows the source of each diagnosis code that is submitted by Freedom and Optimum. If it were concerned about the correctness of any coding, it has all the tools to investigate, including the *Sewell* CIA audits and CMS's ordinary regulatory processes, such as the Risk Adjustment Data Validation audits, which all Medicare Advantage insurers are subject to. As the government's audits from prior years begin to become public, it is apparent that not only are Freedom's and Optimum's alleged rate of erroneous codes below CMS's own error rate or any other error rate, they do not support any overpayment error amount at all. For example, in January 2023, Kaiser Health News released details of 90 government audits of potential Medicare Advantage overpayments to plans, including an audit of America's 1st Choice Holdings of Florida, LLC, which owned Freedom and Optimum. That audit revealed that Freedom's and Optimum's payment error rate per patient was *negative* $112 (-$112), i.e., that they had received zero overpayments from the government for erroneous codes, in fact they were underpaid by the government. *See* https://kffhealthnews.org/news/article/medicare-advantage-audits-investigation-cms-overpayment-recoup-billions/ (accompanying spreadsheet line 58).

32

Regardless of whether further government audits of Freedom and Optimum that become public reveal a positive or negative error rate or what that error rate is (if any), the government gained prior knowledge of the facts underlying the allegedly false claims, and it is well aware of the accuracy of codes submitted by Freedom and Optimum and continues to pay them.

**INTERROGATORY NO. 15:**

Describe the circumstances in which you allege that the United States "ratified or otherwise consented to the transactions, occurrences, conduct and submissions that are the subject of this action including by continuing to pay Medicare Advantage plans at previously determined rate as long as the plans' and their providers' coding errors did not exceed CMS's own error rate or some other error rate, despite CMS's knowledge that some diagnosis codes are, as a general matter, mistaken or otherwise unsupported" as asserted in your Eighteenth Affirmative Defense.

**RESPONSE TO INTERROGATORY NO. 15:**

In addition to the General Objections stated above, Physician Partners objects to this Interrogatory as a premature contention interrogatory inconsistent with Section IV.C.2. of the Handbook on Civil Discovery Practice as not qualifying under either subsection (1) or (2) of Section IV.C.2. and because "Interrogatories that purport to require a detailed narrative of the opposing parties' case are generally improper because they are overbroad and oppressive." Physician Partners objects that this Interrogatory is overbroad, unduly burdensome, and

33

seeking information not proportional to the needs of this litigation in asking for a description of all circumstances by which the United States ratified or otherwise consented to any of the transactions, occurrences, conduct and submissions that are the subject of this action. Subject to and without waiving any objections, Physician Partners states that CMS ratified or consented to transactions, occurrences, conduct and submissions that are the subject of this action because it knows about diagnosis coding errors (if any) yet continues to pay. CMS, through review of annual Independent Review Organization reports, audited Freedom and Optimum as part of the *Sewell* settlement and Corporate Integrity Agreement, including their diagnosis codes. CMS continued to pay the capitated payments every year, despite the allegations in *Sewell* and here. The government has investigated Zafirov's allegations and declined to take action, either in this *qui tam* or under the *Sewell* CIA. In addition, these allegations appeared in a prior civil hearing in which the government was a party. The *Sewell* case involved indistinguishable allegations that Freedom, Optimum, Pagidipati, and others "knowingly submit[ed] incorrect and unsubstantiated risk adjustment data to CMS in order to fraudulently increase their capitation payments." *Compare U.S. ex rel. Sewell v. Freedom Health, Inc., et al.*, No. 8:09-cv-1625-T-35TGW (M.D. Fla.), Doc. 44, Second Am. Compl. ¶ 9 *with* Am. Compl. ¶ 17 ("[T]he Defendants knowingly submitted unsupported diagnosis codes which cost the United States millions of dollars in artificially inflated capitation payments."). *Sewell* resulted in a Corporate Integrity Agreement that is publicly available on

