UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**UNITED STATES OF AMERICA**
**ex rel. DR. CLARISSA ZAFIROV**,

       Plaintiff,

-vs-                      CASE NO. 8:19-cv-1236-KKM-SPF

**FLORIDA MEDICAL ASSOCIATES,**
**LLC d/b/a VIPCARE, PHYSICIAN**
**PARTNERS, LLC, ANION TECHNOLOGIES,**
**LLC, FREEDOM HEALTH, INC., and**
**OPTIMUM HEALTHCARE, INC.,**

       Defendants.
_____/

## DEFENDANTS' JOINT MOTION FOR JUDGMENT ON THE PLEADINGS OR TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.     Legal Background ....................................................................................... 2

II.    Facts and Procedural History ..................................................................... 3

LEGAL STANDARD ........................................................................................... 4

ARGUMENT ........................................................................................................ 5

I.     The FCA's *Qui Tam* Provisions Violate the Vesting and Take Care
Clauses. ...................................................................................................... 5
    A.     The FCA Impermissibly Vests Executive Power in Relators. ............... 5
    B.     The *Qui Tam* Provisions Deny the President Necessary Removal
Authority and Sufficient Supervisory Control over an FCA
Relator. ................................................................................................ 7

II.    The FCA's *Qui Tam* Provisions Violate the Appointments Clause. ............... 13
    A.     An FCA Relator Exercises Significant Federal Authority. ................... 13
    B.     An FCA Relator Holds a Continuing Position under *Morrison v.
Olson* .................................................................................................. 134

III.   Historical Practice Does Not Cure the *Qui Tam* Provisions' Defects. ............ 18
    A.     The Text and Structure of the Constitution Are Conclusive,
Rendering History Irrelevant. ............................................................. 18
    B.     History Does Not Support the *Qui Tam* Provisions'
Constitutionality. ................................................................................. 19
        1.    *The Modern FCA Is Regulatory in Nature and Seriously
Interferes with the Executive Power.* ................................................. 20
        2.    *The Modern Regulatory FCA Has No Historical Tradition.* .............. 22

IV.   The Relator Lacks Standing Because the *Qui Tam* Provisions Are
Invalid. ..................................................................................................... 25

CONCLUSION ................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Auffmordt v. Hedden*,
   137 U.S. 310 (1890) ..........................................................................................18

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ........................................................................ 1, 5, 13, 14, 16

*Cannon v. City of West Palm Beach*,
   250 F.3d 1299 (11th Cir. 2001) .........................................................................4

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
   139 S. Ct. 1507 (2019) .....................................................................................13

*Collins v. Yellen*,
   141 S. Ct. 1761 (2021) .....................................................................................12

*Dep't of Transp. v. Ass'n of Am. Railroads*,
   575 U.S. 43 (2015)..............................................................................................7

*Edmond v. United States*,
   520 U.S. 651 (1997)..........................................................................................14

*Espinoza v. Montana Dep't of Revenue*,
   140 S. Ct. 2246 (2020) .....................................................................................19

*Ex parte Virginia*,
   100 U.S. 339 (1880)..........................................................................................17

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*,
   535 U.S. 743 (2002)..........................................................................................23

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010)............................................................................... 7, 8, 9, 12

*Freytag v. Comm'r*,
   501 U.S. 868 (1991)..........................................................................................17

*Gamble v. United States*,
   139 S. Ct. 1960 (2019) .....................................................................................19

*Gonzalez v. Thaler*,
  565 U.S. 134 (2012) ............................................................4

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
  559 U.S. 280 (2010) ...........................................................20

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ............................................................6

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
  520 U.S. 939 (1997) .....................................................11, 21

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013) ...........................................10

*In re Grand Jury Investigation*,
  916 F.3d 1047 (D.C. Cir. 2019) .........................................15

*In re Plavix Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*,
  974 F.3d 228 (3d Cir. 2020) ..............................................16

*In re Sealed Case*,
  829 F.2d 50 (D.C. Cir. 1987) .............................................15

*Lebron v. Nat'l R.R. Passenger Corp.*,
  513 U.S. 374 (1995) ..........................................................17

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018) ......................................................13

*Marbury v. Madison*,
  5 U.S. 137 (1803) ..............................................................25

*Marsh v. Chambers*,
  463 U.S. 783 (1983) .....................................................19, 24

*Medellin v. Texas*,
  552 U.S. 491 (2008) ..........................................................19

*Moore v. Harper*,
  600 U.S. 1 (2023) ..............................................................25

*Morrison v. Olson*,
  487 U.S. 654 (1988) ...........................................8, 9, 10, 14, 15, 16

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
   918 F.3d 1312 (11th Cir. 2019) ...........................................................................25

*Myers v. United States*,
   272 U.S. 52 (1926)................................................................................... 8, 11, 24

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ........................................................................... 18, 19, 22

*Newman v. United States*,
   382 F.2d 479 (D.C. Cir. 1967) ...............................................................................6

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977).............................................................................................10

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014).............................................................................................19

*Peters v. Cheval Golf & Athletic Club, LLC*,
   No. 8:20-CV-2080-KKM-AAS, 2022 WL 88197 (M.D. Fla. Jan. 7, 2022) ............4

*Printz v. United States*,
   521 U.S. 898 (1997)...............................................................................................7

*Rainwater v. United States*,
   356 U.S. 590 (1958).............................................................................................20

*Riley v. St. Luke's Episcopal Hosp.*,
   252 F.3d 749 (5th Cir. 2001) ............................................... 9, 10, 12, 17, 23, 24

*Roberts v. Swearingen*,
   358 F. Supp. 3d 1341 (M.D. Fla. 2019)..................................................................5

*Rosell v. VMSB, LLC*,
   67 F.4th 1141 (11th Cir. 2023) ..............................................................................9

*Seila L. LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ............................................................................ 1, 5, 8, 12

*Springer v. Philippine Islands*,
   277 U.S. 189 (1928)........................................................................................ 5, 14

*Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*,
   524 F.3d 1229 (11th Cir. 2008) ...........................................................................25

iv

*The Confiscation Cases*,
  74 U.S. 454 (1868).............................................................................................6

*Torres v. Wendy's Co.*,
  195 F. Supp. 3d 1278 (M.D. Fla. 2016).................................................................4

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)...........................................................................................7

*United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*,
  997 F. Supp. 2d 1272 (M.D. Fla. 2014)...............................................................12

*United States ex rel. Bibby v. Mortg. Invs. Corp.*,
  987 F.3d 1340 (11th Cir. 2021) ........................................................................20

