## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA *ex rel.* CLARISSA ZAFIROV,

   Plaintiff,

  v.

FLORIDA MEDICAL ASSOCIATES, LLC; PHYSICIAN PARTNERS, LLC; PHYSICIAN PARTNERS SPECIALTY SERVICES, LLC; SUN LABS USA, INC.; ANION TECHNOLOGIES, LLC; ANTHEM, INC.; FREEDOM HEALTH, INC.; OPTIMUM HEALTHCARE, INC.; and SIDDHARTHA PAGIDIPATI,

   Defendants.

Civil Action No.
8:19-cv-01236-KKM-SPF

## *AMICUS CURIAE* BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR JUDGMENT ON THE PLEADINGS OR TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

Steven A. Engel
 (*pro hac vice* application forthcoming)
Michael H. McGinley
 (*pro hac vice* application forthcoming)
Dechert LLP
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202) 261-3369
Facsimile: (202) 261-3333
steven.engel@dechert.com
michael.mcginley@dechert.com

J. Carter Andersen
Harold Douglas Holder III
Bush Ross, P.A.
1801 North Highland Ave.
Tampa, FL 33602
Telephone: (813) 204-6405
Facsimile: (813) 223-9620
candersen@bushross.com
hholder@bushross.com

*Counsel for* Amicus Curiae
*The Chamber of Commerce of the United States of America*

February 23, 2024

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT ........................................................................................................4

I.    The *Qui Tam* Provisions of the False Claims Act Are Unconstitutional..........4

    A. The *Qui Tam* Provisions Violate Article II's Vesting Clause......................4

        1.   The Framers' Understanding of Executive Power Predated the Constitution. ......................................................................................4

        2.   Article II Vests All Executive Power in the President.....................6

    B. The *Qui Tam* Provisions Violate the Appointments Clause.......................8

    C. The *Qui Tam* Provisions Violate the Take Care Clause...........................13

        1.   The *Qui Tam* Provisions Allow Unharmed Private Actors to Commandeer the Executive's Enforcement Discretion. ......................13

        2.   The *Qui Tam* Provisions Interfere with the Executive's Ability to Execute the Laws. ...........................................................................16

II.   History Cannot Salvage the *Qui Tam* Provisions' Affront to Article II's Text.17

    A. Abuses in Early English *Qui Tam* Practice Led to Its Decline. .................18

    B. Early Congressional Enactments Do Not Support the Constitutionality of the False Claims Act's *Qui Tam* Provisions...................................................20

    C. The False Claims Act Revived an Unconstitutional Practice. ..................23

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County,*
  725 F.3d 255 (D.C. Cir. 2013).......................................................................... 2, 14

*United States ex rel. Atkins v. McInteer,*
  470 F.3d 1350 (11th Cir. 2006)............................................................................21

*Buckley v. Valeo,*
  424 U.S. 1 (1976)................................................................................... 8, 9, 10

*Confiscation Cases,*
  74 U.S. (7 Wall.) 454 (1869) ............................................................................ 7, 17

*Dep't of Transp. v. Ass'n of Am. R.R.,*
  575 U.S. 43 (2015) ........................................................................... 6, 10, 12

*Edmond v. United States,*
  520 U.S. 651 (1997) ...........................................................................................10

*United States ex rel. Foulds v. Texas Tech Univ.,*
  171 F.3d 279 (5th Cir. 1999) ..............................................................................17

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ..................................................................................... 1, 11

*Freytag v. Commissioner,*
  501 U.S. 868 (1991) ..................................................................................... 2, 10

*Hayburn's Case,*
  2 U.S. (2 Dall.) 409 (1792) ................................................................................22

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ................................................................................... 14, 16

*Hughes Aircraft Co. v. United States ex rel. Schumer,*
  520 U.S. 939 (1997) .............................................................................. 3, 15, 24

*United States ex rel. Hunt v. Cochise Consultancy, Inc.,*
  887 F.3d 1081 (11th Cir. 2018)........................................................................2, 7

*United States ex rel. Kelly v. Boeing Co.*,
   9 F.3d 743 (9th Cir. 1993) ..................................................................7

*King v. Burnell*,
   Carth. 478 (K.B. 1700) ......................................................................9

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ..........................................................................7

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................13

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803) ..........................................................22

*Marsh v. Chambers*,
   463 U.S. 783 (1983) ..................................................................22, 25

*Martin v. Hunter's Lessee*,
   14 U.S. (1 Wheat.) 304 (1816) ..............................................6, 12, 20

*United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*,
   961 F.2d 46 (4th Cir. 1992) ............................................................23

*Morrison v. Olson*,
   487 U.S. 654 (1988) ..................................................................12, 16

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ..........................................................3, 17, 22

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
   143 S. Ct. 1720 (2023) ...........................................................*passim*

*Printz v. United States*,
   521 U.S. 898 (1997) ........................................................................14

*Riley v. St. Luke's Episcopal Hosp.*,
   252 F.3d 749 (5th Cir. 2001) .....................................................11, 20

*Robertson v. United States ex rel. Watson*,
   560 U.S. 272 (2010) ..........................................................................4

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ......................................................................6

*Springer v. Gov. of Philippine Islands*,
 277 U.S. 189 (1928) ...................................................................11

*TransUnion LLC v. Ramirez*,
 141 S. Ct. 2190 (2021)..............................................................15

*United States v. Arthrex, Inc.*,
 141 S. Ct. 1970 (2021)..............................................................13

*United States v. Comstock*,
 560 U.S. 126 (2010) ..................................................................20

*United States v. Everglades Coll., Inc.*,
 855 F.3d 1279 (11th Cir. 2018).................................................7

*United States v. Germaine*,
 99 U.S. (9 Otto) 508 (1878)......................................................12

*United States v. McNinch*,
 356 U.S. 595 (1958) ..................................................................23

*United States v. Nixon*,
 418 U.S. 683 (1974) ....................................................................7

*United States v. Texas*,
 143 S. Ct. 1964 (2023)..............................................................16

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
 529 U.S. 765 (2000) ...........................................................*passim*

*Walz v. Tax Comm'n of City of New York*,
 397 U.S. 664 (1970) ..................................................................18

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ....................................................1, 2, 6, 25

U.S. Const. art. II, § 2, cl. 2 ....................................................2, 8, 9, 25

U.S. Const. art. II, § 3...................................................................*passim*

