# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA
ex rel. DR. CLARISSA ZAFIROV,

    Plaintiff/Relator,

v.

FLORIDA MEDICAL ASSOCIATES, LLC, d/b/a VIPCARE; PHYSICIAN PARTNERS, LLC; ANION TECHNOLOGIES, LLC; FREEDOM HEALTH, INC.; and OPTIMUM HEALTHCARE, INC.,

    Defendants.

Case No. 8:19-cv-01236

## DEFENDANTS' RESPONSE IN OPPOSITION TO RELATOR'S MOTION TO COMPEL DISCOVERY REGARDING AFFILIATED PROVIDERS

Physician Partners, LLC, Florida Medical Associates, LLC d/b/a VIPcare, and Anion Technologies, LLC ("Provider Defendants") oppose Relator Zafirov's motion to compel discovery ("Motion") relating to 240 independent non-party affiliated physicians not employed by Provider Defendants for three primary reasons: (1) Zafirov fails to plead even a single exemplar of a claim submitted by Provider Defendants on behalf of an affiliated physician (much less a false claim as defined under the FCA); (2) only affiliated physicians, not Provider Defendants, select diagnosis codes on their own electronic medical records ("EMR") systems; and (3) it would be extraordinarily unduly burdensome to gather, review, and produce every medical record over a four-year period from 240 non-party affiliated physicians who serviced over 56,000 patients and used over 20 different types of EMR systems at many different locations, particularly where Zafirov has not pleaded even one claim Provider Defendants submitted for affiliated physicians.

4859-9094-6983.9

## BACKGROUND

Zafirov's Motion to Compel attempts to brush past the critical differences between independent non-party affiliated physicians and physicians employed by Defendant VIPcare by pointing to a handful of conclusory allegations in the Amended Complaint that assert nothing more than that affiliated physicians are treated the same as employed physicians like Zafirov, without alleging any particularized facts in support. Zafirov cannot simply explain away the important differences that exist between these two groups of physicians—differences that plainly justify the Provider Defendants' position to exclude what would be a gargantuan amount of affiliated physician discovery from the already expansive discovery process.

As Provider Defendants have repeatedly explained to Zafirov's counsel both by letter and through objections to Zafirov's discovery requests, employed physicians, like Zafirov, are W-2 employees who work exclusively for VIPcare pursuant to the terms of an employment agreement. *See* Kollefrath Decl. ¶ 4, filed herewith; *see also* Ltr. from J. Mehta to J. Estes, filed herewith. As employees, these physicians receive most, if not all, of their income and benefits from VIPcare. Kollefrath Decl. ¶ 5.

In contrast, non-party affiliated physicians are independent owners and operators of their own practices at their own locations around the state, and their income derives from several sources, only one of which is Physician Partners. *Id*. ¶¶ 5-6. None of the Provider Defendants have an employer-employee relationship with any affiliated provider. *Id.* ¶ 4. Instead, Physician Partners enters into agreements with affiliated providers that differ from affiliate to affiliate. *Id.* For example, some affiliated

2

providers are paid on a fee-for-service basis, while others have chosen a capitation payment model. *Id.*; Ltr. from J. Mehta to J. Estes. In other words, not only do the contractual relationships between the Provider Defendants and employed and affiliated physicians differ, but so do the contractual relationships *among* affiliated physicians.

Affiliated physicians, moreover, have ownership and responsibility over their own practice, including their facilities, patient scheduling, and, importantly, their own EMR systems on which the affiliated providers—not Provider Defendants—select diagnosis codes. Kollefrath Decl. ¶¶ 6-7. For physicians employed by Defendant VIPcare, on the other hand, such as Zafirov, VIPcare controls the facilities, the selection of insurance programs, patient scheduling, staff hiring and management, and a single unified EMR system. *Id.* VIPcare employed physicians must use the eClinical Works EMR software provided by VIPcare, whereas affiliated physicians are free to select their own EMR software from the many different products available on the market. *Id.* Provider Defendants are aware of more than 20 different EMR systems that the 240 affiliated providers at issue have chosen to use. *Id.*

Zafirov admits it is relevant to her Motion that Physician Partners states that "affiliated providers typically manage their own coding, billing, and referrals," arguing that she should get discovery into the "subset of the affiliated providers [who] do *not* manage their own coding, billing, and referrals." Motion at n.12.[1] Zafirov mentions only

---

[1] Except as otherwise noted, all emphasis in this brief is supplied.

