# EXHIBIT B

# PHYSICIAN AFFILIATE AGREEMENT

This Physician Affiliate Agreement ("Agreement") is entered on _2\6\2017_ ("Effective Date") by George Mansour, M.D., P.A. ("Physician") and Physician Partners, LLC ("IPA").

**WHEREAS,** IPA has established a network of providers to arrange for the provision of health services to certain members of certain health plans and other entities ("Plan(s)") pursuant to an agreement between Plan and IPA ("Plan / IPA Agreement(s)") for such services ("Plan Member(s)"); and

**WHEREAS,** Physician is a primary care physician ("PCP") who desires to enter into this Agreement for the provision of health services covered under the agreement between Member and Plan ("Covered Service(s)") to Plan Members who have been assigned to or selected Physician as their PCP ("Member(s)");

**NOW, THEREFORE,** Physician and IPA agree as follows:

## 1. PHYSICIAN RESPONSIBILITIES

1.1 Physician agrees, and shall enter into written agreements with all of its employed or contracted providers to cause such providers to agree, to abide and be bound by all of the terms, conditions, policies and procedures contained in the applicable Plan / IPA Agreement, this Agreement and Exhibits, and the IPA Provider Manual as updated by IPA from time to time. Physician agrees to provide or arrange for the provision of Covered Services to Members within the scope of Physician's practice: (i) in accordance with the terms of this Agreement and the applicable Plan / IPA Agreement and (ii) only when and in locations expressly approved by Plan and IPA.

1.2 Physician agrees to maintain all licenses, permits and certifications required by state and federal laws to perform Physician's obligations hereunder and shall maintain professional liability coverage in the amounts required by Plan, IPA or by state or federal law, whichever is greater.

1.3 Physician, not IPA, is solely responsible for all Member medical decisions.

1.4 Physician agrees to render Covered Services to Members in accordance with professionally recognized standards of care in the same manner and with the same availability provided to other patients.

1.5 Physician agrees that all claims for medical services and other data provided to Plan or IPA will be *accurate, complete and truthful.*

1.6 Physician agrees to participate in IPA marketing activities and that IPA may use Physician's image, name, practice and other information for such.

## 2. COMPENSATION

In full payment for all Covered Services provided to Members, Physician shall be paid the amounts, and in accordance with the terms, set forth in the applicable Payment Exhibit(s) to this Agreement.

## 3. COMPLIANCE

IPA and Physician agree to abide and be bound by all applicable state and federal laws, regulations, and Medicare and/or Medicaid program requirements, including the provisions of the Regulatory Compliance Exhibit to this Agreement.

## 4. CONFIDENTIALITY

Confidential information, whether oral or written, disclosed prior or subsequent to the execution of this Agreement, shall include, without limitation, this Agreement, IPA's technical and business practices, practice guides, operational methods, procedures, formulas, programs, computer systems, trade secrets, Member information or lists, finances, volume of business, contracts, internal publications and memoranda, and prices and price-related information ("Confidential Information"). During the term of this Agreement and at all times thereafter, IPA and Physician shall each ensure that they, their directors, officers, employees, contractors and agents hold Confidential Information in the strictest confidence and in accordance with state and federal law and shall not disclose such Confidential Information to anyone, directly or indirectly, except as required by law. This Section 4 shall survive the termination of this Agreement.

## 5. INDEMNIFICATION

None of the provisions of this Agreement are intended to create, nor shall be deemed or construed to create, any relationship between IPA and Physician other than that of independent entities contracting with each other hereunder solely for the purpose of effecting this Agreement. Each party indemnifies and holds harmless the other party from and against any claim, demand, loss, lawsuit, settlement, judgment, fine, or other liability, and all related expenses which may accrue therefrom including reasonable attorney fees, arising from or in connection with third party claims alleging any negligence or otherwise wrongful act or omission of a party, its agents or employees in the performance of a party's respective obligations under this Agreement. Physician agrees this Section 5 applies to, but is not limited to, any inaccurate or incomplete medical records, data or information by Physician and Physician's provision of health care services to

# PHYSICIAN AFFILIATE AGREEMENT

Members. Except for willful, intentional or illegal acts, neither party shall be liable for incidental, consequential, exemplary, punitive, special or indirect damages of the other party. This Section 5 shall survive the termination of this Agreement.

## 6. DISPUTE RESOLUTION

Any dispute relating to this Agreement shall be settled exclusively by binding arbitration in Sarasota County, Florida by a single arbitrator, chosen from a panel of licensed attorneys having at least ten years of managed care-related experience, pursuant to the American Health Lawyers Association's Dispute Resolution Rules then in effect. Judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction and enforced accordingly. The arbitrator may grant injunctive relief in a form similar to that which a court of law would otherwise grant. The arbitrator shall be bound by applicable law and shall not award exemplary or punitive damages. Discovery shall be permitted in accordance with the Federal Rules of Civil Procedure. The cost of any arbitration shall be borne equally by both parties and the parties shall each bear their respective legal and related fees. This Section 6 shall survive the termination of this Agreement.

