FUNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
*ex rel.* DR. CLARISSA ZAFIROV,

        Plaintiffs,

    v.                            Case No.: 8:19-cv-1236-T-23SPF

FLORIDA MEDICAL ASSOCIATES, LLC, *et al.*,

        Defendants.

_____/

## <u>UNITED STATES' STATEMENT OF INTEREST</u>

The United States of America respectfully submits this Statement of Interest, in accordance with 28 U.S.C. § 517 and with the Court's leave, to respond to several important legal questions raised by the Defendants' Joint Motion for Judgment on the Pleadings or to Dismiss for Lack of Subject-Matter Jurisdiction, Dkt. 180. The False Claims Act – a statute that has been the United States' primary fraud-fighting tool for 160 years – does not violate the Take Care Clause, Vesting Clause or Appointments Clause of the U.S. Constitution. As every federal circuit to consider these arguments has done, this Court should find the statute is consistent with those Clauses and deny Defendants' Joint Motion for Judgment on the Pleadings.

The United States has not intervened in this False Claims Act ("FCA") *qui tam* case and therefore is not a party to this action. Nevertheless, the United States remains the real party in interest, entitled to share in any recovery that may be

obtained by Relator.  *See* 31 U.S.C. § 3730(d); *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 934-35 (2009); *Timson v. Sampson*, 518 F.3d 870, 873 (11th Cir. 2008).  And, because the FCA is the United States' primary civil tool for remedying fraud against the government, the United States has a substantial interest in the development of the law in this area.  *See U.S. ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 84 (D.C. Cir. 2014) (citing S. Rep. No. 99-345, at 2, 4 (1986)).  The United States is not taking a position on the merits of the factual allegations and only seeks to address Defendants' legal arguments regarding the constitutionality of the *qui tam* provisions of the False Claims Act.

## DISCUSSION

Congress has carefully crafted the False Claims Act to discover and redress fraud against the government.  In fiscal year 2023, federal spending topped $7.7 trillion.[1] Though it is difficult to estimate the percentage of funds lost each year to fraud, even the lowest of estimates produces staggering numbers.  It is as necessary today to incentivize the public to report fraud as it was in 1863 when the FCA, 31 U.S.C. §§ 3729–3733, was enacted.  While the infrastructure of the United States agencies is more robust today than in 1863, so too is the federal budget. Indeed, the

---

[1] U.S. Dep't of Treasury, Fin. Rep. of the United States: Fiscal Year 2023 (Feb. 15, 2024), https://www.fiscal.treasury.gov/files/reports-statements/financial-report/2023/02-15-2024-FR-(Final).pdf (last visited Mar. 8, 2024).

challenges of rooting out fraud in the modern era are more complex; and the FCA has in turn been made more potent through its *qui tam* provisions.

As explained below, the federal courts of appeals that have considered the question have all found the government's control over *qui tam* cases to be constitutionally sufficient. This Court should do the same.

## I.    Background of this *Qui Tam* Action

This *qui tam* case involves allegations that Defendants submitted false or fraudulent diagnosis data resulting in inflated payments for beneficiaries enrolled in Medicare Advantage or Part C.  Relator Zafirov filed her action on May 20, 2019. Dkt. 1.  The United States investigated Relator's allegations and on February 21, 2020, notified the court that it was not intervening.  Dkt. 14.  In its Notice, the United States requested that the Court solicit the written consent of the United States before granting approval of any settlement or dismissal; reserved its right to seek dismissal of the Relator's action or claim; noted that it may move to intervene in the action at a later date for good cause; requested that it receive all pleadings in the action; and reserved its right to order deposition transcripts.  *Id.*  Relator thereafter proceeded to litigate the action.  On February 16, 2024, Defendants filed the instant motion challenging the constitutionality of the *qui tam* provisions of the False Claims Act.  Dkt. 180.

## II.   History of *Qui Tam* Provisions and Statutory Framework

The essence of the *qui tam* mechanism is that a private party may bring suit because of a wrong done to the sovereign and is entitled to a share of the recovery if the action is successful.  The Supreme Court has recognized the "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of such statutes that the First Congress itself enacted.  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774, 776–77 (2000).

