## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA ex rel.
DR. CLARISSA ZAVIROV,

        Plaintiff,

v.

PHYSICIAN PARTNERS, LLC,
FLORIDA MEDICAL ASSOCIATES,
LLC d/b/a ANION TECHNOLOGIES,
LLC, FREEDOM HEALTH, INC. and
OPTIMUM HEALTHCARE, INC.,

        Defendants.

Case No. 8:19-CV-01236-KKM-SPF

---

### BRIEF OF *AMICUS CURIAE* THE ANTI-FRAUD COALITION IN SUPPORT OF PLAINTIFF

Tejinder Singh
  (*pro hac vice* application forthcoming)
Sparacino PLLC
1920 L St. NW
Suite 835
Washington, DC 20036
202-629-3530
tejinder.singh@sparacinopllc.com

Jacklyn N. DeMar
  (*pro hac vice* application forthcoming)
The Anti-Fraud Coalition
1220 19th St. NW
Suite 501
Washington, DC 20036
Telephone: 202-296-4826
jdemar@taf.org

Jonathan Kroner
Jonathan Kroner Law Office
6001 N. Ocean Dr., Suite 806
Hollywood, FL 33019
305-310-6046
jk@floridafalseclaim.com

Steven F. Grover
Steven F. Grover PA
5075 Regency Isles Way
Cooper City, FL 33330
954-290-8826
stevenfgrover@gmail.com


Counsel for *Amicus Curiae*
The Anti-Fraud Coalition

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ....................................................................1

INTRODUCTION ...............................................................................................1

ARGUMENT .......................................................................................................4

I.      Since 1863 the False Claims Act's Public-Private Partnership Has Functioned Successfully to Protect the Federal Treasury from Fraud and to Serve the Public Interest Through Enhanced Enforcement of Laws That Protect the Health and Safety of Citizens. .................................................................................................4

II.     The Unanimous Acceptance of *Qui Tam* Actions by All Three Branches of Government for Over Two Hundred Years Firmly Establishes Their Constitutionality. ........................................................9

        A.    Every Appellate Court to Have Considered the Question Has Concluded That the FCA's *Qui Tam* Provisions Are Constitutional. ..............................................................................10

        B.    Congress has Employed the *Qui Tam* Mechanism Since the Founding. ........................................................................12

        C.    The Executive Branch Has Supported the Constitutionality of the *Qui Tam* Provisions. ...........................15

III.    The Unanimous View of the Three Branches Is Supported by the FCA's Structure, Which Provides the Executive Branch Extensive Control Over *Qui Tam* Actions. ........................................16

        A.    The FCA's *Qui Tam* Provisions Do Not Usurp Executive Power; They Enhance It. ...........................................................16

        B.    The FCA *Qui Tam* Provisions Do Not Violate the Vesting or Take Care Clauses. ...............................................21

        C.    The FCA *Qui Tam* Provisions Do Not Violate the Appointments Clause. ...............................................................24

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Bowsher v. Synar*,
　478 U.S. 714 (1986) ...................................................................................13

*Buckley v. Valeo*,
　424 U.S. 1 (1976) .................................................................................. 24, 25

*Clinton v. City of New York*,
　524 U.S. 417 (1998) .................................................................................13

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
　139 S. Ct. 1507 (2019) ............................................................................2, 24

*Humphrey's Ex'r v. United States*,
　295 U.S. 602 (1935) .................................................................................24

*Juliano v. Fed. Asset Disposition Ass'n (FADA)*,
　736 F. Supp. 348 (D.D.C. 1990), *aff'd* 959 F.2d 1101 (D.C. Cir. 1992) .............20

*Marsh v. Chambers*,
　463 U.S. 783 (1983) .................................................................................13

*Marvin v. Trout*,
　199 U.S. 212 (1905) .................................................................................12

Morrison v. Olson,
　487 U.S. 654 (1988) .................................................................................22

*Myers v. United States*,
　272 U.S. 52 (1926) ...................................................................................13

*Riley v. St. Luke's Episcopal Hosp.*,
　252 F.3d 749 (5th Cir. 2001) ........................................................ 10, 11, 22, 24

*Rosell v. VMSB, LLC*,
　67 F.4th 1141 (11th Cir. 2023) ....................................................................20

*Seila Law LLC v. Consumer Fin. Protection Bureau*,
　140 S. Ct. 2183 (2020) .............................................................................25

*Stuart v. Laird*,
　5 U.S. 299 (1803) ....................................................................................13

*The Laura*,
　114 U.S. 411 (1885) .................................................................................13

*United States ex rel. Amin v. George Washington Univ.*,
   26 F. Supp. 2d 162 (D.D.C. 1998) ....................................................................10

*United States ex rel. Chandler v. Hektoen Inst. for Med. Research*,
   35 F. Supp. 2d 1078 (N.D. Ill. 1999)................................................................10

*United States ex rel. Fallon v. Accudyne Corp.*,
   921 F. Supp. 611 (W.D. Wis. 1995)..................................................................10

*United States ex rel. Karadsheh v. Fata*,
   No. 2:13-cv-13333 (E.D. Mich. 2013) ................................................................7

*United States ex rel. Kelly v. Boeing Co.*,
   9 F.3d 743 (9th Cir. 1993), *cert. denied,* 510 U.S. 1140 (1994)....... 10, 22, 23, 24

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
   985 F.2d 1148 (2d Cir. 1993) ..................................................................... 10, 22

*United States ex rel. Phillips v. Pediatric Servs. of Am., Inc.*,
   123 F. Supp. 2d 990 (W.D.N.C. 2000)..............................................................10

*United States ex rel. Polansky v. Exec. Health. Res., Inc.*,
   599 U.S. 419 (2023) ......................................................... 11, 19, 20, 21

*United States ex rel. Robinson v. Northrop Corp.*,
   824 F. Supp. 830 (N.D. Ill. 1993)....................................................................10

*United States ex rel. Sharp v. Consolidated Medical Trans.*,
   2001 WL 1035720 (N.D. Ill. 2001)..................................................................10

*United States ex rel. Stone v. Rockwell Int'l Corp.*,
   282 F.3d 787 (10th Cir. 2002)..................................................................... 10, 24

