UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**UNITED STATES OF AMERICA
ex rel. DR. CLARISSA ZAFIROV**,

    Plaintiff,

-vs-                                        CASE NO. 8:19-cv-1236-KKM-SPF

**FLORIDA MEDICAL ASSOCIATES,
LLC d/b/a VIPCARE, PHYSICIAN
PARTNERS, LLC, ANION TECHNOLOGIES,
LLC, FREEDOM HEALTH, INC., and
OPTIMUM HEALTHCARE, INC.,**

    Defendants.
_____/

**DEFENDANTS' JOINT REPLY IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR JUDGMENT ON THE PLEADINGS OR TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION**

## INTRODUCTION

Defendants' Joint Motion showed that the False Claims Act's ("FCA") *qui tam* mechanism is an unconstitutional aberration. The FCA is an anomaly among the myriad federal enforcement regimes in the U.S. Code, giving a private individual, with no personal injury, the Executive's power to file suit to remedy injuries that are the government's alone and to obtain a judgment that sends funds to the U.S. Treasury. Unsurprisingly, at least three Supreme Court Justices agree that "[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting);[1] *id.* at 442 (Kavanaugh & Barrett, JJ., concurring).

The opposition briefs insist that the FCA is beyond reproach given the history of *qui tam* provisions and the past lower-court decisions rejecting constitutional challenges. The past decisions are not binding, and most predate recent Supreme Court decisions that clarify the separation of powers. The *qui tam* mechanism is unconstitutional, and history does not save the sprawling, modern regulatory FCA.

To resist this conclusion, the oppositions devote pages to defending the FCA's *qui tam* provisions as "necessary" and "critical" to "root out fraud" against the government.[2] But Congress can, as it has in multiple other contexts, encourage

---

[1] There is a real question whether Congress possesses Article I authority to partially assign the United States's damages claim. *See Polansky*, 599 U.S. at 451 (Thomas, J., dissenting). Relator suggests that authority lies within the Constitution's Property Clause. Dkt. 218 ("Relator's Opp.") at 5-6. Regardless, Relator cites no authority suggesting that the Property Clause allows Congress to authorize private parties to encroach on the Executive's Article II authority.

[2] Dkt. 217 ("Statement of Interest") at 18-19; *see* Relator's Opp. at 1-3; Dkt. 225 ("TAF Br.") at 6-9.

1

whistleblower reports by giving monetary rewards—without also giving away the Executive's power to control litigation for the government.[3] And ultimately, those pragmatic considerations cannot override constitutional structure.

## ARGUMENT[4]

I.  **The FCA's *Qui Tam* Provisions Violate the Vesting and Take Care Clauses.**

The FCA's *qui tam* provisions violate the Vesting and Take Care Clauses by (1) impermissibly vesting executive power in relators while (2) denying the President removal authority and sufficient supervisory control of relators.

**1.** There can be no real dispute that the FCA's *qui tam* provisions vest relators with executive power. Notably, none of the three oppositions addresses the cases that the Defendants cited for the basic proposition that filing a suit and litigating on behalf of the United States is a fundamental exercise of executive power.[5]

The United States cites *Stevens* to contend that "[*q*]*ui tam* relators are private litigants" and therefore do not exercise executive power. Statement of Interest 7-10. But *Stevens* only addressed relators' standing under Article III, even as *Stevens* reserved the question at hand regarding Article II. *Vt. Agency of Nat. Res. v. United States ex rel.*

