# <u>Exhibit A</u>



O'Melveny & Myers LLP                T: +1 202 383 5300
1625 Eye St., NW                     F: +1 202 383 5301
Washington, D.C. 20006               omm.com

February 10, 2023

**Benjamin D. Singer**
D: +1 202 383 5201
bsinger@omm.com

**VIA HAND DELIVERY**

Christi A. Grimm
Inspector General
United States Department of Health and Human Services, Office of Inspector General
330 Independence Avenue, S.W.
Washington, D.C. 20201

**Re:   Defendants' Joint Requests for Documents Pursuant to 45 C.F.R. §§ 2.1–2.6**
         ***United States ex rel. Zafirov**, No. 8:19-cv-01236–KKM-SPF (M.D. Fla.)*

Dear Ms. Grimm:

        We write on behalf of all defendants in the civil action *United States ex rel. Zafirov,* No.
8:19-cv-01236-KKM-SPF, in the U.S. District Court for the Middle District of Florida, including
defendants Freedom Health, Inc. and Optimum Healthcare, Inc. (collectively, "Freedom
Defendants") and defendants Florida Medical Associates LLC d/b/a VIPCare, Physician
Partners, LLC, and Anion Technologies, LLC (collectively, the "Provider Defendants")
(altogether, "Defendants").  By this letter and the accompanying subpoena, *see* Attachments A-
B, which together constitute Defendants' Joint Request for Documents ("Request" or
"Requests"), Defendants respectfully seek information from the Office of the Inspector General
("OIG") for the U.S. Department of Health and Human Services ("DHHS" or the "Department")
as outlined in the Request for Documents attached to the subpoena (Attachment B).  We are
jointly submitting this letter and its attachments pursuant to 45 C.F.R. §§ 2.1-2.6, which set forth
the *Touhy* regulations issued by DHHS. The letter and attachments provide the information that
DHHS has identified as necessary for disclosure under the *Touhy* regulations.

**I.      Background of the Controversy**

        Relator Dr. Clarissa Zafirov ("Relator") filed this *qui tam* action pursuant to the federal
False Claims Act (31 U.S.C. § 3729 et seq.) under seal on May 20, 2019 against the Freedom
Defendants, the Provider Defendants, and several other defendants[1].  The Court unsealed the
action in June 2020, and the government declined to intervene in September 2020.  *See*
Attachment 1.  Upon motion by each of the defendants, the Court dismissed Relator's
Complaint on September 28, 2021 with leave to amend.  Relator filed her First Amended
Complaint ("FAC") on November 12, 2021 against only the Freedom Defendants and Provider

---

[1] Other defendants who were initially named—Physician Partners Specialty Services, LLC, Sun
Labs USA, Inc., Anthem, Inc., and Siddhartha Pagidipati—have since been dismissed from the
litigation.



Defendants.  *See* Attachment 2.  Freedom Defendants and Provider Defendants each moved to dismiss the FAC on January 14, 2022, which the Court denied on September 12, 2022.

Defendants each filed timely Answers to the FAC on October 24, 2022 and discovery commenced.  The Court's Case Management and Scheduling Order set a fact discovery deadline of February 2, 2024.  *See* Attachment 3.

## II.    Relator's Claims

Relator is a former employee of VIPCare, where she worked as a family medicine physician for, in relevant part, Medicare Advantage beneficiaries.  *See* Attachment 2 at ¶ 9.  VIPCare is a provider contracted with the Freedom Defendants to provide care to the Freedom Defendants' Medicare Advantage members.  *Id.* ¶¶ 25, 75.  Relator alleges that the defendants worked "in concert" to "artificially inflat[e] capitation payments" under the Medicare Advantage ("MA") program by "knowingly submit[ing] unsupported diagnosis codes" in violation of the False Claims Act.  *Id.* ¶ 17.  Relator seeks treble damages, civil penalties, a relator's share award, attorneys' fees and costs, and other relief as appropriate and authorized by law.  *Id.* at Plea, ¶¶ a–f.

## III.   Propriety of the Requests for Documents

According to 45 C.F.R. § 2.3, DHHS may produce documents if the Agency head determines, "after consultation with the Office of the General Counsel, that compliance with the request would promote the objectives of the Department."  In particular, 45 C.F.R. § 2.5 ("Subpoena duces tecum") provides in relevant part that "[i]f the General Counsel or his designee determines that the subpoena is legally sufficient, the subpoena was properly served, and the tribunal has jurisdiction, the terms of the subpoena shall be complied with unless affirmative action is taken by the Department to modify or quash the subpoena in accordance with Fed. R. Civ. P. 45 (c)."  We address these requirements below, along with the fact that Defendants' Requests for Documents promote the objectives of OIG and DHHS.[2]

### A.    The Requests

The Requests seek information provided to OIG by Relator during the government's investigation of Relator's allegations.  Both Relator and the government have referenced Relator's cooperation with the investigation and the existence of various materials provided by Relator in filings, including "consensual recordings made by Relator under the direction of the Government over approximately six months while she was still employed by the Provider

---

[2] The Requests for documents are not subject to 45 C.F.R. § 2.4(a) ("Procedures when voluntary testimony is requested or when an employee is subpoenaed") because they do not request "testimony" under 45 C.F.R. § 2.2, but nevertheless they meet the requirements of 45 C.F.R. § 2.4(a).  This letter and the attached subpoena describe "the nature of the requested" material.  45 C.F.R. § 2.4(a).  The Requests are the only means by which Defendants can obtain the information they seek, since the documents requested are in the sole possession of the Department.  *See id.*  Further, providing this material is "in the interest of the DHHS or federal government" for the reasons given *infra*, Part III.B.



Defendants," *see* Attachment 4, at 2, and the government's interview of Relator as part of its investigation in August 2019, *see* Attachment 5, at 3.

**B.    Granting These Requests Promotes the Objectives of DHHS and the Federal Government**

DHHS and the federal government have an interest in ensuring that litigation pertaining to the administration of the MA (Part C) program reaches a fair, just, and correct result. Defendants have submitted narrow Requests, seeking limited information from a narrow time period. The Requests plainly identify the information sought, and the requested discovery will help the Court and jury understand key issues in this case. Collectively, the Requests seek information and documents concerning statements and information Relator provided to OIG as part of the government's investigation of her allegations. This information is relevant to Relator's core allegations, including whether defendants submitted false claims, whether any defendants would have had knowledge of the submission of false claims, whether information submitted to DHHS would have been material to CMS's decision to pay claims, and whether the defendants can substantiate any of their affirmative defenses—including defenses that turn on the content of Relator's disclosure of information to the government. This information is not available elsewhere; Relator has confirmed that she does not have access to the materials sought here. *See* Attachment 4 at 13 (noting that Relator would have to serve a subpoena to obtain copies of audio and video recordings made during the government's investigation).

**C.    Legal Sufficiency, Proper Service, and Jurisdiction of the Tribunal**

The accompanying subpoena satisfies the requirements of 45 C.F.R. § 2.5 because it is legally sufficient, has been properly served, and was issued by a tribunal that has jurisdiction. With respect to the first requirement, the subpoena *duces tecum* satisfies Federal Rule of Civil Procedure 45 because it: (i) states the court from which it is issued; (ii) states the title of the action and its civil-action number; (iii) commands OIG to produce designated documents at a specified time and place; and (iv) sets out the text of Rule 45 subsections (d) and (e). *See* Fed. R. Civ. P. 45(a)(1)(A). Moreover, the subpoena was properly served because it was delivered to the person named therein by a nonparty who is at least eighteen years of age. Fed. R. Civ. P. 45(b)(1). Further, Defendants have served a notice and copy of the subpoena on each party to the action. See Fed. R. Civ. P. 45(a)(4).

Lastly, the tribunal issuing this subpoena has jurisdiction. Since Relator brought the above-captioned *qui tam* action in the United States District Court for the Middle District of Florida[3] pursuant to 31 U.S.C. § 3729 et seq., that court has subject matter jurisdiction over the proceeding because it arises under the laws of the United States. U.S. Const. art. III, § 2; 28 U.S.C. § 1331. Furthermore, courts agree that the federal government has waived its sovereign immunity in any action brought in federal court to enforce a subpoena. *See Linder v. Calero-Portocarrero*, 251 F.3d 178, 181 (D.C. Cir. 2001) (citing *Houston Bus. Journal v. Office of Comptroller*, 86 F.3d 1208, 1212 (D.C. Cir. 1996)) (holding that, in the context of a motion to compel, "sovereign immunity does not insulate the federal government from complying with a Rule 45 subpoena"). Additionally, because DHHS is "subject to the jurisdiction of [the] court[,]" compliance with this subpoena would be consistent with DHHS's policy of "follow[ing] all

---

[3] The U.S. District Court for the Middle District of Florida is the "Issuing Court" for the purposes of the subpoena. *See* Fed. R. Civ. P. 45(a)(2) ("A subpoena must issue from the court where the action is pending.").



applicable procedural and substantive rules relating to the production of information, data, and records by a non-party." *See* 45 C.F.R. § 2.1(b).

## IV.   Request for Certification and Authentication of Records

Title 45 C.F.R. § 2.6 provides that "[u]pon request, DHHS agencies will certify, pursuant to 42 U.S.C. [§] 3505, the authenticity of copies of records that are to be disclosed." By this letter, Defendants formally request that OIG certify the authenticity of all records it produces in response to the attached subpoena, pursuant to 45 C.F.R. § 2.6. Furthermore, Defendants request that OIG certify that the documents produced are "records of a regularly conducted activity" under Federal Rule of Evidence 803(6), such that they constitute "self-authenticating" evidence under Federal Rule of Evidence 902(11). *See* Fed. R. Evid. 803(6)(D); Fed. R. Evid. 902(11).

## V.   Conclusion

Defendants respectfully make this joint request that DHHS produce the documents identified in the attached subpoena for the reasons discussed in this letter. If you have any questions or concerns about this matter or any of the attached materials, please do not hesitate to contact me at your earliest convenience. We appreciate your prompt consideration, and look forward to coordinating with you regarding these Requests.


Sincerely,



*/s/ Benjamin D. Singer*
Benjamin D. Singer
O'Melveny & Myers LLP
*Counsel for Freedom Defendants*


*Jointly Submitted with counsel for Provider Defendants*:

  Arthur Lee Bentley, III
  Bradley Arant Boult Cummings LLP

  Jason Paul Mehta
  Foley & Lardner LLP

  Natalie Hirt Adams
  Foley & Lardner LLP

O'Melveny

Attachments

    A – Subpoena

    B – Defendants' Joint Requests for Documents

    1 – Dkt. 40 from Above-Captioned Action (Government's Notice of Non-Intervention)

    2 – Dkt. 86 with exhibits, Dkts. 86-1–86-8 from Above-Captioned Action (Relator's First Amended Complaint and Exhibits)

    3 – Dkt. 133 from Above-Captioned Action (Case Management and Scheduling Order)

    4 – Dkt. 58 from Above-Captioned Action (Relator's Opposition to Motion to Stay)

    5 – Dkt. 5 from Above-Captioned Action (Government's Memorandum of Law In Support of Consent Application for Extension of Time to Consider Election to Intervene)

CC:   ***Via Electronic Mail***

    J. Jennifer Koh, Assistant U.S. Attorney, United States Department of Justice, Civil Division

    Sean P. Keefe, Assistant U.S. Attorney, Office of the United States Attorney, Middle District of Florida

    Arthur Lee Bentley, III, Bradley Arant Boult Cummings LLP, Provider Defendants' Counsel

    Jason Paul Mehta, Foley & Lardner LLP, Provider Defendants' Counsel

    Natalie Hirt Adams, Foley & Lardner LLP, Provider Defendants' Counsel

    Ginger Barry Boyd, Nelson Mullins Riley & Scarborough LLP, Freedom Defendants' Counsel

# ATTACHMENT A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| United States ex rel. Dr. Clarissa Zafirov | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 8:19-cv-01236-KKM-SPF |
| Florida Medical Associates, LLC et al | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          U.S. Dep't of Health & Human Services, Office of Inspector General
330 Independence Avenue, S.W., Washington, D.C. 20201

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See attached Joint Requests for Documents

| Place: O'Melveny & Myers LLP | Date and Time: |
|---|---|
| 1625 Eye St. NW | |
| Washington, D.C. 20006 | 03/13/2023 12:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    02/10/2023

*CLERK OF COURT*

OR

*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Freedom Health, Inc. and Optimum Healthcare, Inc.                                    , who issues or requests this subpoena, are:

Benjamin D. Singer, 1625 Eye St. NW, Washington, DC 20006, bsinger@omm.com, (202) 383-5300

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT B

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA *ex rel.* DR.
CLARISSA ZAFIROV,

       Plaintiff,

   v.

Florida Medical Associates, LLC d/b/a VIPCare,
Physician Partners, LLC, and Anion
Technologies, LLC, Freedom Health, Inc.,
Optimum Healthcare, Inc.,

       Defendants.

Civil Action 8:19-cv-01236–KKM-SPF

## DEFENDANTS' JOINT REQUESTS FOR DOCUMENTS FROM
## NON-PARTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, OFFICE OF
## INSPECTOR GENERAL

TO:    United States Department of Health and Human Services, Office of Inspector General
        330 Independence Avenue, S.W.
        Washington, D.C. 20201

       Pursuant to Rule 45 of the Federal Rules of Civil Procedure and the accompanying

subpoena, defendants Freedom Health, Inc. and Optimum Healthcare, Inc. (collectively,

"Freedom Defendants") and defendants Florida Medical Associates LLC d/b/a VIPCare,

Physician Partners, LLC, and Anion Technologies, LLC (collectively, the "Provider

Defendants") (altogether, "Defendants"), by and through undersigned counsel, jointly command

the production of the documents responsive to each of the following Requests for Documents

("Requests") and/or to permit inspection and copying of those documents.  You may deliver the

requested documents to counsel for Freedom Defendants on or before March 13, 2023 at

O'Melveny & Myers LLP, 1625 Eye Street N.W., Washington, D.C. 20006, Attn: Benjamin D.

Singer, bsinger@omm.com, or such other location as is mutually acceptable.  Counsel for

1

Freedom Defendants will undertake responsibility for sharing the documents provided with

Provider Defendants, and with other parties as required by the applicable rules and orders

governing discovery in the above-captioned action.  The documents subject to these requests

shall remain available to Freedom Defendants' counsel until the inspection and copying can be

reasonably completed.

All instructions, rules of construction, and definitions set forth in Rules 34 and 45 of the

Federal Rules of Civil Procedure are incorporated herein by reference.  In addition, the following

definitions, conventions, and instructions apply to these Requests.

## **DEFINITIONS**

The following terms shall have the meanings set forth below whenever used in any

definition, instruction, or Request:

1.      "Agreements" refers to any contract, arrangement, or agreement of any kind,

whether formal or informal.

2.      "Communication" means the transmittal of information (in the form of facts, ideas,

inquiries, or otherwise) and refers to every manner or means of disclosure, transfer, or exchange

of information orally or in writing, and to both actual and attempted communications of any

kind.

3.      "Concerning" means relating to, referring to, received from, addressed to, sent to,

alluding to, responding to, announcing, identifying, explaining, evaluating, discussing, showing,

supporting, describing, studying, reflecting, analyzing, or consulting.

4.      The terms "Document" and "Documents" shall have the meaning attributed in

Federal Rule of Civil Procedure 34(a) to the term "documents," and include, without limitation,

electronic data and recordings.  A draft or non-identical copy of a Document is a separate Document within the meaning of this term.

5.      "Person(s)" means any natural person acting in any capacity, and/or any entity or organization, including divisions, departments, and other units therein, and shall include, but not be limited to, a public or private corporation, partnership, association, joint venture, committee, proprietorship, trust, estate, union, any government and/or governmental body, including, but not limited to, any commission, board, bureau, and/or agency.

6.      "Reflecting" means comprising, recording, memorializing, embodying, consisting of, or summarizing the subject matter of the Request.

7.      "Relator" means Relator Dr. Clarissa Zafirov, Relator in the above-captioned action, counsel representing Dr. Clarissa Zafirov (including but not limited to Frederick M. Morgan, Jillian Levy Estes, Kenneth J. Nolan, Marcella Auerbach, Ryon M. McCabe, Adam T. Rabin, Havan M. Clark, and Jonathan M. Lischak), or any other representatives, employees, agents, consultants, experts, contractors, or other Persons acting or purporting to act on behalf of Dr. Clarissa Zafirov.

8.      "You," "Your," or "OIG" refers to the Office of the Inspector General for the United States Department of Health & Human Services and any representatives, employees, agents, consultants, experts, contractors, or other Persons acting or purporting to act on behalf of the Office of the Inspector General for the United States Department of Health & Human Services.

## CONVENTIONS

1.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of each Request any Document that might otherwise be construed to be outside its scope.

2.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.

3.      "Including" shall be construed as "including, without limitation" or "including, but not limited to," so that each Request shall be construed broadly, rather than narrowly.

4.      "Between" and "among" shall be construed as "between or among" as the context so requires, so that each Request shall be construed broadly, rather than narrowly, to bring within the scope of each Request all Documents that might otherwise be construed to be outside its scope.

## INSTRUCTIONS

1.      Unless stated otherwise in a Request, these Requests cover the time period from January 24, 2018 to the present.

2.      These Requests cover all Documents in Your possession, custody, or control.  A Document is in Your possession, custody, or control if it is in Your physical possession, or if You have the right to obtain possession of the Document or a copy of the Document.

3.      Each individual Request should be construed independently, and no Request shall be viewed as limiting the scope of any other Request.  Identical Documents need not be produced in response to more than one Request, but You must identify by Request the specific Bates numbers of the Documents produced in response to that Request.

4.      If You decline or refuse to produce a Document (or part of any Document) in response to these Requests based upon a claim of privilege, You must furnish a privilege log consistent with the requirements of Federal Rule of Civil Procedure 26(b)(5) that:

   a.   states the creation or sent date(s) of the Document;

   b.   describes the nature of the Document, *i.e.*, whether it is an e-mail, memorandum, report, etc.;

   c.   identifies whether the Document is a parent or attachment and identifies the Bates number of the Document's parent;

   d.   identifies the Person or Persons who authored, sent, or received the Document;

   e.   identifies the custodian(s) whose files contained the Document;

   f.   describes the subject matter of the Document with sufficient detail to enable the parties, or the Court if necessary, to determine whether the Document was appropriately designated as privileged;

   g.   states the basis upon which You contend You are entitled to withhold the Document from discovery; and

   h.   identifies the attorney(s) supporting the claim of privilege, including those whose names do not appear on the Document.

5.      Documents are to be produced in full; redacted Documents will not constitute compliance with these Requests.  If any requested Document or thing cannot be produced in full, produce it to the extent possible, indicating which Document, or portion of the Document, is being withheld, and the reason that the Document or portion thereof is being withheld.

6.      In producing Documents, You must produce each Document responsive to the Request(s), together with all non-identical copies and drafts of that Document.

7.      Documents attached to each other shall not be separated and shall be produced as they exist in Your files.

8.      In the event You claim that a Request is overly broad, unduly burdensome, irrelevant, or otherwise objectionable, You shall respond to that portion of the Request which is unobjectionable and shall specifically identify and state the respect in which the Request is allegedly overly broad, unduly burdensome, irrelevant, or otherwise objectionable.  If You object to any Request or part of any Request, You must produce those Documents to which Your objection does not apply.  This instruction applies not only to objections to the Requests as such but also to the instructions and definitions relating to them.

9.      These Requests are continuing in nature.  All Requests shall be construed to include all Documents created up until the date of production(s) and any additional Documents responsive to these Requests which are discovered, acquired, created, or generated after the date of production(s).  Therefore, You shall promptly produce—as supplemental responses to these Requests—any additional Documents or things that You identify, acquire, or become aware of up to and including the time of trial consistent with the requirements of Federal Rule of Civil Procedure 26(e)(1).

## **REQUESTS FOR DOCUMENTS**

**REQUEST NO. 1:** All audio and/or visual recordings made using Relator.

**REQUEST NO. 2:** All Documents, including, without limitation, audio or video recordings or notes, Concerning interviews with Relator.

**REQUEST NO. 3:** All Communications between You and Relator.

**REQUEST NO. 4:** All Documents, including, without limitation, notes, Reflecting Your Communications with Relator.

**REQUEST NO. 5:** All Documents provided by Relator to You.

**REQUEST NO. 6:** All Agreements entered into by You and Relator, including any Agreement

Concerning the scope of any "common interest" privilege existing between You and Relator.

ATTACHMENT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
*ex rel.* DR. CLARISSA ZAFIROV,

        Plaintiffs,

    v.                           Case No.: 8:19-cv-1236-T-23SPF

FLORIDA MEDICAL ASSOCIATES, LLC, *et al.*,

        Defendants.

_____/

## GOVERNMENT'S NOTICE OF ELECTION TO DECLINE INTERVENTION

Pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(4)(B), the United

States hereby notifies the Court of its decision to decline intervention in this action.

Although the United States is not intervening at this time, it respectfully refers the

Court to 31 U.S.C. § 3730(b)(1), which allows the relator to maintain the action in

the name of the United States; providing, however, that the "action may be dismissed

only if the court and the Attorney General give written consent to the dismissal and

their reasons for consenting." *Id.* Therefore, the United States requests that, should

either the relator or the defendant propose that this action be dismissed, settled, or

otherwise discontinued, this Court solicit the written consent of the United States

before ruling or granting its approval.

Furthermore, pursuant to 31 U.S.C. § 3730(c)(3), the United States requests

that all pleadings filed in this action be served upon it. The United States also

1

requests that orders issued by the Court be sent to the Government's counsel.  The

United States reserves its right to order any deposition transcripts, to intervene in this

action, for good cause, at a later date, and to seek the dismissal of the relator's action

or claim.  The United States also requests that it be served with all notices of appeal.

Respectfully submitted,

**JEFFREY BOSSERT CLARK**
Acting Assistant Attorney General

**MARIA CHAPA LOPEZ**
United States Attorney

ANDY J. MAO
PATRICIA L. HANOWER
J. JENNIFER KOH
Attorneys, Civil Division
United States Department of Justice

Dated:  September 21, 2020         By:     *s/ Sean P. Keefe*
                                           SEAN P. KEEFE
                                           Assistant United States Attorney
                                           Florida Bar No. 0413828
                                           400 North Tampa Street, Suite 3200
                                           Tampa, FL 33602
                                           Telephone: (813) 274-6000
                                           Facsimile: (813) 274-6200
                                           E-mail: sean.keefe@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2020, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will provide

electronic service to all counsel of record.


       */s/ Sean P. Keefe*     
SEAN P. KEEFE
Assistant United States Attorney

ATTACHMENT 2

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| ex rel. DR. CLARISSA ZAFIROV, | ) |
|  | ) |
| Relator and Plaintiff, | ) |
|  | ) Case No. 8:19-CV-01236-KMM-SPF |
| v. | ) |
|  | ) Jury Trial Demanded |
| PHYSICIAN PARTNERS, LLC; | ) |
| FLORIDA MEDICAL ASSOCIATES, LLC, | ) |
| d/b/a VIPCARE; ANION | ) |
| TECHNOLOGIES, LLC; FREEDOM | ) |
| HEALTH, INC; and OPTIMUM | ) |
| HEALTHCARE, INC, | ) |
|  | ) |
| Defendants. | ) |

---

# FIRST AMENDED COMPLAINT ALLEGING VIOLATIONS OF THE
# FEDERAL FALSE CLAIMS ACT
# AND
# DEMAND FOR A JURY TRIAL

---

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................... 1

    A.  Summary of Fraudulent Scheme ............................................... 2
    B.  Resulting Claims and Retained Overpayments. ....................... 5

II.  PARTIES ............................................................................................... 7

III.  JURISDICTION AND VENUE ........................................................ 12

    A.  Public Disclosure ..................................................................... 12
    B.  Original Source ........................................................................ 14

IV.  PROCEDURAL POSTURE .............................................................. 14

V.  THE FEDERAL FALSE CLAIMS ACT ......................................... 16

VI.  MEDICARE AND THE MEDICARE ADVANTAGE PROGRAM ............. 17

    A. The Medicare Advantage Risk-Adjustment System .................. 20
    B.  The Role of Providers in the MA Risk Adjustment Process .................... 24
    C.  Repayment Obligations Under the Medicare Advantage Program ...... 27

VII.  ALLEGATIONS OF DEFENDANTS' CONDUCT RESULTING IN
      THE SUBMISSION OF FALSE CLAIMS ........................................ 29

    A. Allegations Against Physician Partners, Anion and VIPcare ................ 30

        i.   Overview of the Relationship between Physician Partners, Anion
            Technologies, and VIPcare ............................................... 32
        ii.  Overview of the 5 Star Checklist ..................................... 35
        iii. Physician Partners Incentivized Employed Physicians to
            Increase the Risk Scores while Reducing Costs to
            Treat Freedom Patients ..................................................... 47
        iv.  Physician Partners Directed and Pressured Physicians to Use Risk
            Adjusting Scores. .............................................................. 54

    B. Allegations Against Freedom and Optimum ............................. 75

VIII.   DEFENDANTS KNOWINGLY SUBMITTED OR CAUSED TO BE
        SUBMITTED FALSE OR FRAUDULENT CLAIMS ......................................... 83

IX.     EXAMPLES OF SPECIFIC FALSE OR FRAUDULENT
        CLAIMS SUBMITTED OR CAUSED TO BE SUBMITTED ........................... 85

        A. Claims Submitted Where Source of Diagnosis Code
           was Changed to Anonymous "Physician" .................................................. 85
        B. Codes Submitted in Relator's Name After She Said No
           or Expressly Notified of Inaccuracy ............................................................ 98
        C. Defendants' Failure to Return Overpayments ........................................ 108

X.      COUNTS ............................................................................................................... 117

## I.  INTRODUCTION

1.  This Civil Action brought by Relator Dr. Clarissa Zafirov alleges manipulation of the Medicare Advantage program from January 2014 through the present by one of Florida's largest healthcare providers, Defendant Physician Partners, LLC ("Physician Partners"), and two insurance companies, Defendants Freedom Health, Inc. ("Freedom") and Optimum Healthcare, Inc. ("Optimum"), who worked in tandem to bilk the United States out of millions of dollars in artificially-increased capitation payments. Taking advantage of a system intended to ensure senior citizens and severely disabled individuals have access to the healthcare services that they need, Physician Partners – for itself and through its subsidiaries Defendants Anion Technologies, LLC ("Anion") and Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare") – submitted unsupported diagnosis codes to Freedom and Optimum, who encouraged and accepted the inflated codes, and then paid Physician Partners with the United States' money.

2.  The United States relies on Medicare providers to honestly and accurately report the health conditions of its beneficiaries through diagnostic codes, and relies on its contracted Medicare Advantage insurers to ensure the accuracy of the providers' claims. As described in Section VI, payments under the Medicare Advantage program hinge on truthful submissions of diagnosis codes in the encounter data, which serve as the claim for payment. See ¶¶48-54.

3.      Thus, when participants in the Medicare Advantage program –
whether providers or insurers – provide false diagnosis codes to make their
beneficiaries look sicker and to increase payments from Medicare, those codes are
false claims which violate the False Claims Act. And when recipients of inflated
capitation payments fail to return overpayments to which they know they are not
entitled, the recipients violate the "reverse False Claims Act" as well.

### A.      Summary of Fraudulent Scheme

4.      Physician Partners is a provider organization which employs or
contracts with about 500 physicians who treat about 130,000 Medicare
beneficiaries throughout Florida. Its subsidiary Anion is the billing arm of
Physician Partners, employing chart reviewers in Florida and India to access
patient records, evaluate diagnosis codes, and modify the codes to enhance risk
scores. Physician Partners and Anion provide their management and services to
contracted private practices, or to practices that are wholly owned and operated
by Physician Partners, like VIPcare.

5.      Through policies, practices and procedures imposed on both
contracted and employed physicians, Physician Partners and Anion systematically
manipulate patient health records to document and submit unsupported
conditions to increase their patients' "risk adjustment scores," which in turn
substantially increases the amount that Medicare pays for the patients' care. The

unsupported risk-adjusting diagnoses are not a matter of medical judgment: They are fraud.

6.     Physician Partners' scheme could not have been successful without the knowledge and participation of Freedom and Optimum, the Medicare Advantage organizations who provide insurance coverage for approximately 90% of Physician Partners' patients. The entities are more than business affiliates; they are inextricably linked by Sidd Pagidipati, the CEO of Physician Partners who took the helm of the provider organization after the policies he implemented as the COO of Freedom and Optimum led those companies to a $32 million False Claims Act settlement. As described at ¶¶26-29, Freedom and Optimum operate as a single entity and are referred to collectively as "Freedom" throughout this Amended Complaint.

7.     Together, Physician Partners and Freedom directed healthcare providers how to code using false and misleading medical information to persuade physicians to set aside their medical judgment in favor of diagnosing inflated, serious conditions. Specifically, physicians, including Dr. Zafirov, were directed to use fictitious criteria to diagnose rare conditions like Major Depressive Disorder or Complicated Diabetes, to "diagnose" cancers which had long been in remission; to characterize prescribed use of pain medication as drug addiction;

and to diagnose conditions based on physical exam rather than the necessary diagnostic tests or imaging.

8.     The principal vehicle used by Physician Partners to implement its scheme is a document called a "5 Star Checklist," an Anion-generated form which "suggests" diagnoses that are ostensibly based on a patient's medical history, but in reality *only* suggest conditions that would increase a patient's risk score, and thus increase the amount that Medicare pays for that patient's care. Freedom knew that Physician Partners used these 5 Star Checklists as improper steering tools, but turned a blind eye so long as the documents were not kept in the patients' medical records. These Checklists are discussed throughout the factual allegations of this Amended Complaint, with a detailed explanation beginning at ¶105.

9.     The relator, Dr. Clarissa Zafirov is Board certified in Family Medicine and was employed as a VIPcare physician. She found countless "suggested" diagnoses on 5 Star Checklists which were not supported by the patient's symptoms, test results, or medical history. Dr. Zafirov's refusal to alter her coding to meet Physician Partner's financial demands was met with relentless, increasing pressure from her VIPcare administrators and directors, Anion chart reviewers, Physician Partners quality analysts and Physician Partners' senior administrators – first threatening her financial success through their bonus structure, and when that didn't work, repeatedly challenging her medical decision-making.

10.     Physician Partners, through Anion, routinely overruled Dr. Zafirov's medical judgment, submitting risk-adjusting diagnosis codes which Dr. Zafirov expressly rejected. The false claims sometimes indicated that Dr. Zafirov made the diagnosis even when she did not, and sometimes were modified to indicate that an unidentified "physician" made the diagnosis even when the medical record contained neither the physician's information nor the diagnosis.

11.     The Amended Complaint details Physician Partners' role in directing fraudulent coding in Section VII(A). Specifically, the financial incentives that they used to pressure employed physicians to diagnose risk-adjusting codes are discussed at ¶¶125-137. Physician Partners' training and directives to inflate risk scores are described at ¶¶138-157. And Physician Partner's use of direct pressure to accept their coding model is discussed at ¶¶158-179. The role that Freedom had in directing and causing the submission of false claims is discussed in Section VII(B) at ¶¶180-194.

## B.     Resulting Claims and Retained Overpayments

12.     In response to the Court's Sept. 28, 2021 Order, Relator's Amended Complaint provides significant additional details regarding Defendants' fraudulent scheme, the resulting false claims, and the failure to return overpayments of fraudulently-obtained capitation payments.

13.     As Dr. Zafirov discovered that false claims were being submitted, she began retaining copies of the 5 Star Checklists that she submitted to Anion. She also had access to Q360, Physician Partners' billing records system which recorded the codes submitted by Anion to Freedom and Optimum for each of her patients, including which codes were paid, the source of those codes, and the date of service on which the code was entered. Dr. Zafirov was also provided with credentials to Freedom's MRA/HEDIS physician portal which allowed her to access Freedom's Member Health Profiles and Prospective Possible Condition Reports. These reports identify the codes that were submitted from Freedom and Optimum to CMS for each patient, including the dates of service and the source for the submitted codes.

14.     As described in Section VI, these submitted codes comprise the service record or "encounter data" that serves as the claim for payment in the Medicare Advantage program.

15.     As a result of her three-part access, Dr. Zafirov is able to trace the false claims alleged in this case from "cradle to grave" – identifying the falsity of the code from the 5 Star Checklist through submission to the United States. Details of exemplar claims, including supporting documents, appear *infra* at Section IX. Specifically, false claims that were submitted with a changed "source" after Dr. Zafirov rejected the code are identified at ¶¶202-240, and false claims that were

submitted in Dr. Zafirov's name even though she did not make the diagnosis are identified at ¶¶241-271.

16.     The false codes also give rise to violations of the "reverse False Claims Act" because neither Physician Partners nor Freedom or Optimum returned overpayments attributable to the unsupported claims. Additional examples overpayments that were not returned are identified at ¶¶272-295.

17.     Through these claims, and as described throughout the Amended Complaint, Dr. Zafirov alleges with specificity that Physician Partners – by itself and through Anion and VIPcare – acted in concert with and severely disabled individuals who rely on the Medicare Advantage program to provide them with healthcare services. In doing so, the Defendants knowingly submitted unsupported diagnosis codes which cost the United States millions of dollars in artificially inflated capitation payments. Each of those unsupported codes is a false claim submitted in violation of the False Claims Act.

## II.     PARTIES

18.     The United States of America is the real party of interest in this case. The United States operates and administers the Medicare and Medicaid programs through the Department of Health and Human Services ("HHS"), which includes its operating division, the Centers for Medicare and Medicaid Services ("CMS"). At all times relevant to this Complaint, CMS administered the Medicare Part C

Program and made Medicare Advantage ("MA") risk-adjusting payments thereunder.

19.     *Qui tam* Plaintiff/Relator Dr. Clarissa Zafirov is a Board-certified Family Medicine physician licensed in the State of Florida. She also holds a Certification of College of Family Physicians in Canada.

20.     From October 2018 through March 2020, Dr. Zafirov was employed as a primary care physician at Florida Medical Associates d/b/a VIPcare. As described herein, Dr. Zafirov regularly interacted with billing and coding specialists from Physician Partners and Anion, attended and watched training sessions created by representatives of Physician Partners and Freedom Health, and had access to the insurers' billing portal for the express purpose of seeing which claims were submitted to the United States.

21.     Dr. Zafirov was provided with access credentials to both the Physician Partners' Q360 billing system and eClinicalWorks electronic medical records, as well as Freedom's MRA/HEDIS physician portal which provided access to claims data submitted from Freedom and Optimum to CMS for each of her enrolled beneficiaries.

22.     Defendant Physician Partners, LLC ("Physician Partners" or "PP") is a medical practice management company which advertises itself as coordinating services between physicians, payors and patients. Physician Partners is a Florida

limited liability company with a principal address of 601 S. Harbour Island Blvd., Suite 200, Tampa, Florida.

23.     Physician Partners employs or manages more than 500 physicians providing services to approximately 130,000 patients. Physician Partners includes fully-owned and operated practice groups, such as Defendant Florida Medical Associates d/b/a VIPcare, for which Physician Partners assigns all patients, manages all billing, and establishes and implements all practices and procedures. Physician Partners also has management contracts with private medical practices through which it handles, *inter alia*, insurance credentialing, and all billing and coding for the practice.

24.     Defendant Anion Technologies, LLC ("Anion"), which also does business as Anion Healthcare Services, is the wholly-owned billing and coding subsidiary of Physician Partners. For all providers, regardless of whether they have a private or affiliated practice, Physician Partners uses uniform billing and coding processes implemented through Anion. Anion's U.S.-based headquarters are located at the same address as Physician Partners, at 601 S. Harbour Island Blvd., Suite 200, Tampa, Florida, but a majority of its employees are located in and access patient records from Hyderabad, India or Ocala, FL. Anion's Ocala facility is located at 2955 SE 3rd St., Ocala, FL, which is also the listed address for SunLabs, Inc. – the entity which paid Dr. Zafirov's salary as a VIPcare physician.

25. Defendant Florida Medical Associates, Inc. ("FMA") d/b/a VIPcare ("VIPcare") is a provider group which is fully affiliated with and operated by Physician Partners. VIPcare operates 45 clinics spanning 16 Florida counties, including its Venice location where Dr. Zafirov was employed as the sole physician. Although FMA does not publicly disclose its association with Physician Partners on its website, its mailing address and principal addresses are also 601 S. Harbour Island Blvd., Suite 200, Tampa, Florida. The policies, procedures, documents, and manuals utilized at VIPcare are created, distributed, and implemented by Physician Partners, and its billing is performed by Anion.

26. Defendant Freedom Health, Inc. ("Freedom") is a health maintenance organization ("HMO") currently operating in 24 Florida counties, pursuant to a Certificate of Authority from the Florida Office of Insurance Regulation. Freedom is a wholly-owned subsidiary of Anthem, Inc., which acquired Freedom in 2018. Freedom is a Florida corporation with its principal place of business in Tampa. Relevant to this case, Freedom participates in the Medicare Advantage ("MA") program pursuant to Contract No. H5427 with CMS. As of October 2021, Freedom had 68,382 enrolled MA beneficiaries.

27. Defendant Optimum Healthcare, Inc. is also an HMO operating in the same 24 counties throughout Florida, pursuant to a Certificate of Authority from the Florida Office of Insurance Regulation. Optimum is also a wholly-owned

subsidiary of Anthem, Inc., and is a Florida corporation with its principal place of business in Tampa. Relevant to this case, Optimum participates in the Medicare Advantage ("MA") program pursuant to Contract No. H5594 with CMS. As of October 2021, Optimum had 52,313 enrolled MA beneficiaries.

28. Defendants Freedom and Optimum are sibling entities and operate indistinguishably from one another. Both are registered with the State of Florida with a mailing address of 4200 W. Cypress Street, Suite 1000, Tampa, Florida, 33607. They were jointly co-founded by Sidd Pagidipati (the owner and former CEO of Physician Partners), who was the Chief Operating Officer of both entities until approximately 2017. Presently, both companies have the same President, Chief Executive Officer, Director, Chief Medical Officer, Treasurer, Assistant Treasurer, Secretary and Assistant Secretary. Enrollees of both entities are directed to contact the companies at the same post office box, fax number and TTY extension through websites that are virtually identical except for color scheme and stock photographs.

29. Freedom and Optimum refer to themselves collectively in publications distributed to its provider physicians. In contractual agreements with the United States, Freedom and Optimum have been referred to collectively as "Freedom," and statutory and regulatory obligations imposed on "Freedom" were

binding as to both entities. Accordingly, Relator refers to Freedom and Optimum collectively as "Freedom," unless otherwise specified.

## III.    JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction over this action per 28 U.S.C. § 1345 because the United States is the real-party-in-interest. In addition, the Court has subject matter jurisdiction over FCA claims for relief under 31 U.S.C. § 3732(a) and (b).

31.    Personal jurisdiction lies under 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, and transacts business in this District, or has committed the alleged acts in this District.

32.    Venue lies in this District under 28 U.S.C. §§ 1391(b), (c) and 31 U.S.C. § 3732(a) because the Defendants can be found in and/or transact business in this District; a substantial part of all of the events or omissions giving rise to the claims occurred in this District; and all of the Defendants are subject to the Court's jurisdiction under the FCA.

### A.    Public Disclosure

33.    This Court's order dated Sept. 28, 2021, concluded that Relator's allegations against Freedom, Optimum and Pagidipati in Relator's original complaint were publicly disclosed by documents related to a prior lawsuit

involving those parties, *U.S. ex rel. Sewell v. Freedom Health, et al.*, Civil Action No. 8:09-CV-01625 (M.D. Fl.).

34. That case was filed in 2009 and all claims against the defendants were dismissed in May 2017. The covered conduct in that case related to false claims submitted between January 2008 and December 2013. In this case, Relator alleges violations beginning in January 2014 through the present. None of the claims alleged to be false in the *Sewell* matter are at issue in this case.

35. The *Sewell* complaint alleged that Freedom and Optimum, at the direction of Pagidipati, submitted unsupported diagnosis data which resulted in manipulation of the risk adjustment scores of their enrolled beneficiaries. In the Medicare Advantage industry, *all* allegations of fraud ultimately relate to the submission of unsupported diagnosis data and the manipulation of the risk adjustment score because that is the only way to increase funding from the Government.

36. The *Sewell* case identified five specific schemes developed by the defendants to manipulate the risk adjustment data. None of those schemes describe the allegations of this case – that Freedom and Optimum actively participated in the operation of a provider group, including training providers on how to code specific diseases, for the purpose of increasing risk scores of the patients being treated by the provider group.

37.     In this Amended Complaint, Relator clarifies how her allegations are distinct from the *Sewell* allegations as to time, scope, and factual basis. Accordingly, Dr. Zafirov's allegations related to Freedom and Optimum in this Amended Complaint were not previously publicly disclosed as defined in the False Claims Act, 31 U.S.C. § 3730(e)(4).

**B.     Original Source**

38.     Even if substantially the same allegations or transactions as alleged in this complaint were publicly disclosed by the *Sewell* case, Relator is an "original source" as defined in 31 U.S.C. § 3730(e)(4)(B). Relator voluntarily disclosed her allegations to the United States Attorney's Office for the Middle District of Florida on May 16, 2019, prior to the filing of this case, and has knowledge that is independent of and materially adds to any information disclosed in the *Sewell* litigation.

**IV.   PROCEDURAL POSTURE**

39.     Relator filed the original complaint in this case on May 20, 2019, in the Middle District of Florida. The Court granted Relator's motion to place the case under seal pursuant to 31 U.S.C. § 3730(b)(2). Counsel for the United States sought a six-month extension of the initial seal date, which the Court granted on July 26, 2019. Dkt. 6.

40. During that time, the Government was actively investigating the case as both a civil and criminal matter. Consistent with its ongoing investigation, the Government requested additional time for the case to remain under seal on or about Jan. 21, 2020. Dkt. 9, 10. The Court denied the request on January 28, 2020, eight months after the case was filed. Dkt. 11. The language of the order departed from the typical unsealing order, acknowledging the public harm associated with the conduct alleged by Relator:

> The relator alleges a widespread, fraudulent scheme in which managed-care entities and healthcare providers act in concert to bilk the public fisc and otherwise injure the public. If true, the activity presents an ongoing and serious injury to the public.

41. The Government's investigation came to an end and the Government filed a notice not to intervene at that time. Dkt. 14. The Government later filed its notice of election to decline intervention. Dkt. 40.

42. Relator timely served her complaint on Defendants, and Defendants responded with motions to dismiss. Dkts. 41, 50 and 51. Briefing was closed on the motions to dismiss on Dec. 16, 2020, upon filing of specific replies permitted by the Court. Dkt. 74 and 75. Less than a month later, on Jan. 8, 2021, this case was reassigned to Judge Mizelle. Dkt. 76.

43. On Sept. 28, 2021, the Court entered an Order dismissing Relator's Complaint pursuant to Rule 9(b), Fed. R. Civ. P., and, as to certain defendants,

public disclosure grounds. Dkt. 81. The Court granted leave for Relator to file this amended complaint by Nov. 12, 2021. Dkts. 81, 84.

## V.     THE FEDERAL FALSE CLAIMS ACT

44.     The Civil War-era False Claims Act ("FCA") is the United States' primary tool to prevent and remedy fraud against the Government and its taxpayers. The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. 99-345, at 1, *reprinted at* 1986 U.S.C.C.A.N. 5266. Since the 1986 enactment of the modern version of the FCA, it has returned more than $64 billion to the United States.

45.     This case invokes three portions of the federal False Claims Act: 31 U.S.C. § 3729(a)(1)(A), (B) and (G). In salient part, the False Claims Act states,

[A]ny person who –

> A. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> B. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]…
>
> G.  Knowingly makes, uses, or causes to be made or use, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

## VI. MEDICARE AND THE MEDICARE ADVANTAGE PROGRAM

46. Medicare is a federally-operated health insurance program administered by CMS for the benefit of individuals 65 and older and certain disabled persons. *See 42* U.S.C. § 1395, *et seq.*

47. There are four parts to the Medicare program. Part A covers inpatient care, Part B covers outpatient care, Part C establishes the Medicare Advantage program, and Part D is prescription drug coverage. A beneficiary eligible for Medicare may choose to be covered under Medicare Parts A and B, known as "traditional Medicare," in which CMS reimburses healthcare providers for services rendered via submission of claims for payment for each service provided. This is known as a fee-for-service payment system.

48. Alternatively, as relevant here, Medicare beneficiaries can elect to enroll in Medicare Part C, the Medicare Advantage program. Beneficiaries who choose this program enroll in a Medicare Advantage plan that is managed by a private insurance company known in this context as a Medicare Advantage Organization, or "MAO." 42 U.S.C. §§ 1395w-21-28; 42 C.F.R. §§ 422.2, 422.503(b)(2). In the Medicare Advantage program, CMS does not reimburse

providers on a fee-for-service basis but pays providers in advance for the anticipated cost of treatment for each beneficiary.

49.     The Medicare Advantage payment process, as graphically illustrated by HHS-OIG, is as follows:



50.     The CMS graphic shows that the information that triggers payment in the Medicare Advantage system is not a standalone "claim for payment" such as those submitted in traditional fee-for-service Medicare. Rather, the service record entered in the CMS encounter data system is itself the claim for payment.

51.     As described in a *Medicare Provider Manual* (pg. 82) jointly published by Defendants Freedom and Optimum and provided to Dr. Zafirov in the course of her employment, "[c]laims submitted under a capitation contract are referred to as 'encounter data.'" Encounter data includes several pieces of information, the most important of which is the clinical conditions with which a patient has been diagnosed.

52.     Because the submission of encounter data is itself the claim for payment, "an unsupported code submitted by a Medicare Advantage insurer [ ] triggers overpayment in every case. That is because individual codes in that program are used to determine payments, not as data points in a complex and rigorous statistical model." *Unitedhealthcare Ins. Co. v. Becerra*, 9 F.4th 868, 890 (D.C. Cir. 2021).

53.     When an overpayment is identified and must be returned, as described *infra*, the MAO or provider does not send a specific amount of money back to the United States, but rather "it is the act of submitting the corrected data to CMS…that constitutes fulfillment of the requirement to report and return the overpayment." 79 Fed. Reg. 29,921. The return of funds then occurs through "routine processing." *Id.* at 29,920.

54.    "The Medicare Advantage capitation payment system is subject to the False Claims Act." *U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 673 (9th Cir. 2018).

### A.    The Medicare Advantage Risk-Adjustment System

55.    The Medicare Advantage capitated system means that, each month, the Government pays a fixed amount per beneficiary enrolled in each MA Plan to each MAO. The baseline capitated amount is determined by an annual bid which is then adjusted by the expected risk of each beneficiary.

56.    The per-member-per-month payment is not determined by the cost of healthcare services provided to an enrollee. Rather, each year, each MAO submits a bid amount for each of its MA plans, which is then compared to a benchmark set by CMS based on a statutory formula to establish the bid price, which is the baseline for the capitated payment. 42 U.S.C. § 1395w-23; 42 CFR § 422.2, subparts F and G.

57.    Since 2000, Congress has required that the bid price be adjusted for each MA Plan enrollee based on (1) the enrollee's demographic factors, including age and gender, among others, and (2) the enrollee's health status. This process is called "risk adjustment."

58.     Risk adjustment results in a "risk score," sometimes referred to as the "risk adjustment factor" or "RAF," which is a multiplier that is applied to the MA organization's bid price to determine the actual amount paid for each enrollee.

59.     The enrollee's health status adjustment is determined using the CMS Hierarchical Condition Category ("HCC") risk-adjustment model. In sum, CMS predicts that patients who have been diagnosed with certain conditions will cost the insurer more to treat than the average Medicare patient, so it adjusts the monthly payment to make up for that cost difference. Likewise, a person who is healthier than the average Medicare patient may cost less to treat, so the bid price is adjusted down for those patients.

60.     To make its predictive process even more accurate, CMS's model factors in the cost of certain co-morbidities, or multiple diagnoses whose treatments in combination are expected to be costlier than the cost of treating each disease separately. In sum, "the point of the Secretary's discretion to select, and obligation to apply, risk factors is to 'ensure that [Medicare Advantage insurers] are paid appropriately for their plan enrollees (that is, less for healthier enrollees and more for less healthy enrollees).'" *Becerra*, 9 F.4th at 874, quoting *Establishment of the Medicare Advantage Program*, 70 Fed Reg. 4588, 4657 (Jan 28, 2005).

61.     Medical conditions, represented by diagnosis codes, are grouped into Hierarchical Condition Categories, or HCCs, which are categories of clinically-

21

related medical diagnoses. 42 CFR § 422.2. Certain HCCs contain diagnoses codes which indicate major, severe and/or chronic illnesses and are predicted to require more expensive treatments. These are referred to as "risk-adjusting diagnosis codes" and are assigned a numerical risk-adjustment score. The numerical scores for all of the risk-adjusting conditions with which a patient is diagnosed are added together to determine the patient's ultimate Medicare Risk Adjustment, or "MRA," value.

62.     Not all diagnosis codes are risk-adjusting, meaning that conditions which are not expected to increase a patient's cost of treatment over an MAO's bid price do not have an associated risk-adjustment value and do not affect the amount paid for that beneficiary.

63.     The HCC model is prospective, such that it relies on risk-adjusting diagnosis codes from one year (the "date of service year") to determine payments in the following year (the "payment year").

64.     The Court of Appeals for the District of Columbia set forth the following explanation and example of how the Medicare Advantage risk adjustment model works in practice:

> To enable CMS to apply those relative factors to pay Medicare Advantage insurer at the correct risk-adjusted rate, the insurers must report to CMS the salient demographic and health characteristics of each of their Medicare-eligible beneficiaries. 42 CFR § 422.310(b), (d). CMS then combines the relative factors for a particular beneficiary to arrive at her individualized overall 'risk score.' *See* Pope et al.,

22

*Evaluation of the CMS-HCC Risk Adjustment Model: Final Report* 15, J.A. 532. CMS posits that an 'average beneficiary' in traditional Medicare has a risk score of 1.0. If a Medicare Advantage beneficiary has a risk score of exactly 1.0, CMS pays the insurer the base payment rate for that beneficiary's location. For Medicare Advantage beneficiaries with risk scores above 1.0, meaning they are of higher-than-average risk, CMS pays insurers more than the base payment rate; for beneficiaries with risk scores below 1.0, the payments are correspondingly lower than the base rate. But Medicare Advantage beneficiaries are not presumptively scored as 1.0; the per-capita payments that CMS makes to insurers instead depend on an aggregation of the beneficiaries' cost-predictive demographic and diagnostic factors.

CMS illustrates the operation of relative factors with an example:

> [U]nder the 2014 model, a 72-year-old woman living independently (relative factor 0.348), with diabetes without complications (relative factor 0.118), and multiple sclerosis (relative factor 0.556) would have a total risk score of 1.022, which means that she is expected to cost Medicare slightly more than the average traditional Medicare beneficiary (who would by definition have a risk score of 1.0)

[Government's Brief at 7] (citing Announcement of CY 2014 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter, at 67-68 (Apr. 1, 2013), J.A. 276-77). In other words, as a woman near the younger end of the Medicare-eligible population and living outside any long-term institutional setting, this sample beneficiary starts with a risk score well below the overall Medicare average. The fact that she suffers from diabetes raises her risk score, but not by much, presumably because she has not experienced complications and ordinary diabetes care is not as costly as many other conditions common among older Americans. The larger bump, putting her over the average predicted costs of care even for the cost-intensive Medicare population, is that she suffers from multiple sclerosis. A Medicare Advantage insurer providing coverage to this woman therefore "would be paid 102.2 percent of the relevant base rate." *Id.* at 8.

*Becerra*, 9 F.4th at 875-76.

65.     The risk-adjustment model was created to incentivize cost-effective care and preventative medicine in an effort to reduce the rapidly increasing costs of the Medicare program, while ensuring that MAOs have sufficient funds available to meet their enrollees' healthcare needs. However, risk-adjusting creates a financial incentive for Medicare Advantage insurers to accept and approve diagnoses codes which make their beneficiaries appear sicker than they really are.

66.     "Overpayment to Medicare Advantage insurers is a serious drain on the Medicare program's finances. In 2016 alone, audits of the data submitted by Medicare Advantage insurers to CMS showed that CMS paid out an estimated $16.2 billion for unsupported diagnoses, equal to 'nearly ten cents of every dollar paid to Medicare Advantage organizations.'" *Becerra*, 9 F.4th at 872-73, quoting *Silingo*, 904 F.3d at 673, *citing* James Cosgrove, U.S. Gov't Accountability Ofc., GAO-17-761T, *Medicare Advantage Program Integrity: CMS's Efforts to Ensure Proper Payments* 1 (2017), https://www.gao.gov/assets/690/685934.pdf.

B.     **The Role of Providers in the MA Risk Adjustment Process**

67.     Many MA organizations contract with Provider Organizations ("POs"), such as hospital networks and physician groups, to furnish healthcare services under the MA plans.

68.     MA organizations pay providers through a variety of arrangements, but many large POs, to include Physician Partners and VIPcare, enter into capitated and/or "gainsharing" arrangements with the MAOs which align their financial interests. In a capitated arrangement, the MAO enters into a contract to pay a portion of the per-enrollee payment from the Government to the PO. In "gainsharing" agreements, the POs receive incentive payments from the MAO based in whole or in part on total revenues that the MAO receives from the Government for the beneficiaries cared for by those providers.

69.     These financial arrangements align the interests of the MAO and the PO. When the PO increases a Medicare Advantage beneficiary's risk adjustment score, the MAO receives a higher capitation payment from the United States.

70.     Pursuant to Medicare regulations, providers can be classified as "first tier entities" or "related entities." See 42 CFR §§ 422.2, 422.500.

71.     A first-tier entity is "any party that enters into a written agreement, acceptable to CMS, with an MA organization…to provide…healthcare services for a Medicare eligible individual under the MA program." 42 CFR § 422.2.

72.     A related entity is "any entity that is related to the MA organization by common ownership or control and (1) [p]erforms some of the MA organization's management functions under contract or delegation; [or]

[f]urnishes services to Medicare enrollees under an oral or written agreement…." 42 CFR § 422.500.

73.     First-tier and related organizations must perform their services in a manner that complies with the MAO's contractual obligations to the Government; must agree to comply with all applicable Medicare laws, regulations and CMS instructions; and must receive effective compliance training and education relating to preventing fraud, waste and abuse. 42 CFR §§ 422.503-04.

74.     If a related or first-tier entity generates data relating to an MAO's claims for payment to the United States, both it and the MAO are required by law to certify that the data is accurate and truthful. 42 C.F.R. § 422.504(l)(1)-(4).

75.     Defendants Physician Partners and VIPcare are first-tier entities who provide healthcare services to Medicare Advantage patients by agreement with Freedom and Optimum.

76.     "[D]iagnosis codes, as reported by medical providers, are the only factors that CMS uses to determine a beneficiary's health status." *U.S. ex rel. Ormsby v. Sutter Health*, 444 F.Supp.3d 1010, 1025 (N.D. Cal. Mar. 16, 2020). Patient records are also critical as the only documentation of a Medicare Part C beneficiary's health status.

77.     As a result, "a traditional Medicare provider that submits an unsupported diagnosis code does not cause CMS to pay out any additional money,

26

whereas a Medicare Advantage provider that submits an unsupported diagnosis code does." *Id.* at 1021, n.1.

78.     "Notwithstanding any relationship(s) that the MA organization may have" with first tier and related entities, "the MA organization maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS." 42 C.F.R. § 422(i)(1).

### C.     Repayment Obligations Under the Medicare Advantage Program

79.     31 U.S.C. § 3729(a)(1)(G) is the "reverse False Claims" provision of the False Claims Act.  It provides that liability will attach when a defendant conceals, avoids, or decreases an "obligation to pay or transmit money or property to the Government." In 2010, Congress amended the definition of the term "obligation" to include "an established duty, whether or not fixed, arising from…the retention of any overpayment."

80.     The Affordable Care Act, enacted by Congress in 2010, includes what has come to be called the "Overpayment Rule."   42 U.S.C. § 1320a-7k(d). The Overpayment Rule obligates any person to report and return any overpayment that they receive from CMS within 60 days of identifying it. 42 U.S.C. § 1320a-7k(d)(1), (2).

81.     The statute defines "overpayments" as "any funds that a person receives or retains under [Medicare or Medicaid] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B).

82.     For purposes of the statute, the definition of the term "person" includes both the provider of services and Medicare Advantage organizations. 42 U.S.C. § 1320a-7k(d)(4)(C).

83.     In 2014, CMS promulgated the Overpayment Rule to implement the statutory requirement for MA Organizations. *Overpayment Rule*, 79 Fed. Reg. at 29,958 (codified at 42 CFR § 422.326(a)). The rule mirrors the statute: "If an MA organization has identified that it has received an overpayment, the MA organization must report and return that overpayment in the form and manner set forth in this section." 42 CFR § 422.326(b). An "identified overpayment" occurs when the MAO has determined, *or should have determined through the exercise of reasonable diligence*, that it received an overpayment. 42 CFR § 422.326(b) (emphasis supplied).

84.     The preamble to the Overpayment Rule states that "a risk adjustment diagnosis that has been submitted for payment but is found to be invalid because it does not have supporting medical record documentation would result in an overpayment." 79 Fed. Reg. at 29,921.

85. The failure to report and return a knowing overpayment within 60 days of discovering it violates the reverse false claims provision of the False Claims Act. 42 U.S.C. § 1320a-7k(d)(3); 42 CFR § 422.326(e).

86. Defendants Freedom and Optimum's *Medicare Provider Manual* (pg. 23) expressly recognizes that "[l]iability can also be created by the improper retention of an overpayment."

## VII. ALLEGATIONS OF DEFENDANTS' CONDUCT RESULTING IN THE SUBMISSION OF FALSE CLAIMS

87. Physician Partners and its subsidiaries, including Anion and VIPcare, acted in concert with Freedom and Optimum to artificially increase risk adjustment scores of their Medicare Advantage enrollees, making their patients look sicker than they were, thus fraudulently increasing costs to the government while minimizing the amount of money actually spent to treat the patients.

88. In its September 28, 2021, Order (Dkt. 81 at 21-22), the Court directed that Relator clarify which conduct is attributable to which defendant. Relator endeavors to do so herein. However, Relator notes that it is critical to the success of this fraudulent scheme that all of the defendants operated in tandem, a relationship made possible largely by the knowledge and former control of Freedom and Optimum held by Siddhartha Pagidipati, the owner and CEO of Physician Partners.

89.     But for these intertwined operations – where, *inter alia*, the Freedom instructed Physician Partners physicians how to increase risk scores and granted the physicians access to their internal claims submission portal, where Physician Partners allowed Freedom access to patients who were enrolled with other MAOs to persuade them to change programs, and where VIPcare bonused its employee physicians based on the risk scores of their Freedom patients – the conduct alleged herein could not have occurred.

### A. ALLEGATIONS AGAINST PHYSICIAN PARTNERS, ANION, AND VIPCARE

90.     Defendants Physician Partners, Anion and VIPcare provide healthcare services to thousands of senior or severely-disabled citizens throughout Florida who receive their care under the Medicare Advantage program. They have created and implemented a coding process designed to inflate their patients' Medical Risk Adjustment (MRA) scores to increase their capitated payments by making the patients look sicker than they are.

91.     Through coordinated efforts to maximize profits, Physician Partners and VIPcare engaged in high-pressure directives to ensure their physicians selected only risk-adjusting HCCs, including tying the physicians' compensation to their willingness to comply with the system. And when physicians like Relator would not comply, Anion submitted unsupported diagnosis codes anyway, either

expressly disregarding the physician's instructions or modifying the code to appear as if it came from some other source.

92.     In this way, Physician Partners ensured the implementation of its corporate directives to increase risk scores without regard to the actual physical condition of the patients.

93.     In reviewing hundreds of 5 Star Checklists in connection with her patients, Dr. Zafirov saw none where the defendants changed a diagnosis code which resulted in lowering the patient's MRA score. Rather, this was always done to increase the patient's MRA score, and increase the funding from the United States.

94.     In Section IX, *infra*, Relator identifies patients who she encountered in the course of her employment at VIPcare whose encounter data was not supported by clinical findings. For some, Relator notified Physician Partners that past codes were inarguably wrong and should be changed, but they were not. For others, Relator expressly rejected the "suggested" codes but Anion submitted them in her name anyway. And for others still, Relator rejected codes so Anion submitted them under an anonymous "physician" descriptor, despite the medical records lacking any support therefor. The patients identified in this complaint are examples only; they are by no means all of the patients with respect to whom false claims were submitted.

95.     The submission of unsupported and false diagnosis codes by Anion, at the direction of Physician Partners and VIPcare, increased patients' risk scores and therefore the capitated payments received for those patients.

96.     However, despite the additional diagnoses, no additional medical services resulted. Often, expensive medical services that *were* actually needed were withheld. Relator's physician colleagues boasted of restricting specialist access, deterring hospital admissions in potentially life-threatening situations, and even touted the cost-saving repercussions when patients suffered untimely deaths. As described herein and specifically stated to Relator by her VIPcare Regional Director Alex Lavin at an in-person meeting at her office on September 26, 2019, Physician Partners' physicians were expected to "do whatever needs to be done" to increase risk scores and lower costs.

### i. Overview of the Relationship between Physician Partners, Anion Technologies, and VIPcare

97.     Physician Partners advertises itself as "the intersection of patients, providers and payors" with more than 129,000 patients, more than 500 providers and relationships with 14 payor entities. www.phypartners.com (last accessed Nov. 2, 2021).

98.     Physician Partners associates with providers in one of two ways. First, it employs physicians through PP-owned provider groups which have their own name and internal corporate structure but are part of the Physician Partners

corporate entity. Second, it enters into management contracts with independent physician practices wherein the physician maintains ownership of the practice, but Physician Partners assumes operational control.

99.    VIPcare is in the former category – it is wholly owned and operated by Physician Partners. Under the VIPcare brand name, Physician Partners operates 45 clinic locations, each of which has one or more primary care physicians and a small nursing and clinical staff. The physicians sign employment contracts with FMA, receive their paychecks through another Physician Partners affiliate called SunLabsUSA (which shares an address with Anion) and are considered employees of Physician Partners.

100.    Dr. Zafirov was employed as the primary care physician at a VIPcare clinic located in Venice, FL. When Dr. Zafirov requested an employment verification letter, she received a letter on SunLabsUSA letterhead which stated, "Dr. Zafirov practiced in our ambulatory primary care clinic for an assigned Medicare-focused patient panel…. She held the position of Physician at our VIPcare clinic located at 333 Tamiami Trail S, Suite 102, Venice, FL during this period." The letter was signed by Katrina Hall, Team Resources Operations Manager, whose signature block provided a Physician Partners email address, teamresources@phypartners.com.

101.  In Relator's experience, and as described herein, VIPcare approved and implemented the directives set forth by Physician Partners. Accordingly, any conduct or policies attributable to Physician Partners are also attributable to VIPcare.

102.  Among the policies and practices implemented by Physician Partners is the use of Anion as the billing and coding entity for all of Physician Partners' physicians, whether employed or independent. Anion employees – some located in Florida and others in Hyderabad, India – interact with a patient's medical record before and after each encounter.

103.  On the day of or just before a patient visit, an Anion representative generates a "5 Star Checklist" (described in detail below) for the patient and transmits it to the physician for use during the visit.

104.  Following a patient visit, an Anion representative reviews the physicians' notes, the physicians' diagnostic coding, and the 5 Star Checklist (if used). If the physician has not appended the codes suggested by Anion on the 5 Star form, or any codes which the Anion representative suggests upon review of the physician's notes, then the Anion representative engages directly with the physician to add the suggested HCCs. As described below, Anion representatives have complete access to the Physician Partners' patient records, enabling them to modify a physician's coding without the consent of the physician.

34

## ii. Overview of the 5 Star Checklist

105.    At the heart of Defendants' scheme to increase patient risk scores is the use of their proprietary code-steering form called the "5 Star Checklist." The Checklist is created in advance of every patient visit by an Anion employee, who populates a daily electronic folder with 5 Star Checklists for all patients scheduled for visits that day. Each morning, an Anion associate based in India, typically Ratnakar Mekala (whose signature block identifies him as Anion Healthcare Services | Process Associate - Provider Department), sends an email to the clinics that the 5 Star Checklists for that day are available and loaded into a Google Docs drive. Each doctor or office then goes onto the drive, downloads the forms for the day, and prints them in hardcopy.

106.    VIPcare Medical Director Dr. Sangeeta Hans instructed Relator at the beginning of her employment that VIPcare physicians *must* complete a 5 Star Checklist for each patient at least once per year, but later instructed that it must be done twice a year. A Checklist is generated by Anion before every patient visit, regardless of whether one or two have already been completed that calendar year.

107.    Despite the importance of the 5 Star Checklist to Anion's coding, Emily Gallman, Senior Director of Healthcare Operations at VIPcare, encouraged Dr. Zafirov to have her medical assistant simply accept the diagnoses on the 5 Star

Checklists and Dr. Zafirov could "just sign them" instead of completing the records herself.

108. The following is an example of a typical 5 Star Checklist, annotated to describe each section of the form:



Annotation Key:

1 – The information at the top of the form provides the name of the current primary care physician, followed by the patient's name, patient number, date of birth, age, gender, risk score for the previous

36

year and the patient's insurance provider and plan. In this example, the patient had an MRA score of 1.007 the prior year, meaning he was very close to the average Medicare patient.

2 – The rectangular bar acts as a dashboard to track how much of the potential risk score suggested by Anion has been coded so far. At the beginning of each calendar year, the rectangle is completely white and says "100% | X.XX" where the X.XX reflects the maximum risk score if the physician agreed with every HCC suggested by Anion. As the suggested risk-adjusting HCCs are diagnosed, the white bar begins to fill up with grey, reflecting the percentage of maximum risk score that the physician has diagnosed. In this example, the patients' MRA score would be 1.842 if all the suggested conditions were accepted, meaning Freedom would receive 184.2% of the negotiated bid price for this patient.

3 – Each white bubble corresponds with a suggested HCC on the table below. All bubbles are white at the beginning of a calendar year, and are greyed out and checked once the HCC has been coded for that patient. The bubbles serve as a visual tally of the specific codes which have been suggested and which are still available to increase the patient's risk score.

4 – An ICD-10 code, often referred to as a "diagnosis code," is an alphanumeric code assigned to every disease process by the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10"). Each HCC is comprised of a series of related ICD codes. In this exemplar form, there is only one suggested ICD-10 code under each HCC, but often 5 Star Checklists include two or more suggested ICD-10 codes under an HCC. Once an ICD-10 code is diagnosed, it closes out that HCC and any subsequent ICD-10 codes under that same HCC will not increase the risk score any further. **There are no ICD codes on 5 Star Checklists which are associated with a non-risk-adjusting HCCs.**

5 – The ICD Description is a brief description of the associated ICD-10 code. The ICD-10 provides a detailed description of what diseases processes must be present to code each diagnosis; the name provided here is a short-form description for purposes of the 5 Star Checklist only.

6 – The "Times Reported" category shows the number of times the specific ICD-10 code was reported in the previous three years. A number in one of those three columns means that Physician Partners submitted that code as part of the patients' encounter data in the specified year. Certain of the numbers should be consistent year to year (i.e. unchangeable physical characteristics like an amputation or interminable diseases like cystic fibrosis or multiple sclerosis) and others will change depending on a patient's health condition.

7 – The "Source" column purports to identify the reason that a submitted a suggested code was placed on the 5 Star Checklist. The options for this column include "Current PCP," "Physician" or "Hospitalist" to indicate a condition that was previously reported to CMS by one of those providers, "past history" to identify a condition that was previously reported to CMS but the specific provider is unknown, "Clinically Inferred Criteria" to identify a condition that is selected by a chart reviewer based on the existence of other medical conditions, and "Review Suspect" to identify a condition that is selected by a chart reviewer based on some other criteria.

8 – The "Comments" field is where the patient's current primary care physician communicates findings to the Anion representative who is conducting the post-encounter chart review. The physician marks "yes," "no," or some other response to convey whether the code should be submitted for the patient. Anion may also put notes in the "Comments" section to explain why a certain condition was suggested.

9 – The "Codes/Conditions Already Reported" chart identifies HCCs – with the corresponding specific ICDs – which have already been diagnosed for that patient in the current calendar year, including the first date of service on which the code was identified and any subsequent dates of service on in which the code was identified. In this section of the chart, "source" indicates the person who actually diagnosed the reported code, so it only has three viable options – "Current PCP" to indicate the doctor presently seeing the patient, "Physician" which indicates a physician other than the current PCP, or "Hospital" if a patient received care in a hospital which resulted in an additional diagnosis. The HCCs in this section correlate to the

bubbles which are greyed-in as described in Section 4 of this paragraph.

109. For patients who are new to Physician Partners or Freedom, the 5 Star Checklist for their first visit is a standard template, rather than drawn from their transferred medical records. The form has a header that says, "PLEASE EVALUATE, ASSESS AND TREAT," and then states, "Listed in the table below are common deseases [sic] that are high prevalent in senior population [sic]. Please complete a comprehensive assessment and evaluate if any of the potential conditions exist on this member. If a condition(s) exist, mark Yes on the last column of the checklist and document appropriately on your progress note." *Every* condition listed has a risk-adjusting diagnosis code; there are no suggested codes which would not result in a risk adjustment, regardless of prevalence in the senior population. The associated comments are also medically inaccurate and misleading.

110. The following is an example of a standard new-patient 5 Star Checklist which bears a "No" marking from Dr. Zafirov indicating that the patient did not have any of the suggested ailments:



111. Physician Partners published a *2020 Quality Training Manual* ("*QTM*") and distributed it to physicians, including Relator, in or about February 2020. The *2020 QTM* included a "Know Your 5 Star Checklist" page which identified the various parts of a 5 Star Checklist. On the example graphic, Physician Partners included a section for "conditions that were marked as not active this year" which

would appear between the top and bottom tables on the example checklist shown above.

112.   Ostensibly, conditions in that section would no longer show up as "care gaps" once they had been identified as inactive. However, in Relator's review of thousands of 5 Star Checklists, she very rarely – if ever – saw that section present on a 5 Star Checklist. Rather, even when she expressly stated "no" to a suggested condition, that condition would remain on the suggested list unless or until it was diagnosed; there were no options to render a condition "inactive."

113.   In the *QTM*, Physician Partners responded to a "Frequently Asked Question" about conditions marked with "no," and acknowledged that physician judgement would be overruled by the Anion review team:

> Why do conditions that have been marked as "No" keep appearing on the 5 Star Checklist?
>
> Conditions that the PCP has said "No" to *and our review team does not find evidence of,* then the condition will appear in the middle (Inactive section) of the 5 Star Checklist. [sic] These are conditions that Physician Partners has received claims, billing, PCP encounters, specialist notes, etc within the past 3 years. These conditions will continue to appear on the 5 Star Checklist to ensure that all data is given to our providers."

(Emphasis added.) Of note, as described below, these conditions are not gathered from patient-specific information but from trend data.

114.   The "frequent" refusal to accept a "no" is consistent with the message that Dr. Sangeeta Hans, VIPcare's Medical Director, conveyed to Relator in a

meeting on Aug. 9, 2019. Dr. Hans explained that even if Dr. Zafirov wrote "no" to reject a suggested condition, Anion would continue to suggest the condition on future 5 Star Checklists because "they" (meaning the Anion chart reviewers) did not agree with Relator, despite the fact that the chart reviewers are not medical professionals. Dr. Hans informed Relator that she would personally begin holding meetings with Relator to evaluate her coding decisions, even though Dr. Hans had not evaluated or treated any of the patients herself.

115. The prior version of the *Quality Training Manual* provided to physicians by Physician Partners described the 5 Star Checklist in more detail, including how the data is aggregated, and how it should be used by a physician. The manual predicted that some physicians may be too busy to look at the medical records of a patient. Rather than direct that physicians must review all necessary documentation to provide appropriate care, Physician Partners condones using the 5 Star Checklist as a shortcut around performing that basic standard of care:

> How will it help the member or [Primary Care Physician]?
>
> Primary Care Physician does not have time to always review specialist notes and hospital discharge summaries, which means there is a chance that PCP may not know all the medical conditions that were addressed by the specialists and hospitals. We gather all that information and present it on the 5 star checklists so that PCP can continue to monitor those conditions and help members achieve better health outcomes.

116.    Moreover, the *QTM* recognized that, despite the 5 Star Checklist stating on its face that it is provided "to show the past medical conditions of the patient," that is not true. The data is gathered from industry trends and from algorithms written into Defendants' system, regardless of whether any physician who actually treated the patient ever diagnosed that condition:

> Where are the chronic medical codes coming from?
>
> Health plans provide us monthly claims files, these files include claims details from all medical providers the members have visited, we extract chronic diagnosis codes from the claims and report them on 5 star checklist [sic].
>
> What are the suspect conditions?
>
> The monthly data that we receive from health plans also include Rx claims and Lab test results. We built suspect algorithms in our system that looks for medications specific to certain chronic conditions and abnormal test results that lead to potential chronic conditions, if such conditions are not already addressed or reported by the PCP, we present them as suspect conditions on the 5 star checklists. These are only suspect conditions and its for the PCP to determine if the conditions are not [sic].

117.    Based on Relator's review of hundreds of 5 Star Checklists and the associated medical charts for her patient panel, the 5 Star Checklists and subsequent billing records routinely include at least three categories of conditions which are inapplicable and not reflective of a patient's actual medical status: (1) diagnoses that have no clinical support but were assigned to the patient at random or based entirely on the algorithms created by Physician Partners and Anion; (2)

diagnoses that may have been historically-accurate but are no longer applicable, e.g. cancer which has been treated and is remission; or (3) conditions which are tangentially related to notes in the patient's chart but are not supported by clinical evidence, e.g. recommending COPD for every patient who ever smoked.

118. The sometimes-preposterous nature of these suggested diagnoses is illustrated by, for example, Patient A.[1] Dr. Zafirov treated Patient A on July 23, 2019. The 5 Star Checklist provided by Anion for Patient A's visit included a suggestion for "complete traumatic amputation of unspecified foot, level unspecified, initial encounter" based on "past history." Except the patient plainly had *not* had either foot amputated (traumatically or otherwise) and, despite the marking that the code had been diagnosed in 2016, it had not actually been. There was nothing in the patient's chart related to an amputation, and the suggestion was completely unfounded.

---

[1] Relator has deidentified all of the patients referenced in this complaint and assigned a name of Patient A, Patient B, etc. Relator can provide the complete patient information to the Court *in camera* upon request, or to Defendants upon entry of a qualified protective order under the Health Insurance Portability and Accountability Act ("HIPAA").

119. At the end of a patient visit, the 5 Star Checklist is submitted to Anion along with the rest of the medical chart, including the physician's notes. The physician is required to sign the Checklist, certifying, "I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date." Although the forms are submitted to Anion for billing, they are not placed in the patients' permanent medical records so they cannot be accessed again by the physician once sent to Anion. Dr. Zafirov began keeping copies of her 5 Star Checklists once she determined that Anion had submitted codes which she had specifically rejected.

120. If a physician had true autonomy over the diagnosis codes applicable to a patient, Anion would accept the 5 Star Checklists as submitted. However, billing specialists at Anion reviewed every chart to determine if the physician rejected any of the suggested conditions on the 5 Star Checklist. If the physician failed to code for a condition on the 5 Star Checklist, regardless of the "source" of that code, then the condition is logged as a "care gap" – the equivalent of a demerit for each unapproved code.

121. "Care gaps" are monitored by Anion, Physician Partners and VIPcare management, and reports documenting "care gaps" are sent to physicians identifying every instance in which a physician did not diagnose a condition that was on the 5 Star Checklist. The care gap remains on the physician's record until

45

the physician reviews the billing suggestion from the Anion employee and either agreed to make the suggested changes or reaffirms the initial diagnosis.

122. Chart reviews are not inherently improper: there are some appropriate occasions where Anion's chart review determines that a physician has entered a diagnostic code but has not closed out the note, has coded a diagnosis but did not document one part of the care necessary to support the code, or even where a physician has documented all of the necessary conditions for a diagnosis in the notes but left the diagnosis code off of the coding paperwork.

123. However, in Relator's experience, a substantial majority of Anion's "care gaps" related to conditions that the physician has said do not exist and Anion wanted to add anyway, conditions that a physician has coded as less severe and Anion wanted to upcoded to appear more severe, or conditions that the physician simply did not discuss but a chart reviewer wanted to apply.

124. Care gaps are not issued for non-risk adjusting diagnoses, meaning even if a physician's note makes clear that the physician intended to diagnose a non-risk adjusting diagnosis code but forgot to do so, the Anion chart reviewers will not create a "care gap" and will not flag that code as an area of review for the physician. Thus, despite the name, "care gaps" are unrelated to patient care and exclusively refer to gaps in risk-adjusting diagnosis codes.

### iii. Physician Partners Incentivized Employed Physicians to Increase the Risk Scores while Reducing Costs to Treat Freedom Patients.

125.    Physician Partners incentivizes physicians to participate in inflating MRA scores by aligning the financial interests of the physician with the financial interests of Physician Partners, much akin to how the gainsharing relationship between Physician Partners and the MAOs align their financial interests. In fact, the physicians are bound by contract to provide treatment "in accordance with FMA's care protocols, quality assurance program, standard operating procedures and managed care requirements" and to "execute any such required forms, including without limitation, assignments, as may be required to facilitate billing and other data captured by FMA for services performed by Physician pursuant to [the Employment] Agreement."

126.    Pursuant to those obligation, Physician Partners, Anion and VIPcare exert consistent pressure to ensure that the physicians participate in their protocols and procedures as expected. And to add additional pressure, Physician Partners directly tie the physician's financial success to their willingness to inflate their patients' risk adjustment scores, both for employed and contracted physicians.

127.    Specifically, in 2018, VIPcare's Performance Bonus Program – as directed by Physician Partners – allowed physicians three opportunities to achieve

47

financial incentives: (1) Monthly Training Bonus, (2) Quality Performance Bonus, and (3) Financial Performance Bonus.

128.    The first two categories are innocuous, and their value is relatively minimal compared to the Financial Performance metric. The Monthly Training Bonus provides $300 bonus for each meeting attended by the physicians, up to an annual limit of $3,600. The Quality Performance Bonus – arguably the most important metric to ensure proper patient care – incentivizes physicians to maintain high scores on the Healthcare Effectiveness Data and Information Set ("HEDIS") which uses nearly 100 factors to assess quality of care. Physicians who maintained HEDIS Star Scores of 4.5-4.74 out of 5 earn up to $5,000 per year, while physicians who have HEDIS Star Scores of 4.75 or greater earn up to $10,000 per year.

129.    The third category, however, directly implicates a physician's willingness to comply with the directives to boost risk adjustment scores. To earn the maximum Financial Performance Bonus, a physician must see more than 600 Freedom Medicare Advantage ("FR MA") patients in a year, and then the physician can be awarded up to 50% of the surplus associated with those patients.

| III. FINANCIAL PERFORMANCE BONUS | | |
|---|---|---|
| GOAL: SURPLUS | | |
| IPA BONUS PROGRAM – INDIVIDUAL PCP PERFORMANCE | | |
| FR MA PATIENTS | ANNUAL POTENTIAL BONUS | PAYMENT FREQUENCY |
| 100 - 249 | 50% of Surplus Up To $20,000 | Quarterly |
| 250 - 599 | 50% of Surplus Up To $50,000 | Quarterly |
| 600+ | 50% of Surplus Up To $100,000 | Quarterly |

130.    Because the bonus considers *only* Freedom Medicare Advantage patients, the physician can *only* generate bonus income by increasing the risk scores and reducing expenditures for their Freedom patients. Relator was advised by VIPcare Senior Direction Gallman that the target capitated payment amount is $800 per patient per month to maximize the bonus.

131.    Relator and her physician-colleagues were also consistently pressured to reduce expenses which are typically related to (1) in-patient hospital admissions, (2) professional expenses like imaging or specialist referrals, and (3) prescription drugs. A physician can reduce expenses by avoiding hospital admissions, writing generic prescriptions instead of brand names, referring patients to use VIPcare's in-house imaging resources, or withholding specialist referrals. If a physician can maximize risk scores and minimize expenditures, the physician is entitled to up to $100,000 over and above their already-generous salaries.

132. Gallman often spoke to Relator about her compensation and bonus potential. In one such conversation in May 2019, Gallman advised Relator that VIPcare physicians need only to "accept the white circles" to increase their bonuses, a reference to the white bubbles at the top of the 5 Star Checklist which represent every HCC suggested by Anion. Gallman also encouraged Relator to minimize expenses by, for example, contacting oncologists who recommended expensive infusion treatments to "see what they want." Relator understood this to mean to inquire about what kind of treatment the doctor would provide and to ration referrals to expensive oncologists to keep the expenses low. Gallman made clear to Relator that the more that VIPcare had to spend on a patient's specialist care, the less money would be available to pay Relator's bonus.

133. VIPcare's Regional Director, Alex Lavin, reiterated this message to Relator in a Zoom conversation held on Aug. 9, 2019. In a meeting also attended by Dr. Sangeeta Hans, VIPcare's Medical Director, Lavin told Relator that he wanted to explain the Physician Partner financial model to her, and that her most important focuses needed to be limiting hospital and emergency room admissions while coding the way she was directed. Lavin specifically stated to Relator that having a higher risk score is important, and that the better she does with the parameters that he described, the more money she would make in bonus payments.

134.    Just one week later, on Aug. 15, 2019, Gallman, Lavin and Hans held another Zoom meeting with Relator to walk through the bonus structure yet again. Together, the VIPcare representatives emphasized that Relator needed to increase her patients' average risk score in order to be profitable, and her target needed to be at least 1.5. Dr. Hans stated that her MRA score was 1.96 (meaning her patients, *on average*, receive nearly 200% of the capitated bid price). Dr. Hans also mentioned that her prescription drug expenses used to be very high due to her cancer patients, but a number of those patients have died so her numbers are better now.

135.    Of note, on another occasion, on Nov. 13, 2019, in a monthly meeting for all VIPcare physicians, Dr. Hans shared her cost-saving story wherein she withheld a referral to a hematologist-oncologist for a young man in his 20s who had metastatic breast cancer and convinced him to go to hospice instead. Dr. Hans admitted that, "if I would have sent him on to oncology, they would have promised they can cure this." The young man's cancer had metastasized, so based on *her* opinion (as a primary care doctor), the expensive specialist care would not be successful and the less-expensive hospice was the right decision. Dr. Hans parlayed the story into a discussion of advanced directives and DNRs for patients who she thought wouldn't survive CPR.

136.    When Relator began employment at VIPcare, she took over a patient panel that had been previously treated by other VIPcare or Physician Partner

51

physicians. In evaluating her patient records, Relator encountered several patients where she determined that referrals to specialists had been withheld, thus reducing VIPcare's costs and increasing those physicians' bonus pools. The following are examples of such rationed care:

a. Patient B, a 95-year-old veteran of World War II, was seen by Dr. David Hunt on Sept. 4, 2018. At 109 pounds and 5 feet, 9 inches tall, Patient B was severely malnourished and had low white count. Patient B was seen by Dr. Akhil Patel on Oct. 25, 2018. Both physicians stated the patient declined interventions, although he had dementia and his mental capacity was in question. The patient was told by Dr. Patel that his diet of Boost alone was adequate for nutrition; no further evaluation or work-up was performed. When Patient B became Dr. Zafirov's patient, she provided two different referrals to appropriate specialists which he readily accepted. From those referrals, Patient B was found to suffer from a likely leukemia and an esophageal stenosis, both treatable conditions which had been contributing to his weight loss.

b. Patient C was seen by Dr. Rick Simovitz on multiple occasions for evaluation of a painful abdominal hernia. Patient C reported to Relator that he begged for a referral to a surgeon, which Dr. Simovitz

refused. The patient brough his son in to discuss the situation, but still no referral was made. When Patient C became Dr. Zafirov's patient, she ordered imaging that revealed a partially incarcerated hernia, which can be life-threatening. Dr. Zafirov immediately referred him to a specialist for a hernia repair.

c.  Patient D was seen by Dr. Patel several times in 2018, during which worsening renal function was diagnosed as approaching stage IV (severe) kidney disease. The condition had been billed on multiple visits, but Patient D was never referred to a nephrologist. When Dr. Zafirov treated him, Patient D reported that he was unaware that he had ever been diagnosed with approaching stage IV kidney disease. Dr. Zafirov referred him to nephrology and cardiology specialists who promptly began to treat him.

d.  Patient E was examined by Dr. Patel on Sept. 6, 2018. Dr. Patel ordered imaging for screening and subsequently told Patient E that the imaging was normal. Dr. Patel commented in his note, "CT abdomen without significant findings supporting weight loss." There was no further follow-up done or referral made. When Patient E became Dr. Zafirov's patient, she reviewed the radiologist's report from the CT scan and determined that it had identified thyroid calcifications

(associated with possible malignancy), emphysema, lung nodules and heavy coronary plaque, gallbladder sludge, adrenal adenoma, renal calculi, and prostate enlargement. A number of those conditions required further imaging and/or referrals, and several could have contributed to the patient's weight loss. Dr. Zafirov promptly made referrals to the appropriate specialists.

137.    Relator also spoke directly with other physicians who indicated that the financial incentives were, in fact, considerations in their patient care decisions. For example, during an August 2019 Monthly Forum Meeting attended by most (possibly all) VIPcare physicians, Relator discussed with Dr. Esenbike Bek (North Port clinic physician) the notion that Physician Partners directed them to administer IV fluids in their offices rather than send patients to the hospital. Relator stated that she would not do so for patients with certain co-morbidities because it was too risky, particularly when there was a hospital right next door. Dr. Bek agreed, but questioned what would happen to their bonuses and wouldn't they lose the bonuses if they sent the patient to the hospital? Dr. Zafirov countered that whatever the bonus would be was not worth losing her medical license.

### iv.    Physician Partners Directed and Pressured Physicians to Use Risk Adjusting Scores

138.    Physician Partners engages with its physicians – both employed and contracted - in person, in writing, via Zoom, and through pre-recorded training

videos to convey and enforce its expected coding protocols. At various times, Physician Partners interacted with physicians directly, and at other times, its messaging was conveyed through VIPcare, Anion, and, remarkably, Freedom and Optimum. The directives have a consistent message: make more money by utilizing only risk-adjusting diagnosis codes to inflate a patients' risk score, even when such codes are inconsistent with or unsupported by the physician's medical training.

139. Physician Partners has favored conditions which it heavily emphasizes in trainings, on 5 Star Checklists, and in one-on-one "training sessions" with physicians like Relator whose diagnostic coding does not meet Physician Partner's expectations. These favored conditions include Diabetes with Manifestation (HCC018), Diabetes without Manifestations (HCC019), Malnutrition (HCC021), Morbid Obesity (HCC022), Drug/Alcohol Dependence (HCC055), Major Depressive Disorder (HCC058), Congestive Heart Failure (HCC085), Vascular Disease (HCC108), COPD (HCC111), Chronic Kidney Disease Stage 5 (HCC136), Chronic Kidney Disease Stage 4 (HCC137), and Angina Pectoris (HCC088).

140. Some or all of Physician Partners' favored conditions were suggested on many 5 Star Checklists prepared by Anion, regardless of the patient's medical history. For example, Relator reviewed sixty 5 Star Checklists prepared for her

55

patients throughout February and March 2019. For those patients, Relator found no patients for whom she found all suggested codes to be supported by clinical evidence. One patient had a risk score of 3.256 in the prior year, but her first 5 Star Checklist of 2019 had 21 conditions suggested which, if accepted by the patient's physician, would yield a total risk score of 6.052. Her capitated payment would be more than 600% of the baseline payment. The suggested codes included favored conditions HCC055, HCC108, HCC088, along with several forms of cancer that she did not have. Relator rejected 19 of the 21 codes as unsupported by clinical findings.

141.    Another patient treated by Dr. Zafirov had a risk score of 1.671 in the prior year, but the 5 Star Checklist supplied by Anion suggested 11 conditions which would have yielded a total risk score of 3.193 if submitted. The suggested codes included favored conditions HCC018, HCC058, HCC108, and HCC088, along with several cancers that he did not have. All suggestions were rejected.[2]

---

[2] For all documents used in or attached to this Amended Complaint, Relator has redacted all Protected Health Information and any other information which may potentially lead to the identity of the patient. Relator has non-redacted copies in her possession and can provide them to the Court or other parties upon request.



142. For the 60 patients represented in the sample of records from February-March 2019, Relator rejected approximately 446 of approximately 523 suggested conditions – an 85% rejection rate. With respect to the favored chronic diagnosis, for these 60 patients, Relator rejected 15 recommended diagnoses of

Congestive Heart Failure, 18 recommended diagnoses of Major Depressive Disorder, 23 recommendations of Chronic Obstructive Pulmonary Disorder, 25 recommendations of Peripheral Vascular Disease, 8 recommendations of Type 2 Diabetes, and 29 recommendations of Nonthrombocytopenic Purpura. In Relator's personal observations and experience, the rejection rate in this sample is representative of the universe of patients she evaluated using the 5 Star Checklists.

143.    In one very common and flagrant example, physicians are pressured to diagnose any patient who has ever been on an antidepressant as having Major Depressive Disorder ("MDD"), a risk-adjusting HCC which has numerous diagnostic criterial and potentially serious consequences for the future healthcare of the patient. For example, in a May 2019 "Performance Forum" (a monthly training meeting for VIPcare physicians), a VIPcare representative presented a slide which stated that there had been 110 instances in which a patient had a score of five or higher on a standardized Patient Health Questionnaire ("PHQ-9") but MDD had not been diagnosed. The MDD care gaps were identified this as a "rework trend," meaning that the code need to be addressed and revised.

144.    However, the industry standard – consistent with the guidance provided by the PHQ-9 test-makers – is that a patient must have a PHQ-9 score of 10 or higher before MDD is even *considered*. A score of five is typically associated

with mild depression at most, and mild depression is not a risk-adjusting diagnosis.

145. Through Physician Partners' Q360 electronic records system, Relator had access to reports which showed the frequency with which other VIPcare physicians diagnosed the favored conditions, including major depressive disorder. These reports indicate that the result of Defendants' concerted effort to increase diagnosis of risk-adjusted conditions is that many VIPcare patients have been diagnosed with serious medical conditions at far greater rates than the Medicare population at large.

146. For example, with respect to Major Depressive Disorder, the prevalence among Medicare beneficiaries is about 4%, meaning four of every 100 patients suffer from the condition. Diniz, B., *Major Depressive Disorder in Older Adults,* accessed at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4615590/ (2014). However, many of the VIPcare physicians diagnosed the condition with far greater frequency – some as much as eight or nine times as often:

| Physician | Prevalence of MDD in 2017 & 2018 |
|---|---|
| Dr. Gil Gutierrez | 25% |
| Dr. David Hunt | 14% |
| Dr. Auxi Peachy | 23% |
| Dr. James Goskowski | 30% |
| Dr. Claudine Fredericks | 29% |
| Dr. John Watson | 16% |
| Dr. Stephen Seecharan | 25% |
| Dr. Myriam A.E. Miller | 31% |

| | |
|---|---|
| Dr. Charles Powers | 10% |
| Dr. Veronica Machado | 31% |
| Dr. Paula Gregory | 16% |
| Dr. Jerome Lopez | 24% |
| Dr. Lawrence Campo | 12% |
| Dr. Jose Llamas | 25% |
| Dr. Rodger Rothenberger | 23% |

147.    In another avenue to influence its providers' coding, Physician Partners uses its Anion chart reviewers to falsely modify patients' "Problem Lists" in their charts to influence treating physicians to agree to suggested diagnosis codes. Problem Lists are a specific section of a patient's medical record where the physician can keep a working diagnostic list. In Dr. Zafirov's experience, the Problem List is a way for physicians to make notes for themselves to review when the patient returns. It may also be a way for physicians to communicate with other physicians in the same practice who may take over the patient's care or see the patient if the PCP is unavailable.  It serves as a quick-view list of a patient's medical condition that a physician *should* be able to rely on at the start of a patient visit without needing to review the entire medical chart every time. Because of the importance of an accurate problem list, no one should make additions, removals, or any other edits to the problem list other than the treating physician.

148.    The Problem List is housed in the patient's eClinicalWorks medical record, not in the Q360 billing system. The Problem List has nothing to do with

billing and there is no valid reason for a billing representative to have the ability to edit it.

149.    Codes entered into the Problem List are not yet claims submitted for payment to an insurer or the United States, so the entrance of unsupported codes on the Problem List is not, in and of itself, a false claim. However, entering codes to appear as though another physician has already diagnosed those codes has the intended purpose of pushing the next physician towards those codes rather than allowing the physician to evaluate the patient with a clean, or at least accurate, slate.

150.    Dr. Zafirov identified several occasions where dozens of suggested codes were added to a patient's problem list by various individuals and then removed shortly thereafter by the treating physician because the codes were unsupported by clinical evidence. While the Problem List shows the name of the person who entered the code, it does not say whether that person is a physician or not. However, Dr. Zafirov determined that the individuals who entered the codes were non-physician Anion representatives.

   a.    For example, Dr. Zafiov was seeing patients for Dr. Amit Ford on or about June 25, 2019, including Patient F. In reviewing Patient F's chart to prepare for the visit, Dr. Zafirov noted that Dr. Ford had removed fourteen conditions from Patient F's Problem List. Dr. Zafirov

determined that seventeen codes, including all of the removed codes, had been entered into the Problem List by an individual named Syed Dastagir on May 9, 2019. Syed Dastagir is an employee of Anion Technologies. Of those conditions, twelve were variations on Type 2 Diabetes, some of which were internally inconsistent with one another (i.e. "Type 2 diabetes mellitus with unspecified diabetic retinopathy without macular edema" and "Type 2 diabetes mellitus with unspecified diabetic retinopathy with macular edema"). Other codes were duplicative, such as three individual codes for a right eye, left eye, and both eyes. Although Dr. Ford had removed the entries for "hypertensive heart disease with heart failure" and "unspecified diastolic (congestive) heart failure," the 5 Star Checklist for RW still listed both conditions as suggested diagnoses

| Action Taken | Code | Item Name | Item Type | Previous Value | Current Value | Modified By | Modified Date |
|---|---|---|---|---|---|---|---|
| Viewed problem list | | | | | | Ford, Anit D | 05/10/2019 16:3 |
| New record added | E11.69 | Type 2 diabetes melitus with other specified complication | | | | Dastagir, Syed | 05/09/2019 20:3 |
| New record added | E11.65 | Type 2 diabetes melitus with hyperglycemia | | | | Dastagir, Syed | 05/09/2019 20:39 |
| New record added | E11.42 | Type 2 diabetes melitus with diabetic polyneuropathy | | | | Dastagir, Syed | 05/09/2019 20:39 |
| New record added | E11.40 | Type 2 diabetes melitus with diabetic neuropathy, unspecified | | | | Dastagir, Syed | 05/09/2019 20:39: |
| New record added | E11.36 | Type 2 diabetes melitus with diabetic cataract | | | | Dastagir, Syed | 05/09/2019 20:39: |
| New record added | E11.3313 | Type 2 diabetes melitus with moderate nonproliferative diabetic retinopathy with macular edema, bilateral | | | | Dastagir, Syed | 05/09/2019 20:39:2 |
| New record added | E11.3312 | Type 2 diabetes melitus with moderate nonproliferative diabetic retinopathy with macular edema, left eye | | | | Dastagir, Syed | 05/09/2019 20:39:2 |
| New record added | E11.3311 | Type 2 diabetes melitus with moderate nonproliferative diabetic retinopathy with macular edema, right eye | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | E11.319 | Type 2 diabetes melitus with unspecified diabetic retinopathy without macular edema | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | E11.311 | Type 2 diabetes melitus with unspecified diabetic retinopathy with macular edema | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | E11.29 | Type 2 diabetes melitus with other diabetic kidney complication | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | E11.22 | Type 2 diabetes melitus with diabetic chronic kidney disease | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | H35.3232 | Exudative age-related macular degeneration of both eyes with inactive choroidal neovascularization | | | | Dastagir, Syed | 05/09/2019 20:39:25 |
| New record added | I50.30 | Unspecified diastolic (congestive) heart failure | | | | Dastagir, Syed | 05/09/2019 20:39:25 |

Page 3 of 4    View 31 - 45 of 48

| Action Taken | Code | Item Name | Item Type | Previous Value | Current Value | Modified By | Modified Date |
|---|---|---|---|---|---|---|---|
| Record removed | I11.0 | Hypertensive heart disease with heart failure | | | | Ford, Anit D | 05/10/2019 18 |
| Record removed | I50.30 | Unspecified diastolic (congestive) heart failure | | | | Ford, Anit D | 05/10/2019 17: |
| Viewed problem list | | | | | | Ford, Anit D | 05/10/2019 17: |
| Record removed | E11.69 | Type 2 diabetes melitus with other specified complication | | | | Ford, Anit D | 05/10/2019 16: |
| Record removed | E11.65 | Type 2 diabetes melitus with hyperglycemia | | | | Ford, Anit D | 05/10/2019 16: |
| Record removed | E11.40 | Type 2 diabetes melitus with diabetic neuropathy, unspecified | | | | Ford, Anit D | 05/10/2019 16:4 |
| Record removed | E11.3312 | Type 2 diabetes melitus with moderate nonproliferative diabetic retinopathy with macular edema, left eye | | | | Ford, Anit D | 05/10/2019 16:4 |
| Record removed | E11.319 | Type 2 diabetes melitus with unspecified diabetic retinopathy without macular edema | | | | Ford, Anit D | 05/10/2019 16:41 |
| Record removed | E11.29 | Type 2 diabetes melitus with other diabetic kidney complication | | | | Ford, Anit D | 05/10/2019 16:41 |
| Record removed | E11.36 | Type 2 diabetes melitus with diabetic cataract | | | | Ford, Anit D | 05/10/2019 16:40:5 |
| Record removed | E11.3313 | Type 2 diabetes melitus with moderate nonproliferative diabetic retinopathy with macular edema, bilateral | | | | Ford, Anit D | 05/10/2019 16:40:5 |
| Record removed | E11.3311 | Type 2 diabetes melitus with moderate nonproliferative diabetic retinopathy with macular edema, right eye | | | | Ford, Anit D | 05/10/2019 16:40:38 |
| Record removed | E11.311 | Type 2 diabetes melitus with unspecified diabetic retinopathy with macular edema | | | | Ford, Anit D | 05/10/2019 16:40:30 |
| Record removed | E11.22 | Type 2 diabetes melitus with diabetic chronic kidney disease | | | | Ford, Anit D | 05/10/2019 16:40:23 |
| Record removed | F13.21 | Sedative, hypnotic or anxiolytic dependence, in remission | | | | Ford, Anit D | 05/10/2019 16:39:26 |

Page 2 of 4    View 16 - 30 of 48

b. On another occasion that Dr. Zafirov was seeing patients for Dr. Ford, Patient G had an appointment scheduled for June 19, 2019. Patient G

had been a patient of Dr. Patel before being assigned to Dr. Ford's patient panel. Dr. Zafirov noted an extensive Problem List for Patient G – 6 pages long. In reviewing the list to familiarize with the patient – as it is intended– Dr. Zafirov noted that a great deal of codes had been entered by Syed Dastagir while Patient G was a patient of Dr. Patel.  Specifically, she noted that Mr. Dastagir added 27 codes to Patient G's Problem List on May 15, 2019. Dr. Patel removed or modified 24 of those added codes the same day. The 5 Star Checklist provided by Anion noted that several codes were reported in the current year, including three forms of complicated diabetes that Dr. Patel had specifically removed from the Problem List, and listed several other removed codes as suggested diagnoses.

151.    Another means by which Physician Partners provides coding guidance to its physicians is through a series of videos called "Five Star University" that is posted on their physician portal. The hours-long video series is broken into segments consistent with the Physician Partners favored diagnoses, plus additional videos for overviews of the Medicare Risk Adjustment System and Documentation Guidelines. Five Star University recordings are presented by Dr. Eric Haas, Chief Medical Officer of Physician Partners; Dr. Ford Brewer, who is

identified only as a "Career Medical Director;" and Dr. Dennis Mihale, Medical

Director of Freedom Health, as pictured below.



152. Five Star University's "Bootcamp Introduction" video directs physicians to the "Quick Coding Guide" in the Physician Partners' *Quality Training Manual*, noting "This colorful laminated tool will help you pick the right diagnosis code for specific disease conditions. We listed about 200 ICD-10 codes with their risk value." This statement is emblematic of Physician Partners' coding directive: Physician Partners represents that the Quick Coding Guide will have "the right diagnosis code," but the Guide *only* contains risk-adjusting codes.

153. The condition-specific videos primarily include guidance and case studies which focus on instructing physicians on opportunities to increase a

patient's risk score, opportunities which often are loosely connected to actual medical science or medical standards.

154.   For example, a video on vascular disease suggests that the diagnosis can be made by physical examination only, rather than the clinical standard of doppler imaging, and recommends the risk-adjusting code for peripheral vascular disease if a patient has leg pain in place of the non-risk adjusting code for "pain in the legs."

155.   A Five Star University video on morbid obesity suggests that a patient has obesity hypoventilation syndrome so long as the patient has a high BMI and sleep apnea, which is inconsistent with the American Thoracic Society's directive that the diagnosis requires additional symptoms that must be confirmed by an arterial blood gas.

156.   A Five Star University video addressing drug dependence states that a patient who had dependency issues 20 years before should *always* be considered to be in remission even if they had no recent issues. Under the risk-adjustment system, "past history" is not risk-adjusting while "in remission" is; thus, diagnosing "remission" results in extra money for the defendants, while noting the patient's past history does not.

157.   The Five Star University videos also characterize certain conditions as common in an effort to influence physicians to become comfortable frequently

66

coding conditions which are actually quite rare. For example, in a video regarding major depressive disorder, Dr. Brewster leads off by stating, "This is one of the most common, highly prevalent conditions in our senior population." This statement is simply false: minor depression may be very common, but Major Depressive Disorder is not and has specific diagnostic criteria. "The prevalence of major depressive disorder at any given time in community samples of adults age 65 and older ranges from 1-5% . . . with the majority of studies reporting prevalence in the lower end of the range." Fiske, A., et al. *Depression in Older Adults*, Annual Rev. Clin. Psychol. 2009, 5: 363-389, accessed at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2852580/; see also Para 146, *supra*.

158.    When the videos and published guidance are not successful in convincing a doctor to code in a manner which inflates risk scores, Physician Partners begins a concerted, direct effort to pressure the nonconforming physician to change their diagnostic practices. Relator was one such physician.

159.    In or around August 2019, Dr. Zafirov was required to participate in routine meetings with a then-newly-hired VIPcare Regional Director named Alex Lavin. Mr. Lavin repeatedly told Dr. Zafirov that VIPcare and Physician Partners were not happy with her coding and the level of her average MRA score, and that

she needed to change her coding practices to be consistent with the Physician Partners financial model.

160.    When Relator expressed resistance to changing her medical practice to achieve some desired financial outcome, Lavin began scheduling Relator for regular meetings – sometimes alone and sometimes with Dr. Sangeeta Hans (Chief Medical Officer of VIPcare), Emily Gallman (Senior Director of Healthcare Operations of VIPcare), Sajitha Johnson (Physician Partners Quality Analyst), and various other individuals who detailed the coding and billing practices with which she was expected to comply. In addition, Relator was required to "check in" with Lavin weekly to discuss her hospital admission rates, HEIDIS data, and her completion of 5 Star Checklists.

161.    On Aug. 21, 2019, Relator had a meeting via Zoom with Hans, Lavin, Johnson and a Physician Advisor named Kothari. Relator's nurse, Catherine Davis, attended as well. The meeting began with the presentation of a chart which compared Relator's coding prevalence to the physicians who treated that practice before her, where every area in which she had a lower prevalence than the previous physicians was marked in red. All of the conditions that were presented on the slide were Physician Partners' favored conditions. For example, the chart showed that Relator diagnosed 15 patients with drug dependency whereas it had been "previously validated" for 80 of the patients in the past; Relator diagnosed 4

with malnutrition as compared to 71 in the past; and Relator diagnosed 21 with major depression as compared to 123 in the past. Lavin and Hans made clear that they believed it was Relator who was under-coding now, not that the prior diagnoses had been improper.



162.    In the same meeting, Dr. Hans then proceeded to walk Dr. Zafirov step-by-step through risk-adjusting diagnoses which she believed Dr. Zafirov should adopt, including medical advice that was either inconsistent with Relator's medical training or blatantly wrong. For example, with respect to diabetes, Dr. Hans advised Dr. Zafirov that *all* diabetes is complicated diabetes.  This is flatly false: not only is it medically inaccurate, but there are separate codes for Diabetes

Without Complications (HCC 19), Diabetes with Chronic Complications (HCC 18) and Diabetes with Acute Complications (HCC 17).[3]

163.    The reason Dr. Hans wanted all diabetes diagnoses to be "complicated" is easily discerned:  the Risk Adjustment Factor for "Diabetes" is approximately 0.105, while the Risk Adjustment Factor for "Diabetes with [chronic or acute] complications" is 0.302 or greater — almost three times as high. A report prepared under contract for CMS for the purpose of evaluating the Risk Adjustment Model makes this point clearly:

> For example, if a beneficiary is diagnosed with uncomplicated diabetes only, his or her expenditure prediction will be relatively modest. But if a beneficiary has diagnoses for diabetes with chronic complications, congestive heart failure, vascular disease, cancer, and chronic obstructive pulmonary disease, his or her predicted expenditures will be much higher.

Pope, G., et al., *Evaluation of the CMS-HCC Risk Adjustment Model*, at 27-28 (RTI Int'l, March 2011).

164.    In that same meeting, Dr. Hans also instructed Dr. Zafirov to diagnose Congestive Heart Failure ("CHF") – a risk-adjusting diagnosis – for any patient

---

[3] Dr. Hans would go on to repeat this directive several more times. At a Weekend Training Bootcamp held on Sept. 21, 2019, Dr. Hans was discussing prevalence rates of various conditions, and stated several times that 0% of patients should have uncomplicated diabetes. At the VIPcare Annual meeting on Jan. 11, 2020, which was attended by Physician Partners senior staff and VIPcare physicians. Dr. Hans announced during a seminar that, "There should not be a patient out there that does not have a complication."

who had structural cardiac damage which was a *potential* precursor to CHF, even when the patient did not yet have actual indications of CHF. Dr. Hans's direction is expressly contradicted by Medicare guidelines which state that the submission of codes that are simply documented as suspected or possible should be avoided.

165.    Also in the same meeting, Dr. Hans repeatedly asserted that Dr. Zafirov would not be "diagnosing" the condition just because she coded it. This is palpably false, as the codes themselves are called "diagnosis codes" and the submission of the code is the only means by which a provider indicates to CMS that a patient has been diagnosed with a condition.

166.    Dr. Zafirov later asked Mr. Lavin if Dr. Hans had similar conversations with other employed physicians. Lavin confirmed she had done so several times.

167.    The following day, August 22, 2019, Mr. Lavin showed up to Relator's office in person even though he had scheduled a Zoom meeting.[4] Lavin told Relator that they had "very serious things" to discuss. Lavin – with no medical

---

[4] Lavin's demeanor in that unexpected, in-person meeting made Dr. Zafirov very uncomfortable. Relator learned days later that Lavin had a lengthy criminal history, including being incarcerated in the Florida prison system on an Aggravated Battery with a Deadly Weapon conviction. Physician Partners and VIPcare had not notified Dr. Zafirov of this and did nothing to stop Lavin from showing up after hours, unannounced, at the office of a female physician. After learning this information, Relator felt Lavin's unannounced visit to be a subtle threat that she cooperate as he requested. As a result, Dr. Zafirov increased the security at her home and took measures not to be alone in her office any longer.

background at all – argued with Dr. Zafirov about her diagnostic coding and argued that she needed to "meet in the middle" with what was expected of her. He also explained that her projected risk score for the following year would be around .7 - 1 (which, with 1 being the calculated average Medicare beneficiary's risk score, is to be expected), and that if she wanted to put money in her own pocket, that would be a factor.

168.   For the next several weeks, Dr. Zafirov was required to have regular meetings with Dr. Hans, Johnson, Lavin and occasionally Gallman, Nursing Manager Jan Morsey, or other Anion chart reviewers. The phone calls became weekly interrogations, where Dr. Hans challenged Dr. Zafirov on specific diagnoses in her charts and Dr. Zafirov was forced to repeatedly defended her medical judgment.

169.   For example, on Sept. 12, 2019, Dr. Hans chastised Dr. Zafirov for sending a patient to the emergency room instead of seeing her in the office first. Dr. Zafirov noted that the patient had acute worsening shortness of breath and a delay in care could have been dangerous. Despite having the patient's chart accessible, it was not until Dr. Zafirov pointed out that the patient had severe congestive heart failure and wore a LifeVest that Dr. Hans conceded that she had made the right choice.

170. Lavin again came to Dr. Zafirov's clinic unannounced on Sept. 26, 2019, and spoke to her for approximately 90 minutes. He said that her clinic was getting negative attention and she was being watched closely. Lavin stated that Dr. Hans and Anion chart reviewers were looking through all of Dr. Zafirov's charts and that Dr. Hans was unhappy about continuing the weekly sparring phone calls about Dr. Zafirov's coding. Lavin told Dr. Zafirov that Physician Partners has certain expectations of her and that her continued employment depended on her to "cod[ing] more aggressively" and reaching a target MRA of 1.5-1.6.

171. By telling her to "code more aggressively," Lavin made clear that Dr. Zafirov was expected to accede to the risk-adjusting diagnoses "suggested" on her patients' 5 Star Checklists.

172. Pressure steadily increased following the threat to Dr. Zafirov's job. One way this happened was the introduction of additional people into the meetings to criticize Relator's coding and persuade her to change.

173. On Oct. 16, 2019, Dr. Zafirov was required to attend a meeting with a nurse in her clinic, Catherine Davis, Sajitha Johnson, Cassidy Cooper, a Physician Partners "Quality Analyst," and Dr. Rajiv Patel, "Physician Consultant/Trainer."

174. In that meeting, Dr. Patel pushed Dr. Zafirov to find alternative risk-adjusting diagnosis codes if she did not want to diagnose their favored codes; for

example, he urged her to diagnose "mood disorder," a risk-adjustment diagnosis, rather than minor depression if she was unwilling to diagnose Major Depressive Disorder.

175.    Dr. Patel also stated to Dr. Zafirov that she should have diagnosed cardiomyopathy based on a years-old imaging result, despite the fact that the patient in question was under the care of a cardiologist who had made no findings of cardiomyopathy. Dr. Patel stated to Dr. Zafirov, "We [primary care physicians] don't look at the notes of cardiology to make our diagnoses."

176.    On Nov. 6, 2019, Relator was required to attend a 90-minute meeting with Emily Gallman and Dr. Eric Haas, Chief Medical Officer of Physician Partners.

177.    Given Dr. Haas's position, Dr. Zafirov relayed to him her concerns about delayed referral approvals by Freedom when she referred to an outside specialist, as well as missing records transmitted by Anion to the primary care physicians from specialists. Dr. Haas asserted that Physician Partners' Preferred Providers were "better" because they were more cost-efficient and have lower hospital admissions. Dr. Haas provided Dr. Zafirov with a list of specialists who he wanted her to use because they use surgery centers instead of hospitals. This list was provided to Physician Partners by Freedom.

178.   Dr. Haas also criticized Dr. Zafirov for not administering a drug, Procrit, to her end-stage renal disease patients rather than referring such patients to a nephrologist. Procrit should always be administered under the supervision of a nephrologist for end-stage renal disease patients. Dr. Haas advised her that other VIPcare physicians were administering Procrit in their clinics, a decision that would allow those physicians to reduce expensive specialist costs and increase the physicians' potential bonus payments.

179.   Dr. Haas provided Dr. Zafirov with a list of the patients he viewed to be her most high-cost, high-risk patients who had recently been to the hospital to review how she had managed their care and coded their diagnoses. Dr. Haas reviewed five patients in depth with Dr. Zafirov, in response to which she identified clinical findings that he had ignored and repeated her explanation as to why she rejected conditions that were inconsistent with her evaluation of the patient.

**B.  ALLEGATIONS AGAINST FREEDOM AND OPTIMUM.**

180.   The conduct of Physician Partners, VIPcare and Anion which led to the submission of false claims was only possible because of the Providers' close relationship with Freedom and Optimum, the MAOs responsible for approximately 90% of the Providers' enrolled patients. Freedom and Optimum's role in the submission of these false claims comes not only from their failure to

conduct appropriate oversight Physician Partner's submitted claims, but from the MAOs' role in the operation of Physician Partners.

181.    The role of Freedom and Optimum as gatekeepers to the providers' access to Medicare and Medicaid funds is precisely delineated in the regulatory regime. CMS requires as "a condition for receiving a monthly payment," that a Medicare Advantage insurer,

> agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract [with CMS] on a document that certifies (based on best knowledge, information, and belief), the accuracy, completeness, and truthfulness of relevant data that CMS requests. Such data include specified enrollment information, encounter data, and other information that CMS may specify.

42 CFR § 422.504(l). The signatory must certify that "the information relied upon by CMS in determining payment (based on best knowledge, information and belief) is accurate, complete, and truthful. 42 CFR 422.504(l)(1).

182.    Freedom and Optimum convey the regulations to providers through a jointly published and distributed *Medicare Provider Manual* ("*MPM*") which bears the logos of both entities on its face and which collectively refers to the two health plans as "we" throughout. Accordingly, all statements made in the *MPM* implicate the knowledge of both defendants without distinction. The *Medicare Provider Manual* acknowledges, *inter alia*, that:

   a. A claim submitted to an intermediary, such as a managed care organization, is included in the definition of a claim "submitted to the government" (pg. 23);

   b. Liability to the Government attaches not only from the submission of false claims but from the improper retention of an overpayment (pg. 23).

   c. Indicators of fraud, waste and abuse include upcoding, the use of fictitious providers, and statistical outliers (pg. 28);

   d. In the Medicare Advantage context, the "claim" is the encounter data submitted after a patient visit (pg. 82).

183. Despite Freedom and Optimum's knowledge of their obligations to the United States, the entities developed a unique relationship with Physician Partners – the provider group run by Sidd Pagidipati, the MAOs' former Chief Operating Officer who paid $750,000 in 2017 to resolve False Claims Act violations related to his conduct and management of the entities.

184. Far from a third-party claims reviewing and processing entity, Freedom took an active role in the operations of Physician Partners including educating physicians on Physician Partners' coding expectations, allowing Physician Partners' physicians access to the Freedom billing portal to review codes submitted to CMS and the patients' running MRA scores, and contacting patients

on behalf of VIPcare to schedule visits. In return, Physician Partners not only increased the profitability of Freedom by submitting inflated risk adjustments, but also allowed Freedom access to its patient records for the purpose of contacting non-Freedom patients to persuade the patient to change their MAO.

185.   With respect to training, Freedom presented a united force with Physician Partners in the Five Star University video series, described above. In particular, Dr. Dennis Mihale, in his capacity as the Medical Director of Freedom Health Plans, provided commentary for several hours over a series of more than a dozen videos, offering both general commentary on coding and specific advice on the discussed conditions.



186.   In his introduction, Dr. Mihale tacitly implies that coding supersedes medical education and experience, stating, "In medical school, we will say,

'history of' because we weren't trained in coding." He continues by suggesting that the physician could just be a bit creative with the coding to achieve a risk adjustment: "Sometimes, you say 'history of,' you just can't do it. But if you put a comma there and say 'active,' then we've done the right kind of coding." In making such an assertion, Dr. Mihale conveyed to the entire 500+ Physician Partner physician network that it is appropriate in Freedom's perspective to code a past condition as active just by "put[ting] a little comma there."

187.   Notably, Dr. Mihale also suggested that physicians may alter their documentation to satisfy certain codes for the purposes of risk adjusting. For example, Dr. Mihale stated that dementia may become a risk-adjusting code the following year and that if it is "we're going to share it with you and then you can adjust your documentation properly." This either presupposes that physicians are not currently documenting their patient's conditions accurately because the disease is not risk adjusting (contrary to standards of medical care) or that the physicians will change their documentation to satisfy different criteria once a code becomes risk-adjusting.

188.   Dr. Mihale participated in offering guidance throughout the entire Five Star University video series, either by affirmatively giving coding guidance or by agreeing with the guidance offered by Drs. Haas or Brewster. Because of his

role, it was clearly conveyed to all of Physician Partners' physicians that the guidance presented in Five Star University is endorsed and approved by Freedom.

189.   Freedom also provided coding guidance directly to Physician Partners physicians through written mailers which emphasized the use of risk-adjusting codes in place of less severe, non-risk-adjusting conditions. For example, a mailer of a "case study" related to "Alcohol Abuse vs Alcohol Dependence" identified that the "ICD-10 classifies alcohol and drug dependence as use, abuse and dependence. but it does not provide guidance as to when each condition is proper. Rather, the graphic shows two alternative coding options – one with a risk-adjusting HCC for alcohol dependence and one with a non-risk-adjusting code for alcohol abuse; it describes use of the latter as a "common error."

| ICD-10-CM Codes:<br>Using the above documentation | Part C:<br>HCC Weight |
|---|---|
| Alcohol Dependence, Uncomplicated (F10.20) | 0.383 (HCC 55) |
| Alcoholic Liver Damage Unspecified (K70.9) | 0.390 (HCC 28) |
| | Total: 0.773 |

**Below are Common errors in documenting Alcohol Dependence:**

| ICD-10-CM Codes:<br>Incorrect Coding | Part C:<br>HCC Weight |
|---|---|
| Alcohol Abuse Uncomplicated (F10.10) | 0 |
| Alcoholic Liver Damage (K70.9) | 0.390 (HCC 28) |
| | Total: 0.390 |

190.    Freedom's coding guidance is complimented by Freedom allowing Physician Partner's physicians to access to Freedom's online billing portal, the MRA/HEDIS Portal. Physicians had access to several different parts of the portal, including patient specific charts identifying the codes that had been submitted for a patient in the current year and in past years along with the dates of service for the past submissions, as well as a report that showed every patient in the physician's Freedom panel with their running MRA scores for the past year, current year, and the score predicted for the following year, as well as the decrease year-over-year (if any).

191.    In return for Freedom's guidance and open access to its billing records, Physician Partners encouraged its physicians to actively engage with Freedom insurance agents in manners wholly unique to Freedom as compared to any other MAO. For example, on Sept. 19, 2019, a bus of approximately 20 Freedom agents arrived at Relator's office, guided by a Physician Partners representative. The Freedom agents included regional insurance agent Danny Stearns. The year prior, Dr. Rand Hans, Regional Director of Operations for VIPcare, and Stearns asked approached Dr. Zafirov and her nurse, asking for Stearns to be granted access to Dr. Zafirov's non-Freedom patient list and for Dr. Zafirov to provide contact information for each patient. Dr. Hans and Stearns were

clear that the information would be used for Stearns could visit the patients in their homes or in Dr. Zafirov's office in an effort to convert them to a Freedom patient.

192.   Physician Partners never brought representatives of any other MAO to Dr. Zafirov's office, never asked her to give access to her patient information to any other MAO, and never encouraged her to hold meet-and-greets with agents who enrolled patients in other MAOs. These were services only provided by Physician Partners to Freedom and Optimum.

193.   For the patients already on the Freedom panel, Freedom took an active role in helping manage Physician Partner's patient care. For example, Physician Partners and Freedom both financially benefited by physicians completing HEIDIS data for each patient, but such data could only be completed at an in-person patient visit and not every patient needed to be seen every year. Relator agreed to try to reach a patient a few times to get them to come in, but if they did not have any medical needs, she was not willing to harass the patient to come in. However, if Freedom determined that HEDIS data had not been captured for a patient in a calendar year, Freedom would repeatedly call the patient on VIPcare's behalf until the patient acquiesced and scheduled a visit.

194.   In addition to Freedom's active role in guiding the coding practices of Physician Partners' physicians, Freedom had or should have had actual knowledge of the policies and practices at Physician Partners which caused false

claims to be made. For example, on Jan. 9, 2020, Dr. Zafirov had a phone call with Dr. Hans, Alex Lavin and Emily Gallman wherein Dr. Zafirov raised a variety of concerns, including both Freedom and Physician Partners' refusals to accept referrals to non-preferred specialists. Dr. Hans stated to Dr. Zafirov that they (meaning the VIPcare administrators) held weekly meeting with Freedom and would discuss the issue then. Based on other conversations with Lavin, Dr. Zafirov understood this to be the standard procedure when a physician made a complaint – reach out to Freedom and handle the conversation together.

## VIII. DEFENDANTS KNOWINGLY SUBMITTED OR CAUSED TO BE SUBMITTED FALSE OR FRAUDULENT CLAIMS

195. By their conduct alleged in this complaint, each Defendant knowingly presented or caused to be presented, false or fraudulent claims; knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim; knowingly made, used or caused to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government; and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money to the United States.

196. The terms "knowing" and "knowingly" are defined by the False Claims Act to mean that, with respect to information, a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the

information." 31 U.S.C. § 3729(b)(1). Knowledge under the False Claims Act does not require proof of a specific intent to defraud. *Id.*

197. All of the Defendants knew that the intended and foreseeable consequence of their fraudulent scheme was the overpayment of claims submitted to the United States pursuant to the Medicare Advantage program.

198. Defendants knew that truthful submission of encounter data, including diagnosis codes, is material to Medicare's decision to pay claims and is a material requirement of Freedom and Optimum's contract with the United States, which requirements flowed to Physician Partners, Anion and VIPcare as first-tier or related entities. Defendants knew that the falsification of diagnosis codes directly affects the amount of reimbursement under the MA Program and renders the claim, via the encounter data, factually false.

199. As alleged throughout this complaint, each Defendant acted with actual knowledge that the diagnoses codes submitted by Physician Partners, through Anion on behalf of VIPcare and other contracted and affiliated providers, to Freedom and Optimum, and from Freedom and Optimum to the United States, were not accurate, complete and truthful and were, in fact, factually false.

200. Alternatively, each Defendant acted with deliberate ignorance or reckless disregard as to the truth or falsity of the diagnoses codes submitted by Physician Partners, through Anion on behalf of VIPcare and other contracted and

affiliated providers, to Freedom and Optimum, and from Freedom and Optimum to the United States.

201.   As a result of the conduct alleged in this complaint, Defendants submitted and caused to be submitted false claims, examples of which are identified below.

## IX.   EXAMPLES OF SPECIFIC FALSE OR FRAUDULENT CLAIMS SUBMITTED OR CAUSED TO BE SUBMITTED

### A.   Claims Submitted Where Source of Diagnosis Code was Changed to Anonymous "Physician"

202.   The following patients are examples where a diagnostic code was listed on a 5 Star Checklist as a code that was submitted for the current year with "Current PCP" listed as the source of the diagnostic code. For each of the listed examples, Dr. Zafirov was the "Current PCP" and did not submit the code. When Dr. Zafirov marked on a subsequent 5 Star Checklist that the patient did not have that condition and/or that she did not submit the code, Defendants did not remove the code but instead changed the source simply to "Physician" – a designation which indicates a physician other than the patient's current primary care provider.   However, the records show that the codes were originally represented as being submitted by Dr. Zafirov and there were no other physicians that treated the patients or provided the code in question. For clarity, select 5 Star Checklists or screenshots from each patient's medical records are identified and

attached hereto as Exhibits to provide a step-by-step illustration of the changed documentation.

## **Patient H**

203.    Patient H was a 73-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP Savings (HMO SNP) plan. The following documents are associated with Patient H:

1. **Exhibit 1-H1**: Screenshot of Patient H's "PCP Encounter & PCP Claims" log from May 31, 2018
2. **Exhibit 1-H2**: Screenshot of Patient H's "PCP Encounter & PCP Claims" log from January/February 2019
3. **Exhibit 1-H3**: March 25, 2019 5 Star Checklist
4. **Exhibit 1-H4:** Screenshot of Paid Claims for 2019
5. **Exhibit I-H5**: April 2019 Five Star Form
6. **Exhibit 1-H6**: Subsequent Five Star Form
7. **Exhibit I-H7**: Dr. Barry Weckesser Cardiology Report from March 12, 2019
8. **Exhibit 1-H8**: Freedom Health Member Health Profile

204.    Patient H was previously a patient of Dr. Akhil Patel. Patient H's records show that the diagnostic code for congestive heart failure (HCC 085 / ICD I50.30) was submitted under Dr. Patel's name on May 31, 2018.  **Exhibit 1-H1.**  Dr. Patel treated Patient H again in January 2019 for knee pain.  He submitted a non-risk-adjusting code for hypertension, but did not code any HCCs at that time. **Exhibit 1-H2.**

205.    Dr. Zafirov saw Patient H on March 25, 2019, in follow-up to a January 2019 general physical. At that time, Dr. Zafirov marked "no" next to the suggested

86

code for HCC 085, "unspecified diastolic (congestive) heart failure" on the 5 Star Checklist submitted by Anion. **Exhibit 1-H3.**

206.    Despite Dr. Zafirov's rejection of the "proposed" congestive heart failure diagnosis, Patient H's billing record, under "PCP Encounters & PCP Claims," reflect that the code for congestive heart failure was submitted for payment under Dr. Zafirov's name on Feb. 25, 2019 (which appears to be a scrivner's error for March 25, 2019, when Patient H was actually seen). *See* **Exhibit I-H2.**  It is listed as a "paid code" for 2019, along with a notation that it was reported four times the previous year (while Patient H was a patient of Dr. Patel) but not in the five years before that. **Exhibit I-H4.**

207.    Dr. Zafirov saw Patient H again on April 17, 2019.  By that time, HCC 085 for "unspecified diastolic (congestive) heart failure" was on the 5 Star Check List as a "condition already reported in the current year" with the listed source of "Current PCP" (who was Dr. Zafirov) and both the first and last date of service as Feb 25, 2019 (again, assumed to be a scriver's error as Dr. Zafirov saw Patient H on March 25, 2019, not February 25, 2019).  Dr. Zafirov marked "No and should be <u>removed</u>" on the 5 Star Checklist next to that entry and returned the form. **Exhibit I-H5** (emphasis in original).

208.    Rather than remove the code as ordered by Dr. Zafirov, a subsequent 5 Star Checklist, dated Aug. 12, 2019, still identified HCC 085, "unspecified

diastolic (congestive) heart failure," as a reported condition. **Exhibit 1-H6.** However, the source was changed from "Current PCP" simply to "Physician" and the last date of service was changed to March 12, 2019, a date on which Dr. Zafirov did not see Patient H.

209. Patient H did see a physician on March 12, 2019 – Dr. Barry Weckesser, a cardiologist with The Heart Institute of Venice. Dr. Weckesser conducted a full cardiac assessment and his notes are in Patient H's medical record. **Exhibit 1-H7.** While Dr. Weckesser notes his impressions of hypertension, mild carotid artery disease, insulin dependent diabetes and mitral insufficiency, he does not diagnose or even mention congestive heart failure anywhere in his notes. There is no indication anywhere else in Patient H's medical file of any physician diagnosing her with congestive heart failure that year.

210. Through the access to the Freedom MRA/HEDIS Portal granted by Freedom to the Physician Partners' physicians, Dr. Zafirov observed that the false code from Physician Partners for HCC085, Unspecified diastolic (congestive) heart failure, was submitted by Freedom to the CMS with the date of service March 12, 2019. **Exhibit 1-H8.**

211. The initial submission of a claim for congestive heart failure for Patient H was a false claim which fraudulently represented that Dr. Zafirov made that diagnosis. This false claim was submitted for payment to Freedom by Anion

on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

212. Physician Partner's decision to falsify the coding source rather than to submit correct records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect resulted in a false record used to conceal an obligation under the Overpayment Rule.

## Patient I

213. Patient I was an 81-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP (HMO SNP) plan. The following documents are associated with Patient I:

1. **Exhibit 2-I1**: January 2019 Five Star Form
2. **Exhibit 2-I2**: April 2019 Five Star Form
3. **Exhibit 2-I3**: Screenshot of Paid Claims for 2019
4. **Exhibit 2-I4**: April 26, 2019 Five Star Form

214. Patient I was a frequent patient of Dr. Zafirov. Dr. Zafirov discussed his physical history with him at length and reviewed the entirety of his medical chart. Patient I had prostate cancer in 1999 – more than twenty years ago – which was resolved without need for further therapy. He has not had any active cancer since that time.

215. Dr. Zafirov first saw Patient I on January 31, 2019. The attendant 5 Star Checklist provided by Anion, **Exhibit 2-I1,** identified Dr. Akhil Patel as the Current PCP because this was Patient I's first visit since he was placed into Dr.

89

Zafirov's patient panel. The 5 Star Checklist suggested HCC012 ("Breast, Prostate, and Other Cancers and Tumors") with the specific diagnosis of ICD-10 C61, "Malignant neoplasm of prostate." The source of the code was "Past History," and the 5 Star Checklist showed that the HCC was reported twice in 2017 and four times in 2016. Dr. Zafirov wrote "No in remission" next to the risk-adjustment code. **Exhibit 2-I1.**

216.   Dr. Zafirov saw Patient I on April 26, 2019. For that visit, Anion provided a 5 Star Checklist which had the HCC 012 risk-adjustment bubble greyed in; included the associated MRA risk-adjustment score of .154 on the progress bar at the top of the form. Under the heading "BELOW CODES/CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR," Anion had listed "Malignant neoplasm of prostate" as assigned on a date of service of April 2, 2019, and the source for the submitted diagnosis was "Current PCP," meaning Dr. Zafirov, who was then the established PCP. **Exhibit 2-I2.**

217.   Dr. Zafirov did not treat Patient I on April 2, 2019, and the patient's medical record did not document any physician visit on that or any other date between January 31, 2019 and the visit of April 26, 2019. Thus, there is no evidence of any medical care which could have given rise to a diagnosis of prostate cancer for Patient I on April 2, 2019. Dr. Zafirov did not assign that diagnosis code on any other day either.

218.    Dr. Zafirov consulted Physician Partners' billing records and determined that the HCC012 code was identified as "Paid" for 2019.  **Exhibit 2-I3.**

219.    In or about August 2019, Dr. Zafirov reviewed the then-current 5 Star Checklist for Patient I.  **Exhibit 2-I4**.  The code for "malignant neoplasm of prostate" was still on the form, and the date of service was still April 2, 2019. However, the "Source" column was altered to read "Physician" instead of "Current PCP."  *Id*.  There is nothing in Patient I's medical record that indicates that any physician other than Dr. Zafirov saw Patient I – much less diagnosed him with prostate cancer – in April 2019 (or any other time since 1999).

220.    The submission of a claim for prostate cancer for Patient I was a false claim which fraudulently represented that Dr. Zafirov made that diagnosis. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

221.    Physician Partner's decision to falsify the coding source rather than to submit correct records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect resulted in a false record used to conceal an obligation under the Overpayment Rule.

## Patient J

222.    Patient J was a 72-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP Savings (HMO C-SNP) plan. The following documents are associated with Patient J:

1. **Exhibit 3-J1**: Dr. Andy Trotti Oncology Report
2. **Exhibit 3-J2**: January 2019 Five Star Form
3. **Exhibit 3-J3**: May 2019 Five Star Form
4. **Exhibit 3-J4**: Subsequent Five Star Form
5. **Exhibit 3-J5**: Screenshot of Paid Claims for 2019
6. **Exhibit 3-J6**: Freedom Health Member Health Profile

223.    Patient J is a 72-year-old who had tonsil cancer in 2017. By 2019, his cancer was in remission and he was in overall good health. On Jan. 3, 2019, Patient J visited his oncologist, Dr. Andy Trotti, for a follow-up examination. Dr. Trotti's report states that he found "No evidence of disease." **Exhibit 3-J1.** Follow-up visits after a cancer is in remission do not generate HCC risk-adjusting codes.

224.    Dr. Zafirov first examined Patient J on January 21, 2019.  The 5 Star Checklist associated with his initial visit listed five "suggested" diagnoses under "HCC 011 – Colorectal, Bladder and Other Cancers," including ICD C09.9 for "Malignant neoplasm of tonsil, unspecified" which had been reported 82 times in 2017 and 8 times in 2018 with a source of "Current PCP."  Because Patient J had not been formally transferred to Dr. Zafirov's patient panel yet, the reference to "Current PCP" at that time meant Dr. Patel. There were also suggested diagnoses of other forms of tonsil cancer, bladder cancer, and a general "malignant neoplasm of head, face and neck." Dr. Zafirov marked "No" next to all of the suggested

cancer diagnoses, and wrote "No, now in remission" with brackets next to the first two codes for throat cancer.  **Exhibit 3-J2.**

225.    Dr. Zafirov next examined Patient J on May 21, 2019.  A new 5 Star Checklist was provided by Anion. The bubble for HCC011 – the cancer diagnosis code - was colored in and the risk-adjustment bar was increased by .317, which is the risk adjustment for HCC 011.  **Exhibit 3-J3.**  There were no conditions on the list for "conditions already reported in the current year" but all of the HCC 011 codes had been removed from the suggested diagnosis code list.

226.    On or about August 11, 2019, Dr. Zafirov reviewed the then-current 5 Star Checklist for Patient J.  At that time, under the heading "BELOW CODES/CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR," Anion had listed "Malignant neoplasm of tonsil, unspecified" as assigned on a first date of service of Jan. 3, 2019, and a last date of service as June 6, 2019. **Exhibit 3-J4.**  The source of the code had been changed from "Current PCP" to "Physician Hospital."

227.    The billing section of Patient J's electronic medical record shows HCC 011 with five different ICD codes for tonsil cancer and bladder cancer as "paid" for 2019.  **Exhibit 3-J5.**  Moreover, the Freedom Health Member Health Profile for Patient J reflects that the code for "Malignant neoplasm of tonslar fossa" was submitted from Freedom to CMS, most recently with a date of service of Jan. 13,

2020. However, as of the time that Dr. Zafirov left VIPcare, there was no documentation in Patient J's medical record to suggest that he had been diagnosed with tonsil or bladder cancer in 2019 and he was not receiving any treatment for cancer at his last visit with Dr. Zafirov.

228.   The submission of a claim for cancer for Patient J was a false claim which fraudulently represented that an anonymous "Hospital Physician" made that diagnosis. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

229.   Further, Physician Partner's decision to falsify the coding source rather than to submit correct records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect resulted in a false record used to conceal an obligation under the Overpayment Rule.

## Patient K

230.   Patient K was an 80-year-old Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP Savings (HMP SNP) plan. The following documents are associated with Patient K:

1. **Exhibit 4-K1**: Screenshots of PCP Claims and PCP Encounters listed in Dr. Patel's name for January 2019
2. **Exhibit 4-K2**: January 2019 Five Star Form
3. **Exhibit 4-K3**: Dr. Zafirov's Notes on January Five Star Form
4. **Exhibit 4-K4**: Screenshot of PCP Claims and PCP Encounters for 2019

    5.  **Exhibit 4-K5**: April 2019 Five Star Form
    6.  **Exhibit 4-K6**: Screenshot of Paid Claims for 2019
    7.  **Exhibit 4-K7**: May 2019 Five Star Form
    8.  **Exhibit 4-K8:** Subsequent Five Star Form
    9.  **Exhibit 4-K9**: Freedom Health Prospective Possible Condition Report

231.   Patient K is an 80-year-old who had been a patient of Dr. Rick Simovitz, a Freedom provider before becoming a patient of Dr. Akhil Patel at VIPcare. She officially became part of Dr. Zafirov's panel in Feb. 2019, but Dr. Zafirov first treated her in Jan. 2019 and several times subsequently since then. The PCP Encounters and Claims records list Dr. Patel as the PCP who submitted codes in January 2019 (**Exhibit 4-K1**), but 5 Star Checklist from January 7, 2019, was submitted by Dr. Zafirov, indicating that some of the visits where Dr. Zafirov saw Patient K may have been documented under Dr. Patel's name

232.   The 5 Star Checklist provided by Anion in January 2019 suggested three codes related to peripheral vascular disease (HCC108), all of which were billed in 2018, even though Dr. Patel's 2018 note establishing patient care makes no mention of this condition. **Exhibit 4-K2.** Dr. Zafirov did not find support for any of the diagnoses on the 5 Star Checklist, and she noted "no mention in cardiology notes, no u/s result" on the personal notes she made on another version of the form.  **Exhibit 4-K3.**

233.   Dr. Zafirov treated Patient K again on Feb. 25, 2019. The PCP Encounter and Claims data from that day reflect a code of HCC 018, ICD I70.201,

"unspecified atherosclerosis of native arteries of extremities, right leg" in Dr. Zafirov's name. **Exhibit 4-K4**. However, peripheral vascular disease cannot be diagnosed without diagnostic tests which Dr. Zafirov did not perform and Dr. Zafirov did not diagnose Patient K with that condition.

234.    An April 18, 2019, 5 Star Checklist listed HCC 018, ICD I70.201, "unspecified atherosclerosis of native arteries of extremities, right leg," as a "condition already reported in the current year" with first and last date of service of Feb. 25, 2019 and a source of "Current PCP," meaning Dr. Zafirov. **Exhibit 4-K5**. HCC 018, ICD I70.209, "unspecified atherosclerosis of native arteries of extremities, unspecified extremity," was listed for the same dates of service but with a source of "Other Provider." Physician Partners claimed not to have received the 5 Star Checklist that Dr. Zafirov submitted in April 2019, and she had to resubmit a 5 Star Checklist for the April visit later in the year. *See* **Exhibit 4-K5**, date line

235.    Both codes are listed in Patient K's billing record as paid in 2019. **Exhibit 4-K6.**

236.    Shortly after Dr. Zafirov resubmitted the form, Anion began changing the "source" of the unsupported atherosclerosis diagnosis. In or about May 2019, a the 5 Star Checklist for Patient K showed that the "unspecified extremity" code

was removed completely, but four other conditions were changed from a generic "physician" or "physician hospital" to "Current PCP." **Exhibit 4-K7.**

237. In or about August 2019, another 5 Star Checklist reflected that Anion changed the "source" once again, making it appear as though some other physician made the diagnosis. The code for "unspecified atherosclerosis of native arteries of extremities, unspecified extremity" that was previously removed has been added back, still with a source of "other provider" but on the same date that Dr. Zafirov rendered services to Patient K. **Exhibit 4-K8.**

238. Through the access to the Freedom MRA/HEDIS Portal granted by Freedom to the Physician Partners' physicians, Dr. Zafirov observed that the Prospective Possible Condition Report (which reflects possible HCCs for each patient based on conditions that were submitted from Freedom to CMS in the past) showed that the HCC for Vascular Disease was "submitted previously" to CMS with a date of service of 02/25/2019 – the same date and code which was falsified by Physician Partners with repeatedly-changing "sources." **Exhibit 4-K9.**

239. The submission of a claim for unspecified athlerosclerosis for Patient K was a false claim which fraudulently represented various sources diagnosed the unsupported code, when none actually did. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

240.   Further, Physician Partner's decision to falsify the coding source rather than to submit correct records to remove the code resulted in a false record used to conceal an obligation under the Overpayment Rule.

### B.   Codes Submitted in Relator's Name After She Said No or Expressly Notified of Inaccuracy

241.   The following patients are examples where a code was submitted in Dr. Zafirov's name and was left on the patient record even after Dr. Zafirov has expressly stated on a 5 Star Checklist or by email that the code is inaccurate.  In these examples, Dr. Zafirov did not initially enter the diagnosis codes, but rather an Anion billing representative appended them following chart reviews.

### Patient L

242.   Patient L was an 81-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Optimum Diamond Rewards (HMO SNP) plan. The following documents are associated with Patient L:

1. **Exhibit 5-L1**: Dr. Zafirov's Progress Note from January 2019
2. **Exhibit 5-L2**: January 2019 Five Star Form
3. **Exhibit 5-L3**: Screenshot of PCP Encounters and PCP Claims
4. **Exhibit 5-L4**: Dr. Zafirov's Progress Note from February 2019
5. **Exhibit 5-L5**: Subsequent Five Star Form
6. **Exhibit 5-L6**: Screenshot of Paid and Excluded Claims for 2019

243.   Patient L was a patient of both Dr. Patel and Dr. Simovitz before being assigned to Dr. Zafirov's patient panel. Dr. Zafirov treated Patient L on January

23, 2019. Dr. Zafirov's progress note from that visit states, "Patient has a past diagnosis of diabetes however at the time of diagnosis in 16 hemoglobin A1C not seen above 6.5." **Exhibit 5-L1**. Under the detailed notes assessing that condition, Dr. Zafirov wrote, "Question initial diagnosis since patient does not follow any particular diet, eats what he wants and maintains his blood sugars with minimal effort. Patient has never had a hemoglobin A1C greater than 6.5."

244. The 5 Star Checklist provided by Anion for Patient L's January 2019 visit recommended three codes for HCC 018, Diabetes with Chronic Complications, but none for uncomplicated diabetes. Based on her clinical findings, Dr. Zafirov wrote "no" next to each of the suggested codes and included, "awaiting lab confirmation" on ICD E11.40, "Type 2 diabetes mellitus with diabetic neuropathy, unspecified." **Exhibit 5-L2.**

245. Despite Dr. Zafirov writing "no" on the submitted 5 Star Checklist, the PCP Encounter and Claims section of the patient's Physician Partners billing records reflected that the ICD code E11.65 for "Type 2 diabetes mellitus with hyperglycemia" was submitted to Optimum, with the source for this code noted as "progress notes" indicating that an Anion representative scanned Dr. Zafirov's progress notes and pulled the code from there. **Exhibit 5-L3**.

246. Dr. Zafirov treated Patient L again on Feb. 25, 2019. At that time, she wrote in the progress notes, "We did check a fasting glucose tolerance test with

labs to confirm diabetes which patient showed to have a glucose level in the 200s as the 1 hour mark." In the detailed notes, Dr. Zafirov diagnosed Patient L with "Type 2 diabetes mellitus *without complication*, without long-term use of insulin" (emphasis supplied) and noted "Well-controlled hemoglobin A1C in normal range." She did not include any mention of any complicating factors. **Exhibit 5-L4**.

247. Despite Dr. Zafirov's notations in January, the 5 Star Checklist for Patient L as of August 2019 showed *both* HCC 018 for "Type 2 diabetes mellitus with hyperglycemia" *and* HCC 019 for "Type 2 diabetes mellitus without complications" as conditions reported in 2019. **Exhibit 5-L5.**

248. Although the two codes are contradictory, Physician Partners did not remove the HCC 018 code for diabetes with a complication. Rather, the 5 Star Checklist provided by Anion still lists the date of service as Jan. 23, 2019, with Current PCP as the source. However, HCC 019 for uncomplicated diabetes is *also* listed with a date of service of Feb. 25, 2019, with Current PCP as the source – this second code is correct and should be the only one reported in 2019.

249. The billing records reflected in Physician Partner's electronic medical records reflect that that is not a possibility to bill for both complicated and uncomplicated diabetes. CD's records show that the correct code of HCC019 (diabetes without complications) is an "excluded code" because HCC019 (diabetes

with chronic complications) – the far more expensive but false code - was also submitted and paid for 2019. **Exhibit 5-L6.**

250.    The submission of a claim for Type 2 diabetes mellitus with hyperglycemia was a false claim because it falsely represented that Dr. Zafirov submitted that diagnosis code when she expressly denied it. This false claim was submitted for payment to Optimum by Anion on behalf of Physician Partners and VIPcare. It was paid by Optimum on behalf of the United States.

251.    Further, once Dr. Zafirov diagnosed Patient L with uncomplicated diabetes, Physician Partner's decision not to correct the previous code with the less expensive but accurate code is a violation of their obligations under the Overpayment Rule.

### Patient M

252.    Patient M was a 76-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom Medicare Plan Rx (HMO) plan. The following documents are associated with Patient ME:

1. **Exhibit 6-M1**: February 2019 Five Star Form
2. **Exhibit 6-M2**: Dr. Zafirov's Progress Note from Feb 2019
3. **Exhibit 6-M3**: Screenshot of Paid Claims from 2019
4. **Exhibit 6-M4**: July 2019 Five Star Form
5. **Exhibit 6-M5**: July 2019 Email to Sajitha Johnson
6. **Exhibit 6-M6**: Subsequent Five Star Form
7. **Exhibit 6-M7**: Freedom Prospective Possible Condition Report

253.    Patient M is a 76-year-old who was previously a patient of Dr. Patel. Dr. Zafirov treated Patient M on Feb. 15, 2019. The 5 Star Checklist provided by Anion for that visit listed two suggested codes under HCC 058, Major Depressive, Bipolar, and Paranoid Disorders.[5] **Exhibit 6-M1**. Dr. Zafirov marked "No" next to both ICD F33.9 for "Major depressive disorder, recurrent, unspecified" and ICD F32.4 for "Major depressive disorder, single episode, in partial remission," which had been reported four and three times the previous year, respectively.

254.    Dr. Zafirov's progress notes from that date of service indicate a score of 0 on the PHQ-9 mental health assessment test, noted that Patient M takes Celexa for anxiety instead of depression, and specifically noted (twice) that the patient denies and has no history of depression. **Exhibit 6-M2**. Per standard protocol, Dr. Zafirov included an assessment for Major Depressive Disorder, but her notes and 5 Star Checklist both plainly indicate she was *not* diagnosing that condition.

255.    In July 2019, Dr. Zafirov reviewed Patient M's medical records and noted that the billing records show that HCC 059, the code for MDD was captured from the Feb. 2015 visit with Dr. Zafirov as the source and is marked as "paid" for 2019. **Exhibit 6-M3**. In addition, HCC 058 for "reactive and unspecified

---

[5] The current HCC code for "Major Depressive, Bipolar and Paranoid Disorders" is HCC 059 as of 2018.  It was HCC 058 in 2017 and prior.  HCC 058 is now the code for "Reactive and Unspecified Psychosis."

psychosis" is listed as "paid" in 2019, though no other details are provided for that code.

256.    A July 2019 5 Star Checklist also showed HCC 058, ICD F32.4 as a condition already reported in 2019 with a date of service as Feb. 15, 2019 by "Current PCP."  **Exhibit 6-M4**.  Dr. Zafirov circled the code and wrote at the bottom the page, "Patient does not have major depressive disorder. Please amend."

257.    Dr. Zafirov also emailed Physician Partner's Quality Analyst Sajitha Johnson or about July 19, 2019, and specifically asked that the code be removed from Patient M's medical records.  **Exhibit 6-M5**.  She wrote,

> In regards to [Patient M], if you read below the code, it is stated not once, but twice that she does not have major depression in the note.  The patient is adamant that she is only taking for anxiety.  It was meant to be a comment on the condition and not a diagnosis.  The note makes that very clear.  Not only that, but it has been marked "no" on the 5-star sheet I turned in to you.  As far as what physicians coded before me, my responsibility lies in my own evaluation in the room with the patient.  I do think that in regards to diagnosis, it is very important that this is done accurately.  I would assume that your team also reads the physicians commentary on a condition as this is relevant.  If there are previous codes on the chart, I will comment and then remove them from the chart after the visit.
>
> So yes, please remove the code from her medical records.

258.    Despite this clear directive from Dr. Zafirov, the code remained on Patient M's medical record. In or about August 2019, the then-current 5 Star

Checklist showed HCC 059, ICD F32.4 for "Major depressive disorder, single episode, in partial remission" with a date of service on Feb. 15, 2019 by "Current PCP," (meaning Dr. Zafirov) under the conditions already reported in the current year. **Exhibit 6-M6**.

259.  Physician Partner's submission of a claim for major depressive disorder for Patient M was a false claim which fraudulently represented that Dr. Zafirov submitted that diagnosis code when she did not. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

260.  As of October 2019, the Prospective Possible Condition Report for Patient M, accessed through the Freedom MRA/HEDIS Portal, reflected "Major Depressive, Bipolar, and Paranoid Disorder" an "HCC submitted previously" for Patient M, but now reflects the source of "other physician" and a date of service of Oct. 9, 2018. This indicates that Physician Partners or Freedom removed Dr. Zafirov's diagnosis code, but did not correct the codes which were previously submitted despite lack of any objective clinical evidence. **Exhibit 6-M7.**

261.  Even if Physician Partners did ultimately remove the code as submitted by Dr. Zafirov, the decision not to submit correct records to remove the prior unsupported code is a violation of their obligations under the Overpayment Rule.

262. Further, if Physician Partners submitted a code and then corrected the submission because the code was unsupported, Freedom knew or should have known that previous diagnosis of that same code were also unsupported. The failure to evaluate the prior code submissions and to submit corrected information to CMS is a violation of Freedom's obligations under the Overpayment Rule.

263. In addition, the February 2019 5 Star Checklist provided to Dr. Zafirov for Patient M suggested a diagnosis of microcephaly under the HCC 072, Spinal Cord Disorders/Injuries, which carries a risk adjustment factor of .509. **Exhibit 6-M1.** The 5 Star Checklist revealed that the code has been submitted to Freedom two times in 2018 and two times in 2017, although the patient was seen at least six times in 2018 at least four times in 2017. Microcephaly is a very rare, incurable birth defect (2-12 out of 10,000 live births) in which a baby's head is significantly smaller than normal, often accompanied by intellectual impairment. https://www. cdc.gov/ncbddd/birthdefects/microcephaly.html. It is a permanent condition which would either be present at all visits or does not exist at all. There are no records in Patient M's chart which support a microcephaly diagnosis and Dr. Zafirov's physical examination of the patient confirmed that the patient did not have the rare disorder, then or ever before.

264. The Prospective Possible Condition Report shows that the HCC for Spinal Cord Disorder/Injurie was previously submitted to CMS for Patient M,

with a date of service of January 24, 2018, and a source of "other physician." Physician Partner's submission of a claim for microcephaly for Patient M was a false claim which fraudulently represented condition had been diagnosed by a physician when there is no support for it in the medical record. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

265. Further, because microcephaly is a permanent condition, Dr. Zafirov's notation that the condition did not exist should have caused Physician Partners to submit correct records to remove the prior unsupported code. The failure to do so is a violation of their obligations under the Overpayment Rule.

266. Likewise, the presence of the diagnoses code for a permanent birth defect – particularly one with such a large MRA score - in some years but not in others should have caused Freedom to review the code and reject it as applied to Patient M because it was not medically supported. The failure to conduct such a review and to submit correct records to remove the unsupported code is a violation of their obligations under the Overpayment Rule.

## **Patient N**

267. Patient N was a 70-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP Savings (HMP SNP) plan. The following documents are associated with Patient N:

1. **Exhibit 7-N1**: January 2019 Five Star Checklist
2. **Exhibit 7-N2**: Dr. Zafirov's Progress Note from Jan. 23 visit
3. **Exhibit 7-N3**: May 2019 Five Star Checklist

268.    Dr. Zafirov treated Patient N on or about Jan. 23, 2019. The 5 Star Checklist provided to Dr. Zafirov by Anion in advance of that appointment suggested a diagnoses of "[diabetes] with diabetic peripheral angiopathy without gangrene." **Exhibit 7-N1.** On the 5 Star Checklist, Relator wrote "No – see below" and included a detailed explanation of why she was rejecting both the suggested diagnosis and why she questioned even the original diagnosis of diabetes for Patient N.

269.    Dr. Zafirov also documented both the rejection of the diagnosis and the reasons why in her progress notes, writing, "Question completeness of initial diagnosis Patient may have been prediabetes but it does not seem the lab criteria quite matches the diagnosis. If it is a question later on, will repeat [testing]." **Exhibit 7-N2.**

270.    Patient N returned to Dr. Zafirov on May 18, 2019 for a follow-up visit. Despite Dr. Zafirov's previous notations, the 5 Star Checklist provided by Anion for the May 2019 visit reflected "[diabetes] with diabetic peripheral angiopathy without gangrene" in the "BELOW CODES/CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR" section with the source of "Current PCP" (meaning Dr. Zafirov) and a date of service of Jan. 22, 2019 – the

same visit on which Dr. Zafirov expressly denied such condition (with a scrivner's error adjusting the date by one day). **Exhibit 7-N3.[6]**

271.    The submission of a claim for diabetes with diabetic peripheral angiopathy without gangrene for Patient N was a false claim because it fraudulently represented that Dr. Zafirov assigned that specific diagnostic code when she expressly rejected it. This false claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

### C.    Defendants' Failure to Return Overpayments

272.    Each of the patient examples in this Amended Complaint resulted in claims for which Physician Partners had actual knowledge of their falsity. By failing to submit proper codes to convey the accurate information to Freedom which would then be passed on to the United States, Physician Partners violated its obligations under the Overpayment Rule and failed to return funds in violation of 31 U.S.C. 3729(a)(1)(G).

---

[6] Of note, on the same date that Dr. Zafirov received the 5 Star Checklist for Patient N which reflected billing that directly contradicted her notations, Sajitha Johnson, the Quality Analyst assigned to Relator, questioned Relator as to whether she maintained copies of any of her old 5 Star Checklists. Relator understood the reason for that inquiry to be because Physician Partners and Anion did not want VIPcare physicians to be able to review their notes on past checklists because Anion continued to suggest codes which had already been rejected or billed conditions under the physician's name despite the physician's rejection of that code.

273.    Likewise, Freedom and Optimum had or should have had knowledge of the falsity of the claims submitted to it by Physician Partners. For each of the above patient examples, by failing to submit proper codes to convey accurate information to CMS, Freedom and Optimum violated their repayment obligations under the Overpayment Rule and failed to return funds in violation of 31 U.S.C. 3720(a)(1)(G).

274.    In addition to the patients identified throughout the Amended Complaint, the following are specific examples where Physician Partners, the MAOs or both had knowledge of the falsity of their codes and failed to submit correct codes pursuant to their overpayment obligations.

### Patient O

275.    Patient O was a 69-year-old on Dr. Zafirov's patient panel who received treatment by VIPcare pursuant to enrollment in the Freedom VIP Savings (HMP SNP) plan. The following documents are associated with Patient O:

1. **Exhibit 8-O1**: January 2019 Five Star Form
2. **Exhibit 8-O2**: Screenshot of Paid Claims for 2019
3. **Exhibit 8-O3**: March 2019 Five Star Form
4. **Exhibit 8-O4**: Dr. Zafirov's Progress Note from March 2019
5. **Exhibit 8-O5**: Dr. Barry Weckesser Cardiology Report from May 2019
6. **Exhibit 8-O6**: Dr. Zafirov's Amended Progress Note from Jan. 2019
7. **Exhibit 8-O7**: Subsequent Five Star Form
8. **Exhibit 8-O8**: Screenshot of PCP Encounters and PCP Claims for 2019
9. **Exhibit 8-O9**: Screenshot of Paid Claims for 2019

10. **Exhibit 8-O10**: Freedom Prospective Possible Condition
Report

276. This is an example where Dr. Zafirov admits to making a mistake on her patient's Five Star form. However, despite Dr. Zafirov's efforts, Physician Partners refused to correct the code even after Dr. Zafirov identified it as an error.

277. Patient O was a patient of Dr. Patel before getting switched to Dr. Zafirov's panel. On January 3, 2019, Dr. Zafirov treated Patient O and submitted a Five Star form that said "OK yes" next to "HCC 085, ICD I50.30, "unspecified diastolic (congestive) heart failure." **Exhibit 8-O1.** The billing records show that code as paid in 2019, and the detailed record shows that the date of service was Jan. 3, 2019, with Dr. Zafirov as the billing provider. **Exhibit 8-O2.**

278. On March 4, 2019, Dr. Zafirov noted that the 5 Star Checklist provided by Anion reflected HCC 085 as a submitted code. **Exhibit 8-O3.** Dr. Zafirov circled the code and marked on the bottom of the form, "HCC 085 – should be corrected. Patient does <u>NOT</u> have. Should be amended." She further noted in the medical record, "Patient scheduled to see cardiology in the next few months. Patient has a grade 1 diastolic dysfunction which is not abnormal for age on cardiac echo. Does not qualify for congestive heart failure as previously on problem list." **Exhibit 8-O4**.

279. Patient O was seen by a cardiologist on May 13, 2019. The cardiologist made no references to congestive heart failure anywhere in the notes. **Exhibit 8-**

**O5**. Dr. Zafirov then went back to her January Progress Note, and added an amendment to the note on May 15, 2019, which stated, "Amendment to chart. No CHF. Should not be included in problem list." **Exhibit 8-O6**.

280. Despite Dr. Zafirov's repeated attempts to correct the code and amend the billing, the code continued to appear on Patient O's 5 Star Checklist with the date of service of Jan. 3, 2019 and the source as "Current PCP." **Exhibit 8-O7.** The PCP Encounters & PCP Claims records also still show the HCC 085 code as submitted by Dr. Zafirov *and* Dr. Patel, *both* on Jan. 3, 2019 (**Exhibit 8-O8**), although only Dr. Zafirov treated Patient O that day.

281. As of August 2019, the billing records still showed HCC 085 for congestive heart failure as a paid code for 2019. **Exhibit 8-O9.** Moreover, as of October 2019, the Prospective Possible Condition Report for Patient O, accessed through the Freedom MRA/HEDIS Portal, reflected Congestive Heart Failure as an "HCC previously submitted" by the PCP (meaning Dr. Zafirov) with a date of service of Jan. 3, 2019. **Exhibit 8-O10.**

282. In this case, the initial submission of the claim for congestive heart failure was not a false claim because Dr. Zafirov had marked "OK" for that code on her 5 Star Checklist. That claim was submitted for payment to Freedom by Anion on behalf of Physician Partners and VIPcare. It was paid by Freedom on behalf of the United States.

283. However, Physician Partner's refusal to submit correct records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect is a violation of its obligations under the Overpayment Rule.

**Additional Patient Examples**

284. In one egregious example, Dr. Zafirov reviewed the billing records of Patient P, an 83-year-old on her Freedom patient panel, in association with a patient visit in March 2019. Relator determined that the patient's Q360 electronic record reflected that Physician Partners was paid in 2017 for risk-adjusting HCC072 (spinal cord disorders/injuries) for the ICD-9 code Q00.0, anencephaly. The billing record shows the code was reported only once in 2017, never before or after.

| 2017 Paid (4) | | | | | # of times reported in service years | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HCC | HCC Description | ICD | ICD9 Description | | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | <=2011 | Logic number |
| HCC040 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | M06.4 | Inflammatory polyarthropathy | | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HCC048 | Coagulation Defects and Other Specified Hematological Disorders | D69.2 D69.6 | Other nonthrombocytopenic purpura Thrombocytopenia, unspecified | | 5 0 | 0 1 | 0 1 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 1 |
| → HCC072 | Spinal Cord Disorders/Injuries | Q00.0 | Anencephaly | | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HCC108 | Vascular Disease | I71.4 I73.9 | Abdominal aortic aneurysm, without rupture Peripheral vascular disease, unspecified | | 8 5 | 4 0 | 3 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 1 |

285. Anencephaly, as defined by the CDC, "is a serious birth defect in which a baby is born without parts of the brain and skull. It is a type of neural tube defect (NTD). As the neural tube forms and closes, it helps form the baby's brain

and skull (upper part of the neural tube), spinal cord, and back bones (lower part of the neural tube)…Almost all babies born with anencephaly will die shortly after birth." A patient would either always or never have anencephaly; Patient P unequivocally does not. The anencephaly diagnosis code is so preposterous that Anion did not put it on Patient P's 5 Star Checklists as a suggested diagnosis code.

286.    Whether the code was initially submitted intentionally or accidently, its continued presence on the "2017 Paid" list indicates that it was not reversed. Physician Partners' failure to submit correct records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect is a violation of its obligations under the Overpayment Rule.

287.    Freedom's Member Health Profile for Patient P reflects that HCC072 for "spinal cord disorders/injuries" was "reported to CMS in the past for this member." However, unlike every other submitted code, the HCC072 entry does not include a provider type, diagnosis code, diagnosis description or date of service.

| Provider Type | Confirmed 2020 DOS | RA FACTOR | Diagnosis Code | Diagnosis Description | Date Of Service | CMS HCC | CMS HCC Description |
|---|---|---|---|---|---|---|---|
| | N | 0.481 | | | | HCC072 | Spinal Cord Disorders/Injuries |
| Physician | Y | 0.521 | H35.32 | Exudative age-related macular degeneration, right eye, with active choroidal neovascularization | 1/6/2020 | HCC124 | Exudative Macular Degeneration |
| Physician | Y | 0.268 | I48.91 | Unspecified atrial fibrillation | 1/24/2020 | HCC096 | Specified Heart Arrhythmias |
| Physician | N | 0.219 | K56.41 | Fecal impaction | 3/8/2019 | HCC033 | |

288.    Freedom knew or should have known that a diagnosis code for anencephaly for a senior citizen was false or accidental, particularly a code that was submitted only once for the patient. Still, Freedom submitted the code to CMS and increased Patient P's risk score by .481. Freedom's failure to identify this clearly inaccurate code as incorrect or fraudulent, and its resulting failure to submit correct records to remove the code is a violation of its obligations under the Overpayment Rule.

289.    In another instance, Physician Partners submitted claims for Patient Q for malignant neoplasm of connective tissue in 2018, even though an oncologist from Moffit Cancer Center noted that the patient only had an angiofibroma, which is a benign condition. Physician Partners also submitted diagnosis codes for malignant neoplasm of the prostate (prostate cancer) during five encounters in 2017, although there is no record in his medical chart for receiving any treatment for prostate cancer. Patient Q's medical record contains no support for either cancer diagnosis and the patient denied having ever been diagnosed with cancer during his evaluation by Dr. Zafirov.

290.    Dr. Zafirov reported on Patient Q's 5 Star Checklist that Patient Q did not have cancer, that he reported, "I've had every test in the world for cancer and nothing," and that patient had no history of prostate cancer. Still, HCC010 for two forms of malignant neoplasm of connective tissue were reported five times in 2018

(4 times for ICD-10 C49.9 and one time for ICD-10 C49.6) and HCC012 for unspecified malignant neoplasm was reported twice in 2018 and once in 2017 for ICD-10 C80.1. Physician Partners should have submitted corrected records to remove the code after Dr. Zafirov specifically informed them that the code was incorrect. The failure to do so is a violation of its obligations under the Overpayment Rule.

291. Freedom also knew or should have known that the Physician Partner's repeated codes for cancer were false because Patient Q never received any treatments related to a cancer diagnosis, let alone two different types of cancer. Given that the entire purpose of increased MRA scores is to provide funding to treat the diagnosed condition, Freedom's failure to return payments for cancer that was "diagnosed" but never treated is a violation of its overpayment obligations.

292. The following failures to return overpayments are specific to Freedom:

293. Paragraph 118, *supra*, describes Patient A, whose 5 Star Checklist from July 23, 2019, included the remarkable suggestion of "complete traumatic amputation of unspecified foot, level unspecified, initial encounter" with a source of "past history." Noting that the patient plainly had *not* had one of her feet amputated, Dr. Zafirov reviewed patient's electronic medical records and identified that Physician Partner's listed the HCC in its 2016 paid claims but

without any specific ICD or reporting date. The HCC appears again in a section called "2017 Leftover" with a notes that clarify "Not previously paid but pending b/c of logic #82." The next column reports that "FRH/OPT reported this HCC as previously paid. ICDs not provided by the plan/s." "FRH/OPT" means Freedom/Optimum and the information links to the data from Freedom's MRA/HEDIS billing portal.



294. There is no indication as to how Freedom came to append this code to Patient A. Freedom either had actual knowledge that it was completely fabricated or should have known that the code for an amputation was inaccurate when it was submitted only once, without any supporting documentation or any related treatment. Freedom should have submitted corrected records to remove the code because it lacked any clinical support, and the failure to do so is a violation of its obligations under the Overpayment Rule.

295. In another example, prior to becoming a VIPcare patient, Patient R was treated by Freedom provider Dr. Rick Simovitz for at least the years 2015-2017. During those years, Freedom submitted diagnostic codes to CMS indicating Patient R had Chronic Lymphocytic Leukemia ("CLL"), a type of bone marrow cancer. However, Patient R's medical records indicate that she did not have a

formal CLL diagnosis and had not seen a hematologist, nor was ever even referred to one for further evaluation. When Patient R did not receive any treatment for CLL, nor did the medical records did identify even a referral for treatment for CLL, Freedom should have submitted corrected codes to remove because it lacked any clinical support. Freedom's failure to do so is a violation of its overpayment obligations.

**FIRST CLAIM FOR RELIEF**
**Violations of 31 U.S.C. § 3729(a)(1)(A)**
**Against Physician Partners, LLC ("Physician Partners")**

296.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) resulted in false claims submitted or caused to be submitted by Physician Partners in violation of 31 U.S.C. § 3729(a)(1)(A).

297.    Defendant Physician Partners violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and causing the presentment of false or fraudulent claims for payment or approval. By engaging in this conduct, Physician Partners caused inflated Medicare reimbursements to which neither it nor the Medicare Advantage organizations were entitled.

298.    Had the United States been aware of Physician Partners' conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Physician Partners provide services.

299.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**SECOND CLAIM FOR RELIEF**
**Violations of 31 U.S.C. § 3729(a)(1)(B)**
**Against Physician Partners, LLC ("Physician Partners")**

300.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) illustrate false claims by Physician Partners in violation of 31 U.S.C. § 3729(a)(1)(B).

301.    Defendant Physician Partners violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. By engaging in this conduct, Physician Partners caused inflated Medicare reimbursements to which neither it nor the Medicare Advantage organizations were entitled.

302.   Had the United States been aware of Physician Partners' conduct, it would have refused to pay the inflated, risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Physician Partners provide services.

303.   By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**THIRD CLAIM FOR RELIEF**
**Violations of 31 U.S.C. § 3729(a)(1)(G)**
**Against Physician Partners, LLC ("Physician Partners")**

304.   Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A), (B) and (C) illustrate false claims by Physician Partners leading to violations of 31 U.S.C. § 3729(a)(1)(G), except for Paragraphs 293-295 which apply to Defendants Freedom and Optimum only.

305.   Defendant Physician Partners violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealing or knowingly and improperly avoiding or decreasing an

obligation to pay or transmit money to the Government. In engaging in this conduct, Physician Partners retained Medicare overpayments to which it was not entitled.

306.    Had the United States been aware of Physician Partners' conduct, it would have demanded repayment of the inflated capitation payments, would have refused to pay the inflated risk-adjusted payments, and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Physician Partners provide services.

307.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## FOURTH CLAIM FOR RELIEF
### Violations of 31 U.S.C. § 3729(a)(1)(A)
### Against Anion Technologies, LLC ("Anion")

308.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) resulted in false claims submitted or caused to be submitted by Anion in violation of 31 U.S.C. § 3729(a)(1)(A).

309.    Defendant Anion violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and causing the presentment of false or fraudulent claims for payment or approval. By engaging in this conduct, Anion caused inflated Medicare reimbursements to which neither it, Physician Partners, VIPcare, nor the Medicare Advantage organizations were entitled.

310.    Had the United States been aware of Anion's conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries for whom Anion, through Physician Partners, provides services

311.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## FIFTH CLAIM FOR RELIEF
### Violations of 31 U.S.C. § 3729(a)(1)(B)
### Against Anion Technologies, LLC ("Anion")

312.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide

critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) illustrate false claims by Anion in violation of 31 U.S.C. § 3729(a)(1)(B).

313.     Defendant Anion violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. By engaging in this conduct, Anion caused inflated Medicare reimbursements to which neither it, Physician Partners, VIPcare, nor the Medicare Advantage organizations were entitled.

314.     Had the United States been aware of Anion's conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries for whom Anion, through Physician Partners, provides services.

315.     By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

### SIXTH CLAIM FOR RELIEF
**Violations of 31 U.S.C. § 3729(a)(1)(G)**
**Against Anion Technologies, LLC ("Anion")**

316.     Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support

of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A), (B) and (C) illustrate false claims by Anion leading to violations of 31 U.S.C. § 3729(a)(1)(G), except for Paragraphs 293-295 which apply to Defendants Freedom and Optimum only.

317.     Defendant Anion violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government. In engaging in this conduct, Anion caused Physician Partners to retain Medicare overpayments to which it was not entitled.

318.     Had the United States been aware of Anion's conduct, it would have demanded repayment of the inflated capitation payments, would have refused to pay the inflated risk-adjusted payments, and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries for whom Anion, through Physician Partners, provides services.

319.     By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## SEVENTH CLAIM FOR RELIEF
### Violations of 31 U.S.C. § 3729(a)(1)(A)
### Against Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare")

320.   Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) resulted in false claims submitted or caused to be submitted by VIPcare in violation of 31 U.S.C. § 3729(a)(1)(A).

321.   Defendant VIPcare violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting or causing the presentment of false or fraudulent claims for payment or approval. By engaging in this conduct, VIPcare caused inflated Medicare reimbursements to which neither it, Physician Partners, nor the Medicare Advantage organizations were entitled.

322.   Had the United States been aware of VIPcare's conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom VIPcare provide services.

323.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

### EIGHTH CLAIM FOR RELIEF
### Violations of 31 U.S.C. § 3729(a)(1)(B)
### Against Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare")

324.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) illustrate false claims by VIPcare in violation of 31 U.S.C. § 3729(a)(1)(B).

325.    Defendant VIPcare violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. By engaging in this conduct, VIPcare cause inflated Medicare reimbursements to which neither it, Physician Partners, nor the Medicare Advantage organizations were entitled.

326.    Had the United States been aware of VIPcare's conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom VIPcare provides services.

327.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## NINTH CLAIM FOR RELIEF
### Violations of 31 U.S.C. § 3729(a)(1)(G)
### Against Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare")

328.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(A)(i)-(iv) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A), (B) and (C) illustrate false claims by VIPcare leading to violations of 31 U.S.C. § 3729(a)(1)(G), except for Paragraphs 293-295 which apply to Defendants Freedom and Optimum only.

329.    Defendant VIPcare violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government. In engaging in this conduct, VIPcare retained Medicare overpayments, or caused Physician Partners to retain overpayments, to which neither entity was entitled.

330.    Had the United States been aware of VIPcare's conduct, it would have demanded repayment of the inflated capitation payments, refused to pay the inflated risk-adjusted payments, and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom VIPcare provide services.

331.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

**TENTH CLAIM FOR RELIEF**
**Violations of 31 U.S.C. § 3729(a)(1)(A)**
**Against Freedom Health, Inc. and Optimum Healthcare, Inc.**
**("Freedom and Optimum")**

332.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(B) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) resulted in false claims submitted or caused to be submitted by Freedom and Optimum in violation of 31 U.S.C. § 3729(a)(1)(A).

333.    As specifically described in Paragraphs 26-29, Freedom and Optimum are indistinguishable entities who operate in tandem, including for purposes of contracting with and executing obligations to the United States. Accordingly, the

allegations made in this Count are made against both Freedom and Optimum, jointly and severally.

334.    Defendants Freedom and Optimum violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and causing the presentment of false or fraudulent claims for payment or approval. By engaging in this conduct, Freedom and Optimum caused inflated Medicare reimbursements to which neither they nor the providers were entitled.

335.    Had the United States been aware of Freedom and Optimum's conduct, it would have refused to pay the inflated risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Freedom and Optimum provide services.

336.    By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

### ELEVENTH CLAIM FOR RELIEF
### Violations of 31 U.S.C. § 3729(a)(1)(B)
### Against Freedom Health, Inc. and Optimum Healthcare, Inc.
### ("Freedom and Optimum")

337.    Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(B) in support of this Count. The paragraphs not specifically realleged in this Count provide critical

contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A) and (B) illustrate false claims by Freedom and Optimum in violation of 31 U.S.C. § 3729(a)(1)(B).

338.    As specifically described in Paragraphs 26-29, Freedom and Optimum are indistinguishable entities who operate in tandem, including for purposes of contracting with and executing obligations to the United States. Accordingly, the allegations made in this Count are made against both Freedom and Optimum, jointly and severally.

339.    Defendants Freedom and Optimum violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims. By engaging in this conduct, Freedom and Optimum cause inflated Medicare reimbursements to which neither they nor the providers were entitled.

340.    Had the United States been aware of Freedom and Optimum's conduct, it would have refused to pay the inflated, risk-adjusted payments and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Freedom and Optimum provide services.

341. By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## TWELFTH CLAIM FOR RELIEF
### Violations of 31 U.S.C. § 3729(a)(1)(G)
### Against Freedom Health, Inc. and Optimum Healthcare, Inc.
### ("Freedom and Optimum")

342. Relator repeats and re-alleges the background allegations contained in Sections V and VI, and the specific allegations in Section VII(B) in support of this Count. The paragraphs not specifically realleged in this Count provide critical contextual support as to how the fraud alleged in this Count occurred. The patient examples alleged in Section IX(A), (B) and (C) illustrate false claims by Freedom and Optimum leading to violations of 31 U.S.C. § 3729(a)(1)(G).

343. As specifically described in Paragraphs 26-29, Freedom and Optimum are indistinguishable entities who operate in tandem, including for purposes of contracting with and executing obligations to the United States. Accordingly, the allegations made in this Count are made against both Freedom and Optimum, jointly and severally.

344. Defendants Freedom and Optimum violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the United States,

or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government. In engaging in this conduct, Freedom and Optimum retained Medicare overpayments, or caused providers to retain overpayments, to which they were not entitled.

345. Had the United States been aware of Freedom and Optimum's conduct, it would have demanded repayment of the inflated capitation payments, refused to pay the inflated risk-adjusted payments, and/or pursued other legal remedies to avoid the potential disruption of Medicare benefits to thousands of Medicare beneficiaries to whom Freedom and Optimum provide services.

346. By virtue of the conduct alleged in this Count, the United States has incurred damages and is entitled to treble damages under the FCA, plus a civil penalty for each violation of the Act.

## PLEA

WHEREFORE, Plaintiff/Relator requests the Court grant judgment for Plaintiff/Relator and the United States against the Defendants, as follows:

a.    For three times the amount of damages proved, pursuant to 31 U.S.C. § 3729(a).

b.    For mandatory civil penalties for each false claim submitted, pursuant to 31 U.S.C. § 3729(a), as adjusted. For violations submitted before Nov. 5, 2015, the minimum mandatory penalty is $5,500 and the

maximum mandatory penalty is $11,000. For false claims submitted to the United States or after Nov. 5, 2015, the amount of the penalties will be determined at the time the penalties are assessed. The minimum mandatory penalty is presently $11,181 per false claim submitted on or after Nov. 5, 2015, and the maximum mandatory penalty is presently $22,363 per false claim submitted on or after Nov. 5, 2015.

c.    For Relator's reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d);

d.    For the maximum Relator's share award, pursuant to 31 U.S.C. § 3730(d);

e.    For pre-judgment and post-judgment interest as provided by law; and

f.    For such other and further relief as may be appropriate and authorized by law.

## **JURY TRIAL DEMAND**

Relator demands a trial by jury for all issues so triable.

Respectfully submitted this 12th day of November, 2021,

/s/ Frederick M. Morgan, Jr.
Frederick M. Morgan, Jr. (Ohio Bar No.
0027687)
Jillian L. Estes  (Fla. Bar No. 0055774)
MORGAN VERKAMP LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Phone: (513) 651-4400
Fax: (513) 651-4405
jillian.estes@morganverkamp.com
rmorgan@morganverkamp.com

Kenneth J. Nolan (Fla. Bar No. 603406)
Marcella Auerbach (Fla. Bar No. 249335)
NOLAN, AUERBACH & WHITE, LLP
435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL   33301
Phone: (954) 779-3943
Fax: (954) 779-3937
ken@whistleblowerfirm.com
marcellla@whistleblowerfirm.com

Ryon McCabe (Fla. Bar No. 0009075)
Havan M. Clark (Fla. Bar No. 1026390)
MCCABE RABIN, P.A.
1601 Forum Pl., Suite 201
West Palm Beach, FL 33401
Phone: (561) 659-7878
Fax: (561) 242-4848
rmmcabe@mccaberabin.com

**Counsel for Relator Dr. Clarissa Zafirov**

## CERTIFICATE OF SERVICE

I, Frederick M. Morgan, Jr., hereby certify that the foregoing motion was served on Nov. 12, 2021, to all parties of record via the CM/ECF electronic filing system.

/s/ Frederick M. Morgan, Jr.
Frederick M. Morgan, Jr.

# EXHIBIT 1

# Documents Related to Patient H

# EXHIBIT 1-H1



CZ_DS004492

# EXHIBIT 1-H2



CZ_DS004493

# EXHIBIT 1-H3

**5 Star Check List - DR. CLARISSA A ZAFIROV**

**PHYSICIAN PARTNERS**

Freedom VIP Savings (HMO SNP) - PCP Effective Date: 02-2019

Visits in last 12 months:    PCP: 13    ER: 0    Specialists: 7    Hospital: 0

| 100% | 2.849 |

     

HCC 021   HCC 040   HCC 018   HCC 085   HCC 058   HCC 108   HCC 048   HCC 088

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported 2018 | 2017 | 2016 | Source | Comments |
|---|---|---|---|---|---|---|
| **HCC021 - Protein-Calorie Malnutrition** | | | | | | RA Factor: 0.713 |
| E46 | Unspecified protein-calorie malnutrition | 3 | 0 | 0 | Physician | No - and no lab data done |
| **HCC040 - Rheumatoid Arthritis and Inflammatory Connective Tissue Disease** | | | | | | RA Factor: 0.74 |
| M46.1 | Sacroiliitis, not elsewhere classified | 6 | 2 | 0 | Physician | No |
| **HCC018 - Diabetes with Chronic Complications** | | | | | | RA Factor: 0.368 |
| E11.40 | Type 2 diabetes mellitus with diabetic neuropathy, unspecified | 6 | 6 | 2 | Past History | No, patient denies * labs attached |
| E11.22 | Type 2 diabetes mellitus with diabetic chronic kidney disease | 0 | 1 | 0 | Past History | No |
| E11.43 | Type 2 diabetes mellitus with diabetic autonomic (poly)neuropathy | 0 | 3 | 0 | Physician | No no neuropathy |
| **HCC085 - Congestive Heart Failure** | | | | | | RA Factor: 0.368 |
| I50.30 | Unspecified diastolic (congestive) heart failure | 3 | 0 | 0 | Physician | No - diast dysf ungraded without CHR *attached echo |
| I50.9 | Heart failure, unspecified | 0 | 0 | 1 | Past History | NO |
| **HCC058 - Major Depressive, Bipolar, and Paranoid Disorders** | | | | | | RA Factor: 0.330 |
| F32.4 | Major depressive disorder, single episode, in partial remission | 6 | 2 | 0 | Physician | Doubtful that - not docum that she meets criteria |
| **HCC108 - Peripheral vascular disease, unspecified** | | | | | | RA Factor: 0.299 |
| I73.9 | Peripheral vascular disease, unspecified | 3 | 0 | 0 | Physician | No, no imaging |
| I70.0 | Atherosclerosis of aorta | 2 | 0 | 0 | Physician | OK. AAA done without |
| **HCC048 - Coagulation Defects and Other Specified Hematological Disorders** | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 6 | 2 | 0 | Physician | No |
| **HCC088 - Angina Pectoris** | | | | | | RA Factor: 0.145 |
| I20.9 | Angina pectoris, unspecified | 3 | 0 | 0 | Physician | No, in last year. |
| I20.8 | Other forms of angina pectoris | 1 | 0 | 0 | Physician | other than anxiety related. |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| | | There are no codes reported / captured in the current year | | | |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: 3/25/19    AAA screen done. Why

*Needs more renal labs attached

I50.3 - Diast dysfunction ≠
diastolic CHF.

E11.22. No evidence of. (attached)
E11.40. Patient denies and
normal sensory foot exam.
I20.9/8 - No chest pain in the
last year

# EXHIBIT 1-H4



EXHIBIT 1-H5

Cdae-fcfd-bd-tO32bbADcH6P11Odorcmnf38nE-Fhd18ADD36 Pfgec222-of-3324jtjdODrt386t

# 5 Star Checklist - DR. CLARISSA A. [REDACTED]

[REDACTED] savings (HMO SNP) - PCP Effective Date: 02-2019

Visits in last 12 months:   PCP: 13      ER: 0         Specialist:

**PARTNERS**

| 13% | 0.368 | | 88% | 2.599 |

      

HCC 085 | HCC 021 | HCC 040 | HCC 018 | HCC 058 | HCC 108 | HCC 048 | HCC 088

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported 2018 | 2017 | 2016 | Source | Comments |
|---|---|---|---|---|---|---|
| **HCC021 - Protein-Calorie Malnutrition** | | | | | | RA Factor: 0.713 |
| E46 | Unspecified protein-calorie malnutrition | 3 | 0 | 0 | Physician | No |
| **HCC040 - Rheumatoid Arthritis and Inflammatory Connective Tissue Disease** | | | | | | RA Factor: 0.374 |
| M46.1 | Sacroiliitis, not elsewhere classified | 6 | 2 | 0 | Physician | No |
| **HCC018 - Diabetes with Chronic Complications** | | | | | | RA Factor: 0.368 |
| E11.40 | Type 2 diabetes mellitus with diabetic neuropathy, unspecified | 7 | 6 | 2 | Physician | No. Normal DM foot exam |
| E11.22 | Type 2 diabetes mellitus with diabetic chronic kidney disease _Cannot say._ | 0 | 1 | 0 | Past History | No - See microalb ok |
| E11.43 | Type 2 diabetes mellitus with diabetic autonomic (poly)neuropathy | 0 | 3 | 0 | Physician | No |
| **HCC058 - Major Depressive, Bipolar, and Paranoid Disorders** | | | | | | RA Factor: 0.330 |
| F32.4 | Major depressive disorder, single episode, in partial remission | 7 | 2 | 0 | Physician | No depression qualifying for MDD |
| **HCC108 - Peripheral vascular disease, unspecified** | | | | | | RA Factor: 0.299 |
| I70.0 | Atherosclerosis of aorta | 3 | 0 | 0 | Physician | Ok - CT 3/28 showing 2019 |
| I73.9 | Peripheral vascular disease, unspecified | 3 | 0 | 0 | Physician | No imaging done |
| **HCC048 - Coagulation Defects and Other Specified Hematological Disorders** | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 7 | 2 | 0 | Physician | No |
| **HCC088 - Angina Pectoris** | | | | | | RA Factor: 0.145 |
| I20.9 | Angina pectoris, unspecified | 3 | 0 | 0 | Physician | No |
| I20.8 | Other forms of angina pectoris | 1 | 0 | 0 | Physician | No |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| HCC085 | I50.30 | Unspecified diastolic (congestive) heart failure | 02-25-2019 | 02-25-2019 | Current PCP |

↳ No and should be removed

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: 4/17/19.

Signature (MD, DO, PA or NP only): 

# EXHIBIT 1-H6



CZ_DS004496

EN-LAP02

1) - czafirov@getvipcare.c ×  |  Q360 - Dashboard  ×  |  - Snapshot - Q ×  |  5-Star-Form

https://myq360.com/msap/member_task_list_2017_long_form_v

Patient Handouts    Preprocedure Patie...    AAOS Essentials of...    Search - UpToDate    Paroxetine-sertralin...    Pathologic Q Wave...    E-FORCSE®, Florid...

| | | | | | |
|---|---|---|---|---|---|
| E11.51 | Type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene | 1 | 0 | 0 | Physician |
| E11.22 | Type 2 diabetes mellitus with diabetic chronic kidney disease | 0 | 1 | 0 | Past History |
| E11.43 | Type 2 diabetes mellitus with diabetic autonomic (poly)neuropathy | 0 | 3 | 0 | Physician |
| HCC058 - Major Depressive, Bipolar, and Paranoid Disorders | | | | | RA Factor: 0.330 |
| F32.4 | Major depressive disorder, single episode, in partial remission | 10 | 2 | 0 | Physician |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 10 | 2 | 0 | Physician |
| HCC088 - Angina Pectoris | | | | | RA Factor: 0.145 |
| I20.9 | Angina pectoris, unspecified | 4 | 0 | 0 | Physician |
| I20.8 | Other forms of angina pectoris | 1 | 0 | 0 | Physician |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| HCC019 | E11.9 | Type 2 diabetes mellitus without complications | 04-17-2019 | 04-17-2019 | Current PCP |
| HCC085 | I50.30 | Unspecified diastolic (congestive) heart failure | 02-25-2019 | 03-12-2019 | Physician |
| HCC108 | I70.0 | Atherosclerosis of aorta | 03-25-2019 | 03-25-2019 | Current PCP |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: _____

Signature (MD, DO, PA or NP only): _____

Same HCC code with source and date changed

08/12/2019 13:11          Please fax form and progress note to 888-978-5655

CZ_DS004497

# EXHIBIT 1-H7



**The Heart Institute**
O F   V E N I C E

**1370 East Venice Avenue, Suite 102**
**Venice, Florida 34285**
**Ph #: 941/412-0026**
**Fax #: 941/412-0027**

**Patient Name:** ▮▮▮▮▮
**Patient ID:** ▮▮▮▮▮▮
**Date of Birth:** ▮▮▮▮▮▮

## Date of Service: 03-12-2019

**Chief Complaint:**
Seen today for results of echocardiogram and carotid ultrasound.

**Past Medical History:**
Abnormal ECG (R94.31) (794.31),Attention and concentration deficit following cerebral infarction (I69.310),Bilateral carotid artery occlusion (I65.23) (433.10) (Bilateral 20-49%),Diabetes mellitus type 1 (E10.9) (250.01),Diastolic dysfunction (I50.30),Hypertensive heart disease without heart failure (I11.9),LVH - Left ventricular hypertrophy (I51.7) (429.3) (Mild),Nonrheumatic mitral (valve) insufficiency (I34.0) (424.0) (Trace),Nonrheumatic tricuspid (valve) insufficiency (I36.1) (424.2) (Trace)

**Procedures:**
Depression Screening (07-10-2015),Polypectomy (6/2016)

**Presenting Medications:**
**aspirin oral** 81mg (1 tablet po qd), **levothyroxine oral** 50mcg (1 tablet qd), **losartan** 50mg (1 tablet po qd), **metformin** tabl 1000mg (1 tablet po bid), **simvastatin** 10mg (1 tablet po hs)

**Allergies:**
cortisone

**Social History:** Smoking Status: Former smoker.    Age Started Smoking: 17.    Age Quit Smoking: 37.    Smoking Cessati Counseling: No.    Language: English.    Race:

- White
    Ethnicity:

- Not Hispanic or Latino

1370 East Venice Avenue, Suite 102
Venice, Florida 34285
Ph #: 941/412-0026
Fax #: 941/412-0027

**Patient Name:**
**Patient ID:**
**Date of Birth:**

**Date of Service: 03-12-2019**

HISTORY OF PRESENT ILLNESS: This [redacted] is followed for hypertension, mild carotid artery disease, insulin dependent diabetes and mitral insufficiency. She has been doing fairly well, denies anginal type chest pain or severe short of breath. She had an echo Doppler done recently, which showed normal systolic function, mild mitral and tricuspid insufficiency. Carotid duplex exam revealed mild disease bilaterally. She does describe some episodes of chest aching sensation just lasting a few minutes, not related to occasional, meals or time of day. I mentioned about doing an exercise t but she does not want to have it done.

REVIEW OF SYSTEMS: No recent history of PND, orthopnea, ankle edema, dizziness, palpitations, syncope, extreme fati diarrhea, nausea or vomiting. I have reviewed the review of systems.

PHYSICAL EXAMINATION:
GENERAL: No acute distress. Conversant.
VITALS: See nurse's notes.
NECK: No jugular venous vein distention or carotid bruits.
LUNGS: Clear to percussion and auscultation.
HEART: Regular rate and rhythm. Heart sounds normal. Grade 1/6 systolic murmur at the lower left sternal border. No rubs gallops; normal PMI.
ABDOMEN: Soft, nontender, normal active bowel sounds. No hepatosplenomegaly. Normal aortic pulsations; no bruits.
EXTREMITIES: No peripheral edema. Normal, symmetric pedal pulses. No digital cyanosis or clubbing.

IMPRESSION:
1. Hypertension.
2. Mild carotid artery disease.
3. Insulin dependent diabetes.
4. Mitral insufficiency.

DISPOSITION: The patient will be seen in followup in another few months.

Barry J. Weckesser, M.D., F.A.C.C.
BJW: ffsl/ha

cc: Clarissa A. Zafirov, M.D. 844-388-6186

d: 03/12/2019 t: 03/13/2019

Patient education material given
outcome health

d: 03/12/2019 t: 03/13/2019

Patient education material given
· outcome health

cc: CLARISSA A ZAFIROV, MD

---



**The Heart Institute**
OF VENICE

**1370 East Venice Avenue, Suite 102**
**Venice, Florida 34285**
**Ph #: 941/412-0026**
**Fax #: 941/412-0027**

**Patient Name:** ███████████
**Patient ID:** ███████████
**Date of Birth:** ███████████

**Date of Service: 03-12-2019**

BARRY J. WECKESSER, MD, FACC

# EXHIBIT 1-H8

Inbox (1) - czafirov@getvipcare.c ✕ | https://apps.freedomhealth.com ✕ | 16 Physician Partners - Calendar - C ✕ | +

← → C 🔒 https://apps.freedomhealth.com/HCCSnapshot/MemberHealthProfileSearchResult

⊞ Apps | 📙 Patient Handouts | 📗 Preprocedure Patie… | 📄 AAOS Essentials of … | U Search - UpToDate | ◎ Paroxetine-sertralin…

◁ | ‹ | 1 | of 1 | › | ▷| | ↻ | 💾 ▾ | Find | Next

Confidential Patient Information

## MEMBER HEALTH PROFILE

**FREEDOM HEALTH**

Provider Name: ZAFIROV, CLARISSA, A

Group Name: FLORIDA MEDICAL ASSOCIATES LLC

Run Date: 10/16/2019

Membership Month 10/01/2019

Review Period: 1/1/2019 To 12/31/2019

Plan Name: Freedom VIP Savings (HMO SNP)

Member Name: ▓▓▓▓▓

Gender: ▓▓

DOB: ▓▓▓▓

Member Phone ▓▓▓▓▓

Member I ▓▓▓▓▓

PCP Name: ZAFIROV, CLARISSA, A

Provider ID: P1045672

Eff Date: 01/01/2019

Group Name: FLORIDA MEDICAL ASSOCIATES LLC

The following are HCC related medical conditions that have been reported to CMS in the past for this member. Please note that some of the conditions may have resolved and / or may not exist in current year.

| Provider Type | Confirmed 2019 DOS | RA FACTOR | Diagnosis Code | Diagnosis Description | Date Of Service | CMS HCC | CMS HCC Description |
|---|---|---|---|---|---|---|---|
| Physician | Y | 0.31 | I50.30 | Unspecified diastolic (congestive) heart failure | 3/12/2019 | HCC085 | Congestive Heart Failure |
| Physician | Y | 0.305 | I70.0 | Atherosclerosis of aorta | 3/25/2019 | HCC108 | Vascular Disease |
| Physician | N | 0.426 | M46.1 | Sacroiliitis, not elsewhere classified | 5/31/2018 | HCC040 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease |
| Physician | Y | 0.106 | E11.9 | Type 2 diabetes mellitus without complications | 9/17/2019 | HCC019 | Diabetes without Complication |
| Physician | N | 0.307 | E11.65 | Type 2 diabetes mellitus with hyperglycemia | 11/20/2018 | HCC018 | Diabetes with Chronic Complications |
| Physician | N | 0.214 | D69.2 | Other nonthrombocytopenic purpura | 11/20/2018 | HCC048 | Coagulation Defects and Other Specified Hematological Disorders |
| Physician | N | 0.353 | F32.4 | Major depressive disorder, single episode, in partial remission | 11/20/2018 | HCC059 | Major Depressive, Bipolar, and Paranoid Disorders |

The following conditions may exist based on CSNP verification, Lab, DME, OTC and Rx data for this member. Please note that some of the conditions may have been resolved and/or may not exist for member in current year.

| Data Source | Suspect Reason | Date of Service | Potential Diagnosis Code | Potential Diagnosis Description | CMS HCC | CMS HCC Description | RA FACTOR |
|---|---|---|---|---|---|---|---|
| MED HX | Pt has a history of Diabetes and Vascular Disease. If a causal relationship exists, please consider coding Diabetes with secondary Vascular Complications | 08/21/2018 | | | HCC018 | Diabetes with Chronic Complications | 0.368 |

LAB -Lab test results suggest patient may have listed condition. Lab test and results provided.
DME/OTC - DME/OTC usage suggests patient may have listed condition. DME/OTC usage provided.
Rx - Rx(Prescription Drug usage) suggests patient may have listed condition. Most recent prescription provided.
Med Hx -Diagnosis history of patient suggests patient may have listed condition. Brief Description provided.
CSNP - Health Plan received a chronic condition confirmation through CSNP verification process but has not received a claim for verified condition listed.

Attestation - By utilizing this portal, you attest that you have documented the medical condition(s) in member's medical records as per CMS guidelines during the stated review period and that specific documentation of the sign, symptom, condition, disease or other reason for the encounter exists therein. Suspected, possible, and rule out diagnoses have not and may not be submitted. You further attest that the information provided is true, accurate and complete to the best of your knowledge.

Confidentiality Notice - The information contained within this portal constitutes confidential information, some or all of which may be protected health information as defined by the federal Health Insurance Portability & Accountability Act (HIPAA). Access to this portal is granted only to the registered user or an employee or agent acting under the direction of the registered) and is intended for the exclusive use of that individual or entity and may contain information that is proprietary, privileged, confidential and/or otherwise exempt from disclosure under applicable law. If you are not the registered user (or an employee or agent acting under the direction of the registered), you are hereby notified that any disclosure, dissemination, distribution or copying of this information is strictly prohibited and may be subject to legal restriction or sanction.

1

# EXHIBIT 2
# Documents Related to Patient I

# EXHIBIT 2-I1

## 5 Star Check List - DR. AKHIL PATEL

Freedom VIP Savings (HMO SNP) - PCP Effective Date: 09-2018

PHYSICIAN PARTNERS

Visits in last 12 months:　　PCP: 17　　ER: 0　　Specialists: 7　　Hospital: 0

100% | 2.029

HCC 040　HCC 111　HCC 058　HCC 108　HCC 112　HCC 048　HCC 012

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported | | | Source | Comments |
|---|---|---|---|---|---|---|
| | | 2018 | 2017 | 2016 | | |
| HCC040 - Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | | | | | | RA Factor: 0.374 |
| M06.9 | Rheumatoid arthritis, unspecified | 21 | 5 | 3 | Current PCP | No - Pending Rh ve |
| HCC111 - Chronic Obstructive Pulmonary Disease | | | | | | RA Factor: 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 4 | 2 | 2 | Current PCP | No |
| HCC058 - Major Depressive, Bipolar, and Paranoid Disorders | | | | | | RA Factor: 0.330 |
| F32.4 | Major depressive disorder, single episode, in partial remission | 3 | 0 | 0 | Current PCP | No |
| HCC108 - Peripheral vascular disease, unspecified | | | | | | RA Factor: 0.299 |
| I77.9 | Disorder of arteries and arterioles, unspecified | 0 | 0 | 1 | Past History | No |
| HCC112 - Fibrosis of Lung and Other Chronic Lung Disorders | | | | | | RA Factor: 0.274 |
| J47.0 | Bronchiectasis with acute lower respiratory infection | 0 | 0 | 1 | Past History | No |
| J84.10 | Pulmonary fibrosis, unspecified | 0 | 1 | 0 | Physician | No |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 4 | 2 | 0 | Current PCP | No |
| HCC012 - Breast, Prostate, and Other Cancers and Tumors | | | | | | RA Factor: 0.15 |
| C61 | Malignant neoplasm of prostate | 0 | 2 | 4 | Past History | No in remission |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| There are no codes reported / captured in the current year | | | | | |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: 1/31/19

Signature (MD, DO, PA or NP only):

CZ_DS004501

# EXHIBIT 2-I2

5 Star Check List - DR. CLARISSA A DAHROW

SSN | 2.243

( 012 ) ( 040 ) ( 085 ) ( 111 ) ( 058 ) ( 108 ) ( 112 ) ( 048 )

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported | | | Source | Comments |
|---|---|---|---|---|---|---|
| | | 2018 | 2017 | 2016 | | |
| HCC040 - Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | | | | | | RA Factor: 0.374 |
| M06.9 | Rheumatoid arthritis, unspecified | 21 | 5 | 3 | Physician | No need verification |
| HCC085 - Congestive Heart Failure | | | | | | RA Factor: 0.368 |
| I50.30 | Unspecified diastolic (congestive) heart failure | 0 | 0 | 0 | Review Suspect | Echo on 04/08/2013 shows Diastolic dysfunction. No |
| HCC111 - Chronic Obstructive Pulmonary Disease | | | | | | RA Factor: 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 5 | 2 | 2 | Physician | No |
| HCC058 - Major Depressive, Bipolar, and Paranoid Disorders | | | | | | RA Factor: 0.330 |
| F32.4 | Major depressive disorder, single episode, in partial remission | 3 | 0 | 0 | Physician | No |
| HCC108 - Vascular Disease | | | | | | RA Factor: 0.299 |
| 77.819 | Aortic ectasia, unspecified site | 0 | 0 | 0 | Review Suspect | CT chest on 09/19/2016 shows ascending aorta is ectatic No |
| 70.0 | Atherosclerosis of aorta | 0 | 0 | 0 | Review Suspect | CT chest on 09/19/2016 shows atherosclerotic calcifications in aorta OK |
| HCC112 - Fibrosis of Lung and Other Chronic Lung Disorders | | | | | | RA Factor: 0.274 |
| 7.0 | Bronchiectasis with acute lower respiratory infection | 0 | 0 | 1 | Past History | No |
| 4.10 | Pulmonary fibrosis, unspecified | 0 | 1 | 0 | Physician | No |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor: 0.262 |
| 9.2 | Other nonthrombocytopenic purpura | 5 | 2 | 0 | Physician | No |

## LOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| | ICD | ICD Description | First DOS | Last DOS | Source | |
|---|---|---|---|---|---|---|
| 012 | C61 | Malignant neoplasm of prostate | 04-02-2019 | 04-02-2019 | Current PCP | No |

Patient Seen: Last seen 4/26. Form resubmission

Signature (MD, DO, PA or NP only):

CZ_DS004502

# EXHIBIT 2-I3



| HCC | HCC Description | HCC Type | Leftover Type | ICD | ICD Description / Suspect Reason / ICDs Not Found | Resolved w/o codes | Coded by same PCP | # of times reported in service years | | | | | | |
|-----|-----------------|----------|---------------|-----|-------------------------------------------------|--------------------|-------------------|------|------|------|------|------|------|------|
| | | | | | | | | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 201 |
| HCC040 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | Chronic | Prev Paid | M06.9 | Rheumatoid arthritis, unspecified | | | 23 | 5 | 3 | 0 | 0 | 0 | 0 |
| HCC048 | Coagulation Defects and Other Specified Hematological Disorders | Chronic | Prev Paid | D69.2 | Other nonthrombocytopenic purpura | | | 7 | 2 | 0 | 0 | 0 | 0 | 0 |
| HCC058 | Major Depressive, Bipolar, and Paranoid Disorders | Chronic | Prev Paid | F32.4 | Major depressive disorder, single episode, in partial remission | | | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| HCC108 | Vascular Disease | Chronic | Prev Paid | I77.9 | Disorder of arteries and arterioles, unspecified | | | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| HCC111 | Chronic Obstructive Pulmonary Disease | Chronic | Prev Paid | J44.9 | Chronic obstructive pulmonary disease, unspecified | | | 7 | 2 | 2 | 0 | 0 | 0 | 0 |
| HCC112 | Fibrosis of Lung and Other Chronic Lung Disorders | Chronic | Prev Paid | J47.0 / J84.10 | Bronchiectasis with acute lower respiratory infection / Pulmonary fibrosis, unspecified | | | 0 / 0 | 0 / 1 | 1 / 0 | 0 / 0 | 0 / 0 | 0 / 0 | 0 / 1 |
| HCC138 | Chronic Kidney Disease, moderate (Stage 3) | Chronic | Prev Paid | N18.3 | Chronic kidney disease, stage 3 (moderate) | | | 5 | 2 | 0 | 1 | 0 | 0 | 1 |

**Suspect HCCs per Jim's file**

| HCC | HCC Description | ICD | ICD9 Description | Source | Suspect Reason | DOS | # of times reported in service years | | | | | |
|-----|-----------------|-----|------------------|--------|----------------|-----|------|------|------|------|------|------|
| | | | | | | | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
| No Suspect HCCs | | | | | | | | | | | | |

**2019 Paid (1)**

| HCC | HCC Description | ICD | ICD9 Description | # of times reported in service years | | | | | | | |
|-----|-----------------|-----|------------------|------|------|------|------|------|------|------|------|
| | | | | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | <=2011 |
| HCC012 | Breast, Prostate, and Other Cancers and Tumors | C61 | Malignant neoplasm of prostate | 0 | 2 | 4 | 0 | 0 | 0 | 0 | 1 |

CZ_DS004503

# EXHIBIT 2-I4

## 5 Star Check List - DR. CLARISSA A ZAFIROV

①File ②Check 2019.
Billing

Freedom VIP Savings (HMO SNP) - PCP Effective Date: 03-2019

Visits in last 12 months:    PCP: 20    ER: 1      Specialists: 6     Hospital: 0

| 13% | 0.154 | | 88% | 2.243 |

( ✓ HCC 012 ) ( HCC 040 ) ( HCC 085 ) ( HCC 111 ) ( HCC 058 ) ( HCC 108 ) ( HCC 112 ) ( HCC 048 )

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the p
Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported | | | Source | Comments |
|-------|-----------------|------|------|------|--------|----------|
| | | 2018 | 2017 | 2016 | | |
| HCC040 - Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | | | | | | RA Factor |
| M06.9 | Rheumatoid arthritis, unspecified | 23 | 5 | 3 | Physician | |
| HCC085 - Congestive Heart Failure | | | | | | RA Factor |
| I50.30 | Unspecified diastolic (congestive) heart failure | 0 | 0 | 0 | Review Suspect | Echo on 04/08/2013 shows Diasto dysfunction. |
| HCC111 - Chronic Obstructive Pulmonary Disease | | | | | | RA Factor |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 7 | 2 | 2 | Physician | |
| HCC058 - Major Depressive, Bipolar, and Paranoid Disorders | | | | | | RA Factor |
| F32.4 | Major depressive disorder, single episode, in partial remission | 4 | 0 | 0 | Physician | |
| HCC108 - Vascular Disease | | | | | | RA Factor |
| I77.819 | Aortic ectasia, unspecified site | 0 | 0 | 0 | Review Suspect | CT chest on 09/19/2016 shows ascending aorta is ectatic |
| I70.0 | Atherosclerosis of aorta | 0 | 0 | 0 | Review Suspect | CT chest on 09/19/2016 shows atherosclerotic calcifications in aor |
| HCC112 - Fibrosis of Lung and Other Chronic Lung Disorders | | | | | | RA Factor |
| J47.0 | Bronchiectasis with acute lower respiratory infection | 0 | 0 | 1 | Past H | |
| J84.10 | Pulmonary fibrosis, unspecified | 0 | 1 | 0 | Physic | |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor |
| D69.2 | Other nonthrombocytopenic purpura | 7 | 2 | 0 | Physician | |

Same HCC with source listed as "Physician" instead of "Current PCP"

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|-----|-----|-----------------|-----------|----------|--------|
| HCC012 | C61 | Malignant neoplasm of prostate | 04-02-2019 | 04-02-2019 | Physician |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: _____

Signature (MD, DO, PA or NP only): _____

CZ_DS004504

# EXHIBIT 3

# Documents Related to Patient J

# EXHIBIT 3-J1

Case 8:19-cv-01236-KKM-SPF Document 258-23 Filed 05/15/24 Page 193 of 332 PageID 105217



**MOFFITT**
CANCER CENTER
12902 USF Magnolia Drive
Tampa, Florida 33612-9497
(813) 745-4673

Patient Name:
MRN:
FIN:
Gender:
DOB:

---

## Radiation Oncology AC Note

SIGNED INFORMATION:                                    TROTTI MD,ANDY M (1/3/2019 15:00 EST)

**Radiation Oncology Follow-up Note**
**Moffitt Cancer Center**

Patient:                    **MRN: 750958**      **FIN: 7932260**
Age:              Sex:          DOB:
Associated Diagnoses:  **Squamous cell carcinoma of left tonsil**
Author:    **TROTTI MD, ANDY M**

**Staging**
   **Staging (ST):**
   No staging data qualified

**Visit Information**
   **Date of Service: 1/3/2019**
   **Visit type:** Scheduled follow-up.

**HPI Related to Consult**
   **Narrative**
   Radiation oncology follow-up note

   750958

   01/03/2019

   This patient returns 1 year and 4 months after completing postoperative radiation and chemotherapy for a pathologic T2 clinical N1 carcinoma of
   the left tonsil, P 16 positive, smoker.

   He reports occasional hypersensitivity to spicy foods and hot foods in the left tonsil region.

   On exam he has scarring of the left tonsil region. There is no oral lesions. He has bilateral atrophy of the neck. No fibrosis. No adenopathy.

   No evidence of disease

   He we Dr. Nall in March

   I'll see him in June of this year

   Andy Trotti M.D.

**Review of Systems**
   **Performance Scale:**        Karnofsky: 90 - Able to carry on normal activity.

**Health Status**
   **Allergies**                         **Reaction**
   fluconazole Drug rash, NOS.**Home Medications: tamsulosin  (Flomax 0.4 mg oral capsule)** 0.4 mg, 1 cap(s), PO, Daily

---

## CONFIDENTIAL PATIENT INFORMATION

Page 1 of 2                          CC Physician:  PATEL MD,AKHIL B
1/3/2019 15:44 EST                        Address:  333 TAMIAMI TRL
51053670                                            STE 397
                                                    VENICE, FL 34285-

CZ_DS004505

Case 8:19-cv-01036KAS-SPF Document 258-23 Filed 05/15/21 Page 194 of 332 PageID 6018

Patient Name [REDACTED]     Moffitt Cancer Center     Patient MRN   750958

---

## Radiation Oncology AC Note

**finasteride  (finasteride 5 mg oral tablet)** 5 mg, 1 tab(s), PO, Q48HR
**ALPRAZolam  (ALPRAZolam 0.5 mg oral tablet)** 0.5 mg, 1 tab(s), PO, BEDTIME, PRN: as needed for anxiety
**ondansetron (ondansetron 8 mg oral tablet)** 8 mg, 1 tab(s), PO, TID, PRN: Nausea/Vomiting, Special Instructions: Wait for 48 hours a
    chemotherapy to take this medication.
**docusate-senna  (Senokot S 50 mg-8.6 mg oral tablet)** 2 tab(s), PO, BID
**Magic Mouth Wash** Special Instructions: 1 part viscous lidocaine 2 %; 1 part maalox ; 1 part diphenhydramine 12.5  per 5 ml elixir; Swis
    and spit 5 to 10 mL  q 6 hrs.
**salt and soda rinses** Swish & Expectorate, QID
**polyethylene glycol 3350  (MiraLax oral powder for reconstitution)** 17 gm, PO, BID, PRN: Constipation
**oxyCODONE  (oxyCODONE 5 mg oral tablet)** Special Instructions: 2-3 tab(s), PO, Q 4 - 6 hrs, PRN pain
**prochlorperazine  (Compazine 10 mg oral tablet)** 10 mg, 1 tab(s), PO, TID, PRN: Nausea/Vomiting
**nystatin  (nystatin 100,000 units/mL oral suspension)** 500,000 unit(s), 5 mL, Swish & Swallow, QID
**omeprazole  (omeprazole 40 mg oral delayed release capsule)** 40 mg, 1 cap(s), PO, QAM
**traZODone  (traZODone 50 mg oral tablet)** PO, BEDTIME

**Impression and Plan**
    **Diagnosis**: Squamous cell carcinoma of left tonsil.

*Electronically Signed on 01/03/2019 03:00 PM*

TROTTI MD, ANDY M

---

**CONFIDENTIAL PATIENT INFORMATION**

CC Physician:  PATEL MD,AKHIL B
Address:   333 TAMIAMI TRL

CZ_DS004506

# EXHIBIT 3-J2

**5 Star Check List - DR. AKHIL PATEL**

PHYSICIAN PARTNERS

Freedom VIP Savings (HMO SNP) · PCP Effective Date: 09-2018

Visits in last 12 months. | PCP: 25 | ER: 0 | Specialists: 14 | Hospital: 0

100% | 4.867

( 008 ) ( 021 ) ( 161 ) ( 085 ) ( 011 ) ( 096 ) ( 012 )

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | | ICD Description | Times Reported | | | Source | Comments |
|---|---|---|---|---|---|---|---|
| | | | 2018 | 2017 | 2016 | | |
| HCC008 - Metastatic Cancer and Acute Leukemia | | | | | | | RA Factor: 1.024 |
| C77.0 | | Secondary and unspecified malignant neoplasm of lymph nodes of head, face and neck | 0 | 49 | 0 | Physician Hospital | No, in remsskn |
| HCC021 - Protein-Calorie Malnutrition | | | | | | | RA Factor: 0.717 |
| R64 | | Cachexia | 0 | 1 | 0 | Past History | NO |
| HCC0161 - Chronic Ulcer of Skin, Except Pressure | | | | | | | RA Factor: 0.516 |
| L97.905 | | | 0 | 0 | 1 | Past History | |
| HCC085 - Congestive Heart Failure | | | | | | | RA Factor: 0.368 |
| I50.30 | | Unspecified diastolic (congestive) heart failure | 2 | 0 | 0 | Current PCP | No, need last echo result |
| HCC011 - Colorectal, Bladder, and Other Cancers | | | | | | | RA Factor: 0.317 |
| C09.9 | | Malignant neoplasm of tonsil, unspecified | 8 | 82 | 0 | Current PCP | No, now in remission |
| C09.0 | | Malignant neoplasm of tonsillar fossa | 4 | 12 | 0 | Current PCP | |
| C67.9 | | Malignant neoplasm of bladder, unspecified | 0 | 4 | 5 | Hospital Physician | No |
| C67.8 | | Malignant neoplasm of overlapping sites of bladder | 0 | 2 | 0 | Physician | No |
| C09.8 | | Malignant neoplasm of overlapping sites of tonsil | 0 | 30 | 0 | Physician Hospital | No |
| HCC096 - Specified Heart Arrhythmias | | | | | | | RA Factor: 0.268 |
| I47.1 | | Supraventricular tachycardia | 0 | 2 | 0 | Past History | No |
| I48.91 | | Unspecified atrial fibrillation | | | | Past History | No |
| HCC012 - Breast, Prostate, and Other Cancers and | | | | | | | RA Factor: 0.154 |
| C76.0 | | Malignant neoplasm of head, face and neck | 0 | 1 | 0 | Physician | No |

Specificially note that the source for ICD C09.9 is "Current PCP"

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| ICC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| | | There are no codes reported / captured in the current year | | | |

Attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: 1/21/19

Signature (MD, DO, PA or NP only): _____

Please fax form and progress note to **888-978-5655**

CZ_DS004507

# EXHIBIT 3-J3

## 5 Star Check List - DR. CLARISSA A ZAFIROV

Freedom VIP Savings (HMO SNP) - PCP Effective Date: 02-2019

Visits in last 12 months: PCP: 17   ER: 0   Specialists: 10   Hospital: 0

PHYSICIAN PARTNERS

| 13% | 0.317 | 88% | 5.115 |

HCC 011 (checked) · HCC 008 · HCC 021 · HCC 161 · HCC 055 · HCC 085 · HCC 108 · HCC 096

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported | | | Source | Comments |
|---|---|---|---|---|---|---|
| | | 2018 | 2017 | 2016 | | |
| HCC008 - Metastatic Cancer and Acute Leukemia | | | | | | RA Factor: 2.48 |
| C77.0 | Secondary and unspecified malignant neoplasm of lymph nodes of head, face and neck | 0 | 49 | 0 | Physician Hospital | No |
| HCC021 - Protein-Calorie Malnutrition | | | | | | RA F |
| R64 | Cachexia | 0 | 1 | 0 | Past History | No |
| HCC161 - Chronic Ulcer of Skin, Except Pressure | | | | | | RA Factor: 0.5 |
| L97.905 | | 0 | 0 | 1 | Past History | |
| HCC055 - Drug/Alcohol Dependence | | | | | | RA Factor: 0.42 |
| F13.20 | Sedative, hypnotic or anxiolytic dependence, uncomplicated | 0 | 0 | 0 | Review Suspect | ON ALPRAZOLAM No |
| HCC085 - Congestive Heart Failure | | | | | | RA Factor: 0.3 |
| I50.30 | Unspecified diastolic (congestive) heart failure | 2 | 0 | 0 | Physician | No |
| HCC108 - Peripheral vascular disease, unspecified | | | | | | RA Factor: 0.2 |
| I70.208 | Unspecified atherosclerosis of native arteries of extremities, other extremity | 0 | 0 | 0 | | History of smoking, evaluate for peripheral vascular disease N |
| HCC096 - Specified Heart Arrhythmias | | | | | | RA Factor: 0. |
| I48.91 | Unspecified atrial fibrillation | 0 | 2 | 0 | Hospital | N |
| I47.1 | Supraventricular tachycardia | 0 | 2 | 0 | Physician | No |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| CC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| | | There are no codes reported / captured in the current year | | | |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: 5/21/19 ·

Signature (MD, DO, PA or NP only): _____

CZ_DS004508

EXHIBIT 3-J4

https://myq360.com/msap/member_task_list_2017_long_form_v2.php?muids=58628

| | | | | | | Source |
|---|---|---|---|---|---|---|
| HCC055 - Drug/Alcohol Dependence | | | | | | RA Factor: 0.420 |
| F13.20 | Sedative, hypnotic or anxiolytic dependence, uncomplicated | 0 | 0 | 0 | Review Suspect | ON ALPRAZOLAM |
| HCC085 - Congestive Heart Failure | | | | | | RA Factor: 0.368 |
| I50.30 | Unspecified diastolic (congestive) heart failure | 2 | 0 | 0 | Physician | |
| HCC108 - Peripheral vascular disease, unspecified | | | | | | RA Factor: 0.299 |
| I70.208 | Unspecified atherosclerosis of native arteries of extremities, other extremity | 0 | 0 | 0 | Clinical Review | History of smoking, evaluate for peripheral vascular disease |
| HCC096 - Specified Heart Arrhythmias | | | | | | RA Factor: 0.295 |
| I48.91 | Unspecified atrial fibrillation | 0 | 2 | 0 | Hospital | |
| I47.1 | Supraventricular tachycardia | 0 | 2 | 0 | Physician | |
| HCC138 - | | | | | | RA Factor: |
| N18.3 | Chronic kidney disease, stage 3 (moderate) | 0 | 2 | 0 | Physician | |

### BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| HCC011 | C09.9 | Malignant neoplasm of tonsil, unspecified | 01-03-2019 | 06-06-2019 | Physician Hospital |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date.

Date Patient Seen: _____

Signature (MD, DO, PA or NP only): _____

08/11/2019 19:11

Please fax form and progress note to **888-978-5655**
Confidential - Do Not Distribute

Page 1 of 1

CZ_DS004509

EXHIBIT 3-J5



CZ_DS004510

EXHIBIT 3-J6

Case 8:16-cv-01477-CEH-AAS Document 118-25 Filed 05/03/24 Page 204 of 332 PageID 10729

Member Health Profile Bulk × +

← → C 🔒 apps.freedomhealth.com/Reports/Search/53

Apps | Patient Handouts | Preprocedure Patie... | AAOS Essentials of... | Search – UpToDate | Paroxetine-sertralin... | Pathol

|◁   <   92   of 93 ?   ▷   ▷|   ↻   🖫 ⌄     Find | Next

Confidential Patient Information

## MEMBER HEALTH PROFILE

**FREEDOM HEALTH**

Run Date: 3/10/2020     Membership Month 03/01/2020     Review Period: 1/1/2020 To 12/31/2020

Plan Name: Freedom VIP Savings (HMO C-SNP)

Member Name: ███████

Gender: ███

DOB: ███████

Member Phone: ███████

Member ID ███████

Provider Name: ZAFIROV, CLARISSA, A

Provider ID: P1045672

Eff Date: 01/01/2020

Group Name: FLORIDA MEDICAL ASSOCIATES LLC

The following are HCC related medical conditions that have been reported to CMS in the past for this member. Please note that some of the conditions may have resolved and / or may not exist in current year.

| Provider Type | Confirmed 2020 DOS | RA FACTOR | Diagnosis Code | Diagnosis Description | Date Of Service | CMS HCC | CMS HCC Description |
|---|---|---|---|---|---|---|---|
| | N | 0.268 | | | | HCC096 | Specified Heart Arrhythmias |
| | N | 0.069 | | | | HCC138 | Chronic Kidney Disease, Moderate (Stage 3) |
| Physician | Y | 0.307 | C09.0 | Malignant neoplasm of tonsillar fossa | 1/13/2020 | HCC011 | Colorectal, Bladder, and Other Cancers |
| Physician | N | 0.331 | I50.30 | Unspecified diastolic (congestive) heart failure | 9/10/2018 | HCC085 | Congestive Heart Failure |

The following conditions may exist based on CSNP verification, Lab, DME, OTC and Rx data for this member. Please note that some of the conditions may have been resolved and/or may not exist for member in current year.

| Data Source | Suspect Reason | Date of Service | Potential Diagnosis Code | Potential Diagnosis Description | CMS HCC | CMS HCC Description | RA FACTOR |
|---|---|---|---|---|---|---|---|
| CSNP | Cardiovascular Disease | 01/02/2013 | | | Various | Cardiovascular Disease | |

LAB -Lab test results suggest patient may have listed condition. Lab test and results provided.
DME/OTC - DME/OTC usage suggests patient may have listed condition. DME/OTC usage provided.
Rx - Rx(Prescription Drug usage) suggests patient may have listed condition. Most recent prescription provided.
Med Rx -Diagnosis history of patient suggests patient may have listed condition. Brief Description provided.
CSNP - Health Plan received a chronic condition confirmation through CSNP verification process but has not received a claim for verified condition listed.

Attestation - By utilizing this portal, you attest that you have documented the medical condition(s) in member's medical records as per CMS guidelines during the stated review period and that specific documentation of the sign, symptom, condition, disease or other reason for the encounter exists therein. Suspected, possible, and rule out diagnoses have not and may not be submitted. You further attest that the information provided is true, accurate and complete to the best of your knowledge.

Confidentiality Notice - The information contained within this portal constitutes confidential information, some or all of which may be protected health information as defined by the federal Health Insurance Portability & Accountability Act (HIPAA). Access to this portal is granted only to the registered user (or an employee or agent acting under the direction of the registered) and is intended for the exclusive use of that individual or entity and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not the registered user (or an employee or agent acting under the direction of the registered), you are hereby notified that any disclosure, dissemination, distribution or copying of this information is strictly prohibited and may be subject to legal restriction or sanction.

92

# EXHIBIT 4

# Documents Related to Patient K

# EXHIBIT 4-K1



**PATEL, AKHIL (2019-01-22)**

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| I25.10 | Atherosclerotic heart disease of native coronary artery without angina pectoris | | PCP Encounters |

**PATEL, AKHIL (2019-01-18)**

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| L57.8 | Other skin changes due to chronic exposure to nonionizing radiation | | PCP Encounters |
| L82.1 | Other seborrheic keratosis | | PCP Encounters |
| D22.9 | Melanocytic nevi, unspecified | | PCP Encounters |
| L85.3 | Xerosis cutis | | PCP Encounters |
| L82.0 | Inflamed seborrheic keratosis | | PCP Encounters |
| R20.8 | Other disturbances of skin sensation | | PCP Encounters |
| L29.8 | Other pruritus | | PCP Encounters |
| L53.8 | Other specified erythematous conditions | | PCP Encounters |
| L57.0 | Actinic keratosis | | PCP Enc |
| Z09 | Encounter for follow-up examination after completed treatment for conditions other than malignant neoplasm | | |



| ICD | ICD Desc | | Sources |
|---|---|---|---|
| D22.9 | Melanocytic nevi, unspecified | | PCP Encounters |
| L85.3 | Xerosis cutis | | PCP Encounters |
| L82.0 | Inflamed seborrheic keratosis | | PCP Encounters |
| R20.8 | Other disturbances of skin sensation | | PCP Encounters |
| L29.8 | Other pruritus | | PCP Encounters |
| L53.8 | Other specified erythematous conditions | | PCP Encounters |
| L57.0 | Actinic keratosis | | PCP Encounters |
| Z09 | Encounter for follow-up examination after completed treatment for conditions other than malignant neoplasm | | PCP Encounters |
| Z87.2 | Personal history of diseases of the skin and subcutaneous tissue | | PCP Encounters |
| L28.1 | Prurigo nodularis | | PCP Encounters |
| I10 | Essential (primary) hypertension | | PCP Encounters |
| M79.10 | | | PCP Encounters |
| Z68.23 | Body mass index (BMI) 23.0-23.9, adult | | PCP Encounters |

**PATEL, AKHIL (2019-01-07)**

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| R06.02 | Shortness of breath | | PCP Encounter |



**PATEL, AKHIL (2019-01-07)**

| ICD | ICD Desc | HCC | Sources |
|-----|----------|-----|---------|
| R06.02 | Shortness of breath | | PCP Encounters |
| I10 | Essential (primary) hypertension | | PCP Encounters |
| I25.10 | Atherosclerotic heart disease of native coronary artery without angina pectoris | | PCP Encounters |
| Z68.24 | Body mass index (BMI) 24.0-24.9, adult | | PCP Encounters |

**PATEL, AKHIL (2019-01-05)**

| ICD | ICD Desc | HCC | Sources |
|-----|----------|-----|---------|
| I49.1 | Atrial premature depolarization | | PCP Encounters |
| I48.91 | Unspecified atrial fibrillation | HCC096 | PCP Encounters |
| I48.92 | Unspecified atrial flutter | HCC096 | PCP Encounters |
| I24.8 | Other forms of acute ischemic heart disease | HCC087 | PCP Encounters |

2018

# EXHIBIT 4-K2

*Handwritten notes (top):*
- Billing needs
- Add for other files,
Needs last S* copy

**5 Star Check List - DR. AKHIL PATEL**

██████ VIP Savings (HMO SNP) - PCP Effective Date: 09-2018

<u>Visits in last 12 months:</u>   PCP: 14   ER: 1   Specialists: 2   Hospital: 2

**PHYSICIAN PARTNERS**

| 100% | 2.399 |

 HCC 055   HCC 085   HCC 111   HCC 108   HCC 096   HCC 112  HCC 048  HCC 088

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | 2018 | 2017 | 2016 | Source | Comments |
|---|---|---|---|---|---|---|
| **HCC055 - Drug/Alcohol Dependence** | | | | | | RA Factor: 0.420 |
| F11.20 | Opioid dependence, uncomplicated | 3 | 0 | 0 | **Current PCP** | No eForce |
| **HCC085 - Congestive Heart Failure** | | | | | | RA Factor: 0.368 |
| I27.0 | Primary pulmonary hypertension | 2 | 1 | 1 | Physician | No |
| I42.0 | Dilated cardiomyopathy | 1 | 0 | 0 | Past History | Ok hyper cardiomy |
| I42.2 | Other hypertrophic cardiomyopathy | 1 | 0 | 0 | Past History | |
| I50.20 | Unspecified systolic (congestive) heart failure | 1 | 0 | 0 | Past History | No |
| I27.20 | Pulmonary hypertension, unspecified | 0 | 2 | 0 | Past History | No |
| **HCC111 - Chronic Obstructive Pulmonary Disease** | | | | | | RA Factor: 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 1 | 0 | 0 | Physician | No - not purposeful Poor pulm eval. |
| **HCC108 - Peripheral vascular disease, unspecified** | | | | | | RA Factor: 0.299 |
| I70.209 | Unspecified atherosclerosis of native arteries of extremities, unspecified extremity | 2 | 1 | 0 | Past History | |
| I70.201 | Unspecified atherosclerosis of native arteries of extremities, right leg | 1 | 1 | 0 | Physician | |
| I70.203 | Unspecified atherosclerosis of native arteries of extremities, bilateral legs | 1 | 0 | 0 | Physician | |
| **HCC096 - Specified Heart Arrhythmias** | | | | | | RA Factor: 0.295 |
| I48.91 | Unspecified atrial fibrillation | 6 | 0 | 1 | **Current PCP** | Ok |
| I48.0 | Paroxysmal atrial fibrillation | 2 | 4 | 6 | Physician Hospital | — |
| I48.92 | Unspecified atrial flutter | 1 | 0 | 0 | Physician | — |
| **HCC112 - Fibrosis of Lung and Other Chronic Lung Disorders** | | | | | | RA Factor: 0.274 |
| J84.10 | Pulmonary fibrosis, unspecified | 2 | 0 | 0 | Physician | No - CT attached |
| **HCC048 - Coagulation Defects and Other Specified Hematological Disorders** | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 3 | 0 | 0 | **Current PCP** | No |
| **HCC088 - Angina Pectoris** | | | | | | RA Factor: 0.145 |
| I20.8 | Other forms of angina pectoris | 3 | 0 | 0 | **Current PCP** | |
| I25.118 | Atherosclerotic heart disease of native coronary artery with other forms of angina pectoris | 1 | 0 | 0 | **Current PCP** | No |
| I20.9 | Angina pectoris, unspecified | 1 | 0 | 0 | Physician | No |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

Please fax form and progress note to 888-978-5655

# EXHIBIT 4-K3

70

**5 Star Check List**

████████████████████████████████

VIP Savings (HMO SNP) - PCP Effective Date: 09-2018

**PHYSICIAN PARTNERS**

Visits in last 12 months:    PCP: 16    ER: 1    Specialists: 2    Hospital: 2

| 100% | 2.399 |

      

HCC 055   HCC 085   HCC 111   HCC 108   HCC 096   HCC 112   HCC 048   HCC 088

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported 2018 | Times Reported 2017 | Times Reported 2016 | Source | Comments |
|---|---|---|---|---|---|---|
| **HCC055 - Drug/Alcohol Dependence** | | | | | | RA Factor: 0.420 |
| F11.20 | Opioid dependence, uncomplicated | 3 | 0 | 0 | Current PCP | No, does not qualify |
| **HCC085 - Congestive Heart Failure** | | | | | | RA Factor: 0.368 |
| I27.0 | Primary pulmonary hypertension | 2 | 1 | 1 | Physician | Ok |
| I42.0 | Dilated cardiomyopathy | 1 | 0 | 0 | Past History | |
| I42.2 | Other hypertrophic cardiomyopathy | 1 | 0 | 0 | Past History | |
| I50.20 | Unspecified systolic (congestive) heart failure | 1 | 0 | 0 | Past History | |
| I27.20 | Pulmonary hypertension, unspecified | 0 | 2 | 0 | Past History | |
| **HCC111 - Chronic Obstructive Pulmonary Disease** | | | | | | RA Factor: 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 1 | 0 | 0 | Physician | No, never had PFT. Only 3 yrs smoking |
| **HCC108 - Peripheral vascular disease, unspecified** | | | | | | RA Factor: 0.299 |
| I70.209 | Unspecified atherosclerosis of native arteries of extremities, unspecified extremity | 2 | 1 | 0 | Past History | No mention in Cardiology notes |
| I70.201 | Unspecified atherosclerosis of native arteries of extremities, right leg | 1 | 1 | 0 | Physician | |
| I70.203 | Unspecified atherosclerosis of native arteries of extremities, bilateral legs | 1 | 0 | 0 | Physician | No U/S result. |
| **HCC096 - Specified Heart Arrhythmias** | | | | | | RA Factor: 0.295 |
| I48.91 | Unspecified atrial fibrillation | 6 | 0 | 1 | Current PCP | Post-op only before/at 2016. Neg now. Holter - Has Ling |
| I48.0 | Paroxysmal atrial fibrillation | 2 | 4 | 6 | Physician Hospital | |
| I48.92 | Unspecified atrial flutter | 1 | 0 | 0 | Physician | |
| **HCC112 - Fibrosis of Lung and Other Chronic Lung Disorders** | | | | | | RA Factor: ~~0.~~ |
| J84.10 | Pulmonary fibrosis, unspecified | 2 | 0 | 0 | Physician | Possible but not confirmed. Ok. Billed for. NOT on imaging |
| **HCC048 - Coagulation Defects and Other Specified Hematological Disorders** | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 3 | 0 | 0 | Current PCP | Ok - drug related |
| **HCC088 - Angina Pectoris** | | | | | | RA Factor: 0.145 |
| I20.8 | Other forms of angina pectoris | 3 | 0 | 0 | Current PCP | Yes |
| I25.118 | Atherosclerotic heart disease of native coronary artery with other forms of angina pectoris | 1 | 0 | 0 | Current PCP | Yes |
| I20.9 | Angina pectoris, unspecified | 1 | 0 | 0 | Physician | See above |

CAD - yes s/p CABG

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

Please fax form and progress note to **888-978-5655**

Confidential - Do Not Distribute

S/P MI    CABG 2015    PCI 3/18.

Page 1 of 2



**PHYSICIAN PARTNERS**

██████████████ - Savings (HMO SNP) - PCP Effective Date: 09-2018

Visits in last 12 months:    PCP: 16    ER: 1    Specialists: 2    Hospital: 2

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|-----|-----|-----------------|-----------|----------|--------|
| There are no codes reported / captured in the current year | | | | | |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: 1/7/19

Signature (MD, DO, PA or NP only): C. _____

██████████

F11.20 - Rare use of pain med & only for chest pain (I20.9 ?)

J44.9 - Patient has never had pulm function test and only 3 yrs smoking total. No evidence by history

2016 last CT available without pulm fibrosis

→ Still billing for afib despite lack of recurrance / non-continuing condition

Pulm fibrosis mentioned as imaging differential without confirmation. Confirmation NOT given after proper pulmonobgy eval.

# EXHIBIT 4-K4

Member Expense Report ✕ | Member Expense Report ✕ | ▇▇▇▇ - Snapshot - Q36 ✕ | +

https://myq360.com/index.php/snapshot/MemSnapshot ▇▇▇▇

Apps | Patient Handouts | Preprocedure Patie... | AAOS Essentials of... | Search - UpToDate | Paroxetine-sertralin... | Pathologic Q Wave... | E-FORCSE®, Florid...

| | | | |
|---|---|---|---|
| I25.10 | Atherosclerotic heart disease of native coronary artery without angina pectoris | | PCP Encounters |
| F41.9 | Anxiety disorder, unspecified | | PCP Encounters |
| I11.9 | Hypertensive heart disease without heart failure | | PCP Encounters |
| I43 | Cardiomyopathy in diseases classified elsewhere | HCC085 | PCP Encounters |
| I10 | Essential (primary) hypertension | | PCP Encounters |
| E78.5 | Hyperlipidemia, unspecified | | PCP Encounters |

### ZAFIROV, CLARISSA, A DR (2019-02-25)

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| I70.201 | Unspecified atherosclerosis of native arteries of extremities, right leg | HCC108 | PCP Encounters |

### ZAFIROV, CLARISSA, A DR (2019-02-21)

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| M85.89 | Other specified disorders of bone density and structure, multiple sites | | PCP Encounters |

### ZAFIROV, CLARISSA, A DR (2019-02-20)

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| I25.810 | Atherosclerosis of coronary artery bypass graft(s) without angina pectoris | | PCP Encounters |

Provide feedback


DELL

# EXHIBIT 4-K5

Freedom VIP Savings (HMO SNP) - PCP Effective Date: 02-2019

**PCP: 20**    **ER: 1**    Specialists: 5    Hospital: 0    PHYS PART

60% | 1.64

40% | 1.955

( HCC 085 ) ( HCC 108 ) ( HCC 096 ) ( HCC 086 ) ( HCC 087 ) ( HCC 088 ) ( HCC 055 ) ( HCC 111 ) ( HCC 112 ) ( HCC 048 )

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported | | | Source | Comments |
|-------|-----------------|------|------|------|--------|----------|
| | | 2018 | 2017 | 2016 | | |
| HCC055 - Drug/Alcohol Dependence | | | | | | RA Factor: 0.47 |
| F11.20 | Opioid dependence, uncomplicated | 4 | 0 | 0 | Physician | No |
| HCC111 - Chronic Obstructive Pulmonary Disease | | | | | | RA Factor: 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 1 | 0 | 0 | Physician | No |
| HCC112 - Fibrosis of Lung and Other Chronic Lung Disorders | | | | | | RA Factor: 0.274 |
| J84.10 | Pulmonary fibrosis, unspecified | 2 | 0 | 0 | Physician | No |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 4 | 0 | 0 | Physician | No |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|-----|-----|-----------------|-----------|----------|--------|
| HCC085 | I43 | Cardiomyopathy in diseases classified elsewhere | 02-26-2019 | 04-18-2019 | Current PCP |
| HCC086 | I21.3 | ST elevation (STEMI) myocardial infarction of unspecified site | 04-03-2019 | | Physician |
| HCC087 | I24.8 | Other forms of acute ischemic heart disease | | | Physician |
| HCC087 | I25.110 | Atherosclerotic heart disease of native coronary artery with unstable angina pectoris | 02-26-2019 | 02-26-2019 | Physician Hospital |
| HCC088 | I25.118 | Atherosclerotic heart disease of native coronary artery with other forms of angina pectoris | 02-26-2019 | 02-26-2019 | Hospital |
| HCC096 | I48.91 | Unspecified atrial fibrillation | 01-05-2019 | 04-17-2019 | Physician Hospital |
| HCC096 | I48.92 | Unspecified atrial flutter | 01-05-2019 | 04-17-2019 | Physician |
| HCC108 | I70.201 | Unspecified atherosclerosis of native arteries of extremities, right leg | 02-25-2019 | 02-25-2019 | Current PCP |
| HCC108 | I70.209 | Unspecified atherosclerosis of native arteries of extremities, unspecified extremity | 02-25-2019 | 02-25-2019 | Other Provider |

Same HCC codes with different sources from same date

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: _Last Seen 4/18/19_ .

Signature (MD, DO, PA or NP only): _____

CZ_DS004525

# EXHIBIT 4-K6

VIP–VEN–LAP02

Q Member Expense Report  ×  | Q Member Expense Report  ×  Q  ▨  napshot  × +

← → C  🔒 https://myq360.com/index.php/snapshot/MemSnapsho▨

⋮⋮⋮ Apps  📙 Patient Handouts  ⬛ Preprocedure Patie…  🌐 AAOS Essentials of…  U Search - UpToDate  ⊙ Paroxetine-sertralin…  🔀 Pathologic Q Wave…  ℞ E-FORCSE®, Florid…  »

## 2019 Paid (3)

| HCC | HCC Description | ICD | ICD9 Description | # of times reported in service years | | | | | | | | Logic number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | <=2011 | |
| HCC085 | Congestive Heart Failure | I27.0 | Primary pulmonary hypertension | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 1 |
| | | I27.20 | Pulmonary hypertension, unspecified | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | I42.0 | Dilated cardiomyopathy | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | I42.2 | Other hypertrophic cardiomyopathy | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | I43 | Cardiomyopathy in diseases classified elsewhere | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | I50.20 | Unspecified systolic (congestive) heart failure | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| HCC088 | Angina Pectoris | I20.8 | Other forms of angina pectoris | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | I20.9 | Angina pectoris, unspecified | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | I25.118 | Atherosclerotic heart disease of native coronary artery with other forms of angina pectoris | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| HCC108 | Vascular Disease | I70.201 | Unspecified atherosclerosis of native arteries of extremities, right leg | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | I70.203 | Unspecified atherosclerosis of native arteries of extremities, bilateral legs | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | I70.209 | Unspecified atherosclerosis of native arteries of extremities, unspecified extremity | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | |

Show hidden icons

Provide feedback

DELL

EXHIBIT 4-K7

CdadaLfcaSatAd5ZEAtAGnANtEWPTCdocaomESsU1 HhkOSSUSSS; Page:222 of 332/6jwj9XXbNH

# 5 Star Check List - DR. CLARISSA A ZAFIROV



Freedom VIP Savings (HMO SNP) - PCP Effective Date: 02-2019

Visits in last 12 months:     PCP: 18     ER: 2     Specialists: 5     Hospital: 0

**PHYSICIAN PARTNERS**

| 60% | 1.64 | 40% | 1.66 |

         

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported | | | Source | Comments |
|-------|-----------------|------|------|------|--------|----------|
| | | 2018 | 2017 | 2016 | | |
| HCC055 - Drug/Alcohol Dependence | | | | | | RA Factor: 0.420 |
| F11.20 | Opioid dependence, uncomplicated | 4 | 0 | 0 | Physician | |
| HCC111 - Chronic Obstructive Pulmonary Disease | | | | | | RA Factor: 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 1 | 0 | 0 | Physician | |
| HCC112 - Fibrosis of Lung and Other Chronic Lung Disorders | | | | | | RA Factor: 0.274 |
| J84.10 | Pulmonary fibrosis, unspecified | 2 | 0 | 0 | Physician | |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 4 | 0 | 0 | Physician | |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|-----|-----|-----------------|-----------|----------|--------|
| HCC085 | I43 | Cardiomyopathy in diseases classified elsewhere | 02-26-2019 | 03-11-2019 | Current PCP |
| HCC086 | I21.3 | ST elevation (STEMI) myocardial infarction of | 04-03-2019 | 04-03-2019 | Current PCP |

Cdad-82eba63250408080f7 Unknown8084 Fde2052028, Page:00of392t8pq59328V7

| HCC111 - Chronic Obstructive Pulmonary Disease | | | | | RA Factor: 0.346 |
|---|---|---|---|---|---|
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 1 | 0 | 0 | Physician |

| HCC112 - Fibrosis of Lung and Other Chronic Lung Disorders | | | | | RA Factor: 0.274 |
|---|---|---|---|---|---|
| J84.10 | Pulmonary fibrosis, unspecified | 2 | 0 | 0 | Physician |

| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | RA Factor: 0.252 |
|---|---|---|---|---|---|
| D69.2 | Other nonthrombocytopenic purpura | 4 | 0 | 0 | Physician |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| HCC085 | I43 | Cardiomyopathy in diseases classified elsewhere | 02-26-2019 | 03-11-2019 | **Current PCP** |
| HCC086 | I21.3 | ST elevation (STEMI) myocardial infarction of unspecified site | 04-03-2019 | 04-03-2019 | **Current PCP** |
| HCC087 | I24.8 | Other forms of acute ischemic heart disease | 01-05-2019 | 02-07-2019 | **Current PCP** |
| HCC088 | I25.118 | Atherosclerotic heart disease of native coronary artery with other forms of angina pectoris | 02-26-2019 | 02-26-2019 | Hospital |
| HCC096 | I48.91 | Unspecified atrial fibrillation | 01-05-2019 | 02-07-2019 | **Current PCP** |
| HCC096 | I48.92 | Unspecified atrial flutter | 01-05-2019 | 02-07-2019 | **Current PCP** |
| HCC108 | I70.201 | Unspecified atherosclerosis of native arteries of extremities, right leg | 02-25-2019 | 02-25-2019 | **Current PCP** |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: _____

Signature (MD, DO, PA or NP only): _____



# EXHIBIT 4-K8

Star Check List - DR. CLARISSA A ZAFIROV

Printed 3/9/19 @ 10:16 am

Freedom VIP Savings (HMO SNP) - PCP Effective Date: 02-2019

Visits in last 12 months:   PCP: 21      ER: 1         Specialists: 5       Hospital: 0



PHYSICIAN PARTNER

| 55% | 1.64 | | 45% | 1.66 |

        

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported 2018 | Times Reported 2017 | Times Reported 2016 | Source | Comments |
|---|---|---|---|---|---|---|
| HCC095 - Drug/Alcohol Dependence | | | | | | RA Factor: 0.420 |
| F11.20 | Opioid dependence, uncomplicated | 4 | 0 | 0 | Physician | |
| HCC111 - Chronic Obstructive Pulmonary Disease | | | | | | RA Factor: 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 1 | 0 | 0 | Physician | |
| HCC112 - Fibrosis of Lung and Other Chronic Lung Disorders | | | | | | RA Factor: 0.274 |
| J84.10 | Pulmonary fibrosis, unspecified | 2 | 0 | 0 | Physician | |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor: 0.262 |
| D69.2 | Other nonthrombocytopenic purpura | 4 | 0 | 0 | Physician | |
| HCC138 | | | | | | RA Factor |
| N18.3 | Chronic kidney disease, stage 3 (moderate) | 4 | 2 | 0 | Physician Hospital | |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| HCC085 | I43 | Cardiomyopathy in diseases classified elsewhere | 02-26-2019 | 04-18-2019 | Current PCP |
| HCC086 | I21.3 | ST elevation (STEMI) myocardial infarction of unspecified site | 04-03-2019 | 04-03-2019 | Physician |
| HCC087 | I24.8 | Other forms of acute ischemic heart disease | 01-05-2019 | 05-06-2019 | Physician |
| HCC087 | I25.110 | Atherosclerotic heart disease of native coronary artery with unstable angina pectoris | 02-26-2019 | 02-26-2019 | Physician Hospital |
| HCC088 | I25.118 | Atherosclerotic heart disease of native coronary artery with other forms of angina pectoris | 02-26-2019 | 02-26-2019 | Hospital |
| HCC096 | I48.91 | Unspecified atrial fibrillation | 01-05-2019 | 05-06-2019 | Physician Hospital |
| HCC096 | I48.92 | Unspecified atrial flutter | 01-05-2019 | 05-06-2019 | Physician |
| HCC108 | I70.201 | Unspecified atherosclerosis of native arteries of extremities, right leg | 02-25-2019 | 02-25-2019 | Physician |
| HCC108 | I70.209 | Unspecified atherosclerosis of native arteries of extremities, unspecified extremity | 02-25-2019 | 02-25-2019 | Other Provider |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: _____

Signature (MD, DO, PA or NP only): _____

CZ_DS004529

# EXHIBIT 4-K9

## PROSPECTIVE POSSIBLE CONDITION REPORT

**Refreshed Date:** 10/7/2019

Plan Name: Freedom VIP Savings (HMO SNP)
Member Name:
Gender:
DOB:
Member Phone:

Member ID:
Provider Name: ZAFIROV, CLARISSA, A
Provider ID: P1045672
EFF Date: 10/01/2013
Group Name: FLORIDA MEDICAL ASSOCIATES LLC

**Status Filter:** --SHOW ALL--

| Action | HCC Description | Possible Review Description | Physicians Involved | DOS | Script Count | Status |
|--------|-----------------|------------------------------|----------------------|-----|--------------|--------|
| Modify | Coagulation Defects and Other Specified Hematological Disorders | HCC submitted previously currently absent from patient clinical diagnoses | Other physician | 10/30/2018 | | UNADDRESSED |
| Modify | Drug/Alcohol Dependence | HCC submitted previously currently absent from patient clinical diagnoses | Other physician | 10/30/2018 | | UNADDRESSED |
| Modify | Fibrosis of Lung and Other Chronic Lung Disorders | HCC submitted previously currently absent from patient clinical diagnoses | Other physician | 04/02/2018 | | UNADDRESSED |
| Modify | Chronic Kidney Disease, Moderate (Stage 3) | HCC submitted previously currently absent from patient clinical diagnoses | CMS | | | UNADDRESSED |
| Modify | Specified Heart Arrhythmias | HCC submitted previously currently absent from patient clinical diagnoses | Other physician | 11/26/2018 | | UNADDRESSED |
| Modify | Chronic Obstructive Pulmonary Disease | Rx data suggests missing diagnosis: SYMBICORT | PCP | 04/12/2019 | 1 | UNADDRESSED |
| Modify | Chronic Obstructive Pulmonary Disease | Rx data suggests missing diagnosis: IPRATROPIUM BROMIDE | PCP | 04/12/2019 | 1 | UNADDRESSED |
| Modify | Chronic Obstructive Pulmonary Disease | Rx data suggests missing diagnosis: IPRATROPIUM BROMIDE/ALBUTEROL | Other physician | 11/26/2018 | 1 | UNADDRESSED |
| Modify | Angina Pectoris | HCC submitted previously currently absent from patient clinical diagnoses | Other Physician | 02/28/2019 | | SECURED |
| Modify | Vascular Disease | HCC submitted previously currently absent from patient clinical diagnoses | Other Physician | 02/25/2019 | | SECURED |
| Modify | Congestive Heart Failure | HCC submitted previously currently absent from patient clinical diagnoses | Other Physician | 02/28/2019 | | SECURED |
| Modify | Acute Myocardial Infarction | Encounter data submitted | Other Physician | 04/03/2019 | 0 | SECURED |
| Modify | Angina Pectoris | Medical Hx may support missing diagnosis: Ischemic/Anginal Disease | Other Physician | 02/26/2019 | | SECURED |
| Modify | Unstable Angina and Other Acute Ischemic Heart Disease | HCC submitted previously currently absent from patient clinical diagnoses | | | | SECURED |
| Modify | Cardiovascular Disease | Member in Chronic SNP with PCP verified Diagnosis of CVD | Other Physician | 02/25/2019 | | SECURED |

1

# MEMBER HEALTH PROFILE

**FREEDOM HEALTH**

**Provider Name:** ZAFIROV, CLARISSA, A    **Group Name:** FLORIDA MEDICAL ASSOCIATES LLC

**Run Date:** 10/18/2019    **Membership Month** 10/01/2019    **Review Period:** 1/1/2019 To 12/31/2019

**Plan Name:** Freedom VIP Savings (HMO SNP)

**Member Name**

**Member ID:** ▮▮▮▮▮

**PCP Name:** ZAFIROV, CLARISSA, A

**Provider ID:** P1045672

**Eff Date:** 01/01/2019

**Group Name:** FLORIDA MEDICAL ASSOCIATES LLC

The following are HCC related medical conditions that have been reported to CMS in the past for this member. Please note that some of the conditions may have resolved and / or may not exist in current year.

| Provider Type | Confirmed 2019 DOS | RA FACTOR | Diagnosis Code | Diagnosis Description | Date Of Service | CMS HCC | CMS HCC Description |
|---|---|---|---|---|---|---|---|
| Physician | Y | 0.305 | I70.201 | Unspecified atherosclerosis of native arteries of extremities, right leg | 2/25/2019 | HCC108 | Vascular Disease |
| Physician | N | 0.216 | J84.10 | Pulmonary fibrosis, unspecified | 4/2/2019 | HCC112 | Fibrosis of Lung and Other Chronic Lung Disorders |
| Physician | Y | 0.22 | I21.3 | ST elevation (STEMI) myocardial infarction of unspecified site | 4/3/2019 | HCC086 | Acute Myocardial Infarction |
| Physician | Y | 0.31 | I43. | Cardiomyopathy in diseases classified elsewhere | 4/18/2019 | HCC085 | Congestive Heart Failure |
| Physician | N | 0.068 | N18.3 | Chronic kidney disease, stage 3 (moderate) | 6/12/2018 | HCC138 | Chronic Kidney Disease, Moderate (Stage 3) |
| Physician | N | 0.214 | D69.2 | Other nonthrombocytopenic purpura | 10/30/2018 | HCC048 | Coagulation Defects and Other Specified Hematological Disorders |
| Physician | N | 0.368 | F11.20 | Opioid dependence, uncomplicated | 10/30/2018 | HCC055 | Substance Use Disorder, Moderate/Severe, or Substance Use with Complic |
| Physician | N | 0.271 | I48.92 | Unspecified atrial flutter | 11/26/2018 | HCC096 | Specified Heart Arrhythmias |

The following conditions may exist based on CSNP verification, Lab, DME, OTC and Rx data for this member. Please note that some of the conditions may have been resolved and/or may not exist for member in current year.

| Data Source | Suspect Reason | Date of Service | Potential Diagnosis Code | Potential Diagnosis Description | CMS HCC | CMS HCC Description | RA FACTOR |
|---|---|---|---|---|---|---|---|
| RX | IPRATROPIUM BROMIDE/ALBUTEROL | 11/26/2018 | | | HCC111 | Chronic Obstructive Pulmonary Disease | 0.346 |
| RX | SYMBICORT | 04/12/2019 | | | HCC111 | Chronic Obstructive Pulmonary Disease | 0.346 |
| RX | IPRATROPIUM BROMIDE | 04/12/2019 | | | HCC111 | Chronic Obstructive Pulmonary Disease | 0.346 |

LAB -Lab test results suggest patient may have listed condition. Lab test and results provided.
DME/OTC - DME/OTC usage suggests patient may have listed condition. DME/OTC usage provided.
Rx - Rx/Prescription Drug usage) suggests patient may have listed condition. Most recent prescription provided.
Med Rx -Diagnosis history of patient suggests patient may have listed condition. Brief Description provided.
CSNP - Health Plan received a chronic condition confirmation through CSNP verification process but has not received a claim for verified condition listed.

Attestation - By utilizing this portal, you attest that you have documented the medical condition(s) in member's medical records as per CMS guidelines during the stated review period and that specific documentation of the sign, symptom, condition, disease or other reason for the encounter exists therein. Suspected, possible, and rule out diagnoses have not and may not be submitted. You further attest that the information provided is true, accurate and complete to the best of your knowledge.

Confidentiality Notice - The information contained within this portal constitutes confidential information, some or all of which may be protected health information as defined by the federal Health Insurance Portability & Accountability Act (HIPAA). Access to this portal is granted only to the registered user (or an employee or agent acting under the direction of the registered user) and is intended for the exclusive use of that individual or entity and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not the registered user (or an employee or

# EXHIBIT 5
# Documents Related to Patient L

EXHIBIT 5-L1



**Guarantor:** ██████████   **Insurance: Optimum**
Healthcare, Inc
Referring: Clarissa A Zafirov
Appointment Facility: VIPcare Venice

01/23/2019   **Progress Notes: Clarissa Zafirov MD**

### Reason for Appointment
1. R/S CPE

### History of Present Illness
Depression Screening.:
  PHQ-9  Little interest or pleasure in doing things  Not at all, Feeling down, depressed, or hopeless  Not at all, Trouble falling or staying asleep, or sleeping too much  Not at all, Feeling tired or having little energy  Not at all, Poor appetite or overeating  Not at all, Feeling bad about yourself-or that you are a failure or have let yourself or your family down  Not at all, Trouble concentrating on things, such as reading the newspaper or watching television  Not at all, Moving or speaking so slowly that other people could have noticed. Or the opposite ? being so fidgety or restless that you have been moving around a lot more than usual  Not at all, Thoughts that you would be better off dead, or of hurting yourself in some way  Not at all, Total Score  0.
COA - Func Stat:
  Cognitive Status Good. Cognitive Status **Please update**.
COA - Medication Review and List:
  Medication List Documented **Yes**. Medication List Documented **Please update**. Medications Reviewed Date:1/23/19.
COA - Pain Assessment:
  Denies : Does the patient have Pain? **Yes** . Denies : Pain Location Rt knee > Lt knee. Denies : Pain scale Moderate pain. Denies : Pain Treatment Plan None.
  Does the patient have Pain? **Yes** ( add CPT code 1125F), No ( add CPT code 1126F), No , **Yes** .
Fall Risk:
  Denies : History of falling , within the last three months **No - O**. Denies : Secondary DX. Denies : Ambulatory Aid. Denies : IV/Heparin Lock. Denies : Gait/Transfering. Denies : Mental Status. Denies : No Risk 0 - 24 Good Basic Nursing Care.
  History of falling , within the last three months **Please Update**.
General ROS:
  c/o Complete physical exam with review of labs and medications..
  Denies : SOB. Denies : Chest pain or Discomfort. Denies : fatigue. Denies : abdominal pain. Denies : Nausea/vomiting. Denies : constipation. Denies : weight gain/weight loss. Denies : pain. Denies : blood in stool . Denies : fever. Denies : chills. Denies : cough. Denies : Edema. Denies : Dizziness. Denies : Diarrhea. Denies : Hematuria. Denies : Dysuria. Denies : discolored rhinorrhea. Denies : sinus pressure. Denies : Decreased Hearing . Denies : Sorethroat . Denies : headaches. Denies : Gait . Denies : Weakness. Denies : Acid Reflux .

Interim History:
  c/o Consultations **Other consultant: pt is currently not following up with any consultants for**
**health concerns.** .
  Brief ROS R/S, Est.
HPI:
  Patient here to establish care with new provider. 81-year-old male previously seen by Dr. some of its. Patient has a past diagnosis of diabetes however at time of diagnosis in 16 hemoglobin A1c not seen above 6.5. Patient does not follow any diabetic diet. He is taking metformin twice daily. Hemoglobin A1c results in the past 5.5, 5.8, 6.0. Patient is due for repeat

---

**Patient:** ██████████   **DOB:** ██████████   **Progress Note: Clarissa Zafirov MD**   01/23/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CZ_DS004561

lab studies. Patient does check his blood sugars at home at least twice daily. He has never had a blood sugar greater than 140.

Patient history of hypertension for which she takes furosemide 20 mg, labetalol 200 mg tablets prazosin 5 mg capsule 3 times a day. Blood pressure today 150/88 but generally at home is in the 130s-140s range systolic.

Patient with some elevation of creatinine on lab studies. This may be related to medication or otherwise.

Patient with recent bereavement but is doing overall well. He is sleeping, eating normally, engaging in regular activities. No history of past depression.

Patient denies any bruising of upper extremities. He does take aspirin which makes him prone to trauma induced injury otherwise. Patient has no history of cardiovascular disease

Patient does have a history of COPD. He does report having pulmonary function testing in the past. Does become short of breath at times. He does smoke 8-9 cigarettes a day. Has smoked for many years and no desire to quit smoking.

Patient without issues in the past with colonoscopy. He does have enlarged prostate and does follow with urology, Dr. Billick. Patient is taking finasteride daily.

COA - Adv Care:

Patient has the below (mark only appropriate ones) Advance Directives.

## Current Medications

### Taking

- metformin 1000 mg tablet 1.5 tab(s) orally 1 AM, 0.5 PM
- prazosin 5 mg capsule 1 cap(s) orally 3 times a day
- finasteride 5 mg tablet 1 tab(s) orally once a day
- aspirin 81 mg tablet, disintegrating 1 tab(s) orally once a day
- furosemide 20 mg tablet 1 tab(s) orally once a day
- labetalol 200 mg tablet 1 tab(s) orally 2 times a day
- FORA Lancets, 100 1 strip 3 times a day 1 strip finger stick 3 times a day / 3 times a week
- FORA V20 Blood Glucose Test Strips 1 strip 3 times a day 1 strip fingerstick 3 times a day / 3 times a week
- Medication List reviewed and reconciled with the patient

### Past Medical History

HTN.
Diabetes (3x QD fingerstick).
High Cholesterol.

### Surgical History

Appendectomy
Tonsils

### Family History

Father: deceased 92 yrs, Diabetes
Mother: deceased 88 yrs, Breast CA

### Allergies

N.K.D.A.

### Hospitalization/Major Diagnostic Procedure

No Hospitalization History.

### Review of Systems

CONSTITUTIONAL:
no Fever. no Chills. no Weight Loss. no Fatigue.
CARDIOLOGY:
no Chest Pain. no Shortness of Breath. no Palpitations. no Dizziness.
DERMATOLOGY:
no Rash.
GASTROENTEROLOGY:
no Abdominal Pain. no Nausea. no Vomiting. no Diarrhea.
MUSCULOSKELETAL:
no Joint Swelling. no Myalgias.
PSYCHOLOGY:

Patient: [redacted]   DOB: [redacted]   Progress Note: Clarissa Zafirov MD   01/23/2019
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

http://192.168.200.12:8080/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?encounterID...   6/26/2019

CZ_DS004562

no Depression. no Anxiety.
**RESPIRATORY:**
no Shortness of Breath. no Persistent Cough. no Wheezing.
**UROLOGY:**
no Dysuria. no Urinary Frequency.

## Vital Signs
Ht 70 in, Wt 217 lbs, BP 150/88 mm Hg, Pulse 67 /min, Resp 14 /min, O2 Sat 97, Temp 97.3 F, BMI 31.13 Index.

## Examination
General Examination:
General Examination Healthy looking for stated age, alert and oriented, well developed and well- nourished, comfortable looking throughout visit.
Skin No abnormal lesions, . No erythema. Truma induced bruise LUE. Skin warm to the touch, clean, dry,Acktinic Keratosis noted..
HEENT: Unremarkable. Sclera WNL bilaterally, pupils within normal size range, equally rounded, reactive to light bilaterally. The oropharynx was clear with moist mucus membranes.
Neck, Thyroid : No Lymphadenopathy, no tenderness with palpation, no JVD.
Heart: S1S2 RRR, no signs of CHF, no edema.
Lungs: Clear to auscultation A/P bilaterally, no wheezes/rhonchi/rales/crackles, regular breathing rate and effort, good air exchange noted throughout.
Abdomen: Soft, non tender, no distension, no palpable masses, BSx4.
Musculoskeletal No joint deformity, swelling, tenderness, pain.
Neurologic Exam: A&O x 3, normal strength and muscle tone, CN's II-XII grossly intact.
Psychiatry Well dressed and well groomed, appropriate behavior and thought process, no anxiety or depression.

## Assessments
1. Encounter for general adult medical examination with abnormal findings - Z00.01 (Primary)
2. Type 2 diabetes mellitus with hyperglycemia - E11.65
3. Benign essential HTN - I10
4. Benign prostatic hyperplasia without lower urinary tract symptoms - N40.0
5. Smoker - F17.200

## Treatment
1. **Type 2 diabetes mellitus with hyperglycemia**
    LAB: TSH with Reflex to Free T4
    LAB: PSA, Free and Total
    LAB: Glucose Tolerance Test, 3 Specimens (75g)
    LAB: Lipid Panel (Q) (LC)
    LAB: Hemoglobin A1c
    LAB: Comprehensive Metabolic Panel w/ EGFR (CMP) (Q) (LC)
    LAB: Urinalysis, Complete, with Reflex to Culture (Q)
    LAB: Microalbumin, Random Urine with Creatinine
    Notes: Question initial diagnosis since patient does not follow any particular diet, eats what he wants and maintains his blood sugars with minimal effort. Patient has never had a hemoglobin A1c greater than 6.5. Will repeat fasting glucose tolerance test. No free fasting glucose results in diabetic range. Reduce metformin to once daily. May reduce frequency of Glucose testing as he was testing BID.

2. **Benign essential HTN**
    Notes: . alpha-blocker not first-line for hypertension. Use of furosemide simply for blood pressure control may not be the best option for this patient. We will try and make some change with medication at next visit. Patient does keep blood pressure log does monitor sodium intake.

3. **Benign prostatic hyperplasia without lower urinary tract symptoms**
    Notes: . Stable continu current medication.

4. **Smoker**

Patient: [redacted]     DOB: [redacted]     Progress Note: Clarissa Zafirov MD  01/23/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

http://192.168.200.12:8080/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?encounterID...  6/26/2019

CZ_DS004563

Notes: Did discuss smoking cessation if possible.

**5. Others**

Notes: Patient does need EKG next visit. We will contested her also for screening aortic ultrasound evaluation given his smoking history. Repeat pulmonary function tests at some point in the future.

## Preventive Medicine

Immunizations: Pneumococcal .... Influenza ....

## Procedure Codes

1158F ADVNC CARE PLAN TLK DOCD
1158F ADVNC CARE PLAN TLK DOCD
1159F MED LIST DOCD IN RCRD
1159F MED LIST DOCD IN RCRD
1160F RVW MEDS BY RX/DR IN RCRD
1160F RVW MEDS BY RX/DR IN RCRD
1170F FXNL STATUS ASSESSED
1170F FXNL STATUS ASSESSED
3288F FALL RISK ASSESSMENT DOCD
G8420 BMI is documented within normal parameters and no follow-up plan is required
1126F AMNT PAIN NOTED NONE PRSNT
3288F FALL RISK ASSESSMENT DOCD
3725F SCREEN DEPRESSION PERFORMED
1125F AMNT PAIN NOTED PAIN PRSNT

## Follow Up

4 Weeks (Reason: f/u lab bp med change)

Electronically signed by Clarissa Zafirov , MD on 01/23/2019 at 03:24 PM EST

**Sign off status: Completed**

VIPcare Venice
333 Tamiami Trail S
Venice, FL 34285-2425
Tel: 941-234-1288
Fax: 844-388-6186

Patient: ▮▮▮▮▮   DOB: ▮▮▮▮   Progress Note: Clarissa Zafirov MD   01/23/2019

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CZ_DS004564

EXHIBIT 5-L2

# 5 Star Check List - DR. AKHIL PATEL

**PHYSICIAN PARTNERS**

Platinum Diamond Rewards (HMO SNP) - PCP Effective Date: 09-2018

Visits in last 12 months:    PCP: 5    ER: 0    Specialists: 3    Hospital: 0

| 100% | 1.767 |

( HCC 018 ) ( HCC 111 ) ( HCC 058 ) ( HCC 011 ) ( HCC 048 ) ( HCC 012 )

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported 2018 | Times Reported 2017 | Times Reported 2016 | Source | Comments |
|---|---|---|---|---|---|---|
| **HCC018 - Diabetes with Chronic Complications** | | | | | | RA Factor: 0.368 |
| E11.40 | Type 2 diabetes mellitus with diabetic neuropathy, unspecified | 3 | 0 | 0 | Current PCP | No - awaiting lab perf |
| E11.22 | Type 2 diabetes mellitus with diabetic chronic kidney disease | 3 | 0 | 0 | Suspect Rules: 4 - DM with CKD | Establish causal relationship between DM E11.9 and CKD N18.x coded previously on DOS 04-11-2017   NL |
| E11.69 | Type 2 diabetes mellitus with other specified complication | 0 | 2 | 4 | Physician | No |
| **HCC111 - Chronic Obstructive Pulmonary Disease** | | | | | | RA Factor: 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 2 | 9 | 3 | Past History | Ok |
| **HCC058 - Major Depressive, Bipolar, and Paranoid Disorders** | | | | | | RA Factor: 0.330 |
| F32.4 | Major depressive disorder, single episode, in partial remission | 3 | 0 | 0 | Current PCP | No |
| **HCC011 - Colorectal, Bladder, and Other Cancers** | | | | | | RA Factor: 0.317 |
| C67.9 | Malignant neoplasm of bladder, unspecified | 0 | 0 | 1 | Past History | No |
| **HCC048 - Coagulation Defects and Other Specified Hematological Disorders** | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 3 | 0 | 0 | Current PCP | NO |
| **HCC012 - Breast, Prostate, and Other Cancers and Tumors** | | | | | | RA Factor: 0.154 |
| C76.41 | Malignant neoplasm of right upper limb | 2 | 0 | 0 | Physician | No |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| There are no codes reported / captured in the current year | | | | | |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: 1/23/19

Signature (MD, DO, PA or NP only):

CZ_DS004565

EXHIBIT 5-L3



| OV, CLARISSA, A DR (2019-02-25) | | HCC | Sources |
|---|---|---|---|
| | ICD Desc | | PCP Encounters |
| | Essential (primary) hypertension | | PCP Encounters |
| 7.200 | Nicotine dependence, unspecified, uncomplicated | | |
| 11.9 | Type 2 diabetes mellitus without complications | HCC019 | PCP Encounters |
| Z68.30 | Body mass index (BMI) 30.0-30.9, adult | | PCP Encounters |

| ZAFIROV, CLARISSA, A DR (2019-01-23) | | HCC | Sources |
|---|---|---|---|
| ICD | ICD Desc | HCC018 | Progress Notes |
| E11.65 | Type 2 diabetes mellitus with hyperglycemia | HCC111 | Progress Notes |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | | |

### 2018

| PATEL, AKHIL (2018-09-18) | | HCC | Sources |
|---|---|---|---|
| ICD | ICD Desc | | PCP Encounters |
| I10 | Essential (primary) hypertension | | PCP Encounters |
| N40.0 | Enlarged prostate without lower urinary tract symptoms | HCC018 | PCP Encounters, Progress Notes |
| E11.65 | Type 2 diabetes mellitus with hyperglycemia | HCC058 | PCP Encounters, Progress Notes |
| F32.4 | Major depressive disorder, single episode, in partial remission | HCC048 | PCP Encounters, Progress Notes |
| D69.2 | Other nonthrombocytopenic purpura | | PCP Encounters |
| Z68.29 | Body mass index (BMI) 29.0-29.9, adult | | |

CZ_DS004566

EXHIBIT 5-L4




**Healthcare, Inc**
**Referring:** Clarissa A Zafirov
**Appointment Facility:** VIPcare Venice

02/25/2019

**Progress Notes:** Clarissa Zafirov MD

## Reason for Appointment
1. 4 week f/u, CPE, labs

## History of Present Illness
HPI:

Patient here for follow-up visit. Patient history of hypertension for which she takes furosemide 20 mg tablets daily, labetalol 200 mg tablets twice daily. Patient blood pressure today 150/80 patient has brought blood pressure log today which shows blood pressures generally in the 130s-140s range systolic with normal diastolic pressures.

Patient current smoker. He is a diabetic as well. He is taking 1/2 tablets of thousand milligrams metformin daily. We did check a fasting glucose tolerance test with labs to confirm diabetes which patient showed to have a glucose level in the 200s at the 1 hour mark. Patient hemoglobin A1c currently 5.5. He does only check his blood sugars as needed now.

Patient difficulty with exercise due to chronic knee pain and arthritis. He did have a knee injection in the past which was not particularly helpful.

Patient labs showing mild elevation of creatinine to 1.27. He does have a GFR of 53 Patient with very mild elevation of microalbumin creatinine ratio.

## Current Medications
**Taking**
- metformin 1000 mg tablet 1.5 tab(s) orally 1 AM, 0.5 PM
- prazosin 5 mg capsule 1 cap(s) orally 3 times a day
- finasteride 5 mg tablet 1 tab(s) orally once a day
- furosemide 20 mg tablet 1 tab(s) orally once a day
- labetalol 200 mg tablet 1 tab(s) orally 2 times a day
- FORA Lancets, 100 1 strip 3 times a day 1 strip finger stick 3 times a day / 3 times a week
- FORA V20 Blood Glucose Test Strips 1 strip 3 times a day 1 strip fingerstick 3 times a day / 3 times a week

**Discontinued**
- aspirin 81 mg tablet, disintegrating 1 tab(s) orally once a day
- Medication List reviewed and reconciled with the patient

## Past Medical History
HTN.
Diabetes (3x QD fingerstick).
High Cholesterol.

## Surgical History
Appendectomy
Tonsils

## Family History
Father: deceased 92 yrs, Diabetes
Mother: deceased 88 yrs, Breast CA

## Social History

---

**Patient:**          **DOB:**          **Progress Note:** Clarissa Zafirov MD   02/25/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CZ_DS004567

Summary View for [REDACTED] Account Number [REDACTED]

Tobacco Use  Smoking Status Current smoker,  When did you start smoking? 16,  How often do you smoke cigarettes? every day,  How many cigarettes a day do you smoke? 6-10,  How soon after you wake up do you smoke your first cigarette? 6-30 min,  Are you interested in quitting? Not ready to quit.
Alcohol: Denies.
Drug use: Never used illegal drugs.
Marital Status: Widow.
Exercise: Denies.
Caffeine: Denies.

### Allergies
N.K.D.A.

### Hospitalization/Major Diagnostic Procedure
No Hospitalization History.

### Review of Systems
CONSTITUTIONAL:
    no Fever. no Weakness.
CARDIOLOGY:
    no Chest Pain. no Palpitations. no Leg Edema.
DERMATOLOGY:
    no Rash.
ENT:
    no Sore Throat.
GASTROENTEROLOGY:
    no Nausea. no Vomiting.
PSYCHOLOGY:
    no Depression.
RESPIRATORY:
    no Shortness of Breath. no Persistent Cough.

### Vital Signs
Ht 70 in, Wt 216 lbs, BP 150/80 mm Hg, Pulse 59 /min, Resp 16 /min, O2 Sat 97, Temp 97.8 F, BMI 30.99 Index.

### Examination
General Examination:
    General Examination Healthy looking for stated age, alert and oriented, well developed and well- nourished, comfortable looking throughout visit.
    Skin No rash noted, unremarkable.
    HEENT: Unremarkable. Sclera WNL bilaterally, pupils within normal size range, equally rounded, reactive to light.
    Neurologic Exam: A&O x 3, normal strength ,No gross focal deficits noted..
Cardiology:
    JVD: none.
    Heart: normal S1S2,No clinical signs of heart failure..
    Heart Murmur: No siginificant murmur noted.
    Lungs: no wheezing, RLL rhonchi regular rate and effort, good air movement, ...
    Extremities: no leg edema.
    Peripheral pulses: normal,symmetric.
Neurology:
    Cranial nerves: CN II-XII grossy intact.

### Assessments
1. Benign essential HTN  I10 (Primary)
2. Smoker - F17.200
3. Type 2 diabetes mellitus without complication, without long-term current use of insulin - E11.9

### Treatment

---

Patient: [REDACTED]    DOB: [REDACTED]    Progress Note: Clarissa Zafirov MD  02/25/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CZ_DS004568

### 1. Benign essential HTN
Notes: Blood pressure stable with current medication. Patient to continue to monitor blood pressure at home. Noted history of sleep apnea for which patient is on CPAP as well. Likely component.

### 2. Smoker
Notes: . Patient has a very lengthy history of smoking I have offered low-dose screening CT as I have no imaging of his lungs. He will consider.

### 3. Type 2 diabetes mellitus without complication, without long-term current use of insulin
Notes: Well-controlled hemoglobin A1c in normal range. Patient to check blood sugars at home only as needed. Continue with metformin 1 tablet daily.

### 4. Others
Notes: . Follow-up in Jul. Plan to repeat labs with hemoglobin A1c in September.

### Preventive Medicine
HEDIS: Fall Risk Assessment 2019. Colonoscopy Does not recall. Eye exam 2014. COA 01/2019.
Immunizations: Tetnus Unsure. Pneumococcal Advised, pt refused. Influenza Advised, pt refused.

### Follow Up
July htn etc

Electronically signed by Clarissa Zafirov , MD on 02/25/2019 at 02:02 PM EST

Sign off status: Completed

**VIPcare Venice**
333 Tamiami Trail S
Venice, FL 34285-2425
Tel: 941-234-1288
Fax: 844-388-6186

Patient [redacted]    DOB: [redacted]    Progress Note: Clarissa Zafirov MD   02/25/2019

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CZ_DS004569

EXHIBIT 5-L5

PHYSICIAN

## 5 Star Check List - DR. CLARISSA A ZAFIROV

Optimum Diamond Rewards (HMO SNP) - PCP Effective Date: 02-2019

Visits in last 12 months:    PCP: 4    ER: 0    Specialists: 3    Hospital: 0

PHYSICIAN PARTNERS

43% | 0.832      57% | 1.399

HCC 018   HCC 111   HCC 019   HCC 058   HCC 011   HCC 048   HCC 012

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported 2018 | 2017 | 2016 | Source | Comments |
|-------|-----------------|------|------|------|--------|----------|
| HCC058 - Major Depressive, Bipolar, and Paranoid Disorders | | | | | | RA Factor: 0.330 |
| F32.4 | Major depressive disorder, single episode, in partial remission | 4 | 0 | 0 | Physician | |
| HCC011 - Colorectal, Bladder, and Other Cancers | | | | | | RA Factor: 0.317 |
| C67.9 | Malignant neoplasm of bladder, unspecified | 0 | 0 | 1 | Past History | |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 4 | 0 | 0 | Physician | |
| HCC012 - Breast, Prostate, and Other Cancers and Tumors | | | | | | RA Factor: 0.154 |
| C76.41 | Malignant neoplasm of right upper limb | 2 | 0 | 0 | Physician | |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|-----|-----|-----------------|-----------|----------|--------|
| HCC018 | E11.65 | Type 2 diabetes mellitus with hyperglycemia | 01-23-2019 | 01-23-2019 | Current PCP |
| HCC019 | E11.9 | Type 2 diabetes mellitus without complications | 02-25-2019 | 02-25-2019 | Current PCP |
| HCC111 | J44.9 | Chronic obstructive pulmonary disease, unspecified | 01-23-2019 | 01-23-2019 | Current PCP |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: _____

Signature (MD, DO, PA or NP only): _____

*Pulled from my visit note where it was connected - 'patient has never had a HybA1c > 6.5.' Was not signed off on 5* and was not meant to be submitted.*

*It was a comment on that particular chart problem, NOT a diagnosis.*

Dr. Zafirov's personal note - not submitted to Anion

Case 8:19-cv-01236-KKM-SPF Document 256-5 Filed 05/15/24 Page 245 of 332 PageID 13269

EXHIBIT 5-L6



# EXHIBIT 6

# Documents Related to Patient M

# EXHIBIT 6-M1



5 Star Check List - DR. ANWHI DATE:

Pr_Medom Medicare Plan Rx (HMO) - PCP Effective Date: 09-2018

Visits in last 12 months:    PCP: 4    ER: 0    Specialists: 1    Hospital: 0

**PHYSICIAN PARTNERS**

100% | 3.862

(077) (072) (055) (075) (040) (018) (111) (058) (108) (048)

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported 2018 | 2017 | 2016 | Source | Comments |
|---|---|---|---|---|---|---|
| **HCC077 - Multiple Sclerosis** | | | | | | RA Factor 0.506 |
| G37.9 | Demyelinating disease of central nervous system, unspecified | 0 | 0 | 1 | Physician | No |
| **HCC072 - Spinal Cord Disorders/Injuries** | | | | | | RA Factor 0.509 |
| Q02 | Microcephaly | 2 | 2 | 0 | Physician | No |
| **HCC055 - Drug/Alcohol Dependence** | | | | | | RA Factor 0.420 |
| F10.21 | Alcohol dependence, in remission | 6 | 4 | 1 | Physician | OK |
| F10.229 | Alcohol dependence with intoxication, unspecified | 0 | 0 | 1 | Hospital | |
| F10.230 | Alcohol dependence with withdrawal, uncomplicated | 0 | 0 | 1 | Hospital | |
| F10.120 | Alcohol abuse with intoxication, uncomplicated | 0 | 1 | 0 | Physician | No |
| F10.121 | Alcohol abuse with intoxication delirium | 0 | 1 | 0 | Physician | |
| F10.129 | Alcohol abuse with intoxication, unspecified | 0 | 3 | 0 | Physician | |
| F10.20 | Alcohol dependence, uncomplicated | 0 | 0 | 1 | Physician | |
| F10.239 | Alcohol dependence with withdrawal, unspecified | 0 | 4 | 1 | Physician Hospital | |
| **HCC075 - Myasthenia Gravis/Myoneural Disorders and Guillain-Barre Syndrome/Inflammatory and Toxic Neuropathy** | | | | | | RA Factor 0.408 |
| G62.1 | Alcoholic polyneuropathy | 0 | 0 | 0 | Clinical Review | Alcohol-dependent, evaluate for alcoholic polyneuropathy   No |
| **HCC040 - Rheumatoid Arthritis and Inflammatory Connective Tissue Disease** | | | | | | RA Factor 0.374 |
| M31.1 | Thrombotic microangiopathy | 0 | 2 | 0 | Physician | No |
| **HCC018 - Diabetes with Chronic Complications** | | | | | | RA Factor 0.368 |
| E11.69 | Type 2 diabetes mellitus with other specified complication | 0 | 0 | 1 | Physician | No |
| **HCC111 - Chronic Obstructive Pulmonary Disease** | | | | | | RA Factor 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 5 | 2 | 0 | Physician Hospital | Ok |
| J42 | Unspecified chronic bronchitis | 4 | 0 | 0 | Current PCP | |
| **HCC058 - Major Depressive, Bipolar, and Paranoid Disorders** | | | | | | RA Factor 0.330 |
| F33.9 | Major depressive disorder, recurrent, unspecified | 4 | 0 | 0 | Physician | No |
| F32.4 | Major depressive disorder, single episode, in partial remission | 3 | 0 | 0 | Current PCP | No |
| **HCC108 - Peripheral Vascular Disease, Unspecified** | | | | | | RA Factor 0.? |

Please fax form and progress note to **888-978-5655**

Confidential - Do Not Distribute

Page 1 of 2

CZ_DS004550



CZ_DS004551

# EXHIBIT 6-M2



**★★★★★ HEALTHCARE**

Referring: Akhil Patel
Appointment Facility: VIPcare Venice

02/15/2019

Progress Notes: Clarissa Zafirov MD

### Reason for Appointment
1. CPE, labs

### History of Present Illness
Depression Screening :
PHQ-9 Little interest or pleasure in doing things Not at all, Feeling down, depressed, or hopeless Not at all, Trouble falling or staying asleep, or sleeping too much Not at all, Feeling tired or having little energy Not at all, Poor appetite or overeating Not at all, Feeling bad about yourself-or that you are a failure or have let yourself or your family down Not at all, Trouble concentrating on things, such as reading the newspaper or watching television Not at all, Moving or speaking so slowly that other people could have noticed. Or the opposite ? being so fidgety or restless that you have been moving around a lot more than usual Not at all, Thoughts that you would be better off dead, or of hurting yourself in some way Not at all, Total Score 0 .

COA - Func Stat :
Cognitive Status Good. Cognitive Status **Please update**. Ambulatory Status Good. Sensory Ability - Hearing Good. Sensory Ability - Vision Fair Glasses. Sensory Ability - Touch Good. Sensory Ability - Smell Good. Sensory Ability - Taste Good. ADLs - mark only the ones patient needs help with Pt does not require any assistance w/ his ADLs.

COA - Medication Review and List :
Medication List Documented **Yes**. Medication List Documented **Please update**. Medications Reviewed Date: 2/15/019.

COA - Pain Assessment :
Denies : Does the patient have Pain? No. Denies : Pain Location. Denies : Pain scale. Denies : Pain Treatment Plan. Does the patient have Pain? **Yes ( add CPT code 1125F)**, **No ( add CPT code 1126F)**, **No** , **Yes** .

Fall Risk :
Denies : History of falling , within the last three months **No - O**, Denies : Secondary DX. Denies : Ambulatory Aid. Denies : IV/Heparin Lock. Denies : Gait/Transfering. Denies : Mental Status. Denies : No Risk 0 - 24 Good Basic Nursing Care.
History of falling , within the last three months **Please Update**.

COA - Adv Care :
Patient has the below (mark only appropriate ones) Living Will Advance Directives. Patient has the below (mark only appropriate ones) Advance Directives.

HPI :
76-year-old female here to establish care with new provider. Patient with a history of alcohol dependence which has been in remission since early 2000 16/2017. Patient at that time had a CT scan showing some cerebral changes including possible ischemic demyelination and cerebral atrophy. Patient is currently has no memory changes other than some issues with word or name finding otherwise is doing well.
Patient has a history of COPD is evident by pulmonary function testing in October 2018. Currently mild stable. Patient not using any inhalers. Denies any wheezing, shortness of breath with exertion. Patient quit smoking in 2003.
Patient is taking Celexa for anxiety not depression. Patient denies any history of depression.
Patient is active with gardening and does try and do that on a regular basis. Patient has overall healthy d et does not eat red meat. She is up-to-date in regards to vaccinations.
Patient history of breast cancer status post bilateral mastectomy.

Patient:          DOB          Progress Note: Clarissa Zafirov MD   02/15/2019
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

http://192.168.200.12:8080/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?encounterID...   7/15/20

CZ_DS004552



Patient has a history of benign essential tremor which is been evaluated by neurology. She is taking a small amount of propranolol which seems to control her tremor to some degree. Patient was on propranolol at a much higher dose in the past which caused bradycardia.

Patient labs showing mild vitamin D deficiency patient is not taking vitamin D or calcium. She is due for repeat bone density scan.

Mild elevation of hemoglobin A1c which is not been present in the past.

Patient with anemia also on labs with a hemoglobin of 10.8. Patient has a history of chronic anemia per reports. In the past, patient reports normal iron levels. Patient has had no change in stool. Patient denies weakness fatigue shortness of breath or other symptoms related to her anemia. No chest pain or palpitations.

General ROS:

Interim History:
c/o Consultations **Other consultant: pt is currently not following up with any consultants for health concerns.** .

### Current Medications
**Taking**
- Celexa 20 mg tablet 1 tab(s) orally once a day

**Discontinued**
- primidone 50 mg tablet 1/2 tab orally qhs
- Medication List reviewed and reconciled with the patient

### Past Medical History
Breast CA .
Mild Depression.
Tremor.
Hx of Alcohol Abuse / stopped 12/31/16.

### Surgical History
Bilateral Masectomies

### Family History
Father: deceased, family history unknown
Mother: deceased 72 yrs, alzheimer's dementia,

### Social History
Tobacco Use   Smoking Status  Former smoker,   When did you start smoking? 1973,   When did you stop smoking? 2003,   Additional Findings: Tobacco Non-User  Ex-light cigarette smoker (1-9/day).
Alcohol: Former Drinker / 12/31/2016.
Drug use: Never used illegal drugs.
Marital Status: Married.
Children: Yes.
Occupation: Retired: RN / State Prison in PA.
Exercise: Active lifestyle.
Caffeine: Coffee, 1 cup per day.

### Allergies
penicillin
Sulfa
Cleocin HCl

### Hospitalization/Major Diagnostic Procedure
Surgery

### Review of Systems
CONSTITUTIONAL:
    no Fever.  no Chills.  no Weight Loss.  no Fatigue.
CARDIOLOGY:
    no Chest Pain.  no Shortness of Breath.  no Palpitations.  no Dizziness.

Patient [REDACTED]  DOB: [REDACTED]   Progress Note: Clarissa Zafirov MD   02/15/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CZ_DS004553



**DERMATOLOGY**:
no Rash.
**GASTROENTEROLOGY**:
no Abdominal Pain. no Nausea. no Vomiting. no Diarrhea.
**MUSCULOSKELETAL**:
no Joint Swelling. no Myalgias.
**PSYCHOLOGY**:
no Depression. no Anxiety.
**RESPIRATORY**:
no Shortness of Breath. no Persistent Cough. no Wheezing.
**UROLOGY**:
no Dysuria. no Urinary Frequency.

**Vital Signs**
Ht 63 in, Wt 128 lbs. BP 124/76 mm Hg. Pulse 65 /min, Resp 16 /min, O2 Sat 97, Temp 98.1 F, BMI 22.67 Index.

**Examination**
General Examination:
    General Examination Healthy looking for stated age, alert and oriented, well developed and well- nourished, comfortable looking throughout visit.
    Skin No abnormal lesions, . No erythema or ecchymosis. Skin warm to the touch, clean, dry.
    HEENT: Unremarkable. Sclera WNL bilaterally, pupils within normal size range, equally rounded, reactive to light bilaterally. The oropharynx was clear with moist mucus membranes.
    Neck, Thyroid : No Lymphadenopathy, no tenderness with palpation, no JVD.
    Heart: S1S2 RRR, no signs of CHF, no edema.
    Lungs: Clear to auscultation A/P bilaterally, no wheezes/rhonchi/rales/crackles, regular breathing rate and effort, good air exchange noted throughout.
    Abdomen: Soft, non tender, no distension, no palpable masses, BSx4.
    Musculoskeletal No joint deformity, swelling, tenderness, pain.
    Neurologic Exam: A&O x 3, normal strength and muscle tone, CN's II-XII grossly intact.
    Psychiatry Well dressed and well groomed, appropriate behavior and thought process, no anxiety or depression.

**Assessments**
1. Encounter for general adult medical examination with abnormal findings - Z00.01 (Primary)
2. Major depress, part remis - F32.4
3. Unspecified chronic bronchitis - J42
4. Benign essential tremor - G25.0
5. Anxiety - F41.9
6. Alcohol dependence in sustained full remission - F10.21
7. Vitamin D deficiency - E55.9
8. Nonrheumatic aortic valve insufficiency - I35.1, ECHO 2018
9. Anemia, unspecified type - D64.9

**Treatment**
**1. Encounter for general adult medical examination with abnormal findings**
    LAB: Lipid Panel (Q) (LC) (Ordered for 10/01/2019)
    LAB: Hemoglobin A1c (Ordered for 10/01/2019)
    LAB: Vitamin B12 (Cobalamin) and Folate Panel, Serum (Ordered for 10/01/2019)
    LAB: Iron, Total and Total Iron Binding Capacity (Ordered for 10/01/2019)
    LAB: Vitamin D, 25-Hydroxy, Total, Immunoassay (Ordered for 10/01/2019)
    LAB: Comprehensive Metabolic Panel w/ EGFR (CMP) (Q) (LC) (Ordered for 10/01/2019)
    LAB: Urinalysis, Complete, with Reflex to Culture (Q) (Ordered for 10/01/2019)
    LAB: CBC (INCLUDES DIFF/PLT) (Ordered for 10/01/2019)
    LAB: Peripheral Smear Pathologist Review (Ordered for 10/01/2019)

**2. Major depress, part remis**
Continue Celexa tablet, 20 mg, 1 tab(s), orally, once a day

Patient:  ▮▮▮▮▮     DOB: ▮▮▮▮▮      Progress Note: Clarissa Zafirov MD    02/15/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

http://192.168.200.12:8080/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?encounterID...    7/15/2

CZ_DS004554

Summary View for [ ] | Account Number:51613

IMAGING: DEXA Axial Skeleton, Hips, Pelvis & Spine, Bone Density.

**3. Others**
Notes:

In regards to COPD, patient is generally stable in regards to any respiratory symptoms. Will monitor closely.

Benign tremor stable with use of small amount of propranolol. Patient to monitor blood pressure at home. Well controlled with this medication.

In regards to anxiety patient is found symptoms are well controlled with use of Celexa 20 mg tablets daily. Denies depression entirely. No history of depression.

History of alcohol dependence in full remission. At some point possible neurologic changes related to alcohol intake but patient from a cognitive and memory standpoint is doing well. Sustained remission. Patient had echo in the last year which was also generally unremarkable with the exception of moderate aortic regurgitation. Patient will need follow-up echo in the future.

Patient otherwise up-to-date in regards to screening with the exception of bone density scan I would like her to repeat bone density scan. Start with vitamin D and calcium supplementation.

In regards to anemia, this is a chronic issue however workup and cause not entirely clear. Will have patient repeat fecal occult. Will check iron levels and possible smear with next labs in October. Fecal occult kit given to patient today to complete.

Plan to repeat labs in October otherwise.

.

**Preventive Medicine**
HEDIS: Mammo  Bilateral Masectomy.  Fall Risk Assessment  10/9/18.  echo  2015 / Carotid 2015.  Stress/Cath  2015.  Colonoscopy  2010.  Eye exam  May 2018 Americas Best.  COA 10/9/18.  DEXA  2010.  PFT  Never.  PHQ9  PHQ9  02/15/2019.
Immunizations:  Pneumococcal  10/2018, ....  Influenza  10/2018, ....  Herpes Zooster Vaccination  2017.

**Procedure Codes**
1126F AMNT PAIN NOTED NONE PRSNT
1158F ADVNC CARE PLAN TLK DOCD
3074F SYST BP LT 130 MM HG
1159F MED LIST DOCD IN RCRD
3078F DIAST BP < 80 MM HG
1160F RVW MEDS BY RX/DR IN RCRD
1170F FXNL STATUS ASSESSED
1170F FXNL STATUS ASSESSED
1160F RVW MEDS BY RX/DR IN RCRD
3288F FALL RISK ASSESSMENT DOCD
1159F MED LIST DOCD IN RCRD
1126F AMNT PAIN NOTED NONE PRSNT
3725F SCREEN DEPRESSION PERFORMED

**Follow Up**
6 Months

CZ_DS004555



Electronically signed by Clarissa Zafirov , MD on 02/15/2019 at 02:51 PM EST

Sign off status: Completed

**VIPcare Venice**
333 Tamiami Trail S
Venice, FL 34285-2425
Tel: 941-234-1288
Fax: 844-388-6186

Patient ▮▮▮▮ DOB: ▮▮▮▮ Progress Note: Clarissa Zafirov MD 02/15/2019

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CZ_DS004556

EXHIBIT 6-M3



# EXHIBIT 6-M4

5 Star Check List - DR. CLARISSA A ZAFIROU

PHYSICIAN PARTNERS

| Visits in last 12 months: | PCP: 5 | ER: 0 | Specialists: 1 | Hospital: 0 |

70% | 3.096

(HCC 055) (HCC 111) (HCC 058) (HCC 077) (HCC 072) (HCC 075) (HCC 040) (HCC 018) (HCC 108) (HCC 048)

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient.
Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported | | | Source | Comments |
|-------|-----------------|------|------|------|--------|----------|
| | | 2018 | 2017 | 2016 | | |
| G37.9 | Demyelinating disease of central nervous system, unspecified | 0 | 0 | 1 | Physician | |
| Q02 | Microcephaly | 2 | 2 | 0 | Physician | |
| G62.1 | Alcoholic polyneuropathy | 0 | 0 | 0 | Clinical Review | Alcohol-dependent, evaluate for alcoholic polyneuropathy |
| M31.1 | Thrombotic microangiopathy | 0 | 2 | 0 | Physician | |
| E11.69 | Type 2 diabetes mellitus with other specified complication | 0 | 0 | 1 | Physician | |
| I71.4 | Abdominal aortic aneurysm, without rupture | 0 | 1 | 0 | Physician | |
| D69.2 | Other nonthrombocytopenic purpura | 4 | 0 | 0 | Physician | |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|-----|-----|-----------------|-----------|----------|--------|
| HCC055 | F10.21 | Alcohol dependence, in remission | 02-15-2019 | 02-15-2019 | Current PCP |
| HCC058 | F32.4 | Major depressive disorder, single episode, in partial remission | 02-15-2019 | 02-15-2019 | Current PCP |
| HCC111 | J42 | Unspecified chronic bronchitis | 02-15-2019 | 02-15-2019 | Current PCP |
| HCC111 | J44.9 | Chronic obstructive pulmonary disease, unspecified | 02-15-2019 | 02-15-2019 | Current PCP |

attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

ate Patient Seen: 7/16/19

gnature (MD, DO, PA or NP only):

*Patient does not have major depressive disorder. Please amend*

CZ_DS004558

# EXHIBIT 6-M5



Fwd: Dr. Zafirov - Query re diagnosis submission. Inbox ×

**Sajitha Johnson**
Good morning Dr. Zafirov, Thank you so much for reaching out to me. I am happy to answer your questions. The data collected on the 5 Star Checklist may include

**Clarissa Zafirov** <czafirov@getvipcare.com>
to Sajitha

Fri, Jul 19, 12:53 PM (5 days ago)

Sajitha,

In regards to [redacted] if you read below the code , it is stated not once, but twice that she does not have major depression in the note . The patient is adamant that she is only taking for anxiety. It was meant to be a comment on the condition and not a diagnosis. The note makes that very clear. Not only that, but it has been marked 'no' on the 5-star sheet I turned in to you. As far as what physicians coded before me, my responsibility lies in my own evaluation in the room with the patient. I do think that in regards to diagnosis it is very important that this is done accurately. I would assume that your team also reads the physicians commentary on a condition as this is relevant. If there are previous codes on the chart I will comment and then remove them from the chart after the visit.

So yes, please remove the code from her medical records.

Thanks,

Dr. Zafirov

Reply    Forward

CZ_DS004559

EXHIBIT 6-M6

## Star Check List - DR. CLARISSA A ZAFIROV



Freedom Medicare Plan Rx (HMO) - PCP Effective Date: 03-2019

Visits in last 12 months:  PCP: 6    ER: 0    Specialists: 0    Hospital: 0

**PHYSICIAN PARTNERS**

| 36% | 1.557 | 64% | 3.096 |

        

HCC 058  HCC 055  HCC 111  HCC 059  HCC 077  HCC 072  HCC 075  HCC 040  HCC 018  HCC 108  HCC 048

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | 2018 | 2017 | 2016 | Source | Comments |
|-------|-----------------|------|------|------|--------|----------|
| HCC077 - Multiple Sclerosis | | | | | | RA Factor: 0.556 |
| G37.9 | Demyelinating disease of central nervous system, unspecified | 0 | 0 | 1 | Physician | |
| HCC072 - Spinal Cord Disorders/Injuries | | | | | | RA Factor: 0.509 |
| Q02 | Microcephaly | 2 | 2 | 0 | Physician | |
| HCC075 - Myasthenia Gravis/Myoneural Disorders and Guillain-Barre Syndrome/Inflammatory and Toxic Neuropathy | | | | | | RA Factor: 0.408 |
| G62.1 | Alcoholic polyneuropathy | 0 | 0 | 0 | Clinical Review | Alcohol-dependent, evaluate for alcoholic polyneuropathy |
| HCC040 - Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | | | | | | RA Factor: 0.374 |
| M31.1 | Thrombotic microangiopathy | 0 | 2 | 0 | Physician | |
| HCC018 - Diabetes with Chronic Complications | | | | | | RA Factor: 0.368 |
| E11.69 | Type 2 diabetes mellitus with other specified complication | 0 | 0 | 1 | Physician | |
| HCC108 - Peripheral vascular disease, unspecified | | | | | | RA Factor: 0.299 |
| I71.4 | Abdominal aortic aneurysm, without rupture | 0 | 1 | 0 | Physician | |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 4 | 0 | 0 | Physician | |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|-----|-----|-----------------|-----------|----------|--------|
| HCC055 | F10.21 | Alcohol dependence, in remission | 02-15-2019 | 02-15-2019 | Current PCP |
| HCC059 | F32.4 | Major depressive disorder, single episode, in partial remission | 02-15-2019 | 02-15-2019 | Current PCP |
| HCC111 | J42 | Unspecified chronic bronchitis | 02-15-2019 | 02-15-2019 | Current PCP |
| HCC111 | J44.9 | Chronic obstructive pulmonary disease, unspecified | 02-15-2019 | 02-15-2019 | Current PCP |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen:

CZ_DS004560

# EXHIBIT 6-M7

## PROSPECTIVE POSSIBLE CONDITION REPORT

**Refreshed Date:** 10/7/2019

| | | | | |
|---|---|---|---|---|
| Plan Name: | Freedom Medicare Plan Rx (HMO) | Member ID: | | |
| Member Name: | | Provider Name: | ZAFIROV, CLARISSA, A | |
| Gender: | | Provider ID: | P1045672 | |
| DOB: | | EFF Date: | 10/01/2016 | |
| Member Phone | | Group Name: | FLORIDA MEDICAL ASSOCIATES LLC | |

**Status Filter:** --SHOW ALL-- ▼



| Action | HCC Description | Possible Review Description | Physicians Involved | DOS | Script Count | Status |
|---|---|---|---|---|---|---|
| Modify | Spinal Cord Disorders/Injuries | HCC submitted previously currently absent from patient clinical diagnoses | Other physician | 01/24/2018 | | UNADDRESSED |
| Modify | Coagulation Defects and Other Specified Hematological Disorders | HCC submitted previously currently absent from patient clinical diagnoses | PCP | 10/09/2018 | | UNADDRESSED |
| Modify | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | HCC submitted previously currently absent from patient clinical diagnoses | Other physician | 02/07/2017 | | UNADDRESSED |
| Modify | Drug/Alcohol Dependence | HCC submitted previously currently absent from patient clinical diagnoses | PCP | 02/15/2019 | | SECURED |
| Modify | Chronic Obstructive Pulmonary Disease | Rx data suggests missing diagnosis: SYMBICORT | PCP | 08/21/2019 | 1 | SECURED |
| Modify | Major Depressive, Bipolar, and Paranoid Disorders | HCC submitted previously currently absent from patient clinical diagnoses | Other physician | 10/09/2018 | | SECURED |
| Modify | Chronic Obstructive Pulmonary Disease | HCC submitted previously currently absent from patient clinical diagnoses | PCP | 02/15/2019 | | SECURED |

« ‹ 1 › »

M Inbox (1) - czafirov@getvipcare. × | https://apps.freedomhealth.com × | E-FORCSE®, Florida Prescription × | Suppurative parotitis rx

← → C 🔒 https://apps.freedomhealth.com/HCCSnapshot/MemberHealthProfileSearchResult

⚏ Apps | Patient Handouts | Preprocedure Patie... | AAOS Essentials of ... | Search - UpToDate | Paroxetine-sertralin... | Patholog

|◁ ⟨ [1] of 1 ⟩ ▷| ↻  💾 ⌄   [ ] Find | Next

Confidential Patient Information

## MEMBER HEALTH PROFILE

🔥 **FREEDOM** HEALTH

**Provider Name:** ZAFIROV, CLARISSA, A

**Run Date:** 10/15/2019

**Group Name:** FLORIDA MEDICAL ASSOCIATES LLC

**Membership Month** 10/01/2019    **Review Period:** 1/1/2019 To 12/31/2019

**Plan Name:** Freedom Medicare Plan Rx (HMO)

**Member Name:** ▮▮▮▮▮

**Gender:** ▮▮▮▮

**DOB:** ▮▮▮▮▮

**Member Phone:** ▮▮▮▮

**Member ID:** ▮▮▮▮

**PCP Name:** ZAFIROV, CLARISSA, A

**Provider ID:** P1045672

**Eff Date:** 01/01/2019

**Group Name:** FLORIDA MEDICAL ASSOCIATES LLC

The following are HCC related medical conditions that have been reported to CMS in the past for this member. Please note that some of the conditions may have resolved and / or may not exist in current year.

| Provider Type | Confirmed 2019 DOS | RA FACTOR | Diagnosis Code | Diagnosis Description | Date Of Service | CMS HCC | CMS HCC Description |
|---|---|---|---|---|---|---|---|
| | N | 0.426 | | | | HCC040 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease |
| Physician | N | 0.519 | Q02. | Microcephaly | 1/24/2018 | HCC072 | Spinal Cord Disorders/Injuries |
| Physician | Y | 0.353 | F32.4 | Major depressive disorder, single episode, in partial remission | 2/15/2019 | HCC059 | Major Depressive, Bipolar, and Paranoid Disorders |
| Physician | Y | 0.335 | J42. | Unspecified chronic bronchitis | 2/15/2019 | HCC111 | Chronic Obstructive Pulmonary Disease |
| Physician | Y | 0.368 | F10.99 | Alcohol use, unspecified with unspecified alcohol-induced disorder | 4/25/2019 | HCC055 | Substance Use Disorder, Moderate/Severe, or Substance Use with Complic |
| Physician | N | 0.214 | D69.2 | Other nonthrombocytopenic purpura | 10/9/2018 | HCC048 | Coagulation Defects and Other Specified Hematological Disorders |

The following conditions may exist based on CSNP verification, Lab, DME, OTC and Rx data for this member. Please note that some of the conditions may have been resolved and/or may not exist for member in current year.

| Data Source | Suspect Reason | Date of Service | Potential Diagnosis Code | Potential Diagnosis Description | CMS HCC | CMS HCC Description | RA FACTOR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

LAB -Lab test results suggest patient may have listed condition. Lab test and results provided.
DME/OTC - DME/OTC usage suggests patient may have listed condition. DME/OTC usage provided.
Rx - Rx(Prescription Drug usage) suggests patient may have listed condition. Most recent prescription provided.
Med Hx -Diagnosis history of patient suggests patient may have listed condition. Brief Description provided.
CSNP - Health Plan received a chronic condition confirmation through CSNP verification process but has not received a claim for verified condition listed.

Attestation - By utilizing this portal, you attest that you have documented the medical condition(s) in member's medical records as per CMS guidelines during the stated review period and that specific documentation of the sign, symptom, condition, disease or other reason for the encounter exists therein. Suspected, possible, and rule out diagnoses have not and may not be submitted. You further attest that the information provided is true, accurate and complete to the best of your knowledge.

Confidentiality Notice - The information contained within this portal constitutes confidential information, some or all of which may be protected health information as defined by the federal Health Insurance Portability & Accountability Act (HIPAA). Access to this portal is granted only to the registered user (or an employee or agent acting under the direction of the registered) and is intended for the exclusive use of that individual or entity and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not the registered user (or an employee or agent acting under the direction of the registered), you are hereby notified that any disclosure, dissemination, distribution or copying of this information is strictly prohibited and may be subject to legal restriction or sanction.

1

# EXHIBIT 7

# Documents Related to Patient N

# EXHIBIT 7-N1

**5 Star Check List - DR. AKHIL PATEL**

Freedom VIP Savings (HMO SNP) - PCP Effective Date: 09-2018

Visits in last 12 months:    PCP: 12    ER: 0    Specialists: 6    Hospital: 0



**PHYSICIAN PARTNERS**

| 100% | 1.801 |
|---|



HCC 055   HCC 018   HCC 085   HCC 111   HCC 108

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported 2018 | 2017 | 2016 | Source | Comments |
|---|---|---|---|---|---|---|
| HCC 055 - Drug/Alcohol Dependence | | | | | | RA Factor: 0.420 |
| F10.20 | Alcohol dependence, uncomplicated | 3 | 0 | 0 | **Current PCP** | Needs patient verifico |
| HCC 018 - Diabetes with Chronic Complications | | | | | | RA Factor: 0.368 |
| E11.51 | Type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene | 3 | 2 | 0 | Suspect Rules: 12 - Diabetic Angiopathy / DM with PVD | Establish causal relationship between DM E11.9 and PAD/PVD I73.9 coded previously on DOS 07-18-2017  No -See below |
| E11.69 | Type 2 diabetes mellitus with other specified complication | 0 | 2 | 2 | Physician | "  " |
| HCC 085 - Congestive Heart Failure | | | | | | RA Factor: 0.368 |
| I42.9 | Cardiomyopathy, unspecified | 2 | 2 | 0 | Physician | Ok |
| HCC 111 - Chronic Obstructive Pulmonary Disease | | | | | | RA Factor: 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 9 | 6 | 1 | **Current PCP** | Ok Spirometry 8/15 mild obstruction |
| HCC 108 - Peripheral vascular disease, unspecified | | | | | | RA Factor: 0.299 |
| I70.0 | Atherosclerosis of aorta | 3 | 0 | 0 | **Current PCP** | Ok |
| I73.9 | Peripheral vascular disease, unspecified | 3 | 12 | 0 | Physician Hospital | Ok |
| I70.213 | Atherosclerosis of native arteries of extremities with intermittent claudication, bilateral legs | 0 | 1 | 0 | Physician | Ok |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| There are no codes reported / captured in the current year | | | | | |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: 1/23/19

Signature (MD, DO, PA or NP only):

E11.51
HgbA1c 2017 -> 2019 only in pre-dm range
    Patient treated for DM. Debatable. No HgbA1C > 6.5
    since 2015. Patient does not follow any diet.
        hard to say here.

**Please fax form and progress note to 888-978-5655**

Confidential - Do Not Distribute                    Page 1 of 1

CZ_DS002798

# EXHIBIT 7-N2



5. HTN (hypertension), benign - I10
6. Peripheral arterial occlusive disease - I77.9
7. Bladder neoplasm - D49.4

**Treatment**

**1. Chronic obstructive pulmonary disease, unspecified**
Notes: Mild. Discussed smoking cessation importance.

**2. Atherosclerotic heart disease of native coronary artery without angina pectoris**
Notes: Significant occlusion. Needs ongoing monitoring.

**3. Type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene**
Notes: . Question completeness of initial diagnosis. Patient may have been prediabetes but it does not seem tha lab criteria quite matches diagnosis. If it is a question later on, will repeat fasting glucose or glucose tolerance testing. Needs lab order to take to Moffitt.

**4. Hypercholesteremia**
Notes: . Patient to continue with statin at current dose.

**5. HTN (hypertension), benign**
Notes: Continue to take lisinopril 10 mg daily. Blood pressure stable.

**6. Peripheral arterial occlusive disease**
Notes: Patient will continue to follow-up with cardiology, Dr. Bermudez. Continue aspirin and clopidogrel. Patient is physically active with his work as a landscaper.

**7. Bladder neoplasm**

# EXHIBIT 7-N3



AP02

https://myq360.com/msap/member_task_list_2017_long_form_v2.php?muids=58632

Handouts | Preprocedure Patie... | AAOS Essentials of... | Search - UpToDate | Paroxetine-sertralin... | Pathologic Q Wave...

(018) (085) (111) (011) (108) (019) (055) (075)

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported | | | Source | Comments |
|---|---|---|---|---|---|---|
| | | 2018 | 2017 | 2016 | | |
| HCC055 - Drug/Alcohol Dependence | | | | | | RA Factor: 0.420 |
| F10.20 | Alcohol dependence, uncomplicated | 5 | 0 | 0 | Physician Hospital | |
| HCC075 - Myasthenia Gravis/Myoneural Disorders and Guillain-Barre Syndrome/Inflammatory and Toxic Neuropathy | | | | | | RA Factor: 0.408 |
| G62.1 | Alcoholic polyneuropathy | 0 | 0 | 0 | | Alcohol-dependent, evaluate for alcoholic polyneuropathy |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| HCC011 | C67.8 | Malignant neoplasm of overlapping sites of bladder | 01-04-2019 | 03-26-2019 | Current PCP |
| HCC011 | C67.9 | Malignant neoplasm of bladder, unspecified | 01-22-2019 | 01-22-2019 | Current PCP |
| HCC018 | E11.51 | Type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene | 01-22-2019 | 01-22-2019 | Current PCP |
| HCC019 | E11.9 | Type 2 diabetes mellitus without complications | 02-15-2019 | 02-15-2019 | Physician Hospital |
| HCC085 | I42.9 | Cardiomyopathy, unspecified | 02-04-2019 | 02-04-2019 | Physician |
| HCC108 | I73.9 | Peripheral vascular disease, unspecified | 01-22-2019 | 01-22-2019 | Current PCP |
| HCC108 | I77.9 | Disorder of arteries and arterioles, unspecified | 01-22-2019 | 01-22-2019 | Physician |
| HCC111 | J44.9 | Chronic obstructive pulmonary disease, unspecified | 01-22-2019 | 01-22-2019 | Current PCP |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: _____

# EXHIBIT 8
# Documents Related to Patient O

# EXHIBIT 8-O1

# 5 Star Check List - DR. AKHIL PATEL



Freedom VIP Savings COPD (HMO SNP) - PCP Effective Date: 05-2018

Visits in last 12 months:  **PCP: 18**  **ER: 1**  **Specialists: 8**  **Hospital: 0**

| 100% | 3.329 |

     

HCC 021  HCC 169  HCC 040  HCC 085  HCC 111  HCC 124  HCC 108  HCC 048  HCC 088

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported 2018 | Times Reported 2017 | Times Reported 2016 | Source | Comments |
|---|---|---|---|---|---|---|
| HCC021 - Protein-Calorie Malnutrition | | | | | | RA Factor: 0.713 |
| E46 | Unspecified protein-calorie malnutrition | 2 | 0 | 0 | Current PCP | No |
| HCC169 - Vertebral Fractures without Spinal Cord Injury | | | | | | RA Factor: 0.497 |
| M48.56XA | Collapsed vertebra, not elsewhere classified, lumbar region, initial encounter for fracture | 2 | 0 | 0 | Physician Hospital | Ok |
| S32.020A | Wedge compression fracture of second lumbar vertebra, initial encounter for closed fracture | 1 | 0 | 0 | Physician | |
| S32.028A | Other fracture of second lumbar vertebra, initial encounter for closed fracture | 1 | 0 | 0 | Physician | ✓ |
| HCC040 - Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | | | | | | RA Factor: 0.374 |
| M46.96 | Unspecified inflammatory spondylopathy, lumbar region | 3 | 0 | 0 | Physician | No |
| HCC085 - Congestive Heart Failure | | | | | | RA Factor: 0.368 |
| I50.30 | Unspecified diastolic (congestive) heart failure | 11 | 0 | 0 | Current PCP | Ok yes |
| HCC111 - Chronic Obstructive Pulmonary Disease | | | | | | RA Factor: 0.346 |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | 16 | 17 | 0 | Current PCP | ok |
| J42 | Unspecified chronic bronchitis | 0 | 8 | 0 | Past History | No |
| J43.9 | Emphysema, unspecified | 0 | 2 | 0 | Physician | No |
| J44.0 | Chronic obstructive pulmonary disease with acute lower respiratory infection | 0 | 2 | 0 | Physician | No |
| HCC124 - Exudative Macular Degeneration | | | | | | RA Factor: 0.335 |
| H35.32 | Exudative age-related macular degeneration | 12 | 0 | 0 | Past History | OK |
| H35.3221 | Exudative age-related macular degeneration, left eye, with active choroidal neovascularization | 1 | 0 | 0 | Physician | ok |
| HCC108 - Peripheral vascular disease, unspecified | | | | | | RA Factor: 0.299 |
| I77.9 | Disorder of arteries and arterioles, unspecified | 1 | 0 | 1 | Current PCP | No |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 5 | 0 | 0 | Current PCP | No |
| HCC088 - Angina Pectoris | | | | | | RA Factor: 0.145 |
| I20.8 | Other forms of angina pectoris | 0 | 5 | 0 | Physician | No |

Please fax form and progress note to 888-978-5655

Confidential - Do Not Distribute

CZ_DS004530

## 5 Star Check List - DR. AKHIL PATEL

Freedom VIP Savings COPD (HMO SNP) - PCP Effective Date: 05-2018

in last 12 months:     PCP: 18     ER: 1     Specialists: 8     Hospital: 0

PHYSI
PARTN

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|-----|-----|-----------------|-----------|----------|--------|
| | | There are no codes reported / captured in the current year | | | |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: 1/3/19

Signature (MD, DO, PA or NP only):

# EXHIBIT 8-O2



VIP–VEN–LAP02

### 2019 Paid (4)

| HCC | HCC Description | ICD | ICD9 Description | # of times reported in service years | | | | | | | | Logic number |
|-----|-----------------|-----|------------------|------|------|------|------|------|------|------|-------|--------------|
| | | | | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | <=2011 | |
| HCC085 | Congestive Heart Failure | I50.30 | Unspecified diastolic (congestive) heart failure | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| HCC108 | Vascular Disease | I77.9 | Disorder of arteries and arterioles, unspecified | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HCC111 | Chronic Obstructive Pulmonary Disease | J44.9 | Chronic obstructive pulmonary disease, unspecified | 21 | 17 | 0 | 1 | 0 | 0 | 0 | 1 | 1 |
| | | J42 | Unspecified chronic bronchitis | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 1 | |
| | | J43.9 | Emphysema, unspecified | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | |
| | | J44.0 | Chronic obstructive pulmonary disease with acute lower respiratory infection | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | |
| HCC124 | Exudative Macular Degeneration | H35.32 | Exudative age-related macular degeneration | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | H35.3221 | Exudative age-related macular degeneration, left eye, with active choroidal neovascularization | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

Provide feedback

# EXHIBIT 8-O3

5 Star Check List DR. AKHIL PATEL

Visits in last 12 months:    PCP: 12    ER: 0    Effective Date: 05-2018    Specialists: 4    Hospital: 0

25% | 0.714      75% | 2.118

PHYSICIAN PARTNERS

HCC 085   HCC 111   HCC 021   HCC 040   HCC 124   HCC 108   HCC 048   HCC 088

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported | | | Source | Comments |
|---|---|---|---|---|---|---|
| | | 2018 | 2017 | 2016 | | |
| HCC021 - Protein-Calorie Malnutrition | | | | | | RA Factor: 0.7 |
| E46 | Unspecified protein-calorie malnutrition | 2 | 0 | 0 | Current PCP | No |
| HCC040 - Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | | | | | | RA Factor: 0.3 |
| M46.96 | Unspecified inflammatory spondylopathy, lumbar region | 3 | 0 | 0 | Physician | No |
| HCC124 - Exudative Macular Degeneration | | | | | | RA Factor: 0. |
| H35.32 | Exudative age-related macular degeneration | 13 | 0 | 0 | Past History | Ok |
| H35.3221 | Exudative age-related macular degeneration, left eye, with active choroidal neovascularization | 1 | 0 | 0 | Physician | No |
| HCC108 - Peripheral vascular disease, unspecified | | | | | | RA Factor: 0 |
| I77.9 | Disorder of arteries and arterioles, unspecified | 2 | 0 | 1 | Current PCP | No |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor: |
| D69.2 | Other nonthrombocytopenic purpura | 6 | 0 | 0 | Current PCP | No |
| HCC088 - Angina Pectoris | | | | | | RA Factor: |
| I20.8 | Other forms of angina pectoris | 0 | 5 | 0 | Physician | No |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| HCC085 | I50.30 | Unspecified diastolic (congestive) heart failure | 01-03-2019 | 01-03-2019 | Current PCP |
| HCC111 | J44.9 | Chronic obstructive pulmonary disease, unspecified | 01-03-2019 | 01-03-2019 | Current PCP |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: _3/4/19._

Signature (MD, DO, PA or NP only): _____

HCC 085 - Should be corrected. Patient does NOT have. Should be amended.

CZ_DS004534

# EXHIBIT 8-O4

Case 8:19-cv-01236-KKM-SPF Document 256-3 Filed 05/15/24 Page 284 of 332 PageID 13508




**★ ★ ★ ★ ★ HEALTHCARE**

Referring: Clarissa A Zafirov
Appointment Facility: VIPcare Venice

03/04/2019                                    Progress Note:  Clarissa Zafirov MD

### Reason for Appointment
1. 2 mo f/u, labs

### History of Present Illness
COA - Pain Assessment:
    Does the patient have Pain? **No** .
COA - Medication Review and List:
    Medication List Documented Yes. Medications Reviewed 3/4/19.
HPI:
    Patient here to follow-up labs. Patient with history of hyperlipidemia for which she takes simvastatin 10 mg tablets daily. Lipid panel in normal range.
    Patient with vitamin D deficiency. She does have a history of spontaneous fracture in her spine. Did have last bone density scan in the last year. Patient taking at thousand milligrams of vitamin D daily.
    Hemoglobin A1c of 5.8 which is a slight decrease from previous.
    Patient continues to smoke about half a pack daily. Does have COPD which is stable currently no cough increased sputum or shortness of breath.
    Patient scheduled to see cardiology in the next few months. Patient has a grade 1 diastolic dysfunction which is not abnormal for age on cardiac echo. Does not qualify for congestive heart failure as previously on problem list.

### Current Medications
**Taking**
- Aspir 81 81 mg delayed release tablet 1 tab(s) orally once a day
- simvastatin 10 mg tablet 1 tab(s) orally once a day (at bedtime)
- Spiriva Respimat 2.5 mcg/inh aerosol 2 puff(s) inhaled once a day
- Trelegy Ellipta 100 mcg-62.5 mcg-25 mcg powder 1 puff(s) inhaled once a day, Notes: haven't started yet
**Discontinued**
- Breo Ellipta 100 mcg-25 mcg/inh powder 1 puff(s) inhaled once a day
- Medication List reviewed and reconciled with the patient

### Past Medical History
High Cholesterol.
COPD.
Seasonal Allergy.
S5 buldging disc.
Arthritis.
Macular Degeneration Lt eye.
Hx of syphilis - Was discovered by blood work..

### Surgical History
Hysterectomy Partial 1982
Lt Rotator Cuff 2008
Cartlidge repair Lt

---

*Patient:* [redacted]          DOB: [redacted]     Progress Note: Clarissa Zafirov MD   03/04/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

http://192.168.200.12:8080/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?encounterID=...   8/8/2019

CZ_DS004535

## Family History
Father: deceased 80 yrs, Lung CA
Mother: deceased 93 yrs
Siblings: Lung CA, Valve Disorder

## Social History
Tobacco Use   Smoking Status  Current smoker 10 Cig a day,   Patient uses other tobacco products: No,  When did you start smoking? 1970,  How often do you smoke cigarettes? every day,  How many cigarettes a day do you smoke? 6-10,  Are you interested in quitting? Thinking about quitting,  Additional Findings: Tobacco User  Light cigarette smoker ((1-9 cigs/day).
Alcohol: Social.
Drug use: Never used illegal drugs.
Marital Status: Seperated.
Children: None.
Occupation: Semi-Retired: Nielson TV Rating.
Exercise: Regularly.
Caffeine: Coffee, 1-3 cups per day, Soda.

## Allergies
Soma: rash

## Hospitalization/Major Diagnostic Procedure
No Hospitalization History.

## Review of Systems
CONSTITUTIONAL:
   no Fever.  no Chills.  no Night Sweats.
CARDIOLOGY:
   no Chest Pain.  no Shortness of Breath.  no Palpitations.  no Dizziness.
DERMATOLOGY:
   no Rash.
HEMATOLOGY/LYMPH:
   no Fatigue.  no Easy Bruising.
GASTROENTEROLOGY:
   no Abdominal Pain.  no Nausea.  no Vomiting.
NEUROLOGY:
   no Headache.  no Visual Changes.
RESPIRATORY:
   no Shortness of Breath.  no Persistent Cough.  no Wheezing.

## Vital Signs
Ht 64 in, Wt 182 lbs, BP 116/80 mm Hg, Pulse 59 /min, Resp 14 /min, O2 Sat 95, Temp 97.7 F, BMI 31.24 Index.

## Past Orders
Lab:Vitamin B12 (Cobalamin) and Folate Panel, Serum (Order Date - 02/12/2019) (Collection Date - 02/12/2019)

| | | | |
|---|---|---|---|
| FOLATE, SERUM | 9.2 | | - ng/mL |
| VITAMIN B12 | 361 | | 200-1100 - pg/mL |

Lab:Vitamin D, 25-Hydroxy, Total, Immunoassay (Order Date - 02/12/2019) (Collection Date - 02/12/2019)

| | | | |
|---|---|---|---|
| VITAMIN D, 25-OH, TOTAL | 27 | L | 30-100 - ng/mL |

Lab:Lipid Panel (Q) (LC) (Order Date - 02/12/2019) (Collection Date - 02/12/2019)

| | | | |
|---|---|---|---|
| Cholesterol, Total | 143 | | <200 - mg/dL |
| **HDL Cholesterol** | **49** | **L** | **>50 - mg/dL** |
| Triglycerides | 99 | | <150 - mg/dL |
| LDL Cholesterol | 76 | | - mg/dL (calc) |
| CHOL/HDLC Ratio | 2.9 | | <5.0 - (calc) |
| Non HDL Cholesterol | 94 | | <130 - mg/dL (calc) |

Patient: ▇▇▇▇  DOB: ▇▇▇  Progress Note: Clarissa Zafirov MD  03/04/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eclinicalworks.com)*

CZ_DS004536

| | | |
|---|---|---|
| EOSINOPHILS | 6.9 | - % |
| BASOPHILS | 1.6 | - % |
| ABSOLUTE BASOPHILS | 0.4 | - % |
| ABSOLUTE EOSINOPHILS | 28 | 0-200 - cells/uL |
| ABSOLUTE LYMPHOCYTES | 110 | 15-500 - cells/uL |
| MPV | 3443 | 850-3900 - cells/uL |
| ABSOLUTE MONOCYTES | 11.9 | 7.5-12.5 - fL |
| ABSOLUTE NEUTROPHILS | 476 | 200-950 - cells/uL |
| RDW | 2843 | 1500-7800 - cells/uL |
| | 12.1 | 11.0-15.0 - % |

Lab:REFLEXIVE URINE CULTURE (Order Date - 02/12/2019) (Collection Date - 02/12/2019)

| | | |
|---|---|---|
| REFLEXIVE URINE CULTURE | NO CULTURE INDICATED | - |

## Examination

General Examination:

General Examination Healthy looking for stated age, alert and oriented, well developed and well- nourished, comfortable looking throughout visit.

Skin No rash noted, unremarkable.

HEENT: Unremarkable. Sclera WNL bilaterally, pupils within normal size range, equally rounded, reactive to light.

Abdomen: Soft, non tender, no distension, no palpable masses, BSx4.

Musculoskeletal No joint deformity, swelling, or limited range of motion with movement.

Neurologic Exam: A&O x 3, normal strength and muscle tone.

Cardiology:

JVD: none.

Heart: No clinical signs of heart failure., normal S1S2.

Heart Murmur: No significant murmur noted.

Lungs: no wheezing/rhonchi/rales, regular rate and effort, good air movement, ...

Extremities: no leg edema.

Peripheral pulses: normal,symmetric.

Neurology:

Cranial nerves: CN II-XII grossy intact.

## Assessments

1. Dyslipidemia - E78.5 (Primary)
2. Low vitamin D level - E55.9
3. Chronic airway obstruction, not elsewhere classified - J44.9
4. Prediabetes - R73.03

## Treatment

### 1. Others

Notes:

In regards to hyperlipidemia patient to continue with simvastatin 10 mg tablets daily. Currently stable. Patient should increase vitamin D to at least 2000 units daily. Will be due for bone density scan in the next 2 years.

---

**Patient:** [redacted] **DOB:** [redacted] **Progress Note: Clarissa Zafirov MD** 03/04/2019

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

http://192.168.200.12:8080/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?encounterID=... 8/8/2(

CZ_DS004537

In regards to COPD patient is currently stable. Was given a trilogy sample which she will try when she runs out of Spiriva. Did discuss again smoking cessation. Repeat CT scan of the lungs in December 2019.

Patient hemoglobin A1c in prediabetic range. Difficulty for exercises patient continues to work on a regular basis.

Plan to repeat labs in September.

.

### Labs
Lab: Hemoglobin A1c (Ordered for 09/04/2019)

Lab: Vitamin D, 25-Hydroxy, Total, Immunoassay (Ordered for 09/04/2019)

Lab: CBC (H/H, RBC, Indices, WBC, PLT) (Ordered for 09/04/2019)

Lab: Urinalysis, Complete, with Reflex to Culture (Q) (Ordered for 09/04/2019)

Lab: CBC (INCLUDES DIFF/PLT) (Ordered for 09/04/2019)

### Preventive Medicine
HEDIS: Mammo  June 19, 2018 RAVE. Fall Risk Assessment  8/7/18.  echo  5/1/18 Carotid US 4/17/18.  Colonoscopy 4/22/16 Dr. DeMasi. COA  11/12/18. DEXA  2/6/18 RAVE.
Immunizations: Pneumococcal  10/30/17, .... Influenza  Advised, pt refused 11/12/18, .... Herpes Zooster Vaccination Declines 11/12/18.

### Procedure Codes
1126F AMNT PAIN NOTED NONE PRSNT

### Follow Up
6 Months

Electronically signed by Clarissa Zafirov , MD on 03/04/2019 at 11:13 AM EST

Sign off status: Completed

VIPcare Venice
333 Tamiami Trail S
Venice, FL 34285-2425
Tel: 941-234-1288
Fax: 844-388-6186

Patient:               DOB:            Progress Note: Clarissa Zafirov MD    03/04/2019

Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

CZ_DS004538

EXHIBIT 8-O5

From The Heart Institute 9414120024          2019-05-14 11:33 EDT          P 1/3



**The Heart Institute**
OF VENICE

1370 East Venice Avenue, Suite 102
Venice, Florida 34285
Ph #: 941/412-0026
Fax #: 941/412-0027

**Patient Name:**
**Patient ID:**
**Date of Birth:**

**Date of Service: 05-13-2019**

**Chief Complaint:**
Seen today for results of stress test, echocardiogram and carotid ultrasound.

**Past Medical History:**
Abnormal ECG (R94.31) (794.31),Aortic sclerosis (I35.8) (424.1) (Mild),Atypical angina (I20.8) (413.9),Benign and innocent cardiac murmurs (R01.0) (785.2),Bilateral carotid artery occlusion (I65.23) (433.10) (Bilateral 20-49%),Calcification of mitral valve (I34.8) (424.0) (w Mild Mitral Sclerosis),Chest pain (R07.9) (786.50),Diastolic dysfunction (I50.30) (Stage 1),HLD - Hyperlipidemia (E78.5) (272.4),Nonrheumatic mitral (valve) insufficiency (I34.0) (424.0) (Trace),Nonrheumatic tricuspid (valve) insufficiency (I36.1) (424.2) (Trace)

**Procedures:**
Cholesterol Screening (02/12/2019),Cholesterol Screening (05/01/2018)

**Presenting Medications:**
**aspirin oral** 81mg (1 tablet po qd), **Breo Ellipta** 100-25mcg/dose (1 puff qd), **simvastatin** 10mg (qd), **Spiriva with HandiHaler**

**Allergies:**
NKDA

**Social History:** Smoking Status: Current some day smoker.   Age Started Smoking: 25.   Smoking Cessation Counseling: Yes on 05-13-2019.   Language: English.   Race:

· White
  Ethnicity:

· Not Hispanic or Latino

**Family History:**
CAD - Coronary artery disease (Father, Sibling)

**Vital Signs:**

| Ht | Wt | BMI | BP - Sys | BP - Dia | BP - Site | BP - Position |
|---|---|---|---|---|---|---|
| 64.5 in | 181 lbs | 30.59 | 112 mmHg | 70 mmHg | Left Arm | Sitting |

| Resp | Temp | Pulse | Pulse Site | Exertion | O2 Sat | Head Circ | Pain Severity |
|---|---|---|---|---|---|---|---|
| 14 prm | | 69 bpm | Radial | Resting | 94 | | |

**Impression:**

**FOLLOWUP VISIT**



**The Heart Institute**
OF VENICE

1370 East Venice Avenue, Suite 102
Venice, Florida 34285
Ph #: 941/412-0026
Fax #: 941/412-0027

**Patient Name:**
**Patient ID:**
**Date of Birth:**

**Date of Service: 05-13-2019**

HISTORY OF PRESENT ILLNESS: This 69-year-old lady with a family history of early coronary artery disease, mild carotid artery disease, hyperlipidemia and abnormal EKG. She has some anginal equivalent symptoms, had an exercise Cardiolite study done, which is normal. Echo Doppler showed normal systolic function, mild mitral and tricuspid insufficiency. Carotid duplex exam revealed mild disease bilaterally.

REVIEW OF SYSTEMS: No recent history of PND, orthopnea, ankle edema, dizziness, palpitations, syncope, extreme fatigue, diarrhea, nausea or vomiting. I have reviewed the review of systems.

PHYSICAL EXAMINATION:
GENERAL: No acute distress. Conversant.
VITALS: Listed.
NECK: No jugular venous vein distention or carotid bruits.
LUNGS: Clear to percussion and auscultation.
HEART: Regular rate and rhythm. Heart sounds normal. Grade I/VI systolic murmur at the lower left sternal border. No rubs or gallops; normal PMI.
ABDOMEN: Soft, nontender, normal active bowel sounds. No hepatosplenomegaly. Normal aortic pulsations; no bruits.
EXTREMITIES: No peripheral edema. Normal, symmetric pedal pulses. No digital cyanosis or clubbing.

IMPRESSION:
1. Family history of early coronary artery disease.
2. Mild carotid artery disease.
3. Hyperlipidemia.
4. Abnormal EKG.

DISPOSITION: The patient will be seen in follow up in another few months.

Barry J. Weckesser, M.D., F.A.C.C.
BJW: lfsl/ha

cc: Clarissa A. Zafirov, M.D. 844-388-6186

d: 05/13/2019 t: 05/14/2019

Patient education material given
· outcome health

cc: CLARISSA A ZAFIROV, MD

CZ_DS004540

EXHIBIT 8-O6

Summary View for ▇▇▇▇ | Account Number:51552                    Page 1 of 5



Referring: Clarissa A Zafirov
Appointment Facility: VIPcare Venice

01/03/2019                              Progress Notes: Clarissa Zafirov MD

## Reason for Appointment
1. CPE/B12 inj

## History of Present Illness
Depression Screening.:
   PHQ-9 Little interest or pleasure in doing things  Not at all, Feeling down, depressed, or hopeless  Not at all, Trouble falling or staying asleep, or sleeping too much  Not at all, Feeling tired or having little energy  Not at all, Poor appetite or overeating  Not at all, Feeling bad about yourself-or that you are a failure or have let yourself or your family down  Not at all, Trouble concentrating on things, such as reading the newspaper or watching television  Not at all, Moving or speaking so slowly that other people could have noticed. Or the opposite ? being so fidgety or restless that you have been moving around a lot more than usual  Not at all, Thoughts that you would be better off dead, or of hurting yourself in some way  Not at all, Total Score  0.
COA - Func Stat:
   Cognitive Status Good. Ambulatory Status Good. Sensory Ability - Hearing Good. Sensory Ability - Vision Glasses. Sensory Ability - Touch Good. Sensory Ability - Smell Good. Sensory Ability - Taste Good.
COA - Medication Review and List:
   Medication List Documented Yes. Medications Reviewed Date:1/3/19.
COA - Pain Assessment:
   Denies : Does the patient have Pain? No. Denies : Pain Location. Denies : Pain scale. Denies : Pain Treatment Plan. Does the patient have Pain? **Yes ( add CPT code 1125F)**, **No ( add CPT code 1126F)**, **No , Yes** .
Fall Risk:
   Denies : History of falling , within the last three months **No - 0**. Denies : Secondary DX. Denies : Ambulatory Aid. Denies : IV/Heparin Lock. Denies : Gait/Transfering. Denies : Mental Status. Denies : No Risk 0 - 24 Good Basic Nursing Care.
   History of falling , within the last three months **Please Update**.
General ROS:

Interim History:
   c/o Consultations **Other consultant: pt is currently not following up with any consultants for health concerns.** .
   Brief ROS CPE, B12 inj.
COA - Adv Care:
   Patient has the below (mark only appropriate ones) Pt does not have a living will, advance directives or dnr. Pt encouraged to have one. Patient has the below (mark only appropriate ones) Advance Directives.
HPI:
   Patient here for physical visit. Patient has a history of COPD. Last pulmonary function test several years prior. She has evidence of chronic bronchitis on imaging. Did have screening CT just this last December which was negative for nodules or other abnormalities. Patient does continue to smoke approximately half a pack daily.
   Patient has history of macular degeneration for which she sees ophthalmology, Dr. Malley. Patient does have injections into her eye on a regular basis.
   Patient has history of compression fracture of second lumbar vertebrae sometime ago. Recurrence in 2018 proximally 1 year prior. Generally stable now without back pain at this time.

Patient: ▇▇▇▇     DOB: ▇▇▇▇     Progress Note: Clarissa Zafirov MD   01/03/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CZ_DS004541

Patient has a history on echo of very mild stage I diastolic congestive heart failure. Also currently stable patient denies symptoms of peripheral edema orthopnea. No increasing shortness of breath with exertion outside of her COPD.

Patient currently takes Brio and Spiriva for COPD. No increased cough or increase in sputum currently.

Patient has a family history of coronary artery disease. Patient with past hyperlipidemia and therefore takes simvastatin 10 mg daily. She also takes daily aspirin.

Patient will be due for minimum mammogram screening in June. She declines influenza vaccine. She has had pneumonia vaccine. Patient does see dermatology on an annual basis.

## Current Medications
**Taking**
- Aspir 81 81 mg delayed release tablet 1 tab(s) orally once a day
- simvastatin 10 mg tablet 1 tab(s) orally once a day (at bedtime)
- Spiriva Respimat 2.5 mcg/inh aerosol 2 puff(s) inhaled once a day
- Breo Ellipta 100 mcg-25 mcg/inh powder 1 puff(s) inhaled once a day

**Discontinued**
- nystatin 100000 units/mL suspension 4 ml orally 4 times a day, Notes: PRN
- Medication List reviewed and reconciled with the patient

## Past Medical History
High Cholesterol.
COPD.
Seasonal Allergy.
S5 buldging disc.
Arthritis.
Macular Degeneration Lt eye.
Hx of syphilis - Was discovered by blood work..

## Surgical History
Hysterectomy Partial 1982
Lt Rotator Cuff 2008
Cartlidge repair Lt

## Family History
Father: deceased 80 yrs, Lung CA
Mother: deceased 93 yrs
Siblings: Lung CA, Valve Disorder

## Social History
Tobacco Use  Smoking Status  Current smoker 10 Cig a day,  Patient uses other tobacco products: No,  When did you start smoking? 1970,  How often do you smoke cigarettes? every day,  How many cigarettes a day do you smoke? 6-10,  Are you interested in quitting? Thinking about quitting,  Additional Findings: Tobacco User  Light cigarette smoker ((1-9 cigs/day).
Alcohol: Social.
Drug use: Never used illegal drugs.
Marital Status: Seperated.
Children: None.
Occupation: Semi-Retired: Nielson TV Rating.
Exercise: Regularly.
Caffeine: Coffee, 1-3 cups per day, Soda.

## Allergies
Soma: rash

## Hospitalization/Major Diagnostic Procedure
No Hospitalization History.

## Review of Systems
*CONSTITUTIONAL*:
no Fever. no Chills. no Weight Loss. no Fatigue.

Patient: ▮▮▮▮▮  DOB: ▮▮▮  Progress Note: Clarissa Zafirov MD  01/03/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CZ_DS004542

CARDIOLOGY:
no Chest Pain. no Shortness of Breath. no Palpitations. no Dizziness.
DERMATOLOGY:
no Rash.
GASTROENTEROLOGY:
no Abdominal Pain. no Nausea. no Vomiting. no Diarrhea.
MUSCULOSKELETAL:
no Joint Swelling. no Myalgias.
PSYCHOLOGY:
no Depression. no Anxiety.
RESPIRATORY:
no Shortness of Breath. no Persistent Cough. no Wheezing.
UROLOGY:
no Dysuria. no Urinary Frequency.

**Vital Signs**

Ht 64 in, Wt 183 lbs, BP 122/62 mm Hg, Pulse 72 /min, Resp 14 /min, O2 Sat 97, Temp 97.9 F, BMI 31.41 Index.

**Examination**

General Examination:
General Examination Healthy looking for stated age, alert and oriented, well developed and well- nourished, comfortable looking throughout visit.
Skin No abnormal lesions, . No erythema or ecchymosis. Skin warm to the touch, clean, dry.
HEENT: Unremarkable. Sclera WNL bilaterally, pupils within normal size range, equally rounded, reactive to light bilaterally. The oropharynx was clear with moist mucus membranes.
Neck, Thyroid : No Lymphadenopathy, no tenderness with palpation, no JVD.
Heart: S1S2 RRR, no signs of CHF, no edema.
Lungs: Clear to auscultation A/P bilaterally,occasional rhonchi regular breathing rate and effort, good air exchange noted throughout.
Abdomen: Soft, non tender, no distension, no palpable masses, BSx4.
Musculoskeletal No joint deformity, swelling, tenderness, pain.
Neurologic Exam: A&O x 3, normal strength and muscle tone, CN's II-XII grossly intact.
Psychiatry Well dressed and well groomed, appropriate behavior and thought process, no anxiety or depression.
GYN:
Breasts: normal - no masses or tenderness or skin changes.

**Assessments**
1. Encounter for general adult medical examination with abnormal findings - Z00.01 (Primary)
2. Dyslipidemia - E78.5
3. Low vitamin D level - E55.9
4. Chronic airway obstruction, not elsewhere classified - J44.9
5. Age-related macular degeneration - H35.30
6. Diastolic congestive heart failure, unspecified chronicity - I50.30
7. Bilateral carotid artery disease - I77.9
8. Coronary artery disease involving native coronary artery of native heart without angina pectoris - I25.10

**Treatment**
**1. Dyslipidemia**
LAB: Vitamin B12 (Cobalamin) and Folate Panel, Serum
LAB: CBC (INCLUDES DIFF/PLT)
LAB: Lipid Panel (Q) (LC)
LAB: Hemoglobin A1c
LAB: Comprehensive Metabolic Panel w/ EGFR (CMP) (Q) (LC)
LAB: Urinalysis, Complete, with Reflex to Culture (Q)
Notes: Will check basic labs today patient to continue with simvastatin 10 mg tablets daily.

**2. Low vitamin D level**

Patient: [redacted]  DOB: [redacted]  **Progress Note: Clarissa Zafirov MD**  01/03/2019
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

CZ_DS004543

LAB: Vitamin D, 25-Hydroxy, Total, Immunoassay
Notes: . Will recheck levels with labs previously, reported condition. Patient was scheduled to have a B12 injection but has no documented history of deficiency and no history of malabsorption. Oral B12 will be fin.

**3. Chronic airway obstruction, not elsewhere classified**
Notes: . Discussed smoking cessation. Patient 93% on room air today. We discussed possibilit of progression to oxygen if we do not have improvement.May try trilogy and exchange for Brio and Spiriva. Stable currently. Rinse mouth after inhaler use.

**4. Age-related macular degeneration**
Notes: . Patient to continue to follow-up with ophthalmolog.

**5. Diastolic congestive heart failure, unspecified chronicity**
Notes: . mild stage I asymptomatic. Patient will need repeat cardiac echo annuall.

**6. Bilateral carotid artery disease**
Notes: Reported condition by cardiology records. Will look for report.

**7. Coronary artery disease involving native coronary artery of native heart without angina pectoris**
Notes: Patient has reports in cardiology records of mild early stage coronary artery disease. Likely given smoking history. As a result, will benefit from continuation of statin as well as aspirin.

**Preventive Medicine**
HEDIS: Mammo June 19, 2018 RAVE. Fall Risk Assessment 8/7/18. echo 5/1/18 Carotid US 4/17/18. Colonoscopy 4/22/16 Dr. DeMuss. COA 12/12/18. DEXA 2/6/18 RAVE.
Immunizations: Pneumococcal 10/30/17, .... Influenza Advised, pt refused 11/12/18, .... Herpes Zooster Vaccination Declines 12/12/18.

**Procedure Codes**
1159F ADWNC CARE PLAN TLK DOCD
1159F ADWNC CARE PLAN TLK DOCD
1159F MED LIST DOCD IN RCRD
1159F MED LIST DOCD IN RCRD
1160F BNW MEDS BY RX, OR IN RCRD
1160F BNW MEDS BY RX, OR IN RCRD
1170F FXNL STATUS ASSESSED
1170F FXNL STATUS ASSESSED
3288F FALL RISK ASSESSMENT DOCD
(G8421 BMI is documented within normal parameters and no follow-up plan is required
1125F ADDNT PAIN NOTED NONE PRSNT
3288F FALL RISK ASSESSMENT DOCD
1125F ADDNT PAIN NOTED PAIN PRSNT
3725F SCREEN DEPRESSION PERFORMED

**Follow Up:**
3 Weeks (Reason: f/u labs)

CZ_DS004544

Summary View for [REDACTED] | Account Number: [REDACTED]                    Page 5 of 5

Electronically signed by Clarissa Zafirov , MD on 01/03/2019 at 02:22 PM EST
Sign off status: Completed

**Addendum:**
05/15/2019 09:42 AM Zafirov, Clarissa A > Ammendment to chart. No CHF. Should not be included in problem list

**VIPcare Venice**
**333 Tamiami Trail S**
Venice, FL 34285-2425
Tel: 941-234-1288
Fax: 844-388-6186

Patient: [REDACTED]   DOB: [REDACTED]   Progress Note: Clarissa Zafirov MD   01/03/2019

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

# EXHIBIT 8-O7

CZ_DS004546

Star Check List - DR. CLARISSA A ZAFIROV


PHYSICIAN PARTNERS

edom VIP Savings COPD (HMO SNP) - PCP Effective Date: 03-2019

its in last 12 months:    **PCP: 13**    **ER: 0**    **Specialists: 3**    **Hospital: 0**

| 56% | 1.493 | 44% | 1.339 |

 HCC 085  HCC 111  HCC 124  HCC 108  HCC 088  HCC 021 HCC 040 HCC 048  HCC 138

## PLEASE EVALUATE, ASSESS, AND TREAT

Disclaimer: This 5 Star checklist is not intended to be part of the patient's medical record. It is provided only to show the past medical conditions of the patient. Please document any existing conditions in your progress note.

| ICD10 | ICD Description | Times Reported | | | Source | Comments |
|---|---|---|---|---|---|---|
| | | 2018 | 2017 | 2016 | | |
| HCC021 - Protein-Calorie Malnutrition | | | | | | RA Factor: 0.713 |
| E46 | Unspecified protein-calorie malnutrition | 3 | 0 | 0 | Physician | |
| HCC040 - Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | | | | | | RA Factor: 0.374 |
| M46.96 | Unspecified inflammatory spondylopathy, lumbar region | 3 | 0 | 0 | Physician | |
| HCC048 - Coagulation Defects and Other Specified Hematological Disorders | | | | | | RA Factor: 0.252 |
| D69.2 | Other nonthrombocytopenic purpura | 10 | 0 | 0 | Physician | RA Factor |
| HCC138 - | | | | | | |
| N18.3 | Chronic kidney disease, stage 3 (moderate) | 3 | 1 | 0 | Physician | |

## BELOW CODES / CONDITIONS ARE ALREADY REPORTED IN THE CURRENT YEAR

| HCC | ICD | ICD Description | First DOS | Last DOS | Source |
|---|---|---|---|---|---|
| HCC085 | I50.30 | Unspecified diastolic (congestive) heart failure | 01-03-2019 | 01-03-2019 | Current PCP |
| HCC088 | I20.8 | Other forms of angina pectoris | 04-02-2019 | 04-02-2019 | Physician |
| HCC108 | I77.9 | Disorder of arteries and arterioles, unspecified | 01-03-2019 | 01-03-2019 | Physician |
| HCC111 | J44.9 | Chronic obstructive pulmonary disease, unspecified | 01-03-2019 | 01-03-2019 | Current PCP |
| HCC124 | H35.32 | Exudative age-related macular degeneration | 01-14-2019 | 04-26-2019 | Other Provider |

I attest that I have reviewed and addressed all relevant medical conditions during the face-to-face encounter with the patient on the below date:

Date Patient Seen: _____

Signature (MD, DO, PA or NP only): _____

Is Amed request sent? Yes March

Case 8:19-cv-01236-KKM-SPF Document 256-3 Filed 05/15/24 Page 299 of 332 PageID 16523

# EXHIBIT 8-O8



CZ_DS004547

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| H35.30 | Unspecified macular degeneration | | PCP Encounters |
| I50.30 | Unspecified diastolic (congestive) heart failure | HCC085 | PCP Encounters |
| I77.9 | Disorder of arteries and arterioles, unspecified | HCC108 | PCP Encounters |
| I25.10 | Atherosclerotic heart disease of native coronary artery without angina pectoris | | PCP Encounters |
| Z68.31 | Body mass index (BMI) 31.0-31.9, adult | | PCP Encounters |

**ZAFIROV, CLARISSA, A DR (2019-01-03)**

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| I50.30 | Unspecified diastolic (congestive) heart failure | HCC085 | Progress Notes |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | HCC111 | Progress Notes |

## 2018

**PATEL, AKHIL (2018-11-12)**

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| L82.1 | Other seborrheic keratosis | | PCP Encounters |
| L81.4 | Other melanin hyperpigmentation | | PCP Encounters |
| D22.5 | Melanocytic nevi of trunk | | PCP Encounters |
| L57.8 | Other skin changes due to chronic exposure to nonionizing radiation | | PCP Encounters |
| F17.200 | Nicotine dependence, unspecified, uncomplicated | | PCP Encounters |
| Z00.01 | Encounter for general adult medical examination with abnormal findings | | PCP Encounters |
| J44.9 | Chronic obstructive pulmonary disease, unspecified | HCC111 | PCP Encounters |
| E78.5 | Hyperlipidemia, unspecified | | PCP Encounters |
| H35.30 | Unspecified macular degeneration | | PCP Encounters |
| I50.30 | Unspecified diastolic (congestive) heart failure | HCC085 | PCP Encounters |
| D69.2 | Other nonthrombocytopenic purpura | HCC048 | PCP Encounters |
| N18.3 | Chronic kidney disease, stage 3 (moderate) | | PCP Encounters |
| R53.83 | Other fatigue | | PCP Encounters |
| I77.9 | Disorder of arteries and arterioles, unspecified | HCC108 | PCP Encounters |
| E53.8 | Deficiency of other specified B group vitamins | | PCP Encounters |
| Z68.31 | Body mass index (BMI) 31.0-31.9, adult | | PCP Encounters |

**PATEL, AKHIL (2018-10-16)**

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| R53.83 | Other fatigue | | PCP Encounters |

**PATEL, AKHIL (2018-09-18)**

| ICD | ICD Desc | HCC | Sources |
|---|---|---|---|
| B37.0 | Candidal stomatitis | | PCP Encounters |
| Z68.30 | Body mass index (BMI) 30.0-30.9, adult | | PCP Encounters |

# EXHIBIT 8-O9



VIP–VEN–LAP02

initial encounter for closed fracture

## 2019 Paid (4)

| HCC | HCC Description | ICD | ICD9 Description | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | <=2011 | Logic number |
|-----|-----------------|-----|------------------|------|------|------|------|------|------|------|--------|--------------|
| HCC085 | Congestive Heart Failure | I50.30 | Unspecified diastolic (congestive) heart failure | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| HCC108 | Vascular Disease | I77.9 | Disorder of arteries and arterioles, unspecified | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HCC111 | Chronic Obstructive Pulmonary Disease | J44.9 | Chronic obstructive pulmonary disease, unspecified | 21 | 17 | 0 | 1 | 0 | 0 | 0 | 1 | 1 |
| | | J42 | Unspecified chronic bronchitis | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 1 | |
| | | J43.9 | Emphysema, unspecified | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 | |
| | | J44.0 | Chronic obstructive pulmonary disease with acute lower respiratory infection | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | |
| HCC124 | Exudative Macular Degeneration | H35.32 | Exudative age-related macular degeneration | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | H35.3221 | Exudative age-related macular degeneration, left eye, with active choroidal neovascularization | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

Provide feedback

CZ_DS004549

# EXHIBIT 8-O10



# PROSPECTIVE POSSIBLE CONDITION REPORT

Refreshed Date: 10/7/2019

**Plan Name:** Freedom VIP Savings COPD (HMO SNP)
**Member Name:**
**Gender:**
**DOB:**
**Member Phone:**

**Member ID:**
**Provider Name:** ZAFIROV, CLARISSA, A
**Provider ID:** P1045672
**EFF Date:** 02/01/2015
**Group Name:** FLORIDA MEDICAL ASSOCIATES LLC

**Status Filter:** --SHOW ALL--

| Action | HCC Description | Possible Review Description | Physicians Involved | DOS | Script Count | Status |
|--------|-----------------|----------------------------|---------------------|-----|--------------|--------|
| Modify | Vertebral Fractures without Spinal Cord Injury | HCC submitted previously currently absent from patient clinical diagnoses | Other physician | 01/13/2018 | | UNADDRESSED |
| Modify | Chronic Kidney Disease, Moderate (Stage 3) | HCC submitted previously currently absent from patient clinical diagnoses | CMS | | | UNADDRESSED |
| Modify | Coagulation Defects and Other Specified Hematological Disorders | HCC submitted previously currently absent from patient clinical diagnoses | PCP | 11/12/2018 | | UNADDRESSED |
| Modify | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | HCC submitted previously currently absent from patient clinical diagnoses | Other physician | 01/22/2018 | | UNADDRESSED |
| Modify | Angina Pectoris | HCC submitted previously currently absent from patient clinical diagnoses | Other physician | 05/08/2017 | | UNADDRESSED |
| Modify | Vascular Disease | HCC submitted previously currently absent from patient clinical diagnoses | PCP | 01/03/2019 | | SECURED |
| Modify | Congestive Heart Failure | HCC submitted previously currently absent from patient clinical diagnoses | PCP | 01/03/2019 | | SECURED |
| Modify | Exudative Macular Degeneration | HCC submitted previously currently absent from patient clinical diagnoses | | 01/14/2019 | | SECURED |
| Modify | Chronic Obstructive Pulmonary Disease | Member in Chronic SNP with PCP verified Diagnosis of COPD | PCP | 01/03/2019 | | SECURED |
| Modify | Chronic Obstructive Pulmonary Disease | HCC submitted previously currently absent from patient clinical diagnoses | PCP | 01/03/2019 | | SECURED |

ATTACHMENT 3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CLARISSA ZAFIROV,

     Plaintiff,

v.                                                                                  Case No: 8:19-cv-1236-KKM-SPF

FLORIDA MEDICAL
ASSOCIATES, LLC, et al.,

     Defendants.

_____

## CASE MANAGEMENT AND SCHEDULING ORDER

     Having considered the parties' Case Management Report, *see* Fed. R. Civ. P. 26(f) and Local Rule 3.02(c), the Court enters this Order whose provisions will be strictly enforced.

1.    Parties are directed to meet the deadlines below:

| | |
|---|---|
| Deadline for Supplemental Rule 26(a) Disclosures | December 5, 2022 |
| Mediation Notice Deadline | January 31, 2023 |
| Third Party Joinder / Amend Pleading | April 3, 2023 |
| Fact Discovery Cut-Off and Fact Discovery-Related Motions Deadline | February 2, 2024 |
| Plaintiff Expert Disclosure | March 15, 2024 |
| Defendant Expert Disclosure | March 15, 2024 |
| Mediation Deadline | April 2, 2024 |
| Rebuttal Expert Disclosure | April 26, 2024 |
| Expert Discovery Cut-Off and Expert Discovery-Related Motions Deadline | August 2, 2024 |
| Dispositive and *Daubert* Motions | October 2, 2024 |
| Final Pretrial Meeting | February 10, 2025 |
| Motions *In Limine* | March 5, 2025 |
| Joint Pretrial Statement | March 12, 2025 |
| Pretrial Conference | April 2, 2025 |

| Trial Briefs | April 14, 2025 |
|---|---|
| Trial Term | May 2025 |

2. Parties are further directed to meet the pretrial disclosure requirements and deadlines in Fed. R. Civ. P. 26(a)(3) and to adhere timely to all requirements in Local Rule 3.06 concerning Final Pretrial Procedures, as supplemented herein at ¶ 6.

3. This case is referred to court-annexed mediation in accordance with the rules governing mediation set forth in Chapter Four of the Local Rules. The parties shall select a Mediator, and counsel for Plaintiff is designated as Lead Counsel to coordinate the scheduling of mediation. The list of certified mediators is available on the internet at www.flmd.uscourts.gov under "For Lawyers/Mediation and Settlement." The list is not exclusive, and any certified mediator is permissible. Lead counsel must file a Mediation Notice which (a) identifies **the selected Mediator** and includes address, telephone, and facsimile information, (b) **sets the date and place** for the mediation conference by the above-designated date, and (c), if a mediator is not on the Middle District of Florida (Tampa Division)'s online list of certified mediators, provide an explanation of the selected mediator's certification. If the parties fail to select a Mediator or do not notify the Court of such selection by the above-designated date, the Court may *sua sponte* and without further notice select an individual to serve as Mediator and issue the appointment. The mediation conference may be conducted any time on or before the above-designated date.

4. **Last Date to Mediate**: The parties shall complete the mediation conference on or before the mediation date set forth earlier in the above table. **Neither the mediator nor the parties have authority to continue the mediation conference beyond this date except on express order of the Court**. In any complex case or case involving multiple parties, the mediator has the authority to conduct the mediation in a series of sessions and in groups of parties so that mediation is complete by the last date to mediate.

5. Parties will please note that motions to amend any pleading or a motion for continuance of any pretrial conference, hearing or trial filed after issuance of this Case Management and Scheduling Order **are disfavored**. *See* Fed. R. Civ. P. 16(b)(4); Local Rule 3.08(a).

2

6. A **Pretrial Conference** will be held before the undersigned in **Courtroom 13B, 801 North Florida Avenue, Tampa, Florida**, on **April 2, 2025**, at **9:00 a.m**. Parties are directed to meet the pretrial disclosure requirements and deadlines in Fed. R. Civ. P. 26(a)(3) and to adhere to all requirements in Local Rule 3.06 concerning final pretrial procedures. The parties shall file a **joint Pretrial Statement** one week before the above-referenced pretrial conference date. Failure to do so may result in the imposition of sanctions. The parties shall file any **motions** *in limine* three weeks before the Pretrial Conference date and any **response to a motion** *in limine* one week before the Pretrial Conference date. Counsel who will act as lead trial counsel in the case and who is vested with full authority to make and solicit disclosure and agreements touching all matters pertaining to the trial must attend the Pretrial Conference. Counsel who do not attend the Pretrial Conference will not be permitted to participate in trial.

7. This case is set for **Jury Trial** during the term commencing **May 5, 2025**, before the undersigned. This **May 2025** trial term shall include the entire month. Estimated length of trial: **3 weeks**.

8. **CONSENT TO TRIAL BY MAGISTRATE JUDGE**:  In accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties may consent to have a United States Magistrate Judge conduct any or all further proceedings in this case, including the trial. Parties are advised that a magistrate judge can provide certainty and flexibility in scheduling, including a **date certain** for trial—unlike the district court calendar that assigns only a trial month and is subject to frequent changes due to the Court's criminal calendar. Parties may consent to proceed before a magistrate by filing a completed Form AO 85 "Notice, Consent, and Reference of a Civil Action to a Magistrate Judge," which is available on the Court's website under "Filing a Case/Forms/Civil Forms." Consent is voluntary, and a party for any reason can decide not to consent and continue before the district judge without adverse consequences. *See* Fed. R. Civ. P. 73(b)(2).

9. **SUMMARY JUDGMENT PROCEDURES**: The following procedures shall be followed by the parties:

    (a)    A party's claims or defenses for which summary judgment is sought shall be

presented in a single motion and incorporated memorandum of law which, absent prior permission of the Court, shall **not exceed twenty-five (25) pages** total. Multiple motions for summary judgment will not be permitted. A violation of any of these directives will result in the Court *sua sponte* striking a party's motion for summary judgment and incorporated memorandum of law without notice. Any record citations should be to page and line of the filed materials.

(b)     Prior to filing a motion for summary judgment, the moving party shall confer in good faith with the party or parties against whom summary judgment is sought for the purpose of narrowing the factual issues in dispute. A party by **separate pleading** filed contemporaneously with the motion for summary judgment and incorporated memorandum of law shall certify that such a conference has taken place and that the parties were or were not able to agree on a narrowing of the factual issues in dispute. The moving party shall file a separate "Joint Statement of Undisputed Facts" (not exceeding 20 pages in length), agreed upon by all parties and with citations to the record, which shall accompany the motion for summary judgment.

(c)     Any party opposing a summary judgment motion shall file a memorandum of law in opposition no later than the time allotted pursuant to Local Rule 3.01(c). To the extent that the party opposing a motion for summary judgment disputes any facts asserted in the motion, the opposing party must include those disputed facts, with citations to the record, in the memorandum responding to the motion for summary judgment. All material facts set forth by the moving party shall be deemed admitted unless controverted by the opposing party in the response to the motion for summary judgment.

(d)     Failure to respond to a motion for summary judgment shall be deemed that the non-moving party does not oppose the motion and may result in final judgment being entered without a trial or other proceeding.

(e)     Oral argument or hearings will generally not be held on the motion.

(f)     A violation of any of these directives will result in the Court *sua sponte* striking a party's motion for summary judgment without notice.

4

10. **For jury trials**, not later than **fourteen (14) days** prior to the date on which the trial term is set to commence, the parties shall file the following:

    (a)    **Proposed Jury Instructions**: The parties must confer about the jury instructions and submit to the Court: 1) all instructions that are undisputed; 2) instructions proposed by the plaintiff but not acceptable to the defense; and 3) instructions proposed by the defense but not acceptable to the plaintiff. A complete set of all written Proposed Jury Instructions shall bear a cover sheet with the complete style of the case and appropriate heading designating the submitting party; there shall be no more than one instruction per page and contain, at the end of each such instruction, citation of authorities; they shall be sequentially numbered and party-identified (e.g., Plaintiff's Requested Instruction No. 1). Counsel must email proposed jury instructions and verdict forms in Microsoft Word (.doc or .docx) format to the chambers inbox. Include the case number and case name in the subject line;

    (b)    A concise (one paragraph preferably) **joint** statement of the nature of the action to be used in providing a basic explanation of the case to the jury venire;

    (c)    **Proposed Verdict Form**; and

    (d)    **Proposed Questions for Voir Dire**: The court conducts the initial voir dire examination and parties should submit all proposed questions by the above deadline. Counsel may submit additional follow-up questions after the court examines the jury venire, but counsel will ordinarily not be permitted to examine potential jurors.

11. **For jury trials**, each party **must** file a **Trial Brief** not later than **fourteen (14) days** prior to the date on which the trial term is set to commence. The brief should include citations of authorities and arguments specifically addressing all disputed issues of law likely to arise at trial.

12. **For bench trials**, not later than **fourteen (14) days** prior to the date on which the trial term is set to commence, each party shall file with the Clerk of Court a **Trial Brief** containing

**Proposed Findings of Fact and Conclusions of Law** along with citations of authorities and arguments specifically addressing all disputed issues of law likely to arise at trial. Each proposed finding of fact shall be separately stated in numbered paragraphs and shall contain a detailed listing of the relevant material facts the party intends to prove, in a simple, narrative form. Each proposed conclusion of law shall contain a full exposition of the legal theories relied upon by counsel. After the conclusion of a bench trial, the court may allow the parties to file additional proposed findings of fact and conclusions of law. The proposed findings of fact and conclusions of law must be emailed to the chambers inbox in Microsoft Word (.doc or .docx) format.

13. No later than **9:00 a.m.** on the business day before trial, the parties shall provide to the Court **an exhibit notebook** containing marked copies of all exhibits. The parties may contact the courtroom deputy clerk to determine whether this requirement may be waived.

14. **SETTLEMENTS**: Lead counsel (as designated above, Plaintiff's counsel) shall **immediately** notify Chambers or the Courtroom Deputy Clerk if their case has settled. *See* Local Rule 3.09. Notices of settlement must be in writing. Failure to notify the Court of a settlement before noon on **Friday, May 2, 2025**, will result in the parties being assessed costs for the jury venire reporting.

**ORDERED** in Tampa, Florida, on November 21, 2022.

Kathryn Kimball Mizelle
United States District Judge

# ATTACHMENT 4

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA      )
*ex rel.* DR. CLARISSA ZAFIROV,      )
     )
       Plaintiff/Relator      )
     )
v.      )
     )    Case No. 8:19-cv-01236-SDM-SPF
FLORIDA MEDICAL ASSOCIATES, LLC,      )
d/b/a VIPCARE; PHYSICIAN PARTNERS, LLC, )
PHYSICIAN PARTNERS SPECIALITY      )
SERVICES, LLC; SUN LABS USA, INC.      )
ANION TECHNOLOGIES, LLC; ANTHEM,      )
INC.; FREEDOM HEALTH, INC.; OPTIMUM      )
HEALTHCARE, INC.; and SIDDHARTHA      )
PAGIDIPATI,      )
     )
       Defendants.      )

---

## RELATOR'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO STAY DISCOVERY

---

In two separate motions, Freedom Health, Inc. and Optimum Healthcare Inc. (collectively the "MA Defendants") and Florida Medical Associates, LLC, Physician Partners, LLC, Sun Labs USA, Inc., and Anion Technologies, LLC (collectively, the "Provider Defendants") [1] along with individual defendant Siddhartha Pagidipati move this Court to stay discovery pending the resolution of their motions to dismiss. Dkts. 43 and 52, respectively. Across both motions, Defendants have failed to demonstrate that discovery in this case should be stayed. They have not shown that their motions to dismiss (Dkts. 41, 44 and 49) are likely to be granted or would be truly

---

[1] Relator is preparing papers to voluntarily dismiss Anthem, Inc. and PPSS as defendants. Thus, "MA Defendants" refer to Freedom Health, Inc. and Optimum Healthcare, Inc. only, while the "Provider Defendants" refer to FMA, Physician Partners, Sun Labs USA and Anion.

dispositive, nor have they established that they would suffer any particularized harm if discovery progresses. The caselaw on which they rely does not support the relief they have sought under the circumstances of this case.

For the reasons set forth herein, Defendants' motions to stay all discovery should be denied and the parties should begin fact discovery forthwith. This is particularly important in a case such as this one where Relator's allegations represent an "ongoing and serious injury to the public." Dkt. 11 at 2. However, in the event the Court is inclined to stay discovery in this matter, Relator respectfully request that the stay be narrowly crafted to permit her to seek discovery in limited categories which would not burden any defendant and would advance the prosecution of this case.

## I.    Relevant Background

Relator Dr. Clarissa Zafirov's complaint alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, was filed on May 20, 2019. Dkt. 1. The United States investigated Relator's allegations (both criminally and civilly) for a period of approximately one year. While the specifics of the Government's investigation are largely unknown, it did involve consensual recordings made by Relator under the direction of the Government over approximately six months while she was still employed by the Provider Defendants. After the Court declined to grant a further extension of the seal (Dkt. 11), the United States filed a notice that it was not intervening at the time. Dkt. 14. Thereafter, pursuant to an Order dated June 11, 2020 (Dkt. 17), this case was unsealed. Relator served the complaint on all Defendants on July 24, 2020, and the United States subsequently filed a Notice declining to intervene. Dkt. 40.

On September 22, 2020, the Defendants filed three motions to dismiss: one by the MA Defendants, one by the Provider Defendants, and one by Defendant Siddhartha Pagidipati. Dkts. 41, 44, and 49, respectively.  The MA Defendants simultaneously moved to stay discovery pending

resolution on their motion to dismiss. Dkt. 43. Pagidipati and the Provider Defendants jointly filed a motion to stay discovery on September 25, 2020. Dkt. 52.

As required by Local Rule 3.05(c), the parties conferred about discovery on Aug. 31, 2020, and filed a joint Case Management Report on September 14, 2020. Dkt. 35 at 1-2. Initial disclosures have been served but the parties have otherwise not engaged in discovery discussions pending resolution of the disagreements noted in the Case Management Report. *See* Dkt. 35 at 5, 7.

## II.    Argument

"District courts have inherent power to control their dockets and manage their cases, including by staying discovery." *United States v. Infilaw Corp.*, 2018 U.S. Dist. LEXIS 24102, at *5 (M.D. Fla. Feb. 14, 2018) (citations omitted). In this district, "[m]otions to stay discovery are disfavored because they tend to delay resolution of proceedings and cause unnecessary litigation expenses and problems." *United States ex rel. Parker v. Space Coast Med. Assocs., L.L.P.*, 2014 U.S. Dist. LEXIS 167346, at *3 (M.D. Fla. Dec. 3, 2014), *citing Kron Medical Corp. v. Groth*, 119 F.R.D. 636, 651 (M.D.N.C. Apr. 7, 1988); *see also Feldman v. Flood*, 176 F.R.D. 651, 652 (M.D. Fla. Sept. 2, 1997). This Court's Discovery Handbook addresses such requests: "Normally the pendency of a motion to dismiss…will not justify a unilateral motion to stay discovery pending resolution of the dispositive motion. Such motions for stay are rarely granted. However, unusual circumstances may justify a stay of discovery in a particular case upon a specific showing of prejudice or undue burden." Middle District Discovery (2015) at 5-6.[2]

---

[2] The Middle District Discovery Handbook can be found on the website for the United States District Court for the Middle District of Florida. The link to the Handbook is:
https://www.flmd.uscourts.gov/sites/flmd/files/documents/flmd-florida-middle-district-courts-civil-discovery-handbook.pdf

The determination of whether a discovery stay is warranted pending resolution of a motion to dismiss calls on the Court to "balance the harm produced by a delay in discovery against the possibility that the motion [to dismiss] will be granted and entirely eliminate the need for such discovery. This involves weighing the likely costs and burdens of proceeding with discovery. *Infilaw*, 2018 U.S. Dist. LEXIS 24102, at *5-6 (citations omitted); *Parker*, 2014 U.S. Dist. LEXIS 167346 at *3; *Feldman*, 176 F.R.D. at 652. The court may, to conduct the balancing test, take a "preliminary peek" at the merits of the pending motion to dismiss in order "to see if it appears to be clearly meritorious and truly case dispositive." *Feldman*, 176 F.R.D. at 652-53.

Defendants, as the parties seeking the stay, carry the burden of showing there is good cause and reasonableness for their request. *Infilaw*, 2018 U.S. Dist. LEXIS 24102 at *5; *Holsapple v., Strong Indus.*, 2012 U.S. Dist. LEXIS 128009, at *2 (M.D. Fla. Sep. 10, 2012). "A showing of good cause 'contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statement.'" *Lewis v. Abbott Labs., Inc.*, 2019 U.S. Dist. LEXIS 187506, at *5 (M.D. Fla. Aug. 2, 2019), *quoting United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)).

### A.     Defendants have not shown that a stay of all discovery is appropriate.

Defendants seek a stay by arguing, in conclusory fashion, that they are likely to prevail on their motions to dismiss. Relator, of course, disagrees, for the reasons set out in her briefs in opposition.[3]  In sum, Relator has stated claims against each defendant with the specificity required by Rule 9(b) at this juncture, and there are no statutory bars which would preclude Relator from proceeding with her case.

---

[3] Insofar as they are material to the Court's evaluation, Relator incorporates her arguments as to Defendants' motions to dismiss as though fully set forth herein. Dkt. 56, 57, and 59 (hereinafter, the "MTD Oppositions").

Even assuming *arguendo* that the Court's preliminary peek at the motions to dismiss leads it to believe that Defendants raised colorable points, the MTD Oppositions provide strong rebuttal arguments that are supported by caselaw and facts. A stay of discovery under such circumstances is not appropriate. *Lewis*, 2019 U.S. Dist. LEXIS 187506, at *7 (finding stay of discovery during pendency of motion to dismiss is not warranted and notes that plaintiff presents "several arguments and authorities" supporting its opposition to motion to dismiss); *Ray v. Spirit Airlines, Inc.*, 2012 U.S. Dist. LEXIS 160948, at *6-7 (S.D. Fla. Nov. 9, 2012) (denying stay of discovery because, *inter alia*, it could not find that case was "surely destined for dismissal" when defendant and plaintiff both offered detailed arguments for and against dismissal); *S.K.Y. Mgmt. LLC v. Greenshoe, LTD*, 2007 U.S. Dist. LEXIS 5109, at *4 (S.D. Fla. Jan. 24, 2007) (finding that there was good reason to question whether the defendant would prevail on its motion to dismiss when defendants "raised colorable legal defenses, but at the same time the [p]laintiff ha[d] strong rebuttal arguments that may result in [the] claims surviving a motion to dismiss"); *Feldman*, 176 F.R.D. at *653 (denying motion to stay discovery even though defendants' motion "present[ed] substantial issues" because plaintiffs also presented rebuttal that made it not clear that dismissal would be granted).

Even if granted, the motions to dismiss would not be truly dispositive, as the Relator would file a fulsome amended complaint unless the Court denied leave to do so, which seems unlikely. Again, a stay under such circumstances is unwarranted. *E.g., United States ex rel. D'Anna v. Lee Mem'l Health Sys.*, 2019 U.S. Dist. LEXIS 2099, at *5 (M.D. Fla. Jan. 7, 2019) (denying stay and noting that "[e]ven if the motion to dismiss is granted, Relator will likely be given leave to amend to plead the fraud allegations with more particularity…"); *Centennial Bank v. Servisfirst Bank Inc.*, 2016 U.S. Dist. LEXIS 184117, at *5 (M.D. Fla. Mar. 23, 2016) (in denying stay of discovery,

court found that dismissal would not be truly case dispositive because "dismissal likely would not be with prejudice"); *Feldman*, 176 F.R.D. at 653 (court's decision to deny discovery stay was influenced by plaintiffs' argument that "even a decision granting the motion to dismiss would not necessarily dispose of the case because plaintiffs could seek leave to file an amended complaint.").

Defendants also fail show that they would be harmed if discovery were to proceed. They argue that discovery will be burdensome and costly, but these generic arguments do not meet the specificity required for a discovery stay. *Centennial Bank*, 2016 U.S. Dist. LEXIS 184117, at *5 (rejecting defendants' burdensome arguments because defendants "offer only speculative and conclusory statements regarding the potential costs of discovery, while failing to identify any specific reason why allowing discovery to proceed in this particular case would be unduly burdensome."). Defendants' "[c]laims of undue burden should be supported by a statement …with specific information demonstrating how the request is overly burdensome." *St. John v. Keller Williams Realty, Inc.*, 2019 U.S. Dist. LEXIS 224130, at *4 (M.D. Fla. Nov. 19, 2019), *quoting Eastwood Enters., LLC v. Farha*, 2010 U.S. Dist. LEXIS 149650, at *4 (M.D. Fla. Apr. 26, 2010). Defendants' vague assertions about undue burden do not suffice.[4]

Defendants try to rest on the parties' joint statement that this case is complex (Doc. 35 at 9) to bolster their undue burden arguments: Because the case is complex, they argue, discovery is necessarily overly burdensome. This preemptive concern has been rejected as a persuasive reason to stay discovery:

> [Defendant] also insinuates that discovery should be stayed simply because this [is] a complex RICO case, as cases of this kind always involve burdensome and costly discovery…These arguments won't do. They are premature and speculative:

---

[4] The inability of Defendants to articulate a burden is not surprising. Relator has not yet served any discovery, and Defendants cannot simply guess what Relator will seek in discovery and preemptively deem any requests as unduly burdensome. If Relator makes overly burdensome discovery requests, Defendants can seek relief from the Court on those specific requests at the appropriate time.

> extensive, expensive discovery has not yet proceeded and likely will not have proceeded very far by the time the Court issues a ruling [on the motion to dismiss]. Because [Defendant] has not come forward with the kind of specific sowing of prejudice or burdensomeness demanded by this District's Local Rules, no stay will issue.

*Ray*, 2012 U.S. Dist. LEXIS 160948, at *9-10 (internal citations omitted).

The fact that Defendants may have to expend money to engage in discovery does not entitle them to stay discovery at this juncture. All discovery requires the expenditure of resources, so that reason alone cannot justify a discovery stay. *Infilaw*, 2018 U.S. Dist. LEXIS 24102, at *11 ("Costs are inherent in discovery…But, there are rules to constrain the parties [from discovery abuse].") It is a reality of litigation that defendants may face costs associated with discovery in cases that are ultimately dismissed but "even so, a stay of discovery should be a sparingly ordered thing." *Ray*, 2012 U.S. Dist. LEXIS 160948, at *10. Further, at least some discovery costs are unavoidable: even if some of the defendants are ultimately dismissed from this matter, they will still be fact witnesses subject to discovery related to the issues at hand. *S.D. v. St. Johns Cty. Sch. Dist.*, 2009 U.S. Dist. LEXIS 97835, at *5 (M.D. Fla. Oct. 1, 2009), citing *Rhodes v. Prince*, 2008 U.S. Dist. LEXIS 77805, at *2 (N.D. Tex. Oct. 3, 2008) (denying motion to stay discovery where individual defendants did not establish the discovery sought by the plaintiff would in any respect be different if the individual defendants were to become mere fact witnesses to the underlying cause of action.").

Finally, Defendants' assertions that Relator would use discovery for a fishing expedition to amend her complaint is also without merit. *See United States ex rel. Pfeifer v. ELA Med., Inc.*, 2009 U.S. Dist. LEXIS 97074, at *5 n.2 (D. Colo. Oct. 7, 2009) (rejecting defendants' contention that relator will use discovery to improperly obtain information to bolster her complaint when relator was able to fend off motions to dismiss without discovery). As detailed in Dr. Zafirov's

papers opposing the motions to dismiss, her complaint pleads with particularity the elements of an FCA case. Relator does not need to go fishing to obtain facts for her complaint and Defendants can point to no evidence of her intention to do so.

All of those considerations are taken in balance with the burden that granting a stay of discovery would place on Relator. *Morgan v. W. Heritage Ins. Co.*, 2012 U.S. Dist. LEXIS 194456, at *5 (M.D. Fla. Oct. 17, 2012) (finding that if the pending dispositive motion was *not* granted, "significant delay and possible prejudice to [the nonmovant] will have resulted." Thus, on balance, the motion to stay was not warranted). Here, this case has already been pending for almost a year and Relator has not been able to conduct discovery while the government carried out its own investigation. Given that Relator's allegations date back several years, the risk that evidence will be lost mounts with each passing day. Moreover, given the realistic volume of discovery that is likely to be produced by the conclusion of this case, Relator and her counsel are prejudiced by not being able to make use of this time to begin gathering, processing and reviewing discovery related to her claims. Given the strength and importance of her allegations, Relator should be permitted to get on with what is likely to be lengthy litigation. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 2015 U.S. Dist. LEXIS 184011, at *3 (M.D. Fla. Sep. 9, 2015) (denying motion to stay where the "Plaintiff has described how a stay of discovery, even briefly, would cause it prejudice and harm.").

Of unique importance here, in declining to extend the seal in favor of moving this case forward, this Court recognized that, "[t]he relator alleges a widespread, fraudulent scheme in which managed-care entities and healthcare providers act in concert to bilk the public fisc and otherwise injure the public. If true, the activity presents an ongoing and serious injury to the public." Dkt. 11 at 2. It would be counterintuitive to press the case forward in the interest of

addressing allegations of public harm, but then stall proceedings while the Defendants challenge the sufficiency of the pleadings. The potential harm extends beyond Relator to patients of the Provider Defendants, enrollees of Freedom and Optimum, and taxpayers who are funding the scheme described in Relator's complaint.

### B. Defendants' cases do not provide support for their arguments.

Defendants' motions to dismiss largely rest on misapplied caselaw. For example, they cite *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353 (11th Cir. 1997), for the proposition that "a stay of discovery is appropriate when a potentially dispositive motion to dismiss under Rule 12(b)(6) is before the Court." Dkt. 43 at 3. But Defendants ignore the numerous cases that have held that *Chudasama* does not stand for that general proposition, but instead holds that meritorious dispositive motions should be expeditiously resolved in order to avoid undue discovery burdens. *Infilaw*, 2018 U.S. Dist. LEXIS 24102, at *7 (recognizing that *Chudasama* "has been analyzed on numerous occasions, and courts have consistently rejected any *per se* requirement to stay discovery pending resolution of a dispositive motion."); *Centennial Bank*, 2016 U.S. Dist. LEXIS 184117, at *4, quoting *In re Winn Dixie Stores, Inc.*, 2007 U.S. Dist. LEXIS 47014, at *1 (M.D. Fla. June 28, 2007) ("*Chudasama* is better interpreted as standing for the narrower proposition that 'courts should not delay ruling on a likely meritorious motion to dismiss while undue discovery costs mount."); *Bingham v. BayCare Health Sys.*, 2015 U.S. Dist. LEXIS 96767, at *3 (M.D. Fla. July 24, 2015) (same); *Schreiber v. Kite King's Lake, LLC*, 2010 U.S. Dist. LEXIS 11020, at *1-2 (M.D. Fla. Oct. 1, 2010) (same); *Romacorp, Inc. v. Prescient, Inc.*, 2011 U.S. Dist. LEXIS 62839, at *5-6 (S.D. Fla. June 7, 2011) (same); *Kook v. Sugar & Felsenthal, LLP*, 2009 U.S. Dist. LEXIS 81153, at *6 (M.D. Fla. Aug. 19, 2009) (same); *Gannon v. Flood*, 2008 U.S. Dist. LEXIS 31016,

at *3 (S.D. Fla. Mar. 24, 2008) (same); *Parker*, 2014 U.S. Dist. LEXIS 167346, at *2-3 (same; also noting that in most cases, a stay of all discovery is inappropriate).

The *Chudasama* case presented "particularly egregious facts which one hopes will be seldom, if ever, duplicated again." *Ray*, 2012 U.S. Dist. LEXIS 160948, at *11. It included contentious litigants that engaged in excessive and dilatory discovery tactics, a dubious claim brought by the plaintiffs (who did not present any United States caselaw in support of their theory), and a district court that failed to rule on a motion to dismiss for a year and a half (but still levied discovery sanctions on defendants). *Chudasama*, 123 F.3d at 1368-69. Those facts are not present here. Defendants only filed their motions to dismiss a few weeks ago, and Relator's opposition deadline has only just arrived. Nor has Relator raised a novel theory, and she has presented substantial caselaw and analysis in her MTD Oppositions to rebut Defendants' dismissal arguments. Simply put, *Chudasama* neither stands for the general proposition that Defendants propose, nor applies to this case.[5]

Defendants also rely upon *McCabe v. Foley*, 233 F.R.D. 683 (M.D. Fla. Mar. 6, 2006), to argue for a stay of discovery, but that case is also factually distinguishable. In *McCabe* – a shareholder derivative lawsuit that alleged, *inter alia*, a breach of fiduciary duties, mismanagement and waste of assets, and unjust enrichment – the motion to stay arose after the original discovery

---

[5] Although not arising on the consideration of a motion to stay discovery, similar anomalous circumstances gave rise to the Court's decision in *Roman v. Tyco Simplex Grinnell*, 731 Fed. App'x 813 (11th Cir. 2018). There, the Court ruled that not allowing a *pro se* plaintiff to access the discovery process was not a violation of his due process rights: "[The district court] permitted Roman to amend his complaint four times; it specifically identified deficiencies in the complaints that needed to be corrected; it informed Roman that he needed to lay out the elements for any claims he was asserting; and it set out the elements for claims that the court believed Roman wished to pursue." *Id.* at 815. It is in that light that the Court observed that the motions to dismiss must be ruled on before Roman could access the discovery process. *Id.* Likewise, the Eleventh Circuit's opinion in *Carter v. Dekalb Cty., Ga.* does not discuss a motion to stay discovery, but is consistent that a plaintiff does not access discovery with "nothing more than conclusions." 521 Fed. App'x 725, 728 (11th Cir. 2013). The holdings are consistent with the maxim that a case can be stayed when it is clear that pending motions are likely to be *truly* dispositive, but are not instructive in Relator's case.

deadline had passed and just months before the case was set for trial. Even by that time, the magistrate judge found that the plaintiff's Verified Amended Complaint still pled conclusory allegations which ran afoul of the requirements of Federal Rule of Civil Procedure 23.1. *Id.* at 685-86. In an analysis unique to the plaintiff's allegations of demand futility, the court acknowledged its obligation to take a "preliminary peek" at the merits of the pending motions to "see if it 'appears to be *clearly meritorious and truly case dispositive*." *Id.* at 685, *citing Feldman*, 176 F.R.D. at 652-53 (emphasis added). After evaluating the unique pleading requirements of demand futility allegations, the Court – though stopping short of opining on the success of the underlying motions pending before the District Court judge – determined that a stay was appropriate based on the "peek" into the motions. *Id.* at 687.

Unlike *McCabe*, Relator's claims here have been plead with considerable particularity (as is articulated in more detail in the MTD Oppositions). She has, *inter alia*, described the fraud scheme in detail, provided specific examples of the alleged fraud, articulated the basis for allegations of the nexus between the fraud and claims submitted to government payors, and identified specific patients and false diagnosis codes submitted pursuant to the scheme. Thus, even if the Court seeks additional details from Relator in an Amended Complaint, there is no indication that the pending motions are "*clearly* meritorious or *truly* case dispositive." Simply, Relator does not suffer from the same pleading infirmities as the *McCabe* plaintiff, and the stay of discovery in that set of circumstances is inapposite.

Defendants' recitation of dicta in cases like *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006) and *United States ex rel. Clausen v. Lab. Corp. of Am.*, 198 F.R.D. 560 (N.D. Ga. 2000), *aff'd*, 290 F.3d 1301 (11th Cir. 2002), is also misplaced. First, "[d]icta is not binding on anyone for any purpose." *Absolute Activist Value Master Fund v. Devine*, 233 F. Supp.

11

3d 1297, 1329 (M.D. Fla. 2017) (internal citations omitted). Second, none of these cases address whether discovery should be stayed during the pendency of a motion to dismiss.

### III. If the Court is inclined to grant any stay, limited discovery of certain discrete topics is still appropriate and permissible.

If the Court is inclined to stay discovery, Relator requests that she nevertheless be allowed to (1) conduct limited discovery concerning Defendants' corporate relationships, and (2) serve a subpoena on the Department of Health and Human Services which may require judicial involvement. With regard to the first category, this Court has allowed limited discovery to continue, even where it has otherwise granted a motion to stay discovery. *United States ex rel. Ruckh v. Genoa Healthcare Consulting, LLC*, No. 8:11-cv-1303-T-23TBM, 2013 U.S. Dist. LEXIS 195926, at *11-12 (M.D. Fla. Mar. 5, 2013) (Merryday, J.) (granting motion to stay discovery and motions to dismiss, but also compelling defendants to respond to relator's request for production concerning defendants' corporate structure). This limited discovery is particularly appropriate in this case, because the corporate defendants are intertwined and appear to operate fungibly, but the defendants have raised challenges to Relator's group pleading format.

As to the second category, Defendants would not be burdened by subpoenas issued to third parties. In *St. John v. Keller Williams Realty, Inc.*, the defendant moved to quash several third-party subpoenas that were served while a motion to dismiss was pending. 2019 U.S. Dist. LEXIS 224130, at *2-3. (Notably, the third-parties receiving the subpoena did not so move. *Id.* at *5.) The defendant argued that the subpoenas should be quashed because, if the motion to dismiss were granted, the defendant could avoid discovery altogether. *Id.* at *3. The court rejected the defendant's argument, finding that it failed to demonstrate any particularized burden or expense as a result of the subpoena. *Id.* at *3, 5. It also found that the defendant lacked standing to move to quash. *Id.* at *5.

Here, Dr. Zafirov asks for leave to serve a subpoena on the Office of Inspector General to secure copies of audio and video recordings made while she was performing consensual monitoring as part of the Government's investigation into this case. Obtaining such recordings from the United States can be lengthy and complex, as can their transcription, so all parties are benefited by getting that process underway expeditiously.

Allowing limited discovery such as corporate relationship discovery and third-party subpoenas would not cause an undue burden on Defendants. Thus, permitting Relator to proceed with these discrete categories of discovery furthers judicial economy and allows progress to be made while the Court considers the pending motions.

## IV.   Conclusion

Relator respectfully requests that the Court deny Defendants' motions to stay discovery, or in the alternative, that the Court allow Relator to proceed with the limited discovery described above.


Respectfully submitted this 20th day of October, 2020,

  /s/ Jillian L. Estes
Frederick M. Morgan, Jr. (Ohio Bar No. 0027687)
Jillian L. Estes (Fla. Bar No. 0055774)
Jonathan Lischak (Ohio Bar No. 97669)
MORGAN VERKAMP LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Phone: (513) 651-4400
Fax: (513) 651-4405
rmorgan@morganverkamp.com
jillian.estes@morganverkamp.com
jonathan.lischak@morganverkamp.com

Kenneth J. Nolan (Fla. Bar No. 603406)
Marcella Auerbach (Fla. Bar No. 249335)
NOLAN, AUERBACH & WHITE, LLP

435 N. Andrews Ave., Suite 401
Fort Lauderdale, FL 33301
Phone: (954) 779-3943
Fax: (954) 779-3937
ken@whistleblowerfirm.com
marcellla@whistleblowerfirm.com

***Counsel for Relator Dr. Clarissa Zafirov***

## CERTIFICATE OF SERVICE

I, Jillian Estes, hereby certify that the foregoing Notice was served on October 20, 2020, to all parties of record via the CM/ECF electronic filing system.

  /s/ Jillian L. Estes
Jillian L. Estes (Fla. Bar No. 0055774)

# ATTACHMENT 5
## (previously under seal)

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

2019 JUL 22  PM 4: 33

UNITED STATES OF AMERICA,
*ex rel.*  DR. CLARISSA ZAFIROV,

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

Plaintiffs,

v.

Case No.: 8:19-cv-1236-T-23SPF

**FILED *EX PARTE*
AND UNDER SEAL**

FLORIDA MEDICAL ASSOCIATES, LLC, *et al.*,

Defendants.

_____/

## UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF ITS *EX PARTE* CONSENT APPLICATION FOR AN EXTENSION OF TIME TO CONSIDER ELECTION TO INTERVENE

The United States of America hereby respectfully submits this memorandum in

support of its *ex parte* consent Application for an Order pursuant to the False Claims Act

("FCA"), as amended, 31 U.S.C. § 3730(b)(3), for a six-month extension of time – July 22,

2019, to and including January 22, 2020 – in which to notify the Court of its decision

regarding intervention in this *qui tam* action, and during which time the complaint and all

other filings in the action shall remain under seal.  The relator, through her counsel, has

advised that she consents to the requested extension of both the seal and the intervention

deadlines.

### I. **Background**

This *qui tam* action alleges the defendants are defrauding the Medicare Advantage

("MA") Program and violating the FCA by knowingly submitting and causing the

submission of thousands of false claims, and the corresponding false statements and records,

and knowingly retained overpayments resulting from the submission of false diagnosis codes. *See* 31 U.S.C. § 3729 (a)(1)(A), (B), (G).

The relator's complaint identifies two categories of defendants: managed care entities ("MA Defendants") and the healthcare provider organizations who treat beneficiaries enrolled in the MA plans ("PO Defendants"). According to the relator, the PO Defendants, in order to increase their own per-member-per-month risk adjustment gain sharing payments from the MA Defendants, falsified patient diagnoses and then submitted false diagnosis codes to the MA Defendants. The MA Defendants, who knew or should have known of the PO Defendant's misconduct, in turn, submitted to CMS false and unsubstantiated diagnosis codes in order to fraudulently obtain higher capitation rates than they were entitled to receive.

## II. **Points and Authorities**

The government has at least sixty days "after it receives both the complaint and the material evidence and information" to elect to intervene in the action. 31 U.S.C. § 3730(b)(2). Congress contemplated, however, that the government might require additional time within which to investigate *qui tam* actions and to decide whether to intervene, and that such extensions should be granted upon a showing of "good cause." The relevant portions of the Act provide:

> A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

> The Government may, for good cause shown, move the court
> for extensions of time during which the complaint remains
> under seal under [the preceding paragraph].

31 U.S.C. §§ 3730(b)(2) and (b)(3). Thus, the FCA provides for extensions of time to allow

the government to complete its evaluation of the allegations contained in a *qui tam*

complaint, and to reach an informed decision as to whether to intervene. The only

requirement is that the government show good cause for the requested extension.

The United States respectfully submits that good cause exists here for the requested

extension of both the seal and the intervention deadlines. Since the government's receipt of

the relator's complaint, the government has assembled an investigative team to examine the

merits of the relator's allegations. The government has also coordinated with relator's

counsel to interview the relator in August 2019. Once the government completes that

interview, it will require additional time to interview other potential witnesses as well as to

secure those records and documentation that might shed further light on the merits of the

relator's allegations.

### III. <u>Conclusion</u>

For all of the above reasons, the United States respectfully requests that the Court

grant the government's Application for a six-month extension of the seal and intervention

deadlines in this matter. A proposed Order is submitted herewith for the Court's

consideration.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

Dated: July **21** 2019      By:

SEAN P. KEEFE
Assistant United States Attorney
Florida Bar No. 0413828
400 N. Tampa Street, Suite 3200
Tampa, FL 33602
Ph: (813) 274-6000
Fax: (813) 274-6200
Email: Sean.Keefe@usdoj.gov

*Counsel for United States of America*