UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
*ex rel.* DR. CLARISSA ZAFIROV,

      Plaintiffs,

v.                                                Case No.: 8:19-cv-1236-T-23SPF

FLORIDA MEDICAL ASSOCIATES, LLC, *et al.*,

      Defendants.
_____/

**UNITED STATES' SUPPLEMENTAL BRIEF REGARDING FOUNDING-ERA HISTORICAL EVIDENCE OF FEDERAL *QUI TAM* ENFORCEMENT**

The United States of America respectfully submits this Supplemental Brief in response to the Court's April 23, 2024 Order, Dkt. 240, for additional briefing on Founding-era historical evidence regarding federal *qui tam* enforcement. The sources identified, while not intended to be comprehensive, show a robust history of enforcement that further confirms that the *qui tam* provisions of the False Claims Act (FCA) are consistent with Article II of the Constitution.[1] Filed with this brief is a

---

[1] The government notes that it does not bear the burden of providing evidence of historical enforcement to justify the constitutionality of the FCA's *qui tam* provisions. In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Court considered the extent to which historical regulations had been enforced only after it had already concluded that the "plain text of the Second Amendment" covered the right at issue—the right to carry handguns publicly for self-defense. 597 U.S. 1, 32 (2022). The Court had thus already concluded that the Second Amendment "presumptively protects that conduct." *Id.* at 17; *see id.* at 33. The burden thus shifted to the government to "justify its regulation" by reference to a "historical tradition of firearm regulation." *Id.* at 17; *see id.* at 33–34. And it was only in that context—with the burden on the government—that the Court found the government's reliance on the surety laws insufficient. *Id.* at 58. Here, in contrast, the plain text of the Constitution does not forbid *qui tam* actions; the burden thus lies with the challengers to establish that the FCA violates Article II.

Notice of Intervention pursuant to 28 U.S.C. § 2403, limited to defending the constitutionality of the *qui tam* provisions.

## DISCUSSION

As the Supreme Court has observed, "[q]ui tam actions appear to have been as prevalent in America as in England" at the Founding era.[2] *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 776 (2000). A recent Eleventh Circuit opinion, drawing on commentary from Chief Justice Marshall, further emphasized that "qui tam actions were viewed as a routine enforcement mechanism in the early Republic." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1313 (11th Cir. 2021). Research on Founding-era *qui tam* enforcement confirms that the Supreme Court and the Eleventh Circuit were correct.

*Qui tam* statutes were among the first category of legislation enacted in our Nation's history. The First Congress passed, and President George Washington signed, a "considerable number" of such statutes, *see Stevens*, 529 U.S. at 776–77 & nn.5–7, and subsequent early Congresses and Presidents did the same. *See* Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 2:5 (Aug. 2023); Act of February 20, 1792, ch. 7, § 25, 1 Stat. 232, 239 (2d Cong.; post office); Act of March 1, 1793, ch. 19, § 12, 1 Stat. 329, 331 (2d Cong.; trading with Indians); Act of March

---

[2] While Defendants may suggest that this is dicta, the Eleventh Circuit has repeatedly cautioned that Supreme Court dicta "is not something to be lightly cast aside." *F.E.B. Corp. v. United States*, 818 F.3d 681, 690 n.10 (11th Cir. 2016) ("there is dicta . . . and then there is Supreme Court dicta").

22, 1794, ch. 11, §§ 1–2, 4, 1 Stat. 347, 349 (3d Cong.; international slave trade); Act of May 19, 1796, ch. 30, § 18, 1 Stat. 469, 474 (4th Cong.; trading with Indians); Act of April 2, 1802, ch. 13, § 18, 2 Stat. 139, 145 (7th Cong.; trading with Indians); Act of April 29, 1802, ch. 36, §§ 3–4, 2 Stat. 171, 172 (7th Cong.; copyright); Act of May 3, 1802, ch. 48, § 4, 2 stat. 189, 191 (7th Cong.; mail carriers); Act of March 26, 1804, ch. 38, § 10, 2 Stat. 283, 286 (8th Cong.; Louisiana slave trade); Act of March 2, 1807, ch. 22, § 3, 2 stat. 426 (9th Cong.; slave trade). The Second Congress also enacted a law providing generally for the award of costs in *qui tam* cases, Act of May 8, 1792, ch. 36, § 5, 1 Stat. 277–78, suggesting that the *qui tam* mechanism was a well-established feature of federal law.

