# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DR. CLARISSA ZAVIROV, <br><br> Plaintiff, <br><br> v. <br><br> PHYSICIAN PARTNERS, LLC, FLORIDA MEDICAL ASSOCIATES, LLC d/b/a ANION TECHNOLOGIES, LLC, FREEDOM HEALTH, INC. and OPTIMUM HEALTHCARE, INC., <br><br> Defendants. | Case No. 8:19-CV-01236-KKM-SPF |

## <u>SUPPLEMENTAL BRIEF OF *AMICUS CURIAE*</u>
## <u>THE ANTI-FRAUD COALITION</u>

Tejinder Singh (pro hac vice)
Sparacino PLLC
1920 L St. NW
Suite 835
Washington, DC 20036
202-629-3530
tejinder.singh@sparacinopllc.com

Jacklyn N. DeMar (pro hac vice)
The Anti-Fraud Coalition
1220 19th St. NW
Suite 501
Washington, DC 20036
202-296-4826
jdemar@taf.org

Jonathan Kroner
Jonathan Kroner Law Office
6001 N. Ocean Dr., Suite 806
Hollywood, FL 33019
305-310-6046
jk@floridafalseclaim.com

Steven F. Grover
Steven F. Grover PA
5075 Regency Isles Way
Cooper City, FL 33330
954-290-8826
stevenfgrover@gmail.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

SUPPLEMENTAL BRIEF ......................................................................................1

    I.     The Relevant Founding-Era Historical Sources....................................1

    II.    *Qui Tam* Statutes Were Ubiquitous at the Time of the Founding, and Their Ubiquity Supports Upholding the False Claims Act......................................................................................7

    III.   Other Founding-Era Evidence Debunks the Core Thesis of Defendants' Arguments......................................................................13

CONCLUSION ......................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Adams v. Woods*,
    6 U.S. (2 Cranch) 336 (1805) ...............................................................................2

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. ---, 2024 WL 2193873 (U.S. May 16, 2024) ..........................................5

*Dep't of Transp. v. Ass'n of Am. R.R.*,
    575 U.S. 43 (2015) ..............................................................................................12

*March v. Chambers*,
    463 U.S. 783 (1983) ..............................................................................................4

*N.L.R.B. v. Noel Canning*,
    573 U.S. 513 (2014) ............................................................................................12

*Robertson, qui tam v. Topham* (D.N.Y. 1801),
    *available at* https://catalog.archives.gov/id/192117725 .......................................5

*The Laura*,
    114 U.S. 411 (1885 ...............................................................................................4

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) ..............................................................................................2

*United States v. Tilden*,
    28 F. Cas. 179 (D. Mass. 1859) ............................................................................3

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000) ..............................................................................................7

## STATUTES

Act of May 10, 1800,
    ch. 51, 2 Stat. 70 .................................................................................................13

An Act Repealing, After the Last Day of June Next, the Duties Heretofore Laid
    upon Distilled Spirits Imported from Abroad, and Laying Others in Their Stead;
    and Also upon Spirits Distilled Within the United States, and for Appropriating
    the Same,
    ch. 15, 1 Stat. 199 (1791) ............................................................................. 10, 11

Slave Trade Act of 1794,
    Pub. L. No. 3-11, 1 Stat. 347 ..............................................................................11

# OTHER AUTHORITIES

Nitisha Baronia et al., *Private Enforcement and Article II* (May 8, 2024) (unpublished manuscript), *available at* https://ssrn.com/abstract=4821934 ................................................. 8, 9

Randy Beck, *Qui Tam Litigation Against Government Officials: Constitutional Implications of A Neglected History*, 93 Notre Dame L. Rev. 1235 (2018) ................................................................. 11

Bob Gourley, Part 1: Chronology of Contractors in American History—The Revolutionary War, GovLoop (Nov. 29, 2012), https://tinyurl.com/yntrcw64 ........................................................................ 14

Mass. Const. Pt. I, Art. XXX (1780) ........................................................................ 8

James F. Nagle, A History of Government Contracting (George Wash. Univ. 1992) ........................................................................ 13, 15

James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in a Partisan World*, 92 Fordham L. Rev. 469 (2023) ........................................................................ 12

