## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* CLARISSA ZAFIROV,<br>　　　　　Plaintiff,<br>　　v.<br>FLORIDA MEDICAL ASSOCIATES, LLC; PHYSICIAN PARTNERS, LLC; PHYSICIAN PARTNERS SPECIALTY SERVICES, LLC; SUN LABS USA, INC.; ANION TECHNOLOGIES, LLC; ANTHEM, INC.; FREEDOM HEALTH, INC.; OPTIMUM HEALTHCARE, INC.; and SIDDHARTHA PAGIDIPATI,<br>　　　　　Defendants. | Civil Action No.<br>8:19-cv-01236-KKM-SPF |

### SUPPLEMENTAL *AMICUS CURIAE* BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR JUDGMENT ON THE PLEADINGS OR TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

J. Carter Andersen
Harold Douglas Holder III
Bush Ross, P.A.
1801 North Highland Ave.
Tampa, FL 33602
Telephone: (813) 204-6405
Facsimile: (813) 223-9620
candersen@bushross.com
hholder@bushross.com

Steven A. Engel
Michael H. McGinley
Dechert LLP
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202) 261-3369
Facsimile: (202) 261-3333
steven.engel@dechert.com
michael.mcginley@dechert.com

*Counsel for* Amicus Curiae
*The Chamber of Commerce of the United States of America*

May 21, 2024

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.............................................................................1

ARGUMENT ...................................................................................................2

I.    The Scattered History of *Qui Tam* Cannot Excuse a Present Constitutional
      Violation. ................................................................................................2

      A. *Qui Tam* Litigation Violates Article II's Text ............................................5

      B. Congress Did Not Consider the Constitutionality of *Qui Tam* ...................8

      C. Even if the First Congress Had Considered the Constitutionality of *Qui
      Tam*, It Came Nowhere Close to Settling the Question.................................13

CONCLUSION ...............................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County*,
  645 F.3d 428 (D.C. Cir. 2011)...................................................................7

*Baldwin v. United States*,
  140 S. Ct. 690 (2020) .............................................................................4

*Buckley v. Valeo*,
  424 U.S. 1 (1976)...................................................................................6

*Dep't of Transp. v. Ass'n of Am. R.R.*,
  575 U.S. 43 (2015).................................................................................6

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)...............................................................................4

*Freytag v. Commissioner*,
  501 U.S. 868 (1991)...............................................................................6

*Hayburn's Case*,
  2 U.S. (2 Dal.) 409 (1792) .....................................................................3

*United States ex rel. Hunt v. Cochise Consultancy, Inc.*,
  887 F.3d 1081 (11th Cir. 2018)..............................................................7

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ................................................................3

*Marsh v. Chambers*,
  463 U.S. 783 (1983) ...................................................................... 2, 5, 13

*Myers v. United States*,
  272 U.S. 52 (1926).................................................................................4

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022)........................................................................ 1, 4, 8, 9

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)...............................................................................3

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
   599 U.S. 419 (2023) ................................................................. 13

*Printz v. United States*,
   521 U.S. 898 (1997) ................................................................... 6

*Riley v. St. Luke's Episcopal Hosp.*,
   196 F.3d 514 (5th Cir. 1999) ..................................................... 9

*Riley v. St. Luke's Episcopal Hosp.*,
   252 F.3d 749 (5th Cir. 2001) ................................................... 10

*United States ex rel. Springfield Terminal Ry. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994) ................................................... 14

*United States v. Comstock*,
   560 U.S. 126 (2010) ................................................................... 7

*United States v. McNinch*,
   356 U.S. 595 (1958) ................................................................. 14

*United States v. Nixon*,
   418 U.S. 683 (1974) ................................................................. 12

*Walz v. Tax Comm'n of City of New York*,
   397 U.S. 664 (1970) ............................................................. 2, 7

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ......................................................... 5

U.S. Const. art. II, § 2, cl. 2 ......................................................... 6

