## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA
*ex rel.* DR. CLARISSA ZAFIROV,

      Plaintiff/Relator,

v.

PHYSICIAN PARTNERS, LLC;
FLORIDA MEDICAL ASSOCIATES,
LLC, d/b/a VIPCARE; ANION
TECHNOLOGIES, LLC; FREEDOM
HEALTH, INC.; and OPTIMUM
HEALTHCARE, INC.,

      Defendants.

Case No. 8:19-cv-01236-KMM-SPF

### RELATOR'S SUPPLEMENTAL BRIEFING ON
### FOUNDING ERA HISTORICAL EVIDENCE
### REGARDING FEDERAL QUI TAM ENFORCEMENT
### (Pursuant to April 23, 2024 Order, Doc. 240)

## <u>TABLE OF CONTENTS</u>

**page(s)**

I.   Introduction .................................................................................. 1

II.  Founding-Era History and Practice Confirms that *Qui Tam* Was a Well Known and Accepted Part of American Practice ............................ 2

III.  The Early Congresses Deliberately Employed *Qui Tam* Provisions ..................... 6

IV.  Federal Qui Tam Enforcement Is Evident in Post-ratification Practice ....................................................... 9

VI.  The False Claims Act is Well-Supported by Founding Era History and Practice.................................................. 13

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                       **page(s)**

*Adams, qui tam v. Woods*
   U.S. (2 Cranch) 336, 1805 U.S. Dist. LEXIS 279 (Feb. 19, 1805) ............................9

*Beadleston v. Sprague,*
   6 Johns. 101, 1810 N.Y. LEXIS 81, (1810) ............................................................2

*Bowsher v. Synar*, 478 U. S. 714, (1986) ..........................................................................1

*Brown v. United States,*
   12 U.S. (8 Cranch) 110, (1814) ...........................................................................10

*Burrow-Giles Lithographic Co. v. Sarony,*
   111 U.S. 53, 57 (1884) .........................................................................................14

*Consumer Fin. Prot. Bureau (CFPB) v. Community Fin. Servs. Ass'n of Am., Ltd.*,
   No. 22- 448, 2024 U.S. LEXIS 2169, (May 16, 2024) ...............................1, 5, 6, 14

*Marvin* v. *Trout,*
   199 U.S. 212, (1905) ..............................................................................................2

*Marbury v. Madison*
   5 U.S. (1 Cranch) 137, (1803) ............................................................................10

*New York State Rifle & Pistol Ass'n v. Bruen*
   597 U.S. 1, 20 (2022) .......................................................................................3, 14

*Sherman qui tam v. The Schooner Exchange,*
   U.S.D.C. New York (1803)..................................................................................12

*The Laura,* 114 U.S. 411 (1885) ..........................................................................13, 14

*United States ex rel. Marcus v. Hess,*
   317 U.S. 537, (1943) ..............................................................................................2

*United States v. Simms,* 5 U.S. 252,
   (U.S. February 23, 1803)......................................................................................10

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
   529 U.S. 765, (2000) .......................................................................................2, 3, 6

**Statutes and Rules**

Act of July 31, 1789, ch. 5, § 38, 1 Stat. 48 .................................................................. 8

Act of February 20, 1792, ch. 7, S 25, 1 Stat. 232 ........................................................ 9

Act of March 1, 1793, ch. 19 S 12, 1 Stat. 329 ............................................................. 9

Act of May 8, 1794, ch. 23 ........................................................................................... 9

Act of May 19, 1796, ch. 30, S 18, 1 Stat. 469 ............................................................. 9

Act of March 2, 1799, ch. 43 ....................................................................................... 9

Act of March 3, 1799, ch. 46, 1 Stat. 743 .................................................................... 9

S. Rep. 99-345, 1986 U.S.S.C.A.N. 5266 .................................................................... 14

**Other Authorities**

*A History of Uniontown: The County Seat of Fayette County,*
  *Pennsylvania* 194-195 (1913) ................................................................................ 13

*Biographies of the Secretaries of State: John Marshall (1755-1835)* ....................... 10

