# *TransUnion*, *Vermont Agency* and Statutory Damages Under Article III

### (forthcoming *Florida Law Review*)
### (Draft: April 30, 2024)

### Randy Beck*

*The Supreme Court concluded in TransUnion LLC v. Ramirez that a plaintiff may not sue to collect statutory damages under a statute like the Fair Credit Reporting Act (FCRA) simply because the defendant violated a right Congress conferred on the plaintiff. Article III instead requires the plaintiff to show that the statutory violation resulted in a "concrete" injury with "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." Under the majority's reading of Article III, "an injury in law is not an injury in fact."*

*The TransUnion Court made no effort to explain how its conclusion could be reconciled with Vermont Agency of Natural Resources v. United States ex rel. Stevens. The Vermont Agency Court unanimously ruled that Congress may authorize a private qui tam informer to sue for statutory penalties based on a violation of duties owed to the public, even though the informer has not suffered any particularized injury attributable to the defendant's unlawful conduct. The Court closely examined statutes of the first Congress in light of Anglo-American legal history to find qui tam actions compatible with Article III. Early legislators understood qui tam actions to present "cases" or "controversies" traditionally resolved through the judicial process.*

*A comparable examination of late eighteenth century federal legislation undermines the majority's decision in TransUnion. Statutory damages are a modern version of statutory forfeitures available under framing era penal statutes. Blackstone explains that a defendant who violates a penal statute must pay a statutory forfeiture to whoever the legislature specifies, whether an aggrieved party, a public official or a qui tam informer. Just as Congress awarded forfeitures to uninjured qui tam informers in early federal legislation, Congress likewise directed forfeitures to aggrieved parties who suffered no injury beyond the defendant's violation of an individual right protected by statute. By claiming judicial authority to determine whether a plaintiff has suffered a "concrete" injury warranting recovery of statutory damages, the TransUnion Court inverted the framing era relationship between legislatures and courts.*

The Supreme Court has refined its Article III jurisprudence over the past three decades in ways that substantially limit congressional control over standing to sue. A central premise has been that Article III only allows private litigants to seek judicial redress for individualized injuries

Electronic copy available at: https://ssrn.com/abstract=4549914

caused by unlawful conduct.[1] An individual may not sue to vindicate rights of the public, a task constitutionally assigned to the Executive Branch.[2] *Lujan v. Defenders of Wildlife* emphasized that Article III requires a plaintiff to demonstrate a "particularized" injury in fact, meaning that the defendant's unlawful conduct "must affect the plaintiff in a personal and individual way."[3] *Spokeo, Inc. v. Robins* stressed that even a particularized injury will not support federal court litigation unless that injury is also "concrete."[4] *TransUnion LLC v. Ramirez* built on *Spokeo*, concluding that the concreteness limitation requires a court to assess "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."[5] Along the way, the *TransUnion* majority rejected Justice Thomas' position that violation of an individual legal right is by itself an injury permitting judicial vindication.[6] What began as a quest to prevent private litigation of public rights thus evolved to prevent private litigation of some private rights, at least if those rights are conferred by Congress and seem novel to federal judges. The Supreme Court has justified these Article III standing restrictions as "rooted in the traditional understanding of a case or controversy" and "grounded in historical practice."[7]

In contrast to the stark historical division between litigation of public rights and litigation of individual rights depicted in recent standing cases, the Court acknowledged a more complex Anglo-American legal history in *Vermont Agency of Natural Resources v. United State ex rel. Stevens*.[8] There the Court raised *sua sponte* the question of whether an individual suing under the *qui tam* provisions of the False Claims Act (FCA) had standing to assert a claim that his employer had defrauded the United States government.[9] Recognizing that the individual pressing the FCA claims had not suffered any particularized injury from the alleged fraud, the Court nevertheless found Article III standing based on the long history of popular enforcement under English and American penal statutes.[10] Numerous statutes of the First Congress followed the then-ubiquitous Anglo-American practice of allowing private informers (often called "relators" in FCA litigation) to sue for a share of a forfeiture imposed for violating statutory requirements.[11] The Court thought this history "well nigh conclusive with respect to the question

---

* Justice Thomas O. Marshall Chair of Constitutional Law, University of Georgia School of Law. I am grateful for helpful comments from Joseph Miller and Stephen Petrany, and for the excellent research assistance provided by Ashlyn Dewberry.

[1] Lujan v. Defenders of Wildlife, 504 U.S. 555, 576-77 (1992).

[2] *Id*.

[3] *Id*. at 560 & n.1.

[4] 578 U.S. 330, 341 (2016).

[5] 141 S. Ct. 2190, 2205 (2021).

[6] *Id*. at 2204 ("an injury in law is not an injury in fact" satisfying Article III), 2207 n.3 (rejecting dissent's proposed analysis).

[7] *Spokeo*, 578 U.S. at 338, 340-41; *see also TransUnion*, 141 S. Ct. at 2204 ("'history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider'") (quoting Spring Communications Co. v. APCC Services, Inc., 554 U.S. 269, 274 (2008)).

[8] 529 U.S. 765 (2000).

[9] *See* Vermont Agency of Natural Resources v. United States ex rel. Stevens, 528 U.S. 1015 (1999) (directing parties to file supplemental briefs on the question: "Does a private person have standing under Article III to litigate claims of fraud upon the government?").

[10] *Vermont Agency*, 529 U.S. at 772-78.

[11] *Id*. at 776-77 & nn. 5-7.

Electronic copy available at: https://ssrn.com/abstract=4549914

before us here: whether *qui tam* actions were 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'"[12] The Court theorized that such legislation could be understood to effect a partial assignment of the government's claim to the private litigant, so that the focus for Article III should be on injury to the government as assignor, rather than injury to the private assignee.[13]

Considered together, these precedents create a puzzle about congressional power to authorize litigation consistent with Article III. Both *Spokeo* and *TransUnion* were decided under the Fair Credit Reporting Act (FCRA), which allows a consumer who demonstrates a willful violation of the statute to collect either actual damages or statutory damages ranging from $100 to $1,000.[14] Why treat such a provision for statutory damages differently than a statutory forfeiture of the sort validated in *Vermont Agency*? If Congress can authorize a *qui tam* informer with no injury to litigate the public's claim for a statutory forfeiture, shouldn't it follow that Congress can confer standing to pursue a statutory-damages claim on a consumer whose legal rights were violated?

Section I of the article will consider the historical understanding of the "case or controversy" requirement embraced in *Lujan* and its progeny, as well as the implications the Court has drawn for congressional power to confer standing.[15] Section II will then discuss the more complex (but more accurate) legal history the Court acknowledged in *Vermont Agency*.[16] Special attention will be paid to late eighteenth century congressional enactments, including those cited in *Vermont Agency* and others in the decade following ratification of the Constitution.[17] The examination will show that legislators in the framing generation understood Congress to have power to authorize forms of litigation impossible to square with *TransUnion*'s restrictive reading of Article III.

Early federal statutes recognized the modern Court's distinction between rights of the public and rights of individuals, but Congress exercised broad legislative authority to decide who could vindicate rights in either category and whether the litigant needed to show a particularized injury caused by the defendant's statutory violation. Sir William Blackstone explained that a legislature enacting a penal statute could authorize collection of a statutory forfeiture by an aggrieved party, a public official or a "common informer," meaning "any such person or persons as will sue for the same."[18] Early Congresses chose among these options on policy grounds, sometimes providing different methods of enforcement for distinct forfeitures in the same legislation. Framing era penal statutes frequently authorized uninjured *qui tam* informers to enforce rights of the public and sometimes permitted uninjured informers to litigate based on legal rights of other individuals. Congress also created forfeitures that could be collected by aggrieved parties, but did not require any showing of concrete injury apart from the defendant's violation of a statutory duty owed to the plaintiff.

---

[12] *Id*. at 777-78 (quoting Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 102 (1998)).
[13] *Id*. at 773-74.
[14] 15 U.S.C. § 1681n(a)(1)(A).
[15] *See infra* notes 25-120 and accompanying text.
[16] *See infra* notes 121-265 and accompanying text.
[17] *See infra* notes 162-265 and accompanying text.
[18] *See infra* text accompanying notes 144-54.

Electronic copy available at: https://ssrn.com/abstract=4549914

Section III.A contends that just as Congress has power to confer Article III standing on uninjured *qui tam* informers, Congress also has power to authorize statutory damage claims like those rejected in *TransUnion*.[19] Following the Court's reasoning in *Vermont Agency*, the best evidence of Article III's implications for congressional power comes from early federal legislation like that surveyed in Section II. Statutory damage provisions are just a modern version of the forfeitures imposed under eighteenth century penal statutes. In each case, the legislature declares specified conduct unlawful, imposes a financial penalty for violation and authorizes a private or public litigant to sue for the penalty. Just as early federal legislation demonstrates congressional power to confer standing on *qui tam* informers who suffer no particularized injury, early federal statutes also show that Congress can authorize statutory damage claims by private plaintiffs whose rights are violated, whether or not a particular plaintiff can show concrete harm beyond the fact of the statutory violation.

Section III.B briefly addresses a question left open in *Vermont Agency*: whether *qui tam* statutes violate Article II of the Constitution by allowing private informers to pursue public claims that can only be litigated by Executive Branch officials subordinate to the President.[20] Three Justices recently expressed interest in taking up this issue in *United States ex rel. Polansky v. Executive Health Resources*.[21] A comparable Article II argument was rejected by the Court in its 1885 decision in *The Laura*.[22] The first Justice Harlan concluded for the Court that a practice embraced by the First Congress and followed in later legislation had placed a definitive construction on the Constitution that could not be rejected a century later based on a re-reading of the President's pardon power.[23] It would be startling for an originalist Court to decide that the Constitution requires rejection of an Anglo-American legal practice firmly established since the 14th century, extensively employed in framing era statutes and relied upon by Congress throughout the 234 years since the Constitution was ratified. In any event, whatever one concludes about the compatibility of *qui tam* legislation with Article II, any Article II concerns seem much weaker in a case like *TransUnion*, where the statutory forfeiture was tied to violation of individual rights rather than public rights.

Section III.C contends that *TransUnion*'s limits on congressional power seem ironic given the separation of powers justification offered for modern standing rules and for the originalist theory from which they are said to derive.[24] Justice Scalia defended originalism based on the premise that it constrains judicial decision making, offering relatively objective historical grounds to resolve constitutional questions in place of the judge's own policy preferences. The Court's application of originalist methodology in a case like *Vermont Agency* illustrates that virtue. Framing era historical evidence persuaded Justice Scalia to find standing in a case that diverged from his previously expressed views on Article III and that created tension with his position on executive power. The *TransUnion* Court, on the other hand, invoked originalist values, but made

---

[19] *See infra* notes 275-334 and accompanying text.
[20] *See infra* notes 335-404 and accompanying text.
[21] 143 S. Ct. 1720, 1737 (2023) (Kavanaugh, J., joined by Barrett, J., concurring); *id*. at 1741 (Thomas, J., dissenting).
[22] 114 U.S. 411, 413-16 (1885).
[23] *Id*. at 416.
[24] *See infra* notes 405-56 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=4549914

only cursory efforts to engage with the historical record that in theory should shape its understanding of Article III. The result was a decision that inverts the framing era relationship between legislatures and courts, empowering judges to make decisions about cognizable injuries that historically would have been left for policy resolution by Congress.

## I.      Limits on Congressional Power Under *Lujan* and Its Progeny

William Baude highlights two themes in the Article III case law that exist in tension and can be difficult to reconcile.[25] The Court often emphasizes, on the one hand, that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."[26] For example, when a black "tester," because of her race, was given false information about the availability of housing in particular complexes, the Court found in *Havens Realty Corp. v. Coleman* that she had established an injury for Article III purposes, even though she had no intention of renting or buying when she made her inquiry.[27] Congress had by statute "conferred on all 'persons' a legal right to truthful information about available housing" and the violation of that statutory right was a sufficient injury by itself to satisfy Article III.[28] On the other hand, the Court has also insisted that some congressional attempts to create rights or confer standing violate minimum Article III requirements. In *Sierra Club v. Morton*, the Court noted that Congress could not by statute authorize a federal court to issue an advisory opinion.[29] In *Raines v. Byrd*, the Court rejected a challenge to the Line Item Veto Act by members of Congress, finding it "settled" that Congress cannot grant a right to sue to someone "who would not otherwise have standing" and thus "erase Article III's standing requirements."[30]

The Supreme Court in recent years has augmented the tension between the principle that Congress can create rights that serve as a basis for standing and the caveat that Article III restricts congressional power to authorize federal litigation. A series of decisions starting with *Lujan v. Defenders of Wildlife* has gradually expanded the Court's understanding of the minimum constitutional requirements imposed by Article III. Those decisions have correspondingly created new limits on congressional power to confer legal rights that establish a basis for litigation in federal court.

### A.  *Lujan v. Defenders of Wildlife*

*Lujan v. Defenders of Wildlife* involved a lawsuit by environmental organizations challenging an Interior Department regulation promulgated under the Endangered Species Act (ESA).[31] The ESA requires federal agencies to consult with the Secretary of the Interior to ensure that actions undertaken or funded by the federal government do not jeopardize endangered or threatened

---

[25] William Baude, *Standing in the Shadow of Congress*, 2016 SUP. CT. REV. 197, 199 (2016).
[26] Linda R.S. v. Richard D., 410 U.S. 614, 617 n.3 (1973).
[27] 455 U.S. 363, 373-74 (1982).
[28] *Id*.
[29] 405 U.S. 727, 732 n.3 (1972).
[30] 521 U.S. 811, 820 n.3 (1997).
[31] *Lujan*, 504 U.S. at 557-58.

Electronic copy available at: https://ssrn.com/abstract=4549914

species or destroy critical habitat.[32] This ESA consultation provision was originally interpreted to apply to U.S.-funded projects anywhere in the world, but revised regulations later limited its application to projects in the United States or on the high seas.[33] The plaintiff environmental organizations filed suit to force a return to the original interpretation that applied the consultation requirement worldwide.[34] The case was brought under the ESA's "citizen suit" provision, which authorizes "any person" to file a civil suit "to enjoin any person, including the United States" alleged to be in violation of any ESA provision.[35]

Justice Scalia's opinion for the *Lujan* Court found that the plaintiff environmental organizations lacked Article III standing, notwithstanding the statutory authorization to sue.[36] The majority began by laying out a familiar three-part standing test from prior cases, which it described as "the irreducible constitutional minimum" of standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."[37]

The plaintiff environmental organizations, according to the majority, failed to demonstrate an imminent, particularized injury to any of their members as a result of the alleged misinterpretation of the ESA. Certain members of the plaintiff organizations professed an intent to travel to places where endangered species were threatened by U.S.-funded projects, but none could show any concrete travel plans describing when those visits would take place.[38]

The most significant portion of the *Lujan* opinion for our purposes is the section rejecting the Court of Appeals' theory that the plaintiffs had standing by virtue of the ESA citizen suit provision allowing "any person" to sue based on "any [ESA] violation."[39] The majority disagreed with the appellate court's view that Congress could confer on everyone a "right" to Executive Branch observance of ESA procedures, so that violation of the right would create a procedural injury supporting standing.[40] The Court reviewed a long line of cases concluding that individuals lack standing to litigate generalized grievances, where the plaintiff asserts injury only to the communal interest in proper application of the law and seeks relief "that no more directly

---

[32] *Id*. at 558 (quoting 16 U.S.C. § 1536(a)(2)).

[33] *Id*. at 558-59.

[34] *Id*. at 559.

[35] *Id*. at 571-72 (quoting 16 U.S.C. § 1540(g)).

[36] *Id*. at 562-78.

[37] *Id*. at 560-61 (citations omitted).

[38] *Id*. at 563-64. A plurality of the Court also found a redressability problem with the plaintiffs' case for standing. *Id*. at 568-71.

[39] *Id*. at 571-78.

[40] *Id*. at 573.

Electronic copy available at: https://ssrn.com/abstract=4549914

and tangibly benefits him than it does the public at large."[41] While most of the generalized grievance cases concerned constitutional claims, the majority did not think the source of the asserted right determinative under Article III.[42] The requirement of an individual injury was essential to identifying "those 'Cases' and 'Controversies' that are the business of the courts rather than of the political branches."[43]

> To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an "individual right" vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed," Art. II, § 3. It would enable the courts, with the permission of Congress, "to assume a position of authority over the governmental acts of another and co-equal department," and to become "'virtually continuing monitors of the wisdom and soundness of Executive action.'"[44]

The majority acknowledged that Congress can create new rights that, when violated, constitute an Article III injury.[45] Congress may "elevate . . . concrete, *de facto* injuries that were previously inadequate in law" so they become the basis for justiciable controversies.[46] But while Congress can broaden the categories of injury that support standing, the person seeking review must still show a particularized injury.[47]

Justice Kennedy authored a concurrence, joined by Justice Souter, in which he qualified *Lujan*'s implications with respect to congressional recognition of new rights. He agreed with the majority that Article III does not allow citizen suits "to vindicate the public's nonconcrete interest in the proper administration of the laws."[48] At the same time, he thought the Court should be sensitive to the articulation of new rights that did not have any "clear analogs in our common-law tradition."[49] He saw nothing in the Court's opinion inconsistent with his view that Congress could "define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before."[50] In exercising this power, though, Congress "must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit," something it had not done in the ESA's broad citizen suit provision.[51]

### B.  *Spokeo v. Robins*

The Court continued the process of narrowing congressional power over standing in *Spokeo v. Robins*. Thomas Robins filed suit under the Fair Credit Reporting Act (FCRA) against Spokeo,

---

[41] *Id*. at 573-74.
[42] *Id*. at 576.
[43] *Id*.
[44] *Id*. at 577 (citations omitted).
[45] *Id*.
[46] *Id*. (citing Trafficante v. Metropolitan Life Ins. Co., 490 U.S. 205, 208-12 (1972)).
[47] *Id*.
[48] *Id*. at 580-81.
[49] *Id*. at 580 (Kennedy, J., concurring).
[50] *Id*.
[51] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4549914

Inc., an online search engine that combs databases for information about a specified person.[52] A consumer reporting agency subject to the FCRA must, among other statutory duties, "follow reasonable procedures to assure maximum possible accuracy" of consumer reports.[53] A consumer reporting agency found in willful violation of the statute can be liable for actual damages or for statutory damages between $100 and $1000, along with attorneys' fees and punitive damages.[54] Robins alleged that Spokeo produced a profile about him that contained inaccurate information, including "that he is married, has children, is in his 50's, has a job, is relatively affluent, and holds a graduate degree."[55] The District Court dismissed Robins' complaint, finding that Robins had not properly pled an injury in fact under Article III.[56] The Ninth Circuit reversed, concluding that Robins had standing because he alleged that "'Spokeo violated *his* statutory rights, not just the statutory rights of other people,' and because his 'personal interests in the handling of his credit information are individualized rather than collective.'"[57]

Justice Alito authored the 6-2 majority opinion in *Spokeo* finding the Ninth Circuit's standing analysis incomplete.[58] Echoing themes from *Lujan* and other cases, the Court explained that standing doctrine "is rooted in the traditional understanding of a case or controversy" and that it reinforces separation of powers because it prevents use of the judicial process "to usurp the powers of the political branches."[59] The Court echoed *Raines'* conclusion that Congress cannot override Article III by granting a right to sue to "a plaintiff who would not otherwise have standing."[60]

Turning to the Ninth Circuit's opinion, the majority explained that an allegation that the plaintiff suffered a particularized injury is necessary for standing, but not sufficient.[61] In addition to being particularized, the injury must also be "concrete."[62] The Ninth Circuit's observation that Robins alleged violations of his own FCRA rights went to the issue of particularization, but overlooked the concreteness inquiry.[63] To be "concrete" means that the injury "must be '*de facto*,'" "must actually exist," must be "real" and not "abstract."[64]

Justice Alito acknowledged that an injury need not be tangible to be concrete.[65] In deciding whether an intangible injury will suffice for standing, the majority considered it "instructive" whether an asserted intangible harm "has a close relationship to a harm that has traditionally

---

[52] *Spokeo*, 578 U.S. at 333.

