Draft May 8, 2024

# PRIVATE ENFORCEMENT AND ARTICLE II

Nitisha Baronia,[*] Jared Lucky,[*] & Diego A. Zambrano[**]

Private enforcement is under attack. In the face of adventuresome statutes that empower private plaintiffs to act as roving bureaucrats, scholars have argued that some private enforcement schemes may be unconstitutional delegations of executive power. That theory is seeing a resurgence in the courts. Taking cues from the Supreme Court's standing jurisprudence, Eleventh Circuit Judge Kevin Newsom recently stated that "Article II's vesting of the 'executive Power' in the President . . . prevents Congress from empowering private plaintiffs"—including those challenging accommodations for compliance with the Americans with Disabilities Act—"to sue for wrongs done to society in general." And in three recent cases, the Supreme Court has flirted with a similar approach when considering whether private relators can represent the interest of the United States in civil litigation (*Polansky*), whether states may deputize private individuals to enforce an anti-abortion statute (*Whole Woman's Health*), and whether a state can permit private citizens to challenge labor-code violations on behalf of their colleagues (*Viking River Cruises*). Beneath each case lurks the same conundrum: How far can Congress extend private enforcement before running afoul of Article II?

This Article refutes the emerging argument, which we term the "Article II Challenge," that the Constitution should be understood to prohibit private enforcement of the law for public wrongs. Applying a novel, mixed-method study of private rights of action—comprising a quantitative analysis applying large language models, an original historical analysis, and a cross-doctrinal mapping—this Article offers a unified understanding of private enforcement and its constitutionality, not just through the cramped lens of standing, but as an independent mechanism of law enforcement in our constitutional structure. We argue that private enforcement can violate Article II only when it amounts to a criminal prosecution, enforces governmental property interests, or crowds the executive out from enforcement entirely—and even then, only under certain conditions. This leaves the vast majority of private enforcement schemes untouched.

---

[*] JD/MA '21; Stanford Law School Rule of Law Fellow; ABA Administrative Law Fellow
[*] PhD History '26, JD '22, Stanford University.
[**] Professor of Law, Stanford Law School. Authors listed alphabetically. For thoughtful comments or conversations, we thank the organizers and enthusiastic participants at several academic conferences at which the authors presented, as well as (in alphabetical order) Gregory Ablavsky, Rachel Bayefsky, Tony Dorron, Amanda Frost, Amalia Kessler, Leah Litman, James Pfander, Elliot Setzer, Jed Shugerman, Amanda Tyler, Steven Winter, and others.

I

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

Introduction ................................................................................................ 1
I.    Private Enforcement of Federal Law ................................................... 6

    A.   Quantifying Federal Private Enforcement ................................... 8
    B.   Situating Private Enforcement and Qui Tam Claims .................. 11

II.   The Article II Challenge .................................................................. 11

    A.   The Article II Challenge's Jurisprudential Roots........................ 14

       1.   Standing Doctrine's Article II Undercurrents.................... 14
       2.   Qui Tam's Article II Problem ............................................. 16
       3.   Articulating The Article II Challenge ................................ 16

    B.   The Article II Challenge in Scholarship..................................... 18

III.  Private Enforcement and Executive Power in the Founding Era ...... 20

    A.   Active Plaintiffs and a Passive King in England ....................... 20
    B.   Even More 'Actions on Statutes' in the Colonies ...................... 25
    C.   Private Rights of Action Reformed and Retained in the States .... 28
    D.   Congress Inherits Private Enforcement ..................................... 33

IV.  Modern Doctrines of Executive Power ............................................ 38

    A.   The Jurisprudence of Executive Power ..................................... 38

       1.   Doctrinal Bounds of Executive Power .............................. 39
       2.   Standing.............................................................................. 43
       3.   State Action ........................................................................ 43
       4.   Nondelegation .................................................................... 45
       5.   Public Rights....................................................................... 46

    B.   Four Cross-Doctrinal Concerns.................................................. 48

       1.   Statutory Authorization ..................................................... 49
       2.   Right................................................................................... 50
       3.   Remedy............................................................................... 51
       4.   Control............................................................................... 52

V.   Impermissible Private Enforcement ................................................. 52

    A.   Dismantling the Article II Challenge ......................................... 52
    B.   Three Narrow Zones of Encroachment....................................... 54

       1.   Punitive, Quasi-Criminal Private Prosecutions.................. 54
       2.   Suits to Enforce Government-Held Property Interests ....... 55
       3.   Crowding Out the Executive ............................................. 57

Conclusion ................................................................................................ 59
Appendix A: Typology of Private Enforcement........................................... 1
Appendix B: Primary Source Guide............................................................. 2

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

## Introduction

Almost uniquely in the world, the federal and state governments in America empower private plaintiffs, rather than solely public agents, to enforce most important statutes.[1] In almost every area of law—from environmental to civil rights and securities law—the typical enforcement action takes place in a private civil suit. Despite (or because of) its ubiquity, private enforcement has always encountered criticism on normative grounds, including from scholars worried about rights suppression via citizen lawsuits, climate scholars exasperated by environmental lawsuits against green infrastructure projects, and businesses worried about frivolous securities and antitrust claims.[2] In the face of expansive statutes that empower private plaintiffs to act as roving bureaucrats, some have also argued that some private enforcement schemes may be unconstitutional delegations of executive power.[3] For many years, these criticisms and underlying constitutional theory gained little traction.

But the tide may be turning, and legislative authority to establish certain private rights of action is now under question.[4] In *Transunion v. Ramirez*, the Supreme Court observed that "[a] regime where Congress could freely authorize unharmed plaintiffs to sue defendants who violate federal law would not only violate Article III *but also would infringe on the Executive Branch's Article II authority*."[5] And in a case that mirrors one recently before the Supreme Court, Circuit Judge Kevin Newsom quoted dicta from that and other recent Supreme Court standing cases to press that "Article II's vesting of the 'executive Power' in the President and his subordinates prevents Congress from empowering private plaintiffs"—including those challenging accommodations for

---

[1] Diego A. Zambrano et al., *Private Enforcement in the States*, 172 U. PA. L. REV. 61 (2023) ("Scholarship . . . has established that America's system of private enforcement is without parallel in the world."). *But see* Jason Rathod & Sandeep Vaheesan, *The Arc and Architecture of Private Enforcement Regimes in the United States and Europe: A View Across the Atlantic*, 14 U.N.H. L. Rev. 303, 337 (2016) (describing recent European efforts to adopt the American model).

[2] *See e.g.*, Aziz Z. Huq, *The Private Suppression of Constitutional Rights*, 101 TEX. L. REV. 1259 (2023) (presenting historical examples of private enforcement regimes that were weaponized against constitutional rights); Jon D. Michaels & David L. Noll, *Vigilante Federalism*, 108 CORNELL L. REV.1187, 1193 (2023) (arguing against private enforcement regimes that allow "vigilantes" to enforce unconstitutional statutes); Anna Mance, *How Private Enforcement Exacerbates Climate Change*, 44 CARDOZO L. REV. 1493, 1516-17 (2023) (arguing that private enforcement regimes can empower interest groups to promote narrow interests that are antithetical to the environment and social welfare).

[3] *See generally* Andrew DeForest Patrick, *Running from the Law: Should Bounty Hunters Be Considered State Actors and Thus Subject to Constitutional Restraints* 52 VAND. L. REV. 171 (1999); Dina Mishra, *An Executive-Power Non-Delegation Doctrine for the Private Administration of Federal Law*, 68   1509 (2015); Alexander Volokh, *The New Private-Regulation Skepticism: Due Process, Non-Delegation, and Antitrust Challenges*, 37 HARV. J.L. & PUB. POL'Y 931 (2014).

[4] The attack comes from multiple angles: some courts are narrowing the scope of private rights of action on statutory grounds, without expressly invoking the Article II argument. *See, e.g.*, *Ark. State Conference NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1207 (8th Cir. 2023) (holding that text of Section 2 of the Voting Rights Act does not create a private right of action).

[5] 594 U.S. 413, 429 (2021) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

compliance with the Americans with Disabilities Act—"to sue for wrongs done to society in general or to seek remedies that accrue to the public at large."[6]

In no less than three decisions over the past two terms, the Court has indicated that this concern about enabling private individuals to file lawsuits that vindicate a public interest may infect private rights of action beyond the narrow context of standing.[7] In *Polansky v. Executive Health Resources, Inc.*,[8] the Court addressed how far a deputized private enforcer may carry her False Claims Act lawsuit after the federal government finds her cause no longer advances the public interest. Justice Thomas suggested that such private enforcers improperly "wield executive authority."[9] In *Whole Woman's Health v. Jackson*, the Court struggled to answer whether states may deputize private individuals to enforce Texas's S.B. 8, an antiabortion statute that empowered private plaintiffs to sue abortion providers while prohibiting government officials from enforcing it.[10] While the Court dodged the question, scholars have argued that S.B. 8 unconstitutionally deputized private vigilantes. And in *Viking River Cruises, Inc. v. Moriana*, the Court questioned the extent to which a state could vest private citizens with the authority to challenge labor-code violations on behalf of their colleagues.[11] Beneath each case lurks one constitutional question: when does private enforcement interfere with executive authority?

Courts have been surprisingly unwilling to answer that core question—and not for want of asking[12]—because they have no developed doctrine for doing so. Yet private enforcement of the law is nothing new,[13] and federal courts have built up robust but disparate doctrines to address it in many other areas of the law. They have, for example, applied contract law to evaluate the propriety of private prisons,[14] looked to due process considerations to address private involvement in rulemaking,[15] and

---

[6] *See* Laufer v. Arpan LLC, 29 F.4th 1268, 1295 (11th Cir. 2022) (Newsom, J., concurring). Judge Newsom grounded this argument in the Supreme Court's statement in *Lujan* that an environmental citizen suit cannot "transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Id.* at 1289 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 577 (1992)).

[7] *Id.* at 1295 ("Do tester plaintiffs like Laufer proactively exercise law-enforcement discretion in a way that implicates—and may actually violate—Article II? . . . It seems to me that they do.").

[8] United States *ex rel.* Polansky v. Exec. Health Res., Inc., 599 U.S. 419 (2023).

[9] *Id.* at 450 (Thomas, J., dissenting).

[10] 593 U.S. 30 (2021).

[11] 596 U.S. 639 (2022).

[12] *See, e.g.*, *Polansky*, 599 U.S. at 443 (Thomas, J., dissenting) ("I would . . . remand for the Third Circuit to consider the serious constitutional questions that may affect the disposition of the Government's motion to dismiss petitioner's *qui tam* suit.").

[13] Several scholars have detailed the long history of private enforcement actions and their many forms. *See, e.g.*, Scott Stern, *Moral Nuisance Abatement Statutes*, 117 Nw. U. L. Rev. 613 (2022); Huq, *supra* note _; Evan Caminker, *The Constitutionality of Qui Tam Actions*, 99 Yale L.J. 341 (1989); James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in a Partisan World*, 92 Fordham L. Rev. 469 (2023).

[14] Challenges to private modes of incarceration have recently seen a resurgence. *See, e.g.*, Jensen v. Shinn, 609 F. Supp. 3d 789 (D. Ariz. 2022) (addressing challenge to private prisons' labor practices as violating the Eighth Amendment), *amended*, No. CV-12-00601-PHX-ROS, 2022 WL 2910835 (D. Ariz. July 18, 2022).

[15] *See* Carter v. Carter Coal Co., 298 U.S. 238 (1936).

Electronic copy available at: https://ssrn.com/abstract=4821934

applied standing jurisprudence to indirectly assess whether a private plaintiff may bring a public controversy to court by looking to whether she shared in the injury.[16]

This Article refutes the emerging argument, which we term the "Article II Challenge," that the Constitution should be understood to prohibit private enforcement of the law for public wrongs. Applying a mixed-method study of private rights of action—comprising a quantitative analysis, an original historical analysis, and a cross-doctrinal mapping—this Article offers a unified understanding of private enforcement and its constitutionality, not just through the cramped lens of standing, but as an independent mechanism of law enforcement in our constitutional structure. As we argue, private enforcement can violate Article II only when it extracts punitive remedies, enforces governmental property interests, or crowds the executive out from enforcement entirely—and even then, only under certain conditions.[17] This leaves the vast majority of private enforcement schemes untouched.

Part I—our quantitative contribution—first lays out the current state of private enforcement across all federal laws. To do so, we rely on a dataset developed using large language models to identify every private right of action in federal law. Using this tool, we develop the most comprehensive measure of private rights at the federal level to date. We also explore the wide scope of private suits in all their forms, from direct contracting to government agencies to the *qui tam* lawsuit in which the government remains heavily involved, all the way to the S.B. 8-style civil-suit provision that deploys private individuals to engage in enforcement without any government involvement. This enables courts and scholars to better understand the universe of private enforcement, its importance, and where its limits may lie.

Part II describes the reemerging Article II challenge in more precise terms, detailing its judicial roots as well as its appearance in various separate but related strands of scholarship, ranging from administrative law scholarship on nondelegation to federal courts scholarship on standing. It also explores the originalist source of the critique, particularly as presented by Judge Newsom and the late Justice Scalia. The Article II Challenge in all its forms boils down to three related concerns we detail below, all of which turn on a perceived executive prerogative to prioritize and proactively enforce the law. The Article II critics explicitly rely on the historical claim that "at common law, individual plaintiffs could sue over violations of their own private rights, but not for violation of public rights, like a defendant's general noncompliance with the law."[18]

In Part III we respond to that claim with an original investigation of statutory private rights of action in the Founding Era. One of us—a trained historian—has surfaced previously neglected sources that illustrate the prominence of private

---

[16] *See, e.g.*, TransUnion LLC v. Ramirez, 594 U.S. 413 (2021).

[17] *See infra* Part V.

[18] *See* Brief for Center for Constitutional Responsibility as Amicus Curiae in Support of Petitioner at 2, Acheson Hotels, LLC v. Laufer, 601 U.S. 1 (2023) (No. 22-429).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

enforcement of regulatory law in England, colonial America, and the Early Republic.[19] This broader legal context reveals the deep constitutional foundation of private enforcement. Founding-Era lawmakers passed reams of statutes empowering private plaintiffs to sue for wrongs done to society, at both the state and federal level. In the eighteenth century, these laws (including both damages actions and *qui tam*-style bounties) were called "penal statutes"—not because they defined a crime, but because they permitted private litigants to collect a *penalty*. This was a ubiquitous category of litigation in the Founding Era, though largely forgotten today. In both England and America, executive officials had little control over these suits, despite the fact that contemporaries understood them as a means of enforcing regulatory law. As the English political economist and statesman Charles Davenant put it in 1699, "Lawgivers have many times fortified their Laws with Penalties wherein Private Persons may have Profit, *thereby to stir up the People to put the Laws in Execution*."[20] This was also the practice in the late colonial period and Early Republic, when state assemblies in Massachusetts and other states created private rights of action in nearly every domain of legislative activity: duties on luxury goods, restraints on roving livestock, fishing and hunting regulations, limits on dirty industries like tanning and smithing, quarantine measures for people and livestock, prohibitions on usury and price gouging, qualifications for the skilled trades, standards for weights and measures, ship building, fish pickling, meat packing, and more.[21] Even when these suits vindicated patently public rights (like interests in common lands, or mere compliance with regulations) contemporaries did not perceive private enforcement as infringing on executive power. State legislatures continued to enact these "penal statutes" even after many states "vested" their executive branches with powers and duties analogous to those conferred by Article II.

This neglected history of statutory private enforcement reveals that the Article II critics have seriously misunderstood their own historical evidence. In particular, they rely heavily on early federal Framers and jurists who articulated a distinction between public and private rights. Proponents of the Article II Challenge admit that *qui tam* laws (which permit plaintiffs to sue on behalf of the government) did constitute an early example of private litigants vindicating public rights. But they waive away this difficulty by assuming that *qui tam* in the Founding Era was essentially what it is today: an unimportant and idiosyncratic remedy, forming an exception to the general rule. But in fact, *qui tam* laws were only one type of "penal statute"—a well-defined and expansive category of Founding Era lawmaking closely analogous to modern private enforcement. As William Blackstone explained, far from being marginal or idiosyncratic, the great "variety" of penal statutes "with which the subject is at present encumbered" would be too "tedious" to enumerate.[22] The Framers (including John Adams, Thomas Jefferson, James Madison, and Alexander Hamilton)

---

[19] See Jared Lucky, "The Colonial Origins of Consumer Protection Law" (forthcoming PhD dissertation at Yale University, on file with author).

[20] CHARLES DAVENANT, AN ESSAY UPON THE PROBABLE METHODS OF MAKING A PEOPLE GAINERS IN THE BALANCE OF TRADE 55 (1699) (emphasis added).

[21] Original historical sources in Appendix B.

[22] II BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *420. Compilations by other eighteenth century jurists referenced hundreds of penal statutes. See, e.g., 2 HAWKINS, PLEAS OF THE CROWN , c. 26 (discussing when an "action on a statute" would lie, and how to bring one.)

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

understood and participated in this broader legal culture of private enforcement—as did pivotal early jurists like Joseph Story and John Marshall. These figures almost certainly assumed such suits would constitute one of the "necessary and proper" means by which Congress could effectuate its enumerated powers under Article I.

In Part IV, we engage in a cross-doctrinal mapping, weaving together how courts view core concerns about executive power and discretion in different strands of law, from the classic Appointments Clause cases to more obscure but insightful cases applying the Penal Judgments Exception to the Full Faith and Credit Clause and emerging disputes concerning the private-public rights distinction that was recently on display in *SEC v. Jarkesy* and emerging disputes about the private nondelegation doctrine. As a doctrinal matter, we find that private enforcement is consistent with both traditional definitions of executive power and judicial conceptions of constitutional delegation, but only where a core set of four cross-doctrinal concerns which we identify are alleviated.

Part V brings these modes of analysis together by rejecting most elements of the Article II Challenge and proposing that it is only in the zones of criminal prosecution, enforcement of public property rights, and in the hypothetical case where the executive is crowded out that there is any historical or doctrinal support for the Challenge. We apply that understanding to the assessment of federal private enforcement schemes that we conducted in Part I and find that this approach leaves the vast majority of private enforcement schemes untouched. Article II probably limits Congress' power to create exclusively private enforcement regimes. The Texas anti-abortion statute, known as SB 8, is a good example of such a regime, even if it is at the state level. In that statute, Texas not only empowered "any person" to sue abortion providers but also prohibited any state officials from enforcing the law.[23] It therefore simultaneously empowered private litigants to enforce a law while expressly *excluding* the executive from doing so. Were Congress to simultaneously empower private plaintiffs in an area of public law and *prohibit* federal officials from both (a) exercising control over the private lawsuits (by pardon or dismissal) and (b) enforcing that same law in parallel, it would violate Article II.

Two points of clarification before proceeding. To be clear, refuting the Article II challenge on private enforcement is a distinct enterprise from debates about private litigants' Article III standing. Because we defend private rights of action writ-large, the narrow zone of interference with Article II that we identify applies without distinction to the vagaries of how a court may describe a plaintiff's injury in a particular case. True, the Supreme Court's recent attention to private enforcement has been almost entirely based on standing limitations in cases like *Transunion*. And we recognize, as Tara Grove does, that "[s]tanding doctrine helps ensure that private parties do not exercise the 'discretionary power' that inevitably accompanies the authority to see that federal law or an area of federal law is obeyed."[24] Chief Justice Roberts, too, has recognized that

---

[23] See TEX. HEALTH & SAFETY CODE ANN. §§171.207(a),171.208 (West 2023).

[24] Tara Leigh Grove, Standing as an Article II Nondelegation Doctrine, 11 U. PA. J. CONST. L. 781, 827-28 (2009); *see also Spokeo*, TK.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

"Article III standing" ensures the Court does not trample on "the executive's responsibility of taking care that the laws be faithfully executed."[25] But we leave standing to the side because we agree with Judge Newsom that the Supreme Court's standing jurisprudence is not supportable.[26] As James Pfander has thoroughly demonstrated, there is no historical support for Article III limits on Congressionally created causes of action, and evidence from the Early Republic is overwhelming that Congress can create Article III standing.[27] Adopting that understanding, we reference standing doctrine only as another lens for viewing how courts consider the practical concerns we are concerned with in that analogous context.

As to our method of constitutional interpretation, our review of the history of private enforcement and its implications leads to a critique of originalist theories of Article II that is internal to the methodology of originalism. To the extent that proponents of the Article II challenge rely on original public meaning, their reading of the history is contradicted by founding-era practice. But, in addition, Part IV focuses instead on case law—the core concern is identifying whether the Article II challenge satisfies the Dworkinian "fit and justification"[28] criteria. Our argument is that it does not—instead, the best reading of the caselaw and existing legal landscape leads to the conclusion that most private enforcement regimes are constitutional.

