# Northwestern

## PRITZKER SCHOOL OF LAW

NORTHWESTERN UNIVERSITY PRITZKER SCHOOL OF

LAW PUBLIC LAW AND LEGAL THEORY SERIES • NO. 23-25

# Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement for a Partisan World

## Fordham Law Review Volume 92
## 2023, forthcoming

## James E. Pfander

### Northwestern University Pritzker School of Law

Electronic copy available at: https://ssrn.com/abstract=4424076

PUBLIC LAW LITIGATION IN EIGHTEENTH CENTURY AMERICA:
DIFFUSE LAW ENFORCEMENT IN A PARTISAN WORLD

## James E. Pfander.[*]

Abstract

For some time, the Supreme Court has used standing doctrine to limit the authority of federal courts to entertain private suits aimed at enforcing public norms. In its most recent iteration, *TransUnion LLC v. Ramirez*, the Court invalidated a federal consumer protection statute on the theory that it wrongly empowered suit by individuals who lacked the requisite injury in fact. Shutting down private litigation was said to advance separation of powers values and to protect the enforcement discretion of a unitary executive branch. The Court characterized private enforcement as a novel feature of the 1970s, a time the Court viewed with evident suspicion as one that inaugurated interest group litigation.

In truth, the tradition of interest group enforcement of public norms extends to the earliest days of the Republic. During the 1790s, Quakers and other anti-slavery activists secured federal legislation prohibiting American involvement in the international trade in enslaved people. Like other legislation of that period, the 1794 statute empowered both the federal government and private informers to enforce the law. The ensuing litigation, brought by private informers associated with such groups as the Providence Abolition Society, led to the forfeiture and sale of the offending vessels in the admiralty courts of Rhode Island and elsewhere. Drawing on federal archives, this Article recounts a history in which all three branches of the federal government – Congress, courts, and executive branch officials – viewed private litigation through what were called "popular" actions as an uncontroversial tool for enforcing public norms. One finds no objections based on Article II or III of the Constitution

* Owen L. Coon Professor of Law, Northwestern University Pritzker School of Law. Thanks to the Northwestern research program for supporting this endeavor; to my research assistants, Natalie Barnaby, Julia Fleurantin, Richard Min, and Mary Zakowski; to my interlocutors at the American Society for Legal History, Fordham Law, Northwestern Law, and Stanford Law; and to Greg Ablavsky, Ron Allen, Kevin Arlyck, Steve Calabresi, Zach Clopton, Jonathan Gienapp, Steve Lubet, John McGinnis, Jenny Martinez, Ajay Mehrotra, Nick Parrillo, Richard Re, Jim Speta, and Diego Zambrano for their comments on early versions of the paper. Errors are on me.

1

Electronic copy available at: https://ssrn.com/abstract=4424076

INTRODUCTION

Ever since the NAACP led the Supreme Court to *Brown v. Board of Education*, we have lived in an interest group litigation world.[1] But the Court has lately followed a more restrictive approach. In *TransUnion LLC v. Ramirez,*[2] channeling Justice Scalia's opinion in *Lujan*, the Court concluded that Article III's standing requirements overrode the Fair Credit Reporting Act.[3]   For the Court, the defendant's procedural wrongs, though made actionable by Congress, did not cause any concrete Article III harm.[4]   No concrete harm, the Court intoned, no standing.[5]

Alongside injuries in fact, modern standing jurisprudence incorporates a muscular conception of unitary executive power.[6] Unitarian theories hold that Article II vests control over the exercise of law enforcement discretion in the President of the United States and in executive branch officials that answer directly to the President.[7]   Such vesting limits Congress's power to authorize groups or individuals outside the executive branch chain of command to enforce federal law.[8]   *TransUnion* explains that standing law protects

---

[1] On the NAACP's role in *Brown v. Board of Education*, 347 U.S. 483 (1954), see Michael J. Klarman, BROWN V. BOARD OF EDUCATION AND THE CIVIL RIGHTS MOVEMENT (2007); Richard Kluger, SIMPLE JUSTICE (1975); Mark Tushnet, BROWN V. BOARD OF EDUCATION: THE BATTLE FOR INTEGRATION (1995).

[2] *See* TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2214 (2021).

[3] *See* TransUnion, 141 S. Ct. at 2211-14 (quoting *Spokeo*, *Lujan*).  For an overview of the Fair Credit Reporting Act and its role in data privacy protection, see Shawn Marie Boyne, *Data Protection in the United States*, 66 Am. J. Comp. L. 299 (2018).

[4] The credit reporting company, TransUnion, had violated the law by collecting damaging information about a group of consumers in a procedurally improper way. *See* TransUnion, 141 S. Ct. at 2208, 2211 (assuming that the company had violated the statute as to all 8000 members of the plaintiff class but noting that as to three-quarters of class members the company had not disclosed damaging information to third parties).

[5] *See* TransUnion, 141 S. Ct. at 2200, 2214.

[6] On the impact of unitarian thinking, see United States v. Arthrex, Inc., 141 S. Ct. 1970 (2021) (invalidating administrative law judge independence as inconsistent with presidential control); Free Enterprise Fund v. Public Co. Acctg. Oversight Bd., 561 U.S. 477, 496-97 (2010) (invalidating limits on presidential removal); *cf.* Morrison v. Olson, (19) (Scalia, J., dissenting) (arguing that statutory provision for an independent counsel violates presidential control over the executive function of prosecution).

[7] For the view that prosecutorial discretion lies at the core of executive power, vested in the president by Article II, see Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 701-04 (defining core power as that to execute the law); Ilan Wurman, In Search of Prerogative, 70 Duke L.J. 93, 143-53 (2020) (arguing that prosecution is a core executive power).

[8] *See* Allen v. Wright, 468 U.S. 737, 759-60 (1984) (questioning viability of suits to compel agency action to regulate other parties); Lujan v. Defenders of Wildlife, 504 U.S. 555, 577 (1992) (expressing concern that Congress could invade the president's duty to ensure faithful execution of laws by converting undifferentiated public interest in compliance with law into an individual right).

2

Electronic copy available at: https://ssrn.com/abstract=4424076

Eighteenth Century Public Law Litigation

executive enforcement primacy and prevents Congress from violating Article II.[9]

Whatever one might say about its wisdom as a matter of policy, the Court's use of strict standing rules to preclude private enforcement of public law cannot be defended on originalist grounds. In 1794, Congress enacted and George Washington signed a bill that prohibited American involvement in the international trade in enslaved people, legislation modeled on state statutes that those opposed to slavery had earlier secured in New England.[10] The 1794 federal legislation authorized private informers to enforce the law by bringing what were known at the time and described in the press as "popular" or "public" actions.[11] Private individuals were authorized to bring these actions, but they lacked any injury in fact within the parlance of modern standing law and held no office under the United States that empowered them to enforce public law.[12] While informers would share in the proceeds of successful litigation, their goal was to deter and denounce those who engaged in illicit commerce in people. As one contemporaneous news account reported, informer proceedings were brought "more to give sanction and efficacy to the law, than to mulct the violat[o]rs thereof."[13]

This Article tells the story of the 1794 Act, focusing on

---

[9] *See TransUnion*, 141 S. Ct. at 2207 (asserting that Congress violates both Article III and Article II when it invests unharmed individuals with power to pursue claims in federal court; such litigation interferes with executive branch authority to calibrate the enforcement potency of a particular statute by investing private parties with enforcement discretion). Such Article II concerns have been a recurrent theme in the Court's standing jurisprudence. *See, e.g.*, Lujan v. Defenders of Wildlife, 504 U.S. at 577 (rejecting congressional power to authorize private litigation as a violation of the president's Article II duty of faithful execution). *Cf.* Sierra v. City of Hallandale Beach, 996 F.3d 1110, 1115, 1132-37 (11th Cir. 2021) (Newsom, J., concurring)

[10] *See* part II.B.

[11] For the history of popular actions, see Steven L. Winter, *The Metaphor of Standing and the Problem of Self-Governance*, 40 Stan. L. Rev. 1371, 1406–09 (1988) (arguing that standing law's injury-in-fact requirement was at odds with the early willingness of federal courts to hear suits brought by informers who sought bounties rather than redress of injuries personal to themselves). On the use of popular actions in Scotland as part of the Roman law tradition, see James E. Pfander, *Standing to Sue: Lessons from Scotland's Actio Popularis,* 66 Duke L.J. 1493 (2017) (describing the civil law roots of the Scots' actio popularis, or popular action).

[12] On qui tam and informer litigation, see Randy Beck, *Qui Tam Litigation Against Government Officials: Constitutional Implications of a Neglected History*, 93 Notre Dame L. Rev. 1235 (2018) (tracing qui tam litigation to its fourteenth century origins in England); Evan Caminker, Comment, *The Constitutionality of Qui Tam Actions*, 99 Yale L.J. (1989) (defending qui tam suits from constitutional criticisms based on both Article II and Article III).

[13] *See* Stanton D. Krauss, Newspaper Reports of Decisions in Colonial, State, and Lower Federal Courts Before 1801, at 507 (2018) (reproducing article from the Providence *Gazette*, Oct. 22, 1791). For an account of *Gordon v. Gardner*, see part I.B.

