*Law of Copyright.*—By the following abstract of the opinion of Mr. Justice Thompson, of the Circuit Court of the United States, delivered on Tuesday last, in a case in which the Editors of this paper were defendants, it will be seen that we have been borne successfully through one of the most vexatious and unjustifiable pieces of litigation, that we recollect to have heard. No such case was ever tried, in this or any other country, before; and by contesting it, we have had the double satisfaction of establishing a principle heretofore unsettled, and of doing so at the expense of our opponents. The latter circumstance would not be mentioned, were it not for the fact, that, not content with trying the question on principle, they sought to recover vindictive damages in a second suit, which they may now withdraw at their leisure.

CIRCUIT COURT OF THE UNITED STATES,  
SOUTHERN DISTRICT OF NEW-YORK.

Edwin B. Clayton and al.  
vs.  
William L. Stone and  
Francis Hall.

This was an action qui tam, under the statute of copy right, for abridging an article published in a number of a semi-weekly newspaper, of which the plaintiffs are proprietors, called "The Price Current." The plaintiff's had never secured their copy-right in any number of their paper except the one now in question.

The action was tried at the early part of the present term, and the jury were, for the purpose of bringing the questions of law before the Court for revision, directed to find a nominal verdict for the plaintiffs. On Tuesday last his honor Judge Thompson delivered the opinion of the Court upon the case, which had been argued before them, ordering judgment to be entered for the defendants.

The following are substantially the reasons assigned by the learned Judge, forming but an outline of the opinion delivered.

I am inclined to think the Price Current can not be considered a book, within the sense and meaning of the act of Congress. The literary property intended to be protected by the act, is not to be determined by the size, form, or shape in which it makes its appearance, but by the subject matter of the work. Nor is this question to be determined by reference to Lexicographers, to ascertain the origin and meaning of the word book. It will be more satisfactory to enquire into the general scope and object of the Legislature, for the purpose of ascertaining the sense in which the word book was intended to be used in the statute.

It seems to be well settled in England, that a literary production to be entitled to the protection of the statutes on copy rights, need not be a book in the common acceptation of the word; a volume written or printed, made up of several sheets and bound up together.—It may be printed on only one sheet, as the words of a song on the music accompanying it. It is true that the English statute of 8th Anne, in the preamble, speaks of books and other writings. But the body of the act speaks only of books the same as in the act of Congress; and a learned commentator upon American Law, seems to think the English decisions on this subject have been given upon the body of the statute of Anne, without laying any stress upon the words, "other writings in the preamble."

In determining the true construction to be given to the act of Congress, it is proper to look at the constitution of the United States, to aid us in ascertaining the nature of the property intended to be protected. "Congress shall have power to promote the progress of science and useful arts, by securing for limited times to authors and inventors, the exclusive right to their respective writings and discoveries." (art. 1, s. 8.) The act in question was passed in execution of the power here given, and the object therefore was the promotion of science. It would certainly be a pretty extraordinary view of the sciences to consider a daily or weekly publication of the state of the market, as falling within any class of the sciences. They are of a more fixed, permanent and durable character. The term science cannot with any propriety be applied to a work of so fluctuating and fugitive a form as that of a newspaper or price current; the subject matter of which is daily changing, and is of mere temporary use. Although great praise may be due to the plaintiffs for their industry and enterprise in publishing this paper, yet the law does not contemplate their being rewarded in this way. It must seek patronage and protection from its utility to the public and not as a work of science.

The title of the act of Congress is " for the encouragement of learning," and was not intended for the encouragement of mere industry, unconnected with learning and the sciences. The preliminary steps required by the law to secure the copy right, cannot reasonably be applied to a work of so ephemeral a character as that of a newspaper. The author is required to deposit a printed copy of the title of his book, in the Clerk's office of the District Court, and the Clerk is required to record the same; a copy of which record must be published for four weeks, in one or more newspapers, within two months from the date thereof: And a copy of the book is to be delivered to the Secretary of State within six months from the publication, to be preserved in his office: And all this would have to be done for every newspaper. The right can not be secured for any given time, for a series of papers published from day to day, or from week to week: And it is so improbable that any publisher of a newspaper would go through the form for every paper, that it cannot reasonably be presumed that Congress intended to include newspapers under the term book. That no such pretence has ever before been set up, either in England or in this country, affords pretty strong argument that such publications never were considered as falling under the protection of the copy right laws.

We are accordingly of opinion, that the paper in question is not a book, the copy right to which can be secured under the act of Congress.

Judgment must accordingly be entered for the defendants.