NEW-YORK SPECTATOR.

*For the Commercial Advertiser.*

**Sonnets,**

**Suggested by Cole's four paintings representing the voyage of life.**

BY MRS. SEBA SMITH.

I.

Thou poet-painter, preacher of great truth,
Far more suggestive thine than written tome.
Lo, we return with thee to that vast dome,
Dim cavern of the past. Visions uncouth,
Vague, rayless, all impalpable in sooth,
Send back the startled soul. The waters come
All tranquilly from that dim cavern forth,
The mystic tide of human life. A child,
Borne on its bosom, sports with blossoms wild.
A presence, felt, but still unseen, the boat
With gentle hand guides onward, and beguiled
With music lost in other years, they float
Upon the stream. The hours unfelt, for life
Is joy in its first voyage, with light and blossoms rife.

II.

Alas, the spirit lingers, but its hand
No more the barque sustains. The daring youth
Has seized the helm, and deeper launches forth,
His eye amid illusions of ideal land—
Bright castles, built in air, fame, glory, worth,
Fabrics, that still receding, seem to stand—
He sports no more mid blossoms of green earth ;
He hears no more the music of his birth ;
The future lures him, pinnacles and towers,
And half he chides the l-gging of the hours,
Unheeds their sunshine, blessedness and mirth ;
For onward is his course, he asks not where,
Since fancy paints the prospect passing fair.

III.

Still onward goes the barque—the deeper tide
Bears it along where breakers foam and roar,
And oaks, unbending, riven, line the shore ;
Dense vapors rising, all the future hide ;
And how shall he that future peril bide ?
The guiding helm he eager grasps no more ;
Time weighs the prow, the wave is deep beside ;
Swift flows the current, fierce the coming strife,
The struggle and the buffettings of life.
Half he recoils, yet calmly bides the test,
With hands clasped firmly on the unconquered breast ;
Nor meets alone that hour with peril rife—
Forth from on high the guardian spirit bends
With ministry of love, and holy strengthening sends.

IV.

Thy mission is accomplished—painter, sage,
Look to thy crown of glory—for thy brow
Is circled with its radiant halo now.
No more earth's turmoil will thy soul engage,
Its hopes unquiet, littleness, or rage.
With thine own voyager thou hast heard the sound
Of that vast ocean, waveless, rayless, dread,
Where time's perpetual tribute, circling round,
Drops silent in, all passionless and dead.
When thine own voyage is o'er, and thou shalt near
The eternal wave, thus, thus above thy head
May opening glories shield thy heart from fear—
A child again, but strong in faith and prayer,
Thou shalt look meekly up behold, thy God is there !

---

**In Chancery—Before the Vice Chancellor— U. H. Levy, vs. James H. [illegible]ay,**

In this case an attachment had been issued against the defendant for refusing to deliver certain property to a Receiver. It appeared that when first brought up for examination before the Master, he was wearing a gold watch, which he was requested to deliver to the Receiver; this, however, he declined to do. The next time he came up, inquiry was made for the watch, and he acknowledged that he had given it to an assignee under an assignment—the watch being included in such assignment.

His Honor said it seemed to him that parting with the possession of the watch must be considered a violation of the injunction, and as far as it was concerned, it was a *fraudulent transaction*. That he considered no such change of possession had taken place as would give the assignee a title to the property; and as the judgment creditor had filed a bill and so held a lien upon the property, he had no right to part with it afterward. The defendant was, therefore, ordered to *stand committed* until he should deliver the watch to the Receiver.

Another question was involved in the present case with regard to some articles of furniture contained in the same assignment. The defendant had confessed judgment, and an execution was issued and his property sold; he, however, had made an *agreement with the auctioneer that certain articles should be bought in*; consequently a piano and various other things were knocked down to a Mrs. Jones, (a fictitious name.) No money passed, and the goods were removed to the defendant's mother-in-law's, 53 Broome street, where himself and family resided, and had remained in his use and occupation.

He was required by the Receiver to give up this property, but refused on the ground that he had no control over it.

His Honor said that it was not shown that any other person had exercised control over it, and, therefore, he was constrained to believe that he had it in his power to deliver the said articles, and therefore, he should order him to do so, excepting such as were exempt by law, and that he *stand committed* until it is done.—*Express.*

---

**United States Circuit Court.**

Before Judges Thompson and Betts.

Timothy Dwight, et als. vs. Daniel Appleton, et als.—Trial in continuation.—The Court opened at the usual hour, and Judge Thompson proceeded to deliver the opinion of the Court, upon the point of law, raised by the defendant's counsel on the previous day.

