UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**UNITED STATES OF AMERICA
ex rel. DR. CLARISSA ZAFIROV**,

      Plaintiff,

-vs-                                    CASE NO. 8:19-cv-1236-KKM-SPF

**FLORIDA MEDICAL ASSOCIATES,
LLC d/b/a VIPCARE, PHYSICIAN
PARTNERS, LLC, ANION TECHNOLOGIES,
LLC, FREEDOM HEALTH, INC., and
OPTIMUM HEALTHCARE, INC.**,

      Defendants.
_____/

**DEFENDANTS' SUPPLEMENTAL BRIEF ON FOUNDING-ERA
*QUI TAM* ENFORCEMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD ................................................................................................. 1

DISCUSSION ............................................................................................................. 2

I.      The Founding Generation Did Not Endorse—or Even Consider—the Constitutionality of the *Qui Tam* Device. ..................................................... 2

II.     Early Informer Statutes Do Not Qualify as Relevant Analogs and Were Enacted Without Due Consideration........................................................... 4

III.    Evidence of Founding-Era *Qui Tam* Enforcement Is Limited. ....................... 8

IV.    History Does Not Justify the FCA's *Qui Tam* Provisions ............................. 13

CONCLUSION ......................................................................................................... 15

CERTIFICATE OF SERVICE .................................................................................. 17

i

## INTRODUCTION

In response to this Court's April 23, 2024 order, Defendants jointly submit this Supplemental Brief providing additional founding-era evidence regarding *qui tam* enforcement. ECF No. 240. The Supreme Court has made clear that the Vesting and Take Care Clauses of Article II require that the President have authority to remove and supervise those who litigate on the United States' behalf—a core executive power. And Supreme Court precedent confirms that those who litigate for the United States must be appointed in accordance with the Appointments Clause. The FCA's *qui tam* provisions violate these firmly established principles; there is no need to review historical *qui tam* enforcement.

At any rate, the historical record does not create an exception to the Constitution that can rescue the FCA's *qui tam* device. There is no apparent historical evidence that the founding generation considered the Article II implications of the *qui tam* device (Part I, *infra*); that the First Congress considered Article II when enacting early informer statutes (Part II, *infra*); nor that private individuals—rather than the government—actually used those *qui tam* statutes to litigate on behalf of the United States with meaningful frequency (Part III, *infra*). The transient *qui tam* enforcement practice at the Founding—imported from England's parliamentary system—does not justify an enduring exception to Article II for the FCA. *See* Part IV, *infra*.

## LEGAL STANDARD

Constitutional interpretation starts with "textual analysis focused on the normal and ordinary meaning of the . . . language." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,

597 U.S. 1, 20 (2022) (cleaned up). An "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification . . . is a critical tool of constitutional interpretation." *D.C. v. Heller*, 554 U.S. 570, 605 (2008).

When, as here, the Constitution's meaning is clear, there is no cause to consult post-enactment historical practice. *See Bruen*, 597 U.S. at 36. By contrast, when the Constitution's meaning remains indeterminate, post-enactment practice may help liquidate meaning. *Id.* at 35-36. Even then courts "must . . . guard against giving postenactment history more weight than it can rightly bear." *Id.* at 35. Only "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Id.* at 36 (citation omitted). "[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (citation omitted).

## DISCUSSION

I. **The Founding Generation Did Not Endorse—or Even Consider—the Constitutionality of the *Qui Tam* Device.**

The founding generation debated numerous constitutional questions, and in those circumstances, the "views of the Framers and their contemporaries" have helped guide constitutional interpretation. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 214 (2020). For example, "[t]he removal of executive officers was discussed extensively in Congress when the first executive departments were created," and "[t]he

2

view that prevailed . . . was that the executive power included a power to oversee executive officers through removal." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010) (cleaned up).  Founding-era consideration weighed heavily in *Myers v. United States*, 272 U.S. 52 (1926)—the path-marking decision on removal authority.  Other examples beyond Article II abound.  *See, e.g.*, *I.N.S. v. Chadha*, 462 U.S. 919, 947 (1983) (interpreting Presentment Clause); *Alden v. Maine*, 527 U.S. 706, 718 (1999) (interpreting Article I authority to abrogate state sovereign immunity); *Marsh v. Chambers*, 463 U.S. 783, 784 (1983) (constitutionality of legislative prayer).

