## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA
ex rel. DR. CLARISSA ZAFIROV,

       Plaintiff/Relator,

v.

FLORIDA MEDICAL ASSOCIATES, LLC, d/b/a
VIPCARE; PHYSICIAN PARTNERS, LLC; ANION
TECHNOLOGIES, LLC; FREEDOM HEALTH, INC.;
and OPTIMUM HEALTHCARE, INC.,

       Defendants.

Case No. 8:19-cv-01236

## PROVIDER DEFENDANTS' RESPONSE IN OPPOSITION TO RELATOR'S MOTION TO COMPEL DISCOVERY AND FOR SANCTIONS

Physician Partners, LLC, Florida Medical Associates, LLC d/b/a VIPcare, and Anion Technologies, LLC ("Provider Defendants") oppose Relator Zafirov's Motion to Compel Discovery and Motion for Sanctions (the "Motion" or "Mot.") (Dkt. No. 281). As she has done in her other discovery motions, Relator overstates what she contends has not been produced, ignores the enormous amount of discovery that has been produced to her, and glosses over her own delays and shortcomings in discovery. Like her other discovery motions, this Motion should be denied.

Relator leads off her brief by claiming that "Provider Defendants have flatly refused production of **any** of the responsive medical records" (Mot. at 2), but then admits that Provider Defendants have produced at least "15,000 pages" of responsive medical records. (*Id.* at 4.) Provider Defendants have in fact produced **all** available medical records for **all** the patients whose claims and diagnoses Relator has identified as

1

allegedly false in her complaint.[1] (Mehta Decl. at ¶ 2, attached hereto as Ex. 1.) Defendants have been trying for over a year to get Relator to identify any other patients whose diagnoses she contends are false in response to Interrogatory No. 1 served on her in January 2023, an entirely fair request since Relator alleges she had full access to all medical records and all claims data while employed by VIPcare (Dkt. No. 86 ¶¶ 13-15, 20, 145), and Defendants produced claims data to her over three months ago. Rather than identifying any other patients at issue during the 19 months she has had for fact discovery, all Relator provided, at the eleventh hour on the last day of fact discovery, is the circular response that every claim "where the diagnosis was not supported by the medical record is a false claim." (Mehta Decl., Ex. 1.) Relator advances the straw-man argument that "Provider Defendants will only produce medical records once Relator *establishes the falsity of* the underlying claims" (Mot. at 2), but all Defendants ask Relator to do is identify which claims she *contends* are false and why, which she has not done.

Provider Defendants offered in *December 2023* to produce medical records for up to 100 more patients, and then offered to increase it to up to 150 patients. (Mehta Decl. at ¶ 4, Ex. B.)[2] But Relator waited until May 15, 2024, just two weeks before the close of fact discovery, to request *1,200* patients' medical records (with 600 "alternates")—most

---

[1] Unless otherwise noted, all emphasis herein is supplied, and citations and quotations are omitted.

[2] This would have been for Freedom's 2015-2016 time period, though the same numbers could be used to extend into 2017-2020, as many patients are seen across multiple years. Provider Defendants continue to reserve all arguments regarding Relator's attempt to use statistical sampling and extrapolation, which Relator has not supported and which Provider Defendants do not believe is appropriate in this case. *See, e.g., U.S. v. Long Grove Manor, Inc.*, No. 10 C 368, 2019 WL 2774149, at *9 (N.D. Ill. July 2, 2019) (rejecting reliance on "statistical evidence" because "a relator must present evidence that a specific claim has actually been submitted.").

of whom were patients of non-party affiliate providers, the subject of another Relator motion to compel. (*Id.* at ¶ 4, Ex. D.)[3] Provider Defendants estimate that 1,200 patients' records would be about *1 million* pages of medical records and would take between *2,400 and 4,800 hours* to collect and produce. (Moorthy Decl. at ¶ 5, attached hereto as Ex. 2.) Assuming 5 employees dedicated 8 hours per day, it would then take anywhere between 60 to 120 days to simply get the records into Relator's hands. (*Id.* at ¶ 6.)

