## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA
*ex rel.* DR. CLARISSA ZAFIROV,

      Plaintiff/Relator,

v.

PHYSICIAN PARTNERS, LLC;
FLORIDA MEDICAL ASSOCIATES,
LLC, d/b/a VIPCARE; ANION
TECHNOLOGIES, LLC; FREEDOM
HEALTH, INC.; and OPTIMUM
HEALTHCARE, INC.,

      Defendants.

Case No. 8:19-cv-01236-KKM-SPF

## DEFENDANTS FREEDOM HEALTH, INC. AND OPTIMUM HEALTHCARE, INC.'S OPPOSITION TO RELATOR'S MOTION TO COMPEL DISCOVERY FROM FREEDOM DEFENDANTS AND REQUEST <u>FOR ORAL ARGUMENT</u>

Defendants Freedom Health, Inc. and Optimum HealthCare, Inc. (collectively, "Freedom Defendants") oppose Relator Dr. Clarissa Zafirov's ("Relator") motion to compel (ECF 279, "Motion" or "Mot.").

This Motion is Relator's latest attempt to gin up a dispute sufficient to reopen discovery.  First, Relator's core demands for either every medical record or 1,200-1,800 "member years" of those records misapprehends Freedom Defendants' business.  As health insurers, Freedom Defendants do not treat patients and therefore do not create or maintain medical records in the normal course.  Freedom Defendants would first have to ask hundreds, if not thousands, of third-party medical providers to give them the records, before then producing them to Relator.  Relator's request seeks a universe of documents that Freedom Defendants do not possess, have no legal right to obtain, and could not possibly produce on any reasonable time scale—let alone in the two weeks remaining in discovery when Relator first identified her "sample."  Relator's request is also untethered to the specific allegations in her Complaint, as she seeks a boundless supply of medical records with which she (or more likely, her experts) may explore unspecified theories of false or fraudulent diagnosis codes—a patently improper use of discovery in a False Claims Act ("FCA") case.

Second, Relator raises other purported deficiencies, most of which she first raised just one business day before the close of fact discovery.  Freedom Defendants explained why Relator's contentions lacked merit before she filed this Motion, but Relator proceeded anyway (wrongly claiming, along the way, that Freedom Defendants never responded, *see* Mot. 6).  To the extent Relator's requests are proper,

Freedom Defendants have fully complied with their obligations, either by (1) already producing the requested discovery, or (2) searching for responsive documents based on the parties' agreements on responsiveness, search terms, and document custodians. Over 19 months, Freedom Defendants have expended substantial resources to comply with their discovery obligations, and Relator's Motion should be denied.

## I.   DISCOVERY BACKGROUND

Discovery in this case began with months-long negotiations over a protective order and ESI Protocol.  Decl. of Amanda M. Santella ISO Opposition ("Santella Decl."), Ex. A,[1] at 2 n.2; Ex. B (ESI Protocol).[2]  The parties also simultaneously negotiated the substantive scope of document discovery pursuant to Relator's First Set of RFPs, *see* ECF 279-1.  These negotiations also lasted months, culminating eventually in an agreement on each Request.  *See* Exs. C-D (memorializing parties' compromises).  The parties also negotiated extensively over custodians and search terms in accordance with the ESI Protocol,[3] and Freedom Defendants eventually produced 329,645 pages of documents, including six full years of encounter data submissions to the Centers for Medicaid and Medicare Services, plus 8,674 pages of

---

[1] All citations to Exhibits in this Opposition are to Exhibits attached to the Santella Declaration.

[2] Pertinent here, the ESI Protocol required the parties to share initial lists of custodians, after which the parties would "meet and confer if any Party reasonably believes that there are additional custodians likely to have unique, relevant information."  Ex. B, at 2. As to search terms, the ESI Protocol required the parties to share lists of proposed search terms, and permitted the requesting party to "provide additional search terms that it believes in good faith are necessary to identify responsive documents."  *Id.* at 3.  The ESI Protocol further contained a detailed dispute resolution provision, requiring negotiation about any purported deficiencies before permitting motions practice.  *Id.* at 10.

[3] Relator requested and received concessions through these negotiations—custodians were added at Relator's request, *see* Ex. A, at 2 n.2, and search terms were renegotiated after Freedom Defendants provided "hit counts" for various proposed search terms, *see id.* at 3-4 n.3.

documents obtained from third parties.  Santella Decl. ¶ 11.[4]

In December 2023, at Relator's request, Freedom Defendants agreed to extend the close of fact discovery to May 29, 2024.  *See* ECF Nos. 170-72.

