```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION

 3

 4   CLARISSA ZAFIROV,              )
                                    )
 5             Plaintiff,           )
                                    )
 6                                  ) Case No.
          vs.                       ) 8:19-CV-01236-KKM-SPF
 7                                  )
                                    )
 8   Florida Medical Associates, LLC,  )
     doing business as VIPCARE, et al., )
 9                                  )
               Defendants.          )
10

11

12   _____

13                      MOTION HEARING
                 (Taken via Zoom Videoconference)

14            BEFORE THE HONORABLE SEAN P. FLYNN
                UNITED STATES MAGISTRATE JUDGE
15
                       JUNE 18, 2024
16                     10:00 A.M.
                     TAMPA, FLORIDA
17   _____

18

19

20

21          Proceedings transcribed via courtroom digital audio
     recording by transcriptionist using computer-aided
22   transcription.

23   _____

                 DAVID J. COLLIER, RMR, CRR
24             FEDERAL OFFICIAL COURT REPORTER
             801 NORTH FLORIDA AVENUE, 7TH FLOOR
25                TAMPA, FLORIDA  33602
```

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFF:

 4

 5   Jillian Levy Estes
     Morgan Verkamp, LLC
 6   4410 Carver Woods Drive, Suite 200
     Blue Ash, Ohio  45242
 7   513-651-4400

 8
     Adam T. Rabin
 9   Havan M. Clark
     Rabin Kammerer Johnson, P.A.
10   1601 Forum Place, Suite 201
     West Palm Beach, Florida  33401
11   561-659-7878

12
     Anne Hayes Hartman
13   Chandra Napora
     Jonathan M. Lischak
14   Morgan Verkamp
     4410 Carver Woods Drive, Suite 200
15   Cincinnati, Ohio  45242
     513-651-4400
16

17

18
     FOR THE DEFENDANT FLORIDA MEDICAL ASSOCIATES, LLC
19   d/b/a VIPCARE, PHYSICIAN PARTNERS, LLC, and ANION TECHNOLOGIES:

20

21   Joseph Warren Swanson
     Lauren Lisette Valiente
22   Samantha Marie Gerencir
     Michael P. Matthews
23   Foley & Lardner, LLP
     100 North Tampa Street, Suite 2700
24   Tampa, Florida  33602
     813-229-2300
25
```

1  **FOR THE DEFENDANT FREEDOM HEALTH, INC. and OPTIMUM**
   **HEALTHCARE, INC.:**

2

3  *Scott P. Drake*
   O'Melveny & Myers, LLP

4  2801 North Harwood Street, Suite 1600
   Dallas, Texas 75201

5  972-360-1915

6  *Amanda M. Santella*
   *Kelly A. McDonnell*

7  O'Melveny & Myers, LLP
   1625 Eye Street, NW

8  Washington, D.C.  20006
   202-383-5300

9

   *Catherine Nagle*
10 O'Melveny & Myers, LLP
   1301 Avenue of the Americas

11 Suite 1700
   New York, New York 10019

12 212-326-2000

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                    - - - o0o - - -
 3           THE COURT:  All right.  Good morning, everyone.
 4           VOICES:  Good morning, Your Honor.
 5           THE COURT:  Mr. Calderon, would you please call the
 6    case.
 7           COURTROOM DEPUTY:  In the matter of Zafirov versus
 8    Florida Medical Associates, LLC, Civil Case Number
 9    8:19-CV-1236-KKM-SPF.
10           THE COURT:  All right.  Would Counsel please make
11    appearances, and if you could do me a favor and identify who is
12    going to be taking the lead for each party during oral
13    arguments, I would appreciate it, beginning with the relator.
14           MS. ESTES:  Good morning, Your Honor.  This is
15    Jillian Estes for relator Dr. Clarissa Zafirov.  I'll be taking
16    the lead with respect to the arguments regarding the affiliate
17    providers, grievant's motion to compel, and relator's motion to
18    compel to the provider defendants, with the exception of the
19    medical records, which really overlaps two of the motions to
20    compel, and my colleague, Anne Hartman, will handle that part
21    of the argument.
22           MR. SWANSON:  Good morning, Your Honor.  Joe Swanson
23    from Foley & Lardner appearing on behalf of the provider
24    defendants, which in this case is Florida Medical Associates
25    d.b.a. VIPCARE, Physician Partners, LLC, and Anion
```

 1   Technologies.  I'll be handling the argument on behalf of those

 2   entities.

 3           I am joined this morning by my colleagues

 4   Lauren Valiente, Mike Matthews, Samantha Gerencir; and

 5   Mike Haber from the company and Priyanka Ghosh-Murthy from the

 6   company as well are present, but I'll be handling the argument.

 7           Thank you.

 8           THE COURT:  All right.  Thank you.

 9           MR. DRAKE:  Good morning, Your Honor.  This is Scott

10   Drake from O'Melveny & Myers on behalf of Freedom Health and

11   Optimum Healthcare.  I'm joined by my partner, Amanda Santella.

12   Ms. Santella will be handling the portion relating to the

13   medical records, I will be handling the grievant's motion to

14   compel the agreement between relator and Dr. Mansour and also

15   the portions of the relator's motion to compel other than the

16   medical records.  So essentially Ms. Santella will handle the

17   medical records issue and I'll handle everything else on behalf

18   of Freedom.

19           THE COURT:  All right.  Anyone else?

20           MR. RABIN:  Good morning, Your Honor.  Adam Rabin and

21   Havan Clark from Rabin Kammerer Johnson.  We are co-counsel for

22   the relator.

23           THE COURT:  Okay.  Thank you.

24           MR. LISCHAK:  Jonathan Lischak, Your Honor.  I'm with

25   Ms. Estes and Ms. Hartman, for relator.

```
 1              THE COURT:  All right.

 2              MS. NAPORA:  Chandra Napora --

 3              THE COURT:  Anyone else?

 4              MS. NAPORA:  -- here as well.  I'm so sorry,

 5   Your Honor.  Chandra Napora, also here for the relator, from

 6   Morgan Verkamp.

 7              MR. McDONNELL:  Hi.  I'm Kelly McDonnell with Freedom

 8   and Optimum.

 9              MS. NAGLE:  And Catherine Nagle with Freedom and

10   optimum.

11              THE COURT:  All right.  Thank you all for being here.

12              We're here to handle -- we have four pending motions

13   that have been noticed for this hearing.  I would like to begin

14   with relator's motion.  Let's start with the first filed one,

15   which is relator's motion to compel discovery from provider

16   defendants, which can be found at docket entry 178.

17              Let me hear from relator first, please.

18              MS. ESTES:  Thank you, Your Honor, and, again, for

19   the record, this is Jillian Estes.

20              Your Honor, this -- the briefs in this particular

21   motion I think are pretty thorough, and so I don't want to use

22   the Court's time renewing all of those.  I'd just like to

23   highlight a couple portions of it.

24              One is that really this motion only arose because

25   provider defendants changed their posture on production midway
```

1   through discovery.  So the initial responses agreed to produce

2   regarding both affiliate and employed physicians, and that was

3   our understanding at the beginning, and about halfway through

4   the discovery period, maybe a little further in, in fact, we

5   were notified that they had changed their opinion on that

6   production and would no longer do so.  They did not ever serve

7   amended responses to the original requests for production

8   changing their definition, but notified us that they would not

9   be producing responsive to anything other than employed

10  physicians.

11          One of the things that I think really goes to the

12  heart of this is that the distinctions that really they have

13  drawn between the provider and the affiliate defendant -- or,

14  excuse me, the employed and the affiliate physicians is --

15  mainly goes to billing and the access through the, you know,

16  EMR to get to the claims submission, but the False Claims Act

17  prohibits both submitted and caused to be submitted false

18  claims, and so really regardless of whether they hit the button

19  for the provider defendants or for the affiliate defend --

20  physicians.  Excuse me.  I've been using the same terminology

21  for a while, it gets confused.

22          Whether they hit the submission button for the

23  affiliate providers the same way that they do for the employed

24  providers doesn't change the pressure that is consistent among

25  all of their physicians, the way that they're trained, the way

1   that they use these steering tools and documents to coach and

2   induce unsupported codes is consistent to all of their

3   providers, which would render the claims false whether they hit

4   the submit button for them or not.  So really it's a

5   distinction without a difference, and it shouldn't be material

6   to whether they are responsive for all of them.

7         There's a few things that have come up in their

8   briefs that I do want to address also just briefly in that the

9   provider defendants have identified the fact that Dr. Zafirov

10   doesn't do sort of -- we call it cradle to grave tracing for

11   affiliate physicians and saying that she had access to

12   Freedom's portal so she should have been able to do that also,

13   but that's simply not true.  She had access to Freedom's portal

14   for her patients.  She didn't have access universally for all

15   patients of all sorts.  She did see patients who had previously

16   been seen by provider defendant -- by affiliate physicians, and

17   she provided information related to some of those in the

18   Complaint, but she wouldn't have a way to go in, for example,

19   to just select a random physician who was affiliated with

20   Physician Partners and go through their records top to bottom.

21         What she knows is that they were all trained the same

22   way.  What all the evidence in this case has shown is that

23   they're all subject to the same pressures, to the same types of

24   inducements, to the same training and use of those five star

25   forms, which are really at the heart of this case, the reworks

1    that come from that to encourage them to change their codes.

2    So all of that is consistent and none of that matters with

3    respect to whether they were employed or affiliated.

4            We did submit some transcript language from their

5    defendants identifying how it was done universally.  More of

6    that type of testimony was induced in the remaining of

7    the depositions that just ended on Friday.  We'd be happy to

8    supplement with more, but we didn't feel like adding more paper

9    to the Court at this point was helpful because it's all

10   incredibly consistent, they -- everybody used the exact same

11   methodology that led to the false claims as we've alleged them.

12           THE COURT:  All right.  Response, Mr. Swanson?

13           MR. SWANSON:  Thank you, Your Honor.

14           On the affiliate issue, I would say a few -- a few

15   points.

16           First, we disagree, you'll not be surprised to hear,

17   with how the record in this case in discovery has borne out the

18   distinctions that we maintain are very fundamental between

19   affiliated physicians and employed physicians.  We outline

20   those significant differences in a deposition that Daniel

21   Kollefrath, the Company's former president, submitted, that's

22   at docket number 193-1.  In our view the depositions that have

23   occurred over the last six weeks have only confirmed those

24   distinctions, including when he testified on Friday through the

25   better part of seven hours, Your Honor, and reiterated what

1   some of those very important distinctions are, and I'll just

2   mention a few of them here, and of course we would be happy to

3   submit his transcript or excerpts from it, if the Court would

4   find that useful.

5          But he explains in his declaration, and was confirmed

6   again on Friday in his -- in his deposition that not only are

7   there important distinctions between the affiliates writ large

8   and employed physicians, but there are important distinctions

9   even among the affiliates themselves, which is just a further

10  wrinkle that makes this discovery inappropriate and burdensome.

11         All of the terms in the affiliate agreements were

12  negotiable, Mr. Kollefrath testified on Friday, and there were

13  varying compensation agreements among the affiliate providers.

14  And I highlight compensation because it's an important point,

15  because in the First Amended Complaint the relator goes to

16  great lengths to talk about the importance of the compensation

17  program at the provider defendants, which she maintains

18  incentivized them to find conditions that did not exist, and so

19  a prominent feature in her Complaint is that there was an

20  incentive compensation program that encouraged providers like

21  her to find codes that -- find conditions that did not exist

22  and to submit those codes.  The discovery has borne out,

23  however, that that incentive program was different for the

24  affiliate providers than it was for the VIPCARE physicians.  So

25  there are important distinctions, and I think it's simply

 1    incorrect to maintain, as Ms. Estes does, that the distinctions

 2    don't have a difference.

 3           You know, we could go on and on about how we believe

 4    the record in this case has vindicated our position about those

 5    distinctions, and I would encourage the Court to review

 6    Mr. Kollefrath's declaration at 193-1, but I would also say

 7    that in -- you know, in an effort to be pragmatic here and make

 8    this as efficient for the Court as possible, you could also set

 9    the discovery record aside, and -- and we and Ms. Estes can

10    agree to disagree, because what is fundamental and what has not

11    changed when it comes to the affiliate discovery is the legal

12    principles that govern this.  And, quite honestly, Your Honor,

13    the legal principles that prompted this Court to rule in

14    November that the temporal scope in this case was for our

15    clients 2017 to 2020 command the same outcome here.

16           You talked about in your order that discovery needs

17    to be limited and tailored to the specificity of the Complaint,

18    and you cited the *Bane* case written by Judge Pizzo to explain

19    that superficial allegations of ongoing misconduct don't meet

20    the particularity requirement of Rule 9(b), and you cited other

21    authorities to support the point that what is in the Complaint

22    is what matters when it comes to the scope of discovery in

23    False Claims Act cases, and that was true in November when you

24    issued that ruling and it's true in June here as we ask you to

25    reject this request for affiliate discovery.

1          The relator filed her First Amended Complaint in

2     November of '21, almost a year and a half after she had left

3     the company.  She had all the incentives in the world to

4     provide as many examples as she could in that Complaint after

5     the original Complaint had been dismissed for failure to plead

6     fraud with particularity.  She alleges that she had access to

7     five star checklists, access to billing records, access to

8     Freedom's portal, to see the codes that were submitted, and

9     that she could trace the false claims from cradle to grave, and

10    she didn't draw a distinction in that Complaint about affiliate

11    providers versus employed physicians, she just said writ large

12    she had this access and as a result provided 20 examples.

13    Well, none of those 20 examples contain an allegedly false

14    claim submitted by an affiliate, and so, you know, in light of

15    that reality and -- and -- and in light of we think the -- the

16    legal principles that led the Court to issue the temporal scope

17    ruling that it did in November, the -- the request for

18    affiliate discovery here should be rejected, setting aside what

19    discovery in this case may have shown and who said what at what

20    depositions.

21          The fact of the matter is the references to affiliate

22    physicians in the Complaint are paradigmatic, superficial

23    allegations, there are maybe a half dozen references to them,

24    Your Honor, they are in meaningless boilerplate allegations

25    about the knowledge that the provider defendants had about

1    allegedly false claims being submitted, and so we would

2    maintain that the legal principles dictate that you reject the

3    request here to provide discovery into affiliates.

4            A second reason to do so, independent, again, of what

5    the discovery record has shown in this case is the highly

6    unreasonable burden that this discovery would impose on our

7    clients.  And, again, Mr. Kollefrath's declaration at 193-1,

8    paragraph 10 in particular, really lays this out.  We could be

9    talking about millions of pages of documents, hundreds of

10   thousands of dollars, perhaps more, to gather, review and

11   produce these.  It may require in-person collection, and it may

12   very well -- will require coordination with affiliates with

13   whom we don't have a contractual relationship anymore.

14           And Ram Moorthy's declaration, which was submitted

15   last Wednesday with our opposition at 290-2, discusses what --

16   the burden attendant to collecting the records that have been

17   requested as part of the medical records request, which I know

18   has not been talked about yet this morning, but his

19   observations about the burden that are attendant to collecting

20   those records are germane to this discussion, and that is

21   because the affiliate records -- of the records that had been

22   requested in May, a good number of those are affiliate

23   providers, and so these burdens, which we'll talk about a bit

24   later this morning when we talk about the medical records, are

25   going to be very, very significant.

 1          We are required to collect affiliate records.  It

 2     will require a manual review and pull from eClinicalWorks and

 3     from another database called Scope.  One patient alone can take

 4     two to four hours.  It may take longer.  It would take hundreds

 5     of thousands of dollars, and weeks if not months of effort to

 6     collect these records, and that is in addition to the fact that

 7     the legal principles that I've just talked about dictate that

 8     they shouldn't get this discovery at all.

 9          And I'll end by just commenting on Ms. Estes' point

10     at the outset of her presentation about our supposed change in

11     position.  I think as a -- as a matter of the calendar, it is

12     probably true that it was midway through discovery, but as a

13     practical matter, Your Honor, it was before any document

14     production, certainly depositions, had been undertaken in this

15     case, and so we were very clear once we arrived at this

16     position, which was based on really wading into what was going

17     to be required of our clients if we needed to collect affiliate

18     records, and it became clear that this was going to be

19     exceedingly burdensome and also not supported by the law.

20          We articulated our position to Ms. Estes and her

21     colleagues very, very clearly last fall, I mean, months ago,

22     and when she filed her motion on this issue in February, among

23     the things that she sought relief for was to be able to test

24     our assertions of burden and the like through discovery.  Well,

25     she's done that, and as I've explained, we maintain that that

1  discovery record has vindicated our position, but what

2  certainly has not changed are the legal principles.  And so for

3  all of those reasons, Your Honor, we respectfully request that

4  you reject the request for affiliate records.

