UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
*ex rel.* CLARISSA ZAFIROV,

    Relator/Plaintiff,

v.

PHYSICIAN PARTNERS, LLC;
FLORIDA MEDICAL ASSOCIATES,
LLC d/b/a VIPCARE; ANION
TECHNOLOGIES, LLC; FREEDOM
HEALTH, INC.; and OPTIMUM
HEALTHCARE, INC.,

    Defendants.
_____/

CASE NO. 8:19-cv-1236-KKM-SPF

**<u>ORDER</u>**

    Before the Court is Relator's Motion to Compel Discovery from Provider Defendants[1] Regarding Affiliate Providers (Doc. 178), Provider Defendants' Response in Opposition to Relator's Motion to Compel Discovery Regarding Affiliated Providers (Doc. 193), Relator's Reply in Support of Motion to Compel Discovery from Provider Defendants Regarding Affiliate Providers (Doc. 214), and Relator's Sur-Reply in Support of Motion to Compel Discovery Regarding Affiliate Providers (Doc. 276). The Court held a hearing on Relator's Motion on June 18, 2024 (Doc. 302). At the hearing, the Court directed the parties to submit certain deposition testimony in support of their respective positions, and the parties timely complied with the Court's order (Docs. 314, 315). Now, upon consideration, the Court finds that Relator's Motion to Compel is due to be GRANTED.

---

[1] The "Provider Defendants" are Physician Partners, LLC ("Physician Partners"); Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare"); and Anion Technologies, LLC ("Anion").

## BACKGROUND

On May 20, 2019, Relator/Plaintiff Clarissa Zafirov ("Relator"), a board-certified family care physician, brought this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, against Defendants (Doc. 1). Relator was employed as a primary care physician by Defendant VIPcare from October 2018 through March 2020. In her Amended Complaint (Doc. 86), Relator alleges that Defendants acted in concert to falsely increase the risk adjustment scores of thousands of Medicare Advantage patients for the purpose of obtaining more funding from the United States than was rightfully owed.

On December 15, 2022, Relator served Defendants with her First Requests for Production (Doc. 143-1). Therein, Relator defined the term "Physician Partners physician" to mean "any physician who is either (1) employed by Physician Partners, or (2) who associated with Physician Partners through a practice management contract or any other similar relationship other than an employment contract." (*Id.* at 72). In their discovery responses, each Provider Defendant objected to that definition as "vague and ambiguous and susceptible to multiple interpretations," but did not assert that the definition was overbroad, unduly burdensome, or otherwise disproportionate to the needs of the case (Doc. 178-1 at 10). Instead, each Provider Defendant stated that, "[f]or the purpose of responding to the Requests and interpreting any Definitions or Instructions that incorporate this term, [the respective Provider Defendant] interprets 'Physician Partners physician' to mean a physician either directly employed by Physician Partners or associated with Physician Partners through a practice management contract." (*Id.*).

In November 2023, the Provider Defendants indicated to Relator that they would agree to an extension of discovery deadlines if "the parties can reach an agreement on the

non-discovery of affiliated providers." (Doc. 178-2). Relator represents that this was the Provider Defendants' first attempt to narrow the scope of discovery to only employed physicians in contrast to their earlier discovery responses. While the parties ultimately agreed on a discovery extension, Relator invited the Provider Defendants to send a letter outlining their position on the scope of discovery with respect to affiliate physicians. Relator never received any such letter, and Defendants never amended their discovery responses to update their objection to the definition of "Physician Partners physician."

In December 2023, Relator served Interrogatories on Physician Partners and Anion, which included the definition of "Physician Partners physician" as "any provider who has been listed in a Physician Partners Provider Directory" (which includes both employed and affiliated providers) (Doc. 178-3). Physician Partners and Anion each raised the same detailed objection to this definition:

