## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA
*ex rel.* CLARISSA ZAFIROV,

      Relator/Plaintiff,

v.                                                  Case No: 8:19-cv-01236-KKM-SPF

FLORIDA MEDICAL
ASSOCIATES, LLC, et al.,

      Defendants.

_____

## <u>ORDER</u>

For five years, Clarissa Zafirov has prosecuted various corporate entities on behalf of the United States, pursuing treble damages and other daunting monetary penalties for alleged harms to the public fisc. Zafirov has determined which defendants to sue, which theories to raise, which motions to file, and which evidence to obtain. If the action proceeds to an appeal, Zafirov will decide which arguments to preserve, further binding the federal government. Yet no one—not the President, not a department head, and not a court of law—appointed Zafirov to the office of relator. Instead, relying on an idiosyncratic provision of the False Claims Act, Zafirov appointed herself. This she may not do.

"Under our Constitution, the 'executive Power'—all of it—is 'vested in a President.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. CONST. art. II, § 1, cl. 1). Central to that power is the "exclusive authority and absolute discretion" to determine who to investigate and which charges to prosecute. *United States v. Nixon*, 418 U.S. 683, 693 (1974). Likewise, "the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court" is "a quintessentially executive power." *Seila Law*, 591 U.S. at 219.

"[T]he Framers expected that the President would rely on subordinate officers for assistance" in discharging his duties. *Id.* at 203–04. Under Supreme Court precedent, anyone who "exercise[s] significant authority pursuant to the laws of the United States" and who occupies a "continuing position established by law" qualifies as an officer. *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quotations omitted). To ensure accountability in the Executive Branch, the Constitution requires "Officers of the United States" to be appointed by "the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl.2.

The defendants correctly argue that Zafirov exercises significant authority, indeed core executive power, under the continuing position of relator but lacks proper appointment under the Constitution. As a result, the case must be dismissed.

## I.   BACKGROUND

### A. The False Claims Act

The False Claims Act (FCA) proscribes fraudulent claims for payment from the United States and the withholding of payments owed to the United States. 31 U.S.C. § 3729(a)(1)(A)–(G), (b)(2)(A)(ii), (b)(3). Those prohibitions sweep broadly. For example, a recipient of federal funds is liable whenever it knowingly misrepresents compliance with a "statutory, regulatory, or contractual requirement" when the representation is "material to the Government's payment decision." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016). A physician is liable when he knowingly certifies to the government, in an attempt to obtain reimbursement, that a procedure is 'reasonable and necessary' " if "the procedure was not reasonable and necessary under the government's definition of the phrase." *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 742–43 (10th Cir. 2018). And a manufacturer is liable who "knowingly supplies nonconforming goods to the government, based on a belief that the nonconforming goods are just as good as the goods specified in the contract." *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998).

The complexity of the regulations and contractual requirements in the fields where FCA litigation often occurs—such as healthcare, defense spending, or government contracting—frequently render the legal obligations of defendants "subject to multiple

interpretations." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1299 (11th Cir. 2019). Of course, FCA litigation generates considerable factual disputes about the materiality of representations and actual damages suffered by the government. *See, e.g.*, *United States ex rel. Heath v. Wis. Bell, Inc.*, 92 F.4th 654, 664–65 (7th Cir. 2024) (concluding that a genuine issue of fact existed as to whether the "alleged falsity of the [defendant's] claims was material to the government's payment decisions"). When found liable, defendants face "significant penalties" for FCA violations: treble damages plus fines up to almost $28,000 for each infraction. *Universal Health Servs.*, 579 U.S. at 180; 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5(a), (d) (2024).

As one would expect, the FCA empowers the United States to prosecute offenders. *See* 31 U.S.C. § 3730(a). More unusually, the statute also entitles any "person" (however broadly that term extends, presumably including a foreign national or any natural person) to enforce the statute by filing a lawsuit in the federal government's name. *Id.* § 3730(b)(1). If that person, known as a "relator," prevails, she may collect an "award" of up to thirty percent of the proceeds of the action. *Id.* § 3730(d). This procedural device, known as a qui tam provision, encourages litigation—so much so that private relators bring the majority of FCA actions. *See* U.S. Dep't of Just., *Fiscal Year 2023 False Claims Act Statistics* (*2023 FCA Stats*) at 2 (Feb. 22, 2024) (showing 712 new FCA qui tam matters

in fiscal year 2023, compared to 500 outside the qui tam process), https://perma.cc/D2HN-SYE8.

The FCA allows a relator not only to direct litigation, but also to bind the federal government without direct accountability to anyone in the Executive Branch. A relator need not consult with the federal government before filing suit, nor does she receive a commission or swear an oath of loyalty to the United States. Instead, a relator enjoys unfettered discretion to decide whom to investigate, whom to charge in the complaint, which claims to pursue, and which legal theories to employ.

Nor does a relator's discretion stop at final judgment. A relator determines whether to appeal and which arguments to preserve, thereby shaping the broader legal landscape for the federal government. In that way, a relator acts with greater independence than a Senate-confirmed United States Attorney or Assistant Attorney General, who must obtain the approval of the Solicitor General to appeal. *See* U.S. Dep't of Just., Just. Manual § 2-2.121 (2024) ("All appeals to the lower appellate courts in cases handled by divisions of the Department and United States Attorneys and all petitions for certiorari and direct appeals to the Supreme Court must be authorized by the Solicitor General."), https://perma.cc/BL95-BUVL.

After filing the complaint, the government may choose to intervene as a plaintiff in the action, which transfers "the primary responsibility for prosecuting the action" from the

relator to the government. *See* 31 U.S.C. § 3730(c). But even when it intervenes, the government must generally seek judicial approval before the relator's action may be settled or dismissed. *See id.* § 3730(c)(2)(A)–(B). If the government declines to intervene, as it does in the vast majority of actions, the relator prosecutes the action without direction from the Department of Justice (DOJ) or consultation with pertinent agencies. *See* Stephen Cox, Deputy Assoc. Att'y Gen., U.S. Dep't of Just., Remarks at the Federal Bar Association Qui Tam Conference (Feb. 28, 2018) ("Despite the significant role that qui tam cases continue to play in the Department's False Claims Act efforts . . . it remains the case that the Department intervenes in only about 1 in 5 cases that are filed."), https://perma.cc/NY8E-DAG3; *see contra* U.S. Dep't of Just., Just. Manual § 4-4.110 (2024) (requiring that government attorneys, but not realtors, "confer with the relevant agency during the investigative, litigation, and settlement phases of [an FCA matter]"), https://perma.cc/ZFL5-TVXB.

Today's frequent use of the FCA's qui tam provision emerged relatively recently. Although the FCA as enacted in 1863 permitted relator suits, it took a package of pro-relator amendments in 1986 to elevate the device from obscurity. At least one study found that the DOJ's records reveal only three qui tam actions in the four decades between 1943 and 1986, *see* WILLIAM L. STRINGER, THE FALSE CLAIMS ACT AMENDMENTS: AN ASSESSMENT OF ECONOMIC IMPACT 23 (1996) (admitting that the records are

incomplete but concluding that qui tam actions were "undoubtedly very few"), while others estimate that the "DOJ used to receive about six qui tam cases a year" before the 1986 amendments, Steve France, *The Private War on Pentagon Fraud*, 76 A.B.A. J. 46, 48 (1990). Whatever the precise figure, the relator amendments triggered an explosion of qui tam lawsuits. *See 2023 FCA Stats* at 1–2 (showing 31 new FCA qui tam matters in fiscal year 1987 rising to 712 new qui tam matters in 2023).

The proliferation of qui tam litigation of the last forty years has yielded mixed results for the United States. On the one hand, qui tam actions now generate increased revenue for the federal government. *See 2023 FCA Stats* at 1–2 (showing that fiscal year 2023 settlements and judgments in FCA qui tam actions totaled over $2.3 billion, as compared to roughly $2.3 million in 1988). On the other hand, non-intervened qui tam actions require the DOJ and federal agencies to "devote significant resources to monitoring them" at the cost of "pursu[ing] other meritorious cases and priorities." *See* Jesse Panuccio, Acting Assoc. Att'y Gen., U.S. Dep't of Just., Remarks at the American Bar Association's 12th National Institute on the Civil False Claims Act and Qui Tam Enforcement (June 14, 2018), https://perma.cc/Q897-3942. This strain on federal resources recently spurred the DOJ to instruct government attorneys to dismiss FCA actions when, among other things, a relator's action lacks merit; duplicates a pre-existing government investigation and adds no useful information; interferes with an agency's policies or programs; or threatens

classified information or national security interests. Michael D. Granston, U.S. Dep't of Just., *Factors for Evaluating Dismissal Pursuant to 31 U.S.C. 3730(c)(2)(a)* (*Granston Memo*) at 1, 3–7 (Jan. 10, 2018); *see* U.S. Dep't of Just., Just. Manual (2024) § 4-4.111 (incorporating the Granston memo), https://perma.cc/6ECC-J85P.