34

the HHS OIG's website and is linked in a DOJ press release about the case. These allegations were also publicly disclosed in the news media. When *Sewell* settled, it generated significant press coverage. *The New Yorker* featured a multi-page unpacking of the *Sewell* allegations. *See* Sheelah Kolhatkar, *The Personal Toll of Whistle-Blowing,* The New Yorker, Jan. 28, 2019. *The New Yorker* stated that "Freedom pressured doctors to . . . assign additional codes that the internal data miners thought would be more profitable." *Compare id. with* Am. Compl. ¶ 91 ("Physician Partners and VIPcare engaged in high-pressure directives to ensure their physicians selected only risk-adjusting HCCs."); *id.* ¶ 4 ("Its subsidiary Anion is the billing arm of Physician Partners, employing chart reviewers . . . to access patient records, evaluate diagnosis codes, and modify the codes to enhance risk scores."). Other national news media covered the allegations. *See, e.g.,* Fred Schulte, *Medicare Advantage Insurer Settles Whistleblower Suit for $32 Million,* NPR (May 31, 2017) https://www.npr.org/sections/healthshots/2017/05/31/530868367/medicare-advantage-insurers-settle-whistleblower-suit-for-32-million. Zafirov's allegations are cut from the same cloth as the publicly disclosed information. The Provider Defendants are downstream of Freedom and Optimum in the Medicare Advantage network and alleged to be under the control of Pagidipati, all of whom were named in the *Sewell* disclosures. Zafirov herself admits that these downstream defendants were a necessary part of the alleged fraud. *See* Am. Compl. ¶ 6 ("The entities are more than business affiliates; they are inextricably

linked by Sidd Pagidipati, the CEO of Physician Partners who took the helm of the provider organization after the policies he implemented as the COO of Freedom and Optimum led those companies to a $32 million False Claims Act settlement."); *id.* ¶ 88 ("[I]t is critical to the success of this fraudulent scheme that all of the defendants operated in tandem, a relationship made possible largely by the knowledge and former control of Freedom and Optimum held by Siddhartha Pagidipati, the owner and CEO of Physician Partners."). The government knows the source of each diagnosis code that is submitted by Freedom and Optimum. If it were concerned about the correctness of any coding, it has all the tools to investigate, including the *Sewell* CIA audits and CMS's ordinary regulatory processes, such as the Risk Adjustment Data Validation audits, which all Medicare Advantage insurers are subject to.  As the government's audits from prior years begin to become public, it is apparent that not only are Freedom's and Optimum's alleged rate of erroneous codes below CMS's own error rate or any other error rate, they do not support any overpayment error amount at all.  For example, in January 2023, Kaiser Health News released details of 90 government audits of potential Medicare Advantage overpayments to plans, including an audit of America's 1st Choice Holdings of Florida, LLC, which owned Freedom and Optimum.  That government audit revealed that Freedom's and Optimum's payment error rate per patient was ***negative*** $112 (-$112), i.e., that they had received zero overpayments from the government for erroneous codes, in    fact    they    were    underpaid    by    the    government.    See

36

https://kffhealthnews.org/news/article/medicare-advantage-audits-investigation-cms-overpayment-recoup-billions/ (accompanying spreadsheet line 58). Regardless of whether further government audits of Freedom and Optimum that become public reveal a positive or negative error rate or what that error rate is (if any), the government is well aware of the accuracy of codes submitted by Freedom and Optimum and continues to pay them, and the government ratified or otherwise consented to the transactions, occurrences, conduct and submissions that are the subject of this action.

As to objections:

/s/ Jason P. Mehta
Jason P. Mehta
Fl. Bar No. 106110
Primary email: jmehta@foley.com
Secondary email: dmills@foley.com

Lauren L. Valiente
Fl. Bar No. 034775
Primary email: lvaliente@foley.com
Secondary email: dguillen@foley.com

Joseph W. Swanson
Fl. Bar No. 29618
Primary email: joe.swanson@foley.com
Secondary email: dmills@foley.com

Michael P. Matthews
Fl. Bar No. 63988
Primary email: mmatthews@foley.com
Secondary email: dguillen@foley.com

**Foley & Lardner LLP**
100 N. Tampa Street, Suite 2700
Tampa, FL 33602
Telephone: (813) 229-2300

37

Facsimile:  (813) 221-4210

*Counsel for Defendant Physician
Partners, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 7, 2024, a copy of the foregoing was served by email to all counsel of record using the email addresses they have registered with the CM/ECF system for the U.S. District Court for the Middle District of Florida (Tampa Division).

By:  */s/ Jason P. Mehta*
Jason P. Mehta

36

## <u>VERIFICATION OF INTERROGATORY ANSWERS</u>

I believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my current knowledge, information, and belief.

Signature  J. Daniel Kollofrath
Representative of Physician Partners, LLC

STATE OF FLORIDA

COUNTY OF Hillsborough

The foregoing instrument was acknowledged before me by means of ☒ physical presence or [ ] online notarization on ____2/7/24____, by

___J. Daniel Kollofrath___ as ___President___ for

Defendant PHYSICIAN PARTNERS, LLC

Alicia Zedella
Comm.#HH060066
Expires: Dec. 22, 2024
Bonded Thru Aaron Notary
(NOTARY SEAL)

Signature of Notary Public-State of Florida

___Alicia Zedella___
Name of Notary Typed, Printed, or
Stamped

Personally Known ___✗___ OR Produced Identification _____

Type of Identification Produced _____

4853-8220-1498.4