*United States ex rel. Butler v. Magellan Health Servs., Inc.*,
  74 F. Supp. 2d 1201 (M.D. Fla. 1999).................................................................12

*United States ex rel. Eisenstein v. City of New York*,
  556 U.S. 928 (2009).......................................................................................2, 7

*United States ex rel. Kelly v. Boeing Co.*,
  9 F.3d 743 (9th Cir. 1993) ..........................................................................12, 14

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
  985 F.2d 1148 (2d Cir. 1993) ...........................................................................12

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
  599 U.S. 419 (2023)........................................... 1, 2, 6, 9, 13, 18, 23

*United States ex rel. Spicer v. Westbrook*,
  751 F.3d 354 (5th Cir. 2014) ...........................................................................16

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
  41 F.3d 1032 (6th Cir. 1994) .......................................................................12, 14

*United States ex rel. Wallace v. Exactech, Inc.*,
  No. 7:18-cv-1010, 2023 WL 8027309 (N.D. Ala. Nov. 20, 2023)........................12

*United States ex rel Stone v. Rockwell Int'l Corp.*,
  282 F.3d 787 (10th Cir. 2002) ..........................................................................12

*United States v. Arthrex, Inc.*,
  141 S. Ct. 1970 (2021) ....................................................................................14

*United States v. Concord Mgmt. & Consulting LLC*,
  317 F. Supp. 3d 598 (D.D.C. 2018) ....................................................8

*United States v. Donziger*,
  38 F.4th 290 (2d Cir. 2022) ..........................................14, 15, 16, 18

*United States v. Eaton*,
  169 U.S. 331 (1898) ......................................................................15

*United States v. Germaine*,
  99 U.S. 508 (1878) .........................................................................18

*United States v. NEC Corp.*,
  11 F.3d 136 (11th Cir. 1993) ........................................................16

*United States v. Nixon*,
  418 U.S. 683 (1974) .........................................................................6

*United States v. Providence J. Co.*,
  485 U.S. 693 (1988) .......................................................................16

*United States v. San Jacinto Tin Co.*,
  125 U.S. 273 (1888) .........................................................................6

*Universal Health Servs., Inc. v. United States*,
  579 U.S. 176 (2016) .......................................................................21

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
  529 U.S. 765 (2000) .........................................6, 7, 22, 24, 25

*Yates v. Pinellas Hematology & Oncology, P.A.*,
  21 F.4th 1288 (11th Cir. 2021) .....................................................12

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) .......................................................................19

**Federal Statutes**

Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133.............................23

Act of March 1, 1790, ch. 2, §§ 3, 6, 1 Stat. 102, 103 ............................22

25 U.S.C. § 201 ...........................................................................24

31 U.S.C. § 3730..............................................................2, 3, 6, 9, 14, 16

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ................................................................ 1, 5

U.S. Const. art. II, § 3 ........................................................................... 1, 5

U.S. Const. art. II, § 2, cl. 2 .................................................................. 13

**Federal Rules**

Fed. R. Civ. P. 12(b) ........................................................................ 1, 2, 4

Fed. R. Civ. P. 12(c) ........................................................................ 1, 2, 4

Fed. R. Civ. P. 15(a)(2) .......................................................................... 4

**Federal Regulations**

DOJ Civil Div. Dir. No. 1-15, 80 Fed. Reg. 31998 (June 5, 2015) ........................... 11

**Other Authorities**

*Application of the Federal False Claims Act to Regulatory Compliance Issues in the Health Care Industry*,
51 Ala. L. Rev. 105 (1999) ..................................................................... 21

Boese & Baruch, *Civil False Claims & Qui Tam Actions* ................................. 20, 21, 22

Charles Doyle, Cong. Rsch. Serv., R40785, *Qui Tam: The False Claims Act and Related Federal Statutes* (updated Apr. 26, 2021) ...................................................... 20, 24

*Constitutionality of the Qui Tam Provisions of the False Claims Act*,
13 Op. O.L.C. 207 (1989) ....................................................................... 23

S. Rep. No. 110-507 (2008) ...................................................................... 20

*The Constitutional Separation of Powers Between the President and Congress*,
20 Op. O.L.C. 124 (1996) ....................................................................... 24

U.S. Dep't of Justice, *Fraud-Statistics–Overview* (2022) ............................... 22

U.S. Dep't of Just., Just. Manual § 4.4.110 ............................................... 11

Defendants hereby submit this Joint Motion for Judgment on the Pleadings or
to Dismiss for Lack of Subject-Matter Jurisdiction. *See* Fed. R. Civ. P. 12(c), 12(b)(1).

## INTRODUCTION

"[T]he 'executive Power'—all of it—is 'vested in a President,' who must 'take
Care that the Laws be faithfully executed.'" *Seila L. LLC v. CFPB*, 140 S. Ct. 2183,
2191 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). The FCA's *qui tam*
provisions violate that fundamental principle by empowering private citizens to initiate
and conduct litigation on behalf of the United States. The Executive cannot control
whether a relator files suit, determine the scope of the claims, require a relator to follow
Department of Justice policy, or unilaterally remove a relator from the case. Relators
instead exercise unilateral control within their spheres, interpreting the law in the first
instance and policing compliance within every corner of the modern regulatory state.

The FCA also violates the Appointments Clause by permitting relators to wield
power that only an "Officer of the United States" may wield, without satisfying the
Constitution's appointment requirements for such Officers. The Supreme Court has
held that "conducting civil litigation" to "vindicat[e] public rights" is a function that
"may be discharged ***only*** by persons who are 'Officers of the United States.'" *Buckley
v. Valeo*, 424 U.S. 1, 140 (1976) (per curiam) (emphasis added).

Last term, Justice Thomas observed that "there are substantial arguments that
the *qui tam* device is inconsistent with Article II"—an observation with which Justice
Kavanaugh and Justice Barrett agreed. *United States ex rel. Polansky v. Exec. Health Res.,
Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting); *id.* at 442 (Kavanaugh &

Barrett, JJ., concurring).  The arguments are not merely substantial, they are correct. The Court should enter judgment on the pleadings for Defendants under Rule 12(c), or dismiss for lack of jurisdiction under Rule 12(b)(1).

## BACKGROUND

### I.   Legal Background

The FCA "is unusual in authorizing private parties—known as relators—to sue on the Government's behalf" by initiating a *qui tam* action.  *Polansky*, 599 U.S. at 423; *see* 31 U.S.C. § 3730(b)(1).  When a relator files a *qui tam* suit, the Government has 60 days during which the case remains under seal, and during which the Government "may elect to intervene."  *See* 31 U.S.C. § 3730(b)(2).