**Statutes**

31 U.S.C. § 3729(a) ....................................................................8, 24

31 U.S.C. § 3730...........................................................................12

31 U.S.C. § 3730(b) ........................................................................ 8, 16

31 U.S.C. § 3730(c) ............................................................ 11, 16, 17, 24

31 U.S.C. § 3730(d) .................................................................... 12, 24

Act of Aug. 4, 1790, 1 Stat. 145 ............................................................ 21

Act of Feb. 25, 1791, 1 Stat. 191 ........................................................... 21

Act of July 20, 1790, 1 Stat. 131 ........................................................... 21

Act of July 31, 1789, 1 Stat. 29 ............................................................ 21

Act of Mar. 2, 1863, 12 Stat. 696 .......................................................... 23

Act of Mar. 3, 1791, 1 Stat. 215 ........................................................... 21

Act of May 31, 1790, 1 Stat. 124 .......................................................... 21

Act of Sept. 1, 1789, 1 Stat. 55 ............................................................ 21

Act of Sept. 2, 1789, 1 Stat. 65 ............................................................ 21

5 Edw. 3, ch. 5 (1331) (Eng.) ............................................................. 19

12 Edw. 2, ch. 6 (1318) (Eng.) ............................................................ 19

18 Eliz., ch. 5 (1576) (Eng.) .............................................................. 19

31 Eliz., ch. 5 (1589) (Eng.) .............................................................. 19

1 Hen. 8, ch. 4 (1509) (Eng.) ............................................................. 19

21 Jac. I, ch. 28 (1623) (Eng.) ........................................................... 19

**Other Authorities**

1 Annals of Congress (1789) ............................................................ 6, 20

5 Matthew Bacon, *A New Abridgement of the Law* (7th ed. 1832) ................................ 6

J. Randy Beck, *The False Claims Act and the English Eradication of* Qui
    Tam *Legislation*, 78 N.C. L. Rev. 539 (2000) ........................................... 18, 19, 24

1 William Blackstone, *Commentaries on the Laws of England* (1768) ................... 5, 7, 13

3 William Blackstone, *Commentaries on the Laws of England* (1768) ........................ 5, 6

4 William Blackstone, *Commentaries on the Laws of England* (1768) ............................ 5

James T. Blanch, *Constitutionality of the False Claims Act's* Qui Tam
    *Provisions*, 16 Harv. J.L. & Pub. Pol'y 701 (1993) ......................................... 11, 16

John T. Boese & Douglas W. Baruch, *Civil False Claims and Qui Tam
    Actions* § 4.11 (5th ed. 2023) .................................................................. 15

Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to
    Execute the Laws*, 104 Yale L.J. 541 (1994) .............................................. 22

3 Sir Edward Coke, *Institutes of the Laws of England* (4th ed. 1797) ........................... 19

1 *Collected Works of James Wilson* (Kermit L. Hall & Mark David Hall
    eds., 2007) ................................................................................................ 6

Cong. Globe, 37th Cong., 3d Sess. 956 (1863) ......................................................... 23

131 Cong. Rec. 22322 (daily ed. Aug. 1, 1985) ........................................................ 15

132 Cong. Rec. 22339 (daily ed. Sept. 9, 1986) ....................................................... 15

132 Cong. Rec. 29322 (daily ed. Oct. 7, 1986) ........................................................ 17

*Constitutionality of the* Qui Tam *Provisions of the False Claims Act*,
    13 Op. O.L.C. 207 (1989) ............................................................. *passim*

Edward S. Corwin, *The President: Office and Powers 1787–1957* (4th ed.
    1957) ........................................................................................................ 9

2 Timothy Cunningham, *A New and Complete Law-dictionary* (1765) ........................ 9

The Federalist No. 21 (Alexander Hamilton) ......................................................... 14

The Federalist No. 29 (Alexander Hamilton) ......................................................... 10

The Federalist No. 39 (James Madison) ................................................................ 10

The Federalist No. 47 (James Madison) ................................................................ 14

The Federalist No. 70 (Alexander Hamilton) ........................................................... 6

The Federalist No. 72 (Alexander Hamilton) ......................................................... 10

Steve France, *The Private War on Pentagon Fraud*, 76 A.B.A. J. 46 (Mar. 1990) ........................................................................................24

4 William S. Holdsworth, *A History of English Law* (1924) ........................................19

8 Legal Observer No. 204 (1834) ..............................................................................19

Letter from James Madison to President Monroe (Dec. 27, 1817), in 3 *Letters and Other Writings of James Madison* (J.B. Lippincott & Co. 1865) ........................................................................................22

John Locke, *Two Treatises on Civil Government* (George Routledge & Sons ed., 1884) ........................................................................ 4, 5, 13

Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* (1890) ........................................................................................10

*Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73 (2007) ........................................................................2

Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780–1940* (2013) ..............................................12

Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671 (2014) ........................................................................14

William Rawle, *A View of the Constitution of the United States of America* (1825) ........................................................................................13

S. Rep. No. 99-345 (1986) ........................................................................................24

*The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124 (1996) ........................................................................2

U.S. Dep't of Justice, *Fraud Statistics—Overview* (Feb. 7, 2023), https://bit.ly/3N3x9cm ........................................................................ 24, 25

2 Noah Webster, *American Dictionary of the English Language* (1828) ......................10

Leonard D. White, *The Federalists* (1956) ................................................................22

Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689 (2004) ............................................21

## INTRODUCTION AND SUMMARY OF ARGUMENT

The *qui tam* provisions of the False Claims Act ("FCA") violate the separation of powers.  Article II of the Constitution vests "[t]he executive Power" in the President, who "shall take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 1, cl. 1; *id.* art. II, § 3.  The Framers adopted that unitary structure to promote accountability and ensure that "a President chosen by the entire Nation" would "oversee the execution of the laws."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010).  Yet the President can ensure that the laws are faithfully executed only when he "oversee[s] the faithfulness of the officers who execute them."  *Id.* at 484.

The FCA's *qui tam* provisions violate this core constitutional requirement because they take the enforcement of the laws out of the President's hands.  Private relators are not injured parties seeking to recover for personalized harms.  They are unaccountable bounty hunters charged with pursuing claims that, in their judgment, should have been asserted by the United States.

Last term, three Justices of the Supreme Court observed that "[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II."  *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 143 S. Ct. 1720, 1741 (2023) (Thomas, J., dissenting); *see id.* at 1737 (Kavanaugh, J., joined by Barrett, J., concurring).  Shortly after the 1986 amendments to the FCA "resuscitat[ed] the dormant qui tam device," the Department of Justice's Office of Legal Counsel also concluded that this private enforcement scheme for the vindication of public rights is "patently unconstitutional."  *Constitutionality of the* Qui Tam *Provisions of the False Claims Act*, 13 Op. O.L.C. 207,

209, 238 (1989) (William Barr, Ass't Att'y Gen.) (hereafter, "OLC Memo").[1]  Indeed, when measured against Article II's text, "this is not even a close question."  *Id.* at 209.