3

one such affiliated provider, Dr. George Mansour, to whom Physician Partners "provided the services at issue in this case," including "billing services." Motion at 10-11. Mansour is in fact the one exception among the 241 affiliated physicians—Mansour did not have his own EMR or billing system, and Anion processed all of Mansour's billing to Freedom and Optimum for him based on documentation he provided (Kollefrath Decl. ¶ 9)—and Provider Defendants agree that Mansour can be included in discovery. But Provider Defendants do *not* agree that the other 240 affiliated physicians should be included in discovery in this case, especially where Zafirov fails to plead even a single exemplar of a claim submitted by the Provider Defendants on behalf of an affiliated provider.[2]

Zafirov asserts that she learned about the Defendants' alleged scheme during her 18-month tenure as an employee of VIPcare, during which time she allegedly had complete access to Freedom's physician portal, which detailed "the codes that were submitted from Freedom and Optimum for each patient, including the dates of service and the source for the submitted codes." Dkt. 86 at ¶ 13. This "open access to [Freedom's] billing records" (*id.* at ¶ 191) allegedly permitted Zafirov to "trace the false claims alleged in this case from 'cradle to grave.'" *Id.* at ¶ 15.

In her unsuccessful attempt to expand the temporal scope of discovery, Zafirov also asserted that she "was in a position to review medical records which included billing and coding information from years prior." Dkt. 143 at 9. Despite this purported

---

[2] Again, the word "claim" is used herein to refer to submissions from Provider Defendants to Freedom Defendants and is not synonymous with the term "claim" as defined by the FCA—neither of which Zafirov has pleaded as to affiliated providers.

4

unfettered access to billing and coding records and medical records, Zafirov does not plead a single alleged false claim that the Provider Defendants submitted to Freedom or Optimum on behalf of an affiliated physician.

Zafirov has requested from all Provider Defendants "[a]ll medical and billing records related to any Physician Partners patient whose services were paid in whole or in part by any Government health insurance program." Zafirov's Request for Production No. 43 to Physician Partners, No. 36 to VIPcare, and No. 36 to Anion. To the extent the Court allows this request to include the 240 affiliate physicians at issue here who collectively serviced more than 56,000 patients, this request alone would impose a crushing discovery burden on Provider Defendants and on the 240 non-party physicians.

These 240 non-party physicians used over 20 different types of EMR systems, each one of which has its own unique formatting, organization, processes and procedures for selecting diagnosis codes and multiple other data elements. Kollefrath Decl. ¶ 7. Provider Defendants may not be able to get access to such medical records, particularly regarding former affiliated providers with whom they no longer have contractual relationships (Kollefrath Decl. ¶ 10), which would necessitate non-party subpoenas to each such provider. Moreover, even some of those affiliated providers with whom Provider Defendants currently have contractual relationships do not have EMRs that would allow Provider Defendants to remotely collect such medical records, which would require Provider Defendants to send teams of staff in person to each such provider to gather reams of medical records from each one. *Id.* ¶ 10.

5

Finally, the amount of medical records that would need to be collected, reviewed, and produced from the affiliated providers would be massive. Over the four-year time period for which Zafirov requests records, the affiliated providers had approximately **970,000** visits with these more than 56,000 patients, each one of which generated a medical record. Kollefrath Decl. ¶ 8.[3] And that number does not even include medical records of visits with other types of providers that would also be in these providers' possession, such as specialists, hospitals, and other providers. *Id.* Provider Defendants estimate that the cost to gather, review, and produce all these millions of pages of records (to the extent Provider Defendants can access them) would be at least in the hundreds of thousands of dollars, perhaps more. *Id.* ¶ 10. And all that for a case in which Zafirov has not identified even one claim submitted by Provider Defendants on behalf of affiliated providers. Zafirov has not carried her burden on this Motion, and her Motion should be denied.