## 7. TERM AND TERMINATION

The initial term of this Agreement shall begin on the Effective Date and shall continue for three (3) years. This Agreement shall renew automatically thereafter for successive one-year periods unless either party provides 120 days written notice of termination to the other party prior to the end of the initial or any renewal term. Either party may terminate this Agreement for material breach of this Agreement by the other party by providing the other party with 60 days written notice. During the first 30 days of the breach notice period, the breaching party may cure the breach to the reasonable satisfaction of the non-breaching party. This Agreement may be terminated immediately upon written notice to Physician in the event of: (i) suspension or revocation of any Physician's license or participation in state or federal programs; (ii) jeopardy of the health and safety of Members; or (iii) a Plan determination. IPA may terminate this Agreement in its entirety or as to one or more specific Plan(s) without cause with 60 days written notice to Physician. Upon termination of this Agreement, Physician may only communicate to each Member: (i) that Physician is no longer participating with Plan; (ii) the names of plans with which Physician participates; and (iii) other information required by state or federal law.

## 8. GENERAL PROVISIONS

8.1 Assignment: IPA may assign this Agreement upon notice to Physician. Physician may assign this Agreement only with IPA's express written consent.

8.2 Amendment: This Agreement may be amended by written agreement signed by both parties. In addition, IPA may deliver a proposed written amendment to Physician and Physician shall then have 20 days to notify IPA that Physician objects to IPA's proposed amendment. If Physician does not notify IPA that Physician objects to the proposed amendment within that notice period, Physician shall automatically be bound by such amendment. Further, in the event IPA deems it necessary to amend this Agreement in order to comply with Plan requirements or state or federal laws or regulations, IPA shall furnish Physician written notice of such amendment and Physician shall automatically be bound by such amendment.

8.3 Notices: All notices required of Physician under Plan / IPA Agreement shall be given to IPA in the same time frames required by Plan. Any notice required to be given under this Agreement shall be in writing and hand delivered or sent via certified or registered mail to the address herein. Each party will notify the other of any address change.

8.4 Item intentionally deleted..

8.5  Item intentionally deleted.

8.6 Non-Compete: "Payors" shall mean any managed care plan, health plan, health insurance company, third-party payor, self-insured entity, governmental program or other entity under which health services are provided or arranged. "MCO" shall mean any organization, including but not limited to, a management services organization, independent physician association or other entity which provides administrative or other services, or develops contracts and provider networks and enters, directly or indirectly, into agreement(s) on a surplus sharing, risk bearing, incentive based or other financial arrangement for or with Payors. Physician acknowledges that IPA has invested and will invest substantial resources including funds, time, effort and goodwill in building its roll of Members assigned to Physician. Physician and/or Physician's directors, officers, principals, employees, contractors, agents or financially related entities shall not, directly or indirectly, in any manner or capacity, engage, participate, invest, or become interested in, affiliated or connected with, or render services or advice in any capacity, with or without compensation or remuneration, to any entity, person, firm, corporation, partnership or

DocuSign Envelope ID: 74E3F1F7-5A08-4F5E-A49E-26CF2393222

# PHYSICIAN AFFILIATE AGREEMENT

organization: (i) that engages in a business competitive with IPA for Medicare Advantage programs; (ii) that may interfere with, or solicit or endeavor to entice away from IPA Plan Members, IPA employed personnel, IPA contracted network providers, or business contracts; or (iii) that is an MCO for Medicare Advantage programs. This Section 8.6 shall apply during the term of this Agreement and survive for two years following the termination of this Agreement.

8.7 Item Intentionally deleted.

8.8 Participation: IPA and Physician agree that IPA has been authorized and appointed by Physician to act as Physician's agent to negotiate with Plans on Physician's behalf. Physician agrees to participate in all Plan / IPA Agreements as mutually agreed-upon by Physician and IPA.

8.9 Item intentionally deleted.

8.10 Successor Entities: For purposes of this Agreement, all references to Medicaid, Medicare or Medicare Advantage shall be interpreted to include all state and federal coordinated care programs, including successor programs.

8.11 Survival: Section 4, Confidentiality; Section 5, Indemnification; Section 6, Dispute Resolution; Section 8.4, Member Non-Solicitation; Section 8.5, IPA Associate Non-Solicitation; Section 8.6, Non-Compete; Section 8.12, Enforcement; and all other sections of this Agreement and Exhibits explicitly indicating survival of such section shall survive termination of this Agreement, and shall be enforceable by IPA through all remedies permitted by law, including without limitation, injunctive relief, without IPA having to prove irreparable injury.

8.12 Enforcement. In the event of any violation of a Member Non-Solicitation or any other provision in the

Plan / IPA Agreement(s) by Physician that results in a financial penalty to IPA and/or Physician, Physician shall pay IPA the amount equal to the actual penalty amount incurred by IPA as a result of any such violation by Physician.

8.13 Severability: If any term or provision of this Agreement is held to be invalid or unenforceable, the remainder of the provisions shall not be in any way affected, but shall remain in full force and effect.

8.14 Third Party Beneficiaries: This Agreement does not create any third party beneficiary rights for any person or entity that is not a party to this Agreement.

8.15 Waiver: The waiver by either party of the violation of any provision or obligation of this Agreement shall not constitute the waiver of any subsequent violation of the same or other provision or obligation.