*Qui tam* suits were thus far from novel when Congress enacted the FCA in 1863.  *See* Act of Mar. 2, 1863, ch. 67, 12 Stat. 696 (1863).  The FCA was originally designed to "stop[] the massive frauds perpetrated by large contractors during the Civil War."  *United States v. Bornstein*, 423 U.S. 303, 309 (1976).  It authorized *qui tam* suits to "be brought and carried on by any person, as well for himself as for the United States," and provided that the action "shall be at the sole cost and charge of such person, and shall be in the name of the United States."  Act of Mar. 2, 1863, § 4, 12 Stat. at 698 (1863).

The contemporary version of the FCA retains the basic structure of the *qui tam* mechanism.  Under the current statute, the Attorney General may bring a civil action to recover treble damages and civil penalties for a violation of the FCA.  *See* 31 U.S.C. § 3730(a).  Alternatively, a private person known as a "relator" may bring suit "for the person and for the United States Government."  *Id*. § 3730(b)(1).  The relator's complaint must be filed under seal and served upon the United States.  *Id*. §

4

3730(b)(2).  The government then has 60 days, subject to extension, to decide whether to intervene and take over the suit.  *Id*. § 3730(b)(2), (3).

If the United States intervenes, "the action shall be conducted by the Government."  *Id*. § 3730(b)(4)(A).  In that circumstance, the government "shall have the primary responsibility for prosecuting the action."  *Id*. § 3730(c)(1).  The government may intervene either initially or "at a later date upon a showing of good cause," *id*. § 3730(c)(3), and, upon doing so, may file its own complaint or amend the relator's complaint to add or clarify claims, *id*. § 3731(c).

If the United States declines to intervene, "the person bringing the action shall have the right to conduct the action."  *Id*. § 3730(b)(4)(B).  The relator, however, is neither the government nor its legal representative.  The relator does not appear on behalf of the United States, nor are her legal and factual representations those of the United States.  She is a "private part[y]" seeking to vindicate her independent interest, which arises by virtue of the statute's "partial assignment of the Government's damages claim" to her.  *Stevens*, 529 U.S. at 773, 786 n.17; *see also* 31 U.S.C. § 3730(d) (entitling a relator to a share of the award if her action results in a financial recovery).  The government is not liable for any expenses the relator incurs in bringing suit.  31 U.S.C. § 3730(f).

## III.   The FCA's *Qui Tam* Provisions Are Constitutional

Defendants ask the Court to hold that the FCA's *qui tam* provisions are unconstitutional.  At bottom, Defendants' contention is that these provisions (1)

interfere with the Executive's responsibility to take care that federal law is faithfully executed, as found in the Take Care Clause and the Vesting Clause, and (2) violate the Appointments Clause by not requiring relators to be appointed as "Officers of the United States." *See* Dkt. 180 at 1.  But every federal court of appeals to consider these arguments has rejected them, recognizing that the FCA's *qui tam* provisions are consistent with Article II of the Constitution.  *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (*en banc*); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993).  And, notably, district courts within this circuit have concluded the same.  S*ee United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-cv-01010-LSC, 2023 WL 8027309, at *4 (N.D. Ala. Nov. 20, 2023); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278 (M.D. Fla. 2014); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999).  For the reasons that follow, this Court should also hold that the *qui tam* provisions are constitutional.

### A.    The FCA's *Qui Tam* Provisions Do Not Violate the Take Care or Vesting Clause

Defendants' contention that *qui tam* actions violate the Take Care Clause of Article II is meritless.  Under the Take Care Clause, the President "shall take Care that the laws be faithfully executed."  U.S. Const. art. II, § 3.  The Vesting Clause states that "The executive power shall be vested in a President of the United States."

U.S. Const. art. II, § 3.  In assessing whether legislation "disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions."  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977).  Defendants' primary contention is that the FCA's *qui tam* provisions interfere with the President's "quintessential executive power" by permitting a relator to proceed in an FCA action, thus diffusing executive authority and limiting executive oversight.  Dkt. 180 at 5, 13.  As courts have long agreed, however, *qui tam* litigation does no such thing.  *See Stone*, 282 F.3d at 805–07; *Riley*, 252 F.3d at 752–57; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 749–57; *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154–55 (2d Cir. 1993).