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
   41 F.3d 1032 (6th Cir. 1994) ..................................................................... 10, 24

*United States ex rel. Thomas v. Mercy Care*,
   2023 WL 7413669 (D. Ariz. Nov. 9 2023) ......................................................12

*United States ex rel. Wallace v. Exactech, Inc.*,
   2023 WL 8027309 (N.D. Ala. Nov. 20, 2023)..................................................12

*United States ex rel. Westrick v. Second Chance Body Armor Inc., et al.*,
   No. 1:04-cv-00280 (D.D.C. 2004) ......................................................................7

*United States v. z-Wright Export Corporation*,
   299 U.S. 304 (1936) ........................................................................................13

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) ............................................................ 2, 11, 13, 14

*Yates v. Pinellas Hematology & Oncology, P.A.*,
  21 F.4th 1288 (11th Cir. 2021) ..................................................... 11

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 2, cl. 2 ......................................................... 24

## STATUTES

18 U.S.C. § 962 .......................................................................... 14

25 U.S.C. § 201 .......................................................................... 14

28 U.S.C. § 593(e) ...................................................................... 23

28 U.S.C. § 596(b)(2) .................................................................. 23

31 U.S.C. § 3730(a) .................................................................... 18

31 U.S.C. § 3730(b)(1) ........................................................... 17, 20

31 U.S.C. § 3730(b)(2) ............................................................. 5, 19

31 U.S.C. § 3730(b)(4) ................................................................ 19

31 U.S.C. § 3730(c)(1) ................................................................ 19

31 U.S.C. § 3730(c)(2)(A) ............................................................ 19

31 U.S.C. § 3730(c)(2)(B) ......................................................... 5, 20

31 U.S.C. § 3730(c)(3) ................................................................ 20

31 U.S.C. § 3730(c)(4) ................................................................ 20

31 U.S.C. § 3730(c)(5) ................................................................ 20

46 U.S.C. § 723, now codified at 46 U.S.C. § 80103(b) ..................... 14

False Claims Act,
  ch. 67, 12 Stat. 696-99 (1863). ...................................................... 5

## OTHER AUTHORITIES

Richard A. Bales, *A Constitutional Defense of Qui Tam*,
  2001 Wis. L. Rev. 381, 439 n.38 (2001) .......................................... 14

Bret Boyce, *The Constitutionality of the Qui Tam Provisions of the False Claims Act Under Article II*,
24 False Claims Act & Qui Tam Q.Rev. 10 (Oct. 2001) ....................................22

Evan Caminker, *The Constitutionality of Qui Tam Actions*,
99 Yale L.J. 341 (1989).........................................................................................22

CNN Newsroom, William Barr's Hearing on Capitol Hill, Transcript (Jan. 15, 2019),
http://www.cnn.com/TRANSCRIPTS/1901/15/cnr.04.html ..............................16

Cong. Globe, 37th Cong., 3d Sess. (1863) ............................................................4, 5

David Nakamura & Aaron Gregg, *Booz Allen Hamilton to Pay $377 Million for False Charges to U.S. Government*, Wash. Post (July 21, 2023),
https://www.washingtonpost.com/national-security/2023/07/21/booz-allen-lawsuit-false-charges/ ...............................................................................................8

Peter Shane, *Returning Separation-of-Powers Analysis to Its Normative Roots: The Constitutionality of Qui Tam Actions and Other Private Suits to Enforce Civil Fines*,
30 Env't. L. Rep. 11,081 (Dec. 2000).....................................................................22

S. Rep. No. 99-345 (1986) .........................................................................................5

Jonathan Tycko, The False Claims Act Has Been A Successful Tool For Combatting Customs Fraud, Mostly Thanks To Whistleblowers (Sept. 18, 2023),
https://www.taf.org/fbtn2023-sept18/ ......................................................................8

U.S. Dep't of Justice, Fraud Statistics – October 1, 1986 – September 30, 2023,
https://www.justice.gov/opa/media/1339306/dl?inline..........................................9

U.S. Dep't of Justice, Press Release, Booz Allen Agrees to Pay $377.45 Million to Settle False Claims Act Allegations (July 21, 2023),
https://www.justice.gov/opa/pr/booz-allen-agrees-pay-37745-million-settle-false-claims-act-allegations ...................................................................................8

U.S. Dep't of Justice, Press Release, Detroit Area Doctor Sentenced to 45 Years in Prison for Providing Medically Unnecessary Chemotherapy to Patients (July 10, 2015),
https://www.justice.gov/opa/pr/detroit-area-doctor-sentenced-45-years-prison-providing-medically-unnecessary-chemotherapy ..................................................7

U.S. Dep't of Justice, Press Release, False Claims Act Settlements and Judgments Exceed $2 Billion in Fiscal Year 2022 (Feb. 7, 2023),

https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-2-billion-fiscal-year-2022 ........................................................................3

U.S. Dep't of Justice, Press Release, Former Second Chance Body Armor President Settles False Claims Act Case Related to Defective Bullet Proof Vests (July 16, 2018), https://www.justice.gov/opa/pr/former-second-chance-body-armor-president-settles-false-claims-act-case-related-defective ......................................................7

U.S. Dep't of Justice, Press Release, Honeywell to Pay $3.35 Million for Alleged False Claims for Zylon Bullet Proof Vests (Oct. 26, 2022), https://www.justice.gov/opa/pr/honeywell-pay-335-million-alleged-false-claims-zylon-bullet-proof-vests ............................................................................8

U.S. Dep't of Justice, Press Release, Providence Health & Services Agrees to Pay $22.7 Million to Resolve Liability From Medically Unnecessary Neurosurgery Procedures at Providence St. Mary's Medical Center (Apr. 12, 2022), https://www.justice.gov/usao-edwa/pr/providence-health-services-agrees-pay-227-million-resolve-liability-medically ................................................................6

## INTEREST OF AMICUS CURIAE[1]

The Anti-Fraud Coalition ("TAF Coalition") is a nonprofit, public interest organization dedicated to combating fraud against the government and protecting public resources through public-private partnerships. The organization has worked to publicize the *qui tam* provisions of the federal False Claims Act ("FCA"), has participated in litigation as a *qui tam* relator and as an *amicus curiae*, including on the issues presented in this case, and has provided testimony to Congress about ways to improve the FCA. TAF Coalition has a strong interest in defending the FCA and ensuring its proper interpretation and application, including defending the FCA's *qui tam* provisions against renewed attacks that they somehow violate the Constitution by impermissibly encroaching on the Executive Branch's powers.