---

[3] *See, e.g.*, 7 U.S.C. § 26 (CFTC whistleblower statute); 15 U.S.C. § 78u-6 (Securities whistleblower statute); 26 U.S.C. § 7623 (IRS whistleblower statutes).
[4] Relator suggests that Defendants' motion is untimely. As Defendants explained (Dkt. 180 ("Motion") at 4 n.4), district courts routinely consider arguments raised by pre-trial motion and without unfair surprise, *e.g.*, *United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-cv-1010, 2023 WL 8027309, at *3 (N.D. Ala. Nov. 20, 2023); *Peters v. Cheval Golf & Athletic Club, LLC*, No. 8:20-CV-2080-KKM-AAS, 2022 WL 88197, at *4 (M.D. Fla. Jan. 7, 2022), and the Court is obligated to address subject-matter jurisdiction. Alternatively, Defendants reiterate their request for leave to amend their answers pursuant to Fed. R. Civ. P. 15(a)(2), if the Court deems amendment necessary.
[5] *See* Motion at 5-7, which cites *Springer v. Philippine Islands*, *Buckley v. Valeo*, *The Confiscation Cases*, *United States v. Nixon*, and *United States v. San Jacinto Tin Co.*—none of which the oppositions discuss in their arguments regarding the Vesting and Take Care Clauses.

*Stevens*, 529 U.S. 765, 778 n.8 (2000). Indeed, *Stevens* underscores that relators execute executive power: *Stevens* reasoned that a relator's private interest in a "portion of the recovery" did *not* convey standing. *Id.* at 772. Rather, *Stevens* reasoned that a relator only has standing as an "assignee" of the government's claim based on the government's "injury in fact." *Id.* at 773-74. A lawsuit—"the ultimate remedy for a breach of the law"—brought by a *qui tam* relator is thus an exercise of core executive authority. *Buckley v. Valeo*, 424 U.S. 1, 138 (1976).

The Anti-Fraud Coalition's ("TAF") brief takes a different tack, casting *qui tam* suits not as private litigation, but rather as an "enhancement" of the Executive's authority. TAF Br. at 4 & 21. Giving *qui tam* litigation a positive spin does not, however, mean a relator is doing anything other than exercising executive power. After all, it is the "Executive Branch['s] exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

TAF's counter—that "FCA actions do not proceed without the government's effective approval"—falls flat. TAF Br. at 19; *cf.* Relator's Opp. at 9-10. Once a relator exercises the Executive's prosecutorial discretion by filing an action, the bell cannot be unrung. And, contrary to TAF's suggestion, the government does not bless an FCA action when it decides against intervention and dismissal. The United States might not intervene for any number of reasons. More importantly, when (as here) the government declines to intervene, a private individual is left free "to conduct the

3

action," 31 U.S.C. § 3730(c)(3), thus exercising the Executive's prosecutorial authority, but outside any Presidential chain of command.

**2.** Because the FCA's *qui tam* provisions vest a relator with core executive power, they must be tested against *Morrison* and limits on the removal power. The oppositions seek to downplay *Morrison*,[6] but *Seila Law* is clear: *Morrison* represents the "outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2200 (2020) (citation omitted).[7] Since *Morrison* is the high-water mark, the Court must measure the *qui tam* mechanism against the restraints on the executive power upheld in *Morrison*.[8]

The key Vesting and Take Care Clause question from *Morrison* is whether the President has retained sufficient removal authority. *See id.* at 2199-2200. The Relators and the United States each cite *United States ex rel. Kelly v. Boeing*, 9 F.3d 743, 755 (9th Cir. 1993), for the proposition that the "concept of removal does not make sense in the *qui tam* context, in which there is no 'office' from which to remove the relator and subsequently fill with someone else." Relator's Opp. at 11 n.7; Statement of Interest at 14-15. But *Kelly* conflates inquiries under the Vesting and Take Care Clauses and