"These early congressional enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning.'" *Haaland v. Brackeen*, 143 S. Ct. 1609, 1637 (2023) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723 (1986)); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, No. 22-448, 2024 WL 2193873, at *8 (U.S. May 16, 2024). Indeed, the enactment of *qui tam* statutes immediately after the Founding says far more about the original understanding of Article II and the separation of powers than does the rate at which private plaintiffs elected to file *qui tam* suits. To the extent enforcement was relevant in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 58 (2022), it was presumably to determine whether historical regulations ever actually fettered the individual right at issue in that case. But here, in determining whether *qui tam* provisions are consistent

3

with the Framers' understanding of Article II, what matters is that *qui tam* statutes were routinely passed by members of early Congresses and signed by early Presidents—many of the same people who had just adopted and ratified Article II.

Even so, there is ample evidence to show that *qui tam* laws were not just on the books but were actually enforced. And when *qui tam* suits of any variety appeared in federal courts in the Founding era, there was never a hint that they raised any Article II concern. Moreover, commentary from 18th and 19th century legal scholars and government officials reinforces that *qui tam* actions—after a long and well-documented tradition in England and the American colonies—remained in common use after the Constitution was ratified. The historical evidence thus erases any doubt about the prevalence of Founding-era federal *qui tam* enforcement.

## I.     Enforcement of the Slave Trade Act of 1794

Passed by the Third Congress and signed by President Washington, the Slave Trade Act of 1794 (the "1794 Act") authorized a bounty for private citizens who sued those engaged in the international slave trade. Slave Trade Act of 1794, ch. 11, §§ 1–2, 4, 1 Stat. 347, 349. The 1794 Act prohibited the modification of vessels in United States ports for the purpose of transporting enslaved people. As amended in 1800, the Act imposed the following penalties: (1) forfeiture of the vessel, (2) a fine of $2,000, to be divided equally between the United States and the informer, and (3) for every enslaved person carried, an additional fine of $200, also to be divided equally between the United States and the informer. *See id.* at §§ 2, 4. Thus, the 1794 Act

4

provided informers who had no independent injury with "both a bounty and an express cause of action," *see Stevens*, 529 U.S. at 776–77, a virtual dead ringer for the FCA's *qui tam* provisions.

### A. Enforcement of the 1794 Act by Abolitionist Society

The 1794 Act quickly attracted the attention of abolitionist groups, particularly the Providence Society for Abolishing the Slave-Trade in Rhode Island, leading to a period of "[r]elatively intense enforcement during the late 1790s and early 1800s [that] reduced the number of voyages to Africa." James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement for a Partisan World*, 92 Fordham L. Rev. 469, 472 (2023) (detailing private enforcement by the Providence Society). As documented by Professor Pfander, many of these suits resulted in recorded cases. *See id.* at 493–98 (citing *U.S. v. Schooner Flying Fish, 1799 Sep*, Nat'l Archives, https://catalog.archives.gov/id/7795499 (last visited May 20, 2024); *U.S and Nathaniel Whitaker v. Paul Brownell, 1800 May*, Nat'l Archives, https://catalog.archives.gov/id/7795514 (last visited May 20, 2024); *William Rotch v. Samuel Packard, 1800 May*, Nat'l Archives, https://catalog.archives.gov/id/7795513 (last visited May 20, 2024); *United States and John West Leonard v. James DeWolfe, 1801 Feb*, Nat'l Archives, https://catalog.archives.gov/id/7795521 (last visited May 20, 2024); *Isaac Sherman v. Brigantine Stork, 1803 Aug*, Nat'l Archives, https://catalog.archives.gov/id/7795572 (last visited May 20, 2024); *U.S. v. Ship Amested, 1803 Sep*, Nat'l Archives, https://catalog.archives.gov/id/7795577