Register of Informers Case Files, 1866-1891, National Archives Catalog, https://catalog.archives.gov/id/6254881 ........................................................................ 6

Saturday March 23, 1776, Founders Online, National Archives, https://founders.archives.gov/documents/Adams/01-03-02-0016- ........................................................................ 14

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881 (1983) ........................................................................ 8

Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163 (1992) ........................................................................ 1

Statement on the Legal Action Against Richard Johnson, 21 May 1804, Founders Online, National Archives, https://founders.archives.gov/documents/Jefferson/01-43-02-0355 ........................................................................ 9

U.S. Naval History & Heritage Command, American Revolution (Apr. 5, 2024), https://tinyurl.com/2p8k3e2b ........................................................................ 14

# SUPPLEMENTAL BRIEF[1]

The Anti-Fraud Coalition ("TAF Coalition") respectfully submits this brief pursuant to this Court's order dated April 23, 2024 (Doc. 240). Our review of the historical record found "no evidence that anyone at the time of the framing believed that a *qui tam* action or informers' action produced a constitutional doubt." Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 175-76 (1992). Instead, such statutes were an integral part of the legal fabric of the early constitutional republic. That history strongly supports a holding that the False Claims Act, which is far more deferential to the executive branch than the founding-era *qui tam* statutes, is constitutional.

## I.  The Relevant Founding-Era Historical Sources

At oral argument, this Court asked two questions about the relevant universe of founding-era historical sources: (1) whether the only statutes that support the False Claims Act's constitutionality expressly authorized uninjured persons to sue, or whether a broader range of early statutes are relevant to the constitutional analysis; and (2) whether the key fact is that a statute was enacted, or whether the statute's enforcement history was also relevant. Before setting forth historical evidence, TAF Coalition offers some thoughts on these questions to shape the inquiry.

---

[1] No counsel for a party authored this brief in whole or part, and no party other than *amicus* or its counsel made a monetary contribution to the preparation or submission of the brief.

1. First, the Court should hold that all manner of *qui tam* statutes constitute relevant evidence that the False Claims Act's *qui tam* mechanism does not violate Article II because all of these statutes illuminate the key question, *i.e.*, whether Congress may authorize private persons to sue on behalf of the United States.

It ought to be uncontroversial that statutes expressly allowing uninjured informers to bring *qui tam* actions are clearly analogous to the False Claims Act. But the same is true of statutes that did not expressly authorize informers to sue. That is because it was commonly understood that, absent contrary language, "[s]tatutes providing for a reward to informers which do not specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943); *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341 (1805) (Marshall, C.J.) ("Almost every fine or forfeiture under a penal statute, may be recovered by an action of debt [by a private informer] as well as by information [by the government]," and when a "statute which creates the forfeiture does not prescribe the mode of demanding it . . . either debt or information would lie"). Indeed, sixty years after the founding, a district court construing a *qui tam* statute explained that when a statute appropriated a penalty "one half to the United States, and one half to the use of the person informing and prosecuting the same," it was not "needful" to "declare how the informer is to prosecute for the same . . . because it was already a part of our law, that when a

2

statute gives part of a penalty to any one who will sue for the same, an action or information of debt is the proper remedy." *United States v. Tilden*, 28 F. Cas. 179, 180 (D. Mass. 1859). This rule of construction shows that these statutes were likewise analogous to the False Claims Act.

The same is true of statutes permitting *qui tam* actions on behalf of injured plaintiffs—although for slightly different reasons. First, many False Claims Act relators were *also* injured by the defendants' wrongful conduct. *Qui tam* actions are frequently brought by employees or shareholders, who may face criminal liability, reputational injury, or financial loss as a result of the defendant's misconduct. Actions are also often brought by injured patients, contractual counterparties cheated out of benefits, or competitors suffering unfair disadvantage—all of whom are injured parties. To be sure, the overlap between injured plaintiffs and relators is not complete because the False Claims Act permits any person to sue—but the overlap is nevertheless substantial. Second, any distinction between statutes authorizing injured plaintiffs to bring *qui tam* actions and statutes authorizing any person to bring such actions has essentially nothing to do with Article II. Instead, the distinction relates principally to whether the plaintiff has Article III standing. But the Supreme Court has already resolved the Article III issue in the False Claims Act context. This Court should accordingly consider all of the early *qui tam* statutes as relevant evidence on the Article II question.