U.S. Const. art. II, § 3 .................................................................. 6

**Statutes**

Act of Apr. 30, 1790, 1 Stat. 112 ............................................... 12

Act of Aug. 4, 1790, 1 Stat. 145 ................................................... 8

Act of Feb. 25, 1791, 1 Stat. 191 ................................................. 8

Act of July 14, 1798, 1 Stat. 597 ................................................. 3

Act of July 20, 1790, 1 Stat. 131 ................................................. 8

Act of July 31, 1789, 1 Stat. 29........................................................ 8, 9, 11

Act of Mar. 1, 1790, 1 Stat. 101 ...............................................................9

Act of Mar. 3, 1791, 1 Stat. 215 ...............................................................8

Act of May 31, 1790, 1 Stat. 124 ..............................................................8

Act of Sept. 1, 1789, 1 Stat. 55 .................................................................8

Act of Sept. 2, 1789, 1 Stat. 65 .................................................................8

**Other Authorities**

Akhil Reed Amar, *America's Constitution: A Biography* (2005)....................................7

William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1 (2019) ................. 4, 13

Randy Beck, *Qui Tam Litigation Against Government Officials:
    Constitutional Implications of a Neglected History*, 93 Notre Dame L.
    Rev. 1235 (2018)................................................................. 9, 10, 11

J. Randy Beck, *The False Claims Act and the English Eradication of* Qui
    Tam *Legislation*, 78 N.C. L. Rev. 539 (2000)......................................14

James T. Blanch, *The Constitutionality of the False Claims Act's* Qui Tam
    *Provision*, 16 Harv. J.L. & Pub. Pol'y 701 (1993) .................................6

Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to
    Execute the Laws*, 104 Yale L.J. 541 (1994) .........................................3

*Constitutionality of the Qui Tam Provisions of the False Claims
    Act*, 13 Op. O.L.C. 207 (1989)..................................................*passim*

Alexander Hamilton, Report of the Secretary of the Treasury (Apr. 23,
    1790), in *The Documentary History of the First Federal Congress of the
    United States, March 4, 1789–March 3, 1791*, at 456 (Charlene Bangs
    Bickford et al., eds. 2019).............................................................11

James B. Helmer, Jr., *False Claims Act: Incentivizing Integrity for 150 Years
    for Rogues, Privateers, Parasites and Patriots*, 81 U. Cin. L. Rev. 1261
    (2013)......................................................................................14

Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some
    Lessons from History*, 38 Am. U. L. Rev. 275 (1989) ...........................12

Thomas R. Lee, *The Standing of Qui Tam Relators Under the False Claims Act*, 57 U. Chi. L. Rev. 543 (1990) ....................................................8

Letter from Epes Sargent to Benjamin Goodhue (May 26, 1789), in *The Documentary History of the First Federal Congress of the United States, March 4, 1789–March 3, 1791*, at 631 (Charlene Bangs Bickford et al., eds. 2019) ..........................................................................................10

Letter from James Madison to President Monroe (Dec. 27, 1817), in 3 *Letters and Other Writings of James Madison* 54 (J.B. Lippincott & Co. 1865) .................................................................................................13

Letter from James Madison to Spencer Roane (May 6, 1821), in 3 *Letters and Other Writings of James Madison* 217 (J.B. Lippincott & Co. 1865) ...................................................................................................5

Letter from James Sullivan to Elbridge Gerry (July 25, 1789), in *The Documentary History of the First Federal Congress of the United States, March 4, 1789–March 3, 1791*, at 1133 (Charlene Bangs Bickford et al., eds. 2019) ..........................................................................................11

Letter from James Sullivan to Elbridge Gerry (June 23, 1789), in *The Documentary History of the First Federal Congress of the United States, March 4, 1789–March 3, 1791*, at 843 (Charlene Bangs Bickford et al., eds. 2019) ..........................................................................................11