2 BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND ..................... 4

3 WILLIAM BLACKSTONE, COMMENTARIES .......................................................... 4

*Presidential Message Transmitting Opinions of Attorneys General*, pt. 2: 1838-51 (1851) ..... 13

*Private Enforcement and Article II*
  (draft publication May 8, 2024) ..................................................................... *passim*

*Public Law Litigation in Eighteenth Century America: Diffuse Law*
  *Enforcement for a Partisan World*, 92 Fordham Law Review 469 (2023) ............. *passim*

*Qui Tam Litigation Against Government Officials: Constitutional*
  *Implications of a Neglected History*, 93 Notre Dame L. Rev. 1235, (2018) ............ 4, 7, 8

*Reports of Cases Argued and Determined in the Circuit Court of the*
  *United States for the First Circuit*, v. 1 (1815) ............................................................ 12

Sylvia, Claire M., (2010). *The False Claims Act: Fraud Against the Government*,
  2nd ed., Thomson West, Rochester, N.Y, §2:6,  ................................................. 14

*The Doctrine of Standing as an Essential Element of the Separation of Powers*,
  17 SUFFOLK U.L. REV. 881 (1983) .......................................................................5

*The Law Practice of Alexander H*amilton, 857 (1969)....................................................... 12

*The Works of the Honourable James Wilson*, L.L.D. 144
  (Philadelphia: Lorenzo Press 1804) ....................................................................... 11

*TransUnion, Vermont Agency and Statutory Damages Under Article III*
  (August 23, 2023) ............................................................................................ *passim*

## I.      Introduction.

As Justice Thomas reiterated in a recent decision, "the practice of the First Congress . . . 'provides contemporaneous and weighty evidence of the Constitution's meaning.'" *CFPB v. Community Fin. Servs. Ass'n of Am., Ltd.*, No. 22-448, 2024 U.S. LEXIS 2169, at *23 (May 16, 2024), *quoting Bowsher v. Synar*, 478 U. S. 714, 723 (1986). Justice Thomas, on behalf of the majority of the Court, engaged in a lengthy analysis of the history of the Appropriations Clause to determine whether Congress's statutory authorization for the CFPB's funding mechanism violates the Constitution. *Id.* The Court's retrospection started with the pre-founding history (including the "practice in the Colonies and early state legislatures") and moved through the events surrounding the passage of the Appropriations Clause at the Constitutional Convention, the practice of the First Congress, and post-ratification practice. *CFPB*, 2024 U.S. LEXIS 2169, at *16-28. Finding that the history "confirms [the Court's] interpretation of the Appropriations Clause," the Court held the CFPB's funding mechanism was constitutional. *Id.* at *27.

In a similar manner, a retrospection of the origins of *qui tam* actions, from colonial and state practice through the practice of the first Congresses and early federal courts, confirms that *qui tam* was an enforcement tool well-known and well-accepted by the Framers, for many of the same reasons that the False Claims Act was signed into law by President Lincoln more than 160 years ago. Far from being a thoughtless "holdover" from English law (Doc.180, Defs.' Joint Mot. at 23), *qui tam* was selectively employed in the earliest laws of this country, and the use of *qui tam* provisions can be found in decisions of the early federal courts, including matters in which Hamilton and Jefferson

1

represented litigants. There is no evidence in any of this historic review that the Framers, any of the early Congresses, the first Presidents, or any court, questioned whether *qui tam* provisions presented any constitutional concern.

## II.   Founding Era History and Practice Confirms that *Qui Tam* Was a Well Known and Accepted Part of American Practice.

The False Claims Act is no modern interloper—it is strongly rooted in hundreds of years of *qui tam* tradition. This uncontroverted history has long been recognized by the Supreme Court. In *United States ex rel. Marcus v. Hess*, the Court recounted: "Statutes providing for actions by a common informer, who himself has no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government . . ." 317 U.S. 537, 541 n.4 (1943), *quoting Marvin* v. *Trout*, 199 U.S. 212, 225 (1905).[1] The Court underscored this in *Stevens*: After reviewing the steeped history of *qui tam* going back to the 13th century, it concluded that "*[q]ui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after