[53] *Id*. at 335 (quoting 15 U.S.C. § 1681e(b)).

[54] *Id*. (quoting 15 U.S.C. § 1681n(a)).

[55] *Id*. at 336.

[56] *Id*.

[57] *Id*. at 337 (quoting 742 F.3d 409, 413 (2014)).

[58] Justice Scalia participated in the oral argument in *Spokeo*, but passed away before the opinion was released. *See* William Baude, *Standing in the Shadow of Congress*, 2016 SUP. CT. REV. 197, 214 (2016).

[59] *Spokeo*, 578 U.S. at 337-38 (quoting Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1146 (2013)).

[60] *Id*. at 339 (quoting Raines v. Byrd, 521 U.S. 811, 820 n.3 (1997)).

[61] *Id*.

[62] *Id*.

[63] *Id*. at 339-40.

[64] *Id*. at 340.

[65] *Id*. at 340-41.

Electronic copy available at: https://ssrn.com/abstract=4549914

been regarded as providing a basis for a lawsuit in English or American courts."[66] Such an analysis is valuable because the case or controversy requirement "is grounded in historical practice."[67] The majority also considered the judgment of Congress important in resolving whether an individual has a concrete injury, because "Congress is well positioned to identify intangible harms that meet minimum Article III requirements."[68]

Applying these principles to Robins' case, the majority recognized that the FCRA imposed procedural requirements for consumer reporting agencies to reduce the risk of disseminating false information about a consumer.[69] But the mere fact that Spokeo violated some FCRA procedural requirements would not establish standing unless Robins could show a resulting concrete harm.[70] The Court remanded for the Ninth Circuit to consider "whether the particular procedural violations alleged in this case entail a degree of risk sufficient to meet the concreteness requirement."[71]

Justice Thomas joined the majority opinion in *Spokeo*, but staked out a distinct position on standing in his concurring opinion.[72] He relied in part on an article by Professors Ann Woolhandler and Caleb Nelson detailing aspects of English and early American law that support modern standing jurisprudence.[73] Reminiscent of *Lujan*, Justice Thomas contended that Anglo-American legal history drew a fundamental distinction between litigation of individual rights and litigation of public rights.[74] When an individual sought to vindicate an individual right, Justice Thomas argued, the mere violation of the right was often a sufficient injury to permit litigation.[75] In cases involving trespass, intellectual property or unjust enrichment, for example, the plaintiff did not need to claim damage beyond the mere violation of his legal rights.[76] On the other hand, as a general rule, only the government could seek to vindicate injuries to the public at large.[77] In those instances where an individual could litigate based on public rights, as in the law of public nuisance, the plaintiff was required to show some individualized damage beyond that suffered by the community at large.[78]

---

[66] *Id.*

[67] *Id.*

[68] *Id.* at 341.

[69] *Id.* at 342.

[70] *Id.*

[71] *Id.* at 342-43.

[72] *Id.* at 343 (Thomas, J., concurring). Justice Ginsburg, joined by Justice Sotomayor, agreed with much of the Court's opinion. *Id.* at 350 (Ginsburg, J., dissenting). However, she saw no need for a remand to determine whether Robins had alleged "concrete" injury, because the complaint indicated that Spokeo disseminated "misinformation about his education, family situation, and economic status, inaccurate representations that could affect his fortune in the job market." *Id.* at 353.

[73] *Id.* at 344 (Thomas, J., concurring) (citing Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 MICH. L. REV. 689 (2004)).

[74] *Id.* ("Common-law courts imposed different limitations on a plaintiff's right to bring suit depending on the type of right the plaintiff sought to vindicate.").

[75] *Id.*

[76] *Id.*

[77] *Id.* at 345.

[78] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4549914

Justice Thomas thought modern standing doctrine should embrace this traditional distinction between claims based on public and private rights by insisting on concrete injury in cases involving individual assertion of public rights and relaxing the requirement when a plaintiff asserted individual rights.[79] Applied to the facts of *Spokeo*, Justice Thomas believed the court on remand should start by determining which sort of right Robins was suing to vindicate: "If Congress has created a private duty owed personally to Robins to protect *his* information, then the violation of the legal duty suffices for Article III injury in fact."[80]

### C. *TransUnion, LLC v. Ramirez*

The Court narrowed congressional power to authorize federal litigation still further in *TransUnion LLC v. Ramirez*. The *TransUnion* decision arose from a class action filed under the FCRA, the same statute at issue in *Spokeo*.[81] After accessing a credit report from TransUnion, a Nissan salesman refused to sell a car to the named plaintiff, Sergio Ramirez, telling the plaintiff his name was on a "terrorist list."[82] TransUnion had included an alert in Ramirez' credit report indicating that his name was a potential match for a name on a list maintained by the Treasury Department's Office of Foreign Assets Control (OFAC).[83] Businesses are generally prohibited from transacting business with the terrorists, drug traffickers and other criminals who appear on the OFAC list.[84] As it turned out, the person named on the OFAC list was someone other than the plaintiff, but TransUnion had not cross-referenced information like birthdates that could have shown that they were different people.[85]

Ramirez' principal FCRA claim was that TransUnion failed to use reasonable procedures to ensure the accuracy of information in his credit file.[86] He also included claims that a pair of mailings from TransUnion failed to satisfy FCRA requirements regarding provision of information to consumers.[87] Ramirez successfully sought class certification on behalf of 8185 individuals who received a mailing from TransUnion during a 7 month period in 2011 similar to the mailing notifying Ramirez that his name was a potential match for a name on the OFAC list.[88] After trial, a jury awarded each class member $984.22 under the FCRA provision authorizing statutory damages for willful failure to comply with FCRA requirements.[89] The jury also awarded $6353.08 per class member in punitive damages.[90] At the Supreme Court, a 5-4

---

[79] *Id*. at 346-47.

[80] *Id*. at 349.

[81] *TransUnion*, 141 S. Ct. at 2200.

[82] *Id*. at 2201.

[83] *Id*.

[84] *Id*. (citing 31 C.F.R. pt. 501, App. A (2020)).

[85] *Id*. at 2202 (TransUnion eventually removed OFAC alert from Ramirez' credit file); *id*. at 2215 (Thomas, J., dissenting).

[86] *Id*. at 2202 (citing 15 U.S.C. § 1681e(b)).

[87] *Id*. (citing 15 U.S.C. §§ 1681g(a)(1) & (c)(2)). Ramirez complained that TransUnion did not send him all the information in his credit file in a single mailing. Instead, the information concerning the OFAC alert was sent in a second mailing. He also complained that the second letter did not include a required statement of his rights, though it had been sent with the first letter. *Id*.

[88] *Id*.

[89] *Id*. at 2201-02.

[90] *Id*. at 2202.

Electronic copy available at: https://ssrn.com/abstract=4549914

majority opinion by Justice Kavanaugh found standing for 1853 class members whose credit reports were sent to third-party businesses.[91] The other 6332 class members did not have standing, according to the majority, because the OFAC alerts with respect to those consumers remained in their credit files and were not disseminated to businesses performing credit checks.[92]

The *TransUnion* majority revisited themes highlighted in *Lujan* and *Spokeo*. Requiring a plaintiff to demonstrate a concrete and particularized injury confines courts to their proper role of deciding "the rights of individuals" and helps them avoid resolution of hypothetical or abstract disputes.[93] In deciding whether a plaintiff has demonstrated a concrete harm, "'history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider."[94] Therefore, drawing from language in the *Spokeo* opinion, the majority held that "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts.'"[95] The fact that Congress has authorized suit to vindicate a statutory right does not suffice for Article III standing in the absence of a concrete injury in fact.[96] For purposes of Article III, "an injury in law is not an injury in fact," so only a plaintiff concretely harmed by a defendant's statutory violation may bring suit in federal court.[97]

The *TransUnion* majority contended that the concrete harm requirement is "essential" to maintain the constitutional separation of powers.[98] If the Court did not require concrete harm, Congress could "authorize virtually any citizen to bring a statutory damages suit against virtually any defendant who violated virtually any federal law."[99] Allowing Congress to authorize suit by "*unharmed* plaintiffs" would violate Article III and undermine Executive authority under Article II.[100] Decisions about law enforcement priorities and how aggressively to enforce statutes should be made by Executive Branch officials, not by private plaintiffs and attorneys who have no accountability to the people and no obligation to pursue the public interest.[101]

Applying these principles to the case at hand, the majority decided that the 1853 class members whose credit reports had been circulated with an OFAC alert had demonstrated a concrete injury. The evidence showed that they experienced a harm with a "close relationship" to the reputational injury caused by defamation.[102] The remaining class members did not suffer a concrete harm because they could show nothing akin to "publication," which has been essential to defamation

---

[91] *Id*. at 2208-09.
[92] *Id*. at 2209-10.
[93] *Id*. (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803)).
[94] *Id*. at 2204 (quoting Spring Communications Co. v. APCC Services, Inc., 554 U.S. 269, 274 (2008)).
[95] *Id*. (citing *Spokeo*, 578 U.S. at 341).
[96] *Id*. at 2205 (citing *Spokeo*, 578 U.S. at 341).
[97] *Id*.
[98] *Id*. at 2207.
[99] *Id*. at 2206.
[100] *Id*. at 2207.
[101] *Id*.
[102] *Id*. at 2209.

Electronic copy available at: https://ssrn.com/abstract=4549914

liability.[103] Inaccurate information in an internal credit file does not create a concrete harm when it has never been disseminated to a third party checking the consumer's credit.[104]

One issue the Court had raised in remanding the *Spokeo* case was whether the alleged violations of FCRA procedures created a sufficient risk of harm to the plaintiff to qualify as a concrete injury.[105] The *TransUnion* Court rejected the argument that inclusion of inaccurate OFAC information in credit files created a risk of harm that should afford standing. The majority thought such a risk of harm might suffice to support a claim for forward-looking injunctive relief.[106] But the majority was persuaded that conduct causing a risk of harm will not support a backward-looking award of damages unless the risk materializes or creates some other concrete harm affecting the plaintiff.[107] The Court also found no evidence showing concrete harm to any class member (other than the named plaintiff Ramirez) based on the alleged FCRA violations relating to TransUnion's mailings.[108]

*TransUnion* was a 5-4 decision, with Justice Thomas writing a dissent joined only in part by the other three dissenters.[109] Justice Thomas reiterated the position taken in his *Spokeo* concurrence: "At the time of the founding, whether a court possessed judicial power over an action with no showing of actual damages depended on whether the plaintiff sought to enforce a right held privately by an individual or a duty owed broadly to the community."[110] The view that an individual may sue to vindicate an individual right without showing actual damages "accords proper respect for the power of Congress and other legislatures to define legal rights."[111] In cases involving public rights, like *Lujan*, the Court had required more than just a statutory cause of action, but Justice Thomas believed that a statute creating a private right and a cause of action to vindicate that right should suffice to establish standing under the Court's cases.[112] In support of this position, he discussed early federal copyright and patent statutes.[113] Rather than an "injury in fact," an "injury in law to a private right" was sufficient to establish a justiciable controversy.[114] All of the class members in the *TransUnion* case had standing because all of them established that TransUnion violated duties owed to them individually, not to the community as a whole.[115] The majority's position, "[i]n the name of protecting the separation of powers," had "relieved the legislature of its power to create and define rights."[116] Justice Thomas also offered a variety of

---

[103] *Id*. at 2209-10.
[104] *Id*. at 2210.
[105] *See supra* note 71 and accompanying text.
[106] *TransUnion*, 141 S.Ct. at 2210 (discussing Clapper v. Amnesty Int'l, USA, 568 U.S. 398 (2013)).
[107] *Id*. at 2210-11.
[108] *Id*. at 2213-14.
[109] *Id*. at 2214 (Thomas, J., dissenting).
[110] *Id*. at 2217.
[111] *Id*. at 2218.
[112] *Id*. at 2220.
[113] *Id*. at 2217.
[114] *Id*. ("While the Court today discusses the supposed failure to show 'injury in fact,' courts for centuries held that injury in law to a private right was enough to create a case or controversy.").
[115] *Id*. at 2218.
[116] *Id*. at 2221.

Electronic copy available at: https://ssrn.com/abstract=4549914

arguments for finding a concrete harm, or risk of harm, even under the majority's view of the law of standing.[117]

While Justices Kagan, Breyer and Sotomayor all "joined" Justice Thomas' dissent, they also joined a separate dissent by Justice Kagan disagreeing with Justice Thomas' position that violation of an individual right created by Congress automatically confers standing.[118] They characterized this as a minor disagreement with limited consequences, and otherwise embraced Justice Thomas' conclusion that there were multiple grounds upon which the Court should find concrete harm to all of the *TransUnion* class members.[119] They thought courts should generally defer to congressional efforts to confer standing, because Congress "is better suited than courts to determine when something causes a harm or risk of harm in the real world."[120]

## II.    Private Enforcement of Statutory Forfeitures in Early Federal Legislation

*Lujan* and its lineal descendants restrict legislative power based on an understanding of what made for a justiciable "case" or "controversy" in the eighteenth century Anglo-American legal systems that provide the historical context for interpreting Article III.[121] In this view, courts were not established to answer abstract legal questions, but rather to remedy injuries that arose from unlawful conduct.[122] An individual could litigate when unlawful conduct produced concrete and particularized harm to that person.[123] When unlawful conduct affected only interests shared by the community collectively, however, the proper litigant was a public official.[124]

Evidence supporting the Court's understanding of Anglo-American legal history can be found in the Woolhandler and Nelson article mentioned in Justice Thomas' *Spokeo* concurrence.[125] The

---

[117] *Id*. at 2221-24.

[118] *Id*. at 2226 (Kagan, J., dissenting).

[119] *Id*. at 2224-26.

[120] *Id*. at 2226.

[121] *See Lujan*, 504 U.S. at 559-60 (doctrine of standing identifies, per Madison in Federalist No. 48, one of the "landmarks" that identify disputes appropriate for judicial resolution), 576 (concrete injury requirement "fundamental to the separate and distinct constitutional role of the Third Branch" consistent with "province" of courts described in Marbury v Madison); *Spokeo*, 579 U.S. at 340-41 (history plays important role in resolving standing issues because case or controversy requirements "is grounded in historical practice"); *TransUnion*, 141 S. Ct. at 2204 (history and tradition offer a meaningful guide to types of cases Article III empowers courts to resolve); Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U.L. REV. 881, 882 (1983) (standing offers "an accurate description of the sort of business courts had traditionally entertained, and hence of the distinctive business to which they were presumably to be limited under the Constitution").

[122] *See Lujan*, 504 U.S. at 560-61 (standing doctrine requires concrete injury, caused by unlawful conduct, likely redressed by favorable decision); *Spokeo*, 578 U.S. at 340 (injury must be concrete, rather than abstract); *id*. at 347 (Thomas, J., concurring) ("standing doctrine keeps courts out of political disputes by denying private litigants the right to test the abstract legality of government action"); *TransUnion*, 141 S. Ct. at 2203 (federal courts do not resolve hypothetical or abstract disputes; only resolve "a real controversy with real impact on real persons").

[123] *See Lujan*, 504 U.S. at 560 (elements of standing), 564 (affidavits show no imminent injury to individual group members), 576 (province of courts is to resolve rights of individuals); *TransUnion*, 141 S. Ct. at 2203 ("[r]equiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only 'the rights of individuals'").

[124] *See Lujan*, 504 U.S. at 577 (Article II gives President the duty to ensure faithful execution of the laws); *TransUnion*, 141 S. Ct. at 2207 (suits by unharmed plaintiffs would Executive Branch authority under Article II).

[125] *See* Woolhandler & Nelson, *supra* note 73.

Electronic copy available at: https://ssrn.com/abstract=4549914

authors point, for example, to the law of public nuisance, relied upon by Justice Thomas in his separate writings in *Spokeo* and *TransUnion*.[126] Courts traditionally would not allow individuals to litigate public nuisance claims unless they could show some special injury, different from the injury suffered by the community as a whole.[127] This special injury requirement resembles modern standing doctrine's requirement of a particularized injury and its denial to individuals of standing to litigate generalized grievances. Apart from the law of public nuisance, Woolhandler and Nelson highlight other early English and American cases in which courts made decisions concerning who could litigate particular issues that seemingly point the way toward something like modern standing doctrine.[128]

At the same time, the historical claims made in the *Lujan* line of cases seem to significantly outstrip the evidence provided by either the Court or the academic literature. When the Court indicates that standing doctrine is "rooted in the traditional understanding of a case or controversy,"[129] it makes a sweeping claim about Anglo-American litigation in the late eighteenth century. Identifying discrete areas of law where courts imposed something like a particularized injury requirement falls short of establishing the broader proposition that a lawsuit by an individual lacking a concrete and particularized injury would not be recognized as a "case" or "controversy" by eighteenth-century lawyers and judges.