## I. Private Enforcement of Federal Law

The term private enforcement, as we use it here, refers to statutory reliance on private parties to file lawsuits for private or public remedies.[29] This type of enforcement can be contrasted from administrative regimes that empower public agencies to file lawsuits. The focus of this definition is on *deliberate* Congressional action to empower private parties as a solution to a legislative problem. It is broad because it captures any and all private rights of action in federal law (but not common law). Yet, we recognize that many private rights of action are narrow, underutilized, apply to private-private civil claims, and are sometimes mere codification of the common law. For that reason, scholars often focus on more robust PRAs that are connected to multiple damages or fee shifting provisions.[30] Even more, private

---

[25] John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 DUKE L.J. 1219, 1230 (1993).
[26] Laufer v. Arpan LLC, 29 F.4th 1268, 1288 (11th Cir. 2022) (Newsom, J., concurring) ("Like me, these jurists have questioned the historical basis for the injury-in-fact requirement.").
[27] *See generally* JAMES E. PFANDER, CASES WITHOUT CONTROVERSIES: UNCONTESTED ADJUDICATION IN ARTICLE III COURTS (2021). Other scholars have exposed standing as a modern construct. *See, e.g.*, Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 Stan. L. Rev. 1371, 1391 (1988) ("The law of standing is, thus, an example of the obfuscating power of metaphor."). Still, there may well be other justifications for our current standing regime, including *stare decisis* based on decades of precedent. We take no position on how broad or narrow current standing rules should be.
[28] Ronald Dworkin, TAKING RIGHTS SERIOUSLY 81, 86- 88 (1977).
[29] *Cf.* Stephen Burbank, Sean Farhang & Herbert Kritzer, *Private Enforcement*, 17 LEWIS & CLARK L. REV. 637, 640 (2013) (using a different definition, "situations in which government responds to a perception of unremedied systemic problems by creating or modifying a regulatory regime and relying in whole or in part on private actors as enforcers").
[30] *Id.*

6

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

enforcement is most interesting when it constitutes the main enforcement mechanism in an area of public law—a legal regime that governs either government institutions or a regulatory area of public concern. Our focus, therefore, is on private enforcement regimes that empower private parties to enforce public laws.

Congress has adopted private enforcement regimes in almost every area of public law. In the Sherman Act of 1891, Congress built in private enforcement as a cornerstone of antitrust law. Seventy years later, the Civil Rights Act of 1964 then kicked off the modern Congressional trend of inserting private rights of action into most federal regulatory statutes, ranging from environmental law and consumer protection, all the way to employment law. As discussed in a recent paper, "[i]n these areas, private parties are often the main vehicle of statutory enforcement—accounting for 90% of antitrust claims, 98% of employment discrimination claims, and a large percentage of litigation in environmental and related contexts.[31]

Take, for instance, the Americans with Disabilities Act of 1990 (ADA), a key area of federal private enforcement.[32] The ADA bars discrimination against disabled individuals in "any place of public accommodation."[33] The motivation behind the statute was that, as one court put it, "there was a 'compelling need' for a 'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.'"[34] But in addition to relying on the Department of Justice, the statute empowers "any person who is being subjected to discrimination on the basis of disability in violation of [Title III]" to bring a civil action."[35] Some of the statutory language goes much further, allowing not just any injured person to sue but also anyone "who has reasonable grounds for believing that [they are] about to be subjected to discrimination."[36] Such a person can file a suit for "preventive relief" and need not "engage in a futile gesture" of actually suffering an injury, as long as they have notice that a covered entity will not comply with the act.[37] But private parties cannot recover damages.[38] Given this ample private right of action, it is no surprise that the federal government has described "private suits" as "an essential complement to [its] enforcement."[39] According to the Chamber of Commerce, ADA lawsuits increased by

---

[31] Žygimantas Juška, *The Effectiveness of Private Enforcement and Class Actions to Secure Antitrust Enforcement*, 62 ANTITRUST BULL. 603, 605 (2017); SEAN FARHANG, THE LITIGATION STATE: PUBLIC REGULATION AND PRIVATE LAWSUITS IN THE U.S. 3 (2010); Epic Sys. Corp. v. Lewis, 584 U.S. 497 (2018) (Ginsburg, J., dissenting); Stephanie Bornstein, *Rights in Recession: Toward Administrative Antidiscrimination Law,* 33 YALE L. & POL'Y REV. 119 (2014).

[32] Burbank et al., *supra* note 29, at 685.

[33] 42 U.S.C. § 12181 *et seq.*

[34] PGA Tour, Inc. v. Martin, 532 U.S. 661, 674 (2001).

[35] 42 U.S.C. § 12188(a)(1).

[36] ADA Title III Regulation, 28 C.F.R. § 36.501(a) (2024).

[37] *Id.*

[38] 42 U.S.C. § 2000a-3(a).

[39] Brief of the United States as Amicus Curiae Supporting Neither Party, Acheson Hotels, LLC v. Laufer, 601 U.S. 1 (2023) (No. 22-429).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

349% between 2012 and 2021, reaching "12,298 filings" and "in 2023 are yet again set to surpass the 10,000 mark."[40]

Congress has also enacted a wave of labor, civil rights, and environmental laws with private rights of action,[41] provoking a robust conservative counter reaction to them in the form of standing doctrine.[42] The State of Texas expanded the bounds of private enforcement in 2021, when S.B. 8 established a private cause of action to sue anyone that assisted in performing an abortion—even while abortion was federally protected at the time.[43] The action took the legal world by surprise and some scholars have identified it as marking new territory,[44] while others have observed that private civil suits—including those that encroach significantly on civil liberties—are rooted in a rich federal and state-level American tradition.[45] Scholars have extensively theorized why these regimes pop up when they do,[46] the shifting political incentives for their use,[47] and others have unearthed a string of historical and contemporary examples that add to the growing body of literature identifying and describing these regimes.[48]

### A.  Quantifying Federal Private Enforcement

In order to fully understand the prevalence of private enforcement—and drive home the vast American legal landscape that the Article II Challenge threatens—we begin by quantifying the appearance of express private rights of action in federal law. A complete description of our methods will follow in an Appendix. But, to summarize, we first obtained a publicly accessible version of the entire U.S. Code assembled by the Office of the Law Revision. We then used 30 keyword queries one of us developed in a previous project that identified private rights of action in state law, such as "may sue," "file an action," and "shall be liable." This first step produced 3,324 subsections to analyze. Next, we used a large language model to identify which of the filtered subsections contained private rights of action. Our process identified the following:

- **618** subsections of the U.S. code associated with a private right of action.
- **383** PRAs occurring near a fee-shifting clause (approximately 62%)

---

[40] Brief of the Chamber of Commerce et al. as Amicus Curiae in Support of Petitioner, *Acheson Hotels* (No. 22-429).

[41] *See, e.g.*, Luke P. Norris, *The Promise and Perils of Private Enforcement*, 108 VA. L.REV. 1483, 1493 (2022); Burbank et al., *supra* note 29, at 643–46.

[42] Cass Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 MICH. L. REV. 163, 197, 211 (1992).

[43] For a detailed description, see Huq, *supra* note **Error! Bookmark not defined.**, at 3–5.

[44] *See, e.g.*, Michaels and Noll, *supra* note **Error! Bookmark not defined.**; Norris, *supra* note 41.

[45] *See, e.g.*, Stern, *supra* note 3; Huq, *supra* note **Error! Bookmark not defined.**; Pfander, *supra* note 13; Z ambrano et al., *supra* note **Error! Bookmark not defined.**, at 64 ("Scholarship on civil litigation has established that America's system of private enforcement is without parallel in the world.").

[46] *See, e.g.*, FARHANG. *supra* note 31, at 60, 64-65.

[47] *See, e.g.*, Sean Farhang & Stephen B. Burbank, *A New (Republican) Litigation State?*, 11 U.C. IRVINE L. REV. 657, 658 (2021).

[48] *See, e.g.*, Zambrano et al., *supra* note 1, at 3 (presenting "the first systematic empirical investigation of the hidden world of state private enforcement"); Huq, *supra* note **Error! Bookmark not defined.** ( presenting historical examples).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

- **407** PRAs occurring near a multiple damages clause (approximately 66%).
- Most PRAs appear in areas of the U.S. Code associated with Commerce and Trade, Public Health and Welfare, Transportation, and Labor.

A more complete methodology section will follow. For now, the table below provides a few examples of keywords that we used and the resulting private rights of action in a range of areas.

| Keywords | Private right of action |
|---|---|
| **bring an action** | any person who suffers direct and substantial economic injury as a result of an alleged violation . . . may bring an action to require compliance with such provision. |
| **is liable** | The owner, charterer, managing operator, agent, master, or individual in charge of a vessel is liable to a person suing them for carrying more passengers than the number of passengers permitted by the certificate of inspection . . . |
| **action may be** | If there is a disagreement about a loss insured under this chapter, a civil action in admiralty may be brought against the United States . . . |
| **bring a civil action** | A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved. If the violation is not corrected . . . the aggrieved person may bring a civil action . . . |
| **private right of action** | Private right of action. A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may. . . bring . . . an action based on a violation of the regulations prescribed under this subsection to enjoin such violation, an action to recover for actual monetary loss from such a viola |
| **commence a civil action** | . . . any person having a valid legal interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter. . . |
| **bring a civil action** | If any person knowingly, or by reason of negligence, discloses a financial record of an individual in violation of subsection (b), such individual may bring a civil action for damages against such person in a district court of the United States. |

Focusing on the more robust forms of private enforcement, we then quantified federal PRAs that are associated with a multiples damages or fee shifting clause.[49] The private enforcement literature sees these provisions as evidence of legislative mobilization of private plaintiffs.[50] Relying on this literature, we utilized a similar methodology to Sean Farhang.[51] We found **383** private rights occurring near a fee-shifting clause (approximately 62%) and **407** private rights occurring near a multiple damages clause (approximately 66%). The best work to date, by Sean Farhang, found about **300** federal PRAs associated with fee shifting or multiple damages. The fact that

---

[49] *See e.g.*, Maureen Carroll, *Fee-Shifting Statutes and Compensation for Risk*, 95 IND. L.J. 1021 (2020); Maureen Carroll, *Fee Shifting, Nominal Damages, and the Public Interest*, 98 ST. JOHN'S L. REV. (forthcoming 2024).
[50] FARHANG, *supra* note 31, at 60.
[51] *Id.* at 81.

9

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

our method produced a similar number is a significant validation of our findings, which demonstrate that if anything, Farhang's work may *under*estimate the number of private enforcement schemes out there.

Finally, we broke down the presence of PRAs by where they appeared in the U.S. Code. Table X below excerpts the top 15 areas where most PRAs appear. These include parts of the code dealing with Commerce and Trade, Public Health and Welfare, Transportation, and Labor.

| Title number (Title name) | PRAs |
|---|---|
| Title 15 (COMMERCE AND TRADE) | 93 |
| Title 42 (THE PUBLIC HEALTH AND WELFARE) | 89 |
| Title 49 (TRANSPORTATION) | 53 |
| Title 29 (LABOR) | 34 |
| Title 26 (INTERNAL REVENUE CODE) | 25 |
| Title 18 (CRIMES AND CRIMINAL PROCEDURE) | 25 |
| Title 17 (COPYRIGHTS) | 25 |
| Title 12 (BANKS AND BANKING) | 23 |
| Title 16 (CONSERVATION) | 22 |
| Title 7 (AGRICULTURE) | 19 |
| Title 28 (JUDICIARY AND JUDICIAL PROCEDURE) | 18 |
| Title 47 (TELECOMMUNICATIONS) | 17 |
| Title 46 (SHIPPING) | 16 |
| Title 33 (NAVIGATION AND NAVIGABLE WATERS) | 15 |
| Title 22 (FOREIGN RELATIONS AND INTERCOURSE) | 12 |

The upshot is that PRAs appear throughout the U.S. Code and in different areas of the law. Many of them contain fee-shifting provisions that incentivize private litigation. Although this quantitative analysis fails to break down PRAs by level of importance, some private rights of action can lead to thousands of cases per year and have a significant effect on the economy. That is the case, for instance, of the private right of action in the securities laws.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

### B. Situating Private Enforcement and Qui Tam Claims

We next situate private rights of action within the broader private enforcement landscape.[52] This list is not exhaustive, but it covers important areas relevant to the analysis in this Article:

*Private Enforcement for Public Harms.* There are robust regimes in the context of private enforcement of public law that seem to depend on public injuries. Return to the ADA: tester plaintiffs often pursue claims against public facilities for injuries to all potential disabled customers. Still, the ADA is an imperfect example because many testers do assert an injury in fact in the form of stigma or denial of access to facilities.

By contrast, a pure example of private enforcement for a purely publicly experienced harm is the Clean Air Act (CAA) (and its companion, the Clean Water Act).[53] Congress adopted the CAA in 1970,[54] crafting a powerful PRA that allows

> any person [to] commence a civil action on his own behalf . . . against any person . . . who is alleged to have violated . . . or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.[55]

This provision was "explicitly justified as a mechanism that would deputize 'private attorneys general' to assist the Environmental Protection Agency (EPA) . . . in the enforcement of environmental regulation."[56] Among other things, "the primary goal of Congress . . . was to protect the public interest by allowing private actions, a policy which it considered a necessary supplement to administrative action."[57] Since its adoption, several groups have become forceful enforcers of the statute, including the Natural Resources Defense Council and Sierra Club Legal Defense Fund.[58] Yet one feature of the statute is that plaintiffs cannot collect damages—the remedy is almost always an injunction (along with attorneys' fees and costs).[59] More recent amendments

---

[52] Of course, scholars have recognized that private enforcement regimes come in different flavors. *See, e.g.,* Norris, *supra* note 41, at1493–94 (describing differences between private-enforcement regimes ranging from *qui tam* regimes to the Freedom of Information Act).

[53] One of the amicus briefs submitted in a recent ADA case in front of the Supreme Court claims that these three statutes "deputize uninjured private citizens to enforce federal law." Brief of Center for Constitutional Responsibility, *supra* note 18, at *3.

[54] 42 U.S.C. § 7604.

[55] *Id.*

[56] Mance, *supra* note**Error! Bookmark not defined.**, at 4 (citing Matthew C. Stephenson, *Public R egulation of Private Enforcement: The Case for Expanding the Role of Administrative Agencies*, 91 VA. L. REV. 93 (2005)).

[57] Edward J. Little, *The Aftermath of the Clean Air Amendments of 1970: The Federal Courts and Air Pollution*, 14 B.C. L. REV. 724, 745 (1973).

[58] Jonathan H. Adler, *Stand or Deliver: Citizen Suits, Standing, and Environmental Protection*, 12 DUKE ENV'T L. & POL'Y F. 39, 47, 50 (2001); Barton H. Thompson, Jr., *The Continuing Innovation of Citizen Enforcement*, 2000 U. ILL. L. REV. 185, 192.

[59] Adler, *supra* note 58.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

allow CAA and CWA plaintiffs to collect "civil fines payable to the treasury."[60] And, of course, plaintiffs "can settle their suits, even where settlement is not expressly authorized, on terms that include cessation of violations, supplemental environmental projects, and payment of monies to the plaintiff or other organizations."[61]

As a whole, the CAA and related statutory schemes empower private citizens and groups to "ensure that federal regulations are enforced and that environmental problems are corrected."[62] Law enforcement (and deterrence of public harms) by private plaintiffs is a core feature.

*Private Enforcement and* Qui Tam. *Qui tam* is an ancient common law writ that allows a plaintiff to sue on behalf of the government, usually for an injury or fraud on the public fisc.[63] For instance, the most prominent *qui tam* provision is embedded in the 1863 False Claims Act, a statute that "imposes civil liability upon '[a]ny person' who, inter alia, 'knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval.'"[64] In other words, the statute seeks to prevent fraud on the government. "[A] private person (the relator) may bring a *qui tam* civil action 'for the person and for the United States Government' against the alleged false claimant, 'in the name of the Government.'"[65]

While *qui tam* is just another name for a form of private enforcement in which an informer receives a bounty, the typical *qui tam* scheme is often unique. First, *qui tam* claims are officially *on behalf* of the government, not the private plaintiff. The injury is solely the government's own interest in preventing fraud. Second, these statutes afford the government significant control over the claim—the executive can usually end any *qui tam* claim at any time. Finally, *qui tam* plaintiffs benefit through a bounty—a fee that comes "out of the [government's] recovery for filing and/or prosecuting a successful action on behalf of the Government."[66] Based on these differences, some scholars and courts have attempted to draw a distinction between *qui tam* and private enforcement of public laws. As we fully explore in Section V below, we think this distinction should not be overstated. There is good evidence that *qui tam* served as a model for modern private enforcement and that Congress believed that many new statutory regimes were consistent with traditional qui tam principles.[67] We therefore take a middle-ground position: we view *qui tam* as a label for certain private

---

[60] *Id.*

[61] Thompson, Jr., *supra* note 58, at 192.

[62] *Id.*

[63] Vermont Agency of Nat. Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 774 (2000); David Freeman Engstrom, *Harnessing the Private Attorney General: Evidence from Qui Tam Litigation*, 112 COLUM. L. REV. 1244 (2012).

[64] *Vermont Agency*, 529 U.S. at 769.

[65] *Id.*

[66] *Vermont Agency*, 529 U.S. at 769.

[67] Barton H. Thompson, Jr., The Continuing Innovation of Citizen Enforcement, 2000 U. ILL. L. REV. 185, 192.

12

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

enforcement regimes, while recognizing that courts may treat those schemes differently.

*Private Rights of Initiation Against Government Action.* Several statutes also create a unique form of private enforcement that empowers plaintiffs to sue the government for failure to pursue its regulatory obligations. For instance, under the Clean Air Act, "citizen enforcement may compel the Administrator [of the EPA] to perform a nondiscretionary duty."[68] Cass Sunstein and Richard Stewart call these provisions a "private right of initiation."[69] The private party "challenges an agency's failure to take action," and in that sense, initiates a dialogue between courts and agencies over their statutory duties.[70] These are a different variation of private enforcement—one that empowers a party to sue only the government. In that sense, they are a form of citizen monitoring of government officials. The Supreme Court has viewed private rights of initiation with suspicion.[71] And, to be sure, these rights implicate similar values and principles as private enforcement. But because they are sufficiently distinct, we do not (for now) focus on these rights of action.

*Other Delegations.* Governments often outsource not only the prosecution of civil claims against those who violate public laws, but also the identification and investigation of those violators. For example, Congress has expanded whistleblower regimes in a range of areas, including, for example, the securities laws. Many of these private regimes run parallel to their public counterparts; others are symbiotic with them. In Appendix A, we develop a typology that roughly categorizes these forms of government action, accompanied by some examples culled from literature. The message is clear: in several doctrinal areas, courts recognize that private parties can and do exercise executive power. And none of it violates Article II.

## II.    The Article II Challenge

This Section introduces the Article II challenge on private enforcement. That challenge rests on three legs: First, proponents argue that private enforcement schemes cannot empower private plaintiffs to exercise prosecutorial discretion (i.e., decide *when and how* to enforce the law) or to proactively enforce the law, because only the Executive has the choice of "how to prioritize and how aggressively to pursue legal actions." Second, that when *unharmed* plaintiffs file a claim that interferes with a *public* right, they do so on behalf of the public in the manner only the publicly accountable executive is authorized to.[72] Third, they argue that private rights of action improperly pursue remedies that accrue to the public at large, and which only the executive may

---

[68] Roger A. Greenbaym & Anne S. Peterson, *The Clean Air Act Amendments of 1990: Citizen Suits and How They Work*, 2 FORDHAM ENV'T L. REV. 79 (2011).

[69] Cass R. Sunstein & Richard B. Stewart, *Public Programs and Private Rights*, 95 HARV. L. REV. 1193 (1981).

[70] *See* Robert L. Glicksman, *The Value of Agency-Forcing Citizen Suits to Enforce Nondiscretionary Duties*, 10 WIDENER L. REV. 353 (2004).

[71] *See* Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 576 (1992).

[72] TransUnion LLC v. Ramirez, 594 U.S. 413, 429 (2021). The argument explicitly relies on the historical claim that "at common law, individual plaintiffs could sue over violations of their own private rights, but not for violation of public rights, like a defendant's general noncompliance with the law." Brief for Center for Constitutional Responsibility, *supra* note 18, at 2.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

bring.[73] The underlying concern is that when private litigants begin to sue like the government does—in a manner that punishes public harms and vindicates public rights—they not only prohibit the discretion guaranteed to the Executive by the Take Care Clause, but also avoid public accountability.

We recognize that describing the Challenge could give undue legitimacy to what might be more easily dismissed as an ends-focused tool for defanging the regulatory state. But as we explain below, the theory has already begun to gain prominence, and we see scholarly value in exposing its weaknesses on its own terms.[74]

## A. The Article II Challenge's Jurisprudential Roots

Judges seem increasingly receptive to the argument that private enforcement can violate Article II, even though it contradicts long running case law holding that private enforcement of the law—in its many forms—is definitively constitutional, regardless of these features.[75] The Supreme Court has itself indicated that it may be open to the Article II challenge but only indirectly: civil-suit standing cases warn that Congress cannot transfer the President's power to enforce the law to private plaintiffs, the Supreme Court has reserved the question of whether the *qui tam* violates Article II, and several Appointments Clause cases open the door to the possibility that delegation to private plaintiffs could violate the Appointments Clause.

### 1. Standing Doctrine's Article II Undercurrents

Begin with original traces of Article II limitations on private enforcement in major Supreme Court precedent on standing—*Valley Forge Christian College v. Americans United for Separation of Church and State*, *Lujan v. Defenders of Wildlife*, and *TransUnion v. Ramirez*. In those standing cases, the Supreme Court signaled that private parties cannot enforce the law without a direct injury at stake. Take, for instance, *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, where the Court voiced a "concern that certain classes of injuries could give private individuals an unlimited amount of prosecutorial discretion."[76] In denying a non-profit organization's standing to challenge a federal government conveyance of property to a Christian college, the Supreme Court noted that the organization could not merely assert that "the Constitution has been violated," implying that a private organization could not take on the role of enforcing the Establishment Clause without a more direct injury to its interests. The Court made its reliance on Article II explicit in *Allen v. Wright*, when it explained while rejecting taxpayer standing to challenge exemptions for allegedly discriminatory private schools that "[t]he Constitution, after all, assigns to the Executive Branch, and not to the Judicial Branch, the duty to 'take Care that the Laws

---

[73] *Id.*

[74] We thank Amalia Kessler and others for emphasizing this distinction.