Electronic copy available at: https://ssrn.com/abstract=4424076

enforcement proceedings in Rhode Island. There, a group of Quakers and like-minded activists founded the Providence Society for the Abolition of Slavery. The Society raised funds to support anti-slavery litigation, hired prominent lawyers, and enjoyed a measure of success in enforcing federal law. Digitized federal archives reproduce the formal papers in these cases, revealing as summarized in the Appendix the nature of the claims and the division of the proceeds.[14] In one early proceeding, the federal judge for Rhode Island entered a forfeiture decree against a leading merchant and politician, John Brown. Other proceedings followed, initiated by the Society, by other private informers, and by representatives of the federal government. Relatively intense enforcement during the late 1790s and early 1800s reduced the number of voyages to Africa.[15]

Like regulated industries today, Rhode Island merchants resisted federal control. In one early example of regulatory capture, Rhode Island merchants kidnaped a federal official to prevent his bidding at the public auction of a forfeited trading ship that the owners meant to repurchase on the cheap.[16] In a second example, merchants physically assaulted an informer who ventured to Rhode Island to enforce the law.[17] Finally, in an early example of revolving-door practices, President Jefferson placed an important Rhode Island district in charge of a customs official who had actively participated in voyages to Africa and showed scant interest in enforcing federal law against his former associates.[18] Coupled with Jeffersonian pardons that restored the freedom and property of convicted traders, friendly customs officials enabled merchants to resist public enforcement of the law.[19] "Politics," in the words of one observer, ultimately "triumphed over law."[20]

Whatever its ultimate success, the Providence Society's early foray into interest group mobilization illustrates early republic reliance on private enforcement of public laws.[21] Contemporary

---

[14] See https://www.archives.gov/research (collecting digitized records of anti-slavery litigation in Rhode Island district court, 1787-1803).

[15] See Jay Coughtry, THE NOTORIOUS TRIANGLE: RHODE ISLAND AND THE AFRICAN SLAVE TRADE, 1700-1807 at 228-29 & Appendix (1981) (reporting a decline in voyages to Africa during period of intense federal enforcement up to 1803 and a subsequent increase in voyages following President Jefferson's appointment of a pro-slave-trade customs officer).

[16] See Charles Rappleye, SONS OF PROVIDENCE: THE BROWN BROTHERS, THE SLAVE TRADE, AND THE AMERICAN REVOLUTION 317-18 (2006) (recounting the kidnaping of one Bosworth to prevent his bidding at the auction of a vessel forfeited to the government)

[17] See note 150 infra (describing the assault on John Leonard).

[18] See notes 167-68 infra (recounting the appointment of Charles Collins).

[19] For Jefferson's pardons of Topham and Ingraham, see note 169 infra.

[20] See Coughtry, supra note 15, at 229.

[21] See Nicholas R. Parrillo, AGAINST THE PROFIT MOTIVE: THE SALARY REVOLUTION IN AMERICAN GOVERNMENT, 1780-1940, at 30-1 (2013) (describing regimes of bounties that

4

Electronic copy available at: https://ssrn.com/abstract=4424076

constitutional actors – presidents, legislators, executive officials, federal judges – embraced private informers as part of a more robust administrative state.[22]   Early acceptance of private enforcement complicates the originalist case for unitary executive control of the law enforcement function; indeed, the Society's work resembles public law litigation efforts today.  As a potential counterweight to executive non-enforcement of the laws, reliance on popular actions may deserve a closer look in this age of partisan division.

This Article takes that look in three parts.  Parts I and II describe the work of the Abolition Society, placing informer proceedings in historical context.  Stepping back, part III suggests that the Abolition Society's role in enforcement of the anti-slavery provisions of the 1794 Act (like other early examples of informer litigation) poses an important challenge to the historical case against citizen suit standing.  The Article concludes that, whatever the unitary executive and standing implications of Articles II and III, they did not disable Congress from allowing private citizens to enforce public laws banning the international trade in people.

## I.   INFORMER SUITS TO ENFORCE PUBLIC LAW

In chronicling America's failure to end slavery in the late eighteenth century, historians contrast the success of gradual emancipation in New England with the failure of abolition movements in the upper and lower South.[23]   Religious groups, including the Society of Friends, or Quakers, played a central role in these abolitionist efforts.[24]   In Rhode Island, Quaker meetings encouraged congregants to free enslaved people, and to support efforts to achieve broader reforms.  In the spirit of broader reform,

---

were either open to all comers or restricted to eligible office holders).

[22] For evidence that undercuts the conventional view of severe weakness in the administrative apparatus of the early Republic, see Jerry Mashaw, CREATING THE ADMINISTRATIVE CONSTITUTION (2012); William Novak, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996); Brian Balogh, A GOVERNMENT OUT OF SIGHT: THE MYSTERY OF NATIONAL AUTHORITY IN NINETEENTH-CENTURY AMERICA (2009).

[23] *See* William M. Wiecek, THE SOURCES OF ANTI-SLAVERY CONSTITUTIONALISM IN AMERICA, 1760-1848, at 90-95 (1977) (describing the progress of gradual emancipation in the North, the failure of similar measures in Upper South, and the utter rejection of emancipation in the Deep South).  Only Vermont, among early states entering the Union, prohibited slavery in its Constitution.  *Id*. at 48.  *See also* Gordon Wood, POWER AND LIBERTY: CONSTITUTIONALISM IN THE AMERICAN REVOLUTION 100-25 (2021); Edmund S. Morgan, AMERICAN SLAVERY, AMERICAN FREEDOM: THE ORDEAL OF COLONIAL VIRGINIA (1975); *Slavery and Freedom: The American Paradox*, 59 J. Am. Hist. 5 (1972).

[24] On religious groups in early abolition efforts, see Wood, supra note , at 100 (describing the Quakers' role in founding the nation's first abolition society in 1775); Wiecek, supra note , at 84-88 (describing the abolition societies as "intensely litigious").

5

Electronic copy available at: https://ssrn.com/abstract=4424076

members of the Quaker meeting in Providence sought legislation that would end the participation of Rhode Island merchants in international human trafficking. Rhode Island had a substantial stake in oceangoing commerce, and many of its merchants participated in the international trade in enslaved people. Indeed, some estimates suggest that, during the eighteenth century, Rhode Island merchants were responsible for 60-90% of the American traffic in African people.[25]

Moses Brown knew the traffic well.[26] Son of a leading Providence merchant, Brown and his brothers had financed voyages to the African coast before 1776. But after joining the Quaker meeting, Brown denounced slavery, freed the people he owned, and joined with other Quakers to secure legislation in 1787 that sought to end Rhode Island's involvement in the international trade.[27] This part describes both the legislation itself and the way members of the Abolition Society used informer actions to secure its enforcement.

### A.   Litigating Rhode Island's Role in the Trade

Taking a page from English law books and religious societies,[28] the early abolition societies in the United States relied extensively on litigation to achieve their goals.[29] Freedom suits

---

[25] Craig A. Landy, *Society of United Irishmen Revolutionary and New-York Manumission Society Lawyer:   Thomas Addis Emmet and the Irish Contributions to the Antislavery Movement in New York*, N.Y. History 193, 202-09 (2014). See also Coughtry, supra note , at 25 (same). Cf. David Fitts, *The Volume and Structure of the Transatlantic Slave Trade*, Wm & Mary Q. (3d Ser.) 22 (2001) (Rhode Island merchants made around 1000 voyages to Africa in the eighteenth century, roughly half of the North American participation).

[26] See Rappleye, supra note , at 127-34 (describing Moses Brown's conversion from slave owner and merchant to abolitionist).

[27] On the passage of the Rhode Island law, see Rappleye, supra note , at 248.

[28] For an account of Granville Sharp's support of the *Somerset* litigation, see Wiecek, supra note , at 25-30. For the suggestion that Mansfield's opinion in the case does not expressly free slaves on their arrival in England, *see id*. at 32 (noting that the case centered on the legality of compelling a slave to return from England to a colonial world of servitude). For background on the anti-slavery movement in Britain, see Roger Anstey, THE ATLANTIC SLAVE TRADE AND BRITISH ABOLITION, 1760-1810 (1975). On the rise of abolition societies in the United States, organized locally within a loose national confederation centered in Philadelphia, see Wiecek, at 83-87. On the extension of such societies into Virginia and the upper South, *see id*. at 88-89.

[29] Religious societies had a complex relationship to informer-style litigation. In seventeenth-century England, religious groups were often the target of informer proceedings and only later came to use informer statutes to enforce public morals. When they did, they worked to rehabilitate the reputation of public-spirited informers by distributing manuals that relayed advice on how to "improve their self-presentation." For an account, Beck, supra note , at __ (quoting Jeanne Clegg, *Reforming Informing in the Long Eighteenth Century*, Textus XVII 337, 343-48 (2004)). On abolition societies in Virginia, see A. Glenn Crothers, *Quaker Merchants and Slavery in Early National Alexandria, Virginia*, 25 J. Early Rep. 48

6

Electronic copy available at: https://ssrn.com/abstract=4424076

proceeded on trespass theories, contesting the legality of confinement and corporal punishment as tortious as applied to free individuals.[30] Much of the litigation was undertaken on a pro bono basis by sympathetic members of the bar, sometimes referred to as "counsellors" to the abolition societies of the day.[31]

Along with other New England states, Rhode Island in 1784 had adopted a statute providing for the gradual emancipation of enslaved people. Three years later, the adopted "An Act to Prevent the Slave-Trade and to Encourage the Abolition of Slavery," prohibiting any citizen or person residing in Rhode Island from any participation in the African trade.[32] The law was written in broad terms to proscribe those with any interest in a vessel (whether as master, factor, or owner) from acting to "buy, sell, or receive on board their vessel" with intent to cause to be imported or transported "any Natives or Inhabitants" of "that part of the World known as Africa" without their voluntary consent. Those convicted of violating the law were subject to a penalty in the amount of £100 for every person so transported and £1000 for every vessel used in the trade. Massachusetts adopted a virtually identical bill in March 1788 and Connecticut followed suit a short time later.[33]

The statute authorized broad enforcement, providing that the penalties were to be recovered by bill, complaint, or information, brought before the courts of the state. As for the proceeds of a successful forfeiture proceeding, the statute specified that one "moiety" would be paid into the general treasury of the state and the other moiety paid "to and for the use of the person or persons who shall prosecute for and recover the same." These were terms of art that were understood to authorize both government officials and

---

(2005).

[30] *See* Wiecek, supra note , at 88-89.

[31] On the importance of counsellors to the abolition societies, see Wiecek, supra note , at 87 (identifying William Lewis, Jared Ingersoll, and William Rawle – all leading members of the bar -- as counsellors to the Pennsylvania abolition society); Moseley, supra note , at 55, 63 (describing counsellors as elected members of the society who provided legal services without charging a fee); Landy, supra note , at 201-02 (describing Thomas Emmet's appearance as counsellor in the Topham litigation, alongside Egbert Benson). Counsellors often came from the legal community's elite ranks, creating an anti-slavery bar comparable to public interest lawyers today.