His Honor said that the Court had been able to find but few facts as precedents, on which to predicate a decision in the matter, as the question of copy-right had been so little litigated in our Courts. The English authorities on the subject were numerous, but they tended but little to enlighten the Court in the matter of arriving at a proper construction of the mere words of the act of Congress.

Section 6th of the act declares, " That if any other persons, from and after the recording the title of any book or books, according to this act, shall, within the term or terms herein limited, print, publish or import, or cause to be printed, published or imported, any copy of such work or books, without the consent of the person legally entitled to the copy-right thereof, first had and obtained in writing, signed in the presence of two or more creditable witnesses; or shall, knowing the same to be so printed, &c. publish, sell, or expose for sale, or cause to be published, &c. any copy of such books without such consent in writing, then such offender shall forfeit every copy of such book to the person legally entitled at the time to the copy-right thereof; and shall also forfeit and pay fifty cents for every such sheet which may be found in his possession, either printed or printing, published, imported, or exposed for sale contrary to the intent of this act, the one moiety thereof to such legal owner of the copy-right as aforesaid, and the other to the use of the United States, to be recovered by action of debt in any court having competent jurisdiction thereof.

This Court, continued his Honor, does not consider the law a penal enactment, but as offering the only remedy afforded the plaintiffs in the case. The procedure the Court viewed in the light of a *qui tam* action, and the words " found in his possession" must apply to every copy of the book found in the defendant's possession at *any time*.—If, said his Honor, the Court were in error in giving this construction of the law, or if they should have fallen into any error, they would be happy to hear the arguments of counsel, either upon a motion for a new trial or for the granting of a writ of error.

Mr. O'Connor rose and remarked that he had other points to which he would call the attention of the Court.

First—He would ask, " As the plaintiffs had only entered the first volume of the work which they claimed to be the original, could they claim thereby a copy-right of the other four volumes ?"

Secondly—Having in the year 1828 published an edition of the work in four volumes, did not such act vitiate the right to recover in the present action ?

Thirdly—Was not each and every volume published in this country a complete book in itself, the same as a newspaper, periodical, or other work ?

Mr. O'Connor was proceeding to address the jury, when Judge Thompson interrupted him, and remarked, that as the Court were desirous of having farther time to consider these difficult points, it would be desirable if the counsel on both sides would agree upon some verdict, subject to the opinion of the Court upon a case to be made. If there were any facts coming peculiarly within the province of the jury, they could pass upon the facts only, and leave the law to be hereafter determined.

It was the opinion of Mr. O'Connor that there were two points upon which the jury could decide as facts.

First. Was there a proper deposite in the district clerk's office of the books within six months after their publication ?

Second. How many copies of the imported books had been proven to in possession of the defendants ?

The Court charged that the case was one of a very novel character, and one of no inconsiderable importance to the public. It had been deemed, therefore, expedient to reserve certain questions of law growing out of the case, for the more mature deliberation of the Court, and therefore the jury would be charged with a decision, and thereby find a verdict upon certain facts which had arisen in evidence, leaving the application of the law to these facts to the Court alone. One of the questions reserved for the Court was, whether each of the volumes was required to contain a certificate of record, which had been found only in one.

Another was as to the necessity of having a copy of each of the volumes deposited in the office of the Secretary of State within six months after their publication ? For the sake of expediting the matter the Court would for the present assume that it was necessary for each volume to be so deposited, and the jury could then determine from the evidence, how many and which of the volumes were deposited, within the time prescribed.

The next point for them to determine was, how many copies of the imported edition had been in possession of the defendants, at any time whatever.

With respect to the first question, it has been had evidence that the first and third volumes were deposited previous to the 10th of January, 1819. For these volumes we have the receipts from the Secretary's office, but in the absence of a receipt for the second volume, a fair inference is that it was not deposited; and from a review of the testimony a similar inference may be drawn in relation to the remaining volumes, viz:—that only the first and third volumes had been deposited within the required six months.

The next question arising, said his Honor, is, how many copies of the imported work were proven to have been sold by defendants.