The *qui tam* device lacks any comparable historical record.  "There is no evidence that the Framers considered the constitutional status of qui tam." *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 214 (1989).  Defendants searched across founding-era sources[1] and uncovered no evidence that the founding generation considered—let alone endorsed—the constitutional implications of the *qui tam* device.  Nor could Defendants locate any secondary sources—no law review articles, no treatises, no scholarly books—providing evidence that the founding generation discussed such issues.  Given that record, The Anti-Fraud Coalition resorts to citing evidence that certain founding generation members were

---

[1] Defendants searched for references to terms such as "informer," "qui tam," "moiety," and "prosecuting," among others, across the following sources:  *The Federalist Papers*; James Madison, *Papers of James Madison, Purchased by Order of Congress; Being His Correspondence and Reports of Debates during the Congress of the Confederation and His Reports of Debates in the Federal Convention*;  James Madison, *Secret Proceedings and Debates of the Convention Assembled at Philadelphia, in the Year 1787, for the Purpose of Forming the Constitution of the United States of America*; Jonathan Elliot, *Debates in the Several State Conventions, on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787*; Jonathan Elliot, *Debates, Resolutions, and Other Proceedings, in Convention, on the Adoption of the Federal Constitution*; and Joseph Story, *Commentaries on the Constitution of the United States*.

3

aware of the existence of *qui tam* actions, but that is a far cry from discussing how *qui tam* actions comported with Article II. *See* ECF No. 261 at 6-9.² Thus, the expressed views of the Framers and their contemporaries give no reason to conclude that Article II accommodates the FCA *qui tam* provisions.

## II. Early Informer Statutes Do Not Qualify as Relevant Analogs and Were Enacted Without Due Consideration.

The Supreme Court has also recognized that "early congressional enactments provide contemporaneous and weighty evidence of the Constitution's meaning." *Printz v. United States*, 521 U.S. 898, 905 (1997) (cleaned up); *see CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. ___, 2024 WL 2193873, at *7 (May 16, 2024). But, of course, "enactment by the First Congress" is not "a guarantee of a statute's constitutionality." *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 450 (2023) (Thomas, J., dissenting) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)); *see also, e.g.*, *Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792).

The First Congress enacted a number of informer statutes, but none was a true analog to the modern FCA's *qui tam* provisions. Analogical reasoning calls for determining "whether . . . two regulations are relevantly similar." *Bruen*, 597 U.S. at 29 (cleaned up). For the Second Amendment, a court determines "whether modern and historical regulations impose a comparable burden on the right of armed self-

---

² Analogies to early state constitutions are unavailing. There is no evidence that Massachusetts or other states thoughtfully considered the impact of *qui tam* enforcement on their Executive Branches, and states often permit greater infringement than the U.S. Constitution permits—Massachusetts, for example, permits its legislature to restrict more severely the chief Executive's removal authority. *See Edwards v. Commonwealth*, 174 N.E.3d 1153, 1165 (Mass. 2021).

4

defense." *Id.* Here, the question is whether these informer statutes interfered with the Executive Power or raised Appointments Clause concerns comparable to the FCA. The FCA's constitutionally relevant features are a private party who has no personal injury but who sues on the United States' behalf, to vindicate the United States' interests across a broad array of highly reticulated regulatory schemes, where the President cannot remove the relator or fully supervise the litigation, as the relator remains a party with rights even when: (1) the government investigates but declines to intervene; (2) the government intervenes; or (3) the government moves to dismiss. *Polansky*, 599 U.S. at 449 (Thomas, J., dissenting); *see* 31 U.S.C. § 3730.

The First Congress enacted 13 laws that had 20 informer provisions. *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 776-77 (2000). Of those early informer provisions, ten provided only a bounty for supplying information.[3] Eight provisions provided a bounty and a cause of action.[4] Three provided a cause of action for an injured party.[5][6]

Most of those early informer provisions are completely irrelevant. A bounty statute does not grant a private party the right to litigate the United States' interest, which is the foundation of the Article II questions here.[7] Early bounty statutes were

---

[3] *Stevens*, 529 U.S. at 777 & n.7 (collecting authorities).

[4] *Stevens*, 529 U.S. at 777 & n.6 (collecting authorities).

[5] *Stevens*, 529 U.S. at 776 & n.5 (collecting authorities).