Relator is not permitted to go fishing for new alleged false claims not pled with particularity in her complaint, particularly because Relator admits she had "open access to [Freedom's] billing records" (Dkt. No. 86 at ¶ 191) which allegedly permitted her to "trace the false claims alleged in this case from 'cradle to grave." (*Id.* at ¶ 15.) *See also* Zafirov Rough Tr. at 182-205 (discussing the documents and records Relator had available to her when preparing the complaint).[4] Even the case law Relator cites in her Motion requires Relator to provide the basis for how these 1,200 patients' claims are "substantially similar to [those] described in the complaint and that similarly fit the pattern of conduct on which the complaint is focused." Mot. at 11 (quoting *U.S. ex rel. McCartor v. Rolls-Royce Corp.*, 2013 U.S. Dist. LEXIS 136387, at * 19 (S.D. Ind. Sept. 24, 2013)). But the Motion does nothing of the sort—Relator does not say a word about who these patients are, how they were selected, whether and what statistical

---

[3] As set forth in Provider Defendants' Response to Relator's Motion to Compel Discovery Regarding Affiliated Providers (Dkt. No. 193), Relator did not plead even one exemplar of a claim submitted by Provider Defendants on behalf of a non-party affiliated physician, much less a false claim. And affiliate physicians are the ones who select diagnosis codes on over 20 different types of electronic medical records ("EMR") systems, which Provider Defendants might not even be able to access. (*Id.* at 5.)

[4] Relator's deposition transcript pages are attached to Provider Defendants' pending Motion to Seal.

methodology was used or not used, whether she contends that claims relating to these patients were false or why, or how claims for their treatment are substantially similar to those described in the complaint and similarly fit the pattern of conduct on which her complaint is focused. Relator is therefore not entitled to these 1,200 patients' medical records, much less to *all* medical records for *all* patients, as she argues—***189,000-member-years'*** worth of records. (Mot. at 5, 9-11.) This Court previously ruled in denying Relator's first motion to compel that "discovery should be limited and tailored to the specificity of the complaint" (Order, Dkt. No. 169 at 5), which is precisely what Defendants have produced. The 17,931 pages of medical records Provider Defendants produced (Mehta Decl. at ¶ 2) for the patients Relator identified as being the subject of allegedly false claims are more than enough.

Relator also complains that Provider Defendants have failed to produce training materials, surplus reports, and bootcamp scripts (Mot. at 15-17), but Provider Defendants *have* diligently produced those documents and confirmed as much to Relator. (Mehta Decl. at ¶ 5.) And while Relator claims that hyperlinked documents were not produced in purported violation of the parties' ESI protocol (Mot. at 17-20), Provider Defendants have produced over 770 of those very documents (Mehta Decl. at ¶ 6), the ESI Protocol and the case law do not require production of hyperlinked documents, and Relator is the one who did not comply with the ESI Protocol by failing to comply with the conditions precedent to filing a motion to compel. Moreover, Relator's Motion to compel responses to her third set of document requests, which

4

Provider Defendants had not even responded to when Relator filed her Motion and which Relator did not meet and confer about, should be summarily denied.

Finally, the Court should deny Relator's baseless motion for sanctions for alleged bad faith regarding Physician Partners' inadvertent non-retention of certain cloud recordings of Zoom Quality Huddles that Relator participated in years ago. Relator asserts that she requested "those precise recordings" and "these exact material" in her first Requests for Production ("RFP") (Mot. at 3, 20). This is not accurate. Relator's RFP No. 22 asked for Five Star University videos, and her RFP No. 25 asked for audiovisual recordings of trainings, meetings, or boot camps discussing Medicare Advantage risk adjustment, diagnosis coding, or 5 Star Checklists, and Provider Defendants produced 139 such videos. (Mehta Decl. at ¶ 12.) Neither of these requests asked for cloud recordings of Zoom Quality Huddles, though Zafirov herself participated in Zoom Quality Huddles and therefore knew of them for years. Zafirov did not identify cloud recordings of Zoom Quality Huddles as being part of what she was requesting until May 2, 2024. And Provider Defendants answered her questions, produced the litigation holds, and produced a Rule 30(b)(6) witness to answer deposition questions under oath about the inadvertent non-retention.

Specifically, as Provider Defendants informed Relator on May 6, 2024, Physician Partners understands from its IT personnel that, unconnected from anything having to do with Relator or this or any other litigation, a Physician Partners IT consultant cleared out certain Zoom cloud recording storage to free up storage space and that the recordings are no longer available from Zoom or anywhere else. (Mehta Decl. at ¶ 9.)