On February 19, 2024, Relator served her Second Set of Requests for Production, to which Freedom Defendants timely responded on March 20, 2024.  *See* ECF 279-2.  Relator's Second RFPs included RFP 41, which requested "[a]ll medical and billing records related to any Physician Partners patient whose services were paid in whole or in part by any Government health insurance program."  *Id.*  As Relator's demand for every medical and billing record for 189,000 member years far exceeded what Freedom Defendants could possibly obtain and produce, Freedom Defendants did not agree to produce any documents they had not already produced.  *Id.*  Freedom Defendants objected based on overbreadth, burden, vagueness, and relevance, and as duplicative of an identical request to Provider Defendants.  *Id.*[5]

With discovery set to close on May 29, 2024, Relator began a series of moves to extend the deadline to which she had previously agreed.  First, on April 25, Relator sought a time-sensitive stay of discovery in light of the Defendants' pending dispositive motion.  ECF 242.  The Court denied Relator's motion on April 29, explaining that

---

[4] While Relator appears to fault Freedom Defendants for making their first substantive ESI production in January 2024 (*see* Mot. 3), that production occurred within six weeks of having reached agreement on search terms, and was preceded by various productions of non-custodial documents even before those search terms had been negotiated, *see* Santella Decl. ¶ 11.

[5] Relator's assertion that Freedom Defendants "refuse to produce any responsive records" even for the patients referenced in the Amended Complaint (Mot. 12) elides *the* critical fact—Freedom Defendants' production of medical records for those patients would be duplicative, because Provider Defendants have already produced their medical records to Relator.  *See* Santella Decl. ¶ 12.

the action had "been pending for almost five years," and that the parties had already "expended substantial resources to comply" with the Court's operative deadlines. ECF 245.  That same day, Relator served 59 new discovery requests on Freedom Defendants, including Relator's Third Set of RFPs.  Santella Decl. ¶ 13.  Freedom Defendants' responses to these requests, and any necessary document productions, would be due on the final day of the fact discovery period.  *Id.*  About two weeks later, on May 14, 2024, Relator filed a joint motion to stay other aspects of the case beyond fact discovery, reiterating to the Court that the "parties have agreed to complete fact discovery by May 29" subject to an exception for certain depositions.  ECF 252.

On May 15, the day after representing to the Court that the parties would complete fact discovery by May 29, Relator's counsel emailed Defendants concerning Relator's requests for 1,800 years of medical records.  *See* Ex. E.  Relator's counsel explained that Relator had "retained an expert to assist in creating a sample of patient records to ensure that the necessary request for medical records is proportional to the needs of the case," and identified a list of 1,800 "member years," from which a "sample" of 1,200 could be pulled.  *Id.*  The letter contained no information as to how Relator generated her sample, but Relator has subsequently explained that she started with a population of all "189,000 member years," took a random sample of those member years, and requested from both sets of Defendants the production of full medical records for at least 1,200 (of 1,800 total) member years.  *See* Mot. 4.[6]

---

[6] Relator demands that, to the extent any of the first 1,200 member years lack full medical records, Defendants supplement their production with another member year from the larger sample.  Mot. 4.

On May 20, Relator filed a second time-sensitive motion, this time seeking an emergency hearing to address purported deficiencies in Defendants' ESI document productions (some of which Relator raises again in this Motion), ECF 255.  The Court denied that motion, too.  *See* ECF 268.

On Sunday, May 26—one business day before the fact discovery deadline, because of the Memorial Day holiday—Relator sent a letter to Freedom Defendants outlining the purported deficiencies that would become the subject of this Motion.  *See* Ex. F.  On May 29, at approximately 9:32 pm ET, Freedom Defendants responded to Relator's May 26 letter.  *See* Exs. A, G.  Freedom Defendants' response explained why their discovery efforts had been sufficient, rebutted certain factual and legal assertions, and described *additional* efforts they had undertaken to supplement existing productions and discovery responses.  *See* Ex. A.  On this last day of fact discovery, Freedom Defendants also met their deadline to respond to Relator's outstanding discovery requests, and made additional document productions.  Santella Decl. ¶ 14.

Approximately twenty minutes after receiving the letter, Relator filed this Motion.  In the Motion, Relator stated that Freedom Defendants had "not responded to the May 26, 2024 letter nor offered availability for meet-and-confer," and cited "Freedom Defendants' failure to respond to multiple requests to engage in a meet-and-confer."  Mot. 6-7; *see also* Mot. 19 ("Freedom Defendants did not respond….").