5        THE COURT:  Mr. Swanson, it may be true the legal

6  principles have not changed.  It appears your client's position

7  has changed.  So if the legal principles were the same at the

8  beginning of the case as they were halfway through the case

9  when you apparently changed positions regarding the affiliate

10 providers, why should the Court go along with your change in --

11 I'll put it this way.  It appears in the beginning of the case,

12 anyway, that you thought the affiliate providers were fair

13 game, in fact were responding on behalf of them, but then

14 midway through changed positions, but the law didn't change,

15 there was no intervening change in the law, so why is it that

16 at the beginning of the case you took one position but then

17 midway through the case you take another?

18       MR. SWANSON:  Your Honor, I think the fact of the

19 matter is our appreciation -- well, the law has not changed.

20 You know, our appreciation of -- of -- of the law crystalized

21 as we were talking with Ms. Estes about an extension for

22 discovery in this case, because part and parcel of that request

23 was also going to be the burden that would be associated with

24 collecting all of these records.  And so I think that,

25 you know, those factors coalesced for us in the fall,

1  Your Honor, to justify this position, which we clearly

2  articulated, and -- and -- and to no prejudice -- with no

3  prejudice to Ms. Estes and her colleagues, given that discovery

4  had not begun at that point.

5          And so whether our appreciation of the law changed or

6  was, you know, fully appreciated at that point, one, doesn't

7  change what the legal principles are, and so we would submit,

8  Your Honor, that it -- what ought to be done is -- is an

9  application of the legal principles as they -- as they are

10  today and as they were in November when you issued your ruling

11  on a temporal scope; and, two, and an independent reason to

12  reject this request is the burden is unchanged, it's

13  unreasonable, it's disproportionate under Rule 26; and a third

14  and final reason is that the discovery that Ms. Estes asked for

15  in her motion in February she has now had several months of,

16  and it has vindicated our position not only on the burden but

17  also on the very meaningful distinctions between affiliates and

18  providers.  I'm sorry.  Affiliates and employed physicians.

19          THE COURT:  And what additional discovery in

20  particular has vindicated that position?

21          MR. SWANSON:  Mr. Kollefrath's deposition on Friday,

22  Your Honor, articulated some very important distinctions.  The

23  corporate rep deposition for Physician Partners, which

24  Chris Barber was the company's corporate rep, he was deposed

25  for a full seven hours on Friday June 7th.  Those are two in

```
1    particular that I think are particularly useful, especially
2    when it comes to the distinctions in how affiliate providers
3    and employed physicians are compensated, which, again, is a
4    central feature of relator's case.  And, again, we would be
5    happy to submit excerpts of those for the Court's
6    consideration.
7             THE COURT:  All right.  But as I understand,
8    Mr. Swanson, initially your clients conceded that the
9    affiliate -- the affiliate discovery was relevant to the claims
10   in this case, but once we got the discovery requests you --
11   because of the burden associated with responding to those
12   requests, your clients decided that it was not proportional to
13   the needs of the case, and so it's not a relevance issue, at
14   least initially, it was a proportionality issue, it was unduly
15   burdensome to comply with these requests, but then when you got
16   further along in discovery, including the recent depositions of
17   the corporate rep, Mr. Kollefrath, you now believe that it's no
18   longer -- the discovery request is also no longer relevant to
19   the claims in this case.  Is that my understanding of your
20   argument?
21            MR. SWANSON:  In part, Your Honor.  I think when we
22   articulated our position to Ms. Estes in the fall of 2023 that
23   we felt discovery from affiliates was not justified in this
24   case.  It was based not only on the burden, which has remained
25   true throughout our discussions with her, but it was also based
```

1  on relevance.  And what I'm saying about the discovery since

2  then is that the discovery since then has further confirmed the

3  points we made to Ms. Estes at the outset of these discussions

4  about why these two constituencies, the affiliates on the one

5  hand and the employed physicians, are fundamentally different.

6       So we maintain they're fundamentally different, we

7  told her that now eight, nine months ago.  Discovery in the

8  intervening months has confirmed that, we believe.  In addition

9  to that, and maybe even most importantly, the legal principles

10 which -- the legal principles also make the discovery into the

11 affiliates improper here.  And third and finally, excuse me,

12 the burden associated with collecting these records articulated

13 throughout these discussions with Ms. Estes and further

14 confirmed throughout discovery make this request unreasonable

15 and disproportionate under Rule 26.

16       THE COURT:  Thank you, Mr. Swanson.

17       Ms. Estes, anything further?

18       MS. ESTES:  I do have just a couple points, if I

19 could follow up, Your Honor.

20       One is that proportionality really only came up at

21 the very end of Mr. Swanson's discussion, and the reality is

22 these are large companies and they used the same fraudulent

23 methods that we've alleged through -- for all of their

24 providers, it doesn't matter whether they were affiliated or

25 employed, and so that is proportional, it's not -- there's not

1   a proportionality pass by committing fraud on a large scale or

2   we wouldn't have False Claims Act cases like we have all around

3   the country all the time, and like you have here, with an

4   entity that chose to use the same methodology across the board.

5          So it really has never been a discussion of

6   proportionality until it's sort of thrown in to sort of meet

7   the discovery standards, but it is not a question of

8   proportionality here.  The allegations expand to all of these

9   providers, and getting discovery through them is relevant to

10  the case, it has been from the beginning, and I would submit

11  that, as Your Honor recognized, that they had the position at

12  the beginning that these were relevant, employees and

13  affiliates, and actually Mr. Kollefrath's testimony on Friday

14  at the very end said the very same thing, the definition of

15  Physician Partners physician to him is both employed and

16  affiliate providers.

17         The other thing that I think is not entirely accurate

18  regarding his testimony is with respect to the compensation.

19  Although there are different compensation bonuses, just the way

20  that it works with affiliated versus employed, he also

21  testified very clearly that the affiliates also have

22  surplus-based bonusing, which is really the crux of how the

23  inducement to the physicians works here, is to either -- induce

24  them to have a higher surplus, which is get more money, spend

25  less money.  That worked across -- the same for both affiliate

1  and employed, under a different name, you know, they titled the

2  programs differently, but the crux of it was universal to all

3  of their employees.

4       And the other testimony that we've discussed that was

5  in our brief and that came up in other depositions regarding

6  the training, all of them were onboarded by -- the same way,

7  they were explained the Medicare Advantage system the same way,

8  they were given the same documents, they were given the same

9  monthly reports which showed the way that they coded and their

10  MRA scores, they were given the same video instruction, all of

11  that is universal.  Those are not superficial allegations that

12  relator made in her Complaint, those are the heart of the

13  allegations that relator made in her Complaint, and that has no

14  distinction between the two groups of physicians.

15       There was one other thing I wanted to note regarding

16  that 193-1, that declaration.  One, self-serving declarations

17  have not a ton of utility with discovery disputes like this,

18  typically, but even in that, during Mr. Kollefrath's

19  declaration I went through paragraph by paragraph with him to

20  really understand what he meant, and in fact some of the things

21  that he put in there as distinctions when we talked about it

22  really weren't distinctions at all.

23       So, for example, he made an allegation regarding --

24  that it was the affiliate physicians that, you know, selected

25  their own codes in the EMR.  Well, it's also the employee

1   physicians that ultimately select their codes, they're just

2   doing it on the basis of the pressure that's being put on them.

3   That's the same between the two groups of providers.  It wasn't

4   like someone else is entering codes for employed physicians

5   while the affiliate physicians are doing it on their own.  So

6   when we really broke down what was set forth in that, there

7   wasn't a lot of practical difference as much as it was sort of

8   surface level descriptions.

9           THE COURT:  All right.  I want to see

10  Mr. Kollefrath's deposition transcript.  I know you just took

11  him -- took it on Friday.  When will the transcript be ready?

12  Have the parties ordered the transcript yet?

13          MS. ESTES:  We've ordered it, Your Honor.  I actually

14  conferred with our typist this morning to see if it was

15  available.  We've put them under a lot of pressure these last

16  two weeks to get everything done.  We can certainly ask him to

17  put that to the top of the pile and to get it done as soon as

18  possible.  I would -- on behalf of him, I'd hate to give a date

19  and not -- you know, that he cannot meet.

20          THE COURT:  I understand.

21          MS. ESTES:  But we can certainly ask him to rush the

22  completed version.  He has a rough almost done, but it sounds

23  like Your Honor would like more than a rough, to get the actual

24  transcript.

25          THE COURT:  Yeah, I don't -- I do not want a rough,

1    I want the actual transcript, and I understand that takes time,

2    especially if it was a long deposition, but you can expedite

3    transcripts, I think the cost associated with doing so is

4    justified in this case, it's a major issue, and so I would like

5    to see that deposition transcript and like the parties to file

6    that transcript as soon as it's available.

7            As far as the corporate rep deposition, Mr. Swanson,

8    if you believe there's relevant portions of that that you would

9    like to file, I'll allow you to do that as well, but I'm mostly

10   interested in Mr. Kollefrath's deposition transcript.  So I'm

11   going to defer ruling on this motion until I've had an

12   opportunity to review that deposition transcript, and, again,

13   ask the parties to please expedite the transcript and file the

14   transcript as soon as it's available.

15           MS. ESTES:  Your Honor, may I clarify that relator

16   can also submit portions of the --

17           THE COURT:  Yes.

18           MS. ESTES:  -- corporate representative and -- there

19   was actually two, there was a corporate representative from

20   Physician Partners and from VIPCARE, which is the employed

21   entity, and some of her testimony I think speaks to this also.

22   Are both of those corporate rep depositions available for

23   accepting?

24           THE COURT:  They are, yes.

25           MS. ESTES:  Thank you.

```
 1              THE COURT:  And if there's any way for the parties
 2    just to coordinate on this so we don't have competing excerpts
 3    from the deposition transcripts of these individuals, the
 4    parties, you know, just designate what portions that you think
 5    are relevant and then jointly submit them and I'll review them
 6    and determine what portions, if any, I think are relevant, but
 7    just so we don't have just competing transcript -- transcript
 8    excerpts being filed on the docket, I'd like the parties to
 9    confer and file one portion of it.  There's going to be no
10    objection to another party's portion, just file everything that
11    either party would like -- believes is relevant and would like
12    to bring to the Court's attention in connection with this
13    motion, and if there's a need to file it under seal then the
14    parties can move to file it under seal as well.
15              MS. ESTES:  Thank you, Your Honor.
16              MR. SWANSON:  Thank you, Your Honor.
17              THE COURT:  All right.  Anything further on that
18    motion?
19              MS. ESTES:  Not today, Your Honor.
20              THE COURT:  Okay.  Let's move on then to the next
21    motion, which is relator's motion to compel discovery from
22    Freedom defendants, which is docket entry 279.
23              Ms. Estes, is that you as well?
24              MS. ESTES:  No, sir, that's my colleague,
25    Ms. Hartman.
```

1          MS. HARTMAN:  Yeah.  Good morning, Your Honor.

2          THE COURT:  Ms. Hartman.

3          MS. HARTMAN:  Yeah.  On the motion to compel,

4    especially the Freedom defendants, that also -- one of the

5    issues in that case overlaps with the provider defendants as

6    well, and that's the motion to compel the medical records.

7    That's a request that went to both parties, so, you know,

8    I think it makes sense to start with that medical records one,

9    which involves both -- both parties.

10         THE COURT:  That's fine, but there's a big

11   distinction in the response in that Freedom defendants are

12   saying they don't actually have access to the medical records,

13   correct?

14         MS. HARTMAN:  Yes, that's correct, and I'll -- let

15   me -- let me jump in on that then.

16         So on the medical records request, which went to both

17   the provider defendants and the Freedom defendants, I think

18   sort of -- I want to back up a little and address that issue of

19   where these records fit into the Medicare Advantage system,

20   because I think it sort of helps to have that background and

21   that context.

22         So in this case the defendants have already produced

23   what we refer to as claims data for beneficiaries enrolled in

24   Freedom and receiving primary care from the provider

25   defendants.  That claims data came in to relator in March of

1    2024.

2           Now, claims data is just that, it's the claims that

3    are submitted by the providers to the Medicare Advantage

4    organization.  Claims are not medical records, but they do

5    include a lot of information, beneficiary, provider, diagnosis,

6    dates of service, et cetera, and including the medical

7    diagnoses for that patient.  So providers send --

8           THE COURT:  I'm familiar with claims data.

9           MS. HARTMAN:  Yeah.  Okay.

10          So providers send that to the MAO and the MAO submits

11   it to CMS.  So while it's only that claims data that is

12   submitted to the Government, CMS regulations and contracts

13   between CMS and Freedom require that all diagnoses submitted by

14   those providers must be unambiguously supported by

15   beneficiaries' medical records from face-to-face encounters

16   with specific types of providers, and medical -- those medical

17   records that plaintiff has requested in this case are the

18   source of truth for the purpose of receiving and retaining risk

19   adjustment payments.

20          So because those medical records are the source of

21   truth but aren't routinely themselves submitted to CMS, MAOs

22   are subject to regular audit by CMS to ensure that the

23   diagnoses they submit are supported by those medical records,

24   you know, and those are -- they're referred to as RADV audits,

25   Risk Adjustment Data Validation audits, where CMS can select a

1    contract for audit, and when a contract is selected for the
2    audit CMS does what plaintiffs are doing here, request a random
3    sample of beneficiaries' medical records, and then the MAO has
4    to obtain those medical records and validate those diagnoses
5    within them.  So for the RADV audit for a large provider like
6    Freedom, that would be 200 beneficiaries per contract year.

7            In addition, of course, MAOs perform their own chart
8    reviews, have their own process of going out and sampling
9    medical records and requesting those from providers.  They do
10   that for their own compliance programs, because they want to
11   mine those charts to add additional diagnoses, because their
12   financial team wants to check on revenue projections that
13   depend on that risk adjustment data, or because, as is the case
14   here, they're subject to a monitoring agreement.

15           There's a corporate integrity agreement here that
16   requires Freedom and Optimum to conduct that chart -- pull a
17   chart review and sampling, and so in this case they had to
18   do -- 100 beneficiaries were randomly selected for audit per
19   year as part of the corporate integrity agreement that they
20   were subject to, and we just got testimony last week from the
21   independent monitor there, and his impression was that there
22   was no problem getting those records, that they were able to
23   turn those requests around quickly.

24           So, you know --
25           THE COURT:  When you say "getting those records," you

1   mean they were able to turn it around for the audit?

2            MS. HARTMAN:  Correct.  Yes.  Exactly.

3            So, you know, because this sort of chart review

4   process is, you know, bread and butter for what MAOs do in

5   different contexts and they have written policies on it, and

6   *(REDACTED)*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24            So that's an example of the kind of chart review that

25   Freedom, like other MAOs, is regularly involved in.  And,

of course, on the provider side, you know, providers similarly
conduct their own chart reviews for similar compliance,
financial, et cetera, reasons.

So this is really, as I said, you know, the bread and
better of the chart review MAO programs, and because this is
such an important part of the program, because of Medicare
regulations that these charts have to be maintained, they're
the source of truth, you know, MAOs have to maintain access to
those medical records, that's in the CMS regulations, it's in
the contract between CMS and the MAOs, it's in the contract
between the provider defendants and Freedom, it's in the
Freedom provider guide that is incorporated in the contract,
and it's, frankly, disingenuous for Freedom to claim that
there's a barrier arising from some purported lack of access to
the medical charts of the provider defendants.  It's not
something, I assume, that they'd want to say to CMS,
for example.

You know, but most significantly, the provider
defendants are here too, you know, they're in this room,
they're subject to this discovery as well, so any way you look
at it, a party with custody and control of the requested
medical records is here today to answer this discovery.
They've been served with a document request that covers those
medical records.  So I think the question of, you know, custody
and control disappears because of that, like the -- these

```
 1   medical records are subject to discovery from one party or

 2   another.

 3              THE COURT:  Right.  Ms. Hartman, is it your

 4   understanding that the Freedom defendants still have custody,

 5   not control but custody of the (REDACTED)

 6

 7              MS. HARTMAN:  For that one -- just for that one year,

 8   yes, it is my understanding that they do, and those have not

 9   been produced.

10              THE COURT:  All right.  And do you believe there's

11   any distinction between their control over patients' medical

12   records for purposes of responding to a Government audit

13   request or a request from CMS versus a request from a relator?

14              MS. HARTMAN:  No, I don't.  I don't believe that

15   there is a difference there, Your Honor.  This is a discovery

16   process as part of, you know, litigation, and they -- there's

17   no reason to draw a distinction on that basis.

18              THE COURT:  All right.  Based on the contract that

19   they have with the physicians as to what needs to be -- what

20   they have control over, what they can gather from the

21   providers; isn't that correct?

22              MS. HARTMAN:  I don't believe that they have created

23   a record on that and shown what the limitations on that basis

24   are, so I'm not able to respond in terms of what their

25   limitations are.
```

1           THE COURT:  Okay.

2           MS. HARTMAN:  And this is, you know, litigation that,

3     you know, relator has brought under the False Claims Act, it's,

4     you know, in the -- in the name of the United States funds

5     recovered and this will go to the United States, so that's

6     another reason for their -- a lack of distinction between

7     whether there's a CMS audit or in litigation.