> Physician Partners objects to the definition of "Physician Partners physician" to the extent it purports to include physicians who were not employed by Florida Medical Associates, LLC d/b/a VIPcare ("VIPcare") or any other Defendant or related entity but were only affiliates. Employed physicians, such as Dr. Zafirov, are W-2 employees who work exclusively for VIPcare. As employees, those physicians receive most, if not all, of their income and benefits from VIPcare. Employed physicians have an employment agreement with VIPcare, and their compensation is comprised mostly of a base salary, with the possibility of various additional incentive payments. By contrast, affiliated physicians are independent owners and operators of their respective practices. In general, affiliated physicians' income derives from several sources, only one of which is Physician Partners. That is because those physicians typically have contractual relationships with other Medicare Advantage plans, as well as other independent physician associations. Physician Partners' contracts with affiliates also vary whereby some affiliates are paid on a fee-for-service basis, while others have chosen a capitation payment model. In other words, there may be stark differences even among Physician Partners' affiliated physicians. Moreover, as independent business owners, affiliated physicians have autonomy over their facilities and patient scheduling. Employed physicians, such as Dr. Zafirov, do not. Rather, VIPcare enjoys unfettered access to the facilities, and employed physicians' patient scheduling is dictated by VIPcare. In addition, affiliated physicians hire and manage their own staff;

3

> employed physicians do not. Affiliated physicians select their own EMR, but employed physicians must use the eClinicalWorks EMR. Further, affiliated physicians typically manage their own coding, billing, and referrals. Employed physicians, on the other hand, have their billing processed by VIPcare, with support from Anion Technologies, LLC ("Anion"). Affiliate physicians are documenting and adding or deleting diagnoses and diagnosis codes, creating and managing medical records, and doing coding and billing of claims to health plans in all kinds of different EMR systems than the eClinicalWorks EMR system used by VIPcare physicians, which would greatly increase the burden on the parties in having to deal with multiple different EMR systems on all these issues if affiliate physicians were included in discovery. There are significant differences between employed physicians on the one hand and affiliated physicians on the other. Also, there are significant variations among the affiliated physicians, such as how they are paid by Physician Partners and how those affiliated physicians manage their practices. These differences make discovery regarding affiliated physicians not relevant to Dr. Zafirov's claims. For these reasons, along with the other objections noted in Physician Partners' written objections to Dr. Zafirov's discovery requests in this matter, Physician Partners will not provide discovery regarding affiliated physicians. Physician Partners answers the Interrogatories only with regard to VIPcare employed physicians, and only in relation to Medicare Advantage beneficiaries of Freedom and Optimum, not other patients or plans.

(Doc. 178-4 at 7–9). In a telephone meet-and-confer on February 2, 2024, the Provider Defendants also represented to Relator that they did not intend to produce documents regarding its affiliate providers in response to Relator's First Request for Production. As such, Relator moves to compel the Provider Defendants to respond to all discovery requests using the definition to which the Provider Defendants themselves created and agreed to nearly a year ago: "Physician Partners physician" means "a physician either directly employed by Physician Partners or associated with Physician Partners through a practice management contract."

## ANALYSIS

Motions to compel discovery are committed to the sound discretion of the trial court. *See Commercial Union Ins. Co. v. Westrope*, 730 F.2d 729, 731 (11th Cir. 1984). Discovery under

4

the Federal Rules is governed by the principle of proportionality. Federal Rule of Civil Procedure 26(b)(1) defines the scope of discoverability as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). The proponent of a motion to compel discovery bears the initial burden of proving that the information sought is relevant. *Moore v. Lender Processing Servs. Inc.*, No. 3:12-CV-205-J, 2013 WL 2447948, at *2 (M.D. Fla. June 5, 2013). "A party resisting discovery must establish 'lack of relevancy or undue burden in supplying the requested information.'" *Craig v. Kropp*, No. 2:17-cv-180-FtM-99CM, 2018 WL 1121924, at *3 (M.D. Fla. Mar. 1, 2018) (quoting *Gober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000)).