The unclear role of litigation funding heightens the tension between qui tam actions and ordinary Executive Branch practice. Because a relator may sell portions of her interest in an FCA action to third parties, including firms that specialize in litigation funding, *see Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1100–03 (11th Cir. 2020), the government might not know who is involved in FCA enforcement. The government has conceded in the past that the DOJ does not "really know the extent to which third party litigation funders are behind the qui tam cases that [the DOJ was] investigating, litigating, or monitoring." Ethan P. Davis, Principal Deputy Att'y Gen., U.S. Dep't of Just., Remarks on the False Claims Act at the U.S. Chamber of Commerce's Institute for Legal Reform (June 26, 2020), https://perma.cc/778D-FLEP. Nor does the government "know whether relators are sharing information with third party funders, or whether and to what extent the funders are exercising control over relators' litigation and settlement decisions." *Id.*

### B. Zafirov's Qui Tam Action under the FCA

In 2019, Zafirov sued her employer and the other defendants for violations of the FCA by misrepresenting patients' medical conditions to Medicare. Am. Compl. (Doc. 86)

¶¶ 1–3, 91–92, 95. Zafirov never asserted that the defendants' allegedly illegal conduct harmed her. Instead, like a United States Attorney, Zafirov proceeds on behalf of the "real party of interest in this case," the "United States of America," Am. Compl. ¶ 18, to avenge "a wrong to the public as a whole," *Trump v. United States*, 144 S. Ct. 2312, 2331 (2024) (quotations omitted).

After the government declined to intervene, Zafirov litigated the action on behalf of the United States for the next five years. *See, e.g.*, (Docs. 40, 56–59, 106–07). Zafirov's tenure as a relator has stretched so long that she now resides in a different country than when the suit began. *See* OA Tr. (Doc. 345) at 104:6–10 (confirming that Zafirov "is currently residing in Canada"). Throughout, the government has refrained from participating, only at times presenting the United States' position in "statements of interest." *See, e.g.*, (Docs. 120, 343). That partly changed when the defendants moved for judgment on the pleadings, arguing that the FCA's qui tam provision violates Article II's Appointments Clause, Take Care Clause, and Vesting Clause. Mot. for J. on the Pleadings (MJP) (Doc. 180). Even then, the government intervened solely to contest the constitutional arguments and otherwise allows Zafirov to drive the litigation. *See* (Doc. 278) at 1 n.1.

The parties, the United States, and two *amici* have extensively briefed the constitutional challenges. After holding oral argument, I invited additional briefing to

allow the parties and their *amici* to address historical evidence of federal qui tam

enforcement in the United States. All briefing is now complete, and the defendants' motion

is ripe.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) permits judgment on the pleadings "[a]fter

the pleadings are closed—but early enough not to delay trial." "Judgment on the pleadings

is appropriate where there are no material facts in dispute and the moving party is entitled

to judgment as a matter of law." *Carson v. Monsanto Co.*, 72 F.4th 1261, 1266 (11th Cir.

2023) (quotations omitted).

## III.   ANALYSIS

The defendants assert that the FCA's qui tam provision is unconstitutional twice

over. First, they argue that the qui tam provision violates the Take Care Clause and the

Vesting Clause of Article II because the FCA "den[ies] the President necessary removal

authority and sufficient supervisory control over" a relator. MJP at 7–13. Second, they

contend that the qui tam provision violates the Appointments Clause because a relator is

an improperly appointed officer of the United States. *Id.* at 13–18. As a result of these

constitutional infirmities, the defendants urge dismissal of the action. Zafirov resists both

arguments, relying on the history of qui tam suits, as well as the relevant precedents, to

contend that she is subject to sufficient control by the President and is not an officer of the United States. *See* Resp. (Doc. 218) at 5-9.

After addressing two preliminary matters, I reach three conclusions about the Appointments Clause argument. First, an FCA relator is an officer of the United States. Second, historical examples of qui tam provisions do not exempt an FCA relator from the Appointments Clause. Third, because Zafirov is not constitutionally appointed, dismissal is the only permissible remedy. Given these conclusions, I do not address the defendants' other Article II argument.

## A. The Defendants' Article II Challenges Are Non-Jurisdictional, Timely, and Unwaived

Before reaching the merits, Zafirov contends that the motion for judgment on the pleadings is untimely. To address this argument, I must answer two preliminary questions. The first is whether the constitutionality of the FCA's qui tam provision cuts to subject matter jurisdiction so that the defendants may raise it at any time. The second is whether the defendants waived the Article II challenges. The answer to both questions is "no."

The defendants contend that, because their Article II challenges bear on Zafirov's standing, the motion for judgment on the pleadings implicates subject matter jurisdiction. MJP at 25. *Vermont Agency of Natural Resources v. United States ex rel. Stevens* forecloses this argument. 529 U.S. 765 (2000). *Stevens* holds that the FCA "gives the relator [her]self an interest in the lawsuit, and not merely the right to retain a fee out of the

11

recovery," and thus that a relator has Article III standing. *Id.* at 772–74. Applying this reasoning, the Supreme Court and the Eleventh Circuit have rejected attacks on a relator's standing while expressly reserving a ruling on an Article II challenge. *Id.* at 778 n.8; *Ruckh*, 963 F.3d at 1100 n.9.[1] Because precedent gives Zafirov standing, the motion for judgment on the pleadings does not threaten subject matter jurisdiction.

With subject matter jurisdiction secured, Zafirov argues that the defendants waived the Article II challenges. Resp. at 4. Zafirov is mistaken. If "a plaintiff receives notice [of a constitutional affirmative defense] . . . by some means other than pleadings, the defendant's failure" may be excused. *Grant v. Preferred Rsch., Inc.*, 885 F.2d 795, 797 (11th Cir. 1989) (quotations omitted). That is the case here. Zafirov received notice of the defendants' Article II challenges in a motion for judgment on the pleadings filed well over a year before the scheduled trial. *See* FED. R. CIV. P. 12(c) (permitting such motions "after the pleadings have closed" but "early enough not to delay trial"); *see also, e.g.*, *King v.*

---

[1] Intervening Supreme Court decisions and longstanding precedent arguably undermine *Stevens*'s core assumption—that a relator's interest in the lawsuit vests before final judgment. *Compare United States ex rel. Polansky v. Exec. Health Res.*, 599 U.S. 419, 428–39 (2023) (explaining that the United States may intervene in an FCA qui tam action at any time and then move to dismiss under a deferential standard), *with id.* at 451 (Thomas, J., dissenting) (explaining that "[f]or [*Stevens*'s] holding to make sense, it appears that [a relator's partial] assignment must be effective no later than the point in time at which the Government declines to intervene in the seal period and the relator may proceed with the action as the only plaintiff in court"). *See also* Saikrishna Prakash, *The Chief Prosecutor*, 73 GEO. WASH. L. REV. 521, 591 (2005) (explaining that nineteenth century precedent "suggests that the qui tam relator has no right to fines until she actually receives them . . . [h]ence, even after the relator commences the suit, the president may pardon or perhaps take the lesser step of entering a nolle prosequi before the court"). Whatever tension exists in the precedent, the Supreme Court has not overruled *Stevens*, so its holding remains binding.

*Akima Glob. Servs.*, 775 F. App'x 617, 620 n.1 (11th Cir. 2019) (per curiam) (concluding that a similar motion filed four months before trial was timely). Zafirov had every opportunity to rebut the challenges in written submissions and at oral argument. Under these circumstances, Zafirov suffers no prejudice by consideration of a motion that is "purely legal and does not require either side to present additional facts or arguments to a jury." *United States ex rel. Wallace v. Exactech, Inc.*, No. 18-cv-1010, 2023 WL 8027309, at *3 (N.D. Ala. Nov. 20, 2023) (permitting the same challenge on a similar procedural posture).

In the alternative but for similar reasons, I would grant the defendants' request for leave to amend their responsive pleadings under Rule 15(a)(2) to include the Article II challenges as affirmative defenses. *See* MJP at 4 n.4; Reply (Doc. 233) at 2 n.4.

### B. An FCA Relator Is an Officer of the United States

"[U]nlike anyone else, the President is a branch of government, and the Constitution vests in him sweeping powers and duties." *Trump*, 144 S. Ct. at 2346. Relevant here, "the 'executive Power'—all of it—is 'vested in [the] President,' who must 'take Care that the Laws be faithfully executed.' " *Seila Law*, 591 U.S. at 203 (quoting U.S. CONST. art. II, § 1, cl. 1; *id.* § 3). That is to say, the President, as the head of the Executive Branch, has the power and the duty to enforce federal law. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 678–79 (2023).

13

The Framers understood that this concentration of power, "unique in our constitutional structure," is "necessary to secure the authority of the Executive so that he could carry out his unique responsibilities." *Seila Law*, 591 U.S. at 223–24. "To justify and check that authority . . . the Framers made the President the most democratic and politically accountable official in Government." *Id.* at 224 (emphasis omitted). Unlike any other elected official, "[o]nly the President (along with the Vice President) is elected by the entire Nation." *Id.* "And the President's political accountability is enhanced by the solitary nature of the Executive Branch, which provides 'a single object for the jealousy and watchfulness of the people.' " *Id.* (quoting THE FEDERALIST NO. 70, at 475 (A. Hamilton) (J. Cooke ed. 1961)).