When (as here) the Government declines to intervene, the relator takes "the lead role" as "the only person then pressing the suit."  *Polansky*, 599 U.S. at 423; 31 U.S.C. § 3730(c)(3).  The relator's suit will have preclusive effect on the Government, *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 936 (2009), even though the Government retains only limited rights to participate,[1] and receives only partial proceeds from any judgment or settlement, 31 U.S.C. § 3730(d)(2).  After initially declining intervention, the Government can later intervene to re-assert primary control over the litigation only by showing "good cause," and without limiting "the status and rights" of the relator.  *Id.* § 3730(c)(3); *Polansky*, 599 U.S. at 433.

---

[1] The Government may, for instance, request to be served with copies of pleadings and deposition transcripts, 31 U.S.C. § 3730(c)(3), or move for a temporary discovery stay if it shows that the relator's efforts "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4).

Even when the Government intervenes and takes "primary responsibility for prosecuting the action," the relator remains a party with the ability to participate. 31 U.S.C. § 3730(c)(1).  The Government cannot dismiss the action without notifying the relator, and the court must provide her "with an opportunity for a hearing on the motion."  *Id.* § 3730(c)(2)(A).  The Government cannot settle the action over the relator's objection without establishing at a hearing that the "proposed settlement is fair, adequate, and reasonable under all the circumstances."  *Id.* § 3730(c)(2)(B).  And the Government cannot limit the relator's "unrestricted participation during the course of the litigation" without establishing that such participation "would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment," *id.* § 3730(c)(2)(C), or "cause the defendant undue burden or unnecessary expense," *id.* § 3730(c)(2)(D).

## II.    Facts and Procedural History

The relator in this *qui tam* action, Clarissa Zafirov, currently based in Canada, brings claims that implicate highly complex aspects of the Medicare Advantage ("MA") program.  She alleges that the Provider Defendants[2] "acted in concert" with the MA Defendants[3] to defraud the Government by knowingly submitting false claims in the form of unsupported risk-adjusting diagnosis codes.  Dkt. 124 at 1, 6 (citing Dkt. 86 ("FAC") ¶¶ 195, 201).  Zafirov's allegations are wide-ranging, and include claims

---

[2] The Provider Defendants include Florida Medical Associates, LLC, d/b/a VIPcare, Physician Partners, LLC, and Anion Technologies, LLC.

[3] The MA Defendants include Freedom Health, Inc., and Optimum Healthcare, Inc.

that the Defendants improperly trained their physicians on billing issues, *e.g.*, FAC ¶ 11, submitted claims for unsupported diagnosis codes, *e.g.*, *id.* ¶¶ 92, 95, and failed to conduct the oversight Medicare Advantage requires, *e.g.*, *id.* ¶¶ 181-82.

Zafirov filed this *qui tam* action in May 2019.  Dkt. 1.  After investigating Zafirov's claims for nine months, the United States declined to intervene in February 2020.  Dkt. 14.  For the past three-and-a-half years, Zafirov has continued to press this litigation on her own.  Dkt. 81, 86.  Since the Court's denial of Defendants' second motions to dismiss, Dkt. 124, Zafirov has prosecuted and controlled the Government's claims, including by moving to compel far-reaching discovery.  Dkt. 129, 130, 143.

## LEGAL STANDARD[4]

Under Rule 12(c), a motion for judgment on the pleadings should be granted when "there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001).  A motion for judgment on the pleadings is timely so long as the motion will not "delay trial." Fed. R. Civ. P. 12(c).  Here, a motion for judgment on the pleadings will not delay trial, which remains 18 months away.

A party may move to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).  Challenges to standing are jurisdictional, *Torres v. Wendy's Co.*,

---

[4] Although Defendants did not raise a constitutional defense in their answers, "[s]ubject-matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).  At any rate, this Court should consider Defendants' constitutional defense because it is adequately raised by pre-trial motion and without unfair surprise. *E.g.*, *Peters v. Cheval Golf & Athletic Club, LLC*, No. 8:20-CV-2080-KKM-AAS, 2022 WL 88197, at *4 (M.D. Fla. Jan. 7, 2022).  If the Court considers an amendment necessary, Defendants hereby request leave to amend their answers to include an affirmative defense that the *qui tam* provisions are unconstitutional. Fed. R. Civ. P. 15(a)(2).

195 F. Supp. 3d 1278, 1281 (M.D. Fla. 2016), and the Court "may consider motions to dismiss for lack of subject[-]matter jurisdiction at any time," *Roberts v. Swearingen*, 358 F. Supp. 3d 1341, 1346 (M.D. Fla. 2019).

## ARGUMENT

I.  **The FCA's *Qui Tam* Provisions Violate the Vesting and Take Care Clauses.**

Article II of the Constitution reflects that "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila L.*, 140 S. Ct. at 2191 (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3.).  The officers whom the President oversees "must remain accountable to the President, whose authority they wield." *Id.* at 2197.  The FCA's *qui tam* provisions violate the Vesting and Take Care Clauses because an FCA relator exercises quintessential executive power by conducting civil litigation on behalf of the United States, and the President can neither remove nor adequately supervise her.

A.  **The FCA Impermissibly Vests Executive Power in Relators.**

The Supreme Court has long made clear that central to the executive power is the authority to "enforce" laws "or appoint the agents charged with the duty of such enforcement." *Springer v. Philippine Islands*, 277 U.S. 189, 202 (1928).  Bringing enforcement actions in court is fundamental to the executive power because "a lawsuit is the ultimate remedy for a breach of the law." *Buckley*, 424 U.S. at 138.

Accordingly, since at least the mid-19th century, "civil suits, in the name and for the benefit of the United States," have been initiated by a United States attorney, "and, in the absence of any directions from the Attorney-General, he controls the

5

prosecution of the same in the district and circuit courts." *The Confiscation Cases*, 74 U.S. 454, 457 (1868). The rule has been "settled" that "courts will not recognize any suit, civil or criminal, as regularly before them, if prosecuted in the name and for the benefit of the United States" absent a United States attorney's involvement. *Id.*; *accord United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279 (1888) (Attorney General in charge of the "litigation … necessary to establish the rights of the [G]overnment").

The executive power to enforce the law includes the discretion not to bring an action at all. *See United States v. Nixon*, 418 U.S. 683, 693 (1974); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Such discretion also encompasses decisions on "what precise charge shall be made" and "whether to dismiss a proceeding once brought." *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967).