First, *qui tam* litigation violates Article II by delegating executive authority to private actors.  The Framers vested the entire "executive Power" in the President.  U.S. Const. art. II, § 1, cl. 1.  And, at the same time, they "carefully husband[ed] the appointment power" to ensure that the President remained accountable for the "'Officers of the United States'" who wielded executive Power in his name.  *Freytag v. Commissioner*, 501 U.S. 868, 883–84 (1991) (quoting U.S. Const. art. II, § 2, cl. 2).  The FCA runs roughshod over these structural safeguards, empowering "self-appointed private attorney[s] general" to exercise substantial executive Power outside the Executive branch.  *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1087 (11th Cir. 2018) (citation omitted), *aff'd* 139 S. Ct. 1507 (2019).

The FCA's *qui tam* provisions also violate the Take Care Clause.  "The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws."  *In re Aiken County*, 725 F.3d 255, 263 (D.C. Cir. 2013) (opinion of Kavanaugh, J.) (citation omitted).  The Framers regarded such enforcement discretion as both an indispensable check against unjust laws and a necessary bulwark for preserving individual liberty.  *See id.* at 264.  But the FCA

---

[1]  The Office of Legal Counsel later took a different view about the Appointments Clause's application to the *qui tam* provisions.  *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 77 (2007) (stating that *qui tam* relators are not officers because their position is not a "continuing" one); *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 142 n.52 (1996) (stating that *qui tam* relators are not officers because they are not employed by the federal government).  As discussed below, the Office's original position in 1989 was correct and consistent with subsequent Supreme Court precedent.  *See infra* Section I.B.

transfers the Executive's discretion to private relators who are "motivated primarily by prospects of monetary reward rather than the public good." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997). And, to make matters worse, the Act significantly curtails the Executive's ability to control a lawsuit as it unfolds. Article II simply does not permit such privatization of the President's responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

The "primary counterargument" for upholding the FCA's *qui tam* provisions emphasizes the "historical pedigree of *qui tam* suits." *Polansky*, 143 S. Ct. at 1741 (Thomas, J., dissenting). But the "adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text"—even laws passed near the Founding—"cannot overcome or alter that text." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2137 (2022) (emphasis and citation omitted). And the historical roots of *qui tam* are limited at best. Unlike the FCA, many of the early enactments provided relators with only a bounty, not a cause of action, and many provided redress to relators who *themselves* had suffered injury. In all events, these early statutes were rarely used and "rapidly fell into disfavor." OLC Memo, *supra*, at 235. Decades later, Congress revived *qui tam* litigation by adopting the original version of the FCA during the Civil War. But those *qui tam* provisions too fell into desuetude after the war. These scattered historical episodes thus cannot excuse the manifest conflict between the FCA's *qui tam* provisions and Article II of the Constitution.

## ARGUMENT

### I.     The *Qui Tam* Provisions of the False Claims Act Are Unconstitutional.

The *qui tam* provisions of the FCA violate Article II several times over.  They empower self-appointed private persons to initiate and conduct civil litigation on behalf of the United States, in violation of Article II's Vesting Clause and the Appointments Clause.  And they inhibit both the President's prosecutorial discretion and his control over declined *qui tam* actions, in violation of the Take Care Clause.

### A.     The *Qui Tam* Provisions Violate Article II's Vesting Clause.

Congress may not authorize private bounty hunters to conduct litigation on behalf of the United States.  The Framers understood that "[a] basic step in organizing a civilized society" was to take the "sword" of law-enforcement actions "out of private hands and turn it over to an organized government, acting on behalf of all the people." *Robertson v. United States ex rel. Watson*, 560 U.S. 272, 282–83 (2010) (Roberts, C.J., dissenting from the dismissal of a writ of certiorari as improvidently granted).  To that end, the Constitution established a unitary and accountable Executive who alone was charged with the responsibility for enforcing federal law.

#### 1.  The Framers' Understanding of Executive Power Predated the Constitution.

The Framers' conception of centralized executive authority finds roots in the influential political theory of John Locke.  As he explained, "in the state of Nature[,] every one has the executive power of the law of Nature."  John Locke, *Two Treatises on Civil Government* 197 (George Routledge & Sons ed., 1884).  But "when they enter

4

into society," individuals "give up the . . . executive power they had in the state of Nature into the hands of the society." *Id.* at 258. That is, the people delegate their executive authority to public officials, whose power is "to be directed to no other end but the peace, safety, and public good of the people." *Id.* at 259.

William Blackstone's *Commentaries* reflect a similar understanding. "In a state of society," he reasoned, the right "to put [the law] in execution" is "transferred from individuals to the sovereign power," who "alone . . . bears the sword of justice by the consent of the whole community." 4 William Blackstone, *Commentaries on the Laws of England* *7–8 (1768). And because the public "delegate[s] all its power and rights, with regard to the execution of the laws, to one visible magistrate," that officer is "the proper person to prosecute for all public offences." 1 Blackstone, *Commentaries* at *258–59. Moreover, this understanding of the executive power was not strictly limited to the prosecution of "criminal" offenses. Rather, it extended to the pursuit of relief for all "infraction[s] of the public rights belonging to th[e] community." 4 Blackstone, *Commentaries* at *2. Vindicating those public rights is the prerogative of the sovereign actor whom the people have empowered to administer the laws. *See id.*

The common law recognized that if a person has personally "suffered the damage" from a public infraction, then he might have a *concomitant* right to demand redress "in his own name." Locke, *supra*, at 196. But that would not permit him to pursue relief on behalf of the public writ large. "[N]o person" other than the official entrusted with the executive authority "can have an action for a public nuisance, or punish it," unless that "private person suffers some extraordinary damage." 3

Blackstone, *Commentaries* at *220.  Because individual persons give up the right to exercise executive authority by entering into society, "the law gives no *private* remedy for any thing but a *private* wrong."  *Id.* at *219 (emphasis in original); *see also, e.g.*, 5 Matthew Bacon, *A New Abridgement of the Law* 798 (7th ed. 1832) (explaining that "common nuisances against the public are only punishable by a public prosecution").