## ARGUMENT

### I.     The Scope of Discovery in False Claims Act Cases is Limited to Facts Pleaded with Particularity in the Complaint.

Discovery is proper only if it is both "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "The party moving to compel discovery has the initial burden of proving the requested discovery is relevant and proportional." *U.S. ex rel. Rosen v. Exact Sci. Corp.*, No. 8:19-CV-1526-

---

[3] Provider Defendants already have to contend with Zafirov's requests that they gather, review, and produce a vast amount of documents relating to VIPcare employed physicians, who performed approximately **450,000** visits with Freedom and Optimum members from 2017-2020. *Id.*

4859-9094-6983.9

MSS-AAS, 2023 WL 1798258, at *1 (M.D. Fla. Feb. 7, 2023). Parties "have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2000 amendment. And "a relator may not assert new theories of liability based on information learned during discovery." *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 116 F. Supp. 3d 1326, 1341 (S.D. Fla. 2015), *aff'd as modified sub nom. U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148 (11th Cir. 2017). Relators are not permitted to engage in discovery concerning unpled claims. *Id.*

In FCA actions, the scope of discovery is "guided … by the principles behind Rule 9(b)," especially in declined *qui tams* like this one, because "the right of action granted to private citizens to bring *qui tam* actions on behalf of the United States is quite limited." *U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, No. 8:06-cv-40-T-24MAP, 2008 WL 4057549, at *1 (M.D. Fla. Aug. 27, 2008) ("discovery in *qui tam* actions must be limited and tailored to the specificity of the complaint."). As the Honorable Mark A. Pizzo explained in *Bane* in rejecting the relator's argument that expansive discovery was warranted because his claims "survived Defendants' motion to dismiss" (as Zafirov argues here, Motion at 9-10), the Court "must still be guided by Rule 9(b)'s parameters and discovery should still be limited to the constraints of the Relator's allegations." *Id.* Thus, as this Court ruled in denying Zafirov's first motion to compel, a relator's specific examples "will support more generalized allegations of fraud only to the extent that the relator's examples are **representative samples** of the

7

broader class of claims." *U.S. ex rel. Zafirov v. Physician Partners, LLC*, 2023 WL 8254360, *3 (M.D. Fla. Nov. 29, 2023) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007) (emphasis in original)). Consistent with *Bane*, the Honorable Amanda Sansone recently denied a relator's motion to compel on Rule 9(b) grounds, holding that the "particularity requirement of *qui tam* actions under the FCA trumps the plaintiffs' request that the court compel" discovery demands supported by "no detailed allegations, such as who, what, when, where, and how fraudulent practices occurred," as such demands were "not ... proportional." *Rosen*, 2023 WL 1798258, at *2-3.

This Court recently held when denying in part Zafirov's first motion to compel that "the specific examples Relator provides in the Amended Complaint **are not representative examples** of a scheme dating back to 2014 and continuing past 2020 . . . [thus, relator's discovery proposal] 'runs counter to the public policy underpinnings of Rule 9(b), the FCA, and qui tam actions.'" *Zafirov*, 2023 WL 8254360, at *3 (quoting *Rosen*, 2023 WL 1798258, at *2). The non-FCA cases Zafirov cites in support of her motion do not overcome this clear precedent, and the Court should apply Rule 9(b)'s gatekeeping function, which extends to discovery, when ruling on this Motion. *See U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 198 F.R.D. 560, 564 (N.D. Ga. 2000) ("The particularity requirement of Rule 9(b), if enforced . . . will result in claims with discernable boundaries and manageable discovery limits.").

4859-9094-6983.9

## II. Discovery in This Case Should be Limited by Zafirov's Failure to Plead Any Claims Submitted by the Provider Defendants on Behalf of Affiliated Providers.