8.16 Entire Agreement: This Agreement, together with all Exhibits hereto, constitutes the entire agreement of the parties and supersedes all previous agreements or understandings between the parties.

8.17 Representations: Physician and the individual signing below for Physician represents and warrants that (i) it is authorized to negotiate and execute this Agreement for and on behalf of itself and its physicians, if any; and (ii) Physician's principals, employees, agents and physicians will abide by the terms and conditions of this Agreement, including each of Physician's employed, subcontracted or independently contracted physicians in the event Physician is organized and providing services hereunder as a group practice.

8.18 Governing Law: This Agreement shall be governed by the laws of the State of Florida. The parties consent to the jurisdiction of a state or federal court located in Tampa, Florida.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

DocuSign Envelope ID: 14E3F117-5A08-413E-A49E-26CFE3933221

# PHYSICIAN AFFILIATE AGREEMENT

**AGREED TO AND ACCEPTED BY PHYSICIAN AND IPA:**

| PHYSICIAN | PHYSICIAN PARTNERS, LLC |
|---|---|
| Signature: | Signature: |
| Name: George Marsh | Name: J. Daniel Kollefrath |
| Title: MD | Title: President and Chief Operating Officer |
| Date: 2/6/17 | Date: February 6, 2017 |

**NOTICE ADDRESSES:**

**PHYSICIAN**

**PHYSICIAN PARTNERS, LLC**

Physician Partners, LLC

ATTN: CEO

PO Box 789

Ocala, FL 34478-0789

**FIRST AMENDMENT**
**TO THE**
**PHYSICIAN AFFILIATE AGREEMENT**
**BETWEEN**
**PHYSICIAN PARTNERS, LLC**
**AND**
**GEORGE MANSOUR, M.D., P.A.**

**WHEREAS,** Physician Partners, LLC ("IPA") and George Mansour, M.D., P.A. ("Physician") have executed a Physician Affiliate Agreement dated ____2\6\17____ ("Agreement"); and

**WHEREAS,** IPA and Physician mutually desire to amend the Agreement;

**NOW THEREFORE,** pursuant to Section 8.2 of the Agreement and in consideration of the mutual promises contained herein, the parties hereby agree as follows:

1. The effective date of this First Amendment shall be ____2\6\17____.

2. Physician and IPA agree that, to the extent there is any conflict or ambiguity between this First Amendment and the Agreement, the terms of this First Amendment shall supersede, govern, control and apply.

3. Notwithstanding anything to the contrary in the Agreement, Physician may terminate the Agreement with 30 days written notice to IPA if IPA fails to pay Physician the amounts due to Physician from IPA under the terms of the Agreement. IPA shall remain responsible for all amounts due to Physician from IPA under this Agreement during the entire term of the Agreement, including during any termination notice period. Further, Physician may terminate the Agreement without cause with 60 days written notice to IPA.

4. IPA acknowledges and agrees that nothing in the Agreement shall restrict or prohibit Physician from directly or indirectly contracting with a Plan.

5. IPA shall not reassign Members to another Physician.

6. IPA shall reimburse fifty percent (50%) of one (1) Advanced Registered Nurse Practitioner or Physician Assistant costs actually incurred by Physician up to a maximum of fifty thousand dollars ($50,000) annually to provide health services to Members under this Agreement. Such reimbursement shall be paid to Physician by IPA on a monthly basis within ten (10) days of receipt of invoice from Physician along with proof of costs incurred by Physician for such. Further, IPA will provide a reasonable level coding, medical record documentation, referral management, prior authorization management and HEDIS support to Physician for the Members under this Agreement.

7. In no event, including but not limited to the existence of a Deficit, shall PCP receive less than the PCP Capitation amount reflected on the applicable Medicare Advantage Payment Exhibit.

8. Physician expressly acknowledges and agrees that Physician shall not own, purchase, enter into, create or otherwise hold an equity or ownership interest in an IPA, MSO or any similar entity for Medicare Advantage programs.

9. Except as modified herein, the Agreement remains in full force and effect.

**IN WITNESS WHEREOF,** IPA and Physician have executed this Amendment this __6th__ day of __February__ , 2017

| **PHYSICIAN** | **PHYSICIAN PARTNERS, LLC** |
|---|---|
| Signature: _____ | Signature: _____ |
| Name: George Mansour, MD | Name: J. Daniel Kollefrath |
| Title: Physician / Owner | Title: President and Chief Operating Officer |
| Date: 2/6/17 | Date: February 6, 2017 |

First Amendment_Mansour_2017                    1 of 1

DocuSign Envelope ID: 4E3F1FF9-C084-4152-A49E-26CFE99332Z1

## PHYSICIAN AFFILIATE AGREEMENT

## MEDICARE ADVANTAGE PAYMENT EXHIBIT

### EFFECTIVE ___2\6\2017___

Unless another payment exhibit specific to an individual Plan or Plan program is entered into by Physician and IPA, this Payment Exhibit shall apply to all Covered Services rendered by Physician for all Plans and Plan programs effective on the date indicated above for Medicare Advantage Members.