### 1.  *Qui Tam* Litigation Does Not Prevent the President from Carrying Out his Constitutional Function

Most fundamentally, regardless of whether the United States intervenes in a given suit, relators' conduct of *qui tam* litigation does not prevent the President from carrying out his constitutional functions—a point on which courts have long agreed.  *Qui tam* relators are private litigants.  The Supreme Court made this clear in *Stevens*, where it expressly declined to adopt a theory that a private relator sues as an "agent of the United States."  *Stevens,* 529 U.S. 765, 772 (2000).  The Court in *Stevens* instead held that, although it is the United States whose injury underlies an FCA suit, the relator has Article III standing because of his independent stake:  he has a

7

"concrete private interest in the outcome of the suit" that arises from Congress's "partial assignment of the Government's damages claim" to him. *Id.* at 772-73. That a relator brings a *qui tam* action "in the name of the Government," 31 U.S.C. § 3730(b)(1), is a procedural practice that does not alter this conclusion, and the merits analysis in *Stevens* further underscores the point. After addressing standing, the Supreme Court held that the FCA does not authorize relators to pursue *qui tam* actions against states because, among other things, actions pursued by relators are "private suit[s]" brought by "private parties." *Stevens*, 529 U.S. at 780-81 n.9, 786 n.17; *see also United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1167 (10th Cir. 2009).

That a relator's suit may also vindicate a federal interest in remedying and deterring fraud on the United States does not change the analysis. As the *en banc* Fifth Circuit explained when it rejected a claim analogous to Defendants', the Take Care Clause "does not require Congress to prescribe litigation by the Executive as the exclusive means of enforcing federal law." *Riley*, 252 F.3d at 753. Instead, as the Sixth Circuit noted, "[o]ur current statutory framework includes many laws that authorize individuals to act as 'private attorneys-general,' bringing causes of action for the common weal," *Taxpayers Against Fraud*, 41 F.3d at 1041, such as Title VII and the Sherman Act.

Courts have also correctly recognized that historical evidence helps establish the validity of the *qui tam* provisions. "Statutes providing for actions by a common

informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943).  In *Stevens*, the Supreme Court reviewed this "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of such statutes that the First Congress itself enacted,[2] and found the evidence "well nigh conclusive with respect to the question . . . whether *qui tam* actions were cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." 529 U.S. at 774, 776-77 (quotation marks omitted), *see also Wallace*, 2023 WL 8027309, at *6.

The historical evidence is also highly relevant to the constitutional question presented here.  *See, e.g., Riley*, 252 F.3d at 752-53.  That the First Congress enacted numerous *qui tam* provisions makes clear that the Framers did not believe relators were performing functions that only federal officers could properly perform.  *See Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986) (explaining that acts of the First Congress "provide[] contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the First Congress had taken part in framing

---

[2] *See, e.g.,* Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101, 102 (census); Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129, 129 (extending census provisions to Rhode Island); Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133 (regulation of seamen); Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137, 137-38 (trade with Indians); Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 199, 209 (duties on liquor); see also Act of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 232, 239 (Post Office); Act of Mar. 1, 1793, ch. 19, § 12, 1 Stat. 329, 331 (trade with Indians); Act of Mar. 22, 1794, ch. 11, §§ 2, 4, 1 Stat. 347, 349 (slave trade).

9

that instrument") (quotation marks omitted).   And the long tradition of *qui tam*

actions in the United States after the Framing provides "additional evidence that the

doctrine of separated powers does not prohibit" this unique practice, given that

"'traditional ways of conducting government . . . give meaning' to the Constitution.*"

*Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube*

*Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)); *see also NLRB v.*

*Noel Canning*, 134 S. Ct. 2550, 2559-60 (2014).

### 2.   FCA Litigation Is Not "quintessential executive power"

Contrary to Defendants' argument, *qui tam* relators do not administer and

enforce public law in the constitutional sense, any more than does a plaintiff who

asserts a private right of action under a federal statute.   Relator's *qui tam* actions are

"private suit[s]" brought by "private parties," *Stevens* 529 U.S. at 780-81 n.17, and

this is consistent with long-standing historical practice, which suggests strongly that

the Framers did not view *qui tam* relators as exercising a "quintessential executive

power."

Defendants rely heavily on *Morrison v. Olson*, 487 U.S. 654 (1988), to argue

that the FCA exceeds the outer limit of permissible congressional restrictions on

executive power.   In *Morrison*, the Court upheld restrictions on the President's ability

to remove an independent counsel who possessed "full power and independent

authority to exercise all investigative and prosecutorial functions and powers of the

Department of Justice." *Id.* at 662.   As a threshold matter, *Morrison* is inapposite.