## INTRODUCTION

Congress enacted the False Claims Act in 1863 to combat widespread fraud on the Treasury. Drawing on a procedural mechanism well-known to the Framers of the Constitution, the Act enlists private citizens to aid in this endeavor, authorizing them to file "*qui tam*" suits on behalf of the United States against those who submit false claims for payment to the United States. Persons initiating such actions, known as "relators," are awarded a share of any recovery obtained through settlement or

---

[1] No counsel for a party authored this brief in whole or part, and no party other than *amicus* or its counsel made a monetary contribution to the preparation or submission of the brief.

trial. Since Congress amended the law in 1986 in ways that enhanced Executive Branch control over *qui tam* cases brought under the Act, those cases have helped return over $75 billion to the government and had an even greater deterrent effect.

Notwithstanding the law's history, in the immediate aftermath of the 1986 amendments, courts across the country considered arguments that the FCA's *qui tam* provisions were unconstitutional under Article II and Article III. Every appellate court that considered those challenges upheld the FCA's constitutionality. These courts concluded that the Act does not offend the separation of powers because the Executive Branch retains sufficient control over *qui tam* litigation and because *qui tam* relators, who pursue only an individual case, are not officers of the United States and do not exercise government power such that they need to be appointed in accordance with Article II. These courts also concluded that relators have standing under Article III, a conclusion that the Supreme Court affirmed, finding history "well nigh conclusive" on that question.[2] More recently, in construing a provision of the FCA that referenced "an official of the United States," the Supreme Court held that relators are private persons, not officials of the United States, and are not charged with responsibility to investigate or prosecute FCA cases.[3]

---

[2] *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 776-77 (2000) (noting that the First Congress adopted a *qui tam* provision).
[3] *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1514 (2019).

This unanimous view of the constitutionality of the Act's *qui tam* provisions is well-supported by both the history and structure of the FCA. Congress grounded the Act in an ancient and effective procedure for increasing the likelihood of detecting and deterring fraud on the government, and has worked with the Executive Branch to improve both the Act's effectiveness and to enhance Executive Branch control over *qui tam* actions. The Executive Branch has supported the constitutionality of the *qui tam* provisions in court, including in this case, and has repeatedly emphasized that "the False Claims Act remains one of the most important tools for ensuring that public funds are spent properly and advance the public interest."[4] The Department of Justice has also expressed gratitude for "the hard work and courage of those private citizens who bring evidence of fraud to the Department's attention, often putting at risk their careers and reputations," and observed that the Department's "ability to protect citizens and taxpayer funds continues to benefit greatly from their actions."[5]

In light of the support of the statute by all three branches of government, together with the history and structure of the FCA, the contention that the *qui tam* provisions of the FCA are unconstitutional is untenable. Indeed, Defendants'

---

[4] U.S. Dep't of Justice, Press Release, False Claims Act Settlements and Judgments Exceed $2 Billion in Fiscal Year 2022 (Feb. 7, 2023), https://www.justice.gov/opa/pr/false-claims-act-settlements-and-judgments-exceed-2-billion-fiscal-year-2022 (statements of Principal Deputy Assistant Attorney General Boynton).
[5] *Id.*

challenge is based on a fundamental misconception of the nature of *qui tam* actions, which are not a usurpation of Executive authority, but instead an enhancement to that power. By helping the Executive Branch detect fraud that would otherwise go unseen, and by allowing the government to partner with relators and their counsel to redress those frauds when the government's resources are not adequate to the task, the Act's *qui tam* provisions only enhance the Executive Branch's ability to take care that the laws are enforced. This Court should join the chorus of judicial opinions rejecting meritless constitutional challenges to this venerable and successful regime.

## ARGUMENT

I.  **Since 1863 the False Claims Act's Public-Private Partnership Has Functioned Successfully to Protect the Federal Treasury from Fraud and to Serve the Public Interest Through Enhanced Enforcement of Laws That Protect the Health and Safety of Citizens.**

In 1863, the federal government, fighting for the survival of the Union, was spending more money and buying more goods than it had ever had. Unscrupulous contractors sought to exploit this flood of federal money. As Senator Henry Wilson of Massachusetts noted during debates on the proposed FCA, although Congress's "Halls have rung with denunciations of the frauds of contractors upon the Government of the United States," and although "[t]he Government is doing what it can to stop these frauds and punish those who commit them," it was not enough.[6] To

---

[6] *See* Cong. Globe, 37th Cong., 3d Sess. 956 (1863).

assist the government's efforts, Congress proposed "a reward to the informer who comes into court" to provide information about fraud against the government.[7] In discussing the proposed law, Senator Jacob Howard of Michigan confidently stated that the *qui tam* aspects of the law were "open to no serious objection."[8] The bill passed and was signed into law by President Abraham Lincoln.[9]

In 1986, after extensive hearings and with the input of the Executive Branch,[10] Congress amended the FCA to make it "a more useful tool against fraud in modern times."[11] The 1986 amendments gave the government enhanced tools to detect false claims. Congress also determined that "only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds."[12] To that end, it reinvigorated the public-private partnership that formed the core of the 1863 Act by both providing relators a greater stake in *qui tam* cases and enhancing the government's control over such cases. Among other things, the government was given the right to intervene and assume responsibility for the case, as well as the right to settle or dismiss a case over the relator's objections.[13]

---

[7] Senator Howard noted that the typical informer would be one who "betrays his coconspirator," but, the law was "not confined to that class." *Id.* at 955.

[8] *Id.*

[9] False Claims Act, ch. 67, 12 Stat. 696-99 (1863).

[10] S. Rep. No. 99-345, at 10-13 (1986). (noting that various Department of Justice officials, including Associate Deputy Attorney General and Assistant Attorney General, "expressed strong support for the amendments to the False Claims Act.").