---

[6] *See* Relator's Opp. at 11-12; TAF Br. at 22; Statement of Interest at 10–12. Contrary to the United States's argument, the fact that *Morrison* involved criminal rather than civil enforcement is irrelevant: "civil enforcement decisions brought by the Federal Government are presumptively an exclusive Executive power." *See, e.g.*, *In re Aiken County*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (opinion of Kavanaugh, J.). *Exactech*'s reliance on this distinction is also mistaken. 2023 WL 8027309, at *5.
[7] Relator's quibbling (Opp. at 11 n.7) about whether *Morrison* or, rather, *Morrison* plus *United States v. Perkins*, 116 U.S. 483 (1886), represents the Constitution's outer limits is inconsequential. As *Seila Law* shows, the relevant test—also embodied in *Perkins*—is laid out in *Morrison*. 140 S. Ct. at 2200 (analyzing the question in light of *Morrison* and not referencing a different test from *Perkins*).
[8] Defendants' approach does not depend on the "higher" bar for dismissal of declined *qui tam* actions that Justice Thomas theorized in his *Polansky* dissent. Relator's Opp. at 16-17.

the Appointments Clause. The question under the Vesting and Take Care Clauses is simply whether the President retains sufficient "ability to supervise and remove the agents who wield executive power in his stead." *Seila L.*, 140 S. Ct. at 2211.

Critically, the oppositions do not argue that FCA relators can be removed from a case.[9] Instead, they suggest that the government's ability to intervene and dismiss is equivalent to removal authority. *See, e.g.*, Statement of Interest at 14-15. But the government's ability to intervene or dismiss a *qui tam* action is no substitute for removal authority. The government cannot fire a relator and appoint a new one who better implements the government's prerogatives. Moreover, even if the government intervenes, a relator *retains* the authority to continue litigating in the case as a party and thus can seek different discovery, present different legal arguments, and even oppose the government's attempts to settle a case. 31 U.S.C. § 3730(c)(1); *id.* § 3730(c)(2). In no other federal enforcement regime can a private individual press litigation alongside DOJ to remedy the government's injury. Yet there is more: a relator must also be given "an opportunity for a hearing" on any motion to dismiss the government brings. *Id.* § 3730(c)(2)(A). The government's intervention—even together with a motion to dismiss—thus hardly amounts to removal authority.

The other "controls" retained by the government are similarly insufficient to satisfy *Morrison* and *Seila Law*. *See* Relator's Opp. at 10 (stating that the FCA places on the government "only modest procedural limitations"); Statement of Interest at

---

[9] *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 763 & n.19 (5th Cir. 2001) (en banc) (Smith, J., dissenting) (citing, *inter alia*, 31 U.S.C. § 3730(c)(1), (c)(3)); *see also* Motion at 9-13.

12-14. TAF argues that it is meaningful the government retains authority "to initiate enforcement actions on its own," "bring[] any case it wants to bring," review *qui tam* complaints under seal, approve any settlement or dismissal, restrict a relator's discovery, belatedly intervene, or "pursue the allegations in an alternative forum." TAF Br. 18-20[10]; *accord* Statement of Interest at 12-13. But these supervisory functions are subordinate to the ultimate (and necessary) authority to *remove* "those who wield executive power on [the President's] behalf." *Seila L.*, 140 S. Ct. at 2191. And short of the circumstances of *Morrison*, *id.* at 2200, restrictions on the Executive's ability to remove his agents are not tolerated by the Constitution, *Free Enterprise Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) ("Since 1789, the Constitution has been understood to empower the President to keep these officers accountable—by removing them from office, if necessary.").

At bottom, putting the Executive to a time-constrained and relator-opposed choice of deciding between dismissing an action or allowing a relator to remain in their position as a party through the pendency of litigation impedes the Executive's "constitutionally assigned functions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977). The unremovable FCA relator significantly undercuts the President's ability "to secure that unitary and uniform execution of the laws" that the Constitution meant

---

[10] TAF similarly asserts that the government's control is more "flexible" than Defendants suggested in their Motion because the government has the option to *partially* intervene in a *qui tam* action. TAF at 20-21. Even if so, the Relator remains in her position as a party until the case concludes. *See* 31 U.S.C. § 3730(c)(1). The fact that the government *could* take over *part* of an action rather than the entire action does not change the constitutional calculus.

to guarantee by "vesting general executive power in the President alone." *Myers v. United States*, 272 U.S. 52, 135 (1926).