(last visited May 20, 2024); *U.S. v. Brigantine Eliza, 1803 Sep*, Nat'l Archives, https://catalog.archives.gov/id/7795576 (last visited May 20, 2024); *Isaac Sherman v. Charles DeWolfe, 1803 Dec*, Nat'l Archives, https://catalog.archives.gov/id/7795606 (last visited May 20, 2024)); *see also Isaac Sherman v. Sloop Nancy, 1803 Aug*, Nat'l Archives, https://catalog.archives.gov/id/7795571 (last visited May 20, 2024) (distiller from Boston claimed to have been the informer in the proceeding). Other such cases are referenced in historical sources, such as private letter correspondence, though the court documents have not survived. *See* Jay Coughtry, *The Notorious Triangle, Rhode Island and the African Slave Trade*, 1700–1807, at 539, 575 n.34; Pfander, *supra*, at 481–82 (describing one unrecorded suit where the court ordered forfeiture of the vessel, but the jury declined to impose a fine, and another that settled out of court with a ship captain in return for a promise that he would no longer engage in the trade of enslaved people).

And while early enforcement efforts were robust, informers might well have filed even more such actions had it not been for the looming threat of retribution. *See* Coughtry, *supra*, at 580–81 n.63 (informants at the principal slaving ports were "not only unpopular but unsafe"). According to reports, Rhode Island merchants assaulted a prominent informer on the courthouse steps to deter the filing of *qui tam* suits under the 1794 Act. *See id.* at 560. On another occasion, merchants reportedly kidnapped the surveyor of customs who planned to bid on a vessel that had been

6

forfeited under the Act. *See* Pfander, *supra*, at 473. Given the apparent risks posed to informers, the number of enforcement actions on record is significant.

Defendants may argue that actions under the 1794 Act are somehow distinguishable because government attorneys sometimes served as counsel for the informers. But that contention is unpersuasive. The role of government attorneys in some (but certainly not all) informer suits was a function of the historical fact that government lawyers often "worked part-time for the government and part-time for their own account." *Id.* at 490. Regardless, private plaintiffs—with or without the help of a government attorney—sued under the 1794 Act in the name of the United States in return for a bounty. No one, it appears, argued that such actions should be dismissed on Article II grounds, nor did anyone allude to the constitutional infirmity that Defendants say exists here.[3] That is strong evidence that the *qui tam* device was

---

[3] If anything, given the modern FCA's strong control mechanisms, *see* United States' Statement of Interest at 12–14, Dkt. 217, its *qui tam* provisions are even further insulated from any constitutional challenge. These control mechanisms reflect that Congress—rather than blindly accepting the *qui tam* device as an unexamined relic—has made a conscientious effort to strike an appropriate balance between incentivizing relators to come forward and respecting the Executive's primary role of enforcement through the Justice Department.

And in any event, the constitutional question presented at this juncture is only whether subjecting Defendants to suit at Relator's behest is consistent with Article II. Any consideration of whether the statutory limits on the government's settlement and dismissal authorities *could* create an Article II problem would be premature because the government has not sought to exercise those authorities in this case. Further, should the Court conclude that the FCA improperly constrains the government from exercising those authorities, the appropriate remedy would be to declare those limits unconstitutional, not to invalidate the FCA's *qui tam* provisions in their entirety.

regarded as constitutionally unproblematic, including in cases where the *qui tam* relator had no personal stake aside from his statutorily provided bounty.