3

2. The Court also asked if the relevant fact is whether a statute was enacted, or instead whether the statute was frequently enforced. As we understand the question, it goes to whether *qui tam* statutes were salient, and whether there were meaningful opportunities for concerned parties to raise constitutional objections to them. The answer is that although a robust enforcement record would also constitute strong evidence of a statute's salience, enactment alone is sufficient in this context—and enactment combined with longstanding acquiescence more than suffices.

The Supreme Court's precedents identify enactment as the reference-point for using historical statutes as evidence of constitutional meaning. That is because the enactment of a statute provides insight into the enactors' views about their powers under the Constitution—and when the legislators that enacted a statute were also present at the framing of the Constitution, the inference of constitutionality is strong. Thus, in *March v. Chambers*, 463 U.S. 783 (1983), the Court explained that "[a]n act passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, . . . is contemporaneous and weighty evidence of its true meaning." *Id.* at 790 (citation and quotation marks omitted). In *The Laura*, 114 U.S. 411 (1885), which involved an early *qui tam* statute, the Court stressed that the actions of early Congresses, unchallenged for an extended period of time, constitute "conclusive" evidence of the Constitution's meaning. *Id.* at 416 (citation and quotation marks omitted). And again last week, the

Supreme Court reiterated this principle and relied on early Congresses' enactments to interpret the Appropriations Clause. *See CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. ---, 2024 WL 2193873, at *8 (U.S. May 16, 2024). In this context, enforcement history adds little to the fact of enactment.

The Court should also focus on enactment because enforcement records will inevitably be underinclusive for two independent reasons. First, enforcement records cannot tell the whole story because *qui tam* statutes also achieved their purposes by deterrence. Indeed, a very effective and highly salient statute might never result in an enforcement action (or result in very few) if the deterrent effect was strong.

Second, finding and reviewing records of founding-era cases is a Herculean, or maybe Sisyphean, task. It is impossible to tell whether the records are complete (many early lower court cases were not compiled in reporters); many records are not maintained electronically (they exist on microfilm at various archive locations, if they exist at all); and even electronically available records are not searchable or even easily legible (they are instead scanned images of cursive longhand, often smudged and faded by time, *see, e.g.*, *Robertson, qui tam v. Topham* (D.N.Y. 1801), *available at* https://catalog.archives.gov/id/192117725 (records of *qui tam* action under the Slave Trade Act)). This means that anybody who tries to conclusively quantify the amount of *qui tam* enforcement activity will necessarily come up short.

5

Indeed, the enforcement records we have found are only the tip of a proverbial iceberg. For example, we located a hand-written ledger called "Register of Informers Case Files, 1866-1891," held in hard-copy form at the National Archives. *See* Register of Informers Case Files, 1866-1891, National Archives Catalog, https://catalog.archives.gov/id/6254881 (basic information about the document). The ledger contains 3677 entries, each corresponding to a "Moiety Award," *i.e.*, an award to an informer. Each entry briefly identifies the case (presumably by defendant), the district in which it was decided, the informer, his occupation, the date the case was decided, and the amount of the award. Although we have not yet located a similar document from the founding era, other evidence suggests that *qui tam* actions were commonplace. *See* Part II, *infra*.

Indeed, we know that *qui tam* statutes were visible in the founding era and thereafter, when the propriety of *qui tam* actions was hotly debated as a policy matter. While the majority favored the use of *qui tam* statutes (as evidenced by their repeated enactment), others believed that informers were improperly motivated by greed, or might lie or collude with defendants, or otherwise bring actions that were not in the public interest. Nevertheless, even the most strident critics of *qui tam* actions *never* argued that the Constitution prohibited them. Instead, they sought to impose safeguards to address specific problems, or occasionally repealed the statutes for policy reasons.