Paul E. McGreal & DeeDee Baba, *Applying Coase to Qui Tam Actions Against the States*, 77 Notre Dame L. Rev. 87 (2001)............................14

Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 1701 (2005)............................................................................................7, 12

Leonard D. White, *The Federalists* (1956)................................................14

Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689 (2004) ......................................12, 14

## PRELIMINARY STATEMENT

At oral argument, this Court recognized that the False Claims Act's *qui tam* provisions would not present a "very close question" under Article II if Congress had adopted the provisions "today for the first time." Oral Arg. Tr. at 150. The *qui tam* provisions cannot be reconciled with the text of Article II, as construed by the Supreme Court, and so, the anomalous statutes adopted during the early Republic reflect the sole remaining thread in support of the constitutionality of the *qui tam* provisions.

The Chamber of Commerce of the United States of America ("Chamber") submits this brief in response to the Court's invitation for additional Founding-era evidence with respect to the enforcement of the early *qui tam* statutes. *See* ECF 240. In reviewing that evidence, the Court must "guard against giving postenactment history more weight than it can rightly bear." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 35 (2022). "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 36.

And as the prior briefing noted, the historical support for *qui tam* litigation is limited at best. *See* ECF 187-1 ("Chamber Amicus Br."), at 17–25. The early statutes reflected an ill-considered, pre-ratification understanding of the Chief Executive, which included private *criminal* enforcement, and which rapidly fell into disuse with the establishment of the Executive Branch. The history does not establish any consistent, deliberative practice that suggests *qui tam* can be reconciled with the

Constitution.  Nor could history excuse the manifest conflict between the FCA's *qui tam* provisions and Article II of the Constitution.

ARGUMENT

This Court correctly viewed "the history [as] the hardest part of this case."  Oral Arg. Tr. at 121.  But that history does not save the FCA's *qui tam* provisions.  There were just a few "FCA-like Qui Tam" statutes in the early days of the Republic.  *Id.* at 16.  And there does not appear to be any evidence that the First Congress considered the constitutionality of those laws giving informers a cause of action to vindicate harms to the United States.

Nor does there appear to be evidence that those statutes led to meaningful *qui tam* litigation.  The *qui tam* device instead "rapidly fell into disfavor," only to be briefly revived three quarters of a century later during the heat of the Civil War—before it quickly "fell into relative desuetude" once again.  *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 209, 235 (1989) (William Barr, Ass't Att'y Gen.) (hereafter, "OLC Memo").  That is not the sort of "unambiguous and unbroken history" that could support the constitutionality of *qui tam* litigation. *Marsh v. Chambers*, 463 U.S. 783, 792 (1983).

## I.     The Scattered History of *Qui Tam* Cannot Excuse a Present Constitutional Violation.

Historical practice will not cure constitutional infirmities even if it "covers our entire national existence and indeed predates it."  *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970).  And though the practices of the First Congress bear

2

upon constitutional meaning, the simple fact of legislative action has never been sufficient to demonstrate constitutionality.

After all, history shows that the "members of the First Congress were not infallible interpreters of the constitutional text."  Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541, 556 (1994).  The First Congress granted to the Supreme Court in the Judiciary Act of 1789 original jurisdiction that was "repugnant to the constitution."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  The next Congress, with many of the same members, directed the circuit courts to register war pensioners subject to correction by the Secretary of War—a non-judicial function that several Justices concluded was an unconstitutional blending of the separation of powers.  *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 (1792).  And later that decade, Congress adopted the Sedition Act, which made it a crime to utter or publish "any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress of the United States, or the President of the United States, with intent to defame . . . or to bring them . . . into contempt or disrepute."  Act of July 14, 1798, ch. 74, § 2, 1 Stat. 597, 597.  That criminal provision has long been recognized to violate the First Amendment.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964).