---

[1] In *Marvin v. Trout*, the Court cited older *qui tam* actions while considering the constitutionality of an Ohio gambling statute, which permitted recovery not just against gamblers, but building owners who permitted gambling, by uninjured informers. The Court concluded "[w]e are aware of no provision in the Federal Constitution which prevents this kind of legislation in a State for such a purpose." 199 U.S. 212, 225 (1905). The *Marvin* court observed: "The right to recover the penalty or forfeiture granted by statute is frequently given to the first common informer who brings the action, although he has no interest in the matter whatever except as such informer." *Id.* at 225 (citations omitted). "To say that it must be limited to a provision allowing a recovery of the money by the one who lost it, would be in effect to hold invalid all legislation providing for proceedings in the nature of qui tam actions." *Id.* Among the cases cited, the Court referenced *Beadleston v. Sprague*, a *qui tam* involving the Distilled Sprits Act. 6 Johns. 101, 1810 N.Y. LEXIS 81 (1810). In that action, the Supreme Court of New York held that "the person who first commences a *qui tam*, or popular action, attaches a right in himself, which no other common informer, by a subsequent suit, can devest; and he may demur to a plea of a recovery in such subsequent suit." *Id.* at 103.

2

the framing of the Constitution." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 776 (2000).

At oral argument, this Court observed that *Stevens* did not do a detailed parsing of the American history of *qui tam* enforcement actions. Tr. at 13-14, April 22, 2024 Hr'g. Referencing the historical analogies set forth in *New York State Rifle & Pistol Ass'n v. Bruen,*[2] the Court asked counsel whether there was a more fulsome compendia of the historical evidence to deduce the relevant comparators and whether *qui tam* made a deliberate entry into the founding era landscape. *E.g.,* Tr. at 16, 17, 35. In recent years, in direct response to questions raised about the historical roots of private enforcement of public laws, several history scholars have published detailed reviews of the *qui tam* enforcement traditions in place at the time of the framing. *See e.g.,* Randy Beck, *TransUnion, Vermont Agency and Statutory Damages Under Article III* (August 23, 2023), accepted for publication in Florida Law Review ("Beck");[3] Nitisha Baronia, Jared Lucky, Diego Zambrano, *Private Enforcement and Article II* (draft publication May 8, 2024) ("Baronia");[4] James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in a Partisan World*, 92 Fordham L. Rev. 469 (2023) ("Pfander").[5]

As Professor Beck summarized, "[f]rom the fourteenth through the eighteenth centuries, *qui tam* litigation by uninjured common informers was one of three extremely common methods of statutory enforcement, alongside suits by public officials and suits

---

[2] 597 U.S. 1, 20 (2022).

[3] We introduce the exhibits through the declaration of Jennifer Verkamp (the "Verkamp Decl."). *See* Verkamp Decl., Ex. 1, and available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4549914.

[4] Verkamp Decl., Ex. 2, and available at http://dx.doi.org/10.2139/ssrn.4821934.

[5] Verkamp Decl., Ex. 3, and available at https://ssrn.com/abstract=4424076.

by injured parties." Randy Beck, *Qui Tam Litigation Against Government Officials: Constitutional Implications of a Neglected History*, 93 Notre Dame L. Rev. 1235, 1254 (2018) ("Beck, *Neglected History*").[6] The use of private *qui tam* informer-initiated actions was widely embedded in the enforcement mechanisms of the American colonies and states. Professor Beck provides a detailed catalog of how early American governments used *qui tam* actions by informers to help ensure a wide range of government functions were implemented. *Id.* at 1269-1291. The *qui tam* mechanism served an important need at a time when government resources were very limited. Beck, at 15.

Ms. Baronia and her co-authors describe that *qui tam* laws were a "well-defined and expansive category of Founding Era lawmaking closely analogous to private enforcement." Baronia, at 4. They describe that many of these laws were also called penal statutes, "not because they defined a crime, but because they permitted private litigants to collect a *penalty.*" *Id.* (emphasis in original). While oft-miscited to require exclusive power of the executive, William Blackstone described that the great variety of penal statutes "would be too 'tedious' to enumerate," and "'more usually'" brought by informers in a *qui tam* action.[7] *Id.* at 4, 23; *see also* Beck, at 15-17. As Blackstone recounted, "penalties given by the legislature to 'any person that will sue for the same'

---

[6] Verkamp Decl., Ex. 4, and available at https://ssrn.com/abstract=2910801.