A number of scholars have argued that the Court's historical understanding of standing to sue in public actions fails to account for important aspects of eighteenth century Anglo-American legal practice.[130] One line of evidence concerns English case law allowing individuals to pursue prerogative writs like mandamus or prohibition to compel performance of public duties.[131] The Georgia Supreme Court, applying originalist principles, recently relied on this body of evidence to reject application of federal standing rules in Georgia courts.[132] Reviewing the eighteenth century English law concerning prerogative writs and finding it consistent with subsequent Georgia case law, the court concluded that "people with a meaningful stake in their community are injured when their local governments violate the legal duty to follow the law."[133] When local officials act unlawfully, the injury that supports litigation in Georgia state courts "can be a generalized one that affects the public at large and is not unique to the plaintiff."[134]

---

[126] *Id.* at 700-03; *Spokeo*, 578 U.S. at 345 (Thomas, J., concurring).

[127] Woolhandler & Nelson, *supra* note 73, at 702-03 (quoting Pennsylvania v. Wheeling & Belmont Bridge Co., 54 U.S. (13 How.) 518, 626 (1862) (bridge obstructing river caused "special damage" to plaintiff) and Mayor of Georgetown v. Alexandria Canal Co., 37 U.S. (12 Pet.) 91, 99 (1838) ("in case of public nuisance, where a bill is filed by a private person, asking for relief by way of prevention, the plaintiff cannot maintain a stand in a court of equity; unless he avers and proves some special injury").

[128] Woolhandler & Nelson, *supra* note 73, at 703-06.

[129] *Spokeo*, 578 U.S. at 338.

[130] Raoul Berger, *Standing to Sue in Public Actions: Is It a Constitutional Requirement?*, 78 YALE L.J. 816 (1969); Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 STAN. L. REV. 1371, 1394-1409 (1988).

[131] Louis L. Jaffe, *Standing to Secure Judicial Review in Public Actions*, 74 HARV. L. REV. 1265, 1269-70 (1961).

[132] Sons of Confederate Veterans v. Henry County Board of Commissioners, 315 Ga. 39, 46-49, 880 S.E.2d 168 (2022).

[133] *Id.* at 54.

[134] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4549914

The historical argument for federal standing doctrine has also been criticized because it fails to adequately account for the extended history of Anglo-American legislation authorizing *qui tam* actions and related forms of popular enforcement.[135] This history led the Supreme Court in *Vermont Agency* to find *qui tam* litigation compatible with Article III.[136] However, the Court failed to consider broader implications of its analysis for standing doctrine and quickly returned to reciting standing principles difficult to square with the extensive early American tradition of public litigation by uninjured informers.[137] To see how the case or controversy limitation was understood in the framing generation, this section will examine methods of enforcing statutory forfeitures in federal legislation enacted in the decade following ratification of the Constitution.

A.      **The Theory and Practice of Popular Enforcement**

Beginning in the fourteenth century, Parliament regularly enacted legislation permitting any member of the public to collect forfeitures imposed for violation of statutory requirements.[138] As the Supreme Court explained in its 1905 decision in *Marvin v. Trout*:

> Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government. The right to recover the penalty or forfeiture granted by statute is frequently given to the first common informer who brings the action, although he has no interest in the matter whatever except as such informer.[139]

Legislation providing for popular enforcement allowed the successful informer to keep part or all of the forfeiture recovered from the defendant.[140] This statutory bounty provided an incentive for private enforcement of legislation at a time when government enforcement resources were far more limited.[141] Legislatures in the American colonies and the early states, facing the same statutory enforcement challenge as the English Parliament, routinely enacted comparable statutes on this side of the Atlantic.[142] As we will see, in a time before the establishment of massive federal bureaucracies, Congress likewise turned repeatedly to popular enforcement to implement statutes that might otherwise go underenforced.[143]

The *Marvin* Court cited two passages from Blackstone's *Commentaries on the Laws of England* discussing legislation authorizing suit by common informers.[144] The first passage, from Book III

---

[135] *See* Berger, *supra* note 130, at 825-27; Winter, *supra* note 130, at 1406-09; Randy Beck, *Qui Tam Litigation Against Government Officials: Constitutional Implications of a Neglected History*, 93 NOTRE DAME L. REV. 1235, 1305-06 (2018).

[136] *Vermont Agency*, 529 U.S. at 774-77.

[137] *See* Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1257-59.

[138] *Id*. at 1259-68; Randy Beck, *The False Claims Act and the English Eradication of Qui Tam Legislation*, 78 N.C. L. Rev. 539, 567-601 (2000) [hereinafter Beck, *English Eradication*].

[139] 199 U.S. 212, 225 (1905).

[140] Beck, *English Eradication*, *supra* note 138, at 551.

[141] *Id*. at 565-66.

[142] Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1269-91.

[143] *See infra* notes 192-264 and accompanying text.

[144] *Marvin*, 199 U.S. at 225.

Electronic copy available at: https://ssrn.com/abstract=4549914

on "Private Wrongs," described "penal statutes," acts of Parliament that inflicted forfeitures "for transgressing the provisions therein enacted."[145] The person violating a penal statute was "bound by the fundamental contract of society" to pay the forfeiture "to such persons as the law requires."[146] Blackstone explains that the person authorized to collect the forfeiture would usually be either "the party grieved" or "any of the king's subjects in general."[147] Blackstone suggests that the latter option—popular enforcement—was more common:

> [M]ore usually, these forfeitures created by statute are given at large, to any common informer; or, in other words, to any such person or persons as will sue for the same and hence such actions are called popular actions, because they are given to the people in general. Sometimes one part is given to the king, to the poor, or to some public use, and the other part to the informer or prosecutor; and then the suit is called a *qui tam* action, because it is brought by a person "*qui tam pro domino rege, &'c, quam pro seipso in hac parte sequitur.*" If the king therefore himself commences this suit, he shall have the whole forfeiture. But if any one hath begun a *qui tam*, or *popular*, action, no other person can pursue it; and the verdict passed upon the defendant in the first suit is a bar to all others and conclusive even to the king himself.[148]

This passage from the *Commentaries* highlights a range of recognized eighteenth century legislative options for enforcing penal statutes.[149] The conduct forbidden by the statute might affect some individual in a particularized way, and the legislature could give the cause of action and the resulting forfeiture to an aggrieved party.[150] Under other statutes, "the king himself" might institute an action to collect the forfeiture, presumably through some public official.[151] But the legislature also had a third option it relied on frequently; it could award the statutory forfeiture to "any such person as will sue for the same."[152] When a statute incorporated this option, the resulting litigation was called a "popular action" because Parliament had created statutory rights enforceable by "the people in general."[153] "*Qui tam*" actions were a subset of the broader category of "popular actions." In a *qui tam* action, the informer sued for the king and for himself, and the statute required a successful informer to share any recovery with the king or with individuals responsible to further some communal purpose.[154]

---

[145] 3 Blackstone, Commentaries *159.

[146] *Id.*

[147] *Id.* at *159-60.

[148] *Id.* at *160.

[149] Beck, *English Eradication*, *supra* note 138, at 550.

[150] 3 Blackstone, *Commentaries*, at *160.

[151] *Id.* Technically, Blackstone is here discussing "the king" bringing suit under a statute authorizing a popular action. However, eighteenth century statutes sometimes imposed forfeitures without making provision for popular enforcement, presumably leaving the initiation of enforcement actions to public officials. *See, e.g.*, 4 Geo.3, ch.34, § 3 (1764) (forfeiture imposed if a governors or commander in chief in an American colony gave assent to legislation providing for creating or issuing paper bills of credit; no provision for suit by common informer).

[152] 3 Blackstone, *Commentaries*, at *160.

[153] *Id.*

[154] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4549914

The *Marvin* Court also cited a passage from Blackstone's Book II on "Things."[155] In discussing ways one might come to own property, Blackstone explains that a person could acquire property rights by litigating under a penal statute that gave the statutory penalty to "him or them that will sue for the same":

> He obtains an inchoate imperfect degree of property, by commencing his suit: but it is not consummated till judgment; for, if any collusion appears, he loses the priority he had gained. But, otherwise, the right so attaches in the first informer, that the king (who before action brought may grant a pardon which shall be a bar to all the world) cannot after suit commenced remit any thing but his own part of the penalty. For by commencing the suit the informer has made the popular action his own private action, and it is not in the power of the crown, or of any thing but parliament, to release the informer's interest.[156]

A statutory forfeiture given to a common informer is "placed as it were in a state of nature, accessible by all the king's subjects."[157] Such forfeitures can thus be analogized to animals in the wild, "open . . . to the first occupant, who declares his intention to possess them by bringing his action."[158]

A third relevant passage of the *Commentaries*, from Book IV on "Public Wrongs," was not cited by the *Marvin* Court, but rounds out Blackstone's discussion of popular enforcement. In a chapter on "the Several Modes of Prosecution," after discussing presentments and indictments, Blackstone discusses proceedings by "information":

> INFORMATIONS are of two sorts: first, those which are partly at the suit of the king, and partly at that of a subject; and secondly, such as are only in the name of the king. The former are usually brought upon penal statutes, which inflict a penalty upon conviction of the offender, one part to the use of the king, and another to the use of the informer; and are a sort of *qui tam* actions, (the nature of which was explained in a former volume) only carried on by a criminal instead of a civil process[.][159]

It was common for English penal statutes to offer the informer a variety of procedural options for collecting a statutory forfeiture, including a civil action of debt and a criminal information.[160] Chief Justice Marshall noted that "[a]lmost every fine or forfeiture under a penal statute, may be recovered by an action of debt as well as by information" and concluded that the same statute of limitations should apply, no matter which procedure an informer selected.[161]

---

[155] *Marvin*, 199 U.S. at 225.
[156] 2 Blackstone, *Commentaries*, at *437.
[157] *Id*. at *438.
[158] *Id*.
[159] 4 Blackstone, *Commentaries* *308.
[160] Beck, *English Eradication*, *supra* note 138, at 552.
[161] Adams v. Woods, 6 U.S. (2 Cranch.) 336, 341 (1805).

Electronic copy available at: https://ssrn.com/abstract=4549914

### B.   *Vermont Agency* and Popular Enforcement of Early Federal Legislation

The most significant remaining federal *qui tam* provision appears in the False Claims Act (FCA).[162] The statute was enacted during the Civil War to address fraud affecting Union army procurement.[163] Congress scaled back *qui tam* enforcement of the FCA during World War II, and considered eliminating popular enforcement altogether.[164] However, new procurement scandals in the 1980's led Congress to substantially increase the potential financial rewards available to those filing *qui tam* actions under the statute.[165] Congress decided to expand *qui tam* litigation to incentivize disclosure of fraudulent conduct, supplement federal enforcement resources and counter Justice Department resistance to vigorous implementation of the statute.[166]

Nearly a decade after Congress revived popular enforcement of the FCA, Jonathan Stevens filed a *qui tam* action in the name of the United States against his former employer, the Vermont Agency of Natural Resources (VANR).[167] The complaint alleged that VANR had defrauded the United States by submitting falsified time and attendance records for employees whose work was funded by Environmental Protection Agency (EPA) grants.[168] The Supreme Court granted *certiorari* to address whether a state agency is a "person" who can be sued under the FCA and whether sovereign immunity protects the state against a popular action by a private relator.[169] However, the Supreme Court also asked the parties to file supplemental briefs on the question: "Does a private person have standing under Article III to litigate claims of fraud upon the government?"[170]

The *Vermont Agency* Court ultimately concluded 7-2 that a state agency was not a "person" subject to a *qui tam* action under the FCA, but the Court was unanimous in finding that Stevens, as a *qui tam* relator, satisfied Article III standing requirements.[171] The majority laid out the "irreducible constitutional minimum" of standing from *Lujan*—the three-part injury-causation-redressability test—but with one major alteration: Justice Scalia's opinion omitted the word "particularized" in describing the constitutionally-required attributes of an Article III injury in fact.[172] Stevens argued that his action would "remedy an injury in fact suffered by the United States."[173] The majority readily concluded that the complaint disclosed sufficient allegations of injury to the United States, "both the injury to its sovereignty arising from violation of its

---

[162] *See* Beck, *English Eradication*, *supra* note 138, at 554-55.

[163] *Id*. at 555-56.

[164] *Id*. at 556-61.

[165] *Id*. at 561-65.

[166] *Id*. at 562-65.

[167] U.S. ex rel. Stevens v. Vermont Agency of Natural Resources, 162 F.3d 195 (2d Cir. 1998).

[168] *Id*. at 198; *Vermont Agency*, 529 U.S. at 770.

[169] Petition for Writ of Certiorari, State of Vermont Agency of Natural Resources v. United States of America *ex rel.* Stevens, at i (May 12, 1999) (Questions Presented); Vermont Agency of Natural Resources v. U.S. ex rel. Stevens, 537 U.S. 1034 (1999) (granting certiorari).

[170] *See* Vermont Agency of Natural Resources v. United States ex rel. Stevens, 528 U.S. 1015 (1999).

[171] *See Vermont Agency*, 529 U.S. at 771-78 (majority opinion), 788 (Ginsburg, J., concurring in the judgment), 801 (Stevens, J., dissenting).

[172] *Id*. at 771.

[173] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4549914

laws . . . and the proprietary injury resulting from the alleged fraud."[174] This did not answer the standing question, however, because "Art. III judicial power exists only to redress or otherwise to protect against injury *to the complaining party*."[175]

The majority first considered the possibility that one could characterize Stevens as an agent for the United States, and that the statutory bounty amounted to a fee paid to the agent out of the government's recovery.[176] This analysis failed to do justice to the statutory scheme, in the majority's view, because the FCA gives the relator an individual interest in the lawsuit.[177] The statute allows an individual to file an action "for the person and for the United States Government."[178] The relator may continue participating in the litigation, even if the Department of Justice intervenes and assumes primary responsibility for the lawsuit.[179] The relator is also entitled to a hearing if the Department of Justice voluntarily dismisses the case and to a judicial determination of the fairness of any settlement reached over the relator's objection.[180] The relator's statutory interest in the litigation puts the individual in a role distinct from that of a mere agent for the government.

The majority also considered the argument that standing could be based on the statutory bounty paid to a successful relator. The right to share in the potential recovery certainly gave the relator a concrete interest in the outcome of the suit.[181] But the majority thought an interest in the outcome of litigation is not enough under Article III unless it "consist[s] of obtaining compensation for, or preventing, the violation of a legally protected right."[182] "A *qui tam* relator has suffered no such invasion[.]"[183] The majority reasoned that the bounty itself would not suffice as a basis for standing in light of prior cases indicating that standing cannot be grounded in rights that are a "byproduct" of the litigation, like an award of attorneys' fees or a right to recover litigation costs.[184]

The majority ultimately found a basis for a *qui tam* relator's standing in cases involving assignment of claims:

> We believe . . . that adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the injury in fact suffered by the assignor. The FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim. Although we have never expressly recognized

---

[174] *Id*.

[175] *Id*. at 771-72 (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975) (emphasis added by the *Vermont Agency* Court)).

[176] *Id*. at 772.

[177] *Cf. supra* notes 156-58 and accompanying text (Blackstone's discussion of acquisition of property rights by filing popular action).

[178] *Id*. (quoting 31 U.S.C. § 3730(b)).

[179] *Id*. (citing 31 U.S.C. § 3730(c)(1)).

[180] *Id*. (citing 31 U.S.C. § 3730(c)(2)(A)-(B)).

[181] *Id*.

[182] *Id*.

[183] *Id*.

[184] *Id*. at 773 (citing Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 107 (1998) and Diamond v. Charles, 476 U.S. 54, 69-71 (1986)).

Electronic copy available at: https://ssrn.com/abstract=4549914

"representational standing" on the part of assignees, we have routinely entertained their suits, and also suits by subrogees, who have been described as "equitable assign[ees.]"[185]

Viewing the *qui tam* relator as a partial assignee, the majority concluded that "the United States' injury in fact suffices to confer standing on respondent Stevens."[186]

In light of the oft-emphasized originalist rationale for standing doctrine, the majority thought its conclusion "confirmed" by "the long tradition of *qui tam* actions in England and the American Colonies."[187] The majority noted the advent of statutes authorizing *qui tam* litigation in the 14th century:

> These were of two types: those that allowed injured parties to sue in vindication of their own interests (as well as the Crown's), and—more relevant here—those that allowed informers to obtain a portion of the penalty as a bounty for their information, even if they had not suffered an injury themselves[.][188]

While the majority acknowledged that *qui tam* litigation had given rise to various abuses, leading to statutory reforms, it noted that England continued to allow *qui tam* actions by informers until 1951.[189] In the time period most relevant to the Court's originalist analysis of Article III, *qui tam* legislation was widespread at both the state and federal levels:

> *Qui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after the framing of the Constitution. Although there is no evidence that the Colonies allowed common-law *qui tam* actions (which, as we have noted, were dying out in England by that time), they did pass several informer statutes expressly authorizing *qui tam* suits. Moreover, immediately after the framing, the First Congress enacted a considerable number of informer statutes. Like their English counterparts, some of them provided both a bounty and an express cause of action; others provided a bounty only.[190]

This history was "well nigh conclusive" with respect to the question of whether *qui tam* actions by uninjured informers presented "cases" or "controversies" amenable to judicial resolution when Article III was adopted.[191] The sections that follow will consider some of the statutes of the First Congress relied upon by the *Vermont Agency* majority, as well as other late 18th century federal penal statutes from the first decade following ratification of the Constitution.

### 1. Private Enforcement of Early Federal Penal Statutes

*Vermont Agency* recognized that the first Congress authorized informers without any particularized injury to enforce statutory rights of the public at large,[192] a pattern that continued

---

[185] *Id*. at 773-74 (citations omitted).
[186] *Id*. at 774.
[187] *Id*.
[188] *Id*. at 775 (citations omitted).
[189] *Id*. at 775-76.
[190] *Id*. at 776-77 (citations omitted).
[191] *Id*. at 777.
[192] *See supra* notes 183, 190 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=4549914

in legislation passed by subsequent Congresses. Provision for popular enforcement was common when Congress sought to regulate decentralized activity—*e.g.*, the slave trade or trade with Native American tribes—that might take place in remote areas outside the view or reach of federal officials.[193] Congress also authorized *qui tam* actions in contexts like revenue collection where Congress had funded a sizable federal workforce, but needed some means to monitor and regulate the conduct of federal officials.[194] Early legislative reliance on popular enforcement was selective, with Congress deploying all three enforcement options discussed by Blackstone.[195] Sometimes the same legislation would impose multiple forfeitures enforced in different ways, some by uninjured common informers, others by federal officials and still others by aggrieved parties.