[75] *See, e.g.*, United States *ex rel.* Kreindler v. United Techs., 985 F.2d 1148, 1155 (2d Cir. 1993); United States *ex rel.* Kelly v. Boeing Co., 9 F.3d 743, 748 (9th Cir. 1993); United States *ex rel.* Stone v. Rockwell Int'l Corp., 282 F.3d 787, 806 (10th Cir. 2002).

[76] Tara Leigh Grove, *Standing Outside of Article III*, 162 U. PENN L. REV. 1311, 1352 & n.190 (2014); Valley Forge Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464 (1982).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

be faithfully executed.'"[77] In other words, standing doctrine has served in part to guard the executive's prerogative to vindicate the public interest through exclusive public suits.[78]

Although the Court then temporarily distanced itself from this Article II justification for standing,[79] its most recent major standing case again made the Article II basis for standing doctrine explicit. In *Transunion*, a case involving a class action claim over alleged violations of the Fair Credit Reporting Act, the Court explained that "[a] regime where Congress could freely authorize unharmed plaintiffs to sue defendants who violate federal law would not only violate Article III *but also would infringe on the Executive Branch's Article II authority*."[80] Justice Kavanaugh's opinion also made a specific—and, as we show below, mistaken—claim about the history: that "until the 20th century, Congress rarely created 'citizen suit'-style causes of action for suits against private parties by private plaintiffs who had not suffered a concrete harm."[81]

Finally, in *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, the Court held that the Clean Water Act's citizen-suit provisions enabled private litigants to extract from defendants monetary penalties payable to the government.[82] Finding that private plaintiffs had standing to extract penalties payable to public coffers, the Court explained that "[s]uch penalties may serve, as an alternative to an injunction, to deter future violations and thereby redress the injuries that prompted a citizen suitor to commence litigation."[83] The opinion prompted Justice Kennedy to observe:

> Difficult and fundamental questions are raised when we ask whether exactions of public fines by private litigants, and the delegation of Executive power which might be inferable from the authorization, are permissible in view of the responsibilities committed to the Executive by Article II of the Constitution of the United States.

Finding that these Article II questions had not been properly raised, Justice Kennedy left them "best reserved for a later case."[84]

---

[77] 468 U.S. 737, 761 (1984).

[78] *See, e.g.*, Sarah Leitner, *The Private Rights Model of* Qui Tam, 76 FLA. L. REV. 1, 10 (2024); Jack Goldsmith & John Manning, *The Protean Take Care Clause*, 164 U. PENN L. REV. 1835, 1845 (2016).

[79] *See* Steel Co v. Citizens for a Better Environment, 523 U.S. 83, 102 n.4 (1998) ("[O]ur standing jurisprudence, which, though it may sometimes have an impact on presidential powers, derives from Article III and not Article II."); Vermont Agency of Natural Resources v. U.S. ex rel. Stevens, 529 U.S. 765, 778 n.8 (2000) (citing *Steel Co.*, 523 U.S. at 102 n.4). We thank Elliot Setzer for this and other critical contributions.

[80] TransUnion LLC v. Ramirez, 594 U.S. 413, 429 (2021).

[81] *Id.* n.1.

[82] 528 U.S. 167, 174 (2000).

[83] *Id.*

[84] *Id.* at 197 (Kennedy, J., concurring). In a dissent, Justice Scalia agreed that the issue had not been raised and did not address Article II concerns with the statute. *See id.* at 209 (Scalia, J., dissenting).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

### 2. *Qui Tam*'s Article II Problem

Similarly, in the context of *qui tam*, litigants, judges, and the Executive Branch have at times indicated that empowering private plaintiffs to bring claims on behalf of the government can be an intrusion into executive power.[85] In *Vermont Agency*, the Court declined to address whether *qui tam* suits violate the Take Care Clause but left open the possibility, noting: "[i]n so concluding, we express no view on the question whether *qui tam* suits violate Article II."[86] Although Justice Thomas joined that opinion in full, he has more recently written separately to endorse the argument that the *qui tam* scheme may improperly usurp executive power under the Take Care clause and the Appointments Clause.[87] Even the Executive, for its part, has equivocated on the constitutionality of *qui tam* actions: a Department of Justice's Office of Legal Counsel Opinion by William P. Barr initially concluded that relator-initiated *qui tam* suits violated Article II.[88] But only a few years later, that same Office adopted the opposite approach.[89]

As described in our Introduction, a recent trio of Supreme Court cases has revived, but ultimately dodged, that core question: *Polansky*, *Whole Woman's Health v. Jackson*, and *Viking River Cruises, Inc.*[90] The upshot is that the Supreme Court has arguably embraced several different ingredients of the Article II challenge—the civil-suit standing cases warn that Congress cannot transfer the President's power to enforce the law to private plaintiffs, *Vermont Agency* reserves the question whether the *qui tam* violates Article II.

### 3. Articulating The Article II Challenge

Drawing on these signals from the Supreme Court, Eleventh Circuit Judge Newsom recently articulated a comprehensive Article II challenge to private enforcement in *Laufer v. Arpan LLC*, with an emphasis on originalism. *Laufer* involved a disabled plaintiff and self-styled advocate who sued a hotel for denying disabled guests an equal opportunity to make reservations for accessible guest rooms.[91] The plaintiff had never visited the hotel nor attempted to make a reservation. Instead, the plaintiff merely visited the hotel's website. By her own admission, the plaintiff was a "tester," an advocate who specializes in monitoring whether "places of public accommodation and their websites comply with the ADA." In this capacity, Laufer filed more than 50 ADA lawsuits against hotel owners for alleged noncompliance with ADA regulations requiring hotels to ensure that disabled individuals "can make reservations for accessible guest rooms . . . in the same manner as individuals who do not need accessible rooms." Plaintiff took advantage of a broad private right of action

---

[85] *See* Leitner, *supra* note 78, at 16 & n.134. Though the Court has thus far rejected that proposition, in part because of the controls that *qui tam* provisions place in the Executive.

[86] *See* Vermont Agency of Nat. Res. V. United States *ex rel.* Stevens, 529 U.S. 765, 778 n.8 (2000).

[87] *See* United States *ex rel.* Polansky v. Exec. Health Res., Inc., 599 U.S. 419, 449 (Thomas, J., dissenting).

[88] OLC Opinion No. TK.

[89] OLC Opinion No. TK.

[90] *See supra* notes TK-TK.

[91] *See* Laufer v. Arpan LLC, 29 F.4th 1268, 1295 (11th Cir. 2022) (Newsom, J., concurring).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

in the ADA, empowering any "aggrieved" person to file a claim. But Laufer admitted that "she ha[d] no intention to visit the [hotel]."

The key question in the case (and the parallel case that the Supreme Court recently disposed of as moot),[92] then, was whether Laufer suffered a concrete injury under Article III. The Eleventh Circuit quickly answered yes, because a tester can satisfy Article III standing by showing an "emotional injury" from discrimination.[93] But Judge Newsom's concurrence took the case into Article II territory. In his telling, there was a separate problem because "Article II's vesting of the 'executive Power' in the President and his subordinates prevents Congress from empowering private plaintiffs to sue for wrongs done to society in general or to seek remedies that accrue to the public at large."[94] An ADA plaintiff, in this view, "principally seeks to advance the rights of disabled people generally." When a plaintiff does that, Newsom argued, they are unduly exercising executive power for the three reasons outlined in Part II above: (1) they usurp executive *discretion*, (2) sue to vindicate a public harm, and (3) extract a remedy payable to the public.

Judge Newsom drew on the case law that we have described above for each of these points—including by leaning heavily on *TransUnion*—but added a focus on history. Drawing on historical scholarship concerning prosecutorial discretion, Judge Newsom first noted that "enforcement discretion is a proper aspect of the executive function."[95] That is so because "a central premise of our constitutional order" is to provide "structural checks against the exercise of arbitrary power."[96] He observed that Laufer "literally manufactures her own standing . . . by bringing herself to the source of her own injury." This violates Article II, he proposes, because "[t]esters exercise the sort of proactive enforcement discretion properly reserved to the Executive Branch," even though they are "accountable to no one."[97] As to the second concern, Judge Newsom has elsewhere argued that the "Framing-era evidence" similarly "indicates that the President's constitutional power 'to enforce the execution of [the] laws'" includes "the pursuit of what we would recognize today as *civil* sanctions—for example, "pecuniary mulcts" (i.e., fines) and "suspension[s] or divestiture[s] of privileges."[98] Third, as to remedy, Judge Newsom noted that the remedy to an ADA tester does not accrue to the plaintiff "but rather to society at large," because Laufer admitted that even though she sought "an injunction ordering the hotel to review their websites," she had no intention to visit the hotel and could not possibly benefit from the hotel's change to its policies. His articulation of the theory adds nuance and gravity to the calls to attack private rights of action on an Article II basis. This focus on history

---

[92] *See* Acheson Hotels, LLC v. Laufer, 601 U.S. 1 (2023).

[93] *Laufer*, 29 F.4th 1268 at 1269.

[94] *Id.* at 1295.

[95] *Id.* (citing Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 701 (2014)).

[96] *Id.* (citing Grove, *supra* note TK).

[97] *Id.*

[98] Sierra v. City of Hallandale Beach, 996 F.3d 1110, 1136, 1140 (11th Cir. 2021) (Newsom, J., concurring) (citing The Federalist No. 21, at 134–35 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

builds on then-Judge Antonin Scalia's influential 1983 law article on standing doctrine.[99]

A critical assumption of the Article II Challenge is that there is a clean dichotomy between public and private rights—but that is not necessarily the case, and infringement on rights considered inherently public (such as the right to clean shared air) may be exercised on an individual basis. Taken to its extreme, this private rights-public rights dichotomy could upend private enforcement in the United States. Like torts, nearly all statutory rights of action seek to redress injuries *and* deter harmful behavior. In that sense, they promote the public interest through the adjudication of private rights, with no opportunity for executive enforcement discretion. Moreover, if Judge Newsom's interpretation of the historical evidence is correct, modern class actions (which are far more concerned with deterrence than compensation, and permit a few private litigants to bring claims on behalf of thousands or even millions of others) would be seriously out-of-step with the original meaning of Article II.

## B. The Article II Challenge in Scholarship

A long thread of scholarship has questioned the constitutional validity of private enforcement regimes based around an executive non-delegation doctrine. Somewhat analogous to the judicial challenge, the academic argument can be summarized as follows: Article II can prevent Congress from delegating the executive power to (1) impose punishment on legal violations and (2) exercise prosecutorial discretion. Congress crosses the line when, in effect, its delegation (3) usurps the executive's role to ensure that "an area of federal law is obeyed."

In *administrative law*, scholars have for decades considered the possibility that delegation of executive power to private parties can violate the separation of powers. Gillian Metzger once argued for a pure "private nondelegation doctrine" that would impose restrictions on private actors when they act as government agents for the purposes of policing government contracts, private prisons, and private-public partnerships for the administration of public benefits.[100] Specifically, Metzger briefly observed that private civil-suit provisions and *qui tam* lawsuits could serve as improper exercises of delegated governmental power by a private entity.[101] But the focus of her critique was, narrowly, on the role of private parties in policing executive power. Building on Metzger's critique, Dina Mishra has argued that "*the* executive power" cannot be delegated, and that any delegation in which the executive sacrifices control over the party exercising executive power may be unconstitutional.[102] Applying her theory to contracts with private prisons, Mishra posited that this nondelegable executive power might include the power to impose punishment and extract violence

---

[99] Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK UNIV. L. REV. 881, 882 (1988). He was not the first to suggest this—in fact, Justice Frankfurter was—but has been easily the most influential jurist in the modern development of standing doctrine.

[100] Gillian E. Metzger, *Privatization as Delegation*, 103 COLUM. L. REV. 1367 (2003).

[101] *Id.* at 1445 & nn. 270–71.

[102] Mishra, *supra* note **Error! Bookmark not defined.**.

18

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

as well as the power to interpret statutes for the purposes of execution.[103] Other scholars have since drawn the same connection.[104]

    *Federal courts scholarship*, too, has developed its own version of an Article II nondelegation doctrine. Professor Tara Leigh Grove has argued that modern standing doctrine ought to be reframed in Article II terms, and that Article II's implicit nondelegation requirement "prohibits the delegation of the Executive Branch's duty to see that federal law or an area of federal law is obeyed."[105] In other words, Grove identifies a similar executive nondelegation doctrine as Mishra, but cloaks it in the language of standing.[106] Other scholars have recognized that the Supreme Court's increasingly cramped view of Article III standing after *TransUnion* throws into question whether *qui tam* relators have standing to bring their claims.[107] One has connected Grove's theory with Newsom's concurrence in *Laufer* to argue that such a doctrine of standing might permit cases that the Supreme Court has rejected on standing grounds to move forward while excluding a narrow class of cases, like the tester-plaintiff case, on Article II grounds.[108]

    Still more, a third class of scholars leaves aside constitutional arguments to make *normative critiques* of private enforcement as potentially threatening individual rights, particularly when states create regimes that may conflict with federally protected rights.[109] Some of this scholarship has reemerged in the wake of Texas' anti-abortion law, S.B. 8. That law empowered "anyone" to sue abortion providers for performing abortions—even though abortion remained constitutionally protected at the time.[110] In response, some scholars argued that such aggressive use of private enforcement violated Article II and the Due Process clause. These arguments begin to share similarities with the Article II Challenge. For instance, Wasserman and Rhodes argue that individuals suing pursuant to S.B. 8 are state actors.[111]

*   *   *

    With judicial and scholarly challenges on private enforcement in mind, we can summarize the constitutional challenge as follows: Article II protects a core of executive non-delegable powers, including prosecutorial discretion (or the ability to pick and choose when to enforce the law), the duty to engage in proactive enforcement

---

[103] Mishra briefly observed that her theory could jettison certain categories of private suits. *Id.* at 1537, 1551–53.

[104] *See* Leitner, *supra* note 78, at 15. (quoting Morrison v. Olson, 487 U.S. 654, 696 (1988)).

[105] Grove, *supra* note **Error! Bookmark not defined.**, at 783-85.

[106] *Id.*

[107] As one scholar notes, "if we take the Court's decision in *TransUnion* seriously, *qui tam* as it is currently understood violates Article III *and* infringes Article II authority." *See* Leitner, *supra* note 78, at 12.

[108] *See* Jonathan Adler, *Standing Without Injury*, 59 WAKE FOREST L. REV. (forthcoming 2024) (manuscript at 38).

[109] *See* Michaels & Noll, *supra* note **Error! Bookmark not defined.**; Huq, *supra* note **Error! Bookmark not defined.**.

[110] For a detailed description, see Huq, *supra* note **Error! Bookmark not defined.**, at 3–5.

[111] Howard M. Wasserman & Charles W. "Rocky" Rhodes, *Solving the Procedural Puzzles of the Texas Heartbeat Act and Its Imitators: The Limits and Opportunities of Offensive Litigation*, 71 AM. U. L. REV. 1029, 1079–83 (2022).

19

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

of the law (so as to ensure that an area of federal law is obeyed), and the ability to seek remedies that accrue to the public at large. Congress cannot delegate a combination of these powers to private enforcers.

## III.    Private Enforcement and Executive Power in the Founding Era

In this Section, we surface previously neglected historical sources to demonstrate the prominence of private enforcement in the Founding Era. Textualist critics argue that "Executive Power" in the eighteenth century entailed an exclusive discretion over law enforcement; as a result, the "Vesting" and "Take Care" clauses of Article II limit the ability of Congress to empower private litigants to enforce federal law. To the extent these critics seek to call private *civil* enforcement into question, their challenge raises a concrete historical question: were regulatory statutes empowering private parties to bring a *civil cause of action* seen as an affront to executive power in the Founding Era?

This Section answers that question by canvassing the relevant sources, from background understandings in the English and colonial legal systems to early state and federal lawmaking. We focus mostly on the law on the books (of which there is more evidence, and which can reflect codified shared societal understandings) but also consider the law in action. In short, the Article II critics ignore key elements of Founding-Era legal practice and seriously misunderstand Founding-Era legal theory. They overstate the discretionary powers of British and American executive officers, and overlook the extensive use of private enforcement by Parliament, colonial assemblies, state legislatures, and early Congresses. In fields that we now regard as "public law," like tax enforcement and economic regulation, statutory private enforcement was the rule rather than the exception in the Founding Era. Standing alone, this history does not provide a mechanical test for defining the separation of powers. But it does show that private rights of action for reasons of public policy were not perceived as inherently executive. The Americans who framed and ratified the Constitution saw no conflict between widespread private enforcement and the separation of powers in the federal Constitution.

### A.  England: Active Plaintiffs, Passive King

First, the Article II critics misunderstand the robust tradition of private enforcement that the Framers inherited from the English legal system. Jurists like Judge Newsom and Justice Thomas are right to suggest that the separation of powers in British constitutional law influenced the Framers, but they do not reckon with the limited enforcement discretion possessed by the Crown and the long history of regulatory private enforcement by statute in England.

The misunderstanding is most evident in the way these critics deploy William Blackstone as an authority for the public rights-private rights approach. Nearly all proponents of the Article II challenge to private enforcement cite the influential distinction his *Commentaries* drew between "private" and "public wrongs" in the late 1760s. At the level of abstraction, the *Commentaries* seem to make a vigorous case for

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

the executive's exclusive power to redress public wrongs. Blackstone wrote that the King, as the embodiment of executive power, was "the proper person to prosecute for all public offences and breaches of the peace."[112] Indeed, "public liberty . . . cannot subsist long in any state, unless the administration of common justice be in some degree separated from both legislative and also from the executive power."[113] Joining the power of the executive and judiciary would soon "over-balance" and usurp the prerogatives of the legislature.[114]

But a closer reading reveals that Blackstone's theory of "public wrongs" did not preclude private enforcement. Far from it: the *Commentaries* themselves reveal that the Crown's executive power to redress public wrongs was fully compatible with (and even presupposed) a system of near total private enforcement.[115] Article II critics tend to identify three core elements of enforcement power: discretion over whether to bring an action; authority to control or terminate a pending case; and the option to pardon or remit a penalty after conviction.[116] With respect to criminal offenses—the quintessential public wrong—the King and his officers possessed these powers only in part. Moreover, the Crown exercised (almost) no control over the suits most relevant to modern debates about private enforcement—private actions to collect civil damages or other penalties authorized by statute.

The Crown had almost no discretion over the decision to initiate criminal actions.[117] When Blackstone wrote that the king "is always present in all his courts, though he cannot personally distribute justice," he was not suggesting that local executive officials acted in the king's stead by deciding when to prosecute.[118] There *were no* local public prosecutors in Blackstone's England.[119] In fact, England had no

---

[112] 1 WILLIAM BLACKSTONE, COMMENTARIES *258-59.

[113] *Id.* *259.

[114] *Id.* *260.

[115] Indeed, Blackstone's public/private distinction likely derived more from civil law theory than common law practice. As David Liebermann notes, one of the chief objectives of the *Commentaries* was to reduce English law to a "System," through a "selective rationalization and adaptation of a messy and technical body of inherited materials." Lieberman, *Blackstone and the Categories of English Jurisprudence*, in Norma Landau (ed.), LAW, CRIME AND ENGLISH SOCIETY (Cambridge 2009). Blackstone frequently seized on Roman and Civil law concepts to make sense of English "materials," and it is striking how heavily his discussions of separation of powers theory rely on continental legal theorists like Montesquieu and Cesare Beccaria, rather than common law mainstays like Coke and Hawkins.

[116] See, e.g., Laufer v. Arpan LLC, 29 F.4th 1268, 1291-94 (2022) (Newsom, J., concurring) (identifying the choice of whether to bring suit, and the ability to decline an existing prosecution, with "executive-style enforcement discretion"); Price, *Enforcement Discretion*, supra note TK.

[117] Studies of seventeenth- and eighteenth-century court records have confirmed the dominance of privately initiated suits in English criminal justice. *See, e.g.*, Norma Landau, *Indictment for Fun and Profit*, 17 L. & HIST. REV. 507 (1999).

[118] 1 WILLIAM BLACKSTONE, COMMENTARIES *259.

[119] J. M. BEATTIE, CRIME AND THE COURTS IN ENGLAND 1660-1800 35-50 (1986) (describing private prosecution in eighteenth century England and tracing the slow rise of public prosecution after 1850). The closest thing to a local public prosecutor in eighteenth-century England was probably the coroner, 4 WILLIAM BLACKSTONE, COMMENTARIES *305.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

officers comparable to American district attorneys until 1879.[120] In nearly every case, a "private prosecutor"—usually, though not necessarily, the crime victim—would hire an attorney at his own expense to pursue the claim in the name of the king.[121] The only meaningful exception was the Attorney General's power to file a criminal information for "public misdemeanors" *ex officio* (that is, by the authority of his office).[122] This category excluded all felony prosecutions, and in practice encompassed only a narrow range of political offenses which might "disturb or endanger [the King's] government"—for example, libels on government, breaches of quarantine, bribery, or obstructing a revenue officer.[123] All other criminal actions—by indictment, presentment, information, and appeal of felony—left private actors with the choice of whether to initiate a case. The *Commentaries* and other contemporary treatises leave no doubt that in the vast majority of cases the King merely "lent the sanction of his name to a [private] prosecutor" over which Crown officials had little or no control.[124]

Executive officers did have some power to intervene in criminal cases that private parties brought in the King's name. The Attorney General could enter a writ of *nolle prosequi* (meaning, roughly, "unwilling to prosecute") to stay a criminal proceeding, even one initiated by a private prosecutor.[125] And, of course, the King could pardon convicted criminals and commute punishments—a regular occurrence in the English justice system, where so many property offenses carried a death sentence.[126] But both the *nolle prosequi* and the pardon were inapplicable against the Founding Era suits most directly relevant to modern private enforcement: actions on "penal statutes."