[32] An Act to Prevent the Slave Trade and the Encourage the Abolition of Slavery (October 1787). For the text of the Rhode Island statute, see Appendix I.

[33] *See* Coughtry, supra note , at 206 (describing the migration of laws throughout New England banning the trade). The Massachusetts law specified penalties of £50 for every person so transported and £200 for every vessel used in the trade. *See* . Although these figures may suggest that Massachusetts effectively adopted a lesser set of penalties, Rhode Island had experienced substantial inflation, reducing the value of its emission of paper money.

Electronic copy available at: https://ssrn.com/abstract=4424076

private parties to bring enforcement actions.[34]   When such suits were successful, private informers would typically retain as a bounty half the proceeds.   It was the bounty, rather than redress for an injury, that gave rise to the plaintiff's interest in the litigation.[35]

Moses Brown and his friends organized the Providence Society for the Abolition of the Stave Trade in February 1789 for the express purpose of privately enforcing the ban on participation in the trade.[36]   Others have told the story of the Brown family, the decision of Moses Brown to join the Quaker meeting, his family's support for the creation of Brown University, and his activities as an abolitionist.[37]   Correspondence and records from the early meetings of the Abolition Society reveal that members paid dues to a fund aimed at supporting anti-slavery litigation.[38]   At the same time, the Society began a public relations campaign, aimed at persuading merchants to renounce the trade voluntarily.[39]

## B.   *Gordon v. Gardner*:   Anti-Slavery's First Popular Action

The Society enforced an anti-slavery statute in *Gordon v. Gardner*, a suit to penalize owners of a vessel that had fitted out in Boston and conveyed over 100 African people into slavery.[40] According to news accounts, members of the Society attended the trial and were described by the defense attorneys as the "patrons of the suit" and the "real plaintiffs" in the action.[41]   The jury returned a

---

[34] *See* Beck, supra note, at 1254-56 (statutes were subject to qui tam enforcement if they gave part of a penalty to a private litigant who shall sue for it); *cf.* Adams v. Woods, 6 U.S. 336 (1805) (recognizing that the 1794 Act contemplates both criminal proceedings by information and civil proceedings by debt).

[35] *See* Marvin v. Trout, 199 U.S. 212, 225 (1905) (observing that the "right to recover the penalty or forfeiture granted by statute is frequently given to the first common informer who brings the action, although he has no interest in the matter whatever except as such informer"); *see generally* Beck, supra note, at 1256 (quoting Hawkins treatise from 1721 to the effect that any person can bring a popular action).

[36] Rappleye, supra note, at 259-60 (describing the Society's organization in February 1789, after six Rhode Island ships cleared for Africa). *See also* Papers of the American Slave Trade Series A: Selections from the Rhode Island Historical Society, at 55-56 (describing the Society's founding, its minute book, and its organizational charter).

[37] *See* Rappleye, supra note, at 127-34; see also Coughtry, supra note, at 205-07, 259-60 (describing the Society's organization in February 1789, after six Rhode Island ships cleared for Africa).

[38] *See* Rappleye, supra note, at 260.

[39] Rappleye, supra note, at 261-67.

[40] *See generally* Rappleye, supra note, at 267-69.   This Article's description of the litigation draws on news accounts in the Providence *Gazette* from October 1791 and the *Columbian Centinel* from November 1791. *See* Stanton D. Krauss, Newspaper Reports of Decisions in Colonial, State, and Lower Federal Courts Before 1801, at 507-12 (2018).

[41] Krauss, supra note, at 509 (reproducing the article "Slave Trade Law Case: Gordon v. Gardner," *Columbian Centinel*, Nov. 9, 1791); Coughtry, supra note, at 208.

8

Electronic copy available at: https://ssrn.com/abstract=4424076

Eighteenth Century Public Law Litigation

plaintiff's verdict for £200, a good deal lower than the amount demanded in the initial complaint or information.

Press accounts reflect broad interest in the trial but do not reveal arguments that such "popular actions" to enforce public law interfered with the role of government or were unfit for judicial resolution because the plaintiffs lacked standing to proceed on behalf of the public.[42]   These were notable omissions: defendants were represented at trial by the Rhode Island Attorney General (Channing) and that state's deputy governor (Bradford).[43] From all that appears, no one challenged the judicial character of the proceeding or the ability of informers to bring suit to enforce a public law.[44]

Sure enough, when we consult treatises, we find that both England and New England often chose to supplement public enforcement of the law by authorizing private parties to take on enforcement duties as informers.[45]   Popular actions of various sorts were also commonplace feature of litigation before the Scottish Court of Session.[46]   For Blackstone as for the lawyers of the early Republic, arguments as to the perceived problems associated with the use of popular actions and informer proceedings were better addressed to legislative bodies than to the courts.[47]

---

[42] See Krauss, supra note , at 508 (quoting the *Columbian Centinel*: "This was a popular action, grounded [on an act of the Massachusetts legislature]").

[43] *See* Coughtry, supra note , at 209.  *See also* Krauss, supra note , at 508-09 (identifying counsel to the defendants as Channing and Bradford). Bradford's sons-in-law were Charles Collins and James DeWolf, both active participants in slave trade. *See* Coughtry supra note, at 209. Collins was later the choice of Thomas Jefferson to serve as the customs collector for the Bristol district.  *See* note 167-68 infra.

[44] Intriguingly, Rotch pursued the claim in the name of Gordon, a local deputy sheriff whose appearance may have helped to ensure that any proceeds were duly shared with the Commonwealth of Massachusetts.  On the role of sheriffs as public accountants, see James E. Pfander & Andrew G. Borrasso, *Public Rights and Article III: Judicial Oversight of Agency Action*, 82 Ohio St. L.J. 493, 508 (2021).

[45] *See* William Blackstone, 3 COMMENTARIES ON THE LAW OF ENGLAND 160 (1765) (explaining that forfeitures "are given at large, to any common informer; or, in other words, to any such person or persons as will sue for the same: and hence such actions are called *popular* actions, because they are given to the people in general"); *see also* 4 id. at 303-04 (describing the use of criminal informations as being pursued as a "sort of qui tam" proceeding, with one part of the penalty payable to the Crown and another "to the use of the informer"). Blackstone recognized that the prospect of popular enforcement creates a risk of multifarious proceedings.  But once any one begins "a qui tam, or popular, action, no other person can pursue it; and the verdict passed upon the defendant in the first suit is a bar to all others and conclusive even to the king himself."  3 id. at 160.  For more on preclusive effect, see note 216-17 infra.

[46] *See* Pfander, supra note 21 (recounting reliance in Scotland on popular actions in equity as well as bounty-based informer litigation).

[47] *See* notes 21, 23 supra.  The Court, in an opinion by Justice Scalia, embraced a narrow version of this history. *See* Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 777 (2000) (invoking history in upholding one form of informer proceedings under the federal False Claims Act).

9

Electronic copy available at: https://ssrn.com/abstract=4424076

The decision was notable, finally, for the reception it received in the newspapers of the day. The *Providence Gazette* ran a favorable notice. This was, the paper recounted, a "popular action" on behalf of the "Abolition Society" of this town in which the plaintiff relinquished the larger claim and settled for a smaller verdict.[48] The paper praised this "mild and humane" procedure.[49] Much the same message came through in the more complete account of the litigation that appeared in the *Columbian Centinel* in November 1791. After recounting the arguments and decision, the editors described the case as "important" to "humanity and to commerce," and expressed confidence that the paper's "faithful" account of the matter would "gratify" its readers.[50]

Rhode Island's reentry into the union in May 1790 complicated enforcement efforts.[51] The 1790s were thus a time of regulatory change, as state control of the waterfront gave way to federal regulators with uncertain power to secure the enforcement of state law. Perceptions of federal primacy may explain why the abolition societies pressed for national legislation.

## II.   INFORMER LITIGATION AND FEDERAL LAW

Shortly after the Constitution took effect and Congress convened to legislate the federal government into existence, the Philadelphia Society of Friends organized a petition drive to persuade Congress to ban slavery.[52] Supported by an aging Benjamin Franklin, the petitions laid bare a sectional divide. James Madison, member of the House of Representatives, sought a middle ground; he urged Congress to declare that its powers did not extend to freeing people from slavery but might well extend to certain aspects of international commerce.[53] This part tells the story of the adoption and early

---

[48] *See* Krauss, supra note , at 508 (quoting *Columbian Centinel*, Nov. 9, 1791).

[49] *See* note 25 supra.

[50] *Id*. at 512.

[51] For an account of Rhode Island's overwhelming initial rejection of the Constitution, acting by popular referendum in 1788, and its narrow vote in convention to ratify two years later, and see Bruce Ackerman & Neal Katyal, *Our Unconventional Founding*, 62 U. Chi. L. Rev. 475, 527-28, 538-39 (1995). Congress wasted little time adopting legislation to establish federal customs districts in Rhode Island and to extend the Judiciary Act to Rhode Island. *See* 1 Stat. 126, ch. XIX (June 14, 1790) (federal customs districts); 1 Stat. 128, ch. XXI (June 23, 1790) (federal courts).

[52] On the 1790 petition drive, and Franklin's role, see Wiecek, supra, at 94-6. For an imaginative reevaluation of the 1790 petition drive and the underpinnings of the pro-slavery federal consensus it seemingly confirmed, see Maeve Glass, Slavery's Constitution: Rethinking the Federal Consensus, 89 Ford. L. Rev. 1815, 1832-37 (2021).

[53] The final House resolution, reaffirming the federal consensus, explained that Congress had "no authority to interfere in the emancipation of slaves, or in the treatment of them within any of the States." Wiecek, supra note , at 95. But the House nonetheless recognized

10

Electronic copy available at: https://ssrn.com/abstract=4424076

Eighteenth Century Public Law Litigation

enforcement of legislation that tracks Madison's suggestion.