The plaintiff is not bound to show that the defendant made the sales in person. It is sufficient if the sales were made by his clerk or agents. The defendant is charged with selling two sets of copies.—Several swear to having purchased copies at his store, and one witness swears that at the time of his purchase he saw several, perhaps as many as twenty-five copies remaining. From the entry at the Custom House, it appears that the defendant imported twenty-five copies in June, 1839. There being no pretence that the books did not arrive here, the opinion of the Court is that he is chargeable with them. Another branch of this question is how many of the books were sold by defendant before the arrival of the invoice by the ship Westminster. This branch is more difficult of decision. The truth can be best arrived at by examining the testimony of the clerk, Mr. Saxton.

It had been urged by the plaintiff's counsel, that the defendants could have proven, had they called their clerks, the exact number of copies of the work sold. This testimony, had it been adduced, could not have varied the general result.

The jury, after a brief absence, returned with a verdict for the plaintiffs for $2000 of debt, with six cents costs subject to the opinion of the Court upon a case to be made, with liberty to liquidate the amount of the verdict, and with liberty to turn the same into a bill of exceptions. And *especially*—

1. Was the first volume deposited within six months after it was published ? Yes.
2. Second volume ? No.
3. Third volume ? Yes.
4. Fourth volume ? No.
5. Fifth volume. No.
6. What number of copies of the English work was in defendant's possession ? 38—*Courier.*

---

The United States, vs. the Executrix and Executors of Henry Eckford, deceased.—This case is on the calendar for to-day. The deceased was security for Robert Swartwout, and his liabilities it is said amount to $480,000. Dr. Lord, Jr. Esq. yesterday applied to the court to postpone the trial until the next term; he said he believed he should be able to prove that the amount was much less The case had been entirely under the charge of F. B. Cutting, who was unexpectedly obliged to go to Europe, and it was now left with Mr. Prescott Hall and himself; but the time was too short to enable them to become masters of the case, and do it the justice it demanded.

The amount was an exceedingly heavy one, and if pressed to trial now, judgment must go by default. If Eckford were alive, it would be very different, and the interests of the United States would suffer by the delay, but under the present circumstances he hoped no objections would be offered to the postponement.

Mr. Butler said he should like the grounds of the motion put in proper form, and he should then have something to say upon the subject.

The counsel were then directed to prepare their affidavits and make the motion this morning.

The court then adjourned.—*Express.*

---

**U. S. Circuit Court.—Saturday.**

Before Judge Thompson.

NEGLIGENCE OF COUNSEL.—His Honor took his seat precisely at 10 o'clock, but not one counsel appeared in Court. After waiting until half past ten, he said—

" I have now waited half an hour, and there is still no business ready; I shall proceed, therefore, now to call the general calendar, and if counsel are not here, they must take the consequence of their non-attendance." He then proceeded to call the calendar, but no counsel appearing, he said " The negligence is evidently with the counsel, and my time is not to be wasted in this manner. I shall, therefore, mark off the causes, and they must take the consequences of their inattention."

Having reached the case of " The United States vs Price," Mr. Butler said he was very desirous to try the cause this term.

Court. " You are at liberty to proceed sir; the parties should have been here."

Mr. Butler—" I know, sir, that if I proceed and take an inquest in the case, a motion will be made to set it aside, and I think the time of the Court will be saved by allowing it to stand over."

Court. " Their application will have no effect with me, sir. I shall not set it aside unless they can show me a very sufficient and satisfactory cause for their absence; go on and take your inquest sir."

Mr. Butler. " I have sent an officer after Mr. Morrell sir, and I expect him every minute."

Court. " You may send an officer sir, but has he any authority to bring him ?"

Mr. Morrell soon after appeared in Court, accompanied by Mr. Price, and the case proceeded.

The United States, vs. Wm. M. Price.—Mr. Price appeared personally, and moved a postponement of his case until the April term of the court. He read a long affidavit, which in substance set forth that on the 15th of last May, he applied to the District Attorney, B. F. Butler, Esq., and requested that proceedings might be instituted against him at the suit of the United States, for the amount which was alleged to be due to them; and that Mr. Butler informed him that he had received no instructions, but would make application and report the reply.

That on the 19th May, Mr. Butler informed him that his instructions were to proceed against him in the usual way. That capias was accordingly issued, and his (Price's) bail justified in the suit on the first day of June last; and on the 31st day of July, the declaration was served, which contained the usual money counts.

The bill of particulars was not served until the 20th of September, and upon examination he found it altogether too general to answer the purposes for which he had applied for a bill of particulars; and on the 11th of November he again applied to Mr. Butler, and stated that it was necessary for him to go to Washington to ascertain whether the monies which had been received in his absence were to be allowed or disallowed; but indisposition had prevented his travelling, and he had not yet received the statement of the monies which had been so received.