[6] *Stevens* included Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129 both as (1) a provision that allowed injured parties to sue for damages on both their own and the United States' behalf and (2) a provision that allowed "both a bounty and an express cause of action." 529 U.S. at 776-77 & nn.5, 6.

[7] As *Stevens* noted, the Supreme Court in 1943 "suggested, in dictum, that '[s]tatutes providing for a

5

instead the historical antecedents of today's whistleblower laws. *See, e.g.*, 7 U.S.C. § 26 (CFTC whistleblower statute); 15 U.S.C. § 78u-6 (Securities whistleblower statute); 26 U.S.C. § 7623 (IRS whistleblower statutes).

The two informer statutes that allowed *injured* parties to sue under federal law likewise lack the FCA's constitutionally relevant features. One such statute allowed a copyright holder to sue for infringement but granted half the forfeiture to the United States. *See* Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124-125. The other statute allowed an assistant census taker to file an action and keep half the penalty when citizens failed to cooperate with the census. *See* Act of Mar. 1, 1790, ch. 2, § 6, 1 Stat. 103. These ordinary claims do not allow a private party to litigate the United States' interest.

This leaves as the only potentially relevant analogs to the modern FCA the eight informer provisions that provided both a cause of action and a bounty. These statutes appear to have authorized private parties who lacked a personal injury to conduct litigation on the United States' behalf. But the statutes are, at most, imperfect analogs for at least two reasons. First, the early statutes were silent as to the government's control of *qui tam* suits, and thus did not expressly empower private individuals to litigate the government's interest as a party even when the government affirmatively declined to intervene, or when it did intervene, or when it moved to dismiss. Second,

---

reward to informers which do not specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue.'" 529 U.S. at 777 n.7 (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943)). That dictum is likely wrong given the Court's warning against courts creating causes of action, *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001), but in any event, the precise number of relevant *qui tam* statutes is not constitutionally significant given their transient nature and the lack of consideration afforded to Article II concerns. *See* Part IV, *infra*.

6

these statutes were narrow in scope and did not grant relators broad authority to assert the government's legal positions in complex regulatory schemes, as the modern regulatory FCA does. Consequently, these early statutes did not pose nearly the same measure of intrusion on the Executive Power as the FCA presents today.

After the First Congress, Congress continued to enact various informer statutes in the 1790s, but these statutes continued to depart from the FCA in relevant ways.[8] Some offered only a bounty;[9] others created a cause of action for an injured party but split the forfeiture between the informer and the United States;[10] and others offered a bounty and a right of action but remained silent as to the government's control of *qui tam* suits.[11] Defense counsel have found no early informer statutes that expressly permitted a private individual to continue litigating as a party even when the government had declined to pursue the action, and even when the government did

---

[8] *See* Leonard D. White, *The Federalists: A Study in Administrative History* 415 (1956) ("From 1789 to 1801 Congress made provision for rewards to informers in over twenty instances."); Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 296 (1989) ("Within the first decade after the Constitution was ratified, Congress enacted approximately ten qui tam provisions authorizing individuals to sue under criminal statutes to help enforce the law.").

[9] *See, e.g.*, Act of March 1, 1793, ch. 19, § 12, 1 Stat. 329, 331 (allowing informer to recover bounty and prosecute for violations of the "Act to regulate Trade and Intercourse with the Indian Tribes"); Act of March 22, 1794, ch. 11, §§ 2, 4, 1 Stat. 347, 349 (providing bounty and allowing private prosecution for violations of the "Act to prohibit the carrying on the Slave Trade from the United States to any foreign place or country"); Act of April 20, 1818, ch. 91, § 3, 4, 6, 7, 3 Stat. 450, 451 (same, but for violations of the "Act to prohibit the introduction (importation) of slaves into any port or place within the jurisdiction of the United States . . .").

[10] *See, e.g.*, Act of February 28, 1800, ch. 12, § 6, 2 Stat. 11, 13 (allowing census taker to sue for and receive half of penalty for failure to cooperate in census).