5

Provider Defendants issued a litigation hold to Physician Partners' IT department in September 2020, requiring IT to preserve "recordings related to any allegation related to the Action." (*Id.* at ¶¶ 8-9, Ex. E.) Provider Defendants followed up to ensure receipt of IT's written Certification of Receipt of and Compliance with Document Hold, signed by Amit Patel, then Physician Partners' Vice President of IT, on September 14, 2020. (*Id.*)

Thereafter, in October 2020, Physician Partners entered into a consulting agreement with Evgeny Koloda, a senior IT specialist. (Koloda Decl. at ¶ 4, attached hereto as Exhibit 3.) Koloda was a consultant for Physician Partners until October 2023, when he became Senior IT Director. (*Id.* at ¶ 5.) From October 2020 through October 2023, Mr. Koloda handled many of Physician Partners' IT functions previously handled by Amit Patel. (*Id.* at ¶ 4.) While he was a consultant prior to entering his role as Senior IT Director, Mr. Koloda did not receive a copy of the litigation hold for his case. (*Id.* at ¶ 6.) Although Koloda does not recall doing so, nearly three years later on August 28, 2023, Koloda or someone using Koloda's administrative access apparently cleared out cloud recording storage that included all Zoom recordings prior to January 3, 2020. (*Id.* at ¶ 7.) Koloda was not aware of this litigation in August 2023, and this clearing out of storage was not directed at Relator, Zoom Quality Huddles with Relator, or anything having to do with this or any other litigation. (*Id.* at ¶ 8.) Provider Defendants explored all possible technical resources to try to recover Zoom recordings, including contacting Zoom, but were told by Zoom that there is no way to retrieve them. (*Id.* at ¶ 9.)

Relator's assertions of "bad faith" and that "no effort was taken" to preserve documents are wholly unsupported. And she did not request "these exact materials" in

6

her RFPs, instead requesting them for the first time on May 2, 2024, though Relator participated in the Zoom Quality Huddles years earlier. Provider Defendants offered Relator the opportunity, which she took, to question witnesses about the recordings and non-retention.[5] There was no bad faith, and the non-retention was inadvertent and wholly unrelated to this case. Relator participated in the Zoom Quality Huddles and knows what was communicated in them. Relator offers nothing to support that her inability to prove her case has anything to do with the non-retention of these cloud recordings. Relator's Motion should be denied.

## ARGUMENT

### I.   Discovery in FCA Cases is Bound to Facts Pleaded with Particularity, and Relator Cannot Use Discovery to Go Fish for New Alleged False Claims.

Discovery is proper only if it is both "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "The party moving to compel discovery has the initial burden of proving the requested discovery is relevant and proportional." *U.S. ex rel. Rosen v. Exact Scis. Corp.*, 2023 WL 1798258, at *1 (M.D. Fla. Feb. 7, 2023). Parties "have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2000 amendment.

A "relator may not assert new theories of liability based on information learned during discovery," including about new alleged false claims not identified in

---

[5] Provider Defendants produced a Rule 30(b)(6) witness to testify under oath about the cloud recordings of Zoom Quality Huddles. (Mehta Decl. at ¶¶ 10, 14, Ex. F (Barber Rough Tr. at 83-92).) The 30(b)(6) witness answered Relator's questions not only about the circumstances of the non-retention, but also about the substance of the Zoom Quality Huddles, such as who would have attended the Zoom Quality Huddles with Relator and when they were recorded and why. (*Id.*)

the relator's complaint. *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 116 F. Supp. 3d 1326, 1341 (S.D. Fla. 2015), *aff'd as modified*, 857 F.3d 1148 (11th Cir. 2017). In *Phalp*, the court granted defendants' motion for partial summary judgment on the exemplar claims pleaded in the complaint. *Id.* The relators sought to supplement with new exemplars, including several they learned about through discovery, and argued that they could not prove more false claims only because defendants refused to produce more in discovery. *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 2016 WL 3961840, at *10 (S.D. Fla. Jan. 11, 2016), *aff'd*, 857 F.3d 1148 (11th Cir. 2017). The court rejected relators' argument: "This deficiency cannot, as Relators suggest, be attributed solely to Defendants' failure to produce discovery because a relator has an obligation to identify and articulate the foundational elements of the fraud with specificity at the time of filing the complaint. Qui tam cases are distinguished from other legal actions in that relator-plaintiffs must possess this information ***before*** discovery has taken place." 2016 WL 3961840, at *10 (emphasis in original) (citing *U.S. ex rel. Keeler v. Eisai, Inc.*, 568 Fed. Appx. 783, 806 (11th Cir. 2014)).[6]