## II.    LEGAL STANDARD

Discovery must be "relevant … and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in

controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  Parties may request documents within these parameters, but only when they are within the "responding party's possession, custody, or control."  Fed. R. Civ. P. 34(a)(1).  "Control" includes the "legal right to obtain the documents requested upon demand."  *See Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984).  While courts assess the extent to which parties have "actually shared responsive information and documents in the normal course of their business dealings" in determining questions of "control," *Sergeeva v. Tripleton Int'l Ltd.*, 834 F.3d 1194, 1201 (11th Cir. 2016), a party's occasional ability to successfully obtain documents does not create a "*legal right* to obtain the documents on demand,*" Searock*, 736 F.2d at 654 (emphasis in original).

The trial court has "wide discretion in setting the limits of discovery." *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985).  The party moving to compel bears the burden of proving relevance, while the party resisting discovery bears the burden of showing that the production of relevant discovery is improper, unreasonable, or unduly burdensome.  *E-Ventures Worldwide, LLC v. Toll Bros., Inc.*, 2023 WL 4419736, at *1 (M.D. Fla. July 10, 2023).  The party seeking production (i.e. Relator) also bears the "burden of proving that the responding party has 'control' over the requested documents."  *Grayson v. No Labels, Inc.*, 2022 WL 1222577, at *1 (M.D. Fla. Feb. 17, 2022) (citing *Supreme Fuels Trading FZE v. Sargeant*, 2011 WL 13172599, at *3 (S.D. Fla. Sept. 15, 2011)).

## III.   ARGUMENT

Relator's Motion seeks discovery that Freedom Defendants do not possess, cannot produce without enormous and undue burdens, is not relevant, has *already* been produced, or is otherwise improper.  The Motion should be denied in full.

### A.   Relator's Request for Medical Records Is Overbroad, Unduly Burdensome, and Improper.

Relator's RFP 41 seeks "All medical and billing records related to any Physician Partners patient."  ECF 279-2.  Relator variously argues that she is "Entitled to All Medical Records," Mot. 8, or that the Court should compel Freedom Defendants to produce all medical records for her sample of 1,200 to 1,800 "member years."  Either demand is enormous and improper: Freedom Defendants do not even possess the requested medical records, and regardless, Relator's overbroad request is unduly burdensome and therefore disproportionate to the needs of this case.

#### 1.   *The requested documents are not within Freedom Defendants' possession, custody, or control.*

Relator bears the burden of proving "control," *see Grayson*, 2022 WL 1222577, at *1, yet addresses it only in a footnote, *see* Mot. 8 n.5.  Relator does not argue that these documents are within Freedom Defendants' *actual* possession.  Nor could she. *See* Ex. A, at 5 ("Freedom Defendants …, as a general matter, do not possess medical records, and only obtain them for limited purposes….").[7]  Relator thus rests her

---

[7] "When pressed, Relator's counsel admitted that they did not know if Freedom Defendants possessed any of the medical records, and did not select the purported 'sample' based on whether Freedom Defendants were more likely to have possession of them—which would have been the case if, for example, the sample was geared toward records that would have been implicated by one of Freedom Defendants' targeted audits."  Ex. A, at 5 (emphasis omitted).

"control" arguments on a theory of constructive possession, *see* Mot. 8 n.5.  Relator's entire argument, relegated to a footnote, is that pursuant to Freedom Defendants' "Provider Agreement" with Physician Partners, Freedom Defendants have a "legal right to obtain medical records for any covered service provided by a Physician Partners physician."  Mot. 8 n.5.  Relator cites no such agreement, let alone its terms, for this proposition, and fails to disclose to the Court that the only employee or former employee of Freedom Defendants who was deposed on this topic told Relator that Freedom Defendants **did not have** such a broad contractual right to these records.[8]

Relator apparently refers to the "Group Participation Agreement" ("GPA") between Freedom Defendants and Physician Partners, but the GPA does not give Freedom Defendants the "legal right," *Searock*, 736 F.2d at 653, to demand the documents Relator seeks to compel.  It gives Freedom Defendants the right, "upon reasonable request," to "obtain, copy and have access" to Physician Partners' medical records for "Covered Services provided by [Physician Partners]," but *only* "pursuant to authorization of the Member signed at time of enrollment during the application process."  *See* ECF 241 (GPA) § 3.14.1; *see also* Decl. of Radha Rai ISO Freedom Defendants' Opp. ("Rai Decl.") ¶ 19.  Thus, Freedom Defendants' access to the relevant documents is governed not by the GPA, but by the agreements with *members* that the GPA incorporates.  Rai Decl. ¶ 19.  Those agreements typically authorize the

---

[8] *See* Ex. H, Karen Kelly Dep. at 57:4-12 ("Q:  Is it your understanding that in general providers who contracted with Freedom are required to make their charts available to Freedom for [chart] review?  A:  I wished.  No.  I have often said it should be in their contracts to provide that but that never happened.")

release of information to Freedom Defendants only "as … necessary for treatment, payment and health care operations." *Id.* (quotation omitted).