8           THE COURT:  Now, talk to me about the statistically

9     valid random sample that you're seeking.

10          MS. HARTMAN:  Yeah.  Exactly.

11          So plaintiff had originally sought medical records,

12    the original request was for medical records for all Freedom

13    beneficiaries, and she's narrowed that to 1,200, and then

14    intends to use that sample to extrapolate from that sample and

15    show the rate of diagnoses errors in claims that are submitted

16    by the provider defendants to Freedom and thereafter by Freedom

17    to CMS, so what -- more specifically, there are six relevant

18    years in this case between the different defendants, 2015 to

19    2020, and relator alleges that during that time period, during

20    that relevant time period defendants engaged in specific

21    patterns and practices that resulted in the submission of false

22    claims in the form of false and unsupported diagnoses.

23          The claims data that defendants produced included

24    189,000 member years, that's the term, and so just to sort of

25    put that in context a little, if there's a -- Jane Doe is a

1   beneficiary under the Freedom plan, seeing Physician Partner
2   doctors for three calendar years during that relevant time
3   period, she accounts for three member years.  If you had 10,000
4   customers, no one joins, no one leaves over the course of
5   three years, that would be 30,000 member years.  So from that,
6   that's how you get to 189 -- that's what that 189,000 number
7   is, and from that 189,000 member years plaintiff's -- it was
8   plaintiff's expert who took this random sample of 1,200
9   patients, which represents roughly 300 in each year.
10          Now, that expert work took some time after production
11   of the claims data.  As I said, we received this claims data
12   only in March of this year, and defendants provided that,
13   you know, raw claims data in a number of different files with
14   different elements collected in different files.  Originally I
15   don't believe we got all the data dictionary information
16   required -- that was required by the ESI stipulation.
17   Defendants revised their production on at least one occasion.
18          So those disparate files had to be combined and were
19   combined into a single database consisting of over 16 million
20   lines of data.  So there was some processing involved.  This
21   wasn't something that we could just turn around.  So, you know,
22   relator did not sit on this data or delay her requests.
23   You know, we didn't receive the claims data in total as revised
24   until mid-March, had to figure out what we were looking at, do
25   that processing, and then get the expert to turn around that

1  sample.

2         And, you know, plaintiff's intent to use a random

3  sample though was not a surprise to the defendants, this had

4  previously been discussed between the parties, and as the

5  correspondence submitted by the provider defendant shows, the

6  parties had discussed this as far back as the fall of 2023, and

7  that was before, of course, defendants had even produced a

8  complete set of claims data.

9         And indeed in those earlier discussions counsel for

10  the provider defendants, you know, acknowledged plaintiff's

11  planned sample and, in fact, offered 75 charts per year from

12  the providers, and that offer applied to years in Freedom's

13  relevant time period, 2015 to 2020, and not in provider's

14  relevant time period.

15         So the defendants have acknowledged the relevance for

16  discovery purposes of charts beyond those individuals that

17  are -- happen to be named in the Complaint.  What we're

18  fighting over here is how many charts that should mean.

19  Provider defendant's counsel earlier offered what amounts to

20  75 charts a year over six years, that's 450 charts.  Relator

21  suggests 1,200 charts.  That's based on our expert's random

22  sample.  That's the gap we need to cover.  That's what we're

23  fighting over, is the number of charts subject to production

24  here.

25         THE COURT:  All right.  Have the provider defendants

```
1    agreed that if they provide you with the number of charts that
2    they think is appropriate that that would constitute a
3    statistically valid random sample?
4              MS. HARTMAN:  They have not.
5              THE COURT:  Has that been discussed between the
6    parties?
7              MS. HARTMAN:  It has not.
8              THE COURT:  Why not?
9              MS. HARTMAN:  It's not something we've been able to
10   engage with the provider defendants on.  They are now taking
11   the position that they won't produce any.
12             THE COURT:  All right.  Anything further,
13   Ms. Hartman?
14             MS. HARTMAN:  Not at this time, Your Honor, but
15   I reserve the -- subject to replying to defense.
16             THE COURT:  All right.  Let me hear a response.
17             MR. SWANSON:  Your Honor, what is the Court's
18   preference for the order in which we would take up the
19   response?  Ms. Santella and I are both prepared to speak to
20   some of these cross-cutting arguments, although each of us also
21   has some idiosyncratic arguments, for example, the Freedom
22   possession, custody and control.  So what would the Court
23   prefer?
24             THE COURT:  However you want, Mr. Swanson.  Whatever
25   you prefer is fine with me.
```

```
 1          MR. SWANSON:  Ms. Santella, I know we're doing this
 2   on the fly.  Is it all right if I just start in on the
 3   cross-cutting arguments?
 4          MS. SANTELLA:  Absolutely.
 5          MR. SWANSON:  All right.  Thank you.
 6          And thanks again, Your Honor, for your flexibility
 7   there.
 8          You know, our position on the request for medical
 9   records I think can be -- can be summarized in three bullet
10   points.  One, the characterization of what has happened in this
11   case, the record is incorrect, and we spell this out at length
12   in the first six or seven pages in the opposition to the motion
13   that we filed last week.  Two, the request for these medical
14   records, for many of the reasons that I just talked about when
15   we were discussing the affiliate issue, is not supported by the
16   case law, is not supported by Eleventh Circuit precedent and
17   the principles that animated your ruling on temporal scope.
18   And, finally, this request imposes an undue burden on the
19   provider defendants and is not proportional to the needs of the
20   case.
21          So taking up the first of those, we have been trying
22   for over a year, we and the Freedom defendants, to get the
23   relator to identify the other patients whose diagnoses she
24   contends are false.  We served an interrogatory in January of
25   2023, and, again, relator in her First Amended Complaint
```

1   professes to have had full access to all medical records and

2   claims data while employed at VIPCARE and as a result could

3   trace the false claims from cradle to the grave.

4          After 19 months of discovery and two weeks left

5   before the close of discovery, we were -- we received this

6   request for 1200 patients, with 600 alternates, most of whom

7   were patients seen by affiliates, and, you know, the

8   Ram Moorthy declaration that we provided with our opposition

9   last week spells out how much work would be attendant to

10  collecting those records.

11         Just the 1200 would be 2400 to 4800 hours, a million

12  pages, and that assumes that we have all of the records at our

13  disposal in the first instance.  For the reasons I've already

14  talked about with regard to affiliates and the fact that many

15  of those affiliates are no longer contracting with us, frankly,

16  it would be very, very difficult to collect those records that

17  we -- that we do not have.

18         And I mentioned the burden point there, which was my

19  third point, only because I think it's very important to be

20  cognizant of that burden as we think about what the controlling

21  legal principles are here.

22         It's simply grossly disproportionate to make a

23  request for these -- for these records where there's not been

24  any articulation of how those records, those patients, are

25  substantially similar to those described in the First

1    Amended Complaint and that similarly fit a pattern of conduct
2    on which the Complaint is based.  And that's a paraphrase
3    I just took from one of relator's leading cases, the *McCartor*
4    case, and we don't even have that explanation from relator in
5    this case and yet we're being asked to undertake this extreme
6    burden.
7              Our opposition cites *Phalp* and a number of other
8    Eleventh Circuit cases, including *Clausen*, for the legal
9    principle that False Claims Act cases are unique and -- and
10   they're particularly unique in a declined qui tam case, and,
11   you know, Your Honor cited those principles when you issued
12   your ruling in November about the temporal scope, you cited the
13   *Bane* case again from Judge Pizzo to say discovery should be
14   limited and tailored to the specificity of the -- of the
15   Complaint, and you cited *Bledsoe* and a number of other cases
16   for the point that there will -- you know, there will be a
17   justification for broader discovery only where there are
18   representative samples of that broader class of claims in the
19   Complaint, and, quite honestly, they're just -- they're just
20   not present in the First Amended Complaint, and it has not been
21   explained to us at all how they would meet the standards that
22   I have just talked about.
23             And so, you know, I think all of those legal
24   principles are important to think about in light of this
25   request, I think they're particularly important in light of the

1  pending motion for judgment on the pleadings challenging the

2  Constitutionality of the False Claims Act, and so if much of

3  what has animated the case law that we've cited in our brief

4  last week and that I've talked about this morning is driven by

5  a concern about False Claims Act and the scope of discovery and

6  how unwieldy and burdensome it can become, I think those --

7  those observations from those courts are all the more pertinent

8  in light of the pending motion.

9          And, you know, on the topic of case law, we feel that

10  the relator's cases are simply distinguishable.  I mean, the

11  *McCartor* case, which did allow discovery outside of some

12  examples in the Complaint, also contained observations that we

13  think vindicate our position.  I mean, the Court said discovery

14  must skew closely to matters specifically described in the

15  Complaint, less the discovery, because of its burden and

16  expense become the centerpiece of litigation strategy, and the

17  Court stressed its concern that there is a high risk for

18  discovery to significantly outsize its worth and impose an

19  unfair burden and expense.

20          And so, again, even offering, as they have, to pare

21  it back to 1200 patients, there's still no explanation for how

22  those were selected.

23          And, you know, one other case to contemplate,

24  Your Honor, as we talk about these issues is the *CKD versus*

25  *Fresenius* case, 333 F.R.D. 25, also cited in our brief.  The

1    relator there sought nationwide discovery based on bald

2    assertions about the scope of the scheme, and the Court

3    distilled a number of these cases and said, you know, the

4    thread running through all of them is that discovery is limited

5    to the universe of transactions about which the relator had

6    knowledge or could plausibly allege were similar to the known

7    transactions, and the Court on that basis rejected the request,

8    and we'd argue here that for many of the same reasons that we

9    believe the affiliate request is unwarranted, here too the case

10   law just does not support the request for -- for these records,

11   particularly given the burden, and I would encourage the Court

12   to consider Mr. Moorthy's declaration filed with our opposition

13   last week.  Again, that is a conservative estimate and assumes

14   that those records are present with us already.  It would only

15   be compounded if, as I suspect, many of these records would be

16   with affiliates with whom we no longer have contractual

17   relationships.  And so I think as you -- as you consider the

18   legal principles, that that burden is inescapable.

19           And I would just add too that if -- if the animating

20   feature of many of these cases is that the Court needs to

21   consider what is in the Complaint, I know we're not here on a

22   motion for summary judgment, but I think it is also important

23   for the Court to be cognizant of what discovery has shown in

24   this case, as it is asked to order us and the Freedom

25   defendants to produce what could be significant amounts of

1   records at considerable expense, you know, a centerpiece, as I

2   said a few minutes ago, of the relator's case is that the

3   compensation, among other things, was structured at the

4   provider defendants to incentivize physicians to find and

5   submit diagnoses that did not exist; and another feature of the

6   Complaint is that there was a conspiracy between our clients

7   and the Freedom defendants.

8           Well, those critical allegations have been proven to

9   be totally false in the course of discovery, and I know that's

10  not directly on point to this issue of the propriety of the

11  medical records request, but as you consider this request to

12  order the discovery of potentially millions of pages of

13  records, I think it's useful to consider that the impetus for

14  that, Your Honor, are allegations that we believe in the

15  Complaint do nothing to support that request, and allegations

16  on other critical issues in that Complaint have proven to be

17  wildly incorrect.

18          THE COURT:  Mr. Swanson, is it an all-or-nothing?  Is

19  it the Court should order the production of the 1200 patient

20  years or -- that's being requested or no patient records at

21  all, or is there a smaller universe of medical records which

22  your clients believe are relevant and proportional to the needs

23  of the case?  It's been suggested that there's been an offer to

24  produce some documents at least or medical records at previous

25  times during discovery.

1        MR. SWANSON:  Your Honor, it is true that several

2    months ago, I think before the first of the year, there were

3    discussions about providing a set, I think it was 100 to 150,

4    of records back when we were engaged in discussions with

5    relator's counsel about medical records from the period outside

6    of our temporal scope but within the temporal scope for the

7    Freedom defendants, that was in 20 -- you know, 2015 and 2016.

8    We made an offer there of 100, 150 records.  We were rebuffed,

9    and the next, you know, we heard about this was a request

10   two weeks before the close of discovery for 1200.

11        And so, you know, the legal principles that require

12   some explanation and justification and tethering of the request

13   for the medical records, we would suggest the Court not lose

14   site of those, regardless of the number of records being

15   requested here, and, you know, the -- Mr. Moorthy's declaration

16   is -- you know, he's laid out the work that would be attendant

17   to collecting any records, and so, you know, the examples he

18   gave were in response to this request for 1200.  I think it

19   would depend on what the number might ultimately be, and it

20   very well still could be exceedingly burdensome and

21   disproportionate and not consistent with Rule 26.

22        THE COURT:  Right, but at least at one point the

23   offer was 75 patient charts per year over two years, so 150

24   charts, right?

25        MR. SWANSON:  That's what it was in discussing a

```
 1    different issue, Your Honor, yes, that -- that was an offer --
 2    an offer we made.
 3              THE COURT:  Explain to me how you derived at that
 4    offer.  What's significant about the 75 per year?
 5              MR. SWANSON:  I think that was just the course of the
 6    negotiations that were being had at that -- at that time,
 7    Your Honor.  I honestly do not have the details to, you know,
 8    furnish the propriety for that, given the passage of time, but
 9    I would say too that what should not be lost in this discussion
10    is we have produced a full set of medical records for the
11    20 patients whose claims are alleged as exemplars in the
12    Complaint.  We produced all of those.  I would submit that they
13    show the examples in the Complaint to be dubious at best, and,
14    you know, I think that is -- and we explored this with relator
15    at her deposition, and the transcript of her deposition was
16    submitted with our motion to seal, and we cited at page 3 of
17    our opposition the relevant pages where we walked through one
18    of the examples that she had alleged in the Complaint and
19    confronted her with a number of medical records.
20              So I -- you know, to be -- to be candid, Your Honor,
21    I don't -- I could tell you that we offered, you know, the
22    figure that I gave you back in the end of 2023 and then have
23    not heard anything since then, and, you know, the burdens we've
24    articulated I think would be -- would be important to consider
25    regardless of what the number might end up being.
```

```
 1            THE COURT:  All right.  So there's no universe of
 2   patients that are similarly situated to the exemplar patients
 3   in the Amended Complaint?
 4            MR. SWANSON:  Well, we have -- we have -- we have the
 5   20 we've produced, and then we have a list -- an Excel
 6   spreadsheet, Your Honor, that is 1200 names, dates of birth and
 7   other identifying information that -- it's -- for the
 8   reasons -- you know, per the cases -- per the cases we've
 9   talked about this morning, it's incumbent on the relator to
10   explain to us why those 1200 have anything to do with the
11   exemplars, and I'm not sure she knows.
12            THE COURT:  All right.  Anything further from you,
13   Mr. Swanson?
14            MR. SWANSON:  No.  Thank you, Your Honor.
15            THE COURT:  Ms. Santella?
16            MS. SANTELLA:  Thank you, Your Honor.
17   Amanda Santella for Freedom defendants.
18            I'll try not to be too repetitive of Mr. Swanson's
19   points, but there are a few points I'd like to highlight from
20   Freedom's opposition and to respond to Ms. Hartman's arguments.
21            The first is that, you know, as you have alluded to
22   at the outset, Your Honor, these medical records are not
23   Freedom's records, they're not a medical provider, these charts
24   are not our documents and we don't collect them, or even most
25   of them, in the ordinary course.
```

1    Ms. Hartman is correct that we collect a small number

2    of medical records for certain specific audits.  For instance,

3    for the IRO or corporate integrity agreement audits that we

4    mentioned in our brief, that is 100 patient records per year,

5    so clearly the scale of relator's request here is vastly

6    different from that.  But even more importantly than the number

7    of records -- or, I'm sorry, the number of members is the

8    specific diagnosis codes, HCCs, or dates of service that those

9    audits target.  This is why relator's request is apples and

10   oranges with Freedom's typical much more narrowly tailored

11   audits in response to CMS requests or the corporate integrity

12   agreement requests.

13   So in those audits what CMS or the IRO officer sought

14   are -- are records supporting specific dates of service for

15   specific diagnosis codes.  In other words, the patient was seen

16   on this date, provide the encounter note for that date, or

17   patient was diagnosed with this condition, provide the specific

18   record that supports that condition.  That's not what relator

19   is asking for here.  Here relator is asking for all medical

20   records for an entire year for the 12 to 1800 patient years

21   she's identified.  That's a vastly more burdensome request than

22   identifying 100 specific dates of service and pulling the

23   encounter notes for those dates, which is typically how Freedom

24   pulls records in response to audits.