*Qui Tam* complaints filed by relators in FCA actions must comply with Rule 9(b). *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) ("This Court has held that complaints alleging violations of the False Claims Act are governed by Rule 9(b)."); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Thus, for FCA cases, the actual submission of the claim must be pleaded with particularity. *Corsello*, 428 F.3d at 1013; *see also United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) ("The public policy underpinnings of Rule 9(b), the FCA, and *qui tam* actions mandate this conclusion."); *United States ex rel. Bledsoe v. Cmty Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007) ("Specifically, we hold that the examples that a relator provides will support more generalized allegations of fraud only to the extent that the relator's examples are *representative samples* of the broader class of claims.") (citations omitted) (emphasis in original). As a result, "discovery in *qui tam*

5

actions must be limited and tailored to the specificity in the complaint." *United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, No. 8:06-cv-40-T-24MAP, 2008 WL 4057549, at *1 (M.D. Fla. Aug. 27, 2008) (citations omitted); *see also Atkins*, 470 F.3d at 1359 ("The particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim.").

Relator argues that her proposed scope of discovery is proper because (1) the Amended Complaint alleges a fraudulent scheme implicating affiliate providers as well as employee providers; (2) in a related case, the court found no distinction between employed and affiliated physicians; (3) documents produced thus far confirm that Defendants treated employed and affiliated providers equally; and (4) Physician Partners fails to demonstrate any undue burden or lack of relevance (Doc. 178). The Provider Defendants respond that the motion should be denied because (1) Relator's Amended Complaint fails to plead a single exemplar of a claim submitted by Provider Defendants on behalf of an affiliated physician; (2) only affiliated physicians, not Provider Defendants, select diagnosis codes on their own electronic medical records ("EMR") systems; and (3) it would be extraordinarily unduly burdensome to gather, review, and produce every medical record over a four-year period from 240 non-party affiliated physicians who serviced over 56,000 patients and used over 20 different types of EMR systems at many different locations (Doc. 193).

    a. <u>The Amended Complaint</u>

First, Relator argues that discovery related to affiliate providers is relevant because the Amended Complaint alleges a scheme that implicates both affiliate and employed providers. The Provider Defendants respond that any allegations related to affiliate providers in the

Amended Complaint are conclusory, and the Amended Complaint does not include a single exemplar of a claim submitted on behalf of an affiliated physician.

In the Amended Complaint, Relator details a purported scheme through which Physician Partners, for itself and through its subsidiaries Anion and VIPcare, submitted unsupported diagnosis codes to Freedom and Optimum, who encouraged and accepted the inflated codes and then paid Physician Partners with the government's money (Doc. 86, ¶ 1). In particular, Relator alleges that, "[t]hrough policies, practices and procedures imposed on both contracted and employed physicians, Physician Partners and Anion systematically manipulate patient health records to document and submit unsupported conditions to increase their patients' "risk adjustment scores," which in turn substantially increases the amount that Medicare pays for the patients' care." (*Id.* at ¶ 5).

Relator states that "the principal vehicle used by Physician Partners to implement its scheme is a document called a '5 Star Checklist,' an Anion-generated form which 'suggests' diagnoses that are ostensibly based on a patient's medical history, but in reality *only* suggests conditions that would increase a patient's risk score, and thus increase the amount that Medicare pays for that patient's care." (*Id.* at ¶ 8). Moreover, Relator alleges that through coordinated efforts to maximize profits, Physician Partners engaged in high-pressure directives to ensure their physicians selected only risk-adjusting hierarchical condition categories ("HCCs"), including tying the physicians' compensation to their willingness to comply with the system (*Id.* at ¶ 91). The primary vehicle for this pressure was through the "Financial Performance Bonus" program, which incentivized physicians to boost risk adjustment scores for Freedom Medicare Advantage Patients (*Id.* at ¶¶ 127–30). The bonus also encouraged physicians to reduce expenses, typically associated with hospital admissions,

7

specialist referrals, and prescription drugs (*Id.* at ¶ 131). Through this bonus, physicians could earn up to $100,000.00 per year (*Id.* at ¶ 129). Relator also alleges that Physician Partners exercised this pressure on its physicians by "engag[ing] with its physicians – both employed and contracted – in person, in writing, via Zoom, and through pre-recorded training videos to convey and enforce its expected coding protocols." (*Id.* at ¶ 138). And when the videos and published guidance were not successful in convincing a doctor to code in the manner which inflates risk scores, Physician Partners began directly applying pressure to the resisting physician (*Id.* at ¶ 151). After describing this scheme, Relator lists specific examples of patients for whom false claims were submitted as a result of this scheme (*Id.* at ¶¶ 203–95).