The Framers also knew that "it would be 'impossib[le]' for 'one man' to 'perform all the great business of the State.' " *Id.* at 213 (quoting 30 WRITINGS OF GEORGE WASHINGTON 334 (J. Fitzpatrick ed. 1939)). Thus, "the Constitution assumes that lesser executive officers will 'assist the supreme Magistrate in discharging the duties of his trust.' " *Id.* (quoting 30 WRITINGS OF GEORGE WASHINGTON 334). To maintain the Executive Branch's unitary structure and prevent the abuse of power, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Id.* at 213. In this way, " 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and

the highest' all 'depend, as they ought, on the President, and the President on the community.' " *Id.* at 224 (quoting 1 ANNALS OF CONG. 499 (1789) (J. Madison)).

The Appointments Clause retains accountability in the Executive Branch by creating a two-track system for appointing "Officers of the United States." "Principal officers," such as agency heads and other senior government officials, must be nominated by the President and confirmed by the Senate. *United States v. Arthrex, Inc.*, 594 U.S. 1, 10 (2021). This appointment procedure balances the separation of powers with the need to secure a "chain of dependence" connecting the President and his subordinates. In addition, this framework "preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power." *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991). "The Framers understood . . . that by limiting the appointment power, they could ensure that those who wielded it were accountable to political force and the will of the people." *Id.* at 884. But as a concession to "administrative convenience," *Edmond v. United States*, 520 U.S. 651, 660 (1997), the Framers included a limited exception that sidesteps the normal "advice and consent of the Senate" requirement. For "inferior Officers," Congress may vest their appointment "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2

The Supreme Court identifies a third category of government official unmentioned in the Constitution: the mere "employees" that comprise "the broad swath of 'lesser

functionaries' in the Government's workforce." *Lucia*, 585 U.S. at 245 (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976) (per curiam)). The Appointments Clause does not apply to a mere employee. *Id.* Thus, much hangs in the balance when distinguishing between an officer and an employee.

The Supreme Court deems an individual an officer of the United States if she "exercis[es] significant authority pursuant to the laws of the United States," *id.* (quoting *Buckley*, 424 U.S. at 126), and "occup[ies] a 'continuing' position established by law," *id.* (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879)). If an individual satisfies both conditions, the Constitution requires that she be appointed consistent with the Appointments Clause.[2]

Applying that test, an FCA relator is an "Officer[] of the United States." Because a relator possesses civil enforcement authority on behalf of the United States, a relator exercises significant authority. And because the FCA prescribes a relator's statutory duties, powers, and emoluments, and the position mirrors the role of a bank receiver or special

---

[2] Once a court concludes that an individual is an officer of the United States, a different test determines whether the individual is a principal or inferior officer. *Arthrex*, 594 U.S. at 13–14. Under *Arthrex*, a plausible argument exists that an FCA relator is a principal officer because she "bind[s] the Executive Branch to exercise executive power in a particular manner" during an enforcement action. *Id.* at 23. In non-intervened cases such as this one, the relator will necessarily make "final [litigation] decisions binding the Executive Branch" as to the allegedly fraudulent conduct at issue. *Id.* On the other hand, *Arthrex* contemplated that an inferior officer might exercise power otherwise reserved to principal officers "under 'special and temporary conditions.' " *Id.* at 22 (citing *United States v. Eaton*, 169 U.S. 331, 343 (1898), for the proposition "that an inferior officer can perform functions of principal office on acting basis"). Because Zafirov was unconstitutionally appointed so long as she is not an employee, no need arises to decide if she is a principal or inferior officer.

prosecutor in its duration and non-personal nature, a relator occupies a continuing position. Thus, Zafirov is subject to the Appointments Clause.

### 1. An FCA Relator Exercises Significant Authority Pursuant to the Laws of the United States

The power to initiate an enforcement action in the name of the United States to vindicate a public right constitutes "significant authority pursuant to the laws of the United States." *Lucia*, 585 U.S. at 245 (quoting *Buckley*, 424 U.S. at 126). The FCA confers that power to relators and allows them to litigate actions to final judgment and beyond. In the process, a relator often binds the federal government (sometimes even in future cases) and recovers punitive damages that flow to the public treasury. Under *Buckley*'s "significant authority" test, an FCA relator passes muster. Executive branch practice confirms the point. And none of Zafirov's abundant attempts to distinguish a relator's power from officials that the Supreme Court holds are constitutional officers persuades otherwise.

### i. An FCA Relator's Civil Litigation Powers Are "Significant Authority"

When articulating the "significant authority" test in *Buckley*, the Supreme Court held that members of the Federal Election Commission (FEC) were "Officers of the United States" for two independent reasons. First, the Court explained that an official vested with the power to "conduct[] civil litigation in the courts of the United States for vindicating public rights" must be an officer under the Appointments Clause. *Buckley*, 424 U.S. at 126, 140. The Court reasoned that "[a] lawsuit is the ultimate remedy for a breach

of the law" and thus an executive function reserved to the President to whom "the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.' " *Id.* at 138 (quoting U.S. CONST. art. II, § 3). Because the FEC possessed civil "enforcement power, exemplified by its discretionary power to seek judicial relief," the commissioners exercised this kind of significant authority. *Id.* As a result, the commissioners must be subject to the Appointments Clause to remain accountable to the Executive Branch.

Second, the FEC commissioners possessed other "broad administrative powers," each of which "represent[ed] the performance of a significant governmental duty exercised pursuant to a public law." *Id.* at 140–41. The Court considered these functions— "rulemaking, advisory opinions, and determinations of eligibility of funds"—as distinct from the FEC's enforcement authority, which the Court understood as unequivocally executive and sufficient to constitute significant authority alone. *Compare id.* at 139–140 (concluding that the FEC's enforcement authority "may be discharged only by persons who are 'Officers of the United States' within the language of [the Appointments Clause]"), *with id.* at 140–41 (analyzing separately the FEC's "administrative powers"). Still, because the FEC's "administrative functions" neither "operate[d] merely in aid of congressional authority to legislate [nor were] sufficiently removed from the administration and

enforcement of public law," they too could be exercised only by officers of the United States. *Id.* at 141.

The Supreme Court continues to rely on *Buckley*'s significant authority standard to discern who qualifies as an officer. In *Morrison v. Olson*, the Supreme Court thought it "clear" that an independent counsel—required by statute not to "hold[] any office of profit or trust under the United States" before appointment, 28 U.S.C. § 593(b)(2)—became an officer when she assumed the government's prosecutorial responsibilities in a single action. 487 U.S. 654, 671 n.12 (1988). The Supreme Court has likewise held that other executive officials who play a role in enforcing or administering federal law are Officers of the United States, including SEC administrative law judges, *Lucia*, 585 U.S. at 241, 244–51, administrative patent judges, *Arthrex*, 594 U.S. at 13, and the Directors of the Consumer Financial Protection Bureau and the Federal Housing Finance Authority, *Seila Law*, 591 U.S. at 219–20; *Collins v. Yellen*, 594 U.S. 220, 250–53 (2021).

Similar to those officials, an FCA relator wields significant authority because she "conduct[s] civil litigation in the courts of the United States for vindicating public rights." *Buckley*, 424 U.S. at 126, 140. A relator may file a complaint, without *ex ante* oversight by the federal government, to initiate an enforcement action on behalf of the United States for treble damages and substantial statutory penalties. 31 U.S.C. §§ 3729(a)(1), 3730(b). That act precludes all but the Attorney General from "interven[ing] or bring[ing] a related

action based on the facts underlying" the complaint. *Id.* § 3730(b)(5). The filing of the complaint also begins a sixty-day seal period during which the government investigates both the claims and the relator and determines whether to intervene. *Id.* § 3730(b)(2). That ticking clock forces the Executive Branch to align its investigative priorities with those of a self-interested third party. If the government elects to intervene, the relator still enjoys "the right to continue as a party to the action, subject to [statutory limitations in § 3730(c)(2)]." *Id.* § 3730(c)(1).[3] If the government does not intervene, the relator may prosecute her action to final judgment however she chooses, including litigating appeals that can become binding precedent on the government. *Id.* § 3730(b)(4). That is textbook "significant authority." *Buckley*, 424 U.S. at 126, 138–39.

Other precedents reinforce the conclusion that a relator exercises significant authority by stressing how enforcement authority is inherent in, and crucial to, the executive power. A relator exercises core executive power[4] by deciding "how to prioritize

---

[3] Under *Polanksy*'s interpretation of the government's intervention and dismissal authority, a relator's statutory "right to continue as a party" stands on tenuous footing when the government decides to terminate the action. *See supra* n.1.