The FCA's *qui tam* provisions undoubtedly grant executive power to relators. A relator brings an action "in the name of the Government" to enforce the FCA and, often as here, compliance with other federal statutes and regulations. 31 U.S.C. § 3730(b)(1). And a relator's only "injury" derives from the United States' "injury-in-fact," including "injury to its sovereignty arising from the violation of its laws." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000).[5] The United States is a "real party in interest" and "bound by the judgment in all FCA actions

---

[5] The Supreme Court in *Stevens* rejected that a relator had a *private* interest (injury-in-fact) in addressing fraud on the Government and instead determined that a relator has standing only as a partial assignee of the Government's damages claim. 529 U.S. at 771-74; *accord Polansky*, 599 U.S. at 437 ("A *qui tam* suit … alleges injury to the Government alone."). *Stevens* expressly declined to consider whether the FCA's *qui tam* device violated Article II. 529 U.S. at 778 n.8.

regardless of its participation in the case." *Eisenstein*, 556 U.S. at 934, 936.  The relator decides whether to file suit, which claims to assert, and the scope of such claims—that is, she exercises prosecutorial discretion.  A relator thus conducts civil litigation on behalf of the United States that would otherwise be conducted by the Executive, despite the Constitution's command that such executive power be wielded only by the President, "personally and through officers whom he appoints." *Printz v. United States*, 521 U.S. 898, 922 (1997).  The FCA's *qui tam* provisions empower private individuals to litigate interests that are solely the Government's.  *Cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021) ("A regime where Congress could freely authorize unharmed plaintiffs to sue defendants who violate federal law … would infringe on the Executive Branch's Article II authority.").  This is all the more remarkable given that "the FCA imposes damages that are essentially punitive in nature."  *Stevens*, 529 U.S. at 784.

At bottom, the *qui tam* provisions impermissibly authorize a private citizen to litigate on the United States' behalf, whereas "[t]he Constitution requires that a President chosen by the entire Nation oversee the execution of the laws."  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010); *see also Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 88 (2015) (Thomas, J., concurring in the judgment); *Printz,* 521 U.S. at 923.

### B.  The *Qui Tam* Provisions Deny the President Necessary Removal Authority and Sufficient Supervisory Control over an FCA Relator.

The FCA's *qui tam* provisions violate the Take Care Clause because they deny the President sufficient supervisory control over the relator.  The President must retain

"the ability to supervise and remove the agents who wield executive power in [the President's] stead." *Seila L.*, 140 S. Ct. at 2211. The removal power is essential: "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them," *Free Enter. Fund*, 561 U.S. at 484, and remove "those for whom he can not continue to be responsible," *id.* at 493 (quoting *Myers v. United States*, 272 U.S. 52, 117 (1926)).

The Supreme Court has only once—in *Morrison v. Olson*, 487 U.S. 654 (1988)—upheld limited restrictions on the President's ability to remove and supervise those who conduct litigation on behalf of the United States. The FCA's *qui tam* provisions are unconstitutional under the test articulated in *Morrison*, which upheld restrictions representing "the outermost constitutional limits of permissible congressional restriction on the President's removal power." *Seila L.*, 140 S. Ct. at 2200 (citation and quotation marks omitted).[6]

In *Morrison*, the Ethics in Government Act authorized the Special Division (a court created by the Act) to appoint an independent counsel "to investigate and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws." 487 U.S. at 660. The Act insulated the independent counsel from removal except for good cause and granted the counsel full and independent

---

[6] *Morrison*—the high-water mark of permissible interference—"has been called into doubt by seemingly all quarters." *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 617 & n.8 (D.D.C. 2018) (Friedrich, J.) (collecting authorities). Defendants maintain that Justice Scalia's dissent in *Morrison s*tates the correct test for Take Care Clause and separation-of-powers violations, such that *any* denial of the President's exclusive control over executive power violates the separation of powers. 487 U.S. at 705 (Scalia, J., dissenting). But assuming the continued viability of *Morrison*'s majority opinion, the FCA's *qui tam* provisions fail even under the majority's test, *see infra* at pp. 9-13.

authority to "exercise all investigative and prosecutorial functions and powers of the Department of Justice." *Id.* at 662.

The Court upheld the Act on the ground that the President retained "sufficient control over the independent counsel." *Id.* at 686. "Most importantly," the Attorney General (who is directly accountable to the President) could remove the independent counsel for good cause. *Id.* at 695-96. In addition, the Attorney General decided whether to authorize the appointment, helped define the independent counsel's jurisdiction, and oversaw Department of Justice policy, which the independent counsel was required to follow. *Id.* at 694-96; *see also Free Enter. Fund*, 561 U.S. at 495 (observing that *Morrison* "sustained the statute" because the President had "several means of supervising or controlling the independent counsel" (cleaned up)).

The FCA's *qui tam* provisions far exceed the restrictions on the President's Take Care authority upheld in *Morrison*. "[T]he Executive has no power to remove the relator from the litigation under any circumstances." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 763 & n.19 (5th Cir. 2001) (en banc) (Smith, J., dissenting) (citing, *inter alia*, 31 U.S.C. § 3730(c)(1), (c)(3)). The United States can fully stop a relator from pursuing the suit only by seeking court approval to dismiss the entire action. To do so, the Executive must demonstrate that "the burdens of continued litigation outweigh its benefits." *Polansky*, 599 U.S. at 438. If the motion is granted—after expending prosecutorial resources and subjecting the executive power to judicial oversight—dismissal terminates the "entire action, and not an individual claim." *Rosell v. VMSB,*

9

*LLC*, 67 F.4th 1141, 1144 (11th Cir. 2023).  Forcing the President to decide between allowing a relator to remain in their position or dismissing the action impedes the Executive from "accomplishing its constitutionally assigned functions," *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977).

The *qui tam* provisions also lack the other supervisory controls that rescued the Ethics in Government Act in *Morrison*.[7]  Unlike the Ethics in Government Act, under which the Attorney General (an Officer accountable to and removable by the President) had discretion to authorize an independent counsel (or not) and determine the factual basis for her investigation, *see* 487 U.S. at 661, the FCA delegates those powers to a private citizen.  A relator need not seek approval to initiate a suit, thus blunting "[o]ne of the greatest *unilateral* powers a President possesses under the Constitution"—"the power to protect individual liberty by essentially under-enforcing federal statutes regulating private behavior."  *In re Aiken County*, 725 F.3d 255, 264 (D.C. Cir. 2013) (Kavanaugh, J.).