## 2.  Article II Vests All Executive Power in the President.

The Framers enshrined this understanding in Article II's text, which vests "[t]he executive Power" in a single "President of the United States."  U.S. Const. art. II, § 1, cl. 1.  By entrusting "the President alone" with "all of" the Nation's executive Power, the Framers sought to ensure that he would remain accountable for all those who would act on his behalf.  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191, 2197 (2020).

Consistent with this need for accountability, the Framers did not vest "[p]rivate entities . . . with the 'executive Power.'"  *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) (quoting U.S. Const. art. II, § 1, cl. 1).  "[T]he intention of the Constitution" was instead "that the first Magistrate should be responsible for the executive department" in its entirety.  1 Annals of Cong. 480 (1789) (statement of James Madison).[2]  Given that design, it would be "utterly inadmissible" for Congress to attempt to vest executive authority "in any other person" besides the President.  *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 330 (1816) (Story, J.).

---

[2] *See also, e.g.*, 1 *Collected Works of James Wilson* 730 (Kermit L. Hall & Mark David Hall eds., 2007) ("In the United States, our first executive magistrate is not obnubilated behind the mysterious obscurity of counsellors . . . . He is the dignified, but accountable magistrate of a free and great people."); The Federalist No. 70, at 429 (Alexander Hamilton) (Clinton Rossiter ed., 2003) ("UNITY of the executive of this State was one of the best of the distinguishing features of our Constitution.").

But that is precisely what Congress did in the FCA's *qui tam* provisions. The legislature "sought to disperse some quantum of executive authority amongst the general public." *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 750 (9th Cir. 1993). That defies Article II.  A "*qui tam* relator has suffered no invasion of his own rights," *United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1287–88 (11th Cir. 2017), for the alleged harm, by definition, was "suffered by the United States," *Hunt*, 887 F.3d at 1091.  As explained above, such a "public offense[]" may be prosecuted only by the President, who—vested with all executive Power delegated by the people—is the only "person injured in the eye of the law."  1 Blackstone, *Commentaries* at *259.  To uphold a redelegation of that power to private entities would dash the constitutional scheme.

Supreme Court precedent confirms the point.  The executive Power includes the "*exclusive* authority and absolute discretion to decide whether to prosecute a case" on behalf of the United States.  *United States v. Nixon*, 418 U.S. 683, 693 (1974) (emphasis added).  And the "[s]ettled rule" has long been that courts cannot entertain "any suit, civil or criminal, as regularly before them, if prosecuted in the name and for the benefit of the United States," unless the government is represented by the Executive.  *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1869).  "[A]ll such suits, so far as the interests of the United States are concerned, are subject to the direction, and within the control of, the Attorney-General," *id.* at 458–59, who answers to the President and may thus exercise executive Power on his behalf, *see United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).  Because *qui tam* plaintiffs are not

similarly accountable, the FCA contravenes the Vesting Clause of Article II.

### B.   The *Qui Tam* Provisions Violate the Appointments Clause.

*Qui tam* litigation is also inherently inconsistent with the Appointments Clause, which works in tandem with Article II's Vesting Clause to ensure that the "executive Power" is exercised only by officers who are accountable to the President.  It requires that all such "Officers of the United States" be appointed by the President, with the advice and consent of the Senate, or in the case of inferior officers, by the Heads of the Executive Departments, if Congress so provides.  *See* U.S. Const. art. II, § 2, cl. 2.

The key test for an "Officer" is whether the person "exercis[es] significant authority pursuant to the laws of the United States."  *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).  Such authority includes the power to "conduct[] civil litigation in the courts of the United States for vindicating public rights."  *Id.* at 140.  And that describes the power of an FCA relator to a tee:  The relator may sue "for the United States" and "in the name of the Government" for "penalt[ies]" and "damages which the Government [has] sustain[ed]."  31 U.S.C. §§ 3729(a)(1), 3730(b)(1).

*Buckley* forbids such a diffusion of executive Power.  There, the Court struck down the original structure of the Federal Election Commission ("FEC"), which had allowed congressional leaders to appoint commissioners.  *See* 424 U.S. at 113.  That structure violated the Appointments Clause, because the congressionally appointed commissioners performed "functions" of Officers of the United States by wielding "enforcement power" to "seek judicial relief" for violations of federal campaign finance laws.  *Id.* at 138, 140.  As *Buckley* explained, "[a] lawsuit is the ultimate remedy

for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" *Id.* at 138 (quoting U.S. Const. art. II, § 3). Thus, "[s]uch functions may be discharged *only* by persons who are 'Officers of the United States' within the language" of the Appointments Clause. *Id.* at 140 (emphasis added) (quoting U.S. Const. art. II, § 2, cl. 2). Congress cannot vest the civil law enforcement authority in any other person—like the relator here—who has not been appointed through the constitutionally prescribed method. *See id.*

In considering whether one exercises a "function" of an executive office, *Buckley*'s interpretation reflects the original public meaning of an "Officer of the United States." "Etymologically, an 'office' is an *officium*, a duty; and an 'officer' was simply one whom the King had charged with a duty." Edward S. Corwin, *The President: Office and Powers 1787–1957*, at 70 (4th ed. 1957). In keeping with that understanding, the Crown argued prior to the Founding that "every Man is a publick Officer who hath any Duty concerning the Publick." *King v. Burnell*, Carth. 478, 478–79 (K.B. 1700). And if one had "any Part of the King's publick care," it does not matter that "his Authority is confined to narrow Limits, because 'tis the Duty of his Office, and the Nature of that Duty, which makes him a publick Officer, and not the Extent of his Authority." *Id.* at 479. Later dictionaries in the eighteenth and nineteenth centuries reflected the same understanding of the term. *See, e.g.*, *Officer*, 2 Timothy Cunningham, *A New and Complete Law-dictionary* (1765) (recounting the *Burnell* formulation nearly

verbatim); *Officer*, 2 Noah Webster, *American Dictionary of the English Language* (1828) ("A person commissioned or authorized to perform any public duty.").

The Framers likewise regarded an "Officer" as one "invested with some portion of the sovereign functions of the government."  Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* 2 (1890).  For example, Alexander Hamilton explained that persons to whose "management" the "executive details" of government "are committed ought to be considered as the assistants or deputies of the Chief Magistrate" and thus "ought to derive their offices from his appointment."  The Federalist No. 72, at 434 (Alexander Hamilton) (Clinton Rossiter ed., 2003).  Those executive appointees alone are "the officers who may be intrusted with the execution of [the] laws."  The Federalist No. 29, at 179 (Alexander Hamilton); *see also* The Federalist No. 39, at 237 (James Madison) (observing that "persons holding their offices" "administer[]" the government and so should "be appointed, either directly or indirectly, by the people").