Zafirov's Motion asks the Court to grant her unfettered discovery regarding 240 affiliate physicians who collectively serviced more than 56,000 patients, a request that is untethered to the specific allegations in the Amended Complaint. Indeed, the only allegations in the Amended Complaint that mention affiliated physicians are unsupported conclusory assertions that affiliated physicians are treated the same as employed physicians like Zafirov, not any specific alleged false claims that the Provider Defendants billed on behalf of affiliated physicians.

The sum total of Zafirov's allegations that implicate the affiliated providers is as follows: "Physician Partners is a provider organization which employs or contracts with about 500 physicians" and that "[t]hrough policies, practices and procedures imposed on both contracted and employed physicians, Physician Partners and Anion systematically manipulate patient health records to document and submit unsupported conditions to increase their patients' 'risk adjustment scores,' which in turn substantially increases the amount that Medicare pays for the patients' care." Dkt. 86 at ¶¶ 4-5. Though Zafirov sprinkles several versions of this conclusory allegation throughout the Amended Complaint,[4] her allegations never go further than suggesting the Provider Defendants' billing practices applied with equal force to the employed

---

[4] *See* Dkt. 86 at ¶ 24 ("For all providers, whether they have a private or affiliate practice, Physician Partners uses uniform billing and coding process. . ."); *id.* at ¶ 102 (Anion was the billing and coding entity for employed and independent physicians); *id.* at ¶¶ 199-200 (Provider Defendants knew false codes were being submitted on behalf of employed and affiliate physicians).

9

and affiliate physicians, without citing any facts in support. And Zafirov does not identify a single instance where the Provider Defendants billed an alleged false claim for an affiliated provider. Instead, despite Zafirov's "open access" to Freedom's billing records, *id.* at ¶ 191, and over twenty specific patient exemplars, *id.* at ¶¶ 201-291, the specific allegations against the Provider Defendants in the Amended Complaint are limited to claims allegedly submitted by the Provider Defendants on behalf of VIPcare employed physicians.[5] Zafirov's Motion does not contend otherwise.

This Court considered the Amended Complaint's exemplar claims when ruling on Zafirov's prior motion to compel concerning the temporal scope of discovery. In its Order, the Court determined that because "the specific examples Relator provides in the Amended Complaint are not 'representative examples' of a scheme dating back to 2014 and continuing past 2020 ... [the] proposed temporal scope 'runs counter to the public policy underpinnings of Rule 9(b), the FCA, and qui tam actions.'" *Zafirov*, 2023 WL 8254360, at *3 (quoting *Rosen,* 2023 WL 1798258, at *2). Just like Zafirov's specific exemplars were insufficient to grant her access to nine years of discovery, her specific exemplars only of claims submitted for VIPcare employed physicians are insufficient to sweep 240 affiliate providers, 56,000 patients, and 970,000 visits within the scope of discovery in this case. Indeed, specific examples "will support more

---

[5] Zafirov identifies one patient in the Amended Complaint who was a ***prior*** patient of Dr. Simovitz, an affiliated provider. Dkt. 86 at ¶ 231. But Zafirov does ***not*** allege that false claims were submitted by the Provider Defendants on behalf of that patient while the patient was under Dr. Simovitz's care, only that the Provider Defendants allegedly submitted false claims while the patient was subsequently being treated by a ***VIPcare employed*** physician, Dr. Akhil Patel, and later treated by Zafirov, also a VIPcare employed physician. *Id.* at ¶¶ 231-239.

10

generalized allegations of fraud only to the extent that the relator's examples are *representative samples* of the broader class of claims." *Bledsoe*, 501 F.3d at 510 (emphasis in original). As a result, the "particularity requirement of *qui tam* actions under the FCA trumps" Zafirov's attempt to bring 240 affiliate providers within the scope of discovery. *Rosen*, 2023 WL 1798258, at *2. In an FCA case alleging false billing, Zafirov's failure to plead a single exemplar even suggesting the Provider Defendants submitted false claims on behalf of an affiliate provider is fatal to Zafirov's relevancy argument. *See* Dkt. 124 at 10 (quoting *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018) ("To satisfy this particularity standard in a *qui tam* action, a relator must allege the actual 'submission of a false claim'")).