| 1 – 149 Total Members | **PCP Capitation: $70** per Member per month ("PMPM") |
|---|---|
| 150+ Total Members | **PCP Capitation: $100** PMPM<br><br>PCP Capitation Withhold: $30 PMPM withheld from PCP Capitation subject to individual Physician performance under Bonus Program.<br><br>**Bonus Program:**<br><br>1. Funding: 80% of Plan Premium<br><br>2. Physician Share: 50%<br><br>3. Calculation: Funding – Physician Payments - Health Services Expenses including Covered Services and IBNR (Incurred But Not Reported) Expenses - Stop Loss Insurance - Plan and IPA Services = Surplus (+) or Deficit (-)<br><br>4. Bonus Payment: If Surplus exists, IPA will release Physician Share up to the PCP Capitation Withhold. If Deficit exists, IPA will apply the PCP Capitation Withhold up to but not exceeding Physician Share.<br><br>5. In no event, including but not limited to the existence of a Deficit, shall PCP receive less than $70 PMPM. |

Physician must be an IPA provider to receive Bonus Payments. IPA shall pay PCP Capitation to Physician within two (2) business days of receipt of capitation payments from the applicable Plan.  Physician may only request adjustments to payments by IPA within 30 days of initial payment, and IPA shall make final determination within 30 days. PCP Capitation is subject to Plan payment policies.

| **PHYSICIAN** | | **PHYSICIAN PARTNERS, LLC** | |
|---|---|---|---|
| Signature: | | Signature: | |
| Name: | George Maus | Name: | J. Daniel Kollefrath |
| Title: | MD | Title: | President and Chief Operating Officer |
| Date: | 2/6/17 | Date: | February 6, 2017 |

# PHYSICIAN AFFILIATE AGREEMENT

## PATIENT CENTERED MEDICAL HOME EXHIBIT

Physician shall, and shall enter into written agreements with its employed or contracted providers to cause such providers to agree to, abide by and comply with the responsibilities set forth in this Exhibit.

1. Physician and IPA will work closely to promote high quality care to Members. Physician will implement the Patient Centered Medical Home ("PCMH") care model for Members with the following principles: (i) access to Physician who leads the Member's care team within a medical practice; (ii) a whole-person orientation to providing Member care; (iii) integrated and coordinated care; (iv) focus on quality and safety; and (v) comprehensive management of all Member medical conditions. Physician will see Members at least two times per year or more frequently (i) as per IPA patient visit frequency standards for certain medical conditions or (ii) as needed.

2. Physician will work closely with IPA to achieve a 5-star rating in HEDIS, CMS and other IPA quality programs. Physician and Physician's team will utilize IPA or Plan web portals, as directed, to complete necessary quality, health services and condition documentation activities.

3. Physician agrees that, to the extent there is any conflict or ambiguity between this Physician Affiliate Agreement, the Plan / IPA Agreement, and/or any other agreement entered into between Plan and Physician, the terms of this Physician Affiliate Agreement shall supersede, govern, control and apply. IPA may enforce this Section 3 as per Section 8.12 of the Agreement.

4. Physician will refer to and utilize IPA's preferred network of specialist, ancillary and hospital providers.

5. Physician will participate in IPA's medication management program to identify effective, lower cost medication alternatives for Members to help Members optimize their prescription drug benefits.

6. Physician will submit claims or encounter data for all services and medical conditions for Members within 30 days of service. Physician will make available all claims information, data and medical records for Members at no cost to IPA. Physician warrants and represents that all such information is entirely accurate and truthful. Physician agrees that IPA may properly submit on behalf of Physician applicable additional or alternative diagnosis codes (i.e., ICD-9 or their successor codes) based on the supporting medical record information and related data as documented and provided by Physician.

7. Physician will collaborate with IPA health services programs, including but not limited to, acute care management, re-admission management, utilization management, and embedded care manager and health care coach programs. Further, Physician will support Plan's model of care and interdisciplinary care team as required under Plan's Medicare Advantage Special Needs Plans. Physician will communicate with and be available to IPA Medical Director and IPA health services team as needed.

8. Physician will work with IPA to implement IPA's condition management and documentation program and protocols.

9. Physician and Physician's designated team shall meet with IPA team at least monthly to review IPA reports. Physician will identify a member of Physician's team as the primary contact person to work with the IPA team and to lead implementation of IPA programs. Physician and Physician's team will attend and participate in IPA and Plan meetings, orientations, and training programs.

10. Physician agrees (i) that IPA has the right to communicate directly with Members and (ii) to close or limit Physician's panel for new Members for one or more Plan(s) upon mutual agreement by IPA and Physician.

| PHYSICIAN | PHYSICIAN PARTNERS, LLC |
|---|---|
| Signature: | Signature: |
| Name: | Name: J. Daniel Kollefrath |
| Title: | Title: President and Chief Operating Officer |
| Date: | Date: February 6, 2017 |

## PHYSICIAN AFFILIATE AGREEMENT

## REGULATORY COMPLIANCE EXHIBIT

The Centers for Medicare and Medicaid Services and its successor agency ("CMS"), the Florida Agency for Health Care Administration and its successor agency ("AHCA") and Plan accreditation and review agencies require that Plan provide for compliance by its participating providers and their respective employees and subcontractors with specific CMS, AHCA and Plan accreditation and review requirements. In addition to the terms and conditions elsewhere in the Agreement, Physician agrees to the terms and conditions set forth in this Regulatory Compliance Exhibit ("RCE"). This RCE supersedes any inconsistent provisions that may be found elsewhere in the Agreement.