*Kelly*, 9 F.3d at 752–53; *Riley*, 252 F.3d at 754–55.  First, there was no question that the independent prosecutor was an officer.  Second, in *Morrison* the prosecutor was assigned to represent the United States itself and to bring criminal prosecutions—a "function [that] cuts . . . to the heart of the Executive's constitutional duty to take care that the laws are faithfully executed."  *Riley*, 252 F.3d at 755.  Therefore, Congress could not—at least not without raising serious separation of powers questions—have assigned that responsibility to a private party outside the Executive and not subject to Executive control.

Further, unlike the independent counsel in *Morrison*, a relator is not empowered to exercise the vast prosecutorial authority of the United States.  The government's own conduct in *qui tam* litigation is entrusted solely to officials within the Executive Branch.  A *qui tam* relator is more aptly analogized, not to a Justice Department attorney who represents the United State in litigation, but a plaintiff who asserts a private right of action under a federal statute.  Congress' decision to authorize private lawsuits may often rest in part on its belief that such actions will vindicate a societal interest in deterring and remedying violations of federal law.  As with plaintiffs who sue under other federal statutes, the potential for *qui tam* relators to furnish practical assistance in the enforcement of federal law does not transform them into the constitutional equivalent of a Justice Department attorney or any other federal officer.

*Qui tam* relators are simply civil litigants; they are not government officials and they do not represent the United States.  *See id.*; *Wallace*, 2023 WL 8027309, at *5. In any event, as discussed below, a relator's case is subject to substantial control by the Executive Branch, thus ensuring it does not infringe the constitutional limitations set by *Morrison*.  *See, e.g.*, *Kelly*, 9 F.3d at 752–53.

### 3.       The FCA's Control Mechanisms Sufficiently Limit Relators' Powers

As courts have recognized, the FCA includes several control mechanisms to ensure that the Executive Branch's prerogatives are not impinged by *qui tam* suits. *See id.* at 753–57; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 753–55; *Kreindler & Kreindler*, 985 F.2d at 1155.  From the outset, every *qui tam* complaint must be filed under seal and served on the government precisely to ensure that the United States can investigate the matter and determine whether it wishes to "intervene and proceed with the action" or potentially move to dismiss it.  31 U.S.C. §§ 3730(b)(2); (c)(2)(A).  If the government chooses to intervene, "the relator loses control" and the action is "'conducted by the Government.'"  *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 143 S. Ct. 1720, 1728 (2023) (quoting 31 U.S.C. § 3730(b)(4)(A)).  In that circumstance, the government "shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the" relator.  31 U.S.C. § 3730(c)(1); *Polansky*, 143 S. Ct. at 1728.  The government can also "elect to pursue its claim through any alternate remedy available to the

Government, including any administrative proceeding to determine a civil money penalty," rather than litigating the FCA suit.  31 U.S.C. § 3730(c)(5).

And if the government initially declines to intervene, it may still intervene at a later time for good cause and move to dismiss the relator's claims.  *See Polansky*, 143 S. Ct. at 1732, 1734.  Such motions are subject to highly deferential review under Federal Rule of Civil Procedure 41(a); indeed, the Supreme Court emphasized that district courts must grant dismissal "in all but the most exceptional cases"—"even if the relator presents a credible assessment to the contrary," *Polansky*, 143 S. Ct. at 1734.  And even where the government does not intervene, it retains a great deal of control over a *qui tam* suit.  The government can settle a pending suit, *see* 31 U.S.C. § 3730(c)(2)(B), and it can veto a relator's proposed settlement or voluntary dismissal of his action, *see id.* § 3730(b)(1).[3]  Further, after declining to intervene, the United States is entitled to receive copies of all pleadings and transcripts, *id.* § 3730(c)(3), and to stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4).

---

[3] For example, in *United States ex rel. Dimartino v. Intelligent Decisions, Inc.*, 308 F. Supp. 2d 1318 (M.D. Fla. 2004), a declined *qui tam* action filed in this District, the United States objected to relator's attempt to voluntarily dismiss his case without the Government's consent.  The court held that the FCA is clear that the Attorney General's consent is required and further stated that "Relator's position would leave this Court impotent to deal with relators who 'manipulate settlements in ways that unfairly enrich them and reduce benefits to the government.'"  *Id* (citations omitted).