[11] *Id.* at 1.

[12] *Id.*

[13] *Id.* at 11-12; 31 U.S.C. § 3730(b)(2), (c)(2)(B).

The post-amendment public-private partnership embodied in the FCA has made a tremendous impact on combating fraud and protecting the public from harm. In the field of healthcare, actions initiated by relators have brought serious concerns about patient harm to the government's attention. For example, in 2022, the government intervened in and settled for $22 million a *qui tam* action in which a whistleblower alleged that two physicians at a large health care and hospital system billed for services never performed, billed for botched spinal surgeries, and falsified diagnoses to justify more complex and higher risk—and higher paying—spinal surgeries.[14] Highlighting the importance of the public-private partnership, the U.S. Attorney for the Eastern District of Washington noted her "special appreciation for our close collaboration and partnership with the Washington Medicaid Fraud Control Division and with the whistleblower and his team, as well as" others.[15]

Whistleblowers have also been instrumental in identifying particularly egregious instances of healthcare providers taking advantage of vulnerable populations. In one example, a whistleblower filed a 2013 *qui tam* action alleging that a Michigan physician submitted false claims for chemotherapy, oncological

---

[14] *See* U.S. Dep't of Justice, Press Release, Providence Health & Services Agrees to Pay $22.7 Million to Resolve Liability From Medically Unnecessary Neurosurgery Procedures at Providence St. Mary's Medical Center (Apr. 12, 2022), https://www.justice.gov/usao-edwa/pr/providence-health-services-agrees-pay-227-million-resolve-liability-medically.
[15] *Id.*

treatment services, and diagnostic tests.[16] In 2015, the physician pleaded guilty to providing medically unnecessary chemotherapy to hundreds of patients and defrauding Medicare and private insurance of roughly $34 million.[17] Government prosecutors and investigators described the physician's conduct as "startling," "abhorrent," and "heinous;" the Chief of the IRS Criminal Investigations team described it as "the most egregious case of fraud and deception that I have ever seen in my career."[18] The government's effort to stop this misconduct was made possible by a whistleblower filing a *qui tam* action.

Whistleblowers also protect law enforcement and military personnel. For example, a whistleblower lawsuit filed in 2004 raised concerns about defective body armor containing Zylon fibers sold to federal, state, and local police agencies. The suit alleged that the fibers used in the armor rapidly degraded, putting police officers at risk,[19] and a subsequent investigation by the National Institute of Justice confirmed these allegations.[20] The whistleblower's suit led to over $136 million in

---

[16] *See United States et al. ex rel. Karadsheh v. Fata et al.*, No. 2:13-cv-13333 (E.D. Mich. 2013).

[17] U.S. Dep't of Justice, Press Release, Detroit Area Doctor Sentenced to 45 Years in Prison for Providing Medically Unnecessary Chemotherapy to Patients (July 10, 2015), https://www.justice.gov/opa/pr/detroit-area-doctor-sentenced-45-years-prison-providing-medically-unnecessary-chemotherapy.

[18] *Id.*

[19] *See United States ex rel. Westrick v. Second Chance Body Armor Inc., et al.*, 1:04-cv-00280 (D.D.C. 2004).

[20] U.S. Dep't of Justice, Press Release, Former Second Chance Body Armor President Settles False Claims Act Case Related to Defective Bullet Proof Vests (July 16, 2018), https://www.justice.gov/opa/pr/former-second-chance-body-armor-president-settles-false-claims-act-case-related-defective.

recoveries against over a dozen individuals and entities involved in the sale of the defective body armor.[21]

Whistleblowers are also responsible for uncovering fraud and abuse in procurement contracting, including last year, when a multinational government contractor paid over $377 million dollars to resolve claims relating to a decades-long fraud.[22] The whistleblower, a former U.S. Marine Corps officer, overcame enormous challenged to expose fraud that would likely not have come to light without her.[23]

Whistleblowers have also been integral to preventing violations of customs duties and tariffs. Over the past decade, the government has recovered over $220 million dollars in FCA cases alleging customs fraud, including allegations of undervaluation, anti-dumping, and avoidance of marking duties. Out of 43 customs fraud FCA cases, 42 were *qui tam* cases.[24]

Since the 1986 amendments, *qui tam* lawsuits originated by whistleblowers have recovered more than $50 billion for the federal government (out of $75 billion

---

[21] *See* U.S. Dep't of Justice, Press Release, Honeywell to Pay $3.35 Million for Alleged False Claims for Zylon Bullet Proof Vests (Oct. 26, 2022), https://www.justice.gov/opa/pr/honeywell-pay-335-million-alleged-false-claims-zylon-bullet-proof-vests.

[22] U.S. Dep't of Justice, Press Release, Booz Allen Agrees to Pay $377.45 Million to Settle False Claims Act Allegations (July 21, 2023), https://www.justice.gov/opa/pr/booz-allen-agrees-pay-37745-million-settle-false-claims-act-allegations.

[23] David Nakamura & Aaron Gregg, *Booz Allen Hamilton to Pay $377 Million for False Charges to U.S. Government*, Wash. Post (July 21, 2023), https://www.washingtonpost.com/national-security/2023/07/21/booz-allen-hamilton-lawsuit-false-charges/.

[24] Jonathan Tycko, The False Claims Act Has Been A Successful Tool For Combatting Customs Fraud, Mostly Thanks To Whistleblowers (Sept. 18, 2023), https://www.taf.org/fbtn2023-sept18/.

in total recoveries under the Act).[25] Most of these recoveries resulted from suits in which the government intervened, but over $5.1 billion came from suits that whistleblowers pursued after the government declined to intervene.[26] The public-private partnership embodied in the FCA has been a vital force for redressing and preventing fraud on the government and the key to its success has been the *qui tam* provisions. As Congress recognized, without the information provided by individuals who are aware of fraud and are incentivized to pursue it, the government would not likely have learned of these frauds, and the resources the private sector brings to assist the government have been critical in effectively pursuing these cases. Congress concluded that the *qui tam* provisions were necessary to protect the Treasury and the public. As demonstrated below, this choice was well within Congress's broad constitutional powers.