**3.** The United States and TAF both argue that the FCA's *qui tam* device "works the same as" other federal statutes that grant a private right of action. TAF Br. at 16-17 (pointing to antitrust laws, securities laws, and RICO); Statement of Interest at 8, 11, 14 (pointing to Title VII and the Sherman Act). But these statutes are dissimilar. None of the statutes identified contains *qui tam* provisions or otherwise allows private plaintiffs to litigate an interest that is only the government's and without their own individualized injury.[11] The only injury in an FCA case is to the United States. *Stevens*, 529 U.S. at 771, 774. This sets apart those federal statutes creating private rights of action to remedy individualized harms.[12]

To be sure, plaintiffs under those provisions can "vindicate a societal interest in deterring and remedying violations of federal law." Statement of Interest at 11. But that is plainly different from conducting litigation on behalf of the United States to remedy the *government's* own injury—an injury that arises from violations of law, and a "proprietary injury," *Stevens*, 529 U.S. at 771, not present in other federal statutes like Title VII. Indeed, there is nothing else like the FCA—a constitutional anomaly

---

[11] *Compare Stevens*, 529 U.S. at 772-73 *with Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175-76 (2011) (Title VII plaintiff must plead at least "an injury in fact") *and Sunbeam Television Corp. v. Nielsen Media Rsch.*, 711 F.3d 1264, 1270 n.15 (11th Cir. 2013) (noting that a private antitrust plaintiff must "show that he has been damaged" to "establish civil liability").

[12] The United States incorrectly asserts that *Stevens*'s holding that states are not subject to *qui tam* actions shows that relators do not wield executive power. Statement of Interest at 8. *Stevens* reached this conclusion based on its "longstanding interpretive presumption that 'person' does not include the sovereign." 529 U.S. at 780. This determination was a matter of statutory interpretation and has no bearing on the constitutionally permissible scope of a relator's authority. *Id.*

by which Congress "authorize[d] *unharmed* plaintiffs to sue defendants who violate federal law" and thus "infringe on the Executive Branch's Article II authority." *Cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

**4.** Finally, the oppositions argue that precedent—from the Supreme Court, Eleventh Circuit, and other circuits—rebuts Defendants' constitutional arguments.[13] But the Supreme Court has not addressed the constitutional questions Defendants raise. *Stevens*, 529 U.S. at 778 n.8. Nor has the Eleventh Circuit. TAF claims that "the Eleventh Circuit has embraced the arguments that courts upholding the FCA have accepted . . . ." (TAF Br. at 11). But the Eleventh Circuit in *Yates* took "no position" on these decisions because "[t]hose constitutional issues are not before us." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1312 (11th Cir. 2021).

Decisions from other courts are unpersuasive. *See* Motion at 12, 14. No circuit court has assessed the FCA's *qui tam* provisions under Article II in over 20 years. None had the benefit of the Supreme Court's subsequent guidance that *Morrison* represents the "outermost" limits on the removal power, *Seila L.*, 140 S. Ct. at 2200, nor the multiple additional decisions that safeguard the President's executive power from dilution. *See Collins v. Yellen*, 141 S. Ct. 1761, 1784, 1786 (2021); *Free Enterprise Fund*, 561 U.S. at 513-14; *cf. TransUnion*, 594 U.S. 413. The vast majority of district court opinions likewise pre-date the Supreme Court's more recent guidance, and the one recent decision (*Exactech*) is unpersuasive, as shown elsewhere.

---

[13] Relator's Opp. at 9, 12; TAF Br. at 22; Statement of Interest at 6.

This Court should operate from "first principles" when addressing these open questions about "constitutionally mandated division[s] of authority." *United States v. Lopez*, 514 U.S. 549, 552 (1995). A proper understanding of the Vesting and Take Care Clauses reveals that the FCA's *qui tam* provisions are invalid.

## II. The FCA's *Qui Tam* Provisions Violate the Appointments Clause.

The *qui tam* provisions violate the Appointments Clause. An individual qualifies as an "Officer" if she wields significant authority pursuant to law and holds a continuing position. *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018).