### B.    Additional Enforcement of the 1794 Act

While the historical research on use of the 1794 Act in Rhode Island near the turn of the century is particularly informative, enforcement of the 1794 Act was not limited to that time and place.  Two early *qui tam* actions arose in federal courts in Pennsylvania and New York.  *See Evans, qui tam v. Bollen*, 4 U.S. 342 (C.C.D. Pa.) (1800); *James Robertson, qui tam v. Philip M. Topham*, Nat'l Archives, https://catalog.archives.gov/id/192117725?objectPage=21 (last visited May 20, 2024).  Only a few years later, a *qui tam* action under the 1794 Act came before the Supreme Court.  *See Adams v. Woods*, 6 U.S. (2 Cranch) 336 (1805).  Though the Court determined that the case should be dismissed on statute-of-limitations grounds, it neither questioned the *qui tam* device nor suggested such actions were unusual.  To the contrary, Chief Justice Marshall observed that "[a]lmost every fine or forfeiture under a penal statute, may be recovered by an action of debt [qui tam]."[4]  *See id.* at 341.  In other words, *qui tam* actions not only were routine at the Founding era, but

---

[4] *See* Dan D. Pitzer, *The Qui Tam Doctrine: A Comparative Analysis of Its Application in the United States and the British Commonwealth*, 7 Tex. Int'l L.J. 415, 417 (1972) (explaining that, "[t]raditionally, a *qui tam* action has been defined as a civil action of debt brought by a private citizen to recover a share of the fine, penalty, or forfeiture imposed by a penal statute").

also do not appear to have produced any constitutional objection at any level of the judiciary.[5]

Finally, additional *qui tam* actions under the 1794 Act appear to have arisen in the context of seizures by military or government personnel, where half the proceeds went to the government and half to the informer. *See, e.g.*, *The Merino*, 22 U.S. 391 (1824) (action by United States soldier under the 1794 Act); *see also The Antelope*, 23 U.S. (10 Wheat.) 66 (1825) (Marshall, C.J.) (action by captain of a revenue cutter under federal law prohibiting the slave trade). Although the informers in such instances were also government actors, the suits were brought in their individual capacity and the 1794 Act allowed private suits without regard to that distinction. The individual relator still reaped the benefit of a bounty even if he was a government official. Thus, enforcement of the 1794 Act, which is a close analogue to the FCA's *qui tam* provisions, establishes that the *qui tam* device not only existed, but was in common use at the Founding era.

---

[5] The National Archives appear to have records of additional informer actions related to the trade and importation of enslaved people. *See, e.g.*, *United States v. McCann, 1803*, Nat'l Archives, https://catalog.archives.gov/id/7868260 (last visited May 20, 2024) (a case in the District of Georgia referring to an informer named Henry Putnam). Efforts to identify historical examples of *qui tam* enforcement are necessarily impacted by the inherent challenges of researching early enforcement. As scholars have noted, "traditional case law research is not especially probative" on such questions, because the records of many cases may not be "well indexed or digitally searchable," or may have been lost to history. Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121, 135 n.53 (2015).

## II.     Enforcement of *Qui Tam* Copyright Statutes

Another relevant line of *qui tam* cases in the early to mid-19th century involved plaintiffs suing for copyright violations. As the Court noted in *Stevens*, 529 U.S. at 776 n.5, the Act of May 31, 1790, ch. 15, 1 Stat. 124–25, § 2, allowed an author or proprietor to sue for and receive half of the penalty for a violation of copyright, *see Clayton v. Stone*, 5 F. Cas. 999 (C.C.S.D.N.Y. 1829). Similarly, *qui tam* actions arose under subsequent copyright statutes, normally brought by an aggrieved party, though not necessarily so. *See Blunt v. Patten*, 3 F. Cas. 762 (C.C.S.D.N.Y. 1828); *Dwight v. Appleton*, 8 F. Cas. 183 (C.C.S.D.N.Y. 1843); *Reed v. Carusi*, 20 F. Cas. 431 (C.C.D. Md. 1845); *Ferrett v. Atwill*, 8 F. Cas. 1161 (C.C.S.D.N.Y. 1846); *Backus v. Gould*, 48 U.S. 798 (1849); *Stevens v. Gladding*, 60 U.S. 64 (1856).