## II. *Qui Tam* Statutes Were Ubiquitous at the Time of the Founding, and Their Ubiquity Supports Upholding the False Claims Act

The Supreme Court has recognized the "long tradition of *qui tam* actions in England and the American Colonies," as well as the prevalence of "*[q]ui tam* actions . . . in America . . . in the period immediately before and after the framing of the Constitution," including recognizing that "the First Congress enacted a considerable number of informer statutes." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774-76 (2000). Thus, the Court in *Stevens* catalogued in three footnotes over a dozen relevant statutes that provide historical precedent for *qui tam* actions. *See id*. at 776-77 n.5-7. It further deemed that history sufficient to establish the constitutionality of the False Claims Act's *qui tam* mechanism under Article III.

Rather than repeat that catalog, this brief examines a few early statutes, as well as the surrounding context, to show just how important and ubiquitous *qui tam* statutes were—and to further show that all three branches of the federal government, early state governments, and prominent legal thinkers of the time never raised any constitutional concern with the *qui tam* mechanism.

First, many colonies and early States relied on *qui tam* actions to enforce a broad variety of laws. Although these governments had different constitutions, their separation-of-powers rules were analogous to, and often stricter than, the federal standard. For example, the Massachusetts Constitution provided that "the legislative department shall never exercise the executive and judicial powers, or either of them;

7

the executive shall never exercise the legislative and executive powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them." Mass. Const. Pt. I, Art. XXX (1780). Then-Judge Antonin Scalia described this document as a more "wordy" enunciation of the principles later embodied in the federal Constitution. Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 881 (1983).

A forthcoming estimate—prepared by a law professor, a trained historian, and an attorney—reports that "[a]pproximately ten percent of all public acts passed in Massachusetts between 1690 and 1820 expressly relied on private litigants for enforcement," reaching "public policy in nearly every domain of legislative activity." *See* Nitisha Baronia et al., *Private Enforcement and Article II* 27 (May 8, 2024) (unpublished manuscript), *available at* https://ssrn.com/abstract=4821934. The colonial versions of these laws remained effective after Massachusetts adopted its constitution. *See id.* at 28-29. And they were frequently used: The scholars report that "both government officials and private citizens frequently brought these types of statutory claims," which were frequently litigated—yet "despite the ubiquity of private claims . . . and frequent complaints about the excesses of 'common informers,' and endemic constitutional debates, *no one* in Revolutionary Massachusetts seems to have made the argument pressed by the Article II critics— that private litigants who sought to enforce a public right were unconstitutionally

8

exercising an 'executive power.'" *Id*. at 28. What is more, "Massachusetts was not an outlier. Every state in the union continued to pass penal statutes (with both private damages awards and *qui tam* provisions) in the first twenty-five years of independence." *Id*. at 30.

Massachusetts is an important example because pivotal figures in the founding generation were there. John Adams litigated *qui tam* actions as an attorney in the colony. *See id*. at 28. And Joseph Story helped compile the colonial laws of Massachusetts, including dozens of informer's actions—and also voted to enact *qui tam* laws as both a federal congressman and a representative in the Massachusetts legislature. *See id*. at 34-35. Relator's brief identifies additional examples of early Massachusetts *qui tams* involving high-profile figures. But again, Massachusetts was by no means alone. Thomas Jefferson and James Madison revised Virginia's laws, which likewise included twelve informer's actions. *See id*. at 30-31. Indeed, Jefferson himself was a *qui tam* plaintiff at least once. *See* Statement on the Legal Action Against Richard Johnson, 21 May 1804, Founders Online, National Archives, https://founders.archives.gov/documents/Jefferson/01-43-02-0355. And Alexander Hamilton drafted a tax law for New York that was enforceable by "any informer." Baronia, *supra*, at 36.

Beginning in 1789, Congress began enacting *qui tam* statutes at the federal level. Nearly all of these statutes infringed far more substantially on executive power

9

than the modern False Claims Act because the government generally was not permitted to intervene or to extinguish an informer's action, nor to meaningfully supervise the conduct of the litigation. Indeed, many of these statutes included provisions permitting private informers to sue *federal officials* who were lax in their duties, thus posing a direct conflict between relators and the executive branch. Nevertheless, nobody ever suggested that such statutes suffered from any constitutional deficiency.