All this shows why the Court has made clear that post-ratification history should be considered, not as determinative proof of constitutional meaning, but as a way of liquidating textual ambiguities into an accepted interpretation.  That is, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate

terms [and] phrases in the Constitution." *Bruen*, 597 U.S. at 36 (quotation marks omitted); *see also Baldwin v. United States*, 140 S. Ct. 690, 693 (2020) (Thomas, J., dissenting from denial of certiorari) (describing "the more general principle of 'liquidation,' in which consistent and longstanding interpretations of an ambiguous text could fix its meaning").

To that end, the Supreme Court has looked to three guiding principles when considering the relevance of history.[1] *First,* the Court must start with the constitutional text because "'[l]iquidating' indeterminacies in written laws is far removed from expanding or altering them." *Bruen*, 597 U.S. at 36 (citation omitted). And therefore, "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text"—no matter how pervasive—"obviously cannot overcome or alter that text." *Id.* (emphasis in original; citation omitted).

*Second*, the Court must consider the extent to which the early Congress adopted a measure after considering its constitutionality. Thus, the Court has given great weight to the "extensive[]" constitutional debate that led to the "Decision of 1789," which established that the President must have the power to remove his subordinate officers. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010); *Myers v. United States*, 272 U.S. 52, 144, 148–54 (1926). The Court similarly credited the constitutional debate over legislative prayer, which was "considered carefully,"

---

[1] *See also* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 1 (2019) (observing that "historical practice" can liquidate the meaning of a constitutional provision where there is: (1) "a textual indeterminacy," and (2) "a course of deliberate practice," which (3) "result[ed] in a constitutional settlement") (cited by *Bruen*, 597 U.S. at 36).

and was not an action "taken thoughtlessly, by force of long tradition." *Marsh*, 463 U.S. at 791. By contrast, as James Madison himself observed, other "[l]egislative precedents" should be "entitled to little respect" when Congress established them "without full examination and deliberation." Letter from James Madison to Spencer Roane (May 6, 1821), in 3 *Letters and Other Writings of James Madison* 217, 221 (J.B. Lippincott & Co. 1865).

*Third*, the Court must consider whether an early practice had become an accepted and settled "part of the fabric of our society," consistent with a shared understanding of our country's governing document. *Marsh*, 463 U.S. at 793. For instance, the Decision of 1789 and legislative prayer were not just adopted by the First Congress but would also come to enjoy widespread acceptance for the better part of our history. That history stands in marked contrast with the *qui tam* statutes, which not only produced little litigation, but quickly fell into disuse.

### A.    *Qui Tam* Litigation Violates Article II's Text.

The early *qui tam* statutes cannot be reconciled with Article II's text. As the government admitted, *qui tam* relators exercise "substantial" and "core executive power" when prosecuting claims on behalf of the United States. Oral Arg. Tr. at 68; *see* Chamber Amicus Br. at 2, 4–9. But the Framers did not allow Congress to freely dispense that authority among self-interested bounty hunters. *See* Chamber Amicus Br. at 4–10. They instead chose to "vest[]" the entire "executive Power" in one publicly accountable President. U.S. Const. art. II, § 1, cl. 1. This "insistence of the Framers upon unity in the Federal Executive" was a critical feature of the

Constitution, as it helped "to ensure both vigor and accountability." *Printz v. United States*, 521 U.S. 898, 922 (1997). *Qui tam* litigation defies the Framers' choice by vesting "executive Power" in private, self-interested individuals. "[N]ot even a fig leaf of constitutional justification" exists for that troubling arrangement. *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring); *see id.* at 88 (Thomas, J., concurring) (recognizing that a "private entity" is "categorically preclude[d]" from exercising executive Power). These early statutes are thus inconsistent with the Vesting Clause.