[7] 2 BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *420; 3 WILLIAM BLACKSTONE, COMMENTARIES *161 ("[M]ore usually these forfeitures created by statute are given at large to any common informer; or, in other words, to any such person or persons as will sue for the same: and hence such actions are called popular actions, because they are given to the people in general. Sometimes one part is given to the king, to the poor, or to some public use, and the other part to the informer or prosecutor: and then the suit is called a *qui tam action*, because it is brought by a person "*qui tam pro domino rege, &c., quam pro se ipso in hac parte sequitur* [who prosecutes this suit as well for the lord king… as for himself]."

are 'placed as it were in a state of nature . . . open therefore to the first occupant, who declares his intention to possess them, by obtaining judgement to recover them.'" Baronia, at 34.[8]

Carrying forward this common understanding of such actions, "the colonial assemblies themselves (and the state legislatures that succeeded them) passed reams of statutes which relied on private enforcement." Id. at 26. By way of example, Founding Era Massachusetts used private informers to enforce "public policy in nearly every domain of legislative activity: duties on luxury goods, restraints on roving livestock, fishing and hunting regulations, limits on dirty industries like tanning and smithing, quarantine measures for people and livestock, prohibitions on usury and price gouging, qualifications for the skilled trades, states, ship building, fish pickling, meat packing, and more." Baronia, at 27.[9] Massachusetts is viewed as a state that embraced a strict approach to separation of powers,[10] but yet still imbued its laws with qui tam provisions. Baronia, at 26-27.[11] This practice also continued post-ratification: "Every state in the union continued to pass penal statutes (with both private damages awards and qui tam provisions) in the first twenty-five years of independence." Baronia, at 30.[11]

---

[8] Quoting 2 WILLIAM BLACKSTONE. COMMENTARIES *437.

[9] See also Pfander, at 474-78 (describing Rhode Island's pre-ratification enactment and successful use in the courts of uninjured informer litigation to prevent slave trade). These enforcement proceedings were publicized in the newspapers of the day. Id. at 478.

[10] Baronia at 26, citing Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 SUFFOLK U.L. REV. 881 (1983).

[11] The authors describe two Massachusetts qui tam cases post-ratification in which two Federalist judges upheld the right of the private qui tam claimant to bring suit. Baronia, at 32-33; see also id. at 33 n. 196.

[11] The authors also note: "A sweeping revision of Virginia's statutes (proposed by Thomas Jefferson in 1776, and later taken up by James Madison) included twelve informer's actions and many more statutory damages provisions." Id. at 30.

As the Court's decision in *CFPB* illustrates, this "practice in the Colonies and early state legislatures" is relevant because it reflects the views that were formed by the Framers "[b]y the time of the Constitutional Convention." *CFPB*, 2024 U.S. LEXIS 2169, at *20, 22. And, at that time, the use of *qui tam* actions by uninjured informers for enforcement of public functions was well understood. "The Framers (including John Adams, Thomas Jefferson, James Madison, and Alexander Hamilton) understood and participated in this broader legal culture of private enforcement—as did pivotal early jurists like Joseph Story and John Marshall." Baronia, at 4-5. "The delegates of the Constitutional Convention, almost without exception, gained their legislative experience in colonial and state assemblies." *Id.* at 26.

## III.   <u>The Early Congresses Deliberately Employed *Qui Tam* Provisions.</u>

The Court recognized in *Stevens* that the First Congress enacted six statutes authorizing uninjured informers to bring *qui tam* suits. 529 U.S. at 777 n.6. Far from the "thoughtless adoption" advocated by Defendants (Tr. at 17, April 22, 2024), the full enactment history of early Congresses supports a deliberate employment of *qui tam* provisions. *Qui tam* statutes with private rights of action by uninjured informers were enacted not just by the First Congress, but by the first nine Congresses, and in numbers not reported in *Stevens*.[12]

Professor Beck's historical examination of this era reflects that the early Congresses made use of the *qui tam* provisions around the needs served by individual