### a.  *Revenue Collection and Financial Controls*

The earliest federal tax statutes provided for collection of duties on imports and tonnage of ships.[196] The regulatory framework concentrated most law enforcement power in federal revenue officials. Forfeitures provided for in the 1789 collection statute and its 1790 successor were generally enforced by federal collectors appointed under the legislation.[197] However, the 1789 statute did include provisions allowing uninjured private informers to collect forfeitures from federal officials who failed to take the statutorily-required oath or who neglected to post "a fair table of the rates of fees, and duties demandable by law."[198] The 1790 statute again allowed uninjured informers to collect the penalty for failure to post a table of fees and duties and also a new forfeiture when a federal official failed to "give a receipt for the fees he shall receive, specifying the particulars."[199] In addition to these provisions allowing popular enforcement against federal officials, both the 1789 and 1790 statutes included a forfeiture "for the use of the party grieved" if a customs officer demanded or received more compensation than the law authorized for performing statutory duties.[200]

Congressional reliance on popular enforcement in the process of revenue collection greatly expanded in 1791 when Congress imposed duties on distilled spirits produced within the United States, and not just spirits imported from abroad.[201] The statute's enforcement provision

---

[193] *See infra* notes 214-30, 240-42 and accompanying text.

[194] *See infra* notes 196-209 and accompanying text.

[195] *See supra* notes 146-54 and accompanying text.

[196] *See* Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1291-96.

[197] *See* An Act to Regulate the Collection of the Duties Imposed by Law on the Tonnage of Ships or Vessels, and on Goods, Wares and Merchandises Imported into the United States, ch. 5, 1 Stat. 29, § 36 (1789) [hereinafter 1789 Collection Act]; An Act to Provide More Effectually for the Collection of the Duties Imposed by Law on Goods, Wares and Merchandise Imported into the United States, and on the Tonnage of Ships or Vessels, ch. 35, 1 Stat. 145, § 67 (1790) [hereinafter 1790 Collection Act]. While these statutes did not allow an informer to sue for most of the penalties specified in the legislation, they did provide for someone who provided information on which an action was based to receive a quarter of the proceeds. *See* 1789 Collection Act, *supra*, § 48; 1790 Collection Act, *supra*, § 69.

[198] 1789 Collection Act, *supra* note 197, §§ 8, 29.

[199] 1790 Collection Act, *supra* note 197, § 55.

[200] 1789 Collection Act, *supra* note 197, § 29; 1790 Collection Act, *supra* note 197, § 55.

[201] *See* An Act Repealing, After the Last Day of June Next, the Duties Heretofore Laid upon Distilled Spirits Imported from Abroad, and Laying Others in Their Stead; and Also upon Spirits Distilled Within the United States,

Electronic copy available at: https://ssrn.com/abstract=4549914

indicated that half of any penalty (unless otherwise allocated) would go to the person who made a seizure authorized by the legislation or who first discovered the facts giving rise to the forfeiture.[202] The forfeiture could be collected through an action of debt maintained in the name of the person entitled to it or through an information filed in the name of the United States.[203] One penalty subject to popular enforcement under the statute applied to federal officials who colluded to help individuals violate or evade the statute.[204] The legislation also allowed informers to collect penalties from private parties for actions such as removing spirits from a distillery at night,[205] importing spirits in undersized containers,[206] or offering bribes to federal revenue officers.[207] Statutes of the Second Congress added more alcohol-related tax forfeitures subject to popular enforcement.[208] The Third Congress incorporated common informers into enforcement of new duties imposed on carriages.[209]

The First Congress also authorized private citizens to help enforce statutes establishing government financial controls. The legislation organizing the Treasury Department created penalties for officials with specified conflicts of interest or who reaped unauthorized personal gains in conducting business for the government.[210] The statute provided that "if any other person than a public prosecutor shall give information of any such offence," resulting in a conviction, the person "giv[ing] information" was entitled to half the forfeiture.[211] This statute might be read as simply providing a reward for private testimony leading to conviction, but assuming it authorized the private informer to file an "information" to initiate the prosecution, an option mentioned by Blackstone, then it amounts to a *qui tam* provision.[212] Another statute of the First Congress, incorporating the Bank of the United States, authorized popular enforcement of

---

and for Appropriating the Same, ch. 15, 1 Stat. 199 (1791) [hereinafter Distilled Spirits Act]; Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1296-98.

[202] *See Distilled Spirits Act*, *supra* note 201, § 44.

[203] *Id*. The provision instructed the federal attorney for the district where the penalty was incurred to file an information in the name of the United States upon application. *Id*.

[204] *Id*. § 49.

[205] *Id*. § 20.

[206] *Id*. § 33.

[207] *Id*. § 47. *See generally* Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1296-97 & nn. 400-403.

[208] *See* An Act for Raising a Farther Sum of Money for the Protection of the Frontiers, and for other purposes therein mentioned; ch. 27, 1 Stat. 259, § 11 (May 2, 1792) (forfeiture for failing to declare wine held for sale prior to adoption of statute); An Act Concerning Duties on Spirits Distilled Within the United States, ch. 32, 1 Stat. 267, §§ 13 (new forfeitures), 17 (incorporating enforcement mechanisms from 1791 act) (May 8, 1792).

[209] *See* An Act Laying Duties Upon Carriages for the Conveyance of Persons, ch. 45, § 10 (June 5, 1794). The statute gave half of any penalty or forfeiture to the person (not a federal inspection officer) who "shall first give information of the cause, matter or thing" giving rise to liability. *Id*. The provision also authorized suit in any federal or state court of competent jurisdiction. *Id*. While the statute did not expressly say that the private informer could file the suit, the Supreme Court has suggested, at least in dictum, that "[s]tatutes providing for a reward to informers which do not specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943) (citing Adams v. Woods, 2 Cranch 336 (1805)); *see Vermont Agency*, 529 U.S. at 777 n.7 (reciting this rule of construction and characterizing it as dictum).

[210] *See* An Act to Establish the Treasury Department, ch. 12, 1 Stat. 65, § 8 (Sept. 2, 1789); *see also* An Act Supplemental to the Act "Establishing the Treasury Department," and for a Farther Compensation to Certain Officers, ch. 18, 1 Stat. 215, § 1 (March 3, 1791) (forfeitures applied to additional Treasury officials).

[211] *Id*.

[212] Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1300-01.

Electronic copy available at: https://ssrn.com/abstract=4549914

forfeitures for engaging in prohibited business transactions or for lending money above specified thresholds without statutory authorization to the federal government or to state or foreign governments.[213]

> b. *Managing Relations with Native American Tribes*

Several early federal statutes relied on common informers to enforce laws regulating interactions with indigenous Native American populations. Popular enforcement may have made sense to Congress in this context on the ground that the sparse federal presence in frontier areas could hinder monitoring and enforcement by Executive Branch officials. The First Congress required a federal license before a person could "carry on any trade or intercourse with the Indian tribes."[214] A person attempting to trade without a license would forfeit merchandise in the person's possession "one half to the benefit of the person prosecuting, and the other half to the benefit of the United States."[215]

The Second Congress replaced the 1791 statute with an expanded regulatory regime.[216] Again, unlicensed attempts to trade with Native American tribes resulted in forfeiture of merchandise, together with fines and imprisonment.[217] A new forfeiture applied to someone who settled on lands belonging to a Native American tribe.[218] Another provision regulated the purchase of horses from Native American territory,[219] and an unauthorized attempt to purchase land from a tribe could result in a fine and imprisonment.[220] A federal official with trade licensing authority was subject to a forfeiture if the official had an interest in a regulated transaction.[221] The enforcement provision of the new statute specified that "all fines and forfeitures" under the act would be divided "one half to the use of the informant, and the other half, to the use of the United States, except where the prosecution shall be first instituted on behalf of the United States, in which case, the whole shall be to their use."[222] This provision tracks Blackstone's discussion of penal statute enforcement in England, which indicated that the king might get a share of a forfeiture collected by a common informer, but could keep the entire forfeiture if the king himself pursued the enforcement action.[223]

The Fourth Congress again replaced prior regulatory regimes designed to preserve harmony with Native American tribes.[224] This statute retained the prior provision for the informer to keep half

---

[213] An Act to Incorporate the Subscribers to the Bank of the United States, ch. 10, 1 Stat. 191, §§ 8-9 (Feb. 25, 1791); Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1301-02.
[214] An Act to Regulate Trade and Intercourse with the Indian Tribes, ch. 33, 1 Stat. 137 (July 22, 1790).
[215] *Id*. § 3.
[216] An Act to Regulate Trade and Intercourse with the Indian Tribes, ch. 19, § 1, 1 Stat. 329 (Mar. 1, 1793); *see* Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1304-05.
[217] An Act to Regulate Trade and Intercourse with the Indian Tribes, *supra* note 216, § 3.
[218] *Id*. § 5
[219] *Id*. § 6.
[220] *Id*. § 8.
[221] *Id*. § 7.
[222] *Id*. § 12.
[223] *See supra* note 148 and accompanying text.
[224] An Act to Regulate Trade and Intercourse with the Indian Tribes, and to Preserve Peace on the Frontiers, ch. 30, 1 Stat. 469, § 21 (May 19, 1796).

Electronic copy available at: https://ssrn.com/abstract=4549914

of any fine or forfeiture unless the United States sued first.[225] Penalties were imposed for a variety of violations, including entering Native American territory without a passport or with hostile intent,[226] settling on tribal land,[227] engaging in unauthorized trade,[228] and purchasing tribal land.[229] The Fifth Congress again passed legislation on this topic, covering much of the same ground as prior statutes and including a comparable provision for popular enforcement.[230]

### c.  *Postal Service Regulations*

Postal regulations adopted under the Articles of Confederation were enforced by actions in state court pursued by either the Postmaster General or the Treasurer of the United States.[231] Under the new Constitution, however, the Second Congress shifted to a set of postal regulations enforced in significant part by *qui tam* informers.[232] The enforcement provision specified that "all pecuniary penalties and forfeitures, incurred under this act" would be distributed "one half for the use of the person or persons informing and prosecuting for the same" and the other half to the United States.[233] Some forfeitures imposed under the statute penalized acts by private parties, such as obstructing the mail, operating a competing postal service or evading payment of postage by counterfeiting the handwriting of someone with franking privileges.[234] Other forfeitures enforceable by private informers regulated actions of postal service employees. Postal workers could be sued, for instance, for seeking payments greater than the postage rates established by law or for delaying, hiding or stealing letters or newspapers in their possession.[235] Subsequent postal statutes adopted by the Third and Fifth Congresses contained comparable provisions, including provisions for popular enforcement by *qui tam* informers.[236]

### d.  *Shipping Regulations, the Slave Trade and Import/Export Controls*

Early Congresses frequently turned to popular enforcement in statutes regulating the shipping industry or imposing controls on imports or exports. A statute of the First Congress, for instance, called on *qui tam* informers to enforce rules concerning the relationship between seamen and their employers. The master or commander of a ship could forfeit $20 for every seaman or mariner who had not signed a written contract, "one half to the use of the person prosecuting for the same" and the other half to the United States.[237] Another provision imposed a forfeiture of

---

[225] *Id*. § 18.

[226] *Id*. §§ 3-4.

[227] *Id*. § 5.

[228] *Id*. § 8-11.

[229] *Id*. § 12.

[230] *See* An Act to Regulate Trade and Intercourse with the Indian Tribes, and to Preserve Peace on the Frontiers, ch. 46, 1 Stat. 743 (Mar. 3, 1799).

[231] *See* Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1302-03.

[232] *Id*. at 1304.

[233] An Act to Establish the Post-Office and Post-Roads Within the United States, ch. 7, 1 Stat. 232, § 25 (Feb. 20, 1792).

[234] *Id*. §§ 5, 14, 20.

[235] *Id*. § 11, 16, 22

[236] *See* An Act to Establish the Post-Office and Post-Roads Within the United States, ch. 23, 1 Stat. 354, § 25 (May 8, 1794); An Act to Establish the Post-Office of the United States, ch. 43, 1 Stat. 733, § 24 (Mar. 2, 1799).

[237] An Act for the Government and Regulation of Seamen in the Merchants Service, ch. 29, 1 Stat. 131, § 1 (July 20, 1790).

Electronic copy available at: https://ssrn.com/abstract=4549914

$10 per day on any person who harbored or hid a seaman who was supposed to be onboard ship, half payable to the person who prosecuted the action.[238] These *qui tam* provisions were in addition to other portions of the statute creating remedies for seamen against their employers and vice versa.[239]

Popular enforcement played a key role in early statutes seeking to suppress the slave trade. A statute of the Third Congress prohibited use or preparation of a U.S. ship for trade or traffic in slaves. Violations could result in seizure and forfeiture of the vessel, and each person knowingly aiding and abetting the violation would forfeit $2000, half to the federal government and the other half "to the use of him or her who shall sue for and prosecute the same."[240] A U.S. citizen would forfeit $200 per person received or transported from abroad for sale into slavery, with half allocated to the person who sued.[241] The legislation organizing the Mississippi Territory (after it was ceded to the federal government by Georgia) provided that any person importing slaves into the territory from outside the United States would forfeit $300 per slave, half to the United States "and the other moiety for the use of any person or persons who shall sue for the same."[242]

International tensions sometimes resulted in legislation designed to further diplomatic or military aims and Congress made selective decisions about who would be entitled to enforce particular provisions. For instance, the Third Congress temporarily restricted export of armaments, providing for enforcement by federal customs and revenue officers.[243] Another statute of the same Congress, however, provided that a ship outfitted in this country for hostilities against a country at peace with the United States would be forfeited, "one half to the use of any person who shall give information of the offence" and the other half to the government.[244] The Fifth

---

[238] *Id.* § 4.

[239] *See id.* §§ 1 (compensation owed from employer to seaman without a contract), 2 (allowing employer to dock wages of seaman who fails to be on ship when scheduled), 3 (remedies if crew complains about fitness of vessel), 5 (forfeiture by seaman absent for more than 48 hours), 7 (employer's remedies against a deserter), 9 (compensation due if ship required to impose short allowances). The First and Second Congresses adopted legislation setting up a system for registration and regulation of ships built in the United States or owned by U.S. citizens. *See* An Act for Registering and Clearing Vessels, Regulating the Coasting Trade, and for Other Purposes, ch. 11, 1 Stat. 55 (Sept. 1, 1789); An Act Concerning the Registering and Recording of Vessels, ch. 1, 1 Stat. 288 (Dec. 31, 1792). The latter act provided that if a U.S. ship did not have its name and port painted on the stern, the owners would forfeit $50, "one half to the person giving the information thereof" and the other half to the United States. An Act Concerning the Registering and Recording of Vessels, *supra*, § 3. However, since these statutes relied principally on enforcement by federal revenue officers, this provision may have simply provided a reward for useful information rather than authorizing the private informer to sue. *See* An Act for Registering and Clearing Vessels, Regulating the Coasting Trade, and for Other Purposes, *supra* § 21 (providing for enforcement using methods employed in legislation for collection of duties); An Act Concerning the Registering and Recording of Vessels, *supra*, § 29 (same).

[240] An Act to Prohibit the Carrying On the Slave Trade from the United States to any Foreign Place or Country, ch. 11, 1 Stat. 347, §§ 1-2 (Mar. 22, 1794).

[241] *Id.* § 4.

[242] An Act for an Amicable Settlement of Limits with the State of Georgia, and Authorizing the Establishment of a Government in the Mississippi Territory, ch. 28, 1 Stat. 549, § 7 (Apr. 7, 1798). The legislation provided that a person imported into the Mississippi Territory in violation of the act was entitled to freedom. *Id.*

[243] An Act Prohibiting for a Limited Time the Exportation of Arms and Ammunition, and Encouraging the Importation of the same, Ch. 33, 1 Stat. 369, § 4 (May 22, 1794).

[244] An Act in Addition to the Act for the Punishment of Certain Crimes Against the United States, ch. 50, 1 Stat. 381, § 3 (June 5, 1794).

Electronic copy available at: https://ssrn.com/abstract=4549914

Congress incorporated popular enforcement into laws relating to the Quasi-War with France. One statute forbade any ship owned or controlled by U.S. residents to travel to a French port, on pain of forfeiting the vessel, with half of the proceeds to the United States and the other half "to the use of any person or persons, citizens of the United States, who will inform and prosecute for the same."[245] Revised legislation on the same topic eight months later continued the ban on travel to French ports and the provision for popular enforcement, but created a defense if the vessel visited the port due to bad weather, shortage of supplies or other unavoidable mishaps.[246]

### e.   *Other Provisions for Popular Enforcement*

Other statutes of the first five Congresses included provisions for popular enforcement of federal laws. For instance, the legislation organizing the first census under the new Constitution allowed either private informers or government officials to sue federal marshals who failed to file timely and accurate census returns.[247] A statute of the Second Congress provided for the United States to mint copper coins.[248] Anyone using or receiving non-U.S. copper coins after the time specified in the legislation would forfeit the coins and an additional $10.[249] The forfeiture could be recovered "with costs of suit for the benefit of any person or persons by whom information of the incurring thereof shall have been given."[250]

### 2.   *Mixing and Matching Remedies*

Most of the penal statutes discussed above fall into the typical eighteenth-century enforcement patterns discussed by Blackstone. When rights or interests of the public were at stake, Congress might provide for enforcement of statutory penalties by government officials or by any member of the public (whether or not injured).[251] When private rights or interests were at stake, Congress might provide a cause of action to the party aggrieved.[252] However, there were also a number of early federal statutes in which Congress varied these standard patterns of enforcement.

The first copyright statute, cited in Justice Scalia's majority opinion in *Vermont Agency*, provides a particularly interesting scheme for enforcing federal copyrights.[253] Any person who printed or imported copies of a copyrighted work without the copyright owner's written consent, or offered unauthorized copies for sale, would forfeit the infringing documents to the copyright holder, who was instructed to destroy them.[254] In addition, the defendant had to pay 50 cents per page for the infringing copies, "the one moiety thereof to the author or proprietor of such map,

---

[245] An Act to Suspend the Commercial Intercourse between the United States and France, and the Dependencies Thereof, ch. 53, 1 Stat. 565, § 1 (June 13, 1798).