The King had almost no power to control prosecutions under penal statutes. To twenty-first century ears, the term "penal statute" is a synonym for a "criminal law." But in the eighteenth century, it had a distinct meaning. Most Founding-Era crimes were common law offenses, defined by judicial precedent rather than statute.

---

[120] Philip B. Kurland and D. W. M. Waters, *Public Prosecutions in England, 1854-79: An Essay in English Legislative History*, 1959 DUKE L.J. 493, 550-562; David D. Friedman, *Making Sense of English Law Enforcement in the Eighteenth Century*, 2 U. CHI. L. SCH. ROUNDTABLE 475, 476 (1995).

[121] Until 1859, when Parliament required private prosecutors of perjury, conspiracy and libel claims to obtain permission from the Attorney General, "any person could prosecute for any crime and could prosecute any person he could get a magistrate to bind over." Thomas J. Robinson Jr., Note, *Private Prosecution in Criminal Cases*, 4 WAKE FOREST INTRAMURAL L. REV. 300, 304 (1968).

[122] 4 WILLIAM BLACKSTONE, COMMENTARIES *305. A modern editor of the Commentaries notes that informations *ex officio* were "perceived to be repressive, as they bypassed the grand jury and were usually reserved for political offences." Ruth Paley, *Introduction* to 4 WILLIAM BLACKSTONE, COMMENTARIES, at xxiii (Wilfrid Prest ed., Oxford Univ. Press 2016).

[123] 4 WILLIAM BLACKSTONE, COMMENTARIES *305; JOSEPH CHITTY, 1 A PRACTICAL TREATISE ON THE CRIMINAL LAW 582 (1818) (giving these examples).

[124] 4 WILLIAM BLACKSTONE, COMMENTARIES *305. Joseph Chitty's influential treatise (written at the close of the Founding Era) gave essentially the same account as Blackstone: *"criminal prosecutions, though in the name of the king, are usually instituted by some particular individual."* 1 CHITTY, *supra* note 123, at iii.

[125] *Id.*, at *849; STEPHENS, HISTORY OF THE CRIMINAL LAW OF ENGLAND 496 (1883).

[126] Friedman, *supra* note 120, at 481-82, 496.

22

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

By contrast, "penal statutes" were positive laws which assessed a *penalty*;[127] as Blackstone defined them, "such acts of parliament whereby a forfeiture is inflicted for transgressing the provisions therein enacted."[128] The penalty could be payable solely to the King, or to "the party aggrieved," but

> more usually these forfeitures created by statute are given at large to any common informer; or, in other words, to any such person or persons as will sue for the same: and hence such actions are called *popular* actions, because they are given to the people in general. Sometimes one part is given to the king, to the poor, or to some public use, and the other part to the informer or prosecutor: and then the suit is called a *qui tam* action, because it is brought by a person "*qui tam pro domino rege, &c., quam pro se ipso in hac parte sequitur* [who prosecutes this suit as well for the lord king, etc., as for himself]." [129]

In other words, the category of "penal statutes" comprehended a broad range of suits authorized by the legislature: some brought by common informers for a penalty, some by aggrieved parties for damages; some by plaintiffs suing solely in their own name, and some by plaintiffs splitting the reward with the sovereign. Actions on penal statutes could be brought by civil or criminal process,[130] but Founding-Era English jurists distinguished them from true "criminal proceedings."[131] While some penal statutes simply attached fines to "particular crimes and misdemeanors," the "greatest part are *mala prohibita*, or such as derive their guilt merely from their prohibition by the laws of the land." [132] In other words, they were regulatory, touching "mere matters of police and public convenience."[133] These actions spanned an "extraordinarily wide range of offenses," from matters directly affecting the public fisc (like customs duties) to regulations of purely private agreements (like usurious loans, or apprenticeships) to vice legislation (like bans on Sunday amusements).[134]

Even though penal statutes sought to achieve *public* regulatory ends, eighteenth-century jurists understood the statutory awards they conferred as a kind of private property. Accordingly, as early as *Stretton and Taylor's Case* in 1588, the common law courts determined that the Attorney General could only enter a *nolle prosequi* for

---

[127] *See, e.g.*, GILES JACOB, *Information, in* A NEW LAW DICTIONARY (1729) (noting that a private plaintiff may proceed "upon the Breach of some Penal Law or Statute, wherein a Penalty is given to the Party that will sue for the same") There appears to have been a semantic shift in the early nineteenth century; by 1820, Chief Justice Marshall used "penal statute" in a more modern sense, to refer to a federal law punishing "manslaughter on the high seas." United States v. Wiltberger, 18 U.S. 76, 93-94 (1820).

[128] 3 WILLIAM BLACKSTONE, COMMENTARIES *161.

[129] *Id.*

[130] In 1729, Giles Jacob categorized informer's suits as civil actions, but noted that they could also "be rank'd under criminal actions." *See* GILES JACOB, *Actions, in* A NEW LAW DICTIONARY, *supra* note 127.

[131] See, e.g., CHITTY, *supra* note 123, at *840-41. (noting that *qui tam* informations were actions "the recovery of a pecuniary penalty, than criminal proceedings")

[132] 2 WILLIAM BLACKSTONE, COMMENTARIES *420.

[133] 2 WILLIAM BLACKSTONE, COMMENTARIES *262.

[134] Paley, *supra* note 122, at iii.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

the Crown's portion of a *qui tam* action.[135] That rule remained in force throughout the eighteenth century,[136] and *Stretton* was cited as good law in England as late as 1861.[137] Similarly, it was well-established that the Attorney General had no power to interfere in an action brought for compensatory damages, whether the injured party sued under common law or penal statute.

The same conceptual limitations applied to the post-conviction power of pardon. If no private informer had brought an action on a penal statute, the king was free to pardon the defendant's conduct and block any future claims.[138] But after the suit commenced, the King could not "remit any thing but his own part of the penalty."[139] By commencing suit, the informer "made the popular action his own private action, and it is not in the power of the crown, or of any thing but parliament, to release the informer's interest."[140]

Penal statutes pose an obvious problem for the public rights-private rights theory of Article II: they are the archetypal example of private litigants enforcing the law on behalf of the public. As the English political economist and statesman Charles Davenant put it in 1699, "Lawgivers have many times fortified their Laws with Penalties wherein Private Persons may have Profit, *thereby to stir up the People to put the Laws in Execution.*"[141] Even though claimants under a penal statute exercised a kind of executive power, the Crown's discretionary controls over public law litigation—the *nolle prosequi* and the pardon—did not apply to them. In that sense, "actions on statutes"[142] clearly anticipated modern statutory rights of action. Their acceptance in the Founding Era suggests that legislatively authorized private enforcement did not infringe on the "Executive power" as Blackstone and other English authorities understood that concept.

In fact, the Article II critics of private enforcement arguably seek to give the Executive authority which the King of England emphatically lacked: the "Power of Dispensing with and Suspending of Lawes and the Execution of Lawes without Consent of Parlyment."[143] The public rights-private rights theorists suggest that the Executive must have the power to override or control legislation which permits private parties to enforce public law. In practice, that principle would amount to a *judicial* power to reject the claims of private litigants who "execute" the law by pursuing

---

[135] *Stretton and Taylor's Case*, 1 Leon. 119 (1588).

[136] Regina v. Allen, 1 B&S 854, 931 (1861).

[137] TK.

[138] *See, e.g.*, Vanderbergh v. Blake, 145 E.R. 451 (Hardres 194, 199) (1673).

[139] 2 WILLIAM BLACKSTONE, COMMENTARIES *436.

[140] *Id.* *438

[141] CHARLES DAVENANT, AN ESSAY UPON THE PROBABLE METHODS OF MAKING A PEOPLE GAINERS IN THE BALANCE OF TRADE 55 (1699) (emphasis added) ("In Countries deprav'd, nothing proceeds well, wherein particular Men do not one way or other find their Accompt, and rather than a Publick Good should not go on at all; without doubt, 'tis better to give Private Men some Interest to set it forward.")

[142] This was William Hawkins's catchall term for civil private enforcement. *See* HAWKINS, *supra* note **Error! Bookmark not defined.**, c. 26, § 1.

[143] English Bill of Rights of 1689, 1 W & M, Sess. 2, Ch. 2 (stripping this power from the king).

24

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

statutory causes of action. Such an account of executive power bears a striking resemblance to the royal prerogative of dispensing—that is, "the power to allow exceptions to the law, to permit what otherwise would be illegal, to grant a subject license to act as if the law dispensed did not exist."[144] In 1689, the English Bill of Rights stripped this power from the King and by extension, from judges who might seek to assert it on the Crown's behalf.[145] For example, in the 1709 case of *Bruse v. Harcourt,*[146] the Court of the Exchequer recognized the implications of the Bill of Rights for private enforcement. There an informer brought an action for an illegal importation of French wine, in violation of a parliamentary embargo. Awkwardly, it turned out that the wine had been purchased "by the Queen's order, with her money."[147] But the Crown could not simply "dispense" with an inconvenient private prosecution. The Queen had to defend herself on grounds of statutory construction, like any other litigant.[148]

It would be very surprising if the Framers understood the English tradition of "Executive power" in the way that Judge Newsom and others suggest. The King's control over criminal proceedings was largely nominal, and the English executive had even less control of actions on penal statutes. Blackstone saw no contradiction between the British constitution's vaunted separation of powers, and the practical reality that most English laws—from crimes, to regulatory statutes, to private disputes—were enforced at the initiative of private litigants. Given the strong association of the dispensing power with the "heavy and insupportable yoke of arbitrary power,"[149] it would have actually been a striking departure from English tradition if Article II's Executive "vesting" or "take care" clauses imparted on the President a free-floating authority to annul private suits (either for damages or monetary penalties) that had been duly authorized by statute.

## B. Importation to the Colonies

Legal practice in early America—both before and after Independence—evinced a similar understanding of private enforcement, at least with regard to civil and regulatory matters. In fact, private enforcement loomed even larger in the colonies than in Britain, simply because Americans were subject to multiple "layers" of regulatory statutes. First, there were the numerous actions on statutes (many hundreds of years old) that the colonists knew from England. Colonial assemblies frequently reenacted English penal statutes, and it appears that many colonists brought claims

---

[144] Carolyn A. Edie, *Revolution and the Rule of Law: The End of the Dispensing Power, 1689*, *in* 10 EIGHTEENTH-CENTURY STUDIES 434, 435 (1977).

[145] *Id.* The English Bill of Rights, enacted after the Revolution of 1688, declared "That the pretended Power of Dispensing with Laws or the Execution of Laws by Regall Authoritie as it hath beene assumed and exercised of late is illegall." 1 W & M, Sess. 2, Ch. 2.

[146] 145 E.R. 778 (Parker 274) (1709).

[147] *Id.*

[148] *Id.* Even before the Glorious Revolution, the English courts would probably not have permitted the Crown to remit a private litigant's claim under a penal statute. *See* Vandebergh v. Blake, 145 E.R. 451 (Hardres 194, 199) (1673).

[149] 1 A VINDICATION OF THE PROCEEDINGS OF THE LATE PARLIAMENT OF ENGLAND 2 (1690), *quoted in* Edie, *Revolution and the Rule of Law, supra* note 144, at 434.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

under English statutes even when they hadn't been specifically reenacted.[150] Then came those Acts of Parliament which applied specially to the colonies.[151] All of these laws were enforced, primarily, by *qui tam* provisions. Finally, the colonial assemblies themselves (and the state legislatures that succeeded them) passed reams of statutes which relied on private enforcement. American legal historians have long recognized the informer's action as a key part of the "colonial heritage" which remained a regulatory tool for both state and federal government throughout the nineteenth century.[152] And informer's actions have been discussed at length in the context of Article III standing[153] and in scholarly discussions of modern *qui tam* statutes.[154] But the prevalence and variety of private enforcement in early American lawmaking—and its significance for the separation of powers—has been largely overlooked.

The interpretative value of colonial and state practice is sometimes discounted on the grounds that these legislatures were not constrained by the same separation of powers framework that the Constitution eventually adopted. That critique largely misses the point. The delegates of the Constitutional Convention, almost without exception, gained their legislative experience in colonial and state assemblies. Furthermore, some colonies already had strict separation of powers in place. Massachusetts, for example, committed itself to an even stricter separation of powers than the federal convention later adopted: "the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and executive powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them."[155] Even Justice Scalia, a trenchant defender of executive power, thought the federal Constitution simply captured the Massachusetts principle with more "economy of expression."[156] Accordingly, legal practice in Founding-Era Massachusetts offers a reasonable proxy for the background understandings of executive power embodied in the federal Constitution.

When Massachusetts obtained a new royal charter in 1692, the reorganized provincial government immediately devised a new court system and enacted statutes empowering private litigants to seek monetary penalties (and sometimes compensatory damages) by "bill, plaint, or information."[157] The legislature never looked back: the

---

[150] *See* ELIZABETH GASPAR BROWN, BRITISH STATUTES IN AMERICAN LAW 1-22 (1969).

[151] *See, e.g.*, The Navigation Act of 1651, 12 Cha. 2 c. 18 *et seq.*

[152] LANGBEIN ET. AL., HISTORY OF THE COMMON LAW 223 (2009); *see also* LAWRENCE FRIEDMAN, A HISTORY OF AMERICAN LAW 39 (3d ed. 2005).

[153] *See, e.g.*, Sunstein, *supra* note 42 (suggesting that *qui tam* and other common law actions provide a precedent for expansive statutory standing); Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine*, 102 MICH. L. REV. 689 (2004) (refuting Sunstein's account).

[154] *See, e.g.*, Randy Beck, *Popular Enforcement of Controversial Legislation*, 57 WAKE FOREST L. REV. 553 (2022) (discussing the historical precedents for the recent Texas abortion statute); Leitner, *supra* note 78 (considering constitutional limits of *qui tam* actions).

[155] MASS. CONST. pt. I, art. XXX (1780).

[156] Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881 (1983).

[157] *See, e.g.*, An Act for the Regulating and Encouragement of Fishery, ch. 32, 1 Acts and Resolves 71 (1692/1693).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

Assembly continued to create private rights of action, in similar terms,[158] well into the nineteenth century. Approximately ten percent of all public acts passed in Massachusetts between 1690 and 1820 expressly relied on private litigants for enforcement.[159] That somewhat understates the prevalence of private enforcement, because some statutes created multiple rights of action.

Those actions enforced public policy in nearly every domain of legislative activity: duties on luxury goods, restraints on roving livestock, fishing and hunting regulations, limits on dirty industries like tanning and smithing, quarantine measures for people and livestock, prohibitions on usury and price gouging, qualifications for the skilled trades, standards for weights and measures, ship building, fish pickling, meat packing, and more.[160] Nearly all of these causes of action were "popular actions" (permitting any informer to sue) but many *also* authorized injured parties to bring claims for damages. These private suits—obviously calculated to achieve public regulatory ends—defy the hard and fast distinction between public and private rights proposed by some Article II critics of private enforcement.

Laws regulating the commons, a quintessential public right, typify this blend of public and private remedies. In 1693, the Assembly passed "An Act For Regulating Of Fences, Cattle, &c.," for "the better preventing of damage in corn-fields, and other improved and common lands, by horses, neat cattle, sheep, or swine, going at large."[161] The Act established limits on the number of "horse-beasts" that townspeople could keep on the commons, and set penalties for overgrazing the commons—ten shillings for each unregistered horse. Half of any penalty collected was earmarked for town use, but the other half was reserved "to him or them that shall inform and sue for the same before any justice of the peace within the county." Another provision required pig owners to yoke swine kept on the common and ring their noses, to keep them from squeezing through fences and rooting up crops. If any unyoked or unringed swine were found on the commons, their owners would "be liable to pay sixpence per head; and if found damage feasant [i.e. rooting up a private field] being unyoked or unringed, to pay twelvepence per head, *over and above double damages to the party injured*."[162] Obviously, a private plaintiff who sued an overgrazer was vindicating a public right in commons property. Claims for harm caused by unyoked pigs—which combined

---

[158] The general practice of permitting the informer to sue by either civil or criminal process continued throughout the period, although the particular enabling language ("by bill, plaint, or information") did change over time. *Cf.* An Act to Provide for the Storing and Safe Keeping of Gunpowder in the Town of Cambridge, ch. 35 (1809) (permitting recovery by information, indictment, or action on the case).

[159] This figure is based on text searchers for legislative terms specific to informer's actions, made possible by the state of Massachusetts's digitization of the Acts and Resolves. Not all of these Acts took effect; some were vetoed by the King (through the oversight of the Board of Trade in London, a committee of the Privy Council responsible for the colonies).

[160] *See* Lucky, *supra* note **Error! Bookmark not defined.**, at 43-67.

[161] An Act for Regulating of Fences, Cattle, &c., ch. 7, 1 Acts and Resolves 138 (1693/1694). The 1693 Act apparently remained in force throughout the following century, with minor amendments in 1751 and 1758.

[162] *Id.* (emphasis added) The per-pig penalty was to be collected by an informer's action, with half the fine going to the town and half to the prosecuting informer; but the damages provision gave a (potentially) separate right of action to the injured party.

27

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

compensatory damages with deterrent penalties—would have redressed injuries to both private property and a public resource.

While provincial court records are spotty, it is clear that both government officials and private citizens frequently brought these types of statutory claims. In his career as a colonial lawyer, John Adams worked on a number of such cases and never identified a separation-of-powers issue even in his most ardent defense against such suits.[163] For example, Adams defended one client from a civil *qui tam* action brought according to a statute governing voting procedures at town meetings.[164] The law provided that any moderator who permitted an unqualified person to "give his voice" at the meeting would forfeit five pounds, half to the poor of the town, "and the other moiety to him or them that shall inform or sue for the same in any of his majesty's courts of record."[165] The plaintiff alleged that the presiding officer of the Rowley town meeting had counted the vote of a man who did not meet the property qualifications for the franchise. It is hard to imagine a more "public right" than one citizen's interest in local electoral procedures. But Adams—constitutional savant and separation of powers obsessive—never seems to have identified this as a problem. In fact, despite the ubiquity of private claims under both Parliamentary and provincial rights of action, and frequent complaints about the excesses of "common informers," and endemic constitutional debates, *no one* in Revolutionary Massachusetts seems to have made the argument pressed by the Article II critics—that private litigants who sought to enforce a public right were unconstitutionally exercising an "executive power."

## C.  Reformation and Retention in the States

That conceptual framework did not change substantially after the American Revolution or the ratification of the Constitution. States retained their colonial *qui tam* laws and private rights of action and continued to enact new ones. Widespread efforts to reform "penal statutes" in the 1780s only demonstrated their continuing vitality in American law. Although many states adopted local prosecutors with discretionary powers far greater than those of the English Attorney General, early state case law shows that their enforcement discretion did not extend to private suits for civil remedies. Neither prosecutors nor judges claimed the power to set aside private statutory claims, even when they interfered with the government's vindication of public rights.

Again, Massachusetts illustrates the general trend. In 1779, the House of Representatives passed an omnibus reenactment of colonial laws (including dozens of *qui tam* laws) which had been found "useful and beneficial."[166] The adoption of the

---

[163] The Adams Papers preserve Adams's notes (and sometimes even his diary entries) on many informer's actions. *See, e.g.*, 2 LEGAL PAPERS OF JOHN ADAMS 147-68, 181 n.28, 396-411 (Wroth & Zobel eds., 1965). In other words, Adams had plenty of occasions to ruminate on the constitutional implications of private enforcement.

[164] *Id.* at 3 (explaining the case in an editorial note, and reproducing Adam's notes on the matter).

[165] Act of 15 Jan. 1743, 3 Acts and Resolves 47-48.

[166] An Act for Continuing Sundry Laws That Are Near Expiring, ch. 18, 5 Acts and Resolves 1120 (1779/1780).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

1780 constitution, with its express commitment to separation of powers, did not dampen the state's enthusiasm for private enforcement. The new constitution provided that all colonial laws "shall still remain and be in full force, until altered or repealed by the Legislature; such parts only excepted as are repugnant to the rights and liberties contained in this Constitution."[167] If executive officials had an *exclusive* power to redress public wrongs, then "popular statutes" would surely have been repugnant to the new constitutional order. But the old actions remained on the books,[168] and the legislature continued to deploy private enforcement schemes for public ends.

If anything, these new causes of action were even more ambitious and public-rights-oriented than their colonial predecessors. In 1783, for example, the legislature overhauled the state's probate laws.[169] One striking new provision imposed a duty on every executor to present the will to the Register of Probate within 30 days of the testator's death.[170] Any executor who failed to do so would forfeit five pounds "for each month he or she shall delay to present the will, to be recovered by action of debt, one moiety to the plaintiff [i.e. the informer], and the other moiety to the legatees."[171] As the Supreme Judicial Court later noted, "The object of the statute was to compel a seasonable presentation of the will to the Probate Court."[172] In other words, the statute permitted any informer to vindicate a *public* interest in reliable public records (and more obliquely, the private statutory rights of will beneficiaries). Any number of modern consumer protection statutes operate on the same theory—from the Fair Credit Reporting Act to the Telephone Consumer Protection Act.

Massachusetts also injected private enforcement into areas that would otherwise have been governed by public nuisance law. To support the contention that private parties should not be allowed to redress public wrongs of a civil or regulatory nature, Article II critics of private enforcement sometimes point to the Founding-Era distinction between private nuisances and public nuisances. Public nuisances vexed or endangered the community at large, rather than inflicting an injury on some private person. Classic examples included obstructions of public roads, keeping hogs in the city, or running a "disorderly inn" or "bawdy house." Because "the law gives no *private* remedy for anything but a *private* wrong," Blackstone noted that "no [civil] *action* lies for a public or common nuisance, but an *indictment* only: because, the damage being common to all the king's subjects, no *one* can assign his particular proportion of it."[173] This is dubious support for a constitutional principle limiting statutory private enforcement. Blackstone was merely restating the common law theory of nuisance,

---

[167] MASS. CONST., ch. VI, art. VI (1780).