### A.    Prohibiting American Involvement in the Slave Trade

The failure of the 1790 petition drive set the stage for a second, more successful, round of petitioning in early 1794. By then, the federal government had moved from New York to Philadelphia and was embroiled in debates over how to address the foreign policy implications of the French Revolution.[54] Many have speculated as to why this second round of petitioning bore fruit. Some credit President Washington's growing personal antipathy to slavery; Washington met with Quaker petitioners and presented their anti-slavery petition to Congress.[55] Others argue that the law was largely symbolic, reflecting a congressional desire to exercise some control over trade and commerce in a world where American shipping faced threats from both French and British combatants.[56]

One might also observe that the legislation represented an early example of sectional compromise over issues related to slavery that conformed to what historians refer to as the federal consensus.[57] Perhaps one might best understand the law in the terms Massachusetts Senator Henry Cabot used: the 1794 Act would affect "the citizens of our northern states, not those of the south." Noting the existence of state-law prohibitions and expressing a desire "to give force to those state laws," Cabot explained the importance of obtaining a "federal regulation" to "help back up the state

---

that Congress might restrict American participation in the trade of enslaved people to foreign ports. *Id.*

[54] Pursuant to the Residence Act of 1790, Congress convened in Philadelphia in December 1790 and would remain there until its move to the District of Columbia in 1800. *See* 1 Stat. 130 (1790). On the political impact of the French Revolution and Citizen Genet's trip up the Eastern seaboard of the United States, see STANLEY ELKINS & ERIC MCKITRICK, THE AGE OF FEDERALISM, 1788-1800, at 330-54 (1993); GORDON S. WOOD, EMPIRE OF LIBERTY: A HISTORY OF THE EARLY REPUBLIC, 1789-1815, at 174, 181-89 (2009).

[55] Quakers came to Philadelphia to lobby Congress and gained an audience with President Washington, who later presented their memorial to Congress. See Rappleye, supra note , at 297. On Washington's views of slavery, and his decision to free his slaves upon his death, see Akhil Reed Amar, THE WORDS THAT MADE US 649-52 (2021) (describing Washington's growing concern with slavery). *See also* Wood, Empire, supra note , at 525 (describing Washington's attitude toward slavery and his role in supporting the 1794 Act).

[56] *See* Sarah A. Batterson, "An Ill-Judged Piece of Business": The Failure of Slave Trade Suppression in a Slaveholding Republic 12 (2013) (unpublished ph.d dissertation on file with author) (linking act of 1794 to military conflict between Britain and France and the American desire to preserve neutrality while asserting regulatory control over the merchant marine).

[57] The consensus held that the federal government was to defer to state decisions as to the legality of slavery. See Wiecek, supra note , at 94-96; Glass, supra note , at 1832-37.

11

Electronic copy available at: https://ssrn.com/abstract=4424076

enforcement machinery."[58]  In short, the law did less to introduce a new set of policies than to facilitate federal enforcement on the waterfront.

Like the New England laws, the 1794 Act prohibited persons from fitting out vessels in the ports of the United States for the purpose of transporting enslaved people.[59]  The act subjected any ship or vessel so fitted out to forfeiture in any federal court for the district in which it was seized and prosecuted.  Apart from condemnation of the vessel, the act also imposed penalties of $2000 on each of the individuals involved in preparing a ship for an enslaving expedition to Africa.  Finally, irrespective of whether the voyage began with vessel preparations in the United States, the act subjected citizens of the United States who participated in the trade to a fine of $200 for every person taken on board a ship for transportation into slavery.  Like the enforcement provisions in the New England statutes, the act provided that any fines imposed would be divided, with one "moiety" to the use of the United States and the other moiety "to the use of him or her who shall sue for and prosecute the same."  Both federal officials and abolition societies could bring suit to enforce the law against private merchants.

The 1794 Act reflects a remarkable consensus as to the legitimacy of no-injury private informer litigation. The Providence Society had procured and enforced similar laws in New England, relying on private informer litigation.  The federal law was modeled on New England legislation and specifically provided for the payment of bounties to informers who successfully prosecuted a violation of the law.[60] Congress and the President both apparently agreed that there was nothing amiss in authorizing such private enforcement.  Litigation to enforce the new law in Rhode Island and elsewhere, the subject of the next section, would confirm that the federal courts shared the consensus view that private informers were proper parties to enforce public norms.

## B.  Enforcement in Rhode Island Federal Court

---

[58] *See* Rappleye, supra note , at 298 (quoting Henry Cabot).  Cabot explained that the proposed act would not affect "the character of the servitude . . .of persons in the United States."  Instead, the "measure affects the citizens of our northern states, not those of the south."  All of the northern states have barred involvement in the trade.  "In order to give force to those state laws, it is desired that a federal regulation be obtained which will help back up the state enforcement machinery." While one historian doubts Cabot's explanation, Rappleye, supra, at 298, one must recognize that federal officers, running the customs houses, may well have lacked authority to enforce state penal laws directly. One can also question whether state laws remained in effect and enforceable after control of seagoing commerce passed to the federal government.

[59] See 1 Stat. 347, 3d Cong., 1st Sess. ch. 11 (March 22, 1794).

[60] Id. at § 2.

12

Electronic copy available at: https://ssrn.com/abstract=4424076

If responsibility for enforcement of the 1794 Act was shared between federal officials and private informers, the federal government was slow to commence prosecutions.  Enter the abolition societies.  Initiating a claim in March 1797, nine members of the Providence Abolition Society brought the first successful prosecution under the new law, targeting the Providence-based merchant John Brown, brother of Moses Brown.[61]  The Society's members financed the litigation, much the way they had underwritten the Massachusetts state court proceeding in *Gordon v. Gardner*.[62]

At the same time they were pursuing Brown, the Society also initiated claims against a second leading merchant, Cyprian Sterry.[63]  Unlike Brown, Sterry sought to negotiate a resolution of the claims against him.  By July 1797, Sterry and the Society had come to terms; he would renounce the trade and the Society would drop its claims.  Historians report that Sterry was as good as his word; in later years, his name does not appear on ship registers or cargo manifests associated with voyages to African ports.[64]  Brown, by contrast, refused to broker a deal with the Society.  His refusal may have had the backing of other merchants in Rhode Island, some of whom reportedly encouraged Brown to make a test of the new federal law.[65]

In the first phase of the proceeding, the federal judge issued an order for the condemnation and sale of the *Hope* under section 1 of the 1794 Act.[66]  Later, the Providence Abolition Society sought to recover the substantial fines and penalties specified for violation of sections 2 and 4 of federal law. The evidence rather clearly suggested that Brown had engaged in forbidden transportation of enslaved people.  But the jury, to which Brown was entitled in a suit to impose a fine, ruled for Brown and assessed the costs of litigation against the Society.[67]  Some suggest that Brown used improper methods to influence the jury.[68]  But the influence may not have been overtly

---

[61] See Rappleye, supra note , at 305-06.

[62] See Rappleye, supra note , at 305-12 (recounting the decision to pursue Brown, the initial success, and the downside of the strategy).

[63] See Coughtry, supra note , at 213-14 (recounting the settlement with Sterry).

[64] See Rappleye, supra note , at 309.

[65] See Coughtry, supra note , at 214-15.

[66] No jury was empaneled, in keeping with practice in admiralty proceedings. *See* Waring v. Clarke, 46 U.S. 441, 460 (1847).  The suit against Brown's ship, the *Hope*, does not appear in the Rhode Island archival materials.  The same vessel was involved in the earlier Massachusetts case, *Gordon v. Gardner*.

[67] Id. at 311-12.  While the Rhode Island archives do not include a record of the proceeding, the amount of costs awarded in such matters could be quite substantial.  In one unsuccessful freedom suit, the New York Manumission Society was obliged to pay $1700 (costs and the amount of the bond forfeited when the suitors failed to appear at trial).  See T. Robert Moseley, *A History of the New-York Manumission Society, 1785-1849*, at 63 (1963) (unpublished dissertation on file with author).

[68] Id. at 312.

Electronic copy available at: https://ssrn.com/abstract=4424076

corrupt. The people of Rhode Island had mixed views about the international traffic in enslaved people and may have seen the vessel's forfeiture as penalty enough. Well-known in Rhode Island, Brown was elected to the U.S. House of Representatives as a Federalist in 1798. His involvement in the prohibited trade to Africa did not entirely undercut his popularity with Rhode Island voters.[69]

Eventually federal officials began more actively to enforce federal law. Historians recount over twenty government prosecutions in the period from 1798 to 1803.[70] But jury nullification meant that officials often sought forfeiture of the offending vessel in an admiralty proceeding triable to the judge.[71] Even this modest penalty was rendered less potent by the maneuvers of owners, who arranged to game the bidding process so as to depress sales prices at forfeiture auctions.[72] Still, federal prosecutions, including those instituted by John Leonard, a government informer sent to Rhode Island, made inroads on the trade.[73]

## C. Enforcement in New York

Something comparable to the work of the Providence Abolition Society was unfolding in New York City. There, the New York Manumission Society had been established to seek an end to slavery, to litigate freedom claims, and to otherwise defend the rights of free people of color.[74] To do so effectively, the Society appointed

---

[69] On Brown's involvement in the destruction of a British revenue cutter in 1772 and other activities in support of the Revolution, see Rappleye, supra note , at 102-26. On Brown's activities in Congress in 1798, *see* Coughtry, supra note , at 221, 225-26 (describing Brown's failed attempt to weaken the 1794 Act and his successful effort to secure legislation that would create a new customs district for the port of Bristol, Rhode Island).

[70] See Coughtry, supra note , 217.

[71] The archives indicate that attorney's fees in forfeiture proceedings in admiralty were roughly double those paid in suits at law to impose a fine. The preference for forfeiture may have also reflected these fee-based incentives.