That he believed and was informed by his counsel, John A. Morrill, that he had a good and substantial defence, which consisted of a great number and a large amount of claims against the several Executive departments of the Government, from the 15th of April, 1834, to the 6th of December, 1838; and it was necessary that he should know whether they were to be allowed or disallowed before he could go to trial.

He therefore prayed that the case might be postponed, as the interests of the United States could not suffer by the delay, and bailable process had been issued, and justified bail given in the cause.

Mr. Butler said there were some omissions in the affidavit which he should like to supply in writing, and put upon the files of the Court.

In the first place, prior to the 19th of May, he had sent to Mr. Price, at Paris, a copy of his account as settled at the Treasury Department, which contained the amount of the claims against him, and intimating that he had received a small amount due to him, which he had paid to the United States; and also that he was instructed to take certain proceedings which would be unpleasant, and asking his consent to pay any monies which were due to him while District Attorney, to the United States.

On his return to this country, he (Mr. Butler) showed him a transcript he had received from the Treasury Department, with the details of the committee of investigation, which had all been included in the bill of particulars, and which he considered sufficient to enable him to prepare his defence; and he had moreover, on more than one occasion, given every information, as he was desirous of trying the cause at the present term. He was aware that application would be made for a postponement, on the ground of the necessity of going to Washington to ascertain whether or not his claim of offsets would be allowed.

It was certainly not right to force him to trial that morning, but he conceived he might be prepared some time during the present term.

Mr. Prince made some remarks in reply to Mr. Butler, and said he had been most anxious, since his arrival, to proceed to the trial of the cause.

His Honor said he thought the application no unreasonable; it appeared the nature of the accounts would require a long and careful investigation, and it was due to all parties that it should be a full and satisfactory one; and under all the circumstances, taking into consideration the indisposition of Mr. Price, he should put off the trial until the next term of the court.—*Express.*

*From the Boston Post of Saturday.*

**U. S. District Court.**

ASSAULT ON AN OFFICER WITH AN AXE, AT SEA.—Four seamen, named Nellums, Cunningham, Tuck and Douglass, were yesterday brought before Judge Davis, for an assault on the mate of the brig Hollander, and endeavoring to create a revolt. Upon the arrival of the Hollander in the bay, the mutineers were taken into custody by Capt. Sturgis, of the revenue cutter Hamilton, who kept them on board until he had completed some official business at Salem. From the testimony of the captain (Charles A. Ranlett) and the mate (Alexander H. P. Brown,) it appeared that on the morning of Nov. 22d, on the homeward voyage from Russia, orders were given to reef the foretopsail. Douglass went aloft to the lee yard arm, and Nellums to the weather arm. Douglass let out on the lee, but Nellums did not bear a hand and cast the sail adrift at his yard

The mate observed that the cause of his tardiness was having mittens on, and he ordered him to take them off. Nellums said he would'nt take them off. The mate then went aloft to enforce his order, and, with Nellums, got the sail adrift, and in the top.—Again he ordered Nellums to take his mittens off, and again he said he would'nt. The mate then struck him three times with a piece of rope, and ordered him on deck. The wind was blowing fresh. The mate followed Nellums on deck, and reiterated his order to take off his mittens. Nellums again replied as before, and the mate again struck him with a rope.—Nellums then seized an ax, and struck him down by a blow on the hip.

In the next moment, Nellums and Capt. Ranlett came in contact, and the mate seized a handspike with the intention of striking Nellums, but did not. Cunningham, who was at the wheel, left it, after Nellums went aft, and said to the mate, " Don't hit that man !" Douglass and Tuck also interfered, by ordering the mate not to hit Nellums. The mate struck Douglass. After Douglass understood the nature of the disturbance, he lent a hand in putting the irons on Nellums Before Nellums was mastered, Tuck called upon the hands in the forecastle to come on deck.

It did not appear that Douglass meant to offer any resistance to the mate or other officers, and he was discharged, but Nellums, Cunningham, and Tuck, were committed for trial at the next Circuit Court.

---

AT CINCINNATI.—On the evening of the 28th of November, the packing box manufactory of James Dunlap, in Vine street, between Second and Third streets, and two or three small dwellings adjoining, were destroyed by fire, and shortly afterward several frame buildings in Fifth street, between Lodge's Alley and Walnut street, were likewise burned.—They were occupied as stores—among the rest by Mr. Podesta, fruiterer, and Mr. Ruffin, dry goods dealer.