[11] *See, e.g.*, Act of June 5, 1794, ch. 50, § 3, 1 Stat. 381, 383 (allowing informer to recover one half of property forfeited for outfitting vessel for foreign service); Act of July 6, 1797, ch. 11, § 20, 1 Stat. 527, 532 (allowing informer to recover one half of fines, penalties, and forfeitures incurred under the "Act laying Duties on stamped Vellum, Parchment and Paper"); Act of March 3, 1801, ch. 24, § 2, 2 Stat. 115, 115 (allowing informer to recover one half of fines from the "inspection of tobacco and flour, surveyors, mills, highways and ferries" in the "district of Columbia").

choose to pursue the action, and even when the government sought to dismiss the action. Thus, it is not accurate to characterize the early Congresses as having regularly enacted true analogs to the modern FCA's *qui tam* provisions.

Defense counsel also searched the Annals of Congress for the first seven Congresses (1789-1803) and found no relevant legislative history discussing the constitutionality of the early informer statutes. As with the constitutional debates, there is no apparent evidence that the First Congress (or any other early Congress) considered the Article II implications of enacting informer statutes.[12] The early informer statutes—*qui tam* provisions among them—were a carryover from the English parliamentary system and apparently adopted without any recorded Article II consideration. *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting).[13]

### III. Evidence of Founding-Era *Qui Tam* Enforcement Is Limited.

"[T]he qui tam statutes adopted by the First Congress gave rise to little actual litigation."[14] Although "[t]he definitive survey of early federal popular actions has yet

---

[12] One scholar argues that the First and Second Congresses "borrowed" the *qui tam* device to monitor *federal officials'* compliance with federal law. Randy Beck, *Qui Tam Litigation Against Government Officials: Constitutional Implications of A Neglected History*, 93 Notre Dame L. Rev. 1235, 1291 (2018). Defendants have found just one instance in the early Congressional record of *any* discussion of *qui tam*, and it reflects that concern: Alexander Hamilton, in a 1790 Report to Congress, noted difficulties enforcing the federal revenue laws, but proposed typical executive solutions, such as new bureaucratic posts and increased naval funding. *See* Alexander Hamilton, Report of the Secretary of the Treasury (April 23, 1790), in *6 The Papers of Alexander Hamilton* at 380-81, 396-97 (Univ. of Va. Press 2019). Hamilton proposed *qui tam* as a potential solution only to address *over*-enforcement, expressing concern that far-flung federal officials might be inadequately supervised. *Id.* at 396-97. Critically, Hamilton nowhere considered the constitutional questions presented here.

[13] *See generally* Note, *The History and Development of Qui Tam*, 1972 Wash. U.L.Q. 81 (1972).

[14] Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 727 (2004); *accord* J. Randy Beck, The False Claims Act and the English Eradication of Qui Tam Legislation, 78 N.C. L. Rev. 539, 541-42 (2000).

8

to be written," Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 587 (2005), Defendants conducted extensive searches within HeinOnline's "Early American Case Law" database, which includes "all available lower federal case law up to 1880."[15] Defendants' independent research supports Woolhandler and Nelson's observation about the dearth of founding-era *qui tam* enforcement actions.

Early reported cases include few express citations to the informer statutes enacted by the First Congress. Of those first thirteen acts,[16] ten were not cited in a reported decision between 1789 and 1820. The Act of April 30, 1790 appears in three reported decisions—each a criminal action prosecuted by the government.[17] The Act of July 20, 1790 also appears in three reported decisions—two involved merchants suing for unpaid wages (not *qui tams*),[18] the other was a petition for habeas corpus (not a *qui tam*).[19] Finally, the Act of March 3, 1791 has one reported decision—an assumpsit action between a tax inspector and tax collector, also not a *qui tam* action.[20]

---

[15] HeinOnline, *Early American Case Law* (last visited May 21, 2024), https://home.heinonline.org/content/early-american-case-law/. Defendants first searched for express references to any Act of the First Congress containing an informer statute. Then Defendants searched again for express references to Statutes at Large citations for each of the informer provisions enacted by the First Congress.

[16] The First Congress passed 13 acts with informer provisions, and some had multiple informer provisions. Defendants thus note 20 different informer *provisions* above and note 13 different *acts* here.

[17] *United States v. Morgan*, 26 F. Cas. 1314 (C.C.D.C. 1805); *United States v. Peter*, 27 F. Cas. 506 (C.C.D.C. 1814); *United States v. Hamilton*, 1 Mas. 52 (C.C.D. Mass. 1816).

[18] *Gammell v. Skinner*, 9 F. Cas. 1142 (C.C.D. Mass. 1814); *Brown v. Jones*, 4 F. Cas. 404 (C.C.D. Mass. 1815).