---

[6] The court in *Phalp* distinguished the same case law Relator relies on in her Motion, *U.S. ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457 (5th Cir. 2015), because in *Rigsby*, the relators survived summary judgment scrutiny before proceeding to a jury trial, where "the Rigsbys **prevailed** on a single bellwether false claim under the FCA." 2016 WL 3961840, at *11 (emphasis in original). The court in *Phalp* pointed out that the Fifth Circuit in *Rigsby* allowed discovery into additional false claims not alleged in the complaint only because in that case "'our decision hinges in large part on the idiosyncratic nature of this case—seldom will a relator in an FCA case present an **already-rendered jury verdict in her favor** while seeking further discovery.'" *Id.* (emphasis in original). Although the court in *Phalp* ruled on the new exemplars, the court made clear that "the stringent requirements of *Clausen*" remain in the Eleventh Circuit, *id.* at *10-11, which require a relator to plead false claims with specificity before getting a "ticket to the discovery" of them. *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1307 (11th Cir. 2002).

As this Court ruled in denying Zafirov's first motion to compel, a relator's specific examples "will support more generalized allegations of fraud only to the extent that the relator's examples are ***representative samples*** of the broader class of claims." *U.S. ex rel. Zafirov v. Physician Partners, LLC*, 2023 WL 8254360, *2 (M.D. Fla. Nov. 29, 2023) (emphasis in original). And as Relator concedes, discovery must be limited to conduct "substantially similar to [that] described in the complaint and that similarly fit[s] the pattern of conduct on which the complaint is focused." (Mot. at 11, quoting *U.S. ex rel. McCartor v. Rolls-Royce Corp.*, 2013 U.S. Dist. LEXIS 136387, *19 (S.D. Ind. Sept. 24, 2013)). Relator has failed to show how her patient exemplars in her complaint "are representative samples of the broader class of claims" or are "substantially similar to" or fitting "the pattern of conduct on which the complaint is focused" regarding the 1,200 patients in her list. She has not carried her burden to get discovery of these 1,200 patients' records for the reasons set forth in Sections III-V below, much less "all" medical records as discussed in Section II.

## II.    Relator Is Certainly Not Entitled to "All Medical Records."

As an initial matter, Relator takes the remarkable position that because the Amended Complaint survived a motion to dismiss, Relator is entitled to "all medical records." (Mot. at 9-11.) In FCA cases, the scope of discovery is "guided . . . by the principles behind Rule 9(b)," especially in declined *qui tams* like this one, because "the right of action granted to private citizens to bring *qui tam* actions on behalf of the United States is quite limited." *U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, 2008 WL 4057549, at *1 (M.D. Fla. Aug. 27, 2008). As the Court explained in

*Bane* in rejecting the relator's argument for expansive discovery because his claims "survived Defendants' motion to dismiss" (as Relator argues here), the Court "must still be guided by Rule 9(b)'s parameters and discovery should still be limited to the constraints of the Relator's allegations." *Id.* n.2. Courts require that any "allegedly false claims at issue must be narrowed in time" to "avoid potentially large costs associated with investigating every claim for every identified physician." *U.S. ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, 2019 U.S. Dist. LEXIS 56510, at *7-8 (D. Minn. Apr. 2, 2019), *report and rec. adopted*, 2019 U.S. Dist. LEXIS 120727.

Relator fails to identify any allegation in the Amended Complaint, pleaded with specificity or otherwise, that supports that the purported "scheme" she alleges extends to *every* claim ever submitted for *every* patient ever seen by a physician employed by *or* affiliated with the Provider Defendants. Without any articulated link between Relator's request for "all" medical records and the allegations in the Amended Complaint, Relator is clearly not entitled to every medical record for ***189,000-member-years***. (Mot. at 5, 9-11.) Permitting Relator to take such expansive discovery unbound by the particularized allegations in the Amended Complaint would fly in the face of Eleventh Circuit precedent. *See U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (if relator is given a "ticket to the discovery process" that is unbound by relator's particularized allegations of false claim submissions, the relator "will request production of every claim submitted by the Defendant during the time period corresponding to Plaintiff's claims").