And the GPA is only one of the documents that would govern Freedom Defendants' "control" over the requested documents. Relator's request also sweeps in records from countless *other* providers, which may or may not be contracted with Freedom Defendants at all. *Id.* To the extent there is a contract between Freedom Defendants and these unknown providers, its provisions would govern the scope of Freedom Defendants' legal right. *Id.* There is no world in which Relator can meet her burden of showing constructive control, and Relator hardly makes any attempt.

2.  *Relator's request is overbroad and unduly burdensome.*

Even now, Relator purports to seek every single medical record from every single one of Freedom Defendants' tens of thousands of Provider Defendant-affiliated patients over the course of six years. *See* Mot. 8 (demanding "All Medical Records"). That's exactly the type of boundless request the Eleventh Circuit and this Court have repeatedly chastised.[9] That request is plainly ridiculous, and while Relator refuses to abandon it completely, Relator's Motion shows that even Relator understands that such a request is indefensible. That is why Relator has "narrowed that request to a statistician-generated sample" (Mot. 2) that she claims ought to resolve the Defendants' objections. It does not. First, Relator's supposed "narrowed" sample

---

[9] *See, e.g.*, *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (expressing worry that a relator given a "ticket to the discovery process" will "request production of every … claim submitted by the Defendant," whereupon "the Defendant may decide to settle the case to avoid the enormous cost of such discovery and the possible disruption of its ongoing business" (internal quotations omitted)); *U.S. ex rel. Fernandez v. Freedom Health*, 2021 WL 2954309, at *2 (M.D. Fla. Mar. 25, 2021).

remains boundless, as Relator has not tethered this sample to her allegations, or to any particular theory of fraud.   Second, Relator's eleventh-hour demand—even as narrowed to 1,200-1,800 patient years—represents an enormous and disproportional burden on Freedom Defendants that Relator cannot justify.

*Overbreadth.*  Relator's "sample" was drawn from a random sample of all of Freedom Defendants' Provider Defendant-affiliated members.  Relator summarizes her "theory" of fraud (Mot. 11) by citing "the universality of the conduct" she alleges, as if it justifies discovery into every single action Freedom Defendants took between 2015 and 2020, and every single medical record.  And even when Relator cites facets of the alleged "fraudulent scheme," *id.*, she frames them as merely illustrative ("*including*"), in another bid to refuse to tailor discovery in this case to any specific issue, or any specific set of allegedly false claims.  Relator's 'every-claim-is-suspect' strategy is anomalous in FCA litigation—and improper.

Normally, in FCA litigation, relators use the fact discovery period to identify a particularized set of allegedly false claims that will be placed at issue at trial.  Courts therefore routinely demand that any "allegedly false claims at issue must be narrowed in time for Defendants to conduct their own discovery and avoid potentially large costs associated with investigating every claim for every identified physician."  *See, e.g.*, *U.S. ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, 2019 WL 1453063, at *3 (D. Minn. Apr. 2, 2019), *R&R adopted by* 2019 WL 3245003[10]; *see also* Order at 1, *U.S. ex rel. Poehling v.*

---

[10] The magistrate judge in *Fesenmaier*—a case litigated by Relator's counsel here—explained that "identification of specific claims … allows [d]efendants to conduct third-party discovery on only those

*United Health Group, Inc.*, No. 2:16-cv-08697 (C.D. Cal. June 8, 2020), ECF No. 400 (ordering response to demand that plaintiff "identify each and every diagnosis code that Plaintiff contends Defendant improperly failed to delete"); *U.S. ex rel. Vainer v. DaVita, Inc.*, 2014 WL 11516330, at *5 (N.D. Ga. July 18, 2014) (discussing orders compelling responses to interrogatory demanding identification of alleged false claims). That is how a relator *must* pursue discovery, because discovery in FCA cases is limited by the relator's knowledge (as Relator recognized in open court in this case, *see* Tr. of Apr. 22, 2024 Oral Argument at 104-105). *See U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 116 F. Supp. 3d 1326, 1341 (S.D. Fla. 2015) (*Phalp I*) & *U.S. ex rel. Phalp v. Lincare Holdings, Inc.* (*Phalp II*), 2016 WL 3961840, at *9-11 (S.D. Fla. Jan. 11, 2016), *both aff'd as modified*, 857 F.3d 1148 (11th Cir. 2017).