25   Again, I don't think it's even in dispute at this

```
1   point that Freedom doesn't have the vast majority of these
2   records.  I'm not suggesting that this request is proper or not
3   burdensome as directed at provider defendants, I agree with
4   everything Mr. Swanson said, but it's doubly improper for us,
5   because our co-defendants whose records these actually are
6   are here, and so this is, you know, fundamentally a duplicative
7   request.
8           Ms. Hartman mentioned that -- that we haven't
9   established what the limitations are on our constructive
10  possession of these records, but it's relator's burden when
11  there is an issue of constructive possession and whether we are
12  able to get control or possession of these records, it's her
13  burden to show that we have constructive possession of the
14  records, and she hasn't done that.
15          Relator addressed this issue in a footnote in her
16  brief, she mentioned the agreement between Freedom and
17  Physician Partners without citing any particular provision of
18  that agreement and simply asserts that we had constructive
19  possession of the records.  That's not true, and, you know,
20  I think our brief addresses this point pretty thoroughly.
21          I just want to make a couple of other points in
22  response to --
23          THE COURT:  Before you move on --
24          MS. SANTELLA:  Sure.
25          THE COURT:  -- Ms. Santella, if I may.
```

1          MS. SANTELLA:  Yes.

2          THE COURT:  So you're representing to the Court that

3    the agreements that you have with the providers do not give you

4    access to the medical records for purposes of responding to

5    relator's requests for production?

6          MS. SANTELLA:  I'm not saying that we never have

7    access to medical records from provider -- I mean, we collect

8    medical records from providers, as I've noted, for specific

9    audits.

10          THE COURT:  That's not my question.  That's not my

11   question.

12          You have access to the medical records in response to

13   audits, or some medical records in response to, you know,

14   having to support the claims that are submitted, but as far as

15   responding to the requests for production in this case from

16   relator, you're representing to the Court that the agreements

17   that you have with the providers do not give you access or

18   control over the medical records for purposes of responding to

19   requests for production?

20          MS. SANTELLA:  Your Honor, I don't know -- I don't

21   believe that Freedom has ever requested from the medical

22   provider a production of records at the scale relator is

23   requesting.  So I do think there is a -- there is a distinction

24   to be made between *(REDACTED)*

25

```
 1

 2

 3

 4          This may be a question better posed to provider

 5   defendants of how they read the agreement *(REDACTED)*

 6

 7

 8

 9

10          THE COURT:  Well, I'd like to know how the Freedom

11   defendant would view the contract.  Again, do you believe that

12   you have *(REDACTED)*

13

14

15          MS. SANTELLA:  Our --  *(REDACTED)*

16

17                                      Again, our co-defendant

18   who possesses these records is -- is here.

19          THE COURT:  I understand.

20          MS. SANTELLA:  So --

21          THE COURT:  I understand, but I'm asking you, I want

22   to know *(REDACTED)*

23

24

25          MS. SANTELLA:  That's right.
```

```
 1              THE COURT:  Okay.  (REDACTED)

 2

 3

 4       I feel like you're being a little evasive, and

 5  perhaps not intentionally, but evasive in response to my

 6  question.  I'm trying to drill down as to what actual right you

 7  believe your client has to access medical records that are

 8  responsive to the requests for production.

 9              MS. SANTELLA:  I -- I certainly don't mean to be

10  evasive.  I suppose the reason it's difficult to answer this

11  question is that   (REDACTED)

12

13

14

15

16

17

18

19

20

21

22

23

24              THE COURT:  All right.  Thank you.

25              You can continue.
```

1          MS. SANTELLA:  Okay.  Thank you, Your Honor.

2          Next, I want to just -- again, hopefully without

3    being too repetitive, just highlight a few points from

4    Mr. Swanson's argument and from our opposition brief that

5    relator's request here is an improper use of discovery.

6          Relator has asked for a broad, undifferentiated set

7    of records that are not tied to any of the allegations or

8    theories in the Complaint.  Her justification is that the

9    universality, that's a quote, universality of the alleged fraud

10   justifies this approach, but that's just another way of saying

11   that she hasn't nailed down any particular theories or

12   allegations of false claims beyond the examples in her

13   Complaint even after many months of discovery.

14         You know, to emphasize the point I just made on the

15   constructive possession and burden argument, relator isn't

16   asking for particular diagnoses or HCCs for these patients.

17   For instance, she's not asking for records that correspond to

18   certain types of cancer or diabetes or other diagnoses that she

19   discusses in the Complaint.  Instead, relator is asking for the

20   entire medical record for these patients, because she doesn't

21   actually know what diagnoses she's looking for.

22         We understand from relator's Counsel that relator's

23   plan is to have her experts look at these records, root around

24   in them to find diagnosis codes that she will then claim are

25   false.  And even the cases relator cites in her brief warn

1    against this type of fishing expedition in discovery.

2            To be clear, relator's -- allowing relator to conduct

3    this broad discovery and root around in the medical records for

4    new theories of false claims will functionally reopen discovery

5    in this case.  This isn't just a matter of the defendants

6    producing a closed universe of documents to relator and then we

7    go on our merry way into expert discovery, because once relator

8    and her experts go through the exercise of looking at the

9    records to figure out what claims they think are false and

10   hopefully finally respond to our interrogatory asking her to

11   identify the universe of false claims, we then need to defend

12   ourself.  That may involve, for instance, seeking third-party

13   discovery, issuing third-party subpoenas to specialists whose

14   diagnoses support the claims that relator will eventually

15   allege are false.

16           So I say all of this to underscore that whether you

17   look at relator's very broad request for all records or her

18   purportedly narrowed request for 12 to 1800 member years of

19   records, this is still an expedition for relator to figure out

20   what her theories of fraud are, which is an improper use of

21   discovery in a False Claims Act case, as Mr. Swanson also

22   highlighted.

23           Finally, you know, I will note that Ms. Hartman said

24   that her -- that relator's random sample that they provided to

25   us two weeks before the close of discovery isn't a surprise

1    because they've always stated that they're going to use a

2    random sampling methodology.

3              Our opposition to that methodology similarly should

4    not be a surprise to relator.  We have said from the very

5    beginning, when relator mentioned a sampling exercise, that we

6    would oppose such a sampling exercise, that it's an

7    inappropriate way to prove false claims in an FCA case, and,

8    you know, so I -- I just -- I want to highlight that point for

9    the Court, because this is not, you know, a sudden about-face

10   on Freedom defendant's part where we are substantively against

11   a sample.  We have always maintained with relator that she must

12   tether her allegedly false claims to the false claims in the

13   Complaint or identify additional false claims during fact

14   discovery, and relator has not done that.

15             I'm happy to answer any questions the Court has, but

16   I think I'm -- I think I've addressed all the points from

17   Ms. Hartman's argument that I meant to.

18             THE COURT:  Thank you, Ms. Santella.  I do have some

19   questions for you, if I may.

20             With respect to the exemplar patients that are in the

21   Amended Complaint, is Freedom defendant able to identify the

22   diagnosis codes or HCCs for those exemplar defendants and apply

23   them to the universe of patient records for patients which

24   Freedom estimated claims for?

25             MS. SANTELLA:  Well, I'll note first that -- that

1    the -- so -- let me back up for a second.

2          We have produced diagnosis code data submitted to

3    CMS.

4          THE COURT:  Right.

5          MS. SANTELLA:  To the extent relator's Complaint

6    identifies specific diagnosis codes that she alleges are false

7    associated with the patients described in the Complaint,

8    I expect that we could look at the claims data and find those

9    same diagnosis codes in the patient population.  To be clear,

10   that's not what relator has requested.

11         THE COURT:  I understand.

12         MS. SANTELLA:  And, of course, fact discovery is

13   closed, so -- you know, so that would be a new request.

14         THE COURT:  But they're asking for more than that.

15   They're not limiting -- I mean, part of your argument is that

16   it's not narrowly tailored, they're asking for all patient

17   records, they're not limiting it to a diagnosis code or HCC

18   that's similar to those of the exemplar patients, that you're

19   suggesting that they're just doing a fishing expedition asking

20   for all medical records, unrelated to any specific diagnosis

21   code or HCC, and then they're going to turn it over to their

22   experts and they're going to run through them and try to

23   generate new diagnosis codes or new theories of their -- of

24   their claims after just getting broad access to all medical

25   records, right?

1          So if it isn't -- it seems to me that you're

2   suggesting that there may be a universe of medical records that

3   would be relevant and proportional to the needs of this case,

4   but those would be limited to the diagnosis codes of the

5   exemplar patients that are listed in the Amended Complaint, or

6   the HCCs for the exemplar patients listed in the

7   Amended Complaint, and that would then prevent the kind of

8   concern that you have of then just getting all medical records

9   for the patient unrelated to any specific diagnosis code --

10  diagnosis code and just rummaging through patients' medical

11  records in order to identify some claim that they could advance

12  or some theory that they could advance in this case.

13          MS. SANTELLA:  No, Your Honor, I was responding to

14  your factual question about whether we could figure out what

15  diagnosis codes similar to the ones in the Complaint appear in

16  the claims data for Freedom defendants, and I believe we could

17  figure that out.  To be clear, that doesn't mean that we have

18  the medical records for those.

19          THE COURT:  No.  I'm sorry.

20          MS. SANTELLA:  But I under -- I under -- I understand

21  your point.

22          You know, I don't know that -- I mean, I guess the

23  topline response to this is that relator hasn't tried to do

24  this narrowing herself.  I mean, her Complaint doesn't state

25  that the defendants had a pattern of, you know, addressing this

1   certain type of cancer diagnosis in a certain way and,

2   you know, outputting it across patients.  That's not what her

3   Complaint says and she hasn't even attempted to narrow it that

4   way.

5           I was providing an example of how a relator might

6   connect a claims or medical records request to allegations in

7   the Complaint.  There are theoretical ways that a relator or

8   this relator could do that, she hasn't done that, and so,

9   you know, I -- I don't know that it would be reasonable either

10  to simply search the claims data for all of the diagnosis codes

11  that appear in the Complaint, though that would certainly at

12  least, you know, have some connection with the Complaint.

13  Again, that's never what relator has requested in all of

14  the months and years of discovery.  Her request has only been

15  for either all medical records or an undifferentiated random

16  sample of medical records.

17          Discovery is now closed, and so, you know, Freedom's

18  position is that relator shouldn't be able to rehabilitate her

19  discovery requests after the discovery window has closed with a

20  broad new request when she refused to date to narrow her

21  request in any way that's reasonably tethered to the Complaint.

22          THE COURT:  All right.  But we have an outstanding

23  broad discovery request, at least you characterize it as a

24  broad discovery request, that was submitted during the

25  discovery period and is before the Court on motion to compel,

1    and you think it would be inappropriate for the Court to narrow

2    that request to make it more proportional to the needs of the

3    case?

4          MS. SANTELLA:   That is our position at this point.

5    Just to be clear about the record, relator issued the -- these

6    RFPs, virtually identical or perhaps exactly identical RFPs to

7    Freedom defendants and provider defendants in February.

8    Freedom defendants objected on burden grounds and the fact that

9    we don't have -- these aren't our records, we don't have

10   possession of them.

11         I understand from Mr. Swanson that there was some

12   negotiation on provider defendants' part, I can't speak to

13   that, but we issued this objection, and relator did not engage

14   with us further on this issue until I believe it was end of

15   April or May and then ultimately issued this revised request

16   for 12 to 1800 years of -- member years of medical records.

17         Ms. Hartman mentioned that relator was unable to

18   engage or couldn't engage with the defendants on this point.

19   You know, that's not because the defendants refused to engage,

20   it's because we received this request two weeks before the end

21   of discovery, so -- so I do believe it would be inappropriate

22   to allow relator to issue a facially overbroad request, narrow

23   her request to something still overbroad and burdensome at the

24   eleventh hour, and, you know, get another shot at this

25   discovery after the discovery window has closed.  It's not

1    defendant's discovery conduct that has prevented relator from

2    receiving a reasonable set of medical records.

3            THE COURT:  Okay.  Explain to me your client's

4    position regarding a statistically valid random sample.  From

5    what I'm hearing, you object to the use of a statistically

6    valid random sample in order to prove false claims, that the

7    argument is that relator must support each false claim

8    individually and not just extrapolate it based on a random

9    sample.

10           If that's the case then why shouldn't the relator be

11   entitled to more discovery on more patient records beyond what

12   they believe is a statistically valid random sample?

13           MS. SANTELLA:  Well, let me -- I will address that

14   question.  Let me clarify just one point, which is that our

15   objection to this discovery is not based on an objection to

16   random sampling, so I just want to be very clear that we

17   haven't refused to provide medical records on the basis that

18   random sampling is inappropriate in a False Claims Act case.

19   You know, that is an issue to be addressed, you know,

20   potentially maybe down the line through various, you know,

21   dispositive and expert-related motions, but our position -- so

22   our position in not responding to this request is on the scale

23   and the scope and the burden of the medical records and the

24   inappropriate use of discovery for a fishing expedition to

25   figure out what relator's theories of false claims are.

1        Relator is not entitled to the broader set of medical

2   records I think for the reasons we've already mentioned and

3   mentioned in our briefing, which is that it's overbroad,

4   burdensome, untethered to the allegations in the Complaint, and

5   relator didn't issue an appropriately-scoped discovery request

6   during fact discovery.

7        I mean, there are various ways that relator could

8   have requested a reasonable population of medical records.  I'm

9   not saying that there's no world in which she would ever be

10  entitled to medical records, though, again, I would reiterate,

11  she wouldn't be entitled to receive them from Freedom

12  defendants.  But putting that aside, she's never made that sort

13  of reasonable request.  So if the question is whether,

14  you know, relator's undifferentiated "the fraud is universal"

15  allegation requires -- entitles her to all of these records,

16  I would say that, you know, for the reasons stated in our

17  opposition discussed today, that's not the case.

18        THE COURT:  All right.  Now, if Freedom takes the

19  position that they don't have control and custody over the

20  medical records that are in the possession of the providers,

21  but Freedom does acknowledge that they do have in their

22  possession some medical records, why shouldn't Freedom be

23  ordered to produce those medical records that are actually in

24  their possession to the relator that are responsive to the

25  requests for production?

1          MS. SANTELLA:  Well, I will note that relator's

2    request for the 12 to 1800 member years of medical records is

3    not -- there is no relation to what we have actually collected

4    or not collected for our targeted RADV and IRO audits, so we

5    would need to explore whether we actually have anything, all,

6    some portions of those records corresponding to those 12 to

7    1800 medical -- member years.

8          I would suspect, you know, because those other audits

9    are targeted at specific HCC diagnosis codes and dates of

10   service, it's very unlikely that we have the full medical

11   record for very many of these patients, if any of them.  So,

12   you know, again, if we're talking -- is it practically -- or is

13   it theoretically a possibility that we could endeavor to find

14   specific dates of service within the broader medical record for

15   some of these 12 to 1800 patients, you know, I suppose we could

16   look for that.  I think that would be a massive undertaking,

17   for us to try to match up those member years with the ad hoc

18   dates of service that they've collected for other purposes.

19   I can't speak to exactly what the burden would be, but I think

20   our opposition highlights that, you know, for just 100 dates of

21   service or diagnosis codes, you know, it took a full team of

22   employees several months to collect those, so, you know, the

23   effort to match those up and then augment what we have with

24   remaining records, you know, I expect that would be a

25   burdensome exercise that would take a very long time.

1    THE COURT:  Even though you already gathered those

2    records in response to an audit, you already have them in your

3    possession, you have them by dates of service, so you know the

4    timeframe of the records that you gathered, it's going to be

5    unduly burdensome for you to look at those records to see

6    whether there's any portion of those that are responsive to the

7    requests for production?

8    MS. SANTELLA:  To match those records up to the 12 to

9    1800 member years that relator has requested in her sample,

10   yeah, I do suspect that that would be quite a burdensome

11   undertaking that -- you know, and again, that isn't what

12   relator had requested from us.  She hasn't requested produce

13   the results of your IRO audit, produce the charts that you've

14   collected in response to RADV audits, that's not been her

15   request, and so Freedom's position is that relator shouldn't be

16   able to rehabilitate her unreasonable request for things she

17   hasn't asked for after fact discovery is closed.

18   THE COURT:  But isn't it incumbent upon -- for

19   already responding to requests for production, if they're

20   making -- if they believe that the request is objectionable on

21   the basis it's overly broad or unduly burdensome, that they are

22   to limit their response to what is not in their view unduly

23   burdensome or overly broad?  If there's a -- there's a

24   different way, there's a small subset that is not

25   objectionable, shouldn't it -- doesn't the responding party

1    have the obligation to provide that in response to a request

2    for production and not just make a blanket objection that

3    everything is unduly burdensome or overly broad?

4           MS. SANTELLA:  Freedom's position in this

5    circumstance is that relator's request for us to find ad hoc

6    records that we've collected a portion of in response to a

7    request for 12 to 1800 medical year -- member years is unduly

8    burdensome.  Again, we -- we collect records for specific dates

9    of service for diagnoses, so we would need to take the member

10   year relator has identified, figure out all of the dates of

11   service and or diagnoses within that year for these often sick,

12   elderly patients, and then cross-reference them with what we've

13   collected for much more targeted specific audits over the years

14   to see if one of those diagnosis codes or dates of service for

15   that number was collected in response to one of these different

16   audits over the years.