The Court finds that Relator's Amended Complaint describes a scheme that is inclusive of affiliate providers. Provider Defendants represent, however, that the specific examples of false claims in the Amended Complaint are limited to claims submitted on behalf of VIPcare employed physicians.[2] Thus, Provider Defendants argue that the allegations of false claims are only pleaded with particularity with respect to employed physicians, and as a result, affiliated physicians should not be included in discovery. Relator responds that the purported distinctions between affiliated and employed physicians are not supported by the record. The Court agrees.

    b. <u>Employed and Affiliated Providers</u>

While Relator attempts to emphasize the similarities between employed and affiliate providers, Defendants attempt to distinguish the two groups. In support of their response to Relator's motion, Provider Defendants submitted the declaration of James Daniel Kollefrath,

---

[2] Relator states in her sur-reply that discovery has revealed that the representative patients in the Amended Complaint were also treated by affiliated physicians (Doc. 276).

President of Physician Partners (Doc. 193-1), which describes various differences between employed and affiliated physicians.  First, Mr. Kollefrath states that employed physicians are W-2 employees employed by VIPcare pursuant to employment agreements, while affiliated physicians associate with Physician Partners through affiliate agreements (which are negotiable and vary from affiliate to affiliate) (*Id.* at ¶ 4).  To that end, VIPcare physicians receive all of their income from VIPcare, whereas affiliated physicians' income derives from multiple sources, only one of which is Physician Partners (*Id.* at ¶ 5).  In addition, affiliated physicians are independent owners and operators of their practices, who are responsible for their facilities, the selection of insurance programs, patient scheduling, and staff hiring and management (*Id.* at ¶ 6).  For employed physicians, on the other hand, VIPcare takes ownership of the facilities and responsibility for these items (*Id.*).  Finally, affiliated physicians are free to select their own electronic medical records ("EMR") software, on which the affiliated providers (not the Provider Defendants) select diagnosis codes, while VIPcare physicians are required to use the eClinical Works EMR software provided by VIPcare (*Id.* at ¶ 7).[3]

Relator responds that these purported distinctions are inconsistent with the facts of the case.  For example, patients were often transferred between affiliated and employed physicians, and employed and affiliated physicians are treated the same way in Freedom's contract with Physician Partners (Doc. 214).  Relator also cited testimony tending to undermine the importance or relevance of these distinctions.  First, Emily Gallman, the Vice President of Healthcare Operations at VIPcare, testified that she had access to claims data

---

[3] Mr. Kollefrath later clarified that both employed and affiliated physicians select their own diagnosis codes (Doc. 315-1 at 214:3–215:19).

9

submitted by both VIPcare and affiliated physicians (Doc. 277-1 at 98:1–11).  Ms. Gallman also confirmed that Physician Partners prepared and distributed monthly reports (including data-driven provider-specific utilization reports) to both employed and affiliated physicians (*Id.* at 264:19–265:6).  Relator also pointed to the testimony of Sajitha Johnson, a Quality Analyst and then Senior Provider Educator for Physician Partners, who confirmed that 5 Star Checklists were available to both employed and affiliated providers (Doc. 277-2 at 89:12–24).  Finally, Relator also provided testimony from Dr. Dennis Mihale, who stated that he drew no distinction between affiliated or employed providers, and provided training to both groups of providers as well (Doc. 277-3 at 108:18–109:1, 123:1–20).

At the hearing, Relator further represented that Mr. Kollefrath's deposition testimony undermined the weight of the representations in his declaration, while Provider Defendants represented that it affirmed the identified distinctions.  As a result, the Court ordered the parties to designate relevant portions of Mr. Kollefrath's testimony as well as any other additional testimony that would be relevant to this issue.  The parties then identified relevant excerpts of Mr. Kollefrath's testimony as well as relevant testimony from the corporate representatives of Physician Partners and VIPcare.  This additional testimony establishes that, while there may be distinctions between employed and affiliated physicians, these distinctions are not sufficiently meaningful to exclude affiliated physicians from discovery.