[4] I label as "core executive power" the power to initiate a civil enforcement action to right a public wrong in the name of the United States because such authority lies at the heart of Article II. *See, e.g., Seila Law*, 591 U.S. at 219 (observing that criminal prosecution is a "core executive power" and that "the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court" is "a quintessentially executive power"); *Buckley*, 424 U.S. at 138 (describing "[a] lawsuit [a]s the ultimate remedy for a breach of law, and it is to the President . . . that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.' "); *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1134 (11th Cir. 2021) (Newsom, J., concurring) ("Thus, at its core, the 'executive power' entailed the authority to bring legal actions on behalf of the community for remedies that accrued to the public generally.").

and how aggressively to pursue legal actions against defendants who violate the law." *Texas*, 599 U.S. at 678 (quotations omitted). Indeed, the ability to initiate an FCA enforcement action for "daunting monetary penalties against private parties on behalf of the United States," *Seila Law*, 591 U.S. at 219, is indistinguishable from the Executive Branch's "exclusive authority and absolute discretion to decide whether to prosecute a case," *Nixon*, 418 U.S. at 693. In sum, by suing on behalf of the United States to secure "essentially punitive" penalties, *Stevens*, 529 U.S. at 784, a relator performs a "traditional, exclusive function of the government," *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1308, 1310 (11th Cir. 2021), that is integral to the "administration and enforcement of the public law," *Buckley*, 424 U.S. at 139. That kind of core executive power is "significant authority."

Executive branch practice confirms this conclusion. For example, the United States regularly asserts that presidential exercise of similar authority is core executive power when litigation involves the President's ability to prosecute and exercise enforcement discretion. *See, e.g.*, *Trump*, 144 S. Ct. at 2334 ("Investigation and prosecution of crimes is a quintessentially executive function." (alterations accepted) (quoting Br. for United States at 19)). Likewise, counsel for the United States conceded that the Attorney General's enforcement of the FCA is "significant," "substantial," and "definitely a core executive power." OA Tr. at 68:1–7. A relator's exercise on behalf of the United States of the same

21

power under the same statute must—for the same compelling reasons—constitute the exercise of significant executive authority.

### ii. Zafirov's Arguments to the Contrary Are Unpersuasive

Zafirov resists this conclusion primarily by citing non-binding decisions that held otherwise. *See* Resp. at 13–15 (collecting cases). Of the four courts of appeals opinions that she cites, only two—both from the early 1990s—addressed the significant authority element. *See United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 757–59 (9th Cir. 1993) (conceding that non-intervened cases "present[] what may seem a close question under *Buckley*"); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994) (concluding without analysis that, "[a]lthough a relator may sue in the government's name, the relator is not vested with governmental power"). The other two courts resolved the Appointments Clause argument on the "continuing position" ground alone; one even appears to assume that an FCA relator exercises significant authority. *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804–05 (10th Cir. 2002) (concluding that meeting *Buckley*'s "significant authority" test is insufficient); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757–58 (5th Cir. 2001) (en banc).

None of those circuits examined, much less reconciled, the long line of Supreme Court precedents explaining that enforcement authority and charging discretion are core executive power, especially when coupled with the authority to impose a punitive sanction.

*See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."); *Nixon*, 418 U.S. at 693; *The Confiscation Cases*, 74 U.S. 454, 457 (1868) ("Civil suits, in the name and for the benefit of the United States," are instituted and controlled by the Attorney General and the district attorneys.); *see also United States v. Cox*, 342 F.2d 167, 190 (5th Cir. 1965) (en banc) (Wisdom, J., specially concurring) ("The prosecution of offenses against the United States is an executive function within the exclusive prerogative of the Attorney General."); Saikrishna Prakash, *The Chief Prosecutor*, 73 GEO. WASH. L. REV. 521, 528 (2005) ("[T]he president is the chief prosecutor, i.e., the constitutional prosecutor of all offenses against the United States."). Nor did those circuits have the benefit of more recent Supreme Court precedents, which only further emphasize the point. See *Texas*, 599 U.S. at 679 ("The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States."); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021); *Seila Law*, 591 U.S. at 219. Although not all the above precedents addressed the Appointments Clause, their repeated emphasis that enforcement through litigation is a core executive power matches *Buckley*'s understanding of "significant authority." *See Buckley*, 424 U.S. at 138–39 (reasoning that the "discretionary power to seek judicial relief[] is authority that cannot possibly be regarded as merely in aid of the legislative function of Congress" but instead belongs

exclusively to the President because "the Constitution entrusts [him with] the responsibility to 'take Care that the Laws be faithfully executed' " (quoting U.S. CONST. art. II, § 3)). And after those circuits rejected the Article II challenge, the Supreme Court has only solidified the strictures of the Appointments Clause. *See Lucia*, 585 U.S. at 244–52; *Arthrex*, 594 U.S. at 11–23.

Zafirov, the United States, and an *amicus* propose a host of distinctions between a relator's power and the exercise of significant authority in *Buckley*. The most substantial proposed distinctions depend on (1) a categorical line between civil and criminal law enforcement, (2) a relator's lack of rulemaking or other administrative powers, (3) the fact that a relator pursues ordinarily only one enforcement action rather than many, (4) the Attorney General's ability to intervene or pursue a parallel action and to dismiss a relator's suit over her objection, and (5) a relator's lack of pre-suit investigatory resources from the federal government. None of these arguments exempt a relator from the need to be appointed consistent with the Appointments Clause.

The Supreme Court has long rejected a constitutional distinction between civil and criminal cases when evaluating whether an individual exercises core executive power. *See Seila Law*, 591 U.S. at 219 (authority to "seek daunting monetary penalties against private parties on behalf of the United States in federal court" is "a quintessentially executive power"). For obvious reasons, the same distinction bears no relevance in assessing whether

an individual wields significant authority. *See Buckley*, 424 U.S. at 140 (concluding that the "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights" is confined to properly appointed officers because civil enforcement authority rests with the President). Zafirov's attempted demarcation between criminal and civil authority ignores the punitive realities inherent in an FCA action. *Yates*, 21 F.4th at 1308 ("FCA monetary awards are, at least, partially punitive."). As the United States conceded, the FCA's financial sanctions "may look worse" than fines imposed in a criminal prosecution for the same conduct, particularly against corporate defendants. *Cf.* OA Tr. at 87:16–88:8; *id.* at 113:11–17 (Zafirov conceding the same, at least "financially").

 *Buckley* rebuts Zafirov's argument that a relator's lack of rulemaking or other administrative powers like those possessed by the FEC commissioners deprives a relator of significant authority. The Supreme Court held that the FEC's enforcement power—by itself—constituted significant authority. 424 U.S. at 140–41. Although the Court also held that the FEC's "administrative functions" properly belonged to officers, *id.* at 141–42, the Court's second holding does not undermine the first. *Cf. The Confiscation Cases*, 74 U.S. at 457 ("Settled rule is that [district and circuit] courts will not recognize any suit, civil or criminal, as regularly before them, if prosecuted in the name and for the benefit of the United States, unless the same is represented by the district attorney, or some one designated by him to attend to such business.").

The frequency of the exercise of enforcement power likewise does not diminish a relator's significant authority. *Buckley*'s reasoning does not depend on the number of enforcement actions brought by one official as compared to another. The officer distinction instead turns on the power bestowed to the official, namely the power to litigate civil cases "in the courts of the United States for vindicating public rights." *Buckley*, 424 U.S. at 138–40. That a relator ordinarily files a single action in no way undercuts the immense power that the FCA grants her. Nor does the FCA preclude a relator from initiating subsequent actions. And, as a practical point, relators collectively prosecute most FCA actions, so they indeed hold the "primary responsibility" in this field. *See 2023 FCA Stats* at 2 (showing 712 new FCA qui tam matters in fiscal year 2023, compared to 500 outside the qui tam process). A contrary conclusion would allow Congress to subvert the Appointments Clause by dispersing core executive power throughout the American people *en masse* rather than establishing power in a properly appointed officer. *See Freytag*, 501 U.S. at 885 (rejecting an "excessively diffuse appointment power"). Zafirov's argument invites the legislative encroachment that, "mask[ed] . . . under complicated and indirect measures," the Framers feared when crafting the Constitution, THE FEDERALIST NO. 48, at 310 (J. Madison) (C. Rossiter ed. 1961); *Freytag*, 501 U.S. at 878, 883–84.

Next, the government's ability to pursue a parallel action and to exert limited control after intervening does not lessen a relator's unchecked civil enforcement authority to initiate

26

an enforcement action. Whether the President exercises sufficient control over a relator is a question better suited to the defendants' other Article II argument, which I need not reach. But back-end executive supervision—exercised by the government in only a fifth of cases—does not diminish the significance of an FCA relator's front-end power to bring an enforcement action against a private party in federal court on behalf of the United States. *See also Kelly*, 9 F.3d at 758 (conceding that the issue is a "close question under *Buckley*" in non-intervened cases where the "relator retains primary responsibility for the litigation").

Lastly, Zafirov lacks support for the view that an individual who prosecutes matters on behalf of the United States must receive federal resources for her pre-suit investigations to be deemed an officer of the United States. Simply naming a power that relators do not possess does not vitiate their officer status. And the lack of government resources to investigate before filing a complaint does not negate the relator's power to sue, which under *Buckley* is significant authority.

In addition to the above proposed distinctions, Zafirov contends that *Cochise Consultancy, Inc. v. United States ex rel. Hunt* settled this issue. Resp. at 13. In *Cochise*, the Supreme Court noted that relators are not officials of the United States "in the ordinary sense of that phrase." 587 U.S. 262, 272 (2019). Zafirov misreads the import of that statement. The Court was rejecting a statutory interpretation argument about why a particular statute of limitations did not apply to relators. In so doing, the Court explained—

27

referencing the FCA's text—why the statute treats relators as private persons, not government officials. *Cochise Consultancy*, 587 U.S. at 272. *Cochise* made the factual observation that relators are not appointed consistent with Article II, but the Court had no occasion to opine on the constitutionality of the FCA's qui tam provision. *Id.* In fact, Justice Thomas, the author of *Cochise*, cited the same language from *Cochise* when raising his Article II concerns in his subsequent dissenting opinion in *Polansky*. 599 U.S. at 449 (Thomas, J., dissenting) (citing *Cochise Consultancy*, 587 U.S. at 272).

The United States and an *amicus* suggest that relators resemble ordinary private plaintiffs, who do not exercise significant authority when they seek relief under other federal statutes. USA Br. (Doc. 217) at 10–12, 15–17; TAF Br. (Doc. 225) at 24–25. That analogy ignores the longstanding distinction between injured parties seeking reparation for private harms and suits by sovereigns that "seek to redress a wrong to the public as a whole, not just a wrong to the individual." *Trump*, 144 S. Ct. at 2331 (quotations omitted). A relator's lack of a personal injury is the crux of the issue in *Stevens*, which held that the FCA gives a relator a partial assignment of the United States's interest in a lawsuit vindicating public rights. 529 U.S. at 772. Such an arrangement is unnecessary for a Title VII plaintiff who sues her employer to remedy discrimination against herself. But unlike a Title VII plaintiff, a relator performs a "traditional, exclusive function of the government," *Yates*, 21 F.4th at 1310, by "seek[ing] daunting monetary penalties against private parties

28

on behalf of the United States," *Seila Law*, 591 U.S. at 219; *Yates*, 21 F.4th at 1308. That power renders the comparison inapt.

Finally, Zafirov gestures at a much broader attack on the Supreme Court's Article II precedent, placing extensive reliance on a draft academic article purporting to "[a]pply[] a novel, mixed-method study of private rights of action" to justify "the vast majority of private enforcement schemes." Nitisha Baronia, et al., *Private Enforcement and Article II* (*Private Enforcement*) (Doc. 264-3) at 1. Yet the article itself concedes that, if any private delegation of enforcement authority is unconstitutional, it is probably the FCA's qui tam provision. *See id.* at 56–57 (explaining that the FCA "implicate[s] nearly every cross-doctrinal concern identified" in the manuscript). Thus, the centerpiece of Zafirov's Article II structural argument not only fails to justify an exception to longstanding Article II jurisprudence, but the article also cuts against her on the constitutionality of the FCA qui tam provision that the defendants challenge.

*    *    *

In the end, none of Zafirov's arguments overcome the reality that an FCA relator initiates a lawsuit that "seek[s] daunting monetary penalties against private parties on behalf of the United States in federal court." *Seila Law*, 591 U.S. at 219. Exercising such "quintessentially executive power" disposes of the significant authority question in the

29

defendants' favor. *Id.*; *see also Buckley*, 424 U.S. at 140. Zafirov's power to enforce public law through litigation necessarily satisfies the first step for officer status.

### 2. An FCA Relator Occupies a Continuing Position Established by Law

In addition to exercising significant federal authority, one deemed an "Officer of the United States" must "occupy a 'continuing' position established by law." *Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 511). The "continuing position" inquiry "stress[es] 'ideas of tenure [and] duration'" and asks whether the individual's statutory duties are "'occasional or temporary' rather than 'continuing and permanent.'" *Id.* (quoting *Germaine*, 99 U.S. at 511–12). As the FCA's structure evidences and Supreme Court precedent confirms, an FCA relator occupies a continuing position.

Because the "continuing position" inquiry focuses on an individual's statutory duties, powers, and emoluments, I begin with the FCA, which defines all three for the office of relator. When a relator initiates an enforcement action, she must comply with several statutory duties. She must file the initial complaint in camera, serve "[a] copy of the complaint and written disclosure of substantially all material evidence and information [she] possesses" on the government, and wait at least sixty days before serving the defendant so that the government may investigate and decide whether to intervene. *See* 31 U.S.C. § 3730(b)(2)–(3). Beyond the ability to initiate and litigate an action that binds the federal government, a relator enjoys unfettered freedom to prosecute the action as she determines

30

best. She may choose which defendants to sue (and which not to sue, for reasons of her own), which theories to raise, which motions to file, and which evidence to obtain. *Id.* § 3730(b)(4)(B) (granting the relator "the right to conduct the action"). Unlike a government attorney, a relator proceeds untethered to, and unbound by, DOJ policy or the Justice Manual. And she has no duty to report to the Attorney General or his subordinates beyond serving (at taxpayer expense and upon request) certain litigation documents on the government. *Id.* § 3730(c)(3). Finally, if the action succeeds, the FCA compensates a relator with a statutory moiety between fifteen to twenty-five percent of the judgment. *Id.* § 3730(d). The existence of statutorily defined duties, powers, and emoluments confirms that a relator holds a continuing office. *Germaine*, 99 U.S. at 511.

As the above statutory duties, powers, and emoluments prove, the office of an FCA relator is continuous even if it is not continually filled. Although a particular person occupies the office—in the manner of an Attorney General, an Ambassador, or Secretary of the Treasury—for a time that varies from occupant to occupant, the office of relator persists by operation of the FCA regardless of the occupant and regardless of any intermittent vacancy, resignation, debilitation, or the like. Stated otherwise, the office of relator exists whether a person is appointed to that office or not, making that office "continuous and permanent."

Precedent suggests that a relator occupies a "continuing position" despite that term expiring at the end of a single matter. In *Morrison v. Olson*, the Supreme Court concluded that Independent Counsel Alexia Morrison—authorized "to exercise all investigative and prosecutorial functions and powers of the Department of Justice" for purposes of a single investigation—was an inferior officer. 487 U.S. at 660–63, 670–73. Although the Supreme Court focused on the distinction between principal and inferior officers, the majority thought it "clear that [Morrison was] an 'officer' of the United States, not an 'employee.' " *Id.* at 671 n.12 (citing *Buckley*, 424 U.S. at 126 & n.162). Justice Scalia agreed on that point, dissenting instead on the basis that Morrison was a principal officer who required Senate confirmation. *Id.* at 715–23 (Scalia, J., dissenting).

Relators self-appoint as special prosecutors to recover punitive damages against private parties on behalf of the federal government. *See Seila Law*, 591 U.S. at 219; *Yates*, 21 F.4th at 1308. Such responsibility is analogous to that of the Independent Counsel in *Morrison*. If anything, a relator occupies a more continuous position because the scope of her prosecutorial jurisdiction is limited only by the complaint (of which she is the master) and § 3730's jurisdictional provisions (which are open-ended rather than narrowly defined by the Attorney General). Like Morrison and her fellow Independent Counsels, an FCA relator is an officer, too.

Older decisions discussing bank receivers offer another helpful analogy. Bank receivers were officials charged with winding up a specific insolvent bank and entrusted with "statutory authority to bring suit, through a [United States] Attorney and under the direction of the Solicitor of the Treasury." *See* Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 110–11 (2007).[5] Even though bank receivers' duties were tied to a specific bank and discharged on completion of the project, "it was the uniform view of the federal courts" in the nineteenth and early twentieth centuries that these officials were "officers of the United States" under a statute conferring federal jurisdiction for certain lawsuits. *Id.* (collecting cases); *see, e.g.*, *United States v. Weitzel*, 246 U.S. 533, 541 (1918) ("The receiver, unlike a [bank] president, director, cashier, or teller, [was] an officer, not of the corporation, but of the United States."); *see also Ex parte Chetwood*, 165 U.S. 443, 457–58 (1897) (holding that a bank receiver appointed by the Comptroller of the Currency "was not the officer of any court, but the agent and officer of the United States"); *Platt v. Beach*, 19 F. Cas. 836, 840 (E.D.N.Y. 1868) (holding that a receiver was an officer because his "duties [were] not defined by any contract, but by law and rule prescribed by the government"); *Stanton v. Wilkeson*, 22 F.

---

[5] The cited Office of Legal Counsel Opinion concluded that relators were not officers of the United States based on the "continuing position" requirement, although the Opinion did not discuss the analogy to bank receivers' authorization to initiate civil litigation on behalf of the United States. Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. at 114. Like other Office of Legal Counsel Opinion documents cited throughout this order, I rely on the opinion as descriptive, not as a statement of the government's position on the appropriate analogy to relators.

33

Cas. 1074, 1075 (S.D.N.Y. 1876) (addressing and rejecting a continuity challenge to a receiver's officer status); *Price v. Abbott*, 17 F. 506, 507–08 (C.C.D. Mass. 1883) (Gray, J.) (explaining that a receiver was an officer of the United States because "being appointed pursuant to an act of congress to execute duties prescribed by that act, he is, in the execution of those duties, an agent and officer of the United States").

Like bank receivers, relators are appointed to handle a specific problem, at the conclusion of which their term in office ends. And like bank receivers, relators are empowered to initiate litigation on behalf of the United States to enforce a complex regulatory scheme with serious implications for the public fisc and for targeted defendants. Thus, like bank receivers, relators are officers of the United States.

Terms that endure for only a single action—such as bank receivers, special prosecutors, and relators—can qualify as continuing positions. Another circuit has rightly recognized that an official occupies a continuing position when "they wield federal prosecutorial power and hold a position that is not personal to a specific individual and may last for years." *United States v. Donziger*, 38 F.4th 290, 294 (2d Cir. 2022), *cert. denied* 143 S. Ct. 868 (2023); *see also Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 821 F.3d 19, 37–38 (D.C. Cir. 2016) (holding that a one-off arbitrator was an officer of the United States). In *United States v. Donziger*, the Second Circuit applied a three-part test to determine "whether a temporary position is an office: (1) the position is not personal to

a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental." 38 F.4th at 297 (citing Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. at 112–13). Although not the ultimate arbiter of whether a temporary position is "continuing" under *Lucia* and *Germaine*, *Donziger* provides a useful rubric and further confirms that a relator is an officer of the United States.[6]

At step one, "to qualify as an office, the position must not depend on the identity of the person occupying it, and the duties should continue, though the person be changed." *Donziger*, 38 F.4th at 297 (quotations omitted). As Chief Justice Marshall opined in 1823, "[a] man may certainly be employed under a contract . . . without becoming an officer. But if [his] duty be a continuing one, which is defined by rules prescribed by the government, and not by contract . . . [and] if those duties continue, though the person be changed; it seems very difficult to distinguish such a charge or employment from an office, or the person who performs the duties from an officer." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.). The FCA contemplates that arrangement for a relator, permitting any "person" to bring an FCA action—and thus, to occupy the position of realtor—if the person can allege the facts of a fraud. 31 U.S.C. § 3730(b)(1).

---

[6] The government (through Special Counsel Jack Smith) recently cited *Donziger* as support for the argument that special prosecutors like Smith are Officers of the United States and not employees. *See* Resp. to Amicus Br. in Supp. of Mot. to Dismiss at 6, *United States v. Trump*, No. 23-cr-80101 (Doc. 432) (S.D. Fla. Apr. 4, 2024).

Put differently, the position of relator does not depend on the identity of the person initiating the action, as any "person" can be the relator if she satisfies the statutory prerequisites. *See id.* § 3730(e). Although the statutory scheme's "first come, first served" preclusion rule contemplates and pretermits duplicative relators, the statute does not grant a preference to potential relators based on superior knowledge, skill, or any other attribute unique to the person. *See id.* § 3730(b)(5).

Eleventh Circuit precedent permitting the alienability of a relator's interest likewise supports the view that the position of an FCA relator operates independent of any particular person who occupies the role. First, when a relator dies, his estate's personal representative may be substituted in the relator's place because "a relator's *qui tam* action survives his death." *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993), *as amended* (Jan. 12, 1994). If another may be substituted in the relator's shoes, then the office is not personal in nature to the original relator. Second, a relator may assign (at least in part) her interest in an FCA action. *Ruckh*, 963 F.3d at 1102. Because a relator's "right to represent the interests of the United States" and pursue her portion of the judgment constitutes her position for Appointments Clause purposes, the ability to assign that right to others confirms that the position does "not depend on the identity of the person occupying it." *Id.*; *Donziger*, 38 F.4th at 297.

At step two, "the position must not be transient or fleeting." *Donziger*, 38 F.4th at 297. The Second Circuit concluded that the special prosecutors appointed by the court were neither "transient [n]or fleeting" because they had "already served for nearly three years." *Id.* Zafirov's tenure nearly doubles three years, and she is hardly an outlier in duration. *See, e.g.*, *United States ex rel Alderson v. Quorum Health Grp., Inc.*, 171 F. Supp. 2d 1323, 1325, 1340–41 (M.D. Fla. 2001) (awarding the relator his statutory moiety after litigating the FCA action for eight years). Thus, "[a]lthough [Zafirov's] duties terminate upon performance," her "position[] [is] not transient or fleeting." *Id.*

At step three, "the duties of the position must be more than incidental to the regular operations of government." *Id.* Consideration of substance is "necessary to ensure against evasion of the Appointments Clause through the creation of temporary positions with the same powers as officers." *Id.* at 297 n.5 (citing Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. at 113). For reasons already given, the power to vindicate public rights through litigation is far from "incidental to the regular operations of government." *Id.* at 297; *see also Trump*, 144 S. Ct. at 2348 n.1 (Thomas, J., concurring) (explaining that "it is difficult to see how an official exercising the Department of Justice's duties to enforce the criminal law by leading a prosecution could be anything but an officer"); *supra* n.4.

In short, officials who exercise important duties are more likely to occupy a constitutional office even when their term is temporary or otherwise cabined to circumstances. That commonsense principle helps explain why bank receivers and the Independent Counsel were officers, but merchant appraisers and civil surgeons were not. *Compare Weitzel*, 246 U.S. at 541; *Morrison*, 487 U.S. at 671 n.12, *with Germaine*, 99 U.S. at 511–12; *Auffmordt v. Hedden*, 137 U.S. 310, 326–28 (1890). The former exercised core executive power by litigating in the name of the United States. Because an FCA relator similarly exercises core executive power, *see supra* at 20–26, her "duties are [by definition] more than incidental to regular government operations." *Donziger*, 38 F.4th at 298; *cf. Buckley*, 424 U.S. at 138–39.

Zafirov and her allies only minimally contest continuity. The thrust of their argument is that a relator's position is personal and that the powers associated with the position are minimal compared to those held by officers in other cases. *See* Resp. at 15–17; USA Br. at 16–17. The FCA's text negates Zafirov's first contention, as any "person" with knowledge of the fraud could sue. 31 U.S.C. § 3730(b)(1). The former contention is also belied by *NEC* and *Ruckh*, which clarify that the position is not personal by permitting substitution or "reassignment" of a relator's "right to represent the interests of the United States in [a] qui tam action[]."11 F.3d at 139; 963 F.3d at 1102. And the latter contention

repackages Zafirov's "significant authority" argument, which is wrong for reasons already explained. *See supra* at 17–30.

An FCA relator possesses all the traditional indicia of holding a constitutional "office." Her position is analogous to other temporary officials wielding core executive power whom courts have categorized as officers. And a relator passes the *Donziger* test for temporary-yet-continuing officers. In sum, Zafirov occupies a "continuing position" as a relator and thus satisfies step two of the test for officer status.

### C. Article II Contains No "Qui Tam" Exception

The historical pedigree of qui tam provisions does not save Zafirov from qualifying as an officer under Supreme Court precedent. Zafirov argues that the FCA's qui tam structure survives constitutional scrutiny because early Congresses enacted some analogous statutes. But no Supreme Court or Eleventh Circuit precedent blesses Zafirov's theory of historical exceptionalism when the enactments directly contradict the Constitution. Simply put, the Constitution prevails over practice, especially when the text is clear and the practice is neither continuous nor challenged. To accept Zafirov's alternative Article II proposal— that historical existence equals constitutionality—would eviscerate longstanding Article II jurisprudence.

A "basic principle" of constitutional interpretation requires that "[t]ext controls over contrary historical practices." *United States v. Rahimi*, 144 S. Ct. 1889, 1912 n.2 (2024)

(Kavanaugh, J., concurring). Thus, "[s]tanding alone, historical patterns cannot justify contemporary violations of constitutional guarantees." *Marsh v. Chambers*, 463 U.S. 783, 790 (1983); *see also Walz v. Tax Comm'n*, 397 U.S. 664, 678 (1970) ("[N]o one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it."). Applying this principle, the Supreme Court explains that when historical evidence of a practice conflicts with well-settled understandings of constitutional text, practice will prevail only when "unambiguous and unbroken history" leaves "no doubt that the practice . . . has become part of the fabric of our society." *Marsh*, 463 U.S. at 792. Evidence that a constitutional concern was raised and dismissed can "infuse[] [a practice] with power by demonstrating that the subject was considered carefully and the action not taken thoughtlessly, by force of long tradition and without regard to the problems posed by [the Constitution's new system of government]." *Id.* at 791. But a practice implemented "without full examination & deliberation" is entitled to little weight. *See* William Baude, *Constitutional Liquidation*, 71 STAN. L. REV. 1, 18 (2019) (quoting Letter from James Madison to Spencer Roane (May 6, 1821), *reprinted in* 2 THE PAPERS OF JAMES MADISON: RETIREMENT SERIES 320 (David B. Mattern et al. eds., 2013)).

An even more careful approach is required when a practice inherited from England implicates the separation of powers. *See* Prakash, *The Chief Prosecutor*, 73 GEO. WASH.

L. REV. at 589 (urging caution before "importing English constraints or exceptions to the executive power, when those limitations might be based on the principle of parliamentary supremacy"); Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 MICH. L. REV. 689, 725–26 (2004). "[R]eflexively resorting to English law or history without careful analysis can sometimes be problematic because America had fought a war . . . to free itself from British law and practices and rid itself of tyrannical British rule." *Rahimi*, 144 S. Ct. at 1915 n.3 (Kavanaugh, J., concurring). Courts, therefore, should approach English common law and historical practice with caution when constitutional questions involve the separation of powers. *See id.* ("[T]he Constitution . . . did not purport to take English law or history wholesale and silently download it into the U.S. Constitution.").

Zafirov's historical argument begins with a recitation of Justice Stevens's dissenting opinion in *Stevens*: that the same evidence cited in support of Article III standing is "sufficient to resolve the Article II question." Resp. at 4 n.3 (quoting *Stevens*, 529 U.S. at 801 (Stevens, J., dissenting)); *see also id.* at 20. Zafirov, the United States, and an *amicus* argue that early congressional enactments of qui tam statutes, even if never enforced, insulate the FCA's qui tam provision from Article II challenge. *See* OA Tr. at 73:12–77:16; 112:4–115:9, 146:7–16; USA Suppl. Br. (Doc. 260) at 1 n.1 (denying the need to show that analogous enactments were used); Relator Suppl. Br. (Doc. 264); TAF Suppl.

Br. (Doc. 261) at 4 ("enactment alone is sufficient"). They also believe that a broad range of informer statutes are relevant to the historical inquiry. Relator Suppl. Br. at 6–9; USA Suppl. Br. at 4–12; TAF Suppl. Br. at 2–3, 9–13. These assertions suffer from three serious methodological flaws.

First, Zafirov's mechanistic focus on enactments is overbroad. As anyone familiar with *Marbury* knows, "enactment by the First Congress [is not] a guarantee of a statute's constitutionality." *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting). "[W]e should be especially careful not to overread [early enactments] given that the Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural departure from the English system of parliamentary supremacy, from which many legal practices like qui tam were inherited." *Id.*; *see also* Prakash, *The Chief Prosecutor*, 73 GEO. WASH. L. REV. at 589; Woolhandler & Nelson, *Does History Defeat Standing Doctrine?*, 102 MICH. L. REV. at 725–26.

Actual practice under these early statutes reveals a complicated relation between founding-era relators and properly appointed officers. For example, district attorneys often represented relators in nominally private enforcement actions, which gave the government a potential gatekeeping mechanism and control over a relator's litigation decisions. *See* James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in a Partisan World*, 92 FORDHAM L. REV. 469, 488–89 & nn.166–73

(2023); *see also id.* at 488 (conceding "some blurring of the lines between public and private proceedings" in the only close study of analogous founding-era enforcement); *cf.* Prakash, *The Chief Prosecutor*, 73 GEO. WASH. L. REV. at 587 (suggesting that "certain popular prosecutions [may not have been] brought precisely because potential popular prosecutors understood that the president might terminate the popular prosecution"). This blurring of public and private enforcement undermines the idea that founding-era enactments alone show a constitutional settlement reconciling the qui tam device with Article II. *See* Baude, *Constitutional Liquidation*, 71 STAN. L. REV. at 1 (explaining that constitutional liquidation requires "textual indeterminacy," "a course of deliberate practice," and "a constitutional settlement" marked by "acquiescence" and "public sanction").

Second, Zafirov overstates the historical case for qui tam provisions by lumping all founding-era bounty statutes together. In her view, every early statute that offered a bounty supports the FCA's relator provision. *See* Relator Suppl. Br. at 6–9; USA Suppl. Br. at 4–12; TAF Suppl. Br. at 2–3, 9–13. But *Stevens* identified three categories of statutes: those that "provided both a bounty and an express cause of action," those that "provided a bounty only," and those "that allowed injured parties to sue in vindication of their own interests (as well as the Crown's)." 529 U.S. at 775–77. Although the Supreme Court sometimes refers to these categories using the umbrella term "qui tam," it does not follow that each is

analogous to the FCA, which permits a relator to perform a "traditional, exclusive function of the government." *Yates*, 21 F.4th at 1310.

For example, consider an ordinary bounty statute offering informers a reward. Such a statute does not authorize the informer to wield power, much less the core executive power a relator exercises by litigating on behalf of the United States to vindicate a public right and impose punitive sanctions on private parties. Similarly, a statute regulating conduct injurious to both public and private rights that attaches additional remedies to a private cause of action operates more like an environmental citizen-suit provision than the FCA. Only *Stevens*'s narrowest category of statutes, those "provid[ing] both a bounty and an express cause of action [to common informers]," 529 U.S. at 777, is "relevantly similar" for Article II purposes, *N. Y. State Rifle & Pistol Assoc. v. Bruen*, 597 U.S. 1, 29 (2022). This narrower view tracks English qui tam practice, where similar statutes generally used language authorizing "any person [to] . . . sue for the [penalty]" as a "common informer." 2 WILLIAM BLACKSTONE, COMMENTARIES *438.[7] Thus, while the exact number of this narrow category of qui tam-like statutes at the founding is uncertain and their use even

---

[7] *Stevens* explained that the Supreme Court had previously "suggested, in dictum, that '[s]tatutes providing for a reward to informers which do not specifically either authorize or forbid the informer to institute the action are construed to authorize him to sue.' " 529 U.S. at 777 n.7 (alteration in the original) (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n. 4 (1943)). But though *Stevens*'s dicta mentioned *Hess*'s dicta, the former did not endorse the latter. *See id.* For good reason—giving conclusive weight to *Hess*'s dicta would work an enormous change in federal law enforcement by converting every bounty statute into a private cause of action. Such a sea change is unwarranted, especially given that *Hess* misinterpreted a third, still earlier piece of dicta in *Adams v. Woods*, 6 U.S. (2 Cranch) 336 (1805). *See* Woolhandler & Nelson, *Does History Defeat Standing Doctrine?*, 102 MICH. L. REV. at 727 n.183.

more unclear, Zafirov's simplistic reliance on all bounty statutes from that time does not establish "a course of deliberate practice." *See* Baude, *Constitutional Liquidation*, 71 STAN. L. REV. at 1.

Third, Zafirov fails to show how those early enactments liquidated the meaning of Article II to permit FCA-style delegations of sweeping litigation authority. Zafirov never identifies a challenge to the constitutionality of FCA-like qui tam actions at the founding (or during the Civil War), much less that those actions were accepted as compatible with the Constitution's separation of powers. *See Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1135 (11th Cir. 2021) (Newsom, J., concurring) (highlighting the "unchallenged" existence of qui tam actions); *Riley*, 252 F.3d at 773 (Smith, J., dissenting) ("[H]istory provides no indication of . . . the founders' general opinions of the constitutionality of qui tam statutes."). Nor has Zafirov proven a continuous, unbroken practice throughout our Nation's history that might otherwise inform an ambiguous constitutional text. *See CFPB*, 601 U.S. at 445 (Kagan, J., concurring, joined by Sotomayor, Kavanaugh, and Barrett, JJ.); *Marsh*, 463 U.S. at 792. Indeed, the widespread use of the FCA qui tam provision appears to be of relatively modern vintage. *See* Constitutionality of the Qui Tam Provisions of the False Claims Act, 13 Op. O.L.C. 207, 209, 235–36 (1989) (William Barr, Ass't Att'y Gen.); JOHN T. BOESE & DOUGLAS W. BARUCH, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 1.01[B] (5th ed. Aug. 2024 update).

Setting Zafirov's methodological problems aside, it is true that early Congresses enacted at least some statutes containing an enforcement mechanism roughly analogous to the FCA. And those provisions were deployed (if perhaps only rarely) by individuals roughly analogous to Zafirov. At least one such provision was explicitly punitive, allowing violators to "be publicly whipped" and inflicting quadruple damages. *See An Act for the Punishment of Certain Crimes Against the United States*, ch. 9, § 16, 1 Stat. 112, 116 (1790). But it appears even these early statutes quickly fell into disuse and were eventually rescinded. Evan Caminker, *The Constitutionality of Qui Tam Actions*, 99 YALE L.J. 341, 342 (1989) (recognizing that "[m]ost early qui tam statutes have long been repealed"); Constitutionality of the Qui Tam Provisions of the False Claims Act, 13 Op. O.L.C. at 235–36 (William Barr, Ass't Att'y Gen.); *see also* LEONARD D. WHITE, THE FEDERALISTS: A STUDY IN ADMINISTRATIVE HISTORY 417 (1948) (explaining that, by 1799, "the tide had begun to turn against informers, although there was yet no repeal of legislation offering them inducements"). And uncritical reliance on such enactments would prove too much. After all, Article II likely would not permit criminal prosecution by a private individual. *See, e.g.*, *Sierra*, 996 F.3d at 1133 (Newsom, J., concurring) ("[F]ew would suggest, for instance, that Congress could outsource the criminal-prosecution power to the plaintiffs' bar.").

Nor can the FCA's history buttress its constitutionality. Although enacted during the Civil War, "few relators came forward to institute actions under the 1863 Act" and "[t]here are few reported . . . FCA decisions prior to 1943." BOESE & BARUCH, *supra*, § 1.01[B]. The statute briefly saw some use in the 1930s and 40s when lawyers realized they could recover generous bounties by filing "parasitical" suits that copied federal criminal indictments. *Id.* In response, the Attorney General pushed for repeal and Congress reacted by passing amendments "discourag[ing] use of the [FCA]" and forbidding parasitical suits. *Id.* §§ 1.01[B], 1.02; *see also* S. REP. NO. 77-1708, at 1–2 (1942) (reproducing Attorney General Francis Biddle's letter urging repeal). The FCA largely returned to dormancy until 1986, when further amendments animated by Congress's "generalized distrust of, and dissatisfaction with, the way the Executive Branch was carrying out its law enforcement responsibilities" ushered in a new era of qui tam litigation. Constitutionality of the Qui Tam Provisions of the False Claims Act, 13 Op. O.L.C. at 230 (William Barr, Ass't Att'y Gen.). Only the last forty years have witnessed a proliferation of FCA qui tam suits. *See* France, *The Private War on Pentagon Fraud*, 76 A.B.A. J. at 48 (estimating that the "DOJ used to receive about six qui tam cases a year" before the 1986 amendments); *2023 FCA Stats* at 2 (showing 712 new FCA qui tam matters in fiscal year 2023).

Zafirov's argument turns on whether the foregoing history requires a departure from the Supreme Court's well-settled Article II jurisprudence. It does not. When the

Constitution is clear, no amount of countervailing history overcomes what the States ratified. *See Rahimi*, 144 S. Ct. at 1912 n.2 (Kavanaugh, J., concurring); *id.* at 1908 (Gorsuch, J., concurring); *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting); *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 573, 613–14 (2014) (Scalia, J., concurring in the judgment, joined by Roberts, C.J., Thomas, and Alito, JJ.).

As already discussed, individuals who are vested with the power that an FCA relator possesses are subject to the Appointments Clause. Zafirov's "strategy for dealing with the [irreconcilability of her historical arguments and the overwhelming weight of Article II jurisprudence] is not to offer a theory for rationalizing this body of law." *Haaland v. Brackeen*, 599 U.S. 255, 279 (2023). "Instead, [she] frame[s] [her] arguments as if the slate were clean. More than two centuries in, it is anything but." *Id.* at 279–80. Zafirov has failed to articulate a coherent way for the FCA's qui tam provision to comport with the Appointments Clause. In lieu of such an explanation, one must conclude that Zafirov's appointment is unconstitutional.

*     *     *

Because Zafirov is an officer, there is no question that she is improperly appointed. At its most permissive, the Appointments Clause allows Congress to "by law" vest the appointment of inferior officers "in the President alone, the head of an executive department, or a court." *Arthrex*, 594 U.S. at 10. The FCA is a law, but rather than vest

the appointment of a relator in the Executive Branch or in a court, the qui tam provision permits any "person" to self-appoint by initiating an enforcement action. *See* 31 U.S.C. § 3730(b)(1). Because self-appointment, obviously, does not satisfy the Appointments Clause, the defendants prevail on this constitutional challenge.[8]

## D. The Remedy Is Dismissal

Under *Lucia*, " 'one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case' is entitled to relief." 585 U.S. at 251 (quoting *Ryder v. United States*, 515 U.S. 177, 182 (1995)). When a litigant's challenge "involve[s] a Government actor's exercise of power that the actor did not lawfully possess," such as when an official is improperly appointed, the remedy is to set aside ultra

---

[8] The Supreme Court has, at times, articulated the "significant authority" element of its test for officer status as a negative restraint on delegated executive power. *See Arthrex*, 594 U.S. at 23 ("Only an officer properly appointed to a principal office may issue a final decision binding the Executive Branch in [inter partes patent adjudication]."); *Buckley*, 424 U.S. at 119 ("[I]f Congress insists upon retaining the power to appoint, then the members of the [Federal Election] Commission may not discharge those many functions of the Commission which can be performed only by 'Officers of the United States,' as that term must be construed within the doctrine of separation of powers."); *id.* at 141 (similar). To the extent that the Appointments Clause contains an Article II nondelegation principle that limits Congress's ability to authorize individuals to wield executive power, *see Consumers' Rsch., Cause Based Com., Inc. v. Fed. Commc'ns Comm'n*, 88 F.4th 917, 933–38 (11th Cir. 2023) (Newsom, J., concurring in the judgment) (discussing this idea), *cert. denied Consumers' Rsch. v. Fed. Commc'ns Comm'n*, 144 S. Ct. 2629 (June 10, 2024), the implication for the defendants' motion is the same. Because Zafirov has not been properly appointed to even an inferior office, she may not exercise significant authority under the laws of the United States by maintaining an enforcement action for punitive sanctions that could bind the government. To conclude otherwise would "create a constitutional loophole" and permit Congress to avoid the Appointments Clause altogether by vesting executive power outside the government. *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, No. 23-5129, 2023 WL 4703307, at *4 (D.C. Cir. July 5, 2023) (Walker, J., concurring). But "[w]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows." *Id.* (quotations omitted).

vires actions. *Collins*, 594 U.S. at 258 (collecting cases); *see also id.* at 283 (Gorsuch, J.,

concurring in part) ("[O]fficials cannot wield executive power except as Article II provides.

Attempts to do so are void."). Put differently, in Appointments Clause cases, "invalidation"

is "the remedy," which "follows directly from the government actor's lack of authority to

take the challenged action in the first place." *CFPB v. All Am. Check Cashing, Inc.*, 33

F.4th 218, 241 (5th Cir. 2022) (en banc) (Jones, J., concurring); *Collins*, 594 U.S. at 266

(Thomas, J., concurring) ("[A]n officer must be properly appointed before he can legally

act as an officer."). Here, these remedial principals require dismissal.

Zafirov, the only litigant on her side of the enforcement action,[9] lacks the authority

to prosecute on behalf of the United States. And absent congressional amendment, there

is no way to obtain such authority (at least under the qui tam provision). Thus, the portion

of this action vindicating the government's interest cannot continue.

Similarly, Zafirov cannot maintain a private action based on her partial assignment

under *Stevens* (if indeed, after *Polansky,* a relator's partial assignment ever truly vests before

final judgment). An FCA relator's partial assignment is inextricably intertwined with the

statute's unconstitutional "attempt to vest the authority to represent the United States in

---

[9] Of course, the government remains both a "real party in interest," *Polansky*, 599 U.S. at 425 (quoting *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 930 (2009), and a limited intervenor under 28 U.S.C. § 2403(a) to defend the qui tam provision's constitutionality and to weigh in on a discovery dispute between Zafirov and the defendants. But I have resolved the constitutional question, and the government has shown no desire to intervene more fully or to take over Zafirov's action.

litigation in a party outside the Executive Branch." *Polansky*, 599 U.S. at 451 (Thomas, J.,

dissenting). In fact, the earliest possible moment such an assignment could have been

created is Zafirov's first *ex officio* act—filing a complaint to initiate an enforcement action

for punitive sanctions on behalf of the United States. Returning things to the way they

were before Zafirov first acted ultra vires means that, for our purposes, no partial

assignment attached.[10]

## IV.   CONCLUSION

It is no surprise that the Supreme Court describes the FCA qui tam provision as

"unusual" and "unique." *Polansky*, 599 U.S. at 423–24. An FCA relator's authority

markedly deviates from the constitutional norm. The provision permits anyone—wherever

situated, however motivated, and however financed—to perform a "traditional, exclusive

[state] function" by appointing themselves as the federal government's "avatar in litigation."

*Yates*, 21 F.4th at 1310. That arrangement directly defies the Appointments Clause by

permitting unaccountable, unsworn, private actors to exercise core executive power with

substantial consequences to members of the public. And although the Supreme Court and

the Eleventh Circuit have reserved the Article II issue, my conclusion that an FCA relator

---

[10] Regardless, the partial assignment would fail given Zafirov's inability to prosecute the government's case. Even in England, an informer's property interest could not attach if the right to recover on behalf of the Crown was extinguished before the informer filed suit. *See* 3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND § 105, *238 (explaining that because an informer "cannot bring an action or information originally for his part only," a relator may not bring a qui tam action if the King "discharge[s] the whole" action before the relator sues).

is an officer of the United States is neither novel nor surprising. *See Polansky*, 599 U.S. at 442 (Kavanaugh, J., concurring, joined by Barrett, J.) (urging the Court to consider in an appropriate case the "substantial arguments" that qui tam is inconsistent with Article II); *id.* at 449 (Thomas, J., dissenting) (same); *Taxpayers Against Fraud*, 41 F.3d at 1050 (Nelson, J., concurring in part and in the judgment) (declining to concur in "Part II of the court's opinion, where the constitutionality of the qui tam provisions of the False Claims Act is upheld"); *Riley*, 252 F.3d at 758–75 (Smith, J., dissenting) (identifying "the FCA's violation of the Appointments Clause"); Constitutionality of the Qui Tam Provisions of the False Claims Act, 13 Op. O.L.C. at 221 (William Barr, Ass't Att'y Gen.) (arguing that "qui tam suits brought by private parties to enforce the claims of the United States plainly violate the Appointments Clause of the Constitution").

Because Zafirov initiated this FCA action when unconstitutionally appointed, I grant the defendants' motion for judgment on the pleadings and dismiss the case.

Accordingly, the following is **ORDERED:**

1.  The defendants' Motion for Judgment on the Pleadings (Doc. 180) is **GRANTED**.

2.  The Clerk is directed to **ENTER JUDGMENT** for the defendants and against Zafirov, which shall read "This case is dismissed with prejudice as to Dr. Clarissa Zafirov."

3.    The Clerk is directed to terminate any pending motions and deadlines, and

to **CLOSE** the case.

**ORDERED** in Tampa, Florida, on September 30, 2024.

Kathryn Kimball Mizelle
United States District Judge