And the Department of Justice has no control over which allegations, claims, or legal theories a relator chooses to advance; it cannot "control the breadth of the matter." *Riley*, 252 F.3d at 763 (Smith, J., dissenting).  This suit shows the importance of that prerogative—the viability of Zafirov's claims depends on the complex interplay of federal statutes and regulations in a massive federal program.  The Court may need

---

[7] To undersigned counsel's knowledge, to date in the Middle District of Florida—one of the busiest *qui tam* dockets in the country—the Government has never moved to dismiss a *qui tam* action (other than for settlement purposes) or moved to limit discovery.  The Government has not, in other words, even exercised the limited controls available to it.

to define what constitutes a "claim" in the MA context, outline the proper components of a medically sound diagnosis, and select and apply the proper tests for "knowledge" and "materiality" under the FCA. And, here, it will be Zafirov—not the Government—pressing her own favored interpretations in the first instance. Needless to say, Zafirov's chosen interpretations of these federal laws may vary from the Government's, since its broad interests lie in administering a functional government program, and the relator's interests lie only in maximizing her monetary award. *See Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 & n.5 (1997).

To that point, relators are unbound by both general and FCA-specific Department of Justice policies. For instance, the Department applies detailed requirements to determine whether to file FCA actions of consequence, including those involving "a novel question of law or a question of policy." *See* DOJ Civil Div. Dir. No. 1-15, § 1(e)(1)(ii)-(iv), 80 Fed. Reg. 31998, 31999 (June 5, 2015). And Department of Justice attorneys must confer with agencies responsible for the government programs affected by FCA litigation, and coordinate litigation with any parallel criminal, regulatory, or administrative proceedings. *See* U.S. Dep't of Just., Just. Manual § 4.4.110. The existence of unaccountable FCA relators undermines the President's ability "to secure that unitary and uniform execution of the laws" that the Constitution meant to guarantee by "vesting general executive power in the President alone." *Myers*, 272 U.S. at 135.

11

True enough, four courts of appeals outside the Eleventh Circuit have held that the President's control over FCA actions avoids a Take Care Clause violation.[8]  Such decisions are not binding in the Eleventh Circuit, where the constitutional question remains open.[9]  *See Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1312 (11th Cir. 2021).  More importantly, these cases—all decided decades ago—are wrong under current law, as Justice Thomas's dissent in *Polansky* explained.  Those decisions did not have the Supreme Court's intervening cases clarifying that *Morrison* marks the outer limit on interference with the Executive.  *See Free Enter. Fund.*, 561 U.S. at 493; *Seila L.*, 140 S. Ct. at 2199; *see also Collins v. Yellen*, 141 S. Ct. 1761, 1786 (2021).  In short, the Supreme Court has made clear that a restriction on the Executive that exceeds the Ethics in Government Act at issue in *Morrison* is unconstitutional.

When answering an open question in the Eleventh Circuit, this Court should apply the law as it stands today.  Under that law, as described by Justice Thomas in his dissent, "the *qui tam* device is inconsistent with Article II and … private relators

---

[8] *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749-55 (9th Cir. 1993); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *Riley*, 252 F.3d at 752-57; *United States ex rel Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 805-07 (10th Cir. 2002).  The Second Circuit has also rejected arguments that the *qui tam* provisions violate "traditional Article III separation-of-powers concerns" or "usurp the executive branch's litigating function."  *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154-55 (2d Cir. 1993).  Its opinion does not, however, discuss the Take Care Clause or the Appointments Clause.

[9] Several district courts in the Eleventh Circuit have rejected constitutional challenges to the *qui tam* provisions.  The most recent decision, *United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-cv-1010, 2023 WL 8027309 (N.D. Ala. Nov. 20, 2023), relied on the unpersuasive reasoning from past courts of appeals decisions, did not address all the arguments raised in this motion, and engaged in only cursory historical analysis.  The earlier decisions, issued in 1999 and 2014, predated Justice Thomas's dissent in *Polansky* and followed the faulty reasoning of the courts of appeals.  *See United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272 (M.D. Fla. 2014); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201 (M.D. Fla. 1999).

may not represent the interests of the United States in litigation." *Polansky*, 599 U.S. at 449 (Thomas, J., dissenting).

## II.  The FCA's *Qui Tam* Provisions Violate the Appointments Clause.

An "Officer of the United States" must be appointed through the methods outlined in the Appointments Clause. *Lucia v. SEC*, 138 S. Ct. 2044, 2049 (2018); *see* U.S. Const. art. II, § 2, cl. 2. Since no one contends that a *qui tam* relator is "*appointed* as an officer of the United States," *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1514 (2019) (emphasis added), the only question before the Court is whether a *qui tam* relator qualifies as an "Officer."

Two requirements determine whether an individual qualifies as an "Officer of the United States." *Lucia*, 138 S. Ct. at 2051. First, an individual must exercise "significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126. Second, "an individual must occupy a continuing position established by law." *Lucia*, 138 S. Ct. at 2051 (cleaned up). An FCA relator satisfies both requirements, so the FCA's *qui tam* provisions violate the Appointments Clause.

### A.  An FCA Relator Exercises Significant Federal Authority.

An FCA relator wields significant federal authority because, as explained above, "[a] lawsuit is the ultimate remedy for a breach of the law." *Buckley*, 424 U.S. at 138. In *Buckley*, the Supreme Court recognized that "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights … may be discharged only by persons who are 'Officers of the United States' within the language of that section." *Id.*  *Buckley* thus held that Congress violated the

13

Appointments Clause by establishing a commission, whose members were improperly appointed, to enforce federal election laws. *Id.* at 138-40.

*Buckley* controls the issue here. An FCA relator brings an action "in the name of the Government" to enforce public rights. 31 U.S.C. § 3730(b)(1); *see supra* at pp. 6-7. In this respect, a relator enforcing the FCA "in the name of the Government" through civil litigation is no different from a commission enforcing the Federal Election Campaign Act. And enforcing federal law is at the heart of the executive power. *See, e.g.*, *Springer*, 277 U.S. at 202 ("Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement.").[10]

### B. An FCA Relator Holds a Continuing Position under *Morrison v. Olson*.

While there is no formal test for when a position is continuing under the Appointments Clause, *see United States v. Donziger*, 38 F.4th 290, 296 (2d Cir. 2022), *Morrison* and related cases establish that a person who litigates on the United States' behalf holds a continuing position.

In *Morrison*, the Supreme Court held that the independent counsel was an "'inferior' officer in the constitutional sense." 487 U.S. at 672. "[T]he office of independent counsel" was "'temporary' in the sense that an independent counsel" was

---

[10] Two courts of appeals outside the Eleventh Circuit have held—in 1993 and 1994—that an FCA relator does not exercise substantial authority, reasoning that the Executive retains the ability to intervene or otherwise participate in litigation. *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 757-59. As the Supreme Court has since clarified, the level of supervision does not determine whether a person is an officer, but rather divides *principal* from *inferior* officers. *See Edmond v. United States*, 520 U.S. 651, 663 (1997); *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1976 (2021).

"appointed essentially to accomplish a single task, and when that task [was] over the office [was] terminated, either by the counsel herself or by action of the Special Division." *Id.* Nonetheless, the temporary nature of the independent counsel's position did not preclude her from being an Officer. *Id.* at 671 n.12 ("It is clear that appellant is an 'officer' of the United States, not an 'employee.'").

The D.C. Circuit has twice recognized that those who litigated on the United States' behalf for a singular purpose—an independent counsel and a special counsel—qualified as Officers. *In re Sealed Case*, 829 F.2d 50, 56-57 (D.C. Cir. 1987); *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019). In both cases, the Attorney General appointed a private prosecutor to conduct a single investigation. Although "'charged with the performance of the duty of the superior [i.e., the Attorney General] for a limited time and under special and temporary conditions'" the independent counsel was nonetheless "an 'inferior Officer' whom the Attorney General … may appoint under the express terms of the Appointments Clause." *In re Sealed Case*, 829 F.2d at 56-57 (quoting *United States v. Eaton*, 169 U.S. 331, 343-44 (1898)); *accord In re Grand Jury Investigation*, 916 F.3d at 1051-53.

Most recently, the Second Circuit held that special prosecutors, appointed by the district court, qualified as Officers. *Donziger*, 38 F.4th at 296. The Second Circuit considered three factors instructive. First, the appointment was "not specific to the attorneys appointed," and "the individuals appointed as special prosecutors could be

replaced without the duties of the positions terminating." *Id.* at 297.[11]  Second, the position was "not transient or fleeting" when the special prosecutors had "already served for nearly three years." *Id.*  Third, the special prosecutors' duties were "more than incidental to the regular operations of government … because prosecution generally is a core power of government." *Id.* at 297-98.

This case law establishes that an FCA relator occupies a continuing position, despite that an FCA relator is likewise "appointed" to "accomplish a single task" and has "no ongoing responsibilities that extend beyond the accomplishment of the mission." *Morrison*, 487 U.S. at 672.  When that mission entails the exercise of core government power to pursue a *qui tam* case for years, the position is a "continuing" one.  And it matters not that the FCA involves conducting civil litigation, while past cases involved criminal enforcement; both are core executive powers.  *United States v. Providence J. Co.*, 485 U.S. 693, 700 (1988) (recognizing that "prosecution" is "an exercise of the sovereign power of the United States"); *Buckley*, 424 U.S. at 138 (recognizing *civil* litigation as another quintessentially executive power).

That a relator does not hold a specific employment position created by statute is immaterial.  "The Constitution constrains governmental action 'by whatever instruments or in whatever modes that action may be taken' … [a]nd under whatever

---

[11] The FCA "does not bar [existing] parties from amending a complaint to add, remove, or swap relators," *In re Plavix Marketing, Sales Practices & Products Liability Litigation (No. II)*, 974 F.3d 228, 236 (3d Cir. 2020), but only with relators' consent, since relators retain the right to participate in the litigation even if the government intervenes, *see* 31 U.S.C. § 3730(c)(1), (c)(3).  *See also, e.g.*, *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 364 (5th Cir. 2014) (upholding substitution of bankruptcy trustee as relator); *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993) (holding "that a relator's *qui tam* action survives his death").

congressional label." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392-93 (1995) (quoting *Ex parte Virginia*, 100 U.S. 339, 346-47 (1880)).  Under *Morrison*, a party who conducts litigation on the United States' behalf for a single case holds a continuing position.  Thus, if Congress created an "office of the relator" and appointed Dr. Zafirov to the position, the law would violate the Appointments Clause because she would be an inferior Officer—but not duly appointed.  The *qui tam* provisions do the same thing through indirect means.  The result, if upheld, would allow Congress to exceed the Appointment Clause's limits on "the universe of eligible recipients of the power to appoint." *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991).

In cases such as *Riley* that have rejected Appointments Clause challenges to the FCA, courts have reasoned that *qui tam* relators do not hold continuing positions because they are not "subject to … the benefits or the requirements associated with offices of the United States."  252 F.3d at 757-58.  But the fact that a *qui tam* relator is even *farther* outside of Article II's chain of authority than other non-"Officer" federal employees cannot make *qui tam* delegations permissible.  *See id.* at 768 (Smith, J., dissenting).  If that were true, "all that Congress or the President must do to circumvent the strictures of the Appointments Clause is to delegate authority to someone who has not officially been appointed to any federal office." *Id.*

Finally, an FCA relator bears no resemblance to the individuals whom the Supreme Court has determined to fall outside the Appointments Clause, such as civil surgeons who examined pensioners only "when called on by the Commissioner of

17

Pensions in some special case," *United States v. Germaine*, 99 U.S. 508, 512 (1878), or merchant appraisers who examined and appraised merchandise "upon the request of the importer for a reappraisal," *Auffmordt v. Hedden*, 137 U.S. 310, 326 (1890). Those individuals were hired to perform occasional, discrete services on the United States' behalf. And their positions "lacked 'any duration as to time,'" and involved "duties that were narrowly limited, specialized, or insignificant." *Donziger*, 38 F.4th at 298. In contrast to those narrow, ad hoc duties, litigating on the United States' behalf— "which can last for years and encompass[es] a wide array of assignments"—plainly involves the exercise of core executive power. *Id.* at 299. An FCA relator thus holds a "continuing position" without any appointment, violating the Appointments Clause.

## III.   Historical Practice Does Not Cure the *Qui Tam* Provisions' Defects.

The FCA's *qui tam* provisions violate the text and settled understanding of Article II of the Constitution. The Court thus need not analyze the history of the FCA nor of *qui tam* provisions generally. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2137 (2022). Even if this history were relevant, however, it would not support the constitutionality of the FCA's *qui tam* provisions.

### A.   The Text and Structure of the Constitution Are Conclusive, Rendering History Irrelevant.

History has a role to play in constitutional interpretation, but only when the Constitution's text is ambiguous. *See id.* "[H]istorical patterns cannot justify contemporary violations of constitutional guarantees, even when the practice in question covers our entire national existence." *Polansky*, 599 U.S. at 450 (Thomas, J.,

18

dissenting) (cleaned up); *see also Medellin v. Texas*, 552 U.S. 491, 532 (2008) ("Past practice does not, by itself, create power." (cleaned up)).   Thus, the Court can—and should—grant this motion without examining the history of *qui tam* actions.

**B.      History Does Not Support the *Qui Tam* Provisions' Constitutionality.**

Regardless, the historical record does not justify the modern FCA.   Historical practice is relevant to constitutional interpretation only insofar as the practice has been "open, widespread, and unchallenged since the early days of the Republic."   *Bruen*, 142 S. Ct. at 2137; *see, e.g.*, *Marsh v. Chambers*, 463 U.S. 783, 791-92 (1983) (finding relevant an "unambiguous and unbroken history of more than 200 years" that the framers had "considered carefully" in Founding-era debates).   When, in contrast, history is inconclusive, past practice cannot serve as a proxy for constitutional legitimacy.   *See*, *e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1970-74 (2019); *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2259 (2020).

The Supreme Court has been especially skeptical toward historical arguments that would blur the separation of powers.   "[W]hen questions involving the Constitution's government-structuring provisions are presented in a justiciable case, it is the solemn responsibility of the Judicial Branch 'to say what the law is.'"   *NLRB v. Noel Canning*, 573 U.S. 513, 571 (2014) (Scalia, J., concurring in the judgment) (quoting *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)).

1.      *The Modern FCA Is Regulatory in Nature and Seriously Interferes with the Executive Power.*

The FCA "was originally passed in 1863 after disclosure of widespread fraud against the Government" during the Civil War.  *Rainwater v. United States*, 356 U.S. 590, 592 (1958).  The Act was used sparingly between the Civil War and World War II.  *See* Boese & Baruch, *Civil False Claims & Qui Tam Actions* § 1.01[A], [B].[12] When relators filed a flurry of actions during World War II, Congress responded with amendments to *narrow* the FCA, including by barring actions premised on information known to the Government, *id.* § 1.02, and the Act returned to obscurity, S. Rep. No. 110-507, at 3 (2008) (noting that "only about six to ten FCA cases [were] filed per year" from 1943 through 1986).  Thus, the FCA's history from 1863 to 1986 does not provide a basis to sustain the FCA of today.

The modern FCA is also disconnected from its early history because, in 1986, Congress dramatically changed the Act.  The 1986 amendments increased awards available to relators, recognized new causes of action for reverse false claims and retaliation against whistleblowers, expanded the Act's statute of limitations, wrote specific intent out of the Act's knowledge requirement, and lifted the total ban on actions based on information already in the Government's possession.  *See* Boese & Baruch § 104[C]-[G]; Charles Doyle, Cong. Rsch. Serv., R40785, *Qui Tam: The False Claims Act and Related Federal Statutes*, at 8-9 (updated Apr. 26, 2021).  "In permitting

---

[12] Both the Supreme Court and the Eleventh Circuit have relied on this FCA treatise.  *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 n.8 (2010); *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1348 (11th Cir. 2021).

actions by an expanded universe of plaintiffs with different incentives, the 1986 amendment essentially create[d] a new cause of action, not just an increased likelihood that an existing cause of action will be pursued." *Schumer*, 520 U.S. at 950.

Moreover, the modern FCA has become a backdoor to regulatory enforcement. To obtain federal funding, recipients frequently must certify that they are in compliance with all federal laws, regulations, contract terms—and often even subregulatory guidance. In many FCA cases, a relator alleges a violation "of a federal statute, regulation, or contract term … as the basis for liability under the FCA in the absence of a factually false claim." Boese & Baruch § 2.03[B][1]; *see also Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 180 (2016) (describing implied-certification theory of FCA liability). This marks a departure from early FCA cases, where relators brought suit against contractors for factually false claims, representing, for example, that the contractor has delivered X, when in fact, it had delivered Y.

Today, relators often base FCA suits on theories of alleged regulatory violations that the Government itself has not previously advanced. That is especially problematic and costly in the healthcare context, where providers face "highly ambiguous standards … complicated by the comprehensive, bewildering array of government and administrative regulations and review processes." *See* Robert Fabrikant & Glenn E. Solomon, *Application of the Federal False Claims Act to Regulatory Compliance Issues in the Health Care Industry*, 51 Ala. L. Rev. 105, 116 (1999). "[I]n addition to health care fraud, the Act also has been used to allege violations of food stamp program requirements, false certifications regarding minority, veterans, or women's ownership

21

of business enterprises, payment of enrollment incentive fees by universities and other educational institutions, against federal mortgage lenders," "in labor disputes," and "with environmental regulations," among other things.  Boese & Baruch § 1.05[A].

The modern FCA, paired with the growth of the regulatory state, has created a Constitutional anomaly in which unaccountable, private litigants play a lead role in pursuing the Government's regulatory interests in federal court.  Relators now file hundreds of *qui tam* actions each year.  They have, in many ways, eclipsed the Government's lawyers in enforcing the FCA:  From 1987 through 2022, relators have filed over 15,246 *qui tam* actions, whereas the Department of Justice has opened only 6,234 FCA non-*qui tam* matters—many of which never result in a suit.[13]

### 2.    *The Modern Regulatory FCA Has No Historical Tradition.*

The modern regulatory FCA lacks "the open, widespread, and unchallenged" tradition "since the early days of the Republic" that could help settle constitutional meaning.  *Bruen*, 142 S. Ct.at 2137 (citation omitted).  It is true that the First Congress passed five statutes with *qui tam* provisions expressly authorizing uninjured parties to initiate an action on the Government's behalf.  *See Stevens*, 529 U.S. at 776-77 & n.6 (collecting statutes).[14]  But each such statute provided only a narrow right of action allowing relators to prosecute violations of established federal law.[15]  At the time,

---

[13]   *See*   U.S.   Dep't   of   Justice,   *Fraud-Statistics–Overview*   2   (2022),   available   at *https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-2-billion-fiscal-year-2022.*

[14] The First Congress also passed laws providing whistleblowers a reward but no express cause of action; some such laws were later read as implying rights of action.  *See Stevens*, 529 U.S. at 777 & n.7.

[15] *See*, *e.g.*, Act of March 1, 1790, ch. 2, §§ 3, 6, 1 Stat. 102, 103 (providing *qui tam* authorization to

"[t]here was no DOJ, and the nugatory prosecutorial arm of the Executive could not adequately monitor fraud committed by governmental contractors." *Riley*, 252 F.3d at 774 (Smith, J., dissenting). These few early *qui tam* provisions were a holdover from "the English system of parliamentary supremacy," from which "the Constitution's creation of a separate Executive Branch" was a structural departure, and there is no indication that the early Congress meaningfully considered how *qui tam* provisions would alienate fundamentally "Executive" power away from the President. *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting); *see also Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 237 (1989) ("OLC FCA Mem.").

The early *qui tam* statutes also differed in kind from the modern FCA. "The Framers, who envisioned a limited Federal Government, could not have anticipated the vast growth of the administrative state." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 755 (2002). The ubiquitous presence of broad certifications of compliance with all statutes, regulations, contracts, and subregulatory guidance did not exist before recent decades. *Id.* While the narrow *qui tam* laws at the Founding incentivized informers to report and prosecute violations of federal law—a pure enforcement role—relators now not only perform an enforcement role in the Executive's stead but also devise *legal positions* for the United States. The difference between purely enforcing public rights and defining public rights through litigation

---

punish United States marshals who refused to file census returns (§ 3) and persons failing to cooperate with the census (§ 6)); Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133 (providing *qui tam* authorization to punish the illegal carriage of seamen (§ 1) and harboring of runaway seamen (§ 4)).

heightens a *qui tam* action's capacity to interfere with the Constitution's vesting of "general executive power in the President alone" "to secure [a] unitary and uniform execution of the laws." *Myers*, 272 U.S. at 135; *Riley*, 252 F.3d at 775 n. 38 (Smith, J., dissenting) ("To encroach on this prosecutorial discretion now is thus a greater violation of separation of powers principles than was the historic use of the FCA.").

Moreover, early *qui tam* statutes never became embedded within the Nation's legal system.  Congress has long since repealed all the *qui tam* provisions enacted in the Founding era.  *Riley*, 252 F.3d at 774 (Smith J., dissenting).  "By the turn of the twentieth century, qui tam statutes had largely fallen into disuse in this country," including the FCA.  Doyle, *supra* at 4.  And only one rarely used *qui tam* provision still exists outside the FCA, 25 U.S.C. § 201.  *See Doyle, supra* at 33.

*Qui tam* actions became a mainstay of federal litigation only after the FCA's 1986 amendments.  But the FCA's prevalence since 1986 is hardly "part of the fabric of our society."  *Marsh*, 463 U.S. at 792.  To the contrary, once FCA actions became more frequent after 1986, constitutional questions did too:  The Office of Legal Counsel issued an opinion declaring the *qui tam* provisions unconstitutional,[16] separation of powers challenges worked their way through multiple courts of appeals, and the Supreme Court expressly left open in *Stevens* whether the FCA's *qui tam* provisions violate the Take Care or Appointments Clauses, 529 U.S. at 778 n.8.  In

---

[16] *See generally OLC FCA Mem.*, *supra*.  OLC has since changed its position to assert that the FCA's *qui tam* provisions do not violate the Appointments Clause.  *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 146 (1996).

sum, this Court should conclude that history does not justify the modern FCA's interference with the Executive Power.

## IV.   The Relator Lacks Standing Because the *Qui Tam* Provisions Are Invalid.

If the Court agrees that the *qui tam* provisions are unconstitutional, this Court should dismiss the action for lack of subject-matter jurisdiction. The *qui tam* provisions are void. *Moore v. Harper*, 600 U.S. 1, 12 (2023) ("'[A]n act of the legislature, repugnant to the constitution, is void.'" (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803))). Zafirov alleges harm only to the United States. FAC ¶¶ 296-346. So, without the *qui tam* provisions, she lacks standing and this Court should dismiss for lack of subject-matter jurisdiction. *See Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1234-35 (11th Cir. 2008) (per curiam).

*Stevens* is not to the contrary. It held only that a relator, as a proper assignee of a portion of the United States' damages claim, could rely on the United States' injury to establish standing, expressly setting aside arguments to the FCA's constitutionality. 529 U.S. at 773-74, 778 n.8. Because the FCA's purported assignment of the claim is void, Zafirov can no longer rely on the United States' injury-in-fact and lacks standing. *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) ("Although *FHCP* suffered an injury-in-fact, *MSPA* only has standing if it was validly assigned the right to sue to vindicate that injury.").

## CONCLUSION

For these reasons, this Court should grant Defendants' Joint Motion for Judgment on the Pleadings or to Dismiss for Lack of Subject-Matter Jurisdiction.

Dated this 16th day of February, 2024

Respectfully submitted,

_/s/ Scott Drake_____
Scott Drake (Lead Counsel)*
O'MELVENY & MYERS LLP
2801 North Harwood Street, Suite 1600
Dallas, TX 75201
(972) 360-1900
(972) 360-1901 (fax)
sdrake@omm.com

Benjamin D. Singer*
Amanda M. Santella*
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
(202) 383-5414 (fax)
bsinger@omm.com
asantella@omm.com

Elizabeth M. Bock*
Elizabeth A. Arias*
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000
(213) 430-6407 (fax)
ebock@omm.com
earias@omm.com

Ginger Boyd
Fla. Bar No. 294550
NELSON MULLINS RILEY &
SCARBOROUGH LLP
215 South Monroe Street, Suite 400
Tallahassee, FL 32301
(850) 205-3356
(850) 521-1472 (fax)
Ginger.Boyd@nelsonmullins.com

_Counsel for Defendants Freedom Health, Inc.
and Optimum Healthcare, Inc._

_/s/ Jason P. Mehta_____
Jason P. Mehta (FBN: 106110)
Lauren L. Valiente (FBN: 034775)
Joseph W. Swanson (FBN: 29618)
FOLEY & LARDNER LLP
100 North Tampa Street, Suite 2700
Tampa, FL 33602-5810
Telephone: 813-229-2300
Facsimile: 813-221-4210
Primary Email: jmehta@foley.com
Secondary Email: dmills@foley.com
Primary Email: lvaliente@foley.com
Secondary Email: dguillen@foley.com
Primary Email: joe.swanson@foley.com
Secondary Email: dmills@foley.com

Matthew D. Krueger*
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
Telephone: 414-297-4587
Primary Email: mkrueger@foley.com

_Counsel for Defendants Physician Partners,
LLC; Florida Medical Associates, LLC
d/b/a VIPcare; and Anion Technologies,
LLC_

_* admitted pro hac vice_

26

**<u>Local Rule 3.01(g) Certification</u>**

Defendants certify that they have conferred with Plaintiff via telephone, who opposes this motion in its entirety.

/s/ *Jason P. Mehta*
Jason P. Mehta (FBN: 106110)

**<u>Certificate of Service</u>**

I hereby certify that on February 16, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.


*/s/ Jason P. Mehta*
Jason P. Mehta (FBN: 106110)

28