This understanding of the word "Officer" explains why the Appointments Clause was no mere matter of "etiquette or protocol."  *Buckley*, 424 U.S. at 125.  It was instead considered, for multiple reasons, to be "among the significant structural safeguards of the constitutional scheme."  *Edmond v. United States*, 520 U.S. 651, 659 (1997).  First, "[t]he Appointments Clause prevents Congress from dispensing power too freely" to those who might wield it improperly.  *Freytag*, 501 U.S. at 880.  And second, the Clause "ensures that those who exercise the power of the United States are accountable to the President, who himself is accountable to the people."  *Ass'n of Am. R.R.*, 575 U.S. at 63 (Alito, J., concurring); *see Freytag*, 501 U.S. at 884.

10

The FCA's *qui tam* provisions place both concerns in full view.  Indeed, Congress could have hardly dispensed the executive Power more freely, "effectively permit[ting] all private persons in the entire world to appoint themselves special fraud prosecutors in the name of the United States."  James T. Blanch, *Constitutionality of the False Claims Act's* Qui Tam *Provision*, 16 Harv. J.L. & Pub. Pol'y 701, 742 (1993).  Congress also shielded relators from removal—and thus the President's ongoing supervision—by providing them a "right to continue as a party" even where duly appointed officials intervene.  31 U.S.C. § 3730(c)(1).  The result is a relator "that is not accountable to the President, and a President who is not responsible for the [relator]."  *Free Enter. Fund*, 561 U.S. at 495.  Such an arrangement violates Article II.

In holding otherwise, some courts have reasoned that relators are not "Officers" because they do not occupy a "continuing and formalized relationship of employment with the United States Government."  *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757–58 (5th Cir. 2001) (en banc).  *But see id.* at 767–69 (Smith, J., dissenting).  Yet that argument ignores the fact that private relators unquestionably wield executive Power.  As the Supreme Court has made clear in a related context, whether or not the relators are "public officers in a strict sense," they may not be "charged with the exercise of executive functions" unless appointed through the method that Article II prescribes.  *Springer v. Gov. of Philippine Islands*, 277 U.S. 189, 203 (1928).  And certainly, they cannot exercise the core executive function of prosecuting claims on behalf of the public for statutory relief that is "essentially punitive in nature."  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000).

11

The employment argument also reads the term "Officer" too narrowly.  It is true that the word "Officer" often "embrace[s]" the employment-related "ideas of tenure, duration, emolument, and duties" as *indicia* of officer status.  *United States v. Germaine*, 99 U.S. (9 Otto) 508, 511 (1878).  But the Supreme Court has never held that all such indicia are *necessary* to confer the same.  To the contrary, the Court held in *Morrison v. Olson* that an independent counsel—a temporary government prosecutor responsible for handling a single investigation—was "clear[ly]" an "'officer' of the United States."  487 U.S. 654, 671 & n.12 (1988).

Like the independent counsel in *Morrison*, *qui tam* relators function as single-case officers with the power to sue on behalf of the United States.  *See* 31 U.S.C. § 3730.  While their "office is limited in tenure" and "'temporary' in the sense that [they are] appointed essentially to accomplish a single task," those limits do not foreclose officer status "in the constitutional sense."  *Morrison*, 487 U.S. at 671–72 & n.12.  And there is little question that relators receive "emoluments" for their services.  *See* 31 U.S.C. § 3730(d).  Indeed, the fractional share of recovery they receive is no different than the "bounties" many federal officers received for their services, instead of "fixed salaries," in the first century of this Nation's existence.  *See* Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780–1940*, at 1–48 (2013).

At bottom, "there is not even a fig leaf of constitutional justification" for empowering "private entities" to prosecute alleged offenders of the FCA on the United States' behalf.  *Ass'n of Am. R.R.*, 575 U.S. at 62 (Alito, J., concurring); *see also Martin*,

14 U.S. (1 Wheat.) at 330.  The legitimacy of such an exercise of executive Power depends upon both (1) a constitutional appointment and (2) ongoing accountability to the public through the President—who is the lone actor to whom the people have entrusted the power to vindicate public rights.  *See United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021).  *Qui tam* plaintiffs possess neither of those constitutional prerequisites.  As independent and self-appointed bounty hunters, they operate well outside the carefully crafted scheme that the Framers adopted in Article II.

## C.   The *Qui Tam* Provisions Violate the Take Care Clause.

The constitutional problems with *qui tam* litigation do not stop there.  The President's "most important constitutional duty" is to "'take Care that the Laws be faithfully executed.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (quoting U.S. Const. art. II, § 3).  And the FCA impedes that prerogative in multiple ways.

### 1.  The *Qui Tam* Provisions Allow Unharmed Private Actors to Commandeer the Executive's Enforcement Discretion.

The Anglo-American legal system has long afforded the Executive discretion "where the public good demands not the execution of the law."  Locke, *supra*, at 196; *see* 1 Blackstone, *Commentaries* at *261.  After all, the law can be a blunt instrument, and "the condition of society would be miserable if the severity of the law could in no form be mitigated" to account for the particular circumstances of a case.  William Rawle, *A View of the Constitution of the United States of America* 163 (1825).

Such enforcement discretion also provides a critical check against legislative overreach.  The Framers knew that there "can be no liberty" if a single body "should

enact tyrannical laws," to have them then "execute[d] . . . in a tyrannical manner." The Federalist No. 47, at 300 (James Madison) (emphasis omitted).  So they divided the Nation's lawmaking and law-enforcement powers.  That "separation of legislative and executive functions helps prevent tyranny precisely because a discretionary decision by executive officers intervenes between the enactment of the prohibition and its application to any particular individual."  Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 702 (2014).

At the same time, "[t]he Constitution does not leave to speculation who is to administer the laws enacted by Congress"—and thus who is to exercise the necessary discretion in their execution.  *Printz v. United States*, 521 U.S. 898, 922 (1997).  "[T]he President, it says, 'shall take Care that the Laws be faithfully executed,' personally and through officers whom he appoints."  *Id.* (quoting U.S. Const. art. II, § 3).  Included within that charge "is the power to protect individual liberty by essentially under-enforcing federal statutes regulating private behavior."  *Aiken*, 725 F.3d at 264 (opinion of Kavanaugh, J.).  And that "special province of the Executive branch" extends to both the criminal and civil realms.  *Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *see also, e.g.*, The Federalist No. 21, at 134–35 (Alexander Hamilton) (observing that the power "to enforce the execution of [the] laws" includes the pursuit of civil remedies like "pecuniary mulcts" (*i.e.*, fines) and the "suspension or divestiture of privileges").

Simply put, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)."

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021).  And there are good reasons for that constitutional design.  "Private plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law."  *Id.*; *see also Schumer*, 520 U.S. at 949.

The FCA's *qui tam* provisions cannot be squared with these principles.  They permit unharmed private parties to commandeer the Executive's enforcement discretion and decide whether, where, when, and how to sue alleged violators of the Act.  Indeed, "[t]he legislative history of the 1986 Amendments shows" that overriding the Executive's prerogative was precisely Congress's aim; Congress passed the amendments "out of generalized distrust of, and dissatisfaction with, the way the Executive Branch was carrying out its law enforcement responsibilities."  John T. Boese & Douglas W. Baruch, *Civil False Claims and Qui Tam Actions* § 4.11 (5th ed. 2023) (citation omitted); *see, e.g.*, 131 Cong. Rec. 22322 (daily ed. Aug. 1, 1985) (statement of Sen. Grassley) (stating that the Executive was "unwilling to guard against or aggressively punish fraud" and so *qui tam* amendments were needed because Congress cannot "legislate aggression on the part of investigators and prosecutors"); 132 Cong. Rec. 22339 (daily ed. Sept. 9, 1986) (statement of Rep. Bedell) (describing the *qui tam* amendments as a "supplement—and prod—to Government prosecution").

This legislative history only highlights the problem with *qui tam* litigation, which "allows Congress to circumvent the Executive's check and to have its laws enforced directly by its own private bounty hunters."  OLC Memo, *supra*, at 211.  That reallocation of power threatens individual liberty.  And it can also undermine the

"overall policies" of the Executive Branch itself. *Heckler*, 470 U.S. at 831. That is why the Framers wisely entrusted these sorts of enforcement decisions to one, publicly accountable President. "[O]nly a unitary executive properly can balance the competing interests at stake, including law enforcement, foreign affairs, national security, and the overriding interest in just administration of the laws." OLC Memo, *supra*, at 232. That is, only the President can "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, so as to best serve the "public-welfare needs of the American people," *United States v. Texas*, 143 S. Ct. 1964, 1972 (2023).

### 2. The *Qui Tam* Provisions Interfere with the Executive's Ability to Execute the Laws.

Other features of the FCA compound the Take Care Clause violation. Where the government declines to intervene, as here, the relator obtains "the right to conduct the action" on behalf of the United States. 31 U.S.C. § 3730(b)(4)(B), (c)(3). In turn, she receives "full control over the litigation," even though she "is under no general constraint to pursue Department of Justice litigation policies or procedures." OLC Memo, *supra*, at 215 & n.4. As the litigation unfolds, the Executive may object to a voluntary dismissal, 31 U.S.C. § 3730(b)(1), seek a brief discovery stay, *id.* § 3730(c)(4), and request copies of pleadings and deposition transcripts, *id.* § 3730(c)(3). But it "cannot participate actively in the litigation" except on a showing of "good cause," *Blanch, supra*, at 762 (quoting 31 U.S.C. § 3730(c)(3)), and that lack of control "interfere[s] severely with the Executive Branch's ability to ensure that the laws are 'faithfully executed' by the relator," *id.* at 764–65 (quoting *Morrison*, 487 U.S. at 696).

16

Even where the government does intervene, the relator still plays a substantial role. To "keep pressure" on the Executive, 132 Cong. Rec. 29322 (daily ed. Oct. 7, 1986), Congress afforded the relator the "right to continue as a party to the action," 31 U.S.C. § 3730(c)(1), (c)(3). The government cannot limit the relator's "unrestricted participation" without court approval. *Id.* § 3730(c)(2)(C). Nor can it "dismiss the action" without notifying the relator, moving the court for permission, and affording the relator "an opportunity for a hearing on the motion." *Id.* § 3730(c)(2)(A); *see also Polansky*, 143 S. Ct. at 1734. Nor can it settle the action over the relator's objection without the court's finding, after a hearing, that the "proposed settlement is fair, adequate, and reasonable under all the circumstances." 31 U.S.C. § 3730(c)(2)(B).

Thus, whether the Executive chooses to intervene or not, the FCA limits its ability to "exercise authoritative control over the case." *United States ex rel. Foulds v. Texas Tech Univ.*, 171 F.3d 279, 290 (5th Cir. 1999). But that cannot be. Under our constitutional framework, "all" suits involving the government must be "subject to the direction, and within the control of" the Executive. *Confiscation Cases*, 74 U.S. at 458–59. *Qui tam* lawsuits, like this one, are not. They are therefore unconstitutional.

## II.   History Cannot Salvage the *Qui Tam* Provisions' Affront to Article II's Text.

The FCA's *qui tam* provisions conflict with the original meaning of Article II's text. The few historical antecedents that exist were materially different or proved short-lived—and they cannot wash away *qui tam*'s constitutional shortcomings in any event. After all, "[t]he Constitution, not history, is the supreme law." OLC Memo, *supra*, at 233; *see Bruen*, 142 S. Ct. at 2137 (stressing that "the text controls" when "later

17

history contradicts what the text says"). As a result, historical practice cannot cure constitutional infirmities even when it "covers our entire national existence and indeed predates it." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970).

At any rate, *qui tam* litigation suffers from a checkered history both in England and the United States. In fact, it did not become ubiquitous in this country until Congress amended the FCA in 1986—two centuries after the Founding. Those modern amendments, of course, are the very provisions at issue.

## A.   Abuses in Early English *Qui Tam* Practice Led to Its Decline.

"*Qui tam* actions appear to have originated around the end of the 13th century, when private individuals who had suffered injury began bringing actions in the royal courts on both their own and the Crown's behalf." *Stevens*, 529 U.S. at 774. This practice was originally aimed at getting "private claims into the respected royal courts, which generally entertained only matters involving the Crown's interests." *Id.* But as the "royal courts began to extend jurisdiction to suits involving wholly private wrongs" in the 1300s, "the common-law *qui tam* action gradually fell into disuse." *Id.* at 775.

Around that time, Parliament was "[f]aced with limited public enforcement resources and the difficulty of implementing national policies over numerous, geographically separated, local jurisdictions." J. Randy Beck, *The False Claims Act and the English Eradication of* Qui Tam *Legislation*, 78 N.C. L. Rev. 539, 567 (2000). It therefore began to experiment with *qui tam* litigation as a creature of statute. *See id.* at 567–73. And, unlike the practice developed at common law, some of these statutes permitted uninjured plaintiffs to "sue[] the Offender" and receive a bounty "as the

18

King's gift."  12 Edw. 2, ch. 6 (1318) (Eng.); *see also, e.g.*, 5 Edw. 3, ch. 5 (1331) (Eng.).

Over the next two centuries, however, *qui tam* "proved a vexatious device that ultimately could not be reconciled with the institutions of free and responsible government."  OLC Memo, *supra*, at 235.  The persons "occupied in this branch of executive jurisprudence" did not "give impartial efficiency to the laws," but acted instead as "instrument[s] of individual extortion, caprice, and tyranny."  8 Legal Observer No. 204, at 20 (1834) (citation omitted).  Informers unearthed old and forgotten statutes "as a means to gratify ill-will."  4 William S. Holdsworth, *A History of English Law* 356 (1924).  They used the threat of private enforcement suits to "levy[] blackmail" against potential defendants.  *Id.*  And they stirred up litigation simply in the hopes of recovering money.  *Id.*  These abuses led to considerable public outrage— so much so that Lord Coke denounced the English informers as "viperous vermin" who "vex and depauperize the subject" for "malice or private ends, and never for love of justice."  3 Sir Edward Coke, *Institutes of the Laws of England* 194 (4th ed. 1797).

In response, Parliament began to curb *qui tam* abuses in the late 1400s.  *See* Beck, *supra*, at 574.  Among other reforms, Parliament shortened the statute of limitations for *qui tam* actions, *see* 1 Hen. 8, ch. 4 (1509) (Eng.); it required unsuccessful informers to pay the defendant's costs, *see* 18 Eliz., ch. 5, § 4 (1576) (Eng.); and it imposed strict venue requirements for the prosecution of claims, *see* 31 Eliz., ch. 5, § 2 (1589) (Eng.).  By the Jacobean era, "many of the old enactments were repealed" entirely.  *Stevens*, 529 U.S. at 775 (citing 21 Jac. I, ch. 28, § 11 (1623) (Eng.)); *see* Coke, *supra*, at 192–93.

Some English *qui tam* statutes did remain in effect up through the Founding. *See Stevens*, 529 U.S. at 775.  But even those lend little support to the constitutionality of *qui tam* litigation in the United States.  After all, "the Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural departure from the English system of parliamentary supremacy, from which many legal practices like *qui tam* were inherited." *Polansky*, 143 S. Ct. at 1741–42 (Thomas, J., dissenting) (citation omitted).  And the English history of *qui tam* litigation only underscores the hazards posed by legislative transfers of the executive power to private hands.

Article II eliminated those hazards.  The Framers decided to vest in one publicly accountable President "the power of appointing, overseeing, and controlling those who execute the laws."  1 Annals of Cong. 481 (1789) (statement of James Madison). That choice forecloses Congress from adopting legislation—like the *qui tam* provisions of the FCA—that "vest[s]" the "executive power" in "any other person." *Martin*, 14 U.S. (1 Wheat.) at 330.

## B.   Early Congressional Enactments Do Not Support the Constitutionality of the False Claims Act's *Qui Tam* Provisions.

Courts that have upheld the FCA's private enforcement mechanism have noted that "the First Congress enacted a number of statutes authorizing qui tam actions." *Riley*, 252 F.3d at 752.  But that cannot salvage the FCA's glaring conflict with Article II's text, as even "a longstanding history of related federal action does not demonstrate a statute's constitutionality." *United States v. Comstock*, 560 U.S. 126, 137 (2010).

The early congressional practice also provides a weak precedent to the modern-

day FCA.  For one thing, many of the early *qui tam* enactments operated differently than the current law, which allows unharmed plaintiffs to "stand[] in the government's shoes" and litigate on the people's behalf.  *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006).  Most of the early statutes offered only a reward to informers for bringing a matter to the government's attention, without providing a cause of action to sue for the sovereign.[3]  Other laws sought to redress private injuries, with only incidental recoveries flowing to the government.[4]

As to the few enactments that allowed informers to pursue the sovereign's claims, *see Stevens*, 529 U.S. at 777 n.6, these provisions "were essentially stop-gap measures, confined to narrow circumstances" to assist the fledging Executive, OLC Memo, *supra*, at 213.  And the "transitory and aberrational" *qui tam* device "never gained a secure foothold within our constitutional structure."  *Id.*  It produced "little actual litigation," Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 728 (2004), and "[w]ithin a decade, 'the tide had turned against' qui tam, and Congress started curtailing its use," OLC Memo, *supra*,

---

[3]  *See, e.g.*, Act of July 31, 1789, ch. 5, §§ 8, 29, 38, 1 Stat. 29, 38, 45, 48 (penalties against collectors, naval officers, and surveyors who failed to take an oath or display rate tables, with a bounty to the informer); Act of Sept. 1, 1789, ch. 11, § 21, 1 Stat. 55, 60 (similar for a maritime law); Act of Aug. 4, 1790, ch. 35, §§ 55, 69, 1 Stat. 145, 173, 177 (similar for a customs law); Act of Sept. 2, 1789, ch. 12, § 8, 1 Stat. 65, 67 (penalties for Treasury Department officials who violated conflict-of-interest and bribery prohibitions, with a bounty to the informer); Act of Mar. 3, 1791, ch. 8, § 1, 1 Stat. 215, 215 (similar); Act of Feb. 25, 1791, ch. 10, §§ 8, 9, 1 Stat. 191, 195–96 (penalties for agents of the United States Bank that engaged in improper trading practices, with a bounty to the informer).

[4]  *See, e.g.*, Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124–25 (giving half of statutory penalty to authors who sued for copyright infringement of their works, with other half to the government); Act of July 20, 1790, ch. 29, § 1, 1 Stat. 131, 131 (giving, on top of damages, half of statutory penalty to seamen or mariners deprived of pre-departure shipping contracts, with other half to the government).

at 235–36 (alterations adopted) (quoting Leonard D. White, *The Federalists* 417 (1956)).

In addition, the actions of the First Congress provide a highly imperfect guide to interpreting Article II, because "[t]here is no evidence" that the First Congress ever "considered the constitutional status of qui tam." *Id.* at 214. The early *qui tam* statutes have the characteristics of action "taken thoughtlessly, by force of long tradition" from an archaic English device, "and without regard to the problems" that it presented to the new constitutional order. *Marsh v. Chambers*, 463 U.S. 783, 791 (1983). The Framers themselves recognized that early congressional practice should receive little weight where, as here, "the question of Constitutionality was but slightly, if at all, examined." Letter from James Madison to President Monroe (Dec. 27, 1817), in 3 *Letters and Other Writings of James Madison* 54, 55–56 (J.B. Lippincott & Co. 1865).

In all events, "members of the First Congress were not infallible interpreters of the constitutional text." Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541, 556 (1994). The Constitution created a novel system of separated powers, including a unitary Executive, so it is unsurprising that some of Congress's initial laws were inconsistent with constitutional limitations. Indeed, the Supreme Court famously struck down part of the Judiciary Act of 1789 as "repugnant to the constitution." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And even before, several Justices riding circuit refused to perform non-judicial statutory functions. *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 (1792). For all these reasons, "postenactment history" should not receive "more weight than it can rightly bear" in discerning the original meaning of Article II's text. *Bruen*, 142 S. Ct. at 2136.

### C.     The False Claims Act Revived an Unconstitutional Practice.

The early *qui tam* provisions had fallen into disuse by the antebellum period. During the Civil War, however, Congress revived the concept following a series of investigations that "painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *United States v. McNinch*, 356 U.S. 595, 599 (1958). With the country's resources stretched to the breaking point, Congress passed the FCA "to stop this plundering of the public treasury." *Id.*

Congress viewed aggressive enforcement of the Act as critical to the war effort. It thus instructed the "district attorneys of the United States" to "be diligent in inquiring into any violation" and initiating actions. Act of Mar. 2, 1863, c. 67, § 5, 12 Stat. 696, 698. But the legislature feared that wartime fraud might outpace traditional enforcement efforts. So, it turned to the "unusual" practice of "authorizing private parties . . . to sue on the Government's behalf." *Polansky*, 143 S. Ct. at 1726. In the legislature's view, allowing "any person" to sue "for the United States" and share in the proceeds, *see* Act of Mar. 2, 1863, c. 67, § 4, 12 Stat. 696, 698, was the "most expeditious way" of "bringing rogues to justice," Cong. Globe, 37th Cong., 3d Sess. 956 (1863) (statement of Sen. Howard). To that end, Congress "let loose a posse of *ad hoc* deputies to uncover and prosecute frauds against the government." *United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992).

After the crisis of the Civil War receded, *qui tam* once again "fell into relative desuetude." OLC Memo, *supra*, at 209. Eventually, "both Houses of Congress voted

23

to repeal the FCA['s] *qui tam* provisions" in the early 1940s, albeit in different sessions. Beck, *supra*, at 558.  Congress then adopted a bill in 1943 that considerably restricted the role and recovery of relators.  *See id.* at 559–61.  Those restrictions all but signaled the death knell for the *qui tam* device, which had "become an anachronism," even if it remained on the books.  OLC Memo, *supra*, at 209.

By 1986, however, Congress had become "dissatisfied with the way the executive branch was enforcing government procurement laws."  *Id.*  So it responded with amendments designed to "encourage more private enforcement suits" and "check" the Executive's enforcement prerogatives.  S. Rep. No. 99-345, at 23–24, 26 (1986).  For instance, Congress "eliminate[d] a defense to a *qui tam* suit—prior disclosure to the Government—and therefore change[d] the substance of the existing cause of action."  *Schumer*, 520 U.S. at 948.  It also afforded relators "the right to continue as a party," even where the government chooses to intervene.  31 U.S.C. § 3730(c)(1).  And it significantly increased the bounty that relators—and their attorneys—could recover.  *See id.* §§ 3729(a)(1), 3730(d).

Having concluded that the President might not aggressively protect the federal fisc, Congress adopted the 1986 amendments to usher in a new era of litigation.  Since those amendments to the FCA, *qui tam* actions have surged more than a hundredfold— to a clip of roughly 700 suits per year.  *Compare* U.S. Dep't of Justice, *Fraud Statistics— Overview* (Feb. 7, 2023), https://bit.ly/3N3x9cm, *with* Steve France, *The Private War on Pentagon Fraud*, 76 A.B.A. J. 46, 48 (Mar. 1990).  That explosion of relator-driven

litigation has exacted a substantial economic toll on businesses nationwide, *see* Mot. for Leave to File *Amicus Curiae* Br. at 1–2, and it has created major problems for the Executive in ensuring the faithful execution of the laws.  Even though many *qui tam* actions are meritless or otherwise not in the best interests of the United States, the sheer volume of suits prevents the government from adequately overseeing relators' litigation tactics.  As a result, the 1986 amendments have threatened the Executive's authority in a way that even prior versions of the FCA did not.  Indeed, private relators now far surpass the Executive Branch as the primary executor of the statute.  *See Fraud Statistics*, *supra*.  Such an alternative means of federal law enforcement can hardly be reconciled with the original understanding of Article II or this Nation's history.

## CONCLUSION

The FCA's *qui tam* provisions do not enjoy "unambiguous and unbroken" historical support.  *Marsh*, 463 U.S. at 792.  And even if they did, "historical patterns cannot justify contemporary violations of constitutional guarantees," *id.* at 790, including those embodied in the text of Article II.  To allow this litigation to proceed would disregard the Framers' choice to "vest[]" all "executive Power" in the President.  U.S. Const. art. II, § 1, cl. 1.  It would wrongly permit relators to serve as "Officers of the United States" outside the safeguards of the Appointments Clause.  *Id.* art. II, § 2, cl. 2.  And it would contravene the President's prerogative to "take Care that the Laws be faithfully executed."  *Id.* art. II, § 3.  For these reasons, the Defendants' motion should be granted.

25

Respectfully submitted,

/s/ J. Carter Andersen

Steven A. Engel                             J. Carter Andersen
  (*pro hac vice* application forthcoming)    Harold Douglas Holder III
Michael H. McGinley                         Bush Ross, P.A.
  (*pro hac vice* application forthcoming)    1801 North Highland Ave.
Dechert LLP                                 Tampa, FL 33602
1900 K Street, NW                           Telephone: (813) 204-6405
Washington, D.C. 20006                      Facsimile: (813) 223-9620
Telephone: (202) 261-3369                   candersen@bushross.com
Facsimile: (202) 261-3333                   hholder@bushross.com
steven.engel@dechert.com
michael.mcginley@dechert.com

*Counsel for* Amicus Curiae
*The Chamber of Commerce of the United States of America*

February 23, 2024