Apparently recognizing this fatal flaw, Zafirov attempts to downplay the absence of specific exemplar claims concerning the affiliate physicians by invoking the alleged "universality of the conduct" in the Amended Complaint, including the Provider Defendants' alleged use of 5 Star Checklists and corporate-wide training materials. Motion at 13. But "[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir.2002). Zafirov's allegations concerning this purportedly "universal" conduct are thus meaningless for setting the proper bounds of discovery absent a specific allegation supported by particularized facts that the Provider Defendants submitted false claims on behalf of the affiliated providers. *See Bane*, 2008

11

WL 4057549, at *1 ("discovery in *qui tam* actions must be limited and tailored to the specificity of the complaint"); *U.S. v. Choudhry*, No. 8:13-CV-2603-T-27AEP, 2016 WL 7205970, at *2 (M.D. Fla. Oct. 11, 2016) ("the particularity requirement of pleading a false claim cannot be overcome by describing other allegedly improper conduct."). Zafirov's Amended Complaint contains no such specific allegations of any false claim or false diagnosis code submitted by Provider Defendants on behalf of affiliated physicians. And, in fact, only affiliated physicians, not Provider Defendants, select diagnosis codes on their own EMR systems. Kollefrath Decl. ¶ 6.

Courts have rejected expansive discovery in similar instances where a pleading fails to link the scope of discovery that the relator seeks to specific claims. *See, e.g., U.S. ex rel. CKD Project, LLC v. Fresenius Med. Care AG & Co. KGAA*, 333 F.R.D. 25, 28 (E.D.N.Y. 2019) (following an analysis of decisions implicating potential nationwide discovery, the court adopted geographic limitations and noted the "thread running through these cases is straightforward: the discovery was limited to the universe of transactions about which the relator had knowledge or could plausibly allege were similar to those known transactions. Absent specific allegations about transactions or entities across the United States, the relator's discovery scope was limited geographically.").[6] Likewise, Zafirov is not entitled to discovery regarding 240

---

[6] *See also U.S. ex rel. Conroy v. Select Med. Corp.*, 307 F. Supp. 3d 896, 900 (S.D. Ind. 2018) (because FCA complaint was limited to alleged fraudulent claims for patients at one long-term acute care hospital only and because the complaint did not encompass any alleged fraud at the more than 100 other hospitals affiliated with parent in some 26 states, discovery was limited to alleged fraudulent claims only at the acute care hospital).

12

physicians providing approximately 970,000 visits at numerous different locations around Florida for whom she did not plead even one false claim billed by the Provider Defendants.

Because Zafirov's allegations concerning the affiliate providers are untethered to the specific allegations set forth in her Amended Complaint, the Court should limit discovery to employed physicians like Zafirov and the single affiliate physician for whom Anion processed all billing to Freedom and Optimum, Mansour.

### III. Expanding Discovery to 240 Affiliated Physicians Who Serviced more than 56,000 Patients Would Be Unduly Burdensome for the Provider Defendants as well as the Non-Party Affiliated Physicians.

Zafirov seeks discovery regarding hundreds of non-party affiliated physicians who collectively serviced over 56,000 patients. Kollefrath Decl. ¶ 8. The inclusion of these 240 affiliate providers in discovery would put at issue approximately 970,000 visits (in addition to the already burdensome 450,000 VIPcare employed physicians' visits) for which millions of pages of medical records and other documents would need to be gathered, reviewed, and produced. *Id.* ¶¶ 8,10. While these numbers alone demonstrate the enormous burden associated with Zafirov's discovery demand, it does not stop there. Indeed, while employed physicians were required to use eClinical Works EMR software throughout the relevant period, affiliate physicians were free to choose their own EMR from the many different options on the market. *Id*. at ¶ 7. Requiring the gathering, review, and production of millions of pages of materials from over 20 different types of EMR systems for hundreds of physicians and tens of thousands of patients is overly burdensome and would cost the Provider Defendants

13

at least hundreds of thousands of dollars in unnecessary document collection and review, especially where Zafirov requests "***all*** medical and billing records related to ***any*** Physician Partners patient whose services were paid in whole or in part by ***any*** Government health insurance program." Zafirov Request for Production No. 43. *See also* Kollefrath Decl. ¶¶ 8, 10.

Given the breadth of information implicated by Zafirov's discovery demand, the significant burden it would impose on parties and non-parties, and the fact that the specific claims alleged in the Amended Complaint are limited to VIPcare employed physicians, the Court should rule that including the 240 affiliated physicians for whom Zafirov seeks discovery is overly burdensome and disproportionate to the needs of this case. Even in cases where there is an articulated need for the discovery sought, which Zafirov has not provided here, courts emphasize that the scope of discovery must recognize "the cost and time associated with producing the documents." *McPherson v. Fla. Dep't of Corr.*, No. 4:19cv156-MW/CAS, 2020 WL 7020373, at *2 (N.D. Fla. Apr. 2, 2020) (ordering the parties to "narrow the scope of Plaintiff's requests" to "reduce the expense and time required to produce responsive documents."). "[G]iving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry" is at the heart of Rule 26(b)(1). Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 1983 amendment. And so, in cases such as this one, where significant collection, review, and production burdens are implicated by each additional physician, "discovery must hew closely to matters specifically described in the complaint lest discovery, because of its burden and expense, become

14

the centerpiece of litigation strategy." *U.S. ex rel. McCartor v. Rolls-Royce Corp.*, No. 1:08-cv-00133-WTL-DML, 2013 WL 5348536, at *7 (S.D. Ind. Sep. 24, 2013).

Permitting Zafirov to take discovery related to 240 affiliate physicians and their 56,000-plus patients and approximately 970,000 visits is exactly what the Eleventh Circuit has warned against: if a relator is given a "ticket to the discovery process" that is unbound by their particularized allegations of false claim submissions, they "will request production of every claim submitted by the Defendant during the time period corresponding to Plaintiff's claims." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006). Zafirov's Motion is directly contrary to binding FCA precedent, and her requested discovery would impose a serious undue burden on the Provider Defendants that far outweighs Zafirov's purported need for the discovery, a burden she has not carried. *See Rosen*, 2023 WL 1798258, at *1 ("The party moving to compel discovery has the initial burden of proving the requested discovery is relevant and proportional.").

## CONCLUSION

Despite her unfettered access to Defendants' billing records and systems, Zafirov fails to link her conclusory allegations concerning affiliated physicians to a single specific allegation of fact in the Amended Complaint, much less a false claim billed by the Provider Defendants on behalf of even one of the 240 affiliated physicians Zafirov seeks to sweep within the scope of discovery. Zafirov's Motion to Compel should be denied, and the Court should enter an order limiting discovery to employed VIPcare providers and Mansour.

4859-9094-6983.9

DATED: February 26, 2024

        Respectfully submitted,

        */s/ Jason P. Mehta*
        Jason P. Mehta
        Fl. Bar No. 106110
        Primary email: jmehta@foley.com
        Secondary email: dmills@foley.com

        Lauren L. Valiente
        Fl. Bar No. 034775
        Primary email: lvaliente@foley.com
        Secondary email: dguillen@foley.com

        Joseph W. Swanson
        Fl. Bar No. 29618
        Primary email: joe.swanson@foley.com
        Secondary email: dmills@foley.com

        Michael P. Matthews
        Fl. Bar No. 63988
        Primary email: mmatthews@foley.com
        Secondary email: dguillen@foley.com

        **Foley & Lardner LLP**
        100 N. Tampa Street, Suite 2700
        Tampa, FL 33602
        Telephone: (813) 229-2300
        Facsimile: (813) 221-4210

        *Counsel for Defendant Physician Partners, LLC, Florida Medical Associates, LLC d/b/a VIPcare, and Anion Technologies, LLC*