If Physician causes non-compliance with state or federal regulatory agencies, Physician shall hold harmless and indemnify Plan and IPA for payment of any fines or penalties as a result of such non-compliance.

For purposes of this RCE, "Physician" means the individual or entity identified as a named party to this Agreement, its employees, contractors and/or subcontractors and those individuals or entities performing administrative services for or on behalf of Physician and/or any of the above referenced individuals or entities performing services related to the Agreement. Physician acknowledges that the requirements contained in this RCE shall apply equally to the above referenced entities and that Physician's agreements with such individuals or entities shall contain the requirements set forth in this RCE. Physician agrees to maintain written agreements with employed and contracted health care physicians and health care professionals providing services under the Agreement in a form comparable to, and consistent with, the terms and conditions of the Agreement. Physician's downstream physician agreements shall include terms and conditions which comply with all applicable requirements for physician agreements under state and federal laws, rules and regulations including, without limitation, the Medicare Advantage rules and regulations to which Plan is subject. In the event of a conflict between the language of the downstream physician agreements and the Agreement, the language in the Agreement shall control.

### MEDICARE REQUIREMENTS

The following provisions apply to Physician when Physician provides and/or arranges for Covered Services to Medicare Members.

1. **Participation in CMS Contracts**: Subject to and in accordance with the terms and conditions of the Agreement, including this RCE, Physician provides Covered Services to Members covered by MA

Benefit Plans offered or administered by Plan and acknowledges that payment from Plan is derived, in whole or in part, from federal funds received from CMS.

2. **Definitions**:

2.1 "CMS Contract" means a contract between CMS and Plan for Plan to provide or arrange for the provision of health care items and services to enrollees in the Medicare Advantage program, as amended from time to time.

2.2 "CMS Contract Period" means January 1 through December 31 of each year during the term of the CMS Contract.

2.3 "Deemed Eligible Member" means a Dual Eligible Member enrolled in a DSNP who has lost the special needs status that qualified the Member to be eligible to have Member expenses paid by the state or Plan, as applicable, but who may regain such eligibility during the Deeming Period.

2.4 "Deeming Period" means the time period that Plan remains obligated under MA Program to provide all plan benefits to Deemed Eligible Members and ensure that such Members are not liable for more than those plan premiums and Member expenses that are payable by Dual Eligible Members who have not lost their special needs status.

2.5 "DSNP" means an MA dual special needs plan for Dual Eligible Members.

2.6 "Dual Eligible Member" means a Member who is also enrolled in Medicaid.

2.7 "Emergency Medical Condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, with an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in (i) serious jeopardy to the health of the individual or, in the case of a pregnant woman, the health of the woman or her unborn child, (ii) serious impairment to bodily functions or (iii) serious dysfunction of any bodily organ or part.

2.8 "Emergency Services" means covered inpatient and outpatient services that are (i) provided by a provider qualified to furnish emergency services, and (ii) needed to evaluate or stabilize an Emergency Medical Condition.

# PHYSICIAN AFFILIATE AGREEMENT

2.9 "MA Benefit Plan" means a benefit plan under a CMS Contract.

2.10 "Medically Necessary" or "Medical Necessity" means, with respect to health care items or services, items and services that are (i) necessary to protect life, prevent significant illness or significant disability or to alleviate severe pain, (ii) individualized, specific and consistent with symptoms or confirm diagnosis of the illness or injury under treatment and not in excess of the Member's needs, (iii) consistent with generally accepted professional medical standards and not experimental or investigational, (iv) reflective of the level of service that can be provided safely and for which no equally effective and more conservative or less costly treatment is available statewide, (v) provided in a manner not primarily intended for the convenience of the Member, the Member's caretaker or the health care provider, and (vi) not custodial care as defined by CMS. For health care items and services provided in a hospital on an inpatient basis, "Medically Necessary" or "Medical Necessity" also means that such items and services cannot, consistent with the provision of appropriate medical care, be effectively provided more economically on an outpatient basis or in an inpatient facility of a different type. The fact that a health care provider has prescribed, recommended or approved health care items or services does not, in itself, make such items or services Medically Necessary or a Medical Necessity.

2.11 "Medicare Advantage" or "MA" means Medicare Advantage, a program under the Social Security Act.

2.12 "Post-Stabilization Care Services" means Covered Services, related to an Emergency Medical Condition, that are provided after a Member is stabilized in order to maintain the stabilized condition, or, under the circumstances described in 42 CFR § 422.113(c)(2)(iii), to improve or resolve the Member's condition.

3. **Oversight / Accountability:**

3.1 Plan shall be entitled to oversee the activities of Physician and its subcontractors under this Agreement and shall be accountable under the CMS Contract for such activities regardless of the provisions of this Agreement. [42 CFR § 422.504(i)(1)]

3.2 *Physician shall comply with all applicable Medicare laws, rules, regulations and CMS instructions.* [42 CFR § 422.504(i)(4)(v); Manual Ch. 11 § 100.4]

3.3 Cumulative to other record retention requirements herein, Physician shall allow audits by CMS and/or its designees and cooperate, assist and provide information as requested, and maintain records a minimum of 10 years. [Manual Ch. 11 § 100.4]

3.4 Cumulative to other oversight and monitoring requirements herein, Plan shall oversee and is accountable to CMS for any functions and responsibilities described in MA regulations. [Manual Ch. 11 § 100.4]

3.5 Plan may revoke delegated activities or reporting requirements, if any, from a Physician in instances where CMS or Plan determines that the Physician has not performed satisfactorily. [42 CFR §§ 422.504(i)(3)(ii) and 422.504(i)(4)(ii)]

3.6 Physician shall cooperate and reasonably comply with Plan's policies and procedures. [Manual Ch. 11 § 100.4]

3.7 Physician agrees to cooperate with the activities and/or requests of any independent quality review and improvement organization utilized by and/or under contract with Plan as related to the provision of services to MA Members. Physician agrees to cooperate with Plan's health risk assessment program.

4. **Record Retention / Access / Audits**: Physician agrees to the following: (i) Plan, DHHS, the Comptroller General, or their designees have the right to inspect, evaluate, and audit any pertinent contracts, books, documents, papers, and records of Physician involving transactions related to the CMS Contract; and (ii) Plan, DHHS, the Comptroller General, or their designees have the right to inspect, evaluate, and audit any pertinent information for any particular CMS Contract Period for 10 years from the final date of the CMS Contract Period or from the date of completion of any audit, whichever is later. [42 CFR § 422.504(i)(2)]

Further, Physician agrees to the following: (i) Plan, DHHS, the Comptroller General, or their designee may evaluate, through inspection or other means (a) the quality, appropriateness, and timeliness of services provided to Medicare Members under the CMS Contract; and (b) the facilities of Physician; (ii) Plan, DHHS, the Comptroller General, or their designees may audit, evaluate, or inspect any books, contracts, medical records, documents, papers, patient care documentation, and other *records of Physician that pertain to any aspect of* services performed, reconciliation of benefit liabilities, and determination of amounts payable under the CMS Contract, as the Secretary of DHHS may deem necessary to enforce the CMS Contract,

DocuSign Envelope ID: 4E5AFFF7-5A04-419E-A49E-26CFE393322F

# PHYSICIAN AFFILIATE AGREEMENT

or as Plan may deem necessary to enforce the Agreement, including this RCE; (iii) Physician shall make available for the purposes specified in 42 CFR § 422.504(d), its premises, physical facilities and equipment, records relating to Members, and any additional relevant information that CMS or Plan may require; and (iv) Plan's, DHHS', the Comptroller General's, or their designees' right to inspect, evaluate, and audit extends through 10 years from the final date of the CMS Contract Period or completion of audit, whichever is later unless (a) CMS determines there is a special need to retain a particular record or group of records for a longer period and notifies Plan at least 30 days before the normal disposition date (in which case Plan shall promptly provide notice to Physician); (b) there has been a termination, dispute, or fraud or similar fault by Plan under the CMS Contract, in which case the retention period may be extended to six years from the date of any resulting final resolution of the termination, dispute, or fraud or similar fault; or (c) Plan, DHHS, the Comptroller General, or their designee determines that there is a reasonable possibility of fraud or similar fault, in which case they may inspect, evaluate, and audit Physician at any time. [42 CFR § 422.504(e)]

5. **Emergency Services**: Physician shall not be required to seek prior authorization for Emergency Services before the Member has been stabilized. Once a Member who receives Emergency Services is stabilized, Physician shall seek prior authorization for Post-Stabilization Care Services for the Member in accordance with the Plan provider manual. [42 CFR § 422.113]

6. **Member Financial Protections**: Physician shall not hold any Member liable for payment of any fees that are the legal obligation of Plan, including, without limitation, in a circumstance of Plan's insolvency or other financial difficulties. [42 CFR §§ 422.504(i)(3)(i) and 422.504(g)(1)(i); Manual Ch. 11 § 100.3]

Physician shall hold Members harmless for payment of fees that are the legal obligation of Plan to fulfill. The foregoing sentence shall apply, but will not be limited to insolvency of Plan, contract breach, and provider billing. [Manual Ch. 11 § 100.4]

Hold Harmless of Dual Eligible Members: With respect to Dual Eligible Members for whom the state Medicaid agency is otherwise required by laws, or voluntarily has assumed responsibility in the state Medicaid Plan to cover those Medicare Part A and B Member expenses identified and at the amounts provided for in the state Medicaid Plan, Physician shall not bill Members the balance of, and that such

Members are not liable for, such Medicare Part A and B Member expenses, regardless of whether the amount a Physician receives is less than the allowed Medicare amount or Physician charges are reduced due to limitations on additional reimbursement provided in the state Medicaid Plan. Physician shall accept Plan's payment as payment in full or will bill the appropriate state source if Plan has not assumed the state's financial responsibility under an agreement between Plan and the state. [42 CFR § 422.504(g)(1)(iii)]

Hold Harmless of Deemed Eligible Members: During the Deeming Period for a Deemed Eligible Member, Physician shall not bill or collect Medicare Part A or B Member expenses from the Deemed Eligible Member and shall bill Plan for such expenses. Physician shall hold Deemed Eligible Members harmless from and such Members are not liable for Medicare Part A or B Member expenses during the Deeming Period. [CMS 2009 Call Letter, page 35]

7. **Compliance with CMS Contract**: Physician agrees that any services or other activity performed under this Agreement with respect to the MA program shall be consistent and comply with Plan's contractual obligations under CMS Contracts. [42 CFR § 422.504(i)(3)(iii)]

8. **Prompt Payment**: Plan agrees to pay clean claims for Covered Services to Members submitted by Physician promptly within the time period for payment of clean claims set forth in the Plan / IPA Agreement. [42 CFR 422.520(b); Manual Ch. 11 § 100.4]

9. **Privacy and Accuracy of Member Records; Data**: Physician shall (i) abide by all federal and state laws regarding confidentiality and disclosure of medical records or other health and enrollment information, (ii) safeguard the privacy of any information that identifies a particular Member and have procedures that specify (a) for what purposes the information will be used within the organization, and (b) to whom and for what purposes it will disclose the information outside the organization; (iii) ensure that medical information is released only in accordance with applicable federal or state laws, or pursuant to court orders or subpoenas, (iv) maintain the records and information in an accurate and timely manner, and (v) ensure timely access by Members to the records and information that pertain to them. [42 CFR §§ 422.118; Manual Ch. 11 § 100.4]

Physician agrees to provide to Plan accurate and complete information regarding the provision of Covered Services by Physician to Members ("Data")

DocuSign Envelope ID: 4AE54FD1-9A06-4192-AA9E-26CF13633221

## PHYSICIAN AFFILIATE AGREEMENT

on a complete CMS 1500 or UB 92 form, or their respective successor forms as may be required by CMS, or such other form as may be required by law when submitting claims and encounters in an electronic format, or such other format as is mutually agreed upon by both parties. The Data shall be provided to Plan on or before the last day of each month for encounters occurring in the immediately preceding month, or such lesser period of time as may be required in the Agreement, or as is otherwise agreed upon by the parties in writing. The submission of the Data to Plan and/or CMS shall include a certification from Physician that the Data is accurate, complete and truthful. In the event the Data is not submitted to Plan by the date and in the form specified above, Plan may, in its sole option, withhold payment otherwise required to be made under the terms of the Agreement until the Data is submitted to Plan.

10. **Continuation of Services**: Physician, shall upon expiration or termination of this Agreement for any reason, except for immediate termination, continue to provide Covered Services (i) for all Members, for the duration of the CMS Contract Period for which CMS payments have been made and (ii) for Members who are hospitalized on the date the CMS Contract terminates or, in the event of an insolvency, through discharge. [42 CFR § 422.504(g)(2); Manual Ch. 11 § 100.3]

11. **Hours of Operation**: Physician shall ensure that (i) the hours of operation of Physician are convenient to the Member population served under benefit plans subject to CMS Contracts and do not discriminate against Medicare enrollees and (ii) Covered Services are available 24 hours a day, 7 days a week, when medically necessary. [42 CFR § 422.112(a)(7)]

12. **Cultural Considerations**: Physician shall ensure that services are provided in a culturally competent manner to all Members, including those with limited English proficiency or reading skills, and diverse cultural and ethnic backgrounds. [42 CFR § 422.112(a)(8)]

13. **Compliance Program**: Physician shall comply with Plan's compliance program elements regarding effective training and education between Plan's compliance officer and Physician. Such training and education shall occur at a minimum annually and must be made a part of the orientation for Physician, its subcontractors and their respective employees. Physicians who have met the fraud, waste, and abuse certification requirements through enrollment into the Medicare program are deemed to have met the training and educational requirements for fraud,

waste, and abuse (but not necessarily other elements of Plan's compliance program). [42 CFR §§ 422.503(b)(4)(vi)(C)]

Physician shall comply with Plan's compliance program elements regarding effective lines of communication, ensuring confidentiality, between Plan's compliance officer and Physician. Such lines of communication must be accessible to all and allow compliance issues to be reported including a method for anonymous and confidential good faith reporting of potential compliance issues as they are identified. Reports may be made anonymously through the Plan's fraud hotline. [42 CFR § 422.503(b)(4)(vi)(D)]

14. **Selection of Providers, Contractors or Subcontractors**: If Plan delegates selection of providers, contractors or subcontractors to Physician or its subcontractor, Plan retains the right to approve, suspend, or terminate any such arrangement. [42 CFR § 422.504(i)(5)]

15. **Delegation Requirements**: Physician shall not delegate any services or activities under this Agreement to any other individual or entity except upon Plan's prior written consent, and such delegation agreements, if made, shall be in writing and conform to MA program requirements, including the following: (i) written arrangements shall specify delegated activities and reporting responsibilities. [42 CFR § 422.504(i)(4)(i)]; (ii) written arrangements shall either provide for revocation of the delegated activities and reporting requirements or specify other remedies in instances where CMS or Plan determine that such parties have not performed satisfactorily. [42 CFR § 422.504(i)(4)(ii)]; (iii) written arrangements must specify that the performance of the parties is monitored by Plan on an ongoing basis. [42 CFR § 422.504(i)(4)(iii)]; (iv) written arrangements must specify that (a) the credentials of medical professionals affiliated with the party or parties will be either reviewed by Plan or (b) the credentialing process shall be reviewed and approved by Plan and Plan must audit the credentialing process on an ongoing basis. [42 CFR § 422.504(i)(4)(iv)]; and (v) all contracts or written arrangements must specify that the contractor or subcontractor must comply with all applicable Medicare laws, rules, regulations and CMS instructions. [42 CFR § 422.504(i)(4)(v)]

16. **Federally Qualified Health Center ("FQHC")**: A subcontract between IPA and Physician that is an FQHC shall provide for a level and amount of payment to the FQHC for Covered Services provided by such FQHC that is not less than the level and amount of payment that Plan would make

## PHYSICIAN AFFILIATE AGREEMENT

for such services if the services had been furnished by an entity providing similar services that was not an FQHC. [Social Security Act § 1857(e)(3)]

17. **Excluded Providers**: Physician agrees to maintain full participation status in the federal Medicare program. This also includes all of Physician's employees, subcontractors, and/or independent contractors who will provide services, including, without limitation, health care, utilization review, medical social work, and/or administrative services under the Agreement. Physician will immediately notify IPA and Plan if it or any employees or physicians are excluded from participation in the Medicare, Medicaid or other state or federal programs.

18. **Physician Incentive Program ("PIP")**: The parties agree: (i) that nothing contained in the Agreement nor any payment made by Plan or IPA, directly or indirectly, to Physician is a financial incentive or inducement to reduce, limit or withhold Medically Necessary services to Members and (ii) that any incentive plans between Plan and Physician, IPA and Physician, and/or between Physician and its employed or contracted physicians and other health care practitioners and/or providers shall be in compliance with applicable state and federal laws, rules and regulations and in accordance with the CMS Contract. Upon request, Physician agrees to disclose to Plan the terms and conditions of any PIP as defined by CMS and/or any state or federal law, rule or regulation. [42 C.F.R. § 422.208]. Plan shall monitor and evaluate any physician participating in the Plan's, IPA's or Physician's PIP in accordance with established and standardized quality performance outcome metrics. Such physicians are expected to provide services in accordance with optimum cost and quality standards. No incentive compensation will be paid to Physicians who do not meet specified quality performance metrics.

19. **Displays**: Physician agrees to post the Consumer Assistance Notice prominently in the reception area,

clearly noticeable by all patients pursuant to Section 641.511(11), F.S. and the Patient Rights and Responsibilities in accordance with Section 381.026, F.S.

20. **Non-Interference with Advice to Members**: Nothing in the Agreement is intended to prohibit or restrict Physician from advising or advocating on behalf of a Member about: (i) the Member's health status, medical care, or treatment options, including alternative treatments that may be self-administered and including providing sufficient information to the Member to provide an opportunity to decide among all relevant treatment options; (ii) the risks, benefits and consequences of treatment or non-treatment; and (iii) the opportunity for the Member to refuse treatment and express preferences about future treatment decisions. Physician must provide information regarding treatment options in a culturally competent manner, including the option of no treatment. Physician must assure that individuals with disabilities are furnished with effective communications in making decisions regarding treatment options.

21. **Regulatory Amendment**: Upon the request of Plan, Plan or IPA may unilaterally amend this RCE to comply with applicable laws and regulations and the requirements of applicable regulatory authorities, including but not limited to CMS. Plan or IPA shall provide written or electronic notice to Physician of such amendment and its effective date. Unless such laws, regulations or regulatory authority(ies) direct otherwise, the signature of Physician will not be required in order for the amendment to take effect.

22. **IPA Payments**: Physician acknowledges and agrees that IPA is not an insurer, indemnifier or guarantor of payments to Physician. IPA shall have no responsibility except as set forth in the Agreement as to payment to Physician for any services rendered by Physician.

| PHYSICIAN | | PHYSICIAN PARTNERS, LLC | |
|---|---|---|---|
| Signature: | _____ | Signature: | _____ |
| Name: | _____ | Name: | J. Daniel Kollefrath |
| Title: | _____ | Title: | President and Chief Operating Officer |
| Date: | _____ | Date: | February 6, 2017 |

Physician Partners_PCP_2013_07

DocuSign Envelope ID: F4E5A4FF-5A0A-4F9E-A49E-26CF13933221

# PHYSICIAN AFFILIATE AGREEMENT

## INDIVIDUAL PHYSICIAN SIGNATURE EXHIBIT

The physician or healthcare practitioner, by evidence of signature below, agrees to abide and be bound by the terms and conditions of the Physician Affiliate Agreement between Physician Partners, LLC ("IPA") and George Mansour, M.D., P.A.

| PHYSICIAN PRINTED NAME | PHYSICIAN SIGNATURE | DATE |
|---|---|---|
| George Mansour, MD | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Physician Partners_PCP_2013_07                    1 of 1