These control mechanisms have been fully available here.  Specifically, the United States has closely monitored the docket in this case, received filings, entered its own filing, *see* Dkt. 120, and could, upon a showing of good cause, move to intervene, settle, or dismiss this case if it chose to do so.

Nevertheless, Defendants insist that the FCA's safeguards insufficiently protect Executive Branch prerogatives.  They argue, for example, that the relator need not seek approval to initiate a suit or seek approval for the substantive allegations of a suit, equating this with prosecutorial discretion.  Dkt. 180 at 7.  But Article II does not require that Executive Branch officials be able to prevent private litigants from suing to vindicate their "private interest[s]," *Stevens*, 529 U.S. at 772, even if those private interests overlap with public ones.  Tellingly, Defendants do not contend that the Constitution would require the Executive Branch to approve private suits under Title VII or the Sherman Act, for example, before they are filed—even though plaintiffs bringing such actions may vindicate public rights.  The FCA empowers the Executive to take measures, up to and including intervention and dismissal of the case, that it deems appropriate.  *Polansky*, 143 S. Ct. at 1732, 1734.

Finally, Defendants contend that the FCA impermissibly constrains the Executive's ability to "remove" relators without dismissing the action in its entirety.  Dkt. 180 at 7-8.  That contention is unpersuasive.  As the Ninth Circuit explained, the "concept of removal does not make sense in the *qui tam* context, [where] there is no 'office' from which to remove the relator and subsequently fill with someone

14

else." *See Kelly*, 9 F.3d at 755.  The Court should reject Defendants' removal argument for that reason alone.  In any event, the Executive's power to intervene and dismiss *qui tam* actions—thus displacing the relator's authority to litigate a case—sufficiently protects Executive Branch prerogatives.  *See Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 387 (3d Cir. 2021), *cert. granted sub nom. United States ex rel. Polansky v. Exec. Health Res., Inc.*, 142 S. Ct. 2834 (2022), and *aff'd sub nom. Polansky*, 143 S. Ct. 1720.  The Constitution does not require that the Executive Branch have any additional power to preclude a private party whose suit would vindicate public rights from litigating a case.

For these reasons, the FCA's *qui tam* provisions are consistent with the Take Care Clause and the Vesting Clause.

### B.   The FCA's *Qui Tam* Provisions Do Not Violate the Appointments Clause

Defendants concede that a *qui tam* relator is not "appointed as an officer of the United States" pursuant to the Appointments Clause.  Dkt 180 at 13.  Defendants cite *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1514 (2019) for this statement, yet they ignore particularly relevant language in *Cochise* that states:

> [A] private relator is not an "official of the United States" in the ordinary sense of that phrase. A relator is neither appointed as an officer of the United States, see U. S. Const., Art. II, § 2, cl. 2, nor employed by the United States.  Indeed, the provision that authorizes *qui tam* suits is entitled "Actions by Private Persons." § 3730(b). Although that provision explains that the action is brought "for the person and for the United States Government" and "in the name of the Government,"

> *ibid.*, it does not make the relator anything other than a private person, much less "the official of the United States" referenced by the statute.

*Cochise*, 139 S. Ct. at 1514 (citing *Stevens*, 529 U.S. at 773, n.4). Although *Cochise* addressed the FCA's use of the term "official" in its statute of limitations provisions, the unequivocal view that a relator is a private person and not an "the official of the United States charged with responsibility to act" is instructive here and underscores Congress's determination that *qui tam* relators are not part of the government and do not exercise its powers.

Further, as discussed in detail above, an FCA relator does not exercise significant federal authority and the *Morrison* test is plainly not relevant to the status of an FCA relator. Defendants also attempt to draw an analogy to the Federal Election Commission members whom the Supreme Court held to be "Officers of the United States" in *Buckley v. Valeo*, 424 U.S. 1 (1976). *See* Dkt. 180 at 14. But Defendants' argument, much like their argument regarding *Morrison's* relevance, disregards critical differences between members of the Federal Election Commission and a *qui tam* relator. Most fundamentally, the positions in *Buckley* were not personal, were not limited to a single case, and were endowed with "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights." *Buckley*, 424 U.S. at 140. A *qui tam* relator, by contrast, bears none of those indicia of being a federal officer. He is instead merely a "private

part[y]" pursuing civil litigation in his own personal interest.  *Stevens*, 529 U.S. at 786 n.17; *see Taxpayers Against Fraud*, 41 F.3d at 1041.

The Supreme Court in *Buckley* also emphasized the Federal Election Commission's "extensive rulemaking and adjudicative powers."  424 U.S. at 110.  In particular, the Court noted that the Commission could bring civil enforcement actions without any "concurrence of or participation by the Attorney General," and "the decision not to seek judicial relief . . . appear[ed] to rest solely with the Commission."  *Id.* at 111.  Under the FCA's *qui tam* provisions, by contrast, a relator's filing suit (or not filing suit) does not limit the ability of the Department of Justice to pursue a claim on behalf of the United States.  To the contrary, as the Eleventh Circuit has recognized, the United States has "considerable authority over intervened and non-intervened qui tam actions."  *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1312 (11th Cir. 2021).

In sum, relators are not officers of the United States and, therefore, the *qui tam* provisions of the FCA do not violate the Appointments Clause.  *See Wallace*, 2023 WL 8027309, at *5.

## C.   Defendants' "Modern Regulatory State" Argument Does Not Change the Constitutional Analysis

Defendant's argument that the "Modern Regulatory State," Dkt. 180 at 1, has created a "Modern Regulatory FCA," *id* at 22, is merely an effort to dissuade this Court from considering the long history of the FCA in particular and *qui tam* statutes

more generally.  At its core, Defendants' argument is that the 1986 amendments to the FCA so drastically changed the statute that it essentially is a new statute, no longer tied to the historical legacy of the pre-1986 FCA.  Although the 1986 amendments were significant, they did not fundamentally transform the FCA.  Instead, they were just another step in the development of the statute that adds another chapter to the history of the FCA.

As discussed above, the Court should consider the entirety of the relevant history, including the fact that the First Congress readily embraced *qui tam* statutes and that the FCA has long been understood by the Supreme Court and other courts as an integral fraud fighting tool to protect the federal fisc from unscrupulous parties who have defrauded the Government.

It is unsurprising, as defendants stress, that federal regulation has increased substantially since the FCA was first enacted.  The national economy and the federal budget have grown equally if not more than the regulatory structure has grown.  In the Medicare Program alone, last year the Government spent $ 829.9 billion,[4] and of that $454 billion[5] was spent on the Medicare Advantage Program.  Given this vast expenditure of federal funds, the United States must be fully equipped to root out

---

[4] Cubanski, Juliette, et al., *FAQs on Health Spending, the Federal Budget, and Budget Enforcement Tools*, (Mar. 20, 2023), https://www.kff.org/medicare/issue-brief/faqs-on-health-spending-the-federal-budget-and-budget-enforcement-tools/ (last visited Mar. 10, 2024)

[5] Ochieng, Nancy, et al., *Medicare Advantage in 2023*, https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-enrollment-update-and-key-trends/#:~:text=In%202023%2C%2030.8%20million%20people,spending%20(net%20of%20premiums) (last visited Mar. 10, 2024)

fraud in Medicare and other federal programs.  A robust FCA is necessary to achieve this objective, and the *qui tam* provisions of the FCA are a critical piece of that undertaking.

## <u>CONCLUSION</u>

For these reasons, the FCA's *qui tam* provisions are consistent with the Constitution's Take Care Clause, Vesting Clause and Appointments Clause. Accordingly, the Court should reject Defendants' arguments – as every federal Circuit Court to decide the issues has done – and deny Defendants' Motion for Judgment on the Pleadings.

Respectfully submitted,

**BRIAN M. BOYNTON**
Principal Deputy Assistant Attorney General

**ROGER B. HANDBERG**
United States Attorney

JAMIE A. YAVELBERG
PATRICIA L. HANOWER
J. JENNIFER KOH
Attorneys, Civil Division
United States Department of Justice

Dated:  March 29, 2024          By:     */s/ Sean P. Keefe*_____
                                        SEAN P. KEEFE
                                        Assistant United States Attorney
                                        Florida Bar No. 0413828
                                        400 North Tampa Street, Suite 3200
                                        Tampa, FL 33602
                                        Telephone: (813) 274-6000
                                        Facsimile: (813) 274-6200
                                        E-mail: sean.keefe@usdoj.gov

19

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 29, 2024, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system which will provide electronic service to all

counsel of record.


*/s/ Sean P. Keefe*
SEAN P. KEEFE
Assistant United States Attorney