## II. The Unanimous Acceptance of *Qui Tam* Actions by All Three Branches of Government for Over Two Hundred Years Firmly Establishes Their Constitutionality.

*Qui tam* actions have existed since the Founding, and the FCA itself is over 150 years old. Throughout the Act's history, Congress and the Executive Branch have worked together to enhance the FCA's effectiveness, and courts have

---

[25] U.S. Dep't of Justice, Fraud Statistics – October 1, 1986 – September 30, 2023, https://www.justice.gov/opa/media/1339306/dl?inline.
[26] *Id.*

repeatedly rejected challenges to the Act's structure. Defendants' efforts to revive such challenges ring hollow.

A. Every Appellate Court to Have Considered the Question Has Concluded That the FCA's *Qui Tam* Provisions Are Constitutional.

The five circuits that have addressed Article II challenges to the constitutionality of the FCA's *qui tam* provision—which include the Second, Fifth, Sixth, Ninth, and Tenth Circuits—have all rejected those challenges.[27] District courts outside of those circuits have also overwhelmingly rejected such challenges.[28]

The Eleventh Circuit has not directly addressed an Article II challenge to the FCA, but it has recognized "the United States' significant control over FCA qui tam actions," as well as the holdings of "our sister circuits" that the *qui tam* provisions "do not violate (i) Article II's Take Care Clause; (ii) the principle of separation of

---

[27] *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (*en banc*) (in non-intervened case, rejecting both Take Care and Appointments Clause challenges); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993), *cert. denied,* 510 U.S. 1140 (1994) (in non-intervened case, rejecting both Take Care and Appointments Clause challenges); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148 (2d Cir. 1993) (in non-intervened case, rejecting separation of powers challenge); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002) (rejecting both Take Care and Appointments Clause challenges); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994). Defendants note only the contrary views of one of the judges sitting en banc in *Riley*, but ignore that thirteen other judges on that panel held the statute constitutional.

[28] *See United States ex rel. Phillips v. Pediatric Servs. of Am., Inc.*, 123 F. Supp. 2d 990, 994 (W.D.N.C. 2000); *United States ex rel. Sharp v. Consolidated Medical Trans.*, 2001 WL 1035720, at *11 (N.D. Ill. 2001); *United States ex rel. Robinson v. Northrop Corp.*, 824 F. Supp. 830, 838 (N.D. Ill. 1993); *United States ex rel. Chandler v. Hektoen Inst. for Med. Research*, 35 F. Supp. 2d 1078, 1081 (N.D. Ill. 1999); *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 623-24 (W.D. Wis. 1995); *United States ex rel. Amin v. George Washington Univ.*, 26 F. Supp. 2d 162, 165 (D.D.C. 1998).

powers; or (iii) the States' Eleventh Amendment Immunity."[29] Thus, the Eleventh Circuit has embraced the arguments that courts upholding the FCA have accepted in a precedential decision that undermines many of Defendants' arguments here.

Although the Supreme Court has not ruled on an Article II challenge to the FCA, the Court has held that *qui tam* relators have standing under Article III based on the existence of *qui tam* actions both before and at the time of the Framing of the Constitution.[30] Two Justices expressed the view that "[t]he historical evidence [that supports a finding of Article III standing] … is also sufficient to resolve the Article II question."[31] On the other hand, while Defendants stress that in *United States ex rel. Polansky v. Executive Health Resources*,[32] three Justices (one dissenting, and two concurring) noted that the FCA raises constitutional questions, no Justice has ever opined that any provision of the Act *actually is unconstitutional*—and of course, a supermajority of six Justices did not even join their colleagues' statements indicating that the FCA raises constitutional questions. The strong appellate consensus thus overwhelmingly favors upholding the statute.

---

[29] *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1311-12 (11th Cir. 2021) (citations omitted).

[30] *See Stevens*, 529 U.S. at 778.

[31] *Stevens*, 529 U.S. at 801 (Stevens, J., dissenting); *see also Riley*, 252 F.3d at 752 ("[I]t is logically inescapable that the same history that was conclusive on the Article III question in *Stevens* with respect to qui tam lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning the statute.").

[32] 599 U.S. 419 (2023).

Indeed, district courts—including in this circuit—that have considered Article II challenges to the FCA's *qui tam* provisions after *Polansky* have rejected the argument. In *United States ex rel. Wallace v. Exactech, Inc.*, then-Chief Judge Coogler held that the FCA does not violate the Appointments Clause because relators are not officers of the United States, as their positions are temporary, they do not "wield governmental power," and the "Government restricts their power as civil litigants: the Government can intervene, monitor and limit discovery, and settle the action without relators' consent."[33] Further, the court held that the FCA does not violate the Take Care Clause, explaining that "[d]ue to the limits placed upon relators in *qui tam* actions, the Executive retains sufficient control over the relator's conduct to ensure that the President is able to perform his constitutionally assigned dut[y]."[34]

B. <u>Congress has Employed the *Qui Tam* Mechanism Since the Founding.</u>

In enacting the FCA in 1863, Congress modeled the statute on a procedural mechanism that had been in use for centuries. *Qui tam* suits were well-known in England since the Middle Ages when such statutes authorized private persons to bring actions in the name of the King in exchange for a share of the recovery.[35] And

---

[33] 2023 WL 8027309, at *4 (N.D. Ala. Nov. 20, 2023).

[34] *Id.* at *6 (citation and quotation marks omitted); *see also United States ex rel. Thomas v. Mercy Care*, 2023 WL 7413669, at *4 (D. Ariz. Nov. 9 2023) (denying the defendant's motion to dismiss on Article II grounds).

[35] *Marvin v. Trout*, 199 U.S. 212, 225 (1905) ("Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by

this form of law enforcement was familiar to those who settled this country. "*Qui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after the framing of the Constitution . . . . Moreover, immediately after the framing, the First Congress enacted a considerable number of informer statutes."[36]

While some such laws provided only a reward for bringing information to the government, others authorized individuals to pursue the case.[37] That the drafters of the Constitution adopted federal *qui tam* laws is a powerful indication that such provisions do not violate that same document. With respect to the structure of government, the Supreme Court has always assigned "great weight" to the historical understandings of "the men who were contemporary with [the Constitution's] formation."[38] Indeed, acts of the First Congress have long been regarded as "contemporaneous and weighty evidence of [the Constitution's] true meaning,"[39] and the Court has upheld practices because the First Congress blessed them—a rule that applies here. Congress also continued to enact and reenact *qui tam* laws well

---

statute, have been in existence for hundreds of years in England, and in this country ever since the formation of our government.") (citing cases).

[36] *Stevens*, 529 U.S. at 776-77 (citing statutes).

[37] *Id.*

[38] *The Laura*, 114 U.S. 411, 416 (1885). *See also, e.g.*, *Clinton v. City of New York*, 524 U.S. 417 (1998) (presidential veto power); *Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986) (removal of officer); *United States v. z-Wright Export Corporation*, 299 U.S. 304, 322 (1936) (President's authority in foreign relations); *Myers v. U.S.*, 272 U.S. 52, 136 (1926) (removal of officers); *Stuart v. Laird*, 5 U.S. 299, 309 (1803) (assignment of judges).

[39] *Marsh v. Chambers*, 463 U.S. 783, 790 (1983).

beyond the First Congress.[40] In addition to the FCA, three other such laws remain in effect.[41]

The Supreme Court found this history of the *qui tam* mechanism "well nigh conclusive" on the question of whether *qui tam* relators had standing under Article III of the Constitution.[42] That history, together with the structure of the FCA, led the Court to conclude unanimously that relators were permitted to bring a suit as partial assignees of the government's injury. The same history also compels the conclusion that the provisions do not violate Article II.

Defendants and the Chamber attempt to brush aside this history by noting that the 1986 FCA differs from the original statute, and by pointing to the growth of the administrative state. These arguments fall flat. The changes Defendants identify—which include increased recoveries, new theories of liability, etc.—do not speak to the relevant historical question, which is whether *qui tam* relators were historically permitted to sue in the government's name. They were, and defendants do not argue otherwise. To the extent the 1986 amendments are relevant, they mitigate any Article

---

[40] *See, e.g.*, Richard A. Bales, *A Constitutional Defense of Qui Tam*, 2001 Wis. L. Rev. 381, 439 n.38 (2001) (citing additional *qui tam* statutes enacted from 1792 through 1870, many of which were re-enacted throughout the 1800s).

[41] 25 U.S.C. § 201 (penalties for violation of laws protecting commercial interests of Native Americans); 18 U.S.C. § 962 (forfeitures of vessels privately armed against friendly nations); 46 U.S.C. §723, now codified at 46 U.S.C. § 80103(b) (forfeiture of vessels taking undersea treasure from the Florida Coast).

[42] *Stevens,* 529 U.S. at 777.

II concern because Congress gave the Executive Branch *far greater control* over *qui tam* actions than it had before. Defendants' arguments accordingly do not provide any justification for holding that the FCA is anything other than a traditional *qui tam* statute of the type that has long been accepted as constitutional.

### C. The Executive Branch Has Supported the Constitutionality of the *Qui Tam* Provisions.

The FCA's *qui tam* provisions have also been supported by the Executive Branch, which has defended their constitutionality.[43] That the Executive Branch does not view the law as unduly encroaching on its powers is strong evidence that the alleged encroachment does not rise to the level of constitutional concern.

In an attempt to argue otherwise, the Chamber of Commerce dredges up a 1989 memorandum from the White House Office of Legal Counsel opining that the FCA's *qui tam* provisions are unconstitutional. That memorandum's conclusion is aberrational, as administrations of both major political parties have determined that the FCA's *qui tam* provisions do not encroach on executive power. What is more, the author of that memorandum recanted his 1989 conclusion during his 2019 Senate confirmation hearings to become Attorney General. Thus, when nominee William Barr was asked, "Is the False Claims Act unconstitutional?" he answered, "No,

---

[43] *See, e.g.,* Brief of the United States in Opp. to Pet. for Cert., *Rockwell Int'l Corp. v. U.S. ex rel. Stone,* No. 05-1272, at 18-23 (2006) (rejecting argument that *qui tam* provisions violate Article II).

senator."[44] He also confirmed that the FCA's "provisions to empower and protect whistleblowers" "benefit the taxpayer," and vowed to "diligently enforce the False Claims Act," including by allowing meritorious whistleblower cases to proceed even when the government does not intervene.[45]

### III.   The Unanimous View of the Three Branches Is Supported by the FCA's Structure, Which Provides the Executive Branch Extensive Control Over *Qui Tam* Actions.

#### A.   The FCA's *Qui Tam* Provisions Do Not Usurp Executive Power; They Enhance It.

Challenges to the constitutionality of the FCA's *qui tam* provisions are rooted in a misconception about what those provisions do. Put simply, they do not usurp executive power; instead, they enhance it by giving the government access to information it would not otherwise have, as well as additional options for redressing fraud. None of that is constitutionally problematic.

It's important to understand the crux of defendants' challenge. In general, it is uncontroversial that private litigants can bring civil actions to enforce federal laws. They do this all the time, for example with respect to antitrust laws, securities laws, and even quasi-criminal statutes like the Racketeer Influenced and Corrupt Organizations Act. Parties can also sue to vindicate the rights of others—as they do,

---

[44] CNN Newsroom, William Barr's Hearing on Capitol Hill, Transcript (Jan. 15, 2019), http://www.cnn.com/TRANSCRIPTS/1901/15/cnr.04.html.
[45] *Id.*

for example, in class actions. As long as the plaintiff has standing, there is nothing constitutionally objectionable about any of those causes of action. Here, the standing issue was resolved when the Supreme Court held that the United States partially assigned its FCA claims to relators. As a practical matter, then, the FCA works the same as these other statutes.

Defendants and the Chamber of Commerce identify one feature that they think distinguishes the FCA from other causes of action: the fact that the relator must sue in the name of the United States. According to the challengers, this feature somehow transfers executive power into the hands of private parties, and compels the Court to strike down a statute that has been on the books since 1863.

That is wrong. Although relators must bring actions "in the name of the Government,"[46] they do not thereby obtain any powers that a private litigant lacks. They do not, for example, obtain subpoena power, or access to government resources. They cannot bring criminal charges or administrative enforcement actions. And they do not receive a government salary or other emolument. Instead, requiring relators to sue in the name of the United States has two effects, neither of which poses a constitutional problem. First, it affects how cases are captioned. So, instead of "Zavirov v. Defendants," the case is "United States ex rel. Zafirov v.

---

[46] 31 U.S.C. § 3730(b)(1).

Defendants." But that has no significance. Second, requiring relators to sue in the government's name helps protect the government's interests by allowing the government to participate in the case and to recover its the proceeds without bringing a separate action. None of the authorities defendants cite suggest that empowering the government creates any constitutional problem—because it doesn't.

Defendants and the Chamber counter that by allowing the relator to file a complaint in the government's name, the FCA permits the relator to usurp the Executive Branch's prosecutorial and enforcement discretion. Thus, they explain, it is the relator who drafts her complaint and decides which facts to allege and which theories of liability to assert. This, they argue, is an executive function that no private person can exercise. But the FCA comprehensively addresses that concern by granting the Executive Branch broad control over *qui tam* actions.

Start with the most obvious point: The FCA allows the government to initiate enforcement actions on its own[47]—and nothing in the statute permits a *qui tam* relator to stop the government from bringing a case it wants to bring. Similarly, contrary to Defendants' insinuation, nothing permits a *qui tam* relator to force the government to bring a case it does *not* want to bring. Instead, when a *qui tam* relator brings an FCA action, the government has essentially plenary authority to decide

---

[47] *Id*. § 3730(a).

whether that action will proceed. Thus, the lawsuit is served first on the government, and not the defendant, so that the government can investigate and evaluate the case in secret.[48] The government then has an unfettered right to intervene in the action if it so chooses, in which case the government "shall not be bound" by any of the relator's actions.[49] Or, if the government wants, it can "dismiss the action notwithstanding the objections of the person initiating the action."[50] The Supreme Court just explained that this dismissal authority is governed by Federal Rule of Civil Procedure 41, which empowers the government to dismiss an action whenever it wants before an answer or summary-judgment motion has been served.[51] Thus, the only practical way that a *qui tam* action can proceed into litigation is if the government decides not to intervene, and also decides not to dismiss it. The upshot is that FCA actions do not proceed without the government's effective approval. Either the government will be the party conducting the action, or it will permit the relator's action to go forward. But the key point is that the Executive Branch alone decides whether or not a case will proceed into litigation.

That ought to end the inquiry because it makes clear that the *qui tam* provisions do not take any power from the Executive Branch; they only give the

---

[48] *Id*. § 3730(b)(2).
[49] *Id*. § 3730(b)(4), (c)(1).
[50] *Id*. § 3730(c)(2)(A).
[51] *Polansky*, 599 U.S. at 435-36.

government extra information and options. But there is more. The Executive Branch's control persists even after the government permits the relator to proceed. Thus, the case may not be settled or dismissed without the Attorney General's consent.[52] The government may seek to restrict the relator's discovery if it would interfere with a criminal investigation or prosecution by the government.[53] And the government may belatedly intervene for "good cause,"[54] at which point it can settle the action,[55] pursue the allegations in an alternative forum,[56] or even dismiss the action, which will be allowed "in all but the most exceptional cases."[57]

As a practical matter, the government's powers are even broader than that. It is commonplace, for example, for the government to partially intervene in *qui tam* actions, taking over some claims while leaving others to the side. And contrary to Defendants' suggestion, the government's dismissal power is not an all-or-nothing proposition; instead, the government's greater power to dismiss an entire *qui tam* action encompasses the lesser power to dismiss some claims and not others.[58] In

---

[52] 31 U.S.C. § 3730(b)(1).

[53] *Id.* § 3730(c)(4).

[54] *Id.* § 3730(c)(3).

[55] *Id.* § 3730(c)(2)(B).

[56] *Id.* § 3730(c)(5).

[57] *Polansky*, 599 U.S. at 437.

[58] *Juliano v. Fed. Asset Disposition Ass'n (FADA)*, 736 F. Supp. 348, 351 (D.D.C. 1990) ("The Act nowhere states that federal prosecutors are confined to proceed in an all or nothing manner, being forced to take or leave the qui tam plaintiff's charges wholesale."), *aff'd* 959 F.2d 1101 (D.C. Cir. 1992). The case Defendants cite, *Rosell v. VMSB, LLC*, 67 F.4th 1141, 1144 (11th Cir. 2023), is not a *qui tam* case, but instead explains that Rule 41 dismissals generally must be of an entire action. That case is inapposite to this situation because, as the Supreme Court explained,

other words, the Executive Branch's supervisory powers over *qui tam* actions are both broad and flexible.

These considerations show how contrived Defendants' and the Chamber's challenge truly is. They have no legitimate argument against private parties suing to enforce federal law. They have no answer to the relator's role as an assignee. And they have no principled explanation for why a statute that enhances the Executive Branch's ability to enforce the law should be regarded as a usurpation of executive power. All they really have is a problem with the *form* of these actions. That is not enough to justify striking down the statute.

### B. The FCA *Qui Tam* Provisions Do Not Violate the Vesting or Take Care Clauses.

The *qui tam* provisions do not violate the Vesting or the Take Care Clauses because, for the reasons explained above, they neither vest executive power in private hands nor inhibit the Executive Branch from enforcing (or declining to enforce) the law as it sees fit. Prior to 1986, the FCA did not permit the government to intervene and assume responsibility for the case, nor provide dismissal authority. Nevertheless, there were no doubts about the Act's constitutionality from 1863 until then. Since 1986, the Executive Branch's control over FCA cases has only increased.

---

the "inquiry is necessary 'contextual,'" and "in this context, the Government's views are entitled to substantial deference." *Polansky*, 599 U.S. at 437 (citation omitted).

Contrary to the Defendants' suggestion that *Morrison v. Olson,*[59] supports their position that the *qui tam* provisions unconstitutionally intrude on the Executive Branch's powers, the circuit courts have unanimously concluded that *Morrison*, which upheld the independent counsel statute, supports the constitutionality of the *qui tam* provisions. Applying *Morrison*'s approach to the *qui tam* provisions, courts have concluded that, taken as a whole, the *qui tam* provisions interfere far less with the Executive Branch's prerogatives than the independent counsel provisions did.[60]

Defendants point to various differences between the FCA and the independent counsel statute—but courts have declined to apply the features of the statute in *Morrison* as a checklist of mandatory requirements. Thus, even though the FCA does not permit the Executive Branch to control initiation of a case, courts have not found this distinction significant. The independent counsel statute delegated authority for criminal prosecutions of the President's closest advisors, whereas the *qui tam* provisions authorize only representation in civil fraud cases. And while the government cannot control the initiation of a *qui tam* suit, once an action has begun, "the government has greater authority to limit the conduct of the prosecutor and

---

[59] 487 U.S. 654 (1988).

[60] *See Riley*, 252 F.3d at 754; *Kelly*, 9 F.3d at 752; *Kreindler & Kreindler*, 985 F.2d at 1155; *see also* Peter Shane, *Returning Separation-of-Powers Analysis to Its Normative Roots: The Constitutionality of Qui Tam Actions and Other Private Suits to Enforce Civil Fines*, 30 Env't. L. Rep. 11,081 (Dec. 2000); Evan Caminker, *The Constitutionality of Qui Tam Actions*, 99 Yale L.J. 341, 364-66 (1989); Bret Boyce, *The Constitutionality of the Qui Tam Provisions of the False Claims Act Under Article II*, 24 False Claims Act and Qui Tam Q.Rev. 10 (Oct. 2001).

ultimately end the litigation in a *qui tam* action than it [had] in an independent counsel's action."[61]

In contrast, under the independent counsel statute, the Attorney General had no authority to terminate a particular investigation until the investigation was completed or substantially completed.[62] Although the Attorney General was authorized to remove a particular independent counsel upon a showing of "good cause" and subject to judicial review, such a removal would not end the investigation because the removed independent counsel could be replaced with another counsel.[63] As the Ninth Circuit concluded in *Kelly*, "because the Executive Branch has power, albeit somewhat qualified, to end *qui tam* litigation, it is not significant that it cannot prevent its start."[64]

More broadly, for the reasons explained *supra*, the *qui tam* provisions neither vest executive power in the hands of relators, nor inhibit the Executive Branch's ability to enforce the law. Instead, they empower the Executive to enforce the law more effectively and flexibly.

---

[61] *Kelly*, 9 F.3d at 754.
[62] 28 U.S.C. § 596(b)(2).
[63] 28 U.S.C. § 593(e).
[64] *Kelly*, 9 F.3d at 754.

C. <u>The FCA *Qui Tam* Provisions Do Not Violate the Appointments Clause.</u>

The Appointments Clause requires that officers of the United States be appointed by the President or the President's appointees.[65] As numerous courts have recognized, relators do not possess the traditional hallmarks of office, such as tenure, salary and continuing duties.[66] The relator's temporary *ad hoc* relationship with the government has never been thought to create the position of officer of the United States.[67] Indeed, in *Cochise Consultancy*, the Supreme Court rejected the argument that a relator was "the official of the United States" as that phrase is used in section 3731(b).[68] Because relators are not officers of the United States, the Appointments Clause does not apply to them.

Defendants do not argue otherwise; instead, they argue that because relators *function* as officers, they must be treated as such. In support, Defendants cite a sentence from *Buckley v. Valeo,*[69] a case that is clearly inapposite. *Buckley* held that Congress was not permitted to reserve for itself the right to appoint members of the Federal Election Commission. The commissioners in *Buckley*, in addition to being

---

[65] *See* U.S. Const. art. II, § 2, cl. 2.

[66] *Riley*, 252 F.3d at 757- 58; *Gen. Elec. Co.*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 759; *Stone*, 282 F.3d at 805.

[67] *See*, *e.g.*, *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) (recognizing that independent agency, with authority to bring cases to prevent unfair competition, was not subject to control by the Executive).

[68] 139 S. Ct. at 1514.

[69] 424 U.S. 1 (1976).

appointed by Congress, were salaried individuals, who occupied a position with tenure, and had ongoing responsibility over the administration of the Federal Election Campaign Act. They had all the hallmarks of officers, as well as "wide-ranging rulemaking and enforcement powers."[70] Among these, they were empowered to bring lawsuits to enforce the statute—many of which "[i]n no respect . . . require[d] the concurrence of or participation by the Attorney General."[71] Against this backdrop, the Court concluded that the provisions enabling Commissioners to sue on the United States' behalf violated the Appointments Clause.[72]

*Buckley* was not about *qui tam* relators, whose roles are far more limited than FEC commissioners,[73] and *Buckley* did not consider the specific historic considerations underlying *qui tam* statutes. For those reasons, courts have uniformly held that *Buckley* does not pose any problem for *qui tam* actions.

## CONCLUSION

The Court should refuse to strike down the FCA as unconstitutional.

---

[70] *Id*. at 118.

[71] *Id*. at 111.

[72] *Id*. at 140.

[73] *Qui tam* relators are also unlike the director of the Consumer Financial Protection Bureau, who "wield[ed] vast rulemaking, enforcement, and adjudicatory authority over a significant portion of the U.S. economy." *Seila Law LLC v. Consumer Fin. Protection Bureau*, 140 S. Ct. 2183, 2191 (2020).

Respectfully submitted,

Tejinder Singh
  (*pro hac vice* application forthcoming)
Sparacino PLLC
1920 L St. NW
Suite 835
Washington, DC 20036
202-629-3530
tejinder.singh@sparacinopllc.com

Jonathan Kroner
Jonathan Kroner Law Office
6001 N. Ocean Dr., Suite 806
Hollywood, FL 33019
305-310-6046
jk@floridafalseclaim.com

/s/ Steven F. Grover
Steven F. Grover
Steven F. Grover PA
5075 Regency Isles Way
Cooper City, FL 33330
954-290-8826
stevenfgrover@gmail.com

Jacklyn N. DeMar
  (*pro hac vice* application forthcoming)
The Anti-Fraud Coalition
1220 19th St. NW
Suite 501
Washington, DC 20036
Telephone: 202-296-4826
jdemar@taf.org

Counsel for *Amicus Curiae*
The Anti-Fraud Coalition