**1.** *Buckley* answers the first question, and the oppositions have no answer to *Buckley*. They seek to distinguish the decision, as a few courts have done, based on the Federal Election Commission possessing both "broad administrative powers" and litigation authority, whereas a relator handles a single case with a private interest in recovery, is not appointed or employed, and is subject to certain DOJ controls.[14] But those distinctions do not matter for the first question under the Officer test—whether a relator wields significant authority. *Buckley* held that "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights . . . may be discharged only by persons who are 'Officers of the United States' within the language of [the Appointments Clause]." 424 U.S. at 140. Because a relator litigates the government's interest, *Stevens*, 529 U.S. at 773 n.4, *Buckley* makes clear

---

[14] Relator's Opp. at 13; TAF Br. at 2, 24; Statement of Interest at 15-16; *see, e.g.*, *Kelly*, 9 F.3d at 758.

9

that an FCA relator exercises "significant authority pursuant to the laws of the United States," 424 U.S. at 126, regardless of other irrelevant features of the FEC.

**2.** A relator also holds a continuing position. Contrary to the opposition briefs, a party who litigates a single case for the United States can and does hold a continuing position under the Appointments Clause, as *Morrison* and other similar cases make clear. *Morrison*, 487 U.S. at 671, 672 n.12; *see also United States v. Donziger*, 38 F.4th 290, 296 (2d Cir. 2022); *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019); *In Sealed Case*, 829 F.2d 50, 56-57 (D.C. Cir. 1987).[15] Relator refers this Court to the Supreme Court's decisions in *Auffmordt* and *Germaine*, Relator's Opp. at 16, but offers no comparison between a relator and the merchant appraisers and civil surgeons at issue in those cases, who performed occasional, discrete services for the United States, nothing like a *qui tam* relator exercising core executive power. Motion at 17-18. Neither *Auffmordt* nor *Germaine* is controlling here. Finally, that a relator exercises that executive authority without being employed or appointed, and with a self-interest, only *heightens* the constitutional problems. *See* Motion at 17. Viewing those factors as favoring constitutionality would suggest that Congress may outsource all manner of Executive Branch litigation. That cannot be right.

**3.** Finally, and contrary to the oppositions' suggestions, the Supreme Court's decision in *Hunt* did *not* address whether a relator is an "officer" under the

---

[15] The only pertinent post-*Polansky* decision—*Exactech*—did not address *Morrison*, *Donziger*, or *In re Grand Jury Investigation* on this point, even though they each dealt with individuals who were charged with litigating a single matter. *See* 2023 WL 8027309, at *4-5.

Appointments Clause. *Hunt* merely interpreted the statutory term "official of the United States," and held that "a private relator is not an 'official of the United States' in the ordinary sense of that phrase." *Cochise Consultancy v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1514 (2019). True, the Court noted that relators are "neither appointed as an officer of the United States nor employed by the United States." *Id.* But this observation of present practice did not address whether relators were definitionally "officers," much less approve of the practice's constitutionality. The oppositions' contrary suggestion is specious, especially given that Justice Thomas, the author of *Hunt*, recently called the *qui tam* provisions into question in his *Polansky* dissent.

### III. Historical Practice Does Not Cure the *Qui Tam* Provisions' Defects.

Although the oppositions cite historical practice to defend the FCA's *qui tam* provisions, the oppositions mistake the legal standards for *whether* and *how* to consider history. As to *whether:* Article II's text and structure are unambiguous that all executive power is "vested in a President" who must "take Care" to execute that power, including the power to appoint and remove subordinates. *Seila L.*, 140 S. Ct. at 2191. The lack of ambiguity dooms the FCA's *qui tam* device and leaves no cause to scrutinize history. Indeed, "this is not even a close question." *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 209 (1989).

In any event, the oppositions fail to acknowledge the Supreme Court's cases on *how* to consider history. Historical practice is relevant insofar as it has been "open, widespread, and unchallenged." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111,

11

2137 (2022) (citation omitted). The FCA's history is checkered and uneven, as the Relator concedes the FCA "fell into disuse" before 1986. Relator at 18. The few bounty statutes passed by the First Congress largely lacked an express private right of action, *See Stevens*, 529 U.S. at 777 & nn. 6 & 7, and there is no evidence that the Framers "carefully considered" them, *Marsh v. Chambers*, 463 U.S. 783, 791-92 (1983).

The oppositions lean heavily on *Stevens*'s historical discussion, but *Stevens* assessed history only to answer whether Article III's standing requirement is met when a relator is assigned an interest in a suit. As *Stevens* expressly reserved, Article II presents entirely different questions regarding the Executive's control over the exercise of executive power. 529 U.S. at 778 n.8.

At bottom, today's sprawling FCA is a thoroughly modern invention. It grants broad latitude to private individuals to file suits to enforce all manner of regulatory requirements by way of certifications of compliance that accompany claims to the government. To the extent they do exist, the FCA's controls do not remotely approach the "outermost" limits set by *Morrison*. Rather, they grant the relator rights even when the government—the real party in interest—wishes to take over the case or dismiss it, *see supra*, at 5. The FCA's *qui tam* provisions stand alone among the various federal enforcement regimes, with no real historical pedigree.

## CONCLUSION

For these reasons and for those stated in Defendants' Motion, this Court should grant Defendants' Joint Motion for Judgment on the Pleadings or to Dismiss for Lack of Subject Matter Jurisdiction.

Dated this 12th day of April, 2024

Respectfully submitted,

/s/ *Scott Drake*
Scott Drake (Lead Counsel)*
O'MELVENY & MYERS LLP
2801 North Harwood Street, Suite 1600
Dallas, TX 75201
(972) 360-1900
(972) 360-1901 (fax)
sdrake@omm.com

Benjamin D. Singer*
Amanda M. Santella*
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
(202) 383-5414 (fax)
bsinger@omm.com
asantella@omm.com

Elizabeth M. Bock*
Elizabeth A. Arias*
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000
(213) 430-6407 (fax)
ebock@omm.com
earias@omm.com

Ginger Boyd
Fla. Bar No. 294550
NELSON MULLINS RILEY & SCARBOROUGH LLP
215 South Monroe Street, Suite 400
Tallahassee, FL 32301
(850) 205-3356
(850) 521-1472 (fax)
Ginger.Boyd@nelsonmullins.com

*Counsel for Defendants Freedom Health, Inc. and Optimum Healthcare, Inc.*

* admitted pro hac vice

/s/ *Jason P. Mehta*
Jason P. Mehta (FBN: 106110)
Lauren L. Valiente (FBN: 034775)
Joseph W. Swanson (FBN: 29618)
FOLEY & LARDNER LLP
100 North Tampa Street, Suite 2700
Tampa, FL  33602-5810
Telephone:  813-229-2300
Facsimile:  813-221-4210
Primary Email:  jmehta@foley.com
Secondary Email:  dmills@foley.com
Primary Email: lvaliente@foley.com
Secondary Email: dguillen@foley.com
Primary Email: joe.swanson@foley.com
Secondary Email: dmills@foley.com

Matthew D. Krueger*
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI  53202
Telephone:  414-297-4587
Primary Email:  mkrueger@foley.com

Priyanka Ghosh-Murthy
(FBN#: 85913)
1300 Riverplace Blvd Ste 605
Jacksonville, FL 32207-9018
Email: priyanka.ghosh@gmail.com
Telephone: 305-812-4986

*Counsel for Defendants Physician Partners, LLC; Florida Medical Associates, LLC d/b/a VIPcare; and Anion Technologies, LLC*

## Certificate of Service

I hereby certify that on April 12, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

/s/ *Jason P. Mehta*
Jason P. Mehta (FBN: 106110)