Defendants may argue that such plaintiffs are not proper analogues because they sued to vindicate a personal interest while FCA relators do not. But *Stevens* forecloses that argument. Though FCA relators are not personally harmed by the conduct that violates the FCA, *Stevens* held that they acquire a concrete stake in the suit—no less concrete or personal than a copyright-holder's interest in a copyright infringement suit—through Congress's partial assignment of the government's claim. 529 U.S. at 773. The fact that FCA relators lack a personal *injury* is fundamentally an Article III issue, rather than a distinction relevant to this Article II inquiry. And, again, the Court in *Stevens* resolved the Article III question by holding that the private financial interest acquired by an FCA relator is a constitutionally valid

10

predicate for suing in federal court. 529 U.S. at 773. The FCA, like early copyright laws, channels the self-interest of private parties to service of the public good, by incentivizing litigation that will enforce federal law. Thus, *qui tam* plaintiffs who brought copyright actions are indeed analogous to FCA plaintiffs for purposes of the Article II analysis.

In any event, it does not appear that copyright suits in the early 19th century were limited solely to injured plaintiffs. An 1846 New York case, *Ferrett v. Atwill*, 8 F. Cas. 1161, illustrates the point. There, two plaintiffs sued for a violation of the Act of February 3, 1831, § 12 (4 Stat. 438), which provided that half of any fine would be paid "to the person who shall sue for the [violation]." *Ferrett*, 8 F. Cas. at 1162 (Betts, J.). The court recognized the "manifest distinction between giving a penalty to a common informer, and imposing one for the benefit of the person aggrieved by the violation of the statute." *Id.* at 1163. And the court understood the Act of February 3, 1831, as giving a cause of action to "a common informer," instead of "recompens[ing] individuals because of their particular injuries." *Id.* The court thus made clear that the Act of February 3, 1831 operated from the same premise as the FCA: that important sovereign purposes could be furthered by enlisting the efforts of private persons through the offer of a bounty collected by an action in federal court.

### III. Other Examples of *Qui Tam* Enforcement Regardless of Injury to Plaintiff

Early *qui tam* enforcement also can be observed in many other areas of the law—a fact that is unsurprising given that the *qui tam* device was construed to allow "[a]lmost every fine or forfeiture," *Adams*, 6 U.S. (2 Cranch) at 341, to be recovered by a *qui tam* action. *See, e.g.*, *Ketland, qui tam v. The Cassius*, 2 U.S. (2 Dall.) 365, C.C.D. Pa. (1796) (*qui tam* action alleging that French ship had been illegally fitted out for war); *The Emulous*, 8 F. Cas. 697 (D. Mass. 1813) (No. 4,479), *revised sub nom., Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814) (seizure of private property belonging to citizens of an enemy nation); *Davison v. Champlin*, 7 Conn. 244, 244 (1828) (suit "in [the plaintiff's] own name and in behalf of the United States" to recover a penalty for a statutory violation, though the suit was dismissed because it was filed in state rather than federal court); *Stearns v. United States*, 22 F. Cas. 1188 (C.C.D. Vt. 1835) (*qui tam* action arguing that defendant should be forced to pay debt to the federal government); *Nichols v. Newell*, 18 F. Cas. 199 (C.C.D. Mass. 1853) (successful *qui tam* action for patent violation); *Wolverton v. Lacey*, 30 F. Cas. 417, 417–18 (N.D. Ohio 1856) (successful *qui tam* action against the owner of a vessel for employing a crew, "none of whom had signed shipping articles of agreement"). These additional examples of actions in which informers, regardless of whether they were injured, pursued a bounty for a harm done to the United States, closely resemble *qui tam* actions under the FCA. And courts presiding over these actions expressed no Article II concerns.

### IV. Writings and Commentary of Blackstone and Government Officials

Though the sources cited above make clear that Congress enacted, Presidents signed, and the federal judiciary adjudicated actions under *qui tam* statutes, 18th and 19th century commentary further reinforces that *qui tam* actions were in common use. In England, the writings of Blackstone, whose Commentaries were "more read in America before the Revolution than any other law book," *C.J. Hendry Co. v. Moore*, 318 U.S. 133, 151 (1943), featured *qui tam* actions, strongly suggesting that the device was familiar at the Founding era.[6] 3 William Blackstone, *Commentaries on the Laws of England* *160; *see Bruen*, 597 U.S. at 21, 35, 57 (citing Blackstone's Commentaries as historical evidence). And across the Atlantic, speeches and writings from members of all three branches of the U.S. government suggest the same.

For instance, after the landmark case *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), which was a state *qui tam* action, a telling quote from a congressional debate reflected that such actions were not viewed as anomalous. *See* Appendix to the History of the Sixteenth Congress, 37 Annals of Cong. 1696 (1821) (Statement of Ethan A. Brown) ("This case, dignified with the important and high-sounding title of 'McCulloch vs. the State of Maryland,' when looked into, is found

---

[6] While this submission focuses on specific examples of federal enforcement, the tradition of *qui tam* actions in England, the American colonies, and the states post-ratification is also highly relevant. *See generally C.J. Hendrey Co. v. Moore*, 318 U.S. 133, 137–38, 145–48 (1943) (discussing the development in England of *qui tam* procedures and citing *qui tam* cases decided by colonial and pre-Constitution American courts).

to be an ordinary qui tam action of debt, brought by a common informer . . . ."). In the federal judiciary, judges—in addition to presiding over *qui tam* actions—mused about their interaction with Presidential powers but apparently saw no constitutional defect. *See United States v. Morris*, 26 F. Cas. 1336, 1344 (C.C.D.N.Y. 1822) (Livingston, J.) ("It may also be the case in a qui tam action, that a pardon does not discharge that portion of the penalty which goes to the plaintiff.").

And in the Executive Branch, Presidents and Attorneys General confronted legal and constitutional questions posed by the *qui tam* device—including the very issue raised by Justice Livingston. President Washington, for example, consulted with Alexander Hamilton about whether a pardon of a defendant could nullify an informer's bounty. *See* Nitisha Baronia *et al.*, *Private Enforcement and Article II* (manuscript at 37), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4821934. And in the mid-19th century, an opinion penned by Attorney General John Crittenden considered the same question. *See Pardoning Power of the President*, 5 U.S. Op. Atty. Gen. 579, 586 (1852) (explaining that *qui tam* suits were prosecutions by "private parties" rather than suits of the United States); *see also* Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 597 n.397 (2005). The fact that on two separate occasions, more than a half century apart, presidential administrations considered the interplay between *qui tam* actions and the Executive pardon power, strongly suggests that *qui tam* statutes were not merely dormant, but were actually in use. The historical record thus makes clear that the *qui tam* device was commonly

14

used, written about, and discussed in early America—and that no one thought this device was constitutionally defective.

## CONCLUSION

Given this strong historical evidence, should the Court consider the question of historical *qui tam* enforcement (which the government submits is not necessary to deny Defendants' motion), it reinforces the view that the *qui tam* device was accepted at the Founding as compatible with the constitutional structure.

Respectfully submitted,

**BRIAN M. BOYNTON**
Principal Deputy Assistant Attorney General

**ROGER B. HANDBERG**
United States Attorney

JAMIE A. YAVELBERG
PATRICIA L. HANOWER
J. JENNIFER KOH
JAMES NEALON
Attorneys, Civil Division
United States Department of Justice

Dated: May 21, 2024   By:   *Sean P. Keefe*
SEAN P. KEEFE
Assistant United States Attorney
Florida Bar No. 0413828
400 North Tampa Street, Suite 3200
Tampa, FL 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6200
E-mail: sean.keefe@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will provide electronic service to all counsel of record.

*Sean P. Keefe*
SEAN P. KEEFE
Assistant United States Attorney