For example, near the end of its first Term, Congress enacted major tax legislation relating to distilled spirits. *See* An Act Repealing, After the Last Day of June Next, the Duties Heretofore Laid upon Distilled Spirits Imported from Abroad, and Laying Others in Their Stead; and Also upon Spirits Distilled Within the United States, and for Appropriating the Same, ch. 15, 1 Stat. 199 (1791). In addition to adjusting duties imposed on imported liquor and imposing new ones on domestic product, Congress included a variety of ancillary requirements designed to ensure that the taxes were paid—for example by requiring inspections and documentation, and prohibiting evasion. *See id*. §§ 8-10, 13, 20, 27-28, 30-33, 45, 47, 48, 55. Congress also provided for forfeitures for fraud or corruption by the federal officers charged with enforcing the act. *See id*. § 49.

These prohibitions were enforceable through a *qui tam* provision that gave "one half of all penalties and forfeitures incurred by virtue of this act, except as

10

above provided," to "the person or persons who shall make a seizure, or who shall first discover the matter or thing whereby the same shall have been incurred; and the other half to the United States. And such penalty and forfeiture shall be recoverable with costs of suit, by action of debt, in the name of the person or persons intitled thereto, or by information, in the name of the United States of America." *Id*. § 44. This was a shift in policy from recent legislation involving customs duties generally, which provided for *qui tam* actions against government officials—but not as a mechanism to enforce the law against private parties.

Professor Randy Beck has analyzed the historical context around the Distilled Spirits Act and concluded that the expansion of *qui tam* litigation was a likely response "to Alexander Hamilton's report about the inadequacy of centralized monitoring of a dispersed network of customs officials, combined with a new, more challenging tax collection environment." Randy Beck, *Qui Tam Litigation Against Government Officials: Constitutional Implications of A Neglected History*, 93 Notre Dame L. Rev. 1235, 1298 (2018). Thus, Congress, responding to a recommendation from the executive branch, utilized *qui tam* actions to advance its purposes—illustrating concretely that the founding generation did not believe that *qui tam* actions threatened the separation of powers.

Another prominent early *qui tam* statute was the Slave Trade Act of 1794, Pub. L. No. 3-11, 1 Stat. 347. Enacted by the Third Congress and signed into law by

11

President Washington, the statute created a *qui tam* cause of action against any person or vessel used in the slave trade.[2] Professor Pfander conducted a detailed analysis of the Slave Trade Act, concluding that "[a]ntislavery law enforcement in the early republic casts serious doubt on the claim that Article II was understood at the time to vest the executive with an exclusive enforcement discretion that forecloses Congress from relying on private informers to play a supplemental or independent role in law enforcement." James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in a Partisan World*, 92 Fordham L. Rev. 469, 491 (2023). The analysis shows that the statute was highly salient to all three branches of the government; indeed, it was frequently invoked (including by private parties opposed to the slave trade), and gave rise to litigation in the Supreme Court—where again, nobody questioned the statute's constitutionality. *See id*. at 486-87. Over time, Congress only strengthened the statute's *qui tam* provisions. Thus, in 1800, Congress amended the statute by

---

[2] By our count, fourteen members of the Third Congress—Abraham Baldwin, Pierce Butler, Jonathan Dayton, Oliver Ellsworth, Thomas Fitzsimons, Nicholas Gilman, Rufus King, John Langdon, James Madison, Alexander Martin, Robert Morris, George Read, Roger Sherman, and Caleb Strong—were also delegates at the Constitutional Convention, as was President Washington and three members of his cabinet, *i.e.*, Alexander Hamilton, James McHenry, and Edmund Randolph. Originalist analyses in the Supreme Court have relied on acts of the Third Congress as evidence of the Constitutions' original meaning. *See Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 78 (2015) (Thomas, J., concurring); *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 599 (2014) (Scalia, J., concurring in the judgment).

increasing the penalties and giving informers a right to the entire value of any ship condemned under the law. *See* Act of May 10, 1800, ch. 51, § 1, 2 Stat. 70.

### III. Other Founding-Era Evidence Debunks the Core Thesis of Defendants' Arguments

At oral argument, the Court asked whether the parties could identify other instances in which private parties perform executive functions. Counsel for relators and TAF Coalition responded that government contractors perform many such functions including fighting alongside our military, securing our borders, collecting and parsing sensitive intelligence, supplying mission-critical technology, building and maintaining infrastructure, administering the Medicare program, and other vitally important functions key to the functioning of the executive branch. This robust and widespread private-sector participation in governance is a clear rebuke to defendants' insistence that only appointed officers can perform executive functions. Instead, the correct legal rule is that when private parties are duly authorized to act, nothing in the Constitution prohibits them from assisting the executive branch—whether through contractual arrangements or *qui tams*.

Founding-era evidence bolsters this argument. Private contractors were essential to the conduct of the Revolutionary War. The Continental Congress created multiple iterations of a contracting system to supply the troops. *See* James F. Nagle, A History of Government Contracting 17-56 (George Wash. Univ. 1992). Contractors also served in the field. One estimate reports that "contractors comprised

13

18% of the Continental Army's fighting force." Bob Gourley, Part 1: Chronology of Contractors in American History—The Revolutionary War, GovLoop (Nov. 29, 2012), https://tinyurl.com/yntrcw64. Most famously, the Continental Congress authorized the issuance of commissions allowing private vessels to capture British merchant vessels and keep a share of the spoils—a system closely resembling *qui tam* litigation, except accomplished with boats and guns. *See* Saturday March 23, 1776, Founders Online, National Archives, https://founders.archives.gov/documents/Adams/01-03-02-0016-0083 (Original source: *The Adams Papers*, Diary and Autobiography of John Adams, vol.3, *Diary, 1782–1804; Autobiography, Part One to October 1776*, 373-75 (Harvard Univ. Press 1961)) (text of the declaration). The U.S. Naval History and Heritage Command reports "that over the course of the war there were more than 2,000 privately armed vessels, carrying more than 18,000 guns, with some 70,000 men," which collectively "constituted the only sustained American naval pressure brought to bear on the British." U.S. Naval History & Heritage Command, American Revolution (Apr. 5, 2024), https://tinyurl.com/2p8k3e2b.

Reliance on private parties was not limited to military applications. The early postal service also relied on contractors to carry mail and build out infrastructure. Thus, in 1785, the Continental Congress required the postmaster general to make inquiries into the most economical contractual arrangements to transport mail. *See*

14

Nagle, *supra*, at 59. In 1790, George Washington's postal system consisted of 75 offices, 1875 miles of roads, and 18 contracts for carrying the mail. *See id*. at 62. The founders continued to rely on contractors to deliver mail, refining the system as they went. Thus, the Act of February 20, 1792 required the Postmaster General to publicly solicit bids for mail transportation contracts before executing them. *See id.* Then, in 1799, Congress began regulating the employment practices of postal contractors—and included a *qui tam* mechanism to police violations. *See id*. at 75.

This history demonstrates that the government has long relied on the private sector to help carry out essential missions. Even though many of these functions—including military defense and mail delivery—are quite obviously the core of executive power, there has never been any suggestion that such widespread and robust outsourcing violates Article II. *Qui tam* actions under the False Claims Act are plainly analogous. Indeed, the False Claims Act is essentially an adjunct to the widespread government contracting (and the risks inherent in such contracting) that necessitated the law in the first place. Defendants' desire to participate in governance (reaping tremendous sums of the public's money) while simultaneously barring the American people from their historically recognized oversight role is both hypocritical and anathema to the founders' intent.

## CONCLUSION

Defendants' motion should be denied.

15

Respectfully submitted,

s/Tejinder Singh

| | |
|---|---|
| Tejinder Singh (pro hac vice) | Jonathan Kroner |
| Sparacino PLLC | Jonathan Kroner Law Office |
| 1920 L St. NW | 6001 N. Ocean Dr., Suite 806 |
| Suite 835 | Hollywood, FL 33019 |
| Washington, DC 20036 | 305-310-6046 |
| 202-629-3530 | jk@floridafalseclaim.com |
| tejinder.singh@sparacinopllc.com | |
| | |
| Jacklyn N. DeMar (pro hac vice) | Steven F. Grover |
| The Anti-Fraud Coalition | Steven F. Grover PA |
| 1220 19th St. NW | 5075 Regency Isles Way |
| Suite 501 | Cooper City, FL 33330 |
| Washington, DC 20036 | 954-290-8826 |
| 202-296-4826 | stevenfgrover@gmail.com |
| jdemar@taf.org | |