In much the same way, the Framers "carefully husband[ed] the appointment power" to ensure that the President could be held responsible for the "'Officers of the United States'" who wielded executive Power in his name. *Freytag v. Commissioner*, 501 U.S. 868, 877, 883–84 (1991) (quoting U.S. Const. art. II, § 2, cl. 2). As a result, "only" properly appointed officers may "conduct[] civil litigation in the courts of the United States for vindicating public rights." *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (per curiam). That is a core executive Power. But Congress has allowed "all private persons in the entire world" to seize that power and "appoint themselves special fraud prosecutors in the name of the United States." James T. Blanch, *The Constitutionality of the False Claims Act's* Qui Tam *Provision*, 16 Harv. J.L. & Pub. Pol'y, 701, 742 (1993). That dispersal of executive authority cannot be squared with the original understanding of the Appointments Clause. *See* Chamber Amicus Br. at 8–13.

Finally, the early *qui tam* provisions are also inconsistent with the Constitution's obliging the President to "take Care that the Laws be faithfully executed." U.S. Const.

art. II, § 3.  The FCA's *qui tam* mechanism delegates that prerogative to private actors. It allows them to commandeer and override the Executive's enforcement discretion. *See* Chamber Amicus Br. at 13–16.  And it permits them to interfere with and undermine the Executive's authoritative control over litigation involving the United States. *See id.* at 16–17.  That "do[es] not fit with the Constitution's vision of executive control of law execution."  Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 1701, 1778 (2005).

In short, "[t]he Framers designed our constitutional structure with the idea that unaccountable power is inconsistent with individual liberty." *In re Aiken County*, 645 F.3d 428, 440 (D.C. Cir. 2011) (Kavanaugh, J., concurring).  Article II thus "makes emphatically clear from start to finish . . . that the president would be personally responsible for his branch."  *Id.* at 439 (quoting Akhil Reed Amar, *America's Constitution: A Biography* 197 (2005)).  The FCA's *qui tam* provisions, however, dash that constitutional scheme by allowing "self-appointed private attorney[s] general" to exercise substantial executive Power outside the Executive branch.  *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1087 (11th Cir. 2018) (citation omitted), *aff'd*, 139 S. Ct. 1507 (2019).

No amount of historical practice could cure that plain constitutional violation— not even a historical pattern that "covers" (or indeed "predates") "our entire national existence." *Walz*, 397 U.S. at 678; *see, e.g.*, *United States v. Comstock*, 560 U.S. 126, 137 (2010).  There is simply not "any sort of 'adverse possession' of

constitutionality." Thomas R. Lee, *The Standing of Qui Tam Relators Under the False Claims Act*, 57 U. Chi. L. Rev. 543, 549 (1990).

### B.   Congress Did Not Consider the Constitutionality of *Qui Tam*.

The early congressional enactments also provide scant support for the FCA's constitutionality because they were adopted without any consideration at the time. The Chamber has not identified any discussion of *qui tam*'s constitutionality in the legislative history of the First Congress.

Nor were most of the *qui tam* statutes "relevantly similar" to the FCA. *Bruen*, 597 U.S. at 29. At oral argument, the Court recognized that the early *qui tam* statutes fell into "three buckets," two of which are not analogous to the modern-day FCA. Oral Arg. Tr. at 74; *see id.* at 13–14. Many of the early statutes offered just a reward to informers for bringing a matter to the government's attention, without providing a private party with a cause of action to sue in the shoes of the sovereign.[2] And other early statutes sought to redress private injuries, with only incidental recoveries flowing to the government.[3] The statutes in these two categories are fundamentally different

---

[2] *See, e.g.*, Act of July 31, 1789, ch. 5, §§ 8, 29, 38, 1 Stat. 29, 38, 45, 48 (penalties against collectors, naval officers, and surveyors who failed to take an oath or display rate tables, with a bounty to the informer); Act of Sept. 1, 1789, ch. 11, § 21, 1 Stat. 55, 60 (similar for a maritime law); Act of Aug. 4, 1790, ch. 35, §§ 55, 69, 1 Stat. 145, 173, 177 (similar for a customs law); Act of Sept. 2, 1789, ch. 12, § 8, 1 Stat. 65, 67 (penalties for Treasury Department officials who violated conflict-of-interest and bribery prohibitions, with a bounty to the informer); Act of Mar. 3, 1791, ch. 8, § 1, 1 Stat. 215, 215 (similar); Act of Feb. 25, 1791, ch. 10, §§ 8, 9, 1 Stat. 191, 195–96 (penalties for agents of the United States Bank that engaged in improper trading practices, with a bounty to the informer).

[3] *See, e.g.*, Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124–25 (giving half of statutory penalty to authors who sued for copyright infringement of their works, with other half to the government); Act of July 20, 1790, ch. 29, § 1, 1 Stat. 131, 131 (giving, on top of damages, half of statutory penalty to seamen or mariners deprived of pre-departure shipping contracts, with other half to the government).

in kind, and they thus have limited bearing on a proper originalist inquiry.  *See Bruen*, 597 U.S. at 29–30, 46–50.

As to those early statutes that allowed informers to pursue claims on behalf of the sovereign, some provided a cause of action against executive officials, not private parties.  *See, e.g.*, Act of July 31, 1789, ch. 5, § 36, 1 Stat. 29, 36 (customs officials); Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101, 102 (census officials).  These types of statutes addressed a unique exigency of the early Republic.  Encumbered by vast Revolutionary War debts, the First Congress "had to figure out how to incentivize and monitor executive compliance with congressional directives, even though federal officials would be geographically dispersed throughout a vast territory."  Randy Beck, *Qui Tam Litigation Against Government Officials: Constitutional Implications of a Neglected History*, 93 Notre Dame L. Rev. 1235, 1291 (2018).  So, to accomplish those aims, the First Congress borrowed "from the practices of the English Parliament and earlier American legislatures, selectively employing *qui tam* regulation of executive branch officials alongside provisions for litigation by injured parties and by government officials."  *Id.*  Such private suits to check abuses from public officials raise different concerns from those posed by actions that authorize private parties to act on behalf of the United States.

That leaves just a handful of "true" *qui tam* statutes from the Founding era that authorized private enforcement actions.  Oral Arg. Tr. at 13.  But "[t]here is no evidence" that the First Congress ever seriously considered the constitutionality of these enactments.  OLC Memo, *supra*, at 214; *see Riley v. St. Luke's Episcopal Hosp.*, 196

F.3d 514, 519 (5th Cir. 1999), *rev'd en banc*, 252 F.3d 749 (5th Cir. 2001) ("There is no evidence that the early Congresses considered the constitutionality of [*qui tam*] actions."). To the contrary, the early *qui tam* statutes were expeditiously passed "stop-gap measures" designed to assist the nascent federal government with responding to the demands of administering a new regime that had to govern a broad geographic region. OLC Memo, *supra*, at 213, 235; *see Riley*, 252 F.3d at 773 (en banc) (Smith, J., dissenting) ("A careful review of the history of *qui tam* laws leads one to conclude that they should be classified among those statutes that have been passed more from expediency than from reasoned constitutional analysis.").

To the extent that the Founding generation did contemplate *qui tam*, the limited evidence suggests that members of the First Congress and the Washington Administration viewed it as a tool to combat government overreach rather than as a mechanism to employ private parties to carry out the work of the nascent federal bureaucracy. The members of the First Congress viewed *qui tam* as a necessary mechanism for enforcing the customs laws, but reliance on relators was no more popular in the early Republic than under the English common law. *See* Beck, *supra*, at 1292–93; Chamber Amicus Br. at 19. In a letter to Massachusetts Congressman Benjamin Goodhue, a merchant expressed hope for a collection system that would operate "without having recourse to the encouragement of a contemptible and infamous host of informers." Letter from Epes Sargent to Benjamin Goodhue (May 26, 1789), in *The Documentary History of the First Federal Congress of the United States, March 4, 1789–March 3, 1791*, at 631, 632 (Charlene Bangs Bickford et al., eds. 2019)

10

(hereafter, "*Documentary History*").  James Sullivan, a former judge and future governor of Massachusetts, captured the mood in a letter to Massachusetts Congressman Elbridge Gerry, noting "the contempt & abhorrence to informers which has long Existed in the united States."  Letter from James Sullivan to Elbridge Gerry (July 25, 1789), in *Documentary History* at 1133; *see also* Letter from James Sullivan to Elbridge Gerry (June 23, 1789), in *Documentary History* at 843 (expressing that the "body of the people" believed that "an Informer against Smuglers was more odious than a theif [sic]").  Given some of the animosity directed against *qui tam*, Congress opted against *qui tam* enforcement of the penalties in the Collection Act, *see* Act of July 31, 1789, ch. 5, § 36, 1 Stat. 29, 36, to the extent they were directed at private parties.  *See* Beck, *supra*, at 1293.

In reporting to Congress on the early *qui tam* provisions, Secretary of the Treasury Hamilton advised that informers had proven "essential to a due supervision of the conduct of the particular officers engaged in the collection of the revenues."  Alexander Hamilton, Report of the Secretary of the Treasury (Apr. 23, 1790), in *Documentary History* at 456; *see also id.* (remarking that it would be impossible for the supervision of government officials to be satisfied "by any attention or vigilance of an Individual or Individuals at the Head of the Treasury.  Distance, and the multiplicity of avocations, are conclusive bars.").  Considerations of expediency, not constitutionality, marked Hamilton's discussion of *qui tam*.

The First Congress's failure to appreciate such constitutional concerns becomes all the more clear given that a number of these earlier statutes called for criminal

11

penalties.  For example, an early larceny statute gave one half of the fine "to the informer and prosecutor," and provided that, "on conviction," the offender would "be publicly whipped, not exceeding thirty-nine stripes."  Act of Apr. 30, 1790, ch. 9, §§ 16–17, 1 Stat. 112, 116; *see also* Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 296–97 & n.104 (1989) (collecting "qui tam provisions authorizing individuals to sue under criminal statutes to help enforce the law").

As the government acknowledged at oral argument, the power of criminal enforcement "goes to the heart of the executive power."  Oral Arg. Tr. at 81.  There can be no serious dispute that allowing a private citizen to enforce criminal law unconstitutionally transgresses the Executive's "*exclusive* authority and absolute discretion to decide whether to prosecute a case."  *United States v. Nixon*, 418 U.S. 683, 693 (1974) (emphasis added).  The Court thus cannot rely upon the early Congress's haphazard enactments to delineate the bounds of Article II.

Indeed, the First Congress legislated shortly after the adoption of the Constitution, at a time when a number of fundamental questions concerning the separation of powers were still being settled.  "Because American-style separation of powers had never been put into practical operation before the 1780s, members of the First Congress could not possibly have grasped all of the questions that it raised, let alone worked out coherent answers to them."  Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 727 (2004); *see also* Prakash, *The Chief Prosecutor*, *supra*, at 589 (noting that, for this reason, "we ought to

be cautious about importing English constraints or exceptions to the executive power, when those limitations might be based on the principle of parliamentary supremacy").

The First Congress's overriding concern was to quickly get the new federal government up and running.  The *qui tam* statutes thus have all the characteristics of action "taken thoughtlessly, by force of long tradition" from an archaic English device, "without regard to the problems" that those statutes posed under the new constitutional order.  *Marsh*, 463 U.S. at 791; *see United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449–50 (2023) (Thomas, J. dissenting).  And as discussed above, the early Congresses adopted not one, but multiple laws, that were soon seen to be unconstitutional.  *See supra* at p. 3.

Add it all up, and the simple adoption of the early *qui tam* statutes cannot be viewed as meaningful evidence of their constitutionality.  These are prototypical examples of instances where "the question of Constitutionality was but slightly, if at all, examined."  Letter from James Madison to President Monroe (Dec. 27, 1817), *in* 3 *Letters and Other Writings of James Madison* 54, 55–56 (J.B. Lippincott & Co. 1865).

### C.   **Even if the First Congress Had Considered the Constitutionality of *Qui Tam*, It Came Nowhere Close to Settling the Question.**

The early *qui tam* enactments could not have liquidated any ambiguity in Article II for another reason:  Namely, they were never tested in a manner that could have "culminated in some kind of settlement" of the constitutional questions that the statutes presented then and still present.  Baude, *supra*, at 18.

13

On the contrary, "the *qui tam* statutes adopted by the First Congress gave rise to little actual litigation, and subsequent Congresses rarely used the device." Woolhandler & Nelson, *supra*, at 727 (footnote omitted); *accord* J. Randy Beck, *The False Claims Act and the English Eradication of* Qui Tam *Legislation*, 78 N.C. L. Rev. 539, 541–42 (2000).  The anomalous enforcement device was also remarkably short-lived. "Within a decade, 'the tide had . . . turn[ed] against' qui tam, and Congress started curtailing its use."  OLC Memo, *supra*, at 235–36 (quoting Leonard D. White, *The Federalists* 417 (1956)).  Qui tam then fell into such desuetude that "[e]ventually all of the[] early *qui tam* statutes would be repealed."  James B. Helmer, Jr., *False Claims Act: Incentivizing Integrity for 150 Years for Rogues, Privateers, Parasites and Patriots*, 81 U. Cin. L. Rev. 1261, 1264 (2013).

During the Civil War, Congress revived *qui tam* to crack down on procurement fraud among military contractors.  *See United States v. McNinch,* 356 U.S. 595, 599 (1958).  But *qui tam*'s renaissance in response to the national crisis proved transitory, and the FCA's "*qui tam* provisions were used sparingly."  *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994); *see* Beck, *English Eradication*, *supra*, at 541–42 ("While qui tam statutes have been on the books since the first Congress and the FCA has contained a qui tam provision since the Civil War, these pre-1986 statutes generated relatively little litigation.").  After the Civil War, *qui tam* once again "fell into disuse for several decades until a new law enforcement need arose."  Paul E. McGreal & DeeDee Baba, *Applying Coase to Qui Tam Actions Against*

14

*the States*, 77 Notre Dame L. Rev. 87, 123 (2001).  A pattern had formed.  The First Congress and later Congresses did turn to *qui tam* out of necessity, yet they did so without much thought to the mechanism's constitutionality.

*   *   *

In the end, "[h]istory cannot save qui tam."  OLC Memo, *supra*, at 232.  Nor is this a "close question."  *Id.*  The historical "use of qui tam, far from being ingrained in our legal institutions, has been marginal at most"—and the text of Article II is clear. *Id.*  The *qui tam* provisions are inconsistent with Article II.

**CONCLUSION**

The Court should grant the Defendants' Joint Motion for Judgment on the Pleadings or to Dismiss for Lack of Subject-Matter Jurisdiction.

Respectfully submitted,

*/s/ Steven A. Engel*

| | |
|---|---|
| J. Carter Andersen | Steven A. Engel |
| Harold Douglas Holder III | Michael H. McGinley |
| Bush Ross, P.A. | Dechert LLP |
| 1801 North Highland Ave. | 1900 K Street, NW |
| Tampa, FL 33602 | Washington, D.C. 20006 |
| Telephone: (813) 204-6405 | Telephone: (202) 261-3369 |
| Facsimile: (813) 223-9620 | Facsimile: (202) 261-3333 |
| candersen@bushross.com | steven.engel@dechert.com |
| hholder@bushross.com | michael.mcginley@dechert.com |

*Counsel for* Amicus Curiae
*The Chamber of Commerce of the United States of America*

May 21, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2024, I caused the foregoing Supplemental *Amicus Curiae* Brief to be filed with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

*/s/ Steven A. Engel*

Steven A. Engel
Dechert LLP
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202) 261-3369
Facsimile: (202) 261-3333
steven.engel@dechert.com