---

[12] An appendix listing 47 statutes authorizing *qui tam* actions by uninjured informers is attached at Verkamp Decl., Ex. 5.

statute: He observed that "[p]rovision for popular enforcement was common when Congress sought to regulate decentralized activity—*e.g.*, the slave trade or trade with Native American tribes—that might take place in remote areas outside the view or reach of federal officials." Beck, at 21.[13]

One of the needs identified by Congress was in the area of revenue collection. "When the House of Representatives opened its doors to the public on April 8, 1789, James Madison gave a speech highlighting the widely recognized 'deficiency in our treasury' and urging an impost on imports to establish a national revenue." Beck, *Neglected History,* at 1291-92. This deficiency was left behind by the debts of the Revolutionary War, and the government had to figure out how to "incentivize and monitor" compliance with congressional directives, at a reasonable cost, in a vast territory with widely dispersed federal monitoring. *Id. Qui tam* litigation was an effective tool to accomplish that objective.

Duties on liquor was one of the first areas that Congress targeted for revenue collection. In 1791, the First Congress passed the Distilled Spirits Act, which imposed duties on distilled spirits and permitted uninjured informers to file an action of debt in their name or the name of the United States. These provisions were expanded by the Second and Third Congresses, including to add expanded provisions for informer enforcement.[14] Prior to these amendments, Treasury Secretary Alexander Hamilton

---

[13] The Slave Trade Act, for example, was passed by the Third Congress with *qui tam* enforcement provisions by uninjured informers with the right to bring actions. Further discussion of the Slave Trade Act can be found in Section III *infra.*

[14] Beck, at 22, *citing* An Act Concerning Duties on Spirits Distilled Within the United States, ch. 32, 1 Stat. 267, §§ 13 (new forfeitures), 17 (incorporating enforcement mechanisms from 1791 act [including

reported to Congress on "the inadequacy of centralized monitoring of a dispersed network of customs officials, combined with a new, more challenging tax collection environment" with federal tax collection efforts widely distributed throughout the country, along with domestic distillers. Beck, *Neglected History,* 1297-98. Expanded *qui tam* provisions helped the government monitor these domestic collection activities.[15]

Conversely, the First Congress also passed the Collection Act in 1789,[16] and congressmen's correspondence at the time reflects debate about whether informers should be used as an enforcement mechanism for collections relating to importing goods. Beck, *Neglected History,* 1292-93. Congress selectively included bounty-only provisions for revenue offenses against private parties, but permitted *qui tam* enforcement actions against collectors who failed to comply with statutory duties. *Id.* at 1293-94.

The enactment history of the early Congresses does not show reactive adoption of English law. Rather, it reflects careful consideration of *qui tam* enforcement because those early Congresses bolstered *qui tam* provisions as needed. For example, the first statute regulating interaction with Native American tribes was passed by the First Congress as a bounty-only statute, but was amended by the Second Congress to add an "expanded regulatory regime" with different divisions of the forfeiture depending on

---

allowing an unaggrieved party to seize property and institute an action in debt]) (May 8, 1792).

[15] There is no evidence Hamilton had any constitutional objections to *qui tam* enforcement. In fact, Baronia and her co-authors identified correspondence between Hamilton and an auditor for the Treasury Department discussing the impact of the pardon power on *qui tam* actions. Baronia, at 37. Hamilton and the auditor determined that the *qui tam* claim could not be displaced. *Id.* at 37-38.

[16] An Act to Regulate the Collection of the Duties Imposed by Law on the Tonnage of Ships or Vessels, and on Goods, Wares and Merchandise Imported into the United States, ch. 5, 1 Stat. 29 (1789).

whether the informer or the United States initiated suit. Beck, at 23.[17] The Fourth and Fifth Congresses passed statutes replacing or amending the regulatory regime for trade with native tribes, but retained the *qui tam* provisions authorizing informer actions. *Id.* at 23-24.[18] By way of further example, the Second Congress implemented postal service regulations enforced by uninjured informer actions, and subsequent statutes by the Third and Fifth Congresses contained comparable *qui tam* provisions.[19]

This history of enactment throughout the early Congresses demonstrates that there was a consensus around the use of *qui tam* provisions by the Framers of the Constitution. Far from there being evidence that *qui tam* was incompatible with the Constitution, "Congress deployed private enforcement—mostly informer's actions— to implement nearly every one of its constitutionally enumerated powers: to make war; raise and support a military; grant copyrights and patents; regulate immigration; establish post offices; lay and collect taxes; coin money; and regulate commerce between the states and with Indian tribes." Baronia, at 36.

**IV.** **Federal Qui Tam Enforcement Is Evident in Post-Ratification Practice.**

The historical evidence confirms that *qui tam* provisions were not just enacted, but used to enforce federal law. In *Adams, qui tam v. Woods*, the Supreme Court applied a

---

[17] An Act to Regulate Trade and Intercourse with the Indian Tribes, ch. 19, § 12, 1 Stat. 329 (Mar. 1, 1793).

[18] An Act to Regulate Trade and Intercourse with the Indian Tribes, and to Preserve Peace on the Frontiers, ch. 30 § 18, 1 Stat. 469, § 21 (May 19, 1796); An Act to Regulate Trade and Intercourse with the Indian Tribes, and to Preserve Peace on the Frontiers, ch. 46, 1 Stat. 743 (Mar. 3, 1799).

[19] Beck, at 24, *citing* An Act to Establish the Post-Office and Post-Roads Within the United States, ch. 7, 1 Stat. 232, § 25 (Feb. 20, 1792); *See* An Act to Establish the Post-Office and Post-Roads Within the United States, ch. 23, 1 Stat. 354, § 25 (May 8, 1794); An Act to Establish the Post-Office of the United States, ch. 43, 1 Stat. 733, § 24 (Mar. 2, 1799).

statute of limitations in a *qui tam* action under the Slave Trade Act. 6 U.S. (2 Cranch) 336, 342, 1805 U.S. Dist. LEXIS 279 (Feb. 19, 1805). There is no indication the Court raised concerns about the constitutionality of the Act. And certainly this was at a time when the Court carefully considered such issues, as this *qui tam* matter was decided after the Court's 1803 decision on mandamus in *Marbury v. Madison*, delivered by Chief Justice Marshall. 5 U.S. (1 Cranch) 137, 153 (1803).

In this same time frame, Justice Marshall delivered an opinion of the Court regarding jurisdiction over a *qui tam* action under penal provisions governing the District of Columbia. *United States v. Simms*, 5 U.S. 252, 259 (U.S. February 23, 1803) ("an action of debt in the name of the United States and of the informer, would seem to be the remedy given by the act"). Just years before, in 1788, Marshall was also personally involved in Virginia's ratification of the Constitution.[20]

Justice Story was also no stranger to *qui tam* actions. "Justice Story helped compile the first complete edition of the colonial session laws of Massachusetts, which included dozens of informer's actions." Baronia, at 34-35. "He also voted to enact *qui tam* laws, both as a federal Congressman and as a Representative in the Massachusetts state legislature." *Id.* For example, in *Brown v. United States* (1814), Justice Story specifically dismissed the suggestion that there was anything improper about the co-mingling of the interests of the United States and the informer. 12 U.S. (8 Cranch) 110, 130-131 (1814) ("I do not think this exception is entitled to much consideration"). Justice

---

[20] *See Biographies of the Secretaries of State: John Marshall (1755-1835)*, available at
https://history.state.gov/departmenthistory/people/marshall-john

Story's experience would have been similar to other Founding Era jurists. For example, in his lectures on law, Justice Wilson (1789-1798) referenced *qui tam* as an ordinary component of criminal prosecutions and civil suits.[21]

      *Qui tam* actions were not just selectively employed by Congress, and heard by the courts, but resulted in recorded revenue to the Treasury. In a "Message from the President of the United States" dated January 26, 1829, President Adams reported, among other things, on the recovery of fines, forfeitures, and other collections.[22] The table included $8,400 in penalties imposed upon slave traders via *qui tam* suits between 1802 and 1803. *Id.* at 12, 14. It showed $658.36 fines assessed via *qui tam* for violation of internal revenue laws taxing distilled spirits. *Id.* In a similar example, an 1816 report from the Secretary of the Treasury noted $10 recovered in Connecticut in 1814 via the *qui tam* suit *Fosdick v. Rotham.*[23]

      The Slave Trade Act, passed by the Third Congress, has perhaps the most detailed survey to date of the history of its specific enactment and enforcement through *qui tam* provisions. Professor Pfander's detailed examination reveals that the statute originated from a proposal in the First Congress to ban slavery, with James Madison urging Congress to enact a middle ground regulating international commerce. Pfander, at 479. By 1789, that middle ground was enacted, in a law deemed to "facilitate federal

---

[21] Verkamp Decl., Ex. 6, 3 James Wilson and Bird Wilson, *The Works of the Honourable James Wilson*, L.L.D. 144 (Philadelphia: Lorenzo Press 1804) ("A second mode of prosecuting crimes and offences is by information. Some informations are brought . . . at the suit of a citizen. These are a species of qui tam actions . . .).

[22] Verkamp Decl., Ex. 7.

[23] Verkamp Decl., Ex. 8.

enforcement at the waterfront." *Id.* at 480.[24] Signed into law by President Washington, "the 1794 Act reflects a remarkable consensus as to the legitimacy of no-injury informer litigation." *Id.* at 481. Pfander's evaluation of Founding Era evidence identified many *qui tam* actions brought by informers to enforce the Slave Trade Act. *Id.* at 481-487.[25]

Notwithstanding the heavy lift it would be to trace every *qui tam* statute and early enforcement decision (and in the case of original handwritten records, a proverbial needle-in the-haystack search), the available records strongly reflect deliberateness on the part of Congress and the use of these *qui tam* provisions going back to the earliest days of our country. Attached at Ex. 9 to the Verkamp Decl. is a list of early *qui tam* decisions involving informer actions identified by news articles and other means.[26] These decisions are by no means exhaustive, but in addition to the Pfander analysis, significantly

---

[24] To the extent Defendants attempt to exclude enforcement mechanisms like the Slave Trade Act as peculiar only to admiralty, such an argument does not bear weight. Not only was *qui tam* enforcement used in other necessary activities of the government, but, at that time, admiralty and customs was a large part of the federal docket. For example, in the year 1814, the First Circuit, U.S. Court of Appeals reported on ninety-six cases. Almost all of them were decided by Justice Joseph Story, as Supreme Court justices then "rode circuit," hearing cases at the appellate level. Seventy-one of these cases (74%) were related to admiralty, customs, or the embargo. 1 John Gallison, *Reports of Cases Argued and Determined in the Circuit Court of the United States for the First Circuit* (1815) ("the many admiralty and maritime cases").

[25] Relator's counsel identified evidence of other Slave Trade Act *qui tam* actions decisions in other districts outside the scope of Professor Pfander's article. Because of their age, some district court archives are in original hard copy or in microfiche available at the National Archives. Indeed, Professor Pfander focused on Rhode Island because he was able to use digital archives for portions of those records. Pfander, at 472. Examples include *Sherman qui tam v. The Schooner Exchange*, U.S.D.C. New York (1803), in which Hamilton represented the vessel owner in a *qui tam* action (Verkamp Decl., Ex. 10, attaching decision and excerpt from 2 Julius Goebel, Jr., *The Law Practice of Alexander Ha*milton, 857 (1969)), and *Samuel Adams qui tam vs. John Edwards*, (September Term 1802) and *Samuel Adams qui tam vs. Thomas Brown* (December Term 1803) reflecting *qui tam* enforcement actions in D. Mass. (Verkamp Decl, Ex. 11, attaching decisions from National Archives).

[26] Through archived news reports, legal research, and inquiry into the works of legal historians, Relator identified a body of caselaw demonstrating the use of *qui tam* statutes from the founding era through the passage of the FCA. Relator cross-referenced caselaw, historic publications, congressional records, and statutory provisions to distill this information into a convenient format, with citations, for the Court's review.

represent the use of *qui tam* statutes. Not one of these decisions or news reports reflect constitutional concern.

Other pieces of historical evidence emphasize this point. For instance, in 1844, with the support of the postmaster, Lucius W. Stockton of Uniontown, Pennsylvania initiated 169 federal *qui tam* suits to recover penalties from state toll collectors on the Cumberland Road. Stockton was not a government official; he was the manager of the National Stage Coach lines, under contract with the postal service to carry the mail. His suits contended that the Commonwealth of Pennsylvania had no right to tax mail carriers under the 1825 postal act.[27]

## V.    The False Claims Act is Well-Supported by Founding Era History and Practice.

In *The Laura*, the Supreme Court considered the constitutionality of a penal statute applicable to the number of passengers on steam vessels, in which the vessel owner challenged under Article II the right of an informer to enforce a lien for penalties under the statute when he obtained a pardon from the Secretary of the Treasury. 114 U.S. 411 (1885). The Court rejected that the pardon power was exclusive, because to hold such would mean rejecting practice "which has been observed and acquiesced in for nearly a century." *Id.* at 414. The Court recognized that "none of the cases in this court or in the Circuit and District Courts of the United States, involving the operation or effect of such warrants of remission, was it ever suggested or intimated that the legislation was an encroachment upon the President's power of pardon…" *Id.* at 415. The Court's decision

---

[27] Verkamp Decl., Ex. 12, *Presidential Message Transmitting Opinions of Attorneys General*, pt. 2: 1838-51 (1851), 2054-2056; James Hadden, *A History of Uniontown: The County Seat of Fayette County, Pennsylvania* 194-195 (1913).

rested on the principle that:

> The construction placed upon the Constitution by the first act of 1790, and the act of 1802, by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is, of itself, entitled to very great weight; and when it is remembered that the rights thus established have not been disputed during a period of nearly a century, it is conclusive.

114 U.S. at 416 (*citing Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884)). *The Laura* – decided twenty years after the passage of the FCA – is instructive as to the conclusion that a type of law, in this case *qui tam* statutes, passed by "men who were contemporary with [the Constitution's formation]" is "conclusive[ly]" constitutional.

So too, here. The FCA's *qui tam* provisions were enacted by Congress and signed into law by President Lincoln, based on Congress's identification of specific needs for *qui tam* enforcement – much like the selective enactment of the early Congresses along specific needs.[28] "So far as we know, the [Founding Era] statutes were signed without objection by early Presidents and applied in judicial proceedings without anyone raising a constitutional issue under Article II." Beck, at 40. Rather, the historical evidence reflects that those contemporary with the Constitution's formation raised no constitutional concern with such provisions, but instead enacted such laws when necessary—on both the federal and state level—and construed them with far less executive control than in place for the FCA. The Court should find, consistent with the analysis in *Bruen* and *CFPB*, that this evidence confirms that the FCA is constitutional.

---

[28] *E.g.,* Sylvia, Claire M., (2010). *The False Claims Act: Fraud Against the Government*, 2nd ed., Thomson West, Rochester, N.Y, §2:6, pp.41-48. Congress continued to strengthen the FCA for the same specific reasons. S. Rep. 99-345, 1986 U.S.S.C.A.N. 5266, 5267-68 (It was "in the face of [] sophisticated and widespread fraud" that Congress sought "a coordinated effort of both the Government and citizenry [to] decrease this wave of defrauding public funds").

Respectfully submitted,

*/s/ Jennifer M. Verkamp*
Jennifer M. Verkamp*
Jillian L. Estes (Fla Bar No. 0055774)
Chandra Napora*
Anne Hayes Hartman*
Jonathan M. Lischak*
Morgan Verkamp LLC
4410 Carver Woods Dr., Suite 200
Cincinnati, Ohio 45242
Telephone: (513) 651-4400
Fax: (513) 651-4405
Email:
jverkamp@morganverkamp.com
jillian.estes@morganverkamp.com
cnapora@morganverkamp.com
ahartman@morganverkamp.com
jonathan.lischak@morganverkamp.com

*Counsel for Relator Dr. Clarissa Zafirov*

*\* admitted pro hac vice*

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will provide electronic service to all counsel of record.

By: */s/ Jennifer M. Verkamp*
Jennifer M. Verkamp

*Counsel for Relator Dr. Clarissa Zafirov*