[246] An Act further to suspend the Commercial Intercourse between the United States and France, and the Dependencies Thereof, ch. 2, 1 Stat. 613, §§ 1, 6 (Feb. 9, 1799).

[247] An Act Providing for the Enumeration of the Inhabitants of the United States, ch. 2, 1 Stat. 101, §§ 2-3 (Mar. 1, 1790); Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1299-1300.

[248] An Act to Provide for a Copper Coinage, ch. 39, 1 Stat. 283 (May 8, 1792).

[249] *Id*. § 2.

[250] *Id*.

[251] *See supra* notes 148, 151-54 and accompanying text.

[252] *See supra* notes 148, 150 and accompanying text.

[253] *See Vermont Agency*, 529 U.S. at 776 n.5.

[254] An Act for the Encouragement of Learning, by Securing the Copies of Maps, Charts, and Books, to the Authors and Proprietors of such Copies, During the Times therein Mentioned, ch. 15, 1 Stat. 124, § 2 (May 31, 1790).

Electronic copy available at: https://ssrn.com/abstract=4549914

chart, book or books who shall sue for the same, and the other moiety thereof to and for the use of the United States."[255]

The initial general criminal statute passed by the first Congress also warrants consideration.[256] Section 16 of the statute made it a crime in areas under the exclusive jurisdiction of the United States or on the high seas to steal "the personal goods of another."[257] The same section criminalized stealing "arms, ordnance, munition, shot or powder, habiliments of war, or victuals" of the United States in a person's custody.[258] Anyone committing or aiding and abetting either offense would be fined four times the value of the stolen property. The statute provided for "one moiety [of the quadruple damages] to be paid to the owner of the goods, or the United States, as the case may be, and the other moiety to the informer and prosecutor."[259] In the case of these property crimes, an uninjured private informer could bring an action based on theft of government property or theft of private property belonging to another individual and, in addition to the informer's bounty, recover statutory compensation payable either to the United States or to the private property owner.[260]

Another interesting enforcement scheme appears in a 1798 statute concerning naturalization.[261] The statute required the clerk or recording officer of a court to accept a declaration by an alien of an intention to become a United States citizen, and to certify and transmit abstracts of such declarations to the Secretary of State.[262] A clerk who refused or neglected to create the certified abstract, after the alien tendered the specified fee, was subject to a forfeiture of $10.[263] Other forfeitures applied to clerks who neglected to transmit certification of naturalizations occurring before the legislation was enacted, and to persons who failed to make required reports concerning aliens living in this country.[264] All of the penalties imposed by the statute were to be "recovered in the name" of "any person, who will inform and sue for the same."[265] Like other early federal statutes, this legislation allowed an uninjured informer to vindicate legal interests of the public, but it also allowed an uninjured informer to sue to vindicate rights of another individual—the alien seeking a path to citizenship.

## III.    Rethinking Statutory Damages in Light of *Vermont Agency*

Originalist reasoning has long played a significant role in the law of standing. Writing for four Justices in a 1939 case about legislative standing, Justice Frankfurter considered it "common ground among judges" that the Constitution "presupposed an historic content" for the Article III

---

[255] *Id*.

[256] An Act for the Punishment of certain Crimes against the United States, ch. 9, 1 Stat. 112 (Apr. 12, 1790).

[257] *Id*. § 16.

[258] *Id*.

[259] *Id*.

[260] *See Vermont Agency*, 529 U.S. at 777 n.6 (noting that statute allowed "informer to conduct prosecution, and receive half of fine, for criminal larceny or receipt of stolen goods").

[261] An Act supplementary to and to Amend the Act, Intituled "An Act to Establish an Uniform Rule of Naturalization; and to Repeal the Act heretofore Passed on that Subject," ch. 54, 1 Stat. 566 (June 18, 1798).

[262] *Id*. § 2.

[263] *Id*.

[264] *Id*. §§ 3, 5.

[265] *Id*. § 7.

Electronic copy available at: https://ssrn.com/abstract=4549914

"judicial Power."[266] The framers of Article III extended judicial power "only to 'Cases' and 'Controversies,'" referencing "what were to them the familiar operations of the English judicial system and its manifestations on this side of the ocean before the Union."[267]

All nine Justices in *Vermont Agency*, regardless of judicial philosophy, found strong support in eighteenth century legal history for the conclusion that a litigant suing under a federal *qui tam* statute satisfies the requirements of Article III standing. Justice Scalia's majority opinion found the long history of popular enforcement in England and the numerous *qui tam* statutes passed by the first Congress nearly conclusive evidence that *qui tam* actions were "cases and controversies" of the sort traditionally resolved by judicial process.[268] Justice Ginsburg, writing for herself and Justice Breyer, agreed with the majority that "history's pages place the *qui tam* suit safely within the 'case' or 'controversy' category."[269] Justice Stevens, joined by Justice Souter, while disagreeing with the Court's interpretation of the FCA, nevertheless agreed that "[t]he historical evidence summarized by the Court is obviously sufficient to demonstrate that *qui tam* actions are 'cases' or 'controversies' within the meaning of Article III."[270] The *Vermont Agency* decision offers a useful reminder that historical evidence of original meaning is significant for most judges engaged in constitutional interpretation, even judges who do not claim the originalist label and who are more pluralistic about permissible methods of interpretation.[271]

The body of historical evidence relied upon to validate *qui tam* actions in *Vermont Agency* also speaks to the more general issue of congressional power to authorize suits for statutory damages, and should have informed the *TransUnion* Court's decision. In Blackstone's taxonomy, the *qui tam* action was a subset of the broader category of "popular actions," which were themselves a subset of the remedies a legislature could select to enforce a "penal statute."[272] In Section II, we surveyed a range of federal penal statutes enacted soon after ratification of the Constitution, including statutes of the first Congress considered in *Vermont Agency* and comparable legislation in the nation's first decade.[273] These early federal statutes illustrate how the framing generation understood Article III and the scope of congressional power to authorize litigation for statutory

---

[266] Coleman v. Miller, 307 U.S. 433, 460 (1939) (Frankfurter, J., concurring, joined by Roberts, Black & Douglas, JJ.); *id*. at 461 ("As abstractions, these generalities represent common ground among judges. ").

[267] *Id*. Judicial power could only be exercised "in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies.'" *Id*. at 460. Courts were not to resolve "abstract, intellectual problems," but rather were to act only when "a concrete, living contest between adversaries called for the arbitrament of law." *Id*.; *see also* Muskrat v. United States, 219 U.S. 346, 356 (1911) ("[B]y the express terms of the Constitution, the exercise of the judicial power is limited to 'cases' and 'controversies.' Beyond this it does not extend, and unless it is asserted in a case or controversy within the meaning of the Constitution, the power to exercise it is nowhere conferred.").

[268] *Vermont Agency*, 529 U.S. at 777.

[269] *Id*. at 788 (Ginsburg, J., concurring).

[270] *Id*. at 801 (Stevens, J., dissenting).

[271] Justice Breyer, for instance, includes text and history among the range of tools judges properly consult in the process of resolving constitutional cases, but also embraces other interpretive tools textualist and originalist judges might downplay. *See* Stephen Breyer, Active Liberty: Interpreting Our Democratic Constitution, at __ (2005).

[272] *See supra* note 148 and accompanying text.

[273] *See supra* notes 192-265 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=4549914

penalties.[274] Just as early congressional enactments showed that common informers without any particularized injury may bring actions permitted by Article III, the same body of evidence indicates that Congress can authorize litigation to recover statutory damages by a person whose rights are infringed, whether or not the litigant has suffered any concrete injury beyond the statutory violation.

### A.   *TransUnion* Reconsidered: Statutory Damages as Modern Forfeitures

The *TransUnion* majority concluded that Article III does not allow Congress to authorize pursuit of statutory damages unless the litigant can show a concrete and particularized injury in fact: "No concrete harm, no standing."[275] For this purpose, the majority thought, the mere fact of a statutory violation is not enough to support standing, even if the defendant violated statutory duties owed to the plaintiff individually.[276] Picking up on *Lujan*'s distinction between litigation of public rights and private rights, the *TransUnion* Court believed that standing requirements, including the requirement that a plaintiff show a concrete and particularized injury, are necessary to keep courts within their proper role, deciding only "the rights of individuals."[277] A regime in which Congress "could freely authorize unharmed plaintiffs to sue defendants who violate federal law," the Court believed, would violate Article III and undermine Executive Branch authority.[278]

While the *TransUnion* majority affirmed the importance of history and tradition in resolving questions of Article III standing,[279] it did not engage in the sort of historical analysis that characterized the *Vermont Agency* opinion.[280] Only Justice Thomas' dissent in *TransUnion* included any substantial consideration of historical materials, and the majority did not discuss the sources Justice Thomas highlighted.[281] The federal statutes reviewed in Section II are particularly relevant to the issue addressed in *TransUnion* because statutory damages under the FCRA are a modern version of the statutory forfeitures at issue in eighteenth century penal statutes. Blackstone explains that a penal statute imposes a forfeiture on a party "transgressing the provisions therein enacted."[282] The FCRA establishes numerous requirements applicable to consumer reporting agencies and authorizes statutory damages (or actual damages) for a willful violation.[283] Blackstone says the offending party under a penal statute is required to pay the

---

[274] The Court has accorded particular significance to early federal legislation in determining constitutional meaning. *See* Cooley v. Board of Wardens of Port of Philadelphia, 53 U.S. 299, 315 (1851) (contemporaneous construction of Constitution by first Congress entitled to great weight); Martin v. Hunter's Lessee, 14 U.S. 304, 351-52 (1816) (construction of Constitution in Judiciary Act of 1789 and acquiescence by states).

[275] *TransUnion*, 141 S. Ct. at 2200.

[276] *Id*. at 2205.

[277] *Id*. at 2203 (quoting Marbury v. Madison, 5 U.S. 137, 170 (1803)).

[278] *Id*. at 2207.

[279] *TransUnion*, 141 S. Ct. at 2204; *id*. at 2206 (arguing broader understanding of congressional power "would flout constitutional text, history, and precedent"); *see also Spokeo*, 578 U.S. at 338, 340-41.

[280] In fairness to the Court, the relative lack of historical examination in *TransUnion* may be because the parties' briefs did not argue the case in a manner that would facilitate such an analysis.

[281] *Id*. at 2216-19 (Thomas, J., dissenting); *see id*. at 2207 n.3 (rejecting Justice Thomas' position based on precedent, without discussing historical evidence).

[282] 3 Blackstone, *Commentaries*, at *159.

[283] 15 U.S.C. § 1681n(a)(1)(A).

Electronic copy available at: https://ssrn.com/abstract=4549914

statutory forfeiture to whoever the legislature specifies.[284] The FCRA requires payment of statutory damages to the consumer whose statutory rights are violated.[285] Statutory damages in modern legislation like the FCRA mirror the operation and serve the same purposes as forfeitures under the eighteenth century penal statutes discussed by Blackstone and relied upon by the Court in *Vermont Agency*.[286]

Once we recognize that the FCRA is a contemporary penal statute and that the FCRA provision authorizing statutory damages is a modern version of an eighteenth-century statutory forfeiture, the early federal statutes reviewed in Section II offer the best available evidence concerning the framing generation's understanding of the congressional power issue *TransUnion* resolved.[287] That evidence undermines the *TransUnion* Court's principal conclusions concerning Article III limits on Congress' power to authorize pursuit of statutory damages. The *Lujan* line of cases rests on the premise that, at the time the Constitution was adopted, Anglo-American jurisprudence embraced a fundamental distinction between litigation of public rights and litigation of individual rights.[288] While that distinction was recognized in eighteenth century jurisprudence and may be decisive for standing in other areas of law, it was not a critical distinction in the context of framing era penal statutes authorizing collection of statutory forfeitures.[289] Whether a forfeiture protected rights of individuals or rights of the community as a whole, the question of who could sue to collect the forfeiture and what kind of injury, if any, the litigant needed to show were deemed matters for legislative determination.[290]

The Court has already recognized in *Vermont Agency* that Congress may authorize a private informer without any particularized injury to sue for a statutory forfeiture based on a violation of public rights.[291] Early federal penal statutes followed the English practice of allowing "actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute."[292] As Justice Scalia noted in *Vermont Agency*, English legislation from the 14th century onward "allowed informers to obtain a portion of the [statutory] penalty as a bounty for their information, even if they had not suffered an injury themselves[.]"[293] Shortly after the framing of the Constitution, Congress passed a "considerable number" of such statutes and continued to do so for at least a decade.[294] Thus, even though the *qui tam* informer in *Vermont Agency* had not been injured in any individual way by the agency's alleged fraud in connection

---

[284] 3 Blackstone, *Commentaries*, at *159-60.

[285] 15 U.S.C. § 1681n(a)(1)(A).

[286] *See*, *e.g.*, Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 352 (1998) ("statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment"); *see id.* at 349-52 (discussing practice under eighteenth century penal statutes protecting copyrights in England and the U.S. in deciding that statutory damages under modern copyright statute should be subject to jury trial).

[287] *See supra* notes 192-265 and accompanying text.

[288] *See supra* notes 39-47 and accompanying text.

[289] *See infra* notes 310-13 and accompanying text.

[290] *See infra* notes 291-309 and accompanying text.

[291] *Vermont Agency*, 529 U.S. at 774 ("We conclude . . . that the United States' injury in fact suffices to confer standing on respondent Stevens.").

[292] 199 U.S. 212, 225 (1905).

[293] *Vermont Agency*, 529 U.S. at 775.

[294] *Id*. at 776-77; Section II(B) *supra*.

Electronic copy available at: https://ssrn.com/abstract=4549914

with federal grants, Article III permitted him to pursue an FCA claim based on harm to the financial and sovereignty-based interests of the United States.[295] The system the *TransUnion* majority considered irreconcilable with Article III—"[a] regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law"—is pretty much the exact system the *Vermont Agency* Court decided was constitutional.[296]

While Congress can authorize an uninjured *qui tam* informer to collect a forfeiture based on violation of public rights, the legislation reviewed in Section II highlights other enforcement patterns followed in early federal penal statutes.[297] For instance, uninjured common informers were sometimes authorized to collect forfeitures based on unlawful conduct affecting other private individuals.[298] We noted the first federal criminal statute, which allowed a private informer to sue for quadruple damages when a defendant stole "the personal goods of another."[299] The forfeiture in such cases was split fifty-fifty between "the owner of the goods" and "the informer and prosecutor."[300] This pattern of statutory enforcement was not as common as *qui tam* litigation to vindicate public rights, but it was by no means unprecedented. For instance, an eighteenth century statute from colonial Georgia allowed a private informer to collect a statutory forfeiture based on performance of a fraudulent land survey, with the recovery divided between "the party or parties aggrieved" and "the person who shall make information thereof, and sue for the same."[301] Another early federal statute allowing private vindication of the rights of others is the immigration statute that authorized an uninjured informer to collect a forfeiture when a clerk of court failed to certify and transmit an alien's declaration of intent to become a U.S. citizen.[302]

Blackstone noted that penal statutes could also authorize collection of statutory forfeitures by "the party grieved."[303] This was another enforcement pattern Congress embraced in early federal legislation. The 1790 statute providing for collection of duties on imports, for example, allowed an uninjured common informer to collect a forfeiture when a federal revenue officer neglected to post a table of rates and fees or failed to give a receipt for fees received, but only "the party grieved" could collect the distinct forfeiture imposed when a federal officer demanded higher

---

[295] *See supra* notes 172-75, 182-91 and accompanying text.

[296] *Compare TransUnion*, 141 S. Ct. at 2207 ("A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority.") *with Vermont Agency*, 529 U.S. at 775 (Parliament enacted *qui tam* statutes "that allowed informers to obtain a portion of the penalty as a bounty for their information, even if they had not suffered an injury themselves"), 776 ("*Qui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after the framing of the Constitution.").

[297] *See supra* notes 192-265 and accompanying text.

[298] *See supra* notes 256-65 and accompanying text.

[299] *See* An Act for the Punishment of certain Crimes against the United States, *supra* note 256, § 16 and accompanying text.

[300] *Id*.

[301] An act to prevent frauds and abuses in the admeasuring and laying out his majesty's lands in this province, § 4 (Mar. 5, 1765), *in* HORATIO MARBURY & WILLIAM H. CRAWFORD, DIGEST OF THE LAWS OF THE STATE OF GEORGIA, FROM ITS SETTLEMENT AS A BRITISH PROVINCE, IN 1755, TO THE SESSION OF THE GENERAL ASSEMBLY IN 1800, INCLUSIVE, at 313-14 (1802).

[302] *See* An Act supplementary to and to Amend the Act, *supra* note 261 and accompanying text.

[303] 3 Blackstone, *Commentaries*, at *159-60.

Electronic copy available at: https://ssrn.com/abstract=4549914

compensation than authorized by law.[304] Congress presumably viewed the two forfeitures imposed on federal officers as different in kind, and therefore thought they should be enforced in different ways. It may be that Congress considered claims that an officer failed to post a table of fees or neglected to give a receipt (subject to a $100 forfeiture) less serious than the charge that the officer demanded unauthorized compensation (subject to a $200 forfeiture), and therefore wanted to shield officers more fully from the potential for frivolous or manufactured claims in the latter category.[305]

Another provision for an aggrieved party to enforce a statutory forfeiture appears in the patent statute enacted by the First Congress, which provided for the person violating a patent to "forfeit to the person aggrieved" the infringing items.[306] The statute also allowed the patent owner to recover damages as assessed by a jury.[307] The first federal copyright statute included the unusual provision discussed earlier, allowing the copyright owner to collect a statutory forfeiture, with half of the money going to the copyright owner and the other half to the United States.[308] As Justice Scalia noted in *Vermont Agency*, this statute allowed an aggrieved party "to sue for damages on both their own and the United States' behalf."[309]

The historical materials reviewed earlier above make clear that penal statutes straddled the divide between public and private rights in eighteenth century Anglo-American legal thought. This explains why Blackstone discussed popular actions in both his volume on Private Wrongs and his volume on Public Wrongs.[310] It illuminates the legislative decision in many penal statutes to let informers choose between civil and criminal procedures for enforcing statutory forfeitures.[311] And it is highlighted in the Latin phrase that gives rise to the term "*qui tam* action," which speaks of a private litigant "who pursues this action on our Lord the King's behalf as well as his own."[312] The theory behind popular enforcement was apparently that even when a statute protects rights of the public, private individuals are proper plaintiffs because they share in the public injury attributable to the defendant's disregard of the community's laws. As Sir William Hawkins observed in his treatise on *Pleas of the Crown*, case law did not require the informer in

---

[304] 1790 Collection Act, *supra* note 197, § 55.

[305] *See* Randy Beck, *Popular Enforcement of Controversial Legislation*, 57 WAKE FOREST L. REV. 553, 577-78 (2022) (discussing problem of baseless or fraudulent claims filed by common informers).

[306] An Act to Promote the Progress of Useful Arts, 1 Stat. 109, § 4 (April 10, 1790).

[307] *Id*. *See also TransUnion*, 141 S. Ct. at 2217 (Thomas, J., dissenting) (discussing *Whittemore v. Cutter*, 29 F. Cas. 1120 (Cir. Ct. Mass. 1813)).

[308] *See supra* notes 253-55 and accompanying text.

[309] *Vermont Agency*, 529 U.S. at 776 n.5. A further Anglo-American variation on private enforcement of the rights of other individuals was a penal statute "which first gives an Action to the Party grieved, and in his Default, after a certain Time, to any one who will sue." 2 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 272 (1721). Another statute from colonial Georgia illustrates this pattern, giving an unlucky gambler six months to recover gambling losses from the winner, after which the suit could be brought by any person, with half of the recovery going to the litigant and the other half to the poor. *An additional act to an act entitled "An act to suppress lotteries, and to prevent other excessive and deceitful gaming*, § 1 (Mar. 25, 1765), *in* MARBURY & CRAWFORD, DIGEST, *supra* note 301, at 253-54.

[310] *See supra* notes 145-54, 159 and accompanying text.

[311] *See supra* note 160 and accompanying text.

[312] *Vermont Agency*, 529 U.S. at 768 n.1.

Electronic copy available at: https://ssrn.com/abstract=4549914

a popular action to plead an individual injury because "every Offense" for which the legislature authorized a popular action "is supposed to be a general Grievance to every Body."[313]

Viewed from the perspective of the framing generation, whether to require some sort of particularized injury as a condition for collecting a statutory forfeiture under a penal statute was a matter for legislative determination in drafting the statute. Blackstone explained that the person violating a penal statute was bound "to obey the directions of the legislature" and pay the forfeiture "to such persons as the law requires."[314] Just as Congress could enact a penal statute to protect rights of the public or rights of individuals, Congress could also decide whether the forfeiture should be recovered by a public official, a common informer with no particularized injury or an aggrieved individual whose statutory rights were violated.[315]

Since Congress often gave statutory forfeitures to informers who had not suffered any particularized injury, it would seem to follow *a fortiori* that Congress had power to give statutory forfeitures to those whose only injury was violation of a legal right conferred by statute. As Blackstone put it, a penal statute awarded a forfeiture "for transgressing the provisions therein enacted."[316] For example, the forfeiture for the "party grieved" under the 1790 federal statute for collection of duties applied "if any officer of the customs shall demand *or receive* any greater or other fee, compensation or reward" for carrying out a responsibility required by law.[317] The forfeiture applied if the officer made a "demand" for extra compensation, and the statute did not require the aggrieved party to show concrete injury in the form of actual payment of the money demanded.

Another illustration can be found in the early copyright statute cited by Justice Scalia in *Vermont Agency*. The owner of the copyright was entitled to recover and destroy copies of infringing works in the defendant's possession.[318] In addition, the copyright owner could recover statutory damages of 50 cents per page for the offending copies.[319] The statutory forfeiture applied to copies in the defendant's possession when they were seized, even though such copies presumably could not have produced any "concrete injury" to the copyright holder in the form diverted sales of the copyrighted work.[320] The legal injury flowing from violation of the plaintiff's copyright was sufficient to recover statutory damages, without any additional showing of harm (like lost profits) attributable to the statutory violation.

An early patent law opinion discussed in Justice Thomas' *TransUnion* dissent confirms the conclusion that Congress could grant a statutory cause of action to a plaintiff whose only injury

---

[313] 2 HAWKINS, *supra* note 309, at 267 ("Also it hath been adjudged, That a Popular Action may conclude *ad grave damnum*, without adding, *of the Plaintiff*; because every Offence, for which such Action is brought, is supposed to be a general Grievance to every Body.").

[314] 3 Blackstone, *Commentaries*, at *159.

[315] *See supra* notes 146-54 and accompanying text.

[316] 3 Blackstone, *Commentaries*, at *159.

[317] *See* 1790 Collection Act, *supra* note 197, § 55.

[318] *See* An Act for the Encouragement of Learning, *supra* note 254, § 2.

[319] *Id*.

[320] *See TransUnion*, 141 S. Ct. at 2217 (Thomas, J., dissenting) (quoting Muransky v. Godiva Chocolatier, Inc., 979 F.3d 917, 972 (11ᵗʰ Cir. 2020) (Jordan, J., dissenting) for the proposition that the first copyright statute allowed recovery of statutory damages "even if the holder 'could not show monetary loss'").

Electronic copy available at: https://ssrn.com/abstract=4549914

was the legal injury arising from violation of a statutory right.[321] *Whittemore v. Cutter* rested in part on an 1800 federal statute providing that if a person should "make, devise, use, or sell" a patented invention without the patent holder's written consent, the person would "forfeit and pay" to the patent holder "three times the actual damages sustained."[322] The defendant argued that the mere making of the patented invention could not violate the statute because an action would lie only if there were actual damages.[323] Justice Story, sitting as a Circuit Court judge, rejected the argument, noting that "where the law gives an action for a particular act, the doing of that act imports of itself a damage to the party."[324] The Justice indicated that where a statutory right is violated, but no actual damages are proved, "the law allows a nominal damage."[325] The *TransUnion* majority never mentioned *Whittemore*, even though it seems to strike at the heart of their conclusion that "an injury in law is not an injury in fact" satisfying Article III and that only a plaintiff who has been "concretely harmed" may sue based on a statutory violation.[326]

Having undertaken an historical investigation comparable to the Court's analysis in *Vermont Agency*, we should also consider what to make of the Court's suggestion that a provision authorizing a *qui tam* action can be analogized to a partial assignment of the government's claim.[327] This portion of the *Vermont Agency* opinion did not purport to offer an eighteenth-century rationale for *qui tam* legislation. Causes of action were not generally assignable at common law, so it is doubtful eighteenth century lawyers would have described popular enforcement in those terms.[328] This facet of the *Vermont Agency* opinion is probably best viewed as an attempt to help modern lawyers make sense of the tradition of popular enforcement by drawing an analogy to a practice recognized in current law. In any event, if standing doctrine is really based on the historical meaning of the words "case" and "controversy," as the Court affirms, the analogy to claim assignment should play a supporting, rather than a leading role. In applying *Vermont Agency*'s reasoning to penal statutes other than those authorizing *qui tam* litigation, we should keep in mind Justice Holmes' reminder that "a page of history is worth a volume of logic."[329]

Our analysis of framing era penal statutes has shown that Congress was understood to have power to award statutory forfeitures to aggrieved parties. Just as Congress sometimes awarded forfeitures to common informers who suffered no injury at all, they likewise awarded forfeitures

---

[321] *TransUnion*, 141 S. Ct. at 2217 (Thomas, J., dissenting) (discussing *Whittemore v. Cutter*, 29 F. Cas. 1120 (Cir. Ct. Mass. 1813)).

[322] *See An Act to Extend the Privilege of Obtaining Patents for Useful Discoveries and Inventions, to Certain Persons therein Mentioned, and to Enlarge and Define the Penalties for Violating the Rights of Patentees*, 2 Stat. 37, ch. 25, § 3 (Apr. 17, 1800)) (referenced in *Whittemore*, 29 F. Cas. at 1121).

[323] *Whittemore*, 29 F. Cas. at 1121.

[324] *Id*.

[325] *Id*.

[326] *TransUnion*, 141 S. Ct. at 2205.

[327] *Vermont Agency*, 529 U.S. at 773-74.

[328] Tiernan v. Jackson, 30 U.S. 580, 597 (1831) ("The general principle of law is, that choses in action are not at law assignable."); Isaac Marcushamer, Note, *Selling Your Torts: Creating a Market for Tort Claims and Liability*, 33 Hofstra L. Rev. 1543, 1549-53 (2005); Teal E. Luthy, Comment, *Assigning Common Law Claims for Fraud*, 65 U. Chi. L. Rev. 1001, 1002-03 (1998).

[329] New York Trust Co. v. Eisner, 256 U.S. 345, 349 (1921).

Electronic copy available at: https://ssrn.com/abstract=4549914

to aggrieved parties whose only injury was the defendant's violation of an individual legal right protected by statute.[330] Early federal penal statutes did not generally include anything like the "concrete injury" requirement imposed in *TransUnion*. A person could recover a forfeiture under a penal statute based on proof that the defendant "transgress[ed] the provisions" of the legislation.[331] Following the reasoning of *Vermont Agency*, these early federal statutes demonstrate how the framing generation understood the "case" or "controversy" requirement and the resulting congressional power to authorize collection of statutory damages.[332]

Since the *TransUnion* jury believed the defendant had violated FCRA duties owed individually to each of the class members,[333] all of the class members satisfied Article III requirements for standing to pursue statutory damages, not just the class members whose credit reports were disseminated to third party businesses. If the *qui tam* relator in *Vermont Agency* had Article III standing to pursue an FCA claim in the absence of any particularized injury, the class members in *TransUnion* surely had standing based on the particularized legal injury attributable to violation of their statutory rights. And since these class members sought statutory damages based on legal injury to their own rights, there is no need to resort to anything like the claim assignment theory offered in *Vermont Agency*.[334]

### B.    Statutory Forfeitures and Executive Power Under Article II

The *Lujan* line of cases has sought to bolster the Court's Article III standing analysis with arguments about executive power under Article II. *Lujan* contended that allowing plaintiffs lacking particularized injuries to enforce legal duties of executive officials would permit Congress to reassign the President's constitutional duty to ensure faithful execution of the laws.[335] The *Spokeo* Court cited this portion of *Lujan*, arguing that "standing doctrine preserves executive discretion."[336] The *TransUnion* majority expanded on the theme, contending that choices about "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch," and should not be left to private plaintiffs and attorneys who lack accountability to the people and a commitment to the public interest.[337] More broadly, several Justices have raised the question of whether *qui tam* statutes like those *Vermont Agency* validated for Article III purposes might nevertheless violate Article II by permitting private litigation of public claims.

Since my argument follows the Court's analysis in *Vermont Agency*, I will first offer a few comments on the compatibility of *qui tam* litigation with Article II. The Court rejected an analogous Article II argument well over a century ago in *The Laura*, and Justice Harlan's

---

[330] *See supra* notes 317-26 and accompanying text.

[331] 3 Blackstone, *Commentaries*, at *159-60.

[332] *See Vermont Agency*, 529 U.S. at 776-78.

[333] *See TransUnion*, 141 S. Ct. at 2202 (jury awards statutory and punitive damages to each class member).

[334] Alternatively, if the Court insists on the point that the class members did not meet Article III's minimum threshold for cognizable injury, the FCRA could be analyzed as involving assignment of a government claim for statutory damages comparable to the claim assignment that occurs in a *qui tam* statute. *See Vermont Agency*, 529 U.S. at 773-74.

[335] *Lujan*, 504 U.S. at 577.

[336] *Spokeo*, 578 U.S. at 347.

[337] *TransUnion*, 141 S. Ct. at 2207.

Electronic copy available at: https://ssrn.com/abstract=4549914

reasoning in that opinion seems equally applicable in this context.[338] In any event, whatever one thinks about executive power in the context of an uninjured *qui tam* relator pressing fraud claims on behalf of the United States, Article II seems considerably less relevant to the issue of statutory damages addressed in *TransUnion*. The President has a unique constitutional role with respect to enforcing rights of the public—one that plausibly implicates constitutional allocations of power—but Article II seems considerably less germane when the issue is an individual's standing to litigate based on violation of the plaintiff's own statutory rights.

### 1. Article II and Qui Tam Litigation of Public Claims

The concerns expressed in the *Lujan* line of cases about preserving Executive Branch law enforcement discretion create significant tension with the Anglo-American tradition of popular enforcement. A *qui tam* statute allows an uninjured private informer to file suit and litigate a claim on behalf of the public without approval from any public official, and the outcome in the popular action generally binds the government.[339] In concluding that *qui tam* relators satisfy Article III standing requirements, the *Vermont Agency* Court made clear in a footnote that it was not addressing "whether *qui tam* suits violate Article II," citing both the Appointments Clause and Article II's instruction that the President must "take care that the laws be faithfully executed."[340] Justice Stevens, by contrast, thought the Court's evidence concerning the extended history of *qui tam* legislation, together with evidence "that private prosecutions were commonplace in the 19th century," were sufficient to resolve any Article II question about the constitutionality of the False Claims Act (FCA).[341]

The question *Vermont Agency* left open about popular enforcement and Article II entered the Court's radar screen again last term in *United States ex rel. Polansky v. Executive Health Resources, Inc.*, a statutory case under the *qui tam* provisions of the FCA.[342] Justice Thomas commented in dissent that "[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II and that private relators may not represent the interests of the United States in litigation."[343] Citing an article by Professor Saikrishna Prakash, Justice Thomas added that "we should be especially careful not to overread the early history of federal *qui tam* statutes given that the Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural departure from the English system of parliamentary supremacy, from which many legal practices like *qui tam* were inherited."[344] Justice Kavanaugh, joined by Justice Barrett, filed a concurring opinion agreeing with Justice Thomas that *qui tam* litigation raises substantial constitutional questions and expressing the view that "the Court should consider the competing arguments on the Article II issue in an appropriate case."[345]

---

[338] *See* The Laura, 114 U.S. 411, 415-16 (1885).

[339] *See* 3 Blackstone, *Commentaries*, at *159-60.

[340] *Vermont Agency*, 529 U.S. at 778 n.8.

[341] *Id*. at 801 (Stevens, J., dissenting) (citing Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 127-28 & nn. 24-25 (1998) (Stevens, J., concurring in the judgment)).

[342] United States ex rel. Polansky v. Executive Health Resources, Inc., 143 S. Ct. 1720 (2023).

[343] *Id*. at 1741 (Thomas, J., dissenting).

[344] *Id*. at 1741-42 (citing Sai Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 589 (2005)).

[345] *Id*. at 1737 (Kavanaugh, J., joined by Barrett, J., concurring).

36

Electronic copy available at: https://ssrn.com/abstract=4549914

The question whether *qui tam* legislation might violate Article II has been the subject of extended scholarly discussion.[346] As a policy matter, there is significant weight to the concern that popular enforcement of public claims can undermine the role of disinterested government officials.[347] A *qui tam* statute contains a built-in conflict of interest, offering private financial gain to encourage litigation on behalf of the public.[348] *Qui tam* enforcement has generated significant controversy at various points in history because informers tend to prioritize their personal financial interests over potentially competing interests of the public.[349] As Justice Thomas wrote for the Court in *Hughes Aircraft Co. v. United States ex rel. Schumer*, "*qui tam* relators are different in kind than the Government" because they are "motivated primarily by prospects of monetary reward rather than the public good."[350] For instance, a *qui tam* plaintiff might be more willing than a Department of Justice lawyer to pursue an FCA claim based on "technical noncompliance" with government reporting requirements that caused no impact to the federal Treasury.[351]

At the same time, such concerns about the effect of popular enforcement on Executive Branch discretion have traditionally been treated as policy questions for the legislature, rather than constitutional questions for judicial resolution. The Court's opinion in *United States ex rel. Marcus v. Hess* illustrates the point.[352] During World War II, a *qui tam* informer filed suit under the False Claims Act, allegedly based on information disclosed in the government's earlier criminal indictment of the defendants.[353] In the United States Supreme Court, the Department of Justice filed an *amicus curiae* brief objecting to the filing of a *qui tam* action by an "informer" who did not actually provide the information forming the basis for the FCA claims.[354] Justice Black's opinion for the Court catalogued a series of concerns laid out in the Justice Department brief:

> It is said that effective law enforcement requires that control of litigation be left to the Attorney General; that divided control is against the public interest; that the Attorney General might believe that war interests would be injured by filing suits such as this; that permission to outsiders to sue might bring unseemly races for the opportunity of profiting from the government's investigations; and finally that conditions have changed since the Act was passed in 1863.[355]

---

[346] *See* Evan Caminker, 99 YALE L.J. 341, 354-80 (1989); Prakash, *supra* note 344, at 576-96.

[347] *See* Beck, *English Eradication*, *supra* note 138, at 637 (*qui tam* litigation removes benefit of disinterested exercise of prosecutorial discretion).

[348] *Id*. at 611-15.

[349] *See, e.g.*, Beck, *Popular Enforcement of Controversial Legislation*, *supra* note 305, at 581-613.

[350] 520 U.S. 939, 949 (1997).

[351] *Id*.

[352] United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943).

[353] *Id*. at 545-46.

[354] *Id*.; Brief for the United States as Amicus Curiae, *United States ex rel. Marcus v. Hess*, No. 173, 1942 WL 54209, at 18 (Dec. 8, 1942) ("The reward for the informer was for the disclosure and not merely for the prosecution of the action. Certainly Congress did not pass the statute in order to permit private persons who had contributed nothing to the discovery of the crime to step in and share the proceeds as soon as the facts had been made known as a result of the Government's own prior investigation.").

[355] *Marcus*, 317 U.S. at 547.

Electronic copy available at: https://ssrn.com/abstract=4549914

The problem with these arguments, according to the Court, was that they were "addressed to the wrong forum."[356] The government offered "strong arguments of policy against the statutory plan," but its arguments focused on what the statute should have done, not what it actually did.[357] The Justice Department anticipated the Court's conclusion in *Marcus* and persuaded Congress to amend the False Claims Act to address the problem of parasitic claims by relators relying on information already uncovered by the government.[358]

The article by Professor Prakash cited in Justice Thomas' *Polansky* dissent considers the constitutional role of the President in enforcing the laws.[359] Professor Prakash assembles an impressive array of evidence that our first three Presidents, with support from the other branches, regularly issued directives instructing federal prosecutors concerning the performance of prosecutorial duties.[360] In the absence of statutory authority for these actions, this historical record provides relatively good evidence that Article II was understood to afford the President a supervisory role with respect to government attorneys representing the United States.[361]

The implications of this historical evidence for *qui tam* legislation are significantly less clear. To begin with, it seems by no means certain that filing a statutory popular or *qui tam* action should be classified as an exercise of "executive power" within the meaning of Article II. Blackstone notes that authorization to file a popular action under a penal statute is "given to the people in general."[362] This sounds like a non-governmental power—perhaps one of the powers "reserved . . . to the people" under the 10th Amendment—and hence not subject to the legislative-executive-judicial categorization applicable to powers of the government.[363] Our Constitution was adopted when governments were far smaller and less powerful than they are today.[364] Popular enforcement authorized by statute fits comfortably alongside an array of other devices—the militia, the community posse (*posse comitatus*), the privateer operating under a letter of marque and reprisal—by which members of the public were authorized to assist in the projection of communal force and the enforcement of communal law.[365]

Even if we do view popular enforcement as an exercise of "executive power," however, Professor Prakash rejects the notion that *qui tam* legislation is unconstitutional.[366] He finds the assertion "a little hard to stomach" in light of centuries in which popular actions served as the principal means of enforcing English penal statutes.[367] Professor Prakash argues instead that Article II should be read to give the President an implicit power to terminate *qui tam* actions in

---

[356] *Id*.
[357] *Id*. at 546-47.
[358] Beck, *English Eradication*, *supra* note 138, at 556-61. The particular issue raised by the Department of Justice in *Marcus* is now addressed through the FCA's "original source" provision. *See* 31 U.S.C. § 3730(e)(4).
[359] *See generally* Prakash, *supra* note 344.
[360] *Id*. at 552-63.
[361] *See id*. at 563-65.
[362] 3 Blackstone, *Commentaries*, at *160.
[363] U.S. Const., amend. X; *see* Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1315-16.
[364] *See* Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 135, at 1315.
[365] *Id*.
[366] Prakash, *supra* note 344, at 577.
[367] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4549914

order to ensure faithful execution of the laws.[368] He makes this case on textual and structural grounds,[369] acknowledging that we do not know whether early Presidents "ever terminated (or unsuccessfully sought to terminate) popular prosecutions."[370] If we follow Professor Prakash in recognizing an implicit presidential power to terminate *qui tam* actions under the Take Care clause, Congress could still enact *qui tam* legislation and informers could still file *qui tam* actions under the FCA and other statutes without violating Article II.[371]

If the Justices ever do take up the question of the constitutionality of *qui tam* legislation under Article II, the Court's 19th century decision in *The Laura* seems particularly relevant to the analysis.[372] The informer in that case sought forfeitures from a steam vessel under a federal penal statute for carrying more passengers than permitted by the ship's certificate of inspection.[373] The owner of the vessel defended on the ground that the Secretary of the Treasury had exercised a statutory power to remit penalties for violation of the statute, including the portion going to the informer.[374] The appellant argued that the statute was unconstitutional because Article II vested an exclusive power to pardon offenses in the President, and Congress could not encroach on that power by vesting part of it in a subordinate official.[375] That constitutional claim seems structurally parallel to the contention that *qui tam* legislation is unconstitutional because it confers on a private litigant executive power that Article II vests exclusively in the President.[376]

In his opinion for the Court in *The Laura*, Justice Harlan rejected the Article II argument as foreclosed by framing era practice followed without constitutional objection for nearly a century. He noted that "[f]rom the adoption of the constitution to the present moment," Congress had asserted a right to provide for remission of fines by government officers other than the President.[377] A 1797 statute containing such a provision had been applied in a number of cases without any suggestion that it violated the Article II pardon power.[378] Justice Harlan quoted the early opinion in *Stuart v. Laird*, which validated the tradition of Supreme Court Justices sitting on circuits courts.[379] The *Stuart* Court reasoned that a practice "'commencing with the organization of the judicial system, affords an irresistible answer, and has, indeed, fixed the construction. . . . [T]he question is at rest, and ought not now to be disturbed.'"[380] To similar effect, Justice Harlan quoted a more recent case concluding that Congress could afford copyright protection to photographs because the 1790 copyright statute included protection for analogous

---

[368] *Id.*
[369] *Id.* at 580-84.
[370] *Id.* at 587.
[371] Prakash, *supra* note 344, at 594.
[372] The Laura, 114 U.S. 411 (1885).
[373] *Id.* at 412.
[374] *Id.* at 412-13.
[375] *Id.* at 413.
[376] *See Polansky*, 143 S. Ct. at 1741 (Thomas, J., dissenting) (questioning *qui tam* statutes based on view that Article II vests executive power in the President alone).
[377] *The Laura*, 114 U.S. at 414-15.
[378] *Id.* at 415.
[379] *Id.* at 416
[380] *Id.* (quoting Stuart v. Laird, 5 U.S. 299, 309 (1803)).

Electronic copy available at: https://ssrn.com/abstract=4549914

works, like maps and charts.[381] A construction placed on the Constitution by legislators "'who were contemporary with its formation, many of whom were members of the convention which framed it'" should receive "very great weight," and when the rights established had "'not been disputed during a period of nearly a century, it is conclusive.'"[382]

A similar train of reasoning would seem to foreclose a contemporary Article II challenge to *qui tam* litigation. The first several Congresses, including members who participated in the Constitutional Convention, enacted a significant number of statutes containing *qui tam* provisions.[383] So far as we know, the statutes were signed without objection by early Presidents and applied in judicial proceedings without anyone raising a constitutional issue under Article II. Over 150 years after ratification of the Constitution, the Supreme Court ruled in *Marcus* that "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it," and emphasized that the Court had no authority to exercise a "veto power" over the legislative decision, notwithstanding "strong arguments of policy against the statutory plan."[384] In these circumstances, following Justice Harlan's reasoning in *The Laura*, it would seem that the early federal *qui tam* legislation reviewed in Section II "fixed the construction" of the President's Article II power in the context of popular enforcement.[385] Congress relied upon that construction during the Civil War when it enacted the False Claims Act and the passage of well over two centuries since this early legislative construction has laid the Article II issue to rest.[386]

### 2. *Article II and Private Claims Seeking Statutory Damages*

Whatever the Court ultimately concludes about *qui tam* legislation and executive power, Article II seems much less relevant to the question of statutory damages at issue in a case like *TransUnion*. A statute authorizing *qui tam* litigation has a much greater capacity to undermine the Executive Branch role in enforcing the law than a statutory damages provision like the one in the FCRA. A *qui tam* statute permits any person to sue without requiring any particular connection to the events giving rise to the litigation.[387] The same informer or group of informers can file dozens or even hundreds of cases on behalf of the public.[388] In jurisdictions making extensive use of *qui tam* statutes, it has been common for individuals to become professional informers, who make a living by pursuing a portfolio of cases to collect statutory forfeitures.[389] While the FCA allows the Department of Justice to intervene and assume control of a *qui tam* action,[390] legislation providing for popular actions has not traditionally included such generous

---

[381] *Id.* (citing Lithographic Co. v. Sarony, 111 U.S. 53, 57 (1884)).

[382] *Id.* (quoting *Lithographic*, 111 U.S. at 57).

[383] *See supra* Section II.

[384] *Marcus*, 317 U.S. at 542, 546.

[385] *The Laura*, 114 U.S. at 416 (quoting *Stuart*, 5 U.S. at 309).

[386] *Id.*

[387] 3 Blackstone, *Commentaries*, at *160 (popular action available to "any such person or persons as will sue for the same"); *Marvin*, 199 U.S. at 225 (common informer has "no interest whatever in the controversy other than that given by statute").

[388] *See* Beck, *Popular Enforcement of Controversial Legislation*, *supra* note 305, at 589 (English excise official coordinated group of 30 informers responsible for claims against 1500 persons under the Gin Act of 1736).

[389] *See* Beck, *English Eradication*, *supra* note 138, at 575-79.

[390] *See* 31 U.S.C. § 3130(b).

Electronic copy available at: https://ssrn.com/abstract=4549914

provisions for participation by government attorneys. Instead, the filing of a popular action has been understood to preclude a separate claim by government officials and the result in a *qui tam* case has been binding on the government, unless it was the product of collusion.[391] These traditional features of *qui tam* legislation effectively allow private parties to take on the role of public prosecutors and to pursue public litigation that government lawyers might view as unwise, unjustified or counterproductive.[392]

The statutory damages provision of the FCRA, on the other hand, has much less capacity to affect the government's role in enforcing the law. The statute provides that a person who violates an FCRA requirement "with respect to any consumer" is liable for actual or statutory damages "to that consumer."[393] A claim can thus be pursued only by someone who demonstrates an individual connection to an FCRA violation. The statute forces particularization of statutory damages claims and effectively limits the number of cases an individual can pursue without risking sanctions.[394] To be part of the class certified in *TransUnion*, for example, it had to be shown that TransUnion had sent a mailing indicating that they had identified the particular class member as a potential match for a name on the OFAC list, a determination alleged to violate FCRA procedures.[395] The filing of a consumer action for statutory damages under the FCRA does not bind the government or preclude government officials from filing public enforcement actions under a different provision of the statute.[396] In sum, a statutory damages claim for violation of individual consumer rights protected by the FCRA has minimal capacity to interfere with government efforts to enforce the statute, and therefore offers little support for the *TransUnion* Court's construction of Article III.[397] The Court has voiced no Article II concerns about FCRA actions by consumers claiming concrete injuries, and additional private claims by consumers who can show only a violation of statutory rights would not seem to interfere with government enforcement to any greater extent than other private claims.[398]

The *TransUnion* majority, in rejecting Justice Thomas' proposed distinction between treatment of claims based on public rights and claims based on private rights, dropped a footnote expressing concern that Congress might purport to create individual rights to mask suits seeking to enforce rights of the public:

> As we understand the dissent's theory, a suit seeking to enforce "general compliance with regulatory law" would not suffice for Article III standing because such a suit seeks to vindicate a duty owed to the whole community. But under the dissent's theory, so long as

---

[391] *See* 3 Blackstone, *Commentaries*, at *160.
[392] Beck, *English Eradication*, *supra* note 138, at 620-33.
[393] 15 U.S.C. § 1681n.
[394] *See* Fed. R. Civ. P. 11.
[395] *See TransUnion*, 141 S. Ct. at 2201-02.
[396] 15 U.S.C. § 1681s.
[397] The statutory requirement of particularization under the FCRA means this is not, for example, a case in which Congress has tried to convert an "undifferentiated public interest" in enforcing the law into an "individual right." *See Lujan*, 504 U.S. at 577.
[398] It's worth noting that the *TransUnion* Court allowed over 1800 class members to recover statutory and punitive damages under the statute, without worrying whether those recoveries would undermine Executive Branch discretion in enforcing the statute. *See TransUnion*, 141 S. Ct. at 2208-09.

Electronic copy available at: https://ssrn.com/abstract=4549914

Congress frames a defendant's obligation to comply with regulatory law as an obligation owed to *individuals*, any suit to vindicate that obligation suddenly suffices for Article III. Suppose, for example, that Congress passes a law purporting to give all American citizens an individual right to clean air and clean water, as well as a cause of action to sue and recover $100 in damages from any business that violates any pollution law anywhere in the United States. The dissent apparently would find standing in such a case. We respectfully disagree. In our view, unharmed plaintiffs who seek to sue under such a law are still doing no more than enforcing general compliance with regulatory law. And under Article III and this Court's precedents, Congress may not authorize plaintiffs who have not suffered concrete harms to sue in federal court simply to enforce general compliance with regulatory law.[399]

This footnote fails to grapple with what the Court decided in *Vermont Agency*.[400] A hypothetical statute allowing anyone to sue for $100 based on violation of a specified statutory requirement appears to describe a garden variety popular action of the kind validated by the *Vermont Agency* decision.[401] It seems comparable, for instance, to the two statutes of the First Congress cited in *Vermont Agency* providing that a federal revenue officer who did not post a table of fees and duties would "forfeit and pay one hundred dollars, to be recovered with costs, in any court having cognizance thereof, to the use of the informer."[402] Since *Vermont Agency* already indicated that informers lacking any concrete injury can satisfy Article III standing requirements and collect forfeitures for violation of statutory duties owed to the public, it is hard to see how this hypothetical counts as an argument against Justice Thomas' position.

In any event, assuming the Court is right to be concerned about Congress purporting to confer "individual rights" that authorize enforcement of public rights, that concern does not seem to be implicated under the FCRA. The FCRA expressly requires the consumer to make a particularized showing that the consumer's individual rights were violated in order to collect statutory

---

[399] *Id*. at 2207 n.3.

[400] *See Vermont Agency*, 529 U.S. at 775 (in approving *qui tam* litigation, Court noted that English *qui tam* statutes relevant to opinion allowed informers to recover statutory bounty "even if they had not suffered an injury themselves").

[401] *See* Beck, *English Eradication*, *supra* note 138, at 552-53 (describing distinctive features of *qui tam* legislation). The majority could try to distinguish this hypothetical statute from typical *qui tam* legislation because a *qui tam* statutes allow an informer to enforce rights of the public, while this one purports to give the plaintiff an individual legal right (though, by hypothesis, an "individual right" that is in fact a disguised public right). But we have seen above that the distinction between public and private rights was not critical in the context of penal statutes. Early Congresses allowed uninjured informers to enforce rights of the public in some statutes and the rights of individuals in other statutes. *See supra* notes 291-313 and accompanying text.

[402] *See* 1789 Collection Act, *supra* note 197, § 29; 1790 Collection Act, *supra* note 197, § 55. *See Vermont Agency*, 529 U.S. at 777 n.7. Justice Scalia cited these statutes in a footnote listing legislation that "provided a bounty only," rather than a separate footnote for statutes that "provided both a bounty and an express cause of action." *Compare id*. at 777 n.6 *with id*. at 777 n.7. To my eyes, the language of these statutes providing for the forfeiture "to be recovered with costs, in any court having cognizance thereof, to the use of the informer" seems fairly express in giving the informer a cause of action. In any event, Justice Scalia notes the rule of construction cited in *dicta* in *Marcus* indicating that "'[s]tatutes providing for a reward to informers which do not specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue.'" *Vermont Agency*, 529 U.S. at 777 n.7 (quoting *Marcus*, 317 U.S. at 541 n.4).

Electronic copy available at: https://ssrn.com/abstract=4549914

damages.[403] This congressional limit on statutory damages clearly distinguishes such a claim under the FCRA from one to enforce "general compliance with regulatory law."[404] Since the FCRA claims at issue in *TransUnion* concerned violation of individual rights, rather than public rights, it is hard to see why Article II concerns should affect the analysis.

### C.    *Vermont Agency*, *TransUnion* and the Separation of Powers

The *TransUnion* majority identified the separation of powers as the "single basic idea" underlying standing doctrine.[405] The Supreme Court has not always viewed standing in those terms. In *Flast v. Cohen*, the Court rejected the government's argument that the traditional bar to federal taxpayer standing was required by Article III: "The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government."[406] But the *Flast* opinion has since been limited to its facts and Justices today often describe standing as a doctrine designed to keep courts within their traditional, historically-defined role.[407]

Viewed from a separation of powers perspective, standing doctrine seeks to "prevent the judicial process from being used to usurp the powers of the political branches."[408] The *Lujan* line of cases generally envisions that mission in terms of limiting congressional power to confer standing so courts do not usurp Executive Branch functions.[409] Ironically, though, the *TransUnion* Court has now pressed that agenda to the point that judges have begun making decisions traditionally left to legislatures.[410] Instead of following the eighteenth-century pattern, in which courts deferentially followed legislative directions regarding who could recover

---

[403] *See supra* note 393 and accompanying text.

[404] *Compare* 15 U.S.C. § 1681n *with TransUnion*, 141 S. Ct. at 2207 n.3; *see also* Elizabeth Earle Beske, *Charting a Course Past Spokeo and TransUnion*, 29 Geo. Mason L. Rev. 729, 776-86 (2022) (Court can readily distinguish statutory private rights from public rights).

[405] *TransUnion*, 141 S. Ct. at 2203 (quoting Raines v. Byrd, 521 U.S. 811, 820 (1997)); *id.* (quoting Marbury, 5 U.S. at 170) ("Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only "'the rights of individuals'[.]"); Allen v. Wright, 468 U.S. 737, 752 (1984) ("the law of Art. III standing is built on a single basic idea—the idea of separation of powers").

[406] 392 U.S. 83, 100 (1968).

[407] *See* Hein v. Freedom from Religion Foundation, Inc., 551 U.S. 587, 603-09 (2007) (plurality opinion) (reading *Flast* as a narrow exception allowing standing only to challenge direct congressional expenditure violating Establishment Clause); *id.* at 635 (Scalia, J., concurring in the judgment) ("*Flast* was explicitly and erroneously premised on the idea that Article III standing does not perform a crucial separation-of-powers function"); *Allen*, 468 U.S. at 761 (separation of powers underlying Article III counsels against recognizing standing "to seek a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties," a task constitutionally assigned to the Executive); *Lujan*, 504 U.S. at 559-60 ("the Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts"); *Spokeo*, 578 U.S. at 344 (Thomas, J., concurring) (standing requirements "preserve separation of powers by preventing the judiciary's entanglement in disputes that are primarily political in nature," a concern "generally absent when a private plaintiff seeks to enforce only his personal rights against another private party").

[408] Town of Chester, N.Y. v. Laroe Estates, Inc., 581 U.S. 433, 438 (2017) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013)); Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 (2014) (same).

[409] *See supra* notes 44, 100-01 and accompanying text.

[410] *See supra* note 314-15, 330-32 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=4549914

statutory forfeitures, the Justices have now taken on the policy-making role of deciding whether particular plaintiffs have "really" been injured in a way that warrants statutory damages.[411] A further irony lies in the fact that this usurpation of legislative functions occurred because a Court committed to augmenting the role of legal history in constitutional decision making has not engaged deeply enough with the framing era history it invokes as the source of its standing rules.[412] The path taken in *TransUnion* contrasts with the *Vermont Agency* opinion, where Justice Scalia allowed framing era legislation to reorient his previously-expressed views on standing.[413]

Justice Scalia was perhaps the most zealous advocate for the separation of powers view of standing doctrine. Even before joining the Supreme Court, he published a lecture entitled, "*The Doctrine of Standing as an Essential Element of the Separation of Powers*."[414] Justice Scalia laid out his understanding that standing doctrine confines courts to their traditional "undemocratic" role of protecting the rights of individuals and minorities against the majority, "and excludes them from the even more undemocratic role of prescribing how the other two branches should function in order to serve the interest of *the majority itself*."[415] The concrete injury requirement, he argued, helps identify those plaintiffs with an injury other than "the mere breach of the social contract" all of us experience when government acts unlawfully.[416] Justice Scalia quoted approvingly the passage from *Marbury v. Madison* in which Chief Justice Marshall described the Court's province as "solely, to decide on the rights of individuals" and disclaimed any desire to intrude on the President's cabinet or interfere with executive discretion.[417]

Themes reminiscent of Justice Scalia's published lecture appeared throughout the majority opinion in *Lujan*. Justice Scalia identified standing doctrine as a constitutionally required expression of separation of powers principles.[418] He quoted the same passage from *Marbury v. Madison* that featured in his lecture.[419] The injury forming the basis for standing must be concrete and particularized, he contended, in order to distinguish the plaintiff from other members of the community; it cannot be a mere "generalized grievance" about Executive Branch compliance with the law.[420] To entertain claims about the legality of Executive Branch activity by plaintiffs lacking any particularized injury would allow courts "to assume a position of authority" over the Executive Branch and become "'virtually continuing monitors' of executive action.[421]

---

[411] *Compare supra* notes 93-101 and accompanying text *with supra* notes 314-15 and accompanying text.

[412] *See infra* notes 439-43 and accompanying text.

[413] *See supra* notes 172, 187-91 and accompanying text.

[414] Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, *supra* note 121, at 881.

[415] *Id*. at 894.

[416] *Id*. at 895.

[417] *Id*. at 883 (quoting Marbury v. Madison, 5 U.S. 137, 170 (1803)).

[418] *Lujan*, 504 U.S. at 559-61, 573-78.

[419] *Id*. at 576.

[420] *Id*. at 560 & n.1, 573-74 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").

[421] *Id*. at 577 (quoting Massachusetts v. Mellon, 262 U.S. 447, 489 (1923); Allen v. Wright, 468 U.S. 737, 760 (1984) and Laird v. Tatum, 408 U.S. 1, 15 (1972)) (internal quotation marks omitted).

44

Electronic copy available at: https://ssrn.com/abstract=4549914

Justice Scalia's advocacy for strict standing rules was part of his broader agenda to constrain federal courts.[422] A similar impulse explains Justice Scalia's frequent defense of originalism as the proper method of constitutional interpretation.[423] Standing doctrine seeks to limit the types of legal disputes judges adjudicate, while originalism seeks to limit the judge's discretion in interpreting the Constitution.[424] In an essay entitled, "*Originalism: The Lesser Evil*," Justice Scalia argued that the "main danger" in constitutional interpretation is that "judges will mistake their own predilections for the law."[425] Originalist theory seeks to counter that danger by establishing "a historical criterion" conceptually distinct from any preference the judge might entertain.[426]

A great deal of debate has taken place over the extent to which originalism can actually perform the function of constraining constitutional decision making by judges.[427] The issue is complicated by the fact that originalists themselves have divided over issues important to the interpretive process.[428] At the same time, originalism does seem to offer a greater capacity than many competing theories to distinguish good constitutional arguments from bad ones.[429] And even if one questions the ability of originalism to constrain decision making by a willful judge (with life tenure), Professor Baude argues that originalist theory can provide valuable internal guidance to a judge who wants to decide legal issues "without importing nonlegal considerations."[430]

Justice Scalia's argument in *Originalism: The Lesser Evil* suggests one picture of what it might look like for originalist methodology to constrain a judge's decision making. If you have evidence that a judge's "predilections" would favor a particular result, but the judge writes an opinion employing originalist methodology to reach the opposite result, you may reasonably

---

[422] Saikrishna Bangalore Prakash, *A Fool for the Original Constitution*, 130 HARV. L. REV. F. 24, 25 (2016).

[423] *Id.*

[424] A defining features of originalism is the belief that judges and other actors "ought to be constrained by the original meaning when they engage in constitutional practice." Lawrence B. Solum, *Originalism and Constitutional Construction*, 82 FORDHAM L. REV. 453, 456 (2013). The most widely-accepted version of originalism posits that the starting point for applying the Constitution is determining the "original public meaning" of the text. *See* James Macleod, *Finding Original Public Meaning*, 56 GA. L. REV. 1, 4-5 (2022).

[425] Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. CINN. L. REV. 849, 863 (1989).

[426] *Id.* at 864.

[427] *See generally* William Baude, *Originalism as a Constraint on Judges*, 84 U. CHICAGO L. REV. 2213 (2017).

[428] For instance, people who might be classified as originalists have disagreed on matters such as whether one should look for the "original intent" behind or the "original meaning" of the constitutional text, whose perspective should be the frame of reference, whether particular sources should be consulted or disregarded in the inquiry, whether the text alone is binding or should be understood to assume unwritten background principles, and whether interpretation should be followed by judicial "construction." *See id.* at 2220-23; Amy Coney Barrett, *Congressional Insiders and Outsiders*, 84 U. CHICAGO L. REV. 2193, 2201-02 (noting some ambiguity in Justice Scalia's thinking on whether relevant interpretative community should be "an ordinary member of the public or a lawyer"); John O. McGinnis & Michael B. Rappaport, *Unifying Original Intent and Original Public Meaning*, 113 NW. U.L. REV. 1371, 1373 (2019) (discussing distinction between original intent and original public meaning approaches).

[429] William Baude & Stephen E. Sachs, *Originalism's Bite*, 20 Green Bag 2d 103, 105 (2016); Michael Stokes Paulsen, *How to Interpret the Constitution (and How Not To)*, 115 YALE L.J. 2037, 2060-61 (2006) ("The existence of reasonably firm criteria makes it easier to check up on originalist interpretations for the soundness of their reasoning and their adherence to correct principles. Nonoriginalism, on the other hand, means never having to say you're sorry.").

[430] Baude, *supra* note 427, at 2223-24

Electronic copy available at: https://ssrn.com/abstract=4549914

conclude that originalism constrained the decisional process.[431] By that standard, *Vermont Agency* offers a good example of a decision in which originalist methodology played a constraining role. Justice Scalia's prior pronouncements indicate a predisposition to deny standing to someone like the *qui tam* relator in *Vermont Agency*. The lawsuit pressed a public claim that the defendant defrauded the government.[432] The relator did not argue that the fraud affected him in any way distinct from its impact on other citizens and taxpayers.[433] This was a classic case of an individual suing to enforce the social contract, rather than seeking to vindicate his own individual rights.[434] The case presented a generalized grievance of the sort *Lujan* ruled improper under Article III, even when Congress purports to authorize litigation.[435]

The *Vermont Agency* opinion was driven by Justice Scalia's originalist methodology. In cases before and after *Vermont Agency*, the Justice found post-ratification history, including acts of the first Congress, persuasive in establishing the original meaning of ambiguous constitutional language.[436] The *Vermont Agency* litigation gave Justice Scalia the opportunity to closely examine penal statutes of the first Congress in light of English legal history.[437] That historical research moved the Justice to write an opinion at odds with his prior views on standing and difficult to reconcile with his earlier positions on executive power. The opinion in *Vermont Agency* cited *Lujan* for the proposition that injury, causation and redressability represent the "irreducible constitutional minimum of standing," but omitted *Lujan*'s reference to "particularized" injury as part of that constitutional floor.[438] As a principled originalist who developed a more nuanced understanding of Anglo-American legal history between writing the opinions in *Lujan* and *Vermont Agency*, Justice Scalia adjusted his constitutional analysis in the direction suggested by that historical research, even though it meant weakening some of his preferred constitutional positions.

The Court in *Spokeo v. Robins* invoked originalism, but the majority resolved the case based on precedent, without close examination of framing era historical sources.[439] The *TransUnion*

---

[431] If a judge employs originalist arguments to reach a result consistent with the judge's own predilections, that does not necessarily mean originalism failed to guide the judicial decision. In this scenario, however, originalism may provide tools for critiquing the quality of the judge's reasoning. *See supra* note 429 and accompanying text. Thus, originalist theory may provide a level of accountability for a willful judge in the form of negative publicity surrounding an errant opinion.

[432] *Vermont Agency*, 529 U.S. at 770.

[433] *Id*. at 772-73 (*qui tam* relator not seeking compensation for violation of a legally protected right).

[434] Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, *supra* note 121, at 895.

[435] *Lujan*, 504 U.S. at 573-78.

[436] *See* Michael D. Ramsey, *Beyond the Text: Justice Scalia's Originalism in* Practice, 92 NOTRE DAME L. REV. 1945, 1957-62 (2017).

[437] *Vermont Agency*, 529 U.S. at 774-78.

[438] *Id.* at 771; Beck, *Qui Tam Litigation Against Government Officials*, *supra* note 138, at 1258. Justice Scalia continued to apply the particularization requirement in later cases, but under statutes that bore less resemblance to framing era penal statutes like those reviewed in *Vermont Agency*. *See*, *e.g.*, Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009).

[439] *Spokeo*, 578 U.S. at 338 (standing doctrine "is rooted in the traditional understanding of a case or controversy" and seeks to "ensure that federal courts do not exceed their authority as it has been traditionally understood")) (quoting Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1146 (2013)). It is interesting to speculate what Justice Scalia might have done in *Spokeo* had he lived longer. He participated in oral argument, but passed away several months before the opinion was released. *Spokeo* was argued on November 2, 2015 and the opinion was released on

Electronic copy available at: https://ssrn.com/abstract=4549914

majority also invoked originalist themes, indicating that "history and tradition offer a meaningful guide" to the kinds of cases Article III courts can consider.[440] Like *Spokeo*, however, the *TransUnion* opinion relied on prior case law for its understanding of Article III, rather than engaging with framing era historical sources.[441] The parties' briefs did not invite consideration of the relevance of framing era penal statutes.[442] Justice Thomas' dissent did discuss early patent and copyright statutes, but the majority rejected his analysis based on inferences from precedent, without devoting close attention to the historical materials he cited.[443]

The *TransUnion* majority may have intended a nod in the direction of originalism when it directed courts to "assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts.'"[444] Assuming that was the goal, the Court seemed to skip over some important steps in an originalist analysis. This portion of *TransUnion* deploys legal history to guide and police a principle limiting congressional innovation in the recognition of rights.[445] New statutory harms must be analogous to traditional legal harms if Congress wants federal courts to provide redress.[446] But the *TransUnion* Court omitted a demonstration, based on originalist methods, that the language of Article III is best read to limit congressional creation of new kinds of statutory rights subject to litigation.[447]

The Court's opinions in *Spokeo* and *TransUnion* make it sound like the majority only wants to resolve simple objective questions about who has in fact been harmed by a statutory violation.

---

May 24, 2016, while Justice Scalia passed away on February 13, 2016. *See* 578 U.S. at 330; Justices 1789 to Present (supremecourt.gov). It would not be too surprising if Justice Scalia had joined the *Spokeo* majority. Even after *Vermont Agency*, one could still mentally categorize *qui tam* provisions as a discrete exception to normal standing rules, rather than as one in a range of legislative options for enforcing duties imposed by penal statutes. On the other hand, it seems possible that the research Justice Scalia undertook in writing *Vermont Agency* might have prompted him to work through the issue of standing to pursue statutory damages in *Spokeo* with a different frame of reference. *See, e.g., Vermont Agency*, 529 U.S. at 776 n.5 (noting copyright statute of First Congress that allowed "injured parties to sue for damages on both their own and the United States' behalf").

[440] *TransUnion*, 141 S. Ct. at 2204 (quoting Spring Communications Co. v. APCC Services, Inc., 554 U.S. 269, 274 (2008)).

[441] *See id.* at 2203-07.

[442] *See* Brief for Petitioner, *TransUnion LLC v. Ramirez* (Feb. 1, 2021); Brief for Respondent, *TransUnion LLC v. Ramirez* (Mar. 3, 2021); Reply Brief, *TransUnion LLC v. Ramirez* (Mar. 19, 2021).

[443] *TransUnion*, 141 S. Ct. at 2216-17 (Thomas, J., dissenting); *id.* at 2207 n.3 (rejecting Justice Thomas' position based on precedent, without reviewing statutes or cases he cited).

[444] *Id.* (citing *Spokeo*, 578 U.S. at 341).

[445] *Compare Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in the judgment) ("As Government programs and policies become more complex and farreaching, we must be sensitive to the articulation of new rights of action that do not have clear analogs in our common-law tradition.").

[446] It is unclear as yet how vigorously *TransUnion*'s bar on judicial enforcement of novel rights will be enforced. We do not know, for instance, how *TransUnion* might affect litigation relating to statutory privacy rights in the context of new technologies affecting people in ways that did not have clear common law analogues. *See* Daniel J. Solove & Danielle Keats Citron, *Standing and Privacy Harms: A Critique of* TransUnion v. Ramirez, 101 B.U. L. REV. ONLINE 62, 68 (2021) ("The common law is constantly evolving, and it is doing so quite rapidly in the privacy and data breach contexts.").

[447] It is worth recalling Chief Justice Marshall's observation that the Constitution was "intended to endure for ages to come" and "to be adapted to the various crises of human affairs." McCulloch v. Maryland, 17 U.S. 316, 415 (1819). That reflection made Marshall skeptical of reading the Constitution in a manner that would narrowly limit the means Congress could choose in pursuing ends within the scope of its enumerated powers. *Id.*

Electronic copy available at: https://ssrn.com/abstract=4549914

To be concrete, an injury must be "real" and "must actually exist."[448] When we consider how the Court applied the concreteness limitation in *TransUnion*, however, the analysis implicitly involves more nuanced policy judgments about what sorts of plaintiffs merit a statutory remedy.

The *TransUnion* majority found standing for every class member whose credit report was disseminated to a third-party business.[449] The Court did not question what business requested a particular consumer's credit report, whether anyone at the business actually read the report or whether the information TransUnion provided about the OFAC list played any role in a business decision adversely impacting the class member.[450] Some class members allowed to recover statutory damages under the majority's analysis may not have suffered any "real" injury at all. It could well be, for instance, that some subset of the 1853 class members awarded statutory damages voluntarily cancelled the transactions that generated credit checks before anyone at the third-party business read the credit report from TransUnion. It would be hard to see how such a consumer suffered a "real" injury from dissemination of the credit report is no one read the report and it played no role in a denial of credit. The majority's holding does not distinguish those who suffered actual injury from those who did it, but instead presumes injury to those whose credit reports were circulated outside TransUnion. The majority's conclusion about which class members suffered a "concrete" injury was not a simple factual determination about an objective reality, but rather a more subtle policy evaluation (loosely informed by the law of defamation) of when an FCRA violation creates sufficient risk to justify statutory damages.[451]

The *TransUnion* majority invoked separation of powers as the basis for standing doctrine, but then reformulated the standing inquiry to invert the framing era relationship between legislatures and courts. In the eighteenth-century legal tradition described by Blackstone, decisions about who should be able to recover statutory forfeitures and what kind of injury, if any, the person needed to show were policy questions within the legislative domain.[452] While the *TransUnion* opinion repeated *Spokeo*'s concession that Congress can elevate "concrete, *de facto*" harms to the status of legally cognizable injuries,[453] it also insisted that courts have a responsibility to "independently decide whether the plaintiff has suffered a concrete harm under Article III."[454]

---

[448] *Spokeo*, 578 U.S. at 340.

[449] *TransUnion*, 141 S. Ct. at 2208-09.

[450] *See id.* at 2200 ("For 1,853 of the class members, TransUnion provided misleading credit reports to third-party businesses. We conclude that those 1,853 class members have demonstrated concrete reputational harm and thus have Article III standing to sue on the reasonable-procedures claim."), 2208-09.

[451] *See TransUnion*, 141 S. Ct. at 2224 (Thomas, J., dissenting) ("Weighing the harms caused by specific facts and choosing remedies seems to me like a much better fit for legislatures and juries than for this Court.") The reallocation of power in *TransUnion* should be a concern even for those who think the majority drew a reasonable line in the FCRA context. There are plausible policy arguments for imposing statutory damages on a credit reporting agency that employs unreasonable procedures, even before false information about a consumer gets circulated to a third-party business. *See id.* at 2221-24. In any event, separation of powers concerns do not focus on the substance of a decision, but rather on a more foundational question of "who decides?" *See* Panhandle Producers and Royalty Owners Ass'n v. Economic Regulatory Admin., 847 F.2d 1168, 1174 (5th Cir. 1988) ("Behind the word 'standing' there always lurks the basic question of who decides; whether accommodation is to be achieved politically or by judicial decree.").

[452] *See supra* notes 146-48 and accompanying text.

[453] *TransUnion*, 141 S. Ct. at 2204-05 (quoting *Spokeo*, 578 U.S. at 341).

[454] *Id.* at 2205.

Electronic copy available at: https://ssrn.com/abstract=4549914

Contrary to the Court's assurance that standing doctrine "prevent[s] the judicial process from being used to usurp the powers of the political branches,"[455] the standing inquiry as formulated by *TransUnion* puts the judiciary in charge of decisions that eighteenth century law left to legislative bodies.[456] At the end of the day, it will be life-tenured judges, rather than politically accountable members of Congress, who decide whether an individual seeking to vindicate a statutory right has suffered an injury worthy of litigation and warranting a statutory recovery.

## IV.   Conclusion

How a court engages with history in the process of constitutional adjudication can make a great difference. Even in a single doctrinal area, two opinions can deploy legal history in very different ways with vastly different consequences. *Vermont Agency* shows a Court careful about its understanding of Anglo-American legal history, resulting in constrained decision making and judicial deference to traditional legislative powers. *TransUnion* shows a Court invoking history, but failing to engage with relevant historical materials, leading the Court to claim powers traditionally exercised by Congress.

---

[455] Town of Chester, N.Y. v. Laroe Estates, Inc., 581 U.S. 433, 438 (2017) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013)); Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 (2014) (same).
[456] *See TransUnion*, 141 S. Ct. at 2221 (Thomas, J., dissenting) ("In the name of protecting the separation of powers, this Court has relieved the legislature of its power to create and define rights."); *id*. at 2225 (Kagan, J., dissenting) ("The Court here transforms standing law from a doctrine of judicial modesty into a tool of judicial aggrandizement.").

Electronic copy available at: https://ssrn.com/abstract=4549914