[168] See Joseph Story et al., *Preface* to THE CHARTERS AND GENERAL LAWS OF THE COLONY AND PROVINCE OF MASSACHUSETTS BAY (Story et al. eds., 1814) (explaining that there was "no general repeal" of colonial laws in that state and that several remained in force even in 1814).

[169] An Act Prescribing the Manner of Devising Lands, Tenements, and Hereditaments, ch. 24, 5 Acts and Resolves (1783).

[170] *Id.* § 16.

[171] Hill v. Davis, 4 Mass. 137, 139 (1808) (Parsons, C.J.) (construing this statute in an informer's action).

[172] *Id.*

[173] 3 WILLIAM BLACKSTONE, COMMENTARIES *219-20.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

which (as he himself recognized) could be altered by statute.[174] As discussed above, even an *indictment* in the King's name would be largely controlled by a private litigant in England.

In any case, American legislatures do not seem to have adopted Blackstone's conceptual framework—they frequently encouraged private civil suits to redress public nuisances. For example, in an age of timber buildings, keeping a large stockpile of gunpowder in a densely populated area was clearly a nuisance and a public wrong.[175] But an 1809 law in Massachusetts empowered informers to police this offense against the public with private suits.[176] The Act required all residents of Cambridge to store gunpowder in "brass, copper, or tin canisters," and forbade anyone from storing more than fifty pounds of gunpowder at a time. Violators would "forfeit and pay the full value" of the gunpowder, "one moiety to the use of the person who shall inform, complain, or sue for the same," the other to the town of Cambridge.[177] The penalty could be recovered "by information or indictment" or by "action on the case" before any court of competent jurisdiction.[178] Massachusetts was not an outlier. Every state in the union continued to pass penal statutes (with both private damages awards and *qui tam* provisions) in the first twenty-five years of independence.[179] A sweeping revision of Virginia's statutes (proposed by Thomas Jefferson in 1776, and later taken up by James Madison) included twelve informer's actions and many more statutory damages provisions.[180]

That is not to say that professional private litigants were popular.[181] Edward Coke famously called informers "viperous vermin," and "common informer" had become a term of abuse by the eighteenth century.[182] Undoubtedly, penal statutes created perverse incentives for both extortion and collusion. Informers often encouraged unwary defendants to break the law and extorted settlements for frivolous claims. Alternatively, because one plaintiff's successful claim would bar subsequent prosecutions, violators of penal statutes sometimes paid a confidante to sue and recover a sham judgement as a shield against legitimate claimants. As early as the reign

---

[174] *Id.* (discussing ways in which Parliament had extended and contracted the definition of a public nuisance); CHITTY, *supra* note 123, *851 (listing "keeping great quantities of gunpowder so as to endanger the neighborhood" alongside other nuisances).

[175] 3 WILLIAM BLACKSTONE, COMMENTARIES *219-20 (citing Acts of Parliament treating gunpowder as a nuisance).

[176] An Act to Provide for the Storing and Safe Keeping of Gunpowder in the Town of Cambridge, ch. 35 (1809).

[177] *Id.* § 1.

[178] *Id.*

[179] See Lucky, *supra* note **Error! Bookmark not defined.**, at 83-87.

[180] 8 PAPERS OF JAMES MADISON 391-99 (Rutland & Rachal eds., 1973) (editorial note on James Madison's manuscript list of the Jefferson's proposed bills).

[181] Gerald Hurst, *The Common Informer*, 147 CONTEMP. REV. 189, 190 (1935). More recent work has captured the profound resentment against informers at the popular level. *See, e.g.*, Warner, Jessica, and Frank Ivis, *'Damn You, You Informing Bitch': Vox Populi and the Unmaking of the Gin Act of 1736*, 33 J. SOC. HIST. 299, 300 (1999) (recounting mob action against informers who brought cases under the Gin Act in London).

[182] Joseph Chitty's treatise on criminal procedure noted in passing that "common informer" had become a mere "epithet" on par with "extortioner," "heretic," and "vagabond." CHITTY, *supra* note 123, *207.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

of Queen Elizabeth, Parliament had imposed limitations on penal statutes to reduce the potential for such abuse.[183] Actions on statutes usually had to be brought within a year of the offense.[184] Informers also had to bring suit in the locality where the offense occurred, where judges would have more awareness of the plaintiff's character and better access to the evidence.[185]

As American jurisdictions continued to create private rights of action after Independence, several states reenacted these longstanding restraints on penal statutes. One of Jefferson's model bills—which James Madison passed in 1786—provided that collusive private prosecutions of a penal statute would not bar recovery by a subsequent good faith plaintiff.[186] It also made any private prosecutor who settled or discontinued a *qui tam* action without leave of court liable for the whole penalty. In 1788, Massachusetts passed an "Act for the Ease of the Citizens Concerning Actions Upon Penal Statutes" which imposed the familiar one-year statute of limitations, required the informer to bring his action in the county where the offense occurred, and permitted defendants to make a general denial of the informer's factual allegations.[187] New York's 1788 "Act to Redress Disorders by Common Informers and to Prevent Malicious Informations" imposed the same restrictions as Massachusetts, and copied the Virginia anti-collusion provisions verbatim.[188] The thrust of these reforms was to make private enforcement *more effective and less onerous* by imposing legislative safeguards familiar from English history. They did not eliminate private claims or subject them to the control of executive officers.

However, early American legal culture diverged from English practice in one important respect. By the eve of the American Revolution, many of the colonies did have local public prosecutors.[189] Although private criminal prosecutions continued in most states, public prosecuting attorneys were charged with bringing indictments to the grand jury and supervising important criminal cases. The early move toward public prosecution in America might support a more expansive view of executive discretion over *criminal* law in the Founding Era.[190] But what about the broader power—claimed

---

[183] See GILES JACOB, A REVIEW OF THE STATUTES, BOTH ANCIENT AND MODERN; ESPECIALLY CONCERNING THE PRACTICK PART OF THE LAW 8-9 (1715) (digesting limitations on informer's actions imposed by statutes and case law).

[184] *Id.*

[185] *Id.*

[186] A Bill Providing That Actions Popular, Prosecuted by Collusion, Shall Be No Bar to Those Which Be Pursued with Good Faith, *in* 2 PAPERS OF THOMAS JEFFERSON 626-27 (Jefferson's manuscript copy). The Bill was enacted unchanged on Nov. 28, 1786. *See* 12 Hening Stat. 354-55.

[187] Act of June 19, 1788, ch. 13.

[188] Act of Feb. 6, 1788, ch. 9.

[189] "Some were county officials appointed by the courts; some were deputies of the attorney general but were nominated by the court and operated with little supervision; some were deputies of the attorney general operating directly under his purview." Jacoby, supra note __, at 30.

[190] However, even this suggestion presents a problem for the defenders of the Article II challenge: local prosecutors were officers of the *states* rather than the federal government. The fact that state officers frequently enforced federal law in the Founding Era weighs against the idea that Article II contemplates a truly exclusive enforcement discretion for the federal executive. *See* Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 303 (1989).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

by supporters of the Article II Challenge—over private *civil* claims vindicating a public interest under a statute? If public prosecutors possessed such a power, they would likely have exercised it over private *qui tam* suits. As the reforms of the 1780s indicate, these claims frequently conflicted with (or even subverted) the government's enforcement priorities. Evidence that American prosecutorial officials quashed private statutory claims would demonstrate a striking divergence from English practice, and support the private rights-public rights interpretation of Article II.

But the evidence points in the opposite direction. The settled rule in America seems to have mirrored the common law limits on the *nolle prosequi* in England: the Attorney General (or other prosecuting officer) could bar private litigants from pursuing a penalty if he filed first. But he could not terminate a private party's preexisting civil action. A South Carolina case explicitly reconciled such informer's actions with state constitutional law.[191] In *State v. Matthews* (1806), the court construed a 1784 statute which provided a *qui tam* penalty against anyone keeping a billiard table without a license. The law had adopted the standard formula of English penal statutes, which permitted the informer to proceed "by bill, plaint, or information." Keeping an unlicensed billiards table was a purely regulatory offense—an affront to the public interest, but not the cause of any private injury. Moreover, the state constitution put law enforcement firmly in executive hands, with provisions mirroring the federal "take care" and "vesting" clauses—in addition to an express requirement that "all prosecutions shall be carried on in the name and by the authority of the State of South Carolina." Despite these constitutional commitments to executive power, the court upheld the statute's private enforcement scheme. Justice Grimke explained that public-rights oriented *qui tam* actions were "in a great measure, private suits"—in contrast to actions implicating physical punishment or imprisonment. Private claims for monetary penalties—even those brought to vindicate a public interest—were thus "civil" matters beyond the control of government prosecutors.

An early Massachussets case demonstrates how private *qui tam* claimants could use these rules of preclusion to actively thwart a state prosecution. In *Commonwealth v. Churchill* (1809),[192] a private plaintiff "sued an action of the case *qui tam* against the defendant to recover a penalty for taking usurious interest," under a 1783 statute which "provided that the penalty may be recovered by indictment, or by action on the case, one moiety to any person who may prosecute for the same." The trial court found in favor of the defendant, and the plaintiff appealed. Before the appellate proceedings commenced, the Solicitor General initiated a criminal indictment "for the same offence, and to recover the same penalty." The defendant answered that the pending civil claim was a bar to the state's indictment.[193] Citing a bevy of English authorities, Chief Justice Theophilus Parsons ruled against the Commonwealth, identifying a distinction between "indictments to recover forfeitures on penal statutes" and

---

[191] State v. Matthews, 2 Brev. 82 (S.C. 1806).

[192] 5 Mass. 174, 4 Tyng 174 (1809).

[193] After this plea was entered, the civil plaintiff appears seems to have dropped the suit—a strong indication of a collusive prosecution designed expressly to thwart enforcement. *Id.* That makes the court's decision to block the Solicitor General's subsequent claim even more striking.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

"indictments for crimes." [194] Although usury was widely regarded as a serious wrong and an offense against the community, Massachusetts law did not denominate it a misdemeanor or a felony. Bringing an indictment to recover the statutory penalty was the most potent enforcement tool available to public prosecutors. Nonetheless, the court found that the statutory authorization of a private suit overrode the enforcement priorities of the Solicitor General. "Perhaps the positive rules of law furnish [the usurer] this screen," concurring Justice Sedgwick concluded. "If they do, it is for the *legislature only* to remedy the evil."[195]

The constant use of private enforcement by state legislatures, coupled with cases like *Matthews* and *Churchill,* demonstrate that American jurists saw no separation of powers problem with private litigants bringing statutory claims to vindicate a public right.[196] That remained true even after states adopted public prosecutors, and vested their executive officers with a constitutional duty to enforce the laws.

## D. Post-Constitutional Debates and Article I

The theory and practice of the early federal government reveals broad-strokes agreement with the English, colonial, and state background: widespread private enforcement of public wrongs, through statutorily authorized suits, did not infringe on the constitutional powers of the executive.

Article II challengers make two argumentative moves with the early federal evidence to reach the opposite conclusion, that private enforcement of public rights runs afoul of the original meaning of executive power. The first move concerns legal theory: Article II critics quote the Framers' emphatic endorsements of the separation of powers, and then quote American jurists who articulated the private rights / public rights distinction. From these abstract principles, the Article II critics deduce that enforcement discretion is an exclusively executive power, and that this discretion extends beyond criminal law to regulatory or civil matters that concern the public. The second move concerns legal practice: the Article II critics minimize the significance of private enforcement in early federal law generally, and suggest that *qui tam* laws in particular were an "idiosyncratic exception." But on closer inspection, both of these claims rely on anachronistic assumptions.

First, the Article II critics fundamentally misapprehend the way early American jurisprudence conceptualized private enforcement. The judicial opinions endorsing the

---

[194] *Id.* (citing *Rex* vs. *Stratton & al. Doug. 240.;* Rex vs. *Swan & Jeffry. Fast.* 104; Reginia v. Harris, *Cro. Eliz.* 261.; *Hawk. P. C. B.* 2. c. 26. § 63).
[195] *Id.* 183 (emphasis added).
[196] Coincidentally, the authors of both opinions (John Grimke and Theophilus Parsons) were Federalists who defended the national Constitution's expansive executive powers in their states' respective ratifying conventions. If anyone had endorsed the Article II Challenge in the Founding Era, it would have been these two jurists. But they did not.

33

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

public rights view of Article II follow a predictable sequence.[197] After the inevitable citation to Blackstone (to show that redressing public wrongs is an executive power), comes a nod to the Federalist No. 47 (to show that such a power must be kept away from the other branches): "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." Then comes Justice Story's dicta on Article II in *Martin v. Hunter's Lessee,* for the implication that this power may not be delegated to private parties:

> The second article declares that 'the executive power shall be vested in a president of the United States of America.' Could congress vest it in any other person; or, is it to await their good pleasure, whether it is to vest it at all? It is apparent that such a construction, in either case, would be utterly inadmissible.[198]

The speech of future-Justice Marshall to the House of Representatives in 1800 completes the loop: "A private suit instituted by an individual, asserting his claim to property, can only be controlled by that individual. But a public prosecution carried on in the name of the United States, can without impropriety be dismissed at the will of the government."[199] Top this off with the irresistible dictum of *Marbury v. Madison* that "the province of the Court is solely to decide on the rights of individuals," and a constitutional principle emerges. When Congress authorizes private suits in furtherance of some public goal—economic regulation, protection of civil rights, etc.—it might be giving litigants "the sort of proactive enforcement discretion property reserved to the Executive Branch."[200]

But that early federal evidence appears in a radically different light when viewed in the broader context of Founding Era private enforcement. As discussed above, statutory plaintiffs (including common informers) were widely understood to possess an "imperfect" property interest in their claims. As Greg Ablavsky has recently shown, in the parlance of the Early Republic, an imperfect or inchoate right was nonetheless *vested*, even though title was not yet absolute.[201] In Blackstone's evocative phrase, penalties given by the legislature to "any person that will sue for the same" are "placed as it were in a state of nature . . . open therefore to the first occupant, who declares his intention to possess them, by obtaining judgement to recover them."[202] As described above, the same conception governed colonial and state practice—as Justice Story and Justice Marshall knew well. Justice Story helped compile the first complete edition of the colonial session laws of Massachussets, which included dozens of

---

[197] Typical examples include Muransky v. Godiva Chocolatier, Inc., 979 F.3d 917, 972 (11th Cir. 2020) (Jordan, J., dissenting); Thole v. U.S. Bank N.A., 140 S. Ct. 1615, 1622 (2020) (Thomas, J., concurring); Sierra v. City of Hallandale Beach, 996 F.3d 1110, 1116–17 (Newsom, J., concurring); Laufer v. Arpan LLC, 29 F.4th, 12681295 (Newsom, J., concurring).

[198] 14 U.S. (1 Wheat.) 304, 329–30(1816) (Story, J.)

[199] John Marshall, Speech Delivered in the House of Representatives of the United States, on the Resolutions of the Hon. Edward Livingston 28 (Mar. 7, 1800).

[200] Acheson Hotels, LLC v. Laufer, 601 U.S. 1, 13 (2023) (Thomas J., concurring) (citation omitted).

[201] Gregory Ablavsky, *Getting Public Rights Wrong: The Lost History of the Private Land Claims*, 74 STAN. L. REV. 277, 347 (2022).

[202] 2 WILLIAM BLACKSTONE. COMMENTARIES *437.

34

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

informer's actions.[203] He also voted to enact *qui tam* laws, both as a federal Congressman and as a Representative in the Massachussets state legislature.

Chief Justice Marshall's articulation of the public/private rights distinction must be understood in the same light. As he noted in *Adams v. Woods*, "almost every fine or forfeiture under a penal statute, may be recovered by an action of debt, as well as by information."[204] Since at least the time of Hawkins, an action of debt was considered the default civil process for collecting a statutory penalty—a practice followed in colonial America and the Early Republic. The reason is simply that the claimant had a private property interest in a penalty (or damages) conferred by the statute. So when Marshall referred (in his House speech) to private suits "asserting a claim for property," he was not referring only to legal claims for some *preexisting* property right, like a debt or an interest in land. Statutes that created new rights out of whole cloth—e.g. damages unavailable at common law, or informer's penalties—could also give rise to what *Marbury* called the "rights of individuals." *Woods* shows that this was the case even for *qui tam* actions brought under criminal process, to redress a public wrong. Marshall's House Speech was simply stating the conventional wisdom when he said that the executive could "give no direction" regarding such cases. In other words, private statutory claims for novel rights of action could be litigated in federal courts at the discretion of private parties, without offending the Article II power over "public prosecutions."

Broader articulations of the separation of powers—in the *Federalist*, and by other Founding Fathers—are wholly consistent with this understanding. While the *Federalist Papers* argued for an executive with the authority to enforce the laws, and a judiciary that was institutionally independent from the executive,[205] they clearly presupposed that private litigants would continue to play the decisive role in enforcing civil regulatory law.

Puzzlingly, Judge Newsom cites *The Federalist* No. 21 for the proposition that the President's executive discretion to enforce federal law extends to civil remedies such as "pecuniary mulcts."[206] But that essay is a criticism of the Articles of Confederation, not an exposition of the powers of the President. Implicitly, it makes the opposite point—arguing for a stronger federal government which can "raise its own revenues in its own way." The Congress created by the proposed Constitution would do this by laying duties on "articles of consumption." Contemporaries would have recognized that these duties would be enforced by *qui tam* laws. As Hamilton wrote in *The Federalist* No. 15, an indispensable power of Congress was the authority to ensure that laws had a "penalty annexed to disobedience," which (in matters of taxation, as well as public policy) would have invariably been done by authorizing

---

[203] Story et al., *supra* note 168.

[204] 6 U.S. (2 Cranch) 336, 341 (1805) (discussing *qui tam* penalties in Act of Mar. 22, 1794, ch. 11, § 2).

[205] THE FEDERALIST NO. 47, at 298 (James Madison) (Clinton Rossiter ed., 1961) ("[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny")

[206] THE FEDERALIST NO. 21, 134–35 (Alexander Hamilton).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

private suits.[207] In fact, just a few months after writing the Federalist Papers, Hamilton himself drafted a tax law enforceable by "any informer" as a Representative in the New York State Assembly.[208] He presumably regarded private suits as simply one of the "necessary and proper" tools available to Congress for implementing the enumerated powers of Article I.

The second argumentative move that the Article II critics make concerns legal practice. The Article II critics are aware of *qui tam* suits, but regard them as "an idiosyncratic exception."[209] They often draw on Article III standing scholarship, where the historic ability of non-injured parties to bring statutory suits has long been debated. For example, Caleb Nelson and Anne Woodhandler have argued that while informer suits do challenge the principle of executive control over suits on behalf of the public, "*qui tam* is at best an anomaly," and "the existence of one historically grounded exception to a general principle of constitutional law does not require repudiation of the entire principle."[210]

That response is inadequate for two reasons. First, as discussed above, private enforcement in the Founding Era was not just *qui tam*; informer's actions were only one of many remedies employed by "penal statutes," which also authorized novel causes of action for damages. Second, while *qui tam* enforcement might seem peculiar or exotic today, there was nothing anomalous about it in the Founding Era. For Blackstone, penal statutes were not an "idiosyncratic exception," but a vast body of encumbrances and obligations that would be too "tedious" to enumerate—for that he directed his readers to several other "laborious compilers."[211] As discussed above, American colonial and state governments used *qui tam* extensively, and "popular statutes" remained just as important for the fledgling federal government. Between 1789 and 1820, Congress deployed private enforcement—mostly informer's actions— to implement nearly every one of its constitutionally enumerated powers: to make war; raise and support a military; grant copyrights and patents; regulate immigration; establish post offices; lay and collect taxes; coin money; and regulate commerce between the states and with Indian tribes.[212] While it is difficult to assess how much

---

[207] *See* THE FEDERALIST NO. 15, at __ (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[208] Second Draft of an Act for Raising Certain Yearly Taxes Within This State (Feb. 9, 1787), *in* 4 PAPERS OF ALEXANDER HAMILTON 41-50 (Harold Syrett ed., 1965) (reproducing document in Hamilton's hand proposing penalty for tax evasion, "to be recovered by action of debt for the benefit of any informer")

[209] Laufer v. Arpan LLC, 29 F.4th 1268, 1288 (2022) (Newsom, J., concurring).

[210] Woodhandler & Nelson, *Does History Defeat Standing Doctrine, supra* note __, at 731 n.197.

[211] *E.g.*, HAWKINS, *supra* note **Error! Bookmark not defined.**, at c. 26, § 17 (discussing when an "action o n a statute" will lie, and how to bring one).

[212] *See, e.g.*, Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124–25 (permitting statutory damages for copyright infringement); Patent Act of 1793, Act of Feb. 21, 1793, ch. 11, § 5, 1 Stat. 318; Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 199, 209 (informer's action for import of liquor without paying duties); Act of May 19, 1796, ch. 30, § 18, 1 Stat. 469, 474 (informer's action prohibiting trade with Indian tribes); Act. of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 232, 239 (informer's action for failure to comply with postal regulations); Act of Mar. 22, 1794, ch. 11, § 2, 1 Stat. 347, 349 (informer's action against slave trade with foreign nations).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

*qui tam* litigation actually occurred, a substantial body of federal law developed regarding the property rights of informers in their private claims.

The nature of the Executive's control over these actions soon became a practical question for Hamilton, when he became the first Treasury Secretary of the United States Samuel Dodge, a customs inspector in New York, violated a provision of the 1790 customs act by permitting a vessel to unload several hogsheads of molasses in the dark.[213] After being indicted by an informer suing in the name of the United States, Dodge appealed to George Washington for a pardon. His petition was compelling. Even the grand jury had found that Dodge had no intent to defraud the treasury, and he "maintained that he had been entirely ignorant of the regulation forbidding unlading after seven o'clock in the evening, which had gone into effect only a few days before the incident."[214] The sticking point, however, was that the Act awarded half of the $400 fine to the United States, divided the other half between any private informer and local treasury officials.[215]

Washington requested Hamilton's advice, and Hamilton promptly asked Richard Harrison, a lawyer and the Auditor of the Treasury Department, for his take on how the distribution of the penalty among between the United States, a private person, and several government officers would impact the pardon power.[216] While acknowledging the difficulty of these "untried points," Harrison gave a clear answer the following month: Washington could remit only the United States' portion of the fine, and the other criminal punishments in the act (particularly a ban on federal officeholding).[217] With regard to the portions of the penalty awarded to private individuals, the pardon would be a "mere nullity." Harrison, however, saw no "objection to making the pardon conditional, 'provided the offender satisfy the officers &c. for the one half of the fine or penalty & pay the expences of prosecution.'" Washington ultimately pardoned Dodge—but with the caveat suggested by Harrison.[218] In sum, Hamilton and Harrison came to the conclusion that the Executive had no power to displace a private claim, even when it was brought solely in the name of the United States. The informer's claim was an egregious impingement on prosecutorial discretion; Dodge's violation was purely technical, and a public prosecutor would never have proceeded against him. Nevertheless, in Harrison's view, the only remedy lay with Congress. In 1825 the Supreme Court seems to have taken a similar view in *United States v. Morris,* noting that the authority of the Secretary to remit

---

[213] See *supra* at 1.

[214] See editorial note on the case at 7 PAPERS OF GEORGE WASHINGTON 493–95, n.1 (Jack D. Warren, Jr., ed., 1988).

[215] 1 Stat. 177, § 69.

[216] Letter from Alexander Hamilton to Richard Harrison (26 Apr. 1791), *in* 8 PAPERS OF ALEXANDER HAMILTON 312-14 (Harold Syrett ed., 1965).

[217] Letter from Richard Harrison to Alexander Hamilton (24 May 1791), *in* 8 PAPERS OF ALEXANDER HAMILTON 352-54 (Harold Syrett ed., 1965).

[218] 7 PAPERS OF GEORGE WASHINGTON 493–95, n.1 (Jack D. Warren, Jr., ed., 1988) (explaining the aftermath of Dodge's petition).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

a fine or forfeiture "must depend on the construction to be given to the act under which the power was exercised."[219]

In sum, the early federal evidence does not support the inferences drawn by the Article II critics. Theoretical expositions of the separation of powers—even those which made a clear distinction between public and private rights—presupposed that Congress would enforce its laws with "penalties" largely collected by private litigants. Rather than an "idiosyncratic exception," private enforcement in the name of the public was a pillar of the new federal government's regulatory ambitions. Whatever discretion the executive possessed over private claimants was conferred by statute, or limited to blatantly criminal punishments that did not affect the statutory rights of the private plaintiff.

## IV.    Modern Doctrines of Executive Power

Thus far, we have examined the origins and substance of the Article II challenge and the historical evidence that contradicts the challenge. However, an equally important question is whether the Article II challenge is compatible with the judicial system's conception of the executive's core prerogative to take care that the law be faithfully executed. As described below, standing doctrine ensures that private individuals do not haul into court public injuries that ought to be prosecuted by the executive, state-action doctrine attempts to parse out when private entities begin to wield governmental (and often executive) power, and administrative law attempts to distinguish private rights that individuals must adjudicate in an Article III court from public ones that Congress can permit the executive to adjudicate on its own.

This Part first offers a brief summary of related doctrinal approaches to executive power and the considerations within several doctrinal areas that can inform when, if ever, private rights of action interfere with Article II. It then identifies the key cross-cutting themes that emerge from these distinct doctrinal areas and which inform our subsequent discussion in Part V of when certain private rights of action may infringe upon the Take Care Clause.

### A.  The Jurisprudence of Executive Power

Below, we lay out, in necessarily broad strokes, five doctrinal areas related to executive power that address the core concerns about executive discretion with which this article is concerned. We begin with (1) doctrine delineating the meaning of Article II's Vesting and Take Care Clauses as well as the Appointments Clause. We then move to (2) doctrine on standing, which we have referenced above. After that, we move to three doctrines that concern executive power but which scholars rarely consider when discussing private rights of action. They include (3) state-action doctrine, (4) various formulations of nondelegation doctrines, and (5) cases concerning the public-private rights distinction in administrative law.

---

[219] 23 U.S. 246, 287 (1825)

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

### 1. Doctrinal Bounds of Executive Power

The Take Care Clause is a slippery thing. And so before diving into specific cases, a brief mention of scholarship and the usefulness of case law on this topic is in order. Scholars have written extensively on its scope, and on the ways in which case law has over time identified some key components of executive authority that the Clause protects as executive in nature. But as scholars have pointed out, those cases neither define what the Take Care Clause encompasses nor hold that the private civil suit provisions are themselves an improper Congressional divestment of executive power. Indeed, beyond proclaiming (with thin historical support) that the exercise of prosecutorial discretion in criminal cases is a wholly executive prerogative, the Court's cases say little about the extent to which the Clause limits individuals outside the executive branch from pursuing *civil* actions.[220]

The conceptually unsatisfying throughline of the Supreme Court's case law on executive power is that functions Congress and the Court have traditionally permitted the executive to exercise exclusive control over—such as law enforcement—are executive in nature. The Court has found that executive power entails at a minimum the power to prosecute criminal offenses, some unidentified and circularly defined civil enforcement power when carrying out the obligations of executive agencies, the power to appoint executive officials, and to carry out the enumerated provisions of Article II, including the power to protect and engage in diplomacy and war.[221] And although less relevant to our core question, it is worth noting that the executive may also hold some residual power to ensure the laws are faithfully executed, including "to take 'incidental' measures that may be necessary to effectuate statutory commands."[222]

In the civil arena, then, the Court has left muddled not only what executive power entails, but also whether and when Congress can divest it.[223] While the Court has adopted a broad interpretation of the Clause, it has never engaged in a detailed historical or textual analysis of the Clause's meaning.[224] Instead, it has laid down layers of conclusory statements over time that have built up a doctrinal account of executive power.[225] With that caveat in mind, we now turn to a brief description of the Court's understanding of executive power in each of the categories described above.

---

[220] Scholars widely acknowledge that "[t]he Court has used the Take Care Clause in numerous ways that are, in many respects, in tension." Goldsmith & Manning, *supra* note 78, at 1853.; *see also* Andrew Kent et al., *Faithful Execution and Article II*, 132 HARV. L. REV. 2111, 2116 (2019).

[221] *See Id.* at 1839–53.

[222] *Id.* at 1851. (citation omitted). This power, to the extent it exists, is more a scholarly creation than a doctrinal one. *See id.*; *see also* Henry P. Monaghan, *The Protective Power of the Presidency*, 93 COLUM. L. REV. 1, 61-63 (1993).

[223] Some have argued that the Clause merely tells the Executive that she must not *rebuff* prosecutorial responsibility. *See* Ledewitz, supra note 9, at 797; Rosenberg, Congress's Prerogative, *supra* note 9, at 690; Strauss, *Place of Agencies*, *supra* note 11, at 600-02.

[224] Scholars, of course, have done that work. *See, e.g.*, Prakash, *supra* note 230.

[225] *See* Goldsmith & Manning, *supra* note 78, at 1860–61.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

a. Criminal Prosecutorial Power

The Court has implied that the "Take Care" duty encompasses at a minimum "the duty to ensure competence, observance of law, and prevention of misconduct,"[226] and its cases indicate that criminal prosecutions are squarely executive. In *United States v. Nixon*, the Supreme Court flatly stated that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."[227] Similarly, in *Morrison v. Olson*, the Court concluded that acts taken by an independent counsel are indisputably "executive" because they "typically have been undertaken by officials within the executive branch."[228] That case and others like it express particular concern about preserving in the executive a unitary prosecutorial discretion to initiate and terminate cases, and do not appear as concerned with who moves the case forward. (Indeed, the Court has sanctioned the government's use of private contract attorneys to assist with prosecutions on a contingent fee basis once they have begun, even though some scholars argue that their use threatens constitutional structure because those private lawyers act as delegees and exercise state power.)[229]

When it does find a violation of the Take Care Clause, the Court rarely rejects congressional authority to establish officers who may exercise executive power; instead, it often applies a narrow backstop it draws from Article II's Appointments Clause: require Congress to ensure that the executive retains control over the appointment or termination of the officer charged with executive responsibility.[230] This Appointments Clause analysis in turn considers the level of control the executive retained over the officer.[231]

One odd and critical exception—and one that further exposes the Article II Challenge as a doctrinal misfit—is the Court's historical comfort with *state* enforcement of federal criminal law. With only a few exceptions, the Court regularly authorizes states to enforce federal law without finding a violation of the Take Care Clause,[232] and Congress frequently expressly authorizes states to enforce federal criminal laws.[233] These cases are, of course, motivated by a concern for the special status that states hold in our federalist constitutional structure: as Litman points out,

---

[226] *Id.* at 1842.

[227] United States v. Nixon, 418 U.S. 683, 693 (1974); *see also* United States v. Armstrong, 517 U.S. 456, 464 (1996). Other federal courts shared this understanding. *See, e.g.*, United States v. Cox, 342 F.2d 167 (5th Cir. 1965).

[228] 487 U.S. 654, 696 (1988).

[229] *See generally* Martin H. Redish, *Private Contingent Fee Lawyers and Public Power: Constitutional and Political Implications*, 18 SUP. CT. ECON. REV. 77 (2010).

[230] *See, e.g.*, Myers v. United States, 272 U.S. 52, 133 (1926) (quoting Cunningham v. Neagle, 135 U.S. 1, 63 (1890)); Morrison v. Olson, 487 U.S. 654, 662 (1988).

[231] *See Morrison*, 487 U.S. at 671-72.

[232] A critical exception is *Arizona v. United States*, 567 U.S. 387 (2012), which rejected in large part Arizona's attempt to enforce federal civil (but quasi-criminal) immigration law. But even in that case, the Court struck down Arizona's attempt to enforce federal immigration law because it viewed immigration law as uniquely within the "federal power," not because it interpreted Arizona to have encroached upon the Take Care Clause specifically. *See id.* at 395; Litman, *supra* note TK, at 1312.

[233] *See* Litman, *supra* note TK, at 1311-1312 (citing cases and statutes).

40

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

the Court's presumption against preemption, for example, "is rooted in" the "idea that states have a right to enforce the law, and in doing so, to diverge from how the President enforces the law."[234] That distinction, however, cannot explain away the state encroachment on federal enforcement power, and as Litman argues, the better explanation may be that state enforcement of federal law only further supports "the case for rejecting the absolute interpretation of Article II inherent in separation-of-powers cases and instead embracing the idea that Congress may limit the executive's discretion over the execution of federal law by dividing up the authority to enforce federal civil laws."[235] That power may serve several interests, such as ensuring that federal law is enforced even when an executive declines to enforce it.[236] Peter Shane has advanced a similar argument that the Take Care Clause does not consistently shield federal criminal authority, highlighting as another example federal courts' widely accepted criminal enforcement authority to "appoint prosecutors to handle cases of criminal contempt."[237]

b.   Civil Enforcement Power

How does all this apply to civil enforcement power of the kind private litigants may exercise? While courts have recognized that the Executive has discretion over civil administrative enforcement, the boundaries of executive power—and its potential exclusivity—are not so clear in the civil arena.[238] The Court has recognized that Congress may not *entirely* usurp the President's discretion to bring civil suits in the name of the United States by empowering non-executive officials to make the executive file civil enforcement lawsuits. As described below, those cases reveal the Court's understanding that the executive must retain control over lawsuits brought to enforce a statutory scheme, and that Congress may not vest in officials who sit outside the executive's control the power to mandate that the executive file a lawsuit or otherwise act to enforce the regime in a particular way (as in *Heckler* or *Buckley*).[239]

In the *qui tam* context, the Court has recognized that private individuals—who serve as informants and have an interest in receiving a lump sum of the government's civil recovery—hold only a "conditional" interest in the reward "until the money is paid over, as required by law."[240] In those cases, the government controls the prosecution of the case, and the Attorney General has complete discretion to end the lawsuit.[241] It has been "[s]ettled rule" that "courts will not recognize any suit, civil or criminal, as regularly before them, *if prosecuted in the name and for the benefit of the United*

---

[234] *Id.* at 1315.
[235] *Id.* at 1322, 1337.
[236] *See id.* at 1347 (describing non-enforcement concern).
[237] *See* Peter M. Shane, *Prosecutors at the Periphery*, 94 Chi.-Kent L. Rev. 241, 261-62 & n.86 (2019) (describing this power and former Justice Scalia's lone opposition to it).
[238] Todd Garvey, Cong. Rsch. Serv., R43708, The Take Care Clause and Executive Discretion in the Enforcement of Law 15 (2014).
[239] Outside the civil lawsuit context, the Court has also expressed concerns with requiring the executive to enforce a civil firearm background-check regime in parallel to the states where it is designed to enable criminal prosecutorial enforcement powers. *See* Printz v. United States, 521 U.S. 898, 904 (1997).
[240] *See Confiscation Cases*, 74 U.S. 454, 462 (1868).
[241] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

*States*, unless . . . represented by the district attorney, or someone designated by him to attend to such business, in his absence."[242]

Even outside the *qui tam* context, the Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to that agency's absolute discretion."[243] In *Heckler v. Chaney*, the Court approved the FDA's decision not to impose regulations on drugs used for lethal injections and concluded that the FDA's "refusal to institute" regulatory proceedings "share[d] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch" because "it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'"[244] The Court has also emphasized the normative benefits of vesting civil prosecutorial discretion in a single expert agency.[245]

The Court has also struck down a law that gave non-presidentially appointed officers the "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights."[246] In *Buckley v. Valeo*, the Court explained that the Federal Election Commission exercised executive enforcement power because it exercised "discretionary power to seek judicial relief," an "authority that cannot possibly be regarded as merely in aid of the legislative function of Congress."[247] This, the Court explained, was because "[a] *lawsuit is the ultimate remedy for a breach of the law*, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'"[248] Because the statute that established the Commission "vest[ed] in the Commission primary responsibility for conducting civil litigation of the courts of the United States for vindicating public rights," the Court held, its members had to be appointed consistent with the requirements of Article II's Appointments Clause.[249] Despite this sweeping language, however, what ultimately bothered the Court was a specific statutory requirement that "upon request by the Commission[,] the Attorney General on behalf of the United States *shall* institute a civil action for relief."[250] In other words, where Congress empowers an office to *command* the executive to file suit on behalf of the United Sates, it encroaches on the Take Care power, and the office's membership must be subjected to some form of Executive control to cure the congressional overreach.

Whatever its reach, the executive's prosecutorial discretion in civil cases appears far more limited than in the criminal arena. In *Dunlop v. Bachowski*, for example,

---

[242] *Id.* at 458 (emphasis added).

[243] Heckler v. Chaney, 470 U.S. 821, 831 (1985).

[244] *Id.* at 832 (quoting U.S. Const. art. II, § 3). For futher discussions of this case as it relates to the Take Care Clause, see Goldsmith & Manning, *supra* note 78, at 1848; Garvey, *supra* note 238, at 10.

[245] *Heckler*, 470 U.S. at 831.

[246] *See* Buckley v. Valeo, 424 U.S. 1, 140 (1976).

[247] *Id.*

[248] *Id.* (quoting U.S. Const. art. II, § 3) (emphasis added); *see also id.* (citing *Confiscation Cases*, 7 Wall. 454, 458-59 (1869)).

[249] *Buckley*, 434 U.S. at 140.

[250] *Id.* at 140 n.24 (quoting 26 U.S.C. § 437g(a)(7) (1974)).

Electronic copy available at: https://ssrn.com/abstract=4821934

the Court held that Congress could reasonably limit the Secretary of Labor's enforcement discretion to decline civil prosecutions for violations of the Labor-Management Reporting and Disclosure Act by requiring the Secretary to provide a reasoned basis for exercising that discretion.[251]

### 2. Standing

As we have explained, the Court's standing cases have invoked the Take Care Clause as a justification for tightening standing requirements in civil cases. These cases recognize an Article II concern, but address it through the lens of injury and remedy.[252] And some of the doctrine is loosely linked to a historical claim. As discussed above, the *Transunion* majority made a specific, and mistaken, historical claim: that "until the 20th century, Congress rarely created 'citizen suit'-style causes of action for suits against private parties by private plaintiffs who had not suffered a concrete harm."[253]

The Court's majority opinion in *Friends of the Earth*, however, adds a third consideration to the mix. In responding to Justice Scalia's separation-of-powers concerns with the Clean Water Act's provisions permitting private plaintiffs to exact penalties paid out to the government, the Court found comfort in the fact that "the Federal Government majority retain[ed] the power to foreclose a citizen suit by undertaking its own action," and that "if the Executive Branch opposes a particular citizen suit, the statute allows the Administrator of the EPA to 'intervene as a matter of right' and bring the Government's views to the attention of the court."[254] The Court, in other words, found no separation-of-powers issue because Congress had designed the private right of action to give the executive sufficient control over the litigation.

### 3. State Action

The Supreme Court has separately recognized a set of scenarios in which private actions sufficiently motivated by or intertwined with government action may be considered state action and therefore made subject to constitutional standards.[255] Although these cases are more about protecting the due process of individuals impacted by the private actor's wielding of governmental authority and do not address Article II, they help probe when litigants may be acting with governmental authority of the kind that could divest the Executive of her Article II authority. The state-action cases scrutinize private conduct that relies in large part on government funding, resembles traditional government activity (such as the establishment of a town),[256] is

---

[251] 421 U.S. 560, 562-63, 573 (1975).

[252] *See supra* Part II.A.

[253] *Id.* n.1.

[254] Friends of the Earth, Inc. v. Laidlaw Env't Servs., 528 U.S. 167, 188 n.4 (2000) (quoting 33 U.S.C. §§ 1365(b)(1)(B), 1365(c)(2)).

[255] As Alexander Volokh explains, "Delegating coercive power to private parties has long been held to be a potential violation of due process." Volokh, *supra* note **Error! Bookmark not defined.**, at 941.

[256] *Id.* at 183–84.; *see* Marsh v. Alabama, 326 U.S. 501, 505-10 (1946); Evans v. Newton, 382 U.S. 296, 301 (1966); Jackson v. Metro. Edison Co., 419 U.S. 345 (1974).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

directed by the government,[257] or otherwise relies on state largess,[258] perhaps in the form of an implied partnership that an ordinary person would impute to the state.[259] Generally, the private use of government-sanctioned private remedies does not itself constitute state action. As the late Justice O'Connor explained in *Tulsa Professional Collection Services v. Pope*, the mere "[p]rivate use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . . But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found."[260] In that case, a state probate court's opening up of state probate proceedings triggered the very state statute that the petitioners had challenged.[261] Thus, even though a private individual invoked the state statute to prohibit the petitioner's claim, the state probate court engaged in state action when it invoked the statute to eliminate petitioner's claim.[262]

All that determines when a private litigant's actions trigger separate state action on behalf of the implementing court that can be challenged. But there is also a narrow set of circumstances in which the Court has extended that logic to hold, in effect, that a private litigant can herself act as an arm of the state. Where the action in question is not adverse to the government,[263] a private litigant may in a narrow set of circumstances constitute a state actor.[264] And in some cases, she may engage in state action. In *Edmonson*, the Court applied state-action doctrine to hold that a private corporate litigant in a private tort case acted as a state actor when it engaged in racially discriminatory jury selection.[265] The Court explained that modern state-action doctrine considers "first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority, and second, whether the private party charged with the deprivation could be described in all fairness as a state actor."[266] To answer that second, somewhat tautological question, the Court looks to "the extent to which the actor relies on governmental assistance and benefits, whether the actor is performing a traditional governmental function, and whether the injury caused is aggravated in a unique way by the incidents of governmental authority."[267] Because "a private party could not exercise its peremptory challenges

---

[257] *See supra* note 256; *see also Jackson*, 419 U.S. at 357.

[258] Patrick, *supra* note _ at 179 (citing cases).

[259] *Id.* at 185.

[260] 485 U.S. 478, 485-86 (1988). The canonical example of this, of course, is *Shelley v. Kraemer*, in which the Court ruled that state courts' enforcement of racially restrictive covenants constituted state action. 334 U.S. 1 (1948).

[261] *Tulsa Professional Collection Services.*, 485 U.S. at 487.

[262] *Id.*

[263] For this reason, a public defender "is not a state actor." Edmonson v. Leesville Concrete Co., 500 U.S. 614, 627 (1991) (citing Polk County v. Dodson, 454 U.S. 312 (1981)).

[264] *Id.* at 627; *see also Shelley*, 334 U.S. at 19 (private litigants may not use the courts to enforce racially restrictive covenants); Dennis v. Sparks, 449 U.S. 24, 28 (1980) (bribing a judge).

[265] *Id.* at 622.

[266] *Id.* at 620 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 939-942 (1982)).

[267] *Id.* at 621-22 (citations omitted).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

absent the overt, significant assistance of the court" in excluding jurors based on their race, the private litigant became a state actor.[268]

As *Tulsa Professional*'s author has observed, the Court's "cases deciding when private action might be deemed that of the state have not been a model of consistency."[269] But *Edmonson* teaches at least that private litigants can in a narrow set of circumstances wield implicit governmental authority. In such cases, then, private individuals may encroach upon the Executive's prerogative to wield that authority.

4. Nondelegation

Courts have also identified a related "due process rationale for striking down delegations of regulatory authority to private parties."[270] These cases, including *Carter Coal*, establish what Alexander Volokh describes as a "mandatory-discretionary" line: when private individuals "force an alteration in the legal regime without any discretion remaining in government and without any protection against their personal biases," they violate due process.[271] The test, then, is outcome-focused: it asks whether the *effect* of the private action is to tie the government's hands at the risk of unchecked private bias. Under that line of cases, Volokh posits that because "[s]uing someone in court . . . has no coercive effect beyond forcing the opposing party to appear to answer your charges," the doctrine does not reach rights of action that empower private individuals to bring civil suits that have the effect of depriving others of their rights, so long as the suits do not operate at the exclusion of parallel executive enforcement.[272]

Justices Alito, Thomas, and Gorsuch have been eager to revive and clarify the private nondelegation doctrine—and after a recent opportunity to do so fell away, a new vehicle for clarifying the doctrine now sits before the Court.[273] In *Oklahoma v. United States*, the question presented is whether Congress may through the Horseracing Integrity and Safety Act of 2020 delegate to a private regulatory body the ability to impose upon states regulations governing horseracing.[274] The Fifth Circuit recently held that it may not, while the Sixth held that Congress's subsequent amendment to enable the FTC to disprove the private body's rules when they violate the enabling statute saves the Act. In their petition for certiorari, the Act's challengers argue that it specifically delegates "prosecutorial power to a private entity" because it permits the private horseracing authority to seek injunctive relief in court.[275] They note that this power to seek injunctive, and not merely monetary, relief makes the Authority less like a *qui tam* relator and more like an Article II prosecutor.

---

[268] *Id.* at 624. Jury selection, of course, is unique in that it employs the courts directly in the act of discrimination. *See id.* at 626.

[269] Edmonson v. Leesville Concrete Co., 500 U.S. 614, 632 (1991) (O'Connor, J., dissenting).

[270] Volokh, *supra* note 4 at 944.

[271] *Id.* at 946 & n.74.

[272] *Id.* at 947.

[273] Justice Alito expressed regret that the Court had to deny review. *See* Texas v. Commissioner, 142 S. Ct. 1308, 1309 (2022) (Alito, J., concurring).

[274] No. 23-402 (2024).

[275] *See* Petition for Certiorari at 21, Oklahoma v. United States, No. 23-402 (2024).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

A related doctrine grounded in constitutional separation-of-powers principles requires that Congressional power not be delegated to private individuals. Drawing from the due process cases cited above, the Court has held that Congress may not delegate its own regulatory power to private individuals.[276] The result is that legislative delegations of power to private individuals is held to the same "intelligible principle" standard as delegations to the executive.[277] In holding that Amtrak was a public entity subject to constitutional restrictions, the Court highlighted the statutory restrictions on Amtrak's appointed leadership and prerogative, Amtrak's reporting requirements to the government and the public, and its public benefits.[278] State versions of the private nondelegation doctrine often conduct a more expansive inquiry and consider the potential for private bias and whether the delegation enables private actors to wield traditional state authority (especially the ability to sanction or punish).[279] As one scholar has uncovered, state-level nondelegation doctrines are often driven not only by a concern about the constitutional separation of powers, but at times by concerns of state sovereignty.[280]

As Volokh notes, courts have often doctrinally confused the "doctrine of private delegations" as arising from both the Vesting Clause and the Due Process Clause, even though both Clauses are driven by distinct concerns and ought to impose distinct consequences: the former buttresses structural constraints in our tripartite form of government, and the latter secures individual fairness.[281] But for our purposes, that doctrinal mingling may be healthy. As Volokh argues, *Carter Coal* itself appeared to implicate both doctrines and offered no clarity as to which it relied on, implying that when it is private individuals to whom Congress is delegating power, both separation-of-powers and due-process considerations may be at play.[282] (Volokh, for his part, does not believe there is any basis in Article I for a separate non-delegation doctrine for delegations to private, as opposed to public, entities).[283]

### 5. Public Rights

As was recently on display at the Supreme Court in the oral argument for *SEC v. Jarkesy*,[284] the Court has also recognized a distinction in public and private rights that sits at the intersection of its doctrines interpreting individual rights pursuant to the Seventh Amendment and structural limitations on administrative agencies.

---

[276] *See* Currin v. Wallace, 306 U.S. 1 (1939); *see also Id.* at 958–60. (citing these and related cases).

[277] *Id.* at 961–62.

[278] Dep't of Transp. v. Ass'n of Am. R.Rs., 135 S. Ct. 1225, 1233 (2014).

[279] *See Id.* at 966–68.

[280] Benjamin Silver, *Nondelegation in the States*, 75 VAND. L. REV. 1211, 1242–43 (2022).

[281] Volokh, *supra* note 4 at 973–74.

[282] *Id.* at 977–78.

[283] *See* Sasha (Alexander) Volokh, *The Horseracing Case, Part 2: Private Delegation Before and After Schechter Poultry*, REASON: THE VOLOKH CONSPIRACY (Nov. 22, 2022), https://reason.com/volokh/2022/11/22/the-horseracing-case-part-2-private-delegation-before-and-after-schechter-poultry/. *But see* Dep't of Transp. v. Ass'n of Am. R.Rs., 575 U.S. 43, 61–62 (2015) ("When it comes to private entities . . . there is not even a fig leaf of constitutional justification.") (Thomas, J., concurring).

[284] No. 22-859 (2023).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

Specifically, in order to determine whether a proceeding constitutes an exercise of Article III's judicial power (and therefore carries with it the procedural protections that ought to accompany Article III proceedings, such as the right to a jury trial), the Court has "distinguished between 'public rights' and 'private rights,'" and has in doing so "given Congress significant latitude to assign adjudication of public rights to entities other than Article III courts."[285] The doctrine is also driven by a judicial nondelegation concern of sorts: Congress may not unconstitutionally usurp the judicial power (which is uniquely suited to adjudicate private claims) and give it to the executive, unless the right at issue is more public than private.

The implications of this doctrine for determining whether Congress may assign a cause of action to a private individual are unclear. One of the key concerns driving the doctrine immediately drops out: private rights of action (as discussed here) are brought in Article III courts and so preserve the defendants' right to a jury trial. To the extent that the structural concerns about usurping judicial authority could be transposed here, they would paradoxically prohibit Congress from assigning to private litigants the ability to file suits that threaten others' privately held rights, but permit suits that threaten publicly held rights.

As oral argument in *Jarkesy* revealed, the doctrine has little light to shed on what constitutes a private right and when a lawsuit threatens it.[286] The Court has defined a public right circularly, as a matter that does not "require judicial determination,"[287] or as one arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments."[288] In its *Jarkesy* briefing, the Solicitor General argued that the mere fact that violations of a congressionally created civil remedy "could *also* give rise to common-law" private claims of injury did not make the remedy a private one.[289] It remains unclear what does.

The sources of the doctrine, too, are shaky. Although it derives from *Murray's Lessee*, which purportedly adopted the proposition that private land claims may not be adjudicated in a public forum, more recent scholarship has uncovered that historically, "Congress subjected vested rights to private property to non-Article III tribunals, usually with appellate Article III or congressional review but sometimes with sole and final decisionmaking power."[290] The best public-private rights test, then, may be one rooted in congressional intent rather than rigid rules about which rights are public.[291]

---

[285] Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC, 584 U.S. 325, 334 (2018) (citations omitted).

[286] *See id.* ("This Court has not 'definitively explained' the distinction between public and private rights . . . ." (citation omitted) (quoting oral argument)).

[287] *Id.* at 1373 (quotation omitted).

[288] *Id.* (quoting Crowell v. Benson, 285 U.S. 22, 50 (1932)).

[289] Brief for the Petitioner at 24, SEC v. Jarkesy, No. 22-859 (argued Nov. 29, 2023).

[290] Ablavsky, *supra* note 201, at 347.

[291] *Id.* at 348.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

### B.  Four Cross-Doctrinal Concerns

These doctrines reveal that courts evaluate the propriety of a private delegation or other divestment of executive power along one of four key axes, each of which entails its own set of considerations. When evaluating whether an invocation of judicial power by a private litigant interferes with executive authority, courts consider (1) the formal *relationship* that the delegation creates between Congress and the private individual, (2) the nature of the *right or claim* that the private actor brings into court, (3) the *remedy* that results, and (4) the level of *control* that the Executive retains over the reins to assert the underlying right and drive the course of the specific suit. A preview of these axes and their doctrinal sources follows, after which we describe each axis along with the scholarship that supports it.

<u>Doctrinal Axes—A Preview</u>

| Axis | Relevant Questions | Key Cases |
|------|--------------------|-----------|
| *The Authorization* | • Has Congress expressly authorized the private litigant to sue on behalf or as an agent of the United States? <br> • Has Congress implicitly done so through indirect funding mechanisms? | • *Vermont Agency* <br> • *Edmonson* <br> • *Oklahoma* |
| *The Right* | • Does the right interfere with a parallel and traditional governmental function? <br> • Does the right concern an interest—such as in public property—traditionally held exclusively by the government or political community? Is that right assignable at common law? <br> • Does the right invoke a government-created right or benefit? | • *Morrison* <br> • Justice Thomas's Dissents in *TransUnion* and *Spokeo* <br> • *Edmonson* |
| *The Remedy* | • Is the private plaintiff's requested remedy punitive or otherwise designed to accrue to the public? <br> • Does implementing the requested remedy require extensive state involvement? <br> • Does the remedy extend beyond monetary to injunctive relief? | • *Morrison* <br> • *Kokesh* <br> • *Huntington* |
| *Control* | • Can the Executive control the litigation? <br> • Does the litigant remain accountable to the public and are there checks to prevent interest-group capture? <br> • Has the executive been excluded from vindicating that right in parallel? | • *Morrison* <br> • *Amtrak* <br> • *Vermont Agency; Ex rel. Polansky* |

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

### 1. Statutory Authorization

The first, and most prominent, theme that emerges both from the history and doctrines is that private suits do not necessarily interfere with Article II unless they proceed with the express—and perhaps in some cases, the implicit—imprimatur of governmental authority. In other words, statutory provisions that give private parties the power to prosecute a claim *on behalf* of the government raise the most direct constitutional questions. The clearest examples are *qui tam* actions and statutes expressly vesting federal prosecutorial authority in legal officers who sit outside the purview of the executive branch, such as special prosecutors. When Congress authorizes individuals to sue as agents of the United States—as it in *qui tam* claims—it gives them authority to act with the imprimatur of executive power, which can encroach on the executive's prerogative to "Take Care that the laws be faithfully executed." Both case law and scholarship attach great weight to the statutory label of the private actor. A statute that delegates the authority to sue on behalf of the United States also vests the traditionally exclusive imprimatur of federal executive authority. The formal assignment of the right to sue to a private litigant, as one scholar has noted, is far from "merely cosmetic."[292]

Let's begin with *qui tam* claims. In *Vermont Agency*, the Supreme Court focused almost exclusively on a relator's power to file suit *on behalf* of the United States. The Court homed in on this question mostly to assess whether the government's standing could be assigned to the relator. But, arguably, the delegation of governmental authority to a private party should also be probative of the core question that the Court dodged: whether *qui tam* actions violate Article II. *Vermont Yankee* posits that *qui tam* is constitutional only if it establishes a principal-agent relationship between private civil litigants and the government.[293]

But it is not so clear that the same logic would apply to other private litigants who do not formally sue on the nation's behalf. Recall that the Court's concern in its cases concerning interference with prosecutorial discretion has been that private individuals should not be able to make the executive sue.[294] And the civil statutes at issue in *Heckler v. Chaney* and *Buckley v. Valeo* each concerned mandatory provisions that required the executive to sue—in the name of the government—upon the application of a non-executive entity.[295] For those rights of action, state-action doctrine points to an additional inquiry: the creation of an *implied* agency relationship between Congress and the private litigant based on apparent authority. Private individuals who exercise apparent authority might be said to be, in effect if not by delegation, suing on behalf of the United States and thereby interfering with the executive's exclusive prerogative. A similar inquiry—one rooted in cases like *Edmonson*—might identify

---

[292] Martin H. Redish, *Private Contingent Fee Lawyers and Public Power: Constitutional and Political Implications*, 18 Sup. Ct. Econ. Rev. 77, 97 (2010).
[293] Such a relationship ensures that the executive is still the principal and the *qui tam* relator merely an agent. *See* Gilles, *supra* note 86 at 351.
[294] *See Confiscation Cases*, 74 U.S. 454, 458 (1868); Heckler v. Chaney, 470 U.S. 821, 832 (1985); Buckley v. Valeo, 424 U.S. 1, 142 (1976); Morrison v. Olson, 487 U.S. 654, 662 (1988).
[295] *See supra* notes TK.

49

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

some narrow class of private litigants acting without express authorization who may still be acting as improperly appointed executors of law.[296]

In evaluating whether a private suit infringes on the Take Care Clause, the place to begin may therefore be the form of the delegation to the private litigant, formalistic as it may be. This rule may also extend to a very narrow subset of cases in which the tie between the Executive and the private litigant is so strong that an agency relationship can be implied.[297]

2.   Right

Taken together, the doctrines also focus on the nature of the right being vindicated. Lawsuits that assert rights shared by the political community might be understood as within the Executive's exclusive prerogative, while those that assert individually held rights (such as most civil rights) can be understood as properly brought by private individuals, even if their assertion of those privately held rights ultimately produces public benefits. Although the concepts are similar, this form of inquiry is distinct from whether a party has suffered individual injury for the purposes of determining her standing to sue. Take, for example, *Laufer*, the ADA tester case. Laufer may not have suffered an individual injury for standing purposes because she filed her lawsuit against a hotel she may not have had any intention to visit. But the underlying right she asserted—the right to be free from discrimination pursuant to the ADA—is best understood as an individually held, rather than a communal, right. Contrast this with a *qui tam* litigant who files a False Claims Act lawsuit against the hotel for its fraudulent use of accessibility-focused tax incentives. That litigant may have standing because he shares a monetary interest in the statutory remedy (as the Court recognized in *Vermont Agency*), but the right he asserts—to be free from fraud—belongs to the government or to the public, not to the private litigant.

To get at whether the right being asserted is private or public, we may look both to Nondelegation doctrines and to Article III's Private Rights Doctrine (though neither provide a clear or satisfying line). Albeit in different contexts and for different purposes, both doctrines attempt to distinguish private from public rights by looking to, among other factors, whether (1) the right of action interferes with a parallel and traditional governmental function, (2) whether it concerns an interest—such as in public property—traditionally held exclusively by the government, and (3) whether it invokes a government-created right or benefit.[298] Leah Litman has proposed another, similar way to conceptualize a private-public rights distinction, grounded in *Lujan*'s standing analysis: "that a suit attempts to vindicate public interests where it seeks to vindicate the interest in living under law—that is, in having people, private citizens, and government respect the law simply because it is the law."[299]

---

[296] *See* Edmonson v. Leesville Concrete Co., 500 U.S. 614, 621-22 (1991). .

[297] At the state level, Texas's S.B. 8 might resemble one such scheme.

[298] *See supra* Part IV.A.4–5.

[299] Leah Litman, *Taking Care of Federal Law*, 101 Va. L. Rev. 1289, 1305 (2015).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

### 3. Remedy

Several other doctrines look to the punitive nature of the remedy sought when distinguishing public from private suits: is it merely disgorging the wrongdoer of profits, compensating a private victim, or punishing the wrongdoing itself, much as a prosecution would? When a litigant seeks merely compensatory remedies, her lawsuit seeks to vindicate a private injury; but when her lawsuit requests punitive remedies, such as fines, that serve to punish the defendant but do not accrue to her personally, the lawsuit may serve to remedy a public harm of the form that the Executive ought to retain sole discretion over. And as the dispute in the horseracing case makes clear, a private party with the power to impose an injunctive remedy may be wielding traditional prosecutorial power of the kind mere monetary relief does not trigger.

As relevant to the Article III Public-Private Rights Doctrine, in interpreting punitive statutes, the Court has defined the term "penalty" as applying only when a punishment is imposed "for an infraction of a public law" and not one "for the purpose of redressing a private injury, even though the wrongful act be a public offense."[300] Where the underlying violation for which an agency extracts a payment from the wrongdoer is "committed against the United States rather than an aggrieved individual"—as is the case in a securities action that may proceed even where the victims do not support the prosecution—its prosecution is public.[301] And when that kind of public sanction is "intended to deter, not to compensate," it is further considered a penalty.[302] That is because under the Court's logic, a "violation" of the securities laws "is committed against the United States rather than an aggrieved individual," so that when the Commission seeks penalties "it acts in the public interest, to remedy harm to the public at large."[303] Another, rarely discussed doctrine adopts a similar formulation: in interpreting the "penal judgments exception" to the Constitution's Full Faith and Credit Clause, the Court has explained that whether a law is penal turns on "whether its purpose is to punish an offense against the public justice of the State, or to afford a private remedy to a person injured by the wrongful act."[304]

*Edmonson* (the jury-selection case) approached remedy from a different angle: there, the Court noted that one factor in determining whether a private litigant has become a state actor is whether "the injury caused" by her actions to the opposing party "is aggravated in a unique way by the incidents of governmental authority."[305] That case suggests that the nature of the remedy the private litigant seeks (there, a racially biased jury) may be relevant not just as to whether it is compensatory or punitive, but also as to the extent to which the litigant draws on governmental resources and power to implement it. The logic suggests that particular types of injunctive actions requiring heavy Executive involvement (such as a DOJ-monitored

---

[300] Meeker v. Lehigh Valley R. Co., 236 U.S. 412, 423 (1915).
[301] *See* Kokesh v. SEC, 581 U.S 455, 463 (2017).
[302] *Id.*
[303] *Id.*
[304] Huntington v. Attrill, 146 U.S. 657, 666 (1893).
[305] Edmonson v. Leesville Concrete Co., 500 U.S. 614, 621-22 (1991) (citations omitted).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

consent order) may be particularly suspect, because the private litigant can be said to have acted much like the Executive by invoking ongoing federal governmental authority to enforce a given cause of action.

### 4.   Control

The doctrines discussed above point to several additional, process-level considerations that can inform judgments about whether a private right of action interferes with the Executive's prerogative. They focus on who holds the ultimate reigns over the litigation and ultimately, the underlying issue. The relevant questions include (1) whether the Executive maintains ultimate control over the litigation and its outcome, either through specific executive-control provisions (such as in the False Claims Act's checks on *qui tam* actions) or through the mechanism by which the private litigant may be removed (perhaps in compliance with the Appointments Clause); (2) whether the litigant remains accountable to the public in the manner that the executive might be, or if there are other checks in place to prevent interest-group capture over the right of action; and (3) whether the executive may vindicate the underlying right in parallel to the private litigant.

This concern also appears in the standing cases. In *Friends of the Earth*, for example, the Supreme Court worried that the Clean Water Act's provisions permitting private plaintiffs to exact penalties paid out to the government could unconstitutionally constrain Executive power. The Court rejected the argument because "the Federal Government retain[ed] the power to foreclose a citizen suit by undertaking its own action," and that "if the Executive Branch opposes a particular citizen suit, the statute allows the Administrator of the EPA to 'intervene as a matter of right' and bring the Government's views to the attention of the court."[306] The Court, in other words, recognized the potential Article II problem but rejected it in that case because Congress had given the executive sufficient control over the litigation.

## V.   Impermissible Private Enforcement

The concerns that the Article II challenge identifies do not fit neatly with history or doctrine, though there are some general areas of overlap. We address them before laying out our understanding of the narrow scope any Article II challenge must take: if there is anything to an Article II critique of private enforcement, it should extend only to those private rights of action that (1) extract punitive or quasi-criminal remedies, or (2) invoke an interest in government property. (Though we continue to research the possibility that there may be some support for a third, more flexible category of impermissible private enforcement in cases where the private enforcement mechanism crowds the executive out from parallel enforcement.)

### A.  Dismantling the Article II Challenge

---

[306] Friends of the Earth, Inc. v. Laidlaw Env't Servs., 528 U.S. 167, 188 n.4 (2000) (quoting 33 U.S.C. §§ 1365(b)(1)(B), 1365(c)(2)).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

The first set of concerns that the Article II challenge identifies—a concern that private litigants may interfere with prosecutorial discretion while proactively enforcing the law, does appear in the history but has not been historically treated as a separation-of-powers concern. Executive officials in the Founding Era exercised only limited prosecutorial discretion over criminal actions, and they had essentially no control over private suits for monetary awards authorized by statute. In fact, the financial incentives provided by penal statutes created a well-known class of "common informers" who actively searched for violations that could give rise to successful suits. Informers were not a popular group in England or America. But despite widespread distaste for informers, Founding Era jurists do not seem to have understood them as exercising executive power. Even legislative reform efforts sought to retain the "proactive" elements of *qui tam* enforcement. Founding Era lawmakers viewed overenforcement by private litigants as a policy problem to be remedied through legislation, rather than an unconstitutional intrusion on executive power.

Doctrinally, however, modern courts have been understandably concerned about infringement of the executive's prosecutorial discretion. The concern motivates at least two areas of doctrine. First, the Court has referred to Article II concerns in its standing decisions that concern organizational plaintiffs—those well-resourced to go fishing for violations of law in areas where the executive may exercise more caution or enforcement discretion. The canonical case is *Lujan*: there, the Court expressed concern that the Endangered Species Act gave anyone the ability to police "agencies' observance of a particular, statutorily prescribed procedure" for protecting species.[307] In the criminal and civil Article II cases, the concern about enforcement discretion is more explicit: the criminal prosecution cases, such as *Nixon* and *Morrison*, both express concerns about allowing private individuals to prosecute without deferring to the executive's enforcement discretion.[308] (Though in the civil enforcement cases, such as *Buckley*, the Court's Article II concern is limited to groups that make the *executive* sue— not merely where they may sue on their own.[309])

The Article II Challenge's second concern, that private plaintiffs should not be able to sue over violations of "*public rights*," such as "noncompliance with the law,"[310] has minimal support in history and doctrine when so broadly framed. It also assumes a clean public/private rights divide that falls apart when one considers public rights as held both by the political community and by private individuals within it. Historically, as detailed extensively in Part III, private rights of action have touched public rights of all kinds, including rights shared by the broader public community. The one area in which courts and the legislature have imposed more guardrails is the

---

[307] Lujan v. Defs. of Wildlife, 504 U.S. 555, 576-77 (1992). The implication, of course, was that environmental groups would employ such a provision to over-enforce a set of laws the Executive may seek to retain discretion over.

[308] *See* Part IV.A.a, *supra*.

[309] *See supra* Part IV.A.1.b.

[310] Brief for Center for Constitutional Responsibility, *supra* note 18, at 2.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

*qui tam* action vindicating an injury to the public fisc (here, even Hamilton worked to enable a workaround but eventually had to acknowledge that the executive had no power to interfere with the private action directly). As for the doctrine, as we detail in Part IV.B.2 above, both the nondelegation doctrines and the private rights doctrine do consider whether the right asserted is best described as public in nature. But to identify such rights, they look to whether the right interferes with a parallel government function (such as prison management) or concerns an interest held exclusively by the government—such as a right in public property. This does not sweep into its ambit "violations of law" more generally, including civil rights (which as we explain above, are held by individuals and may be enforced either individually or collectively).

The Article II challenge's third concern—*remedies*—was less relevant in history as it is in modern doctrine. In the Founding Era, colonial assemblies and state legislatures frequently relied on private enforcement to protect public resources (like commons land or fisheries) and deter conduct harmful to the public at large (like pollution from tanneries, or the fire risk posed by gunpowder stores). And all "popular statutes," whether state or federal, afforded a remedy to any member of the public who could prove the violation in court. These included injunctive remedies that would halt the challenged conduct, and often included fines that would be paid out in part to the public fisc. As a modern jurisprudential concern, however, the public versus private nature of the remedy rears its head across the cross-doctrinal areas that we have identified in case law touching on Article II. Both state-action doctrine and the Article III public-private rights doctrine consider the nature of the remedy a party seeks in determining whether the private party is acting in a manner that displays incidents of, or encroaches with, executive authority.

### B.  Three Narrow Zones of Encroachment

Our review of the landscape of private enforcement, the history of these actions, and the doctrinal concerns that courts have articulated support at most a narrow zone in in which private enforcement may infringe on Article II's Take-Care Clause: where there the private civil enforcement action (1) approaches criminal enforcement—a distinction that mostly turns on remedy, (2) enforces a public property interest held exclusively by the government, or potentially (3) crowds the executive out from enforcement. Beyond these narrow zones, Congress may vest in private individuals the authority to bring private rights of action, even for injunctive relief, without interfering with historical or doctrinal understandings of the Take Care Clause.

#### 1.   Punitive, Quasi-Criminal Private Prosecutions

Both historically and across doctrinal areas, courts have treated criminal punishment as a distinctly executive function. Although private prosecution was the norm in the early colonies, several colonies by the Founding had to turn to a public

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

prosecution model,[311] and there is some historical evidence that the extraction of punitive remedies was identified as an executive prerogative by then—though as Peter Shane has pointed out, this may speak more to the authorization, and not the exclusive prosecutorial power of, prosecutors.[312]

Modern jurisprudence, too, considers criminal punishment as a unique—though not necessarily exclusive—province of the executive. In cases across doctrines in which the Court has expressed concern about private involvement in civil litigation, the Court has emphasized the extraction of punitive remedies as a uniquely executive prerogative.[313] In both *Nixon* and *Morrison*, for example, the Court asserted that criminal prosecutions are squarely executive in nature, and required private individuals engaging in such prosecutions to be held accountable to the Executive—in those cases, by requiring their appointment be consistent with the Appointments Clause.[314] arCauses of action that extract a punitive public remedy—such as damages paid directly to the public fisc as punishment or injunctive actions that approach the power to jail—may be constitutionally suspect if the statute is designed with few practical limitations on the way in which a cause of action can be brought and procedures by which the executive can exert some control over it. Yet this concern is not necessarily cross-doctrinal, as the Court's comfort with and protection for state executive enforcement of federal criminal law undermines the argument that the Take Care Clause commands that the federal executive exclusively enforce federal law, including criminal law.[315]

Even so, there are strong normative reasons to recognize this limitation, the precise contours of which will need to be fleshed out in future scholarship. Such a line, if drawn narrowly, might functionally separate punitive components of remedies for traditionally private tort-like suits from those that extract public benefits in the name of the people. It may also be consistent with the conclusions of scholars considering delegation in political legal theory that the power to delegate violence is uniquely problematic.[316]

2. Suits to Enforce Government-Held Property Interests

Both history and doctrine support that to the extent that the executive has a sole prosecutorial prerogative in the civil context, it may include protecting and enforcing the property of the United States, because the interest at stake in those cases is not shared diffusely by the public, but held entirely and concretely by the

---

[311] *See supra* note 183 and surrounding text.

[312] *See* Peter M. Shane, *Prosecutors at the Periphery*, 94 CHI.-KENT L. REV. 241, 259 (2019); *supra* notes 196-200 and accompanying text (discussing two cases in Early Republic suggesting that informer's actions were in substance "civil" because they carried only monetary penalties, rather than threat of imprisonment.)

[313] *See, e.g.*, Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183, 2194 (2020) (identifying criminal prosecution as a "core executive power").

[314] *See supra* Part IV.A.1.a.

[315] *See id.*

[316] Jacob D. Charles & Darrell A. H. Miller, Symposium, *Violence and Nondelegation*, 135 HARV. L. REV. F. 463 (2021).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

government. It is, in other words, an interest held by a singular and identifiable public entity, rather than one experienced by private individuals in the manner a Clean Air Act violation may be. Rights of action to vindicate that interest must, as many *qui tam* provisions already do, subject the private action to some form of executive oversight.[317]

Historically, the evidence on this is somewhat mixed. Early colonial America's grazing and yoking laws enabled private citizens to police public commons with little to no restrictions. [318] And as the *Dodge* example illustrates, the executive in early America could not prevent a private plaintiff from bringing a prosecution based on injury to the public fisc—but it *could* prohibit a private plaintiff from enforcing the portion of the damages meant to be paid out to the public fisc.[319] Hamilton's concern in the *Dodge* example illustrates that at the founding, concerns about private enforcement as encroaching on executive power appeared only when a private litigant claimed to be vindicating a harm to the public fisc.

Doctrinally, too, this distinction could make sense of some discrepancies. It would resemble the flipside of Sarah Leitner's solution, and would, in line with Justice Thomas's separate writings in *TransUnion* and *Spokeo*, treat injuries to property as limited to those who own an interest in that property: just as an individual may not sue to vindicate an interest in another's privately held property without the property-owner's authorization, so too she cannot sue to vindicate an interest in government property without specific authorization. The Penal Judgments Exception to the Full Faith and Credit Clause, too, views the executive interest in protecting government property as core to executive power.[320]

*Qui tam* provisions as they exist today offer the perfect example. The False Claims Act—the classic and most invoked federal *qui tam* right of action—*expressly authorizes* private relators to sue on behalf of the government in order to recover for fraud on the government—in other words, to recover an injury to the public fisc.[321] And it is these *qui tam* actions that have come under the most direct doctrinal scrutiny, first in *Vermont Agency*—where they survived only because of the statutory form of the delegation to the relator to sue directly on the government's behalf—and then as the target of Justice Thomas's dissents. Scholars, too, have treated *qui tam* actions with suspicion, carving them out as though they are separate from the classic private right of action. But the distinction that makes certain *qui tam* suits a threat to Article II is that they grant private litigants the remarkable authority to vindicate harm to the federal government's property (in the False Claims Act, that property is the public fisc; in parts of the Indian Protection Act, it is Native land). Such provisions, then, implicate nearly every cross-doctrinal concern identified in Part IV.B: they (1) formally grant the litigant the authority to sue on behalf of the United States, (2) involve a claim not to a

---

[317] But keep in mind that the 1863 False Claims Act did not subject *qui tam* claims to complete executive control. That change came later on in the history of *qui tam*. 31 U.S.C. §§ 3729 – 3733.

[318] *See supra* Part III.B.

[319] *See id.*

[320] Huntington v. Attrill, 146 U.S. 657, 669 (1892) (quoting Rafael v. Verelst, 2 W. Bl. 1055, 1058).

[321] *See* 31 U.S.C. § 3729 *et seq.*

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

publicly distributed interest in the manner a civil rights statute might, but rather to a concretely held public property interest, and (3) may obtain injunctive and punitive remedies (indeed, False Claims Act treble damages are unique in their public and punitive purpose). The only backstop, and one the Supreme Court interpreted and emphasized in *Polansky*, is the extensive manner in which the False Claims Act now permits the Executive to (4) control the private litigant.[322]

### 3. Crowding Out the Executive

There is some support in the doctrine and history for a final Article II backstop: that Congress cannot *crowd out* the executive from enforcing or otherwise influencing in some way the judicial interpretation of a statute in parallel to private litigants. The main historical support for the backstop is that the King, governors, and President could always pardon a penal statute violation *before* anyone filed a claim.[323] This gave the executive some way to limit these claims. Still, this was likely an extremely narrow power because, as a practical matter, the executive likely could not learn about violations of penal statutes until an informer filed a claim.

The doctrine, too, seems to support the existence of a backstop. Return to Grove's argument that Article II "prohibits the delegation of the Executive Branch's duty to see that federal law or *an area of federal law is obeyed*."[324] Article II may therefore safeguard some role for the executive to influence how federal law is obeyed, even if indirectly. That is why in *Friends of the Earth*, the Supreme Court at first worried that the Clean Water Act could unconstitutionally constrain the Executive power. But the Court rejected the argument because "the Federal Government retain[ed] the power to foreclose a citizen suit by undertaking its own action," and that "if the Executive Branch opposes a particular citizen suit, the statute allows the Administrator of the EPA to 'intervene as a matter of right' and bring the Government's views to the attention of the court."[325] The Court, in other words, recognized the potential Article II problem but rejected it in that case because Congress had given the executive sufficient control over the litigation.

Congress has also supported the Article II backstop by giving the executive specific enforcement power in almost every private enforcement regime. We might interpret this as Congressional understanding of the constitutional limits of its own power—relevant for liquidation and other interpretive methodologies. As David Engstrom points out, "private enforcement has seen some of its most rapid growth in areas like securities, antitrust, and job discrimination, where public actors already possess substantial regulatory and enforcement authority."[326] As far as we can tell, Congress almost never creates exclusively private enforcement regimes. Not only does Congress empower agencies and the President alongside private enforcers, it also explicitly gives the executive a way to influence private enforcement cases. For

---

[322] United States *ex rel.* Polansky v. Exec. Health Res., Inc., 599 U.S. 419, 424 (2023).

[323] *See, e.g.*, Vanderbergh v. Blake, 145 E.R. 451 (Hardres 194, 199) (1673).

[324] Grove, *supra* note 106, at 783–85.

[325] A quantification is forthcoming.

[326] A quantification is forthcoming.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

instance, Congress sometimes gives the executive the power to intervene in private claims, to disempower private plaintiffs (e.g., *qui tam*), to require notice before a private claim is filed, or to require a "license" from an agency before a private lawsuit can proceed.[327] Congressional action, then, seems to support the existence of some constitutionally protected role for the executive.

A concern with retaining *some* way for the executive to influence an area of federal law also finds some support in the doctrinal axes identified above. As discussed above, the Court has expressed concerns about encroachment upon Article II when a statute (1) expressly authorizes private litigants to sue on behalf of the United States, (2) does so for the vindication of a publicly held interest, (3) imposes a punitive remedy paid out to the public, or (4) fails to grant the Executive sufficient control to shape the law.

There are two ways to conceptualize a crowding-out test:

The first, narrow version would limit Congress' power to create exclusively private enforcement regimes. The Texas anti-abortion statute, S.B. 8, is a good example of such a regime, even if it is at the state level. In that statute, Texas not only empowered "any person" to sue abortion providers but also prohibited any state officials from enforcing the law. It therefore simultaneously empowered private litigants to enforce a law while expressly *excluding* the executive from doing so. Were Congress to simultaneously empower private plaintiffs in an area of public law and *prohibit* federal officials from both (a) exercising control over the private lawsuits (by pardon or dismissal) and (b) enforcing that same law in parallel, it would potentially violate Article II.[328] Of course, the distinction between complementing and replacing executive enforcement may in practice be more a distinction in degree than in kind.

The second, more robust version could obligate Congress to affirmatively give the executive both parallel enforcement power *and* the ability to influence private enforcement cases. Under a more expansive reading of Article II, whenever Congress creates a private enforcement regime it would have to give the executive some form of input into private lawsuits: either the ability to intervene, to "license" private parties before they file lawsuits, or some other method to effectively influence the enforcement of federal law. Congress could, for instance, ward off any Article II concerns by inserting a rider into each private right of action that gives the executive some sort of power to step in with *nolo prosequi* authority.[329] Such a robust conception of Article II could ensure that the executive retains an effective, pardon-power-like ability to restrict private rights of action that run amok. Given that the pardon power is constitutionally confined to criminal cases, however, the primary support for any

---

[327] A quantification is forthcoming.

[328] *Cf.* Ex parte Young, 209 U.S. 123, 159-60 (1908) ("If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is, in that case, stripped of his official or representative character, and is subjected in his person to the consequences of his individual conduct.").

[329] We thank Amanda Tyler for the language here.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

such backstop would be a set of normative, policy-based concerns. Although the actions of testers pursuant to the ADA comes close, Congress did include several provisions that gave the executive power to influence those cases. Moreover, under the ADA, individuals ultimately bring an individualized right—the right to be free from discrimination—and so do not raise the concern with private claims over purely public injuries.

Even if there is some weak form of Article II backstop, both of these options are a far cry from the Article II challenge. Neither would limit Congress' power to empower private plaintiffs. Rather, the crowding-out concern would limit Congress' power to directly (and in some rare cases, indirectly) limit the *executive*. This will rarely justify striking down a statutory regime, because Congress typically gives the executive specific enforcement power in nearly every private enforcement regime.

*     *     *

An assessment of this proposed test against the federal rights of action that we quantified in Part I.A has confirmed our understanding that Congress has closely avoided the zones of encroachment that we identify. Nearly every private right of action that we identified extracts only private or non-punitive public remedies, and the few that enable private litigants to assert the government's property interests—most prominently, the Federal Claims Act—contain provisions enabling executive control over the right of action.[330] Our dataset reveals a few novel statutory provisions that may pose an Article II problem. The Telecommunications Act, for example, contains a provision enabling certain broadcast stations to sue satellite carriers that broadcast content without authorization—a harm to the public. But as a condition for collecting statutory damages, the broadcaster must stipulate that the station will "donate the full amount in excess of $1,000 of any statutory damage award to the United States Treasury for public purposes."[331] In other words, Congress has deputized broadcasters to collect statutory awards payable directly to the government as punishment for a civil violation. This potentially implicates our first zone of encroachment (the second zone remains untouched, as the injury here is to public broadcasting, not to any governmental property interest). This unique enforcement scheme may be unconstitutional pursuant to Article II. Little else is.

## Conclusion

As it begins to reemerge, the Article II challenge to private enforcement is plausible and perhaps even compelling. But there is little historical support for any separation-of-powers limitation on private rights of action, and doctrines addressing the subject do not identify any single attribute of private rights of action that mark them as threats to Article II. We argue that while there is something to the Article II challenge, it must be limited in application to private rights of action that extract punitive remedies or claim injuries to government property interests without a

---

[330] A quantification is forthcoming.
[331] 47 U.S.C. § 325.

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

mechanism for meaningful executive control over the underlying action. Beyond that narrow sliver, private rights of action need not be placed under a microscope.

Defendants may of course turn to other constitutional arguments that this article does not address, including arguments grounded in the Eighth Amendment and the Due Process Clause. First, it is at least conceivable some types of private statutory claims implicate the Eighth Amendment's limitation of "excessive fines." The Supreme Court technically left this question open in *Browning-Ferris Industries v. Kelco Disposal*, and the broad meaning of "fine" in the Founding Era might support applying it to certain private rights of action that extract stiff monetary penalties. Second, the Fifth and Fourteenth Amendments bar the state and federal governments (including courts) from depriving "any person of life, liberty, or property, without due process of law." One can conceive of, and there may be some historical support for, a potential due process problem with private enforcement of criminal law—i.e., private prosecution of offenses which could lead to imprisonment or corporal punishment. After all, by the time of the Founding (and certainly by the adoption of the Fourteenth Amendment in 1868) many American jurisdictions had rejected the English tradition of private prosecution.

The final backstop, then, lies with Congress. One particular concern with Laufer and with testers more generally is that while they may often serve the public and root out instances of civil-rights violations, they could become motivated by the perverse prospect of settlement.[332] The ADA's right of action, for example, provides only injunctive relief and attorney's fees, but serial testers sometimes offer to settle immediately for cash—one notorious tester filed hundreds of boilerplate complaints accompanied by $10,000 settlement offers for "attorney's fees."[333] This may resemble the illegal "compounding" of eighteenth century informers. But as then, the concern is not that our constitutional structure cannot bear testers. It is that testers may develop financial motivations of the same kind that concerned some quarters at the founding. As then, the solution lies in statutory design: amending civil-rights statute to cap serial settlements by repeat litigants would ameliorate that concern while retaining a critical component of modern civil-rights law.

---

[332] The law and economics literature has always discussed this problem. *See* K. Elzinga & W. Breit, THE ANTI-TRUST PENALTIES: A STUDY IN LAW AND ECONOMICS (1976); Landes & Posner, The Private Enforcement of Law, 4 J. LEGAL STUD. I(1975); Polinsky, Private Versus Public Enforcement of Fines, 9 J. LEGAL STUD. 105 (1980); Schwartz & Mitchell, An Economic Analysis of the Contingent Fee in Personal Injury Litigation, 22 STAN. L. REV. 1125 (1970).

[333] Acheson Hotels, LLC v. Laufer, 601 U.S. 1, 7 (2023) (Thomas J., concurring).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

## Appendix A: Typology of Private Enforcement

| Model | Investigator | Prosecutor | Examples |
|---|---|---|---|
| *Public law enforcement* | State | State | • Criminal law[334]<br>• Antitrust enforcement actions |
| *Private reporting regimes* | Private citizens | State | • Informal report-thy-neighbor regimes[335]<br>• Whistleblower regimes<br>• Moiety Acts |
| *Outsourced investigatory regimes* | Private entity contracted by the state | State | • Bail bondsmen models<br>• Criminal investigations conducted through third-party actors[336] |
| *Parallel public enforcement regimes* | State or Private citizens (though often must exhaust public remedies) | State or Private citizens | • California Consumer Protection Act[337]<br>• California's PAGA<br>• *Qui tam* suits<br>• Environmental civil enforcement actions<br>• public-private board arrangements<br>• Piggyback and reverse piggyback suits<br>• State governments hiring private law firms<br>• "Tester" suits |
| *Private law enforcement* | Private citizens | Private citizens *only* | • Texas's S.B. 8<br>• Nuisance actions<br>• Breach-of-contract suits |

---

[334] *See, e.g.*, *Cruz v. Arizona*, 598 U.S. _ (2023).

[335] *See, e.g.*, Joe Yurcaba, *Texas Governor Calls on Citizens to Report Parents of Transgender Kids for Abuse*, NBC NEWS, https://www.nbcnews.com/nbc-out/out-politics-and-policy/texas-governor-calls-citizens-report-parents-transgender-kids-abuse-rcna17455 ("Texas Gov. Greg Abbott is calling on 'licensed professionals' and 'members of the general public' to report the parents of transgender minors to state authorities if it appears the minors are receiving gender-affirming medical care."); Huq, *supra* note 3, at 21 (describing historical racial reporting regimes dating to the Jim-Crow era, including vagrancy statutes).

[336] One key example of this phenomenon is the FBI's frequent reliance on private actors to assist with investigations. *See, e.g.*, Ellen Nakashima, *FBI Paid Professional Hackers One-Time Fee to Crack San Bernardino iPhone*, WASH. POST (Apr. 12, 2016), https://www.washingtonpost.com/world/national-security/fbi-paid-professional-hackers-one-time-fee-to-crack-san-bernardino-iphone/2016/04/12/5397814a-00de-11e6-9d36-33d198ea26c5_story.html.

[337] For a description, see Charles W. Rhodes & Howard Wasserman, *Solving the Procedural Puzzles of the Texas Heartbeat Act and Its Imitators*, 71 AM. U. L. REV. 1029 (2022).

Electronic copy available at: https://ssrn.com/abstract=4821934

Draft May 8, 2024

## Appendix B: Primary Source Guide

[*Note to the Reader*: Our piece cites a number of Founding-Era treatises, newspapers, dictionaries, and statutes; most are publicly available in their original format through Google Books, Haithi Trust, and Archive.org. We think that scholars should be more transparent about the use of these sources—as they have become accessible to a wider audience, more and more articles and amicus briefs deploy them without the appropriate context. Accordingly, we plan to prepare an appendix of primary sources for the final version of the article to help the reader locate the works we cite in reliable online editions. We hope this will also facilitate the editorial review and citation process (since we know that these sources can also be difficult for editors to locate).]

Electronic copy available at: https://ssrn.com/abstract=4821934