[72] See Rappleye, supra note , at 317-18 (sale of forfeited vessels sometimes fetched as little as $10 at auction). Historians report that in 1799 slave merchants had Samuel Bosworth, the surveyor of customs, kidnaped and transported some miles away from the site of an auction at which Bosworth planned to bid on a vessel sold by court order. *See id*.; Coughtry, supra note , at 218 (describing the role of John Brown in the kidnaping of Bosworth and concluding that it ended local enforcement of the 1794 Act). *See also* United States v. Brig Orange (February 1800) (Case 7 Appendix II) (dismissing a forfeiture proceeding under the 1794 Act in deference to an earlier, friendly suit for mariners' wages that led to the sale of the vessel and a change of ownership that was said to shield the new owners from liability for prior violations). For an account, see Coughtry, supra note , at 220 (describing government officials as "stunned" by the decision immunizing the ship from forfeiture).

[73] On Leonard's role as a government-sponsored prosecutor or informer, see Coughtry, supra note , at 22-24. For evidence of a decline in voyages to Africa, see appendix II.

[74] For an account of the New York organization and its role in qui tam litigation, see

14

Electronic copy available at: https://ssrn.com/abstract=4424076

a standing committee to collect information about the unlawful kidnaping of people of color, enabling the Society to intervene quickly when individuals faced possible sale into slavery.[75] The Society learned in February 1801 that a Rhode Island merchant, Phillip Topham, had just returned from an African voyage as the captain and nominal owner of the brig *Peggy* and had stopped off in New York on his way home.  James Robertson, a member of the Society's standing committee, had Topham arrested to answer an informer proceeding seeking to impose of fine of some $30,000. Eventually, Topham raised bail and was released from jail to return to Rhode Island.[76]

The New York Society brought the case to trial before the New York federal circuit judge William Paterson in 1805.[77]  The suit proceeded in the name of Robertson, qui tam, and was handled by lawyers closely associated with the New York Society.[78]  Among those giving evidence in the case were Society members and the Rhode Island collector, William Ellery, who introduced a cargo manifest showing that the *Peggy* cleared out of Newport harbor in 1799 bound for Africa with a cargo of rum.[79]  That, coupled with evidence from witnesses from the West Indies who had seen people of color aboard the *Peggy*, was enough to persuade the jury to bring in a plaintiff's verdict of some $16,000.[80]  Unable to pay that amount, Topham was imprisoned.  Efforts to secure a pardon began immediately, as Topham's friends and supporters in Rhode Island pressed both the Society and President Jefferson for relief.[81]

### D.  Enforcement under President Jefferson

---

Moseley, *supra* note  , at 166-68.  *See also*  Landy, supra note  , at 202-09 (recounting the litigation in *Robertson v. Topham*, a qui tam action brought in New York federal district court to enforce section 4 of the 1794 statute against a Rhode Island sea captain).

[75]  *See* Moseley, supra note  , at 166-68; Landy, supra note  , at 202-09.

[76]  Later, a dispute arose as to the financial implications for those who backed the voyage of the Peggy.  Justice Story, riding circuit in Rhode Island, held that the courts were not available to enforce, or otherwise sort out the affairs of the parties to, an illegal transaction. *See* Fales v. Mayberry, 8 Fed. Cas. 970 (C.C. Dist. R.I. 1815).  Story also rejected the claim that the assignment of an interest in the transaction removed the taint of illegality.  Id. at 972. *See also* The Alexander, 1 F. Cas. 362 (Cir. Ct. D. Mass. 1823) (Story, J.) (upholding forfeiture of vessel that was employed in trafficking but interdicted before any African people had been taken on board).

[77] See Landy, supra note  , at 205-07.

[78] See Landy, supra note  , at 204-09 (highlighting the efforts of Thomas Emmet, among others, as counsellors to the New York Society).

[79] *Id*. at 205-06.

[80] *Id*. at 206.

[81] *Id*. at 207-08.

Electronic copy available at: https://ssrn.com/abstract=4424076

Presaging the policy-inflected swings in enforcement priorities that we see today, enforcement faltered under President Thomas Jefferson, especially in Rhode Island. Several factors contributed to the change in enforcement intensity. For one thing, Jefferson replaced the Treasury comptroller with a Maryland Republican, Gabrielle Duvall.[82] For another, Rhode Island merchants persuaded Congress in the waning months of the Adams Administration to create a new customs district for the port of Bristol, thus enabling ships to clear directly from that port without having to deal with the more exacting customs officials at Newport.

Fending off these efforts for a time, outgoing President John Adams appointed Jonathan Russell, a Federalist committed to enforcement of the law, as the customs official for the new Bristol district. A short time later, in response to petitions from the merchants in Bristol, Jefferson removed Russell from office and replaced him with Charles Collins. A close protégé of DeWolf, Collins had himself served as the captain of slaving voyages before accepting the responsibility for the enforcement of federal law.[83] Historians report that from 1804 to 1807, federal prosecutions of ceased, as local officials declined to enforce the law. As a result, voyages to Africa from Rhode Island ports rose during the period, marking the completion of a transition from Federalist to Republican administrations.[84]

Apart from the appointment of officers with active hostility to federal enforcement, President Jefferson pardoned earlier violations.[85] But the limited power Jefferson wielded confirms that he regarded private informer enforcement as constitutionally proper.[86] Under the law of pardons, Jefferson could release Phillip Topham from prison and remit any penalty the government had collected but a presidential pardon did not reach the private property

---

[82] See Coughtry, supra note , at 227.

[83] On the appointment of Collins and the resulting decline in prosecutions and increase in African clearances, see Coughtry, supra note , at 228-29.

[84] Id.

[85] For an account of Jefferson's pardons of Nathaniel Ingraham and Phillip Topham, both Rhode Island captains, see Landy, supra note, at 207-08. Landy reports that Jefferson rejected early appeals on their behalf, taking the position that both should serve some time in prison for their violations of the law. Topham's pardon took effect in 1808, Ingraham's in 1804. The government returned its share of Ingraham's fine to him that same year. Id. at 207 n.54; *see also* Coughtry, supra note, at 223 (reporting on the return of the government's moiety to Ingraham).

[86] On pardons for civil offenses, see Saikrishna Prakash, Imperial from the Beginning: The Constitution of the Original Executive 105 (2015) "'[o]ffenses against the United States' [in Article II] should be understood as encompassing any violation of federal law in which public interests predominate," including "civil offenses prosecutable by the government."); see generally Noah Messing, *A New Power? Civil Offenses and Presidential Clemency*, 64 Buff. L. Rev. 661 (2016) (collecting scholarly views).

16

Electronic copy available at: https://ssrn.com/abstract=4424076

rights of third parties.[87]  Jefferson respected that limit and explained that Topham had served a suitable prison term for the violation of federal law.  In granting tailored relief based on particular facts, Jefferson stopped well short of issuing a blanket pardon to all persons prosecuted under the terms of the 1794 act.  In accepting the legitimacy of Topham's conviction, Jefferon's approach differed from that he took in pardoning those convicted under the Sedition Act.[88]  While Jefferson saw the Sedition Act as a nullity that could not support prosecutions or convictions of any sort,[89] he did not express similar qualms about the enforcement of the 1794 act.

Nonetheless, Jefferson's pardons and appointments express a policy of toleration for the international traffic in people that undercut the enforcement of the 1794 law.  To be sure, Jefferson signed the 1808 ban on the importation of enslaved people into the United States.[90]  But Jefferson did little else to challenge slavery abroad and actively took steps, through the implementation of the Louisiana Purchase and other measures, to extend the reach of slavery at home.[91]  Jefferson acted to enhance (through import restrictions) the value of the people he and his fellow planters already owned and did little to end slavery in the United States or curtail American participation in the trade with other countries.[92]

---

[87] See William F. Duker, *The President's Power To Pardon: A Constitutional History*, 18 WM. & MARY L. REV. 475, 526 (1977) ("[I]f a suit was for the king's branch of a law only and not to the particular damage of any third party, the king could pardon or dispense; if the suit was not only for the king's benefit but for the profit or safety of a third person, the king could not release the party."); William Hawkins, A TREATISE OF THE PLEAS OF THE CROWN, § 34, at 392 (3d ed. 1739) ("[T]he King cannot by any Dispensation, Release, Pardon or Grant whatsoever, bar any Right, whether of Entry, or Action, or any legal Interest, Benefit or Advantage whatsoever before vested in the Subject."). Knote v. United States, 95 U.S. 149 (1877) (general pardon releases individual from crime but does not automatically restore property forfeited into the hands of the government).

[88] *See* Saikrishna Prakash, *The Executive's Duty to Disregard Unconstitutional Laws*, 96 Geo. L.J. 1613, 1664-74 (2008).  In addition to granting blanket pardons and declining to consider the specific facts of the case, Jefferson directed government attorneys to dismiss any pending prosecutions under the Sedition Act. *Id.*

[89] *Id.* at 1664-74 (describing Jefferson's blanket pardons to nullify convictions for sedition).

[90] On the import ban in 1808, see WOOD, EMPIRE OF LIBERTY, supra note , at 357–365.

[91] For an account of the Louisiana Purchase from the perspective of Northern opinion, see Garry Wills, "NEGRO PRESIDENT": JEFFERSON AND THE SLAVE POWER 114–26 (2005) (noting the Federalist opposition to Southern expansion and to the eventual admission of more slave states to the Union).  Jefferson and the Virginians took a different view, welcoming slave states and the political power they would add to Congress and the Electoral College, as well as the wealth a growing domestic market would transfer to plantation owners in the old South.  Indeed, the legislation implementing the Louisiana Purchase banned the importation of slaves to that region, thereby raising the value of enslaved people in the old South. Wills, *supra*, at 121.  Jefferson himself sold eighty-five people, seventy-one at public auction, and thereby benefited personally from the growing domestic market. *Id.*

[92] The domestic market in enslaved people extended the institution throughout the old

Electronic copy available at: https://ssrn.com/abstract=4424076

### E.  The Supreme Court and the 1794 Act

The Supreme Court did not immediately take up litigation under the 1794 Act.  The Court had power under the Judiciary Act to issue writs of prohibition to district courts, sitting in admiralty, but merchants in Rhode Island did not pursue such relief.[93]  Several years later, as forfeiture appeals began to arrive, the Court fine-tuned federal procedure,[94] but it did not question the constitutionality of the statute under Articles II or III.[95]  In the end, then, we can say that the practice of the federal courts at all levels – district, circuit, and supreme – was to proceed to the merits of claims under the 1794 Act without raising doubts as to their bona fides.[96]  All three branches thus appear to have shared the consensus view as to the legality of informer-based litigation, a consensus even Jefferson did not contest.

### III.   BOUNTY-BASED ENFORCEMENT IN CONTEXT

This part situates the bounty-based enforcement practices of

American southwest and the new southern territory encompassed within the Louisiana Purchase.  For an account of Jefferson's implacable opposition to importation and his steady support for expanding the domestic market for enslaved people, see James E. Pfander & Elena Joffroy, *Equal Footing and the States "Now Existing": Slavery and State Equality Over Time*, 89 Fordham L. Rev. 1975 (2021).  On Jefferson and the political power conferred by the three/fifths clause, see Wills, supra note , at 2-13.

[93] For the Court's first encounter with the law, see Adams v. Woods, 6 U.S. 336, 342 (1805) (argued in 1804 on a division of authority in the circuit court for the district of Massachusetts) (applying general federal two-year limitation period to action, brought in debt, to enforce the 1794 Act).  On the Court's oversight of admiralty courts, see James E. Pfander, *Jurisdiction-Stripping and the Supreme Court's Power to Supervise Inferior Tribunals*, 78 Tex. L. Rev. 1433, 1471-74 (2000) (describing review by writs of prohibition).

[94] *See* Caroline v. United States, 11 U.S. 496, 500 (1813) (requiring greater particularity in libel seeking forfeiture of vessel for fitting out in violation of the 1794 Act but granting leave to amend on remand); *see also* The Merion, 22 U.S. 391, 408 (1824) (granting leave to amend on remand).  On the applicable statute of limitations, see Adams v. Wood, 6 U.S. at 342.  *Compare* Tryphenia v. Harrison, 24 Fed. Cas. 252 (Cir. Ct. D. Pa. 1806) (1794 Act does not apply to the movement of enslaved people from one Caribbean Island to another).

[95] Thus, in *The Merino*, the Court confirmed the power of a court of admiralty to forfeit vessels captured in Spanish Florida for violation of the 1794 Act (as amended in 1800).  *See* The Merino, 22 U.S. 391 (1824) (upholding forfeiture brought by a U.S. army colonel under the 1794 Act).  As with *The Merino*, litigation after 1820 often arose from military seizures of slave-trade vessels. Similarly, the Court upheld the forfeiture of a vessel, despite its conveyance in a straw sale to evade the law's application. *See* The Plattsburgh, 23 U.S. 133, 145 (1825).  *See also* The Emily and Caroline, 22 U.S. 281 (1824) (affirming forfeiture as vessel was being made ready to sail).

[96] Justice Paterson presided over the *Topham* litigation in New York as part of his circuit-riding duties.  For an account of the Topham litigation, see notes 118-25 supra and accompanying text.  Justice Story frequently encountered the 1794 Act on circuit.  *See* note 120 *supra*.

Electronic copy available at: https://ssrn.com/abstract=4424076

the Providence Abolition Society in the web of enforcement tools more generally available to Congress, drawing on Nicholas Parrillo's indispensable work on the way fees, bounties, and salaries shaped the enforcement incentives of private actors and government officials.[97] Then this part considers the manner in which private enforcement worked in tandem with public enforcement, contributing to the efficacy of federal law in a fee-based enforcement world.

### A. Anti-Slavery Litigation in a Fee-Based World

Parrillo's account of the early Republic's fee-based enforcement system helps to clarify much that seems curious about anti-slavery litigation and informer proceedings more generally. As a form of what Parrillo called an alien imposition, these laws sought to challenge an ingrained practice that some wealthy and influential merchants viewed as a legitimate source of private gain. That helps to explain why Congress in 1794 chose to follow the lead of state legislatures in New England in relying on bounties and private informers to ensure enforcement. The character of anti-slavery laws as a form of alien imposition also helps to explain some otherwise curious choices by the Providence Abolition Society. The Society sought to change cultural norms and to encourage voluntary compliance with anti-slavery laws. The members had reason, therefore, to compromise their claims in exchange for promises that merchants would forgo the trade. By using the threat of enforcement to procure promises of future compliance, the Society sought voluntary compliance.

The alien quality of the anti-slavery law may also explain why the Society did not pursue maximum penalties in every case. As we have seen, in *Gordon v. Gardner*, the Society deliberately cut back on its demand apparently in an effort to persuade the public that its purpose was to serve as a high-minded exponent of public values, rather than as the sort of "viperous vermin" who were often attracted to informer litigation.[98] Moreover, when the Society attempted to impose a substantial penalty on John Brown in federal litigation, the jury refused to convict and saddled the Society with court costs. Some historians have criticized the relatively mild enforcement choices of the Society, suggesting that a more vigorous program may have more effectively ended merchant involvement with the trade.[99] But increasing rigor may have only accentuated the alien quality of

---

[97] *See* Parrillo, supra note.

[98] *See* J. Randy Beck, The False Claims Act and the English Eradication of Qui Tam Litigation, 78 N. Car. L. Rev. 539, 578 (2000) (quoting Lord Coke's disparaging description of informers in England).

[99] *See* Coughtry, supra note , at 229 (characterizing the strategy of leniency as unwise).

Electronic copy available at: https://ssrn.com/abstract=4424076

the enforcement regime and further undermined the perceived legitimacy of federal law in the local community.

Parrillo's account also predicts some blurring of the lines between public and private proceedings, something we see in Rhode Island litigation. Indeed, the government attorney for the district of Rhode Island, David Barnes, appeared as counsel for the United States and for several informers. Thus, in *Whitaker*, Barnes signed the declaration as counsel for the informer, just as he did in *Rotch v. Packard* (Case 10 Appendix II) – a nominally "private" enforcement proceeding. At the same time, Barnes appeared for the United States in a series of "public" libels brought to forfeit vessels.[100] One supposes that Barnes was known in the Rhode Island district for his experience handling such proceedings; he was later appointed federal district judge for Rhode Island. Judging from court papers in the Rhode Island archives, Barnes would earn the same fee whether he libeled a vessel in the name of the government or in the name of an informer; such fees were payable from the proceeds of any forfeiture as part of the costs of the action and the evidence from the bills of costs in the archives suggests that the attorney fees were the same in public and private litigation.[101] In terms of legal representation and payment, then, little might separate the government's forfeiture action from the informer proceeding.[102]

---

[100] Barnes appears as counsel of record in at least eleven proceedings in Rhode Island district court. See Appendix II.

[101] In the records of *United States v. Schooner Betsy* (August 1799) (Case 3 Appendix II) and *United States v. Neptune* (December 1799) (Case 6 Appendix II), we find bills of costs prepared by the clerk of court. Costs include attorney's fees for the district attorney, David Barnes, in the amount of $17.00 in both cases. The *Neptune* record indicates that the clerk signed a receipt, acknowledging payment of his fees by the marshal. The marshal's returns in the two cases indicate that the *Betsy* was sold for $351 and the *Neptune* was sold for $451. In a successful libel proceeding brought by a private informer, *Sherman v. Brig Stork* (August 1803) (Case 18 Appendix II), counsel for the libellant (then United States district attorney David Howell) was apparently paid the same amount, $17.00, that Barnes had been paid in public cases.

[102] The law of preclusion, for example, appears to have operated with equal force as to initial proceedings brought by the government and by an informer. *See* 2 William Hawkins, A TREATISE OF THE PLEAS OF THE CROWN 125 (1751) ("it seems agreed, that a conviction or acquittal *bona fide* in any action or information on a penal statute, whether by the party grieved, or a common informer, or a release *bona fide* from the party grieved, or common informer, after such a conviction, hath always been a good bar of any subsequent prosecution for the same offense."); 1 Matthew Bacon, A NEW ABRIDGMENT OF THE LAW 67 () ("Wherever a suit on a penal statute may be said to be depending, it may be pleaded in bar of a subsequent prosecution, being expressly averred to be for the same offence, as it may, though it be laid on a day different from that in the former…"); *see generally* Harold Krent, *Executive Control Over Criminal law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 301 (1989) (describing qui tam actions as quasi-criminal and likely preclusive of subsequent criminal proceedings). Notably, as the limiting reference in Hawkins to *bona fide* releases suggests, qui tam settlements could pose problems of collusion; hence the rule that settlements had no preclusive effect on subsequent proceedings unless approved by the

Electronic copy available at: https://ssrn.com/abstract=4424076

## B.  The Lessons of Federalist-Era Enforcement

One can understand why public figures in the early Republic did not view informer litigation as a threat to the executive role:  the institutions of law enforcement looked very different in the 1790s. The government lawyers of the United States, known as "district attorneys" until Congress changed their name in 1948 to United States Attorneys, did not answer to higher-ups in a Department of Justice.  Indeed, Congress did not create the Department until 1870, in the aftermath of the Civil War.[103]  Nor does it appear that district attorneys answered to the Attorney General of the United States, a partially fee-paid lawyer in the nation's capital and a member of the President's cabinet but one with limited duties.[104]  Instead, local government lawyers worked part time for the government and part time for their own account.[105]  They received no salary, and were entitled only to such "fees" as were payable to lawyers in the courts where they practiced; government prosecutors were not placed on salary until much later in the nineteenth century. In admiralty proceedings, such as those to forfeit vessels for violation of federal

---

court.  *See* Raynham v. Rounseville, 9 Pick. 44 (Mass. 1829).  The extension of non-party preclusion to informer actions suggests that their quasi-criminal character implicated double jeopardy concerns.

[103] See Jed Shugerman, The Creation of the Department of Justice: Professionalization without Civil Rights or Civil Service, 66 Stan. L. Rev. 121 (2014).

[104] The office of attorney general originated in section 35 of the Judiciary Act of 1789, which called for the appointment of a lawyer to "prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned" and to offer legal advice and opinions to the President and department heads.  For an account, see James Eisenstein, COUNSEL FOR THE UNITED STATES: U.S. ATTORNEYS IN THE POLITICAL AND LEGAL SYSTEMS (1978); Susan Low Bloch, *The Early Role of the Attorney General In Our Constitutional System:  In the Beginning There Was Pragmatism*, 1989 Duke L.J. 561, 566 (quoting statute).  The attorney general was paid $1500 a year for part-time work and was not provided with any additional funds to hire staff or maintain an office.  Unlike those that created the Departments of War and Foreign Affairs, the relevant statute did not require the attorney general to comply with presidential directives.  *See* Bloch, *supra*, at 573-79, 581.  Nor did it empower the attorney general to supervise the work of the district attorneys.  This was a matter about which the nation's first attorney general, Edmund Randolph, complained to Washington.  Id. at 586 n.85 (noting the absence of any supervisory authority over district attorneys).

[105] The duty cast on district attorneys was to "prosecute" crimes and offenses against the United States and "all civil actions in which the United States shall be concerned."  JA 89 § 35.  But the statute did not obligate the district attorney to answer to the Attorney General or President in making decisions about what to prosecute.  As a result, the Treasury Department appears to have played a far more important supervisory role than the Attorney General.  The recalibration of enforcement priorities under Jefferson took place within Treasury as the department responsible for overseeing merchant shipping in the nation's ports.  See Coughtry, supra note , at 226-27; Rappleye, supra note , at 327 (describing the role of Treasury Secretary Wolcott in demanding more stringent enforcement).

Electronic copy available at: https://ssrn.com/abstract=4424076

law, the case files in the Rhode Island archives reveal that the government's attorney was paid fees from the proceeds of the sale of the condemned vessel.[106]

## C. Article II, Separation of Powers, and Public Actions

The experience with anti-slavery law enforcement in the early republic casts serious doubt on the claim that Article II was understood at the time to vest the executive with an exclusive enforcement discretion that forecloses Congress from relying on private informers to play a supplemental or independent role in law enforcement. As we have seen, all three branches of government proceeded on the assumption that laws conferring bounty-hunting rights on private suitors posed no constitutional threat to the executive's role. Washington, in supporting the legislation and signing the bill into law in 1794, did not threaten a veto to preserve executive power. Nor did Article II concerns arise as an issue for those who debated the bill in Congress. Nor finally did the federal courts in Rhode Island or New York raise such concerns, as they proceeded to adjudicate forfeiture claims under the federal statute. No one seems to have been concerned with any threatened dilution of the executive's enforcement authority.

After the switch to salary-based compensation, as Professor Parrillo shows, the incentives of local prosecutors changed.[107] For one thing, government prosecutors on salary were encouraged to exercise some discretion in deciding what claims to pursue. That discretion, coupled with their placement within a hierarchical Department of Justice, encouraged local prosecutors to attend more closely to their departmental superiors than to local claimants in deciding what matters to pursue.[108] Salary-based compensation also corresponded to a switch to full-time employment; local government attorneys could no longer practice part-time for their own account earning fees for their role in private informer litigation.[109] Such

---

[106] See Appendix III. One salaried federal judge paid himself fees from the proceeds of suits in admiralty, until Congress intervened to countermand the practice. For an account, see James E. Pfander, *Judicial Compensation and the Definition of Judicial Power in the Early Republic*, 107 Mich. L. Rev. 1, 25-28 (2008).

[107] *See* Parrillo, supra note , at 273-89.

[108] For an account of the changes to a hierarchical system, see Bloch, supra note , at 816 (recounting the congressional decisions to put the attorney general on a full-time salary in 1853, to place the attorney general in charge of the district attorneys and marshals in 1861, and to establish a Department of Justice in 1870).

[109] The switch from fees to salary, although recommended in a prescient report of attorney general William Bradford in 1795, did not take place until 1896. *Compare* Fees for Courts, Report of Wm Bradford to U.S. House of Representatives, January 1795, in No. 61, American State Papers: Miscellaneous 117 (1794) (recommending an end to fee-based

22

Electronic copy available at: https://ssrn.com/abstract=4424076

institutional changes practically eliminated the ability of local prosecutors to handle the suits of private litigants and drove a wedge between the role of the district attorney and the private informer.

The history of informer litigation suggests that today's conception of Department of Justice primacy in the enforcement of federal law rests on modern congressional design rather than early republican notions of constitutional compulsion. But opinions giving voice to originalist claims about unitary executive control fail to take account of the change in institutional structure. Justice Scalia's dissent in *Morrison v. Olson*,[110] did not address the comparative independence of early republic informers and district attorneys in Rhode Island and elsewhere. His later opinion in *Vermont Agency*, upholding private informer litigation under the federal False Claims Act,[111] did engage with the weight of history. But Justice Scalia stopped well short of upholding the standing of private informers to enforce public laws whose violation caused no injury, proprietary or otherwise, to the federal government.[112] His grudging acceptance of informer suits to recover government money did not extend to informer suits to enforce public laws.[113]

## IV.   CONCLUSION

Distant and often inaccessible, the past provides a questionable set of guideposts for the development of modern policy. But at a minimum, the story of the Providence Abolition Society shows that the Supreme Court does not fully grasp the history of interest group engagement in the articulation and enforcement of public law norms. Deeply religious and morally opposed to slavery, the members of the Providence Abolition Society lobbied and litigated for something that was to them more important than private gain:   an end to slavery and to American involvement in the international commerce in enslaved people.   Although much has changed in the intervening centuries, the abolitionists of New England had at least one thing in common with the consumers in *TransUnion*:   their private suits to enforce public norms would supplement public enforcement and did not identify a personal injury. That the modern Court has come to view such litigation as

---

compensation) *with* Parrillo, supra note , at 277 (describing the legislative decision to switch to salaries in 1896).

[110] *See* Morrison v. Olson, (19) (Scalia, J., dissenting)

[111] *See* Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 777 (2000).

[112] *See* Vermont Agency, 529 U.S. at 778 n.8.

[113] See James E. Pfander, Cases Without Controversies:  Uncontested Adjudication in Article III Courts (2021) (discussing *Vermont Agency*).

Electronic copy available at: https://ssrn.com/abstract=4424076

constitutionally problematic perhaps tells us more about the novelty of the Court's standing and unitary executive doctrines than about the history of no-injury litigation.

APPENDIX I

*An Act to Prevent the Slave Trade and the Encourage the Abolition of Slavery, Rhode Island October 1787*

Be it enacted . . . That no citizen of this State, or other person residing within the same shall for himself or any other person whatsoever, either as master, factor, or owner of any vessel, directly or indirectly import or transport, buy or sell, or receive on board their vessel with intent to cause to be imported or transported from their native country, any of the natives or inhabitants of any state or kingdom in that part of the world called Africa, as slaves, or without their voluntary consent.

And be it further enacted . . . That every citizen, inhabitant, or resident, as aforesaid, who shall import or transport, or cause to be imported or transported, any of the said inhabitants of Africa, contrary to the true intent and meaning of this Act, and be thereof lawfully convicted, shall forfeit the sum of one hundred pounds lawful money for every person by him or them so imported or transported; and the sum of one thousand pounds for every vessel by him or them employed in the importation or transportation aforesaid, to be recovered by bill, complaint, or information before the superior court, or either of the inferior courts within this state: The one moiety whereof shall be paid into the general treasury for the use of this state, and the other moiety to and for the use of the person or persons who shall prosecute for and recover the same.

24

Electronic copy available at: https://ssrn.com/abstract=4424076

APPENDIX II

ENFORCEMENT PROCEEDINGS, 1799 - 1803
ACT OF 1794, 1 STAT. 347
RHODE ISLAND FEDERAL DISTRICT COURT[114]

| Case Number | Lead Plaintiff | Defendant(s) | Claim Type | Date | Fine or Price at Auction | Owner | Counsel | Informer | Archive Number |
|---|---|---|---|---|---|---|---|---|---|
| 1 | [115]U.S. | Schooner Lucy | Forfeiture and Sale | July 1799 | $800 | Charles DeWolf | David Leonard Barnes, District Attorney | | 7795496 |
| 2 | U.S. | Brigantine Eliza | Forfeiture and Sale | July 1799 | | | Barnes | | 7795497 |
| 3 | [116]U.S. | Schooner Betsy | Forfeiture and Sale | Aug 1799 | $351 | Estate of John Woodman | Barnes | | 7795501 |
| 4 | [117]U.S. | Schooner Flying Fish | Forfeiture and Sale | Sep 1799 | $1601 | Samuel Packard | Barnes | Rotch | 7795499 |
| 5 | [118]U.S. | Sloop Ranger | Forfeiture and Sale | Oct 1799 | $605 | | Barnes | | 7795498 |

[114] Proceedings before the U.S. district court for the district of Rhode Island, Judge Benjamin Bourne presiding.  Bourne served as district judge from 1796 to 1801, when he was appointed judge of the circuit court created in the Midnight Judges' Act of 1801.  Bourne lost his judgeship when Congress repealed the Act in 1802.  In most proceedings in the archives, the United States was represented by David Leonard Barnes, District Attorney for Rhode Island until his appointment as the district judge of the Rhode Island federal district court in 1802, after Bourne's elevation created a vacancy.  For Rhode Island judicial biographies, see https://www.rid.uscourts.gov/historical/district-court-judges-biographies.

[115] Following the decree of forfeiture, the vessel was purchased at auction by P. DeWolf, a name suggestively similar to that of the previous owner.  The DeWolf clan were among the most active human traffickers in Rhode Island but historians do not identify a DeWolf family member whose name begins with P.  See Coughtry, supra note , at 47-49.

[116] In this, as in many of the forfeiture case files, the bill of costs includes attorney's fees of $17.00, payable to Barnes from the proceeds of the sale.  Counsel for the estate argued unsuccessfully that the vessel was no longer subject to forfeiture after the owner's death transferred title to the estate.

[117] This successful forfeiture proceeding antedated a penalty proceeding, later pursued by William Rotch (a member of the Providence Abolition Society) against the captain, Samuel Packard, who fitted out the Flying Fish for the slave voyage that led to the vessel's forfeiture.  See Rotch v. Packard (Case 10).

[118] Case file reveals that the vessel was forfeited and sold at auction for $605 to Captain James Terry of Newport.

25

Electronic copy available at: https://ssrn.com/abstract=4424076

| Case Number | Lead Plaintiff | Defendant(s) | Claim Type | Date | Fine or Price at Auction | Owner | Counsel | Informer | Archive Number |
|---|---|---|---|---|---|---|---|---|---|
| 6 | [119]U.S. | Schooner Neptune | Forfeiture and Sale | Dec 1799 | $451 | | Barnes | | 7795495 |
| 7 | [120]U.S. | Brigantine Orange | Forfeiture and Sale | Feb 1800 | | | Barnes | | 7795500 |
| 8 | [121]U.S. | Snow Mary | Forfeiture and Sale | Apr 1800 | $701 | | Barnes | | 7795522 |
| 9 | [122]U.S. | Paul Brownell | Fine | May 1800 | $800 | Ship Mac | | Nathaniel Whitaker | 7795514 |
| 10 | [123] William Rotch | Samuel Packard | Fine | May 1800 | | | | Rotch | 7795513 |

[119] The case file includes the usual bill of costs, reflecting fees of $17 for the attorney. The case file also includes a receipt from the clerk of the court, Edmund Ellery, acknowledging receipt of fees from the marshal, presumably following the vessel's sale. The marshal's return reveals sale of schooner for $451 to Jeremiah Ingraham of Bristol, the highest bidder. William Ellery served as the customs officer for the district of Providence.

[120] Coughtry reports that the *Orange* was boarded by naval officers on the high seas while transporting people into slavery. See Coughtry, supra note , at 219-20. When news reached Rhode Island, Barnes initiated a forfeiture proceeding against the vessel. One Munro appeared as owner, claiming that he had purchased the *Orange* for $7300 following a forfeiture proceeding instituted to collect seamans' wages. Judge Bourne ruled in favor of Munro, despite some evidence that the wage suit and forfeiture were collusive. *See id.* After Barnes became the district judge, he ruled in 1803 that seamen had no cognizable claim for wages when serving on a slave voyage, thus invalidating a seamen's wage forfeiture proceeding aimed at forestalling a genuine forfeiture action. Coughtry, supra note, at 220. *See also* The San Jago de Cuba, 22 U.S. 409 (1824) (rejecting seamen's claim for payment of wages from the proceeds of a forfeited vessel).

[121] A "snow" is a two-masted sailing ship.

[122] Nathaniel Whitaker, described as resident of Bath, Maine, brought suit against Paul Brownell, resident of Newport, to recover a fine of $800 for four persons taken on board the ship Mac and transported into slavery in Cuba. Whitaker, in the declaration, stated that he sues "as well for the United States of America, as for himself" and complained that Brownell, on March 2, 1799, transported four persons from Africa to Cuba "to be there sold as slaves". Following a conviction, counsel for the defendant moved unsuccessfully for a new trial. See Coughtry, supra note , at 222. Court issued a warrant for an attachment of defendant. Barnes appeared as the attorney for Whitaker. Bill of costs includes an attorney's fee ($2.00); a fee for the writ ($.25); a fee for service of the writ ($5.50); and for the preparation of the writ ($1.00). One supposes that the small charge was to purchase the form of writ from the court and the $1.00 fee for completing the form may have gone to Barnes. In addition, the bill included a "fee for all other services" $6.00, much like the fee in forfeiture matters. In all events, it appears that Barnes may have earned $8.00 or $9.00 in fees for a debt proceeding to collect a fine as compared to the $17.00 in fees he earned for a successful action to forfeit a vessel in admiralty.

26

Electronic copy available at: https://ssrn.com/abstract=4424076

| Case Number | Lead Plaintiff | Defendant(s) | Claim Type | Date | Fine or Price at Auction | Owner | Counsel | Informer | Archive Number |
|---|---|---|---|---|---|---|---|---|---|
| 11 | U.S. | Snow Fair Eliza | Seizure of Property (the Ship); Sale of the Ship for the US | July 1800 | $600 | Jeremiah Ingraham | Barnes | | 7795524 |
| 12 | U.S. | Sloop Juliet | Forfeiture and Sale | July 1800 | $801 | Captain John Stanton | Barnes | | 7795523 |
| 13 | U.S. | Sloop Good Intent | Forfeiture and Sale | Sep 1800 | | | | | 7795525 |
| 14 | [124]U.S. | James DeWolf | Fine | Feb 1801 | $3,000 | Nathaniel Ingraham; James DeWolf | Barnes | John West Leonard | 7795521 |
| 15 | U.S. | Brigantine Warren | Forfeiture and Sale | June 1803 | | | | | 7795658 7795659 |

[123] This was a follow-on suit to the earlier proceeding (Case 4) to forfeit the Flying Fish. Rotch had Packard arrested on a debt claim to enforce the 1794 Act. The writ of attachment explains that Packard of Providence Rhode Island on March 15, 1799, fitted out the schooner, The Flying Fish, for transporting people from Africa "to be there sold of disposed of as slaves contrary to the form of the statute in such case made and provided." The proceeding was discontinued, perhaps after the parties reached a settlement. Ordinarily, the courts must approve such settlements, see Haskins v. Newcomb, 2 Johns. 405 (1807), a rule that serves both to ward off collusive or extortionate arrangements and ensures the government's receipt of its moiety.

[124] On Leonard's appearance in Rhode Island as special prosecutor, see supra notes __ and accompanying text. In the declaration, Leonard describes himself as citizen of New York, suing as well for himself as for the United States in an action in debt. Seeking $20,000 in penalties, Leonard proceeded in debt to recover money owed. The case file includes an affidavit by Thomas Cook (signed with an X, his mark). Cook sailed aboard the Fanny, captained by Nathaniel Ingraham of Bristol. The Fanny took on board 73 people for sale. DeWolf was at the wharf in Bristol when the ship sailed and the Fanny carried rum and tobacco to Africa. DeWolf was represented at the deposition and asked if Leonard paid or promised Cook anything to appear in the proceeding. Cook said no. The case file also includes an affidavit from Samuel Arnold, to the same effect, with similar questions from DeWolf. While the jury acquitted DeWolf, Leonard successfully prosecuted the ship's captain, Ingraham, who was heavily fined and jailed for his role. *See* Coughtry, supra note , at 222-24. On later successful efforts to persuade Jefferson to pardon Ingraham, *see id.* at 223.

Electronic copy available at: https://ssrn.com/abstract=4424076

| Case Number | Lead Plaintiff | Defendant(s) | Claim Type | Date | Fine or Price at Auction | Owner | Counsel | Informer | Archive Number |
|---|---|---|---|---|---|---|---|---|---|
| 16 | U.S. | Brigantine Minerva | Forfeiture | July 1803 | | James DeWolf; Nicholas Peck; Charles Collins; William Stagg; William May | | | 7795673 |
| 17 | [125] U.S. | Sloop Nancy | Forfeiture and Sale | July 1803 | | James DeWolf; Sweeney Freeden; Nicholas Peck | | | 7795674 |
| 18 | [126] Isaac Sherman | Brigantine Stork | Forfeiture | Aug 1803 | | James DeWolf | | Isaac Sherman | 7795572 |
| 19 | [127] Isaac Sherman | Sloop Nancy | N/A | Aug 1803 | | | David Howell, district attorney; George Blake, counsel for claimant (owner) | Isaac Sherman | 7795571 |

[125] Some evidence of efforts to prevent witness from testifying, apparently leading to contempt proceedings.  Evidence, including a deposition from William Stagg, suggests that the ship was outfitted for slave trade and that slaves were transported from Africa to Havana, Cuba.

[126] Judge Barnes decrees a forfeiture and sale, apparently by default.  Bill of costs includes attorney's fees of $17.00.  Case file includes three or four depositions in support of claim, making out a strong case on liability.

[127] In this proceeding, Sherman (a self-described citizen of Boston and a distiller) claims to have been the informer in preferring a complaint to the district attorney David Howell.  Howell initiated a successful libel to forfeit the vessel. By this point, Barnes had accepted the district judgeship where he would serve until 1812.

28

Electronic copy available at: https://ssrn.com/abstract=4424076

| Case Number | Lead Plaintiff | Defendant(s) | Claim Type | Date | Fine or Price at Auction | Owner | Counsel | Informer | Archive Number |
|---|---|---|---|---|---|---|---|---|---|
| 20 | [128]U.S. | Ship Amested | Forfeiture and Sale | Sep 1803 | | | Howell | John Earle | 7795677 7795675 |
| 21 | [129]U.S. | Brigantine Eliza | Forfeiture by default | Sep 1803 | $4,075 | Hail Gladding (Informer) | Howell | Hail Gadding | 7795576 |
| 22 | [130] Isaac Sherman | Charles DeWolf | Fine | Dec 1803 | | Herald, Sloop of War aka the Thomas Jefferson | | Isaac Sherman | 7795606 |

[128] Ship was harbored in Bristol, Rhode Island.  This was an emergency libel to arrest the vessel and subject it to forfeiture. John Earle was named as informer. David Howell served as the attorney for the government.  Judge Barnes held an emergency session to issue warrant.  Marshal returns the warrant with a fee for service, but some ambiguity as to whether the vessel was ever served.  No further documents.  Perhaps the proceeding was settled and discontinued.

[129] This proceeding resulted in a forfeiture decree by default.

[130] The complaint was styled "Isaac Sherman qui tam vs. Charles DeWolf."  Sherman was represented by district attorney David Howell.  The jury returned a split verdict, finding the defendant indebted to the plaintiff for "aiding and abetting in fitting out the ship Thomas Jefferson as is set forth in the declaration and the other two charges we find not against him." Signed by 12 jurors. On Sherman's role as an informer, see Coughtry, supra note , at 225 (indicating that Sherman had been willing to compromise until some local toughs cut off a piece of his ear, hardening his view of the defendants).

29

Electronic copy available at: https://ssrn.com/abstract=4424076