[19] *Ex parte D'Olivera*, 7 F. Cas 853 (C.C.D. Mass. 1813). The Act of July 20, 1790, ch. 29, § 7 allowed an employer to have a seaman or mariner held in a "house of correction" if he deserted his ship during a voyage and while under contract.

[20] *Wells v. Neville*, 29 F. Cas. 674 (C.C.D. Pa. 1818).

Going beyond express statutory references, Defendants searched for informer-related litigation arising between 1789 and 1820, reviewing hundreds of cases that hit upon broad search terms.[21] Despite the search's breadth, Defendants identified only two reported decisions that expressly involved informer-led litigation on the United States' behalf.[22] In one, *Evans v. Bollen*, 8 F. Cas. 836 (C.C.D. Pa. 1800), an informer brought a *qui tam* action for the United States against a defendant who violated a statutory prohibition against "the carrying on the slave trade, from the United States to any foreign place or country." *Id.* at 837 (citing Act of March 22, 1794). In the second, an informer brought a *qui tam* action arguing that a vessel was illegally outfitted within the jurisdiction of the United States. *Ketland v. The Cassius*, 2 U.S. (2 Dall.) 365 (C.C.D. Pa. 1796). That is all: two reported cases from 1789 to 1820.

In just two other cases that Defendants found, private uninjured individuals may have enforced federal law for a bounty, albeit not expressly on the United States' behalf. *See Tryphenia v. Harrison*, 24 F. Cas. 252 (C.C.D. Pa. 1806) (reversing sentence for unlawfully engaging in slave trade under Act of March 22, 1794); *Coxe v. Pennington*, 6 F. Cas. 692 (C.C.D. Pa. 1803) (plaintiff sued over applicability of tax provision to refined sugar under Act of June 5, 1794's informer provisions for non-payment of taxes). Beyond those, however, Defendant's broad search of all reported

---

[21] This search again used HeinOnline's "Early American Case Law" database. Defendants conducted a key word search using the following terms: "informer," "person giving such information," "the other half," "moiety," "person prosecuting," "persons informing," "qui tam," "on behalf of the United States," or "instituted on behalf of the United States." At least one of the terms or phrases appeared in nearly all informer statutes from the 1790s.

[22] It is unclear whether *Adams v. Woods*, 6 U.S. (2 Cranch) 336 (1805) was informer-led.

cases uncovered no other cases involving private individuals, who lacked a personal injury, litigating a claim to enforce federal law.

Indeed, most early informer-related cases identified through Defendants' research bore no resemblance whatsoever to modern *qui tam* litigation. Some reported cases involve the *government*—rather than a private individual—suing or prosecuting under statutes that provided a cause of action both to the government and informers. *See*, *e.g.*, *The Bolina*, 3 F. Cas. 811 (C.C.D. Mass. 1812) (seizure action); *United States v. Burr*, 25 F. Cas. 1 (C.C.D. Ky. 1806) (criminal prosecution).[23] Other decisions involved informers (or other parties) suing over unpaid bounties but without indication they had prosecuted the underlying cause of action for the government. *See Sawyer v. Steele*, 21 F. Cas. 586 (C.C.D. Pa. 1818); *Sawyer v. Steele*, 21 F. Cas. 583 (C.C.E.D. Pa. 1819); *The Langdon Cheeves & The Caledonian* (*Ex parte Cahoone*), 14 F. Cas. 1112 (C.C.D.R.I. 1820); *see also Ex parte Marquand*, 16 F. Cas. 776 (C.C.D. Mass. 1815) (collector sues marshal for possession of fines paid to court for distribution under informer statute). These cases would be akin to a modern-day IRS whistleblower suing to recover his or her share of a bounty and are not relevant analogs.

The opposition briefs only underscore how sparse is the history of relevant *qui tam* enforcement. The government chiefly relies on an essay discussing early

---

[23] *See also, e.g.*, *United States v. Smith*, 27 F. Cas. 1186 (C.C.D.N.Y. 1806) (criminal prosecution); *United States v. Workman*, 28 F. Cas. 771 (C.C.D. La. 1807) (criminal prosecution); *United States v. Smith*, 27 F. Cas. 1246 (C.C.D. Pa. 1811); *Ex parte Needham*, 17 F. Cas. 1274 (C.C.D. Pa. 1817) (habeas corpus petition related to informer statute); *United States v. Malebran*, 26 F. Cas. 1145 (C.C.D.N.Y. 1820) (criminal prosecution).

11

enforcement of the Slave Trade Act of 1794. ECF No. 260 at 4-7. The essay's appendix, however, reflects that most of the cases identified involved the United States as the lead or sole plaintiff, where the only recorded attorneys of record were federal district attorneys, and where (for a majority of cases) no informer was identified.[24] These are not relevant analogs; if anything, they show that *the government* actively enforced federal laws that had informer provisions.

Beyond that, the government cobbles together a few other Slave Trade Act cases through the mid-1800s, *see* ECF No. 260, at 8-9; a few cases involving copyright enforcement, primarily by injured plaintiffs, *id.* at 10-11; and a few cases involving other statutes decided in the mid-1800s, long past the Framing and not all involving relevant analogs, *id.* at 12.[25] For its part, TAF cites a collection of cases filed from nearly 100 years after the Framing (1866-1891) that involved a "Moiety Award," but offers no evidence that those cases involved an informer who actually litigated the government's claim, rather than simply received a bounty. ECF No. 261 at 6. That the opposition reach so far to make their case speaks volumes.

Contrary to the opposition's claims, the lack of evidence is not explained by pointing to challenges in researching early enforcement cases. *See* ECF 260 n.5. Numerous scholars have studied the topic, yet none has shown a widespread pattern of uninjured individuals litigating the government's claims. As Defendants' research

---

[24] *See* James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in a Partisan World*, 92 Fordham L. Rev. 469, 493-98 & nn. 196-219 (2023).

[25] The government cites *The Emulous*, 8 F. Cas. 697 (C.C.D. Mass. 1813), but it involved a *district attorney*'s action for forfeiture after a citizen initially seized the cargo—not a *qui tam* action.

shows, there are readily accessible databases of thousands of early reported federal cases. There is no reason to think those reported cases are not representative of early enforcement activity, yet those reported cases show hardly any relevant *qui tam* suits.

In sum, the scant early enforcement history does not suffice to show that the Constitution's original public meaning permitted private individuals to wield core Executive authority—a result that contradicts established Supreme Court decisions elucidating that meaning. At best, the early reported decisions indicate only that there were a few, scattered incidents of a hold-over practice from England, at a time when the Executive branch was still being established, and the conflict that *qui tam* practice poses to the separation of powers was not yet recognized.

## IV. History Does Not Justify the FCA's *Qui Tam* Provisions

As Justice Thomas explained, "we should be especially careful not to overread the early history of federal *qui tam* statutes given that the Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural departure from the English system of parliamentary supremacy." *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting). "[T]he early statutes are the kind to which the Court gives no weight— 'action . . . taken thoughtlessly, by force of long tradition and without regard to the problems posed.'" *Constitutionality of the Qui Tam Provisions of the False Claims Act*, *supra* at 214 (quoting *Marsh*, 463 U.S. at 791).

The lack of consideration of *qui tam* actions makes the subsequent diminishment of *qui tam* actions all the more pertinent. "At most, . . . the early qui tam statutes provide some legislative precedents that arguably started the process of 'liquidating'

13

the Constitution's meaning on these debatable points." Woolhandler & Nelson, *supra* at 726. But the liquidation was never perfected. *See generally* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13-21 (2019). "By 1799 the tide had begun to turn against informers," and Congress enacted reforms to curb informer abuses. White, *supra* at 417. "By the turn of the twentieth century, qui tam statutes had largely fallen into disuse in this country." Charles Doyle, Cong. Rsch. Serv., R40785, *Qui Tam: The False Claims Act and Related Federal Statutes* at 6 (Apr. 26, 2021).

There has been no "open, widespread, and unchallenged" practice of *qui tam* litigation "since the early days of the Republic." *Bruen*, 597 U.S. at 36 (citation omitted). The FCA itself was essentially dormant from the 1880s until World War II, used briefly during World War II, and then returned to obscurity until the 1986 Amendments.[26] Robust *qui tam* litigation in the United States only started in 1986 in the modern regulatory FCA and has been disputed on constitutional grounds since.

Our legal tradition has abandoned *qui tam* in other ways. "[T]he English legal system made . . . extensive use" of private *criminal* prosecutions, and this tradition "carried over to the English colonies . . . and persisted . . . after the Constitution went into effect." John D. Bessler, *Private Prosecution in America* 125 (2022). The First Congress enacted at least one informer provision allowing an informer to prosecute and collect a bounty "for criminal larceny or receipt of stolen goods." *Stevens*, 529 U.S. at 777 n.6 (citing Act of Apr. 30, 1790, ch. 9, §§ 16, 17, 1 Stat. 116). Likewise,

---

[26] *See* Boese & Baruch, *Civil False Claims & Qui Tam Actions* § 1.01[A], [B]; S. Rep. No. 110-507, at 3 (2008) (noting that "only about six to ten FCA cases [were] filed per year" from 1943 through 1986).

14

"citizens in the first years under the Constitution evidently presented evidence of crimes directly to the grand jury." Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 292 (1989).

If "the historical practice of qui tam is per se constitutional because of its pedigree, then we must accept the entire practice as it actually existed, not merely those aspects of it that seem least objectionable to modem sensibilities." *Constitutionality of the Qui Tam Provisions of the False Claims Act*, *supra* at 236 n.21. But courts today would not countenance private federal prosecutions or involvement in grand jury proceedings. *In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997); *accord United States v. Ucciferri*, 960 F.2d 953, 954 (11th Cir. 1992). Far from being "part of the fabric of our society," *Marsh*, 463 U.S. at 792, the *qui tam* device is an anachronism abandoned by our legal tradition until the FCA revived it less than forty years ago.

In the end, "[t]he Constitution does not leave to speculation who is to administer the laws enacted by Congress." *Printz*, 521 U.S. at 922. And "[a] lawsuit is the ultimate remedy for a breach of the law" entrusted "to the President." *Buckley v. Valeo*, 424 U.S. 1, 138 (1976). The President must have authority to remove and supervise those who litigate on the United States' behalf, and such persons must be appointed in accordance with the Appointments Clause. The FCA's *qui tam* provisions violate these principles, and history does not warrant a different result.

## CONCLUSION

This Court should grant Defendants' Motion for Judgment on the Pleadings or to Dismiss for Lack of Subject-Matter Jurisdiction.

Dated this 21st day of May, 2024

Respectfully submitted,

*/s/ Scott Drake*
Scott Drake (Lead Counsel)*
O'MELVENY & MYERS LLP
2501 North Harwood Street, Suite 1700
Dallas, TX 75201
(972) 360-1915
(972) 360-1901 (fax)
sdrake@omm.com

Benjamin D. Singer*
Amanda M. Santella*
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
(202) 383-5414 (fax)
bsinger@omm.com
asantella@omm.com

Elizabeth M. Bock*
Elizabeth A. Arias*
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000
(213) 430-6407 (fax)
ebock@omm.com
earias@omm.com

Ginger Boyd
Fla. Bar No. 294550
NELSON MULLINS RILEY &
SCARBOROUGH LLP
215 South Monroe Street, Suite 400
Tallahassee, FL 32301
(850) 205-3356
(850) 521-1472 (fax)
Ginger.Boyd@nelsonmullins.com

*Counsel for Defendants Freedom Health, Inc. and Optimum Healthcare, Inc.*

*/s/ Jason P. Mehta*
Jason P. Mehta (FBN: 106110)
Lauren L. Valiente (FBN: 034775)
Joseph W. Swanson (FBN: 29618)FOLEY & LARDNER LLP
100 North Tampa Street, Suite 2700
Tampa, FL  33602-5810
Telephone:  813-229-2300
Facsimile:  813-221-4210
Primary Email:  jmehta@foley.com
Secondary Email:  dmills@foley.com
Primary Email: lvaliente@foley.com
Secondary Email: dguillen@foley.com
Primary Email: joe.swanson@foley.com
Secondary Email: dmills@foley.com

Matthew D. Krueger*
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI  53202
Telephone:  414-297-4587
Primary Email:  mkrueger@foley.com

Priyanka Ghosh-Murthy
(FBN#: 85913)
1300 Riverplace Blvd Ste 605
Jacksonville, FL 32207-9018
Email: priyanka.ghosh@gmail.com
Telephone: 305-812-4986

*Counsel for Defendants Physician Partners, LLC; Florida Medical Associates, LLC d/b/a VIPcare; and Anion Technologies, LLC*

*\* admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

/s/ Jason P. Mehta
Jason P. Mehta (FBN: 106110)