10

Ignoring this precedent and any reasonable bounds of proportional discovery, Relator argues she is entitled to "all" medical records because all such records are within "the full scope of the allegations in the complaint" (Mot. at 11) and because requiring her to establish the falsity of the underlying claims is a "cart before the horse" demand. *Id.* at 2. But Provider Defendants are not arguing that Relator must establish the falsity of the underlying claims before she gets discovery of them, only that she must provide a real answer to Interrogatory No. 1 and identify which claims Relator contends are false and why, which she has not done. As the court directed in *Phalp*, "a relator has an obligation to identify and articulate the foundational elements of the fraud with specificity at the time of filing the complaint" and "must possess this information **before** discovery has taken place," rather than trying to fish for additional alleged false claims through the discovery process. *Phalp*, 2016 WL 3961840, at *10.

## III. Relator's Purported "Sample" of 1,200 Patients Is Unexplained and Untethered to Any Allegations in the Amended Complaint.

After months of asking Relator to identify any alleged false claims beyond the 20 patient exemplars in the Amended Complaint, with only two weeks left in discovery, Relator sent a list of 1,200 patients (and 600 "alternates") for which Relator demanded production of medical records. (Mehta Decl. at ¶ 4, Ex. C.) The "sample" was not negotiated by the parties, and Relator provides no explanation in her Motion for how her expert selected the sample size or identified the sample members.

Relator offers nothing to show how her exemplars of patients in her complaint "are representative samples of the broader class of claims" or are "substantially similar

to" or fitting "the pattern of conduct on which the complaint is focused" regarding the 1,200 patients in her list. *Zafirov,* 2023 WL 8254360, at *2-3; *McCartor*, 2013 U.S. Dist. LEXIS 136387, at *19. Fatal to Relator's proposed "sample" is Relator's failure to offer *any* explanation or link in her Motion between the 1,200 "sample" members (or the 600 "alternates") and the specific patient exemplars in the Amended Complaint. Instead, she simply hangs her hat on the flawed notion that she is entitled to this expansive discovery because her Amended Complaint survived dismissal and she can therefore seek discovery concerning any patient treated by any physician over a multi-year period. But this notion is contrary to well-established precedent, and her Motion should be denied. *See, e.g., Bane*, 2008 WL 4057549, at *1 n.2 (rejecting relator's argument that expansive discovery was warranted because his claims "survived Defendants' motion to dismiss," holding that the Court "must still be guided by Rule 9(b)'s parameters and discovery should still be limited to the constraints of the Relator's allegations").

## IV.   Requiring Production of 1,200 Patients' Records Is Unduly Burdensome.

Zafirov seeks medical records for 1,200 patients, without any explanation or link in her Motion between those 1,200 patients and the patients or allegations identified in the Amended Complaint. By Provider Defendants' estimate, based on what it took to produce the medical records they have produced to date, this would implicate approximately ***one million pages*** of medical records that would take between ***2,400 and 4,800 hours*** to collect and produce from the different sources that would need to be accessed. (Moorthy Decl. ¶¶ 4-5.)

Moreover, the majority of these patients were exclusively treated by non-party affiliate physicians, the subject of another of Relator's motions to compel. While employed physicians like Zafirov were required to use eClinical Works EMR software, affiliate physicians were free to choose their own EMR from the many options on the market. *See* Dkt. No. 193 at 13. Requiring the collection, review, and production of an enormous amount of materials from 20 or more different types of EMR systems for hundreds of physicians and over a thousand patients who have no demonstrated similarity to the patient exemplars in the Amended Complaint is unduly burdensome, not proportional, and would cost the Provider Defendants hundreds of thousands of dollars. (Moorthy Decl. at ¶¶ 4;7.)

Even in cases where there is an articulated need for the discovery sought, which Relator has not provided here, courts order parties to "narrow the scope of Plaintiff's requests" to "reduce the expense and time required to produce responsive documents." *McPherson v. Fla. Dep't of Corr.*, 2020 WL 7020373, at *2-3 (N.D. Fla. Apr. 2, 2020). And so, in cases like this one, where significant burdens are implicated by each additional patient's records, "discovery must hew closely to matters specifically described in the complaint lest discovery, because of its burden and expense, become the centerpiece of litigation strategy." *McCartor*, 2013 U.S. Dist. LEXIS 136387 at *20.

## V.   Relator Failed to Follow Up on Provider Defendants' Offers in 2023 to Produce a Reasonable Number of Additional Medical Records.

While Provider Defendants believe Relator's 1,200 patient discovery demand is unreasonable and unrelated to the allegations in the Amended Complaint,

Provider Defendants have not, as Relator's Motion incorrectly asserts, "flatly refused production of any of the responsive medical records." (Mot. at 2.) Provider Defendants have produced 17,931 pages of medical records for patients Relator has identified as being the subject of allegedly false claims (Mehta Decl. at ¶ 2), and Relator's Motion ignores the offers Provider Defendants made in December 2023 to produce a reasonable amount of additional patients' medical records.

On December 12, 2023, Provider Defendants' counsel offered to produce an additional 100 patients' medical records (for Freedom's 2015-2016 time period, though the same numbers could be used to extend into 2017-2020, as many patients are seen across multiple years). (Mehta Decl. at ¶ 4., Ex. B.) When Relator's counsel would not commit to 100 more patients, Provider Defendants proposed an additional 50 patients for a total of 150 additional patients' medical records for that period. (*Id.*) But Relator declined these offers and decided to "move forward without reaching a stipulation" to the number of patients and instead said Relator would seek medical records first from Freedom/Optimum and then from Physician Partners, "and we can tackle any objections at that point." (*Id.*, Ex. C) However, Relator did not do any of that in the ensuing six months, instead waiting until there was just two weeks left in fact discovery to send a list of 1,200 patients and 600 alternates, ten times the number of patients Provider Defendants proposed. (*Id.,* Ex. D) Relator should not get rewarded for her dilatory behavior with a million pages of medical records for 1,200 patients requested at the end of fact discovery simply based on her say-so.

**VI.    Provider Defendants Produced Hyperlinked Documents, Which Were Not Mentioned in the ESI Protocol and Are Burdensome to Produce.**

Relator further contends that Provider Defendants refused to produce documents and document folders "hyperlinked" in emails. (Mot. at 18.) But this, like many of the Motion's other representations, is incorrect. During the parties' May 29, 2024 meet and confer, Provider Defendants' counsel stated that they would produce retrievable hyperlinked documents in their June 1, 2024 production, and they did. (Mehta Decl. at ¶ 6.) Contrary to Relator's assertion that the Provider Defendants failed to articulate the specific burden created by production, during that same meet and confer Provider Defendants' counsel also explained, in detail, the burden associated with manually collecting and reviewing additional hyperlinked documents. As Relator's Motion ignores, Provider Defendants expressed willingness to collect a reasonable set of additional hyperlinked documents identified by Relator that she believes may be relevant. Relator did not take Provider Defendants up on their offer and instead filed this Motion. (*Id.* at ¶ 7.) On June 1, 2024, Provider Defendants produced 770 hyperlinked documents, again provided Relator with an explanation of the burden, and reiterated their willingness to collect additional hyperlinked documents identified by Relator. Relator did not respond. (*Id.* at ¶ 6.)

Moreover, Relator's attempt to equate email attachments to hyperlinks within emails is misplaced in light of the parties' agreed-upon ESI protocol and the case law. The ESI protocol does not mention hyperlinks or contemplate that hyperlinks are attachments, and courts have rejected attempts to equate the two or to require

15

production of hyperlinks. *See, e.g., Nichols v. Noom Inc.*, 2021 WL 948646, at \*4 (S.D.N.Y. Mar. 11, 2021) ("the Court does not agree that a hyperlinked document is an attachment"); *Deibler v. SanMedica Int'l, LLC*, 2021 WL 6198062, at \*14 (D.N.J. Dec. 30, 2021) (finding no basis to compel where there was no indication that ESI protocol included hyperlinks); *In re Insulin Pricing Litig.*, 2024 WL 2808083 (D.N.J. May 28, 2024) (producing hyperlinks would be "unduly burdensome").[7] Relator's Motion to compel unidentified additional hyperlinked documents should be denied.

## VII.   Relator's Motion Violates the ESI Protocol.

The parties' agreed ESI Protocol requires that the moving party provide "(1) a written explanation of the disputing party's position, sent no later than ten days prior to the filing of any motion with the Court and (2) a telephonic meet-and-confer with opposing party no later than five days prior to the filing of any motion with the Court." In violation of the Protocol's requirements, Relator did not inform Provider Defendants of the issues alleged in her Motion until three days before filing it. Relator waited until May 26, 2024 to raise purported deficiencies that Relator allegedly discovered as a result of three depositions. Relator's untimeliness in raising these issues violates the ESI protocol, and any argument that she could not follow the Protocol falls flat, because these depositions were between April 16 and May 7.

Moreover, as Provider Defendants have repeatedly confirmed, the alleged "deficiencies" raised in the Motion are not deficiencies at all because Provider

---

[7] Relator mis-cites what occurred in *In re StubHub Refund Litigation* (Mot. at 19). In *StubHub*, **unlike** here, the ESI Protocol explicitly required production of "hyperlinks," and the court found good cause to **remove** that and **not** require production of hyperlinked documents because of the difficulty of doing so. Case No. 20-md-02951, 2024 WL 2305604, \*1-3 (N.D. Cal. May 20, 2024).

Defendants have produced all responsive documents Relator claims she learned of through depositions or confirmed that such documents do not exist. The Motion takes issue with the exclusion of certain "training materials" (Mot. at 2, 6-7, 16), but Provider Defendants have produced, and confirmed they produced, all responsive training materials they could locate, including boot camp scripts (such as PHYSPART_0000654 and PHYSPART_0004147). (Mehta Decl. at ¶ 5.) Likewise, Provider Defendants have produced and confirmed to Relator that they produced all "surplus reports" (such as PHYSPART_0021004 and PHYSPART_0029664). Relator's Motion also mentions an unidentified spreadsheet Sajitha Johnson testified about, which Provider Defendants located and produced. (*Id.* at ¶ 13.) And as to the "templates" Relator demands, there is nothing to compel because, during 2017-2020, Provider Defendants did not create or provide to physicians such templates for procedures. (Moorthy Decl. at ¶ 8.) Relator's Motion should be denied, both as untimely under the ESI Protocol and because there is nothing more to compel.

## VIII. The Non-Retention of Zoom Huddle Recordings Was Inadvertent, and Relator Cannot Show Bad Faith or Resulting Inability to Prove Her Case.

Relator argues the Provider Defendants "destroyed" recordings of Zafirov's Zoom Quality Huddles in "bad faith." (Mot. at 20-24.) But Relator fails to back up her accusation of bad faith destruction with any evidence, because there is none. As Relator's own cited case law confirms, "'[m]ere negligence' in losing or destroying [ ] records is not enough" to trigger the imposition of sanctions. *Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1280 (M.D. Fla. 2009) (quoting *Bashir v. Amtrak*, 119 F.3d 929,

17

931 (11th Cir.1997)). Instead, "an Eleventh Circuit requirement for imposing spoliation sanctions in Florida . . . [is] an affirmative showing of bad faith," *Com. Long Trad. Corp. v. Scottsdale Ins. Co.*, 2013 WL 1100063, at *1 (S.D. Fla. Mar. 15, 2013) (denying motion for sanctions), which requires something more than even gross negligence, such as affirmative intent "to harm the [plaintiff], obstruct the lawsuit, or conceal evidence." *AZ55S, LLC v. Flinsco.com, LLC*, 2023 WL 4564631, at *4 (S.D. Fla. June 30, 2023), *report and rec. adopted*, 2023 WL 4561628.

Relator has made no such showing and could not make such a showing. The recordings were inadvertently not retained, Physician Partners required signed certifications of litigation holds, and Provider Defendants diligently tried to recover the recordings from before January 3, 2020 but could not.[8] The loss of the recordings was due to "mere negligence," which does not warrant sanctions. *Swofford,* 671 F. Supp. 2d at 1280; *Traverse Ther. Servs., PLLC v. Sadler-Bridges Wellness Grp., PLLC*, 2024 WL 896168, at *2 (W.D. Wash. Mar. 1, 2024) (denying sanctions because there was "no evidence that the failure to retain the messages was willful or done with a culpable state of mind"). As in other cases in which the Eleventh Circuit affirmed denial of spoliation sanctions, "nothing in the record smacks of bad faith. Under these facts, [Provider Defendants'] explanation reasonably suggests that the [Zoom recordings were] not destroyed to hide adverse evidence. At most, [Relator] has

---

[8] Provider Defendants never had any Zoom Quality Huddle recordings with Relator from after January 3, 2020. (Mehta Decl. at ¶ 11.) Provider Defendants believe that any Zoom Quality Huddle recordings with physicians other than Relator from 2020 were neither requested in RFP Nos. 22 or 25 nor proportional to the needs of the case.

provided evidence that [Provider Defendants] were negligent" in disposing of the evidence at issue. *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1186 (11th Cir. 2020) ("the right hand not talking to the left is not the same thing as the right hand telling the left to destroy evidence").[9]

Moreover, as Relator notes, to prove spoliation, Relator must show "significant impairment in the ability to prove the lawsuit" and "a causal relationship between the evidence destruction and the inability to prove the lawsuit." Mot. at 21 (quoting *Swofford,* 671 F. Supp. 2d at 1280). But as Relator herself concedes, she cannot say for sure whether the Zoom Quality Huddle recordings would even help her case even though she attended them, stating only that they "***may*** be critical." (Mot. at 22.) This is plainly insufficient to establish spoliation sanctions in this Court, as Zafirov has not shown how they are so crucial to her case that she cannot win because of the non-retention. *See Seneca Ins. Co., Inc. v. Kumho Tire U.S.A., Inc.*, 2021 WL 2417673, at *4 (M.D. Fla. June 14, 2021) (denying sanctions where defendant failed to make required showing that destroyed evidence was "crucial to its case"); *Alonzo v. Biomet, Inc.*, 2023 WL 2815079, at *3 (S.D. Fla. Feb. 22, 2023) (recommending denial of spoliation sanctions where moving party failed to show bad faith or that evidence was crucial), *report and rec. adopted in part*, 2023 WL 2809920.

---

[9] This is especially true where, as here, the one who did not retain the potential evidence was a contractor. *See, e.g., 4DD Holdings, LLC v. U.S.*, 143 Fed. Cl. 118, 134 (2019) ("The contractors responsible for giving the 'go' for shredding similarly did not know the effect that decommissioning would have. This communication failure is undoubtedly negligent but falls short of the intentional behavior expected under Rule 37(e)(2).").

**IX.    Provider Defendants Had Not Even Responded to Relator's Third Set of Document Requests When Relator Moved to Compel, Much Less Met and Conferred, and Her "Placeholder" Motion Should Be Denied.**

Thirty days before the close of fact discovery, Relator served 22 Requests for Production on each Provider Defendant, along with dozens of Requests for Admission and Interrogatories. Before even receiving Provider Defendants' responses, much less meeting and conferring on them, Relator filed this Motion regarding her third set of document requests. This plainly violates the ESI Protocol, which requires the party demanding discovery to serve a written explanation of the disputing party's position ten days before filing a motion to compel and meet and confer at least five days before filing a motion to compel.

Relator knew the discovery motion deadline she was up against, but did not move the court to extend it, despite being well aware of the need to do so. Indeed, Relator's same counsel filed a motion to extend the discovery motions deadline in the *Mansour* case against Physician Partners, and Relator's counsel asked Provider Defendants to consent to the same motion here, which they did not. Relator failed to preserve her right to challenge Provider Defendants' responses to Relator's third set of document requests. Her "placeholder" motion on these requests should be denied.

Dated: June 12, 2024                          Respectfully submitted,

                                              *s/Jason P. Mehta*
                                              Jason P. Mehta
                                              Fl. Bar No. 106110
                                              Primary email: jmehta@foley.com
                                              Secondary email: dmills@foley.com

Lauren L. Valiente
Fl. Bar No. 034775
Primary email: lvaliente@foley.com
Secondary email: dguillen@foley.com

Joseph W. Swanson
Fl. Bar No. 29618
Primary email: joe.swanson@foley.com
Secondary email: dmills@foley.com

Michael P. Matthews
Fl. Bar No. 63988
Primary email: mmatthews@foley.com
Secondary email: dguillen@foley.com

Samantha Gerencir
Fla. Bar No. 1019553
Foley & Lardner LLP
Primary email:
samantha.gerencir@foley.com
Secondary email: dmills@foley.com

**Foley & Lardner LLP**
100 N. Tampa Street, Suite 2700
Tampa, FL 33602
Telephone: (813) 229-2300
Facsimile: (813) 221-4210

*Counsel for Defendant Physician Partners,*
*LLC, Florida Medical Associates, LLC d/b/a*
*VIPcare, and Anion Technologies, LLC*

4865-5311-4054.9