Relator cites precedents establishing that FCA discovery can extend beyond exemplars pleaded in a relator's complaint, *see* Mot. 9, but she fails to accept the core principle that representative samples must be *representative*. Relator's leading cases on this point are *U.S. ex rel. Bledsoe v. Cmty. Health Sys. Inc.*, 501 F.3d 493 (6th Cir. 2007) and *U.S. ex rel. McCartor v. Rolls-Royce Corp.*, 2013 WL 5348536 (S.D. Ind. Sep. 24, 2013), but neither does her any favors. The *McCartor* court recognized that relators should not be barred from "discovering other examples of behavior substantially similar to those described" in a complaint, but also *repeatedly* stressed the "high risk"

---

claims actually at issue without wasting resources on potentially hundreds or thousands of irrelevant claims…." 2019 WL 1453063 at *3. Here, after 19 months of intensive discovery, Relator has insisted on her right to review every single diagnosis code submitted, and every single medical record generated, for tens of thousands of patients over a six-year period.

that discovery in that case could "outsize significantly its worth and impose unfair burden and expense, and … be used as the proverbial fishing expedition." 2013 WL 5348536, at *1, *6-7. And the *McCartor* court refused to compel sweeping productions of documents concerning even the sample, instead limiting production to a single type of summary-level report (the "Major Quality Failure Logs"), which the relator could analyze to identify violations "sufficiently similar" to those described in their complaint and request discovery about them. *Id.* at *7. Relator, in contrast, seeks a large and random sample of every single patient chart, where the production of each "member year" could involve producing hundreds or thousands of pages of records that Freedom Defendants do not currently possess, *see supra*, Section III.A.1.

The Sixth Circuit in *Bledsoe* likewise recognized that representative examples can "support more generalized allegations of fraud only to the extent that the relator's examples are *representative samples* of the broader class of claim," 501 F.3d at 510, and in fact upheld Rule 9(b) dismissals of the relator's "scheme"-based claims because they departed from the *specific* examples of fraud that the relator pleaded in the complaint, *id.* at 513-14.[11] Relator's other cases are similarly aligned on the fundamental principle that even if FCA discovery may extend beyond the specific examples in a complaint, surviving a Rule 9(b) motion does not grant a relator license to examine each of the

---

[11] Relator's Motion (at 8-9) overreads this Court's dismissal order as if it put its imprimatur on *every* allegation in the Amended Complaint, including Relator's conclusory assertions that the defendants worked to "increase[] risk adjustment scores" through "high-pressure tactics," *see* Mot. 11. The dismissal order instead found that Relator adequately pleaded specific *examples* of false claims. *See* ECF 124, at 13. Under *Bledsoe*, Relator could pursue discovery of a "materially similar set of claims," 501 F.3d at 511, but cannot, by simple virtue of surviving Rule 9(b) as to *some* examples, demand a random sample of *every claim* Freedom Defendants ever submitted for a Provider Defendant patient.

defendant's daily interactions in the hopes of substantiating broad claims of fraud.[12]

Applying these principles, Relator's sample population is a sample of everything, and nothing.  Relator's sample makes no effort to test any of her particular theories:  for instance, Relator faults Freedom Defendants for "push[ing] … high-value risk-adjusting codes," Mot. 11, and could have analyzed the produced claims data to select a sample of specific codes.  Relator did nothing of the sort, opting instead to root around in thousands of medical records *in search* of a theory of fraud that she failed to plead or even devise through discovery.  It is Relator who puts the "cart before the horse."  *Contra* Mot. 2.  Relator's demand here, shorn of any limiting principle, far outstrips the scope of discovery permitted in the cases she cites.  The FCA and the Federal Rules forbid a relator to proceed in that manner, and this Court should, too.

*Burden.*   The burden imposed by Relator's request is undue and disproportionate.[13]   Far narrower audits conducted by Freedom Defendants are burdensome enough, and Relator's demand outstrips them by orders of magnitude.  *See* Rai Decl. ¶¶ 8, 13-15.

---

[12] *See U.S. ex rel. Walker v. R & F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1359 (11th Cir. 2005) (discussing only the temporal scope of discovery); *U.S. ex rel. Brooks v. Stevens-Henager Coll., Inc.*, 2018 WL 296088, at *8 (D. Utah Jan. 4, 2018) (agreeing with plaintiff on temporal scope, but otherwise warning parties not to engage in "fishing expedition"); *U.S. ex rel. Polukoff v. Sorensen*, 2020 WL 4904164, at *7-8 (D. Utah Aug. 20, 2020) (compelling production of records associated with *a single type of procedure*, from a *single physician*); *U.S. ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 467-69 (5th Cir. 2015) (remanding for "limited discovery" where district court denied "*any* additional discovery" after relator had won a bellwether trial on alleged false claim (emphasis in original)). Relator's final case is not an FCA case, was not governed by Rule 9(b), and is therefore irrelevant. *See Uchytil v. Avande, Inc.*, 2018 U.S. Dist. LEXIS 31737, at *6 (W.D. Wash. Feb. 27, 2018).

[13] Relator's sample asks directly for full medical records for 1,200 member years—already an extraordinary request—but, in practice, Freedom Defendants would need to collect records for all 1,800.  *See* Rai Decl. ¶ 18 (explaining that Freedom Defendants will not know whether a member year needs to be "skipped" until they collect the records).

Unlike the requests involved in Government or Freedom Defendants' internal MRA audits, Relator's request is not limited to specific dates of service, diagnosis codes, or Hierarchical Condition Categories ("HCCs"). *Id.* ¶¶ 8, 13-15, 18. To attempt to satisfy Relator's request, then, Freedom Defendants would first need to analyze the encounter data for each of the 1,800 member years to determine how to even locate a "full" medical record for each member year. *Id.* ¶ 9. This would require a manual review of the data to determine which primary care providers, specialists, hospitals, or other medical providers the member visited in that year and what records those encounters would have generated. *Id.* While it is likely that Freedom Defendants have collected *some* medical records for *some* of the 1,800 member years, it is "highly unlikely" that Freedom Defendants previously collected the *full* medical record for many of them. *Id.* ¶ 16. Freedom Defendants generally collect far narrower sets of medical records in the ordinary course of their business. *See id.* ¶¶ 6, 16.

Only after completing these threshold steps can Freedom Defendants begin the massive undertaking of collecting the full medical records for all 1,800 member years. *Id.* ¶¶ 11-12. It would be impossible to precisely identify how long that would take, and how much money it would cost. *Id.* ¶ 17. Far narrower IRO audits—wherein Freedom Defendants need only collect provider records sufficient to justify individual diagnostic codes rather than *full* medical records—required 8-9 employees to work for 4-6 months to complete.[14] *Id.* ¶ 13. And those audits concerned just 100 member years

---

[14] This feature of Relator's request further crystallizes its disproportionate burden—many of the medical records Relator demands will be irrelevant, since *other* medical records (perhaps more easily

(rather than 1,800), and happened on a regular cadence that permitted Freedom Defendants to plan ahead and allocate resources accordingly. *Id.* ¶¶ 8, 13.

Setting employee resources aside, Relator's request would also be costly. Many specialists, hospitals, and primary care providers use vendors to transmit medical records to Freedom Defendants, and these vendors generally charge $10–25 per patient chart. *Id.* ¶ 17. Other specialists transmit the records themselves, but charge upward of $30 per chart. *Id.* Even if each member year required Freedom Defendants to pay $10 each for just 10 charts, Freedom Defendants would be out $180,000.

Lastly, Relator never considers the "parties' relative access to relevant information," but this Court must. *See* Fed. R. Civ. P. 26(b)(1). Freedom Defendants do not here suggest that Relator's identical request to Provider Defendants is legitimate, or that compliance with it would be proportional to the case (or even feasible). Indeed, Freedom Defendants are confident that Relator's last-minute demand to Provider Defendants presents a significant hardship to them, too. But Provider Defendants likely have far *greater* access to the majority of the documents than do Freedom Defendants. There is simply no reason to simultaneously compel duplicative and burdensome discovery from *both* sets of Defendants, and Relator offers no contrary argument. Relator's request for medical records should be denied.

## B.   Relator's Other Supposed Deficiencies Are Groundless.

Relator's laundry list of other complaints is baseless, as Freedom Defendants

---

obtained) will be sufficient to provide the necessary support for the specific diagnosis codes at issue. *See* Rai Decl. ¶ 13.

explained in their letter preceding this Motion.  *See* Ex. A.  Relator first raised them on May 26, one business day before the close of fact discovery.  In the midst of other responsibilities—including completing and serving responses and objections to 59 discovery requests served on the last possible day and producing documents requested in 23 new requests for production—Freedom Defendants diligently reviewed Relator's purported deficiencies and addressed them one-by-one.  In some cases, Freedom Defendants located and produced additional documents and information notwithstanding their objections to the propriety of Relator's requests.

Had Relator sought the requested discovery in a timely fashion—or read Freedom Defendants' response, Ex. A—this Motion could have been avoided. Relator's conduct suggests that the information is not the point—the *dispute* is the point.  While this background provides critical context, Relator's arguments are clearly meritless even without that context.  Freedom Defendants have already addressed each of these disputes in detail, and thus refer the Court to their letter instead of recounting those specifics again here.  *See* Ex. A.

Relator's demands for new discovery fall into these categories: (1) information Freedom Defendants already produced earlier in the discovery window; (2) documents Freedom Defendants produced the same day Relator filed this Motion—either in response to the discovery requests due on May 29, or voluntarily as a compromise in response to Relator's May 26 letter; (3) documents already requested in Relator's May 20 emergency motion (which Freedom Defendants produced, to the extent such documents *existed*); and (4) discovery not permitted under the Federal Rules.

*Discovery already produced.* As explained in Freedom Defendants' letter, Freedom Defendants already produced documents such as certain audit documents, reports on IPAs, and certain documents incorporating "risk registers." *See* Ex. A, at 4 (noting that "Freedom Defendants produced responsive audit materials to Relator, some of which Relator has used at the depositions of Freedom Defendants' personnel," and providing examples of documents); *id.* at 5 (providing examples of produced IPA reports, and noting that Relator's counsel questioned Ms. Rai about one such example in her deposition). Relator apparently argues that other documents (which may or may not exist) are "responsive" to RFPs as *Relator drafted them*, without analyzing whether they are "responsive" to the RFPs as they were narrowed through (1) the parties' extensive negotiations and Relator's *agreement* to narrow the substantive reach of many of her RFPs, and (2) the parties' extensive negotiations on custodians and search terms (as governed by the ESI Protocol).[15] Relator's "deficiencies" are illegitimate to the extent she has already received the documents she now demands.

*Documents produced on May 29.* Freedom Defendants also produced additional

---

[15] To provide a more detailed case study into just one of Relator's demands here, Relator's letter demanded "every audit, including the audited records and resulting report, associated with a Physician Partners physician that Freedom conducted between 2015 and 2020." Ex. F, at 4; *see also* Mot. 15 (reiterating request for "audit results"). In response to the only RFPs touching on "audits" (RFPs 16 and 17), Freedom Defendants promised to produce "final versions of nonprivileged Medicare Advantage risk adjustment review reports" and documents, if any, "that evaluate the financial impact on Freedom Defendants of any increase in [risk scores]" for certain members referenced in the Amended Complaint. *See* ECF 279-1, at 58-63; Relator *agreed* with the scope of the search that Freedom Defendants promised to undertake. *See* Exs. C-D. Freedom Defendants *produced those records. See* Ex. A, at 4. Freedom Defendants also produced *additional* audit records that were responsive to other RFPs. *Id.* at 4-5. Freedom Defendants then produced *additional audit records* on the final day of discovery based on a *subsequent* request in Relator's Third Set of RFPs (served on the final day such discovery could have been served). It is unclear what more (if anything) Relator believes she should receive, but she nonetheless raises this "dispute" in her Motion.

documents after Relator's May 26 letter but before the close of fact discovery.  *See* Santella Decl. ¶ 15.  Much of this discovery was never requested or promised before April 29, when Relator issued 59 new discovery requests—responses to which were not due until May 29.  *See, e.g.*, Ex. A, at 6 (explaining Freedom Defendants' May 29 document production of "minutes and/or [PowerPoint] presentations for quarterly Medicare compliance meetings and for the delegation oversight committee," which Relator did not request until April 29).   While Freedom Defendants voluntarily produced other documents responsive to these new requests *early*, so that Relator could use the documents at depositions, many of the documents were not located, reviewed for privilege, and produced until May 29—the day their production was due.  Santella Decl. ¶¶ 14-15.   Freedom Defendants also went above and beyond the parties' agreements on search parameters to locate and produce additional documents on May 29 based solely on the requests made in Relator's May 26 Letter.  *Id.* In other words, Freedom Defendants spent Memorial Day weekend responding to Relator's last-minute requests, only to be served with a Motion to Compel those same documents as they were being produced.   *See* Ex. A, at 6 (describing production of additional "risk register" documents).  Relator's Motion is baseless as to these documents, too.

*Documents already sought through May 20 emergency motion.*  Relator here renews her request for documents related to Ms. Gareau, despite this Court already having reviewed (and rejected) Relator's assertions of impropriety, *see* ECF 268.  As Freedom Defendants have already explained to the Court, *see* ECF 263, Relator's allegations are a red herring.  Relator's grievance concerns Dr. Mansour's production (by counsel *who*

*also represent* Relator in this case) of a letter he sent to Physician Partners, with copy to Ms. Gareau, that contains a single mention of a "5 Star Checklist." *See id.* Freedom Defendants did not produce the document because Ms. Gareau was not a custodian—an outcome to which Relator did not object, despite having ample opportunity. Ex. A, at 2, 3-4. No prejudice resulted, including because Freedom Defendants searched for any similar documents and found only documents that Relator's counsel already had; Freedom Defendants re-produced those documents to Relator regardless. *Id.* at 5. All of these facts were before the Court when the Court denied Relator's motion for an emergency status conference, finding that "[g]iven Defendants' representations, the Court is not persuaded that the April 2019 emails reveal any production deficiencies." *See* ECF 268 at 3. This is no basis to reopen document discovery.

*Improper discovery.* Relator also seeks, for instance, "data" and "source[s]" that Freedom Defendants can supposedly "query" to generate information for Relator, and discovery on discovery about Freedom's instant messaging services. As to the data, the Federal Rules impose no obligation to create reports to produce them to Relator. Rule 34(a) does not require "another party to create or prepare a new or previously non-existent document solely for its production." *Advanced Cable Ties, Inc. v. Am. Elite Molding, LLC*, 2019 WL 13280288, at *5 (N.D. Fla. Feb. 7, 2019) (quoting *Mir v. L-3 Commc'ns Integrated Sys., L.P.*, 319 F.R.D. 220, 227 (N.D. Tex. 2016)).[16] As to

---

[16] *See also Hallmark v. Cohen & Slamowitz*, 302 F.R.D. 295, 299 (W.D.N.Y. 2014) (litigant need not create audited financial statements to comply with plaintiff's discovery request); *Alexander v. F.B.I.*, 194 F.R.D. 305, 310 (D.D.C. 2000) ("Rule 34 only requires a party to produce documents that are already in existence.").

documents from the "Microsoft Teams" platform, Relator ignores Ms. Kortsch's testimony that she did not personally use the platform "for work purposes," and that (to her knowledge) other employees used the platform only for "general communication." *See* Ex. A, at 5 (quotation omitted).

*   *   *

As evidenced by the foregoing, Relator's claims of deficiencies lack merit. Freedom Defendants expended enormous resources to comply with the "ambitious discovery schedule" in this case, *see* ECF 268 at 3, and satisfied the obligations imposed by the Federal Rules and the parties' own, extensively negotiated agreements. Relator seeks to upend those agreements—which were the product of compromise on both sides—at the final hour. The Court should hold Relator to her side of the bargains she struck, and reject her demands for additional and unwarranted discovery.

## IV.   CONCLUSION

For these reasons, the Court should deny Relator's motion to compel in full.

Dated:  June 12, 2024                    Respectfully submitted,

By: */s/ Amanda Santella*
  Amanda M. Santella*
  Benjamin D. Singer*
  William Buffaloe*
  Kelly McDonnell*
  O'MELVENY & MYERS LLP
  1625 Eye Street NW
  Washington, DC 20006
  (202) 383-5300
  asantella@omm.com
  bsinger@omm.com

wbuffaloe@omm.com
kmcdonnell@omm.com

Scott Drake (Lead Counsel)*
O'MELVENY & MYERS LLP
2801 North Harwood Street
Suite 1600
Dallas, TX 75201
(972) 360-1900
sdrake@omm.com

Catherine Nagle*
O'MELVENY & MYERS LLP
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
(212) 326-2000
cnagle@omm.com

Ginger Boyd
Fla. Bar No. 294550
NELSON MULLINS RILEY &
SCARBOROUGH LLP
215 South Monroe Street, Suite 400
Tallahassee, FL 32301
(850) 205-3356
ginger.boyd@nelsonmullins.com
*Counsel for Defendants Freedom Health,
Inc. and Optimum Healthcare, Inc.*


*\* admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2024, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will provide electronic service to all counsel of record.

By: /s/ Amanda Santella

Amanda Santella*

*Counsel for Freedom Defendants*
*\* admitted pro hac vice*