17          Freedom's position is that that is an unduly

18   burdensome exercise, and, you know, again, had relator

19   negotiated with us and attempted to narrow her request to

20   records that Freedom possessed in response to our objections,

21   we might be in a different world here, but that's not how

22   discovery materialized in this case.

23          THE COURT:  But my question is what's your obligation

24   in response to a request for production.  You make an objection

25   and you say that it's unduly burdensome or overly broad or not

1    proportional.  Don't you have an obligation to identify what is
2    not objectionable, what subset of that request would not be
3    objectionable?
4            MS. SANTELLA:  We -- Freedom's position is that
5    that -- there is not a portion of that request that is
6    unobjectionable with respect to Freedom defendants for the
7    reason of the burden, for the reasons of us not having
8    possession of the records, for the reasons of it being an
9    improper request not tethered to the allegations in relator's
10   Complaint.
11           THE COURT:  All right.  Thank you, Ms. Santella.
12   Anything further from you?
13           MS. SANTELLA:  No, Your Honor.
14           THE COURT:  All right.  Mr. Swanson, we addressed
15   some issues that I don't think were addressed by your argument
16   as an initial matter.  Do you want to weigh in on any of those?
17           MR. SWANSON:  I would just add, Your Honor, that --
18   and I said this before, but just to reiterate, we did produce
19   the medical records for the 20 patients identified in the
20   Complaint, you know, approaching 20,000 pages of documents.
21   We served an interrogatory a year and a half ago asking for
22   identification of claims.  We had these negotiations very early
23   stages with the relator many, many months ago and never heard
24   anything more on it, and, you know, weren't given another
25   alternative to consider until two weeks before the close of

1  fact discovery this list of 1200 patients with no explanation

2  other than this is derived from work our experts have done

3  landed in our -- our laps, and so I would just -- I would just

4  add those additional points or amplify those previously made.

5           THE COURT:  All right.  Thank you.

6           Ms. Hartman?

7           MS. HARTMAN:  Yes.  Just briefly, Your Honor.

8           Relator did serve a document request within the

9  discovery period, and what the parties are trying to do here is

10 narrow that.  As I said earlier here, we're fighting about the

11 number of charts that should be produced and also, apparently,

12 how that sample is selected, whether it should be targeted to

13 certain HCCs.  You know, if that's something that the parties

14 can discuss further, you know, we're happy to do so.  That's

15 not something that had been raised before.

16          You know, relator is not trying to find new theories

17 of liability here, relator is quite happy with the theories of

18 liability she already has, and, you know, if there's

19 something -- this does not need to be an all-or-nothing

20 request, you know.  As your -- as the Court has pointed out,

21 you know, what has already happened here includes that we

22 served a valid discovery request before we even narrowed it,

23 you know, to this 1200 random sample, Freedom was sitting on a

24 cache of responsive medical charts that they didn't even review

25 at that point for production.  So I think that given that

1    the -- where we are in this case, with a valid outstanding --

2    with a discovery request outstanding within the discovery

3    window for medical charts that are relevant to relator's

4    claims, that some discovery should be ordered here.

5            THE COURT:  But, Ms. Hartman, your request is not at

6    all tailored to any specific diagnosis code for HCC; is that

7    correct?

8            MS. HARTMAN:  At this point it was not tailored to

9    specific diagnosis codes.  You know, happy to discuss that

10   further with defendants, you know, if we have an agreement

11   about -- you know, our concern, of course, was that, you know,

12   we have something that was statistically valid as a random

13   sample.  You know, if defendants will agree to some other

14   process, perhaps targeted to HCCs, happy to explore that with

15   them.

16           THE COURT:  Well, statistically valid based on the

17   claim, the universe of the claim, right?  So if the universe --

18           MS. HARTMAN:  Right.

19           THE COURT:  -- of the claim that you're asserting is

20   based on a diagnosis code that's been submitted, you know, the

21   false claim is routinely submitted under one diagnosis code or

22   multiple diagnosis codes or HCCs, then that's the universe of

23   claims of which there's statistically valid random samples

24   drawn from, but it appears from what I'm hearing that that's

25   not what relator is doing, relator is just going to the

1   universe of all patients from Freedom, that Freedom submitted

2   claims on their behalf, and you're taking that universe and

3   trying to draw a statistically valid random sample from, and

4   what I'm hearing from the defendants is that if you are

5   entitled -- I mean, they're taking the position you're not

6   entitled to any medical records, it appears, but even if you

7   were entitled to some, you would need to identify what's the

8   actual false claims that are being submitted to the Government

9   and tie your request for medical records to the exemplar

10  patients that you have in your Complaint, or if you've

11  developed, you know, new theories based on the discovery to

12  date, that you articulate what those are, and so your requests

13  for patient records are tied to the exemplar patients or the

14  information that you've learned through discovery, and what I'm

15  hearing is that it's not at all, it's just you want to look at

16  a statistically valid random sample, at least what your experts

17  believe to be a statistically valid random sample of the

18  universe of all patient records of claims submitted by Freedom.

19          MS. HARTMAN:   Correct, Your Honor.  And just to back

20  up a little on what our expert did, you know, we did ask

21  originally -- and I'd need to look at this further, and I think

22  it would be something to meet and confer on.  We looked at the

23  claims data, and those -- the diagnoses in question that are,

24  for example, the diagnoses identified in the Complaint appear

25  in 90 percent of the claims data, is my recollection, and

1    I don't want to -- you know, I would need to confirm that, but
2    my recollection is that that wasn't a meaningfully -- a
3    meaningful way to narrow it, by only focusing on those HCCs,
4    but I would want to confirm that.
5            THE COURT:  But, again, it seems to me that as an
6    initial matter that would be the first step of relator, would
7    be to look at the claims data and see the claims that are being
8    submitted that you are alleging to be false claims that were
9    submitted to the Government and look to see what claims were
10   actually submitted and see if there is similarities between the
11   exemplar patients that you've alleged in your Complaint, and
12   you have that information, you have the claims data, right?
13           MS. HARTMAN:  Yes, we do have the claims data, and it
14   is -- you know, as I said, we did have our expert look at
15   whether it could be narrowed to the member years that had those
16   HCCs of interest, and of the HCCs that were identified,
17   90 percent of the member years had one of those HCCs of
18   interest, so with that vast majority of member years would
19   already be in that population, so it was not a meaningful
20   restriction or would not, in our expert's view, have made the
21   sample more precise.  But if that's something, you know, to cut
22   out some 10 percent as -- again, you know, if we're talking
23   about how to target this sample or what size it should be, we
24   can provide further information on that.
25           THE COURT:  All right.  And explain to me the member

1   years, because my understanding is, you know, one patient, but

2   if they saw different providers those are considered different

3   member years even if it's occurred in the same year, correct?

4          MS. HARTMAN:  No, Your Honor.  The member years are

5   not tied to providers, they're tied to the member.  So,

6   you know, if I am a member of Freedom for three years then

7   that's three member years, regardless of how many doctors,

8   different providers, I see during that year, during those

9   years.

10          THE COURT:  Okay.  And when you ask for the patient

11   records for those patients, you're asking for their entire

12   medical record, their entire -- the universe of medical records

13   for the given member year?

14          MS. HARTMAN:  That's something also we'd be happy to

15   meet and confer on.  You know, the defendant in this case is --

16   is -- the provider defendants, you know, according to them

17   these are supported diagnoses, so if there's some way to stage

18   this and start with medical records only from the provider

19   defendants, you know, the provider declaration suggests that

20   they have to go get things from DME providers or, you know,

21   things that aren't even risk adjusting sources of data,

22   you know, if there's some staging that would be appropriate

23   there, that's something I think would make sense, to start with

24   what is supported in the provider records, the provider

25   training records.

```
 1              THE COURT:  But isn't it that that's what they're
 2    required to have in order to support the claims that are
 3    submitted to the Government?  It's a --
 4              MS. HARTMAN:  Correct.  That's what the Medicare
 5    Advantage program requires.  Yes.
 6              THE COURT:  Right.  It's a smaller subset of the
 7    patient records, it's not the entire patient record, it's just
 8    that which supports the claim that's being submitted.
 9              MS. HARTMAN:  Correct, Your Honor.
10              THE COURT:  All right.  So why aren't you asking just
11    for that?
12              MS. HARTMAN:  If that's something that would make
13    defendants more able to respond, we'd be happy to narrow it in
14    that way.
15              THE COURT:  Mr. Swanson, is that how your clients
16    maintain the medical records?  Are they maintained in a way
17    which it's easier to pull just the medical records that support
18    a claim submitted for a specific HCC or diagnosis code?
19              MR. SWANSON:  It may be, Your Honor, but I think,
20    you know, particularly if the Court is, as I get the sense
21    here, directing the parties to try to come up with some
22    compromise, that would have to be something we would need to
23    confirm with our client, if that is to be made part of some
24    discussions with -- with relator's counsel.
25              And to that end, and to the extent the Court is
```

1   considering some alternative here to the request that we've

2   heretofore been dealing with, I would just reiterate what's

3   clear from the cases, that the relator can't, you know,

4   bootstrap these theories based on what she's learned during

5   discovery.  She -- we -- we -- we only need to -- we should

6   only need to contend with what she brought to this case, and --

7   and that's what's in the Complaint.  And I agree with

8   Ms. Santella wholeheartedly, it's -- there is not some coherent

9   theory in there about certain HCCs or, you know, other --

10  you know, diagnosis codes, and so we're left with, you know,

11  the 20 exemplar -- examples and we've provided them and -- and

12  have not heard any of these other alternative formulations

13  until really this morning.

14          THE COURT:  I understand, but my frustration with the

15  parties is that there's a request that the defendants believe

16  is overly broad and it doesn't appear to me that there's been

17  any meaningful conferral process between the parties in order

18  to determine what isn't overbroad, what is an appropriate

19  subset of the request.  It seems to me that relators submitted

20  a request for production that perhaps is overly broad and

21  unduly burdensome and not proportional to the needs of the

22  case, but yet defendants just made the objection and there's

23  been no effort to narrow down the request to what is not

24  objectionable and what should be provided to relator, and,

25  quite frankly, I'm just -- I'm surprised that the parties have

1    not engaged in these discussions in order to determine what is

2    appropriate.  I find it hard to believe that there are no

3    subset of medical records that are relevant and proportional to

4    the needs of this case, but yet that seems to be the position

5    of the defendants, is throwing their hands up in the air and

6    saying this is -- this is too much, this is not narrowly

7    tailored to the -- to the claims in the Complaint, and that's

8    it, we're not going to give you anything.

9                MR. SWANSON:  Well, I think --

10               THE COURT:  Other than the 20 exemplar patient

11   records that we've given you.

12               MR. SWANSON:  I think -- I think, first of all, there

13   were efforts to work through this with the relator many,

14   many months ago, as I've talked about, and it was then radio

15   silence on this issue until two weeks before discovery, and so

16   we are -- we are left with, you know, a world in which there's

17   a request for everything, which is, you know, we think, grossly

18   disproportionate to the case for all the reasons we've talked

19   about, and the alternative is 1200 patients with no explanation

20   given for those, and so I -- Your Honor, I understand,

21   you know, your desire, it seems, for the parties to have found

22   some way forward here, but, you know, in our shoes, where we

23   had produced nearly 20,000 pages of records for the 20 who are

24   in the Complaint, had made these efforts, had served an

25   interrogatory on them 18 months earlier to identify the claims,

1    and then, you know, our consolation prize was a list of 1200

2    patient with no explanation for the provenance of those

3    patients, you know, we're -- and -- and where the obligation

4    lies with the relator to articulate some theory to justify

5    this, you know, we -- I understand -- I understand, you know,

6    your -- your frustration, but I think the record, at least

7    where we sit, is -- is defensible, but we're also mindful of

8    the observations you've made this morning and, frankly,

9    revelations we've heard for the first time, such as the

10   expert's assessment that, you know, these HCCs are present in

11   90 percent of the -- of the claims.  I mean, we're -- if -- if

12   the Court's directive is for us to meet and confer about this

13   further and reserve our rights subject to those discussions,

14   you know, we're -- we're happy to do that.

15            THE COURT:  And I don't mean to suggest by my

16   arguments that it's -- my frustration is solely with the

17   defendants, it is not, it's a two-way street.  The relator,

18   after receiving the objection to this request, should have

19   tried to articulate what exactly they need and what exactly is

20   relevant and proportional to the needs of their case in order

21   to help defendants narrow the patient records that should be

22   provided, and, you know, we're discussing these issues for the

23   first time at this hearing, and I'm just -- again, I'm just

24   surprised, with all the attorneys that are on this Zoom

25   hearing, that there hasn't been a meaningful effort by all

1   parties in order to determine, okay, what is a reasonable

2   subset of medical records that are both relevant to the claims

3   asserted in the Amended Complaint and proportional to the needs

4   of this case, and it doesn't seem like the parties have really

5   undergone that effort.

6          There appears there was at least some discussion

7   early on about providing a smaller subset, perhaps 75 patient

8   records per year for two years, and I understand why you're not

9   in a position to articulate how defendants came up with that

10  number, but there -- at this hearing there is no explanation as

11  to why that offer was made or what that was based on.  I mean,

12  I think these are discussions that need to be had between the

13  parties, is if 75 is the appropriate number, then why is that

14  the appropriate number?  What are we looking at?  How are we

15  narrowing this down to something that makes sense?

16         So if the parties are asking the Court to do all or

17  nothing, to either grant the motion to compel as to the request

18  for production in total or deny it in total, then that's --

19  then that's what I'll do, but I think that the parties are

20  really doing themselves a disservice by not meaningfully

21  engaging in a conferral process in order to narrow it down to

22  what is actually needed in this case.

23         So I am going to order the parties to confer on this

24  issue, I'm going to give you two weeks to do that and to narrow

25  it down.  If you can't narrow it down then you just need to

1    file a joint notice to the Court saying that the parties have

2    been unable to narrow the issues and the parties request that

3    the Court either grant in full or deny in full the motion to

4    compel as to the requests for production.

5              Does that make sense, Ms. Hartman?

6              MS. HARTMAN:  Yes.  Thank you, Your Honor.

7              THE COURT:  Mr. Swanson?

8              MR. SWANSON:  Yes.  Thank you, Your Honor.

9              THE COURT:  And Ms. Santella?

10             MS. SANTELLA:  Yes, Your Honor.

11             THE COURT:  Anything further on this motion before

12   I move on?

13             MS. HARTMAN:  Your Honor, plaintiff did have other

14   categories of Freedom documents that we moved to compel on as

15   well, and I want to briefly hit a couple of those.

16             You know, as we have taken depositions in this case,

17   you know, it's become apparent that there are certain

18   categories of Freedom documents that were not produced, and

19   that, of course, often happens in discovery, but here again

20   we're hitting in many cases a brick wall, and the motion is --

21   has been necessary.

22             You know, because when we raise these issues with

23   Freedom about these missing categories of documents, the reply

24   typically is that they produced documents based on the search

25   terms and custodians, but, you know, that really misses the

1   point.  You know, the ESI protocol that was agreed on, the

2   search terms and custodians, that's a floor, not a ceiling.

3   Where there are responsive documents defendants are not excused

4   from producing them simply because they don't hit on some

5   search terms that were provided by defendants or happen not to

6   be found in some custodian's files, where those custodians were

7   identified by defendants, and I want to focus on a couple of

8   categories.

9          *(REDACTED)*

10

11

12

13

14

15

16

17

18          What relator received, as far as I can tell, in the

19   production -- as we can tell in the production, is there's a

20   single PowerPoint presentation from such a meeting related to

21   the fourth quarter 2016 meeting, held in December 2016.  That

22   one document has been produced three times, but it's the only

23   one, for something that they say happened on a quarterly basis.

24          That document, you know, provides information about

25   this 3,405 member records, et cetera, but we don't see others,

1   and there's no indication that Freedom undertook to look for

2   that shared drive and produce those documents, so -- and also

3   that document makes clear that *(REDACTED)* and,

4   there again, Freedom said, well, we don't have to produce, we

5   don't have to query a database, and that's just not true.

6          The parties' ESI protocol, which, again, is a floor

7   and not a ceiling, says that if an existing report format is

8   not reasonably available or usable, the parties will meet and

9   confer to attempt to identify a mutually agreeable form of

10  production based on the specific needs and the content and

11  format of data within that structured data source.  So if that

12  *(REDACTED)*

13                                      let's meet and confer

14  instead of just getting an answer that, you know, they have

15  done -- run the search terms against the custodians.  That's

16  not an answer.

17          *(REDACTED)*

18          The second category I want to highlight is there's a

19  *(REDACTED)*

20

21

22          We have not received a complete set of those at all.

23  So it's just something that as far as we can tell that Freedom

24  has not reviewed their own systems, aside from running search

25  terms against a database and not actually doing that work.

1   And they, you know, identify these on their Rule 26

2   disclosures, the issue of the compliance meetings as being

3   relevant, so I'm not sure why we haven't got those.

4          One other category of documents, there's a service

5   fund report that Mr. Kollefrath just testified about that

6   Physician Partners received from Freedom and Optimum, we don't

7   have those documents, those haven't been produced, and

8   they're -- they're about the funding, they're about how much is

9   spent from -- how much money Physician Partners receives from

10  Freedom and Optimum, it really goes to the core of the

11  allegations in this case, and we haven't received those from

12  Freedom and Optimum.

13         So those are the three categories of documents that

14  I would really highlight as just sort of confused why we

15  haven't received those.

16         THE COURT:  All right.  Who is responding on behalf

17  of Freedom?

18         MR. DRAKE:  Thank you, Judge.  Scott Drake on behalf

19  of Freedom.

20         Your Honor, I think some of this motion practice is

21  due to the timeline which we outlined in our opposition, but

22  I think one of the issues, Judge, is that these documents,

23  PowerPoints and things like that, weren't called for until

24  relator served their final set of requests for production, and

25  we walked through this timeline, but for the Court's

```
 1   recollection, they were served April 29th, the last day
 2   possible, and the motion that relator filed was filed on
 3   May 29th, the same due that our -- the same day, rather, that
 4   our responses were due, and they sent a letter on the Sunday of
 5   Memorial Day Weekend, May 26th.  We responded to that on
 6   Wednesday, addressing a lot of these things that specifically
 7   said they were going to be produced in response to that final
 8   set, and they filed their motion 20 minutes after we sent our
 9   letter, and, you know, to be fair to them, they probably felt
10   like it was the last day and they filed it without really
11   having time to analyze our letter, so not necessarily
12   criticizing them, I'm just saying that's the timeline, and
13   these -- these PowerPoints -- and we said this in our letter
14   and we said it in our motion that they were going to be
15   produced that day, and we made a production that includes these
16   compliance department PowerPoints and things like that that
17   they were complaining about.
18            It was a little hard to tell from their motion, they
19   have a bulleted list on page 15 and another bulleted list on
20   page 16, but, Judge, we've largely addressed this in our
21   response, and I don't know, Judge, if they have had time since
22   we made that production to review that production.  It was made
23   timely.  I mean, in fact, it was made on the day the responses
24   were due.  We didn't ask for extensions.  In fact, we worked
25   hard to produce things voluntarily before the deadline, which
```

1    we were criticized for.  We tried to get documents that they

2    had just requested on the very last day they could, and we

3    tried to get them before the depositions, even though our

4    responses weren't due, and, you know, they've complained about

5    that in their motion, but I don't know, Judge, if relator's

6    team has had time to analyze that final production where they

7    think those documents are still -- still haven't been produced,

8    because, as we said in our response, we believe those

9    PowerPoints Ms. Hartman just referenced were -- were produced,

10   so I'm not understanding that.

11            The other thing --

12            THE COURT:  I'm sorry, Mr. Drake.  Before you move

13   on, Ms. Hartman says there's only one PowerPoint that was

14   produced three times, and you're saying that that's not

15   accurate?

16            MR. DRAKE:  I believe -- and, Judge, she can

17   obviously correct me, but I believe one version of that

18   document was produced in the earlier productions that predated

19   those -- final set that specifically requested those materials,

20   and I believe that's what she's referring to, not that the same

21   document was produced three times in that final May 29

22   production.  I don't know --

23            THE COURT:  In your response you're basically telling

24   the Court that you've complied, that you've produced

25   everything.  Is that -- is that correct?

1          MR. DRAKE:  Well, I -- I think -- you know, we break

2     our response into four categories.  We say some things were

3     produced previously; we say some things were being produced in

4     connection with the final report; the Gareau issue, which she

5     hasn't addressed specifically, but we said that was already

6     teed up and decided by Your Honor; and then there is a category

7     we do just say there is some limit and -- for instance,

8     generating reports and things like that, that we're not

9     required to do.

10          So I don't want to overstate -- I don't want to make

11    a representation, yes, we've produced every single document

12    they've asked for, you know, that's -- that's not -- that's not

13    fair.

14          THE COURT:  But other than the fourth category, where

15    you say discovery not permitted under the rules, which is the

16    generating reports, documents that are not or have not already

17    been created but require you to actually create a document,

18    generate a report, other than that, you're representing that

19    you've either -- that you've produced the documents either

20    previously or in response to this request for production,

21    right?

22          MR. DRAKE:  Well, again, I want to be careful not

23    to -- not to overstate.  There are some things --

24          THE COURT:  Well, Mr. Drake, maybe it's easier to do

25    it this way.  What have you not -- what are you withholding?

1  What have you not produced?

2        MR. DRAKE:  Well, I think, Judge, if you look at

3  their list, on page 15 of their motion, the first bullet is

4  Excel files from a shared drive, and throughout the lengthy

5  process we identified various -- not just custodians, but

6  shared drives and reviewed those shared drives and made

7  productions based on the agreed scope of the shared drives and

8  custodians and the search terms, and we produced what was

9  responsive to those.

10        On bullet 2, that is something we believe, again,

11  we're not obligated to query something and generate a report,

12  *(REDACTED)*

13

14        Number 3 is medical records, which I think you

15  discussed at length with Ms. Santella and Mr. Swanson.

16        Number 4, again, is another query and app to generate

17  a list or response.  We have produced, as I've said, Judge,

18  many, many documents about the

19  *(REDACTED)*

20

21  they're very -- they're very informed, and so, again, what

22  I would say, as I've highlighted in our opposition, this was a

23  very lengthy, lengthy discovery process that started months if

24  not over years ago, where we agreed through compromise charts

25  about their requests, and, Judge, I think we did what you were

1    talking about you wished had been done more with the medical

2    records.

3            You know, saying any document that in any way relates

4    to any audit, that's overly broad, in our view, and so we had

5    multiple, multiple conferences with relator's counsel, and we

6    had a chart we called a compromise chart, and we narrowed it by

7    agreement and said, okay, within, for instance, the audit

8    topic, this is what we will agree to produce, and that was on

9    their first and second set, and then what happened, Judge, is

10   they asked for more specific documents in the third set and we

11   made that production.

12           So what I would say is we have complied with

13   producing things responsive to their requests as narrowed by

14   agreement of counsel, because our view is that when initially

15   served they were overly broad, and we spent months narrowing

16   them by agreement and said, okay, within this topic, this

17   request, here's what we'll agree to give you, and everybody

18   agreed to that and we complied with that.

19           THE COURT:  All right.  Thank you, Mr. Drake.

20           Anything further, Ms. Hartman?

21           MS. HARTMAN:  Just that these requests, as Mr. Drake

22   acknowledges, you know, aren't -- these documents that we're

23   asking -- talking about now are not responsive to -- only to

24   these -- those -- the document requests that were served later.

25   In the case of the -- for example

1   *(REDACTED)*

2        I mean, those are documents that were identified in

3   defendant's initial disclosures, and I have had a chance to

4   look at these late requests, and we still only have for that

5   *(REDACTED)* that one that we didn't receive.

6            You know, they collect all these medical records and

7   review them and come up with an error rate for these --

8   you know   *(REDACTED)*                         I don't know what the

9   results of that review are, they haven't produced documents

10  that show that, and I have reviewed the most recent productions

11  as well.

12           You know, in terms of their narrowing and, you know,

13  what the parties -- we relied on them to tell us, and,

14  you know, they had said in the -- for example, in their initial

15  disclosures that they would be producing -- or that these

16  documents were relevant, these *(REDACTED)*

17  for example, yet we don't have them.

18               THE COURT:  All right.  Thank you.

19               All right.  Let's move on to relator's last motion.

20               MS. ESTES:  Thank you.  Excuse me.  Thank you,

21  Your Honor.  This is Jillian Estes again.

22           A lot of the issues with this motion, of course, also

23  overlap with the medical records, so I won't go into any of

24  those, I'll focus instead on the other specific documents that

25  we've requested.

 1          What I painted here and I think is really instructive
 2    to our requests here is this is sort of -- maybe an analogy,
 3    but it strikes me a little bit as like playing the game of
 4    Battleship, if you remember, like they're incumbent upon
 5    relator to say -- like to call our specific coordinates, and if
 6    we didn't do that there was no giving us those documents.  So
 7    it's sort of been, well, you didn't say these words, you didn't
 8    say these names, you didn't identify this spot where you would
 9    have no way of knowing that we kept documents except for our
10    representations to you of what was responsive and relevant, and
11    so we've relied on those things and we did the best we could
12    with the information we had, and what's happened and what
13    precipitated these motions was the Freedom motion ANRs with
14    respect to the provider defendants, is through depositions we
15    found out we didn't have the right information, that the things
16    that we've relied on didn't get us to the categories of
17    information that we would need to prove our case or need to
18    supplement what we already have.
19          So it's not a failure of meeting and conferring.
20    I think Mr. Drake is correct that we did have a lot of those
21    conversations with respect to documents from early on.
22    Mr. Swanson is also correct in the representation he made
23    earlier that halfway through the discovery period we hadn't
24    gotten any documents yet.  So it was a really difficult,
25    challenging process to get anything to come to us, and we've

1    tried in all of that, and only now, as we're in these late

2    stages, are we realizing really how deficient that ended up

3    being.

4            So it's not for lack of participating in the process.

5    It has been an ongoing effort to participate in this process,

6    and where we are now is with the deficits that we have

7    identified.  So I just wanted to sort of explain where we were.

8    It's not for lack of anyone trying and hoping to get these

9    things.

10           THE COURT:  I understand, but isn't it an issue of

11   the parties agreed to certain protocols and certain ways of

12   responding to the requests for production, that was agreed, the

13   defendants complied with their obligations as agreed by the

14   parties, and then now you're realizing there's additional

15   information that you want, but is it a question of whether they

16   didn't comply with the agreements that you reached in the

17   conferral process or is it a question of you've now identified

18   new sources of information that you want?

19           MS. ESTES:  I think it's a little bit of a chicken

20   and the egg thing there.  So I think we agreed to things that

21   we understood would get us the documents that we had requested

22   and that then we relied upon what they told us would do that

23   and gave us some, although not all of those things, because as

24   Ms. Hartman identified, there's still things where we would get

25   a single document, and that exists very much as well in the

1   Physician Partners productions, like these surplus reports that
2   are very much at the heart of the compensation agreement for
3   the employed physicians that we have a few what we've come to
4   understand are monthly reports created for all employed
5   physicians and we don't have a subset of that for the entire
6   four year period for the Physician Partners.

7   Same thing, there is these KOS reports, which
8   identify the number of providers -- excuse me, the providers
9   and the number of patients they had for the entire network that
10   were generated every single day, and we have a very small
11   number, certainly not a daily report over four years, but
12   there's patterning to those numbers that are really helpful for
13   us to be able to see trends and things that -- and clearly they
14   were responsive reports in that we got some of them but not all
15   of them.

16   So it's a little bit of both, and both that we didn't
17   get a complete set of what we agreed upon, and what we agreed
18   upon is not a complete set of what we requested, because we
19   relied on the representations made during that meet and confer
20   process.

21   And so, with that, that sort of gets us to the
22   surplus reports, as I mentioned, and these Google Drives.
23   That's an issue that has come up very frequently now.  When we
24   were negotiating the ESI protocol, this was a very hotly
25   debated topic between counsel as to how searching would work,

 1    what would be searched, and there was a lot of discussion that
 2    the possessors of the documents are the ones who are in the
 3    best position to tell us what they needed to search and where,
 4    because we asked, you know, for directories of all of these
 5    things and, you know, they -- the representations were, look,
 6    we're the ones who know where the responsive information will
 7    be, we don't need to give you a directory of our whole system
 8    for you to be able to pick categories, but as it turns out,
 9    that wasn't the case.  So there were very relevant, responsive
10    records, and this Johnson report I think is maybe the most
11    emblematic of that.
12            So the document that's in a report identified by
13    Sajitha Johnson in her deposition for the first time, she
14    described it as like a spreadsheet where people could go to
15    enter in concerns about unsupported diagnosis codes being
16    submitted.  We have never heard of that document before.
17    In fact, in Ms. Gallman's 30(b)(6) testimony on behalf of
18    VIP Partners we asked if there was sort of a consolidated area
19    where there -- and she said no.
20            So we're -- we had very conflicting information as to
21    what that was.  It didn't get -- finally something was
22    identified on June 12th, the report was produced to us after
23    the 30(b)(6) from VIPCARE, after the 30(b)(6) from Physician
24    Partners, where the VIPCARE person had denied that there was
25    any such repository.  The document was produced to us for only

1  one year, it has data only for 2020, we have no idea if it
2  exists for '17, '18, '19, if it was versioned so that it's
3  overwritten and we'd have to go back and create, we don't have
4  any information about it, and of course the 30(b)(6)s are done.

5      It came the night before a person who I think
6  probably would have been able to speak to it a little bit, but
7  coming in at eight o'clock the night before a deposition
8  doesn't give us time to evaluate it and understand how,
9  you know, to work it into the deposition a couple hours later.
10  And Mr. Kollefrath, whom we deposed the following day, denied
11  having any knowledge of claims data, so he wouldn't have been
12  instructive on that.

13      But that's a really emblematic thing to us, because
14  it's hard to imagine a report more fundamental to our
15  allegations of the submission of false claims than a place that
16  generates complaints on the submission of false claims, and
17  that that didn't come to us, either because the document -- we
18  still don't know what it's called, I can't refer to it by name
19  so I call it the Johnson report, because it didn't come named
20  to us still, so we can't search on any of our production to see
21  if other people talked about it, we can't get prior years of
22  it, because we don't know about it.

23      So that's been our concern, is that we relied on
24  things, and when we find out there's something like that that
25  existed that we didn't have, we really question the completion

1  of the information that was provided to us.

2          So I think maybe what was provided to us in large

3  part was -- excuse me, the information that was provided to us

4  in large part was provided, with the exception of some of these

5  multiple reports, but the concern is what else is there that we

6  don't know about, and it seems, unfortunately, like there's

7  really foundational information in that section of information.

8          And just to supplement that, this -- there were --

9  there was testimony about scripts that were very, very

10  important because that's universal training information that

11  went to all of the providers.  The person who read the scripts

12  said there was multiple.  We've only received one.  We don't

13  know what repository or place those would live that we didn't

14  get more, but we only have one.

15          And I think those are the main areas of things that

16  need to be searched that we didn't get.  I can pause there,

17  because there are two sort of distinct issues on linked e-mails

18  and the destroyed documents, if you want me to answer any

19  questions about where we've been so far.

20          THE COURT:  No, you can continue.

21          MS. ESTES:  Okay.  So the other two areas that are

22  presented in this motion and I think are sort of the most --

23  not to say they're most important, all of the information is

24  very important to us, especially including those -- the Johnson

25  report and the versions -- versioning of that, but as this

1   process in e-mails of the way that -- once data started coming

2   in, we understood that e-mails are used largely in the system

3   through their Google drive system using links instead of

4   attachments, and I think it's probably a technology update,

5   you know, it's probably far more efficient to send things that

6   way.  The problem is that the links were not produced to us as

7   attachments.

8          We've looked at I think it's just over 2,000

9   documents that have those sorts of links, sometimes they're

10  videos, sometimes they're -- they seem to be identifying a

11  document, and we understand from the defendants that sometimes

12  it's attaching an entire directory, and I think with respect to

13  whether -- you know, if someone attaches an entire directory,

14  it's probably safe to have some agreement that we don't need

15  the entirety of that directory, but it would be helpful for us

16  to know what the directory is and what part of it was

17  responsive, because clearly the e-mail conveying it hit on the

18  search terms and the custodian, so there's something in it that

19  is relevant and responsive to what we're talking about here.

20  It's not, you know, totally out of left field that -- that this

21  e-mail was produced to us.

22          So we have gotten some but not all, and the response,

23  as I understand it from defendants, is a little bit flipped on

24  its head, which is, you know, you tell us which ones are really

25  important and we'll see about getting those, it would be too

1  burdensome for us to produce the other 1300 or so that haven't

2  been produced, they gave us about 700 of them, and we're just

3  not in a position to do that.

4        1300 in the size of a case like this is not a large

5  number, it's supported by other cases that did a very similar

6  review of Google drive attachments, and given that it's already

7  a culled set of e-mails, it's already been narrowed for what's

8  relevant and responsive, so going beyond that to say we have to

9  kind of pick a subset or identify why we think those things are

10  important is putting the burden in the wrong place.  That's not

11  on us.  We've already asked for relevant documents, they've

12  already identified these as relevant documents, and we're

13  entitled to the production of them, and the case law developing

14  around these Google drives is really supportive of that.

15        THE COURT:  But there wasn't an agreement in the ESI

16  protocol regarding these hyperlink documents, right?

17        MS. ESTES:  It's not in the ESI protocol, Your Honor.

18  We didn't have an understanding of the volume of e-mails that

19  would be produced that way.  We do think that was incumbent

20  upon defendants, to identify to us that that's the primary way

21  that e-mails are used, and a little disingenuous to negotiate

22  so much around attachments without --

23        THE COURT:  I understand.

24        MS. ESTES:  -- articulating that.

25        THE COURT:  And I understand.  And the e-mails that

1  you do have are in response to a keyword search that the

2  parties agreed to?

3          MS. ESTES:  That's correct.

4          THE COURT:  But you -- you would agree that just

5  because it was -- it hit on a keyword search doesn't

6  necessarily mean that it's relevant to the case?

7          MS. ESTES:  Well, I mean, at this point it was

8  produced to us, and not every single thing is immediately

9  relevant, of course, to the facts, but that's -- the idea

10 behind doing the word search was to narrow what was reviewed

11 and produced.

12         THE COURT:  Right.

13         MS. ESTES:  So some of them may be less relevant

14 maybe to the core issues of it, but we've already narrowed it

15 down to a set of documents that are relevant by virtue of the

16 fact that we have them.

17         THE COURT:  Yeah, but any time you do a keyword

18 search, I mean, you recognize that there's going to be false

19 hits, you're going to get documents that aren't truly relevant

20 to the case just because they hit on one of the words that the

21 parties agree to, to make sure -- because you want to

22 over-capture, not under-capture, right?  So --

23         MS. ESTES:  Certainly.  Oh, I'm sorry.

24         THE COURT:  That's okay.

25         MS. ESTES:  I think that that was done already in the

 1     production to us.  My understanding wasn't that there was

 2     searches done and we received the entirety of the response to

 3     that.  I think that search narrowed the responsive documents

 4     for their review to produce relevant documents.  I don't think

 5     that it was a search and an automatic send-off to us.

 6                 THE COURT:  All right.  So all the documents, the

 7     e-mails that you have with these hyperlinks, it's your position

 8     all of them are relevant to the claims in this case?

 9                 MS. ESTES:  I -- that's my understanding, yes.

10                 THE COURT:  Okay.

11                 MS. ESTES:  And like I said, I do think some of the

12     directories, to the extent they were attaching directories,

13     I will not represent to the Court that I think every document

14     in an attached directory is immediately relevant and responsive

15     to this case by virtue of the directory being attached to a

16     responsive e-mail.

17                 THE COURT:  So what would you want then, a screenshot

18     of the directory?  I mean, my concern is it's a link, and

19     directories change over time.  I guess I'll hear from the

20     defendant, but is that -- is it your understanding that the

21     link now would take you to the directory as it existed at the

22     time of the e-mail, or it would take you to the current

23     directory, which may not be the same?

24                 MS. ESTES:  So I think your question is actually the

25     same both for directories and attachments, because that issue

1    arises with both of those, and I want to be candid about that.

2    I don't think that that's limited necessarily to the directory.

3            I do think we see from case law that there are

4    products that can identify the version that existed at the time

5    of the e-mail, and that for companies who are using this type

6    of program, that it's incumbent upon them to use that software

7    to identify the attachment as it existed at the time that it

8    was transmitted by e-mail.  So whether that exists, I will say

9    I don't know for the entirety of the directory.  I think we

10   could certainly come to some compromise and it would be fair to

11   say that we're -- you know, perhaps a tree, just to see what

12   the files were in there, so we could understand why they were

13   being transmitted in this responsive way, of, you know, what

14   was in the directory at the time rather than -- it -- who knows

15   what -- what volume could be attached to that, and I understand

16   that, but I think --

17           THE COURT:  Like a screenshot of the directory tree?

18           MS. ESTES:  I think that would be fair, at the time

19   that the e-mail was sent.  Same thing with the versioning of

20   the document, we would want it at the time that it was sent.

21           THE COURT:  All right.  Any further argument?

22           MS. ESTES:  The last part, Your Honor, is on the

23   spoliation issue with respect to the documents that were

24   destroyed well into the production here, and this is identified

25   in the motion primarily with respect to the Zoom recordings.

1        Our biggest concern here is that the defendant's

2   response doesn't actually ameliorate the issue but rather

3   highlights it to us.  They produced this declaration from a

4   person, and I'm sorry, I don't know if the name is a male or a

5   female, so -- but I'll say "the declarant," with respect to

6   their use of the Zoom profile, whatever it was that housed

7   these things, and the response was that that person hadn't

8   received the litigation hold, which is supposedly why it led to

9   these -- this destruction happening.

10        The problem is that that person didn't receive the

11   litigation hold.  I'm not implying malice or, you know,

12   mal-intent on behalf of that person at all, I don't have any

13   reason to suspect that they were acting out-of-line, but the

14   company had an obligation to identify people who had access to

15   relevant, responsive records, and to identify them and tell

16   them not to destroy these things if they had the capacity to do

17   so, and clearly this person did have access to be able to

18   direct the destruction of relevant and responsive records and

19   never received the litigation hold.  That's the problem that we

20   have here.

21        And as we've gone through discovery we've asked more

22   people, now that we know about this litigation hold, who

23   received it and who didn't, and I believe Chris Barber, who was

24   the 30(b)(6) representative for Physician Partners, told us he

25   hadn't received a litigation hold.  He is the person identified

1    to speak on all of these topics.  So it's really hard to

2    understand who got it and who didn't, except that I understand

3    from his testimony it sounds like maybe it was only people who

4    directly interfaced with Dr. Zafirov.  That's plainly not the

5    scope of this care and it hasn't been, and even if the

6    defendant somehow narrowed it to that at the time that they,

7    you know, learned of the case, it's -- when we pass the motions

8    to dismiss it's certainly a broader case than that, and I think

9    it would be a little intentionally narrow to say only people

10   who interfaced directly with Dr. Zafirov were directed not to

11   destroy records, and even that doesn't seem to be true when

12   it's with respect to the person holding, for example, the

13   recordings related to Dr. Zafirov.

14           So I don't have -- it does not require malice to get

15   an adverse inference as to the content of destroyed records,

16   but it doesn't require bad faith, and we do assert that it was

17   bad faith not to identify the people who had the capacity to

18   destroy relevant, responsive records and instruct them not to.

19           THE COURT:  All right.  The records that have been

20   destroyed, you've only identified the Zoom recordings that were

21   on the cloud that were allegedly -- or they were deleted when

22   they had a new vendor, IT vendor, come in; is that right?

23           MS. ESTES:  So I don't know that it's a new IT vendor

24   who came in.  It was -- it seems it was actually the same

25   person, according to the declarant's testimony, from October of

1   2020 through now, she was just hired by the company rather than
2   an outside vendor.  So she was working in that capacity for all
3   three years, from -- I think her testimony was October '20 to
4   October 2023, but still was never instructed on the litigation
5   hold.  So it's -- in title, I believe she became an employee
6   versus a vendor after that window, but it was the same person
7   throughout that time.
8           THE COURT:  Okay.  But, again, it's just the Zoom --
9   I mean, I'm not minimizing it, but it's the Zoom video
10  recordings that were -- that we're talking about that you're
11  aware that have been destroyed?
12          MS. ESTES:  So the other issue that has come up,
13  Your Honor, is with respect to cell phone records, it's
14  something we've asked for from the early parts of this case, is
15  for cell phones to be searched, and we understood from early
16  communications that they didn't have cell phones that were
17  searched.  It seems there's been some varying testimony over
18  time whether Physician Partners employees did have cell phones,
19  most have testified that they did in fact, but the -- certain
20  of the people who had cell phones have informed us that they
21  did not preserve them.
22          For example, one of the people who worked directly
23  with Dr. Zafirov, who was the regional director for her
24  offices, switched at some point during this case from an
25  Android to an iPhone and lost all of the data on his previous

1   phone.  We asked him for where that phone was.  I believe his

2   testimony, and I would have to pull it up to quote directly,

3   was that he was told to keep it and it's no longer in his

4   possession, he lost it, whether he threw it away or gave it

5   away or something, he doesn't have it.  So there are text

6   messages that are also part of our concern.  Now, they're not

7   identified in the motion, because those were really highlighted

8   in the last two weeks of depositions.

9               THE COURT:  But they're not part of the motion?

10              MS. ESTES:  The identity -- the spoliation is part of

11  the motion, I mean, the spoliation of evidence is, but that --

12  identifying them as cell phones is not in there because that

13  came up in the last couple of weeks.

14              THE COURT:  I understand, but the spoliation that

15  you're asking me to rule on in the motion is the -- this Zoom

16  recordings that were on the cloud.

17              MS. ESTES:  That's correct, Your Honor.

18              THE COURT:  Okay.  That's what's before the Court,

19  right?

20              MS. ESTES:  Yes.  I'm sorry.  I thought you were

21  asking if we had other concerns and I was identifying them.

22  This motion identifies the Zoom recordings, yes.

23              THE COURT:  Okay.  I just want to make sure that

24  I understand the universe of what I'm being asked to rule upon,

25  and that's the spoliation of the Zoom recorded meetings that

1  were on the cloud that were destroyed when they were increasing

2  more space from the cloud server.

3            MS. ESTES:  Correct, Your Honor.  Yes.

4            THE COURT:  All right.  Now, how specifically is

5  relator prejudiced by the destruction of those recordings?

6            MS. ESTES:  So -- because those recordings really get

7  to the training that -- and the pressure that is involved in

8  all of these things.  Our understanding is that they were part

9  of these huddles, which is Physician Partners' term for their

10 meetings, where they would have these conversations challenging

11 Dr. Zafirov on her diagnoses, pressuring her to increase --

12 only ever pressuring her to increase to higher risk adjusting

13 conditions, there was never discussions to go to other

14 conditions or non-risk-adjusting, which is really important in

15 our explanation of how their pressure worked.  It was always

16 up, always up.  And all of that would be relevant and

17 responsive on those recordings, to hear how they went.

18            There is some notes from them in -- they call them

19 REIC notes, but they certainly don't get to the actual words

20 that were being said, and that's really the importance of it.

21 I have a hard time thinking any employee is going to go and

22 say, you know, pressure Dr. Zafirov to up-code her conditions

23 today, that really only comes from the actual verbal

24 interactions between them, and those are -- my understanding is

25 those are lost and the ability to reflect how those

1    conversations went.

2           I will say I believe there is one of the

3    conversations that was also part of the recordings that

4    Dr. Zafirov made for the Government as a confidential

5    informant.  We would not assert that there's burden to that

6    because that is captured in another way, but for the remainder

7    of them, and -- and I think what is not addressed in

8    Mr. Swanson's e-mail to me but -- is that it would be to other

9    providers as well, even if it was only to the VIPCARE

10   providers.  I don't think it was Dr. Zafirov's set that was not

11   produced or that was destroyed, I think it was those huddles

12   with other providers as well, which also should have been

13   produced to us.

14          THE COURT:  All right.  So what's the specific remedy

15   that would be no greater than necessary to cure the prejudice?

16          MS. ESTES:  So I think there's two of them possible.

17   I think an adverse inference to a jury is the most appropriate,

18   to instruct that there were recordings of these meetings that

19   were made in which the communications that are at -- as

20   alleged, and I'm not trying to craft the language of the

21   instruction right now, but just the nature of it would be to

22   explain that these recordings existed and were deleted during

23   the case.

24          I think it could also -- you know, to the extent that

25   Dr. Zafirov is the only one with a memory of those things, that

1    they can just not be able to oppose her representations of it,

2    but I find that one a little more challenging because,

3    of course, you know, they already have and will continue to

4    challenge her impressions of these conversations, which is why

5    the actual words are so important.

6              But I think an adverse instruction to the jury

7    explaining that there were captures of these exact

8    conversations that are alleged here and are not available to

9    them and so that they can assume that the content would not

10   have been responsive of the defendant's testimony.

11             THE COURT:  All right.  Response?

12             MR. SWANSON:  Your Honor, I'll start with -- I guess

13   in the same order that Ms. Estes walked through them, and I

14   believe that that was first with the Sajitha Johnson chart, as

15   it's been referred to this morning.

16             You know, we have -- we have operated throughout this

17   case with diligence and good faith, and I believe all sides

18   have tried to do that here, and I think that's important to

19   state at the outset as you consider these myriad issues about

20   these remaining items, and that is entirely the case with this

21   spreadsheet.

22             It was identified for the first time in a May 7th

23   deposition that they took of Ms. Johnson.  Ms. Estes did not

24   follow up with us on it for almost three weeks later.  And

25   I don't mention that to malign anyone for a lack of follow-up,

1   but I think a subtext from a lot of the argument we've heard

2   certainly in the last 20 to 30 minutes is that there's been

3   some kind of, you know, dilatory action on our part, and

4   nothing could be further from the truth.

5          I mean, the last six weeks there have been

6   depositions nearly every day, Your Honor, the parties have been

7   working very, very hard, and that includes, apart from getting

8   witnesses ready and defending their depositions, following up

9   on, as Ms. Hartman acknowledged is routine in these cases,

10  somebody mentions a document that heretofore was not on

11  someone's radar screen.  That's what happened here.

12         So, you know, we're also trying to prioritize the

13  issues that seem important to the relator and work through all

14  of the -- you know, this scheduling May and June, and so

15  I think it's relevant to note that this was not something they

16  followed up with us on for a few weeks later, and when they

17  did, we looked into it promptly.  We got that letter over

18  Memorial Day Weekend, we worked with the client to try to

19  identify what this file was, and then we produced it last

20  Wednesday, and we made sure to produce it on Wednesday in time

21  for Rajit Patel's deposition the following day.

22         Rajit Patel was Sajitha Johnson's supervisor.  At her

23  deposition on May 7th she testified that he was her supervisor

24  and that she would have shared this chart with him.

25         I will grant you that it was produced in the evening

1   on June 12th, that is again a function of all that we've been

2   trying to do to accomplish and meet the deadlines set for us in

3   this case, but nonetheless it was produced on the evening of

4   the 12th and Mr. -- Dr. Patel was deposed the following day for

5   seven hours and there was not one question about this document,

6   despite the fact that the relator's counsel had downloaded it

7   within 30 minutes of our having provided it last Wednesday.

8           Again, I'm not casting aspersions, they've had a lot

9   on their plate too, but I want the Court to have a full picture

10  of the efforts that have been undertaken to try to deal with

11  what is inherent in these cases, which is a document is

12  identified and we chased it.

13          So we produced it, we produced it as quickly as we

14  could, and there was no questioning of the witnesses over the

15  next two days, totaling nearly 14 hours.  That may be because

16  they were busy on the relator's side, it may also have been a

17  strategic prerogative of theirs, I don't know, but I can just

18  assure you that we acted diligently and in good faith in

19  finding it and producing it.

20          And I will say too, again, as part of the bigger

21  picture, the Sajitha Johnson spreadsheet I think is germane to

22  whether codes were supported or not or had sufficient

23  documentation.  We had produced documents sufficient to

24  identify deleted codes to the relator back on March 1st, so we

25  have been cognizant of this issue and have timely produced

1   many, many, many other things when we've been aware of them and

2   able to produce them.

3          THE COURT:  How did this particular document fall

4   through the cracks though?

5          MR. SWANSON:  I -- I think it's a function,

6   Your Honor, of a discovery period here that's now, you know,

7   three, four years prior to the current date, a lot of materials

8   for us to try to identify and collect.  I think we produced

9   here for 31 custodians in this case.  It -- frankly, the fact

10  that this was a file that was otherwise a surprise to the

11  client and the folks with whom we've worked in large part to

12  gather documents throughout this process I think shows that

13  this just was not something that was otherwise on the company's

14  radar screen, and when it was brought to our attention, we

15  moved on it and we got it to them.

16         THE COURT:  All right.

17         MR. SWANSON:  I think the next topic was the

18  hyperlink document issue, and a few preliminary points about

19  the case law and the record in this case.

20          First, and the Court noted this, and I think it's

21  very, very significant, the ESI protocol talks about

22  attachments, it doesn't talk about hyperlink documents, and

23  I don't have any reason to believe there was any gamesmanship

24  there to avoid that.  It's just not part of the ESI protocol.

25  And the cases that we've cited, you know, have Courts

1    explaining attachments are not hyperlink documents, they're two

2    different things.  So we take issue with relator's

3    characterization of what the case law shows.

4            And, you know, I think the emerging law in this area

5    reflects the technological difficulties attendant to these

6    kinds of materials.  In one of the cases that relator cites,

7    the Stubhub case in the Northern District of California, just a

8    month ago, the Court there removed the hyperlink from the ESI

9    protocol and did not require production of hyperlink documents

10   because it was proving to be too technologically challenging,

11   and that's the situation we end up with here, Your Honor.

12           When this issue, like the others, was brought to our

13   attention by Ms. Estes, we acted promptly and in good faith.

14   We had a meet and confer, asked them to identify other

15   documents that they believed would be responsive, cognizant

16   again of the burden that's otherwise associated with these

17   kinds of materials, and the burden in particular here is -- and

18   this has been talked about a bit during Ms. Estes' discussion,

19   many of these links link to folders, and that is inherently

20   difficult, if not impossible, to collect from, certainly in a

21   way that's not highly burdensome.

22           The links also link to live documents, and so,

23   you know, that's just a function of how the technology

24   operates.  That also can make it challenging to collect these

25   materials.

1    The links may be to employees who have left, and

2 left -- you know, and it's just not possible to access those

3 documents anymore.

4    So I think all of these practical realities,

5 you know, explain why in the first instance the ESI protocol

6 doesn't have hyperlink documents in it and explains why the

7 cases that we've cited stand for the proposition that this is

8 not otherwise a requirement where it's not otherwise negotiated

9 among the parties.

10    THE COURT:  All right.

11    MR. SWANSON:  On the -- on the Zoom issue, which I

12 believe is the third and final one, there's a two part test,

13 and we lay this out in our -- in our opposition.  There has to

14 be bad faith in the Eleventh Circuit and there has to be a

15 significant impairment in the ability of the relator to prove

16 her lawsuit, or as some courts or cases have described it, the

17 lost evidence has to have been crucial.  Neither of those have

18 been met in this case, Your Honor.

19    The -- the finding of bad faith requires something

20 even more than gross negligence, it requires something akin to

21 an affirmative intent to harm the plaintiff, obstruct the

22 lawsuit or conceal evidence, and that is simply not borne out

23 by the record in this case, and it sounds like relator's theory

24 is that because this one individual did not receive the

25 litigation hold, that that is in and of itself bad faith.  I'm

1    not aware of case law that stands for the proposition that,

2    you know, one person in a case as large and complex as this who

3    does not receive a litigation hold and then, completely

4    unrelated to this litigation, inadvertently destroys those

5    materials, that that is somehow bad faith or comes anywhere

6    near bad faith, and I just don't think it's even close under

7    the -- under the Eleventh Circuit cases and the cases that have

8    implemented that standard.

9            I think our -- you know, the record we've laid out in

10   our brief and in our affidavits explains the chronology here,

11   and so I won't -- I won't belabor it, but I do think that at

12   the end of the day, Your Honor, this is at worst the right hand

13   not talking to the left, it's regrettable, but the *Tesoriero*

14   case in the Eleventh Circuit makes clear that that is at worst

15   negligence and that does not suffice for bad faith, and even if

16   it did, relator still has not explained, both in her motion and

17   I would suggest today, how the loss of those recordings was

18   otherwise crucial to her case.  You know, I think her motion

19   refers to these as may be crucial.  Well, that's not showing

20   that they are.

21           And as you evaluate this second prong, and we suggest

22   you not even get to the second prong, I do want to, you know,

23   mention a few other items from the record that do bear on this

24   second factor.  One is that, as she -- as Ms. Estes

25   acknowledged, the relator made a number of recordings for the

1    Government in this case, so there is already -- and I think she

2    feels quite good about what those recordings show -- a record,

3    contemporaneous record of conversations that were had with

4    relator and employees at the provider defendants.

5         Two, we have produced 139 recordings to relator in

6    this case in addition to the recordings that she already made,

7    and, again, for strategic reasons or otherwise, you know, I'm

8    not -- I'm not casting aspersions on them one bit, but the

9    relator did not ask any -- or did not play any of these

10   recordings for any of the -- any of the deponents, and so

11   I just want the Court to be cognizant of that record.

12        Under the case law we don't believe there's anything

13   coming close to bad faith here, and there's certainly not a

14   showing that these records were otherwise crucial.

15        And I do want to also be clear about, you know, what

16   it is that we are talking about here in terms of the recordings

17   and, you know, in the spirit of good faith here too.

18        As our declarations make clear, these are recordings

19   from January 3rd, 2020 and earlier, and we've identified the

20   ones that involved Dr. Zafirov.  As our declaration has also

21   made clear, it was all of the Zoom recordings from that period

22   and before, again, because there was no targeting of the

23   recordings for Dr. Zafirov or, frankly, anything having to do

24   with this case, and so that's the state of affairs for those.

25        It turns out that there are some Zoom recordings

1  after January 3rd, 2020 that we've just become aware of in the
2  last few days.  Those do not involve Dr. Zafirov.  She left the
3  company I think six weeks after early January.  The early
4  indications are that the vast majority of them are with
5  affiliate providers.  Of course, we maintain, you'll recall
6  from a couple of hours ago, that that discovery is not
7  warranted here, but we are operating in good faith, reviewing
8  those and assessing whether they are responsive and
9  proportional to any pending requests.
10          THE COURT:  All right.  Let's move on to the last
11  pending motion, and that's defendant Freedom Health, Inc. and
12  Optimum Healthcare, Inc.'s motion to compel documents in
13  response to request for production number 11, and this is the
14  joint prosecution agreement between the relator -- let me pull
15  this up -- and Dr. Mansour, who at one time was a relator in
16  a -- in a separate action.
17          Now the relator in this case's response to the motion
18  was, one, they don't believe it should be produced but have
19  invited the Court to review it in camera to determine whether
20  it -- a portion of it should be produced or it should be
21  withheld in its entirety.
22          I'm inclined to look at it in camera.  If the parties
23  want to provide any additional oral argument -- I mean, I think
24  the issue is pretty straightforward and briefed in the -- in
25  the documents, but since we are here, it's noticed for the

1    hearing, if the parties would like to be heard on this, I'll

2    hear it now, but I do intend to order the relator to produce

3    this document in camera for the Court to inspect and then the

4    Court will rule on that, that document.  But let me hear from

5    Freedom, if they would like additional oral argument or any

6    oral argument on this motion.

7            MR. DRAKE:  Yeah.  Thank you, Judge.  Scott Drake on

8    behalf of Freedom.

9            Judge, if I may just make two comments quickly for

10   the Court's benefit on the prior motions.  I didn't want to

11   interrupt counsel.

12           One, on the motion that relator filed, while the

13   other motion was being heard, I did confirm in our production

14   May 29th, Ms. Hartman suggested there was only one version of a

15   committee declaration produced three times.  We produced

16   624 documents in response to request for production 46, which

17   *(REDACTED)*

18

19   PowerPoints produced in that.  So, again, just for the Court's

20   benefit, just for that one request, 624 documents.

21           On this motion that was just heard relating to the

22   Zoom recordings, Judge, I viewed that motion, docket 281, filed

23   only against the provider defendants -- I viewed it kind of as

24   Freedom didn't really have a dog in that fight, so to speak.

25   The relief requested in it was not very specific, it just said

```
 1  sanctions.  I think they asked for terminating sanctions or
 2  possibly in footnote 8 they said, if not, then, you know, the
 3  defendant should be prevented from offering con --
 4  converting -- contradictory evidence.  Excuse me.  Just now
 5  Ms. Estes suggested they would like an adverse inference.
 6          All I would say, Judge, is -- obviously I'm not
 7  weighing in on the appropriateness of whether there has been
 8  discovery conduct that warrants any type of sanction, that --
 9  I believe there's no allegations Freedom was involved in that,
10  had these recordings or was involved in the unintentional
11  deletion, but I would say, to the extent there is an adverse
12  instruction or inference given to this jury, should this case
13  be tried, Freedom would want to be heard on that, because the
14  nature of the relator's allegations are that everybody acted
15  together, all the defendants, including the Freedom defendants,
16  and I would want -- again, I think this is an issue to the
17  extent the Court entertains any type of relief or sanction, we
18  would want to be heard to the extent this was a -- something at
19  trial as opposed to a monetary sanction, because I think we
20  would be unfairly prejudiced by an instruction.
21          I'm just flagging that issue.  We didn't jump into
22  the fight, but as relator's counsel mentioned that just a
23  minute ago, I wanted to just flag the issue.  I don't think
24  it's something that we have to deal with today, but to the
25  extent the jury was being instructed any -- any type of adverse
```

1   inference, we would want to be heard, so that Freedom is not

2   unfairly prejudiced, since we're not alleged to have been

3   involved in the conduct forming the basis of the motion.

4           So I just wanted to flag those two issues.

5           I'll be very brief, Judge.  I heard your comments.

6   It's been briefed.

7           I'll just raise -- I think the relevance and all that

8   we've briefed, but I would just take a minute or two to

9   highlight -- I think the Court is aware of this from the

10  briefing, but the cases relator cites in their opposition and

11  even their characterization as a joint prosecution agreement,

12  Dr. Mansour is a fact witness, he had his own qui tam case that

13  he voluntarily dismissed, he also was then given a 30 percent

14  interest in the relator's case, but he's not a party, he is not

15  a party, and we think, Judge, that's a very important

16  distinction, because what the relator has done is entered into

17  a financial agreement to share 30 percent of the recovery in

18  this case, to the extent there is one, with a fact witness who

19  we believe is going to be their main corroborating non-party

20  fact witness.  Mr. -- Dr. Mansour will presumably come to trial

21  and allege he too saw the same thing relator complains about,

22  and we're entitled to know what this arrangement is, not just

23  the economic terms but all the terms, the circumstances around

24  it, why it was entered into, and you can't couch that as a

25  joint defense agreement or joint prosecution agreement like

1    Freedom has with PPC, that's a very classic joint defense,

2    common interest.  We're both parties in the same lawsuit, being

3    sued by this relator, alleged to have jointly engaged in this

4    conduct.

5            Dr. Mansour is a fact witness, and I don't think the

6    law or the cases relator cites supports the notion that you can

7    effectively enter into a financial arrangement with a fact

8    witness and then couch that as, oh, this is all protected by a

9    common interest or attorney-client or work product when we

10   don't think any of those apply, especially to a fact witness,

11   because you could essentially go out and arrange a contractual

12   arrangement with any fact witness in the case, offer them

13   financial compensation and then shield the terms of that from

14   the other party by saying, oh, we have a common interest, we're

15   jointly prosecuting this.

16           There is one relator, it's Dr. Zafirov.  Dr. Mansour

17   had very similar claims which he voluntarily dismissed, and I'd

18   just ask, Judge, when you review the document and look at the

19   cases the relator cites, you remember that this is not a party,

20   this is not a relator, this is not someone jointly prosecuting

21   anything, this is a fact witness, and we don't think it's

22   appropriate to couch contractual arrangements, especially

23   involving financial compensation, which relator has alleged,

24   and this came up in the deposition, without any support, that

25   this is a billion dollar case, so Dr. Mansour's financial

1  recovery could be very, very significant, and we're entitled to

2  know the circumstances of this arrangement with a fact witness.

3           And so we would ask, Your Honor, when you review the

4  document in camera that you keep the relationship of the

5  parties and, in Dr. Mansour's case, a non-party fact witness in

6  mind as you do your analysis.

7           Thank you, Judge.

8           THE COURT:  Thank you, sir.

9           Relator, would you like to make a brief argument?

10          MS. ESTES:  Very brief, Your Honor.

11          I appreciate that your -- your willingness to review

12  it in camera.  We'll certainly contact your chambers for how to

13  best transmit it to you, and we think that the document speaks

14  exactly to what Mr. Drake said on its face as to the

15  relationships of the parties and why it is in fact a protected

16  document.

17          I will only just note, as we put in our response

18  brief, that Freedom had the opportunity to question Dr. Mansour

19  on any other obligations that arise from this, case law fully

20  supports that as a basis for getting to more information about

21  a protected document, they had it, he answered in sworn

22  testimony, they did not question Dr. Zafirov on it at all,

23  which certainly belies their, you know, meaning that it had

24  some great weight, but the record will speak for itself, and we

25  are more than happy to answer any other questions the Court

```
 1   has, you know, in camera as well, if any of it needs context
 2   during your evaluation, but we think it will speak for itself.
 3               If I could, Your Honor --
 4               THE COURT:  I'm not going to do that.  I'm not going
 5   to allow you to make argument, ex parte argument in camera, but
 6   I am going to ask you to submit the document to the Court by
 7   close of business on Thursday, and you can submit it to the
 8   Court's chambers e-mail address.
 9               MS. ESTES:  Certainly.
10               If I -- I'm sorry.
11               MR. DRAKE:  Oh, I didn't know you had something else.
12   Go ahead.
13               I do have one other comment, Judge, about the --
14               THE COURT:  Hold on.  Let Ms. Estes finish, please.
15               MR. DRAKE:  Yeah.  I didn't realize she wasn't
16   finished.  I apologize.
17               MS. ESTES:  Your Honor, close of business by
18   Thursday, we'll submit it, of course.
19               I just wanted to respond to one of the things that
20   Mr. Drake said with respect to the arguments of Mr. Swanson, if
21   that's -- if we can go back to the -- that motion for a minute,
22   if Your Honor is prepared to resolve it.  I also understand
23   we've been here probably longer than --
24               THE COURT:  No, it's okay, I allowed Mr. Drake to go
25   back, so I'll let you address it.
```

1          MS. ESTES:  Thank you.

2          I just wanted to -- with respect to the Zoom

3    documents, I will say we did address adverse inference in the

4    motion, so I don't think this is the first time kind of coming

5    up sort of thing today, but Your Honor did ask, and I think the

6    law supports a wide latitude on what is an appropriate

7    sanction, and one of the things that Mr. Swanson raised is that

8    there are other recordings that, you know, address other

9    communications, not all the ones that were lost here, and

10   I think it might -- to the extent appropriate, and I know that

11   there's dispute between Physician Partners and the Government

12   as to the creation of some of those recordings and the agent

13   that's involved there, it's not a motion I'm familiar with

14   right now, but to the extent that the -- it may be an

15   appropriate sanction to say that those records are -- you know,

16   have to be admissible or can't be challenged in place of that,

17   because if those recordings are not permitted for any reason

18   and the recordings were dismissed, then it's an even more

19   crucial lack of evidence for relator as to the content of those

20   communications, so it's perhaps an alternative and somewhat

21   creative approach to how to resolve it if the use of those

22   recordings is directed in place of the ones that were dismissed

23   or some way of doing that.  So I just wanted to raise that as

24   an alternative, given the representation by Mr. Swanson that

25   they had similar content on those recordings.

1          And the last thing, and I promise I'm done after

2     that, is with respect to that Johnson document.  What

3     Mr. Swanson didn't address is that we only ever received the

4     2020 version.  Even after all those things, I think, by all

5     means, we've all been working really hard, no one is, you know,

6     casting aspersions on any of the -- getting on those dates, but

7     with respect to the fact that we just got it and it only had

8     one year, we would request, and it might be an appropriate

9     thing here, is -- because it came after the 30(b)(6), days

10     after the 30(b)(6) witnesses, that we could either open one of

11     those for the limited purpose of asking about that document and

12     the creation and use of it, or submit questions in a late

13     interrogatory targeted only at that document, just so we have

14     some way to get context around something that is a really

15     foundational document that seems to have fallen through the

16     cracks, as Counsel described.

17          THE COURT:  I'm going to ask you, Mr. Swanson, to

18     confer on that.  I think you can probably work out that issue,

19     and if not then you can let me know and I'll address it.

20     I don't require a full briefing on the issue, but just confer

21     with Mr. Swanson.  I'm confident that you two can work it out,

22     and if not then just advise the Court that there's an issue and

23     I'll address it.

24          MS. ESTES:  Thank you, Your Honor.

25          THE COURT:  All right.  Mr. Drake, you want to be

1    heard?

2         MR. DRAKE:  Yes, very briefly.

3         Judge, I would just ask, in light of Ms. Estes'

4    comments on -- this is about the Mansour agreement, that we

5    didn't elicit any testimony.  I would ask, Judge, that when

6    they submit the document, we submit the testimony, because

7    Dr. Mansour -- or, excuse me, Dr. Zafirov was asked --

8         THE COURT:  No.  Mr. Drake, I'm not worried about

9    that.

10        MR. DRAKE:  Okay.

11        THE COURT:  I'm not concerned about that.

12        MR. DRAKE:  Okay.  Thank you, Judge.

13        THE COURT:  All right.  Anything further from anyone?

14        MS. ESTES:  Not for us today, Your Honor.  We

15   appreciate all your time.

16        THE COURT:  Yeah.  Well, I want to thank all the

17   parties for their time.  I know this hearing went long, but we

18   had a lot of issues and substantive issues that I appreciate

19   the benefit of oral argument that I heard today, so thank you

20   all for being so prepared and ready to provide your arguments

21   to the Court, it was helpful, and we will rule on it as soon as

22   we can.

23        The parties -- again, relator is going to submit the

24   joint prosecution agreement with Dr. Mansour in camera by close

25   of business on Thursday, and the parties are also going to

1    provide the deposition transcripts that we've previously

2    discussed at the hearing.

3             All right.  Is there -- and if there's nothing

4    further then, we'll be adjourned.  Thank you.

5             MS. ESTES:  Thank you.

6             MR. SWANSON:  Thank you.

7                          - - - - -

8             (Proceedings concluded at 12:46 p.m.)

9                          - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript of

4    proceedings taken in a motion hearing in the United States

5    District Court is a true and accurate transcript of the

6    proceedings taken by me in machine shorthand and transcribed by

7    computer under my supervision, this the 25th day of June, 2024.

8

9

10                              /S/ DAVID J. COLLIER

11

12                              DAVID J. COLLIER

13                              OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25