Mr. Kollefrath testified that the operating agreement operating agreement between Physician Partners and Freedom states that Physician Partners shall require both affiliated and employed physicians to maintain records (Doc. 315-1 at 95:16–96:17).  While affiliate agreements are negotiable and can vary from affiliate to affiliate, they are each based on a template agreement (*Id.* at 206:15–23).  And while "arguably" each term was negotiable, the

10

"primary" change would be the financial arrangement (*Id.* at 207:21–210:9). He also testified that Physician Partners reviews affiliates' medical records (*Id.* at 219:1–21). Physician Partners provided quality training manuals, a poster with ICD-10 and HCC codes, and 5 Star Checklists to both sets of providers (*Id.* at 220:5–221:12). It identifies care gaps and generates reports reflecting validation rates of HCC codes as well as MRA scores for both groups as well (*Id.* at 221:20–222:18). Finally, Mr. Kollefrath confirmed that there is a shared surplus bonus available to affiliated physicians, though there are some differences from the surplus bonus program available to VIPcare physicians (*Id.* at 269:20–275:13).

       The parties also submitted additional testimony from Emily Gallman, this time in her capacity as corporate representative of VIPcare (Doc. 315-2). Ms. Gallman describes VIPcare as "an affiliate group of" Physician Partners, meaning it has "contracted with Physician Partners to then contract on our behalf with Medicare Advantage insurance entities." (*Id.* at 36:20–37:1). She then testified that any interaction between VIPcare and Physician Partners would have been documented through the physician affiliate agreement, and her understanding is that "Physician Partners uses it for all of their affiliate physicians and so with VIPcare being an affiliate provider of Physician Partners that would have been a document that memorialized our agreement and our participation in the health plans." (*Id.* at 40:2–24).

       Finally, the parties submitted testimony from Christopher Barber, the corporate representative of Physician Partners (Doc. 315-3). Mr. Barber explained that, as Vice President of Business Development for Better Health Group, he provides services for Physician Partners, VIPcare, and "all of our affiliate providers." (*Id.* at 20:20–21:15). He also explained that Physician Partners has access to affiliate providers' electronic medical records except when the "provider has refused that anyone have outside access or the provider is on

paper charts, which is very rare these days," although it was apparently more common during the relevant period (*Id.* at 59:13–21). Mr. Barber also confirmed that there are shared surplus bonus programs available to VIPcare physicians and affiliated physicians, though the eligibility requirements differed (*Id.* at 106:5–109:9).

Taken together, while there do appear to be differences between employed and affiliated providers, the Court does not find these differences to be relevant or significant enough to exclude affiliated providers from discovery. Indeed, three primary aspects of the scheme alleged in Relator's Amended Complaint—the 5 Star Checklist, the bonus program, and training materials—were available to and used by both groups of physicians. As a result, Relator has shown their relevance.

   c. <u>Undue Burden</u>

Finally, the Court addresses Provider Defendants' contention that included affiliated physicians in discovery would impose an undue burden on Provider Defendants. Provider Defendants represent that "discovery related to the 240 affiliate physicians at issue will implicate millions of pages of documents, which would likely cost at least hundreds of thousands of dollars and perhaps more to gather, review, and produce[.]" (Doc. 193-1 at ¶ 10). Provider Defendants represent that this will be particularly burdensome considering Relator has requested "*all* medical and bill records related to *any* Physician Partners patient whose services were paid in whole or in part by *any* Government health insurance program." (Doc. 193 at 14 (quoting Zafirov Request for Production No. 43)). To the extent individual requests are overly broad and unduly burdensome, Defendants may raise an appropriate objection. Moreover, the Court has already ordered the parties to confer on an appropriate sample of medical records to be produced (Doc. 316) and would expect the parties to confer

on any specific requests implicated by this ruling. The Court orders the parties to confer on the number of medical records to be produced, as well as the scope of any specific requests implicated by this order, on or before September 13, 2024.

Considering the foregoing, the Court finds affiliate providers are included in the scope of discovery. Accordingly, it is hereby **ORDERED** that Relator's Motion to Compel Discovery from Provider Defendants Regarding Affiliate Providers (Doc. 178) is **GRANTED**.

**ORDERED** in Tampa, Florida, September 3, 2024.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE